# Exhibit B

AGREEMENT BETWEEN
UMASS MEMORIAL MEDICAL GROUP, INC.
AND
Charu Desai, M.D.

AGREEMENT by and between the UMass Memorial Medical Group, Inc., a non-profit corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at One Biotech Park, Worcester, Massachusetts 01605 (the "Medical Group"), a subsidiary corporation of UMass Memorial Health Care, Inc. (the "System") and     Charu Desai, M.D., a physician duly licensed to practice medicine in the Commonwealth of Massachusetts (the "Practitioner").

## RECITALS

The principal purpose of the Medical Group is to employ physicians to provide, on behalf of the System, patient care at a level of quality and efficiency consistent with generally accepted standards and otherwise to fulfill professional and institutional obligations to patients, students of health care, health care professionals, and the community; and,

The successful fulfillment of the principal purpose of the Medical Group is dependent on the rendering of professional medical and administrative services in conjunction with the clinical operations of the System by qualified practitioners; and,

The Practitioner is trained and qualified and desires to provide professional medical, educational and administrative services to the Medical Group; and,

The Medical Group desires to engage the Practitioner to provide professional medical, educational and administrative services;

Therefore, in consideration of the mutual covenants and conditions set forth below, the Medical Group and the Practitioner do hereby agree as follows:

1. RESPONSIBILITIES OF PRACTITIONER

    1.1.    Professional Qualifications

    (a) The Practitioner must at all times during the term of this Agreement: (i) possess a valid and unlimited license to practice medicine pursuant to Chapter 112, Section 2 of the General Laws of the Commonwealth of Massachusetts; and, (ii) be appointed to and maintain continuous status as a member in good standing of the UMass Memorial Medical Center (the "Medical Center") Active Medical Staff or the Medical Staff of the appropriate Member Hospital with appropriate clinical privileges in the Department of Radiology (the "Department") (iii) for

those physicians who are on staff at the Medical Center, receive, and maintain, a faculty appointment at the University of Massachusetts Medical School (the "Medical School"); (iv) possess a valid federal narcotics number and state controlled substances number (unless such number is not required by the Practitioner's specialty); (v) be, and remain, a participating provider in the Medicare and Medicaid programs and not be barred, excluded or otherwise ineligible to participate in these or other Federal programs; and (vi) be or, at the Medical Group's request, agree to be, and remain, a participating physician in any health insurance plan or managed care program accepted by the System, including the System's contractual relationships with preferred provider organizations and health maintenance organizations, and to execute any documents requested by the Medical Group in connection with participating in a provider contract in which the Medical Group or the System agrees to participate. If at any time during the term of this Agreement the Practitioner fails to meet one or more of the qualifications set forth herein, such failure shall constitute a breach in accordance with Section 7.4 of this Agreement.

(h) The Medical Group and the Practitioner further acknowledge and agree that this Agreement is not, and shall not be construed as, any form of guarantee or assurance by the System that the Practitioner will receive and maintain the necessary appointment to the Active Medical Staff or the grant of appropriate clinical privileges for the purposes of discharging the Practitioner's responsibilities hereunder; application, appointment, reappointment, and the grant of clinical privileges shall be governed solely by the Bylaws of the Medical Staff of the Medical Center then in effect. Further, appointment to the faculty of the Medical School shall be governed solely by the applicable policies and procedures of the Medical School.

1.2. Services. The Practitioner shall be responsible for providing professional medical and administrative services as set forth in Appendix A, attached and incorporated as part of this Agreement.

1.3 Provider Agreements. The Practitioner hereby authorizes the Medical Group to execute provider agreements, acknowledgments and consent forms that obligate or confirm the Practitioner's obligation to participate in provider agreements executed by or on behalf of the Medical Group and to abide by and conform to all applicable requirements under such provider agreements.

1.4. Schedule of Fees. The Medical Group will establish a current schedule of fees, as may be amended from time to time, to be charged by the Medical Group for direct patient care services provided by the Practitioner under this agreement.

1.5. Standards of Practice. The Practitioner shall at all times provide services in a competent and professional manner, consistent with quality assurance standards of the Medical Center's Active Medical Staff and in compliance with all applicable statutes, regulations, rules and directives of federal, state and other governmental and regulatory bodies having jurisdiction over the Medical Center; the Bylaws, Rules and Regulations, policies and procedures of the

System, the Medical Center and the Medical Staff; applicable standards of the Joint Commission on Accreditation of Health Care Organizations and currently accepted and approved methods and practices applicable to the provision of medical services.

1.6. <u>Compliance and Quality Assurance</u>. The Practitioner shall abide by the Code of Ethics and Business Conduct of the System. The Practitioner shall participate in the programs of the System and the Medical Center regarding compliance, quality assurance, utilization review, risk management, and peer review, in accordance with the rules, policies and bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, the Patient Care Assessment regulations of the Board of Registration in Medicine, and upon request of the Department Chair. The Quality Assurance committee of the Medical Staff of the Medical Center will be responsible for reviews and audits of and concerning quality assurance in the Department.

1.7. <u>Committee Responsibilities</u>. The Practitioner shall serve on committees of the Medical Center's Medical Staff and committees established pursuant to the Bylaws of the System, upon reasonable request of the Chairman of the Board of Trustees, the President/Chief Executive Officer, the Chief Operating Officer, the Chief Medical Officer, the President of the Medical Group (the "President") or the Department Chair.

1.8. <u>Medical Records and Reports</u>. (a) The Practitioner shall prepare or cause to be prepared in a timely manner any and all appropriate notes and information in the medical records of and reports pertaining to each patient for whom the Practitioner has rendered services pursuant to this Agreement. The Practitioner shall cause these records and reports to be completed and submitted within such period of time after the rendering of such services as may be required by the Bylaws of the Medical Staff of the Medical Center, upon request of the President or Department Chair, or by applicable law or regulation. The parties understand and agree that the System has the rights of ownership and control of all of the patients' medical records and reports generated pursuant to this Agreement. It is further agreed that all practitioners at the System have the right to consult such records and reports in order to facilitate the continuity of proper patient care.

(b) <u>Time Allocation Reports</u>: The Practitioner agrees to cooperate with the Department Chair to maintain adequate and proper time records in accordance with the Medical Group's policies. This may include submitting a written allocation of time reports specifying the respective amounts of time the Practitioner has devoted to clinical, administrative, teaching and research activities. The Practitioner agrees to make available to the Medical Group all time records and data recorded by the Practitioner upon the request of the Medical Group.

1.9. <u>Academic Service</u>. The Practitioner shall aid in the clinical teaching program of the Medical Center as an attending physician on in-patient services and in ambulatory settings. The Practitioner shall also aid in the didactic teaching programs of the Medical Center upon the request of the Department Chair. The Practitioner shall also participate for reasonable periods of time as an instructor in education programs conducted or offered by the Medical Center,

3

including grand rounds, and shall perform such other teaching functions within the Medical Center as are reasonable and necessary to assure the Medical Center's compliance with the requirements of all applicable accrediting bodies, upon the request of the Department Chair. The Practitioner, as a member of the Medical School faculty, is expected to provide a reasonable amount of academic service (on the order of approximately two hundred (200) hours per year) under the supervision of the Chancellor at the direction of the Chair or his designee.

1.10. Non-Physician Personnel. The Practitioner shall, upon the request of the President or Chair, or at such other times as are appropriate, make recommendations concerning the qualifications, hiring, firing, and disciplining of such non-physician personnel as the System or the Medical Group may employ, engage or otherwise provide in support of the Practitioner's practice. The Practitioner shall make any such recommendations in furtherance of and in accordance with the needs and best interests of the Medical Group and the proper conduct of its functions. The Practitioner agrees that any supervision of nurse practitioners and physician assistants shall be conducted in accordance with the governing regulations of the Board of Registration in Medicine.

1.11. Protocols and Procedures. The Practitioner agrees to work cooperatively with all of the System's clinical departments, Medical Staff, the Medical Group, administration, the President and the Department Chair to assure that services are available on a timely, coordinated, efficient, and professional basis. The Practitioner also agrees to comply with all of the Medical Center's clinical policies and procedures and all applicable Human Resources policies.

1.12. Confidentiality of Information. The Practitioner agrees to uphold and maintain the confidentiality of patient and other information for which the Practitioner has an ethical, professional, or legal obligation not to disclose. The Practitioner further agrees to uphold and maintain the confidentiality of proprietary or other confidential information relating to the Medical Group or the System of which the Practitioner may become aware while employed hereunder. This provision shall survive the termination of this Agreement.

1.13. Continuing Education. The Practitioner shall comply with and satisfy any and all of the professional obligations and requirements regarding continuing education and any other related areas of medical practice required for the maintenance of a license to practice **medicine** in Massachusetts or appropriate to the rendering of competent professional services pursuant to this Agreement as determined by the Department Chair.

1.14. Dual-Employment with Medical School. The parties acknowledge that a certain percentage of the Practitioner's time and salary may be allocated to, and governed by, a so-called "Dual-Employment" arrangement with the Medical School (the "Dual-Employment Arrangement"). The Practitioner acknowledges that the terms and conditions of employment with the Medical Group are governed by this Agreement and the policies and practices of the Medical Group. The Practitioner further acknowledges that if this Agreement is terminated for any reason, the related employment relationship with the Medical School shall also terminate

4

unless the Practitioner has a new or continuing agreement with the Medical School or is a tenured faculty member.

2. RESPONSIBILITIES OF THE SYSTEM

   2.1. Space, Equipment, Services, and Supplies.

   (a) The Medical Group, through agreement with the System, shall be committed to making available reasonable and necessary space, equipment and supplies for the delivery of the agreed services hereunder by the Practitioner, shall provide customary services and maintenance to maintain such equipment in good order and repair, shall furnish services to the Practitioner including, but not limited to, utilities, telephone, housekeeping and record keeping services; and shall provide all necessary supplies needed for the proper provision of services by the Practitioner pursuant to this Agreement.

   (b) The Practitioner agrees to use such space, equipment, services and supplies for purposes of the System and in furtherance of the obligations governed by this Agreement.

   2.2. Non-Physician Personnel. The System or the Medical Group shall employ, engage or otherwise make available to the Practitioner all non-physician personnel determined by the Medical Group to be reasonably needed for the proper delivery of services pursuant to this Agreement. The System or the Medical Group shall exercise ultimate control and management of non-physician personnel.

   2.3 Professional Liability Insurance. The Medical Group, at its expense, shall arrange for professional liability insurance coverage for the Practitioner with regard to professional medical services rendered by the Practitioner for Medical Group-related activities billed through the Medical Group during the term of this Agreement. The Practitioner shall be covered by such insurance to the same extent as other similarly-situated practitioners within the Medical Group. Coverage limits shall be set in the discretion of the Medical Group and/or the UMass Memorial Self-Insurance Program from time to time and shall be made known to the Medical Group Practitioners on a regular basis.

3. REIMBURSEMENT REQUIREMENTS

   3.1. The Practitioner shall comply with all laws, regulations and System requirements, policies and procedures regarding record keeping relating to third-party reimbursement for services provided pursuant to this Agreement as may be in effect from time to time. In the event that there are subsequent changes or clarifications of statutes, regulations or rules relating to record-keeping which the Medical Group determines must be complied with to insure proper reimbursement from third parties for services provided pursuant to this Agreement, the Medical Group shall, after reasonable notice and opportunity to comply, notify the Practitioner of any actions it reasonably deems are necessary to comply with such changes and the Practitioner shall

5

promptly take such actions.

## 4. COMPENSATION

4.1. <u>Compensation of Practitioner</u>. The Medical Group shall compensate the Practitioner for the services which the Practitioner renders in accordance with the terms of this Agreement. The agreed compensation is set forth in detail in Appendix B, attached and incorporated as part of this Agreement.

## 5. BILLING AND PAYMENT

5.1. <u>Billing</u>. Except as otherwise may be expressly stated in this Agreement or other published, written policy or procedure of the Medical Group, all fees, payments and other income attributable to the Practitioner's clinical services during the term of this Agreement shall belong to the Medical Group, whether paid to the Practitioner, to the Medical Group or its designee or to a third party. The Medical Group shall have the sole right to bill for and to receive, hold and disburse such fees and income and the Practitioner agrees to abide by the billing policies and procedures of the Medical Group. The Practitioner hereby assigns to the Medical Group all of the Practitioner's rights in all fees, payments, bonuses or distributions or other income or monies due from all sources relating directly or indirectly to clinical services rendered by the Practitioner pursuant to this Agreement. The Practitioner shall cooperate fully with the Medical Group in facilitating collection of such monies, including prompt endorsement and delivery to the Medical Group of all checks received from patients or third-party payors on behalf of the Practitioner and completion of all forms necessary for such collections. To the extent applicable, the Practitioner agrees to work with the Medical Group to collect all patient co-payments for services rendered and promptly to forward such funds to the Medical Group. Upon termination of this Agreement for any reason whatsoever, all such monies then outstanding shall be deemed to be the sole and exclusive property of the Medical Group and not subject to any claim by the Practitioner. The Practitioner's obligation under this provision shall survive termination of this Agreement.

## 6. TERM

This Agreement shall be effective from your original hire date of January 5, 1992 and shall remain in effect unless otherwise terminated by the parties as provided in Section 7 of this Agreement. As of the effective date of this Agreement, this Agreement shall supercede and revoke any existing prior employment agreement with the Medical Group or any of its predecessor entities.

## 7. TERMINATION

7.1. <u>Mutual Agreement</u>. This Agreement may be terminated by mutual agreement of the parties, in a writing signed by the parties, at any time from the date of execution hereof.

7.2  Notice of Party. This Agreement may be terminated by the Medical Group at any the giving of written notice to the Practitioner (as set forth in Section 14.1 below), in accordance with the following notice schedule:

| Number of Years Practitioner Employed | Requisite Notice Period |
|---|---|
| 0-2 | 4 months |
| >2 – 10 | 6 months |
| >10- 15 | 8 months |
| >15 – 20 | 10 months |
| >20 | 12 months |

This Agreement may be terminated by the Practitioner at any time upon the giving of as much notice as is practicable to the Medical Group, and in any event a minimum of one hundred twenty (120) days' written notice.

Where either the Medical Group or the Practitioner is terminating the employment relationship, the Notice Period is characterized as "working notice." In the interests of patient care, the Medical Group expects the Practitioner to continue to fulfill the responsibilities of the position and to maintain productivity levels for the full notice period. Vacation time may be taken during the Notice Period only with the consent of the Department Chair and the President of the Medical Group. The Practitioner will be compensated for unused pro-rated vacation time not taken at the time of termination. The Medical Group does not permit "terminal vacations," i.e., the use of vacation time to complete the final portion of the Notice Period.

7.3     For Cause. The Medical Group may terminate this Agreement effective immediately for cause at any time upon written notice to the Practitioner setting forth in reasonable detail the nature of such cause. "Cause" shall be defined as any material breach by the Practitioner of this Agreement, including but not limited to the following:

i.     Practitioner's fraud or dishonesty with respect to the Medical Group or those associated with it, acts or conduct materially detrimental to patient care or to the reputation or operations of the Medical Group, or otherwise in connection with the Practitioner's services under this Agreement;

ii.     Practitioner's conviction of, a plea of nolo contendere or admission of sufficient facts to a crime involving moral turpitude, or an offense relating to health care or adversely affecting the Practitioner's ability to perform services under this Agreement; or

iii.     Practitioner's  material negligence or misconduct (other than by reason of disability or approved leave) in the performance of duties assigned by the Chair under this

7

Agreement.

    iv.    Failure of the Practitioner to follow UMass Memorial policies and procedures and other rules of conduct made known to the Practitioner and applicable to all physicians of UMass Memorial and/or the Medical Group, including without limitation, policies prohibiting unlawful discrimination, and the Practitioner has exhausted the grievance procedure available to Medical Group physicians and, if applicable, all due process procedures available under the Medical Staff Bylaws of the Medical Center.

    7.4.    Automatic.  This Agreement shall terminate automatically upon the breach of Section 1.1. by the Practitioner, except that the Medical Group, in its sole discretion, may, but is not obligated to, suspend this Agreement for a specified reasonable period to enable the Practitioner to cure the breach. If the Practitioner fails to cure the breach within the specified period, this Agreement will terminate immediately upon written notice to the Practitioner by the Medical Group. Further, the Medical Group reserves the right to terminate this Agreement in the event the Practitioner's medical staff membership or clinical privileges are suspended or in any way restricted.

    7.5  Suspension.  The Medical Group may suspend the Practitioner for cause, without compensation. Such cause may include, but shall not be limited to, any suspension, restriction or revocation of the Practitioner's Medical Staff membership or clinical privileges at the Medical Center or any suspension, restriction or revocation of the Practitioner's license to practice medicine in any jurisdiction.

## 8.    EFFECT OF TERMINATION

    8.1.    Effect of Termination on this Agreement.  The termination of this Agreement in accordance with Section 7, hereunder, shall terminate any and all rights and obligations of the Medical Group and the Practitioner pursuant to this Agreement. The effective date of termination of this Agreement shall be as set forth in the above-mentioned section(s); provided, however, that upon the termination of this Agreement, the parties shall be and remain obligated and responsible for: (i) any and all obligations accruing prior to the date of termination; and, (ii) any and all obligations, promises, or covenants contained herein which are expressly made to extend beyond the term of this Agreement; and, (iii) the Practitioner shall use reasonable and diligent efforts to assist the System and the Medical Group in arranging for appropriate alternative medical coverage for patients under the care of the Practitioner. Prior to the termination of this Agreement, the Practitioner shall prepare a notice to patients in a form approved by the Medical Group and the Department Chair. Practitioner shall finalize all outstanding billing documentation and complete all patient records prior to his or her departure. Immediately upon the termination of this Agreement, the Practitioner shall deliver to the System sole custody, and total, exclusive and complete use of the System's space, equipment and supplies and shall remove any and all personal possessions from the property of the System. The System shall give the Practitioner reasonable time to effect these conditions. In the event of

termination of this Agreement, payment by the Medical Group of any base salary due the Practitioner under Section 4.1 and Appendix B to the date of termination and of any pay in lieu of notice due Practitioner under Section 7.2 shall constitute the entire obligation of the Medical Group to the Practitioner. The Practitioner recognizes that no compensation is earned after termination of this Agreement.

## 9. GOVERNING RULES, REGULATIONS AND BYLAWS

9.1 Governing Rules, Regulations and Bylaws. Notwithstanding anything in this Agreement to the contrary, it is hereby expressly understood and agreed by and between the Medical Group and the Practitioner that any and all rights, responsibilities, and obligations of the parties shall at all times during the term of this Agreement be subject to the Bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, all applicable rules and regulations of the System, or its successor, as now exist or as hereinafter may be amended or promulgated by the Board of Trustees of the Medical Group, the Medical Staff of the Medical Center and the President/Chief Executive Officer of the System, or any duly authorized designee thereof.

## 10. ASSIGNMENT AND DELEGATION

10.1. Assignment and Delegation. No assignment of this Agreement or the rights hereunder, or delegation of this Agreement or the obligations hereunder shall be valid without the specific written consent of both parties; provided, however, that this Agreement may be assigned by the Medical Group as a result of reorganization or merger, or to any successor entity providing the services now provided by the System or the Medical Group.

## 11. ENTIRE AGREEMENT

11.1. Entire Agreement. This Agreement contains the entire agreement between the parties and no statement, promises, inducements, or writings made by any party or agent of any party which is not contained in this written Agreement shall be valid or binding; and this Agreement may not be enlarged, modified, or altered except in a subsequent writing signed by the parties and attached hereto. This Agreement supersedes any and all prior agreements for professional services between the Practitioner and the Medical Group, the System or any other affiliate of the System.

## 12. AMENDMENTS

12.1. Amendments. This Agreement may be amended only by an instrument in writing signed by the Medical Group and the Practitioner. Such writing must make specific reference to the terms and conditions of this Agreement which it amends, and will become effective as of the date stipulated therein.

9

## 13. GOVERNING LAW

13.1. Massachusetts Law. This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed in the Commonwealth of Massachusetts.

## 14. NOTICE

14.1. Notice. Notices or communications required or permitted to be given pursuant to this Agreement shall be given in writing to the respective parties by hand, by certified mail or by overnight delivery service (e.g., Federal Express, UPS) (such notice being deemed given as of the date of mailing) and addressed to the Practitioner at the Practitioner's last known address kept within the records of the Medical Group, or in the case of the Medical Group, One Biotech Park, Worcester, Massachusetts, attention of the President, UMass Memorial Medical Group.

## 15. EXECUTION

15.1. Execution. This Agreement and any and all amendments hereto shall be executed in duplicate copies on behalf of each party by the Practitioner and an official specifically authorized by the Medical Group Board with respect to such execution. Each duplicate copy shall be deemed an original, but both duplicate originals shall together constitute one and the same instrument.

## 16. SECTION HEADINGS

Section Headings. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

## 17. WAIVER.

Waiver. A waiver of the breach of any term or condition of this Agreement by either party shall not constitute a waiver of any subsequent breach or breaches of the same term or condition, or any other term or condition hereunder.

## 18. SEVERABILITY.

Severability. If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect by a court of competent jurisdiction, then the remainder of this Agreement, and the application of such provision in circumstances other than those as to which it is so declared invalid or unenforceable, shall not be affected thereby, and each such provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

IN WITNESS WHEREOF, the Medical Group and the Practitioner have caused this Agreement to be signed and sealed as of this _____ day of _____, 20__.

Dated:      By: _____
                Charu Desai , M.D.

UMASS MEMORIAL MEDICAL GROUP, INC.

Dated 2/12/    By: _____
                Michele Streeter, Executive Director

          By: _____
                Joseph T. Ferrucci, M.D., Chair
                Department of Radiology

## APPENDIX A

The Practitioner shall be responsible for providing professional medical services to patients of the System in need of such services and to enrollees of health plans as to which the Medical Group and Practitioner are participating providers. The services to be rendered hereunder include, but are not limited to outpatient work, inpatient consultative work and direct patient care. The Practitioner's performance hereunder shall be evaluated by the President of the Medical Group and the Department Chair in accordance with the Bylaws of the Medical Staff of the Medical Center. The Practitioner agrees that the practice of medicine shall be limited to the services to be provided pursuant to this Agreement or for the Medical School under its agreement unless Practitioner obtains the prior written approval of the Chair under Medical Group policy to do otherwise.

The Medical Group and the Department Chair shall determine the specific professional medical duties to be performed by the Practitioner, as well as the time and manner of performance, in accordance with and subject to the terms of this Agreement; provided, however, the Medical Group and Department Chair shall not impose requirements which would interfere with the Practitioner's professional judgment in connection with the treatment of patients or cause the Practitioner to violate applicable ethical codes or any law or regulation.

The Practitioner shall at all times provide services to all persons who may become patients of the Medical Group in accordance with the Medical Group's policies and without regard to race, color, creed, sex or ability to pay for services; and

The Practitioner shall participate in Medicare, Medicaid and managed care programs and other third party payor arrangements or governmental programs in which the Medical Group participates and the Practitioner shall abide by and act in accordance with the terms and conditions of all managed care agreements, network, affiliation agreements, provider agreements and other contracts to which the Medical Group or Practitioner (with the Medical Group's consent) is or becomes a party.

## APPENDIX B

1. The Practitioner's compensation for services rendered pursuant to this Agreement, and under a Dual-Employment Arrangement with the Medical School, if applicable, shall be a total base salary, which if annualized would be at the rate of Three-hundred Twenty-Five Thousand Dollars ($325,000) per year, less all legally required and voluntarily-authorized deductions, payable in accordance with Medical Group payroll practices. (Practitioners who participate in the Dual-Employment Arrangement with the Medical School may receive paychecks from both the Medical Group and the Medical School, which together shall equal the base salary referenced above.)

The Practitioner shall also participate in the Physician Incentive Compensation Program of the Department as established by the Medical Group (the "Incentive Compensation Program"), subject to its terms and conditions of participation as in effect or amended from time to time. The Incentive Compensation Program includes eligibility for bonuses and/or salary increases based upon productivity. The Practitioner acknowledges that participation in the Incentive Compensation Program may also involve imposing salary withholds if performance does not meet Medical Group requirements. The Practitioner further acknowledges that, following the first twelve months' of the Practitioner's employment, under the terms of the Incentive Compensation Program, the Medical Group may decrease the Practitioner's base salary if the applicable productivity targets are not met. Salary adjustments will be made upon thirty (30) days written notice to the Practitioner. Salary reductions, if any, shall be consistent with the Department's compensation plan and shall in no event exceed twenty percent of the Practitioner's base salary in any twelve month period.

Subject to the Practitioner's payment of any contribution required of physician employees generally, the Practitioner will be eligible to participate during the term of this Agreement in any and all employee benefit plans made generally available to other physician employees of the Medical Group as in effect from time to time. Such participation by the Practitioner shall be subject to (i) the terms of the applicable plan documents, (ii) generally applicable policies of the Medical Group, and (iii) the discretion of the Board of Trustees of the Medical Group or any administrative or other committee provided for in or contemplated by such plan or policy of the System. A description of the benefits program currently in effect (and subject to change by the Group Board and UMass Memorial Compensation Committee) is attached hereto as Appendix C, "Physician Benefits at a Glance."