# Exhibit F

CHARGE OF DISCRIMINATION
MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

FEPA NUMBER :

EEOC NUMBER :

FILING DATE : January 7, 2018

VIOLATION DATE: March 14, 2018

NAME OF AGGRIEVED PERSON OR ORGANIZATION

Charu Desai, M.D.
32 Whisper Drive
Worcester, MA 01609

TELEPHONE NUMBERS
HOME : 508-799-5280
OFFICE :

RECEIVED
JAN - 7 2019
MCAD
BOSTON

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY OR STATE/LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME

1. UMASS MEMORIAL
   MARLBOROUGH HOSPITAL
   157 Union Street
   Marlborough, MA 01752

   TELEPHONE NUMBER: 508-334-1000
   NO. OF EMPLOYEES: over 300

2. Karin Dill, M.D.,
   Division Chief of Chest Radiology
   UNIVERSITY OF
   MASSACHUSETTS MEMORIAL
   MEDICAL CENTER
   55 Lake Avenue North
   Worcester, MA 01655

   TELEPHONE NUMBER: 508-856-3252

CAUSE OF DISCRIMINATION BASED ON: AGE, RACE, NATIONAL ORIGIN, GENDER AND DISABILITY

THE PARTICULARS ARE:

1) I am female. I was born on July 6, 1950. As of the date of this filing, I am 67½ years of age. I was born in India and immigrated to the United States in 1974. I have a serious heart condition that substantially compromises my health and required the implantation of a pacemaker in 2001.

2) I graduated from Government Medical College at the South Gujarat University School of Medicine, in Surat, Gujarat, India, in 1972. I completed an internship at Civil Hospital in Surat, India, in 1973.

3) In 1975, I completed one year of Residency in Pathology at the Mt. Auburn Hospital in Cambridge, Massachusetts. From 1976-1977, I worked as a house physician at Cushing Hospital in Framingham, Massachusetts.

4) From 1978-1981, I was a Resident in Diagnostic Radiology at the University of Massachusetts Memorial Medical Center ("UMass").[1] I served as Chief Resident from 1979-1981 and, in 1981, became the first individual to complete the Diagnostic Radiology residency at UMass. Following my residency, I completed a fellowship in Computed Body Tomography / Ultrasound at UMass, and then joined the staff of UMass for one year.

5) I became board certified by the American Board of Radiology in 1983.

6) From 1983 through 1992, I worked in private practice (in radiology) in the Worcester area.

7) I returned to UMass in January 1992, as an Assistant Professor of Radiology not on the tenure track. I served in that role and as an attending physician in the Division of Thoracic (Chest) Radiology from 1992 to August 2001.

8) Effective September 1, 2001, I was promoted to the position Clinical Associate Professor of Radiology not on the tenure track. I continued to serve as an attending physician in the Division of Chest Radiology at UMass.

9) I also regularly interpreted radiology readings originating from UMass Memorial Marlborough Hospital ("Marlborough Hospital").

10) Throughout the entirety of my time at UMass, my work was extremely highly regarded. Indeed, Dr. Jerry Balikian, a former Division Chief of Chest Radiology, who was recognized as one of the most celebrated and nationally reputed radiologists to have worked at UMass and who worked with and directly supervised my work for

---

[1] Over the course of my employ, there have been a number of corporate restructurings and mergers involving the University of Massachusetts Medical School, the University of Massachusetts Medical Center, Memorial Hospital, UMass Memorial, UMass Memorial Medical Group (a physician organization), and various of my employment records and documents reflect each of these entity names. Given their interrelatedness, I refer to all of them, collectively, as UMass.

25 years, routinely and consistently praised my work. Drs. Joseph Ferrucci and Edward Smith, who served as Chairs of the Department of Radiology, similarly routinely praised my work, as did (does) Dr. Richard Irwin, Chief of Pulmonology at the Medical Center, who routinely has patients requiring my expertise. (Dr. Ferrucci nicknamed me "Goddess of Chest Radiology.") In connection with my promotion to Clinical Associate Professor, my reviewers stated, among other things, that I was an "outstanding radiologist in terms of my diagnostic ability, particularly with reference to thoracic radiology," a "superb chest radiologist" with an "exceptional mind in picking up abnormalities" and "an extremely competent clinical thoracic radiologist" whose "opinion is widely sought by pulmonary specialists, clinicians, other radiologists, and residents." And as recently as June 2017, I received the Teacher of the Year Award for outstanding teaching and mentoring of residents.

11) To my knowledge, throughout the entirety of my career, I have never received a complaint about my performance, clinical skills or readings. None of my cases have been the subject of a quality assurance review or of a morbidity and mortality conference. None of my colleagues or supervisors over the course of my time at UMass ever raised any concerns to me about my performance, clinical skills, or readings. On the contrary, my colleagues at UMass have consistently sought me out for readings. Indeed, countless attending physicians, residents, and physicians from other departments have consulted with me for interpretations of their patients' x-rays and CT scans. They have praised, among other things, my attention to detail and ability to detect the most subtle of findings. (Colleagues nicknamed me "Nodule Queen" for this.) Colleagues describe me as careful, thorough, and accurate, and several have stated that I am among the best radiologists with whom they have had the pleasure of working.

12) In approximately 2012, Dr. Max Rosen replaced Dr. Ferrucci as the Chairman of the Department of Radiology.

3

13) I am reliably informed and believe that in October or November 2016, a group of older radiologists including Doctors Adib Karam, Gopal Vijayaraghanavan, Joseph Makris, and Christopher Cerniglia demanded a meeting with Dr. Stephen Tosi, the CEO of UMass (and UMass Memorial Medical Group), to express frustration with Dr. Rosen ongoing underpayment of them compared to younger radiologists that Dr. Rosen had hired. (I am reliably informed and believe that they had raised this issue directly with Dr. Rosen as early as 2013 and 2014, but that he did not correct the disparities.) I am also reliably informed and believe that at the meeting in October or November 2016, Dr. Tosi reprimanded Dr. Rosen for his actions and ordered the salaries to be adjusted.

14) Since Dr. Rosen became Chair, a number of radiologists have left UMass: Dr. Joseph Makris (who is, to my knowledge, in his fifties), Dr. Abhijit Roychowdhury (a senior physician who has over 36 years of experience, and who is Indian), and Dr. Adib Karam (who has approximately twenty years experience, and is Lebanese) have all left (or been forced out of) the Department of Radiology. I am reliably informed and believe that Dr. Rosen stated to Dr. Roychowdhury, "you don't fit my vision of the Department," or words to that effect. I am also reliably informed and believe that he stated to Dr. Padmaja Surapaneni (a female doctor of Indian descent), "you are useless." I am reliably informed and believe that as a result of Dr. Rosen's treatment of her, and despite the fact that she worked in the Radiology Department for approximately 15 years, she will be leaving for another position offering significantly less compensation, effective June 2018.

15) My experience of Dr. Rosen was (is) similarly troubled. In March 2016, Dr. Rosen hired Dr. Karin Dill (a less experienced, younger radiologist, who is white) to serve as Division Chief of Chest Radiology, even though I had significantly more experience in the field. I am informed and believe that Dr. Dill's compensation is significantly greater than my own. I also am informed and believe that Dr. Rosen

has given to Dr. Dill (and, I understand, other younger doctors) one and one half days per week – i.e., approximately 70 days per year – as "academic/administrative days" (i.e., days on which no clinical duties are expected). Dr. Rosen's treatment of me was (is) markedly worse. As an accommodation to my serious heart condition, I had Dr. Rosen asked for twelve academic days per year. Dr. Rosen declined to give me any. Also as an accommodation to my serious heart condition, I asked Dr. Rosen that I be given a workstation so that I might perform work at home over the weekend. Dr. Rosen declined that request, as well, although he gave to Dr. Dill and other of my younger colleagues equipment to work from home and permits them to do work from home. In addition, I have also learned that Dr. Rosen is paying other newly-hired (and far younger / more junior) radiologists more than I am being paid, despite my far greater experience and seniority.

16) As a result of occasional flares of my heart condition / cardiac arrhythmia, which flares cause me extreme (and debilitating) shortness of breath, I was (am) occasionally forced to be late to work. Although Dr. Rosen was aware of my condition, in May 2016, he reprimanded me for my occasional tardiness. I asked if, as an accommodation to my heart condition, he would assign to me fewer "call days" (days on which I would be on call for the radiology practice). He refused my request, telling me to work part time or as a locum tenens. (I did, in fact, apply for and was granted FMLA leave. In light of Dr. Rosen's treatment of me, however, I have rarely used it in fear of reprisal if I do, even when I have had episodes of cardiac arrhythmia.)

17) In or about May 2016, I voiced concerns to Dr. Rosen about his disparate (and far more favorable) treatment of younger, less-experienced, and newly-hired physicians in the allotment of academic days, which he seems to provide to every young(er) radiologist involved in giving departmental conferences. In the presence of Myra Shah, a human resources representative, Dr. Rosen asserted that he would not honor

my requests for academic days that he was eagerly providing to those younger, less experienced, newly-hired physicians. At this same meeting, I requested fewer calls given my heart condition. Dr. Rosen also refused this request.

18) Rather than provide to me these reasonable accommodations (which he granted to others who are not disabled), Dr. Rosen instead suggested, as he had with other older radiologists, that I should simply work part-time or as a locum, rather than full-time. I declined to do so.

19) Nevertheless, Dr. Rosen continued to attempt to pressure me to go part-time or accept a locum tenens position. Indeed, I am reliably informed that in late 2017, he met with the former Chair of the Department, Dr. Joseph Ferrucci, and urged Dr. Ferrucci to convince me to accept a part-time or locum tenens position. (Dr. Ferrucci informed me of Dr. Rosen's actions.) I again declined to accept a part-time or accept a locum tenens position.

20) In retrospect perhaps not surprisingly in light of continuing pressure to have me reduce my hours or accept a locum tenens position and my continuing refusal to do so, on March 14, 2018, Dr. Rosen gave me a letter informing me that my employment with UMass would be terminated effective March 17, 2019. The letter gave no reason for my termination. I was stunned.

21) When I asked Dr. Rosen what prompted him to terminate my employment, he first stated that he did not need a reason to terminate me. Particularly in light of my 26 years of dedicated and loyal service to UMass, I was (again) stunned by his dismissive disregard of me. He then stated that he was terminating me because my work was of poor quality. In all of my performance reviews, including my most recent performance review in June 2017, however, there was no indication whatsoever that my work was anything other than completely fine. So I therefore asked him to provide any examples. He was unable to do so. When I continued to press him for any proof of his assertion, he claimed that he had conducted his own

6

independent review. It was not until three weeks after I requested the data that he reviewed that he agreed to meet with me. Moreover, at no prior point, had he (or anyone else) brought to my attention any problems or complaints or concerns about my work, or spoken with me in connection with any investigation (or otherwise) into my work.

22) Dr. Rosen then told me that effective immediately following the meeting on March 14, 2018, in which I was informed of my termination of employment, I could no longer read any Chest CT scans. He told me that I could (can) still read chest x-rays, but that he was "going to keep a close eye on me" (or words to that effect). I was again stunned. In light of my post-residency subspecialty fellowship training focusing on the interpretation of CT scans, his claim about my purportedly poor quality CT readings was (is) nonsensical. That is particularly true where, as here, at no prior point had he (or anyone else) brought to my attention any problems or complaints or concerns about my reviews of Chest CT scans.

23) As I was (and remain) disbelieving of Dr. Rosen's allegations about my performance, shortly after the meeting on March 14, 2018, I asked Dr. Steven Baccei, the Vice-Chair of Quality, Patient Safety, and Process Improvement for the Department of Radiology at UMass, if there had been any issues with my readings. He stated that he was not aware of any.

24) By email on March 24, 2018, I again asked Dr. Rosen to provide evidence of my purportedly poor quality work. It was not until three weeks later, on April 17, 2018, that he responded.

25) In the meantime, although I was also absolutely humiliated at the thought I would have to state to colleagues and residents who routinely consult with me about their patients' Chest CT scans that I could no longer do so, I nevertheless complied with Dr. Rosen's order. Paradoxically, despite forbidding me to review Chest CT scans, Dr. Rosen has nevertheless still required me to provide "noon coverage" once per

week (i.e., to cover the lunch hour, when everyone else is absent), which coverage includes the review of Chest CT scans (including emergency pulmonary embolus studies). This inconsistency makes no sense.

26) Also in the meantime, I am reliably informed and believe that on or about April 7, 2018, Dr. Darren Brennan (who I believe is in his forties), the Vice Chair of Community Radiology at UMass and Chief of Radiology at Marlborough Hospital, stated to Dr. Ferrucci, "we feel bad about what we had to do to Charu" (or words to that effect). As Dr. Brennan is Chief of Radiology at Marlborough Hospital, he was clearly at least in part responsible for the decision to curtail my CT scan reads and terminate my employment.

27) I am also reliably informed and believe that Dr. Rosen told Dr. Ferrucci that he fired me as a result of issues/complaints from Marlborough Hospital. At no prior point, however, had he (or anyone else) brought to my attention any problems or complaints or concerns about my work at Marlborough Hospital.

28) As I noted above, by email dated April 17, 2018, Dr. Rosen finally responded to my March 24 email asking for evidence of my purportedly poor quality work. In his email response, he stated that he would be happy to set up a meeting to discuss the results of an "independent analysis" he had performed on my work. He told me I could bring a colleague. I asked to bring an independent expert with me to that meeting instead of a colleague to assess the concerns he raised, explaining that I was concerned that my colleagues would feel uncomfortable contradicting him, given his authority over them. He refused to permit me to bring an independent expert.

29) In a separate email to me also on April 17, 2018, Dr. Rosen stated that it was inappropriate for me to speak with residents about my employment, and he threatened, "I want to confirm your understanding that it is inappropriate for you to discuss ANY issues related to your UMMMG or UMMS employment with the

Radiology residents, and that you will avoid doing so going forward."² (Emphasis in original.) I was not, in fact, aware that I could not discuss ANY issues related to my employment with colleagues. (I am aware of no such proscription in any UMass handbooks and, indeed, I believe that such a prohibition would be illegal.) Moreover, I had not actually had any "inappropriate" conversations with residents regarding my employment. Rather, in response to residents' requests for assistance reading CT scans (which had been my job), I had simply informed them, accurately, that I was no longer permitted to read CT scans. When they asked me why, I stated, accurately, that I believed that my employment at UMass would be short lived. Here too, then, Dr. Rosen's criticisms / accusations are not based on facts.

30) On April 24, 2018, I met with Dr. Rosen and Dr. Baccei about my purportedly poor quality work. My colleague Dr. Sarwat Hussain (who reports to Rosen) accompanied me, instead of the independent reviewer I had requested, in light of Dr. Rosen's refusal to permit me to have an independent reviewer join me. The entire meeting lasted only approximately fifteen minutes; Dr. Rosen gave me virtually no substantive information.

   i) At this meeting, I asked Dr. Rosen when the review was conducted. He initially stated that he did not know. He then checked his computer and stated that he began investigating my work at the end of 2016 and did so through the first quarter of 2017. That explanation seems false, however, for three reasons. First, he did not bring any purported issue to my attention during this time period, nor did he do so at any time before he informed me on March 14, 2018 of my termination effective March 2019. Second, my most recent performance review, which was conducted in or about June 2017 (just a few short months after the close of the first

---

² I understand Dr. Rosen's references to UMMS and UMMMG to be references to UMass Medical School and the University of Massachusetts Memorial Medical Group.

9

quarter of 2017), similarly does not even mention the existence of any purported concerns about the quality of my work. *Third, and perhaps most importantly, it is not at all credible that I was permitted to continue to read CT scans for over one year after the conclusion of an "independent review" (purportedly conducted from the end of 2016 and through the first quarter of 2017) allegedly concluded that my work was of poor quality.*

ii) When I asked Dr. Rosen the name of the independent reviewer he used to review my work and the hospital at which s/he worked, he refused to tell me.

iii) When I asked Dr. Rosen for all the patient records and other pertinent information regarding my purported deficiencies, he refused to provide it.

iv) When I asked Dr. Rosen for a written copy of the information that he presented to me (by projecting information on a screen) about the alleged deficiencies in the quality of my CT scan readings, he refused to give it to me. (The information he projected, which purported to show my poor quality work, included the reports of several other radiologists in a manner that was seemingly intentionally disorganized and extremely difficult to comprehend. It is not at all clear, from the little information I was "presented" and the very little time I was given to review it, that any of the purported poor quality readings were indeed mine.)

v) The summary report of my purportedly poor quality work that Dr. Rosen did provide did not include any concrete examples of my deficiencies; it simply cited "statistics" from the investigation. I was given no opportunity to analyze any information he allegedly used, and therefore have no ability whatsoever to rebut / refute these assertions that my work is of "poor quality."

10

vi) In or around August 2018, I discovered a "peer review" evaluation that Dr. Karin Dill performed assessing the quality of my work from the time period July 2016 to June 2017. Dr. Dill reported that I made errors that were "likely to be significant" in the readings that she purportedly reviewed. However, upon review of Dr. Dill's "peer review" results, I discovered that the cases that Dr. Dill claimed showed errors did not in fact show any error on my part, much less significant ones. Indeed, one case that Dr. Dill claimed showed a deficiency was actually a reading done by Dr. Dill, not me. Dr. Dill had falsely asserted that a case that she personally interpreted and signed, which she reported as having a significant error, was actually attributable to me.

vii) Given Dr. Dill's incorrect attribution to me of errors and misreads in a number of cases, and her consequent misrepresentation of my work, Dr. Dill's actions support an inference that her "peer review" was a deliberate attempt to sabotage me. In doing so, she aided in prematurely derailing my illustrious career and caused significant harm to my professional reputation.

viii) Upon information and belief, Dr. Dill did not similarly misrepresent the work of younger, male, non-disabled, and/or white radiologists within Medical Group at Medical Center and/or Marlborough Hospital.

ix) It is routine practice within the Department of Radiology at UMass to send emails to the radiologist who conducted a reading in which significant misreads or concerns are detected during the "peer review" process. I never received any such correspondence regarding the purportedly "significant errors" documented on Dr. Dill's purported peer review of me. Further, I never received any correspondence concerning

misreads from any of my peer reviews, throughout my entire employment at UMass and Marlborough Hospital.

x) Upon information and belief, Dr. Dill's targeted and factually incorrect "peer review" of certain of my cases was used by Dr. Rosen as grounds to terminate my employment (Dr. Rosen included the "incorrect readings" from Dr. Dill's peer review as part of his purportedly "independent" review that concluded that my work was "of poor quality.")

31) Dr. Rosen's purported reason for my termination is riddled with weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions.

32) On May 4, 2018, I filed a Charge of Discrimination against the University of Massachusetts Memorial Medical Center, UMass Memorial Medical Group, the University of Massachusetts Medical School, Max Rosen, M.D., Darren Brennan, M.D., and Stephen E. Tosi, M.D., alleging that I was discriminated against because of my age, race, national origin, gender and disability in violation of Title VII, the Americans With Disabilities Act, the Age Discrimination in Employment Act, and Mass Gen. L. c. 151B. That case is MCAD Docket No: 18WEM01247 and EEOC No: 16C-2018-01520.

33) Following my May 4, 2018 Charge, I discovered that additional Respondents, Marlborough Hospital and Dr. Dill, participated in discrimination against me.

### Age Discrimination Claims

34) In giving the role and title of Division Chief of Chest Radiology to Dr. Karin Dill, a younger, far less experienced radiologist, despite my qualifications, experience and seniority, Respondent Marlborough Hospital discriminated against me on the basis of age.

35) In terminating me while at the same time hiring Dr. Barile, a younger, less experienced radiologist to replace me (after my departure in March 2019), Respondent Marlborough Hospital discriminated against me on the basis of age.

36) In providing CT training to my younger, less experienced radiology colleagues while failing to offer the same training to me, Respondent Marlborough Hospital discriminated against me on the basis of age.

37) In paying me less than it/they paid my younger, less experienced colleagues, Respondent Marlborough Hospital discriminated against me on the basis of age.

38) In providing to me fewer (no) academic days in contrast to the number of days provided to my younger, less experienced colleagues, Respondent Marlborough Hospital discriminated against me on the basis of age.

### Race / National Origin Discrimination Claims

39) In giving the role and title of Division Chief of Chest Radiology to a far less experienced radiologist who is white, notwithstanding my similar qualifications, greater experience and greater seniority, Respondent Marlborough Hospital discriminated against me on the basis of race and/or national origin.

40) In terminating me while at the same time hiring Dr. Barile, a less experienced white radiologist to replace me (after my departure in March 2019), Respondent Marlborough Hospital discriminated against me on the basis of race and/or national origin.

41) In paying me less than white colleagues, Respondent Marlborough Hospital discriminated against me on the basis of race and/or national origin.

42) In providing to me fewer (no) academic days than the number provided to my white colleagues, Respondent Marlborough Hospital discriminated against me on the basis of race and/or national origin.

### *Gender Discrimination Claims*

43) In paying me less than my male colleagues, Respondent Marlborough Hospital discriminated against me on the basis of gender.

44) In providing to me fewer academic days than the number provided to male colleagues, Respondent Marlborough Hospital discriminated against me on the basis of gender.

### *Disability Discrimination and Failure To Accommodate Claim*

45) In providing me fewer (no) academic days than it/they provided to my non-disabled colleagues, and in refusing to permit me to work from home on weekdays and weekends (in contrast to my non-disabled colleagues), Respondent Marlborough Hospital discriminated against me on the basis of disability and failed to accommodate my disability.

### *Aiding and Abetting Claims*

46) By her role assisting UMass, Marlborough Hospital and Dr. Rosen in terminating my employment by producing a fraudulent peer review of my work, Dr. Dill aided and abetted discrimination against me.

### *Conclusion*

47) I therefore charge the Respondents with violating federal and state law, including Title VII, the Americans With Disabilities Act, the Age Discrimination in Employment Act, and Mass Gen. L. c. 151B.

48) As a consequence of Respondents' unlawful conduct, I have already lost salary and related benefits of employment, have suffered emotional distress, have lost personal and professional reputation and professional opportunities and have suffered other financial losses. The Respondents are liable for all of these losses, plus attorney's fees and costs.

I ALSO WANT THIS CHARGE FILED WITH THE EEOC: ___X___

I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCESSING OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.

I SWEAR OR AFFIRM THAT I HAVE READ THIS COMPLAINT AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF

_Charu S Desai_
(SIGNATURE OF COMPLAINANT)

SWORN AND SUBSCRIBED BEFORE ME THIS _6_ DAY OF JANUARY, 2019.

NOTARY PUBLIC: _Jay Cut_
MY COMMISSION EXPIRES: _JUNE 21, 2024_

Jonjy Amrit-Rishy Raj Ananth
My Commission Expires _JUNE 21, 2024_

On this 6th day of January, 2019, before me, the undersigned notary public, Chari Desai personally appeared, proved to me through satisfactory evidence of identification, which were personal knowledge of the identity of the principal, to be the person who signed the preceding or attached document and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of her knowledge and belief.

_Jay Cut_

I ALSO WANT THIS CHARGE FILED WITH THE EEOC: _____X_____

I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCESSING OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.

I SWEAR OR AFFIRM, UNDER THE PAINS AND PENALTIES OF PERJURY, THAT I HAVE READ THIS COMPLAINT AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_Charu S. Desai_
(SIGNATURE OF COMPLAINANT)

SWORN AND SUBSCRIBED BEFORE ME THIS _20_ DAY OF JANUARY, 2018.

NOTARY PUBLIC: _____
MY COMMISSION EXPIRES: _JUNE 21, 2024_

On this 20th day of ~~20th~~ January 2019 before me the undersigned notary public, Charu Desai personally appeared, proved to me through satisfactory evidence of identification which were personal knowledge of the principal, to be the person who signed the preceeding or attached document in my presence and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of her knowledge and belief.

Jonjy Amrit-Rishy Raj Ananth
My Commission Expires _JUNE_ 21, 2024