UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-CV-10520-TSH

| | |
|---|---|
| CHARU DESAI,<br>          Plaintiff,<br><br>     v.<br><br>UMASS MEMORIAL MEDICAL<br>CENTER, INC., et al.,<br>          Defendants. | **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS, UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL MEDICAL GROUP, INC., MAX ROSEN, M.D., AND STEPHEN TOSI, M.D.** |

Defendants, UMass Memorial Medical Center, Inc. (the "Medical Center"), UMass

Memorial Medical Group, Inc. (the "Medical Group"), Max Rosen, M.D. ("Dr. Rosen"), and

Stephen Tosi, M.D. ("Dr. Tosi"), pursuant to Fed. R. Civ. P. Rule 56 and Local Rule 7.1, submit

their Memorandum of Law in Support of their Motion for Summary Judgment.[1]

## I.     Discrimination (Counts I, III, IV, and V)

Plaintiff alleges that Defendants discriminated against her in several respects on the basis

of her sex, age, and disability, in violation of Title VII, the ADA, the ADEA, and Chapter 151B.[2]

### A.     Termination

Plaintiff claims her employment was terminated because of her sex, age, and disability. In

order to evaluate a discrimination claim based on circumstantial evidence, courts apply the

---

[1]    A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003) (internal quotations omitted).

[2]    Defendants address Plaintiff's claims of discriminatory pay practices in Section II below.

familiar three-stage, burden-shifting framework. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990); Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 681 (2016).

Initially, Plaintiff must meet her burden of proving the *prima facie* elements of her claims. While the elements can vary based on the nature of the claim, courts generally require a showing that a plaintiff performed her job satisfactorily or that her work was sufficient to meet her employer's legitimate expectations. See Medina-Munoz, 896 F.2d at 8; Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000); Bulwer, 473 Mass. at 681. Plaintiff cannot establish a *prima facie* case, as she did not perform her job at an acceptable level.[3] Her employment was in fact terminated for performance deficiencies; the basis also cited by Defendants to rebut Plaintiff's *prima facie* case.

Defendants can rebut the presumption created by the *prima facie* case by articulating a legitimate, nondiscriminatory reason for its decision. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981); Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441-42 (1995). Defendants' burden at this stage is "only a burden of production, not a burden of persuasion; the task of proving discrimination remains the claimant's at all times." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991). To meet this burden, a defendant "need not persuade the court that it was actually motivated by the proffered reasons," but "must clearly set forth, through the introduction of admissible evidence, the reasons for the [decision]." Burdine, 450 U.S. at 254-255. With a legitimate reason being produced for the decision, "the inference raised by the prima facie case dissolves." Mesnick, 950 F.2d at 823; Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 128 (1997) ("Once the defendant meets its burden, the presumption of discrimination vanishes.").

---

[3] For the purpose of this Motion only, Defendants admit that Plaintiff can meet the remaining elements of a *prima facie* case.

Plaintiff's employment was terminated by the Medical Group due to the Department of Radiology Chair's concerns with her performance, after conducting an independent and objective review of her quality. In his role as Chair, Dr. Rosen is responsible for ensuring that the Department provides high quality and safe medical care to its patients. S.O.F., ¶¶ 18, 173.[4] Dr. Rosen received complaints and concerns about the quality of Plaintiff's interpretations of chest CTs from her Division Chief, both based on her own assessment as well as reports to her from treating physicians. S.O.F., ¶¶ 126-128. Dr. Rosen also received complaints directly from a pulmonologist, Dr. Kimberly Robinson, who was also the President of the Medical Staff at Marlborough Hospital, one of the hospitals that the Medical Group's Department of Radiology serves. S.O.F., ¶¶ 129-130, 135. The concerns of Dr. Robinson culminated in a meeting between Dr. Rosen, Dr. Robinson, and leadership from Marlborough Hospital. S.O.F., ¶¶ 141-147. At the meeting, Dr. Robinson expressed concerns specific to chest imaging, and she stated to Dr. Rosen that she never believed Plaintiff's reports and could not rely on them. S.O.F., ¶¶ 142, 145. In response, Dr. Rosen agreed to take certain steps to improve chest imaging and to conduct a focused peer review of Plaintiff's quality. S.O.F., ¶¶ 146-147.

Dr. Rosen believed that he had to address the concerns raised to him in the interests of patient safety and the Department's obligations to provide high quality services to patients and providers. S.O.F., ¶ 148. Radiology, like other diagnostic medical work, can involve a degree of probability and subjectivity, and issues or disagreements can be raised by attending physicians at times. S.O.F., ¶¶ 131-133. However, based on the nature of the complaints about Plaintiff and the insistence of a well-respected pulmonologist that Plaintiff's reads, in particular, could not be trusted, Dr. Rosen decided that he must take action. S.O.F., ¶¶ 148, 150-152.

---

[4]     Citations to "S.O.F." are to the Statement of Material Facts in Support of Motion for Summary Judgment by the Medical Center, Medical Group, Dr. Rosen, and Dr. Tosi, filed contemporaneously herewith.

To ensure fairness and to confirm that the quality concerns were justified, Dr. Rosen arranged for an independent, blinded review of Plaintiff's CT reads. S.O.F., ¶ 149. Dr. Rosen engaged a well-respected, un-biased expert in chest CT imaging from outside of UMass Memorial to perform the review. S.O.F., ¶¶ 160-167. Chest CT studies read by Plaintiff as well as an equal number of chest CT studies read by other radiologists, as a control group, were randomly selected and reviewed by the expert blindly.[5] S.O.F., ¶¶ 152-156. The expert's conclusions, when un-blinded by Dr. Rosen, revealed that Plaintiff's reads contained significantly more major errors and errors affecting patient care than those of the control group. S.O.F., ¶¶ 169-170. Dr. Rosen reviewed the results and determined that Plaintiff's quality was not acceptable. S.O.F., ¶ 171. In reliance on the independent review, Dr. Rosen decided that Plaintiff could not continue to work in the Department. S.O.F., ¶ 171. Accordingly, he provided notice to Plaintiff that her employment would be terminated in accordance with the notice period provided for in her contract of employment. S.O.F., ¶¶ 192-193.

Based on the foregoing, Dr. Rosen, on behalf of the Medical Group, made the decision to terminate Plaintiff's employment for a legitimate, non-discriminatory business reason, which clearly rebuts any inference raised by a *prima facie* discrimination claim. In order to overcome the Medical Group's legitimate reason for its decision and be able to prove discrimination, Plaintiff "is required to show, unassisted by the original inference of discrimination, that the employer's proffered reason is actually a pretext for discrimination of the type alleged." Mesnick, 950 F.2d at 823; Bulwer, 473 Mass. at 681 (A plaintiff must show that "the employer's articulated justification for the termination is not true but a pretext."). "In assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer

---

[5]    The control group was not restricted to reads by radiologists specializing in chest imaging, which created a lower standard of comparison in favor of Plaintiff. S.O.F., ¶¶ 157-159.

believed its stated reason to be credible. It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [s]he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive [of] discrimination." Mesnick, 950 F.2d at 824 (internal quotations omitted; emphasis added).

Plaintiff can offer no evidence that Dr. Rosen did not believe that the quality of Plaintiff's chest CT reads was deficient, based on his reliance on an independent assessment. Plaintiff is simply second-guessing the judgment of Dr. Rosen, which was based on the independent reviewer's blind analysis. Discrimination law "does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision to fire does not stem from the person's age [or other protected classes]. Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions." Mesnick, 950 F.2d at 825 (internal quotations omitted); Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 56 (2005) (The Court's "task is not to evaluate the soundness of [an employer's] decision making, but to ensure it does not mask discriminatory animus."). "Calling into question the employer's reason for termination is not enough." Tombeno v. FedEx Corp. Servs., Inc., 284 F. Supp. 3d 80, 87 (D. Mass. 2018). Instead, Plaintiff must "refute the clear evidence put forward by" Defendants and "advance evidence of [her] own showing that [their] asserted reason was a pretext hiding discrimination." Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 105 (1st Cir. 2005).

It is unclear what evidence, if any, Plaintiff believes supports her claim that discriminatory animus based on her sex, age, and disability was the real reason for Defendants'

decision to terminate her employment. In fact, Plaintiff <u>admits</u> that Dr. Rosen's action in conducting the independent review was fair and justified and not motivated by discrimination.

Plaintiff <u>admits</u> that Dr. Rosen has an obligation to ensure patient safety and the quality of reads by radiologists in the Department. S.O.F., ¶ 173. She <u>admits</u> that Dr. Rosen should take action if he believes a radiologist's quality is substandard. S.O.F., ¶ 176. She <u>admits</u> that Dr. Rosen did not make up his concerns with her quality. S.O.F., ¶ 183. She <u>admits</u> that using an independent expert to perform a review is a way to assess quality without the risk of discrimination. S.O.F., ¶ 184. Plaintiff <u>admits</u> that Dr. Rosen's decision to conduct an independent review of her reads was <u>not based on her sex, age, or disability</u>.[6] S.O.F., ¶¶ 178-181. Indeed, she is adamant that the review and her protected classes <u>have nothing to do with each other and do not have any connection</u>. S.O.F., ¶¶ 178-181.[7]

Plaintiff <u>admits</u> that the independent expert determined that she had quality problems and that Dr. Rosen should not have ignored the independent expert's findings. S.O.F., ¶¶ 174-175. She <u>admits</u> that Dr. Rosen relied on the independent expert's evaluation in making the decision to terminate her.[8] S.O.F., ¶ 185. She <u>admits</u> that Dr. Rosen acted fairly and appropriately by relying on an independent expert's evaluation. S.O.F., ¶ 187. She <u>admits</u> that Dr. Rosen's

---

[6]   Plaintiff alleges that Dr. Rosen should have spoken with her before conducting the review, but does not claim that Dr. Rosen's action in not speaking with her before conducting the independent review was because of her age, disability, or sex. S.O.F., ¶ 182.

[7]   Plaintiff testified: "I don't think [the] review has anything to do with the age. Both don't go together." S.O.F., ¶ 178. When asked at deposition if she is claiming that Dr. Rosen made the decision to have her reviewed because of her age, she testified that it "[h]as nothing to do with age." S.O.F., ¶ 178. When asked if she believes that Dr. Rosen made the decision to review her cases for quality by an independent expert because she is a female, Plaintiff testified: "No." S.O.F., ¶ 179. When asked if she is claiming that Dr. Rosen decided to do the review based on her disability, Plaintiff responded: "I don't think it has a connection with the disability." S.O.F., ¶ 180. Plaintiff testified that her age and disability "[h]ad nothing to do with the independent review." S.O.F., ¶ 181.

[8]   To the extent Plaintiff claims that the independent reviewer was incorrect in her findings, she can offer no evidence that Dr. Rosen knew or believed that any findings were incorrect. Additionally, Plaintiff does not claim that Dr. Litmanovich discriminated against her in performing her review. S.O.F., ¶ 189.

decision to terminate her was action based on his assessment that her quality was substandard. S.O.F., ¶ 177.

Plaintiff <u>admits</u> that Dr. Rosen had a responsibility to ensure quality, believed she had quality problems, fairly engaged an independent review for reasons that had nothing to do with Plaintiff's age, sex, or disability, and made his decision to terminate her based on his reasonable reliance on the findings. The analysis of pretext begins and ends with these admissions, and based on the undisputed facts, Plaintiff cannot establish a claim for discrimination and Defendants are, therefore, entitled to summary judgment.

Despite Plaintiff's admissions, and to the extent she intends to nevertheless offer theories to suggest pretext, no other facts she may offer change anything about the undisputed facts regarding the decision process and independent review described above, and they are simply distractions that do not alter the facts <u>material</u> to the termination decision.

Plaintiff appears to take issue with the methodology in which Dr. Rosen chose to conduct the independent review, contending that in her opinion, Dr. Rosen should have compared her to an equal number of studies performed by the same physician instead of a control group comprised of multiple physicians. S.O.F., ¶ 190. However, she does not and cannot contend that Dr. Rosen chose the methodology for any reason other than his good faith belief that it would result in a fair comparison, nor can she identify how any alternate methodology would have come to a different result. Her assertion is simply second-guessing that has nothing to do with pretext or discrimination, and such second-guessing by the Court is foreclosed as a matter of law. <u>See</u> <u>Mesnick</u>, 950 F.2d at 825.

To the extent Plaintiff claims that Defendants treated her differently with respect to concerns raised regarding quality, <u>her own opinions</u> on how the Department Chair should

respond to concerns based on her perceptions do nothing to raise an inference that unlawful discrimination motivated her termination. Instead, she is simply placing herself (and asking this Court to place itself) in the shoes of the decision-maker and second-guessing Dr. Rosen's judgment based on her own incomplete and self-serving viewpoint. Dr. Rosen did indeed receive other complaints and concerns regarding radiologists' reads from time to time. However, he evaluated every concern raised and took action based on the individual circumstances.[9] S.O.F., ¶¶ 131-133.

Regarding concerns raised by Dr. Robinson as to other physicians' reads, Plaintiff was the only one complained of who specialized in chest imaging.[10] S.O.F., ¶ 135. For other radiologists performing limited chest work, Dr. Rosen evaluated concerns raised, and in one instance, removed a physician from reading chest CTs in response.[11] S.O.F., ¶¶ 136-139. In other specialties, Dr. Rosen has terminated multiple radiologists (outside Plaintiff's protected classes) due to quality concerns, some after reviews were performed.[12] S.O.F., ¶ 203-206.

---

[9] "A claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in material respects. Accordingly, the proponent of the evidence must show that the individuals with whom he seeks to be compared have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996) (internal citations and quotations omitted).

[10] Plaintiff can point to no other radiologist who was singled out as one whose reads could not be relied upon, let alone by a specialist in her same field (in this case, chest medicine) and who was a leader among the medical staff of a hospital that the Medical Group served.

[11] This physician's specialty was in a different area, so he could be removed from reading chest CTs and be able to continue to read in his area of specialty. S.O.F., ¶ 139.

[12] To the extent Plaintiff suggests that other physicians who were terminated due to performance reasons were offered an "opportunity to resign" and Plaintiff was not, this is simply a mischaracterization and not supported by evidence. Dr. Rosen treated the employees in the same way: He provided them the requisite notice that their employment would be terminated, and those other physicians elected to resign in lieu of a formal termination. (Thus, their separations are designated as voluntary resignations.) S.O.F., ¶ 207. For whatever reason, Plaintiff opted not to do so during the entire year of her notice period, before the time came when her termination was eventually actualized. S.O.F., ¶¶ 208-209.

Through her assault on Dr. Rosen's decision-making, Plaintiff is asking this Court to wade into the depths of intricate medical matters and substitute its own judgment (or hers) for that of the Department Chair in making decisions based on diverse, complex, and individualized circumstances. A medical practice's decisions made for the grave purpose of protecting patient safety should not be subject to second-guessing based on an employee's opinions of unfairness.

To the extent Plaintiff cites a statement by another physician, Dr. Joseph Ferrucci – who was not a decision-maker – implying based on his own opinion that Dr. Rosen had an obligation to recruit younger staff, this stray remark was not made by Dr. Rosen and this subject was never discussed with Dr. Ferrucci. S.O.F., ¶¶ 84-86. "[S]tray workplace remarks, as well as statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus." Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002).

Dr. Rosen, in fact, did not have a desire to recruit physicians based on their age. The demographics of Dr. Rosen's hiring decisions do not reflect any such motive (or any discriminatory motive), and the demographic make-up of the Department and Dr. Rosen's employment decisions undermine any claim that he was motivated by discriminatory animus. During Dr. Rosen's tenure, he has hired 14 radiologists over 60 years of age and two over 70 years of age. S.O.F., ¶ 235. The Department currently includes 24 radiologists over 60 years old (including Dr. Rosen himself), and three over 70 years of age, out of a staff of approximately 92. S.O.F., ¶¶ 232-234. Dr. Rosen has hired 32 radiologists who are female, including the radiologist who replaced Plaintiff. S.O.F., ¶¶ 230, 235. The Medical Group employs another radiologist, Mona Korgaonkar, M.D., who is a female and is older than Plaintiff. Of the eight regularly-

employed radiologists whose employment was ended by Dr. Rosen, seven were younger than Plaintiff and seven are males. S.O.F., ¶ 236.

Based on the undisputed facts, there is no genuine issue as to any <u>material</u> fact as to the bases of Dr. Rosen's decision to terminate Plaintiff's employment.[13] Therefore, Defendants are entitled to summary judgment.

      B.    <u>Terms of Employment</u>

Plaintiff contends that she was treated differently than other radiologists in the Department with respect to aspects of her employment; specifically, that she was required to work "call," she was not granted academic time, and she was not granted a remote "home workstation." However, the Medical Group's policies regarding these subjects were uniformly applied in the Department, their enforcement was not adverse employment action under the law, and there is no evidence that Plaintiff was treated in a discriminatory manner.

It is undisputable that every radiologist in the Department who performed clinical work and was regularly employed (i.e., not including those who are "per diem"), was required to take call on weekends and holidays pursuant to an equitable schedule. S.O.F., ¶¶ 62-66. It is undisputable that this policy was applied uniformly and no physician was exempted from call. S.O.F., ¶¶ 76-77.[14]

It is also undisputable that academic time was provided to radiologists in accordance with the academic work they performed, Plaintiff did not perform any academic work, she never made

---

[13]    Plaintiff also alleges, in prepared documents, that Dr. Rosen's restriction of her reading CT images during her notice period was discriminatory. However, in reality, Plaintiff <u>admits</u> that Dr. Rosen's decision to restrict her ability to read CTs was <u>not</u> motivated by her disability or her age. S.O.F., ¶¶ 194-196. Regardless, this restriction underscores the legitimacy of Dr. Rosen's decisions, and as with the termination, the restriction of CTs was made to protect patient safety and ensure the provision of high quality services. S.O.F., ¶ 194.

[14]    The limited exception to this policy was one under which Plaintiff herself was one of the few radiologists exempted from call. For a two-year period, staff members were permitted to "sell" their call to others, and during this time, Plaintiff "sold" the majority of her calls to other radiologists. S.O.F., ¶¶ 67-71.

a proposal to do academic work, and she never intended to perform academic work. S.O.F., ¶¶ 40-41, 45-53. In fact, Dr. Rosen asked Plaintiff to submit a proposal to substantiate her request, and she refused. S.O.F., ¶ 51. Plaintiff cannot point to another radiologist who was granted academic time and did not perform any academic work. S.O.F., ¶¶ 54-57.

Plaintiff also claims that she was unlawfully denied a home workstation, but there is once again no evidence at all for such a claim. Remote workstations were implemented in a very limited trial beginning in 2017, and by the time Plaintiff's employment ended, only nine members of the Department had one at any point (out of approximately 92 employees). S.O.F., ¶¶ 96-99. The decisions regarding who used a home workstation were made on a case-by-case basis, and there no evidence that decisions were based on protected class. S.O.F., ¶¶ 100-103.

Moreover, none of these aspects of Plaintiff's employment constitute adverse employment actions which are actionable under discrimination law, because they did not materially affect the terms or conditions of her employment. See Cham v. Station Operators, Inc., 685 F.3d 87, 94 (1st Cir. 2012); Yee v. Massachusetts State Police, 481 Mass. 290, 295-96 (2019). Even if they did constitute adverse actions, each decision was made by the Medical Group for legitimate, non-discriminatory reasons, and there is no evidence that those reasons are pretext or have anything to do with Plaintiff's sex, age, or disability. See Mesnick, 950 F.2d at 823. Accordingly, Defendants are entitled to summary judgment on these claims.

C.      Reasonable Accommodation

Plaintiff alleges that she has a heart condition which constitutes a disability, as it causes her to have periodic episodes where she is briefly incapacitated (i.e., for several minutes). S.O.F., ¶ 22. Plaintiff claims that Defendants unlawfully denied her reasonable accommodations that she needed due to her condition. Defendants admit for the purpose of this Motion only that Plaintiff

was a qualified disabled individual.[15] However, Plaintiff's claim fails because, as she admits, she was granted the only accommodation she needed and requested.

It is undisputed that the only accommodation Plaintiff needed for her medical condition was the ability to take time off in the event of an episode. S.O.F., ¶¶ 33-35. Due to her condition, beginning in early 2015, Plaintiff requested intermittent leave under the Family and Medical Leave Act (FMLA) to be absent for up to two days every two months. S.O.F., ¶¶ 24-28. The Medical Group approved her request, and continued to approve her requests each year, from 2015 to 2019. S.O.F., ¶¶ 24-28. Plaintiff admits that she was never denied the ability to take FMLA leave, and her ability to take this leave was never prevented or interfered with in any way. S.O.F., ¶ 32. Indeed, Plaintiff was never prevented from taking a break when she needed one. S.O.F., ¶ 31. Plaintiff additionally had an abundance of sick leave. S.O.F., ¶ 29.

Plaintiff admits that her medical condition did not affect her ability to perform the essential functions of her job, except to the extent she needed to use her approved FMLA leave in the event of an episode. S.O.F., ¶¶ 33-34. Plaintiff admits that the only request she ever made to the Medical Group to assist her with her medical condition was the ability to take time off under the FMLA. S.O.F., ¶ 35. Plaintiff admits that she never told Dr. Rosen or the Medical Group that she was not capable of performing the essential functions of her job due to a disability. S.O.F., ¶ 36. Thus, based on the undisputed record evidence, Plaintiff was provided the only accommodation she ever requested or needed.

---

[15]   To establish a claim for the failure to reasonably accommodate a disability, Plaintiff must show that (1) she was a qualified disabled person capable of performing the essential functions of her job with reasonable accommodation, (2) she requested an accommodation, (3) the Medical Group refused to provide it, and, (4) as a result of the refusal, she suffered some harm. See Smith v. Bell Atlantic, 63 Mass. App. Ct. 702, 711 (2005); see also Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007).

Despite having been granted the exact accommodation she needed or requested, Plaintiff now, after the fact, claims that every time she requested something at work, it was due to her medical condition. But, the fact is that Plaintiff <u>never</u> requested a home workstation, academic time, or an exception to working call as an accommodation for a disability.[16] Her present claim is an attempt to convert every previous workplace gripe into an unlawful denial of accommodation.

Plaintiff alleges that she asked Dr. Rosen if she could have a home workstation, on one occasion, so that she could take call at home because she gets tired. S.O.F., ¶ 106. However, Plaintiff admits that she did not mention her heart condition as the reason she got tired or the reason she desired a home workstation in this meeting or at any other time. S.O.F., ¶ 107. In fact, at one point, Plaintiff expressed she desired a home workstation so that she could work from home during times of inclement weather. S.O.F., ¶ 104. Plaintiff never told Dr. Rosen or the Medical Group that she was not capable of performing the essential functions of her job without the use of a home workstation. S.O.F., ¶ 109. Plaintiff admits that she never submitted medical documentation regarding a need for a home workstation. S.O.F., ¶ 110.

Likewise, Plaintiff never requested academic time for any reason related to her health condition. In fact, she believes she should have been granted academic time based on being "grandfathered" and exempt from the policy based on seniority. S.O.F., ¶ 59.[17] As described above, academic time is non-clinical time in which a member of the Department performs research or scholarly activity. S.O.F., ¶¶ 40-41. Plaintiff did not perform any academic work, did not propose doing any academic work, and did not intend to perform any academic work. S.O.F.,

---

[16]   The Medical Group has granted an accommodation for a medical issue to another presently-employed radiologist in the form of a change in work hours. S.O.F., ¶ 39.

[17]   It is undisputed that the Academic Time Policy makes no provision for granting academic time based on seniority or "grandfathering." S.O.F., ¶ 61.

¶ 45-52. Instead, Plaintiff admits that she simply desired time to take a break from work; time which she was appropriately provided through FMLA leave. S.O.F., ¶ 51.

Neither did Plaintiff ever request to be relieved from call responsibilities due to her medical condition. In fact, when Plaintiff requested to be exempt from call, she attributed her entitlement to such an exception to her longevity in the Department, wanting to be absolved from call based on how many years she had worked for the Medical Group. S.O.F., ¶¶ 74-75. Plaintiff never related her desire to a medical condition, and Dr. Rosen had no idea that she wanted to be exempted from call because of a disability. S.O.F., ¶¶ 87-90.

Despite the fact that the Medical Group did not know Plaintiff wanted an exception from call due to a disability, Plaintiff was offered multiple means by which to avoid call responsibilities. For two years, from October 1, 2015, to September 30, 2017, Plaintiff was allowed to "sell" her calls, and sold six of her call weekends each year. S.O.F., ¶¶ 67-72. When she asked to be exempt from call altogether, Dr. Rosen offered her the ability to go to per diem status, in which there were no call requirements, and she declined. S.O.F., ¶¶ 78-83, 91, 108.[18]

The law requires that an employer grant "reasonable accommodations to the *known* physical or mental limitations of an employee." Reed v. LePage Bakeries, Inc., 244 F.3d 254, 260-61 (1st Cir. 2001) (emphasis in original); 42 U.S.C. § 12112(b)(5)(A). It is "[a]n employee's obligation to request an accommodation" and "an employer is not required to accommodate a need that it does not know exists." Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination, 441 Mass. 632, 649 n. 21 (2004).

> Consequently, for an employee's actions to constitute a request for accommodation, they must make the employer aware that the employee is entitled to and needs accommodation. Specifically, the request must let the employer know that the employee is a qualified handicapped person, and that the employee is currently

---

[18]   Other radiologists have chosen this option to avoid taking call. S.O.F., ¶¶ 78-81.

unable either to perform the essential functions of his job or to enjoy equal terms, conditions, and benefits of employment.

Id.; see also Reed, 244 F.3d at 261 ("The employee's request must be sufficiently direct and specific, giving notice that she needs a special accommodation." (internal quotations omitted)). As the First Circuit has articulated clearly: "At the least, the request must explain how the accommodation requested is linked to some disability. The employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace." Reed, 244 F.3d at 261. An employee expressing a desire for exceptions to policies, for a home workstation, or for a schedule modification is not sufficient to put an employer on notice that the employee needs an accommodation for a disability.[19]

Plaintiff is not permitted to accept an accommodation that the Medical Group believed was effective and acceptable to her, decline others, and sit back, to later claim that every workplace perk she ever requested was in fact a request for a reasonable accommodation for a disability. An employee in need of an accommodation, as well as the employer, "must approach the accommodation process in good faith." Finlan v. Verizon New England, Inc., 74 Mass. App. Ct. 1127, 2009 WL 2252267 at *2 (2009); E.E.O.C. v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 132 (1st Cir. 2014) (holding that good faith is imperative).

Even if Plaintiff had made the requests as accommodations for a disability, it is undisputed that she was in fact provided an effective accommodation in the form of intermittent leave.[20] The law does not require that an employer provide an employee with the precise

---

[19]   This remains the case even if an employee relates the desire to some general illness or physical manifestation (i.e., Plaintiff "getting tired"). See Freadman, 484 F.3d at 103-04 (finding lack of notice when employee stated "she needed to take some time off because she was starting not to feel well," because employee, "who had better knowledge than [her supervisor] of her condition and symptoms, had some burden to be specific about the accommodation she required").

[20]   See S.O.F., ¶¶ 33-34; Deposition of Charu Desai, M.D., at 186-187 (Q: In order to perform your job effectively, the only accommodation you needed was the ability to take time off . . . is that right? A: Yes.").

accommodation requested, it requires only that an effective accommodation be granted. Plaintiff alleges that she required intermittent time off as an accommodation for her disability, and she was granted exactly that. The Medical Group's unwillingness to make exceptions to its policies to suit Plaintiff's preferences is not a denial of a reasonable accommodation for a disability.

"An employer is not required to provide an employee's first choice of accommodation, but must provide reasonable accommodation to allow the employee to perform the essential functions of his job." Murray v. Warren Pumps, LLC, No. 11-40176-DPW, 2013 WL 5202693 at *10 (D. Mass. Sept. 12, 2013). "[A]n employer does not have to choose the best accommodation available or the accommodation that the employee prefers. Instead, the employer has the 'ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.'" Quintiliani v. Massachusetts Bay Transp. Auth., No. 98-11085-RGS, 2000 WL 1801841 at * 6 (D. Mass. Nov. 29, 2000) (quoting 29 C.F.R. § Pt. 1630, App.).[21] There is no dispute that Plaintiff was provided with an accommodation that was effective for its purpose – to allow Plaintiff to take time off intermittently when she needed a break or had an occurrence of symptoms.

Further, as to Plaintiff's request to be relieved from call, this is an essential function of her job that the Medical Group is not required to eliminate as an accommodation. The removal of an essential duty from a position is not a reasonable accommodation. See Cox v. New England Tel. & Tel. Co., 414 Mass. 375, 383 (1993); Mulloy v. Acushnet Co., 460 F.3d 141, 153 (1st Cir. 2006). While a reasonable accommodation may include job restructuring, "the law does not

---

[21]   "In determining the type of reasonable accommodation required for an … employee, the employer need not provide the best accommodation available, or the accommodation specifically requested by the individual with the handicap. Rather, the employer must provide an accommodation … that is effective for its purpose." MCAD Guidelines, Employment Discrimination on the Basis of Handicap, § II.C.; see Finlan, 2009 WL 2252267 at *2.

require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous." Mulloy, 460 F.3d at 153; see also Soto-Ocasio v. Fed. Exp. Corp., 150 F.3d 14, 20 (1st Cir. 1998). An employer's judgment as to the essential functions of a particular job are to be given deference. A fact-finder's inquiry "into essential functions is not intended to second guess the employer or to require the employer to lower company standards." Mulloy, 460 F.3d at 147 (internal quotations omitted).

Performing call responsibilities is an essential feature of the job of a radiologist in the Department. Every radiologist who performs clinical work and is a regular employee (i.e., not including those on "per diem" status) is required to take call. S.O.F., ¶¶ 62-65, 76. It is common that radiologists do not want to take call, but it is essential in order to provide timely and high-quality service to patients. S.O.F., ¶¶ 66, 73. Call responsibilities are divided in an equitable manner among radiologists covering each division, and if one radiologist is not available for call, this responsibility falls directly on others in the Department. S.O.F., ¶¶ 64-66.

It is undisputed that Plaintiff was provided with the accommodation that she requested and which was effective. She did not advise the Medical Group that any other work privilege she requested was connected with a disability, and even if she did, the Medical Group was not required to provide it. Because Plaintiff cannot meet the elements of her claim, Defendants are entitled to summary judgment on Plaintiff's claim of a denial of reasonable accommodation.

D.    Failure to Promote

Plaintiff appears to allege that years before her termination for poor work performance, the Medical Group unlawfully hired Dr. Karin Dill over her as the Division Chief. First, Dr. Dill was hired on February 29, 2016, S.O.F., ¶ 119, and any related claim is time barred. Plaintiff did

not file a complaint with the Massachusetts Commission Against Discrimination until May 4, 2018, over two years later. S.O.F., ¶ 202. By law, a complaint must be filed within 300 days of the alleged act of discrimination. See M.G.L. c. 151B, ¶ 5; 42 U.S.C. § 2000e-5(e)(1).

Even if such a claim were not barred, Plaintiff admits that 1) she did not apply for the position, S.O.F., ¶ 121, and 2) she was not better qualified for the position than Dr. Dill, S.O.F., ¶ 123; both admissions which dispose of her claim. Indeed, Plaintiff admits that she is not alleging that she should have been given the position, but only complains that she faced discrimination in that she should have been "automatically" asked as a "common courtesy" if she would like the position. S.O.F., ¶¶ 124-125.[22]

E.    Dr. Tosi

Plaintiff cannot make a claim against Dr. Tosi under Chapter 151B for aiding and abetting discrimination, regardless of her claims against the Medical Group.[23] To establish such a claim, "a plaintiff must show (1) that the defendant committed a wholly individual and distinct wrong separate and distinct from the claim in main; (2) that the aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender; and (3) that the aider or abetter knew of his or her supporting role in an enterprise designed to deprive the plaintiff of a right guaranteed him or her under G.L. c. 151B." Saari v. Allegro Microsystems, LLC, 436 F. Supp. 3d 457, 466 (D. Mass. 2020) (quoting Lopez v. Com., 463 Mass. 696, 713 (2012)).

Plaintiff alleges that the sole basis for her claim of discrimination against Dr. Tosi is that he signed her termination letter, and he could have stopped or questioned the decision. S.O.F.,

---

[22]   There is also no evidence that discrimination played a role in the decision. Dr. Dill was undeniably more qualified for the position than Plaintiff, and there is no evidence that the decision was pretext. S.O.F., ¶ 122.

[23]   M.G.L. Chapter 151B, § 4(5) provides that it is unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so."

¶ 227. Dr. Tosi's approval of Dr. Rosen's decision to terminate Plaintiff's employment is insufficient to prove discrimination on his part. Plaintiff cannot offer any evidence at all that Dr. Tosi committed a distinct discriminatory act, that he had any discriminatory animus, or had any idea that he was involved in some alleged discriminatory enterprise by Dr. Rosen. The fact that Dr. Tosi could have overruled Dr. Rosen's employment termination decision, while true, provides no support that his not doing so was motivated by discriminatory animus. Dr. Tosi is therefore entitled to summary judgment on Plaintiff's discrimination claim.

## II.   Equal Pay (Counts II and IV)

Plaintiff brings claims for violation of the federal Equal Pay Act and Massachusetts Equal Pay Act against Defendants, and additionally claims violations of state and federal discrimination law (Title VII, ADEA, Chapter 151B, § 4) for discriminatory pay practices. Specifically, Plaintiff alleges that she was paid less than younger and male radiologists.

Plaintiff's claims are limited by the applicable statutes of limitations, which, at their maximum, limit her claims to compensation within three years of the filing of this action.[24] Plaintiff filed this action on March 19, 2019 (Doc. 1), so her claims are limited to alleged violations occurring after March 19, 2016, at the earliest.[25]

---

[24]   Under the U.S. Equal Pay Act, claims must be brought within two years of the allegedly wrongful conduct, or three years if the violation is proven to be willful. 29 U.S.C. §§ 206(d)(3), 255(a). Under the Massachusetts Equal Pay Act, the statute of limitations is three years. M.G.L. c. 149, § 105A. For claims under Title VII, claims are limited to a period of two years preceding the filing of a charge of discrimination, and under Chapter 151B, claims are limited to those arising 300 days prior to a charge. 42 U.S.C. § 2000e-5(e)(3)(B); M.G.L. c. 151B, § 5; Silvestris v. Tantasqua Reg'l Sch. Dist., 446 Mass. 756, 768-770 (2006). The ADEA has the same statute of limitations as the U.S. Equal Pay Act. 29 U.S.C. § 626(e)(1); Hamilton v. 1st Source Bank, 895 F.2d 159, 165 (4th Cir. 1990).

[25]   Because each discriminatory payment is a discrete action, the "continuing violation doctrine" does not apply to payments outside the limitations period. See Silvestris v. Tantasqua Reg'l Sch. Dist., 446 Mass. 756, 769-70 (2006); O'Donnell v. Vencor Inc., 466 F.3d 1104, 1113 (9th Cir. 2006); E.E.O.C. v. McCarthy, 768 F.2d 1, 4 (1st Cir. 1985).

A.     Defendants' Good Faith Pay Practices

In 2016, the Medical Group's Radiology Department undertook efforts to standardize salaries in an effort to address pay inequities and to increase rates to align more closely with the market. S.O.F., ¶ 237. The Department conducted an internal review and performed an external study to assist in the evaluation. S.O.F., ¶ 237. The result of these efforts was the implementation of a new, standardized salary structure effective March 1, 2017. S.O.F., ¶¶ 238-239. Under this pay structure, the Department set a base salary, with additional designated sums based on academic rank as well as leadership and administrative positions which carried with them additional job duties and responsibilities. S.O.F., ¶ 239.

As a result of the implementation of the new pay structure, the salaries of a large percentage the Department were increased and put in line with the scale. S.O.F., ¶ 238. Plaintiff received a substantial increase in pay, from $302,575 to $340,000;[26] the base salary for a diagnostic radiologist of $330,000, plus an additional $10,000 due to her rank as Associate Professor. S.O.F., ¶ 240. Plaintiff did not hold any leadership roles or perform additional duties for the Department. S.O.F., ¶ 241.

To the extent any disparities in compensation existed prior to the March 1, 2017, implementation of the new pay structure, Defendants have a complete affirmative defense to any claims under state law with respect to allegedly discriminatory pay practices.

Pursuant to M.G.L. c. 149, § 105A(d), an employer who:

> within the previous 3 years and prior to the commencement of the action, has both completed a self-evaluation of its pay practices in good faith and can demonstrate that reasonable progress has been made towards eliminating wage differentials based on gender for comparable work, if any, in accordance with that evaluation, shall have an affirmative defense to liability under subsection (b) and to any pay discrimination claim under section 4 of chapter 151B.

---

[26]  Plaintiff's salary was reduced voluntarily at this time period due to her "sale" of calls to other radiologists, described above, in the amount of $19,200 per year. S.O.F., ¶ 70.

There is no question that the Medical Group completed a good faith evaluation and that reasonable progress has been made (if any disparities have existed at all), as Plaintiff admits. S.O.F., ¶¶ 243-245. As a result of the new pay structure, every single full-time female radiologist who was employed as of March 1, 2017, who was not already paid at the standard, received a pay increase, and they were paid in accordance with the scale. S.O.F., ¶ 242. Therefore, Defendants have a complete defense to any claims for discriminatory pay practices under the Massachusetts Equal Pay Act or Chapter 151B, and are entitled to summary judgment on this basis.

Further, claims under federal law are limited to two years from the filing of an action, unless the violation is proven to be willful. Plaintiff can offer no evidence that any pay disparities were due to willful conduct by Defendants,[27] and therefore, her claims are limited by law to compensation paid following the March 1, 2017, implementation.

B.      Plaintiff's Claims

Under the Massachusetts Equal Pay Act, it is unlawful to pay an employee less than that paid to employees of a different gender for comparable work, with "comparable work" being that which "requires substantially similar skill, effort and responsibility and is performed under similar working conditions." M.G.L. c. 149, §§ 105A(a), 105A(b). Under the U.S. Equal Pay Act, it is unlawful for an employer to pay employees less than employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions," however, variations are permitted if

---

[27]    Conduct is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute," and requires "more than mere awareness of the existence of a governing federal law, or negligence in complying with it." LeGoff v. Trustees of Boston Univ., 23 F. Supp. 2d 120, 125 (D. Mass. 1998) (internal quotations omitted).

based on a differential factor other than sex. 29 U.S.C. § 206(d)(1). The critical inquiry under both laws is whether the positions being compared "entail comparable skill, effort, responsibility, and working conditions." See Gu v. Boston Police Dep't, 312 F.3d 6, 15 (1st Cir. 2002).[28]

In discovery, Plaintiff has not identified a male radiologist in a role requiring equal or substantially similar skill, effort, and responsibility who was paid more than her. She has additionally not identified a younger or male radiologist who was paid more than her based on a discriminatory motive. Instead, she points to radiologists who earned less than her or who hold leadership and/or administrative positions in the Department and were paid additional sums directly related to those responsibilities, including her own supervisor.

In her sworn answers to interrogatories (and Amended Complaint), Plaintiff cites, as the sole basis for her belief that she was paid less than her colleagues, the fact that Dr. Aaron Harman was paid more than her, and she identifies Dr. Harman as the only co-worker she claims was paid more than her because of gender.[29] S.O.F., ¶ 246. Dr. Harman's job duties are indisputably not equal to, the same, or substantially similar to those of Plaintiff. Plaintiff was a diagnostic radiologist, and Dr. Harman is an interventional radiologist. S.O.F., ¶ 249. While diagnostic radiology involves reviewing images of the body and making interpretations, interventional radiology is image-guided surgery. S.O.F., ¶ 250. These physicians perform invasive procedures on patients, and the radiology component relates to the use of imaging (including CT, ultrasound, MRI) to guide their procedures. S.O.F., ¶ 250. Accordingly, as

---

[28]   Title VII, the ADEA, and Chapter 151B require proof of intentional discrimination related to compensation under the same legal framework described above with respect to her other discrimination claims. See Mullenix v. Forsyth Dental Infirmary for Children, 965 F. Supp. 120, 144 (D. Mass. 1996); MacPherson v. Univ. of Montevallo, 922 F.2d 766, 774 (11th Cir. 1991). The Medical Group based its pay decisions on legitimate, non-discriminatory bases, and there is no evidence of pretext.

[29]   Discovery has closed, and Plaintiff has not supplemented her interrogatory answers with the identification of any other individuals who she contends were paid more than her.

Plaintiff admits, interventional radiologists generally earn substantially more than diagnostic radiologists. S.O.F., ¶¶ 251-252. Thus, the Department has implemented an entirely different pay scale for interventional radiology, under which Dr. Harman earned the base salary. S.O.F., ¶ 251. Plaintiff's claim that Dr. Harman held the same or substantially similar role as her is not supported by any evidence, and is not made in good faith.

At her deposition, Plaintiff grasped to identify other radiologists who earned more than her, naming either employees who earned less than her, or employees who are specifically compensated additional sums due to leadership and administrative roles. S.O.F., ¶¶ 247-261.

Regarding Eric Schmidlin, M.D., it is undisputable that he was not paid more than Plaintiff. When Dr. Schmidlin was hired, despite working in the same division and performing the same job as Plaintiff, he was paid less than Plaintiff, and he continued to be paid less throughout his employment. S.O.F., ¶ 253.[30] Plaintiff additionally points to Byron Chen, M.D., and Hemang Kotecha, M.D., but these employees were also paid less than her. S.O.F., ¶ 254.

The other physicians identified, Karin Dill, M.D., Steven Baccei, M.D., Christopher Cerniglia, D.O., Dennis Coughlin, M.D., and Sathish Dundamadappa, M.D., all held leadership positions in the Department for which they were compensated set sums in addition to the standard base salary.[31] S.O.F., ¶¶ 255-261. They were all Division Chiefs at one time, and additionally, Dr. Baccei served as the Department's Vice Chair of Quality, Safety, and Process Improvement, and both Dr. Cerniglia and Dr. Dundamadappa held positions with substantial

---

[30] Dr. Schmidlin left regular employment with the Medical Group on June 28, 2016, and he continued to work on a per diem, hourly basis. S.O.F., ¶ 253. His hourly rate since has been $162.50, which is less than the equivalent of Plaintiff's hourly rate of $163.46. S.O.F., ¶ 253.

[31] Of course, because Dr. Dill is also a female, she was not paid more than Plaintiff due to sex discrimination. To the extent Plaintiff claims that Dr. Dill was paid more than her due to age discrimination in violation of the ADEA and Chapter 151B, the Medical Group made the decision to pay Division Chiefs a higher salary due to a legitimate, non-discriminatory reason, and there is no evidence whatsoever that this rationale was pretextual.

additional job responsibilities which added significant value to the Department, for which they were compensated.[32] S.O.F., ¶¶ 255-261. Plaintiff's claim that she should have been paid the same as those with substantial leadership and administrative responsibilities – including her own supervisor – is meritless.

The Medical Group has made good faith efforts to compensate staff fairly and equally, and Plaintiff offers only examples of radiologists holding leadership positions or in different departments (or different positions altogether, in the case of Dr. Harman) who are paid additional sums based specifically on those additional job responsibilities. Plaintiff cannot offer evidence of pay disparities to make a claim, and Defendants are entitled to summary judgment.[33]

### III.   Tortious Interference (Count VII)

Plaintiff alleges that Dr. Rosen and Dr. Tosi tortiously interfered with her business relations by terminating her employment for discriminatory reasons. Plaintiff's claim fails because she can offer no facts to establish the requisite motive on the part of Dr. Rosen or Dr. Tosi in making the decision to end her employment. To establish a claim for tortious interference, she must produce evidence sufficient to show that "the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means." See Blackstone v. Cashman, 448 Mass. 255, 260 (2007). But Dr. Rosen and Dr. Tosi were Plaintiff's supervisors, and were officials acting on behalf of the very entities who were the parties to the relationships with which Plaintiff claims were interfered. Supervisors are entitled to end an employee's employment without tort liability, as they are "privileged to interfere with the

---

[32]   With the exception of Dr. Dill, none of these physicians specialized in chest imaging, and they worked in different divisions than Plaintiff. S.O.F., ¶¶ 255-261.

[33]   The Medical Center was not Plaintiff's employer, and Plaintiff makes no claims against it. Further, Plaintiff has admitted that she is not claiming that Dr. Tosi did not pay her correctly under the Equal Pay Act. S.O.F., ¶ 223.

employee's advantageous relationship." See Sklar v. Beth Israel Deaconess Med. Ctr., 59 Mass. App. Ct. 550, 554-55 (2003).

The standard for a tortious interference claim against a supervisor or other official of the employer is higher than that of "improper motive or means." Instead, Plaintiff must show "that the 'controlling factor' in the alleged interference was 'actual' malice." See Weber v. Cmty. Teamwork, Inc., 434 Mass. 761, 782 (2001). Courts have stressed that "'implied' malice is not sufficient," and they "have defined the requisite 'malice' in this context as 'a spiteful, malignant purpose, unrelated to the legitimate corporate interest' of the employer." Id. at 781-82. This "actual malice" standard is intended to "provide[] a measure of protection to corporate supervisors, who must necessarily make adverse employment decisions from time to time and who otherwise would be unduly exposed to the tortious interference claims of disgruntled former employees," and to "prevent[s] such an employee from simply recasting a nonexistent wrongful discharge claim as a tort claim for wrongful interference with advantageous business relations." Kelleher v. Lowell Gen. Hosp., 98 Mass. App. Ct. 49, 54-55 (2020), review denied, 486 Mass. 1104 (2020). This rule exists to ensure that officials' "freedom of action directed toward corporate purposes should not be curtailed by fear of personal liability." See Blackstone, 448 Mass. at 261 (quoting Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 663-64 (1981)).

Motive is the crux of a tortious interference claim, and it cannot be established "if the plaintiff can show nothing more than an adverse impact or a 'laundry list' of facts which may or may not indicate the defendant acted out of actual malice." Sklar, 59 Mass. App. Ct. at 555. Instead, Plaintiff must "demonstrate a link between the defendant's conduct and evidence of a spiteful purpose or personal hostility." Id. To meet this standard, a plaintiff "must allege specific facts from which a plausible inference of malice can be drawn." Id; Gram, 384 Mass. at 664

("Any reasonable inference of malice must … be based on probabilities rather than possibilities." (internal quotations omitted)).

The sole basis for Plaintiff's tortious interference claim is discrimination in the termination of her employment. See Amended Complaint, ¶ 104; S.O.F., ¶ 222. Allegations of discriminatory animus are not necessarily sufficient to support an inference of malice. See Weber, 434 Mass. at 782. As set forth above in Section I, not only is there insufficient factual support to demonstrate that discriminatory animus played any role in Plaintiff's termination, no facts have been revealed in discovery which are sufficient to prove the existence of actual malice on the part of Dr. Rosen or Dr. Tosi. In fact, Plaintiff asserts that the sole basis for her claim for tortious interference against Dr. Tosi is that he could have stopped the termination. S.O.F., ¶ 228. Being in the position to stop an action – even if the action is wrongful – is insufficient to establish that Dr. Tosi acted or failed to act with actual malice. There is simply no evidence that Dr. Tosi acted maliciously or with any improper motive for that matter, and Plaintiff cannot prove her claim against him.

Because Plaintiff cannot offer sufficient evidence to establish the requisite motive as to Dr. Rosen and Dr. Tosi, Defendants are entitled to summary judgment.

## IV.   Defamation (Count VIII)

Plaintiff brings a claim of defamation against all Defendants. In order to establish such a claim, Plaintiff must prove that "the defendant published a false statement regarding the plaintiff – that is, the defendant communicated the statement concerning the plaintiff to a third party." Flagg v. AliMed, Inc., 466 Mass. 23, 37 (2013). "The publication element of defamation requires that the defendant communicate the defamatory statement to a third party." White v. Blue Cross & Blue Shield of Massachusetts, Inc., 442 Mass. 64, 66 (2004).

Plaintiff's claim fails because she cannot identify any statement that a Defendant made about her which was published to a third party. Plaintiff alleges that Defendants defamed her through several documents, including 1) her 2017-2018 Faculty Annual Performance Review, 2) a "Peer Review" document, 3) an April 17, 2018, letter from Dr. Rosen to Plaintiff, 4) a April 17, 2018, e-mail from Dr. Rosen to Plaintiff, 5) an April 18, 2018, e-mail from Dr. Rosen to Plaintiff, 6) her termination letter given to her by Dr. Rosen, and 7) the independent review by Dr. Litmanovich. S.O.F., ¶ 210. However, Plaintiff <u>admits</u> that to her knowledge <u>none</u> of these documents were ever provided to a third party. S.O.F., ¶¶ 211-216, 219. This admission disposes of Plaintiff's claim as to each of the above.[34]

Plaintiff also claims that she was defamed by Dr. Rosen's statements about the results of the independent review in a meeting. S.O.F., ¶ 210. This was a confidential meeting that Plaintiff requested, and the allegedly defamatory information shared was information she insisted be provided to her. S.O.F., ¶¶ 197-200. Then, the information was shared only with Plaintiff, the Medical Group's Vice Chair of Quality, and another physician whom Plaintiff invited for the specific purpose of hearing about the results. S.O.F., ¶¶ 197-200. Plaintiff <u>admits</u> that the information shared was not disseminated beyond this meeting. S.O.F., ¶ 218. Accordingly, her claims fails with respect to this meeting.

Moreover, to the extent any information in these documents or expressed in the meeting includes an assessment of Plaintiff's work performance by Dr. Rosen or another official, such assessments are statements of opinion which are not actionable as defamation under Massachusetts law. <u>See</u> <u>Saad v. Am. Diabetes Ass'n</u>, 123 F. Supp. 3d 175, 177 (D. Mass. 2015)

---

[34] The only defamatory statement alleged by Dr. Tosi is the termination letter, which Plaintiff admits was true and admits that Dr. Tosi did not distribute; facts which are fatal to any defamation claim against Dr. Tosi. S.O.F., ¶ 229.

(citing HipSaver, Inc. v. Kiel, 464 Mass. 517, 526 n. 11 (2013)). To be defamatory, "a statement generally must contain an objectively verifiable assertion," and "a statement cannot be defamatory if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." Id. (internal quotations omitted). A supervisor's assessments of an employee's work quality are not defamation, no matter how much second-guessing is done by the employee.

Critically, every act alleged by Plaintiff to be defamatory was taken by the Medical Group for legitimate employment and business purposes. An employer and its officials have the conditional privilege to "disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job." Bulwer, 86 Mass. App. Ct. at 335. Further, a privilege exists where "the publisher and the recipient share a common interest and the communication is of a kind reasonably calculated to protect or further it." Sklar, 59 Mass. App. Ct. at 558. This privilege is lost only where the publisher "(1) knew the information was false, (2) had no reason to believe it to be true, (3) recklessly published the information unnecessarily, unreasonably, or excessively, or (4) that it acted out of malice." Id.; see also Sklar, 59 Mass. App. Ct. at 558.

All of the information alleged by Plaintiff to be defamatory was either indisputably true, or there is no evidence to indicate that Dr. Rosen did not believe it to be true. Plaintiff admits that the independent reviewer identified problems and that it was appropriate for Dr. Rosen to rely on the review. S.O.F., ¶¶ 174, 185-188. Plaintiff further admits that it is true that she was terminated, and it is true that she was not permitted to read CT images, a fact she herself freely communicated to others when asked. S.O.F., ¶¶ 217, 220. There is further no evidence that Defendants handled its communications regarding Plaintiff's employment and termination in

anything but the most discreet and professional manner possible. Plaintiff cannot claim that Dr. Rosen or anyone else published any information recklessly, unnecessarily, unreasonably, or excessively, or that they acted out of malice. The fact of Plaintiff's termination was not shared unnecessarily or with any characterization as to Plaintiff's quality, and any communications regarding Plaintiff's restriction of reading CTs – a decision made for good faith patient safety purposes – were made discreetly for the very limited purposes of scheduling and workflow.[35] S.O.F., ¶ 221. Any and all communications regarding quality were maintained as peer review privileged and confidential information.[36]

Plaintiff additionally alleges that Defendants' suspension of her ability to read CT images and her termination itself "constitute defamation by deed." S.O.F., ¶ 210. However, the Medical Group's execution of its employment decisions is not defamation, and an employer is permitted (and privileged) to carry out its employment decisions without tort liability. Court decisions permitting defamation claims as to an employer's actions, as opposed to verbal or written statements, are narrowly limited to those cases in which the alleged actions are separate from the decision itself, and which may suggest malice. See, e.g., Simas v. First Citizens' Fed. Credit Union, 63 F. Supp. 2d 110, 117 (D. Mass. 1999) (unprecedented escorting of employee out of building); Petsch-Schmid v. Boston Edison Co., 914 F. Supp. 697, 705-06 (D. Mass. 1996)

---

[35]   In Bulwer, the plaintiff-physician claimed that internal e-mails sent by his employer-hospital notifying staff that the plaintiff was departing with "instructions that Bulwer was not permitted to see or treat patients" were defamatory. 86 Mass. App. Ct. at 335. The Court rejected the plaintiff's claim that these e-mails falsely implied "his incompetence as a physician was such that he should not be engaged in a medical career," and affirmed summary judgment, holding that the plaintiff "did not meet his burden of putting forward a record on summary judgment that would permit a rational fact finder to conclude that the hospital was not entitled to the conditional privilege." Id.

[36]   Critically, the communications at issue dealt with issues of quality and patient care. Therefore, such communications constituted medical peer review information privileged under state law. See M.G.L. c. 111, §§ 203, 204; Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 396 (2005); Miller v. Milton Hosp. & Med. Ctr., Inc., 54 Mass. App. Ct. 495, 501 (2002) ("The peer review privilege … is designed to foster a candid exchange of information regarding the quality of medical care.").

(escorting employee out of building and raising voice in a demeaning manner in front of other employees). To hold that a termination decision alone constitutes defamation would create a tort action for any employment termination, eviscerating the employment at-will doctrine. There is no evidence at all that Defendants took any action that is separate and apart from the employment decision which could constitute defamation.

Plaintiff attempts to establish a defamation claim against her former employer and its officials simply based on their employment decisions and related, necessary communications. However, Plaintiff cannot offer evidence to establish the requisite elements to transform internal privileged communications into defamation, and Defendants are entitled to summary judgment.

## V.    UMass Memorial Medical Center

It is undisputable that the Medical Center was never Plaintiff's employer, and that it did not take any discriminatory or defamatory action against her. Indeed, Plaintiff can offer no facts in support of her claims, and there are no facts to support a claim that the Medical Center was her "joint employer."[37] She was employed by, and her work was directed by, the Medical Group. S.O.F., ¶¶ 1-3, 10-11, 14. The Medical Center did not set her compensation, set her work schedule, direct her work, or have the power to hire, fire, or discipline her.[38] S.O.F., ¶¶ 11-12. Accordingly, the Medical Center is entitled to summary judgment on all claims.

---

[37]  "[J]oint employment exists only when there is an actual employment relationship between the employee and each joint employer." Hamilton v. Partners Healthcare Sys., Inc., 209 F. Supp. 3d 379, 390 (D. Mass. 2016). Courts look to four factors to evaluate whether such an employment relationship exists: "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir. 1998).

[38]  The facts that Plaintiff had been granted clinical privileges to practice at the Medical Center and physically performed her work at the Medical Center's premises does not support a claim that she was an employee. See Perry v. VHS San Antonio Partners, L.L.C., 990 F.3d 918, 929 (5th Cir. 2021), cert. denied, U.S., No. 21-172 (Nov. 22, 2021) (holding that "[a] physician with hospital privileges is not a hospital employee for purposes of federal antidiscrimination law," and citing cases); Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 262 (4th Cir. 1997); Wojewski v. Rapid City Reg'l Hosp., Inc., 450 F.3d 338, 343-44 (8th Cir. 2006).

Respectfully submitted,

**UMASS MEMORIAL MEDICAL
CENTER, INC., UMASS MEMORIAL
MEDICAL GROUP, INC., MAX
ROSEN, M.D., and STEPHEN
TOSI, M.D.**

By their attorneys,


/s/ Reid M. Wakefield
Robert L. Kilroy, Esq., BBO # 636853
Reid M. Wakefield, Esq., BBO # 569026
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA  01581
Phone 508.860.1474
Fax 508.983.6261
rkilroy@mirickoconnell.com
rwakefield@mirickoconnell.com

Dated:  December 17, 2021


<u>CERTIFICATE OF SERVICE</u>

I, Reid M. Wakefield, hereby certify that this document, filed through the ECF system
will be sent electronically to the registered participants as identified on the Notice of Electronic
Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on
this day.

/s/ Reid M. Wakefield
Reid M. Wakefield, Esq.

Dated:  December 17, 2021