UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-CV-10520-TSH

| | |
|---|---|
| CHARU DESAI,<br>　　　Plaintiff,<br><br>　　v.<br><br>UMASS MEMORIAL MEDICAL<br>CENTER, INC., et al.,<br>　　　Defendants. | **STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL MEDICAL GROUP, INC., MAX ROSEN, M.D., AND STEPHEN TOSI, M.D.** |

Pursuant to D. Mass. Local Rule 56.1, Defendants, UMass Memorial Medical Center, Inc. (the "Medical Center"), UMass Memorial Medical Group, Inc. (the "Medical Group"), Max Rosen, M.D. ("Dr. Rosen"), and Stephen Tosi, M.D. ("Dr. Tosi"), submit the following Statement of Material Facts in support of their Motion for Summary Judgment.[1]

**A.　Plaintiff's Employment**

　　　1.　　Plaintiff, Charu Desai, M.D., was employed by the Medical Group as a physician specializing in chest radiology. See Affidavit of Max Rosen, M.D., M.P.H. ("Rosen Aff."), at ¶ 4, attached as **Exhibit A** to Affidavit of Reid Wakefield, Esq. ("Wakefield Aff.").

　　　2.　　Plaintiff was employed pursuant to an Agreement between UMass Memorial Medical Group, Inc., and Charu Desai, M.D. ("Employment Agreement"). Ex. A, Rosen Aff. at ¶ 5; see also Employment Agreement, attached as **Exhibit B** to "Wakefield Aff."

---

[1]　This Statement of Material Facts is offered for the purpose of Defendants' Motion only. The facts recited herein are accepted for this purpose only, and they do not constitute admissions or stipulations for trial.

3.      Pursuant to the Employment Agreement, Plaintiff was dually-employed by the Medical Group and the University of Massachusetts Medical School. Ex. A, Rosen Aff. at ¶ 5; Ex. B, at ¶ 1.14.

4.      Plaintiff's job duties involved reviewing radiological images in the form of computed tomography ("CT") or radiographs ("x-rays" or "plain films"), interpreting the images, describing findings, and opining on diagnoses of disease and medical conditions revealed in the images. Ex. A, Rosen Aff. at ¶ 7.

5.      Plaintiff was not qualified to read magnetic resonance imaging (MRI) and did not read MRIs in the course of her employment. Ex. A, Rosen Aff. at ¶ 7.

6.      As a radiologist, Plaintiff's practice was focused on and limited to thoracic (a/k/a chest) imaging, and Plaintiff worked within the Thoracic Division (a/k/a Chest Division). Ex. A, Rosen Aff. at ¶ 8.

7.      The Medical Center is a multi-facility academic hospital which provides tertiary-level care. Ex. A, Rosen Aff. at ¶ 9.

8.      Plaintiff performed her duties for the Medical Group while located at Medical Center facilities. Ex. A, Rosen Aff. at ¶ 9.

9.      In her role as a radiologist for the Medical Group, Plaintiff reviewed and interpreted images for patients originating from multiple hospitals, including campuses of UMass Memorial Medical Center, Marlborough Hospital, and Clinton Hospital, which are each separate entities. Ex. A, Rosen Aff. at ¶ 10.

10.     The Medical Group was responsible for staffing radiologists to review images originating from different hospitals, and the Medical Group directed radiologists' assignments. Ex. A, Rosen Aff. at ¶ 11.

11.     The hospitals, including Marlborough Hospital and UMass Memorial Medical Center, did not direct Plaintiff or any other radiologist with respect to the reading of images or in any other job duties. Plaintiff was supervised by Medical Group employees. Ex. A, Rosen Aff. at ¶ 12.

12.     UMass Memorial Medical Center did not set the compensation for radiologists, did not set the work schedules for radiologists, and did not have the power to hire, fire, or discipline radiologists, including Plaintiff. Ex. A, Rosen Aff. at ¶ 13.

13.     In order to provide medical services as a physician for Medical Center patients, Plaintiff was required to be granted clinical privileges by the Medical Center and be a member of the Medical Center's medical staff. Ex. A, Rosen Aff. at ¶ 14.

14.     Plaintiff was never employed by the Medical Center. Ex. A, Rosen Aff. at ¶ 13.

15.     Max Rosen, M.D., was appointed as the Chair of the Department of Radiology (the "Department") effective September 1, 2012. See Deposition Transcript of Max Rosen, M.D. ("Rosen Dep."), at 17:1-10, attached as **Exhibit C** to Wakefield Aff.; Ex. A, Rosen Aff. at ¶ 2.

16.     Dr. Rosen is employed by the Medical Group and the Medical School. Ex. C, Rosen Dep. at 17:1-10; Ex. A, Rosen Aff. at ¶ 3.

17.     In his capacity as Chair, Dr. Rosen supervised and managed all radiologists employed by the Medical Group, including Plaintiff. Ex. A, Rosen Aff. at ¶ 6.

18.     Among Dr. Rosen's duties as Chair is to ensure that the Department provides high quality and safe imaging services for patients. Ex. C, Rosen Dep. at 17:16-21; Ex. A, Rosen Aff. at ¶ 6.

19.     Darren Brennan, M.D., served as the Chief of Radiology for Marlborough Hospital from 2015 to 2018. He was not an employee of Marlborough Hospital, but is employed by the Medical Group. Ex. A, Rosen Aff. at ¶ 15.

20.     Dr. Brennan served as the Vice Chair for Enterprise Operations and Community Radiology from 2015 to 2019. Ex. A, Rosen Aff. at ¶ 17.

21.     In Dr. Rosen's absence, he would sometimes designate Dr. Brennan to address concerns within the Department in his role as Vice Chair. On September 21, 2017, Dr. Brennan addressed a matter between Plaintiff and Karin Dill, M.D., in that capacity and at Dr. Rosen's request. Ex. A, Rosen Aff. at ¶ 17.

**B.**     **Plaintiff's Medical Condition and Accommodations**

22.     Plaintiff has been diagnosed with a heart condition, tachy-brady syndrome. This condition causes Plaintiff to experience spells where she becomes weak, tired, and incapacitated typically for a few minutes. See Deposition Transcript of Charu Desai, M.D. ("Desai Dep."), at 185:13-186:19, attached as **Exhibit D** to Wakefield Aff.

23.     When Plaintiff gets tired, her spells occur more frequently. Ex. D, Desai Dep. at 423:18-22. Due to her condition, Plaintiff needs a day off on occasion. Ex. D, Desai Dep. at 110:21-111:8.

24.     Plaintiff requested and was approved for intermittent leave under the FMLA to take time off of work if she needed it due to her medical condition. Ex. D, Desai Dep. at 154:10-155:3.

25.     Plaintiff was approved by the Medical Group to take intermittent leave under the FMLA for the period of March 26, 2015, through March 25, 2016, to be absent as she requested for two one-day episodes every two months due to her medical condition. Ex. D, Desai Dep.

at 268:5-270:8; see also Approval of Leave Notification 2015, attached as **Exhibit E** to Wakefield Aff.

26.     Plaintiff was approved by the Medical Group to take intermittent leave under the FMLA for the period of April 8, 2016, through March 8, 2017, to be absent as she requested one to two days every two months due to her medical condition. Ex. D, Desai Dep. at 273:4-274:15; see also Approval of Leave Notification 2016, attached as **Exhibit F** to Wakefield Aff.

27.     Plaintiff was approved by the Medical Group to take intermittent leave under the FMLA for the period of March 9, 2017, through March 8, 2018, to be absent as she requested one to two days every two months due to her medical condition. Ex. D, Desai Dep. at 327:18-329:3; see also Approval of Leave Notification 2017, attached as **Exhibit G** to Wakefield Aff.

28.     Plaintiff was approved for intermittent leave under the FMLA for the period of March 21, 2018, through March 20, 2019, to be absent as she requested one to two days every two months due to her medical condition. Ex. D, Desai Dep. at 357:11-360:2; see also Approval of Leave Notification 2018, attached as **Exhibit H** to Wakefield Aff.

29.     Plaintiff had a Sick Bank as well as Salary Continuation she could use for paid medical leave. At the time of her separation from employment, Plaintiff had not exhausted her available sick leave and had available 116.55 hours in her Sick Bank. Ex. A, Rosen Aff. at ¶ 18.

30.     Plaintiff acknowledges that if she was tired then she could call in sick. Ex. D, Desai Dep. at 428:6-11.

31.     The Medical Group never interfered with Plaintiff's ability to take time off if she needed a break from work. Ex. D, Desai Dep. at 154:10-155:3.

32.     The Medical Group never prevented Plaintiff from taking leave for a break when needed. Ex. D, Desai Dep. at 154:10-155:3; 269:14-21; 273:20-24; 328:18-21; 359:24-360:2.

33.     Plaintiff's medical condition did not affect her ability to perform the essential functions of her job except to the extent she had an episode that might require her to use FMLA leave. Ex. D, Desai Dep. at 186:20-187:11.

34.     Plaintiff admits the only accommodation she needed was the ability to take time off in the event of an episode. Ex. D, Desai Dep. at 187:7-11.

35.     The only request Plaintiff made to assist her with her medical condition was the ability to take time off through FMLA when she would have an occurrence of symptoms. Ex. D, Desai Dep. at 199:8-14.

36.     Plaintiff never told Dr. Rosen or the Medical Group that she was not capable of performing the essential functions of her job due to a disability. Ex. D, Desai Dep. at 145:20-23.

37.     On May 13, 2016, Dr. Rosen met with Plaintiff to discuss several work-related matters, including a concern that Plaintiff was not arriving to work timely or adhering to her work schedule. See E-mail from M. Rosen to C. Desai, May 13, 2016, attached as **Exhibit I** to Wakefield Aff.

38.     At the meeting, Dr. Rosen and Plaintiff discussed accommodating Plaintiff's need for FMLA leave in scheduling, and Plaintiff was advised that if there are medical reasons that she has to be late to contact Human Resources regarding a plan to accommodate her and adjust scheduling. Ex. I, E-Mail May 13, 2016.

39.     In 2014, a physician in the Department, S.A. M.D., requested a change in her work hours due to a medical issue, and an accommodation to her schedule was approved by Dr. Rosen which remains in place to the present day. Ex. D, Desai Dep. at 385:2-10; Ex. A, Rosen Aff. at ¶ 19.

C.      **Academic Time**

40.     The Department maintained a policy for physicians to be allotted academic or administrative time to conduct non-clinical duties. Ex. A, Rosen Aff. at ¶ 20; see also Academic and Administrative Time Policy, attached as **Exhibit J** to Wakefield Aff.

41.     Pursuant to the Academic and Administrative Time Policy, academic time can be allotted to academic responsibilities including teaching and conference preparation, writing papers or texts, completing research projects, attending institutional and department committees, attending a conference, or serving on committees of local, regional, national or international organizations. Ex. A, Rosen Aff. at ¶ 20; Ex. J, Academic and Administrative Time Policy.

42.     Pursuant to the policy, a staff member's academic activities are reviewed on an annual basis during individual annual academic planning sessions. Ex. C, Rosen Dep. at 376:4-377:3; Ex. J, Academic and Administrative Time Policy.

43.     Dr. Rosen reviewed each staff member's current and proposed academic activities at these annual meetings to ensure they were pursuing academic endeavors consistent with the academic time policy. Ex. C, Rosen Dep. at 107:15-24; 376:4-377:3.

44.     Staff members used academic time as time when they were not scheduled to perform clinical work, but the Medical Group was flexible as to when a staff member performed the academic work, which was sometimes done on nights and weekends. Regardless of when it was performed, the expectation at the end of the year was that the staff member produced an amount of academic work commensurate with the time taken. Ex. C, Rosen Dep. at 109:5-17.

45.     Plaintiff was not allotted academic time since at least 2010, and the Department does not have a record of Plaintiff having ever been allotted academic time. Ex. C, Rosen Dep. at 108:1-3; Ex. A, Rosen Aff. at ¶ 21.

46.     Plaintiff has not written any scholarly publications since 2002. Ex. D, Desai Dep. at 32:11-23; see also Curriculum Vitae of Charu S. Desai, M.D., attached as **Exhibit K** to Wakefield Aff.

47.     Plaintiff did not perform any academic activities from at least 2009 through the end of her employment. Ex. D, Desai Dep. at 250:19-252:23; 254:1-257:22; 259:9-263:14; 265:4-267:5; 316:12-317:8; 355:17-357:7; see also Annual Faculty Reviews for Charu Desai, M.D., 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, 2016-2017, attached as **Exhibit L** to Wakefield Aff; Annual Faculty Review for Charu Desai, M.D., 2017-2018, attached as **Exhibit M** to Wakefield Aff.

48.     As a part of Plaintiff's 2013-2014 evaluation, Plaintiff and Dr. Rosen discussed options for academic time, but Dr. Rosen advised that the policy cannot be modified on an individual basis. Ex. D, Desai Dep. at 262:1-263:14.

49.     Since at least 2012, Plaintiff never requested academic time for the purposes of performing academic work. Ex. A, Rosen Aff. at ¶ 21.

50.     In a May 13, 2016, meeting with Dr. Rosen, Plaintiff expressed a desire to have academic time. Dr. Rosen advised her that academic time is allocated based on the policy, and that if she believes academic time is justified to advise him which academic activities she would like to undertake and they could discuss additional time for the activities. Ex. I, Email May 13, 2016.

51.     While Plaintiff was told to submit a proposal to substantiate her need for academic days, Plaintiff never submitted a proposal to substantiate what she was going to use her academic days for. At no point did Plaintiff ever make a proposal to Dr. Rosen to conduct

academic work of any kind. Ex. D, Desai Dep. at 105:3-16; 118:18-119:5; 281:4-18; 318:6-11; Ex. A, Rosen Aff. at ¶ 21.

52.     As of 2015, Plaintiff did not have prior academic activity, and she never mutually-agreed with Dr. Rosen regarding future activity. Ex. D, Desai Dep. at 117:9-13.

53.     Plaintiff did not intend to use the requested academic time to perform academic work; instead, she intended to use it to take a break from work. Ex. D, Desai Dep. at 112:12-14.

54.     While Dr. Rosen was Chair, other female radiologists were granted academic days. Ex. D, Desai Dep. at 117:14-18.

55.     While Dr. Rosen was Chair, other radiologists over the age of forty were granted academic days. Ex. D, Desai Dep. at 117:23-118:1.

56.     Plaintiff cannot identify any radiologist who performed no academic activity and was granted academic time. Ex. D, Desai Dep. at 118:13-17.

57.     Plaintiff cannot identify any radiologist who received academic time who was not entitled to it under the policy. Ex. D, Desai Dep. at 308:8-12.

58.     Plaintiff did not have an administrative role that would qualify her for administrative time. Ex. D, Desai Dep. at 119:6-14.

59.     Plaintiff believed that she should have been granted academic time based on being "grandfathered" and exempt from the policy based on her seniority. Ex. D, Desai Dep. at 120:7-11.

60.     Plaintiff cannot identify any other radiologist who Dr. Rosen granted an exception to the Academic and Administrative Time Policy based on seniority. Ex. D, Desai Dep. at 120:12-15.

61.     The Academic and Administrative Time Policy does not contemplate any exception or grandfathering based on seniority. Ex. D, Desai Dep. at 120:16-22; Ex. J, Academic and Administrative Time Policy.

**D.      Call Time**

62.     All Medical Group radiologists are required to work "call" where they are scheduled to work certain weekends and holidays to ensure coverage for patients every day of the year. Ex. A, Rosen Aff. at ¶ 22.

63.     The Department has a policy which requires all regularly-employed staff members to provide "call" coverage on weekends and holidays. Ex. A, Rosen Aff. at ¶ 22; see also Call and/or Weekend/Holiday Coverage Policy, attached as **Exhibit N** to Wakefield Aff.

64.     The requirements for call vary by division due to coverage needs, but the time commitment of the call coverage is substantially the same. Ex. C, Rosen Dep. at 192:13-193:21; Ex. A, Rosen Aff. at ¶ 22; Exhibit N.

65.     For members of the Chest Division, a radiologist must work one-fifth of weekends, or ten weekends per year, as well as a portion of holidays, which are scheduled in advance in an equitable manner among the radiologists working in the division. Ex. A, Rosen Aff. at ¶ 23.

66.     Performing call is an essential and critical part of being a radiologist in the Department, and is required in order to provide timely and high-quality care to patients, as UMass Memorial is a tertiary-care referral center and level one trauma center which operates twenty four hours a day every day of the year. If a radiologist does not perform call, those responsibilities fall on other employees. Ex. A, Rosen Aff. at ¶ 24.

67.     At one time, the Department implemented a program in which staff members could elect to "sell" calls, where other staff radiologists could perform additional call for additional compensation, and the radiologist not doing call would have their salary reduced by an equivalent amount. Ex. A, Rosen Aff. at ¶ 25.

68.     This policy was in place for two fiscal years, from October 1, 2015, to September 30, 2017. Ex. A, Rosen Aff. at ¶ 25.

69.     Plaintiff elected to sell, and others in the department elected to "take" six out of her ten call weekends for these years, and during this period she performed substantially reduced call. Ex. A, Rosen Aff. at ¶ 26.

70.     Plaintiff's salary was reduced accordingly during this time period due to her "sale" of her calls to other radiologists, in the amount of $19,200 per year. The rate that each call was valued was in accordance with the Department's per diem rates in effect at that time. Ex. A, Rosen Aff. at ¶ 26.

71.     At least one other radiologist in the Department also elected to sell their calls. Ex. A, Rosen Aff. at ¶ 27.

72.     The policy of selling calls was ended due to the administrative difficulties in managing the program, as well as the lack of staff members interested in taking additional calls. Ex. A, Rosen Aff. at ¶ 28.

73.     It is common for staff radiologists to not want to take call. Ex. A, Rosen Aff. at ¶ 29.

74.     Plaintiff told Dr. Rosen that she should be absolved from calls because of the number of years she has worked in the Department. Ex. C, Rosen Dep. at 50:13-18; 227:19-228:1.

75.     Plaintiff believes that she should have been exempted from calls because of how many years she worked for the Department. Ex. D, Desai Dep. at 304:12-15.

76.     While Dr. Rosen has been Chair, no radiologist of the Medical Group who does clinical work has been exempted from the call policy, except for those on per diem status. Ex. C, Rosen Dep. at 192:15.

77.     Plaintiff is not aware of any exception being made to the call policy. Ex. D, Desai Dep. at 305:20-23.

78.     The Medical Group employs physicians in part-time roles, in which their hours are reduced and their call obligations are proportionately reduced. Ex. A, Rosen Aff. at ¶ 30.

79.     The Medical Group employs physicians in "per diem" status, in which the employees work on an hourly basis, and are not obligated to take call. Ex. A, Rosen Aff. at ¶ 31.

80.     Because staff radiologists who are on per diem status are not obligated to take call, some radiologists have chosen to change their status to per diem in order to be relieved of that obligation. Ex. A, Rosen Aff. at ¶ 31.

81.     Mona Korgaonkar, M.D., a female radiologist who is older than Plaintiff, requested to move to a part time schedule, which was granted by Dr. Rosen, and she subsequently requested that she not take calls, and she was offered and accepted the ability to change her status to per diem to be exempt from call responsibilities. Dr. Korgaonkar remains employed by the Medical Group. Ex. D, Desai Dep. at 225:20-228:15; Ex. A, Rosen Aff. at ¶ 32.

82.     In response to Plaintiff's request for reduced hours and to not take call, Dr. Rosen offered her the ability to change to part-time or per diem status. Ex. D, Desai Dep. at 123:7-18; 229:21-231:9; Ex. A, Rosen Aff. at ¶ 33.

83.     Plaintiff declined to reduce her hours to part-time or elect per diem status. Ex. D, Desai Dep. at 123:7-18; 229:21-231:9.

84.     In October 2017, Dr. Rosen asked Dr. Ferrucci if he would consider speaking with Plaintiff to share his experience moving from active to per diem status with the Medical Group to assist Plaintiff with her decision. Ex. A, Rosen Aff. at ¶ 34.

85.     Dr. Rosen did not tell Dr. Ferrucci that he intended to terminate Plaintiff's employment or to require her to move from active to per diem status. Ex. A, Rosen Aff. at ¶ 34.

86.     Dr. Rosen did not tell Dr. Ferrucci that he had an obligation to think about recruiting younger staff for service needs, and he did not discuss the age or longevity of any staff member, including Plaintiff, at any time, with Dr. Ferrucci. Ex. A, Rosen Aff. at ¶ 34.

87.     At no time did Plaintiff state that she desired to be exempted from taking calls due to her heart condition. Ex. C, Rosen Dep. at 50:13-24; Ex. A, Rosen Aff. at ¶ 35.

88.     Plaintiff never requested an alteration to her call schedule due to a medical condition. Ex. C, Rosen Dep. at 112:16-113:11; Ex. A, Rosen Aff. at ¶ 35.

89.     Dr. Rosen was not aware that Plaintiff desired to not take calls or reduce her call time due to her heart condition. Ex. C, Rosen Dep. at 110:1-5.

90.     Dr. Rosen was not aware that Plaintiff had medical episodes more frequently when she worked many days in a row and was unable to rest for a day. Ex. C, Rosen Dep. at 109:18-24.

91.     Plaintiff believes it was too much for her to work 10 days in a row, Dr. Rosen offered her the opportunity to not work 10 days in a row, and she turned it down. Ex. D, Desai Dep. at 146:12-19.

92.      Dr. Rosen was not aware that Plaintiff had medical episodes while at work due to her heart condition, and Plaintiff never advised him of this. Ex. C, Rosen Dep. at 110:8-14.

93.      On February 10, 2017, Dr. Ferrucci sent Dr. Rosen an E-mail advising him that he encountered Plaintiff short of breath, that she had been ill that week, and that she was leaving work to see her physician. Ex. C, Rosen Dep. at 177:22-178:14; see also E-mails between M. Rosen and J. Ferrucci, February 10, 2017, attached as **Exhibit O** to Wakefield Aff.

94.      Dr. Rosen did not have any reason to believe that this incident was related to a heart condition or any disability that Plaintiff had. Ex. C, Rosen Dep. at 179:19-180:11.

95.      On February 10, 2017, Plaintiff left work and visited her primary care physician, who diagnosed her with an upper respiratory illness likely viral in nature, which resulted in a runny nose, fever, cough, and dyspnea on exertion. At this visit, neither Plaintiff nor her physician identified her heart condition as being related in any way to the symptoms she was experiencing. See Record of Primary Care Visit by C. Desai, February 10, 2017, attached as **Exhibit P** to Wakefield Aff.

**E.      Home Workstation**

96.      The Department began to utilize remote workstations for staff radiologists to use from home on a trial basis beginning in early 2017. Ex. C, Rosen Dep. at 233:10-23; Ex. A, Rosen Aff. at ¶ 36.

97.      Only the following radiologists used home workstations in the initial year of the implementation: Andrew Chen, M.D., Karin Dill, M.D., and Philip Steeves, M.D. Ex. A, Rosen Aff. at ¶ 36.

98.      Dr. Steeves is five years older than Plaintiff. Ex. A, Rosen Aff. at ¶ 37.

99.     Nine radiologists used home workstations from implementation until the date of Plaintiff's separation: Aly Abayazeed, M.D., Satish Dundamadappa, M.D., Carolyn Dupuis, M.D., David Choi, M.D., Andrew Chen, M.D., Karin Dill, M.D., Sami Erbay, M.D., Philip Steeves, M.D., and Eric Schmidlin, M.D. Ex. C, Rosen Dep. at 233:10-23; Ex. A, Rosen Aff. at ¶ 38.

100.    Dr. Abayazeed, Dr. Dundamadappa, Dr. Choi, Dr. Chen, and Dr. Erbay specialized in neuroradiology and were among the first to test and use home workstations due to the unique scheduling in neuroradiology where radiologists would rotate working routine evening shifts. Ex. C, Rosen Dep. at 233:10-23; Ex. A, Rosen Aff. at ¶ 39.

101.    Dr. Dill had a home workstation for a short period of time as a trial to see whether it would be helpful for her to be able to read cardiac studies on an emergency basis, but due to technical challenges, the use was discontinued. Ex. C, Rosen Dep. at 234:2-235:9.

102.    Dr. Schmidlin had a home workstation for a period of time when he worked as a per diem employee, so that he could continue to assist the department to fulfill service needs on a part-time basis after he left full-time employment. The primary need for him to have a home workstation was in order to be available to read cardiac MRIs. Ex. C, Rosen Dep. at 163:17-164:20.

103.    Plaintiff did not perform cardiac imaging or read cardiac MRIs. Ex. D, Desai Dep. at 420:14-16.

104.    On June 14, 2017, a meeting of the Chest Division was held in which home workstations were discussed. At this meeting, Plaintiff voiced a desire to have a home workstation so that during times of inclement weather, she can read from home. See Minutes from Chest Division Meeting, June 14, 2017, attached as **Exhibit Q** to Wakefield Aff.

105.    No staff member was permitted to take call remotely through the use of a home workstation or otherwise during the time Plaintiff was employed. Ex. A, Rosen Aff. at ¶ 40.

106.    Plaintiff asked Dr. Rosen if she could have a home workstation on one occasion so that she could take call at home because she gets tired. Ex. D, Desai Dep. at 222:9-223:22.

107.    Plaintiff did not mention her heart condition as the reason she got tired or desired a home workstation, in this meeting or at any other time. Ex. D, Desai Dep. at 222:9-223:22.

108.    In response, Dr. Rosen offered her the opportunity to go part-time or per diem ("locum"). Ex. D, Desai Dep. at 224:3-13.

109.    Plaintiff never told Dr. Rosen or the Medical Group that she was not capable of performing the essential functions of her job without the use of a home workstation. Ex. D, Desai Dep. at 145:20-146:4.

110.    Plaintiff never submitted medical documentation regarding a need for a home workstation or to otherwise work at home. Ex. D, Desai Dep. at 359:11-360:2.

**F.**    **Quality Assurance**

111.     The Department has a quality assurance system designed to improve the quality of radiology services. Ex. A, Rosen Aff. at ¶ 41.

112.    Prior to 2019, the quality assurance system was based, in part, on a peer review system, where other radiologists within the Department would review each other's reads. Ex. A, Rosen Aff. at ¶ 41.

113.    In this system, all radiologists in the Department were asked to enter information into the quality assurance system in two circumstances: (1) through an automated process that requests that a certain number of cases be double-read periodically by each radiologist on staff; and (2) when a radiologist is made aware of a quality issue about an interpretation, the

radiologist was obligated to enter that information into the peer review privileged database. Ex. C, Rosen Dep. at 224:8-225:6; Ex. A, Rosen Aff. at ¶ 42.

114.    When radiologists reviewed the studies, they would input a numerical score as to their review, with scores denoting the following: a "1" indicated the reviewer concurred with the reviewee's radiological interpretation; a "2" indicated the reviewer identified a discrepancy in interpretation/not ordinarily expected to be made, but which was denoted as an "understandable miss;" a "3" indicated the reviewer identified a discrepancy in the reviewee's interpretation and that the discrepancy should have been caught by the radiologist "most of the time;" and a "4" indicated the reviewer noted a discrepancy in interpretation that represented a "misinterpretation of findings" and that should be identified "almost every time." Ex. A, Rosen Aff. at ¶ 43.

115.    At their annual faculty reviews, Dr. Rosen provided staff radiologists with information from the quality assurance database regarding peer review reads labelled with scores of either "3" or "4." Dr. Rosen would advise the radiology staff members of these entries and ask the staff member to review the cases if they had not already done so, as a part of the quality improvement process. Ex. C, Rosen Dep. at 153:9-13; Ex. A, Rosen Aff. at ¶ 44.

116.    Plaintiff was provided with such a summary from the quality assurance system during her 2016-2017 annual faculty review, which was conducted by Dr. Rosen. Ex. A, Rosen Aff. at ¶ 45; Ex. C, Rosen Dep. at 224:2-07; see also Peer Review Summary Document (the "Peer Review Summary"), attached as **Exhibit R** to Wakefield Aff.

117.    Plaintiff speculated during testimony she believes that Dr. Dill produced the Peer Review Summary, and Plaintiff admitted she has "no idea" how she obtained the Peer Review Summary, but believes she found it when cleaning her office. Ex. D, Desai Dep. at 322:3-323:2; 325:17-24.

118.    Plaintiff does not know whether the Peer Review Summary or the information within is related to discrimination. Ex. D, Desai Dep. at 325:17-24.

**G.    Division Chief Hiring**

119.    Karin Dill, M.D., was hired as a radiologist and the Division Chief of the Thoracic Division on February 29, 2016. Ex. A, Rosen Aff. at ¶ 46.

120.    The Division Chief position was publicly posted and the Department conducted recruiting efforts to fill the position. Ex. A, Rosen Aff. at ¶ 46.

121.    Plaintiff did not apply for or express interest in the position of Division Chief of the Thoracic Division. Ex. D, Desai Dep. at 155:4-7; Ex. A, Rosen Aff. at ¶ 46.

122.    Dr. Dill was more qualified than Plaintiff to be Division Chief, based on her education, training, professional involvement, research, qualifications, and experience. Ex. A, Rosen Aff. at ¶ 46.

123.    Plaintiff does not believe her qualifications are superior to those of Dr. Dill to be the Division Chief. Ex. D, Desai Dep. at 157:12-15.

124.    Plaintiff does not allege that she should have been given the position of Division Chief. Ex. D, Desai Dep. at 157:12-18.

125.    Plaintiff claims that she should have been asked if she wanted the Division Chief position as a "common courtesy," and because she believes a staff member who is senior should be asked "automatically." Ex. D, Desai Dep. at 155:4-10; 157:12-18; 169:16-24.

**H.    Independent Review**

126.    Dr. Rosen received complaints about the quality of Plaintiff's CT reads from Dr. Dill, and Dr. Dill advised him that concerns about Plaintiff's reads had been brought to her by treating physicians. Ex. C, Rosen Dep. at 53:23-54:3; 153:14-20.

127.    As the Division Chief, Dr. Dill was responsible for the quality of the Chest Division. Ex. C, Rosen Dep. at 54:18-55:1; 88:10-12.

128.    Dr. Dill told Dr. Rosen that treating physicians would ask her to re-read or review studies that Plaintiff had interpreted. Ex. C, Rosen Dep. at 54:18-55:1; 153:14-20.

129.    Kimberly Robinson, M.D., was a pulmonologist (specializing in the respiratory system) who treated patients at Marlborough Hospital, and for a period served as President of the Medical Staff for Marlborough Hospital. Ex. A, Rosen Aff. at ¶ 48.

130.    Dr. Robinson expressed concerns to Dr. Rosen regarding the quality of Plaintiff's CT interpretations. Ex. C, Rosen Dep. at 53:23-54:3; 55:2-11; 152:18-153:3.

131.    Radiology, like other diagnostic medical work, can involve a degree of probability and subjectivity, and concerns or disagreements can be raised by treating physicians at times. Ex. A, Rosen Aff. at ¶ 49.

132.    Treating physicians have raised concerns to Dr. Rosen with individual reads or quality issues from time to time. Dr. Rosen evaluated quality concerns raised to him and took appropriate action based on the individual circumstances. Ex. A, Rosen Aff. at ¶ 49.

133.    Dr. Rosen evaluated quality concerns whenever they were raised to him by Dr. Robinson. Ex. C, Rosen Dep. at 139:8-20; Ex. A, Rosen Aff. at ¶ 49.

134.    Marlborough Hospital officials had concerns regarding radiology services for the chest specialty. Ex. C, Rosen Dep. at 143:2-8.

135.    On January 3, 2018, Dr. Robinson expressed concerns specifically about reads by Plaintiff, Dr. ███J.F.███, Dr. █H.L.█, Dr. ██G.T.██ and Dr. ████D.B.████. Dr. Robinson also identified the lack of specialty reads for chest radiology as an issue. Ex. C,

Rosen Dep. at 321:2-322:3; see also E-mails initiated from K. Robinson, January 3, 2018, attached as **Exhibit S** to Wakefield Aff.

136.    Dr. Rosen evaluated the concerns regarding the physicians Dr. Robinson expressed concerns about, including Dr. ▮J.F.▮, Dr. ▮H.L.▮ Dr. ▮G.T.▮ and Dr. ▮D.B.▮ Ex. C, Rosen Dep. at 322:4-323:6.

137.    None of these physicians specialized in chest radiology. Ex. A, Rosen Aff. at ¶ 50.

138.    Dr. ▮J.F.▮ is 12 years older than Plaintiff, Dr. ▮G.T.▮ is less than 2 years younger than Plaintiff, and Dr. ▮D.B.▮ is 60 years old. Ex. A, Rosen Aff. at ¶ 50.

139.    In response to Dr. Robinson's concerns regarding Dr. ▮G.T.▮'s chest CT reads, Dr. Rosen had Dr. ▮G.T.▮ stop performing reads of chest CT images. He did not specialize in chest, and was able to focus on his area of specialty. Ex. C, Rosen Dep. at 322:4-13.

140.    Dr. Rosen was aware that several of Plaintiff's cases were entered in the Department's quality assurance database labelled as potentially significant misses, based on his distribution of data from the quality assurance system to Plaintiff as a part of her 2016-2017 annual review. Ex. C, Rosen Dep. at 152:18-153:13; Ex. A, Rosen Aff. at ¶ 51.

141.    On January 31, 2017, Dr. Rosen met with representatives from Marlborough Hospital and its medical staff regarding radiology issues at the Hospital. This meeting included the President of the Marlborough Hospital Medical Staff and pulmonologist Kimberly Robinson, M.D., and the President of Marlborough Hospital, Steven Roach. Rosen Aff. at ¶ 52; see also E-mail from M. Rosen regarding Meeting Minutes, February 8, 2017, attached as **Exhibit T** to Wakefield Aff.

142.    A significant concern addressed at the meeting was the quality of chest imaging. Ex. A, Rosen Aff. at ¶ 53.

143.    At the time, there were three radiologists specializing in chest in the Medical Group's Chest Division, Karin Dill, M.D., Eric Schmidlin, M.D., and Plaintiff. Ex. A, Rosen Aff. at ¶ 53.

144.    No concerns were raised at the meeting related to the reads of Dr. Dill or Dr. Schmidlin. Ex. A, Rosen Aff. at ¶ 53.

145.    At this meeting, Dr. Robinson expressed serious concerns with the quality of CT reads performed by Plaintiff. Dr. Robinson stated to Dr. Rosen that she never believed Plaintiff's reports and could not rely on them. Ex. C, Rosen Dep. at 55:2-11; Ex. A, Rosen Aff. at ¶ 54; Exhibit T.

146.    In response, Dr. Rosen agreed that he would conduct a focused review of Plaintiff's CT reads. Ex. A, Rosen Aff. at ¶ 55; Exhibit T.

147.    Dr. Rosen additionally agreed that Dr. Dill and Dr. Schmidlin would read all high resolution chest CTs, and that Dr. Schmidlin would use a home workstation since he had recently moved to per diem status, with a full-time position at another institution. Ex. C, Rosen Dep. at 163:17-166:2; Exhibit T.

148.    Dr. Rosen believed that he had to address the concerns raised to him in the interests of patient safety and the Department's obligations to provide high quality services to patients and providers. Ex. A, Rosen Aff. at ¶ 55.

149.    To ensure fairness and to confirm that the quality concerns were justified prior to taking further action, Dr. Rosen opted to have an independent, blinded review of Plaintiff's CT reads conducted. Ex. A, Rosen Aff. at ¶ 56.

150.     Dr. Rosen did not choose to arrange an independent review of Plaintiff's reads based on isolated concerns regarding a read or a request to re-review a study read by Plaintiff. Dr. Rosen did not make the decision to do so based on one or two misreads by Plaintiff. Ex. A, Rosen Aff. at ¶ 57.

151.     Dr. Rosen made the decision to perform an independent review based on reports of quality concerns from Dr. Dill, his awareness of errors in the peer review system, and the complaints from Dr. Robinson, in particular her comments at the January 31, 2017, meeting. Ex. A, Rosen Aff. at ¶ 58.

152.     Following Dr. Robinson's complaints regarding Plaintiff at the January 31, 2017 meeting, Dr. Rosen began making arrangements to have an outside independent review conducted. Ex. C, Rosen Dep. at 154:1-19; 166:5-12; see also E-mails between K. Green and M. Rosen, February 1, 2017, attached as **Exhibit U** to Wakefield Aff.

153.     Dr. Rosen requested that the Department's file room staff randomly select 25 chest CT studies reviewed by Plaintiff and, as a control group, 25 chest CT studies reviewed by other radiologists. Ex. C, Rosen Dep. at 154:20-155:12; 166:5-12; Ex. A, Rosen Aff. at ¶ 60.

154.     The studies included in the review were selected randomly, and Dr. Rosen was not involved in selecting the studies. Ex. C, Rosen Dep. at 155:16-18; Ex. A, Rosen Aff. at ¶ 60.

155.     These studies, comprised of images and radiologist reports, were de-identified so that the patient information and identity of the reading radiologist were removed. Ex. C, Rosen Dep. at 158:6-18.

156.     Each study was assigned an identification number so the reports could be linked with the images. Ex. C, Rosen Dep. at 158:6-18.

157.    The CT studies selected for inclusion in the review were thoracic/chest studies, but the studies were not limited to those read by radiologists specializing in chest imaging. Ex. C, Rosen Dep. at 156:12-158:5; Ex. A, Rosen Aff. at ¶ 61.

158.    Dr. Rosen elected to compare Plaintiff's reads to those of radiologists not necessarily specializing in chest in order to give Plaintiff the benefit of the doubt and, thereby, implement a lower standard of comparison. Ex. C, Rosen Dep. at 156:12-158:5.

159.    Eighteen out of the 25 control group studies were read by radiologists who did not specialize in chest imaging. Ex. A, Rosen Aff. at ¶ 61.

160.    Dr. Rosen selected Diana Litmanovich, M.D. to conduct the independent review. Ex. A, Rosen Aff. at ¶ 62.

161.    Dr. Litmanovich was a thoracic radiologist at Beth Israel Deaconess Medical Center and was a faculty member of Harvard Medical School. Ex. A, Rosen Aff. at ¶ 62.

162.    Dr. Litmanovich was not employed by the Medical Group or affiliated with the UMass Memorial Health system. Ex. A, Rosen Aff. at ¶ 62.

163.    Dr. Rosen believed Dr. Litmanovich to be an expert in the interpretation of thoracic CT images. Ex. A, Rosen Aff. at ¶ 62.

164.    Dr. Rosen selected Dr. Litmanovich to conduct the review because she had a reputation of being a good thoracic radiologist, and he knew that she was well-respected and competent. Ex. C, Rosen Dep. at 159:10-21.

165.    Dr. Rosen provided Dr. Litmanovich with the CT images for the fifty studies, as well as the de-identified report for each of studies. Ex. C, Rosen Dep. at 158:20-159:9.

166.    Dr. Rosen requested that Dr. Litmanovich review the images for each CT study and the corresponding report, and provide her opinion whether she agreed or disagreed with the

interpretation, and if she disagreed, to indicate whether it was a minor or major disagreement and whether or not the disagreement would have an impact on patient care in her opinion. Ex. C, Rosen Dep. at 158:20-159:9; Ex. A, Rosen Aff. at ¶ 63.

167.    The Medical Group engaged Dr. Litmanovich and compensated her for her review. See Agreement to Review Radiology Scans, attached as **Exhibit V** to Wakefield Aff.

168.    Dr. Litmanovich provided her findings to Dr. Rosen, who un-blinded them through reference to their identifying numbers. Ex. A, Rosen Aff. at ¶ 64.

169.    Based on her findings, Dr. Litmanovich concluded that of the reads conducted by Plaintiff, there were five major errors and nine errors she opined would impact patient care. Ex. A, Rosen Aff. at ¶ 64.

170.    Based on her findings, Dr. Litmanovich concluded that of the reads conducted by other radiologists, there was one major error and five errors she opined would impact patient care. Ex. A, Rosen Aff. at ¶ 64.

171.    As a result of Dr. Rosen's assessment of the results of the independent review, he determined that Plaintiff's quality was not acceptable for the Department, and he made the decision that Plaintiff could not continue to work in the Department in order to ensure patient safety and provide high quality services to patients. Ex. A, Rosen Aff. at ¶ 65.

172.    As Chair, Dr. Rosen is responsible for the performance of Medical Group physicians in the Radiology Department. Ex. A, Rosen Aff. at ¶ 6.

173.    Plaintiff admits that, in his role, Dr. Rosen has an obligation to ensure patient safety, and has an obligation to ensure the quality of radiological reads by the radiologists in the Department, including Plaintiff. Ex. D, Desai Dep. at 74:11-75:8.

174.    Plaintiff admits that the independent expert determined that she had quality problems. Ex. D, Desai Dep. at 94:15-24.

175.    Plaintiff admits that Dr. Rosen should not have ignored the expert's determinations. Ex. D, Desai Dep. at 95:1-12.

176.    Plaintiff believes that Dr. Rosen should take action if he believes a radiologist's quality is substandard. Ex. D, Desai Dep. at 78:2-14.

177.    Plaintiff believes that by her termination, Dr. Rosen took action based on his assessment that her quality was substandard. Ex. D, Desai Dep. at 79:4-13.

178.    Plaintiff does not believe that Dr. Rosen made the decision to ask an expert to review a sample of her cases for quality purposes because of her age. Plaintiff does not think the "review has anything to do with the age," the two things "don't go together," and Dr. Rosen's decision to have her quality review "[h]as nothing to do with age." Ex. D, Desai Dep. at 84:21-85:7.

179.    Plaintiff does not believe that Dr. Rosen made the decision to have her cases reviewed for quality purposes by an independent expert based on the fact that she is a female. Ex. D, Desai Dep. at 85:8-12.

180.    Plaintiff does not believe that Dr. Rosen made the decision to perform the independent review because she has a disability, and she does not "think it has a connection with the disability." Ex. D, Desai Dep. at 195:12-17.

181.    Plaintiff believes that her age and disability are "separate" and they "[h]ad nothing to do with the independent review." Ex. D, Desai Dep. at 86:6-10.

182.    Plaintiff alleges that Dr. Rosen should have spoken with her before conducting the review, but does not claim that Dr. Rosen's action in not speaking with her before conducting

the independent review was because of her age, disability, or because she is a female. Ex. D, Desai Dep. at 88:1-20; 89:16-90:14.

183.    Plaintiff does not believe that Dr. Rosen made up his concern regarding her quality. Ex. D, Desai Dep. at 91:9-11.

184.    Plaintiff admits that using an independent expert to review records is a way to assess quality without the risk of being discriminatory. Ex. D, Desai Dep. at 91:12-92:1.

185.    In making the decision to terminate Plaintiff's employment based on a quality concern, Dr. Rosen relied on an independent expert's evaluation. Ex. D, Desai Dep. at 79:14-21.

186.    Plaintiff admits that by doing an independent review, Dr. Rosen was trying to remove himself from being the one assessing her quality so that a third party expert could make the assessment without knowing that it was Plaintiff being reviewed. Ex. D, Desai Dep. at 91:9-92:1.

187.    Plaintiff admits that Dr. Rosen acted fairly and appropriately by relying on an independent expert's evaluation as opposed to him making the evaluation himself. Ex. D, Desai Dep. at 94:10-14.

188.    Plaintiff cannot offer any facts to show that Dr. Rosen was acting maliciously in seeking an independent expert's evaluation of her quality. Ex. D, Desai Dep. at 96:5-21.

189.    Plaintiff does not claim that Dr. Litmanovich discriminated against her in performing her independent review. Ex. D, Desai Dep. at 362:15-363:17.

190.    Plaintiff believes that the methodology of the review was wrong and that her studies should have been compared to an equal amount of reads by a single other radiologist. Ex. D, Desai Dep. at 92:10-93:1.

191.    Dr. Rosen did not consider Plaintiff's age, sex, or disability in making the decision to have the independent review performed. Ex. A, Rosen Aff. at ¶ 59.

**I.      Termination**

192.    On March 14, 2018, Dr. Rosen met with Plaintiff and informed her that her employment will be terminated on March 17, 2019. Ex. A, Rosen Aff. at ¶ 66.

193.    Pursuant to Plaintiff's Employment Agreement, Plaintiff was entitled to twelve months' notice prior to termination. Ex. A, Rosen Aff. at ¶ 67; Ex. B, Employment Agreement, at ¶ 7.2.

194.    Dr. Rosen determined that in the time until Plaintiff's employment ended, she would be restricted from reading CT images and would review only x-rays, due to the concerns raised regarding the quality of her CT reads from the independent review and Dr. Rosen's obligation to ensure patient safety and provide high quality services to patients. Ex. C, Rosen Dep. at 342:3-14; Ex. A, Rosen Aff. at ¶ 68.

195.    Plaintiff does not believe that Dr. Rosen's decision to restrict her ability to read CT images was made because she had a disability, and she is not claiming that he made this decision based on her disability. Ex. D, Desai Dep. at 188:21-189:10.

196.    Plaintiff is not claiming that the decision to restrict her ability to read CT images was made because of her age. Ex. D, Desai Dep. at 237:19-22.

197.    Plaintiff requested that Dr. Rosen provide her with the information regarding her quality on which he made his decision. Ex. C, Rosen Dep. at 342:15-23; see also E-mails between M. Rosen and C. Desai, March 24, 2018, to April 17, 2018, attached as **Exhibit W** to Wakefield Aff.

198.    Dr. Rosen agreed to meet with Plaintiff to discuss the independent review findings. Ex. C, Rosen Dep. at 342:15-23.

199.    Plaintiff requested that she be able to bring a colleague to the meeting and elected to invite Sarwat Hussain, M.D. Ex. C, Rosen Dep. at 344:12-20.

200.    On April 24, 2018, a meeting was held at which Plaintiff, Dr. Rosen, Dr. Hussain, and Vice Chair for Quality, Patient Safety and Process Improvement Steven Baccei, M.D., attended, and Dr. Rosen provided Plaintiff with data from the independent reviewer's findings. Ex. A, Rosen Aff. at ¶ 70.

201.    Plaintiff recognizes that hospital credentialing is dependent on being employed as a physician. Ex. D, Desai Dep. at 390:5-12.

202.    Plaintiff filed a complaint against Defendants with the Massachusetts Commission Against Discrimination on May 4, 2018, alleging discrimination in her employment and in her termination. See MCAD Complaint, May 4, 2018, attached as **Exhibit X** to Wakefield Aff.

## J.    **Other Terminations**

203.    Dr. Rosen has ended the employment of other physicians in the Department due to performance concerns related to ability, including R.G. M.D., separated June 23, 2017; R.N. , D.O., separated May 31, 2017; and A.R. M.D., separated December 12, 2015. Ex. A, Rosen Aff. at ¶ 71.

204.    An external independent review was performed of Dr. R.G. 's competency prior to the decision to end his employment. In addition, Dr. Rosen reviewed data from the quality assurance system to evaluate Dr. R.G. 's performance. Ex. A, Rosen Aff. at ¶ 72.

205.     An internal review and investigation was conducted of Dr. ██R.N.██'s performance prior to the decision to end his employment. Ex. A, Rosen Aff. at ¶ 73.

206.     Dr. ██R.N.██ was forty years of age at the time of his separation. Ex. A, Rosen Aff. at ¶ 73.

207.     With respect to these physicians, Dr. Rosen advised them that due to their performance, they would no longer be able to be employed with the Medical Group, and the physicians elected to resign in lieu of termination. Ex. C, Rosen Dep. at 57:16-59:1; 134:17-135:6; 365:12-24; 367:16-368:2; Ex. A, Rosen Aff. at ¶ 74.

208.     When Dr. Rosen informed Plaintiff that she was being terminated, she did not elect to resign. Ex. C, Rosen Dep. at 365:12-24; 367:16-368:2.

209.     In the year between the time Plaintiff was notified of her termination and the end of her employment, Plaintiff did not elect to resign or ask if she could resign in lieu of termination. Ex. C, Rosen Dep. at 365:12-24; 367:16-368:2.

**K.** **Defamation**

210.     Plaintiff alleges that Defendants made the following defamatory statements about her:

1. 2017 – 2018 Faculty Annual Performance Review of C. Desai by M. Rosen. [Ex. M.]

2. July 1, 2016 – June 30, 2017 Peer Review of Dr. Desai by K. Dill. [Ex. R.]

3. April 17, 2018 Letter from M. Rosen to C. Desai. [See **Exhibit Y** to Wakefield Aff.]

4. April 17, 2018 3:58 PM Email from M. Rosen to C. Desai re: March 14th, 2018 Meeting. [Ex. W.]

5. April 18, 2018 5:12 PM Email from M. Rosen to C. Desai re: Meeting to Review QA data. [See **Exhibit Z** to Wakefield Aff.]

6. March 9, 2018 Letter from M. Rosen and S. Tosi to C. Desai re: Notice of Termination of Employment. [See **Exhibit AA** to Wakefield Aff.]

7. April 24, 2018 Meeting between Dr. Rosen and Dr. Desai, also attended by Dr. Sarwat Hussain. At this meeting, Dr. Rosen stated and projected on a screen false statements that Dr. Desai had performance issues and had committed major misreads of radiology films.

8. September – December 2017, Quality Assurance Review by D. Litmanovich and accompanying documents.

9. Defendants' suspension of Dr. Desai's performance of duties and responsibilities, known to all in the radiology department and to numerous others throughout the hospital, constitutes defamation by deed. Defendants' termination of Dr. Desai, known to all in the radiology department and to numerous others throughout the hospital, also constitutes defamation by deed.

See Plaintiff's Answers to UMass Memorial Interrogatories, excerpts, attached as **Exhibit BB** to Wakefield Aff.

211.    Plaintiff does not claim that Dr. Rosen provided her 2017-2018 evaluation to any third party. Ex. D, Desai Dep. at 367:3-8.

212.    Plaintiff does not claim that the Medical Group provided the "peer review" document to any third party. Ex. D, Desai Dep. at 367:9-23.

213.    Plaintiff is not aware of the Medical Group having provided the April 17, 2018, letter from Dr. Rosen to her to any third party, and does not claim that it was. Ex. D, Desai Dep. at 367:24-368:4.

214.    Plaintiff is not aware of the Medical Group having provided the April 17, 2018, E-mail from Dr. Rosen to her to any third party, and does not claim that it was. Ex. D, Desai Dep. at 368:5-10.

215.    Plaintiff is not aware of the Medical Group having provided the April 18, 2018, E-mail from Dr. Rosen to her to any third party, and does not claim that it was. Ex. D, Desai Dep. at 368:12-18.

216.     Plaintiff is not aware of the Medical Group having provided the March 9, 2018, termination letter to anyone except for administrative staff, and does not claim that it was. Ex. D, Desai Dep. at 245:6-246:12; 342:17-343:5; 368:19-369:4.

217.     Plaintiff agrees that the termination letter simply informed her of the termination of her employment, and agrees that Dr. Rosen and Dr. Tosi were being truthful in the letter when they stated that her employment was being terminated. Ex. D, Desai Dep. at 249:11-250:7.

218.     Plaintiff is not aware of the Medical Group having provided information regarding her April 24, 2018, meeting with Dr. Rosen and Dr. Baccei to any third party, aside from Dr. Sarwat Hussain who was present due to Plaintiff's invitation, and does not claim that it was. Ex. D, Desai Dep. at 369:5-23.

219.     Plaintiff is not aware of the Medical Group having provided the results of Dr. Litmanovich's review to any third party, and does not claim that it was. Ex. D, Desai Dep. at 369:24-370:6.

220.     Plaintiff informed other individuals that she was not permitted to read CT images, and was not concerned with answering inquiries about her ability to do so truthfully. Ex. D, Desai Dep. at 370:7-371:11.

221.     Neither Dr. Rosen nor the Medical Group communicated Plaintiff's restriction from reading CTs throughout the Department, and shared it only in a discreet manner on a need to know basis for the purposes of scheduling and workflow for the reading of studies. Ex. A, Rosen Aff. at ¶ 69.

## L.     **Tortious Interference**

222.     Plaintiff is claiming tortious interference with her business relations because of Dr. Rosen's decision to terminate her employment. Ex. D, Desai Dep. at 239:8-10.

**M.**   **Dr. Tosi**

223.   Stephen Tosi, M.D., was the President of UMass Memorial Medical Group, Inc., at the time of Plaintiff's termination. Ex. A, Rosen Aff. at ¶ 75.

224.   Plaintiff does not know if Dr. Tosi made the decision to pay in a discriminatory way, and is not claiming that Dr. Tosi did not pay her correctly under the Equal Pay Act. Ex. D, Desai Dep. at 129:12-15; 175:7-9.

225.   Dr. Tosi did not make the decision regarding the use of home workstations. Ex. D, Desai Dep. at 160:12-15.

226.   Plaintiff is not claiming that Dr. Tosi engaged in discrimination in the hiring of Dr. Dill. Ex. D, Desai Dep. at 168:12-15.

227.   The basis for Plaintiff's claim of discrimination against Dr. Tosi is that he signed her termination letter, and he could have stopped or questioned the decision. Ex. D, Desai Dep. at 217:23-219:3.

228.   The basis for Plaintiff's claim against Dr. Tosi for tortious interference is that he could have stopped her termination. Ex. D, Desai Dep. at 242:16-23.

229.   The only thing Plaintiff claims that Dr. Tosi did that was defamatory was his signing of her termination letter, and she does not know if he sent the letter to anyone other than her. Ex. D, Desai Dep. at 246:19-247:24.

**N.**   **Department Demographics**

230.   Following Plaintiff's notice of her termination, she was replaced in the Department by Maria Barile, M.D., who is a female. Ex. A, Rosen Aff. at ¶ 76.

231.   After Plaintiff's separation, Dr. Rosen hired a new Division Chief for the Thoracic Division who is 59 years of age. Ex. A, Rosen Aff. at ¶ 77.

232.    Presently, the Medical Group employs approximately 92 radiologists. Ex. A, Rosen Aff. at ¶ 78.

233.    The Department includes 24 radiologists who are age 60 years or older, and three over 70 years of age. Ex. A, Rosen Aff. at ¶ 78.

234.    Dr. Rosen is 62 years of age. Ex. A, Rosen Aff. at ¶ 78.

235.    During Dr. Rosen's tenure as Chair of the Department, he has hired 14 radiologists who are 60 years of age or older and two over 70 years of age, as well as 32 radiologists who are female. Ex. A, Rosen Aff. at ¶ 79.

236.    Dr. Rosen has made the decision to end the employment of eight regularly-employed radiologists as Chair (who either were terminated or elected to resign in lieu of termination), and seven were male, and seven were younger than Plaintiff. Ex. A, Rosen Aff. at ¶ 80.

## O.    Radiologist Compensation

237.    In 2016, the Medical Group conducted an internal review of the compensation of its radiologists as a part of an effort to standardize salaries to address pay inequities and increase compensation to align more closely with the market for all radiologists. The Medical Group also engaged an outside resource to perform an external market study to assist in establishing a standardized compensation structure. Ex. A, Rosen Aff. at ¶ 81.

238.    As a result of these efforts, the Medical Group was able to provide additional funds to the Radiology Department, and a large percentage of radiologists' salaries were increased. Ex. A, Rosen Aff. at ¶ 82.

239.    Based on the evaluation, the Medical Group implemented a new, standardized salary structure for radiologists effective March 1, 2017. Under this pay structure, the

Department set a base salary, with additional designated sums based on academic rank as well as leadership and administrative positions which carried with them additional job duties and responsibilities. Ex. A, Rosen Aff. at ¶ 83; see also Letter to Diagnostic Radiology Faculty, February 14, 2017, attached as **Exhibit CC** to Wakefield Aff.

240.    As a result of the implementation of the new compensation structure, Plaintiff received a large increase in pay, from $302,575 to $340,000 per year. Her compensation was set based on the base salary for a diagnostic radiologist of $330,000, plus an additional $10,000 due to her rank as Associate Professor. Ex. A, Rosen Aff. at ¶ 84; see also Letter from M. Rosen to C. Desai, February 16, 2017, attached as **Exhibit DD** to Wakefield Aff.

241.    Plaintiff did not hold any leadership roles or perform additional duties for the Department. Ex. A, Rosen Aff. at ¶ 85.

242.    As a result of the new pay structure, every single full-time female radiologist who was employed as of March 1, 2017, received a pay increase, and they were paid in accordance with the standardized pay scale. Ex. A, Rosen Aff. at ¶ 86.

243.    Plaintiff admits that the Medical Group undertook an analysis of compensation within the Department and attempted to correct any pay disparities by making compensation standardized. Ex. D, Desai Dep. at 180:24-182:8.

244.    Plaintiff admits that the Medical Group took a reasonable approach and acted in good faith to address any pay disparities existing within the last three years of her employment. Plaintiff admits that the Medical Group made reasonable progress to address any pay disparities. Ex. D, Desai Dep. at 181:17-183:3; 314:22-315:15.

245.    Plaintiff admits that as a result of this analysis and new pay structure, she received a substantial increase in pay. Ex. D, Desai Dep. at 180:24-182:18.

246.    In her answers to interrogatories, Plaintiff cites, as the sole basis for her belief that she was paid less than her colleagues, the fact that Dr. Aaron Harman was paid more than her, and she identifies Dr. Harman as the only co-worker she claims was paid more than her because of gender. Ex. BB, Answers to Interrogatories.

247.    At deposition, Plaintiff has cited Eric Schmidlin, M.D., as a younger, male radiologist allegedly paid more than her, and additionally identified Steven Baccei, M.D., Christopher Cerniglia, D.O., Karin Dill, M.D., Byron Chen, M.D., Hemang Kotecha, M.D., Dennis Coughlin, M.D., and Sathish Dundamadappa, M.D., as those being paid more than her. Ex. D, Desai Dep. at 129:22-130:14; 133:10-17; 176:17-178:6.

248.    Except for Dr. Schmidlin and Dr. Dill, all of the physicians identified by Plaintiff worked in different divisions and had different job duties than Plaintiff. Ex. A. Rosen Aff. at ¶¶ 87, 89-90, 94-97.

249.    Plaintiff was a diagnostic radiologist, and Dr. Harman is an interventional radiologist. Ex. A, Rosen Aff. at ¶ 87.

250.    Diagnostic radiology involves reviewing images of the body and making interpretations, and interventional radiology is image-guided surgery. Interventional radiologists perform invasive procedures on patients, and the radiology component relates to the use of imaging such as fluoroscopy, CT, ultrasound, and MRI to guide their procedures. Interventional Radiologists also have completed additional training through an ACGME accredited Interventional Radiology fellowship and some (including Dr. Harman) have also taken an additional board-certifying examination (Certificate of Added Qualification) in Interventional Radiology. Ex. A, Rosen Aff. at ¶ 87.

251.    Interventional radiologists generally earn substantially more than diagnostic radiologists. Thus, the Department has implemented a different pay scale for interventional radiology from diagnostic radiology. Under this structure, Dr. Harman's salary was $365,000 per year, which is the base salary for an interventional radiologist. Ex. A, Rosen Aff. at ¶ 88.

252.    Plaintiff is familiar with the market rates of compensation for interventional radiology, and she admits that interventional radiologists are paid more than diagnostic radiologists. Nevertheless, Plaintiff believes that she should be paid the same as an interventional radiologist and does not believe the difference in market rates to be justified despite the significant difference in job duties and education. Ex. D, Desai Dep. at 136:3-137:7.

253.    Dr. Schmidlin specialized in chest imaging and worked within the Chest Division with the same duties as Plaintiff. Dr. Schmidlin did not make more than Plaintiff. His starting salary in 2012 was $300,000 per year, less than Plaintiff's salary, and at the time of his separation from regular employment, he earned $294,000 per year, less than Plaintiff's salary. Dr. Schmidlin left regular employment with the Medical Group on June 28, 2016, and he continued to work on a per diem, hourly basis. His hourly rate since has been $162.50, and Plaintiff's rate when calculated on an hourly basis is $163.46. Ex. A, Rosen Aff. at ¶ 89.

254.    Byron Chen, M.D., and Hemang Kotecha, M.D., have also always earned less than Plaintiff; each with a salary of $330,000 per year at the time of Plaintiff's separation. Ex. A, Rosen Aff. at ¶ 90.

255.    Dr. Dill's base salary was the same as Plaintiff's. However, Dr. Dill served as a Division Chief, and was paid an additional sum for those duties and responsibilities. Ex. A, Rosen Aff. at ¶ 91.

256.     Division Chiefs are responsible for the effective daily operational management of their division, financial stability, long term strategic planning, faculty development, and service for patients and referring clinicians. Divisions Chiefs are responsible for the business and operational functions of their divisions, and include responsibilities for clinical operations, financial sustainability, customer service, quality assurance and improvement, faculty development, recruitment and retention, research/scholarship, innovation, resident/fellow training, medical student education, and other division-specific functions. Ex. A, Rosen Aff. at ¶ 92.

257.     A radiologist's performance of non-clinical duties for the Department, including service in leadership and administrative positions, is separate and apart from their clinic duties and is extremely valuable to the Department. Ex. A, Rosen Aff. at ¶ 93.

258.     Dr. Baccei was paid a higher salary due to his leadership roles within the Department, pursuant to the salary structure. Dr. Baccei was the Division Chief for musculoskeletal radiology, and he served as the Department's Vice Chair of Quality, Safety, and Process Improvement. The duties of the Vice Chair include oversight of all quality assurance functions of the Department, specifically, maintaining the peer review database, managing department quality assurance meetings and review processes, responding to quality issues, handling risk management matters, and management of quality review projects, among other duties. Ex. A, Rosen Aff. at ¶ 94.

259.     Dr. Cerniglia served in multiple leadership and administrative roles in the Department, for which he received additional compensation. Prior to 2017, he had served as a Division Chief for musculoskeletal radiology, and, thereafter, he continued to serve as 1) the Director for Medical Student Education in Radiology, in which he is responsible for organizing

all of the radiology educational activities for the first and second year medical students, 2) the Co-Course Director for the UMass Medical School DSF (Design, Structure, and Function) course, in which he runs the imaging lab within the anatomy lab, oversees imaging in connection with the course, and oversees all medical student, non-radiology interns and resident, and visiting medical student rotations in radiology, and 3) the Fellowship Director for Musculoskeletal Radiology, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education policies. Ex. A, Rosen Aff. at ¶ 95.

260.    Sathish Dundamadappa, M.D., has served as the interim Division Chief of neuroradiology as well as the Fellowship Director for Neuroradiology and the Fellowship Director for MRI, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education, for both of these areas, as well as compliance with accreditation requirements for neuroradiology, and he has received additional compensation for these additional duties and responsibilities. Ex. A, Rosen Aff. at ¶ 96.

261.     Dennis Coughlin, M.D., has served as the Division Chief for Emergency

Radiology, for which he has been compensated an additional amount for those duties and

responsibilities. Ex. A, Rosen Aff. at ¶ 97.

Respectfully submitted,

**UMASS MEMORIAL MEDICAL
CENTER, INC., UMASS MEMORIAL
MEDICAL GROUP, INC., MAX
ROSEN, M.D., and STEPHEN TOSI,
M.D.**

By their attorneys,

/s/ Reid M. Wakefield
Robert L. Kilroy, Esq., BBO # 636853
Reid M. Wakefield, Esq., BBO # 569026
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA  01581
Phone 508.860.1474
Fax 508.983.6261
rkilroy@mirickoconnell.com
rwakefield@mirickoconnell.com

Dated:  December 17, 2021


CERTIFICATE OF SERVICE

I, Reid M. Wakefield, hereby certify that this document, filed through the ECF system
will be sent electronically to the registered participants as identified on the Notice of Electronic
Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on
this day.

/s/ Reid M. Wakefield
Reid M. Wakefield, Esq.

Dated: December 17, 2021