# **<u>EXHIBIT A</u>**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:4:19-CV-10520-TSH

CHARU DESAI,
Plaintiff,

v.

UMASS MEMORIAL MEDICAL
CENTER, INC., et al.,
Defendants.

**AFFIDAVIT OF REID M.
WAKEFIELD, ESQ., IN SUPPORT OF
MOTION FOR SUMMARY
JUDGMENT BY UMASS MEMORIAL
MEDICAL CENTER, INC., UMASS
MEMORIAL MEDICAL GROUP,
INC., MAX ROSEN, M.D., AND
STEPHEN TOSI, M.D.**

I, Reid M. Wakefield, hereby depose and state as follows:

1.     I am employed as an attorney with the law firm Mirick, O'Connell, DeMallie, &

Lougee, LLP, and have been retained as defense counsel, along with Robert L. Kilroy, Esq., for

Defendants, UMass Memorial Medical Center, Inc., UMass Memorial Medical Group, Inc., Max

Rosen, M.D., and Stephen Tosi, M.D., in the above-referenced action.

2.     I have personal knowledge of the facts contained within this affidavit.

3.     I attest to the following Exhibits, which are attached hereto, as containing true and

accurate copies of the documents referenced therein:

4.     **Exhibit A** is a true and accurate copy of the Affidavit of Max Rosen, M.D.,

M.P.H., dated December 15, 2021 (redacted).

5.     **Exhibit B** is a true and accurate copy of the Agreement between UMass

Memorial Medical Group, Inc., and Charu Desai, M.D.

6.     **Exhibit C** is a true and accurate copy of excerpts of the transcript of the

deposition of Max Rosen, M.D., taken on May 7, 2021 and June 1, 2021 (redacted).

7.     **Exhibit D** is a true and accurate copy of excerpts of the transcript of the

deposition of Charu Desai, M.D., taken on September 18, 2020 and October 22, 2020 (redacted).

8.      **Exhibit E** is a true and accurate copy of the 2015 Approval of Leave Notification and Certification of Health Care Provider for Employee's Serious Health Condition.

9.      **Exhibit F** is a true and accurate copy of the 2016 Approval of Leave Notification.

10.     **Exhibit G** is a true and accurate copy of the 2017 Approval of Leave Notification.

11.     **Exhibit H** is a true and accurate copy of the 2018 Approval of Leave Notification.

12.     **Exhibit I** is a true and accurate copy of an e-mail from Max Rosen, M.D., to Charu Desai, M.D., dated May 13, 2016.

13.     **Exhibit J** is a true and accurate copy of the Academic and Administrative Time Policy of the UMass Memorial Medical Group Department of Radiology.

14.     **Exhibit K** is a true and accurate copy of the Curriculum Vitae of Charu S. Desai, M.D.

15.     **Exhibit L** are true and accurate copies of the Annual Faculty Reviews for Charu Desai, M.D., for years 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, and 2016-2017.

16.     **Exhibit M** is a true and accurate copy of the Annual Faculty Review for Charu Desai, M.D., for year 2017-2018.

17.     **Exhibit N** is a true and accurate copy of the Call and/or Weekend/Holiday Coverage Policy of the UMass Memorial Medical Group Department of Radiology.

18.     **Exhibit O** is a true and accurate copy of e-mails between M. Rosen and J. Ferrucci, dated February 10, 2017.

19.     **Exhibit P** is a true and accurate copy of redacted medical record notes by George Eypper, M.D., for a visit by Charu Desai on February 10, 2017, produced by Dr. Eypper pursuant to a subpoena (redacted).

20.     **Exhibit Q** is a true and accurate copy of minutes from the June 14, 2017, Chest Division meeting, by Karin Dill, M.D.

21.     **Exhibit R** is a true and accurate copy of the 2016-2017 Peer Review Summary Document (redacted).

22.     **Exhibit S** is a true and accurate copy of emails from Kimberly Robinson, M.D., and between Max Rosen, M.D., and Darren Brennan, M.D., dated from January 3 to January 8, 2018 (redacted).

23.     **Exhibit T** is a true and accurate copy of an e-mail from Max Rosen, M.D., to Darren Brennan, M.D., et al., regarding minutes from January 31, 2017, meeting.

24.     **Exhibit U** is a true and accurate copy of e-mails between Max Rosen, M.D., and Kathryn Green, M.D., dated February 1, 2017.

25.     **Exhibit V** is a true and accurate copy of an Agreement to Review Radiology Scans by Diana Litmanovich, M.D.

26.     **Exhibit W** is a true and accurate copy of e-mails between Max Rosen, M.D., and Charu Desai, M.D., dated March 24, 2018, and April 17, 2018.

27.     **Exhibit X** is a true and accurate copy of the Complaint of Discrimination filed at the Massachusetts Commission Against Discrimination May 4, 2018.

28.     **Exhibit Y** is a true and accurate copy of a letter from Max Rosen, M.D., to Charu Desai, M.D., dated April 17, 2018.

29.     **Exhibit Z** is a true and accurate copy of an e-mail from Max Rosen, M.D., to Charu Desai, M.D., dated April 18, 2018.

30.     **Exhibit AA** is a true and accurate copy of a Notice of Termination of Employment from Max Rosen, M.D., and Stephen Tosi, M.D., to Charu Desai, M.D., dated March 9, 2018.

31.     **Exhibit BB** is a true and accurate copy of excerpts of Plaintiff Charu Desai's Answers to Defendant UMass Memorial Medical Center, Inc.'s First Set of Interrogatories.

32.     **Exhibit CC** is a true and accurate copy of a letter from Max Rosen, M.D., to the Diagnostic Radiology Faculty, dated February 14, 2017.

33.     **Exhibit DD** is a true and accurate copy of a letter from Max Rosen, M.D., to Charu Desai, M.D., dated February 16, 2017.

Signed under pains and penalties of perjury this 17th day of December, 2021.

_____
Reid M. Wakefield, Esq.

**<u>EXHIBIT A</u>**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-cv-10520-TSH

CHARU DESAI,
      Plaintiff,

     v.

UMASS MEMORIAL MEDICAL
CENTER, INC., et al.,
      Defendants.

**AFFIDAVIT OF
MAX ROSEN, M.D., M.P.H.**

I, Max Rosen, M.D., M.P.H, hereby depose and state as follows:

1.      I am the Chair of the Department of Radiology for UMass Memorial Health (the "Department"), and in this capacity I have personal knowledge of the facts set forth herein.

2.      I was appointed as the Chair of the Department effective September 1, 2012.

3.      I am employed by UMass Memorial Medical Group, Inc., and the University of Massachusetts Medical School.

4.      Charu Desai, M.D., was formerly employed by the Medical Group as a physician specializing in chest radiology.

5.      Dr. Desai was employed pursuant to an Agreement between UMass Memorial Medical Group, Inc., and Charu Desai, M.D. ("Employment Agreement"), a copy of which is attached as **Exhibit A.** Pursuant to the Employment Agreement, Dr. Desai was dually-employed by the Medical Group and the University of Massachusetts Medical School. Exhibit A, ¶ 1.14.

6.      In my capacity as Chair, I supervised and managed all radiologists employed by the Medical Group, including Dr. Desai. As Chair, I am responsible for the performance of

Medical Group physicians in the Radiology Department. Among my duties as Chair is to ensure that the Department provides high quality and safe imaging services for patients.

7.      Dr. Desai's job duties involved reviewing radiological images in the form of computed tomography ("CT") or radiographs ("x-rays" or "plain films"), interpreting the images, describing findings, and opining on diagnoses of disease and medical conditions revealed in the images. Dr. Desai was not qualified to read magnetic resonance imaging (MRI) and did not read MRIs in the course of her employment.

8.      As a radiologist, Dr. Desai's practice was focused on and limited to thoracic (a/k/a chest) imaging, and Dr. Desai worked within the Department's Thoracic Division (a/k/a Chest Division).

9.      Dr. Desai performed her duties for the Medical Group while located at UMass Memorial Medical Center (the "Medical Center") facilities. The Medical Center is a multi-facility academic hospital which provides tertiary-level care.

10.     In her role as a radiologist for the Medical Group, Dr. Desai reviewed and interpreted images for patients originating from multiple hospitals, including campuses of the Medical Center, Marlborough Hospital, and Clinton Hospital. These hospitals are each separate entities.

11.     The Medical Group is responsible for staffing radiologists to review images originating from different hospitals, and the Medical Group directs the radiologists' assignments.

12.     The hospitals, including Marlborough Hospital and the Medical Center, did not direct Dr. Desai or any other radiologist with respect to the reading of images or in any other job duties. Dr. Desai was supervised by Medical Group employees at all times.

13.     Dr. Desai was never employed by the Medical Center. The Medical Center did not set the compensation for radiologists, did not set the work schedules for radiologists, and did not have the power to hire, fire, or discipline radiologists, including Dr. Desai.

14.     In order to provide medical services as a physician for Medical Center patients, Dr. Desai was required to be granted clinical privileges by the Medical Center and be a member of the Medical Center's medical staff.

15.     Darren Brennan, M.D., served as the Chief of Radiology for Marlborough Hospital from 2015 to 2018. He was not an employee of Marlborough Hospital, but at all times has been employed by the Medical Group as a radiologist.

16.     As Chief of Radiology, Dr. Brennan performed an administrative role which involved serving as a representative of the Medical Group's Radiology Department, serving as a liaison with Marlborough Hospital, and ensuring that the Medical Group was performed its obligations under its contract with Marlborough Hospital. In Dr. Brennan's capacity as Chief of Radiology, he oversaw staffing coverage for the Medical Group's reading of studies originating from Marlborough Hospital.

17.     Dr. Brennan served as the Department's Vice Chair for Enterprise Operations and Community Radiology from 2015 to 2019. In my absence, I would sometimes designate Dr. Brennan to address concerns within the Department in his role as Vice Chair. On September 21, 2017, Dr. Brennan addressed a matter between Dr. Desai and Karin Dill, M.D., in that capacity and at my request.

18.     Dr. Desai had a Sick Bank as well as Salary Continuation she could use for paid medical leave. At the time of her separation from employment, Dr. Desai had not exhausted her available sick leave and had available 116.55 hours in her Sick Bank.

19.     In 2014, a physician in the Department, ███ S.A. ███, M.D., requested a change in her work hours due to a medical issue, and an accommodation to her schedule was approved by me which remains in place to the present day.

20.     The Department maintained a policy for physicians to be allotted academic or administrative time to conduct non-clinical duties ("Academic and Administrative Time Policy"), a copy of which is attached as **Exhibit B**. Pursuant to the Academic and Administrative Time Policy, academic time can be allotted to academic responsibilities including teaching and conference preparation, writing papers or texts, completing research projects, attending institutional and department committees, attending conferences, or serving on committees of local, regional, national or international organizations.

21.     Dr. Desai was not allotted academic time since at least 2010, and the Department does not have a record of Dr. Desai having ever been allotted academic time. In the time I have been Chair, Dr. Desai never requested academic time for the purposes of performing academic work, research, or other scholarly activities nor has she ever made any proposal for academic work she wished to perform. In addition, she never requested time to participate in the work of local, regional, national, or international organizations.

22.     Medical Group radiologists are required to work "call" where they are scheduled to work certain weekends and holidays to ensure coverage for patients every day of the year. The Department has a policy which requires all regularly-employed staff members to provide "call," a copy of which is attached as **Exhibit C**. The requirements for call vary by division due to coverage needs, but the time commitment of the call coverage is substantially the same.

23. For members of the Chest Division, a radiologist must work one-fifth of weekends, or ten weekends per year, as well as a portion of holidays, which are scheduled in advance in an equitable manner among the radiologists working in the division.

24. Performing call is an essential and critical part of being a radiologist in the Department, and is required in order to provide timely and high-quality care to patients, as UMass Memorial is a tertiary-care referral center and level one trauma center which operates twenty four hours a day every day of the year. If a radiologist does not perform call, those responsibilities fall on other employees.

25. At one time, the Department implemented a program in which staff members could elect to "sell" calls, where other staff radiologists could perform additional call for additional compensation, and the radiologist not doing call would have their salary reduced by an equivalent amount. This policy was in place for two fiscal years, from October 1, 2015, to September 30, 2017.

26. Dr. Desai elected to sell, and others in the department elected to "take" six out of her ten call weekends for these years, and during this period she performed substantially reduced call. Dr. Desai's salary was reduced accordingly during this time period due to her "sale" of her calls to other radiologists, in the amount of $19,200 per year. The rate that each call was valued was in accordance with the Department's per diem rates in effect at that time.

27. At least one other radiologist in the Department also elected to sell calls during this period.

28. The policy of selling calls was ended due to the administrative difficulties in managing the program, as well as the lack of staff radiologists interested in taking additional call.

29. It is common for staff radiologists to not want to take call.

30.     The Medical Group employs physicians in part-time roles, in which their hours are reduced and their call obligations are proportionately reduced.

31.     The Medical Group employs physicians in "per diem" status, in which the employees work on an hourly basis, and are not obligated to take call. Because staff radiologists who are on per diem status are not obligated to take call, some radiologists have chosen to change their status to per diem in order to be relieved of that obligation.

32.     Mona Korgaonkar, M.D., a female radiologist who is older than Dr. Desai, requested to move to a part time schedule, which I granted, and she subsequently requested that she not take call, and I offered, and she accepted the ability to change her status to per diem to be exempt from call responsibilities. Dr. Korgaonkar remains employed by the Medical Group.

33.     In response to Dr. Desai requesting to be exempt from call, I discussed with her the option to transition to per diem status.

34.     In October 2017, I asked Dr. Joseph Ferrucci if he would consider speaking with Dr. Desai to share his experience moving from active to per diem status with the Medical Group to assist her with her decision. I did not tell Dr. Ferrucci that I intended to terminate Dr. Desai's employment or to require her to move from active to per diem status. I did not tell Dr. Ferrucci that I had an obligation to think about recruiting younger staff for service needs, and I did not discuss the age or longevity of any staff member, including Dr. Desai, at any time, with Dr. Ferrucci.

35.     At no time did Dr. Desai state that she desired to be exempted from taking call or desired an alteration to her call scheduled due to a heart condition or any other health condition.

36.     The Department began to utilize remote workstations for staff radiologists to use from home on a trial basis beginning in early 2017. Only the following radiologists used home

workstations in the initial year of the implementation: Andrew Chen, M.D., Karin Dill, M.D.,

and Philip Steeves, M.D.

37.     Dr. Steeves is five years older than Dr. Desai.

38.     Nine radiologists used home workstations from implementation until the date of

Dr. Desai's separation: Aly Abayazeed, M.D., Satish Dundamadappa, M.D., Carolyn Dupuis,

M.D., David Choi, M.D., Andrew Chen, M.D., Karin Dill, M.D., Sami Erbay, M.D., Philip

Steeves, M.D., and Eric Schmidlin, M.D.

39.     Dr. Abayazeed, Dr. Dundamadappa, Dr. Choi, Dr. Chen, and Dr. Erbay

specialized in neuroradiology and were among the first to test and use home workstations due to

the unique scheduling in neuroradiology where radiologists would rotate working routine

evening shifts.

40.     No staff member was permitted to take call remotely through the use of a home

workstation or otherwise during the time Dr. Desai was employed.

41.     The Department has a quality assurance system designed to improve the quality of

radiology services. Prior to 2019, the quality assurance system was based, in part, on a peer

review system, where other radiologists within the Department would review each other's reads.

42.     In this system, all radiologists in the Department were asked to enter information

into the quality assurance system in two circumstances: (1) through an automated process that

requests that a certain number of cases be double-read periodically by each radiologist on staff;

and (2) when a radiologist is made aware of a quality issue about an interpretation, the

radiologist was obligated to enter that information into the peer review privileged database.

43.     When radiologists reviewed the studies, they would input a numerical score as to

their review, with scores denoting the following: a "1" indicated the reviewer concurred with the

reviewee's radiological interpretation; a "2" indicated the reviewer identified a discrepancy in interpretation/not ordinarily expected to be made, but which was denoted as an "understandable miss;" a "3" indicated the reviewer identified a discrepancy in the reviewee's interpretation and that the discrepancy should have been caught by the radiologist "most of the time;" and a "4" indicated the reviewer noted a discrepancy in interpretation that represented a "misinterpretation of findings" and that should be identified "almost every time."

44.     At their annual faculty reviews, I provided staff radiologists with information from the quality assurance database regarding peer review reads labelled with scores of either "3" or "4." I would advise the radiology staff members of these entries and ask the staff member to review the cases if they had not already done so, as a part of the quality improvement process.

45.     I provided Dr. Desai with such a summary from the quality assurance system during her 2016-2017 annual faculty review (the "Peer Review Summary"), a copy of which is attached as **Exhibit D**.

46.     Karin Dill, M.D., was hired as a radiologist and the Division Chief of the Thoracic Division on February 29, 2016. The Division Chief position was publicly posted and the Department conducted recruiting efforts to fill the position. Dr. Desai did not apply for or ever express interest in the position. Dr. Dill was more qualified than Dr. Desai to be Division Chief, based on her education, training, professional involvement, research, qualifications, and experience.

47.     According to data recorded in the quality assurance system, in the course of Dr. Dill's employment, she entered information in the quality assurance system indicating disagreement with the radiologist's initial read for 31 radiologists, in 79 instances.

48.     Kimberly Robinson, M.D., is a pulmonologist (a physician specializing in the respiratory system) who treats patients at Marlborough Hospital, and for a period served as President of the Medical Staff for Marlborough Hospital.

49.     Radiology, like other diagnostic medical work, can involve a degree of probability and subjectivity, and concerns or disagreements can be raised by treating physicians at times. Treating physicians have raised concerns to me with individual reads or quality issues from time to time. I evaluated quality concerns raised to me and took appropriate action based on the individual circumstances. I likewise evaluated quality concerns whenever they were raised to me by Dr. Robinson.

50.     Neither Dr. J.F. Dr. H.L., Dr. G.T. nor Dr. D.B. specialized in chest radiology. Dr. J.F. is 12 years older than Dr. Desai, Dr. G.T. is less than 2 years younger than Dr. Desai, and Dr. D.B. is 60 years old.

51.     I was aware that several of Dr. Desai's cases were entered in the Department's quality assurance database labelled as potentially significant misses, based on my distribution of data from the quality assurance system to Dr. Desai as a part of her annual review.

52.     On January 31, 2017, I met with representatives from Marlborough Hospital and its medical staff regarding radiology issues at the hospital. This meeting included the President of the Marlborough Hospital Medical Staff and pulmonologist Kimberly Robinson, M.D., and the President of Marlborough Hospital, Steven Roach. A copy of the minutes of this meeting are attached as **Exhibit E**.

53.     A significant concern addressed at the meeting was the quality of chest imaging. At the time, there were three radiologists specializing in chest in the Medical Group's Chest

Division, Karin Dill, M.D., Eric Schmidlin, M.D., and Dr. Desai. No concerns were raised at the meeting related to the reads of Dr. Dill or Dr. Schmidlin.

54.     At this meeting, Dr. Robinson expressed serious concerns with the quality of CT reads performed by Dr. Desai. Dr. Robinson stated to me that she never believed Dr. Desai's reports and could not rely on them.

55.     In response, I agreed that I would conduct a focused review of Dr. Desai's CT reads. I believed that I had to address the concerns raised to me in the interests of patient safety and the Department's obligations to provide high quality services to patients and providers.

56.     To ensure fairness and to confirm that the quality concerns were justified prior to taking further action, I opted to have an independent, blinded review of Dr. Desai's CT reads conducted.

57.     I did not choose to arrange an independent review of Dr. Desai's reads based on isolated concerns regarding a read or a request to re-review a study read by Dr. Desai. I did not make the decision to do so based on one or two misreads by Dr. Desai.

58.     I made the decision to perform an independent review based on reports of quality concerns from Dr. Dill, my awareness of errors in the peer review system, and the complaints from Dr. Robinson, in particular her comments at the January 31, 2017, meeting.

59.     I did not consider Dr. Desai's age, sex, or disability in making the decision to have the independent review performed.

60.     I requested that the Department's file room staff randomly select 25 chest CT studies reviewed by Dr. Desai and, as a control group, 25 chest CT studies reviewed by other radiologists. The studies included in the review were selected randomly, and I was not involved in selecting the studies.

61.     The CT studies selected for inclusion in the review were thoracic/chest studies, but the studies were not limited to those read by radiologists specializing in chest imaging. Eighteen out of the 25 control group studies were read by radiologists who did not specialize in chest imaging.

62.     I selected Diana Litmanovich, M.D., to conduct the independent review. Dr. Litmanovich is a thoracic radiologist at Beth Israel Deaconess Medical Center and is a faculty member of Harvard Medical School. Dr. Litmanovich is not employed by the Medical Group or affiliated with the UMass Memorial Health system. I believe Dr. Litmanovich to be an expert in the interpretation of thoracic CT images.

63.     I requested that Dr. Litmanovich review the images for each CT study and the corresponding report and provide her opinion whether she agreed or disagreed with the interpretation, and if she disagreed, to indicate whether it was a minor or major disagreement and whether or not the disagreement would have an impact on patient care in her opinion.

64.     Dr. Litmanovich provided me with her findings, and I un-blinded them through reference to their identifying numbers. Based on the findings, Dr. Litmanovich concluded that of the reads conducted by Dr. Desai, there were five major errors and nine errors she opined would impact patient care. Dr. Litmanovich concluded that of the reads conducted by other radiologists, there was one major error and five errors she opined would impact patient care.

65.     As a result of my assessment of the results of the independent review, I determined that Dr. Desai's quality was not acceptable for the Department, and I made the decision that Dr. Desai could not continue to work in the Department in order to ensure patient safety and provide high quality services to patients.

66.     On March 14, 2018, I met with Dr. Desai and informed her that her employment will be terminated on March 17, 2019.

67.     Pursuant to Dr. Desai's Employment Agreement, she was entitled to twelve months' notice prior to termination. Exhibit A, ¶ 7.2.

68.     I determined that in the time until Dr. Desai's employment ended, she would be restricted from reading CT images and would review only x-rays, due to the concerns raised regarding the quality of her CT reads from the independent review and my obligation to ensure patient safety and provide high quality services to patients.

69.     Neither I nor anyone else communicated the restriction of Dr. Desai from reading CTs throughout the Department, and this information was shared only in a discreet manner on a need-to-know basis for the purposes of scheduling and workflow for the reading of studies.

70.     On April 24, 2018, at Dr. Desai's request, I held a meeting with Dr. Desai and Vice Chair for Quality, Patient Safety and Process Improvement Steven Baccei, M.D., as well as Dr. Sarwat Hussain, a radiologist in the Department who Dr. Desai invited. At the meeting, I provided Dr. Desai with data from the independent reviewer's findings.

71.     I have made the decision to end the employment of other physicians in the Department due to performance concerns related to ability, including R.G. , M.D., separated June 23, 2017, R.N. , D.O., separated May 31, 2017, and A.R. M.D., separated December 12, 2015.

72.     An external independent review was performed of Dr. R.G. s competency prior to the decision to end his employment. In addition, I reviewed data from the quality assurance system to evaluate Dr. R.G. s performance.

73.     An internal review and investigation was conducted of Dr. R.N. 's performance prior to the decision to end his employment. Dr. R.N. was forty years of age at the time of his separation.

74.     With respect to these physicians, I advised them that due to their performance, they would no longer be able to be employed with the Medical Group, and the physicians elected to resign in lieu of termination.

75.     Stephen Tosi, M.D., was the President of UMass Memorial Medical Group, Inc., at the time of Dr. Desai's termination.

76.     Following Dr. Desai's notice of termination, she was replaced in the Department by Maria Barile, M.D., who is a female.

77.     In 2019, I hired a Division Chief for the Thoracic Division who is 59 years of age.

78.     Presently, the Medical Group employs approximately 92 radiologists. The Department includes 24 radiologists who are age 60 years or older, and three over 70 years of age. I myself am 62 years of age.

79.     During my tenure as Chair of the Department, I have hired 14 radiologists who were 60 years of age or older and two who were over 70 years of age, as well as 32 radiologists who are female.

80.     I have made the decision to end the employment of eight regularly-employed radiologists as Chair (who either were terminated or elected to resign in lieu of termination), and seven were male, and seven were younger than Dr. Desai.

81.     In 2016, the Medical Group conducted an internal review of the compensation of its radiologists as a part of an effort to standardize salaries to address pay inequities and increase compensation to align more closely with the market for all radiologists. The Medical Group also

engaged an outside resource to perform an external market study to assist in establishing a standardized compensation structure.

82.     As a result of these efforts, the Medical Group was able to provide additional funds to the Radiology Department, and a large percentage of radiologists' salaries were increased.

83.     Based on the evaluation, the Medical Group implemented a new, standardized salary structure for radiologists effective March 1, 2017. Under this pay structure, the Department set a base salary, with additional designated sums based on academic rank as well as leadership and administrative positions which carried with them additional job duties and responsibilities. A copy of my correspondence to diagnostic radiologists informing them of this new structure is attached as **Exhibit F**.

84.     As a result of the implementation of the new compensation structure, Dr. Desai received a large increase in pay, from $302,575 to $340,000 per year. Her compensation was set based on the base salary for a diagnostic radiologist of $330,000, plus an additional $10,000 due to her rank as Associate Professor. A copy of my correspondence to Dr. Desai informing her of her new salary is attached as **Exhibit G**.

85.     Dr. Desai did not hold any leadership roles or perform additional duties for the Department.

86.     As a result of the new pay structure, every single full-time female radiologist who was employed as of March 1, 2017, whose pay was not already at the standard, received a pay increase, and they were paid in accordance with the standardized pay scale.

87.     Dr. Desai was a diagnostic radiologist, and Dr. Aaron Harman is an interventional radiologist. Diagnostic radiology involves reviewing images of the body and making

interpretations, and interventional radiology is image-guided surgery. Interventional radiologists

perform invasive procedures on patients, and the radiology component relates to the use of

imaging such as fluoroscopy, CT, ultrasound, and MRI to guide their procedures. Interventional

Radiologists also have completed additional training through an ACGME accredited

Interventional Radiology fellowship and some (including Dr. Harman) have also taken an

additional board-certifying examination (Certificate of Added Qualification) in Interventional

Radiology.

88.     Interventional radiologists generally earn substantially more than diagnostic

radiologists. Thus, the Department has implemented a different pay scale for interventional

radiology than diagnostic radiology. Under this structure, Dr. Harman's salary was $365,000 per

year, which is the base salary for an interventional radiologist.

89.     Dr. Eric Schmidlin specialized in chest imaging and worked within the Chest

Division with the same duties as Dr. Desai. Dr. Schmidlin did not receive higher compensation

than Dr. Desai. His starting salary in 2012 was $300,000 per year, less than Dr. Desai's salary,

and at the time of his separation from regular employment, he earned $294,000 per year, less

than Dr. Desai's salary. Dr. Schmidlin left regular employment with the Medical Group on June

28, 2016, and he continued to work on a per diem, hourly basis. His hourly rate since has been

$162.50, and Dr. Desai's rate when calculated on an hourly basis is $163.46.

90.     Byron Chen, M.D., and Hemang Kotecha, M.D., have always earned less than Dr.

Desai; each with a salary of $330,000 per year at the time of Dr. Desai's separation. Both worked

in different divisions than Dr. Desai.

91.     Dr. Karin Dill's base salary was the same as Dr. Desai's. However, Dr. Dill

served as a Division Chief, and was paid an additional sum for those duties and responsibilities.

92.     Division Chiefs are responsible for the effective daily operational management of their division, financial stability, long term strategic planning, faculty development, and service for patients and referring clinicians. Divisions Chiefs are responsible for the business and operational functions of their divisions, and include responsibilities for clinical operations, financial sustainability, customer service, quality assurance and improvement, faculty development, recruitment and retention, research/scholarship, innovation, resident/fellow training, medical student education, and other division-specific functions.

93.     A radiologist's performance of non-clinical duties for the Department, including service in leadership, academic, and administrative positions, is separate and apart from their clinical duties and is extremely valuable to the Department.

94.     Steven Baccei, M.D., was paid a higher salary due to his leadership roles within the Department, pursuant to the salary structure. Dr. Baccei was the Division Chief for musculoskeletal radiology, and he served as the Department's Vice Chair of Quality, Safety, and Process Improvement. The duties of the Vice Chair include oversight of all quality assurance functions of the Department, specifically, maintaining the peer review database, managing department quality assurance meetings and review processes, responding to quality issues, handling risk management matters, and management of quality review projects, among other duties.

95.     Christopher Cerniglia, D.O. served in multiple leadership and administrative roles in the Department, for which he received additional compensation. Prior to 2017, he had served as a Division Chief for musculoskeletal radiology, and, thereafter, he continued to serve as 1) the Director for Medical Student Education in Radiology, in which he is responsible for organizing all of the radiology educational activities for the first and second year medical students, 2) the

Co-Course Director for the UMass Medical School DSF (Design, Structure, and Function) course, in which he runs the imaging lab within the anatomy lab, oversees imaging in connection with the course, and oversees all medical student, non-radiology interns and resident, and visiting medical student rotations in radiology, and 3) the Fellowship Director for Musculoskeletal Radiology, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education policies.

96. Sathish Dundamadappa, M.D., has served as the interim Division Chief of neuroradiology as well as the Fellowship Director for Neuroradiology and the Fellowship Director for MRI, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education, for both of these areas, as well as compliance with accreditation requirements for neuroradiology, and he has received additional compensation for these additional duties and responsibilities.

97. Dennis Coughlin, M.D., has served as the Division Chief for Emergency Radiology, for which he has been compensated an additional amount for those duties and responsibilities.

Signed under pains and penalties of perjury this 15th day of December 2021.

_Max Rosen_

Max Rosen, M.D., M.P.H.

## **<u>EXHIBIT A</u>**

AGREEMENT BETWEEN
UMASS MEMORIAL MEDICAL GROUP, INC.
AND
Charu Desai , M.D.

AGREEMENT by and between the UMass Memorial Medical Group, Inc., a non-profit corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at One Biotech Park, Worcester, Massachusetts 01605 (the "Medical Group"), a subsidiary corporation of UMass Memorial Health Care, Inc. (the "System") and   Charu Desai, M.D., a physician duly licensed to practice medicine in the Commonwealth of Massachusetts (the "Practitioner").

## RECITALS

The principal purpose of the Medical Group is to employ physicians to provide, on behalf of the System,  patient care at a level of quality and efficiency consistent with generally accepted standards and otherwise to fulfill professional and institutional obligations to patients, students of health care, health care professionals, and the community; and,

The successful fulfillment of the principal purpose of the Medical Group is dependent on the rendering of professional medical and administrative services in conjunction with the clinical operations of  the System by qualified practitioners; and,

The Practitioner is trained and qualified and desires to provide professional medical, educational and administrative services to the Medical Group; and,

The Medical Group desires to engage the Practitioner to provide professional medical, educational and administrative services;

Therefore, in consideration of the mutual covenants and conditions set forth below, the Medical Group and the Practitioner do hereby agree as follows:

1.    RESPONSIBILITIES OF PRACTITIONER

1.1.    Professional Qualifications

(a)   The Practitioner must at all times during the term of this Agreement: (i) possess a valid and unlimited license to practice medicine pursuant to Chapter 112, Section 2 of the General Laws of the Commonwealth of Massachusetts; and, (ii) be appointed to and maintain continuous status as a member in good standing of the UMass Memorial Medical Center (the "Medical Center") Active Medical Staff or the Medical Staff of the appropriate Member Hospital with appropriate clinical privileges in the Department of Radiology (the "Department")  (iii) for

Charu Desai, MD

Exhibit_11

9/18/2020

those physicians who are on staff at the Medical Center, receive, and maintain, a faculty appointment at the University of Massachusetts Medical School (the "Medical School"); (iv) possess a valid federal narcotics number and state controlled substances number (unless such number is not required by the Practitioner's specialty);   (v) be, and remain, a participating provider in the Medicare and Medicaid programs and not be barred, excluded or otherwise ineligible to participate in these or other Federal programs; and (vi) be or, at the Medical Group's request, agree to be, and remain, a participating physician in any health insurance plan or managed care program accepted by the System, including the System's contractual relationships with preferred provider organizations and health maintenance organizations, and to execute any documents requested by the Medical Group in connection with participating in a provider contract in which the Medical Group or the System agrees to participate.  If at any time during the term of this Agreement the Practitioner fails to meet one or more of the qualifications set forth herein, such failure shall constitute a breach in accordance with Section 7.4 of this Agreement.

(b)  The Medical Group and the Practitioner further acknowledge and agree that this Agreement is not, and shall not be construed as, any form of guarantee or assurance by the System that the Practitioner will receive and maintain the necessary appointment to the Active Medical Staff or the grant of appropriate clinical privileges for the purposes of discharging the Practitioner's responsibilities hereunder; application, appointment, reappointment, and the grant of clinical privileges shall be governed solely by the Bylaws of the Medical Staff of the Medical Center then in effect.   Further, appointment to the faculty of the Medical School shall be governed solely by the applicable policies and procedures of the Medical School.

1.2.    Services.  The Practitioner shall be responsible for providing professional medical and administrative services as set forth in Appendix A, attached and incorporated as part of this Agreement.

1.3    Provider Agreements.  The Practitioner hereby authorizes the Medical Group to execute provider agreements, acknowledgments and consent forms that obligate or confirm the Practitioner's obligation to participate in provider agreements executed by or on behalf of the Medical Group and to abide by and conform to all applicable requirements under such provider agreements.

1.4.    Schedule of Fees.  The Medical Group will establish a current schedule of fees, as may be amended from time to time, to be charged by the Medical Group for direct patient care services provided by the Practitioner under this agreement.

1.5.    Standards of Practice.   The Practitioner shall at all times provide services in a competent and professional manner, consistent with quality assurance standards of the Medical Center's Active Medical Staff and in compliance with all applicable statutes, regulations, rules and directives of federal, state and other governmental and regulatory bodies having jurisdiction over the Medical Center; the Bylaws, Rules and Regulations, policies and procedures of the

2

CD 00052

System, the Medical Center and the Medical Staff; applicable standards of the Joint Commission on Accreditation of Health Care Organizations and currently accepted and approved methods and practices applicable to the provision of medical services.

1.6. **Compliance and Quality Assurance.** The Practitioner shall abide by the Code of Ethics and Business Conduct of the System. The Practitioner shall participate in the programs of the System and the Medical Center regarding compliance, quality assurance, utilization review, risk management, and peer review, in accordance with the rules, policies and bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, the Patient Care Assessment regulations of the Board of Registration in Medicine, and upon request of the Department Chair. The Quality Assurance committee of the Medical Staff of the Medical Center will be responsible for reviews and audits of and concerning quality assurance in the Department.

1.7. **Committee Responsibilities.** The Practitioner shall serve on committees of the Medical Center's Medical Staff and committees established pursuant to the Bylaws of the System, upon reasonable request of the Chairman of the Board of Trustees, the President/Chief Executive Officer, the Chief Operating Officer, the Chief Medical Officer, the President of the Medical Group (the "President") or the Department Chair.

1.8. **Medical Records and Reports.** (a) The Practitioner shall prepare or cause to be prepared in a timely manner any and all appropriate notes and information in the medical records of and reports pertaining to each patient for whom the Practitioner has rendered services pursuant to this Agreement. The Practitioner shall cause these records and reports to be completed and submitted within such period of time after the rendering of such services as may be required by the Bylaws of the Medical Staff of the Medical Center, upon request of the President or Department Chair, or by applicable law or regulation. The parties understand and agree that the System has the rights of ownership and control of all of the patients' medical records and reports generated pursuant to this Agreement. It is further agreed that all practitioners at the System have the right to consult such records and reports in order to facilitate the continuity of proper patient care.

(b) **Time Allocation Reports:** The Practitioner agrees to cooperate with the Department Chair to maintain adequate and proper time records in accordance with the Medical Group's policies. This may include submitting a written allocation of time reports specifying the respective amounts of time the Practitioner has devoted to clinical, administrative, teaching and research activities. The Practitioner agrees to make available to the Medical Group all time records and data recorded by the Practitioner upon the request of the Medical Group.

1.9. **Academic Service.** The Practitioner shall aid in the clinical teaching program of the Medical Center as an attending physician on in-patient services and in ambulatory settings. The Practitioner shall also aid in the didactic teaching programs of the Medical Center upon the request of the Department Chair. The Practitioner shall also participate for reasonable periods of time as an instructor in education programs conducted or offered by the Medical Center,

3

CD 00053

including grand rounds, and shall perform such other teaching functions within the Medical Center as are reasonable and necessary to assure the Medical Center's compliance with the requirements of all applicable accrediting bodies, upon the request of the Department Chair. The Practitioner, as a member of the Medical School faculty, is expected to provide a reasonable amount of academic service (on the order of approximately two hundred (200) hours per year) under the supervision of the Chancellor at the direction of the Chair or his designee.

1.10.   Non-Physician Personnel.   The Practitioner shall, upon the request of the President or Chair, or at such other times as are appropriate, make recommendations concerning the qualifications, hiring, firing, and disciplining of such non-physician personnel as the System or the Medical Group may employ, engage or otherwise provide in support of the Practitioner's practice.   The Practitioner shall make any such recommendations in furtherance of and in accordance with the needs and best interests of the Medical Group and the proper conduct of its functions.   The Practitioner agrees that any supervision of nurse practitioners and physician assistants shall be conducted in accordance with the governing regulations of the Board of Registration in Medicine.

1.11.   Protocols and Procedures.   The Practitioner agrees to work cooperatively with all of the System's clinical departments, Medical Staff, the Medical Group, administration, the President and the Department Chair to assure that services are available on a timely, coordinated, efficient, and professional basis.   The Practitioner also agrees to comply with all of the Medical Center's clinical policies and procedures and all applicable Human Resources policies.

1.12.   Confidentiality of Information.   The Practitioner agrees to uphold and maintain the confidentiality of patient and other information for which the Practitioner has an ethical, professional, or legal obligation not to disclose.   The Practitioner further agrees to uphold and maintain the confidentiality of proprietary or other confidential information relating to the Medical Group or the System of which the Practitioner may become aware while employed hereunder. This provision shall survive the termination of this Agreement.

1.13.   Continuing Education.   The Practitioner shall comply with and satisfy any and all of the professional obligations and requirements regarding continuing education and any other related areas of medical practice required for the maintenance of a license to practice **medicine** in Massachusetts or appropriate to the rendering of competent professional services pursuant to this Agreement as determined by the Department Chair.

1.14.   Dual-Employment with Medical School.   The parties acknowledge that a certain percentage of the Practitioner's time and salary may be allocated to, and governed by, a so-called "Dual-Employment" arrangement with the Medical School (the "Dual-Employment Arrangement").   The Practitioner acknowledges that the terms and conditions of employment with the Medical Group are governed by this Agreement and the policies and practices of the Medical Group. The Practitioner further acknowledges that if this Agreement is terminated for any reason, the related employment relationship with the Medical School shall also terminate

4

CD 00054

unless the Practitioner has a new or continuing agreement with the Medical School or is a tenured faculty member.

2.     RESPONSIBILITIES OF THE SYSTEM

      2.1.     Space, Equipment, Services, and Supplies.

          (a) The Medical Group, through agreement with the System, shall be committed to making available reasonable and necessary space, equipment and supplies for the delivery of the agreed services hereunder by the Practitioner, shall provide customary services and maintenance to maintain such equipment in good order and repair, shall furnish services to the Practitioner including, but not limited to, utilities, telephone, housekeeping and record keeping services; and shall provide all necessary supplies needed for the proper provision of services by the Practitioner pursuant to this Agreement.

          (b) The Practitioner agrees to use such space, equipment, services and supplies for purposes of the System and in furtherance of the obligations governed by this Agreement.

      2.2.     Non-Physician Personnel. The System or the Medical Group shall employ, engage or otherwise make available to the Practitioner all non-physician personnel determined by the Medical Group to be reasonably needed for the proper delivery of services pursuant to this Agreement. The System or the Medical Group shall exercise ultimate control and management of non-physician personnel.

      2.3     Professional Liability Insurance. The Medical Group, at its expense, shall arrange for professional liability insurance coverage for the Practitioner with regard to professional medical services rendered by the Practitioner for Medical Group-related activities billed through the Medical Group during the term of this Agreement. The Practitioner shall be covered by such insurance to the same extent as other similarly-situated practitioners within the Medical Group. Coverage limits shall be set in the discretion of the Medical Group and/or the UMass Memorial Self-Insurance Program from time to time and shall be made known to the Medical Group Practitioners on a regular basis.

3.     REIMBURSEMENT REQUIREMENTS

      3.1.     The Practitioner shall comply with all laws, regulations and System requirements, policies and procedures regarding record keeping relating to third-party reimbursement for services provided pursuant to this Agreement as may be in effect from time to time. In the event that there are subsequent changes or clarifications of statutes, regulations or rules relating to record-keeping which the Medical Group determines must be complied with to insure proper reimbursement from third parties for services provided pursuant to this Agreement, the Medical Group shall, after reasonable notice and opportunity to comply, notify the Practitioner of any actions it reasonably deems are necessary to comply with such changes and the Practitioner shall

CD 00055

promptly take such actions.

4.    COMPENSATION

4.1.    **Compensation of Practitioner.**   The Medical Group shall compensate the Practitioner for the services which the Practitioner renders in accordance with the terms of this Agreement.   The agreed compensation is set forth in detail in Appendix B, attached   and incorporated as part of this Agreement.

5.    BILLING AND PAYMENT

5.1.    **Billing.**   Except as otherwise may be expressly stated in this Agreement or other published, written policy or procedure of the Medical Group, all fees, payments and other income attributable to the Practitioner's clinical services during the term of this Agreement shall belong to the Medical Group, whether paid to the Practitioner, to the Medical Group or its designee or to a third party.  The Medical Group shall have the sole right to bill for and to receive, hold and disburse such fees and income and the Practitioner agrees to abide by the billing policies and procedures of the Medical Group.  The Practitioner hereby assigns to the Medical Group all of the Practitioner's rights in all fees, payments, bonuses or distributions or other income or monies due from all sources relating directly or indirectly to clinical  services rendered by the Practitioner pursuant to this Agreement.  The Practitioner shall cooperate fully with the Medical Group in facilitating collection of such monies, including prompt endorsement and delivery to the Medical Group of all checks received from patients or third-party payors on behalf of the Practitioner and completion of all forms necessary for such collections.  To the extent applicable, the Practitioner agrees to work with the Medical Group to collect all patient co-payments for services rendered and promptly to forward such funds to the Medical Group.  Upon termination of this Agreement for any reason whatsoever, all such monies then outstanding shall be deemed to be the sole and exclusive property of the Medical Group and not subject to any claim by the Practitioner.  The Practitioner's obligation under this provision shall survive termination of this Agreement.

6.    TERM

This Agreement shall be effective from your original hire date of January 5, 1992 and shall remain in effect unless otherwise terminated by the parties as provided in Section 7 of this Agreement.  As of the effective date of this Agreement, this Agreement shall supercede and revoke any existing prior employment agreement with the Medical Group or any of its predecessor entities.

7.    TERMINATION

7.1. **Mutual Agreement.** This Agreement may be terminated by mutual agreement of the parties, in a writing signed by the parties, at any time from the date of execution hereof.

6

CD 00056

7.2   <u>Notice of Party</u>. This Agreement  may be terminated by the Medical Group at any [..] the giving of written notice to the Practitioner (as set forth in Section 14.1 below), in accordance with the following notice schedule:

| Number of Years Practitioner Employed | Requisite Notice Period |
|---|---|
| 0-2 | 4 months |
| >2 – 10 | 6 months |
| >10- 15 | 8 months |
| >15 – 20 | 10 months |
| >20 | 12 months |

This Agreement may be terminated by the Practitioner at any time upon the giving of as much notice as is practicable to the Medical Group, and in any event a minimum of  one hundred twenty (120) days' written notice.

Where either the Medical Group or the Practitioner is terminating the employment relationship, the Notice Period is characterized as "working notice." In the interests of patient care, the Medical Group expects the Practitioner to continue to fulfill the responsibilities of the position and to maintain productivity levels for the full notice period. Vacation time may be taken during the Notice Period only with the consent of the Department Chair and the President of the Medical Group. The Practitioner will be compensated for unused pro-rated vacation time not taken at the time of termination. The Medical Group does not permit "terminal vacations," i.e., the use of vacation time to complete the final portion of the Notice Period.

7.3      <u>For Cause</u>. The Medical Group may terminate this Agreement effective immediately for cause at any time upon written notice to the Practitioner setting forth in reasonable detail the nature of such cause. "Cause" shall be defined as any material breach by the Practitioner of this Agreement, including but not limited to the following:

i.      Practitioner's fraud or dishonesty with respect to the Medical Group or those associated with it, acts or conduct materially detrimental to patient care or to the reputation or operations of the Medical Group,  or otherwise in connection with the Practitioner's  services under this Agreement;

ii.      Practitioner's conviction of, a plea of nolo contendere or admission of sufficient facts to a crime involving moral turpitude, or an offense relating to health care or adversely affecting the Practitioner's ability to perform services under this Agreement; or

iii.      Practitioner's   material negligence or misconduct (other than by reason of disability or approved leave) in the performance of duties assigned by the Chair under this

7

Agreement,

iv.     Failure of the Practitioner to follow UMass Memorial policies and procedures and other rules of conduct made known to the Practitioner and applicable to all physicians of UMass Memorial and/or the Medical Group, including without limitation, policies prohibiting unlawful discrimination, and the Practitioner has exhausted the grievance procedure available to Medical Group physicians and, if applicable, all due process procedures available under the Medical Staff Bylaws of the Medical Center.

7.4.   Automatic.  This Agreement shall terminate automatically upon the breach of Section 1.1. by the Practitioner, except that the Medical Group, in its sole discretion, may, but is not obligated to, suspend this Agreement for a specified reasonable period to enable the Practitioner to cure the breach.  If the Practitioner fails to cure the breach within the specified period, this Agreement will terminate immediately upon written notice to the Practitioner by the Medical Group.  Further, the Medical Group reserves the right to terminate this Agreement in the event the Practitioner's medical staff membership or clinical privileges are suspended or in any way restricted.

7.5  Suspension.  The Medical Group may suspend the Practitioner for cause, without compensation.  Such cause may include, but shall not be limited to, any suspension, restriction or revocation of the Practitioner's Medical Staff membership or clinical privileges at the Medical Center or any suspension, restriction or revocation of the Practitioner's license to practice medicine in any jurisdiction.

8.     EFFECT OF TERMINATION

8.1.   Effect of Termination on this Agreement.  The termination of this Agreement in accordance with Section 7, hereunder, shall terminate any and all rights and obligations of the Medical Group and the Practitioner pursuant to this Agreement.   The effective date of termination of this Agreement shall be as set forth in the above-mentioned section(s); provided, however, that upon the termination of this Agreement, the parties shall be and remain obligated and responsible for: (i) any and all obligations accruing prior to the date of termination; and, (ii) any and all obligations, promises, or covenants contained herein which are expressly made to extend beyond the term of this Agreement; and, (iii) the Practitioner shall use reasonable and diligent efforts to assist the System and the Medical Group in arranging for appropriate alternative medical coverage for patients under the care of the Practitioner. Prior to the termination of this Agreement, the Practitioner shall prepare a notice to patients in a form approved by the Medical Group and the Department Chair. Practitioner shall finalize all outstanding billing documentation and complete all patient records prior to his or her departure. Immediately upon the termination of this Agreement, the Practitioner shall deliver to the System sole custody, and total, exclusive and complete use of the System's space, equipment and supplies and shall remove any and all personal possessions from the property of the System. The System shall give the Practitioner reasonable time to effect these conditions.  In the event of

CD 00058

termination of this Agreement, payment by the Medical Group of any base salary due the Practitioner under Section 4.1 and Appendix B to the date of termination and of any pay in lieu of notice due Practitioner under Section 7.2 shall constitute the entire obligation of the Medical Group to the Practitioner. The Practitioner recognizes that no compensation is earned after termination of this Agreement.

9.     GOVERNING RULES, REGULATIONS AND BYLAWS

9.1   Governing Rules, Regulations and Bylaws.   Notwithstanding anything in this Agreement to the contrary, it is hereby expressly understood and agreed by and between the Medical Group and the Practitioner that any and all rights, responsibilities, and obligations of the parties shall at all times during the term of this Agreement be subject to the Bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, all applicable rules and regulations of the System, or its successor, as now exist or as hereinafter may be amended or promulgated by the Board of Trustees of the Medical Group, the Medical Staff of the Medical Center and the President/Chief Executive Officer of the System, or any duly authorized designee thereof.

10.    ASSIGNMENT AND DELEGATION

10.1.   Assignment and Delegation.   No assignment of this Agreement or the rights hereunder, or delegation of this Agreement or the obligations hereunder shall be valid without the specific written consent of both parties;  provided, however, that this Agreement may be assigned by the Medical Group as a result of reorganization or merger, or to any successor entity providing the services now provided by the System or the Medical Group.

11.    ENTIRE AGREEMENT

11.1.   Entire Agreement.   This Agreement contains the entire agreement between the parties and no statement, promises, inducements, or writings made by any party or agent of any party which is not contained in this written Agreement shall be valid or binding; and this Agreement may not be enlarged, modified, or altered except in a subsequent writing signed by the parties and attached hereto. This Agreement supersedes any and all prior agreements for professional services between the Practitioner and the Medical Group, the System or any other affiliate of the System.

12.    AMENDMENTS

12.1.   Amendments.   This Agreement may be amended only by an instrument in writing signed by the Medical Group and the Practitioner. Such writing must make specific reference to the terms and conditions of this Agreement which it amends, and will become effective as of the date stipulated therein.

9

CD 00059

13.   GOVERNING LAW

13.1. Massachusetts Law. This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed in the Commonwealth of Massachusetts.

14.   NOTICE

14.1. Notice. Notices or communications required or permitted to be given pursuant to this Agreement shall be given in writing to the respective parties by hand, by certified mail or by overnight delivery service (e.g., Federal Express, UPS) (such notice being deemed given as of the date of mailing) and addressed to the Practitioner at the Practitioner's last known address kept within the records of the Medical Group, or in the case of the Medical Group, One Biotech Park, Worcester, Massachusetts, attention of the President, UMass Memorial Medical Group.

15.   EXECUTION

15.1. Execution. This Agreement and any and all amendments hereto shall be executed in duplicate copies on behalf of each party by the Practitioner and an official specifically authorized by the Medical Group Board with respect to such execution. Each duplicate copy shall be deemed an original, but both duplicate originals shall together constitute one and the same instrument.

16.   SECTION HEADINGS

Section Headings. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

17.   WAIVER.

Waiver.   A waiver of the breach of any term or condition of this Agreement by either party shall not constitute a waiver of any subsequent breach or breaches of the same term or condition, or any other term or condition hereunder.

18.   SEVERABILITY.

Severability. If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect by a court of competent jurisdiction, then the remainder of this Agreement, and the application of such provision in circumstances other than those as to which it is so declared invalid or unenforceable, shall not be affected thereby, and each such provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

10

CD 00060

IN WITNESS WHEREOF, the Medical Group and the Practitioner have caused this Agreement to be signed and sealed as of this_____ day of _____, 20____.

Dated:          By: _____

Charu Desai , M.D.

UMASS MEMORIAL MEDICAL GROUP, INC.

Dated 2/2/     By: _____

Michele Streeter, Executive Director

By: _____

Joseph T. Ferrucci, M.D., Chair
Department of Radiology

11

CD 00061

## APPENDIX A

The Practitioner shall be responsible for providing professional medical services to patients of the System in need of such services and to enrollees of health plans as to which the Medical Group and Practitioner are participating providers. The services to be rendered hereunder include, but are not limited to outpatient work, inpatient consultative work and direct patient care. The Practitioner's performance hereunder shall be evaluated by the President of the Medical Group and the Department Chair in accordance with the Bylaws of the Medical Staff of the Medical Center. The Practitioner agrees that the practice of medicine shall be limited to the services to be provided pursuant to this Agreement or for the Medical School under its agreement unless Practitioner obtains the prior written approval of the Chair under Medical Group policy to do otherwise.

The Medical Group and the Department Chair shall determine the specific professional medical duties to be performed by the Practitioner, as well as the time and manner of performance, in accordance with and subject to the terms of this Agreement; provided, however, the Medical Group and Department Chair shall not impose requirements which would interfere with the Practitioner's professional judgment in connection with the treatment of patients or cause the Practitioner to violate applicable ethical codes or any law or regulation.

The Practitioner shall at all times provide services to all persons who may become patients of the Medical Group in accordance with the Medical Group's policies and without regard to race, color, creed, sex or ability to pay for services; and

The Practitioner shall participate in Medicare, Medicaid and managed care programs and other third party payor arrangements or governmental programs in which the Medical Group participates and the Practitioner shall abide by and act in accordance with the terms and conditions of all managed care agreements, network, affiliation agreements, provider agreements and other contracts to which the Medical Group or Practitioner (with the Medical Group's consent) is or becomes a party.

CD 00062

## APPENDIX B

1. The Practitioner's compensation for services rendered pursuant to this Agreement, and under a Dual-Employment Arrangement with the Medical School, if applicable, shall be a total base salary, which if annualized would be at the rate of Three-hundred Twenty-Five Thousand Dollars ($325,000) per year, less all legally required and voluntarily-authorized deductions, payable in accordance with Medical Group payroll practices. (Practitioners who participate in the Dual-Employment Arrangement with the Medical School may receive paychecks from both the Medical Group and the Medical School, which together shall equal the base salary referenced above.)

The Practitioner shall also participate in the Physician Incentive Compensation Program of the Department as established by the Medical Group (the "Incentive Compensation Program"), subject to its terms and conditions of participation as in effect or amended from time to time. The Incentive Compensation Program includes eligibility for bonuses and/or salary increases based upon productivity. The Practitioner acknowledges that participation in the Incentive Compensation Program may also involve imposing salary withholds if performance does not meet Medical Group requirements. The Practitioner further acknowledges that, following the first twelve months' of the Practitioner's employment, under the terms of the Incentive Compensation Program, the Medical Group may decrease the Practitioner's base salary if the applicable productivity targets are not met. Salary adjustments will be made upon thirty (30) days written notice to the Practitioner. Salary reductions, if any, shall be consistent with the Department's compensation plan and shall in no event exceed twenty percent of the Practitioner's base salary in any twelve month period.

Subject to the Practitioner's payment of any contribution required of physician employees generally, the Practitioner will be eligible to participate during the term of this Agreement in any and all employee benefit plans made generally available to other physician employees of the Medical Group as in effect from time to time. Such participation by the Practitioner shall be subject to (i) the terms of the applicable plan documents, (ii) generally applicable policies of the Medical Group, and (iii) the discretion of the Board of Trustees of the Medical Group or any administrative or other committee provided for in or contemplated by such plan or policy of the System. A description of the benefits program currently in effect (and subject to change by the Group Board and UMass Memorial Compensation Committee) is attached hereto as Appendix C, "Physician Benefits at a Glance."

13

CD 00063

**<u>EXHIBIT B</u>**

Updated June 8, 2017

## ACADEMIC AND ADMINISTRATIVE TIME POLICY

I.   **Academic Time**

1.   Academic time is defined as time allocated to academic responsibilities including teaching/conference preparation, writing papers/texts, completing research project, attending institutional and department committees, attending a conference, serving on committees of local, regional, national or international organizations other than UMMMS or UMMMC.

2.   Academic activities will be reviewed annually during individual annual academic planning sessions

3.   In order to be eligible for academic time a radiologist must be 0.6 FTE or greater. As a new hire, academic time will be granted for up to 2 years based on mutually agreed upon planned activity. For faculty with 2 or more years of service, allocation will be based on prior activity and mutually agreed upon future activity.

4.   The baseline for academic time is 12 days/year (1 day/month). This number is prorated for FTE.

II.   **Administrative Time**

Administrative time is defined as time allocated to specific administrative roles as defined in job descriptions. The number of days is determined as follows:

| Administrative Role | Days Per Year |
|---|---|
| Residency Program Director | 49 (includes 4 days AUR) |
| Quality and Patient Safety Director | 67.5 |
| Assist Residency Program Director | 12 (includes 4 days AUR) |
| Radiology Undergraduate Medical Education | 99 days (includes 4 days AUR, 5 days AAMC or GEA/NEGEA, 36 days DSF course) |
| Fellowship Director ACGME | 12 |
| Fellowship Director  Non-ACGME | 4 |
| Division Chief | 12 |
| Other – Admin/Academic Functions defined by Chair | 6 to 46 Days per year at Chair Discretion |

**During academic/administrative time, faculty must be reachable by pager and available to cover clinical service if need arises (unless away at a conference).**

Charu Desai, MD
Exhibit_12
9/18/2020

**Academic time can be used to attend a conference, however, prior approval must be obtained from the Chair.**

III.     **Scheduling of Academic/Administrative time**

1.  Academic/ administrative time off will be assigned by the Physician Staffing Coordinator under the direction of the Division Chief and/or Chair. Faculty requests will be considered and honored when feasible.

2.  Requests to attend meetings/conferences using accumulated academic/administrative time must be requested within the context of vacation planning, subject to vacation request deadlines and approved by the Division Chief.

3.  Clinical Schedule will take precedence over academic and/or administrative time.

4.  Academic/Administrative time may be scheduled in half day increments.

5.  Academic/Administrative time will not be routinely scheduled on Friday unless preapproved by Division Chief.

6.  Academic/Administrative time cannot be used to extend a leave (vacation) and will not be scheduled immediately before or after a leave.

7.  Academic/Administrative time will be reduced on a prorated basis if an authorized leave of absence is taken during the Fiscal Year. For example if a leave is 3 of 12 months, academic/administrative time is reduced by 25%.

8.  Academic/Administrative time should be taken within the quarter and cannot be carried over to the next Fiscal Year.

9.  Academic/Administrative time will be removed once a resignation notice is communicated.

**<u>EXHIBIT C</u>**

**Revised October 2015**

## CALL AND/OR WEEKEND/HOLIDAY COVERAGE POLICY

## PRINCIPLES

1.  Call and/or Weekend/ Holiday Coverage is Division based.

2.  The frequency of call and/or Weekend/Holiday duties will be maintained at approximately 1/5 or roughly 10 to 11 weeks or weekends per year.  Minor adjustments may be necessary from time to time for Divisions temporarily under or overstaffed at the discretion of the Chair's Office.

3.  WRVU's earned during call or weekend/holiday obligation will count for yearend productivity calculation.

4.  Call and weekend/holiday schedule will be made by the Division Chief in concert with the Physician Staffing Coordinator.  When possible call/weekend/holiday schedule will be done one year in advance at the beginning of each FiscalYear and follow Departmental guidelines.

5.  Senior attending  are exempt from call and weekend/holiday coverage but will maintain incentive bonus eligibility if they meet  2 of the following 3 criteria:

    - Age 72 years.
    - Academic rank of full Professor
    - 20 years of continuous service to the Department.

1

UMM-04922

## WEEKEND AND HOLIDAY COVERAGE – 1/5

ABDOMINAL IMAGING DIVISION – ON SITE MEMORIAL CAMPUS
   8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
Memorial House Doctor - Contrast Coverage, emergent US and Fluoro
Responsible for any NVIR procedures at Memorial Campus.
On Site Chest person will be back-up House Doctor.

   Reading Assignments
   Adult non ED Abdominal Imaging – All locations
      Priority
      a.   Stats
      b.   Inpatient
      c.   Outpatient
      (Each category Prioritized by Date and Time (not Campus))

MSK DIVISION – ON SITE SHREWSBURY STREET
   8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
   Contrast Monitoring – Shrewsbury Street MR

   Reading Assignments
   Adult non ED MSK imaging all locations
      Priority
      a.   Stats
      b.   Inpatient
      c.   Outpatient
      (Each category Prioritized by Date and Time (not location)

CHEST DIVISION – ON SITE – MEMORIAL CAMPUS
   8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
   Reading Assignments
   Adult non ED CHEST imaging all locations
      Priority
      a.   Stats
      b.   Inpatient
      c.   Outpatient
      (Each category Prioritized by Date and Time (not location)

UMM-04923

**SATURDAY COVERAGE (12/YEAR)**

BREAST DIVISION – ON SITE- MEMORIAL CAMPUS
8 HOUR SHIFT- with FELLOW

ASSIGNMENT RESPONSIBILITIES: Screening

**CALL 7 DAYS -  FRIDAY 5 PM TO FRIDAY 8 AM INCLUDING ON-SITE SAT/SUN/HOLIDAY – 1/5**

PEDIATRIC DIVISION – ON SITE – UNIVERSITY CAMPUS
8A-5P – SATURDAY/SUNDAY/HOLIDAY
BEEPER AFTER 5, 7 days (FRIDAY TO FRIDAY)

Reading Assignments (Saturday/Sunday/Holiday)
All Pediatric Imaging –all locations
Priority
a. ED-Pedi (Read out resident)
b. Stats
d. Inpatient
e. Carewell Urgent Care: read all prior day's cases, be available for STAT calls
f. Outpatient
(Each category Prioritized by Date and Time (not location))

NEURORADIOLOGY DIVISION – ON SITE – UNIVERSITY CAMPUS
8A-5P – SATURDAY/SUNDAY/HOLIDAY
BEEPER AFTER 5,  7 days (FRIDAY TO FRIDAY)

Reading Assignments (Saturday/Sunday/Holiday)
All Neuroradiology Imaging –all locations
Priority
Read out resident
a. ED-Neuro
b. Stats
c. Inpatient
d. Outpatient
(Each category Prioritized by Date and Time (not location)

**CALL (7 DAYS) ONLY**

VASCULAR DIVISION –ON CALL FOR VIR AND ABDOMINAL* PROCEDURES
CALL 7 days (FRIDAY 5P THRU FRIDAY 8A)
*All Abdominal Procedures EXCEPT Memorial Campus Saturday/ Sunday/ Holiday 8A-5)

NEURO INTERVENTIONAL DIVISION –ON CALL FOR PROCEDURES
CALL 7 days (FRIDAY 5P THRU FRIDAY 8A)

3

UMM-04924

**ED Division- ON SITE- University Campus 24/7**

**Mon-Fri Shifts**

7am-4pm
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro and Pediatrics)
Carewell urgent care cases from prior day, available for STAT calls

4pm-10pm
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro)
Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.
Available for calls from Carewell until 8pm
      Priority
      a.  ED
      b.  STATs- All non-neuro including non-ED
           i.  Inpatient
           ii.  Outpatient
*Pediatric cases will be entered as Preliminary by ED resident*

10pm-7am
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital
Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.
      Priority
      a.  ED
      b.  STATs- All non-ED STATs including Neuro
           i.  Inpatient
           ii.  Outpatient
           iii.  Other backlog in non-STAT, non-ED cases
*Pediatric cases will be entered as Preliminary by ED resident*
*Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only*

**Sat/Sun/Holiday**

7am-4pm
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro and Pediatrics)
Carewell urgent care cases from prior day, available for STAT calls

4pm-10pm
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital
Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.
Available for calls from Carewell until 8pm
      Priority
      a)  ED
      b)  STATs- All non-ED STATs including Neuro
           i.  Inpatient
           i.  Outpatient
           ii.  Other backlog in non-STAT, non-ED cases
*Pediatric cases will be entered as Preliminaryby ED resident*
*Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only*

4

UMM-04925

10pm-7am All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital

Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.

 Priority

a) ED

b) STATs- All non-ED STATs including Neuro

 i. Inpatient

 ii. Outpatient

 iii. Other backlog in non-STAT, non-ED cases

*Pediatric cases will be entered as Preliminaryby ED resident*

*Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only*

5

UMM-04926

**<u>EXHIBIT D</u>**

CD 000049

Charu Desai, MD
Exhibit_34
10/22/2020

## Peer Review:          Desai, Charu                                    7/1/2016 - 6/30/2017

4b. Likely to be significant

Desai, Charu

Review Count

| Modality | Comment | Drop-Down Selection | Reviewee | Accession | Study Description | Study Date Time |
|---|---|---|---|---|---|---|
| CR | Called to review cor. Cardiomegaly. Regular subsegmental atelectasis. KDill | 4b. Likely to be significant | Desai, Charu | | | 3/7/2017 12:01 PM |
| CT | RUL nodule adjacent to cyst highly suspicious for lung ca | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 4/24/2017 4:18 PM |
| CT | Asked to review case. Growing tracheal nodule since CT 2013. This was not accurately identified (question of comparison) reported as, "Question mucus along the anterior wall of upper trachea, Image 22 series 4." K DillMD | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Contrast | 3/17/2016 11:38 AM |
| CR | Asked to review. approx 6.5 cm ascending aortic aneurysm not diagnosed/ mentioned on cor. KDill | 4b. Likely to be significant | Desai, Charu | | Chest:PA,AP, Apcial or Lateral | 4/28/2016 5:48 AM |
| CT | asked to re-review case. PET demonstrates nodule is FDG avid. Report stated, "Approximately 5 mm ill-defined nodular density anteriorly in the left upper lobe. Question etiology. Question small focal area of infiltrate less likely nodule." KDill MD | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 2/24/2016 1:31 PM |
| CT | asked to over read. CT dictated as nodular density, likely not nodule –no call made or electronic recording of notification for f/u. subsequent pre op CT reveals enlargement and new nodule, no physician was aware of nodule. | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 2/24/2016 1:31 PM |

**<u>EXHIBIT E</u>**

## Rosen, Max

| | |
|---|---|
| **From:** | Rosen, Max |
| **Sent:** | Wednesday, February 08, 2017 1:02 PM |
| **To:** | Brennan, Darren; Tennyson, Joseph; Robinson, Kimberly (Pulmonary); Roach, Steve; Brown, Douglas |
| **Cc:** | Rosen, Max |
| **Subject:** | Meeting – Review of Radiology issues at Marlborough: |
| | |
| **Categories:** | Desai_Confidential |

Please let me know if anyone has any edits, etc.

Thanks for meeting with me and Darren.
Max

Meeting – Review of Radiology issues at Marlborough:

Drs. Rosen, Brennan, Tennyson, Robinson, Mr. Roach & Brown Jan 31, 2017

1. Actions taken to address concerns about turn around time and accessibility of Radiologists:
   o Changed staffing model:  All studies read on site (at Marlborough) expect Neuro, Peds, ED, Nucs
   o Radiology has created Community Radiology Division to be more responsive to community needs
   o New Community Neuroradiology rotation:  M-F 8 am to 10 pm, one single phone number for point of contact
   o Extended hours for Community Radiology until 8 pm, M-F
   o Trainees will not be reading Marlborough studies
   o Will work with new version of PowerScribe to see if time-stamp for addenda can be designed to not "add" to TAT   BRENNAN [ ]
   o Dr. Brennan will report monthly Radiology TAT to Med-Exec
2. Chest:
   o Dr. Schmidlin now has home workstation
   o Drs. Schmidlin and Dill will read all high resolution chest CTs
   o Will create template to standardize all chest CT reads          DILL [ ]
   o Template for CXR has been implemented, feedback has been positive
   o Quality issues:  Dr. Rosen will perform focused peer-review for physician where issues have been raised.   ROSEN [ ]
3. Stroke:  Will work on streamlining  stroke activation  & review current performance          BRENNAN [ ]
4. Identification of inpatient exams needing to be read at night/weekends:
   o Dr. Brennan will work with Paul Riggieri to have techs manually mark all inpatient CTs "stat" when performed nights/weekends.   BRENNAN [ ]
5. QA:
   o Dr. Rosen has reviewed, and provided feedback for Dr. Robinson for neuro case that was questioned.
   o Radiology will provide access to the person from Marlborough who maintains the QA reporting system (? STARS) so that any Radiology cases can be entered in the Radiology (Pe   BRENNAN [ ]
   o

Max P. Rosen, M.D.

Exhibit_27

5/7/2021

**CONFIDENTIAL**                                                                 **UMM-00707**

Max P. Rosen, MD MPH
Professor and Chair
U Mass Memorial Medical Center
U Mass School of Medicine
55 Lake Ave. North - Room S2-824
Worcester, MA 01655
508-856-3252
508-856-4910 fax

max.rosen@umassmemorial.org
Follow me on LinkedIn or Twitter
**www.umassmed.edu/radiology**

*Confidentiality Notice:*
*This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain*
*confidential, proprietary and privileged information. Any unauthorized review, use, disclosure or distribution is*
*prohibited. If you are not the intended recipient, please contact the sender immediately and destroy or*
*permanently delete all copies of the original message.*

**CONFIDENTIAL**                    **UMM-00708**

# **EXHIBIT F**

  **University of Massachusetts Medical School**

Department of Radiology

University Campus
55 Lake Avenue North
Worcester, MA 01655
Tel: 508-856-3252
Fax: 508-856-4910
max.rosen@umassmemorial.org
www.umassmemorial.org

Max P. Rosen, MD, MPH, FACR
Professor and Chair

February 14, 2017

Dear Diagnostic Radiology Faculty,

I am pleased to introduce the new salary structure for the Department of Radiology that will be effective March 1, 2017.

Here are the highlights:

1) The base salary will be $330,000.
2) Associate Professors will receive an additional $10,000.
3) Professors will receive an additional $10,000.
4) Division and/or Medical Chiefs will receive $15,000.
5) Vice Chairs will receive $15,000.
6) Other administrative/clinical roles may receive monetary support at the discretion of the Chair.
7) The above salary and stipends are full-time faculty and will be prorated for part-timers.

For this year, salary adjustments will be made for faculty with more than a 1000 RVUs behind the 50th percentile of the AAARAD RVU benchmark. The adjustment will be capped at 5% of the total salary. The monetary value of an RVU will be based on the average collection/RVU in fiscal year 2016. This was mandated by the hospital's funds flow committee.

You will receive individual letters outlining your new salary effective March 1, 2017.

Thank you for your patience with this project. I am confident that this new structure will provide competitive salaries, compensation transparency, and a clear promotion trajectory.

Sincerely,

Max P. Rosen, MD, MPH
Chair Department of Radiology

Cc. Randa Mowlood

**<u>EXHIBIT G</u>**

 

UMassMemorial | University of Massachusetts Medical School

Department of Radiology

University Campus
55 Lake Avenue North
Worcester, MA 01655
Tel: 508-856-3252
Fax: 508-856-4910
max.rosen@umassmemorial.org
www.umassmemorial.org

Max P. Rosen, MD, MPH, FACR
Professor and Chair

February 16, 2017

Charu Desai, MD
Abdominal Division
Department of Radiology
UMass Memorial
55 Lake Avenue North
Worcester, MA 01655

Dear Charu,

As you know, we are introducing a new salary structure for the Department of Radiology that will be effective March 1, 2017.

Your annual salary will increase from $ 302,575 to $340,000.  Your new salary was calculated as follows:

| | |
|---|---|
| Base: | $330,000 |
| Associate Professor: | $10,000 |
| Total: | $340,000 |

Thank you for your commitment to our Department.

Sincerely,

Max P. Rosen, MD, MPH
Chair Department of Radiology

Cc. Randa Mowlood

Charu Desai, MD
Exhibit_32
10/22/2020

**<u>EXHIBIT B</u>**

AGREEMENT BETWEEN
UMASS MEMORIAL MEDICAL GROUP, INC.
AND
Charu Desai , M.D.

AGREEMENT by and between the UMass Memorial Medical Group, Inc., a non-profit corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at One Biotech Park, Worcester, Massachusetts 01605 (the "Medical Group"), a subsidiary corporation of UMass Memorial Health Care, Inc. (the "System") and     Charu Desai, M.D., a physician duly licensed to practice medicine in the Commonwealth of Massachusetts (the "Practitioner").

## RECITALS

The principal purpose of the Medical Group is to employ physicians to provide, on behalf of the System,  patient care at a level of quality and efficiency consistent with generally accepted standards and otherwise to fulfill professional and institutional obligations to patients, students of health care, health care professionals, and the community; and,

The successful fulfillment of the principal purpose of the Medical Group is dependent on the rendering of professional medical and administrative services in conjunction with the clinical operations of  the System by qualified practitioners; and,

The Practitioner is trained and qualified and desires to provide professional medical, educational and administrative services to the Medical Group; and,

The Medical Group desires to engage the Practitioner to provide professional medical, educational and administrative services;

Therefore, in consideration of the mutual covenants and conditions set forth below, the Medical Group and the Practitioner do hereby agree as follows:

1.     RESPONSIBILITIES OF PRACTITIONER

1.1.     Professional Qualifications

(a)   The Practitioner must at all times during the term of this Agreement: (i) possess a valid and unlimited license to practice medicine pursuant to Chapter 112, Section 2 of the General Laws of the Commonwealth of Massachusetts; and, (ii) be appointed to and maintain continuous status as a member in good standing of the UMass Memorial Medical Center (the "Medical Center") Active Medical Staff or the Medical Staff of the appropriate Member Hospital with appropriate clinical privileges in the Department of Radiology (the "Department")  (iii) for

Charu Desai, MD

Exhibit_11

9/18/2020

those physicians who are on staff at the Medical Center, receive, and maintain, a faculty appointment at the University of Massachusetts Medical School (the "Medical School"); (iv) possess a valid federal narcotics number and state controlled substances number (unless such number is not required by the Practitioner's specialty);   (v) be, and remain, a participating provider in the Medicare and Medicaid programs and not be barred, excluded or otherwise ineligible to participate in these or other Federal programs; and (vi) be or, at the Medical Group's request, agree to be, and remain, a participating physician in any health insurance plan or managed care program accepted by the System, including the System's contractual relationships with preferred provider organizations and health maintenance organizations, and to execute any documents requested by the Medical Group in connection with participating in a provider contract in which the Medical Group or the System agrees to participate.  If at any time during the term of this Agreement the Practitioner fails to meet one or more of the qualifications set forth herein, such failure shall constitute a breach in accordance with Section 7.4 of this Agreement.

(b)  The Medical Group and the Practitioner further acknowledge and agree that this Agreement is not, and shall not be construed as, any form of guarantee or assurance by the System that the Practitioner will receive and maintain the necessary appointment to the Active Medical Staff or the grant of appropriate clinical privileges for the purposes of discharging the Practitioner's responsibilities hereunder; application, appointment, reappointment, and the grant of clinical privileges shall be governed solely by the Bylaws of the Medical Staff of the Medical Center then in effect.  Further, appointment to the faculty of the Medical School shall be governed solely by the applicable policies and procedures of the Medical School.

1.2.   Services.  The Practitioner shall be responsible for providing professional medical and administrative services as set forth in Appendix A, attached and incorporated as part of this Agreement.

1.3   Provider Agreements.  The Practitioner hereby authorizes the Medical Group to execute provider agreements, acknowledgments and consent forms that obligate or confirm the Practitioner's obligation to participate in provider agreements executed by or on behalf of the Medical Group and to abide by and conform to all applicable requirements under such provider agreements.

1.4.   Schedule of Fees.  The Medical Group will establish a current schedule of fees, as may be amended from time to time, to be charged by the Medical Group for direct patient care services provided by the Practitioner under this agreement.

1.5.   Standards of Practice.  The Practitioner shall at all times provide services in a competent and professional manner, consistent with quality assurance standards of the Medical Center's Active Medical Staff and in compliance with all applicable statutes, regulations, rules and directives of federal, state and other governmental and regulatory bodies having jurisdiction over the Medical Center; the Bylaws, Rules and Regulations, policies and procedures of the

2

System, the Medical Center and the Medical Staff; applicable standards of the Joint Commission on Accreditation of Health Care Organizations and currently accepted and approved methods and practices applicable to the provision of medical services.

1.6.    Compliance and Quality Assurance.  The Practitioner shall abide by the Code of Ethics and Business Conduct of the System.  The Practitioner shall participate in the programs of the System and the Medical Center regarding compliance, quality assurance, utilization review, risk management, and peer review, in accordance with the rules, policies and bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, the Patient Care Assessment regulations of the Board of Registration in Medicine, and upon request of the Department Chair.  The Quality Assurance committee of the Medical Staff of the Medical Center will be responsible for reviews and audits of and concerning quality assurance in the Department.

1.7.    Committee Responsibilities.  The Practitioner shall serve on committees of the Medical Center's Medical Staff and committees established pursuant to the Bylaws of the System, upon reasonable request of the Chairman of the Board of Trustees, the President/Chief Executive Officer, the Chief Operating Officer, the Chief Medical Officer, the President of the Medical Group (the "President") or the Department Chair.

1.8.    Medical Records and Reports.  (a)  The Practitioner shall prepare or cause to be prepared in a timely manner any and all appropriate notes and information in the medical records of and reports pertaining to each patient for whom the Practitioner has rendered services pursuant to this Agreement.  The Practitioner shall cause these records and reports to be completed and submitted within such period of time after the rendering of such services as may be required by the Bylaws of the Medical Staff of the Medical Center, upon request of the President or Department Chair, or by applicable law or regulation.  The parties understand and agree that the System has the rights of ownership and control of all of the patients' medical records and reports generated pursuant to this Agreement.  It is further agreed that all practitioners at the System have the right to consult such records and reports in order to facilitate the continuity of proper patient care.

(b)    Time Allocation Reports:  The Practitioner agrees to cooperate with the Department Chair to  maintain adequate and proper time records in accordance with the Medical Group's policies.  This may include submitting a written allocation of time reports specifying the respective amounts of time the Practitioner has devoted to clinical, administrative, teaching and research activities.  The Practitioner agrees to make available to the Medical Group all time records and data recorded by the Practitioner upon the request of the Medical Group.

1.9.    Academic Service.  The Practitioner shall aid in the clinical teaching program of the Medical Center as an attending physician on in-patient services and in ambulatory settings. The Practitioner shall also aid in the didactic teaching programs of the Medical Center upon the request of the Department Chair.  The Practitioner shall also participate for reasonable periods of time as an instructor in education programs conducted or offered by the Medical Center,

3

CD 00053

including grand rounds, and shall perform such other teaching functions within the Medical Center as are reasonable and necessary to assure the Medical Center's compliance with the requirements of all applicable accrediting bodies, upon the request of the Department Chair. The Practitioner, as a member of the Medical School faculty, is expected to provide a reasonable amount of academic service (on the order of approximately two hundred (200) hours per year) under the supervision of the Chancellor at the direction of the Chair or his designee.

1.10.   Non-Physician Personnel.   The Practitioner shall, upon the request of the President or Chair, or at such other times as are appropriate, make recommendations concerning the qualifications, hiring, firing, and disciplining of such non-physician personnel as the System or the Medical Group may employ, engage or otherwise provide in support of the Practitioner's practice.   The Practitioner shall make any such recommendations in furtherance of and in accordance with the needs and best interests of the Medical Group and the proper conduct of its functions.   The Practitioner agrees that any supervision of nurse practitioners and physician assistants shall be conducted in accordance with the governing regulations of the Board of Registration in Medicine.

1.11.   Protocols and Procedures.   The Practitioner agrees to work cooperatively with all of the System's clinical departments, Medical Staff, the Medical Group, administration, the President and the Department Chair to assure that services are available on a timely, coordinated, efficient, and professional basis.   The Practitioner also agrees to comply with all of the Medical Center's clinical policies and procedures and all applicable Human Resources policies.

1.12.   Confidentiality of Information.   The Practitioner agrees to uphold and maintain the confidentiality of patient and other information for which the Practitioner has an ethical, professional, or legal obligation not to disclose.   The Practitioner further agrees to uphold and maintain the confidentiality of proprietary or other confidential information relating to the Medical Group or the System of which the Practitioner may become aware while employed hereunder.   This provision shall survive the termination of this Agreement.

1.13.   Continuing Education.   The Practitioner shall comply with and satisfy any and all of the professional obligations and requirements regarding continuing education and any other related areas of medical practice required for the maintenance of a license to practice **medicine** in Massachusetts or appropriate to the rendering of competent professional services pursuant to this Agreement as determined by the Department Chair.

1.14.   Dual-Employment with Medical School.   The parties acknowledge that a certain percentage of the Practitioner's time and salary may be allocated to, and governed by, a so-called "Dual-Employment" arrangement with the Medical School (the "Dual-Employment Arrangement").   The Practitioner acknowledges that the terms and conditions of employment with the Medical Group are governed by this Agreement and the policies and practices of the Medical Group. The Practitioner further acknowledges that if this Agreement is terminated for any reason, the related employment relationship with the Medical School shall also terminate

4

CD 00054

unless the Practitioner has a new or continuing agreement with the Medical School or is a tenured faculty member.

2.    RESPONSIBILITIES OF THE SYSTEM

    2.1.    Space, Equipment, Services, and Supplies.

        (a)  The Medical Group, through agreement with the System, shall be committed to making available reasonable and necessary space, equipment and supplies for the delivery of the agreed services hereunder by the Practitioner, shall provide customary services and maintenance to maintain such equipment in good order and repair, shall furnish services to the Practitioner including, but not limited to, utilities, telephone, housekeeping and record keeping services; and shall provide all necessary supplies needed for the proper provision of services by the Practitioner pursuant to this Agreement.

        (b)  The Practitioner agrees to use such space, equipment, services and supplies for purposes of the System and in furtherance of the obligations governed by this Agreement.

    2.2.    Non-Physician Personnel.  The System or the Medical Group shall employ, engage or otherwise make available to the Practitioner all non-physician personnel determined by the Medical Group to be reasonably needed for the proper delivery of services pursuant to this Agreement.  The System or the Medical Group shall exercise ultimate control and management of non-physician personnel.

    2.3    Professional Liability Insurance.  The Medical Group, at its expense, shall arrange for professional liability insurance coverage for the Practitioner with regard to professional medical services rendered by the Practitioner for Medical Group-related activities billed through the Medical Group during the term of this Agreement.  The Practitioner shall be covered by such insurance to the same extent as other similarly-situated practitioners within the Medical Group.  Coverage limits shall be set in the discretion of the Medical Group and/or the UMass Memorial Self-Insurance Program from time to time and shall be made known to the Medical Group Practitioners on a regular basis.

3.    REIMBURSEMENT REQUIREMENTS

    3.1.    The Practitioner shall comply with all laws, regulations and System requirements, policies and procedures regarding record keeping relating to third-party reimbursement for services provided pursuant to this Agreement as may be in effect from time to time.  In the event that there are subsequent changes or clarifications of statutes, regulations or rules relating to record-keeping which the Medical Group determines must be complied with to insure proper reimbursement from third parties for services provided pursuant to this Agreement, the Medical Group shall, after reasonable notice and opportunity to comply, notify the Practitioner of any actions it reasonably deems are necessary to comply with such changes and the Practitioner shall

5

CD 00055

promptly take such actions.

4.    COMPENSATION

4.1.    **Compensation of Practitioner.**    The Medical Group shall compensate the Practitioner for the services which the Practitioner renders in accordance with the terms of this Agreement.    The agreed compensation is set forth in detail in Appendix B, attached   and incorporated as part of this Agreement.

5.    BILLING AND PAYMENT

5.1.    **Billing.**   Except as otherwise may be expressly stated in this Agreement or other published, written policy or procedure of the Medical Group, all fees, payments and other income attributable to the Practitioner's clinical services during the term of this Agreement shall belong to the Medical Group, whether paid to the Practitioner, to the Medical Group or its designee or to a third party.  The Medical Group shall have the sole right to bill for and to receive, hold and disburse such fees and income and the Practitioner agrees to abide by the billing policies and procedures of the Medical Group.  The Practitioner hereby assigns to the Medical Group all of the Practitioner's rights in all fees, payments, bonuses or distributions or other income or monies due from all sources relating directly or indirectly to clinical  services rendered by the Practitioner pursuant to this Agreement.  The Practitioner shall cooperate fully with the Medical Group in facilitating collection of such monies, including prompt endorsement and delivery to the Medical Group of all checks received from patients or third-party payors on behalf of the Practitioner and completion of all forms necessary for such collections.  To the extent applicable, the Practitioner agrees to work with the Medical Group to collect all patient co-payments for services rendered and promptly to forward such funds to the Medical Group.  Upon termination of this Agreement for any reason whatsoever, all such monies then outstanding shall be deemed to be the sole and exclusive property of the Medical Group and not subject to any claim by the Practitioner.  The Practitioner's obligation under this provision shall survive termination of this Agreement.

6.    TERM

This Agreement shall be effective from your original hire date of January 5, 1992 and shall remain in effect unless otherwise terminated by the parties as provided in Section 7 of this Agreement.  As of the effective date of this Agreement, this Agreement shall supercede and revoke any existing prior employment agreement with the Medical Group or any of its predecessor entities.

7.    TERMINATION

7.1. Mutual Agreement.  This Agreement may be terminated by mutual agreement of the parties, in a writing signed by the parties, at any time from the date of execution hereof.

6

CD 00056

7.2  <u>Notice of Party</u>. This Agreement may be terminated by the Medical Group at any the giving of written notice to the Practitioner (as set forth in Section 14.1 below), in accordance with the following notice schedule:

| Number of Years Practitioner Employed | Requisite Notice Period |
|---|---|
| 0-2 | 4 months |
| >2 – 10 | 6 months |
| >10- 15 | 8 months |
| >15 – 20 | 10 months |
| >20 | 12 months |

This Agreement may be terminated by the Practitioner at any time upon the giving of as much notice as is practicable to the Medical Group, and in any event a minimum of one hundred twenty (120) days' written notice.

Where either the Medical Group or the Practitioner is terminating the employment relationship, the Notice Period is characterized as "working notice." In the interests of patient care, the Medical Group expects the Practitioner to continue to fulfill the responsibilities of the position and to maintain productivity levels for the full notice period. Vacation time may be taken during the Notice Period only with the consent of the Department Chair and the President of the Medical Group. The Practitioner will be compensated for unused pro-rated vacation time not taken at the time of termination. The Medical Group does not permit "terminal vacations," i.e., the use of vacation time to complete the final portion of the Notice Period.

7.3     <u>For Cause</u>. The Medical Group may terminate this Agreement effective immediately for cause at any time upon written notice to the Practitioner setting forth in reasonable detail the nature of such cause. "Cause" shall be defined as any material breach by the Practitioner of this Agreement, including but not limited to the following:

i.     Practitioner's fraud or dishonesty with respect to the Medical Group or those associated with it, acts or conduct materially detrimental to patient care or to the reputation or operations of the Medical Group, or otherwise in connection with the Practitioner's services under this Agreement;

ii.    Practitioner's conviction of, a plea of nolo contendere or admission of sufficient facts to a crime involving moral turpitude, or an offense relating to health care or adversely affecting the Practitioner's ability to perform services under this Agreement; or

iii.   Practitioner's     material negligence or misconduct (other than by reason of disability or approved leave) in the performance of duties assigned by the Chair under this

7

CD 00057

Agreement,

iv.    Failure of the Practitioner to follow UMass Memorial policies and procedures and other rules of conduct made known to the Practitioner and applicable to all physicians of UMass Memorial and/or the Medical Group, including without limitation, policies prohibiting unlawful discrimination, and the Practitioner has exhausted the grievance procedure available to Medical Group physicians and, if applicable, all due process procedures available under the Medical Staff Bylaws of the Medical Center.

7.4.    Automatic.    This Agreement shall terminate automatically upon the breach of Section 1.1. by the Practitioner, except that the Medical Group, in its sole discretion, may, but is not obligated to, suspend this Agreement for a specified reasonable period to enable the Practitioner to cure the breach. If the Practitioner fails to cure the breach within the specified period, this Agreement will terminate immediately upon written notice to the Practitioner by the Medical Group. Further, the Medical Group reserves the right to terminate this Agreement in the event the Practitioner's medical staff membership or clinical privileges are suspended or in any way restricted.

7.5    Suspension. The Medical Group may suspend the Practitioner for cause, without compensation. Such cause may include, but shall not be limited to, any suspension, restriction or revocation of the Practitioner's Medical Staff membership or clinical privileges at the Medical Center or any suspension, restriction or revocation of the Practitioner's license to practice medicine in any jurisdiction.

8.    EFFECT OF TERMINATION

8.1.    Effect of Termination on this Agreement. The termination of this Agreement in accordance with Section 7, hereunder, shall terminate any and all rights and obligations of the Medical Group and the Practitioner pursuant to this Agreement.    The effective date of termination of this Agreement shall be as set forth in the above-mentioned section(s); provided, however, that upon the termination of this Agreement, the parties shall be and remain obligated and responsible for: (i) any and all obligations accruing prior to the date of termination; and, (ii) any and all obligations, promises, or covenants contained herein which are expressly made to extend beyond the term of this Agreement; and, (iii) the Practitioner shall use reasonable and diligent efforts to assist the System and the Medical Group in arranging for appropriate alternative medical coverage for patients under the care of the Practitioner. Prior to the termination of this Agreement, the Practitioner shall prepare a notice to patients in a form approved by the Medical Group and the Department Chair. Practitioner shall finalize all outstanding billing documentation and complete all patient records prior to his or her departure. Immediately upon the termination of this Agreement, the Practitioner shall deliver to the System sole custody, and total, exclusive and complete use of the System's space, equipment and supplies and shall remove any and all personal possessions from the property of the System. The System shall give the Practitioner reasonable time to effect these conditions.  In the event of

CD 00058

termination of this Agreement, payment by the Medical Group of any base salary due the Practitioner under Section 4.1 and Appendix B to the date of termination and of any pay in lieu of notice due Practitioner under Section 7.2 shall constitute the entire obligation of the Medical Group to the Practitioner. The Practitioner recognizes that no compensation is earned after termination of this Agreement.

9.   GOVERNING RULES, REGULATIONS AND BYLAWS

    9.1   Governing Rules, Regulations and Bylaws.   Notwithstanding anything in this Agreement to the contrary, it is hereby expressly understood and agreed by and between the Medical Group and the Practitioner that any and all rights, responsibilities, and obligations of the parties shall at all times during the term of this Agreement be subject to the Bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, all applicable rules and regulations of the System, or its successor, as now exist or as hereinafter may be amended or promulgated by the Board of Trustees of the Medical Group, the Medical Staff of the Medical Center and the President/Chief Executive Officer of the System, or any duly authorized designee thereof.

10.   ASSIGNMENT AND DELEGATION

    10.1.   Assignment and Delegation.   No assignment of this Agreement or the rights hereunder, or delegation of this Agreement or the obligations hereunder shall be valid without the specific written consent of both parties;  provided, however, that this Agreement may be assigned by the Medical Group as a result of reorganization or merger, or to any successor entity providing the services now provided by the System or the Medical Group.

11.   ENTIRE AGREEMENT

    11.1.   Entire Agreement.   This Agreement contains the entire agreement between the parties and no statement, promises, inducements, or writings made by any party or agent of any party which is not contained in this written Agreement shall be valid or binding; and this Agreement may not be enlarged, modified, or altered except in a subsequent writing signed by the parties and attached hereto. This Agreement supersedes any and all prior agreements for professional services between the Practitioner and the Medical Group, the System or any other affiliate of the System.

12.   AMENDMENTS

    12.1.   Amendments.   This Agreement may be amended only by an instrument in writing signed by the Medical Group and the Practitioner. Such writing must make specific reference to the terms and conditions of this Agreement which it amends, and will become effective as of the date stipulated therein.

9

CD 00059

13.   GOVERNING LAW

13.1. Massachusetts Law. This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed in the Commonwealth of Massachusetts.

14.   NOTICE

14.1. Notice. Notices or communications required or permitted to be given pursuant to this Agreement shall be given in writing to the respective parties by hand, by certified mail or by overnight delivery service (e.g., Federal Express, UPS) (such notice being deemed given as of the date of mailing) and addressed to the Practitioner at the Practitioner's last known address kept within the records of the Medical Group, or in the case of the Medical Group, One Biotech Park, Worcester, Massachusetts, attention of the President, UMass Memorial Medical Group.

15.   EXECUTION

15.1. Execution. This Agreement and any and all amendments hereto shall be executed in duplicate copies on behalf of each party by the Practitioner and an official specifically authorized by the Medical Group Board with respect to such execution. Each duplicate copy shall be deemed an original, but both duplicate originals shall together constitute one and the same instrument.

16.   SECTION HEADINGS

Section Headings. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

17.   WAIVER.

Waiver.   A waiver of the breach of any term or condition of this Agreement by either party shall not constitute a waiver of any subsequent breach or breaches of the same term or condition, or any other term or condition hereunder.

18.   SEVERABILITY.

Severability. If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect by a court of competent jurisdiction, then the remainder of this Agreement, and the application of such provision in circumstances other than those as to which it is so declared invalid or unenforceable, shall not be affected thereby, and each such provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

10

CD 00060

IN WITNESS WHEREOF, the Medical Group and the Practitioner have caused this Agreement to be signed and sealed as of this_____ day of _____, 20___.

Dated:          By: _Charu S. Desai    MD_
                     Charu Desai , M.D.


UMASS MEMORIAL MEDICAL GROUP, INC.

Dated 2/2/    By: _____
                   Michele Streeter, Executive Director

             By: _____
                   Joseph T. Ferrucci, M.D., Chair
                   Department of Radiology

11

CD 00061

## APPENDIX A

The Practitioner shall be responsible for providing professional medical services to patients of the System in need of such services and to enrollees of health plans as to which the Medical Group and Practitioner are participating providers. The services to be rendered hereunder include, but are not limited to outpatient work, inpatient consultative work and direct patient care. The Practitioner's performance hereunder shall be evaluated by the President of the Medical Group and the Department Chair in accordance with the Bylaws of the Medical Staff of the Medical Center. The Practitioner agrees that the practice of medicine shall be limited to the services to be provided pursuant to this Agreement or for the Medical School under its agreement unless Practitioner obtains the prior written approval of the Chair under Medical Group policy to do otherwise.

The Medical Group and the Department Chair shall determine the specific professional medical duties to be performed by the Practitioner, as well as the time and manner of performance, in accordance with and subject to the terms of this Agreement; provided, however, the Medical Group and Department Chair shall not impose requirements which would interfere with the Practitioner's professional judgment in connection with the treatment of patients or cause the Practitioner to violate applicable ethical codes or any law or regulation.

The Practitioner shall at all times provide services to all persons who may become patients of the Medical Group in accordance with the Medical Group's policies and without regard to race, color, creed, sex or ability to pay for services; and

The Practitioner shall participate in Medicare, Medicaid and managed care programs and other third party payor arrangements or governmental programs in which the Medical Group participates and the Practitioner shall abide by and act in accordance with the terms and conditions of all managed care agreements, network, affiliation agreements, provider agreements and other contracts to which the Medical Group or Practitioner (with the Medical Group's consent) is or becomes a party.

CD 00062

## APPENDIX B

1.  The Practitioner's compensation for services rendered pursuant to this Agreement, and under a Dual-Employment Arrangement with the Medical School, if applicable, shall be a total base salary, which if annualized would be at the rate of Three-hundred Twenty-Five Thousand Dollars ($325,000) per year, less all legally required and voluntarily-authorized deductions, payable in accordance with Medical Group payroll practices. (Practitioners who participate in the Dual-Employment Arrangement with the Medical School may receive paychecks from both the Medical Group and the Medical School, which together shall equal the base salary referenced above.)

The Practitioner shall also participate in the Physician Incentive Compensation Program of the Department as established by the Medical Group (the "Incentive Compensation Program"), subject to its terms and conditions of participation as in effect or amended from time to time. The Incentive Compensation Program includes eligibility for bonuses and/or salary increases based upon productivity. The Practitioner acknowledges that participation in the Incentive Compensation Program may also involve imposing salary withholds if performance does not meet Medical Group requirements. The Practitioner further acknowledges that, following the first twelve months' of the Practitioner's employment, under the terms of the Incentive Compensation Program, the Medical Group may decrease the Practitioner's base salary if the applicable productivity targets are not met. Salary adjustments will be made upon thirty (30) days written notice to the Practitioner. Salary reductions, if any, shall be consistent with the Department's compensation plan and shall in no event exceed twenty percent of the Practitioner's base salary in any twelve month period.

Subject to the Practitioner's payment of any contribution required of physician employees generally, the Practitioner will be eligible to participate during the term of this Agreement in any and all employee benefit plans made generally available to other physician employees of the Medical Group as in effect from time to time. Such participation by the Practitioner shall be subject to (i) the terms of the applicable plan documents, (ii) generally applicable policies of the Medical Group, and (iii) the discretion of the Board of Trustees of the Medical Group or any administrative or other committee provided for in or contemplated by such plan or policy of the System. A description of the benefits program currently in effect (and subject to change by the Group Board and UMass Memorial Compensation Committee) is attached hereto as Appendix C, "Physician Benefits at a Glance."

13

CD 00063

# EXHIBIT C

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3    -------------------------------x

4    CHARU DESAI,

5                  Plaintiff,

6       vs.                              Civil Action No.
                                         4:19-cv-10520-DHH
7
     UMASS MEMORIAL MEDICAL CENTER,
8    INC., ET AL.,

9                  Defendants.

10   -------------------------------x

11

12

13

14          DEPOSITION OF MAX P. ROSEN, M.D.

15               Conducted Remotely

16              1800 West Park Drive

17                   Suite 400

18            Westborough, Massachusetts

19                   May 7, 2021

20            10:10 a.m. to 5:03 p.m.

21

22

23

24   Reporter:  Laurie J. Berg, CCR, RPR, CRR, CLR, CER

17

1        You are employed at UMass Memorial Health
2   Care, correct?
3      A.   I'm actually employed by UMass Memorial
4   Medical Group and UMass Medical School.
5      Q.   You serve as the chair of the Department of
6   Radiology at UMass Memorial Medical Center; is that
7   correct?
8      A.   Correct.
9      Q.   When did you begin working there?
10     A.   In September of 2012.
11     Q.   Had you been the chair of any department
12  before you became chair of radiology at UMass
13  Memorial?
14     A.   I was the vice chair -- the executive vice
15  chair at Beth Israel Deaconess before this.
16     Q.   So you're -- tell me, what are the duties and
17  responsibilities that you have in your role as chair
18  of the Department of Radiology?
19     A.   There are several.  The first is to ensure
20  the department provides high-quality and safe imaging
21  services for our patients.  The other responsibilities
22  are to ensure the smooth, efficient and appropriate
23  running of the department for -- to support the
24  institution and the other physicians and departments

50

 1  them to HR and the FMLA process, and then wait for a

 2  determination to be made and then abide by that

 3  determination.

 4      Q.   Did you suggest that Dr. Desai speak with HR

 5  about her request for reduced call?

 6      A.   (Deponent viewing exhibit.)  From my comment

 7  here, where I state, "These had all been previously

 8  discussed with Dr. Desai and representatives from the

 9  HR department," I assume that refers to discussions

10  that she had with HR and that I had recommended that

11  she talk to HR about any concerns that would be HR

12  appropriate.

13      Q.   When she discussed with you the issue of call

14  responsibilities, did she tell you that she needed

15  time to recover because of her heart condition?

16      A.   No.  She told me that she should be absolved

17  from call because of the number of years that she had

18  been in the department.

19      Q.   And it's your testimony that you did not

20  understand, at any time, her request for reduced call

21  responsibilities to be related to her health?

22      A.   To my recollection, she never linked the two.

23      Q.   Nor did you?

24      A.   Correct.

1  did.

2      Q.   Do you recall if Dr. Ferrucci ever told you

3  that he had any concerns about Dr. Desai's

4  performance?

5      A.   I don't recall.

6      Q.   Who is Dr. Richard Irwin?

7      A.   Dr. Irwin is a -- either critical care or

8  pulmonologist -- critical care specialist or

9  pulmonologist.  I'm not sure of his exact specialty,

10  and was one of the senior critical care pulmonary

11  people at UMass.

12      Q.   In his capacity as a senior pulmonologist at

13  UMass, would he have had opportunity to work with

14  Dr. Desai?

15      A.   Yes.

16      Q.   Did Dr. Irwin ever express to you concerns

17  about Dr. Desai's performance?

18      A.   I asked Dr. Irwin for his opinion of

19  Dr. Desai's performance.

20      Q.   Do you recall when that was?

21      A.   I don't recall the exact date.

22      Q.   Do you recall why you asked him?

23      A.   I had received, from Dr. Dill, several

24  complaints about Dr. Desai's performance, and concerns

54

1  had been brought to Dr. Dill.  Also Dr. Robinson, at

2  Marlborough Hospital, had raised concerns with me

3  about Dr. Desai's performance.

4      Q.   When you asked Dr. Irwin about Dr. Desai's

5  performance, what did he tell you?

6      A.   He shrugged his shoulders and said, well, I

7  can read my own chest x-rays.

8      Q.   And you understood from that, that he was

9  saying that he did not need her?

10     A.   Correct.  That he was perfectly capable of

11 interpreting his own chest x-rays and was not -- did

12 not need to rely on Dr. Desai's interpretation.

13     Q.   You -- you mentioned a minute ago that you

14 asked him, because Dr. Dill brought concerns to your

15 attention and that concerns had been brought to her

16 attention; is that correct?

17     A.   Correct.

18     Q.   Do you know who brought concerns to

19 Dr. Dill's attention?

20     A.   Not specifically, and I don't recall

21 specifically.  But as the section chief, Dr. Dill was

22 responsible for the quality of -- of the division,

23 and, often, people would ask her to re-read or review

24 studies that Dr. Desai had interpreted for Dr. Dill's

55

1   opinion.
2       Q.   You also said that Dr. Robinson brought
3   concerns to your attention --
4       A.   Yes.
5       Q.   -- correct?
6            Did she -- can you summarize what her
7   concerns were?
8       A.   General concerns about doctor -- the quality
9   of Dr. Desai's interpretations.  At one point, she
10  said to me that she never believed any of Dr. Desai's
11  reports and could not rely on them.
12      Q.   Did you, at any point prior to your decision
13  to terminate Dr. Desai, inform her of these concerns?
14      A.   No.  I communicated the concerns to Dr. Dill,
15  as the section chief, who would then be responsible
16  for overseeing the quality of people in her division.
17      Q.   So you would agree with me that Dr. Robinson
18  lodged a number of complaints about radiologists in
19  the radiology department at UMass Memorial, correct?
20      A.   Dr. Robinson, over time, had raised multiple
21  issues with me; some, you know, over a wide range of
22  topics.
23      Q.   Including the performance of the radiologists
24  at UMass Memorial, correct?

57

 1   him, correct, dated May 5, 2015?

 2       A.    Correct.

 3       Q.    Dr. [A.R.], in the second paragraph,

 4   memorializes a meeting with you in your office on

 5   April 23rd, 2015, about his resignation.

 6           Do you recall speaking with Dr. [A.R.]

 7   about his resignation?

 8       A.    Not specifically, but, clearly, I did.

 9       Q.    In -- in the third paragraph of this letter,

10   Dr. [A.R.] writes, it is unfortunate that I have

11   not been able to convince you of my ability to be part

12   of your team and continue my growth in this

13   department.

14           Do you see that?

15       A.    (Deponent viewing exhibit.)  Yes.

16       Q.    Why -- can you tell, from that sentence, why

17   Dr. [A.R.] believed that he had not been able to

18   convince you of his ability to be part of your team?

19       A.    Can you repeat the question, please?

20       Q.    Sure.  Do you understand, or do you know why

21   Dr. [A.R.] would have written, in the third

22   paragraph, it's unfortunate I have not been able to

23   convince you of my ability to be part of your team?

24       A.    I had discussed with Dr. [A.R.] my need

58

1  to have an abdominal radiologist, which is what he

2  was, perform at a higher level for an academic

3  abdominal radiologist than I thought that he was able

4  to perform at.

5      Q.   So, in the second paragraph, Dr. A.R.

6  memorializes that, in April of 2015, you discussed his

7  resignation.

8          Do you see that?

9      A.   (Deponent viewing exhibit.)  Yes.

10     Q.   Yeah.  That suggests that you did not, in

11 fact, simply terminate him for your concerns that his

12 abdominal radiology work needed to be at a higher

13 level, correct?

14     A.   Correct.

15     Q.   Why did you give him an opportunity to resign

16 rather than simply terminate him immediately?

17     A.   Because we had a discussion that his level of

18 -- the level that he was reading abdominal imaging at

19 was not the level that we needed to have in a

20 tertiary-level academic referral center, and I

21 suggested that, given his specific level of skill and

22 expertise, that there would be other departments where

23 that would be a better fit than the level of abdominal

24 imaging expertise that we required at UMass.  We do

59

1  very high-level abdominal imaging.

2        For example, we are a major liver transplant

3  center.  We're also a major center for -- for other

4  forms of liver disease, particularly hepatitis C.  And

5  we also do high-level, complex prostate imaging in the

6  abdominal division, and these are all exams which

7  require a very high level of expertise in interpreting

8  and supporting the clinical services that send us

9  patients.

10     Q.   The -- the point of my question that I,

11  clearly, did not ask well enough was; why did you give

12  him an opportunity to resign?  And I'll contrast that

13  to your informing Dr. Desai that she was being

14  terminated.

15     A.   Dr.  [A.R.]  was not performing at a

16  level required -- that I felt was required for our

17  academic tertiary-level department.

18        In Dr. Desai's case, I had many complaints

19  about her, the quality of her interpretations,

20  conducted an independent review of the quality of her

21  interpretation of chest CT, which found many

22  deficiencies and required a chest radiologist who

23  could perform high-level chest CT.  Without having

24  that ability to perform high-level chest CT, I did not

88

 1  was available, she was your default; is that correct?

 2      A.   Yes.

 3      Q.   I see.  At the time that you asked her to

 4  serve as the quality person working with Dr. Baccei

 5  for the chest division, had you concerns about her

 6  performance?

 7      A.   I don't recall the exact date that I -- that

 8  Dr. Desai was serving in the quality function for the

 9  department, so I really can't answer that.

10      Q.   Was she ever removed from that role?

11      A.   At some point, Dr. Dill took over the quality

12  role in the division.

13      Q.   Did you ever explain to Dr. Desai that she

14  would no longer serve in that role because of concerns

15  about her performance?

16      A.   I don't recall ever speaking to her about her

17  role -- the quality role within the division.

18      Q.   Does UMass have a morbidity and mortality

19  conference or process in place?

20      A.   Yes.  That's -- the way our quality structure

21  works is that the cases are in our database, and then

22  each division should have a quality review meeting on

23  a regular basis, and the frequency depends on each

24  individual section's specifics.  And that cases from

107

```
 1      A.   (Deponent viewing exhibit.)  Yes.
 2      Q.   I take it, from -- from that notation, that
 3 Dr. Desai was asking you about being granted academic
 4 days.
 5      A.   Yes.
 6      Q.   Would you agree with me?
 7      A.   Yes.
 8      Q.   And you did not award her or grant to her
 9 academic days, correct?
10      A.   Correct.
11      Q.   You wrote, "Having measurable outcomes and
12 deliverables will be necessary for any consideration,"
13 correct?
14      A.   (Deponent viewing exhibit.)  Correct.
15      Q.   Did you apply that having-outcomes-
16 and-deliverables standard to all of the radiologists?
17      A.   Yes.
18      Q.   Without exception?
19      A.   To the best of my knowledge.
20      Q.   How did you check on that?
21      A.   At the annual -- at everybody's annual
22 review.  If you look at that form, it has areas for
23 academic activity, such as publications, lectures,
24 conferences, other educational material, research.
```

108

1   And to the best of my recollection, Dr. Desai, in all

2   the years that I was her chair, never had any

3   activities in those categories.

4        Q.   Was it your understanding that the

5   radiologists who were granted academic days were, on

6   those days, doing academic work?

7        A.   Could you clarify that question, please?

8        Q.   Sure.  Do you -- so radiologists who were

9   granted academic days, occasionally, took academic

10  days, correct?

11       A.   Yes, they -- on our schedule would be

12  allocated an academic day, on, say, a Wednesday.

13       Q.   Did they have to report in to work that day?

14       A.   Our policy is that if somebody is on an

15  academic day, they have to be available to come in if

16  there's an unforeseen need, but they don't have to be

17  in the hospital.

18            An exception to that is, if people want to

19  use their academic day to attend a meeting or a

20  conference that is outside of, you know, Central

21  Massachusetts, that they need to get approval from me

22  first.

23       Q.   With regard to the academic days that

24  radiologists take and do not appear, physically, at

109

1  UMass Memorial, do you have any way of assessing
2  whether, on that academic day, they were, in fact,
3  doing work toward the deliverables that you cite in
4  Item Number 5 on Exhibit 15?
5       A.   This goes back to the idea that the faculty
6  are professionals, and I am not micromanaging what
7  they do each hour of the day.  The expectation is that
8  they've been allocated x-number of nonclinical days,
9  and there's an expectation at the end of the year that
10 they produce a commensurate amount of work.
11          Whether they do that on the weekend or nights
12 or some other time, which is not clinical time, is
13 their business.  What I care about is that they
14 produce the work.  Many radiologists, and I'm sure
15 many other, you know, physicians in the medical
16 center, create a lot of academic and educational and
17 other professional work, nights and weekends.
18      Q.   I just want to go back to something we were
19 discussing just a few minutes ago about when Dr. Desai
20 had an episodic, unpredictable episode.
21          Did -- were you aware that these happened
22 more frequently if she had been working for many days
23 in a row and was unable to rest for a day?
24      A.   No.

110

1      Q.    So, despite her repeated requests to be
2  reduced on-call time, it's your testimony that you did
3  not know that she was asking because she had a heart
4  condition that was frequently triggered by fatigue?
5      A.    I was not aware of that connection.
6      Q.    And then let me just ask one more question
7  about this.
8            Are you aware, Dr. Rosen, that, Dr. Desai had
9  these episodes, actually, while at work, not just on
10 the way into work or before work began or after she
11 left for the day?
12     A.    She never communicated that to me.
13     Q.    Did anyone actually inform you of this?
14     A.    No.
15            (Exhibit 16 marked for identification.)
16     BY MS. WASHIENKO:
17     Q.    I am going to distribute, with luck, a
18 document that's been marked as Exhibit 16 and ask you
19 to take a look at it, Dr. Rosen.
20            MS. WASHIENKO:  For the record, it is
21 UMM-04739 through -740.
22     A.    (Deponent viewing exhibit.)  Okay.
23     Q.    Dr. Rosen, do you recognize this document?
24     A.    (Deponent viewing exhibit.)  I recognize that

112

 1 | minutes ago; wouldn't you agree?

 2 |     A.   I would assume that is her interpretation of

 3 | it.

 4 |     Q.   Do you recall, Dr. Rosen, if you warned any

 5 | other physicians in the department about tardiness?

 6 |     A.   Not in the chest division.

 7 |     Q.   I'll direct your attention to the paragraph

 8 | below that, Dr. Desai writes, "As you are aware of my

 9 | health issues, I did speak with Human Resources (Kelly

10 | Zage -- Zalegowski)" -- my apologies -- "over the

11 | phone.  I will inform all necessary parties in the

12 | event I arrive late to work for medically related

13 | issues as per my conversation with HR."

14 |          Do you see that?

15 |     A.   (Deponent viewing exhibit.)  Yes.

16 |     Q.   At this point, then, you are quite clearly

17 | aware of her health issues, correct?

18 |     A.   Well, I'm aware that she says that she has

19 | health issues.  I'm unaware of the specifics of the

20 | health issue.

21 |     Q.   And you, aware of health issues at this time,

22 | continue to decline to alter her call schedule,

23 | correct?

24 |     A.   I have not altered her call schedule, and she

113

1  has not communicated with HR, in the absence of the
2  people who manage FMLA, the need to do that.  If she
3  had communicated that need, and that need was
4  communicated to me from HR and FM -- FMLA people, I
5  would have accommodated her, as I have accommodated
6  other people in the department.
7        There is at least one other person in the
8  department who has -- who has an FMLA accommodation to
9  their work schedule, which I am more than happy --
10  I've been more than happy over the years to work with
11  them and to accommodate their needs.
12     Q.   Just not Dr. Desai.
13          (Exhibit 17 marked for identification.)
14     BY MS. WASHIENKO:
15     Q.   I'm going to ask you to take a look at the
16  document that I've marked as Exhibit 17, which, with
17  luck, I will manage to distribute.
18     A.   (Deponent viewing exhibit.)  Okay.
19     Q.   Dr. Rosen -- oh, sorry.
20          MS. WASHIENKO:  For the record, the
21  document is UMM-30081 through 30084.
22          BY MS. WASHIENKO:
23     Q.   Turning to the third page of this document,
24  Dr. Rosen -- well, let me -- let me -- let me,

134

1  with the x-ray, and we interpret the x-ray, sort of,

2  after the fact, after -- after the patient visit.

3          So, at some point, he was no longer

4  performing the full range of musculoskeletal radiology

5  but was only interpreting x-rays that -- for the most

6  part was interpreting x-rays which had been obtained

7  in conjunction with a patient visit to orthopedics.

8  The ortho -- the orthopod had seen the patient, seen

9  the x-ray and made a treatment decision based on those

10 two.  And the interpretation of the x-ray was to

11 document the report in the radiology system.

12     Q.   Are you aware, Dr. Rosen, that -- that UMass

13 permitted Dr. R.N. to resign, following a discussion

14 with him of performance concerns?

15     A.   I'm sorry.  Could you just restate that or

16 repeat it, rather?

17     Q.   Are you -- are you aware that UMass Memorial

18 permitted Dr. R.N. to resign, after discussing with

19 him performance concerns rather than unilaterally

20 terminating him?

21     A.    If I recall, our conversations with

22 Dr. R.N. were that he would be better off practicing

23 in a location that did not require tertiary-level,

24 academic-level, musculoskeletal imaging.  As -- as a

135

```
 1  complex tertiary referral center, we need to interpret
 2  complex studies.
 3          We also support a very robust sports medicine
 4  group within orthopedics, and there's a certain level
 5  of sophistication that our musculoskeletal
 6  radiologists need to have to support those services.
 7      Q.   I'll just direct your attention to -- to
 8  Page 2 of this document.  It's marked 08916.  In the
 9  first full paragraph, slightly more than halfway down,
10  Dr. Cerniglia wrote, "Unfortunately it appeared that
11  he," Dr. R.N.       "could not identify common findings
12  of gout and over called fractures several times which
13  were not present.  His level of sophistication in
14  interpretation of MSK cases," musculoskeletal cases,
15  "is well below what I expect for a fellowship trained
16  board certified radiologist.  In fact, many of the
17  cases I would expect a general radiologist or senior
18  resident to make the findings and proper diagnosis or
19  differential."
20          Do you see that?
21      A.   (Deponent viewing exhibit.)  Yes.
22      Q.   That -- that seems to have absolutely no
23  correlation to the fact that UMass Memorial is a
24  tertiary-level-care provider; wouldn't you agree?
```

139

1  again."

2          So I take it, from this notation in the

3  minutes of the meeting on November 2nd, 2016, that --

4  that there were, again, fewer people staffing the

5  chest division than might have been ideal?

6      A.   I don't know.  You can determine that from --

7  or infer this, from this.

8      Q.   It appears from this sentence that, because

9  the division chief was out sick, reads were not being

10 completed in a timely fashion, would you agree?

11     A.    Often, Dr. Robinson would complain about

12 things without substantiated numbers and, on

13 turnaround time, it's always better to look at the

14 numbers than perception.

15     Q.    So -- so Dr. Robinson's complaints,

16 occasionally, or, in your word, "often," complained

17 without substantiation of her complaint?

18     A.    Well, I would always take her complaints and

19 then go and do my own analysis to see if they were

20 founded or not.

21               (Exhibit 23 marked for identification.)

22          BY MS. WASHIENKO:

23     Q.    I am now going to share with you a document

24 that has been marked as Exhibit 23.

143

1      A.    (Deponent viewing exhibit.)  Yes.

2      Q.    So Marlborough was really just, generally,

3  very unhappy with UMass Memorial's provision of

4  radiology services --

5      A.    (Inaudible.)

6      Q.    -- (inaudible) chest; is that correct?

7            MADAM COURT REPORTER:  I'm sorry --

8      A.    Correct.

9            MADAM COURT REPORTER:  -- I only got up

10  to Memorial's provision of radiology services, then

11  someone spoke, and I couldn't hear what -- it was cut

12  out.

13          I don't know --

14            THE DEPONENT:  I apolo --

15            MADAM COURT REPORTER:  -- if you can

16  start it over again.

17          It's okay.  It happens.

18          BY MS. WASHIENKO:

19      Q.    So -- so, before -- before Dr. Brennan sent

20  this e-mail to the staff, excluding Dr. Desai, you

21  obviously, were aware that Marlborough physicians had

22  expressed concerns about timely or not reading of

23  Marlborough chest CTs, correct?

24      A.    I'm sorry, can you just repeat the question?

1  page; Kathy Green writing to you on Wednesday,

2  Feb 1, 2017, in which Ms. Green writes, and I think

3  it's just a crazy printing issue, but she appears to

4  be writing, I'm working with Julie to pull reports and

5  images together for Charu but I need to know, colon,

6  with a couple of questions; Number 1 and Number 2,

7  underneath that.

8          First, who is Julie?

9      A.   That should be Julie Rivers, who's one of our

10 PACS IT administrators.

11     Q.   I gather from her e-mail to you that, prior

12 to her writing this to you, you had tasked her with

13 pulling reports and images together for Charu,

14 correct?

15     A.   I don't know if I had asked Kathy Green

16 directly or Steve Beaudoin, who's the radiology

17 director at University.

18     Q.   And why had you asked someone, either Steve

19 or Kathy Green, to pull reports and images together

20 for Dr. Desai?

21     A.   Because I was concerned about Dr. Desai's

22 quality.

23     Q.   What made you --

24     A.   As --

Charu Desai vs                                          Max P. Rosen, M.D.
UMASS Memorial Medical Center, Inc., et al.                  May 07, 2021

153

1      Q.    -- concerned about her quality at that time?
2      A.    Well, a few things.  As I said earlier, I had
3  several complaints from Kim Robinson.  I've also, you
4  know, stated that Kim Robinson had, you know, several
5  issues.  Also, looking at our QA database, that there
6  were several cases in there that were labeled threes
7  or fours which are, you know, potentially significant
8  misses from Dr. Desai.
9           And at everybody's annual review, my standard
10  process was to print out threes and fours for people
11  and give them to the radiology faculty to make sure
12  that they were aware of these cases and ask them to go
13  and look at them.
14          And then, also, with issues raised by
15  Dr. Dill, in her role as the section chief for
16  thoracic radiology, where people would come to her and
17  ask her to re-review studies that Dr. Dill had
18  interpreted and -- that Dr. Desai had interpreted and
19  Dr. Dill had -- had concerns about the quality of
20  Dr. Desai's reads.
21          So, at that point, I felt it had risen to the
22  level where I needed to conduct an independent review
23  to see if what I was concerned about was substantiated
24  by a blind, independent review process.

154

1      Q.   So, to the best of your recollection now, the
2  -- the -- well, so let me pause.  I'm going to direct
3  your attention up to the -- to the next part of the
4  e-mail thread.  You are responding to Kathy Green and
5  you state, Hi -- Just wanted to state that this is a
6  confidential review, which has been requested by a
7  clinician outside of radiology.
8           Who was that?
9      A.   I'm assuming that's my res -- my taking
10  Dr. Robinson's complaints and operationalizing those.
11     Q.   Are you aware if there was a different
12  clinician who brought concerns to you, such that you
13  would have initiated a confidential review of
14  Dr. Desai's cases?
15     A.   Most of the complaints that I received
16  directly were from Dr. Robinson.  But Dr. Dill, I
17  think, had also received complaints from other
18  clinicians who had asked her to review Dr. Desai's
19  studies.
20     Q.   So you let Kathy Green know that you
21  wanted 25 random chest CTs and reports dictated by
22  Dr. Desai, 25 chest CTs and reports dictated by other
23  attendings, and then you just sort of describe in
24  Numbers [sic] 3 and Number 4 the -- sort of the

155

 1  mechanics of the review.

 2          How did you -- how did you decide to

 3  do 25 random chest CTs dictated by Dr. Desai?

 4      A.   I wanted to have a -- a matched number of

 5  Dr. Desai's versus a control group, and I also wanted

 6  to keep the number of studies manageable for one

 7  reviewer.  And an average chest radiologist can read

 8  about 25 chest CTs in a day, and I felt that about two

 9  days' worth of work was appropriate for this, but the

10  -- the selection of 25 was not scientific --

11      Q.   Ahh --

12      A.   -- or, rather, 50.

13      Q.   So do you have any idea how many other

14  attendings' reads were included in the Section 2,

15  25 chest CTs dictated by other attendings?

16      A.   I don't remember.  Again, the studies were

17  pulled randomly.  I was not involved in selecting the

18  studies.

19      Q.   Fair to say that, unless the random selection

20  pulled all 25 from just one other radiologist, that

21  the number of reads by other radiologists that were

22  reviewed in connection with this confidential review,

23  were fewer than the number read that were Desai's

24  reads?

156

1      A.   Correct.  My -- my -- my goal was to compare

2   a body of reads from Dr. Desai against a collective

3   body of reads from 20 -- from other radiologists.

4           And although it's not in here, I think, at

5   some point, I asked for the comparison group not to

6   include Dr. Dill or Dr. Schmidlin, because I wanted to

7   compare Dr. Dill to nonthoracic radiologists -- to

8   compare doctor -- I wanted to compare Dr. Desai to

9   nonthoracic radiologists, so I -- I -- at some point,

10  should have excluded any reads by Dr. Dill or

11  Dr. Schmidlin.

12          And the reason I wanted to compare Dr. Desai

13  to nonthoracic radiologists was actually to give her

14  the benefit of the doubt, because, in my opinion, her

15  level of training and expertise was not at the level

16  of Dr. Dill or Dr. Schmidlin and what a current,

17  modern chest radiologist should be doing.

18     Q.   So you had reports pulled to compare 25 of

19  Dr. Desai's reviews with 25 collective reviews from

20  other attendings.

21          I -- I suppose I'll say it this way; setting

22  aside any sort of comparitory issues, in that however

23  many mistakes might have been revealed by a review of

24  Dr. Desai's cases, fewer would, by definition, be

157

1  revealed of reviews by other attendings, because other
2  attendings did not similarly have 25 readings
3  reviewed?

4       A.   My point was not to compare Dr. Desai to any
5  specific radiologist.  My point was to compare
6  Dr. Desai to a collective of other radiologists who
7  were not thoracic radiologists who were reading chest
8  CTs.

9       Q.   Right.  But one of the consequences of how
10 you pulled the cases is that none of the other
11 attendings had the same number of images to have been
12 reviewed.  In other words; another of the attendings,
13 had he or she had 25 cases reviewed, might have had
14 any number of alleged misreads also uncovered that was
15 not part of the analysis that you set up in pulling
16 just 25 total reads from other radiologists.

17      A.   Well, it's only speculation about what the
18 outcome would've been if I picked 25 of one
19 radiologist, but I could've easily compared Dr. Desai
20 to 25 of Dr. Dill's or 25 of Dr. Schmidlin's, but I
21 was trying to give Dr. Desai the benefit of only being
22 compared to nonthoracic radiologists who were reading
23 chest CT.

24           And Dr. Desai was holding herself out as a

158
```
 1  thoracic radiologist.  So you could argue that the
 2  appropriate comparison would've been against a board
 3  certified thoracic or -- or fellowship trained,
 4  rather, there's no board -- a fellowship-trained
 5  thoracic radiologist.
 6      Q.   So, you pulled, or had pulled, 25 random
 7  chest CTs of Dr. Desai's and 25 chest CTs dictated by
 8  other attendings.
 9           What did you do with them, then?
10      A.   I asked that they were loaded into a system
11  called LifeImage, which is a -- a cloud-based image
12  sharing system.  And also had the reports
13  de-identified, so there was no patient name, medical
14  record number and no indication of who the radiologist
15  was who read it.  And the file room team identified --
16  matched each study, each imagine, with the report by a
17  number, 001, 002, 003, so the reports could be linked
18  with the images.
19      Q.   Then what?
20      A.   So I, then, identified a thoracic radiologist
21  who was willing to review these studies, and the
22  instructions that I gave them was that I had 50 chest
23  CTs with de-identified reports that I would like them
24  to review.  I did not tell them how many were from one
```

159

1  person versus the comparative group or anything else.

2  It was 50 chest CTs to be read.

3          And I asked the person to report whether they

4  agreed or disagreed with the interpretation.  If they

5  disagreed with the interpretation, whether it was a --

6  in their opinion, a minor disagreement or a major

7  disagreement, and whether or not that agree -- whether

8  or not that disagreement would have an impact on

9  patient care, in their opinion.

10     Q.   Do you recall who you identified as the

11  radiologist to do this review?

12     A.   Yes.

13     Q.   Who was that?

14     A.   Dr. Litmanovich.

15     Q.   How did you identify her?

16     A.   She has a reputation of being a good thoracic

17  radiologist and that she is somebody who I worked in

18  the same department with years ago.  And so I knew

19  that she was, you know, well-respected, competent,

20  and, if she agreed to do something, that she would,

21  you know, carry through on the project.

22     Q.   Where was it that you worked together?

23     A.   Beth Israel Deaconess.

24              MR. WAKEFIELD:  Let's go off the record

163

1      A.   I think he's a physician at Marlborough, but
2  he might be an ED doc there, but I'm not a hundred
3  percent sure.
4      Q.   So does this document refresh your
5  recollection as to who was at a meeting on
6  January 31st, 2017?
7      A.   Yes.
8      Q.   And that will have included you, Dr. Bren --
9  Dr. Brennan, Dr. Tennyson and Dr. Robinson, as well as
10 Mr. Roach and Mr. Brown, correct?
11     A.   Correct.
12     Q.   Was -- so I note, from the minutes that you
13 forwarded, that you memorialized actions taken to
14 address concerns about turnaround time and
15 accessibility, that's Bullet Point 1 --
16     A.   (Deponent viewing exhibit.)  Mm-hmm.
17     Q.   -- that in Paragraph 2 you note that
18 Dr. Schmidlin has a home workstation.
19          Why did he have a home workstation?
20     A.   So, I think at this time, Dr. Schmidlin was
21 no longer working full-time at UMass, although I don't
22 know the exact date that he -- or offhand, I don't
23 know the exact date that he transitioned from working
24 full-time at UMass to working at the Brigham.  But,

164

 1  when he stopped working full-time at UMass, he had

 2  offered that he was willing to, you know, do some per

 3  diem work or could work for us to help us out.

 4          And the -- the major need for Dr. Schmidlin's

 5  services was for helping us with our cardiac imaging

 6  volume, because Dr. Dill, at that time, was the only

 7  cardiac radiologist in the department.  And the

 8  cardiology service and the cardiothoracic surgery

 9  service was beginning to rely on our ability to

10  perform cardiac MR for certain patients in making

11  decisions about whether they needed to go have

12  emergency surgery.

13          So, while infrequent, it was clinically

14  important for us to be able to have somebody available

15  who could interpret a cardiac MR study, you know,

16  nights and weekends or when -- when Dr. Dill was on

17  vacation.

18      Q.   You're referring to "cardiac MR" right now.

19          Is that magnetic resonance?

20      A.   Yes.

21      Q.   I'm just going to draw your attention to

22  Bullet Point Number 2 under Chest.

23      A.   (Deponent viewing exhibit.)  Mm-hmm.

24      Q.   This says that "Drs. Schmidlin and Dill will

165

1  read all high resolution chest CTs."

2       That's different than MRs, correct?

3       A.   (Deponent viewing exhibit.)  Yes, I -- I was

4  addressing the need for Dr. Schmidlin to have a home

5  workstation, and the distinction I was making is that

6  the cardiac MRs, not infrequently, needed to be read

7  on an urgent or emergent basis, necessitating the home

8  workstation, where a high-resolution chest CT, those

9  are not emergencies.

10       Usually, they're done to evaluate chronic

11  changes in the lung, and the person appropriating the

12  study needs to be specialty trained and sophisticated,

13  but they are not life-threatening studies that need to

14  be read in a certain time frame.

15       Q.   And -- and then in the second bullet point

16  that we're also eyeballing, it -- it does say

17  Schmidlin and Dill will read all high-resolution chest

18  CTs.

19       Does -- does that mean that, in fact,

20  Dr. Desai did not read high-res chest CTs?

21       A.   It meant that I wanted Dill and Schmidlin to

22  be reading the high-res chest CTs because of their

23  level of sophistication.

24       Q.   Did you believe that Dr. Desai was not able

166

1  to read them competently?

2      A.   Yes.

3      Q.   Did you ever tell her that?

4      A.   No.

5      Q.   And then the -- I think it's the fifth bullet

6  point down, it says, "Quality issues:  Dr. Rosen will

7  perform focused peer-review for physician where issues

8  have been raised."

9           The focused peer review is the 25 random

10 chest CTs pulled, read by Dr. Desai, compared with the

11 25 chest CTs dictated by other attendings, correct?

12     A.   Correct.

13     Q.   How quickly did that focused peer review

14 occur?

15     A.   I think Dr. Litmanovich probably contacted

16 her at some point before November, because November is

17 a large radiology meeting called RSNA, and I remember

18 her saying, well, I can get to it, but it has to be

19 after RSNA, because she was preparing papers and

20 abstracts and things for the meeting and so I -- so I

21 contacted her at some point before November, and she

22 completed the review, I imagine, December, January,

23 you know, after -- after the -- after the meeting.

24     Q.    I'm going to direct your attention down to

177

```
 1  reports myself, was another piece of information that
 2  led me to believe that there were serious quality
 3  issue -- potential serious quality issues with
 4  Dr. Desai's work.
 5      Q.   So did you ever bring those issues to her
 6  attention?
 7              MR. WAKEFIELD:  Object to form.
 8          You can answer, if you can.
 9      A.   No.  Aside from giving her the -- the report
10  at the annual review.
11              (Exhibit 28 marked for identification.)
12          BY MS. WASHIENKO:
13      Q.   Dr. Rosen, on a different note, I'm going to
14  ask you to take a look at a document that I have
15  marked as Exhibit 28.
16      A.   (Deponent viewing exhibit.)
17      Q.   Have you had a chance to review it?
18      A.   Yes.
19              MS. WASHIENKO:  For the record, this is
20  UMM-04602.
21          BY MS. WASHIENKO:
22      Q.   We were discussing earlier, Dr. Rosen, your
23  knowledge of Dr. Desai's health issues.  This appears
24  to be an e-mail from Dr. Ferrucci to you dated
```

178

1   Feb 10, 2017, at 9:30 a.m., in which he writes to you,
2   "Max, She came in this morning.  But was severely
3   dyspneic.  I saw her in the hallway, gasping.  Some
4   acquaintance of hers who I didn't know was assisting
5   her to see her primary care doctor.  She did not look
6   good.  I advised her to go home ASAP.  I think that is
7   possibly four days at least this week where she has
8   been ill.  Just an FYI."  A couple of questions.
9           First, why was Dr. Ferrucci letting you know
10  this?
11      A.   I don't know, but it I would imagine that he
12  was concerned about a colleague not being well and
13  also to -- I don't know if Dr. Desai asked him to let
14  me know that she wasn't going to be at work.
15      Q.   I read the first sentence of his e-mail to
16  you, "She came in this morning," as an odd sentence,
17  unless it implied that she, Dr. Desai, was not
18  expected that morning; would you agree?
19      A.   (Deponent viewing exhibit.)  I have no
20  comment one way or another.  I mean, the subject is
21  Re:  Charu Desai, so I'm assuming that she refers to
22  Dr. Desai who is in the subject line.
23      Q.   My question inartfully posed was; do you have
24  any memory, Dr. Rosen, as to why Dr. Ferrucci would

179

 1  have let you know that Dr. Desai came in this morning?
 2  Was it his usual practice to let you know when
 3  Dr. Desai came in?
 4      A.   No, but I can only -- I can't speculate on
 5  Dr. Ferrucci's syntax.
 6      Q.   Had you asked Dr. Ferrucci to let you know
 7  when Dr. Desai was in at work?
 8      A.   No.
 9      Q.   Had you asked him to report on her health?
10      A.   No.
11      Q.   Are you aware of any reason he will have
12  written to you, "I think that pos -- I think that is
13  possibly four days at least this week where she has
14  been ill"?
15      A.   No.  Other than him being concerned about a
16  colleague.
17      Q.   When you became aware of this -- well, strike
18  that.
19           Fair to say that, at least at this point, you
20  were aware that she might be, at times, severely
21  dyspneic and could present in a hallway gasping,
22  correct?
23      A.   Well, what this e-mail tells me is, on this
24  day, on February 10th, she, Dr. Desai, was at work and

180

 1  was severely short of breath.  It doesn't tell me
 2  anything about her underlying medical condition or the
 3  frequency of -- of any health issues.  And this is
 4  Dr. Ferrucci telling me.  This is not -- not Dr. Desai
 5  coming to me and saying, I have a health issue.  It's
 6  Dr. Ferrucci telling me about a colleague.
 7      Q.   Right.  But then you were clearly aware of
 8  her health issue?
 9              MR. WAKEFIELD:  Object to form.
10      A.   I mean, I'm aware that Dr. Desai was short of
11  breath on February 10th.
12      Q.   I think you testified earlier that you were
13  aware that she had a heart condition?
14      A.   I was aware that she had a pacemaker.
15      Q.   Which is not a heart condition?
16              MR. WAKEFIELD:  Object to form.
17              BY MS. WASHIENKO:
18      Q.   Is having a pacemaker a heart condition,
19  Dr. Rosen?
20      A.   People can have a pacemaker for many reasons,
21  and I am not privy, nor should I be privy, to the
22  details of her medical information.
23      Q.   Are any of the reasons that you can identify
24  someone would have a pacemaker for unrelated to

Charu Desai vs                                    Max P. Rosen, M.D.
UMASS Memorial Medical Center, Inc., et al.           May 07, 2021

192

1      A.   I mean, I don't recall that, but I have no
2  reason to think that she wouldn't have said something
3  like that.
4      Q.   Do you have any recollection that -- that she
5  would have said something asking to be excepted from
6  some call responsibilities?
7      A.   Yes.  And I know I had multiple conversations
8  -- at least several conversations with her where she
9  requested to, you know, be removed from call.
10     Q.   And -- and do you recall that she pointed
11 out, in fact, that newcomers were given schedules that
12 exempted them from call responsibilities at times?
13     A.   To my recollection, there is no one in the
14 department who does clinical work who doesn't take
15 call who's not a per diem.
16     Q.   And is it your testimony that, whoever is on
17 the call schedule, all of those radiologists are
18 assigned the same amount of call?
19     A.   There are slight variations.  So our standard
20 contract for a full FTE includes ten weeks or weekends
21 of call, depending on the requirements of the
22 division.  And that assumes that there are
23 approximately five FTEs in -- in the call pool or 5.2,
24 and there's only one person on call at a time.  And

193

 1  that holds in many sections, but, in some sections, we
 2  actually require two to three people on call on the
 3  weekend.
 4          And in those situations, and you can do the
 5  math, if you need two people on call each weekend,
 6  then you need 10.4 FTEs in the call pool to cover
 7  call.  Or, if you have, say, six people in the call
 8  pool, then you only really need people on every, you
 9  know, nine or probably 8.8 weeks a year.  So the math
10  varies, but we try very hard to make it fair and
11  equitable.
12          So, for example, in mammography, there's
13  really no need to have somebody on call in
14  mammography.  There really aren't emergencies.  The
15  only emergency would be draining a breast abscess, and
16  those are covered by the intervention person on call.
17          So, to make it fair, we take the number of
18  people in the breast division and divide that by 52,
19  and make sure that every weekend somebody from breast
20  is working to help clean up any leftover cases from --
21  from the week.
22      Q.   Do you recall if, in that meeting, you will
23  have informed Dr. Desai that you had been made aware
24  of complaints about her work?

# In the Matter of:

*Charu Desai vs*

*UMASS Memorial Medical Center, Inc., et al.*

---

*Max P. Rosen, M.D. Vol II*

*June 01, 2021*

---

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



224

1    BY MS. WASHIENKO:

2        Q.  I'm now going to turn our attention to a

3    document that I think I've managed to mark as

4    Exhibit 35 and distribute.  Dr. Rosen, can you tell

5    me what this form is.

6        A.  This is a form which was generated from our

7    quality assurance reporting system in radiology.

8        Q.  So it's automatically generated based on

9    what?

10       A.  So data is or cases are entered into this

11   system in two ways; one was through an automated

12   system which requested that X number of cases that

13   were being read by a radiologist were then

14   double-read.

15           So, for example, if I was reading a chest

16   x-ray on Mr. Jones on June 1st and it was the X

17   number of cases that I had read that day and there

18   was a prior x-ray of the chest for Mr. Jones in his

19   record, this system would automatically ask me to go

20   back and reread the prior chest x-ray and report if

21   I agreed or disagreed with the original

22   interpretation.

23           The second way that things -- that cases

24   can be entered into this database is, if somebody is

225

1   made aware of a quality issue about an

2   interpretation of a case, that the radiologist would

3   then enter that case into the database.

4          So there is an automated identification of

5   cases, and then there is a manual identification of

6   cases which are entered into this database.

7      Q.  When you look at this document, Dr. Rosen,

8   can you tell whether any of the entries was

9   generated automatically by the system requesting a

10  double-read or whether it was manually entered by a

11  radiologist who believed he or she saw a potentially

12  significant error?

13     A.  The only way to identify cases which were

14  flagged through an automated process or a manual

15  process would be in the comments.

16     Q.  And, looking at the comments here, can you

17  tell me if Dr. Dill manually entered the first in

18  the row, "Called to review cxr.  Cardiomegaly,

19  lingular subsegmental..." -- however you say that

20  last word.

21     A.  Atelectasis.

22     Q.  Thank you.  Can you tell if she manually

23  entered that?

24     A.  I would assume because Dr. Dill commented,

227

1   to as Peer Review, has fallen out of use in most
2   departments because of the failure of the automated
3   identification process to identify meaningful cases
4   and useful data, and most departments, including
5   UMass., have now moved to a system which is
6   generally called Peer Learning where everybody is
7   encouraged to put both problem cases and, as we
8   would call, you know, great calls into the database
9   because it was found that the peer learning -- the
10  peer review -- peer review methodology was imprecise
11  and did not yield meaningful actionable quality
12  data.
13       Q.  Dr. Rosen, I'm going to ask if -- if in the
14  spring of -- well, in May of 2017, do you recall
15  meeting with Dr. Desai sort of generally catching up
16  on concerns she had about her working conditions at
17  UMass.?
18       A.  I do not recall specifics.
19       Q.  So you have no memory that, in May 2017,
20  she told you that she in the following year was
21  going to have completed her 26th year at UMass.?
22       A.  I remember meeting with Dr. Desai at some
23  point and having her tell me -- having her ask to be
24  absolved from call because she had been in the

228

1   department so many years.

2       Q.  Do you have any memory that she told you

3   that other radiologists in the department and

4   particularly -- I should clarify -- the locum tenens

5   that were staffing the department along with Dr.

6   Desai were not actually reading difficult cases but

7   leaving them to her?

8       A.  No, I do not recall that.

9       Q.  Do you recall her stating that she believed

10  she was being discriminated against and unfairly

11  treated?

12      A.  No.

13      Q.  Do you recall that she asked you if you had

14  heard any complaints about her work?

15      A.  No.

16      Q.  I'm going to circle back briefly to Day 1

17  of the deposition again.  In -- in Day 1, we were

18  discussing Dr. Irwin, and I believe I asked if you

19  had spoken with some of Dr. Desai's colleagues, and

20  you then stated that you asked Dr. Irwin about

21  Dr. Desai's reads, and he shrugged his shoulders and

22  said, well, I can read my own chest x-rays.  Do you

23  recall that?

24      A.  Yes.

233

1        A.  Yes.

2        Q.  Did you discuss personal workstations for

3    radiologists with anyone?

4            MR. WAKEFIELD:  Object to form.

5        A.  Could you be more specific about anyone.

6        Q.  Did -- fair question.  Did you discuss work

7    from home personal workstations with any of the

8    radiologists in the department?

9        A.  Yes.

10       Q.  Do you recall with whom you spoke?

11       A.  Certainly, with the radiologists who were

12   part of our trial period who were the first few

13   people to have a home work station.

14       Q.  And do you recall who they were?

15       A.  Excuse me?

16       Q.  Do you recall who...

17       A.  Thank you.

18       Q.  Do you recall which of those -- who those

19   radiologists were?

20       A.  One of the earlier radiologists to have a

21   home work station, I think, was Dr. Andrew Chen in

22   neuroradiology and also, likely, Dr. Satish

23   Dundamadappa also in neuroradiology.

24       Q.  Do you recall if Dr. Dill made a proposal

234

1  to use a workstation at home?

2       A.  I don't recall if it was Dr. Dill's

3  proposal, but Dr. Dill did for a short period have a

4  home work station.

5       Q.  And I'm going to direct your attention to

6  your Answers to Interrogatories which will be

7  Exhibit 9, and I will specifically direct your

8  attention to Interrogatory No. 5 and Answer No. 5,

9  which, with luck, will show up on Page 3 of Exhibit

10  9.  In the second paragraph of Answer No. 5 --

11      A.  Okay.

12      Q.  -- you state -- one, two, three, four --

13  five lines up from the bottom the sentence starts,

14  "No radiologist requested a personal workstation."

15  Do you see that sentence?

16      A.  Yes.

17      Q.  "...except that Dr. Dill made a proposal to

18  use a workstation at home in order to be available

19  to read cardiac studies on an emergency basis after

20  identifying a need in the department for such

21  service.  Dr. Dill's proposal was attempted for a

22  short period of time until it was determined to be

23  not technically feasible at the time."  Did I read

24  that correctly?

235

1        A.  You did.

2        Q.  Why was it not technically feasible at that

3   time?

4        A.  I don't remember all the specifics, but

5   some of the technical reasons and some of the

6   technical problems that people had early on was very

7   slow download of images into the home PAC station.

8   Other -- other issues were related to maintaining

9   connectivity.

10       Q.  Dr. Rosen, in the pandemic, did

11  radiologists read images from workstations at

12  home?

13       A.  Yes.

14       Q.  So it was possible to resolve those

15  issues?

16       A.  We have resolved several of the issues, but

17  the system is still not a hundred percent

18  fool-proof.

19               (Document marked as Exhibit 38

20                for identification)

21  BY MS. WASHIENKO:

22       Q.  With luck, I have now just distributed a

23  document that's been marked as Exhibit 38.

24  Dr. Rosen, this appears to be an email sent from

321

1    BY MS. WASHIENKO:

2        Q.  I am going to try to pull up a different

3    exhibit that might be already Exhibit 57.  For the

4    record, this is UMM-04299 through 04300.

5        A.  Okay.

6        Q.  Directing your attention to the bottom of

7    the first page, this is an email from Dr. Robinson

8    to Steve Roach dated January 3rd, 2018, that -- and

9    then just above that that -- that Dr. Brennan was

10   cc'd on, and just above that is Dr. Brennan

11   forwarding this email, presumably, to you because on

12   January 8th, 2018, at 2:27 p.m., he writes, "Hi

13   Max."  Do you have memory of this email, Dr.

14   Rosen?

15       A.  Not specifically, but it is an email

16   addressed to me.

17       Q.  Okay.  I just want to direct your attention

18   to Dr. Robinson's email to -- to Mr. Roach and

19   Darren Brennan.  She writes, "Please treat this as

20   confidential and do not forward.  Issues:  Quality

21   of reads," and then she cites Drs. ███ , ███

22   ███   Desai, and most recently ███ .  "Issues

23   include missed findings, inaccurate description of

24   findings, not comparing to old studies that are

Charu Desai vs                                    Max P. Rosen, M.D.
UMASS Memorial Medical Center, Inc., et al.              June 01, 2021

322

1    reasonably available, reading as no change."  Do you
2    see that?
3         A.  Yes.
4         Q.  Did you happen to conduct any quality
5    review of Dr. G.T. ?
6         A.  As -- no continue.  I'm sorry.
7         Q.  No.  No.  That was oddly where my question
8    ended.
9         A.  Oh, okay.  Actually, I discussed with
10   Dr. G.T. his reading chest CT's, and we decided
11   that it was better use of his time and skills to
12   just focus on abdominal and pelvic imaging which is
13   what his fellowship training was in.
14        Q.  What about with Dr. H.L.?
15        A.  First, actually, his name is H.L. , but
16   he's the head of our ED radiology group, and I have
17   no issues with his functioning as an ED radiologist.
18        Q.  What about with Dr. J.F.
19        A.  Again, I have no issues with Dr. J.F.
20   functioning in his ability to read x-rays and bone
21   films and Dr. J.F. does not read CTs.  He
22   focuses on the -- the images and the modalities that
23   he is comfortable with at this stage of his
24   career.

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Max P. Rosen, M.D.
June 01, 2021

323

1    Q.   And Dr. [D.B.] ?

2    A.   Yeah, again, no specific issues here, and

3    Dr. [D.B.] is somebody who works in both our

4    chest -- our chest, our community, and our breast

5    imaging divisions, and is somebody who fills in to

6    help balance the schedule.

7    Q.   Dr. Brennan forwards that email to you and

8    says that he encloses Dr. Robinson's summary of the

9    issues as she sees them in radiology.  The last line

10   says, "Probably best to talk through these as there

11   was an additional unfortunate language publicly used

12   to describe the Radiologists here that I want to

13   follow up on."  Do you see that?

14   A.   Yes.

15   Q.   Do you recall speaking with Dr. Brennan

16   about that?

17   A.   I don't recall, but I expect that I did.

18   Q.   Do you recall what the unfortunate language

19   likely used was?

20   A.   No, I don't.

21   Q.   And it appears from Dr. Brennan at the top

22   of the email that this was Dr. Robinson's publicly

23   used language, correct?

24   A.   Yes.  That would be my interpretation.

342

1   that correct?

2        A.   That is correct.

3        Q.   At -- at that point, did you tell Dr. Desai

4   that there were any limitations placed on her

5   reading of images from the date of that meeting

6   through March 17, 2019?

7        A.   I don't know specifically when I told her

8   that, but I did tell her that I wanted her to no

9   longer read chest CTs and to only read chest x-rays.

10        Q.   And that was because the review suggested,

11   apparently, that Dr. Desai's reads of chest CTs

12   were -- or her reads of them were of poor quality,

13   is that correct?

14        A.   Correct.  Yes.

15        Q.   Dr. Desai pressed you to explain more about

16   the purported deficiencies in her readings, didn't

17   she?

18        A.   Yes.

19        Q.   And, in fact, you met with Dr. Desai

20   shortly thereafter so she could review some

21   information about her readings that you compiled, is

22   that correct?

23        A.   I recall meeting with her, yes.

24        Q.   Do you recall that she asked to be

344

1  see the information that you compiled about her poor

2  quality reads?

3       A.  Yes.

4       Q.  Did she have an opportunity to, in fact,

5  address any of the images that you identified as

6  poor quality?

7       A.  No.  We never -- I never showed her images.

8  It was summary data.

9       Q.  So you never gave her a chance to respond

10  to the specific alleged misreads by image?

11       A.  Correct.

12       Q.  Can you tell me who else was at the -- the

13  meeting you had with Dr. Desai about her reads?

14       A.  I don't remember exactly.  I think that

15  Dr. Tosi was at one meeting, Dr. Cavagnaro, who was

16  the interim CMO was at a meeting, and if I remember

17  correctly, I think Dr. Desai wanted to bring

18  somebody to a meeting and might have brought

19  Dr. Hussein, but I'm not sure who was at which

20  meeting.

21       Q.  How many meetings were there?

22       A.  I don't recall exactly, but I do remember

23  that Dr. Cavagnaro was involved in a meeting and I'm

24  pretty sure that Dr. Hussein came to another

365

```
 1        A.  Yes.
 2        Q.  Line 11, [E.S.]        "Retired Following
 3   Discussion of Performance Concerns."  Dr. [R.N.]  is
 4   way down on Line 24, "Resigned Following Discussion
 5   of Performance Concerns."  Line 25 is Dr. [R.G.],
 6   "Resigned Following Discussion of Performance
 7   Concerns."  Line 32, [J.A.]    is, "Resigned
 8   Following Discussion of Performance Concerns," and
 9   Line 39, Dr. Desai is, "Involuntary - Performance."
10   Do you see that?
11        A.  Yes, I do.
12        Q.  Is it my understanding from this document
13   that you determined that it was not worth speaking
14   with Dr. Desai about performance concerns to permit
15   her to resign but that you just decided
16   involuntarily to terminate her?
17        A.  With all the other people who you've just
18   listed, I essentially told them that their job --
19   that they were being terminated, and they all went
20   out and found other jobs.  When I told Dr. Desai
21   that she was being terminated, she never requested
22   time to go find another job; so while on paper this
23   looks different, the reasons and the conversations
24   with everybody was really the same.
```

367

1    Q.  As far -- as far as I know, doctor -- I'm

2  sorry.

3         MR. WAKEFIELD:  No.  Go ahead.

4    A.  Dr. Desai never raised that issue with me

5  or asked that question to give her time to go find

6  another job and then resign.

7    Q.  You testified, I think, earlier that you

8  informed her not just of performance concerns in

9  your meeting with her on May 14 but that you, also,

10  informed her of her termination.  It sounds to me

11  that what you are saying about the other doctors

12  that I've listed on Exhibit 71 is that you expressed

13  to them concern about their performance and that

14  thereafter they were given an opportunity to resign.

15  Am I misunderstanding?

16    A.  The conversation that I would have had in

17  general with everyone who had performance issues was

18  that they were no longer going to be employed by the

19  medical group, and in fact, they were being

20  terminated with the appropriate notice given the

21  amount of years that they had.

22         I imagine, in every case, everybody said

23  will you give me time to go find another job, except

24  Dr. ■■■■ who said can I just retire.  So the

368

1   conversation was the same; the response of the
2   individuals was different.
3        Q.  I'm now going to try to introduce a
4   document that I am going to need Mr. Sweeney's
5   assistance with because the version of it that was
6   produced to us originally said something about BEING
7   produced in a native file, and when I --
8        A.  Do you mind if we take a five-minute break
9   here?
10       Q.  Happy to.  It will give me a chance to get
11  this up.  Thank you.
12            MR. WAKEFIELD:  Patty, do you have an idea
13  I know we -- we overshot a little bit on an
14  estimate, which is not uncommon, but do you have an
15  idea of -- of how much longer we might have?
16            MS. WASHIENKO:  I have three exhibits
17  that -- one -- we can be off the record.
18            (Recess, 4:42 p.m. - 4:50 p.m.)
19                 (Document marked as Exhibit 72
20                  for identification)
21  BY MS. WASHIENKO:
22       Q.  I have just distributed a document that has
23  been marked as Exhibit 72.  I need to represent,
24  because I think it's not outrageously clear from the

376

1    apparently, October 1, 2017 through 9/30/2018,

2    yes?

3        A.  Correct.

4        Q.  Do you have memory, Dr. Rosen, did all of

5    the people listed on this chart discuss with you

6    their proposals for their academic time?

7        A.  Yes.  This is something that I would review

8    every year at people's annual academic planning

9    meeting.

10       Q.  This document you would review with them?

11       A.  Not this document but their allocation of

12   academic time.

13       Q.  And do you -- do you recall that all of

14   these allocation numbers that -- in the Max column

15   were based on conversations you had with each of

16   them during their annual reviews?

17       A.  Yes.

18       Q.  If you can give me just one more quick

19   second.

20           Do you recall, Dr. Rosen, if -- if -- if

21   you required the -- the faculty members listed on

22   Exhibit 73 to submit proposals about how they were

23   going to use their academic days?

24       A.  I don't ask people to submit formal

377

1  proposals, but I do review with them what they've
2  done in the prior year and which they have detailed
3  in their academic planning form.
4          MS. WASHIENKO:  Gentlemen, although I'm
5  always a little bit nervous to say this, I am going
6  to say, unless I have any redirect, I have no
7  further questions right now.
8          MR. JOHNSON:  I don't have any questions.
9          MR. WAKEFIELD:  I don't have any questions
10  either.
11          MS. WASHIENKO:  Well, then I have limited
12  redirect.  Thank you all for your time today.  And I
13  am off the record.
14          THE REPORTER:  And can I just get your
15  transcript orders, please.
16          MS. WASHIENKO:  I would like, please, one
17  mini and one regular.
18          THE REPORTER:  Okay.
19          MR. WAKEFIELD:  And for me a regular, mini
20  and electronic only is fine.
21          THE REPORTER:  Okay.
22          MR. JOHNSON:  And I'll do the same a mini,
23  regular, and electric.
24          THE REPORTER:  Okay.  Thank you very much.

**<u>EXHIBIT D</u>**

1              UNITED STATES DISTRICT

2              DISTRICT OF MASSACHUSETTS

3                 CIVIL ACTION NO. 4:19-cv-10520-DHH

4    * * * * * * * * * * * * * * * * * * * * * * * *
     CHARU DESAI,
5                   PLAINTIFF

6     v.

7    UMASS MEMORIAL MEDICAL CENTER, INC., et al.,
                     DEFENDANTS
8    * * * * * * * * * * * * * * * * * * * * * * * *

9

10

11          DEPOSITION OF CHARU DESAI, M.D.,

12              Conducted Remotely

13          211 Congress Street, Suite 720

14          Boston, Massachusetts   02110

15

16           Friday, September 18, 2020

17            10:37 a.m. to 5:00 p.m.

18

19                Pages 1-202

20

21

22

23

24

Charu Desai vs                                    Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.        September 18, 2020

32

1     it's been 17 years since your termination of
2     employment, when I ask whether you've done any
3     scholarly publications in the last 15 years and
4     you said yes, that wouldn't be accurate, is that
5     fair?
6          MS. WASHIENKO:  Bob, would you repeat the
7     question?
8          MR. KILROY:  Sure.  I'll try and break it
9     up.  It's a little convoluted.
10         MS. WASHIENKO:  Thank you.
11   Q   So you had told -- and I'll just lead into it.
12    You had told me earlier in testimony that you had
13    a memory of having done scholarly publications,
14    you couldn't remember specifics, but within the
15    last 15 years.  And then I just said to you, your
16    resume would indicate you hadn't done any
17    scholarly publications for 17 years.
18         So does that refresh your recollection that
19    actually, you haven't done any scholarly
20    publications in the last 15 years?
21   A   Yes, I stated that it was so long ago I didn't
22    remember.  So if my resume has it 17 years ago,
23    so -- I'm not trying to hide anything here.
24   Q   Okay.  Are you a member of a medical staff

74

1       produced for 2019, 2018, and 2017.

2              Am I correct that since 2017, you have not

3       been employed by any entity other than UMass.

4       Memorial?

5   A   Please repeat the question?

6   Q   Sure.  Am I correct that since 2017, you've had no

7       employment with any entity other than UMass.

8       Memorial Medical Group and your dual employment

9       with the medical school?

10  A   Yes.

11  Q   Do you know who Dr. Rosen is?

12  A   Yes.

13  Q   He was your chair of radiology during the last few

14      years of your employment with UMass. Memorial,

15      correct?

16  A   Yes.

17  Q   And as the chair of the radiology department, he

18      was -- he had overall responsibility for radiology

19      at UMass. Memorial Medical Group, correct?

20  A   Yes.

21  Q   Would you agree that Dr. Rosen, as chair of

22      radiology, had an obligation to ensure patient

23      safety?

24  A   Yes.

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu Desai, M.D.
September 18, 2020

75

1   Q   Would you agree that Dr. Rosen, as chair of

2       radiology, had an obligation to ensure quality of

3       radiological reads by the radiologists who report

4       up to him?

5   A   Yes.

6   Q   And that would include you, correct, when you

7       worked there?

8   A   Yes.

9   Q   Do you believe that Dr. Rosen, based on his

10      training and experience, is capable of assessing

11      the competence of a radiologist?

12          MS. WASHIENKO:  Objection.

13  A   Please repeat the question?

14  Q   I'm sorry, I didn't catch your answer, ma'am.

15  A   Please repeat the question.

16  Q   Oh, sorry.  Sure.  Do you believe that Dr. Rosen,

17      based upon his training and experience, and his

18      role as chair, is capable of assessing a

19      radiologist's competence?

20          MS. WASHIENKO:  Objection.  You can answer,

21      Dr. Desai.

22  A   Maybe.

23  Q   And why do you hesitate and say "maybe" as opposed

24      to yes or no?

Charu Desai vs                                          Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.            September 18, 2020

                                                                    78

1           to discuss.

2    Q    That could be action, ma'am.  That would be an

3         action for that discussion.  So I'm asking, do you

4         agree that Dr. Rosen -- I'm not asking you

5         specific action, I'm asking just in general -- do

6         you agree Dr. Rosen, as the chair of the

7         department, and as part of his job duties, should

8         take action if he believes a radiologist's quality

9         is substandard?

10   A    He can.

11   Q    I didn't ask if he can.  I know he can.  I'm

12        asking if you believe he should, or should he

13        ignore it?

14   A    He should.

15   Q    Okay.  Do you know why Dr. Rosen made the

16        determination to terminate your employment and

17        give you the one-year notice of termination?

18   A    When he gave me the letter, he told me it was a

19        no-cause termination.

20   Q    I'm asking, do you know why he made that decision

21        to give you a no-cause termination?

22            MS. WASHIENKO:  Objection.  You can answer,

23        Dr. Desai.

24   A    So in the beginning he told me no-cause

79

1        termination, and then further, because I was

2        really upset and I ask him why, then he is telling

3        me it is poor quality of work.

4    Q   Okay.  So you've testified that Dr. Rosen had an

5        obligation to maintain patient safety, an

6        obligation to maintain quality, an obligation as

7        part of his job duties, to take action if he

8        believes a radiologist's quality is substandard,

9        and then, he actually took action in the form of

10       no-cause termination to you based on his

11       assessment that your quality was substandard.  Is

12       that fair?

13   A   I believe that's what he did.

14   Q   Okay.  And are you aware that Dr. Rosen, when

15       making that determination to terminate your

16       employment, based on a quality concern, relied on

17       an independent expert valuation of 25 randomly

18       selected cases of yours?

19            MS. WASHIENKO:  Objection.  You can answer,

20       Dr. Desai.

21   A   I'm aware.

22   Q   Okay.  So are you claiming that by Dr. Rosen

23       asking an independent expert to review 25 randomly

24       selected cases of yours, that he did so based on a

84

1      what are you asking, in general what?

2  Q   In general, you would say that the expert's review

3      of your cases constituted a thorough, accurate

4      review of your cases?

5          MS. WASHIENKO:  Objection.  You can answer.

6  A   I do not agree with some of her conclusion.

7  Q   You said just one or two though, right?

8  A   No, that was actually completely different patient

9      she wrote it on, so that's completely miss.  Like

10      case number this, had nothing do with what the

11      planning was.

12  Q   Okay.

13  A   And on the list of things which said it was wrong,

14      I do not agree to most of them.

15  Q   So tell me -- let's start with your age.  Do you

16      believe that Dr. Rosen had cases randomly selected

17      for independent review by an expert because you

18      were age 67 at the time?

19  A   Please repeat the question?

20  Q   Sure.

21          Do you believe Dr. Rosen made a decision to

22      have 25 of your cases reviewed by an expert for

23      quality purposes because you were age 67 at the

24      time?

Charu Desai vs                                          Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.           September 18, 2020

85

1              MS. WASHIENKO:  Objection.

2    A   I don't think review has anything to do with the

3        age.  Both don't go together.

4    Q   I agree.  I'm just trying to make sure you agree.

5        So you're not claiming that he made the decision

6        to have it reviewed because of your age?

7    A   Has nothing to do with age.

8    Q   Okay.  Do you believe that Dr. Rosen made the

9        decision to have 25 of yours cases reviewed for

10       quality purposes by an independent expert based on

11       the fact that you're a female?

12   A   No.

13   Q   Do you believe that Dr. Rosen made a decision to

14       have 25 of your cases reviewed by an independent

15       expert for quality purposes because of your

16       national origin?

17   A   No.

18   Q   Do you believe that Dr. Rosen made a decision to

19       have 25 of your radiological reads reviewed by an

20       independent expert for quality purposes because of

21       your race?

22   A   No.

23   Q   So upon what basis do you claim that Dr. Rosen's

24       decision was discriminatory?

Charu Desai vs                                    Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.       September 18, 2020

86

1           MS. WASHIENKO:  Objection.

2           On the basis of age, Bob?

3           MR. KILROY:  No.  Any basis.  I went through

4       the categories that are named in her Complaint.  I

5       want to know if there's something I'm missing.

6   A   I think we are mixing up two things.  The

7       independent review is number one.  The age, race,

8       national origin, disability, everything is a

9       separate thing.  Has nothing to do with the

10      independent review.

11  Q   Okay.  So the independent -- just so I'm clear,

12      the independent review you said is not affected in

13      any way by Dr. Rosen acting in a discriminatory

14      manner?

15          MS. WASHIENKO:  Objection.  You can answer.

16  A   To my belief, first of all --

17          MS. WASHIENKO:  Are you okay, Dr. Desai?

18          THE WITNESS:  Huh?

19          MS. WASHIENKO:  Are you okay?

20  A   I believe that without even discussing that

21      anything was wrong, why did he do the independent

22      review?

23  Q   Do you think that he didn't discuss with you

24      before the independent review because of your age?

Charu Desai vs                                        Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.          September 18, 2020

88

1   Q   Do you believe Dr. Rosen chose not to speak with
2       you before seeking an independent review because
3       of your age?
4           MS. WASHIENKO:  Objection.
5   A   I don't know where the age comes in.  I still
6       don't understand the question.  I really don't.
7   Q   You told me Dr. Rosen didn't speak with you before
8       he sent out for independent review, correct?
9   A   Yeah.  My --
10  Q   It's yes or no, ma'am.  Is that correct?
11  A   Yes.  No, he did not.
12  Q   Okay.  And are you claiming that he chose not to
13      speak with you because of your age?
14          MS. WASHIENKO:  Objection.
15  A   No.
16  Q   Are you claiming he chose not to speak with you
17      before sending out for the independent review
18      because of your claimed disability?
19          MS. WASHIENKO:  Objection.
20  A   No.
21  Q   Are you claiming he chose not to speak with you
22      before sending out for independent review because
23      of your national origin?
24  A   No.

89

```
 1   Q   Are you claiming he chose not to speak with you
 2       before sending out for independent review because
 3       of your race?
 4   A   No, but all these things has no relation with the
 5       independent review.  That's my answer.
 6   Q   Are you claiming that he chose not to speak with
 7       you before sending out for an independent review
 8       because you're a female?
 9           MS. WASHIENKO:  Asked and answered, Bob.
10       Her answer has been --
11           MR. KILROY:  I want an answer yes or no to
12       this, Pat.
13           MS. WASHIENKO:  It's not a yes or no
14       question.
15           MR. KILROY:  Of course it is.
16   Q   Are you claiming that he didn't speak with you
17       because you're female?
18   A   What's the relation here?  I don't get it.  I do
19       not get it.
20   Q   You don't have to.  You don't have to get my
21       question.  Would you answer the question, please?
22           MS. WASHIENKO:  Bob, you're badgering her.
23       You're yelling at my witness.
24   Q   Do you understand the question?  Did he not speak
```

Charu Desai vs                                         Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.            September 18, 2020

90

1       with you because you're female?  Do you understand

2       the syntax there?

3            MS. WASHIENKO:  Ooh, Bob, that's badgering.

4            MR. KILROY:  I'm trying to make sure she

5       understands me, Pat.

6    A  I understand --

7    Q  Okay.

8    A  I understand that this has no relation, that's

9       what I understand, and you still asking me the

10      same question.

11   Q  No, I haven't -- you haven't answered yes or no to

12      the female question.

13   A  Independent review has no relation to the age,

14      sex, whatever.  Why you asking that question?

15   Q  You don't have to worry about why.  So, you --

16   A  Yeah, I do, because I'm answering the question.

17   Q  Am I correct then that you're saying that the

18      independent review has nothing to do with your

19      allegation of discrimination?

20           MS. WASHIENKO:  Objection, but you can

21      answer, Dr. Desai.

22   A  In a way, it is.

23   Q  I'm sorry?

24   A  In a way, it is discrimination.

91

1   Q   You're claiming the independent review decision by
2       Dr. Rosen was discriminatory.
3            Now tell me why that's discriminatory to
4       decide to send out for an independent review?
5   A   Because there are a lot of people in the
6       department.  There are maybe qualities for
7       something.  Did he do independent review for all
8       of them?  I don't think so.  I do not think so.
9   Q   Do you think that he made up his concern about
10      quality for you because of your race?
11  A   I do not think he made up.
12  Q   Okay.  So he didn't make it up and he has an
13      obligation to ensure quality.  Would you agree
14      that one way to assess quality, so that it's not
15      running a risk of being discriminatory, is to ask
16      for an independent expert to take a look at the
17      records?  Would you agree that that's one way to
18      assess quality?
19  A   Yes.
20  Q   And would you agree that by doing that, it shows
21      Dr. Rosen is trying to remove himself from being
22      the one assessing your quality directly so he
23      could have a third-party expert make the
24      assessment without knowing that it was you?

92

1   A   Yes.

2   Q   And would you agree that if you are trying to

3       assess someone's quality, whether yours or someone

4       else's, that that's a fair way for a supervisor to

5       go about trying to assess quality?

6           MS. WASHIENKO:  Objection.  You can answer,

7       Dr. Desai.

8   A   Yes, but if it is done the right way.

9   Q   Okay.  I understand.

10  A   But done the right way, and it cannot be people

11      you know.  It has to be third party means third

12      party.  This is not -- it is not done the right

13      way.  If it is done the right way, yes, but in our

14      case, it was not done the right way.

15  Q   Okay.  What was not done right?

16  A   Yeah, just like I told you, take my 25, take other

17      25 for other person, take third person 25, and

18      then compare with each one of them.  You can't

19      compare two of them and 25 of me, or two of

20      someone else, X, Y, Z.  It's completely done

21      wrong.  I do not agree.

22  Q   So you just -- you have a concern that there

23      weren't enough cases reviewed by the expert for

24      other individuals?

93

1   A   Yes.  It should be one to one.

2   Q   And if they had, and the expert came out with the

3       same results as to you, which as you know were

4       five major misses and I think four minor out of

5       the 25, if the expert had the same analysis as to

6       you, could he rely on the expert's analysis as to

7       you?  Forgetting about what she might find on the

8       others.

9   A   I do not agree completely with the expert report.

10  Q   I know but -- I understand that.  This has

11      nothing --

12  A   If is not by major and minor, then it is not.  It

13      is not.

14  Q   But he's relying on what an expert tells him.

15  A   But then even if it is, you know, you talking

16      about somebody 50 year spent, and not only that, I

17      spent 27 years at UMass., and all of a sudden, you

18      are no good?  That I don't agree whatsoever.

19  Q   I didn't say that to you, ma'am.  I didn't say

20      you're not good.

21  A   Yeah, you are saying independent review called

22      five major and five minor, whatever the number is.

23      I do not agree.  So then that is the end of

24      my reason.

94

1   Q   So you want to substitute your judgment for the

2       independent expert's judgment?

3           MS. WASHIENKO:  Objection.

4   Q   Is that right, would you agree, if Dr. Rosen is

5       acting fairly by relying on an independent

6       expert's evaluation as opposed to his own

7       evaluation?

8           MS. WASHIENKO:  Objection.

9   A   So what is the -- please repeat that?

10  Q   Sure.  Would you agree Dr. Rosen acted fairly,

11      appropriately, by relying on an independent

12      expert's evaluation as opposed to him making the

13      evaluation himself?

14  A   I agree.

15  Q   Okay.  And so, what he received from the

16      independent expert said you had some quality

17      problems.  You agree with that, right?

18  A   I do not.

19  Q   You don't agree that that's what the report said?

20  A   Report said, but I do not agree.

21  Q   No, I understand you don't agree that the report

22      is right, but you agree that's what the report

23      told him, right?

24  A   Yes.

95

1   Q   Okay.  Now, do you think he should ignore the

2       report of the independent expert who was hired to

3       do the evaluation?

4           MS. WASHIENKO:  Objection.  You can answer.

5   A   I didn't say that.

6   Q   I'm sorry?

7   A   I did not say that.

8   Q   So you agree that he should not ignore the report,

9       right?

10          MS. WASHIENKO:  Objection.

11  Q   You have to answer, ma'am.

12  A   Yeah, he should not.

13  Q   Okay.  And you would agree, he did not ignore the

14      report, isn't that right?

15  A   He did not, but there are other steps he could do

16      to see.

17  Q   And in seeking an independent expert's evaluation,

18      do you think Dr. Rosen was acting maliciously

19      toward you?

20  A   I did not hear.  Please repeat.

21  Q   In seeking an independent expert's evaluation, do

22      you think Dr. Rosen was acting maliciously toward

23      you?

24  A   No comment.

96

1    Q    What's that?

2              MS. WASHIENKO:  You have to answer,

3         Dr. Desai.

4    A    Please repeat the question?

5    Q    Sure.  Dr. Rosen sought an independent expert's

6         evaluation on quality, and part of that was an

7         evaluation of your quality.  Do you think he was

8         acting maliciously in seeking an independent

9         expert's evaluation on quality?

10             MS. WASHIENKO:  Objection.  You can answer.

11   A    I hope not.

12   Q    Do you have any facts that would support that he

13        was acting maliciously toward you by seeking that

14        independent expert's evaluation?

15   A    Please repeat the question?

16   Q    Can you offer any facts that would the indicate

17        that Dr. Rosen acted maliciously when he was

18        seeking an independent expert's evaluation?

19   A    I do not have right now.

20   Q    I'm sorry, ma'am, I didn't hear you?

21   A    I do not have right now.

22   Q    I'm getting ready to show you Exhibit 11, which is

23        your Employment Agreement with UMass. Memorial

24        Medical Group.

Charu Desai vs                                          Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.            September 18, 2020

105

1   A   Pay, yeah.

2   Q   Okay.  That's all I was getting at.

3           Did you ever submit a proposal to anyone at

4       UMass. Memorial to substantiate what you were

5       going to use your academic days for?

6   A   I did not, but at the same token, everybody new

7       hire, when they came, they got one day without --

8       they haven't proven that they have a proposal,

9       so -- and I was not asking once a week.  They were

10      all getting once a week.  I was asking 12 days for

11      a year.  I didn't ask hand and foot.

12  Q   You were told to submit a proposal to substantiate

13      your need for academic days, weren't you?

14  A   Yeah.

15  Q   And you chose not to, didn't you?

16  A   It's not a question of not choosing.  I did not.

17      But the same thing applies to the other people

18      too.

19  Q   Ma'am, I need to ask you that question.  We'll be

20      here for days on end.

21  A   That proves the point.  I want to answer what I

22      think is correct, that yeah, I did not.  To answer

23      the first question, and the substantiate to what I

24      am telling you, people who are just coming out of

110

1  A  Nobody at least anymore from my time.

2  Q  Okay.  So no one got grandfathered that you're

3     aware?

4          MS. WASHIENKO:  Objection.

5  Q  Did you want them to make an exception for you

6     based on your age?

7          MS. WASHIENKO:  Objection.

8  A  Yeah, there were rules, 20 plus years of service

9     and all that.  Not only that, for my disability, I

10    wanted them to give me a break.

11 Q  I didn't ask you that question.

12         Did you want them to treat you better than

13    others based on your age with respect to academic

14    time?

15 A  Please repeat the question?

16 Q  Did you want them to treat you better than others

17    based on your age with respect to academic time?

18 A  No.

19 Q  Okay.  So you didn't want them to make an

20    exception based on your age?

21 A  I wanted to make an exception for my disability

22    because working 15 days in a row, impossible.

23    Very difficult.  Okay.

24 Q  So you wanted an exception based on your

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu Desai, M.D.
September 18, 2020

111

1       disability.  What was it about your disability
2       that prevented from you doing your job?
3               MS. WASHIENKO:  Objection.  Dr. Desai, you
4       can answer.
5   A   I am doing five days of clinical work, then I'm
6       doing the weekend.  Weekend is busy with lot of
7       CT.  And then I'm doing another five days before I
8       get a break, and it just was too much for me.
9   Q   And you submitted a doctor's note saying that you
10      needed to be able to take time off because of the
11      disability, is that right?
12  A   My thing is known for 20 years.
13  Q   Did you submit a doctor's note saying you needed
14      time off, ma'am?
15  A   Not to my knowledge.
16  Q   No, you didn't.
17              And did you ever tell Dr. Rosen you were
18      incapable of performing your clinical job because
19      of your heart condition?
20              MS. WASHIENKO:  Objection.
21  A   That's not the correct word.  It is not incapable.
22      It is tired.
23  Q   So you were capable -- hold on, so you were
24      capable of performing your job despite the heart

112

```
 1       condition, is that right?
 2   A   Yeah, but I used to get tired.
 3   Q   Right.  And do you think other people get tired
 4       working?
 5           MS. WASHIENKO:  Objection.
 6   A   Yeah, they were using their academic time in the
 7       following week.
 8   Q   What were you going to do --
 9   A   They got tired.  They all got tired and they told
10       me.
11   Q   Ma'am, no question is pending.
12           What were you going to do with your academic
13       time?
14   A   Take a break so I can recuperate for the next day.
15   Q   You wanted a day off, didn't you, ma'am?
16           MS. WASHIENKO:  Objection.
17   A   Don't give me that.
18   Q   Ma'am, you wanted a day off, didn't you?
19           MS. WASHIENKO:  Objection.
20   Q   Answer the question, please.
21           MS. WASHIENKO:  Objection.  I'm going to
22       instruct my client not to answer.
23           MR. KILROY:  No, that's a fair question,
24       Pat.
```

117

1   A   On the first page, right?

2   Q   Yes.

3   A   Number 3.  "In order to be eligible"?

4   Q   Yes.  And last sentence of that paragraph says,

5       "For faculty with two or more years of service,

6       allocation will be based on prior activity and

7       mutually agreed upon future activity."

8   A   Correct.

9   Q   Am I correct that, one, you had no prior activity

10      as of 2015 on for academic service, academic

11      activity, that is, and you never mutually agreed

12      with your chair on future activity?

13  A   Yes.

14  Q   And you would agree that within the radiology

15      group, under the leadership of Dr. Rosen, that

16      other radiologists who were female were granted

17      academic days, correct?

18  A   Yes.

19  Q   And other radiologists who were the same race and

20      national origin as you were granted academic days,

21      correct?

22  A   Yes.

23  Q   And other radiologist over the age of 40 were

24      granted academic days, right?

118

1    A    Yes.

2    Q    And other radiologists who might have had a health

3         condition were granted academic days as well,

4         right?

5    A    I do not recall about them.

6    Q    You don't know?

7    A    Don't recall.  Yeah, I don't know about them.

8    Q    Can you identify any radiologist within the group

9         under Dr. Rosen who had no scholarly activity, no

10        research activity like you, but were granted

11        academic time?

12   A    Please repeat the question?

13   Q    Sure.  Can you identify any radiologist under

14        Dr. Rosen who had no scholarly activity and no

15        research activity, same as you, who was

16        nonetheless granted academic time?

17   A    I do not recall.

18   Q    Okay.  And Dr. Rosen, during several meetings with

19        you over time, discussed this academic time policy

20        with you, right?

21   A    Yes.

22   Q    And he specifically told you, that you could

23        submit a proposal in writing for how you want to

24        use any academic days that you are proposing,

119

1      correct?

2   A   Yes.

3   Q   And you opted not to submit a written proposal to

4       him, right?

5   A   Yes.

6   Q   Under the Academic and Administrative Time Policy,

7       there is a section that deals with administrative

8       time.  You did not have any administrative role

9       that would qualify you for administrative time,

10      right?

11  A   Yes.

12  Q   Yes, meaning you didn't have an administrative

13      role?

14  A   No, I did not.

15  Q   Okay.  And if we continue on in the document to

16      section Roman numeral III, which I believe is the

17      second page, paragraph 2 under Roman numeral III,

18      states, "Requests to attend meetings/conferences

19      using accumulated academic/administrative time

20      must be requested within the context of vacation

21      planning, subject to vacation request deadlines

22      and approved by the Division Chief."

23          Had you ever complied with that by

24      submitting requests in the context of vacation

120

1        planning?

2   A    To the best of my knowledge, yes.

3   Q    And were you denied your request for a conference

4        when you submitted correctly within the context of

5        vacation planning?

6   A    Not that I can recall.

7   Q    And you believed, based on your testimony earlier,

8        that you should have been granted academic time

9        based on being grandfathered or based on your

10       seniority?  Do I have that right?

11  A    Yes.

12  Q    And yet, you can't identify any radiologist whom

13       Dr. Rosen granted academic time based on

14       seniority, correct?

15  A    Because there is nobody right now, from my time.

16  Q    And there is nothing in the policy that specifies

17       that a radiologist should be granted academic time

18       based on seniority, correct?

19  A    Yes.

20  Q    Meaning you agree with me, the policy doesn't

21       address that?

22  A    I agree.

23  Q    I'm going to go to the next Exhibit, Exhibit 13.

24       You'll see it in just a second.

123

1        Dr. Desai.

2   A    No, I did not, except for I was asking for

3        academic time.

4   Q    Right.  But you were asking for academic time for

5        a day off, not to do academics, right?  Correct?

6   A    I was asking for break time, yes.

7   Q    Okay.  And Dr. Rosen actually offered you the

8        chance for a lighter schedule if you desired it,

9        and you turned him down, right?

10  A    Yes.  He asked me to go part time or go locum.

11  Q    Right.  You could have had days off that you were

12       seeking based on being tired, but you chose not to

13       accept that offer?

14  A    At the time.

15  Q    Well, at all time, you never took him up on that

16       offer, right?

17  A    Because I did not want to go to part time at the

18       time.

19  Q    Right.  You just wanted to have days off while

20       still getting paid, right?

21            MS. WASHIENKO:  Objection, but you can

22       answer, Dr. Desai.

23  Q    Was that a correct statement I made?

24  A    Repeat the question again, please?

Charu Desai vs                                                    Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.                      September 18, 2020

129

```
 1        pay you differently than white males?
 2   A    I don't know who does the decision.
 3   Q    Well, ma'am, you've claimed he -- this is
 4        important because you have made an assertion in a
 5        public document that one could argue, if it wasn't
 6        in a court document, would be defamatory.  You
 7        have said, Dr. Tosi discriminated against me in my
 8        pay, and now you're saying "I don't know."
 9             Are you claiming that or not?
10   A    What I'm saying, the paper is -- whoever signed
11        the paper, they are in it.
12   Q    Okay.  So you're not claiming Dr. Tosi made that
13        decision?
14             MS. WASHIENKO:  Objection.
15   A    I don't know who made the decision, but it is.
16   Q    And you're not claiming Dr. Rosen made that
17        decision?
18             MS. WASHIENKO:  Objection.
19   A    I think he has the power.  He is the one who is
20        doing it.  I think -- I don't know for sure, but I
21        think he does.
22   Q    Okay.  Who do you claim are the white male
23        radiologists paid more than you based on just your
24        gender?
```

130

1    A    So Eric Schmidlin.  He is also with the chest

2         radiologist.  He is younger, he is white, and lot

3         less experience, but more pay than I did.

4    Q    You're claiming the decision was made because of

5         his age and his gender to pay him more?

6              MS. WASHIENKO:  Objection.

7    Q    Do I have that right?

8    A    Repeat the question, please?

9    Q    Am I correct that you're claiming that this

10        Dr. Schmidlin was paid more than you, and the

11        decision to pay him more was based on your gender

12        and your age?

13             MS. WASHIENKO:  Objection.

14   A    Gender and his age?  That's what I believe.

15   Q    Okay.

16   A    Because those are the facts.

17   Q    Those are -- well, there is a fact that he may be

18        younger than you.  There is a fact that he's male.

19        Those are facts.

20   A    Yeah.

21   Q    The question though is, why do you claim that the

22        decision for his pay is based on him being male

23        and being younger than you as opposed to some

24        other reason?

133

1        being white and male?

2    A   Can you project me that thing, please, the pay

3        thing?

4    Q   No.  No, this is your claim.  I'm asking who it is

5        that you are claiming is paid more than you based

6        on being white and male?

7            MS. WASHIENKO:  So Bob, you're not going to

8        share the discovery document with Dr. Desai?

9            MR. KILROY:  Not currently, no.

10           MS. WASHIENKO:  Dr. Desai, to the best of

11       your memory right now, without looking at a

12       document, can you identify anyone else?

13   A   I think in the bone, Dr. Baccei, Dr. Cerniglia,

14       Dr. Dill.  I don't remember.  There are a lot of

15       people, but I don't remember offhand.  Some of

16       them are not even associate.  Some of them are

17       assistant professor too.

18   Q   Dr. Baccei, Dr. Cerniglia.  Who was the next one?

19   A   Dr. Dill.

20   Q   Who is Dr. Dee?

21   A   Dr. Dill.

22   Q   Oh, Dill.

23           So you believe you should be compared to the

24       Division Chief?

136

1    A    I don't agree.

2              All the radiologist, they have to --

3    Q    Is it your testimony that you should be paid the

4         same as interventional radiologists?

5    A    That is my testimony.  I'm telling you that all

6         the radiologists in general, they have to go

7         through the same training, so many years, and

8         everybody looks at the images.

9    Q    Can you answer my question, please; is it your

10        testimony that you should be paid the same as

11        interventional radiologists?

12   A    Repeat the question?

13   Q    Sure.  Is it your testimony that you should be

14        paid the same as an interventional radiologist

15        despite not being an interventional radiologist?

16   A    Yes.

17   Q    Okay.  And have you ever looked at the prevailing

18        market data for interventional radiologists versus

19        general radiologists or chest radiologists?

20   A    Yes.

21   Q    And fair to say, interventional radiologists are

22        paid more, aren't they?

23   A    Yeah.  But it is not justified because everybody

24        does -- just happens they do on a different --

```
 1        they get trained -- it is just everybody, all the
 2        radiologists go through the basic training, go --
 3        they have to have all the same qualification, and
 4        then, they'll be doing just a different part of
 5        the body; they analyze it, make the diagnosis, and
 6        give the written report.  So it just a different
 7        unique setting they are working.
 8   Q    Sure, and a cardiac surgeon --
 9   A    Plus to how many years too, the physician, whether
10        somebody just came out of the training, so
11        assistant associate, I think they should be the
12        same.
13   Q    And ma'am, a cardiac surgeon goes through training
14        just like an orthopedic surgeon, but I'm betting
15        cardiac surgeons make more.  Do you think those
16        should be level playing fields as well; they all
17        should make the same?
18             MS. WASHIENKO:  Objection.
19   A    It is not my place to decide for them.
20   Q    Okay.  But it's your place to decide for the
21        entire market of interventional radiologists
22        versus general radiologists?
23             MS. WASHIENKO:  Objection.
24   A    I didn't say that.
```

145

1      you haven't even applied for a teleradiology

2      position.  You have applied only for positions you

3      would have to commute to, correct?

4               MS. WASHIENKO:  Objection.  You can answer,

5      Dr. Desai.

6   A   Yeah, I have not.

7   Q   Right, because you are capable of commuting to

8      work and performing your job, right?

9               MS. WASHIENKO:  Objection.

10  A   Only in the city, short distance.

11  Q   Yes.

12  A   I have not gone on highway.

13  Q   You have never said during your employment with

14     UMass. Memorial to anyone, that you were incapable

15     of performing your job based on your disability,

16     did you?

17              MS. WASHIENKO:  Objection.  You can answer,

18     Dr. Desai.

19  A   Please repeat the question.

20  Q   You never told anyone at UMass. Memorial you were

21     incapable of performing the essential functions of

22     your job due to your disability, correct?

23  A   No, I did not say that.

24  Q   You never said to anyone at UMass. Memorial that

146

1      you would be incapable of performing your job

2      unless you were allowed to perform your job from a

3      home workstation, correct?

4    A  Yes.

5    Q  In fact, you just wanted the home workstation

6      because it would be easier, not because you had to

7      have it based on disability, right?

8         MS. WASHIENKO:  Objection.

9    A  That's not true.

10   Q  You told me you wanted it because it would have

11     been easier for you to work at home.

12   A  Yeah, because, because it is too much to work 10

13     days in a row.  I'm not making it up.

14   Q  Right.  And you were offered the opportunity to

15     not work 10 days in a row from Dr. Rosen and you

16     turned it down, right?

17        MS. WASHIENKO:  Objection.

18   A  Because he did not want to accommodate me in any

19     way or form.

20   Q  I'm sorry, I didn't understand.  Say that again,

21     please?

22   A  Repeat the question, please?

23        MS. WASHIENKO:  Well, let's just have the

24     court reporter read back the answer.

154

1     capable of performing your job despite your

2     disability "most of the time."  Based on your

3     testimony, I'm asking, were there times where you

4     were incapable of performing your job due to your

5     disability?

6  A   No.  It is I have to just take a break, that's

7     all, like what just happened.  It is, like, if I

8     get three, four spell, I have to stop what I'm

9     doing.  Why are you --

10  Q   Okay.  And did UMass. Memorial ever prevent you

11     from taking a break when you had an issue?

12  A   No.

13  Q   And in fact, you had years worth of FMLA approvals

14     to allow you to take time off from work if you had

15     a problem with your heart, isn't that right?

16  A   Yeah, but I hardly used it except the surgery.

17  Q   Yes.  And in fact, you were given full ability to

18     take as much time as you needed based on years

19     worth of FMLA approvals if you had a problem due

20     to your health condition, isn't that true?

21  A   Because I applied for FMLA, yes.

22  Q   And UMass. Memorial, Marlborough Hospital,

23     University of Massachusetts Medical School,

24     Dr. Tosi, Dr. Rosen, Dr. Brennan, Dr. Dill, nobody

155

1        ever interfered with your ability to take time off
2        if you felt you needed a break, isn't that true?
3    A   Yes.
4    Q   Did you apply for Division Chief Physician,
5        Division Chief of Chest Radiology when it was
6        open?
7    A   No.
8    Q   Why not?
9    A   Because it was automatically, that if you are
10       senior, that you should be a case asked.
11   Q   I'm sorry, I didn't mean to interrupt you.
12           Is this similar to your view that you should
13       be grandfathered?
14           MS. WASHIENKO:  Objection.
15   A   No.  Please repeat the question?
16   Q   You're saying, based on your seniority, you should
17       have been asked to be given the position.  Is this
18       similar to your view that you should have been
19       grandfathered in for academic time?
20   A   No, that has been happening in the department.
21   Q   So you believe that they should not have
22       interviewed for the position but they should have
23       given you the position?
24   A   No, they should have asked.

157

1    you can't even land a job as a radiologist, but

2    you think you were qualified to be a Division

3    Chief at U. Mass. Medical Center for chest?

4         MS. WASHIENKO:  Objection.

5  A  Say the question again, please?

6  Q  Of course.  Can you explain how it is that you

7    believe that you should have been the Division

8    Chief for Chest Radiology at UMass. Medical

9    Center, yet you haven't even been able to get an

10   interview for two years anywhere in the country?

11        MS. WASHIENKO:  Objection.

12 Q  Do you believe your qualifications are superior to

13   Dr. Dill's to be Division Chief of Chest

14   Radiology?

15 A  No.

16 Q  But you thought you should have been given the job

17   any ways?

18 A  Should have been asked.

19 Q  Outside of the academic days that you claim you

20   should have been given, outside of your

21   compensation where you identified Dr. Baccei,

22   Dr. Cerniglia, did -- I'm sorry, Dr. Dill,

23   Dr. Schmidlin, and Dr. Cerniglia as being paid

24   more than you, and the PACS workstation working

160

1    Q    Was it the University of Massachusetts Medical

2         School?

3    A    I don't believe.  Probably.

4    Q    So you're not claiming that they made a

5         discriminatory decision against you with respect

6         to a PACS workstation?

7    A    I don't know.

8    Q    And same with Marlborough Hospital, you're not

9         claiming Marlborough Hospital made that decision,

10        are you?

11   A    I do not think so.

12   Q    And you're not claiming Dr. Tosi made the decision

13        as to use of home workstations, right?

14            MS. WASHIENKO:  Objection.

15   A    Not to my knowledge.

16   Q    Right.  So you're not making that claim against

17        him?

18            MS. WASHIENKO:  Objection.

19   Q    Are you claiming the medical center, as opposed to

20        the medical group, your employer, made that

21        decision?

22            MS. WASHIENKO:  Objection.

23   A    I do not know.

24   Q    Are you claiming Dr. Rosen made the decision as to

168

```
 1      you -- strike that.
 2           Do you think it would have been responsible
 3      for you to ask Dr. Rosen why he assigned those
 4      workstations as opposed to saying that he is
 5      motivated by race?
 6           MS. WASHIENKO:  Objection.
 7   Q  You can answer.
 8   A  I could have asked him.
 9   Q  On the hire of Dr. Dill, do you know who made the
10      decision to hire her?
11   A  I believe Dr. Rosen.
12   Q  Okay.  So you're not claiming that Dr. Tosi
13      engaged in discrimination in the hiring of
14      Dr. Dill, are you?
15   A  I don't think so.  No.
16   Q  And you're not claiming that the University of
17      Massachusetts Medical School made a discriminatory
18      decision to hire Dr. Dill, right?
19   A  No.
20   Q  And you're not claiming Marlborough Hospital made
21      a discriminatory decision to hire Dr. Dill,
22      correct?
23   A  Yes.  They did not.
24   Q  So you're claiming instead, Dr. Rosen made a
```

169

```
 1        discriminatory decision to hire Dr. Dill, right?
 2             MS. WASHIENKO:  Objection.
 3   A    Yes.
 4   Q    And what -- are you claiming that was based on her
 5        gender, her age, her disability, or lack thereof,
 6        her race, her color, her national origin?  What
 7        are you claiming the discrimination was?
 8   A    Race, age.
 9   Q    I'm sorry, I missed it.
10   A    Race, age.
11   Q    Race and age.  Okay.
12             And did you ever ask Dr. Rosen why he made
13        the decision to hire Dr. Dill?
14             MS. WASHIENKO:  Objection.
15   A    I did not.
16   Q    And why would you claim it's race and age-based
17        when you admitted that you are not as well
18        qualified as Dr. Dill for that position?
19             MS. WASHIENKO:  Objection.  You can answer,
20        Dr. Desai.
21   A    They should have asked me.  That's the main thing.
22        I have been there for 20 plus years.  It's called
23        common courtesy, and they have done that before in
24        other section.
```

Charu Desai vs                                          Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.            September 18, 2020

175

1          you correctly under the Equal Pay Act?

2     A    No.

3     Q    Are you claiming the University of Massachusetts

4          Medical School did not pay you correctly under the

5          Equal Pay Act?

6     A    No.

7     Q    Are you claiming Dr. Tosi did not pay you

8          correctly under the Equal Pay Act?

9     A    No.

10    Q    Are you claiming Dr. Dill did not pay you

11         correctly under the Equal Pay Act?

12    A    No.

13    Q    Are you claiming Dr. Brennan didn't pay you

14         correctly under the Equal Pay Act?

15    A    No.

16    Q    Are you claiming UMass. Memorial Medical Center

17         didn't pay you correctly under the Equal Pay Act?

18    A    I don't know if they are the deciding factor

19         though, so I cannot tell about that.  Probably,

20         but I don't know.

21    Q    Are you claiming UMass. Memorial Medical Group

22         didn't pay you correctly under the Equal Pay Act?

23    A    To my knowledge, yes.

24    Q    Okay.  And are you claiming Dr. Rosen didn't pay

176

1     you correctly under the Equal Pay Act?

2  A  Yes.

3  Q  We've identified three individuals that you

4     identified as being paid more than you thus far;

5     Dr. Baccei, Dr. Cerniglia, and Karin Dill.  Karin

6     Dill is the same gender as you obviously, so I

7     assume you're not claiming that there is a

8     violation of the Equal Pay Act by paying her more

9     than you, right?

10 A  No.  Yes.

11        MS. WASHIENKO:  Objection.

12 Q  And is there any other male employees that you

13    claim were paid more than you for substantially

14    equal or lesser work?

15 A  So there were people with younger, less

16    experience, and assistant professor.

17 Q  I'm just talking about male versus female equal

18    pay at the moment, Dr. Desai.  Are you claiming

19    other males who got paid more than you for

20    performing substantially equal or lesser work than

21    you?

22 A  Can I see the paper you --

23 Q  I don't have it up as an Exhibit, so I can't show

24    it to you.  I'm hoping it's in my packet of 55,

177

| | | |
|---|---|---|
| 1 | | but I don't have it -- |
| 2 | A | You're saying only male?  You are asking male |
| 3 | | only, right? |
| 4 | Q | Only male, yes. |
| 5 | A | Andrew Chen, Byron.  Let's see.  Sathish, Hemang, |
| 6 | | Dennis.  Those are a few names I can recall. |
| 7 | Q | So I heard Hemang.  Is that Kotecha? |
| 8 | A | Yes. |
| 9 | Q | And you named a couple of names I didn't catch. |
| 10 | | Who are the other ones? |
| 11 | A | Andrew Chen. |
| 12 | Q | Andrew Chen, okay. |
| 13 | A | Byron. |
| 14 | Q | Sorry, who is that? |
| 15 | A | Byron.  He is with -- |
| 16 | Q | How do you spell his last name? |
| 17 | A | B-Y-R-O -- |
| 18 | Q | B-I-D-E-N? |
| 19 | A | No, B-Y-R-O-N. |
| 20 | | MS. WASHIENKO:  Byron. |
| 21 | Q | B-Y-R-O-N? |
| 22 | A | Coughlin.  He is an ED person.  He works in |
| 23 | | emergency room. |
| 24 | Q | And what's his last name, ma'am? |

178

1   A   I'm blanking out.  Coughlin.  C-O-U-T-H.

2   Q   C-O-U-T-H?  Okay.

3           Sathish.  S-A-T-I, Sathish.

4   Q   There anyone else?

5   A   Let me think.

6           I can't recall.

7   Q   Okay.  Now, Byron Chen, you actually made more

8       than in 2018 and '19, so why are you claiming that

9       he was paid more than you?  You were making

10      339,999.  He was making 329,999.

11  A   But he is probably assistant, that's why.  He has

12      less years of experience.  See, there are two,

13      three factors here; the how many years they having

14      in the practice and what is the title.

15  Q   Where in the compensation study was there anything

16      that said about years in practice?

17  A   I don't know.

18  Q   On what basis are you claiming that you were

19      entitled to more pay based on years in practice?

20  A   I don't have that document.  I do not know.

21  Q   You've never seen anything that allocated pay

22      based on years of service within radiology,

23      correct?

24  A   I have not seen.

180

1    A    I forgot.

2    Q    Okay.  And what I said was, male employees paid

3         more than you for substantially equal work.  Are

4         you claiming that your work, noninvasive work, is

5         substantially equal to his invasive interventional

6         radiology work?

7    A    Like I said before, at the end of the day, we

8         basically kind of do the same thing.

9    Q    Kind of similar to, at the end of the day, an

10        orthopedic surgeon cuts on my wrist and a

11        neurosurgeon cuts on my brain?  Like that?

12             MS. WASHIENKO:  There's no question.

13   Q    Is that an appropriate analogy; they are both

14        doing the same thing, performing surgery on the

15        body, just different parts?

16   A    That's what I'm saying, that we are taking care of

17        different parts of the body in radiology in

18        general.

19   Q    So you would agree that all surgeons should be

20        paid the same as well?

21             MS. WASHIENKO:  Objection.  You can answer,

22        Dr. Desai.

23   A    Yes, it's not my decision what they do.

24   Q    Now, you are aware that UMass. Memorial responded

Charu Desai vs                                          Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.           September 18, 2020

181

```
 1       to pay concerns that were raised in 2016 by
 2       undertaking an analysis of pay within the
 3       radiology department, correct?
 4   A   Yes.
 5   Q   And as a result, you received a substantial
 6       increase in pay, hadn't you?
 7   A   I did.  I'm trying to think how much.  I did.  But
 8       that was last two years I think it was corrected.
 9   Q   You had gone from 283,000 to 329,000.  That's a
10       pretty substantial increase, correct, from January
11       '17 to March of '17?
12   A   Yes.
13   Q   And ultimately, you only went to 320 in March
14       because you had sold back call time.  Do you
15       recall that?
16   A   Just for one year.
17   Q   Yes.  And that depressed your income somewhat.
18       And then in '18 and '19, you went up to just short
19       of $340,000.  And so for the last three years of
20       your employment with UMass., they had actually
21       undertaken a study and attempted to correct any
22       pay disparities within the radiology group --
23       fair?
24   A   Yes.
```

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu Desai, M.D.
September 18, 2020

182

1   Q   And not only had they undertaken that, but they
2       ensured that you received a sizable increase in
3       salary, right?

4   A   Yes.  They make same for all the associate or
5       something like that, they did, I think.

6   Q   But they tried to make it standard across the
7       board, right?

8   A   Yes.

9   Q   And ultimately, from January of '17 to when you
10      left, you had received about a 56,000 plus dollar
11      increase in order to address pay disparities,
12      right?

13  A   Within the two years, right?

14  Q   Yes.

15  A   Okay.

16  Q   And you would agree that was a substantial
17      increase?

18  A   Yes.

19  Q   Do you think that was a reasonable approach by
20      UMass. to try and address the pay disparities?

21          MS. WASHIENKO:  Objection.

22  A   Yes, but how about all the other years I lost?

23  Q   Right.  I'm not asking about that though.

24          Do you think they acted in good faith when

183

1    they tried to address the pay disparities during

2    those last three years of your employment?

3  A   Yes.

4        MS. WASHIENKO:  Hey, Bob?

5        MR. KILROY:  Yes.

6        MS. WASHIENKO:  Is there any chance this

7    might be a reasonable time for a break because I

8    could use a bio break?

9        MR. KILROY:  Yes, absolutely.  This is a

10   good time, Pat.

11       MS. WASHIENKO:  Thank you very much.

12            (Recess taken.)

13 BY MR. KILROY:

14 Q   All right, Dr. Desai, you all set?

15 A   All set.

16 Q   In Count 3 of your Complaint, you have a claim for

17   Violation of the Americans With Disabilities Act,

18   and is that based on your heart condition?

19 A   Yes.

20 Q   Okay.  And am I right that the only medical

21   documentation you've presented to UMass. Memorial

22   related to your heart condition was Exhibit 13,

23   which you should be looking at currently on the

24   eDepoze, the 2008 letter?

185

1   A   Dr. Rosen.

2   Q   All right.  Dr. Rosen.

3          Anyone else?

4   A   I don't know who took a part in my termination.

5   Q   Okay.  So whoever took part in your termination

6       decision you believe was engaging in disability

7       discrimination?

8   A   Yes.

9   Q   Okay.  And setting aside the termination decision,

10      are you claiming anything else was done to

11      constitute disability discrimination?

12  A   Not that I can recall.

13  Q   What is your actual medical condition that you

14      claim is a disability for you?  What's it called?

15  A   It's, like, brady-tachy syndrome, so sometime I

16      just -- like today, do you remember we were taking

17      break, it happened, and at that time, I cannot,

18      literally, function.  It --

19  Q   You become dizzy or lightheaded?

20  A   Not really.  I get really short of breath, my eyes

21      start tearing, weakness all over the body, so if

22      you ask me move from the chair to the couch, I

23      cannot do that.

24          I didn't know if you ask me, are you okay, I

186

1      can nod my head, but any can last few minutes or

2      longer, or it can come back to back.

3            So basically, I'm not doing that, and then,

4      there are so many times on the road, I have to

5      pull the car.  So I never drive on a hill, where

6      there is a hill, because then it will be difficult

7      to pull the car.

8  Q   Right.

9  A   And there are times I have to pull over.

10 Q   So in terms of daily activities or life activities

11     that it limits you in, it sounds like it can

12     affect your breathing, it can affect your driving.

13     Anything else?

14 A   When I am driving.  And the tiredness.  When I get

15     that, then I feel very tired.  And if I don't

16     break the cycle, then the frequency -- next day,

17     the frequency will increase.  So, like, if it

18     comes today, tomorrow, I just, on purpose, I have

19     to do nothing so I can calm down my body kind of.

20 Q   If I'm correct, and correct me if I'm wrong, but

21     just based on what we discussed today, my

22     understanding is that the tachy-brady syndrome did

23     not affect your ability to perform the essential

24     functions of your job except to the extent where

187

1      you would have an episode that might require you

2      to use FMLA leave, correct?

3  A   Correct.

4  Q   Okay.  Absent that, when you were on the job, you

5      could do all the essential functions of the job?

6  A   Yes.

7  Q   And in order to perform your job effectively, the

8      only accommodation you needed was the ability to

9      take time off in the event of one of these

10     episodes, is that right?

11 A   Yes.

12 Q   And I'm going to probably drive Pat nuts on this

13     question because it's an asked and answered

14     question.

15         MS. WASHIENKO:  I'm ready.

16 Q   It's late in the day and I didn't listen close

17     enough, so I apologize.

18         I heard you say that the action or inaction

19     that you believe was taken based on your

20     disability was the termination decision, and I

21     think I asked, Was there anything else.  And I

22     apologize, I didn't listen close enough.  Is there

23     anything else that you're claiming was an action

24     or inaction by any of the defendants related to

188

1       your disability?

2   A   I can't recall at this time.

3   Q   Okay.  Now, in reviewing your Complaint, and this

4       might jog your memory, there is a statement in

5       your Complaint where you indicate you were

6       restricted from performing CT scans based on your

7       disability.

8           Why do you claim the restriction was based

9       on your disability?

10          MS. WASHIENKO:  Objection.  Can you just

11      direct us to that paragraph, Bob, because I'm not

12      sure that's what that says.

13          MR. KILROY:  It's in my outline, Pat, so

14      it's possible I misconstrued the Complaint, but

15      that's where I would have gotten it from.  Then if

16      I'm wrong, I'm fine with being told I'm wrong,

17      but.

18  Q   Let me ask the question more open-ended.  That

19      might be helpful.

20  A   Okay.

21  Q   Do you claim that when Dr. Rosen told you you were

22      going to be restricted from performing CT scans,

23      that he did that based on your having this

24      disability?

189

1   A   No, I don't think so because based on he was
2       saying it was poor quality work.
3   Q   Okay.
4           MR. KILROY:  It's paragraph 84 of the
5       Complaint, Pat.
6           MS. WASHIENKO:  Show off.
7   Q   So you're actually not claiming that he made the
8       decision to restrict your privileges based on your
9       disability then, fair?
10  A   Yes.
11  Q   You also claim that, in your Complaint, a
12      fraudulent investigation was conducted related to
13      the quality investigation or quality review.  What
14      is the factual basis for claiming that
15      investigation was fraudulent?
16  A   Like I said all year, the way it was conducted was
17      not correct.
18  Q   You're using the term "fraudulent."  Is that -- I
19      mean, are you claiming that it was done
20      fraudulently, falsely?  Maybe a better question
21      is, what do you mean by "the investigation was
22      fraudulent"?
23  A   It was not done the right way.  That's the thing.
24      It's someone he knew already, so that is, right

195

1  Q   So you think that -- let's assume for a moment,
2      just assume for a moment that any number of people
3      would say, Well, it probably would have been
4      better had the chair talked to you first, right?
5      Assume that everyone agrees with that.  Do you
6      think that he had the investigation into quality
7      done because you were disabled, or do you think he
8      had it done because there were quality concerns?
9          MS. WASHIENKO:  Objection.  You can answer,
10     Dr. Desai.
11 A   You can ask him -- Dr. Rosen.
12 Q   I'm asking you.  Are you claiming that he decided
13     to have the quality review done based on quality
14     concerns, or was it based on the fact that you
15     have this disability?
16 A   I don't think it has connection with the
17     disability.
18 Q   Okay.  Are you claiming that you had no quality
19     issues at UMass. Memorial as to CT scans?
20 A   To my recollection.
21 Q   Could your quality have improved?
22         MS. WASHIENKO:  Objection.
23 A   To the best of my knowledge, I put my heart and
24     soul what I did over the years.

199

1      I was coming to work and doing it.  Only major

2      time I took, when I had the change of the brady --

3      procedure.  Procedure.  That's the mainly time

4      then.

5           Usually, I didn't call in sick or, you know,

6      not come because I was dedicated.  I love my work.

7      UMass. is my place.

8  Q   Yes, I'm not challenging that at all.  I'm just

9      making sure I understand that the only request you

10     made to assist you with your medical condition was

11     the ability to take time off through the FMLA

12     process when you would have an occurrence of

13     symptoms.

14  A   Yes.

15          MR. KILROY:  Pat, I think this is a good

16     stopping place.

17          MS. WASHIENKO:  Perfect.

18          MR. KILROY:  And we can convene early next

19     week or so, if that works, and look at dates.

20          MS. WASHIENKO:  Perfect.

21          MR. KILROY:  Dr. Desai, thanks very much.

22          (whereupon the deposition was suspended at

23           5:00 p.m.)

24

# In the Matter of:

*Charu Desai vs*

*UMASS Memorial Medical Center, Inc., et al.*

---

*Charu S. Desai, M.D. Vol II*

*October 22, 2020*

---

68 Commercial Wharf • Boston, MA 02110

888.825.3376 - 617.399.0130

Global Coverage

court-reporting.com



Charu Desai vs                                        Charu S. Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.            October 22, 2020

217

1      Q.  Okay.  I'm going to move to Defendant,

2   Marlborough Hospital.  So you've named Marlborough

3   Hospital as a specific Defendant in this action, and

4   again, as I read your complaint, I don't see

5   specific allegations against Marlborough Hospital.

6   I see it for other entities and individuals such as

7   Dr. Rosen.  I don't see specifics against

8   Marlborough.

9           What are you claiming specifically

10  Marlborough Hospital did or didn't do that forms the

11  basis for your complaints?

12     A.  Because it started from one of the

13  physicians from Marlborough Hospital.  Robinson is a

14  pulmonary physician.  That's why.

15     Q.  Meaning that Dr. Robinson complained about

16  your quality and so that's why you're claiming

17  Marlborough Hospital --

18     A.  Yes.

19     Q.  -- engaged in discrimination?

20     A.  Yes.

21     Q.  Okay.  Anything else?

22     A.  Not that I recall.

23     Q.  Okay.  And now I'd like to move to

24  Dr. Stephen Tosi.  His name does appear in the

218

1  complaint, but it's not clear to me what you're
2  claiming he did or didn't do that formed the factual
3  basis for any of your claims against him.  What are
4  you claiming he did or didn't do that forms the
5  basis of your complaints against him?
6        A.  My termination letter has his signature.
7        Q.  Anything else?
8        A.  And he knows me for more than 30 years.  He
9  knows who I am.  So he could have stopped it or
10 questioned it, why are you doing this.
11       Q.  And by, "he could have stopped it," you
12 mean he could have stopped your termination?
13       A.  Yeah.  Not stopped -- yeah.  Termination
14 or, for that matter, why -- to ask Dr. Rosen what is
15 going on here.  We -- we know each other for more
16 than 30 years, not one day, not two day.  So I was
17 hoping that all that should have recounted.
18            See, the people are talking about
19 somebody's life, somebody's schedule, somebody's
20 hard work for 50 years, not one day.
21       Q.  Anything --
22       A.  Things shouldn't happen even to my enemy;
23 let's put it that way.
24       Q.  Anything else that you would claim Dr. Tosi

219

1   did or didn't do that constitutes the basis for your

2   claims against him?

3       A.  Not that I recall.

4       Q.  Okay.  And, now, the -- the last individual

5   Defendant named was Dr. Karin Dill, and she's

6   addressed in your complaint in various places.  But

7   my question is, what are you specifically claiming

8   she did or didn't do that forms the basis for your

9   complaints against her?

10      A.  I think that she did say a few things

11  against me which was not true.

12      Q.  Okay.  And what specifically did she say

13  that you claim was not true?

14      A.  I don't recall everything but...

15      Q.  Anything that you recall?

16      A.  I don't recall anything.

17      Q.  I'm sorry?

18      A.  I don't recall.

19      Q.  Okay.  Is there anything else that you're

20  claiming Dr. Dill did or didn't do that forms the

21  basis for your complaint, other than your belief

22  that she said things that weren't true but you can't

23  recall what those things are?

24      A.  No.

222

1       Q.  Dr. Rosen's office?

2       A.  Yes.

3       Q.  Okay.  And what was, if you recall, the

4   purpose of the meeting?  In other words, was this

5   discussion of the workstation the purpose of the

6   meeting or was that embedded in another broader

7   meeting with him?

8       A.  I don't recall.

9       Q.  Okay.  As best as you can recall in this

10  meeting with Dr. Rosen around May of 2017, what did

11  you say to him specifically, if you recall, to

12  convey your desire or need for a home workstation?

13      A.  Mainly, I was telling him that it would be

14  very helpful if I can just do the call from home,

15  read the studies from home on the weekend, because

16  it was too much -- it was just asking for reasonable

17  accommodations.

18          I was getting -- when you work five days,

19  Monday through Friday, Saturday, Sunday and then I

20  have another five days to work.  So ten days was

21  just too much for me.

22      Q.  Okay.  I'm not asking you why at the

23  moment.  I'm just asking what you said to him.  And

24  so you told him, It would be helpful if I could do

223

1    the call on the weekends.  Did you say anything else

2    other than that sentence I just indicated?

3              MS. WASHIENKO:  Objection.

4         A.  That I get tired, and that's why.

5         Q.  I know that's why.  I am asking, did you

6    tell him?  Did you say to him, I get tired, that's

7    why I'm asking for this?

8         A.  I did --

9         Q.  Okay.

10        A.  -- as far as I remember, that it is too

11   much, and other people were getting it, too, even

12   weekdays and weekends.

13        Q.  But I haven't asked you that question.  I'm

14   just going to ask you to focus on my questions.

15   Okay.

16             So you told him, I get tired.  Did you say

17   anything else, other than I get tired?

18        A.  See, my heart (inaudible) exercise so I

19   start getting spell back to back, and that's the

20   thing.

21        Q.  But did you say that to him?

22        A.  I don't recall.

23        Q.  Okay.  What do you recall him saying in

24   response to you, if anything?

224

1      A.  He did not give it to me.  I don't
2  remember, but he did not say that he give it to me.
3      Q.  Well, when you asked for this, did he say,
4  for instance, Dr. Desai, I'm not going to approve
5  that?  Did he say, Dr. Desai, I'll think about it?
6  Did he -- did he just ignore you?  I mean, was there
7  any -- do you remember any level of response, verbal
8  response from him?
9      A.  The only thing I know that he -- I did not
10  get it.  He did -- I don't remember exactly what he
11  said, but at that point, he said on the contrary --
12  he was saying that go part time or go locum, forget
13  about giving me any accommodations.
14      Q.  Did -- did you ask him -- did you ever ask
15  him why he denied your request for a home
16  workstation?
17      A.  I don't -- I don't recall.
18      Q.  You don't remember?
19      A.  No.
20      Q.  So fair to say you don't know why he denied
21  the request for a home workstation, correct?
22      A.  I don't know why.
23      Q.  Okay.  Did -- based on the denial of the
24  home workstation, fair to say you still received

225

1   your full pay for work that you performed after that

2   denial?

3           MS. WASHIENKO:  Objection.

4           Dr. Desai, you can answer.

5       A.  Yes.

6       Q.  Okay.  And your --

7       A.  And everybody else -- everybody else does,

8   too --

9       Q.  Yes.

10      A.  -- even -- even when they do from home.

11      Q.  Right.  And -- and your benefits didn't

12  change, and by that I mean your employee benefits,

13  health insurance, dental, all the rest.  None of

14  your benefits changed because he denied your home

15  workstation, correct?

16      A.  No reason to change as far as I'm

17  concerned.

18      Q.  Right.  And they didn't, right?

19      A.  Yes.

20      Q.  Okay.  Do you know a doctor physician named

21  Mona Korgaonkar?

22      A.  Yes.

23      Q.  How do you know her?

24      A.  We know each other for 40 years.

226

1       Q.  And do you know -- you know her
2    professionally for 40 years?
3       A.  She is a little bit senior than I am.
4       Q.  Right.
5       A.  She -- she was -- see, when -- when I did
6    my residency, I was -- I was the first and only
7    resident from UMass. when the program started.  We
8    were hired two people, but they let go the second
9    person.  So, when I graduated, I'm the first and
10   only one from UMass.
11           UMass. at the time did not have the volume,
12   so I was -- they were taking it Worcester City.  I
13   don't know the time of the year.  There was a
14   hospital called Worcester City Hospital so -- and
15   Dr. Korgaonkar I knew even before that.  She's the
16   one, her husband was a Worcester City surgeon, and
17   when I met her, my -- my husband was at Worcester
18   City also.
19           So we were living on the same ground, and
20   Dr. Korgaonkar at the time went back home to live
21   her kid in India because he was doing radiology back
22   home, but she was going to do Boston City for
23   radiology training again.
24           So we became friends so we were in the same

227

1   complex.  So she's the one who told me there might
2   be opening at UMass. in radiology, and I used to
3   call, like, everyday.  So six months later the
4   program got approved, and I got the job that way.
5   So I knew her even before that, and at Worcester
6   City she was one of the attendings.
7       Q.  Okay.  So she's a fellow -- when you left
8   UMass. Memorial, she was a fellow radiologist that
9   you worked with, correct?
10      A.  Yeah, but when I left, she became more like
11  a locum.
12      Q.  And, during your time working for her, she
13  reported up the chain to Dr. Max Rosen, as well as
14  the chair of the department, correct?
15          MS. WASHIENKO:  Objection.
16      Q.  Is that right?
17          MS. WASHIENKO:  You can answer, Dr. Desai.
18      A.  Yeah.  Dr. Rosen is my boss.  He's the
19  chair.  So he's the boss.  (Inaudible).
20      Q.  Right.  So you would agree that Dr. Rosen
21  was her boss as well?
22      A.  Yes.
23      Q.  And, now, Dr. Korgaonkar, she is -- she has
24  the same national origin as you, correct, Indian?

228

1      A.  Yes.

2      Q.  And she's female?

3      A.  Yes.

4      Q.  She's older than you, isn't she?

5      A.  A few years.

6      Q.  Same -- same race as you, correct?

7      A.  Yes.

8      Q.  Same -- same basic skin color as you?

9      A.  Yes.

10     Q.  Are you aware that she had requested from

11  Dr. Rosen a reduction in her hours at some point in

12  time?

13     A.  I do not know what the situation was, but I

14  know she went part-time, and now she's only locum.

15  That I know --

16     Q.  So you don't know what --

17     A.  -- as far as I can -- as far as I can

18  recall.

19     Q.  Okay.

20     A.  She...

21     Q.  You don't know whether or not she went part

22  time at her request?

23     A.  I wouldn't know.

24     Q.  Okay.  Are you aware that Dr. Korgaonkar

229

1   did not want to continue taking call at

2   UMass.Memorial?

3        A.  I don't.

4        Q.  Are you aware that she requested that she

5   be moved to a per diem status so she would not have

6   to take call?

7        A.  I don't know what her situation.

8        Q.  Now, you yourself, never requested to move

9   to per diem, correct?

10       A.  No.

11       Q.  But you were offered the opportunity to

12   move to per diem status, right?

13       A.  He -- he said.  That doesn't mean --

14   everybody's situation is different, correct?

15       Q.  Well, I was asking if you were offered the

16   opportunity?

17       A.  It was not offered the opportunity.  It was

18   in place of accommodating for my disability.  It's

19   not the same thing.

20       Q.  All you need to do is focus on my question,

21   ma'am.  I'm asking, did Dr. Rosen offer you the

22   opportunity to go per diem, yes or no?

23            MS. WASHIENKO:  Objection.  Asked and

24   answered.

230

1    Q.  Is that a yes?

2    A.  He -- he proposed to me.

3    Q.  Okay.  And you -- you declined that offer,

4  correct?

5    A.  I didn't say anything.  At the time it is

6  not something you make a decision.

7    Q.  What -- what I mean is ultimately you

8  declined the offer; you never took him up on going

9  per diem?

10   A.  It was not the conversation I went for.  He

11 just in lieu of.

12   Q.  Yes.

13   A.  If you get tired -- no.  You have --

14   Q.  Please focus on my question.

15   A.  Whether you -- you like it or not, when the

16 conversation arise when asked for academic day of

17 machine at home, those were the options given to me.

18 So that's not the same.

19   Q.  No, no.

20   A.  It is not.

21   Q.  I'm not -- I'm not comparing it to

22 anything, Dr. Desai.  I'm just asking whether or not

23 the offer was made and whether or not you ultimately

24 declined it.  I'm not asking you why.

231

1          So we've established he made the offer.  I
2    just want to make clear that you ultimately decided
3    not to take that option, correct?
4          MS. WASHIENKO:  Objection.
5      A.  At that point.
6      Q.  Well, at no point -- at no point did you
7    ever take that option, right?
8      A.  At -- at that point, I didn't say that I'm
9    going to.
10     Q.  Okay.  Are you aware of Dr. Korgaonkar's
11   duties as a radiologist ever being restricted in any
12   way?
13     A.  Not that I know.
14     Q.  And you understand that she's still
15   employed by UMass. Memorial, correct?
16     A.  As a locum.
17     Q.  Right.  And, as I've represented to you,
18   that was at her request?
19         MS. WASHIENKO:  Objection.
20     A.  I don't know.
21     Q.  Okay.  So fair enough.  You don't know.
22         Are you aware of any reason why Dr.
23   Korgaonkar who's older than you, same gender as you,
24   same national origin as you, same race, same skin

237

1  after you left?

2         MS. WASHIENKO:  Objection.

3      A.  One of them.

4      Q.  What else?

5      A.  Even for the division chief, also, they --

6  they didn't even ask me.  They just appointed

7  younger white female.

8      Q.  Okay.  What else?

9      A.  Yeah.  I don't -- I don't recall at this

10  moment other stuff.

11     Q.  Okay.  So what I have based on your under

12  oath testimony is they hired a division chief who

13  was younger than you and you believe that was age

14  discriminatory, and they hired someone younger after

15  your employment was terminated and you believe that

16  was age discriminatory, correct?

17     A.  Yes.

18         MS. WASHIENKO:  Objection.

19     Q.  Are you claiming that the decision that was

20  made to restrict your privileges with respect to CT

21  scans was done because of your age?

22     A.  No.

23     Q.  I'm going to move to Count 7 in your

24  complaint.  Count 7 is a claim for tortious

239

 1   relationships, if anything?

 2           MS. WASHIENKO:  Objection.

 3           You can answer, Dr. Desai.

 4       A.  Interference in the sense that whatever the

 5   action Dr. Rosen did, it spoiled my reputation.

 6   Like, they terminated me -- when they terminated me,

 7   what -- everything is on the same page.

 8       Q.  Okay.  So the interference was Dr. Rosen's

 9   decision to terminate your employment?

10       A.  Yeah.

11       Q.  All right.  Now, you may recall from Day 1

12   you testified that Dr. Rosen had an obligation to

13   ensure patient safety and quality within the

14   radiology division, right?

15       A.  Yes.

16       Q.  Okay.  And you also testified on Day 1 that

17   Dr. Rosen had made a decision to terminate your

18   employment based on his assessment of your quality,

19   right?

20           MS. WASHIENKO:  Objection.

21           You can answer.

22       A.  That's what he's saying.  But do you -- do

23   you have -- I want you to look at the document, the

24   Robinson email, if you find it, and if you look at

242

1   medical center, the medical school, or Marlborough
2   Hospital?
3       A.  He -- he could have told Dr. Rosen --
4   nothing specific -- he specifically did, but he was
5   in charge of radiology at that point, and he knew
6   who I was.  In the department, people know who I
7   was, what I do, how I do --
8       Q.  Okay.
9       A.  -- what quality I do.
10      Q.  All right.  I'm -- I'm going to move to --
11      A.  And -- and Robinson is complaining about a
12  lot of the people.  Okay.  And the reason
13  Dr. Robinson --
14      Q.  Ma'am, you have to focus on my question.  I
15  didn't ask you about Kim Robinson.
16          I'm moving to Dr. Tosi.  What are you
17  claiming that Dr. Tosi did to interfere with your
18  relationship with the medical group, the medical
19  center, the medical school, or Marlborough Hospital?
20      A.  It's the same answer I gave before, that he
21  knew me very well for more than 30 years, and he
22  would have stopped this nonsense, basically.  This
23  is nonsense.  Somebody scared your life.
24      Q.  Okay.

245

1  afternoon.

2      Q.  Yeah.  I'm asking you, what did he say?

3  If -- if you -- if your answer is he didn't say

4  anything, that's fine.

5          MS. WASHIENKO:  Asked and answered.

6      Q.  Did he say anything to somebody that you

7  claim was defamatory toward you?

8          MS. WASHIENKO:  Objection.  Asked and

9  answered.

10     A.  Just the -- just the (inaudible).

11     Q.  I'm sorry.  I didn't hear you.

12     A.  Just the letter he gave and he told me

13  verbally.

14     Q.  And the letter he gave, are you claiming

15  that he published that to someone else other than

16  you?

17     A.  There's nothing to publish.

18     Q.  Just focus on my question.  Are you

19  claiming he sent that to anyone else other than

20  you?

21     A.  Not outside of the department and all the

22  people where we work.

23     Q.  Who --

24     A.  Not outsiders.

246

1      Q.  Who did he send it to within the
2  department --
3      A.  No.
4      Q.  -- the letter?
5      A.  No, not the department.  Who everything
6  was.  Like, first he has to sign the paper on my --
7  then has to do some paperwork, so those are the
8  people who knows.
9      Q.  So it was just within Dr. Rosen's office
10 and Dr. Tosi's office that you were aware had seen
11 that letter, other than you, is that right?
12     A.  As far as I know.
13     Q.  Okay.  Anything else that you claim
14 Dr. Rosen stated either verbally or in writing
15 that -- to someone that you claim was defamatory
16 toward -- toward you?
17     A.  Not that I recall.  This is more than
18 enough.  This is...
19     Q.  Okay.  Dr. Tosi.  What did Dr. Tosi either
20 write or say about you to anyone that you claim was
21 defamatory toward you?
22         MS. WASHIENKO:  Objection.
23         But you can answer -- you can answer,
24 Dr. Desai.

247

```
 1        A.  Only thing that he signed was my
 2   termination letter.
 3            THE REPORTER:  I'm sorry?  Only?
 4            MS. WASHIENKO:  She said, "Only thing he
 5   signed my termination letter."
 6            THE REPORTER:  Thank you.
 7            THE WITNESS:  Yeah.  That was --
 8            MS. WASHIENKO:  I -- I think technically
 9   the answer was, "Only that he signed was my
10   termination letter," but why don't we have Dr. Desai
11   clarify.
12   BY MR. KILROY:
13        Q.  Go ahead, Dr. Desai.  You can clarify that,
14   please.
15        A.  Yeah.  Only thing that he signed my
16   termination letter.
17        Q.  Okay.  Thank you.
18            And are you claiming he sent that letter to
19   anyone, other than you?
20        A.  I would not know.
21        Q.  Okay.  Anything else that Dr. Tosi said or
22   wrote that you claim was defamatory, other than
23   signing your termination letter?
24        A.  Not that I recall.
```

249

1      Q.  Yeah.  She --

2      A.  -- to colleagues.

3      Q.  She may be right or wrong when she calls

4  you rude but it's her -- it's her opinion as to

5  whether or not she thinks you're rude, right?

6      A.  Yes.

7      Q.  Okay.  Anything else that Dr. Dill said or

8  wrote about you that you claim constitutes

9  defamation?

10      A.  Not that I recall.

11      Q.  Now, you mentioned the termination letter

12  that was signed by Dr. Rosen and Dr. Tosi as the

13  letter itself constituting a basis for the

14  termination.  You'd agree that -- that you were, in

15  fact, terminated from employment, right?

16      A.  Yeah.

17      Q.  And the letter simply informed you of the

18  termination of your employment, correct?

19      A.  Yes.

20      Q.  So they were being truthful when they wrote

21  that letter to you as to what was happening to your

22  employment, correct?

23          MS. WASHIENKO:  Objection.

24          But you can answer.

250

1        A.   Please -- please, repeat the question.

2        Q.   They were -- they were truthfully informing

3    you that your employment was being terminated,

4    correct?

5             MS. WASHIENKO:  Objection.

6             You can answer.

7        A.   Yes.

8        Q.   Bear with me just a second.  I'm going to

9    move to some exhibits.

10            MS. WASHIENKO:  Hey, Bob, can we take a

11   break?  I need a glass of water.

12            MR. KILROY:  Yeah.  You bet.  Let's take a

13   break.

14            MS. WASHIENKO:  Thank you.

15            (Recess, 10:55 a.m. - 10:59 a.m.)

16                 (Document marked as Exhibit 14

17                  for identification)

18   BY MR. KILROY:

19        Q.   I'm distributing Exhibit 14 to Dr. Dasai's

20   deposition.

21        A.   Okay.  Let me see.  I have to open it,

22   right?

23        Q.   Yes, please.

24        A.   Okay.  What is the question here?

251

1    Q.  Dr. Desai, this is a performance eval.

2  completed for you during the July 1, 2009, to

3  June 30th, 2010, time frame.  Do you see that?

4    A.  Yeah.

5    Q.  And this was a eval. done by your then

6  supervisor, Dr. Ferrucci, correct?

7    A.  I don't see the whole thing.  Am I -- oh,

8  sideways?  Okay.

9    Q.  So, if you click forward, it will --

10    A.  Right.

11    Q.  -- scroll through the whole thing if you

12  want to take a look.  Under the department chair's

13  signature, I believe that's Dr. Ferrucci, is that

14  correct?  Do you recall he was your chair at that

15  time?

16    A.  He was a chair for a few years.  Let me

17  see.

18    Q.  If you go back to the second page.

19    A.  Of that document?

20    Q.  Of the document, yeah.

21    A.  Second page.  Let me see.

22    Q.  You -- you see there's an opportunity for

23  you to list for that one-year period any of your

24  research, creative, or scholarly activities.  Do you

252

1   see that?

2           THE WITNESS:  This is it?

3           MS. WASHIENKO:  That was this.  Yes.

4           MR. SWEENEY:  You're on -- you're on Page 2

5   right here.

6           THE WITNESS:  Page 2.

7   BY MR. KILROY:

8       A.  Yeah.

9       Q.  And so fair to say that, at least during

10  that year, you didn't have any research, creative,

11  or scholarly activities, right?

12          MS. WASHIENKO:  Objection.

13          You can answer, Dr. Desai.

14      A.  Yeah.

15      Q.  And if we go forward --

16      A.  Which page?

17      Q.  -- to the very next page, there's a space

18  to list your leadership activities.  And you had

19  none that year according to this performance

20  evaluation, right?

21          MS. WASHIENKO:  Objection.

22          But you can answer, Dr. Desai.

23      A.  Yeah.

24      Q.  And then, in your supervisor's comments

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu S. Desai, M.D.
October 22, 2020

254

1             (Document marked as Exhibit 15
2             for identification)
3    BY MR. KILROY:
4        Q.  You should be seeing the next performance
5    evaluation.
6        A.  Hold on.  Hold on.  I don't have it.
7        Q.  Okay.
8            THE WITNESS:  This is the...
9            MS. WASHIENKO:  You have to go back.
10           THE WITNESS:  Okay.
11           MR. SWEENEY:  Okay.  All set.
12   BY MR. KILROY:
13       Q.  Do you have it now, Dr. Desai?
14       A.  I do.
15       Q.  And, if you look on the first page, it
16   shows -- well, midway down that you have zero
17   percent of your time devoted to research, correct?
18       A.  Which ones?  Yes.  The current -- where it
19   says, "Current: Clinical," correct?
20       Q.  Correct?
21       A.  Yeah.  Yeah.  Like I said, I'm on the
22   clinical side.  I was not hired as academic.
23       Q.  Right.  And, on Section 3, the next page
24   for research, creative, and scholarly activities,

255

1   you have no entries there for this entire year,

2   correct?

3        A.  Which page, the second page?

4        Q.  Yes.  Section 3, Research, Creative and

5   Scholarly Activities.

6        A.  Yes.

7        Q.  And, if we go forward two pages, two

8   additional pages, you'll see under Professional

9   Development, Roman numeral IX that you attended a

10  radiology review course given by Harvard in March of

11  2011.  Do you see that?

12       A.  Yes.

13       Q.  Why did you attend that course, if you

14  recall?

15       A.  Why?  You get all the -- you get updated.

16  That's why.

17       Q.  Okay.  So you --

18       A.  I don't remember.  It is 2011.  It's so

19  long ago.

20       Q.  Right.  But you attended it to try to

21  remain current in your profession, fair?

22       A.  Yeah.

23       Q.  Okay.  And, during this year, fair to say

24  you didn't request any type of accommodation for

256

1  your heart condition, is that right?

2          MS. WASHIENKO:  Objection.

3      Q.  Am I right about that?

4      A.  I don't recall.

5      Q.  Well, did you ask for a home workstation?

6      A.  Not to my knowledge.

7              (Document marked as Exhibit 16

8              for identification)

9  BY MR. KILROY:

10     Q.  I'm going to move to the next exhibit.  It

11 should come up now.  Exhibit 16.  While you're

12 accessing it, I'll just read it into the record.

13 It's your annual faculty review dated July 1st,

14 2011, to July 30th, 2012.  Do you see that

15 document?

16         MS. WASHIENKO:  Yeah.  We haven't pulled it

17 up yet, Bob.

18         MR. KILROY:  Okay.

19         THE WITNESS:  Where am I looking?

20         MR. KILROY:  Are you not seeing it, Pat?

21         MS. WASHIENKO:  It's just downloading

22 really slowly.

23         MR. KILROY:  Oh, okay.

24         MS. WASHIENKO:  Viola.  I'm now caught up

257

1  to you, Bob.

2        MR. KILROY:  Great.

3  BY MR. KILROY:

4        Q.  Dr. Desai, do you see Exhibit 16, Your

5  annual faculty review for 2011 to 2012?

6        A.  I do.

7        Q.  All right.  And, just as we did with the

8  last faculty reviews --

9        A.  Uh-huh.

10       Q.  -- on Section 3 Page 2, again, you have no

11  research, creative or scholarly activities for the

12  entire year, correct?

13       MS. WASHIENKO:  Objection.

14       A.  Yes.

15       Q.  Okay.  And, if we go to the next page at

16  the bottom, at least based on your annual

17  evaluation, there's no listing of any professional

18  development activities that you participated in that

19  year, right?

20       MS. WASHIENKO:  Dr. Desai, Mr. Kilroy is on

21  Page 3 in Section Roman numeral IX.

22       A.  Yes.  I see it.

23       Q.  Okay.  And, at this point in time, you have

24  not been granted any academic days by the chair of

259

1    other people once in a while fill in because there

2    was not enough staffing so...

3            But --

4       Q.  So the only one you can recall, other than

5    you, is Dr. Sana?

6       A.  Yeah.  Yeah.  At -- at present, yeah.

7       Q.  I'm showing you Exhibit 17 to your

8    deposition.

9                  (Document marked as Exhibit 17

10                  for identification)

11   BY DR. KILROY:

12      A.  17.

13      Q.  That's the annual performance review from

14   July 1st, 2012, to June 30th, 2013.

15      A.  I don't have it yet.

16      Q.  Okay.  I'll hold up.

17      A.  Thank you.

18           MS. WASHIENKO:  Okay, Bob.

19           MR. KILROY:  All right.  Thank you.

20           MS. WASHIENKO:  Dr. Desai, do you have that

21   document?

22           THE WITNESS:  Yeah.  It seems like it's

23   loading.  It's just taking time.  The one I don't

24   know if it's the --

260

1    BY MR. KILROY:

2        A.  Okay.  So where am I looking?

3        Q.  So, if -- if we look on Page 2 again,

4    Section 3, Roman numeral III, this is another year

5    where you have no research, creative, or scholarly

6    activities, correct?

7            MS. WASHIENKO:  Objection.

8            You can answer.

9        A.  Yes.

10       Q.  And, likewise, if we jump two pages ahead

11   to Section 9, Professional Development, this is

12   another year where there's no professional

13   development activities listed for you, correct?

14       A.  Yes.

15       Q.  If we go two pages further -- and I

16   apologize for the poor quality of the copy.  But

17   you'll see the department chair's evaluation, and

18   the second sentence, he states, (as read) "I have

19   offered to consider any education or career

20   development opportunities that might be interested

21   in," correct?

22       A.  I can't read here.  It is too blurry.  I

23   can't read it.

24           MR. KILROY:  I'll read what it says on --

261

1    on my version on the screen.

2         And, certainly, Pat, if I misread this or

3    if you have a different view, by all means, let me

4    know.

5         MS. WASHIENKO:  I -- I can't actually read

6    it.  It's too -- too blurry as well.

7    BY MR. KILROY:

8         Q.  Well, I'll read it and then I'll ask you a

9    question.  It states, (as read) "I've offered to

10   consider any education or career development

11   opportunities that Dr. Desai might be interested in.

12   At this time, Dr. Desai is content with her faculty

13   rank as clinical associate professor."

14        Do you recall at this time in the 2012-2013

15   time frame that the chair of the department was

16   offering to consider any education or career

17   development opportunities you might like to pursue?

18        A.  Yeah.  I don't recall, but I see the

19   writing here.  It's so long ago.

20        Q.  Okay.  Do you -- do you know whether or not

21   you ever asked for any career development or

22   education opportunities from your chair?

23        A.  Not that I recall.

24        Q.  Okay.  I'm going to bring up Exhibit 18.

262

1          (Document marked as Exhibit 18
2           for identification)
3    BY MR. KILROY:
4        Q.  While it's loading, I'll just note it's a
5    faculty annual performance review for you, July 1st,
6    2013, to June 30th, 2014, and if you would just let
7    me know when you've received it, please.
8        A.  Yeah.  I have it.
9        Q.  All right.  And if you go forward to
10   Section III, once again, Research, Creative and
11   Scholarly Activities; fair to say that this is
12   another year where you have none listed?
13       A.  Yes.
14       Q.  And, if we move forward to Section IX
15   Professional Development Activities, again, this is
16   another year where you have no professional
17   development activities recorded, correct?
18       A.  Yes.
19       Q.  If we go to the last page of the document
20   which bears your department chair's signature, Max
21   Rosen, and I'm specifically looking at Roman numeral
22   IX, the department chair's evaluation.  Dr. Rosen
23   writes -- and I'll quote -- "Dr. Desai and I
24   discussed options for academic time.  Unfortunately,

263

1    the Department's policy has been in place for at

2    least two years, and cannot be modified on an

3    individual basis.  I appreciate the clinical efforts

4    of Dr. Desai as well as her contribution to resident

5    teaching at the PACS station."

6              So Dr. Rosen as of September of 2014

7    informed you that you did not qualify for academic

8    time under the department's policy that had been in

9    place for at least two years, correct?

10             MS. WASHIENKO:  Objection.

11             But you can answer, Dr. Desai.

12        A.   That's what he says here.

13        Q.   Do you recall him telling you that?

14        A.   Long ago.

15        Q.   You do or you don't recall?

16        A.   I see it here, but I don't remember the

17   conversation, per se, because it is 2014 --

18        Q.   Okay.

19        A.   -- so years ago.

20        Q.   And did you want Dr. Rosen to modify the

21   policy specific for you?

22             MS. WASHIENKO:  Objection.

23             You can answer, Dr. Desai.

24        A.   I did not say that we need to modify it.

265

1      Q.  So you're not claiming the policy itself
2  was discriminatory, right?
3      A.  No.
4      Q.  I'm going to move to Exhibit 19.
5           (Document marked as Exhibit 19
6           for identification)
7  BY MR. KILROY:
8      Q.  As it's loading on your end, I'll note that
9  it's the faculty annual performance review for you
10 from July 2014 to June 30th, 2015, and if you would
11 just let me know when you have it loaded and you can
12 see it, please.
13     A.  Yeah.  I have it.
14     Q.  All right.  And, as we did in the past, if
15 you go to the second page for Section III, Research,
16 Creative and Scholarly Activities; fair to say this
17 is another year where you have recorded none,
18 correct?
19     A.  Yes.
20     Q.  And, if we jump ahead to Section IX,
21 Professional Development Activities, this is another
22 year where there are none listed for you, correct?
23          MS. WASHIENKO:  This is Page 3, Dr. Desai.
24          THE WITNESS:  Yes.

266

1        A.  Yeah.  I see it.

2        Q.  You agree that there are no professional

3    development activities listed for you for the entire

4    year, right?

5        A.  Yes.

6        Q.  I'm going to go to Exhibit 20.

7                (Document marked as Exhibit 20

8                for identification)

9    BY MR. KILROY:

10       Q.  Exhibit 20 is your performance eval.

11   July 1, 2015, to June 30th, 2016.  Let me know when

12   you see it.

13       A.  I see it.

14       Q.  And the second page, Section III, Research,

15   Creative, and Scholarly Activities; once again,

16   there's nothing recorded for you, correct?

17       A.  Section III, yes.  And what was the other

18   thing?

19       Q.  You have recorded nothing by way of

20   research, creative or scholarly activities for the

21   entire year, correct?

22       A.  Yes.

23       Q.  And then Section IX, Professional

24   Development Activities, which includes courses,

267

1  programs, workshops which you participate in to

2  enhance your professional development; it's now

3  another year where you've recorded nothing by way of

4  professional development, correct?

5       A.  Yes.

6       Q.  I'll move to Exhibit 21.

7            (Document marked as Exhibit 21

8            for identification)

9  BY MR. KILROY:

10      Q.  Exhibit 21 should be showing up.

11      A.  It's upside down kind of.

12      Q.  Yeah.  I'm looking to see if there's a

13  button that allows me to rotate it for you.  There

14  doesn't appear to be.  There we go.

15           MS. WASHIENKO:  Brendan.

16           MR. SWEENEY:  Yes.

17           MS. WASHIENKO:  Put your hand on the screen

18  and twist it.

19           MR. SWEENEY:  Oh, gees.  It's following me,

20  unfortunately.  There's a way to unlock it.

21           MS. WASHIENKO:  Let me try to give it a

22  shot.

23           THE REPORTER:  Do you want to go off the

24  record?

268

1          MR. KILROY:  Sure.  That's fine.  We can go

2     off.

3          (Recess, 11:28 a.m. - 11:29 a.m.)

4     BY MR. KILROY:

5          Q.  So, Dr. Desai, I apologize for the small

6     print on this document.  It is a form known as The

7     Standard form which was at UMass., the folks who

8     processed Family Medical Leave Act requests.  And,

9     if you look at this form, it indicates that you had

10    requested Family Medical Leave Act leave for your

11    own serious health condition for a period between

12    March 26th, 2015, through March 25th, 2016, and you

13    were approved for FMLA leave during that period,

14    correct?

15         A.  Yes.

16         Q.  And, specifically, it indicates that you

17    were approved for intermittent FMLA leave of

18    possible absences of one day duration up to two days

19    every two months, correct?

20         MS. WASHIENKO:  Bob, can you point out

21    where you're reading that or seeing that?

22         A.  At the bottom, right?

23         Q.  Sure.

24         MR. KILROY:  So, in the middle of the

269

1  document, Pat, it says, "Intermittent time taken

2  within," so it -- which refers to what's going to be

3  intermittently, and then two lines from the bottom,

4  "Frequency 2 times every 2 months.  Duration 1 day

5  per episode."

6          MS. WASHIENKO:  Thank you very much.

7          MR. KILROY:  You bet.

8  BY MR. KILROY:

9      Q.  And, Dr. Desai, during this period, March

10  of 2015 to March of 2016, you didn't request any

11  other form of accommodation related to your serious

12  health condition, correct?

13      A.  Not that I recall.

14      Q.  And, during this year time frame, March of

15  2015 to March of 2016, no one at UMass. Memorial or

16  the medical school or Marlborough Hospital, any of

17  the Defendants, nobody ever denied you the ability

18  to take FMLA leave pursuant to this authorization,

19  correct?

20      A.  To my knowledge, yes.  Based on my

21  knowledge, yes.

22      Q.  And, during this particular year, you would

23  agree that you were capable of performing all your

24  essential job duties as a radiologist so long as you

270

1  were permitted to take FMLA leave of up to one day

2  duration up to two times every two months,

3  correct?

4          MS. WASHIENKO:  Objection.

5          But you can answer, Dr. Desai.

6      A.  Yes.  I did not use FMLA for that.

7      Q.  But you were authorized to, right?

8      A.  Yeah.  Yeah, because I -- like, even when I

9  was sick I used to come to work and people actually

10 were saying why are -- I took my work very

11 seriously.  Okay.  It's not a joke.

12         When -- when I was so, so sick, I was

13 almost in two weeks in a coma and I was checking

14 resident.  The resident finally said this time

15 there's something wrong.

16         You don't know who I am.  I -- I put my

17 heart and soul for UMass.  UMass. was my base.

18 Okay.

19     Q.  Dr. Desai, I'm showing you Exhibit 22.

20     A.  A different one?

21     Q.  Yes.  It's a letter addressed to you at

22 your home address from The Standard.  Just let me

23 know if you see that.

24     A.  Let me see.

273

1              (Document marked as Exhibit 25
2              for identification)
3    BY MR. KILROY:
4        Q.  Do you see Exhibit 25, Dr. Desai?
5        A.  I do.
6        Q.  All right.  And, this is a continuation of
7    your approval for intermittent FMLA now for the
8    period through April 8th, 2016, to March 8th, 2017,
9    and again, down at the bottom, (as read) "Frequency:
10   1 to 2 times every 2 months; Duration: 1 day per
11   episode."  Do you see that?
12       A.  Yes.
13       Q.  And, just as was in the year prior, you
14   were requesting FMLA leave in case you needed it due
15   to a flare-up of your heart condition, correct?
16       A.  Yes.
17       Q.  Okay.  And, at least for this year, we see
18   that your request was approved, right?
19       A.  Yes.
20       Q.  You were never denied FMLA leave during the
21   period April of 2016 to March of 2017 when you
22   needed time off due to your heart condition,
23   correct?
24       A.  Yes.

274

1        Q.   And this is the only accommodation you
2   requested of your employer with respect to your
3   heart condition during this year, right?
4             MS. WASHIENKO:  Objection.
5             You can answer, Dr. Desai.
6        A.   Yes.  Where -- I recall, yes.
7        Q.   And you -- you'd agree with me that, during
8   this year period April of 2016 to March of 2017, you
9   were able to do all of your essential jobs functions
10  as a radiologist as long as you were granted the
11  right to take off intermittent FMLA if you had a
12  heart condition flare-up, correct?
13            MS. WASHIENKO:  Objection.
14            But you can answer, Dr. Desai.
15       A.   Yes.
16       Q.   Let's move though Exhibit 26.
17            (Document marked as Exhibit 26
18            for identification)
19  BY MR. KILROY:
20       Q.   While it's loading, I'll just state what it
21  is for the record.  It's an email dated May 13th,
22  2016, at 3:15 p.m. from Max Rosen to Charu Desai.
23  The subject is confirmation of our meeting today.
24  It's about a page and a half long.  Dr. Desai, I'll

281

1   enter quality assurance issues into the Peer-Vue

2   system, correct?

3        A.  Yes.

4        Q.  And he spoke with you concerning the

5   academic time policy, didn't he?

6        A.  Yes.

7        Q.  He specifically advised you, if you

8   believed academic time for you was justified, then

9   you should identify in writing what activities you

10  intended to undertake and then he would discuss

11  additional time for those specific activities,

12  didn't he?

13          MS. WASHIENKO:  Objection.

14          You can answer.

15       A.  Yes.

16       Q.  And you never responded in writing as your

17  chair directed, did you?

18       A.  Not that I recall.  But how about people

19  who got hired --

20       Q.  There's no question pending, Dr. Desai.

21       A.  No.  But to have --

22       Q.  Dr. Desai, there's not a question pending.

23  I'm moving on.

24       A.  You can move on, but the new people who

304

1              (Document marked as Exhibit 31

2              for identification)

3   BY MR. KILROY:

4       Q.  Do you recognize that document?

5       A.  Let me see.  Just one page, yeah.

6       Q.  Yes.

7       A.  Okay.  So what is -- this is my own note.

8   I think we probably gave it to you because you say

9   you have to --

10      Q.  But that's your handwriting, correct?

11      A.  It is.

12      Q.  On what basis do you claim you should have

13  been exempted from call requirements within the

14  radiology department?

15      A.  Because of how many years of -- of work.

16  That's what I'm -- see, originally when I started

17  the job, it was five call per year and one holiday

18  when I took the job.  Then it become ten call per

19  year and two holiday.

20      Q.  Is there a policy that says that you get

21  exempted from call in radiology based on number of

22  years working at UMass. Memorial?

23      A.  Yes, there is, but it is -- there are, I

24  think, 20 years, and there is age.  That's kind of

305

1  policy but I -- I didn't -- I was not that age, but

2  I finished more than my --

3      Q.  So you weren't eligible to be exempted --

4      A.  Yeah.

5      Q.  -- from call-in policy?

6      A.  Yes, but I was asking him if he could -- he

7  would reduce the call or --

8      Q.  You were asking for an exception to be made

9  to the --

10     A.  I did.

11     Q.  -- policy, correct?

12     A.  I did.

13     Q.  Was an exception made for anyone else, to

14  your knowledge?

15     A.  Nobody had that seniority and they are not

16  around.  Nobody is around.

17     Q.  So the answer is --

18     A.  I was the last -- I was the last one, so I

19  think that was to get rid of the last one.

20     Q.  So your answer is you're not aware of an

21  exception being made to the call policy in radiology

22  for anyone, correct?

23     A.  Not to my knowledge.  Yes.

24     Q.  Bullet Point 5, could you read that to me,

308

 1          MS. WASHIENKO:  Dr. Desai, I'll circle back
 2     with you at the end on that.
 3          MR. KILROY:  I'm sorry, Pat.  I couldn't
 4     hear you.
 5          MS. WASHIENKO:  I said, Dr. Desai, I'll
 6     circle back with her in the end on that.
 7     BY MR. KILROY:
 8          Q.  Dr. Desai, are you identifying -- can you
 9     identify someone that you're claiming received
10     academic time who was not entitled to it under the
11     policy?
12          A.  I can't.
13          Q.  Okay.
14          A.  I won't.  You already have the schedule who
15     gets academic time.  You already know who is doing
16     research and not doing research.  I can't imagine
17     people just got hired, gets academic time the
18     following week, and they already produced a paper.
19     No.  Unbelievable.
20          Q.  When you state discrimination, on what
21     basis -- and by that I mean, are you claiming
22     discrimination as of May 25th, 2017, based on your
23     age, based on your race, your color, your gender,
24     your national origin?  What are you claiming was in

314

1   date, but yes.  They went, actually, to Dr. Tosi and

2   all of that.  Yes.

3        Q.   And those male doctors included white male

4   doctors, didn't they?

5        A.   Some.

6        Q.   And younger, doctors younger than you, male

7   white younger doctors, right?

8        A.   Yeah.  Younger than I am.

9        Q.   And fair to say that this new salary

10   structure was intended to try and address the

11   differences in pay that existed across the

12   department, right?

13        A.   I think so.

14        Q.   Are you claiming the new structure was

15   discriminatory in any way?

16        A.   I think, in my case, I can't say that.

17        Q.   You can or you can't?

18        A.   I -- I cannot say that it is -- it looks

19   okay here because I don't know about the other

20   people but I -- I lost a lot of money previous years

21   because I was underpaid.

22        Q.   Okay.  Would you agree that, once UMass.

23   Memorial undertook this analysis to put in a new

24   salary structure, that they made reasonable progress

315

1   with your pay to try and eliminate differences in

2   pay?

3           MS. WASHIENKO:  Objection.

4           You can answer.

5       A.  They did.  They did.

6       Q.  I'm sorry, Dr. Desai.  I didn't hear your

7   answer.

8       A.  They did.

9       Q.  Okay.  They did.

10          And, would you agree that they were acting

11  in good faith when they were addressing these pay

12  differences?

13          MS. WASHIENKO:  Objection.

14          But you can answer.

15      A.  Yes, they did.

16      Q.  In the interest of time, I'm going to skip

17  over Exhibit 33 and go to Exhibit 34.

18              (Document marked as Exhibit 33

19              for identification)

20  BY MR. KILROY:

21      Q.  Exhibit 34, Dr. Desai, is a --

22      A.  I don't have it.  I don't have it.

23          MS. WASHIENKO:  It hasn't shown up yet,

24  Bob.  33 showed up.

316

1   BY MR. KILROY:

2       Q.  Do you have it or no?

3       A.  You want to skip the 33, right?

4       Q.  I will skip 33.  Oh, you know what; it

5   showed up as 33.  It must have changed the numbering

6   automatically on us.

7           MS. WASHIENKO:  Okay.

8           MR. KILROY:  Let me just go back and look

9   for a second.  That's weird.  Yeah.  All right.  So

10  it did.  So it's listed as Exhibit 33 now.  I'll

11  just have to adjust my outline.

12      Q.  So Exhibit 33 is a faculty annual

13  performance for you, Dr. Desai from July 1, 2016, to

14  June 30, 2017.  Do you see that?

15      A.  Yes.

16      Q.  And I'll let you scan through it.  Fair to

17  say this shows us another year where you haven't

18  recorded any continuing medical education?  Is that

19  right?

20      A.  Yes.

21      Q.  And it's another year that's gone by with

22  no research, creative, or scholarly activities

23  recorded for you, right?

24      A.  Yes.

317

1      Q.  Another year where there's been no
2  professional development activities recorded for
3  you, correct?
4      A.  Yes.
5      Q.  And, once again, Dr. Rosen notes that he
6  spoke with you about the academic time policy,
7  right?  It's on the last page.
8      A.  Yes.  The same thing, yes.
9      Q.  All right.  And, once again, this is where
10  you want to be granted academic time without
11  actually performing academic duties, right?
12          MS. WASHIENKO:  Objection.
13          But you can answer.
14      A.  I was only asking for 12 days per year.
15      Q.  Ma'am, just answer my question.  Do you
16  remember my question?
17      A.  Once, and I was speaking by the -- I got
18  the teacher of the year award, too.
19      Q.  Did you hear my question, ma'am?
20      A.  Yeah.  I heard.  You would -- go ahead.
21  You can ask again.
22      Q.  Once again, you wanted to be granted
23  academic days without needing to actual perform
24  academic duties under the academic time policy,

318

1    correct?

2           MS. WASHIENKO:  Objection.

3           But you can answer, Dr. Desai.

4       A.  Yes.  So were the other people were getting

5    it without doing the academic duties.

6       Q.  And -- and, once again, despite your chair

7    telling you to submit a proposal in writing in the

8    past, you never submitted a proposal in writing for

9    what you would do with the academic time, isn't that

10   right?

11      A.  Yes.  Same with the newcomers.  They did

12   not give any proposal and all of that.  They were

13   getting once a week.  I am asking 12 per year.  I am

14   not asking (inaudible).  And I should have been

15   grandfathered because that was given to me when I

16   started the job.

17      Q.  Ma'am, you keep referencing -- you keep

18   referencing newcomers.  I asked you to identify

19   anyone who was granted academic --

20      A.  The department already knows.

21      Q.  Let me finish.

22      A.  We will give you the list if you want.

23      Q.  Let me finish.

24      A.  The whole -- basically, whole department.

322

1 introduced it yet.  I'm sorry.

2          MS. WASHIENKO:  It's okay.

3          MR. KILROY:  Yup.  It's Exhibit 34 now.

4          MS. WASHIENKO:  Okay.

5 BY MR. KILROY:

6     Q.  Do you recognize this document?

7     A.  Let me see.  Yes.

8     Q.  Do you see that it has a Bates stamp C --

9 excuse me -- CD 00049 up in the top right corner?

10     A.  Say that again, please.

11     Q.  CD 00049, do you see that number?

12     A.  Yes.

13     Q.  Okay.  I'll represent to you that's a

14 number that was put on there by your -- your

15 counsel.  So this document was produced by you.  You

16 had this document.  Why did you have a peer-review

17 document in your possession?

18     A.  I have -- I have no idea.  I mean, I was

19 cleaning my office.  This happened when I came

20 across this.

21     Q.  How did you get access to this document

22 when you were working there?

23     A.  I have no idea.  I'm telling you the truth

24 under oath.  I just cleaning my office, and I

323

1  happened to see it, and then I thought, wow, she is

2  doing damage to me.

3         Then, by the way, when I looked at the

4  cases because I was still working there, one of them

5  is on, and all the other work she's getting it is

6  bad, it's completely wrong, my friend.  This is

7  somebody trying to damage you.  That's what I was

8  saying, that somebody --

9      Q.  Were you -- were you required to -- to

10  conduct an analysis of these cases, these peer

11  review cases?

12      A.  When I came across when I was cleaning my

13  office, I don't recall how I had it, to be truthful,

14  but then I looked at it.  This is saying for me

15  everything is significant.  Completely is wrong,

16  wrong to the wazoo.

17      Q.  Who do you -- who have you shared this

18  document with, other than your counsel?

19      A.  Nobody else, no.

20      Q.  Did you share it with your daughter, Diana

21  Desai?

22      A.  No.  I'm saying I have nothing to do with

23  this, my case.  She has nothing to do with this it

24  seems.  She saw it as a -- as a document but nothing

325

1  friend.

2      Q.  Has she seen the document, Dr. Desai?

3      A.  I wouldn't know, but my file had -- had

4  this document, and we -- we put away the file, you

5  know...

6      Q.  Do you have peer-review reports -- reports

7  like this for other individuals?

8      A.  No.  Why would I have for other

9  individuals?

10      Q.  Do you claim that this peer-review document

11  somehow supports your claim of discrimination?

12      A.  It is -- here it is marked personal.  This

13  is somebody sabotaging you with wrong readings.

14      Q.  Answer my question, please.  Are you

15  claiming this document supports your claims?

16      A.  Claiming -- say that question, please.

17      Q.  Are you claiming this document supports

18  your claims of discrimination?

19      A.  I don't know if you put this under

20  discrimination or not.  I don't know.  I'm -- I'm

21  just saying the word, CD, was wrong.  That's all I'm

22  saying.

23      Q.  Who is she?  Who is she?

24      A.  Dr. Dill did that.

327

1   Very interesting.

2                   (Document marked as Exhibit 35

3                   for identification)

4   BY MR. KILROY:

5       Q.  I'm showing you Exhibit 35.

6           Before I move off the last document, does

7   Diana Desai have a copy of all of your documents,

8   all your files?

9       A.  No.

10      Q.  Does she have a copy of any of your files

11  in this case?

12      A.  She does not.  What is this?

13      Q.  Did Diana Desai help you decide what

14  documents to produce to your counsel?

15      A.  No.  A hundred percent no.

16      Q.  All right.  Exhibit 35.

17      A.  What is this about?

18      Q.  Exhibit 35.  It's another FMLA document.

19      A.  Uh-huh.

20      Q.  And you see now your FMLA absences had been

21  approved through March of 2018, correct?

22      A.  Yeah.  Yeah, because this is the -- yes.

23  This is...

24           I think this might be.  I am not hundred

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu S. Desai, M.D.
October 22, 2020

328

1  percent sure, but I had the -- I had the battery
2  changed.  I had the battery changed for my pacer.  I
3  think.  I'm not sure.  Okay.  I don't know.  It
4  says, expected to return to work, so I must have
5  taken time.  I'm not sure.
6      Q.  Dr. Desai, all I'm asking is, is it fair to
7  say that you were approved for intermittent absences
8  from March 9th of 2017 through March 8th of 2018?
9      A.  Yes.
10     Q.  All right.  And this was, again, an FMLA
11 approval to help you with your serious health
12 condition involving your heart, correct?
13     A.  Yes.
14     Q.  And the frequency remained the same, one to
15 two times every two months, a duration of one day
16 per episode, right?
17     A.  Yes.
18     Q.  And you were never denied FMLA when you
19 requested it during this one-year period, March
20 of '17 to March of '18, right?
21     A.  Yes.
22     Q.  And, during this one-year period, you were
23 capable of performing the essential functions of
24 your job as a radiologist, provided you were allowed

329

1   to take intermittent leave as approved through FMLA

2   certification here, right?

3       A.   Yes.

4            Can I take a break?

5       Q.   Sure.   Absolutely.

6            MS. WASHIENKO:   It's a good time for me to

7   ask.   Bob, I have us going on close to three hours

8   now for, which I think it is about 45 minutes past

9   what we thought we would be doing based on where we

10  ended.   What -- what's your sense of what you have

11  left?

12           MR. KILROY:   Sure.

13           MS. WASHIENKO:   Because, to the extent we

14  can avoid the judge, I'm happy to try to do that,

15  but I also don't want to subject Dr. Desai to

16  lengthy additional questioning.

17           MR. KILROY:   I would guess -- and it's just

18  a guess, Pat.   I would guess an hour to an hour and

19  a half.

20           MS. WASHIENKO:   I don't think that she's

21  got that in her without being compelled.   I will

22  speak with her and report back.   I will --

23           MR. KILROY:   I mean, I'm willing -- well,

24  I'm not willing to agree that -- that I can't

342

1      Q.  Ma'am, there's no question pending on your
2  mind.
3      A.  Fine.  You can pending or no pending.  You
4  should know that this is not a regular letter to
5  somebody.  You ruining people 40, 50-year life, and
6  you telling me, oh, why didn't you look for the job.
7  Wow.  No.
8          MR. KILROY:  Pat, will you please control
9  your witness so that I can get through this.
10     A.  There is nothing to control.  Nobody can
11 control.  I'm telling you the truth.
12     Q.  I know no one can control you.  I've seen
13 it.
14     A.  Yeah.  This is -- this is insulting.
15         MS. WASHIENKO:  Dr. Desai, I'll circle back
16 with you at the end.
17     Q.  This letter on Exhibit 40 that we just
18 talked about, the termination letter, is that the
19 one that you were claiming was defamatory by
20 Dr. Rosen and Dr. Tosi?
21     A.  Hundred percent.
22     Q.  And -- and who did it get sent to you other
23 than you?
24     A.  That I do not know.

343

 1      Q.  Okay.  So you can't identify that it was
 2   published to anyone but you, correct?
 3           MS. WASHIENKO:  Objection.
 4           You can answer.
 5      A.  Yes.  I cannot.
 6               (Document marked as Exhibit 41
 7               for identification)
 8   BY MR. KILROY:
 9      Q.  I'm showing you Exhibit 41.  Did you
10   receive this email from -- I'm sorry.  Did you send
11   this email to Dr. Rosen on March 23rd, 2018?
12           MS. WASHIENKO:  It was arriving before
13   then, Bob.
14      A.  I don't have.  Hold on.  Hold on.  Which --
15   which number now?
16      Q.  41.
17           MR. SWEENEY:  Got it?  Yeah.
18      A.  Okay.  What about this?
19      Q.  Did you send this email to Dr. Rosen
20   confirming that per his order, on March 14th, you
21   could no longer read CT scans?
22      A.  As per his order.
23      Q.  Yes.  Who made the decision to prohibit you
24   from reading CT scans as of March 14th, 2018?

355

1        A.  Oh, I was not reviewing patient chart.  I

2   was checking the deal thing which I came across when

3   I was cleaning my office.  I told you that, and then

4   she is saying everything is significant, which is

5   not.  It is absolutely not, and one of them she laid

6   down by herself.  You know, that is -- because I had

7   to pick it up myself, too, when I come across

8   something.  So there is nothing I did wrong here.

9        Q.  You completed the annual HIPAA training,

10  correct?

11       A.  Yes.

12       Q.  And your testimony under oath is that you

13  didn't understand medical record numbers constituted

14  protected health information?

15       A.  No, I did not.  I knew the patient names.

16  That I knew.

17                  (Document marked as Exhibit 46

18                   for identification)

19  BY MR. KILROY:

20       Q.  Are you seeing Exhibit 46?  It should be an

21  annual performance review July 1, 2017 to June 30th,

22  2018.  Do you see that?

23       A.  Yes.

24       Q.  Okay.  And fair to say this is another full

356

1  year where you have no scholarship activity?

2        MS. WASHIENKO:  Objection.

3     Q.  And no research activity?

4        MS. WASHIENKO:  Objection.

5     Q.  Is that right?

6        MS. WASHIENKO:  Objection.

7     A.  Yes, but I am not -- I am on clinical

8  track.  I'm not academic.

9     Q.  Right.  You're on a clinical track, so,

10 therefore, you don't need academic time I

11 understand.

12       MS. WASHIENKO:  Objection.

13    Q.  Professional development --

14 It's not that -- I didn't say academic time.  I

15 don't have to do the papers and all of that.  That's

16 what I'm saying.  You are testing -- you are testing

17 the matter.

18       THE REPORTER:  You are?  I'm sorry.

19    A.  You are changing the subject on me.  That's

20 what I don't deserve.  Yeah.  A lot of people get to

21 academic time and they don't show any paper or

22 anything.  When you come in the hospital the first

23 week, you don't give the papers and all of that.

24       MS. WASHIENKO:  Dr. Desai, I will circle

1   back with you.

2          THE WITNESS:  That's fine.

3      Q.  And it's another full year where you don't

4   have listed any professional development courses,

5   programs, workshops that you participated in to

6   enhance your professional development, correct?

7      A.  Yes.

8              (Document marked as Exhibit 47

9              for identification)

10  BY MR. KILROY:

11     Q.  I show you Exhibit 47.  Exhibit 47 is a

12  letter to you from Absence One, which is the new

13  FMLA provider for UMass.  And fair to say you were

14  approved for another year's worth of intermittent

15  FMLA from March 21st, 2018, through March 20th of

16  2019, right?

17     A.  Yes.

18     Q.  And you were approved for two episodes

19  every two months with each absence lasting up to a

20  day, right?

21     A.  Yes.  But I never did take any time --

22     Q.  And --

23     A.  -- a few times -- except my pacer battery

24  change.  I didn't --

Charu Desai vs                                    Charu S. Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.                October 22, 2020

358

1        Q.  And this was -- this was in order to help
2    you deal with your heart condition in the event of a
3    flare-up, right?
4        A.  Yes.
5        Q.  And, other than this request for
6    intermittent FMLA, two episodes every two months
7    lasting up to a day, you hadn't requested any other
8    assistance with respect to your heart condition,
9    correct?
10           MS. WASHIENKO:  Objection.
11       A.  Please, repeat the question.
12       Q.  Other than asking the ability to take time
13   off as listed here on your FMLA certification during
14   this year, you haven't requested any other
15   assistance based on your heart condition, correct?
16           MS. WASHIENKO:  Objection.
17       A.  I -- I requested for the -- just for the
18   call and all of that.
19       Q.  For the -- you mean for the weekend call?
20       A.  Yeah.
21       Q.  And so, other than the weekend call
22   requesting a home workstation and other than the
23   FMLA, you didn't request anything?
24           MS. WASHIENKO:  Objection.

359

1        A.  I asked what the -- like I was saying, the

2    12 days for teaching academic time.  I -- yeah.  I

3    don't recall anything else.

4        Q.  And the -- you never submitted a doctor's

5    note of any kind that said you needed to be able to

6    do remote reads from your home, did you?

7        A.  I don't need the doctor's note.  It is,

8    like, ten days working in a row.

9        Q.  Ma'am, will you just answer my question.

10   Did you ever submit a doctor's certification

11   indicating that you needed to work from home when

12   on-call?

13       A.  No.

14       Q.  And were you able to actually complete your

15   call duties without working from home?

16       A.  Always.  I -- I did it at my house.  Even

17   if I get the spell, I just sit down and then do it.

18       Q.  So you were capable of performing the

19   essential functions of your job as long as you were

20   given FMLA per this certification during 2018

21   to '19, right?

22           MS. WASHIENKO:  Objection.

23       A.  Yes.

24       Q.  And you were never denied the right to take

360

1    that FMLA, were you?

2        A.  No.

3                (Document marked as Exhibit 48

4                for identification)

5    BY MR. KILROY:

6        Q.  Next is Exhibit 48.  Do you know who

7    Dr. Litmanovich is?

8            MS. WASHIENKO:  It hasn't shown up yet,

9    Bob.

10           MR. KILROY:  I'm sorry.

11       A.  I don't know.

12       Q.  Do you know who --

13       A.  I don't know who she is.

14       Q.  Okay.  Do you understand that she was hired

15   as an expert in radiology to do a quality assurance

16   review for the department with respect to 50

17   cases?

18       A.  That what it says here.

19       Q.  Okay.  And you -- you think it was wrong

20   for them to hire Dr. Litmanovich because Dr. Rosen

21   knew of her, is that right?

22           MS. WASHIENKO:  Objection.

23           You can answer.

24       A.  Partly because it is biased.  Right.  And

362

1      Q.  I didn't you ask you for your agreement or

2    not.

3      A.  If you did or not, I have to -- I have to

4    say that it is completely wrong.

5      Q.  Fair to say that --

6      A.  And -- and, by the way, one of the cases

7    she's -- she's not even talking about my case.

8      Q.  Ma'am -- ma'am, I don't have a question

9    pending.  Please, stop.

10         MS. WASHIENKO:  Dr. Desai --

11     A.  If you don't, you should listen.

12         MS. WASHIENKO:  Dr. Desai, I will circle

13   back with you.

14         THE WITNESS:  Yeah, but --

15     Q.  Are you -- are you -- are you claiming Dr.

16   Litmanovich, when she arrived at her findings of

17   five major findings for you, five minor findings,

18   one major for the other 25 and seven minor, are you

19   claiming that her analysis was discriminatory in any

20   way?

21         MS. WASHIENKO:  Objection.

22         You can answer.

23     A.  I'm not saying it is discriminatory.  I'm

24   saying it is wrong.

363

1      Q.  Okay.  But you're not claiming that she was
2  discriminating based on age, race, color, gender,
3  disability or national origin, right?
4      A.  I hope not.
5      Q.  Well, it's your claim, ma'am.  I need to
6  know.  Are you claiming she was discriminating when
7  she did this, yes or no?
8          MS. WASHIENKO:  Objection.  Asked and
9  answered.
10         MR. KILROY:  Well, she said, "I hope not,"
11  so now I'm confused.  I don't know what she's
12  actually claiming.
13     A.  How do I know what is going in their mind?
14  I'm not the one.
15     Q.  So you're not claiming she was
16  discriminating, right?
17     A.  I don't think so.
18     Q.  Okay.  I'm going to show you Exhibit -- I
19  believe we're on 49.
20         MS. WASHIENKO:  We might be up to 50, Bob.
21         MR. KILROY:  Yup.  You're correct.  It is
22  50.  Thank you, Pat.
23         MS. WASHIENKO:  You're welcome.  It's about
24  the extent of my math, but I'll show that part.

367

1  identifying the individual you claim made the
2  alleged defamatory statement."
3          And, in your answer, there is nine items
4  listed.  The first one is your 2017 to 2018 faculty
5  annual performance review by Dr. Rosen.  Who, other
6  than you, do you claim received a copy of that from
7  Dr. Rosen?
8      A.  No, nobody.
9      Q.  Nobody.  No. 2, July 1st, 2016, to
10  June 30th, 2017, peer review of Dr. Desai by
11  Dr. Dill.  Who, other than you, do you claim
12  received a copy of that from -- from Dr. Dill?
13          MS. WASHIENKO:  Objection.
14      A.  See, apart from my agony because she has
15  all the copies.  You're not talking about the
16  attorney, are you?
17      Q.  I'm talking about what your answer says
18  here, ma'am.  It's your answer.
19      A.  You're saying who has the document.  My
20  attorney does have the document.
21      Q.  Oh, I'm sorry.  I'm saying, who -- who did
22  Karin Dill send the document to, other than you?
23      A.  Probably, nobody.  I don't know.
24      Q.  Okay.  No. 3, April 17th, 2018, letter from

368

1    Dr. Rosen to yourself.  Who, other than you, did
2    Dr. Rosen send that letter to?
3          MS. WASHIENKO:  Objection.
4       A.  Just me.  I don't know.
5       Q.  Okay.  Let's move to the next page, No. 4.
6    The next page on No. 4 is an April 17th, 2018, email
7    from Dr. Rosen to yourself regarding the March 14th,
8    2018, meeting.  Are you claiming Dr. Rosen sent that
9    to anyone else, other than you?
10      A.  No.
11         MS. WASHIENKO:  Objection.
12      Q.  No. 5, April 18th, 2018, email from
13   Dr. Rosen to yourself regarding meeting to review QA
14   data.  Are you claiming that Dr. Rosen sent that to
15   anyone else?
16         MS. WASHIENKO:  Objection.
17         You can answer.
18      A.  No.
19      Q.  No. 6, March 9th, 2018, from Dr. Rosen to
20   Dr. Tosi -- I'm sorry -- from Dr. Rosen and Dr. Tosi
21   to you regarding the notice of termination of
22   employment.  Are you claiming that either Dr. Rosen
23   or Dr. Tosi sent that to anyone else other than
24   you?

369

1          MS. WASHIENKO:  Objection.

2          You can answer.

3      A.  No.  No, except for the people who have to

4  do the paperwork, administration.

5      Q.  No. 7, April 24th, 2018, meeting between

6  Dr. Rosen and Dr. Desai also attended by Dr. Sarwat

7  Hussain.  At this meeting, Dr. Rosen stated and

8  projected on a screen false statements that

9  Dr. Desai had performance issues and committed major

10  misreads of radiology films.  Am I correct that

11  Dr. Hussain was at that meeting at your request?

12      A.  Yes.

13      Q.  And, outside of yourself, Dr. Rosen, and

14  Dr. Hussain, is there anyone else that you're

15  claiming Dr. Rosen shared that information with?

16      A.  Dr. Baccei was in the meeting, too.

17      Q.  Doctor who?  I'm sorry?

18      A.  Baccei.

19      Q.  Dr. Baccei.  And was -- and he was involved

20  in quality --

21      A.  Yeah.

22      Q.  -- correct?

23      A.  Yeah.

24      Q.  Next No. 8, September to December 2017

370

1  quality assurance review by D. Litmanovich and

2  accompanying documents.  Who were you claiming that

3  that quality assurance review was published to or

4  sent to, other than yourself?

5        MS. WASHIENKO:  Objection.

6     A.  Yeah.  Me and my lawyer.

7     Q.  Okay.  And No. 9, you reference suspension

8  of your performance of duties and responsibilities,

9  known to all in the radiology department and to

10  numerous others throughout the hospital constitutes

11  defamation by deed.  By suspension, are you

12  referring to the removal of your CT scan

13  privileges?

14     A.  Yes.

15     Q.  And you were actually informing people of

16  that, correct, that you couldn't do CT scans any

17  longer?

18        MS. WASHIENKO:  Objection.

19     A.  No.  They were asking me.  So I had to say

20  something, right, because normally that morning I

21  was checking the resident.  That afternoon I'm

22  supposed to check them, too.

23     Q.  Did -- did you think of sending them to Dr.

24  Rosen to get an answer?

371

1          MS. WASHIENKO:  Objection.

2      A.  I don't see any need for it.  I'm the one

3  who has to answer.  I just said per his order.

4      Q.  You -- you weren't concerned with informing

5  them yourself, then, correct, answering them

6  truthfully?

7          MS. WASHIENKO:  Objection.

8      A.  It has nothing to be concerned about.  They

9  asked me, and I give them the answer that I'm

10  (inaudible) for his order.  There's nothing wrong

11  about that.

12      Q.  Are you claiming that Dr. Rosen did

13  anything with respect to your employment that did

14  not fall within his job duties as a chair of the

15  department?

16          MS. WASHIENKO:  Objection.

17      A.  Please, repeat the question.

18      Q.  Sure.  Is there anything you're claiming

19  Dr. Rosen did that did not fall within his duties as

20  chair of the department?

21          MS. WASHIENKO:  Objection.

22      A.  Yes.

23      Q.  And what did --

24      A.  Yes, he did.

385

 1        A.  I'm not aware.
 2        Q.  Do you know of any of your colleagues who
 3   had a medical condition that needed an
 4   accommodation?
 5        A.  I don't know.  Maybe, Dr. [S.A.], she
 6   went part-time or seeked reduced hours because of
 7   her eye.  That's the only I know.
 8        Q.  Okay.  And that was approved, right?  She
 9   still works for them?
10        A.  I assume it was.
11        Q.  Okay.
12        A.  I can't speak for her.
13             MR. KILROY:  Pat, I'm all set with the
14   exception of, possibly, if there's medical documents
15   we haven't received, but otherwise, I'll -- I'll
16   pass the witness.  Thank you.
17                  CROSS EXAMINATION
18   BY MR. JOHNSON:
19        Q.  Dr. Desai, name is Mark Johnson, and I
20   represent only the medical school in this case.
21        A.  Okay.
22        Q.  And I have a couple of questions.
23             As part of your dual employment, you had a
24   faculty appointment at the medical school, isn't

390

1   Mr. Kilroy asked you some questions about your

2   medical license and credentials.  Do you recall that

3   line of questions?

4        A.  Yes.

5        Q.  I just want to follow up on a few things.

6   Are you currently a member of any medical

7   practice?

8        A.  No.

9        Q.  Are you credentialed anywhere?

10       A.  No, because I don't have any job.  Unless

11  you have a job, there is no question to credential

12  you.

13       Q.  Are you still licensed to practice

14  medicine?

15       A.  Yes.  I am good until '21.

16       Q.  So your license is active -- is active

17  until then?

18       A.  It is active until July '21.

19       Q.  Mr. Kilroy also asked you questions in your

20  first day of your deposition about your privileges,

21  and specifically he asked if you had ever been

22  denied privileges anywhere, and you I believe

23  testified that you did not recall, but I'd just like

24  to have that be a little bit clearer.  Have you ever

420

 1  don't know who decides the pay, but the supervisor,
 2  department chair, and maybe Dr. Tosi.  I don't know
 3  really who decides.  They are the superior people
 4  so...
 5       Q.  On the first day of your deposition,
 6  Mr. Kilroy asked if you believed your qualifications
 7  were superior to Dr. Dill's.  Do you recall that?
 8       A.  Yes.
 9       Q.  Yeah.  Do you have an opinion as to how
10  your qualifications compared to Dr. Dill's?
11            MR. KILROY:  Objection.  Asked and
12  answered.
13       A.  I did recall, and I have a lot more years
14  of experience.  She did do cardiac, which I did not.
15  So that -- that -- she does have more qualification
16  in the cardiac.
17       Q.  In the first day of your deposition and
18  again today, Mr. Kilroy asked about the facts that
19  you believe -- the actions that UMass. personnel
20  took that you believed were discriminatory against
21  you on the basis of your disability.  Can you just
22  clarify what actions the Defendants took or didn't
23  take so that we just get it all neat and clear in
24  one spot.

423

1    know, because they don't know what is going on.  I
2    cannot walk.  I cannot talk.  I have to sit down.
3    So, yes, many times, not once.
4         Q.  And when -- sorry.  I just want to drill
5    down on this a little bit more.  In the morning when
6    you went in to work those days --
7         A.  Yes.
8         Q.  -- did you think about putting in for a
9    sick day under the FMLA?
10        A.  On the day I get the spell, that's what
11   you're asking me?
12        Q.  Yes.
13        A.  No.  On the contrary.  Even with my spells,
14   so many spells, I came to work because I took it
15   very seriously, and this is the reward I get.  I
16   hardly call in sick unless there is a surgery or
17   whatever.
18        Q.  Do you have any idea, Dr. Desai, about how
19   frequently you may have had those spells in your --
20        A.  Unpredictable.  Unpredictable.  But, when I
21   get tired, it comes more often.  I had to break the
22   cycle kind of.
23        Q.  Dr. Desai, I'd like to -- to draw your
24   attention back to Exhibit No. 50.

428

1  holiday, if you are covering, and so you give little
2  bit in advance.
3      Q.  I'm sorry.  Go ahead.
4      A.  You have to tell the section head that this
5  is the vacation I want kind of.  Yeah.  So just,
6  like, if I am tired and I cannot just take vacation
7  just like, then I have to call in sick, but I did
8  not want to call in sick.  I love my work.  I was
9  dedicated.  I only call in sick when I have some
10 procedure or I really cannot get out of the bed.
11 That's the bottom line.
12     Q.  So Dr. --
13         MR. KILROY:  Objection.  Move to strike as
14 nonresponsive.
15     Q.  Dr. Desai, you testified earlier that you
16 had spells occasionally between when you parked your
17 car and when you got to your workstation at work.
18 If that happened, were you at some point able to
19 work that day?
20     A.  I did after I -- my spells go away.  I
21 became very tired that day, and there are so many
22 times that I'm checking the resident.  The resident
23 is next to me and I get the spell, but most of them
24 kind of know.  Some people who don't know get

## **EXHIBIT E**

LeaveLink Integrated Absence Management Software by Absentys                    Page 1 of 2

LEAVE AND DISABILITY SPECIALISTS

**TheStandard**

| Task List | Reports | Doctors | eFMLA Reqs | SEARCH | CONTACT US | LOGOUT |

Client Reference Screen >>   UMass Memorial Health Care, Inc.

### Details for Leave 212176 (CHARU DESAI)

| | | | |
|---|---|---|---|
| Reason | Own Serious Health Condition | Leave Owner  Claudette Jolly | Status  Approved |
| First Absence  03/26/2015 | | | Status Date  03/27/2015 |
| Expected RTW  03/26/2016 | | STD Applied?  No | Status By  Claudette Jolly |

ABSENCES | CERTIFICATION | STD / WC | INTAKE | ELIGIBILITY | CORRESPONDENCE | AUDIT TRAIL | BACK TO WORK

**Document View**

PREVIOUS EMAIL NOTICE SENT 12/23/2015 10:47 AM

Recipients: LOA.mailbox@umassmemorial.org

Subject: CHARU DESAI, Approval of Leave

Body:

Employee: CHARU DESAI, Member ID 118101
Reason for Leave: for your own health condition
Leave Decision: Approval
Leave Number: 212176

The Standard Benefit Administrator is sending this communication on behalf of Standard Insurance Company (The Standard).

CHARU DESAI's absence from 03/26/2015 through 03/25/2016 has been certified as detailed below:

Intermittent time taken within the last 30 days is as follows under these policies:

Family and Medical Leave Act (FMLA)

12/18/2015, 6.00 hours: FMLA Approved

The expected return to work date for CHARU DESAI is 03/26/2016. NOTE: This date could be the actual or estimated return to work date for a continuous leave. If this is an intermittent leave, this is the date through which we have currently certified based on the most recent documentation from the employee and/or medical provider.

Frequency: 2 times every 2 months  Duration: 1 day per episode

Please do not hesitate to contact us at 1-855-757-4715 with any questions.

**Document Details**

ADD NEW | SUBMIT

04/07/2016
EE own Health Cert
Uploaded
EE own Health Cert
Reassign to different leave

03/31/2016
Recertification Letter
Raul Espinoza Granados
Review letter verbiage
Recreate PDF

Batch printed 04/01/2016

12/23/2015
Approval - Leave Only
Karaice McGregor
View Email

09/24/2015
Approval - Leave Only
Karaice McGregor
View Email

09/24/2015
Approval Letter
Karaice McGregor
Review letter verbiage
Recreate PDF

Batch printed 09/25/2015

09/22/2015
EE own Health Cert
Uploaded
EE own Health Cert
Reassign to different leave

09/18/2015
Recertification Letter
Karaice McGregor
Review letter verbiage
Recreate PDF

Batch printed 09/21/2015

04/01/2015
Approval - Leave Only
Claudette Jolly
View Email

04/01/2015
Approval Letter
Claudette Jolly
Review letter verbiage
Recreate PDF

Batch printed 04/02/2015

03/31/2015
EE own Health Cert
Uploaded
EE own Health Cert
Reassign to different leave

03/30/2015
AUTHORIZATION
Uploaded

6/5/2019

**UMM 00424**

Charu Desai, MD
Exhibit_21
10/22/2020



September 24, 2015

CHARU DESAI
32 WHISPER DR
WORCESTER, MA 016091150

RE: UMASS MEMORIAL MEDICAL GROUP
    Leave No: 212176

Dear Ms. DESAI:

 The Standard Benefit Administrators is sending this communication on behalf of Standard Insurance Company (The Standard).

We are pleased to inform you that your leave request with Standard Insurance Company (The Standard), administrator of the leave program for UMASS MEMORIAL MEDICAL GROUP, has been approved under the leave laws and/or policies specified below. This letter explains the terms of your leave and provides other important information.

<u>APPROVAL DATES</u>

Your request for Family/Medical Leave for your own health condition has been approved from 03/26/2015 through 03/25/2016.

Because the leave will be unscheduled, currently it is not possible to provide the hours, days, or weeks that will be counted against your FMLA and/or state leave entitlement. However, you have the right to request this information once in a 30-day period (if leave was taken in the 30-day period).

Intermittent time off to be determined.

Unless otherwise indicated, your leave under applicable leave laws and/or policies will run concurrently.

The summary above specifies the leave dates that are approved, as well as the leave laws and/or policies under which your leave was approved, including continuous and/or intermittent leaves. If any requested leave dates have not been approved, these are also listed above. Please contact us if you have questions regarding the leave dates and/or policies listed above.

NOTE: The leave dates approved above take into account "replenishment", that is, dates that are now approved because you have entered a new 12-month entitlement period, or you have reached the anniversary of previously used FMLA time.

**WHAT YOU NEED TO DO**

<u>Leave Communication Requirements</u>



Charu Desai, MD
Exhibit_22
10/22/2020

Please remember that it is your responsibility to follow your company's normal absence reporting procedures.

*Intermittent Leaves*

**Every absence related to an approved intermittent leave must be reported to The Standard at 1-855-757-4715 in addition to reporting to your employer.**

**To report intermittent leave dates:**

1. Contact our Customer Service line at 1-855-757-4715.
2. When asked how we can help you, say "report an absence."
3. When prompted, enter your leave number, which is 212176.
4. Follow the prompts for other key information, including your date of birth and the date and hours of your absence.
5. Repeat the above steps for any additional absences. Note this service is available anytime, 24 hours a day, 7 days a week.

If any portion of your leave is being used for planned events such as doctors visits, therapy or treatment, coordinate and schedule this portion of your leave in advance with your supervisor unless it is not medically possible to do so.

You must report any unforeseen absences as qualifying leave as soon as possible, preferably the same day, although FMLA regulations permit giving notice one to two days later. Absences reported later than that may not be approved for job-protected leave.

RECERTIFICATION

While on leave you may be required to recertify your leave. When recertification is needed, we will send you an additional Certification of Health Care Provider for Employee's Own Health Condition form for your health care provider to complete and return to our office to certify additional time away from work.

WHAT HAPPENS TO YOUR PAY

Family Medical Leave is unpaid. You may be required to substitute or use your available sick, vacation and/or other paid time in accordance with the earned time policy and/or CBA during your absence, unless prohibited by state law.

If you receive paid time (e.g. sick pay, vacation pay, PTO), this leave will also be considered protected FMLA or government-mandated leave and will be counted against your leave entitlement under these policies/laws.

We hope that the above information helps you understand your leave of absence. If you have any questions concerning your leave, you may call our office at the number below. Please have your company name and your leave number on hand (as listed above). We will be happy to assist you.

Sincerely,

Absence Management Service Center
1-855-757-4715

**UMM 00427**

09-22-'15 07:09 FROM-UMMHC          +774-442-6959          T-799  P0001/0002 F-112

**Standard Insurance Company**
866.756.8116 Tel 866.751.5174 Fax
PO Box 3877 Portland OR 97208

**Certification of Health Care Provider for**
**Employee's Serious Health Condition**

| Employee's Name | | Date of Birth |
|---|---|---|
| CHARU DESAI | 212176 | 7 \| 6 \| 1950 |

*INSTRUCTIONS to the HEALTH CARE PROVIDER: Your patient has requested leave under the FMLA and/or other leave laws or policies. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.*

NOTE: The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic Information" as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

**PART A: MEDICAL FACTS**

1. Approximate date condition commenced: _11/2000_     Probable duration of condition: _chronic_

   Mark below as applicable:

   Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility? ☐ Yes ☐ No

   If so, dates of admission: _11/2000_

   Date(s) you treated the patient for condition: _multiple_

   Will the patient need to have treatment visits at least twice per year due to the condition? ☑ Yes ☐ No

   Was medication, other than over-the-counter medication, prescribed? ☑ Yes ☐ No

   Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)? ☐ Yes ☑ No

   If so, state the nature of such treatments and expected duration of treatment: _____

2. Is the medical condition pregnancy? ☐ Yes ☑ No   If so, expected delivery date: _____

3. If the employee has provided you with a list of essential functions or a copy of his/her job description, please use that information to answer this question. If the employer has not provided that information, please answer these questions based upon the employee's own description of his/her job functions.

   Is the employee able to perform the essential functions of his/her job: ☑ Yes ☐ No

   If no, identify the job functions the employee is unable to perform: _____

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment): _initially diagnosed with sino atrial node dysfunction and had a pacemaker implanted 11/2000. Pt continues to have episodes of altered consciousness and generalized weakness without loss of consciousness._

**PART B: AMOUNT OF LEAVE NEEDED**

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ☐ Yes ☑ No

   If so, estimate the beginning and ending dates for the period of incapacity: _____

09-22-'15 07:09 FROM-UMMHC          +774-442-6959          T-799  P0002/0002 F-112

**Standard Insurance Company**
866.756.8116 Tel 866.751.5174 Fax
PO Box 3877 Portland OR 97208

**Certification of Health Care Provider for**
**Employee's Serious Health Condition**

---

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ☒ Yes ☐ No

   If so, are the treatments or the reduced number of hours of work medically necessary? ☒ Yes ☐ No

   Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period: _episodes seem to be triggered by work_ _related stress and fatigue_

   Estimate the part-time or reduced work schedule the employee needs, if any:

   _____ hour(s) per day; _____ days per week from _____ through _____

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ☒ Yes ☐ No

   Is it medically necessary for the employee to be absent from work during the flare-ups? ☒ Yes ☐ No

   If so, explain: _Pt unable to function when she is experiencing_ _a spell._

   Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

   Frequency: _1-2_ times per _____ week(s) _2_ month(s)

   Duration: _____ hours or _1_ day(s) per episode

---

ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.
_etiology behind spells in unclear. Initially thought to be_
_due to bradycardia. she has also been evaluated by a_
_Neurologist. spells consist of generalized weakness without_
_loss of consciousness. she is unable to speak or move._
_episode lasts minutes but she then feels crashed_
_out and fatigued._

---

Health Care Provider's Name
_Lawrence Rosenthal_

| Address _UMASSMemorial Medical Centre_ | City _Worcester_ | State _MA_ | ZIP _01655_ |
|---|---|---|---|

| Phone No. _774 441 6649_ | Fax No. _774 442 6959_ |
|---|---|

Specialty/Type of Practice
_Cardiac Electrophysiology_

I certify that the information on this form is accurate and truthful to the best of my knowledge.

| Signature of Health Care Provider | Date _9/22/2015_ |
|---|---|

---

**UMM 00429**

**<u>EXHIBIT F</u>**

View Email History                                                                                      Page 1 of 1

PREVIOUS EMAIL NOTICE SENT 09/12/2016 03:59 PM

**Recipients:** LOA.mailbox@umassmemorial.org

**Subject:** CHARU DESAI, Approval of Leave

**Body:**

Employee: CHARU DESAI, Member ID I18101
Reason for Leave: for your own health condition
Leave Decision: Approval
Leave Number: 281776

CHARU DESAI's absence from 04/08/2016 through 03/08/2017 has been certified as detailed below:

Intermittent time taken within the last 30 days is as follows under these policies:

Family and Medical Leave Act (FMLA)

09/06/2016, 8.00 hours: FMLA Approved
09/07/2016, 8.00 hours: FMLA Approved

**The expected return to work date for CHARU DESAI is 03/09/2017. NOTE:** This date could be the actual or estimated return to work date for a continuous leave. If this is an intermittent leave, this is the date through which we have currently certified based on the most recent documentation from the employee and/or medical provider.

**Please note the following _estimated_ Frequency and Duration:**
**Frequency:** 1-2 times per 2 month
**Duration:** 1 day per episode

Please do not hesitate to contact us at 1-855-757-4715 with any questions.



Charu Desai, MD
Exhibit_25
10/22/2020

**<u>EXHIBIT G</u>**

View Email History                                                                    Page 1 of 1

PREVIOUS EMAIL NOTICE SENT 09/28/2017 10:24 PM

**Recipients:** LOA.mailbox@umassmemorial.org

**Subject:** CHARU DESAI, Approval of Leave

**Body:**

Employee: CHARU DESAI, Member ID I18101
Reason for Leave: for your own health condition
Leave Decision: Approval
Leave Number: 340534

CHARU DESAI's absence from 03/09/2017 through 03/08/2018 has been certified as detailed below:

Intermittent time off to be determined.

The expected return to work date for CHARU DESAI is 03/09/2018. **NOTE:** This date could be the actual or estimated return to work date for a continuous leave. If this is an intermittent leave, this is the date through which we have currently certified based on the most recent documentation from the employee and/or medical provider.

**Please note the following _estimated_ Frequency and Duration:**
**Frequency:** 1-2 times per 2 months
**Duration:** 1 day per episode
**Appointments:** N/A

Please do not hesitate to contact us at 1-855-757-4715 with any questions.


Charu Desai, MD
Exhibit_35
10/22/2020

**EXHIBIT H**



**UMass Memorial Leave and Disability Service Center**
P.O. Box 14192 Lexington, KY 40512-4192
Phone Number: (855) 209-4802
Fax Number: (859) 264-4384

September 18, 2018

Charu Desai
32 Whisper Dr
Worcester, MA 01609

RE:     **UMass Memorial Health Care**
        **Approval of Leave Request**
        **Case Number: 301897530440001IFN**
        **Leave Type: Employee Medical**

Dear Charu:

**We have made a decision on your request for leave.**
You have been approved for your leave request beginning 03/21/2018 due to your own serious health condition..

**Leave Request Determination**
- You are approved under the Family and Medical Leave Act (FMLA) from 03/21/2018 through 03/20/2019. Your absences under this leave request will be counted against your FMLA entitlement.

The certification allows for the following frequency and duration:
Absences for the Condition: 2 episode(s) per 2 Month(s) with each absence lasting up to 1 Day(s)
Absences for Treatments: None

If your first day of absence is in the future, we will review your eligibility again at the start of your leave.

Since the leave you requested will be unscheduled, it is not possible to provide the hours, days, or weeks that will be counted against your FMLA and/or State leave entitlement at this time. You have the right to request this information once in a 30-day period (if leave was taken in the 30-day period). You can also access this information 24 hours a day, 7 days a week on "viaOne Express" at www.AbsenceOne.com/UMassMemorial.

If your first day of absence is in the future, we will review your eligibility again at the start of your leave.

**Actions Required**
- **Release to Return to Work:** Before you return to work, you will need to have a return-to-work note completed by your health care provider, certifying that you are able to resume work and to carry out your work duties. You must also contact Employee Health Services at 508-793-6400 to schedule a return-to-work appointment at least one week prior to your anticipated return to work. You should bring the completed return-to-work note from your provider to your Employee Health Services appointment. If the return-to-work note is not received by the time you are scheduled to return to work, your return may be delayed until the return-to-work note is provided.

9-18-2018                               301897530440001IFN

UMM

Charu Desai, MD
Exhibit_47

10/22/2020

- **Return to Work Notification:** On the date you return to work please contact AbsenceOne to update your leave request status by using www.AbsenceOne.com/UMassMemorial or by calling our "viaOne voice" interactive voice response (IVR) system at the toll free number above.

- **Intermittent Absence Time Reporting:** You are required to report all absences according to your departmental guidelines. In addition, you are required to report your intermittent absences, whether full or partial days, within **2** business days of the absence to AbsenceOne. You can report intermittent absences by:
  - ○ Calling the UMass Memorial Leave and Disability Service Center Absence Reporting Line at (855) 209-4802, option 2 and say "Absence" or press option 2;or
  - ○ Submitting your intermittent absence through viaOne Express at www.AbsenceOne.com/UMassMemorial
- **Recertification:** In conjunction with an absence under the FMLA, the FMLA allows recertification on approved leaves no more often than every 30 days unless the minimum duration of the serious health condition is more than 30 days, or in less than 30 days when: (a) circumstances of your leave change significantly from the certification used to approve your leave; (b) you request an extension of leave; or (c) the employer receives information that casts doubt upon the employee's stated reason for the absence or the continuing validity of the certification. If the serious health condition is expected to last beyond 6 months; recertification will be required every 6 months. Once recertification is requested, the existing certification is no longer valid and any absences will be kept in a pending status, meaning they are neither approved nor denied, until you have returned the required documentation and we are able to make a final leave determination.

- During the recertification process, you should continue to report all time missed for this leave reason to AbsenceOne and you are also required to report your absence(s) to your department according to departmental guidelines. Failure to provide updated information supporting the change in circumstance may result in the denial of FMLA and/or State leave law coverage and a denial of pending absences. You will be notified if/when recertification will be required based on the specifics of your leave.

- **Pay:** To the extent you have accrued, available earned time, vacation, personal and/or sick days, or any Short-Term Disability leave in the case of your own serious health condition, you may be required to exhaust such paid leave during your FMLA leave, consistent with UMass Memorial policies and collective bargaining agreements regarding earned, sick, vacation and personal time. Whether you are required to do so will be dictated by UMass Memorial policies and collective bargaining agreements applicable to your position. Please contact your Human Resources if you would like to review the applicable policies or agreement(s).
- Note, notwithstanding the above, if the leave also qualifies as parental leave under the Massachusetts Parental Leave Act, you may elect to use paid leave during such leave period, but will not be required to do so.
- **End of Approval:** This approval will expire on 03/20/2019. You will need to provide updated documentation if an extension is needed.

**Need additional help?**
You can access your leave request information any time by logging into www.AbsenceOne.com/UMassMemorial or by calling our "viaOne voice" interactive voice response (IVR) system at the toll free number above. If you have any questions or experience a change in your circumstances please contact UMass Memorial Leave and Disability Service Center Monday through Friday 8:00 a.m. - 8:00 p.m. Eastern Time.

Thank you,
Margaret Casey
Leave Specialist

## **EXHIBIT I**

**Mowlood, Randa**

| | |
|---|---|
| **From:** | Rosen, Max |
| **Sent:** | Friday, May 13, 2016 3:15 PM |
| **To:** | Desai, Charu |
| **Cc:** | Rosen, Max; Mowlood, Randa |
| **Subject:** | Confirmation of our emeting today |

Dear Charu,

Thanks for meeting with me and Randa today.  I wanted to review what we discussed:

1) Work Hours:
   a. I understand that you filed with the HR department to be eligible for FMLA. You agreed that you will meet with Kelly Zalegowski so that you can understand your rights and protections under this policy.  As we discussed, if there are medical or other reasons that meet the standards of hospital policies, that preclude you from being at work on a regular basis at 8 am, Kelly can work with you put in place an accommodation plan. If such a plan is implemented, we can plan the chest division schedule accordingly. Otherwise, we really need you to be work on time. Please let me know once you have met with Kelly.
   b. Work day – while the routine day is 8 am to 5pm – it's the departments' expectation that all urgent or other appropriate cases will be cleaned up before anyone leaves.
   c. I understand the Chest section staffing is limited, and I will work with Karin, in her role as Division Chief, to make sure that we have adequate staffing based on expected wRVU demand.
2) E-mail: Email is the default way that we need to communicate in the department for most written communication.  Please make sure to read and respond to your email in a timely manner.
3) Impediments to efficient workflow: If there are impediments to efficient work flow, please make sure you escalate these issues, first to Karin, and then Randa or me, rather than letting them continue without resolution.  An example of this is the problem you reported with your PACS system, and the phone in the chest reading room.  It's your responsibility to escalate any issues to the appropriate people so that we can create a safe, efficient work environment for you.
4) Peer-Vue / critical results and Q/A reporting:  It's our department expectation that if you identify any QA issues that they will be entered in into Peer-Vue, and that you will use our critical results reporting tools, and follow our departmental policies for critical results reporting.   Dr. Baccei can get you copy of the policies if you need them.

1

UM   Charu Desai, MD
Exhibit_26
10/22/2020

5) Academic time is allocated based on departmental guidelines, as vacation time is per medical group policies. If you feel that more academic time is justified, please let me know, in writing , which activities you would like to undertake, and we can discuss additional time for these specific, additional activities.  Having measurable outcomes and deliverables will be necessary for any consideration.

6) If you would like to have information on departmental policies re: part time, etc. please let me or Randa know.

7) Please make sure to submit your vacation requests in compliance with departmental policy.

Thanks for your continued commitment to the department.

Can you please respond that you have received and agree?  If you feel I have misrepresented anything, please let me know.

Best,

Max

Max P. Rosen, MD MPH
Professor and Chair
U Mass Memorial Medical Center
U Mass School of Medicine
55 Lake Ave. North - Room S2-824
Worcester, MA 01655
508-856-3252
508-856-4910 fax

max.rosen@umassmemorial.org
Follow me on LinkedIn or Twitter
www.umassmed.edu/radiology

UMM 00315

**EXHIBIT J**

Updated June 8, 2017

## ACADEMIC AND ADMINISTRATIVE TIME POLICY

I.  **Academic Time**

1.  Academic time is defined as time allocated to academic responsibilities including teaching/conference preparation, writing papers/texts, completing research project, attending institutional and department committees, attending a conference, serving on committees of local, regional, national or international organizations other than UMMMS or UMMMC.

2.  Academic activities will be reviewed annually during individual annual academic planning sessions

3.  In order to be eligible for academic time a radiologist must be 0.6 FTE or greater. As a new hire, academic time will be granted for up to 2 years based on mutually agreed upon planned activity. For faculty with 2 or more years of service, allocation will be based on prior activity and mutually agreed upon future activity.

4.  The baseline for academic time is 12 days/year (1 day/month). This number is prorated for FTE.

II.  **Administrative Time**

Administrative time is defined as time allocated to specific administrative roles as defined in job descriptions. The number of days is determined as follows:

| Administrative Role | Days Per Year |
|---|---|
| Residency Program Director | 49 (includes 4 days AUR) |
| Quality and Patient Safety Director | 67.5 |
| Assist Residency Program Director | 12 (includes 4 days AUR) |
| Radiology Undergraduate Medical Education | 99 days (includes 4 days AUR, 5 days AAMC or GEA/NEGEA, 36 days DSF course) |
| Fellowship Director ACGME | 12 |
| Fellowship Director Non-ACGME | 4 |
| Division Chief | 12 |
| Other – Admin/Academic Functions defined by Chair | 6 to 46 Days per year at Chair Discretion |

**During academic/administrative time, faculty must be reachable by pager and available to cover clinical service if need arises (unless away at a conference).**

Charu Desai, MD
Exhibit_12
9/18/2020

**Academic time can be used to attend a conference, however, prior approval must be obtained from the Chair.**

III.   **Scheduling of Academic/Administrative time**

1.  Academic/ administrative time off will be assigned by the Physician Staffing Coordinator under the direction of the Division Chief and/or Chair. Faculty requests will be considered and honored when feasible.

2.  Requests to attend meetings/conferences using accumulated academic/administrative time must be requested within the context of vacation planning, subject to vacation request deadlines and approved by the Division Chief.

3.  Clinical Schedule will take precedence over academic and/or administrative time.

4.  Academic/Administrative time may be scheduled in half day increments.

5.  Academic/Administrative time will not be routinely scheduled on Friday unless preapproved by Division Chief.

6.  Academic/Administrative time cannot be used to extend a leave (vacation) and will not be scheduled immediately before or after a leave.

7.  Academic/Administrative time will be reduced on a prorated basis if an authorized leave of absence is taken during the Fiscal Year. For example if a leave is 3 of 12 months, academic/administrative time is reduced by 25%.

8.  Academic/Administrative time should be taken within the quarter and cannot be carried over to the next Fiscal Year.

9.  Academic/Administrative time will be removed once a resignation notice is communicated.

**<u>EXHIBIT K</u>**

# CURRICULUM VITAE

**Charu S. Desai, M.D.**
32 Whisper Drive
Worcester, MA  01609
(508) 799-5280

## EDUCATION

| | |
|---|---|
| **Premedical**<br>1966-1968 | PT Saravajanik College of Science<br>Surat, India, BS  1968 |
| **Medical School**<br>1968-1972 | Government Medical College, Surat<br>India, MBBS, 1972 |

## POSTGRADUATE TRAINING

| | |
|---|---|
| **Internship**<br>1972-1973 | Civil Hospital<br>Surat, India |
| 1974-1975 | House Physician<br>Youville Hospital<br>Cambridge, MA |
| 1975 | ER Physician<br>Central Hospital<br>Somerville, MA |
| **Residency**<br>1975-1976 | Pathology<br>Mount Auburn Hospital<br>Cambridge, MA |
| 1976-1977 | House  Physician<br>Cushing Hospital<br>Framingham, MA |
| 1978-1981 | Diagnostic Radiology U<br>Mass Medical Center<br>Worcester, MA |
| 1979-1981 | Chief Resident<br>U Mass Medical Center<br>Worcester, MA |
| **Fellowship**<br>1981-1982 | Computed Body Tomography/Ultrasound<br>U Mass Medical Center<br>Worcester, MA |

## CERTIFICATION

| | |
|---|---|
| 1975 | ECFMG – Certificate #194-965-0 |
| 1982 | FLEX – Passed |
| 1983 | Board Certified, Diagnostic Radiology |

Charu Desai, MD

Exhibit_5

9/18/2020

Charu Desai, M. D.

## POSITIONS

| | |
|---|---|
| 1982-1983 | Assistant Professor of Radiology<br>U Mass Medical Center<br>Worcester, MA |
| 1983-1992 | Radiology Clinic, Inc.<br>Worcester, MA |
| 1992-2002 | Assistant Professor of Radiology<br>U Mass Medical Center<br>Worcester, MA |
| 2002-present | Clinical Associate Professor of Radiology<br>U Mass Medical Center<br>Worcester, MA |
| 2015-Present | Attending Radiologist, Clinton Hospital, Clinton, MA |
| 2015-Present | Attending Radiologist, Marlborough Hospital,<br>Marlborough, MA |

## PROFESSIONAL APPOINTMENTS

| | |
|---|---|
| 1983-1990 | Attending Radiologist<br>Worcester City Hospital<br>Worcester, MA |
| 1983-1990 | Attending Radiologist<br>Fairlawn Hospital and Rehabilitation Center<br>Worcester, MA |
| 1983-1990 | Attending Radiologist<br>Doctor's Hospital<br>Worcester, MA |
| 1983-1990 | Attending Radiologist<br>Holden Hospital<br>Holden, MA |
| 1983-1992 | Attending Radiologist<br>Harrington Memorial Hospital<br>Southbridge, MA |
| 1992-present | Clinical Associate Professor and<br>Attending Radiologist<br>U Mass Medical Center<br>Worcester, MA |
| June, 2017 | Best Teacher Award presented by<br>Residents |

Charu Desai, M. D.

**SOCIETIES**                  Radiological Society of North America
                              NERRS (Junior Membership 1978-1981)

**TEACHING EXPERIENCE**

1983-1987                     Actively involved in teaching the residents in general surgery,
                              internal medicine, emergency medicine and family practice
                              conducting daily radiology rounds of in-house patients --
                              Worcester City Hospital.

1992-present                  Actively involved in teaching radiology residents and medical
                              students rotating through the radiology department.

                              On Line teaching residents and medical students 8 to 5 p.m. in
                              chest rotation twice a week.

                              Teaching residents on-call on weekends
                              Consultation daily with attendings, residents and medical
                              students.

                              Sometimes discussion of cases at clinical radiological pulmonary
                              conference.

                              Monitoring residents for 10 a.m. medical conference.

                              Sometimes discussion of cases at clinical radiology/pulmonary
                              conference.

                              Giving conference to medical students.   11/11/99, 2/24/00,
                              3/1/00, 9/29/00

**LEARNING EXPERIENCES**

10/79-6/80                    Physics Course -- Massachusetts General Hospital

5/12/80-6/20/80               Armed Forces Institute of Pathology (AFIP)
                              Washington, DC
                              Radiologic Pathology Course

4/80                          Children's Hospital Medical Center-Elective
                              Boston, MA

1980-81                       U Mass Medical Center, Worcester, MA
                              Resident Representative for Radiology,

**CONFERENCES & CERTIFICATES**

| | |
|---|---|
| 1986 | Chest Conference, San Francisco, CA |
| 1987 | Mammography Course, Boston, MA |
| 1990 | Diagnostic Radiology, San Francisco, CA |
| 1993 | Chest Imaging, Boston, MA |
| 1996 | Mammography Conference, Virginia |
| 1997 | ASER Meeting, New Orleans, LA |
| 1998 | Summer Radiology, South Carolina |
| 1998 | Radiology 2000, South Carolina |
| 1999 | Missed & Delayed Diagnosis of Breast Cancer, NY |
| 2000 | Clinical Essentials of CT & MRI, Las Vegas, NV |
| 2000 | Advanced Seminars in Ultrasound Diagnosis, NY |
| 2002 | Chest Imaging, Boston, MA |
| 2002 | Emergency Radiology, New York, NY |
| 2003 | Neuroradiology, Harvard Medical School, Boston, MA |
| 2011 | Radiology Review Course given by Harvard in March, 2011 |
| 2012 | Imaging in Hawaii Conference, Kapalua, HI in September, 2012 |
| 2015 | CT Boot Camp; Principles, Pearls and Protocols |
| 2015 | Abdominal and Pelvic Imaging |

**PUBLICATIONS**

| | |
|---|---|
| 1996 | Familial Pulmonary Fibrosis in Twins |
| 1997 | The Importance of Azygo-Esophageal Line, presented at RSNA – Poster |
| 1998 | Pulmonary Sling in Adults with Recurrent Pneumonia An Episode of Pulmonary Embolism- Abstract |
| 1999 | Deep Sulcus Sign, presented at AUR - Abstract |
| 2002 | Radiologic imaging of Perflubron, a mode of treatment of ARDS. Abstract. Exibit-AUR. |
| 2002 | Talc geanulomata with positive PET scan. Multiple mass like opacities on plain CXR & CT scan, in a patient with biopsy proven talc geanuloma. Abstract AUR |

**EXHIBIT L**

## UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
### WORCESTER, MA

### ANNUAL FACULTY REPORT AND EVALUATION OF PROFESSIONAL ACTIVITIES

**NOTES ON PROCEDURE:** *Please complete electronically.* This report is intended to document contributions as a faculty member at the University of Massachusetts Medical School and our clinical partner UMass Memorial Health Care, Inc.

### I. *General Information*

| | |
|---|---|
| **Dates of Evaluation - From:** July 1, 2009 | **To:** June 30, 2010 |
| **Name:** Charu Desai, MD | **Date:** May 21, 2010 |
| **Department:** Radiology | **Division:** Thoracic Radiology |
| **Rank:** Clinical Associate Professor | **Years in Present Rank:** 9 |
| **Faculty Type:** Academically-salaried | **FTE:** FTE- 100% |
| **Date of UMMS Appointment:** 7/15/01 | **Tenure Decision Year:** |
| **Highest Degree:** MD | **Degree Date:** 1973 |

**Percentage effort in the following activities during the evaluation period** (N.B. percentage effort cannot exceed 100%. Time spent on administrative service and leadership functions are to be included in the appropriate categories.):

**Clinical:** 92  %  **Education:** 8  %  **Research:** 0  %

### II. *Teaching*

A.  Teaching and development of formal courses for ***undergraduate medical*** education, including individual or group supervision.

> On line teaching residents 3-4 times/wk and preview on call residents

B.  Teaching and development of formal courses for ***graduate*** education, including biomedical science and nursing students, residents, etc.; individual or group supervision; CME and other presentations; mentoring faculty.

>

C.  Briefly summarize your impression and data, if available, of student feedback regarding your formal teaching activities.

>

D.  Describe any major changes in your teaching approach or responsibilities during the last year.

> Teaching on line in chest rotation

Annual Faculty Report
Revised: 02/19/2009

Charu Desai, MD
Exhibit_14
10/22/2020

E.  Describe your major teaching activities this past year in areas other than the formal curriculum (e.g. clinical teaching, student advising and students or fellows who conducted research under your direction)?

Daily consultant to clinicians, primarily in chest diseases and general radiology in reading room

## III.  *Research, Creative and Scholarly Activities*

A.  Published articles, abstracts, books, monographs, editorials, pre-reviews and reviews during evaluation period (include exact reference with full title, publisher, dates and inclusive pagination).

B.  Work accepted for publication but not yet in print.

C.  Current grants, contracts and clinical studies (identifying the following for each: agency, title, entire project dates, salary percentage, amount funded, and position on project).

D.  Pending grants, contracts and clinical studies (identifying the following for each: agency, title, entire project dates, salary percentage, amount funded and position on project).

E.  Other scholarly activities. (e.g. peer review of articles and editorships of journals and books)

## IV.  *Professional Service*

A.  Departmental/divisional service (e.g. committees and candidate interviews).

B.  School, campus and clinical system service (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.  Regional, national and international committees and other service activities. (e.g. peer review of grants)

Annual Faculty Report
Revised: 02/19/2009

UMM 00266

D.   Professionally related service activities (e.g. community service and consulting).

V.   **Clinical Inpatient and Outpatient Activities**
A.   Describe clinical practice and specialized clinical skills, including by patient setting/location.

B.   Patient care productivity using departmental measures (see addendum provided by Department).

C.   Quality and timely completion of patient records and billing (see addendum provided by Department).

D.   Other measures and outcomes (patient satisfaction, patient outcome, etc).

E.   Describe efforts to improve quality and safety of patient care, including how you've identified and addressed your own needs to enhance your clinical competencies.

VI.   **Leadership**
Describe what leadership responsibilities you have regarding clinical, education and research. Note accomplishments in these activities over the past year that you think have had an impact.

VII.   **Diversity Efforts**
Describe efforts related to diversity that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment.
(For assistance with completing this section, go to http://www.umassmed.edu/ofa/afr/diversity.aspx)

To equally treat diverse staff in education, research, service, clinical, and administration activities

VIII.   **Honors and Awards**

Annual Faculty Report
Revised: 02/19/2009

**UMM 00267**

IX.    *Faculty Objectives and Career Development*

A.    What were your stated goals and objectives for the past year?  Describe your accomplishments in each of these.  What do you see as your most important contribution to your department, school, and institution?

| | |
|---|---|
| 1. | Increase productivity in clinical work. |
| 2. | Online teaching Residents and medical students. |
| 3. | |
| 4. | |
| 5. | |

B.    State three to five goals for the next year, in priority order, in the following areas: *education; research, creative and scholarly activities; service; clinical; leadership; diversity.* One goal must be related to *diversity.* Include one or more specific measureable objectives for each goal. (For assistance with completing this section, go to http://www.umassmed.edu/ofa/afr/goals.aspx)

| | |
|---|---|
| 1. | Education - engage resident case presentation biweekly, when in chest rotation |
| 2. | Teaching residents and medical students with more emphasis on DID of the disease |
| 3. | In the absence  of the division director, take responsibility of covering the division |
| 4. | Attend Medical Grand Rounds participation |
| 5. | |

C.    Identify your current mentoring activities: faculty and staff you mentor and those who mentor you (including those who may be from outside the University).

Rotating medical student and visiting residents

D.    Describe career development activities completed during the previous year.

Attend continuing Med Ed conferences and specialty meetings

E.    Describe career development plans for the next year (e.g. continuing medical education and career development courses, career development awards and other activities).

Same

Page 4

UMM 00268

**X.** *Supervisor / Evaluator Evaluation (Assigned by Department)*

A.    Evaluate the faculty member's contributions to clinical care.

Adequate quality though just at the median % in terms of productivity. Overall, range of skills is only modest.

B.    Evaluate the faculty member's contributions to education.

Reading room only. No formal didactic contributions.

C.    Evaluate the faculty member's contributions to research and scholarly activities.

None.

D.    If applicable, evaluate the faculty member's contributions to leadership.

NA

**XI.** *Faculty's Comments*

**XII.** *Department Chair's Evaluation (if not supervisor/evaluator)*
Summary weighted to correspond with effort assignment.

Stressed new emphasis on measuring multiple missions ie., clinical productivity as well science and teaching.

**XIII. Signatures**

Faculty Member (Signature/Date): _Charles . Desai , M.D._

Supervisor / Evaluator (Signature/Date): _____

Department Chair (Signature/Date): _Fer_____ _5/24/201c_

Vice Provost for Faculty Affairs, (Signature/Date): _____

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS
UNIVERSITY CAMPUS, S2-333**

Page 5

UMM 00269

# UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
## WORCESTER, MA

### ANNUAL FACULTY REVIEW

**NOTES ON PROCEDURE:** *Please complete electronically.* This report is intended to document contributions as a faculty member of the University of Massachusetts Medical School and UMass Memorial Health Care, Inc.

## I.   *General Information*

**Dates of Evaluation - From:**   July 1, 2010   **To:**  June 30, 2011

**Name:**  Charu Desai, MD       **Date:**  July 11, 2011

**Department:**  Radiology       **Division:**  Thoracic Radiology

**Rank:**  Clinical Associate Professor   **Years in Present Rank:**   10

**Faculty Type:**  Academically-salaried   **FTE:**  FTE

**Tenure Decision Year:**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department.  Faculty member should *not* complete this section.):

**Current:**

| Clinical: | 92 | % | Education: | 8 | % | Research: | 0 | % | Other: | 0 | % | Other: | 0 | % |

**Proposed:**

| Clinical: | 92 | % | Education: | 8 | % | Research: | 0 | % | Other: | 0 | % | Other: | 0 | % |

## II.   *Education*

A.   List teaching and development of courses for *undergraduate medical* education, including individual or group supervision.

Teaching medical students on line in chest rotation.

B.   List teaching and development of courses for *graduate* education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship.

On line teaching residents 3-4 times/wk in chest rotation.

C.   List any other teaching activities during the last year, including CME, or other presentations; outreach or community education.

UMI

Charu Desai, MD
Exhibit_15
10/22/2020

D. List current mentoring or advising activities, including student advising, students or fellows who conducted research under your direction, postdoctoral fellows, staff and faculty.

E. Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

### III. Research, Creative and Scholarly Activities

A. List published articles, books, monographs, editorials and reviews (include exact reference with full title, publisher, dates and inclusive pagination).

B. List works submitted for publication (indicate status: under revision, accepted).

C. List active (during reporting period) grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded, and position on project).

D. List pending grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded and position on project).

E. List invited presentations & presentations at professional meetings (include date and institution or place and name of meeting and abstract reference if appropriate).

F. List other research and scholarly activities (e.g. patents and peer review of articles and editorships).

UMM 00271

## IV.   Professional Service

A.   List service activities for the department and division (e.g. committees and candidate interviews).

B.   List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.   List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels).

D.   List external service community activities that use your professional expertise.

## V.   Leadership

List any leadership responsibilities or positions.

## VI.   Clinical Service

A.   Describe clinical practice and specialized clinical skills, including patient population/location.

B.   Patient care productivity using departmental measures (provided by Department).

22.71 % above the 50th percentile of WRVU productivity

C.   Quality and timely completion of patient records and billing (provided by Department).

N/A

D.   Other measures and outcomes (patient satisfaction, patient outcomes, etc.).

UMM 00272

> N/A

E.   Describe efforts to improve quality and safety of patient care.

> 

## VII.   Diversity Efforts

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment.  (For assistance, see http://www.umassmed.edu/ofa/academic/afr-diversity.aspx)

> To equally treat diverse staff in education, research, service, clinical, and administration activities

## VIII.   Honors and Awards

> 

## IX.   Professional Development

List any professional development activities in which you participated.

> Attended Radiology Review course given by Harvard in March, 2011.

## X.   Goals and Self Assessment

A.   List your goals and objectives for this year: copy Section IX.B of your Annual Faculty Review for the previous year.

> Education - engage resident case presentation biweekly, when in chest rotation

> Teaching residents and medical students with more emphasis on DID of the disease

> In the absence of the division director, take responsibility of covering the division

> Attend Medical Grand Rounds participation

B.   Provide a self-assessment narrative summarizing performance during this year: highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

UMM 00273

Increased productivity in clinical work.
Attended continuing Med Ed conferences.

C. State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.* Include one (or more) specific measureable objective for each goal. (For assistance with completing this section, go to: http://www.umassmed.edu/ofa/academic/goals-objectives.aspx)

| 1. | Continue to teach residents and medical students in chest rotation |
|---|---|
| 2. | Continue participation in the Radiology medical rounds. |
| 3. | Continue helping other departmental clinicians to discuss the chest cases when needed |
| 4. | Take responsibility of covering the division in the absence of the division director |
| 5. | |

D. Based on your career/professional development plan as noted above, what are your anticipated mentoring needs for the next year?

**XI.** ***Supervisor / Evaluator Evaluation (Assigned by Department)***

    A.    Evaluate the faculty member's contributions to clinical care (as appropriate).

    B.    Evaluate the faculty member's contributions to education.

    C.    Evaluate the faculty member's contributions to research and scholarly activities.

    D.    Evaluate the faculty member's goals for the coming year.

    E.    Other comments (i.e. from other evaluators or other in other areas).

**XII.** ***Faculty's Comments***

Thank you very much.

**XIII.** ***Department Chair's Evaluation (if not supervisor/evaluator)***

Summary weighted to correspond with effort assignment.

Steady, productive, competent, seasoned, professional at all times. Delight to have her continue.

**XIV.** ***Signatures***

Faculty Member
(Signature/Date): _____ Charu S. Desai, M.D. 7/14/2021 _____

UMM 00275

Supervisor / Evaluator
    (Signature/Date):

Department Chair
    (Signature/Date): _____ 7/14/2011

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS
UNIVERSITY CAMPUS, S2-343**

UMM 00276

# UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
## WORCESTER, MA

## ANNUAL FACULTY REVIEW

**NOTES ON PROCEDURE:** *Please complete electronically.* This report is intended to document contributions as a faculty member of the University of Massachusetts Medical School and UMass Memorial Health Care, Inc.

## I.  *General Information*

**Dates of Evaluation –   From:**  July 1, 2011     **To:**  June 30, 2012

**Name:**  Charu Desai, MD     **Date:**  May 23, 2012

**Department:**  Radiology     **Division:**

**Rank:**  Clinical Associate Professor     **Years in Present Rank:**  11

**Faculty Type:**  Academically-salaried     **FTE:**  FTE

**Tenure Decision Year:**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should *not* complete this section.):

**Current:**
   Clinical:  92  %  Education:  8  %  Research:  0  %  Other:  0  %  Other:  0  %

**Proposed:**
   Clinical:  92  %  Education:  8  %  Research:  0  %  Other:  0  %  Other:  0  %

## II.  *Education*

A. List teaching and development of courses for ***undergraduate medical*** education, including individual or group supervision.

B. List teaching and development of courses for ***graduate*** education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship.

C. List any other teaching activities during the last year, including CME, or other presentations; outreach or community education.

D. List current mentoring or advising activities, including student advising, students or fellows who conducted research under your direction, postdoctoral fellows, staff and faculty.

E. Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

Page 1

Annual Faculty Report
Revised: 04/09/2012

UMI

Charu Desai, MD
Exhibit_16
10/22/2020

## III.  *Research, Creative and Scholarly Activities*

A.  List published articles, books, monographs, editorials and reviews (include exact reference with full title, publisher, dates and inclusive pagination).

B.  List works submitted for publication (indicate status: under revision, accepted).

C.  List active (during reporting period) grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded, and position on project).

D.  List pending grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded and position on project).

E.  List invited presentations & presentations at professional meetings (include date and institution or place and name of meeting and abstract reference if appropriate).

F.  List other research and scholarly activities (e.g. patents and peer review of articles and editorships).

## IV.  *Professional Service*

A.  List service activities for the department and division (e.g. committees and candidate interviews).

B.  List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.  List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels).

D.  List external service community activities that use your professional expertise.

Annual Faculty Report
Revised: 04/09/2012

UMM 00278

*V.*   *Leadership*

List any leadership responsibilities or positions.

*VI.*   *Clinical Service*

A.   Describe clinical practice and specialized clinical skills, including patient population/location.

B.   Patient care productivity using departmental measures (provided by Department).

For Q1 and Q2 of fiscal year 2012 – Above 50th percentile.

C.   Quality and timely completion of patient records and billing (provided by Department).

N/A

D.   Other measures and outcomes (patient satisfaction, patient outcomes, etc).

N/A

E.   Describe efforts to improve quality and safety of patient care.

*VII.*   *Diversity Efforts*

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment.   (For assistance, see http://www.umassmed.edu/ofa/academic/AFRdiversity.aspx)

*VIII.*   *Honors and Awards*

*IX.*   *Professional Development*

List any professional development activities in which you participated.

Annual Faculty Report
Revised: 04/09/2012

**UMM 00279**

## X. *Goals and Self Assessment*

A.  List your goals and objectives for this year: copy Section IX.B of your Annual Faculty Review for the previous year.

B.  Provide a self-assessment narrative summarizing performance during this year: highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

C.  State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.*  Include one (or more) specific measureable objective for each goal.  (For assistance with completing this section, go to: http://www.umassmed.edu/ofa/academic/AFRgoals.aspx)

1.

2.

3.

4.

5.

D.  Based on your career/professional development plan as noted above, what are your anticipated mentoring needs for the next year?

Annual Faculty Report
Revised: 04/09/2012

UMM 00280

**XI.** *Supervisor / Evaluator Evaluation (Assigned by Department)*

    A.    Evaluate the faculty member's contributions to clinical care (as appropriate).

    B.    Evaluate the faculty member's contributions to education.

    C.    Evaluate the faculty member's contributions to research and scholarly activities.

    D.    Evaluate the faculty member's goals for the coming year.

    E.    Other comments (i.e. from other evaluators or other in other areas).

**XII.** *Faculty's Comments*

Thank you very much.

**XIII.** *Department Chair's Evaluation (if not supervisor/evaluator)*
Summary weighted to correspond with effort assignment.

Good job this year in focusing on enhanced clinical work output. Otherwise, positive supportive presence in Dept at large. Continue as is!

**XIV.** *Signatures*

Faculty Member (Signature/Date): *Charu S Desai, M.D. 5/23/2012.*

Supervisor / Evaluator (Signature/Date):

Department Chair (Signature/Date):

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS
UNIVERSITY CAMPUS, S2-343**

Annual Faculty Report
Revised: 04/09/2012

**UMM 00281**

UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
WORCESTER, MA

FACULTY ANNUAL PERFORMANCE REVIEW

**NOTES ON PROCEDURE:** *Please complete electronically.* This report is intended to document contributions as a faculty member of the University of Massachusetts Medical School and UMass Memorial Health Care, Inc.

## I.   *General Information*

**Dates of Evaluation -   From:** July 1, 2012   **To:** June 30, 2013

**Name:** Charu Desai, MD   **Date:** June 3, 2013

**Department:** Radiology   **Division:** Thoracic Radiology

**Rank:** Associate Professor   **Years in Present Rank:** 12

**Faculty Type:** Academically-salaried   **FTE:** FTE

**Tenure Decision Year:**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should *not* complete this section.):

**Current:**

Clinical: 75 %   Education: 25 %   Research: 0 %   Other: 0 %   Other: 0 %

**Proposed:**

Clinical: 75 %   Education: 25 %   Research: 0 %   Other: 0 %   Other: 0 %

## II.   *Education*

A.   List teaching and development of courses for ***undergraduate medical*** education, including individual or group supervision.

> Teaching medical students on line in chest rotation.

B.   List teaching and development of courses for ***graduate*** education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship.

> On line teaching residents 3 – 4 times/wk in chest rotation.
> Teaching anesthesia and internal medicine residents in chest rotation.

C.   List any other teaching activities during the last year, including CME, or other presentations; outreach or community education.

D.   List current mentoring or advising activities, including student advising, students or fellows who conducted research under your direction, postdoctoral fellows, staff and faculty.

E.   Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

UMM 00282

## III. *Research, Creative and Scholarly Activities*

A.  List published articles, books, monographs, editorials and reviews (include exact reference with full title, publisher, dates and inclusive pagination).

B.  List works submitted for publication (indicate status: under revision, accepted).

C.  List active (during reporting period) grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded, and position on project).

D.  List pending grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded and position on project).

E.  List invited presentations & presentations at professional meetings (include date and institution or place and name of meeting and abstract reference if appropriate).

F.  List other research and scholarly activities (e.g. patents and peer review of articles and editorships).

## IV. *Professional Service*

A.  List service activities for the department and division (e.g. committees and candidate interviews).

B.  List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.  List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels).

D.  List external service community activities that use your professional expertise.

UMM 00283

## V. Leadership

List any leadership responsibilities or positions.

## VI. Clinical Service

A. Describe clinical practice and specialized clinical skills, including patient population/location.

B. Patient care productivity using departmental measures (provided by Department).

Fiscal year 2013 – At 50th percentile
(October 2012 through March 2013)

C. Quality and timely completion of patient records and billing (provided by Department).

N/A

D. Other measures and outcomes (patient satisfaction, patient outcomes, etc).

N/A

E. Describe efforts to improve quality and safety of patient care.

## VII. Diversity Efforts

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment. (For assistance, see http://www.umassmed.edu/ofa/academic/AFRdiversity.aspx)

To equally treat diverse staff in education, research, service, clinical, and administration activities.

## VIII. Honors and Awards

## IX. Professional Development

List any professional development activities in which you participated.

Annual Faculty Report
Revised: 01/31/2013

UMM 00284

## V.   Leadership

List any leadership responsibilities or positions.

## VI.   Clinical Service

A.   Describe clinical practice and specialized clinical skills, including patient population/location.

B.   Patient care productivity using departmental measures (provided by Department).

Fiscal year 2013 – At 50th percentile
(October 2012 through March 2013)

C.   Quality and timely completion of patient records and billing (provided by Department).

N/A

D.   Other measures and outcomes (patient satisfaction, patient outcomes, etc).

N/A

E.   Describe efforts to improve quality and safety of patient care.

## VII.   Diversity Efforts

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment.  (For assistance, see http://www.umassmed.edu/ofa/academic/AFRdiversity.aspx)

To equally treat diverse staff in education, research, service, clinical, and administration activities.

## VIII.   Honors and Awards

## IX.   Professional Development

List any professional development activities in which you participated.

Page 3

UMM 00285

## X.   *Goals and Self Assessment*

A.   List your goals and objectives for this year: copy Section X.C of your Faculty Annual Performance Review for the previous year.

> Education – engage resident case presentation biweekly, when in chest rotation.
> Teaching residents and medical students with more emphasis on D/D of the disease.
> In the absence of the division director, take responsibility of covering the division.

B.   Provide a self-assessment narrative summarizing performance during this year: highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

> Increased productivity in clinical work.

C.   State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.*  Include one (or more) specific measureable objective for each goal.  (For assistance with completing this section, go to: http://www.umassmed.edu/ofa/academic/AFRgoals.aspx)

| | |
|---|---|
| 1. | Continue to teach residents and medical students in chest rotation. |
| 2. | Continue helping other departmental clinicians to discuss the chest cases when needed |
| 3. | Take responsibility of covering the division in the absence of the division director. |
| 4. | |
| 5. | |

D.   Based on your career/professional development plan as noted above, what are your anticipated mentoring needs for the next year?

Page 4

UMM 00286

**XI.**   *Supervisor / Evaluator Evaluation (Assigned by Department)*

A.   Evaluate the faculty member's contributions to clinical care (as appropriate).

> Fine.

B.   Evaluate the faculty member's contributions to education.

> Only 2 responses on resident evaluation for Dr. Desai – however, all were outstanding.

C.   Evaluate the faculty member's contributions to research and scholarly activities.

> N/A

D.   Evaluate the faculty member's goals for the coming year.

> Continue providing excellent clinical service and clinical teaching at the PACS workstation.

E.   Other comments (i.e. from other evaluators or other in other areas).

**XII.**   *Faculty's Comments*

> Thank you very much.

**XIII.**   *Department Chair's Evaluation (if not supervisor/evaluator)*
Summary weighted to correspond with effort assignment.

> No issues.  We discussed how improved functionality of PACS and implementation of a critical results reporting system will facilitate Dr. Desai's workflow and productivity. I have offered to consider any education or career development opportunities that Dr. Desai might be interested in. At this time Dr. Desai is content with her faculty rank as Clinical Associate Professor.

**XIV.**   *Signatures*

Faculty Member (Signature/Date):   Charu Desai, MD   6/3/13   *Charu S. Desai, M.D.*

Supervisor / Evaluator (Signature/Date):

Department Chair (Signature/Date):   *Max Rosen*   6/3/13

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS
UNIVERSITY CAMPUS, S2-337**

Page 5

Annual Faculty Report
Revised: 01/31/2013

UMM 00287

# UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
## WORCESTER, MA

## FACULTY ANNUAL PERFORMANCE REVIEW

**NOTES ON PROCEDURE:** *Please complete electronically.* This report is intended to document contributions as a faculty member of the University of Massachusetts Medical School and UMass Memorial Health Care, Inc.

## I.   *General Information*

**Dates of Evaluation -   From:**  July 1, 2013   **To:**  June 30, 2014

**Name:**  Charu Desai, MD                          **Date:**  September 10, 2014

**Department:**  Radiology                          **Division:**  Thoracic Radiology

**Rank:**   Clinical Associate Professor            **Years in Present Rank:**  13

**Faculty Type:**   Academically-salaried           **FTE:**   FTE

**Tenure Decision Year:**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should *not* complete this section.):

**Current:**                                  (As of Academic Year 2013)
   Clinical:   75   %   Education:   25   %   Research:   0   %   Other:   0   %   Other:   0   %

**Proposed:**
   Clinical:   75   %   Education:   25   %   Research:   0   %   Other:   0   %   Other:   0   %

## II.   *Education*

A.   List teaching and development of courses for ***undergraduate medical*** education, including individual or group supervision.

> Teaching medical students on line in chest rotation.

B.   List teaching and development of courses for ***graduate*** education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship.

> On line teaching residents 3 – 4 times/wk in chest rotation.
> Teaching anesthesia and internal medicine residents in chest rotation.

C.   List any other teaching activities during the last year, including CME, or other presentations; outreach or community education.

D.   List current mentoring or advising activities, including student advising, students or fellows who conducted research under your direction, postdoctoral fellows, staff and faculty.

E.   Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

Page 1

Charu Desai, MD
Exhibit_18
10/22/2020

## III.   Research, Creative and Scholarly Activities

A.   List published articles, books, monographs, editorials and reviews (include exact reference with full title, publisher, dates and inclusive pagination).

B.   List works submitted for publication (indicate status: under revision, accepted).

C.   List active (during reporting period) grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded, and position on project).

D.   List pending grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded and position on project).

E.   List invited presentations & presentations at professional meetings (include date and institution or place and name of meeting and abstract reference if appropriate).

F.   List other research and scholarly activities (e.g. patents and peer review of articles and editorships).

## IV.   Professional Service

A.   List service activities for the department and division (e.g. committees and candidate interviews).

Quality control representative from Chest division

B.   List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.   List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels).

D.   List external service community activities that use your professional expertise.

Annual Faculty Report
Revised: 01/31/2013

**UMM 00289**

*V.*   ***Leadership***

      List any leadership responsibilities or positions.

```
┌────────────────────────────────────────────────────────────┐
│                                                              │
│                                                              │
└────────────────────────────────────────────────────────────┘
```

*VI.*   ***Clinical Service***

    A.   Describe clinical practice and specialized clinical skills, including patient population/location.

```
┌────────────────────────────────────────────────────────────┐
│                                                              │
│                                                              │
└────────────────────────────────────────────────────────────┘
```

    B.   Patient care productivity using departmental measures (provided by Department).

```
┌────────────────────────────────────────────────────────────┐
│ FY13 October 2012 to September 2013 - @ or above 50th        │
│ percentile.                                                  │
│ (FY14 Data incomplete at this time)                          │
└────────────────────────────────────────────────────────────┘
```

    C.   Quality and timely completion of patient records and billing (provided by Department).

```
┌────────────────────────────────────────────────────────────┐
│ N/A                                                          │
│                                                              │
└────────────────────────────────────────────────────────────┘
```

    D.   Other measures and outcomes (patient satisfaction, patient outcomes, etc.).

```
┌────────────────────────────────────────────────────────────┐
│ N/A                                                          │
│                                                              │
└────────────────────────────────────────────────────────────┘
```

    E.   Describe efforts to improve quality and safety of patient care.

```
┌────────────────────────────────────────────────────────────┐
│                                                              │
│                                                              │
└────────────────────────────────────────────────────────────┘
```

*VII.*   ***Diversity Efforts***

      Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment.  (For assistance, see http://www.umassmed.edu/ofa/academic/AFRdiversity.aspx)

```
┌────────────────────────────────────────────────────────────┐
│ To equally treat diverse staff in education, research,       │
│ service, clinical, and administration activities.            │
└────────────────────────────────────────────────────────────┘
```

*VIII.*   ***Honors and Awards***

```
┌────────────────────────────────────────────────────────────┐
│                                                              │
│                                                              │
└────────────────────────────────────────────────────────────┘
```

*IX.*   ***Professional Development***

      List any professional development activities in which you participated.

```
┌────────────────────────────────────────────────────────────┐
│                                                              │
│                                                              │
└────────────────────────────────────────────────────────────┘
```

Annual Faculty Report
Revised: 01/31/2013

**UMM 00290**

**X.    *Goals and Self Assessment***

A.    List your goals and objectives for this year: copy Section X.C of your Faculty Annual Performance Review for the previous year.

> Education – engage resident case presentation biweekly, when in chest rotation.
> Teaching residents and medical students with more emphasis on D/D of the disease.
> In the absence of the division direction, take responsibility of covering the division.

B.    Provide a self-assessment narrative summarizing performance during this year: highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

> Increased productivity in clinical work.

C.    State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.*  Include one (or more) specific measureable objective for each goal.  (For assistance with completing this section, go to: http://www.umassmed.edu/ofa/academic/AFRgoals.aspx)

| | |
|---|---|
| 1. | Continue to teach residents and medical students in chest rotation. |
| 2. | Continue helping other departmental clinicians to discuss the chest cases when needed. |
| 3. | Take responsibility of covering the division in the absence of the division director. |
| 4. | |
| 5. | |

D.    Based on your career/professional development plan as noted above, what are your anticipated mentoring needs for the next year?

Page 4

UMM 00291

**XI.** *Supervisor / Evaluator Evaluation (Assigned by Department)*

   A.    Evaluate the faculty member's contributions to clinical care (as appropriate).

   B.    Evaluate the faculty member's contributions to education.

   C.    Evaluate the faculty member's contributions to research and scholarly activities.

   D.    Evaluate the faculty member's goals for the coming year.

   E.    Other comments (i.e. from other evaluators or other in other areas).

**XII.** *Faculty's Comments*

Thanks.

**XIII.** *Department Chair's Evaluation (if not supervisor/evaluator)*
Summary weighted to correspond with effort assignment.

Dr. Desai and I discussed options for academic time. Unfortunately, the Department's policy has been in place for at least two years, and cannot be modified on an individual basis. I appreciate the clinical efforts of Dr. Desai as well as her contribution to resident teaching at the PACS station.

**XIV.** *Signatures*

Faculty Member (Signature/Date):  *Charu S. Desai, M.D.*    9/10/2014

Supervisor / Evaluator (Signature/Date): _____

Department Chair (Signature/Date): *[signature]*    9/10/14

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS**
**UNIVERSITY CAMPUS, S2-337**

Annual Faculty Report
Revised: 01/31/2013

UMM 00292

**UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL**
**WORCESTER, MA**

**FACULTY ANNUAL PERFORMANCE REVIEW**

A Guide to the APR is available online: http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/guide.

## I.   *General Information*

Dates of Evaluation -   **From:**   July 1, 2014          **To:**   June 30, 2015

**Name:**   Charu Desai, MD                              **Date:**   June 25, 2015

**Department:**   Radiology                                **Division:**   Thoracic Radiology

**Rank:**   Clinical Associate Professor            **Years in Present Rank:**   13.58

**Faculty Type:**   Academically-salaried          **FTE:**   1.00

**Tenure Decision Year:**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should *not* complete this section.):

**Current:**
   Clinical:   75   %   Education:   25   %   Research:        %   Other:        %   Other:        %

**Proposed:**
   Clinical:   75   %   Education:   25   %   Research:        %   Other:        %   Other:        %

## II.   *Education and Mentoring*

A.   List teaching and development of courses for *undergraduate medical* education, including individual or group supervision. Identify any that are inter-professional.

> Teaching medical students on line in chest rotation.

B.   List teaching and development of courses for *graduate* education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship. Identify any that are inter-professional.

> On line teaching residents 3 – 4 times/wk in chest rotation.
> Teaching anesthesia and internal medicine residents in chest rotation.

C.   List any other teaching activities during the reporting period, including CME, or other presentations; outreach or community education. Identify any which are inter-professional.

D.   List individuals (student, residents, postdoctoral trainees, faculty) whom you have directly advised or mentored during the reporting period. Include the names, program, your role, their current position and any outcomes achieved.

E.   Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

Annual Faculty Report
Revised: 01/31/201312/18/2014

UMI

Charu Desai, MD
Exhibit_19
10/22/2020

**III.   Research, Creative and Scholarly Activities**

A.   List articles, books, monographs, editorials and reviews published during the reporting period (include complete reference with full title, all authors and inclusive pagination).

B.   List works submitted for publication during the reporting period (indicate status: under revision, accepted).

C.   List active (during reporting period) grants, contracts and clinical trials. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding dates. State your role, identify the PI if not you, and your percent effort.

D.   List pending grants, contracts and clinical trials submitted during the reporting period. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding period. State your role, identify the PI if not you, and your percent effort.

E.   List invited presentations & presentations at professional meetings (include title, date and institution or place and name of meeting and abstract reference if appropriate).

F.   List other research and scholarly activities (e.g. patents, peer review of articles or editorships).

**IV.   Professional Service**

A.   List service activities for the department and division (e.g. committees and candidate interviews).

Quality control representative from Chest division

B.   List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.   List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels). Note your role including any leadership positions.

D.   List external community service activities that use your professional expertise.

**UMM 00294**

*V.   Leadership*

List leadership responsibilities or positions.

*VI.   Clinical Service*

A.   Describe clinical practice and specialized clinical skills, including patient population/location.

B.   Patient care productivity using departmental measures (provided by Department).

FY15 -- October 2014 to May 2015 -- 50th percentile

C.   Quality and timely completion of patient records and billing (provided by Department).

N/A

D.   Other measures and outcomes (patient satisfaction, patient outcomes, etc).

N/A

E.   Describe efforts to improve quality and safety of patient care.

*VII.   Honors and Awards*

*VIII.   Diversity Efforts*

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment. For assistance, see http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/diversity/

To equally treat diverse staff in education, research, service, clinical, and administration activities.

*IX.   Professional Development*

List any activities (course, programs, workshops etc.) in which you participated to enhance your professional development.

**UMM 00295**

## X.   *Goals and Self Assessment*

A.   List your goals and objectives for this year; copy Section X.C of your Faculty Annual Performance Review for the previous year.

> Education – engage resident case presentation biweekly, when in chest rotation.
> Teaching residents and medical students with more emphasis on D/D of the disease.
> In the absence of the division direction, take responsibility of covering the division.

B.   Provide a self-assessment narrative summarizing performance during this year; highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

> Increased productivity in clinical work.

C.   State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.* Include one (or more) specific measureable objective for each goal. For assistance with completing this section, go to: http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/goals/

> 1.   Continue to teach residents and medical students in chest rotation.
>
> 2.   Continue helping other departmental clinicians to discuss the chest cases when needed.
>
> 3.   Take responsibility of covering the division in the absence of the division director.
>
> 4.
>
> 5.

D.   Based upon your goals as noted above, what are your anticipated mentoring needs for the next year? Do you need assistance to identify mentors?

UMM 00296

**XI.    *Supervisor / Evaluator Evaluation (Assigned by Department)***

   A.    Evaluate the faculty member's contributions to clinical care (as appropriate).

   B.    Evaluate the faculty member's contributions to education.

   C.    Evaluate the faculty member's contributions to research and scholarly activities.

   D.    Evaluate the faculty member's goals and mentoring needs for the coming year.

   E.    Other comments (i.e. from other evaluators or other in other areas).

**XII.   *Faculty's Comments***

   Thank you very much.  I value your feedback.

**XIII.  *Department Chair's Evaluation (if not supervisor/evaluator)***
   Summary weighted to correspond with effort assignment.

   Dr. Desai and I discussed the overall staffing/functioning of the Thoracic imaging division and growth planned with the arrival of Dr. Dill as the new division chief. As always I appreciate her commitment to the department and teaching our residents.

**XIV.  *Signatures***

Faculty Member (Signature/Date): _Charan S. Desai, M.D._

Supervisor / Evaluator (Signature/Date): _____

Department Chair (Signature/Date): _MauPaula 9/24/2015_

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS**

UMM 00297

**UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL**
**WORCESTER, MA**

**FACULTY ANNUAL PERFORMANCE REVIEW**

A Guide to the APR is available online: http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/guide.

## I.  General Information

**Dates of Evaluation -   From:** July 1, 2015        **To:** June 30, 2016

**Name:** Charu Desai, MD                              **Date:** June 23, 2016

**Department:** Radiology                              **Division:** Thoracic Radiology

**Rank:** Clinical Associate Professor                **Years in Present Rank:** 14.5

**Faculty Type:** Academically-salaried               **FTE:** 1.00

**Tenure Decision Year:**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should *not* complete this section.):

**Current:**
   Clinical:  75  %  Education:  25  %  Research:ยาง__  %  Other:____  %  Other:____  %

**Proposed:**
   Clinical:  75  %  Education:  25  %  Research:____  %  Other:____  %  Other:____  %

## II.  Education and Mentoring

A.   List teaching and development of courses for ***undergraduate medical*** education, including individual or group supervision. Identify any that are inter-professional.

> Teaching medical students on line in chest rotation.

B.   List teaching and development of courses for ***graduate*** education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship. Identify any that are inter-professional.

> On line teaching residents 3 – 4 times/wk in chest rotation.
> Teaching anesthesia and internal medicine residents in chest rotation.

C.   List any other teaching activities during the reporting period, including CME, or other presentations; outreach or community education. Identify any which are inter-professional.

D.   List individuals (student, residents, postdoctoral trainees, faculty) whom you have directly advised or mentored during the reporting period. Include the names, program, your role, their current position and any outcomes achieved.

E.   Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

UM
Charu Desai, MD
Exhibit_20
10/22/2020

## III.   Research, Creative and Scholarly Activities

A.   List articles, books, monographs, editorials and reviews published during the reporting period (include complete reference with full title, all authors and inclusive pagination).

B.   List works submitted for publication during the reporting period (indicate status: under revision, accepted).

C.   List active (during reporting period) grants, contracts and clinical trials. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding dates. State your role, identify the PI if not you, and your percent effort.

D.   List pending grants, contracts and clinical trials submitted during the reporting period. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding period. State your role, identify the PI if not you, and your percent effort.

E.   List invited presentations & presentations at professional meetings (include title, date and institution or place and name of meeting and abstract reference if appropriate).

F.   List other research and scholarly activities (e.g. patents, peer review of articles or editorships).

## IV.   Professional Service

A.   List service activities for the department and division (e.g. committees and candidate interviews).

Quality control representative from Chest division

B.   List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.   List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels). Note your role including any leadership positions.

D.   List external community service activities that use your professional expertise.

## V. Leadership

List leadership responsibilities or positions.

[ ]

## VI. Clinical Service

A. Describe clinical practice and specialized clinical skills, including patient population/location.

[ ]

B. Patient care productivity using departmental measures (provided by Department).

FY15 – October 2014 to September 2015 – Actual RVU's – 5,071
FY16 – October 1, 2015 to January 31, 2016 – Actual RVU's – 1,515

C. Quality and timely completion of patient records and billing (provided by Department).

N/A

D. Other measures and outcomes (patient satisfaction, patient outcomes, etc).

N/A

E. Describe efforts to improve quality and safety of patient care.

[ ]

## VII. Honors and Awards

[ ]

## VIII. Diversity Efforts

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment. For assistance, see http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/diversity/

To equally treat diverse staff in education, research, service, clinical, and administration activities.

## IX. Professional Development

List any activities (course, programs, workshops etc.) in which you participated to enhance your professional development.

[ ]

## X. Goals and Self Assessment

A. List your goals and objectives for this year: copy Section X.C of your Faculty Annual Performance Review for the previous year.

Education – engage resident case presentation biweekly, when in chest rotation.
Teaching residents and medical students with more emphasis on D/D of the disease.

In the absence of the division direction, take responsibility of covering the division.

B.   Provide a self-assessment narrative summarizing performance during this year: highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

Increased productivity in clinical work.

C.   State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.*  Include one (or more) specific measureable objective for each goal.  For assistance with completing this section, go to: http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/goals/

| 1. | Continue to teach residents and medical students in chest rotation. |
| 2. | Continue helping other departmental clinicians to discuss the chest cases when needed. |
| 3. | Take responsibility of covering the division in the absence of the division director. |
| 4. | |
| 5. | |

D.   Based upon your goals as noted above, what are your anticipated mentoring needs for the next year? Do you need assistance to identify mentors?

**XI.** *Supervisor / Evaluator Evaluation (Assigned by Department)*

A.  Evaluate the faculty member's contributions to clinical care (as appropriate).

B.  Evaluate the faculty member's contributions to education.

C.  Evaluate the faculty member's contributions to research and scholarly activities.

D.  Evaluate the faculty member's goals and mentoring needs for the coming year.

E.  Other comments (i.e. from other evaluators or other in other areas).

**XII.** *Faculty's Comments*

Thanks.

**XIII.** *Department Chair's Evaluation (if not supervisor/evaluator)*
Summary weighted to correspond with effort assignment.

Dr. Desai has contributed to the chest section through her clinical work interpreting chest x-rays and chest CT and teaching residents at the PACS station.

**XIV.** *Signatures*

Faculty Member (Signature/Date):   Charu S .Desai,M.D. 8/22/2016    *Charu S. Desai 9/9/2016*

Supervisor / Evaluator (Signature/Date):

Department Chair (Signature/Date):   *Marshall  9/28/2016*

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS**

UMM 00302

## UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
## WORCESTER, MA

### FACULTY ANNUAL PERFORMANCE REVIEW

A Guide to the APR is available online: http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/guide.

### I.  *General Information*

Dates of Evaluation -   July 1, 2016    **To:**  June 30, 2017

**Name:**  Charu Desai, MD                      **Date:**  June 22, 2017

**Department:**  Radiology                      **Division:**  Thoracic Radiology

**Rank:**  Clinical Associate Professor         **Years in Present**          15.5

**Faculty Type:**  Academically-salaried        **FTE:**  1.00

**Tenure Decision**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should *not* complete this section.):

**Current:**
   Clinical:  75  %  Education:  25  %  Research:     %  Other:     %  Other:     %

**Proposed:**
   Clinical:  75  %  Education:  25  %  Research:     %  Other:     %  Other:     %

### II.  *Education and Mentoring*

A.  List teaching and development of courses for *undergraduate medical* education, including individual or group supervision. Identify any that are inter-professional.

> Teaching medical students on line in chest rotation.

B.  List teaching and development of courses for *graduate* education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship. Identify any that are inter-professional.

> On line teaching residents 3 – 4 times/wk in chest rotation.
> Teaching anesthesia and internal medicine residents in chest rotation.

C.  List any other teaching activities during the reporting period, including CME, or other presentations; outreach or community education. Identify any which are inter-professional.

D.  List individuals (student, residents, postdoctoral trainees, faculty) whom you have directly advised or mentored during the reporting period. Include the names, program, your role, their current position and any outcomes achieved.

E.  Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

Page 1

UM

Charu Desai, MD
Exhibit_33
10/22/2020

## III.   *Research, Creative and Scholarly Activities*

A.   List articles, books, monographs, editorials and reviews published during the reporting period (include complete reference with full title, all authors and inclusive pagination).

B.   List works submitted for publication during the reporting period (indicate status: under revision, accepted).

C.   List active (during reporting period) grants, contracts and clinical trials. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding dates. State your role, identify the PI if not you, and your percent effort.

D.   List pending grants, contracts and clinical trials submitted during the reporting period. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding period. State your role, identify the PI if not you, and your percent effort.

E.   List invited presentations & presentations at professional meetings (include title, date and institution or place and name of meeting and abstract reference if appropriate).

F.   List other research and scholarly activities (e.g. patents, peer review of articles or editorships).

## IV.   *Professional Service*

A.   List service activities for the department and division (e.g. committees and candidate interviews).

B.   List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.   List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels). Note your role including any leadership positions.

D.   List external community service activities that use your professional expertise.

**UMM 00304**

## V.  Leadership

List leadership responsibilities or positions.

## VI.  Clinical Service

A.  Describe clinical practice and specialized clinical skills, including patient population/location.

B.  Patient care productivity using departmental measures (provided by Department).

FY16 – October 2015 to September 2016 – Actual RVU's – 4,669
FY17 – October 1, 2016 to January 31, 2017 – Actual RVU's – 1,336

C.  Quality and timely completion of patient records and billing (provided by Department).

N/A

D.  Other measures and outcomes (patient satisfaction, patient outcomes, etc).

N/A

E.  Describe efforts to improve quality and safety of patient care.

## VII.  Honors and Awards

Teacher of the Year Award 2017  given by the Residents

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment. For assistance, see http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/diversity/

To equally treat diverse staff in education, research, service, clinical, and administration activities

## IX.  Professional Development

List any activities (course, programs, workshops etc.) in which you participated to enhance your professional development.

## X.  Goals and Self Assessment

A.  List your goals and objectives for this year: copy Section X.C of your Faculty Annual Performance Review for the previous year.

Education – engage resident case presentation biweekly, when in chest rotation.
Teaching residents and medical students with more emphasis on D/D of the disease.

UMM 00305

> In the absence of the division direction, take responsibility of covering the division.

B.   Provide a self-assessment narrative summarizing performance during this year: highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

> Increased productivity in clinical work.

C.   State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.* Include one (or more) specific measureable objective for each goal. For assistance with completing this section, go to: http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/goals/

| | |
|---|---|
| 1. | Continue to teach residents and medical students in chest rotation. |
| 2. | Continue helping other departmental clinicians to discuss the chest cases when needed |
| 3. | Take responsibility of covering the division in the absence of the division director. |
| 4. | |
| 5. | |

D.   Based upon your goals as noted above, what are your anticipated mentoring needs for the next year? Do you need assistance to identify mentors?

UMM 00306

## XI.  *Supervisor / Evaluator Evaluation (Assigned by Department)*

A.   Evaluate the faculty member's contributions to clinical care (as appropriate).

B.   Evaluate the faculty member's contributions to education.

C.   Evaluate the faculty member's contributions to research and scholarly activities.

D.   Evaluate the faculty member's goals and mentoring needs for the coming year.

E.   Other comments (i.e. from other evaluators or other in other areas).

## XII.  *Faculty's Comments*

Thanks.

## XIII.  *Department Chair's Evaluation (if not supervisor/evaluator)*
Summary weighted to correspond with effort assignment.

Dr. Desai and I discussed her recognition by this year's graduating Residents as their "teacher of the year". We also discussed several of her concerns about allocation of academic time, call responsibilities, etc. These had all previously been discussed with Dr. Desai and representatives from the HR department.

## XIV.  *Signatures*

Faculty Member (Signature/Date):   *Chaaru S. Desai, M.D.   9/11/2017*

Supervisor / Evaluator (Signature/Date):

Department Chair (Signature/Date):   *9/20/2017*

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS**

UMM 00307

**EXHIBIT M**

UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
WORCESTER, MA

FACULTY ANNUAL PERFORMANCE REVIEW

A Guide to the APR is available online: https://www.umassmed.edu/ofa/academic/faculty-reviews/apr.

## I.   General Information

Dates of Evaluation -   **From:**  July 1, 2017        **To:**  June 30, 2018

**Name:**  Charu Desai, MD                 **Date:**  May 10, 2018

**Department:**  Radiology                 **Division:**  Thoracic Radiology

**Rank:**  Associate Professor             **Years in Present Rank:**  16.6

**Faculty Type:**  UMMHC Employed          **FTE:**  1.00

**Tenure Decision Year:**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should _not_ complete this section.):

**Current:**

  Clinical:  75  %  Education:  25  %  Research:      %  Other:      %  Other:      %

**Proposed:**

  Clinical:  75  %  Education:  25  %  Research:      %  Other:      %  Other:      %

## II.   Education and Mentoring

  A.   List teaching and development of courses for **_undergraduate medical_** education, including individual or group supervision. Identify any that are inter-professional.

  | Teaching medical students on line in chest rotation. |

  B.   List teaching and development of courses for **_graduate_** education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship. Identify any that are inter-professional.

  | On line teaching residents 3 – 4 times/wk in chest rotation. Teaching anesthesia and internal medicine residents in chest rotation. |

  C.   List any other teaching activities during the reporting period, including CME, or other presentations; outreach or community education. Identify any which are inter-professional.

  D.   List individuals (student, residents, postdoctoral trainees, faculty) whom you have directly advised or mentored during the reporting period. Include the names, program, your role, their current position and any outcomes achieved.

  E.   Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

Charu Desai, MD
Exhibit_46
10/22/2020

### III.   Investigation

A.   List active (during reporting period) grants, contracts and clinical trials. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding dates. State your role, identify the PI if not you, and your percent effort.

B.   List pending grants, contracts and clinical trials submitted during the reporting period. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding period. State your role, identify the PI if not you, and your percent effort.

C.   List other research activities (e.g. patents, development of software).

### IV.   Scholarship

A.   List articles, books, monographs, editorials and reviews published during the reporting period (include complete reference with full title, all authors and inclusive pagination).

B.   List works submitted for publication during the reporting period (indicate status: under revision, accepted).

C.   List invited presentations & presentations at professional meetings (include title, date and institution or place and name of meeting and abstract reference if appropriate).

### V.   Academic Service

A.   List service activities for the department and division (e.g. committees and candidate interviews).

B.   List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

Quality Improvement Committee

C.   List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels). Note your role including any leadership positions.

UMM 00309

D.   List editorial and peer review responsibilities.

E.   List external community service activities that use your professional expertise.

## VI.   *Leadership*

List leadership responsibilities or positions.

## VII.   *Health Care Delivery*

A.   Describe expertise in a clinical specialty and roles and responsibilities in health care delivery, including patient population/location. Describe any innovations in health care delivery, such as a clinical program, diagnostic test, or intervention, with documented outcomes.

B.   Patient care productivity using departmental measures (provided by Department).

FY17-October 1, 2016-September 30, 2017 - Actual RVU's 4,491
FY18-October 1, 2017-January 31, 2018 – Actual RVU's 1,297

C.   Quality and timely completion of patient records and billing (provided by Department).

N/A

D.   Other measures and outcomes (patient satisfaction, patient outcomes, etc).

N/A

E.   Describe efforts to improve quality, safety, and/or efficacy of patient care, including the outcomes of these efforts.

## VIII.   *Honors and Awards*

Teacher of the Year Award 2017  given by the Residents

## IX.   *Diversity Efforts*

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment. For assistance, see http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/diversity

To equally treat diverse staff in education, research, service, clinical, and administration activities

**X.**   *Professional Development*

List any activities (course, programs, workshops etc.) in which you participated to enhance your professional development.

**XI.**   *Goals and Self Assessment*

A.   Define your primary Area of Distinction. Your primary Area is where you devote most effort and/or have the greatest achievements (see here for information on the Areas of Distinction).

Health Care Delivery: [X]   Education: [X]   Investigation: [ ]   Population Health and Public Policy: [ ]

Use the box below for *optional* comments (e.g., if you have more than one Area of Distinction)

B.   List your goals and objectives for this year: copy Section X.C of your Faculty Annual Performance Review for the previous year.

> Education – engage resident case presentation biweekly, when in chest rotation.
> Teaching residents and medical students with more emphasis on D/D of the disease.
> In the absence of the division direction, take responsibility of covering the division.

C.   Provide a self-assessment narrative summarizing performance during this year: highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

> Increased productivity in clinical work.

D.   State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.* Include one (or more) specific measureable objective for each goal. For assistance with completing this section, go to:
http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/goals

| | |
|---|---|
| 1. | Continue to teach residents and medical students in chest rotation. |
| 2. | Continue helping other departmental clinicians to discuss the chest cases when needed. |
| 3. | Take responsibility of covering the division in the absence of the division director |
| 4. | |
| 5. | |

E.   Based upon your goals as noted above, what are your anticipated mentoring needs for the next year? Do you need assistance to identify mentors?

UMM 00311

**XII.** *Supervisor / Evaluator Evaluation (Assigned by Department)*

A.  Evaluate the faculty member's contributions to clinical care (as appropriate).

B.  Evaluate the faculty member's contributions to education.

C.  Evaluate the faculty member's contributions to research and scholarly activities.

D.  Evaluate the faculty member's goals and mentoring needs for the coming year.

E.  Other comments (i.e. from other evaluators or other in other areas).

F.  Rate the faculty member's performance:

☐ Satisfactory

☐ Unsatisfactory

A rating of unsatisfactory performance must be supported by documentation in the APR and is based on one or more of the following (*check which apply*):

☐ Failure to meet previously set goals

☐ Failure to perform assigned duties or responsibilities

☐ Repeated failure by the Faculty Member to respond to direction from the supervisor

☐ Material violations of the employer's, Department's and/or other applicable and published policies, procedures, or codes of conduct

Supervisor / Evaluator (Signature/Date): _____

UMM 00312

**XIII.** *Faculty Member's Comments (optional)*

> Your comment on my reliance on residents for interpretation on vascular study warrants further explanation. As per your instruction as of March, 2018, I am only to read plain chest x-rays. Which is why I do not involve myself in interpreting other study.
>
> Also, to clarify, I have never read MRI study.

Faculty Member (Signature/Date): _Chang - Desai, M.D. 9/11/2018_

**XIV.** *Department Chair's Evaluation (if not supervisor/evaluator)*
Summary weighted to correspond with effort assignment.

> Dr. Desai and I met today (8/22/18), and I asked (and Dr. Desai agreed) that Ms. Randa Mowlood— our group practice administrator join us. We reviewed this faculty performance review form, and I clarified that Dr. Desai's comment in section XI B *"In the absence of the division direction, take responsibility of covering the division"* referred to times when she was the only chest attending in the reading room NOT that the division lacked a division chief. I also reviewed the resident's evaluations and gave Dr. Desai a copy. I discussed, but did not distribute, the one written resident comment which raised concerns about Dr. Desai's apparent reliance on the residents for interpretation of vascular studies. This should no longer be an issue, as Dr. Desai is focusing her efforts of x-rays (rather than CT or MRI).

Department Chair (Signature/Date): _Mark Paul_ 9/28/18

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS**

TO CLARIFY -
This evaluation period covers 7/1/17 - 6/30/18 During 9 months
of this period - DR. DESAI WAS READING CHEST CT.

_MPP 9/28/18_

UMM 00313

# EXHIBIT N

**Revised October 2015**

## CALL AND/OR WEEKEND/HOLIDAY COVERAGE POLICY

## PRINCIPLES

1. Call and/or Weekend/ Holiday Coverage is Division based.

2. The frequency of call and/or Weekend/Holiday duties will be maintained at approximately 1/5 or roughly 10 to 11 weeks or weekends per year.  Minor adjustments may be necessary from time to time for Divisions temporarily under or overstaffed at the discretion of the Chair's Office.

3. WRVU's earned during call or weekend/holiday obligation will count for yearend productivity calculation.

4. Call and weekend/holiday schedule will be made by the Division Chief in concert with the Physician Staffing Coordinator.  When possible call/weekend/holiday schedule will be done one year in advance at the beginning of each FiscalYear and follow Departmental guidelines.

5. Senior attending  are exempt from call and weekend/holiday coverage but will maintain incentive bonus eligibility if they meet  2 of the following 3 criteria:

   - Age 72 years.
   - Academic rank of full Professor
   - 20 years of continuous service to the Department.

1

**WEEKEND AND HOLIDAY COVERAGE – 1/5**

ABDOMINAL IMAGING DIVISION – ON SITE MEMORIAL CAMPUS
    8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
Memorial House Doctor - Contrast Coverage, emergent US and Fluoro
Responsible for any NVIR procedures at Memorial Campus.
On Site Chest person will be back-up House Doctor.

        Reading Assignments
        Adult non ED Abdominal Imaging – All locations
            Priority
            a.   Stats
            b.   Inpatient
            c.   Outpatient
        (Each category Prioritized by Date and Time (not Campus))

MSK DIVISION – ON SITE SHREWSBURY STREET
    8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
    Contrast Monitoring – Shrewsbury Street MR

        Reading Assignments
        Adult non ED MSK imaging all locations
            Priority
            a.   Stats
            b.   Inpatient
            c.   Outpatient
        (Each category Prioritized by Date and Time (not location)

CHEST DIVISION – ON SITE – MEMORIAL CAMPUS
    8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
    Reading Assignments
    Adult non ED CHEST imaging all locations
        Priority
        a.   Stats
        b.   Inpatient
       c.   Outpatient
    (Each category Prioritized by Date and Time (not location)

2

UMM-04923

## SATURDAY COVERAGE (12/YEAR)

BREAST DIVISION – ON SITE- MEMORIAL CAMPUS
8 HOUR SHIFT- with FELLOW

ASSIGNMENT RESPONSIBILITIES: Screening

## CALL 7 DAYS -  FRIDAY 5 PM TO FRIDAY 8 AM INCLUDING ON-SITE SAT/SUN/HOLIDAY – 1/5

PEDIATRIC DIVISION – ON SITE – UNIVERSITY CAMPUS
8A-5P – SATURDAY/SUNDAY/HOLIDAY
BEEPER AFTER 5, 7 days (FRIDAY TO FRIDAY)

Reading Assignments (Saturday/Sunday/Holiday)
All Pediatric Imaging –all locations
Priority
a.   ED-Pedi (Read out resident)
b.   Stats
d.   Inpatient
e.   Carewell Urgent Care: read all prior day's cases, be available for
STAT calls
f.   Outpatient
(Each category Prioritized by Date and Time (not location))

NEURORADIOLOGY DIVISION – ON SITE – UNIVERSITY CAMPUS
8A-5P – SATURDAY/SUNDAY/HOLIDAY
BEEPER AFTER 5,  7 days (FRIDAY TO FRIDAY)

Reading Assignments (Saturday/Sunday/Holiday)
All Neuroradiology Imaging –all locations
Priority
Read out resident
a.   ED-Neuro
b.   Stats
c.   Inpatient
d.   Outpatient
(Each category Prioritized by Date and Time (not location)

## CALL (7 DAYS) ONLY

VASCULAR DIVISION –ON CALL FOR VIR AND ABDOMINAL* PROCEDURES
CALL 7 days (FRIDAY 5P THRU FRIDAY 8A)
*All Abdominal Procedures EXCEPT Memorial Campus Saturday/ Sunday/
Holiday 8A-5)

NEURO INTERVENTIONAL DIVISION –ON CALL FOR PROCEDURES
CALL 7 days (FRIDAY 5P THRU FRIDAY 8A)

UMM-04924

## ED Division- ON SITE- University Campus 24/7

**Mon-Fri Shifts**

7am-4pm — All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro and Pediatrics) Carewell urgent care cases from prior day, available for STAT calls

4pm-10pm — All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro) Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.
Available for calls from Carewell until 8pm
     Priority
      a.  ED
      b.  STATs- All non-neuro including non-ED
          i.    Inpatient
          ii.   Outpatient
***Pediatric cases will be entered as Preliminary by ED resident***

10pm-7am — All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.
     Priority
      a.  ED
      b.  STATs- All non-ED STATs including Neuro
          i.    Inpatient
          ii.   Outpatient
          iii.  Other backlog in non-STAT, non-ED cases
***Pediatric cases will be entered as Preliminary by ED resident***
***Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only***

**Sat/Sun/Holiday**

7am-4pm — All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro and Pediatrics) Carewell urgent care cases from prior day, available for STAT calls

4pm-10pm — All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.
Available for calls from Carewell until 8pm
     Priority
      a)  ED
      b)  STATs- All non-ED STATs including Neuro
          i.    Inpatient
          i.    Outpatient
          ii.   Other backlog in non-STAT, non-ED cases
***Pediatric cases will be entered as Preliminaryby ED resident***
***Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only***

UMM-04925

10pm-7am

All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital
Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.

Priority
a)   ED
b)   STATs- All non-ED STATs including Neuro
     i.      Inpatient
     ii.     Outpatient
     iii.    Other backlog in non-STAT, non-ED cases

*Pediatric cases will be entered as Preliminaryby ED resident*
*Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only*

UMM-04926

**EXHIBIT O**

| | |
|---|---|
| **From:** | Rosen, Max <max.rosen@exchange.com> |
| **Sent:** | Friday, February 10, 2017 10:01 AM |
| **To:** | Ferrucci, Joseph <Joseph.Ferrucci@umassmemorial.org> |
| **Cc:** | Mowlood, Randa <Randa.Mowlood@umassmemorial.org> |
| **Subject:** | Re: Charu Desai |

Thanks Joe

Glad you encouraged her to get to see her pcp.

Max

Sent from my iPhone

> On Feb 10, 2017, at 9:30 AM, Ferrucci, Joseph <Joseph.Ferrucci@umassmemorial.org> wrote:
>
> Max,
> She came in this morning. But was severely dyspneic. I saw her in the hallway, gasping. Some acquaintance of hers who I didn't know was assisting her to see her primary care doctor. She did not look good. I advised her to go home ASAP. I think that is possibly four days at least this week where she has been ill.
> Just an FYI.
>
>
>
>

Max P. Rosen, M.D.
Exhibit_28
5/7/2021

UMM-04602

**<u>EXHIBIT P</u>**

UMass Memorial Health Care                                    CHARU DESAI 7/6/1950
PRIMARY CARE                                          MRN: ██████  ACCT: ██████

## UMass Allscripts EMR

| Facility Progress Note | |
|---|---|

| | | | |
|---|---|---|---|
| **Patient Name:** | DESAI , CHARU | **#:** | ██████ |
| **MRN #:** | ██████ | **Birth Date:** | 7/6/1950 |
| **Admit Date:** | 2/10/2017 | **Discharge Date:** | 2/10/2017 |
| **Physician:** | EYPPER , GEORGE | | |
| **Service Location:** | Internal Medicine Facility | **Service Date:** | |
| **Site:** | PRIMARY CARE | | |

Umass Memorial Medical Center

Patient: Desai, Charu
Acct.#: ██████
MR#: ██████
Date of Birth: 07/06/1950
Date of Service: 02/10/2017
Loc: PRI
Dict By: George H Eypper MD
Dict Date: 03/05/2017
Trans: 03/05/2017 22:25 PM

Primary Care Clinic Note

HISTORY OF PRESENT ILLNESS:   The patient is a 66-year-old female who is here because of a cough and then a fever.   This had developed on February 7th.   I had seen her on February 6th for elevated blood pressure.   She was started at that time on lisinopril 2.5 mg daily.   She says that her symptoms over the last 3 days started with a runny nose, then a fever and a slight cough. She apparently called in sick for the past 3 days.   She has also had some dyspnea on exertion.   She did come to work today.

PAST MEDICAL HISTORY, FAMILY HISTORY AND SOCIAL HISTORY:   Available on Allscripts.

ALLERGIES AND ADVERSE DRUG REACTIONS:   None are known.

CURRENT MEDICATIONS:
1.  Levothyroxine 75 mcg daily.
2.  Lisinopril 2.5 mg daily.
3.  Multivitamins daily.
4.  Vitamin D 2000 units daily.

PHYSICAL EXAMINATION:
VITAL SIGNS:   Height 5 feet 5 inches, weight 128 pounds, blood pressure 131/67 with a heart rate initially of 78 and then of 102, temperature 98.4, oxygen saturation 98% on room air and then a second reading trending of 99% on room air.   Blood pressure taken by me in the right arm was initially 142/82 and then 126/78.   When taken in the left arm, I got 128/90 and then 138/90.   When taken again in the right arm, I got 142/84.
LUNGS:   Clear to percussion and auscultation.
HEENT:   Nasal passages are somewhat inflamed.

ASSESSMENT AND PLAN:   The patient has an upper respiratory illness and appears to be improving on a day by day basis.   It is thought that this is viral in nature and she does not need an antibiotic.   She does have a followup visit on May 1st.   She is given a requisition to see a dietitian, especially regarding salt and cholesterol as her LDL cholesterol is elevated.   She will return.


Attending: George Eypper, MD


**CONFIDENTIAL**                                              **UMM-30362**

UMass Memorial Health Care                                              CHARU DESAI 7/6/1950
PRIMARY CARE                                                    MRN: ██████  ACCT: ██████

## UMass Allscripts EMR

| Facility Progress Note | |
|---|---|

| | | | |
|---|---|---|---|
| **Patient Name:** | DESAI , CHARU | **#:** | ██████ |
| **MRN #:** | ██████ | **Birth Date:** | 7/6/1950 |
| **Admit Date:** | 2/10/2017 | **Discharge Date:** | 2/10/2017 |
| **Physician:** | EYPPER , GEORGE | | |
| **Service Location:** | Internal Medicine Facility | **Service Date:** | |
| **Site:** | PRIMARY CARE | | |

17457993/271377

cc:

Electronically signed by:GEORGE   EYPPER M.D.   Mar   6 2017   6:12PM EST

**CONFIDENTIAL**

**<u>EXHIBIT Q</u>**

| From: | KD <kdill123@yahoo.com> |
|---|---|
| Sent: | Wednesday, June 14, 2017 8:51 PM |
| To: | charu.desai@umassmemorial.org; Laureen.Sena@umassmemorial.org; Max Rosen <max.rosen@umassmemorial.org>; Desai, Charu <Charu.Desai@umassmemorial.org>; Sena, Laureen <Laureen.Sena@umassmemorial.org>; Rosen, Max <Max.Rosen@umassmemorial.org> |
| Cc: | Karin Dill <karin.dill@umassmemorial.org>; Dill, Karin <Karin.Dill@umassmemorial.org> |
| Subject: | Minutes from chest division meeting 6/14/17 |

Minutes from chest division meeting 6/14/17
11:00 to 11:45 AM

Faculty present:

Dr. Dill
Dr Desai
Dr. Sena

Agenda

I. Monthly division meetings are now established

The group came to a consensus that monthly meetings should be held on Thursday mornings from 11 to 11:45 AM.

II. Powerscribe 360

Issues were discussed regarding the new power scribe 360. Templates are not propagating, Leaving dictation fields blank. This requires manual selection of templates which slows down workflow. In addition, incorrect templates have been linked to exam codes which also requires work to fix. Upon discussion with Julie in IT, certain codes do not exist for vascular, cardiac studies. Chad Winslow was emailed by Dr Dill about this issue to see if he can elicit assistance from the power scribe 360 team.

III. Triage of chest cases

The team discussed ways to place a marker as a red! On high priority cases. Dr. Dill discussed how she has been working with the technologist to place red! on cases indications including PE, chest pain, query dissection. The observation is that this is not a consistent labeling process. We discussed a better way to implement this change and to involve a scheduler. Dr. Dill will follow up with the schedulers on the second floor to investigate this implementation.

IV. Agfa

Dr. Sena discuss the concept of streamlining workflow with Agfa. She will send an example of searchable items to Dr. Dill and Dr. Desai for review. This will be the topic for discussion at our next monthly meeting.

V. Home PACs workstations

Group discussed home workstations and how this functions. Dr. Dill explained her experience. Dr. Sena voiced desire to have a homework station in the future so that she can sign and read cases from home as a moonlighter. Dr. Desai also voiced desire to have a homework station so that during times of inclement weather, she can read

UMM-04377

from home.

VI. CTA reads on weekends

Dr. Desai raised the question if the abdominal section can read the vascular stat CTs on the weekends. Dr. Dill will discuss with the interim chief of abdominal imaging.

VII. Work list at Clinton and Marlborough hospitals

Dr. Desai raised a question about how reads are handled at Clinton and Marlborough. It is noted that the University reading room receives many calls about protocols and reads for these hospitals and wonders if there are staff assigned at these locations to cover these responsibilities. Dr. Dill will discuss with Dr. Brennan to confirm coverage in an attempt to streamline workflow.

VIII. Reading room assistant

The group discussed the need for a reading room assistant so that the radiologists can increase efficiency and maintain focus. With the increased volume and length of reading list, increasing number of calls from clinicians have been observed in the reading room which distracts attention and impedes work. There was discussion that this assistant should not work directly in the reading room but nearby to facilitate physician/assistant interaction. The role of the reading room assistant would be to answer phones, contact IT when there are software/hardware issues, connect radiologist to doctors offices, for example. In addition, an accurate phone directory including the reading rooms and hospital sites is needed. Dr. Sena noted that the directory available is outdated. Several of the phone numbers are not accurate.

The meeting was concluded at 11:45am. An email was sent to Ashley to distribute an invitation for the next meeting on July 13, 11 to 11:30 AM .

**EXHIBIT R**

CD 000049

Charu Desai, MD
Exhibit_34
10/22/2020

**Peer Review:**    **Desai, Charu**    7/1/2016 - 6/30/2017

4b. Likely to be significant

Desai, Charu

| Modality | Comment | Drop-Down Selection | Reviewee | Accession | Study Description | Study Date Time |
|---|---|---|---|---|---|---|
| CR | Called to review cor. Cardiomegaly. Regular subsegmental atelectasis. KDill | 4b. Likely to be significant | Desai, Charu | | | 3/7/2017 12:01 PM |
| CT | RUL nodule adjacent to cyst highly suspicious for lung ca | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 4/24/2017 4:18 PM |
| CT | Asked to review case. Growing tracheal nodule since CT 2013. This was not accurately identified (question of comparison) reported as, "Question mucsa along the anterior wall of upper trachea, image 22 series 4." K DllMD | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Contrast | 3/17/2016 11:38 AM |
| CR | Asked to review. approx 8.5 cm ascending aortic aneurysm not diagnosed/ mentioned on cor. KDill | 4b. Likely to be significant | Desai, Charu | | Chest:PA,AP, Apcial or Lateral | 4/28/2016 5:48 AM |
| CT | asked to re-review case. PET demostrates nodule is FDG avid. Report stated, "Approximately 5 mm ill-defined nodular density anteriorly in the left upper lobe. Question etiology. Question small focal area of infiltrate less likely nodule." KDill MD | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 2/24/2016 1:31 PM |
| CT | asked to over read. CT dictated as nodular density, likely not nodule –no call made or electronic recording of notification for f/u. subsequent pre op CT reveals enlargement and new nodule, no physician was aware of nodule. | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 2/24/2016 1:31 PM |

Review Count

**<u>EXHIBIT S</u>**

| From: | Brennan, Darren <brennan, darren39a@exchange.com> |
|---|---|
| Sent: | Monday, January 8, 2018 2:33 PM |
| To: | Rosen, Max <Max.Rosen@umassmemorial.org> |
| Subject: | RE: radiology issues- summary |

Dr Robinson

**From:** Rosen, Max
**Sent:** Monday, January 08, 2018 2:33 PM
**To:** Brennan, Darren <Darren.Brennan@umassmemorial.org>
**Subject:** Re: radiology issues- summary
**Sensitivity:** Confidential

Thanks. I've heard about this from Alice

Who was the source of the language ?

Sent from my iPhone

On Jan 8, 2018, at 2:27 PM, Brennan, Darren <Darren.Brennan@umassmemorial.org> wrote:

> Hi Max
>
> Now that you're back from vacation, I enclose Dr Robinsons summary of the issues as she sees them in
> Radiology. I got ambushed slightly last Wednesday after Med Executive. Dr Sioufi who was cc'd is the CMO for
> Marlboro so he may have forwraded to Charley. Probably best to talk through these as there was additional
> unfortunate language Publicly used to describe the Radiologists here that I will want to follow-up on
>
> DB
>
> _____
>
> **From:** Robinson, Kimberly (Pulmonary)
> **Sent:** Wednesday, January 03, 2018 12:32 PM
> **To:** Roach, Steve <Steve.Roach@umassmemorial.org>
> **Cc:** Brennan, Darren <Darren.Brennan@umassmemorial.org>; Sioufi, Habib
> <Habib.Sioufi@umassmemorial.org>; Jain, Chandrika (Marlborough) <Chandrika.Jain@umassmemorial.org>
> **Subject:** radiology issues- summary
> **Sensitivity:** Confidential
>
>
> Please treat this as confidential and do not forward.
>
> Issues:
> 1. Quality of reads
> a.   Drs. G.T. HL J.F. Desai, and most recently, D.B.
>       i.   Issues include missed findings, inaccurate description of findings, not comparing to old studies that
>       are readily available, reading as "no change"
> b.   Lack of specialty reads for chest radiology
>
> 2. CT guided lung biopsies
> c.   CT fluoro not needed for most cases

Max P. Rosen, M.D.
Exhibit_57
6/1/2021

**CONFIDENTIAL**                                    **UMM-04299**

d.   Procedure for scheduling as communication has been poor
e.   Ensuring our patients can safely have their procedure at Marlborough
f.   I has asked for data regarding biopsies: complications rates (bleeding, pneumothorax), and number of biopsies with positive findings (alveolated lung tissue, organizing pneumonia, malignancy) and those with no findings or unintentional findings such as skeletal muscle or liver.

3.   Follow up
g.   Many of these issues are not new and have been previously addressed but seems to be no plan in place to fix
h.   Was told chest reads would be template driven to prevent reads such as "no change" and to assure lines and tubes were reported out, that has not consistently happened
i.   Have raised issue of reports stating "no change" in past but seems like 1 particular physician continues to read this way
j.   Is FPPE process robust to document / identify trends/ correct issues?

4.   Critical results
k.   Powerscribe 360 system does not function well. Many missed critical results

Feel free to contact me for more detail if needed,
Thank you,
Kim

**Kimberly A. Robinson MD, MPH**
**Mass Lung & Allergy, PC**
Director of Critical Care
President of the Medical Staff
Marlborough Hospital
159 Union St. Suite 102
Marlborough, MA 01752
pager: 508-722-5027
office: 508-486-5733

**CONFIDENTIAL**

**UMM-04300**

**<u>EXHIBIT T</u>**

**Rosen, Max**

| | |
|---|---|
| **From:** | Rosen, Max |
| **Sent:** | Wednesday, February 08, 2017 1:02 PM |
| **To:** | Brennan, Darren; Tennyson, Joseph; Robinson, Kimberly (Pulmonary); Roach, Steve; Brown, Douglas |
| **Cc:** | Rosen, Max |
| **Subject:** | Meeting – Review of Radiology issues at Marlborough: |
| | |
| **Categories:** | Desai_Confidential |

Please let me know if anyone has any edits, etc.

Thanks for meeting with me and Darren.
Max

Meeting – Review of Radiology issues at Marlborough:

Drs. Rosen, Brennan, Tennyson, Robinson, Mr. Roach & Brown Jan 31, 2017

1. Actions taken to address concerns about turn around time and accessibility of Radiologists:
   - Changed staffing model:  All studies read on site (at Marlborough) expect Neuro, Peds, ED, Nucs
   - Radiology has created Community Radiology Division to be more responsive to community needs
   - New Community Neuroradiology rotation:  M-F 8 am to 10 pm, one single phone number for point of contact
   - Extended hours for Community Radiology until 8 pm, M-F
   - Trainees will not be reading Marlborough studies
   - Will work with new version of PowerScribe to see if time-stamp for addenda can be designed to not "add" to TAT   BRENNAN [ ]
   - Dr. Brennan will report monthly Radiology TAT to Med-Exec
2. Chest:
   - Dr. Schmidlin now has home workstation
   - Drs. Schmidlin and Dill will read all high resolution chest CTs
   - Will create template to standardize all chest CT reads        DILL [ ]
   - Template for CXR has been implemented, feedback has been positive
   - Quality issues:  Dr. Rosen will perform focused peer-review for physician where issues have been raised.   ROSEN [ ]
3. Stroke:  Will work on streamlining  stroke activation  & review current performance        BRENNAN [ ]
4. Identification of inpatient exams needing to be read at night/weekends:
   - Dr. Brennan will work with Paul Riggieri to have techs manually mark all inpatient CTs "stat" when performed nights/weekends.  BRENNAN [ ]
5. QA:
   - Dr. Rosen has reviewed, and provided feedback for Dr. Robinson for neuro case that was questioned.
   - Radiology will provide access to the person from Marlborough who maintains the QA reporting system (? STARS) so that any Radiology cases can be entered in the Radiology (Pe   BRENNAN [ ]
   - 

Max P. Rosen, M.D.
Exhibit_27
5/7/2021

Max P. Rosen, MD MPH
Professor and Chair
U Mass Memorial Medical Center
U Mass School of Medicine
55 Lake Ave. North - Room S2-824
Worcester, MA 01655
508-856-3252
508-856-4910 fax

max.rosen@umassmemorial.org
Follow me on LinkedIn or Twitter
**www.umassmed.edu/radiology**

*Confidentiality Notice:*
*This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential, proprietary and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender immediately and destroy or permanently delete all copies of the original message.*

**<u>EXHIBIT U</u>**

| | |
|---|---|
| **From:** | Green, Kathryn (Radiology) <Kathy.Green@umassmemorial.org> |
| **Sent:** | Wednesday, February 1, 2017 11:12 AM |
| **To:** | Rosen, Max <Max.Rosen@umassmemorial.org> |
| **Cc:** | Baccei, Steven <Steven.Baccei@umassmemorial.org> |
| **Subject:** | Re: confidential QA |

Am aware of confidential nature and already discussed confidentially with Julie.  No one else will be involved in this process.

I think life iinage is best option.  We can de-identify and attach the report to the images.  I'll work directly with Julie on this.
Sent from my iPhone

On Feb 1, 2017, at 10:34 AM, Rosen, Max <Max.Rosen@umassmemorial.org> wrote:

> Hi -
>
> Just want to state that this is a confidential review, which has been requested by a clinician outside of radiology.  Please make sure that no one involved discusses this with Charu or with anyone else.
>
> I would like reports and images de-identified.
>
> Can we get
>
> 1. 25 Random Chest CTs (and reports) dictated by Dr. Desai
> 2. 25 Chest CTs (and reports) dictated by other attending
> 3. The reports can be printed and I can cut out the attending's name.
> 4. If we can then have the images loaded onto life images, I could then have an outside reviewer review the image once they have access to Life Images.
>
> Let me know if this makes sense.
>
> Thanks. Max
>
> _____
> **From:** Green, Kathryn (Radiology)
> **Sent:** Wednesday, February 01, 2017 10:21 AM
> **To:** Rosen, Max; Baccei, Steven
> **Subject:**
>
> I'm working with Julie to pull reports and images together for Charu but I need to know:
>
> 1. Is this an external or internal review?  It will help to know in terms of whether we need to de-identify patient information or just the physician info.
> 2. Also, it might be a little complicated to attach the report to images.  However, I thought we might be able to do this through LifeImage.  If we can do this through LifeImage it will safe an enormous amount of time for the File room.
>
> Please let me know
> Thanks

Max P. Rosen, M.D.
Exhibit_26
5/7/2021

K

*Sr. Director, Radiology Services*
*UMass Memorial Medical Center*
*55 Lake Ave, North*
*Worcester, MA   01655*
*(774) 443-2631 office*
*(508) 426-0706  pager*

<< OLE Object: Picture (Device Independent Bitmap) >>

CONFIDENTIAL

**<u>EXHIBIT V</u>**

September 19, 2017

Diana Litmanovich, MD
783 Newton Street
Chestnut Hill, MA 02467

RE:  Agreement to Review Radiology Scans

Dear Dr. Litmanovich:

Thank you for agreeing to provide Quality Assurance Review for the Department of Radiology at UMass Memorial Medical Group ("UMMMG").  This letter summarizes the terms of this arrangement.

UMMMG Radiology will provide you with fifty (50) Chest CT scans and associated reports which have been de-identified.  The CT images will be provided to you by a secure web-based imaging sharing system.  Following your review of the CT scan and associated report, you agree to complete the attached review form for each case.

We agree that we will not identify you as the Reviewer without your permission.

In consideration for your services, UMass Memorial will compensate you at the rate of $300 per hour devoted to this project.  The total fee for the project will not exceed Five Thousand Dollars ($5,000).  We ask that you submit an invoice upon the completion of the project, documenting the time spent and the amount owed.  We agree that the project will be completed no later than November 30, 2017.

Please confirm your acceptance of these terms and conditions by signing below and returning a signed copy of this letter to my attention.  We look forward to working with you.

Sincerely,

Max Rosen, MD, MPH, Chair
Department of Radiology

Accepted and Agreed:

_____
Diana Litmanovich, MD
Date:

UMM 00694

**EXHIBIT W**

**Rosen, Max**

| | |
|---|---|
| **From:** | Rosen, Max |
| **Sent:** | Tuesday, April 17, 2018 3:58 PM |
| **To:** | Desai, Charu |
| **Cc:** | Tosi, Stephen; Cavagnaro, Charles; Rosen, Max |
| **Subject:** | RE: March 14th, 2018 Meeting |

Dear Dr. Desai,

I am writing in response to your email below.

I am happy to set up a meeting for you, myself, and Dr. Baccei – our director for Radiology QA to review the results of the independent analysis that I had performed.  As you have asked previously and I am happy to support, you are welcome to invite a colleague to attend this meeting with you.

You will be able to review that data that was presented to me, but will not be able to take any hard-copies of the reports.

Please contact Cindy to schedule if you still want to meet.

Sincerely,

Max

---

**From:** Desai, Charu
**Sent:** Saturday, March 24, 2018 8:29 AM
**To:** Rosen, Max <Max.Rosen@umassmemorial.org>
**Cc:** Tosi, Stephen <Stephen.Tosi@umassmemorial.org>; Cavagnaro, Charles <Charles.Cavagnaro@umassmemorial.org>
**Subject:** Re: March 14th, 2018 Meeting

Dear Dr. Rosen,

I am writing regarding the meeting held on March 14, 2018 at noon.  In this meeting, you provided me a written letter indicating that my employment at UMMHC would be terminated.  You verbalized that this was due to my poor quality work.  Can you please elaborate with evidence to substantiate your allegations?

Dr. Desai

Max P. Rosen, M.D.
Exhibit_65
6/1/2021

**UMM 00540**

1

**<u>EXHIBIT X</u>**

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**484 Main Street, Room 320, Worcester, MA 01608**
**Phone:  (508) 453-9630 Fax:  (508) 755-3861**

---

MCAD DOCKET NUMBER: 18WEM01247         EEOC/HUD CHARGE NUMBER: 16C-2018-01520
FILING DATE: 05/04/18                             VIOLATION DATE: 03/14/18

-----------------------------------------------------------------------------------------------------------

Name of Aggrieved Person or Organization:
Charu Desai
32 Whisper Drive
Worcester, MA 01609
Primary Phone: (508)799-5280

-----------------------------------------------------------------------------------------------------------

Named is the employer, labor organization, employment agency, or state/local government agency who discriminated
against me:

UMass Memorial Medical Center
Attn: Human Resources/Legal Department
55 Lake Ave North
Worcester, MA 01655

Stephen E. Tosi
Attn: Human Resources/ Legal Department
55 Lake Ave North
Worcester, MA 01655
Primary Phone: (508)334-1000

UMass Memorial Medical Group
Attn: Human Resources/Legal Department
55 Lake Ave North
Worcester, MA 01655

UMass Memorial Medical School
Attn: Human Resources/Legal Department
55 Lake Ave North
Worcester, MA 01655

Darren Brennan
Marlborough Hospital
Attn: Human Resources/Legal Department

No. of Employees:        25+

-----------------------------------------------------------------------------------------------------------

Cause of Discrimination based on:
National Origin (Indian descent); Age (67); Sex (Female); Disability (cardiac arrhythmia); Race/ Color (Non-White).

-----------------------------------------------------------------------------------------------------------

**The particulars are:**
I, Charu Desai, the Complainant believe that I  was discriminated against by Respondents, UMass Memorial Medical
Center, UMass Memorial Medical Group, UMass Memorial Medical School, Darren Brennan, and Stephen Tosi, on the
basis of  National Origin, Age, Sex, Disability, Race, Color. This is in violation of M.G.L. c. 151B, Section 4, Paragraphs
1B, 1, 16 and Title VII, ADEA, and ADA.

See Attached.

-----------------------------------------------------------------------------------------------------------

I hereby verify, under the pains and penalties of perjury, that I have read this complaint and the allegations contained herein
are true to the best of my knowledge.

_____
(Signature of Complainant)

MCAD Docket Number 18WEM01247, Complaint

CHARGE OF DISCRIMINATION
MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

FEPA NUMBER  :

EEOC NUMBER  :

FILING DATE : May 4, 2018

VIOLATION DATE: March 14, 2018

RECEIVED

NAME OF AGGRIEVED PERSON OR ORGANIZATION

MAY  − 4  2018

Charu Desai, M.D.
32 Whisper Drive
Worcester, MA  01609

TELEPHONE NUMBERS
HOME   : 508-799-5280
OFFICE :

MCAD
BOSTON

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, OR
STATE/LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME

1.  UNIVERSITY OF
    MASSACHUSETTS MEMORIAL
    MEDICAL CENTER
    55 Lake Avenue North
    Worcester, MA  01655

TELEPHONE NUMBER:  508-334-1000
NO. OF EMPLOYEES:  over 300

2.  UMASS MEMORIAL MEDICAL
    GROUP
    55 Lake Avenue North
    Worcester, MA  01655

TELEPHONE NUMBER:  508-856-3252
NO. OF EMPLOYEES:  over 300

3.  UNIVERSITY OF
    MASSACHUSETTS MEDICAL
    SCHOOL
    55 Lake Avenue North
    Worcester, MA  01655

TELEPHONE NUMBER:  508-334-1000
NO. OF EMPLOYEES:  over 300

4.  Max Rosen, M.D.,
    Chair of the Department of Radiology
    UNIVERSITY OF
    MASSACHUSETTS MEMORIAL
    MEDICAL CENTER
    55 Lake Avenue North
    Worcester, MA  01655

TELEPHONE NUMBER:  508-334-1000

5.  Darren Brennan, M.D.,                    TELEPHONE NUMBER:  508-334-1000
    Vice Chair of Community Radiology
    (and Chief of Radiology at
    Marlborough Hospital)

    UNIVERSITY OF
    MASSACHUSETTS MEMORIAL
    MEDICAL CENTER
    55 Lake Avenue North
    Worcester, MA  01655

6.  Stephen E. Tosi, M.D.,                   TELEPHONE NUMBER:  508-334-1000
    Senior Vice President/Chief Physician
    Executive, Chief Medical Officer
    UNIVERSITY OF
    MASSACHUSETTS MEMORIAL
    MEDICAL CENTER
    55 Lake Avenue North
    Worcester, MA  01655


CAUSE OF DISCRIMINATION BASED ON:  AGE, RACE, NATIONAL ORIGIN, GENDER
AND DISABILITY

THE PARTICULARS ARE:

1)  I am female.  I was born on July 6, 1950.  As of the date of this filing, I am 67½
    years of age.  I was born in India and immigrated to the United States in 1974.  I
    have a serious heart condition that substantially compromises my health and required
    the implantation of a pacemaker in 2001.

2)  I graduated from Government Medical College at the South Gujarat University
    School of Medicine, in Surat, Gujarat, India, in 1972.  I completed an internship at
    Civil Hospital in Surat, India, in 1973.

2

3) In 1975, I completed one year of Residency in Pathology at the Mt. Auburn Hospital in Cambridge, Massachusetts. From 1976-1977, I worked as a house physician at Cushing Hospital in Framingham, Massachusetts.

4) From 1978-1981, I was a Resident in Diagnostic Radiology at the University of Massachusetts Memorial Medical Center ("UMass").[1] I served as Chief Resident from 1979-1981 and, in 1981, became the first individual to complete the Diagnostic Radiology residency at UMass. Following my residency, I completed a fellowship in Computed Body Tomography / Ultrasound at UMass, and then joined the staff of UMass for one year.

5) I became board certified by the American Board of Radiology in 1983.

6) From 1983 through 1992, I worked in private practice (in radiology) in the Worcester area.

7) I returned to UMass in January 1992, as an Assistant Professor of Radiology not on the tenure track. I served in that role and as an attending physician in the Division of Thoracic (Chest) Radiology from 1992 to August 2001.

8) Effective September 1, 2001, I was promoted to the position Clinical Associate Professor of Radiology not on the tenure track. I continued to serve as an attending physician in the Division of Chest Radiology.

9) Throughout the entirety of my time at UMass, my work was extremely highly regarded. Indeed, Dr. Jerry Balikian, a former Division Chief of Chest Radiology, who was recognized as one of the most celebrated and nationally reputed radiologists

---

[1] Over the course of my employ, there have been a number of corporate restructurings and mergers involving the University of Massachusetts Medical School, the University of Massachusetts Medical Center, Memorial Hospital, UMass Memorial, UMass Memorial Medical Group (a physician organization), and various of my employment records and documents reflect each of these entity names. Given their interrelatedness, I refer to all of them, collectively, as UMass.

3

to have worked at UMass and who worked with and directly supervised my work for 25 years, routinely and consistently praised my work. Drs. Joseph Ferrucci and Edward Smith, who served as Chairs of the Department of Radiology, similarly routinely praised my work, as did (does) Dr. Richard Irwin, Chief of Pulmonology at the Medical Center, who routinely has patients requiring my expertise. (Dr. Ferrucci nicknamed me "Goddess of Chest Radiology.") In connection with my promotion to Clinical Associate Professor, my reviewers stated, among other things, that I was an "outstanding radiologist in terms of my diagnostic ability, particularly with reference to thoracic radiology," a "superb chest radiologist" with an "exceptional mind in picking up abnormalities" and "an extremely competent clinical thoracic radiologist" whose "opinion is widely sought by pulmonary specialists, clinicians, other radiologists, and residents." And as recently as June 2017, I received the Teacher of the Year Award for outstanding teaching and mentoring of residents.

10) To my knowledge, throughout the entirety of my career, I have never received a complaint about my performance, clinical skills or readings. None of my cases have been the subject of a quality assurance review or of a morbidity and mortality conference. None of my colleagues or supervisors over the course of my time at UMass ever raised any concerns to me about my performance, clinical skills, or readings. On the contrary, my colleagues at UMass have consistently sought me out for readings. Indeed, countless attending physicians, residents, and physicians from other departments have consulted with me for interpretations of their patients' x-rays and CT scans. They have praised, among other things, my attention to detail and ability to detect the most subtle of findings. (Colleagues nicknamed me "Nodule

Queen" for this.)  Colleagues describe me as careful, thorough, and accurate, and several have stated that I am among the best radiologists with whom they have had the pleasure of working.

11) In approximately 2012, Dr. Max Rosen replaced Dr. Ferrucci as the Chairman of the Department of Radiology.

12) I am reliably informed and believe that in October or November 2016, a group of older radiologists including Doctors Adib Karam, Gopal Vijayaraghanavan, Joseph Makris, and Christopher Cerniglia demanded a meeting with Dr. Stephen Tosi, the CEO of UMass (and UMass Memorial Medical Group), to express frustration with Dr. Rosen ongoing underpayment of them compared to younger radiologists that Dr. Rosen had hired.  (I am reliably informed and believe that they had raised this issue directly with Dr. Rosen as early as 2013 and 2014, but that he did not correct the disparities.)  I am also reliably informed and believe that at the meeting in October or November 2016, Dr. Tosi reprimanded Dr. Rosen for his actions and ordered the salaries to be adjusted.

13) Since Dr. Rosen became Chair, a number of radiologists have left UMass:  Dr. Joseph Makris (who is, to my knowledge, in his fifties), Dr. Abhijit Roychowdhury (a senior physician who has over 36 years of experience, and who is Indian), and Dr. Adib Karam (who has approximately twenty years experience, and is Lebanese) have all left (or been forced out of) the Department of Radiology.  I am reliably informed and believe that Dr. Rosen stated to Dr. Roychowdhury, "you don't fit my vision of the Department," or words to that effect.  I am also reliably informed and believe that he stated to Dr. Padmaja Surapaneni (a female doctor of Indian descent), "you are

useless." I am reliably informed and believe that as a result of Dr. Rosen's treatment of her, and despite the fact that she worked in the Radiology Department for approximately 15 years, she will be leaving for another position offering significantly less compensation, effective June 2018.

14) My experience of Dr. Rosen was (is) similarly troubled. In March 2016, Dr. Rosen hired Dr. Karin Dill (a less experienced, younger radiologist, who is white) to serve as Division Chief of Chest Radiology, even though I had significantly more experience in the field. I am informed and believe that Dr. Dill's compensation is significantly greater than my own. I also am informed and believe that Dr. Rosen has given to Dr. Dill (and, I understand, other younger doctors) one and one half days per week – i.e., approximately 70 days per year – as "academic/administrative days" (i.e., days on which no clinical duties are expected). Dr. Rosen's treatment of me was (is) markedly worse. As an accommodation to my serious heart condition, I had Dr. Rosen asked for twelve academic days per year. Dr. Rosen declined to give me any. Also as an accommodation to my serious heart condition, I asked Dr. Rosen that I be given a workstation so that I might perform work at home over the weekend. Dr. Rosen declined that request, as well, although he gave to Dr. Dill and other of my younger colleagues equipment to work from home and permits them to do work from home. In addition, I have also learned that Dr. Rosen is paying other newly-hired (and far younger / more junior) radiologists more than I am being paid, despite my far greater experience and seniority.

15) As a result of occasional flares of my heart condition / cardiac arrythmia, which flares cause me extreme (and debilitating) shortness of breath, I was (am)

occasionally forced to be late to work. Although Dr. Rosen was aware of my condition, in May 2016, he reprimanded me for my occasional tardiness. I asked if, as an accommodation to my heart condition, he would assign to me fewer "call days" (days on which I would be on call for the radiology practice). He refused my request, telling me to work part time or as a locum tenens. (I did, in fact, apply for and was granted FMLA leave. In light of Dr. Rosen's treatment of me, however, I have rarely used it in fear of reprisal if I do, even when I have had episodes of cardiac arrhythmia.)

16) In or about May 2016, I voiced concerns to Dr. Rosen about his disparate (and far more favorable) treatment of younger, less-experienced, and newly-hired physicians in the allotment of academic days, which he seems to provide to every young(er) radiologist involved in giving departmental conferences. In the presence of Myra Shah, a human resources representative, Dr. Rosen asserted that he would <u>not</u> honor my requests for academic days that he was eagerly providing to those younger, less experienced, newly-hired physicians. At this same meeting, I requested fewer calls given my seniority and my heart condition. Dr. Rosen also refused this request.

17) Rather than provide to me these reasonable accommodations (which he granted to others who are not disabled), Dr. Rosen instead suggested, as he had with other older radiologists, that I should simply work part-time or as a locum, rather than full-time. I declined to do so.

18) Nevertheless, Dr. Rosen continued to attempt to pressure me to go part-time or accept a locum tenens position. Indeed, I am reliably informed that in late 2017, he met with the former Chair of the Department, Dr. Joseph Ferrucci, and urged Dr.

Ferrucci to convince me to accept a part-time or locum tenens position. (Dr. Ferrucci informed me of Dr. Rosen's actions.) I again declined to accept a part-time or accept a locum tenens position.

19) In retrospect perhaps not surprisingly in light of continuing pressure to have me reduce my hours or accept a locum tenens position and my continuing refusal to do so, on March 14, 2018, Dr. Rosen gave me a letter informing me that my employment with UMass would be terminated effective March 17, 2019. The letter gave no reason for my termination. I was stunned.

20) When I asked Dr. Rosen what prompted him to terminate my employment, he first stated that he did not need a reason to terminate me. Particularly in light of my 26 years of dedicated and loyal service to UMass, I was (again) stunned by his dismissive disregard of me. He then stated that he was terminating me because my work was of poor quality. In all of my performance reviews, including my most recent performance review in June 2017, however, there was no indication whatsoever that my work was anything other than completely fine. So I therefore asked him to provide any examples. He was unable to do so. When I continued to press him for any proof of his assertion, he claimed that he had conducted his own independent review. It was not until three weeks after I requested the data that he reviewed that he agreed to meet with me. Moreover, at no prior point, had he (or anyone else) brought to my attention any problems or complaints or concerns about my work, or spoken with me in connection with any investigation (or otherwise) into my work.

21) Dr. Rosen then told me that effective immediately following the meeting on March 14, 2018, in which I was informed of my termination of employment, I could no longer read any Chest CT scans. He told me that I could (can) still read chest x-rays, but that he was "going to keep a close eye on me" (or words to that effect). I was again stunned. In light of my post-residency subspecialty fellowship training focusing on the interpretation of CT scans, his claim about my purportedly poor quality CT readings was (is) nonsensical. That is particularly true where, as here, at no prior point had he (or anyone else) brought to my attention any problems or complaints or concerns about my reviews of Chest CT scans.

22) As I was (and remain) disbelieving of Dr. Rosen's allegations about my performance, shortly after the meeting on March 14, 2018, I asked Dr. Steven Baccei, the Vice-Chair of Quality, Patient Safety, and Process Improvement for the Department of Radiology at UMass, if there had been any issues with my readings. He stated that he was not aware of any.

23) By email on March 24, 2018, I again asked Dr. Rosen to provide evidence of my purportedly poor quality work. It was not until three weeks later, on April 17, 2018, that he responded.

24) In the meantime, although I was also absolutely humiliated at the thought I would have to state to colleagues and residents who routinely consult with me about their patients' Chest CT scans that I could no longer do so, I nevertheless complied with Dr. Rosen's order. Paradoxically, despite forbidding me to review Chest CT scans, Dr. Rosen has nevertheless still required me to provide "noon coverage" once per week (i.e., to cover the lunch hour, when everyone else is absent), which coverage

9

includes the review of Chest CT scans (including emergency pulmonary embolus studies). This inconsistency makes no sense.

25) Also in the meantime, in early April 2018, I learned that Dr. Rosen hired another radiologist to cover part-time in the Chest Division and part-time in the Abdominal Division. Upon information and belief, she is approximately 15 years younger than I am.

26) Also in the meantime, I am reliably informed and believe that on or about April 7, 2018, Dr. Darren Brennan, the Vice Chair of Community Radiology at UMass and Chief of Radiology at Marlborough Hospital (who I believe is in his forties), stated to Dr. Ferrucci, "we feel bad about what we had to do to Charu" (or words to that effect). As Dr. Brennan is Chief of Radiology at Marlborough Hospital, he was clearly at least in part responsible for the decision to curtail my CT scan reads and terminate my employment.

27) I am also reliably informed and believe that Dr. Rosen told Dr. Ferruci that he fired me as a result of issues/complaints from Marlborough Hospital. At no prior point, however, had he (or anyone else) brought to my attention any problems or complaints or concerns about my work at Marlborough Hospital.

28) As I noted above, by email dated April 17, 2018, Dr. Rosen finally responded to my March 24 email asking for evidence of my purportedly poor quality work. In his email response, he stated that he would be happy to set up a meeting to discuss the results of an "independent analysis" he had performed on my work. He told me I could bring a colleague. I asked to bring an independent expert with me to that meeting instead of a colleague to assess the concerns he raised, explaining that I was

concerned that my colleagues would feel uncomfortable contradicting him, given his authority over them.  He refused to permit me to bring an independent expert.

29) In a separate email to me also on April 17, 2018, Dr. Rosen stated that it was inappropriate for me to speak with residents about my employment, and he threatened, "I want to confirm your understanding that it is inappropriate for you to discuss ANY issues related to your UMMMG or UMMS employment with the Radiology residents, and that you will avoid doing so going forward.[2]" (Emphasis in original.)  I was not, in fact, aware that I could not discuss ANY issues related to my employment with colleagues.  (I am aware of no such proscription in any UMass handbooks and, indeed, I believe that such a prohibition would be illegal.)  Moreover, I had not actually had any "inappropriate" conversations with residents regarding my employment.  Rather, in response to residents' requests for assistance reading CT scans (which had been my job), I had simply informed them, accurately, that I was no longer permitted to read CT scans.  When they asked me why, I stated, accurately, that I believed that my employment at UMass would be short lived.  Here too, then, Dr. Rosen's criticisms / accusations are not based on facts.

30) On April 24, 2018, I met with Dr. Rosen and Dr. Baccei about my purportedly poor quality work.   My colleague Dr. Sarwat Hussain (who reports to Rosen) accompanied me, instead of the independent reviewer I had requested.  The entire meeting lasted only approximately fifteen minutes; Dr. Rosen gave me virtually no substantive information.

---

[2] I understand Dr. Rosen's references to UMMS and UMMMG to be references to UMass Medical School and the University of Massachusetts Memorial Medical Group.

i)  At that meeting, I asked Dr. Rosen when the review was conducted. He initially stated that he did not know. He then checked his computer and stated that he began investigating my work at the end of 2016 and did so through the first quarter of 2017. That explanation seems false, however, for three reasons. First, he did not bring any purported issue to my attention during this time period, nor did he do so at any time before he informed me on March 14, 2018 of my termination effective March 2019. Second, my most recent performance review, which was conducted in or about June 2017 (just a few short months after the close of the first quarter of 2017), similarly does not even mention the existence of any purported concerns about the quality of my work. *Third, and perhaps most importantly, it is not at all credible that I was permitted to continue to read CT scans for over one year after the conclusion of an "independent review" (purportedly conducted from the end of 2016 and through the first quarter of 2017) allegedly concluded that my work was of poor quality.*

ii)  When I asked Dr. Rosen the name of the independent reviewer he used to review my work and the hospital at which s/he worked, he refused to tell me.

iii)  When I asked Dr. Rosen for all the patient records and other pertinent information regarding my purported deficiencies, he refused to provide it.

iv)  When I asked Dr. Rosen for a written copy of the information that he presented to me (by projecting information on a screen) about the alleged

12

deficiencies in the quality of my CT scan readings, he refused to give it to me. (The information he projected, which purported to show my poor quality work, included the reports of several other radiologists in a manner that was seemingly intentionally disorganized and extremely difficult to comprehend. It is not at all clear, from the little information I was "presented" and the very little time I was given to review it, that any of the purported poor quality readings were indeed mine.)

v) The summary report of my purportedly poor quality work that Dr. Rosen did provide did not include any concrete examples of my deficiencies; it simply cited "statistics" from the investigation. I was given no opportunity to analyze any information he allegedly used, and therefore have no ability whatsoever to rebut / refute these assertions that my work is of "poor quality."

31) Dr. Rosen's purported reason for my termination is riddled with weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions.

*Age Discrimination claims*:

32) In giving the role and title of Division Chief of Chest Radiology to Dr. Karin Dill, a younger, far less experienced radiologist, despite my qualifications, experience and seniority, Respondents UMass and Dr. Rosen discriminated against me on the basis of age.

33) In terminating me while at the same time hiring Dr. Dill, a younger, less experienced radiologist to replace me (after my departure in March 2019), Respondents UMass and Dr. Rosen discriminated against me on the basis of age.

13

34) In providing CT training to my younger, less experienced radiology colleagues while failing to offer the same training to me, Respondents UMass and Dr. Rosen discriminated against me on the basis of age.

35) In paying me less than it/they paid my younger, less experienced colleagues, Respondents UMass and Dr. Rosen discriminated against me on the basis of age.

36) In providing to me fewer (no) academic days in contrast to the number of days provided to my younger, less experienced colleagues, Respondents UMass and Dr. Rosen discriminated against me on the basis of age.

*Race / National Origin Discrimination Claims*

37) In giving the role and title of Division Chief of Chest Radiology to a far less experienced radiologist who is white, notwithstanding my similar qualifications, greater experience and greater seniority, Respondents UMass and Dr. Rosen discriminated against me on the basis of race and/or national origin.

38) In terminating me while at the same time hiring Dr. Dill, a less experienced white radiologist to replace me (after my departure in March 2019), Respondents UMass and Dr. Rosen discriminated against me on the basis of race and/or national origin.

39) In paying me less than white colleagues, Respondents UMass and Dr. Rosen discriminated against me on the basis of race and/or national origin.

40) In providing to me fewer (no) academic days than the number provided to my white colleagues, Respondents UMass and Dr. Rosen discriminated against me on the basis of race and/or national origin.

*Gender Discrimination Claims*

41) In paying me less than my male colleagues, Respondents UMass and Dr. Rosen discriminated against me on the basis of gender.

42) In providing to me fewer academic days than the number provided to male colleagues, Respondents UMass and Dr. Rosen discriminated against me on the basis of gender.

*Disability Discrimination and Failure To Accommodate Claim*

43) In providing me fewer (no) academic days than it/they provided to my non-disabled colleagues, and in refusing to permit me to work from home on weekdays and weekends (in contrast to my non-disabled colleagues), Respondents UMass and Dr. Rosen discriminated against me on the basis of disability and failed to accommodate my disability.

*Aiding and Abetting Claim*

44) By his role in terminating my employment, Dr. Brennan aided and abetted discrimination against me.

45) By his actions in refusing to correct Dr. Rosen's discriminatory behavior and disparate treatment of me based on my gender, age, national origin and disability, despite his knowledge of same, Dr. Tosi has aided and abetted discrimination against me.

46) I therefore charge the Respondents with violating federal and state law, including Title VII, the Americans With Disabilities Act, the Age Discrimination in Employment Act, and Mass Gen. L. c. 151B.

47) As a consequence of Respondents' unlawful conduct, I have already lost salary and related benefits of employment, have suffered emotional distress, have lost personal

financial losses.  The Respondents are liable for all of these losses, plus attorney's

fees and costs.

I ALSO WANT THIS CHARGE FILED WITH THE EEOC: _____X_____

I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE
NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCESSING
OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.

I SWEAR OR AFFIRM THAT I HAVE READ THIS COMPLAINT AND THAT IT IS
TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF

_____
(SIGNATURE OF COMPLAINANT)

SWORN AND SUBSCRIBED BEFORE ME THIS _30th_ DAY OF APRIL, 2018.

NOTARY PUBLIC: _Patricia Jo Hanley_
MY COMMISSION EXPIRES: _____

Patricia-Jo Hanley
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
April 2, 2021

16

**<u>EXHIBIT Y</u>**

 UMassMemorial  **University of Massachusetts**
**Medical School**

*Department of Radiology*

*University Campus*
*55 Lake Avenue North*
*Worcester, MA 01655*
*Tel: 508-856-3252*
*Fax: 508-856-4910*
*max.rosen@umassmemorial.org*
*www.umassmemorial.org*

*Max P. Rosen, MD, MPH, FACR*
*Professor and Chair*

April 17, 2018

Charu Desai, MD
University of Massachusetts Medical Center
55 Lake Avenue, North
Worcester, MA 01655

Dear Dr. Desai,

I am writing to follow-up from our meeting on Wednesday April 11. At our meeting, I shared with you reports I have received regarding your conversations with certain residents about your personal employment situation. As I indicated to you, these conversations placed the residents in an awkward position and made them uncomfortable. It is not appropriate for you to have such conversations, as they are a distraction in the workplace.

I want to confirm your understanding that it is inappropriate for you to discuss ANY issues related to your UMMMG or UMMS employment with the Radiology residents, and that you will avoid doing so going forward.

This does not preclude discussing any clinical or educational topics with the residents, as you would do the normal course of your role as a faculty member.

Please acknowledge receipt of this email. (I have also asked Cindy to hand deliver a printed copy to you, to ensure that you have received this). As always, I am available to discuss any questions or issues that you may have.

Thank you.

Max P. Rosen, MD, MPH
Professor and Chair

**UMM-03726**

**<u>EXHIBIT Z</u>**

| | |
|---|---|
| **From:** | Desai, Charu <charu.desai@exchange.com> |
| **Sent:** | Thursday, March 14, 2019 1:50 PM |
| **To:** | Ddesai1@northwell.edu |
| **Subject:** | FW: Meeting to Review QA data |

From: Rosen, Max
Sent: Wednesday, April 18, 2018 5:12 PM
To: Desai, Charu
Cc: Rosen, Max
Subject: Meeting to Review QA data

Dear Dr. Desai,

I will be glad to meet with you, but will not permit an independent reviewer to attend our meeting.

You are welcome to bring a colleague from our Department with you if you wish.

Please call Cindy to schedule a mutually-convenient time for our meeting.


Max


From: Desai, Charu
Sent: Wednesday, April 18, 2018 2:05 PM
To: Rosen, Max <Max.Rosen@umassmemorial.org>
Subject: RE: March 14th, 2018 Meeting

Dr. Rosen,
I accept the offer to meet with you to discuss the assertions you made regarding the quality of my work, both in our meeting on March 14, 2018 and in your email below.
I also accept your offer to have a colleague accompany me. I am concerned, however, that anyone who works under you in the Radiology Department will be placed in an uncomfortable position, and may be reticent to voice their true opinion out of fear of retaliation. Therefore, I would like to choose an independent, expert reviewer to accompany me to this meeting, to ensure neutrality and avoid any potential bias favoring either of our positions on the information presented.
I look forward to speaking with you and hope to arrange a mutually convenient meeting date and time.
Dr. Desai

From: Rosen, Max
Sent: Tuesday, April 17, 2018 3:57 PM
To: Desai, Charu
Cc: Tosi, Stephen; Cavagnaro, Charles; Rosen, Max
Subject: RE: March 14th, 2018 Meeting
Dear Dr. Desai,

I am writing in response to your email below.

UMM-03957

I am happy to set up a meeting for you, myself, and Dr. Baccei – our director for Radiology QA to review the results of the independent analysis that I had performed. As you have asked previously and I am happy to support, you are welcome to invite a colleague to attend this meeting with you.

You will be able to review that data that was presented to me, but will not be able to take any hard-copies of the reports.

Please contact Cindy to schedule if you still want to meet.

Sincerely,

Max

From: Desai, Charu
Sent: Saturday, March 24, 2018 8:29 AM
To: Rosen, Max <Max.Rosen@umassmemorial.org<mailto:Max.Rosen@umassmemorial.org>>
Cc: Tosi, Stephen <Stephen.Tosi@umassmemorial.org<mailto:Stephen.Tosi@umassmemorial.org>>;
Cavagnaro, Charles
<Charles.Cavagnaro@umassmemorial.org<mailto:Charles.Cavagnaro@umassmemorial.org>>
Subject: Re: March 14th, 2018 Meeting

Dear Dr. Rosen,

I am writing regarding the meeting held on March 14, 2018 at noon. In this meeting, you provided me a written letter indicating that my employment at UMMHC would be terminated. You verbalized that this was due to my poor quality work. Can you please elaborate with evidence to substantiate your allegations?

Dr. Desai

UMM-03958

**<u>EXHIBIT AA</u>**

 **UMassMemorial**     **University of Massachusetts
Medical School**

*Department of Radiology*

*University Campus*
*55 Lake Avenue North*
*Worcester, MA 01655*
*Tel: 508-856-3252*
*Fax: 508-856-4910*
*max.rosen@umassmemorial.org*
*www.umassmemorial.org*

*Max P. Rosen, MD, MPH, FACR*
*Professor and Chair*

**VIA HAND DELIVERY**

March 9, 2018

Charu Desai, MD
Department of Radiology
UMass Memorial Medical Group
55 Lake Avenue North
Worcester, MA  01655

RE:  *Notice of Termination of Employment*

Dear Dr. Desai:

As Dr. Rosen has discussed with you, this letter serves as notice that your employment with UMass
Memorial Medical Group and the University of Massachusetts Medical School will terminate on March
17, 2019.

Kathleen LeBlanc in our Human Resources Department will be available to discuss any questions you
may have regarding benefits and related matters.

Thank you for your efforts and contributions on behalf of the Medical Group and the Medical School.

Sincerely,

Max Rosen, MD
Chair, Department of Radiology

Stephen Tosi, MD, President
UMass Memorial Medical Group

Cc:  LuAnn Thorndyke, MD

Max P. Rosen, M.D.
Exhibit_64
6/1/2021

**UMM 00253**

**<u>EXHIBIT BB</u>**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARU DESAI, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | CIVIL ACTION NO.: |
| ) | **4:19-CV-10520-DHH** |
| UMASS MEMORIAL MEDICAL CENTER, ) | |
| INC.; UMASS MEMORIAL MEDICAL ) | |
| GROUP; UNIVERSITY OF ) | |
| MASSACHUSETTS MEDICAL SCHOOL, ) | |
| UMASS MEMORIAL MARLBOROUGH ) | |
| HOSPITAL, MAX ROSEN, M.D., DARREN ) | |
| BRENNAN, M.D., STEPHEN TOSI, M.D., ) | |
| And KARIN DILL, M.D., ) | |
| ) | |
| Defendants ) | |

## PLAINTIFF CHARU DESAI'S ANSWERS TO DEFENDANT UMASS MEMORIAL MEDICAL CENTER, INC.'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Charu Desai, M.D., ("Plaintiff" or "Dr. Desai"), hereby submits the following answers and objections to Defendant UMass Memorial Medical Center, Inc.'s ("Medical Center") First Set of Interrogatories.

The following responses are made without waiver of, and with preservation of (a) all applicable rights and privileges; (b) all objections as to competency, relevancy, materiality, privilege, and admissibility of each response and the documents referred to therein; (c) the right to object on any grounds at any time to any demand or request or further documents or other discovery proceeding involving or relating thereto; and (d) the right at any time to revise, supplement, amend or clarify any of the responses made herein, whether at the conclusion of the discovery or otherwise.

These answers are based on Plaintiff's present knowledge, information, and belief. Plaintiff reserves the right to supplement, amend or otherwise change these answers in the event that discovery reveals facts that would justify such supplementation, amendment or change. Each Interrogatory is responded to subject to the general objections set forth below.

Plaintiff answers Defendant UMass Memorial's First Set of Interrogatories as follows:

1

**INTERROGATORY NO. 7**

Identify each co-worker whom you claim was paid more than you based on gender and state the basis for your claim, including the dates by which such co-worker was paid more than you based on gender and the amounts you claim he or she was paid more than you based on gender.

**ANSWER NO. 7**

Dr. Desai refers to and incorporates in her answer the facts set forth in her Amended Complaint in this action, her Charges of Discrimination filed with the Massachusetts Commission Against Discrimination ("MCAD"), and Plaintiff's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1).  Dr. Desai further answers as follows:

1. Dr. Aaron Harman
   Medical Center, 55 Lake Avenue North, Worcester, MA 01655, (508) 334-1000.
   Dr. Harman was hired in or about July 2017. Upon information and belief, at his hire Dr. Harman was paid a salary of approximately $365,000.  Despite Dr. Desai's greater experience, the Medical Group and Medical Center paid Dr. Desai only $340,000 per year.

Dr. Desai has requested salary information from defendants regarding the pay of her male colleagues in radiology from Defendants. Dr. Desai expressly observes her right to supplement this answer as discovery is ongoing.

**INTERROGATORY NO. 8**

Identify each verbal or written statement you claim is defamatory, including without limitation, identifying the individual you claim made the alleged defamatory statement.

**ANSWER NO. 8**

Dr. Desai refers to and incorporates in her answer the facts set forth in her Amended Complaint in this action, her Charges of Discrimination filed with the Massachusetts Commission Against Discrimination ("MCAD"), and Plaintiff's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1).  Dr. Desai further answers as follows:

1. 2017-2018 Faculty Annual Performance Review of C. Desai by M. Rosen; the document speaks for itself; a copy of this document has been produced.

2. July 1, 2016 – June 30, 2017 Peer Review of Dr. Desai by K. Dill; the document speaks for itself; a copy of this document has been produced.

3. April 17, 2018 Letter from M. Rosen to C. Desai; the document speaks for itself; a copy of this document has been produced.

4. April 17, 2018 3:58 PM Email from M. Rosen to C. Desai re: March 14th, 2018 Meeting; the document speaks for itself; a copy of this document has been produced.

5. April 18, 2018 5:12 PM Email from M. Rosen to C. Desai re: Meeting to Review QA data; the email speaks for itself; a copy of the communication has been produced.

6. March 9, 2018 Letter from M. Rosen and S. Tosi to C. Desai re: Notice of Termination of Employment

7. April 24, 2018 Meeting between Dr. Rosen and Dr. Desai, also attended by Dr. Sarwat Hussain. At this meeting, Dr. Rosen stated and projected on a screen false statements that Dr. Desai had performance issues and had committed major misreads of radiology films.

8. September – December 2017, Quality Assurance Review by D. Litmanovich and accompanying documents; the documents speak for themselves; Defendants have produced some documents related to this review. Plaintiff has requested further documents in Defendants' possession, custody, and control concerning this review.

9. Defendants' suspension of Dr. Desai's performance of duties and responsibilities, known to all in the radiology department and to numerous others throughout the hospital, constitutes defamation by deed. Defendants' termination of Dr. Desai, known to all in the radiology department and to numerous others throughout the hospital, also constitutes defamation by deed.

Dr. Desai expressly observes her right to supplement this answer as discovery is ongoing.

**INTERROGATORY NO. 9**

Please describe in detail every request for an accommodation related to a disability you may have that you made to UMass Memorial from January 1, 2000, through the end of your employment, and provide the date each request was made, identify the person to whom each request was made, identify all communications related to each request, and state whether each requested accommodation was granted.

**ANSWER NO. 9**

Dr. Desai refers to and incorporates in her answer the facts set forth in her Amended Complaint in this action, her Charges of Discrimination filed with the Massachusetts Commission Against Discrimination ("MCAD"), and Plaintiff's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1). Dr. Desai further answers as follows:

In or about May 2016, Dr. Desai complained to Dr. Rosen about his disparate allotment of academic days compared to her younger and/or non-disabled colleagues. Dr. Desai requested that she be granted the same number of academic days as her younger and/or non-disabled colleagues as an accommodation for her heart condition. See May 13, 2016 3:15 PM Email from

Signed under the penalties of perjury, this 5th day of June, 2020.


/s/ Charu Desai
CHARU DESAI


AS TO OBJECTIONS:

CHARU DESAI
By her attorneys,


/s/ Patricia A. Washienko
PATRICIA A. WASHIENKO (BBO 641615)
pwashienko@fwlawboston.com
BRENDAN T. SWEENEY (BBO 703992)
bsweeney@fwlawboston.com
FREIBERGER & WASHIENKO, LLC
211 Congress Street, Suite 720
Boston, Massachusetts 02110
Telephone:  617-723-0008
Fax:  617-723-0009

Dated: June 5, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2020 Plaintiff Charu Desai's Answers To Defendant UMass Memorial Medical Center Inc.'s First Set Of Interrogatories was served by electronic mail only to counsel for the above named Defendants:

Robert L. Kilroy, Esq.
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
(508) 860-1477
rkilroy@mirickoconnell.com

Mark Johnson, Esq.
University of Massachusetts Office of the General Counsel
333 South Street, 4th Floor
Shrewsbury, MA 01545
(617) 287-4064
MAJohnson@umassp.edu

/s/ Patricia A. Washienko
Patricia A. Washienko

**<u>EXHIBIT CC</u>**

 

University of Massachusetts
Medical School

Department of Radiology

*University Campus*
*55 Lake Avenue North*
*Worcester, MA 01655*
*Tel: 508-856-3252*
*Fax: 508-856-4910*
*max.rosen@umassmemorial.org*
*www.umassmemorial.org*

*Max P. Rosen, MD, MPH, FACR*
*Professor and Chair*

February 14, 2017

Dear Diagnostic Radiology Faculty,

I am pleased to introduce the new salary structure for the Department of Radiology that will be effective March 1, 2017.

Here are the highlights:

1) The base salary will be $330,000.
2) Associate Professors will receive an additional $10,000.
3) Professors will receive an additional $10,000.
4) Division and/or Medical Chiefs will receive $15,000.
5) Vice Chairs will receive $15,000.
6) Other administrative/clinical roles may receive monetary support at the discretion of the Chair.
7) The above salary and stipends are full-time faculty and will be prorated for part-timers.

For this year, salary adjustments will be made for faculty with more than a 1000 RVUs behind the 50th percentile of the AAARAD RVU benchmark.  The adjustment will be capped at 5% of the total salary. The monetary value of an RVU will be based on the average collection/RVU in fiscal year 2016.  This was mandated by the hospital's funds flow committee.

You will receive individual letters outlining your new salary effective March 1, 2017.

Thank you for your patience with this project. I am confident that this new structure will provide competitive salaries, compensation transparency, and a clear promotion trajectory.

Sincerely,

Max P. Rosen, MD, MPH
Chair Department of Radiology

Cc. Randa Mowlood

UMM-03898

## **EXHIBIT DD**

 **UMassMemorial** |  **University of Massachusetts Medical School**

*Department of Radiology*

*University Campus*
*55 Lake Avenue North*
*Worcester, MA 01655*
*Tel: 508-856-3252*
*Fax: 508-856-4910*
*max.rosen@umassmemorial.org*
*www.umassmemorial.org*

*Max P. Rosen, MD, MPH, FACR*
*Professor and Chair*

February 16, 2017

Charu Desai, MD
Abdominal Division
Department of Radiology
UMass Memorial
55 Lake Avenue North
Worcester, MA 01655

Dear Charu,

As you know, we are introducing a new salary structure for the Department of Radiology that will be effective March 1, 2017.

Your annual salary will increase from $ 302,575 to $340,000. Your new salary was calculated as follows:

| | |
|---|---|
| Base: | $330,000 |
| Associate Professor: | $10,000 |
| Total: | $340,000 |

Thank you for your commitment to our Department.

Sincerely,

Max P. Rosen, MD, MPH
Chair Department of Radiology

Cc. Randa Mowlood

Charu Desai, MD
Exhibit_32
10/22/2020