# **EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:4:19-CV-10520-TSH

CHARU DESAI,
Plaintiff,

v.

UMASS MEMORIAL MEDICAL
CENTER, INC., et al.,
Defendants.

**AFFIDAVIT OF REID M.
WAKEFIELD, ESQ., IN SUPPORT OF
MOTION FOR SUMMARY
JUDGMENT BY DEFENDANT,
MARLBOROUGH HOSPITAL**

I, Reid M. Wakefield, hereby depose and state as follows:

1.      I am employed as an attorney with the law firm Mirick, O'Connell, DeMallie, &
Lougee, LLP, and have been retained as defense counsel, along with Robert L. Kilroy, Esq., for
Defendant, Marlborough Hospital, in the above-referenced action.

2.      I have personal knowledge of the facts contained within this affidavit.

3.      I attest to the following Exhibits, which are attached hereto, as containing true and
accurate copies of the documents referenced therein:

4.      **Exhibit A** is a true and accurate copy of excerpts of the transcript of the
deposition of Charu Desai, M.D., taken on September 18, 2020 and October 22, 2020.

5.      **Exhibit B** is a true and accurate copy of the Agreement between UMass
Memorial Medical Group, Inc., and Charu Desai, M.D.

6.      **Exhibit C** is a true and accurate copy of the Affidavit of Max Rosen, M.D.,
M.P.H., dated December 15, 2021.

7.      **Exhibit D** is a true and accurate copy of the Affidavit of Michael J. Paruta, dated
December 10, 2021.

Client Matter 15602/00540/A7516455.DOCX

8.      **Exhibit E** is a true and accurate copy of the Affidavit of Steven P. Roach, dated December 6, 2021.

9.      **Exhibit F** is a true and accurate copy of the Professional Services Agreement by and between Marlborough Hospital and UMass Memorial Medical Group, Inc.

10.     **Exhibit G** is a true and accurate copy of an e-mail from Darren Brennan, M.D., to Charu Desai, M.D., dated September 21, 2017.

11.     **Exhibit H** is a true and accurate copy of the Independent Contractor Agreement as Medical Director for Intensive Care Unit between Marlborough Hospital and Kimberly Robinson, M.D.

12.     **Exhibit I** is a true and accurate copy of the Independent Contractor Agreement as Medical Director for Respiratory Care Services between Marlborough Hospital and Kimberly Robinson, M.D.

13.     **Exhibit J** is a true and accurate copy of the Physician Consultant Contract between Marlborough Hospital and Kimberly Robinson, M.D.

14.     **Exhibit K** is a true and accurate copy of the Intensivist Coverage Agreement between Marlborough Hospital and Mass Lung and Allergy, P.C.

15.     **Exhibit L** is a true and accurate copy of a letter from Steven P. Roach to Charu S. Desai, M.D., dated April 4, 2019.

16.     **Exhibit M** is a true and accurate copy of excerpts of Plaintiff Charu Desai's Answers to Defendant Marlborough Hospital's First Set of Interrogatories.

17.    **Exhibit N** is a true and accurate copy of excerpts of Plaintiff Charu Desai's

Answers to Defendant UMass Memorial Medical Center, Inc.'s First Set of Interrogatories.

Signed under pains and penalties of perjury this 17th day of December, 2021.

Reid M. Wakefield, Esq.

# **EXHIBIT A**

1                UNITED STATES DISTRICT

2              DISTRICT OF MASSACHUSETTS

3                CIVIL ACTION NO. 4:19-cv-10520-DHH

4    * * * * * * * * * * * * * * * * * * * * * * * *
     CHARU DESAI,
5                    PLAINTIFF

6     v.

7    UMASS MEMORIAL MEDICAL CENTER, INC., et al.,
                       DEFENDANTS
8    * * * * * * * * * * * * * * * * * * * * * * * *

9

10

11          DEPOSITION OF CHARU DESAI, M.D.,

12                Conducted Remotely

13            211 Congress Street, Suite 720

14            Boston, Massachusetts   02110

15

16            Friday, September 18, 2020

17             10:37 a.m. to 5:00 p.m.

18

19                  Pages 1-202

20

21

22

23

24

96

1   Q   What's that?

2           MS. WASHIENKO:  You have to answer,

3       Dr. Desai.

4   A   Please repeat the question?

5   Q   Sure.  Dr. Rosen sought an independent expert's

6       evaluation on quality, and part of that was an

7       evaluation of your quality.  Do you think he was

8       acting maliciously in seeking an independent

9       expert's evaluation on quality?

10          MS. WASHIENKO:  Objection.  You can answer.

11  A   I hope not.

12  Q   Do you have any facts that would support that he

13      was acting maliciously toward you by seeking that

14      independent expert's evaluation?

15  A   Please repeat the question?

16  Q   Can you offer any facts that would the indicate

17      that Dr. Rosen acted maliciously when he was

18      seeking an independent expert's evaluation?

19  A   I do not have right now.

20  Q   I'm sorry, ma'am, I didn't hear you?

21  A   I do not have right now.

22  Q   I'm getting ready to show you Exhibit 11, which is

23      your Employment Agreement with UMass. Memorial

24      Medical Group.

97

1         (Exhibit 11 marked for identification and

2              displayed.)

3    Q    Do you see that?

4    A    How many pages is this?

5    Q    Goes from CD 51 to CD 63, a total of 13 pages.

6    A    All right.  So what are we talking?  Which place

7         you want me to go?

8    Q    At this point, I'm just asking if you agree you

9         were subject to an employment agreement with

10        UMass. Memorial Medical Group?

11   A    Yes.

12   Q    Okay.  And you were dual employed with the

13        University of Massachusetts Medical School,

14        correct?

15   A    Yes.

16   Q    You did not have employment, an employment

17        agreement with the UMass. Memorial Medical Center,

18        correct?

19   A    Please repeat the question?

20   Q    Sure.  So what I'm establishing is that the

21        agreement you had for employment was with the

22        medical group and the medical school.  You did not

23        execute an agreement with the medical center,

24        correct?

Charu Desai vs                                              Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.                September 18, 2020

99

1              MS. WASHIENKO:  Objection.  You can answer.

2    A   Yeah, I don't recall.

3    Q   Okay.

4    A   I don't recall.

5    Q   And you do not have a separate employment

6        agreement with Marlborough Hospital, correct?

7    A   As far as I know.  To my knowledge, no.

8    Q   Okay.

9              Now, in paragraph 7.2 of the employment

10       agreement --

11   A   Page number, please?

12   Q   Sure.  Bear with me now.  It is page seven.

13   A   Okay.  Let me scroll.  Seven.  I have seven.

14   Q   And 7.2 is Notice, the Notice provision in the

15       event of termination of employment?

16   A   I see that, yeah.

17   Q   And fair to say, you were provided the appropriate

18       notice period required by your employment

19       agreement, prior to your termination of

20       employment, based on your years of service, right?

21   A   Yes.

22   Q   And you agreed in writing, based on your signature

23       to this agreement, that UMass. Memorial Medical

24       Group could, in fact, terminate your employment

Charu Desai vs                                              Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.              September 18, 2020

128

1        to happen, someone had to make a decision that
2        says, in your mind I assume, pay her less because
3        she's female, or because she's Asian, or because
4        she's Indian, compared to some male or someone who
5        is male and white.
6            I'm saying, who are you claiming made that
7        nefarious decision?
8            MS. WASHIENKO:  Objection.  But you can
9        answer, Charu.
10   A   See, I did not decide how much money and all that
11       I get.  It is the institution, so I did not -- I
12       didn't do discriminate.  I saw what the other
13       people were getting, and that's why I think it is
14       discriminatory.
15   Q   So you can't tell me anyone who works at
16       Marlborough Hospital who made a decision to pay
17       you differently than white males?
18   A   Not that I can recall.
19   Q   And you can't tell me anyone at the University of
20       Massachusetts Medical School who made a decision
21       to pay you differently than they pay white males?
22   A   I don't know how it depends to and who decides
23       what to pay to who.  I don't.
24   Q   So are you claiming Dr. Tosi made a decision to

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu Desai, M.D.
September 18, 2020

159

1   Q   The ones that we just talked about.  Anything
2       beyond that though?
3   A   I can't recall.
4   Q   Anything upon which you're claiming discrimination
5       based on gender, other than what we've just
6       discussed?
7   A   Not that I can recall.
8   Q   And how about age; any other basis of claim of age
9       other than what we just discussed?
10  A   Nothing, other than we already discussed.  And I
11      was the most left over senior in the department.
12  Q   And any other allegations related to your
13      disability other than what we've just discussed?
14  A   Not that I recall.
15  Q   As to the compensation where you believe that you
16      were paid less than white younger males, you don't
17      know who made the compensation decisions that
18      affected you, right?
19  A   Yes.
20  Q   As to the PACS workstation, where you complained
21      Dr. Dill and Dr. Schmidlin had rights to use a
22      home PACS workstation, who made that decision, do
23      you know?
24  A   Someone in the department.  I don't know.

Charu Desai vs                                        Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.            September 18, 2020

160

1    Q    Was it the University of Massachusetts Medical
2         School?
3    A    I don't believe.  Probably.
4    Q    So you're not claiming that they made a
5         discriminatory decision against you with respect
6         to a PACS workstation?
7    A    I don't know.
8    Q    And same with Marlborough Hospital, you're not
9         claiming Marlborough Hospital made that decision,
10        are you?
11   A    I do not think so.
12   Q    And you're not claiming Dr. Tosi made the decision
13        as to use of home workstations, right?
14             MS. WASHIENKO:  Objection.
15   A    Not to my knowledge.
16   Q    Right.  So you're not making that claim against
17        him?
18             MS. WASHIENKO:  Objection.
19   Q    Are you claiming the medical center, as opposed to
20        the medical group, your employer, made that
21        decision?
22             MS. WASHIENKO:  Objection.
23   A    I do not know.
24   Q    Are you claiming Dr. Rosen made the decision as to

168

1       you -- strike that.

2           Do you think it would have been responsible

3       for you to ask Dr. Rosen why he assigned those

4       workstations as opposed to saying that he is

5       motivated by race?

6           MS. WASHIENKO:   Objection.

7   Q   You can answer.

8   A   I could have asked him.

9   Q   On the hire of Dr. Dill, do you know who made the

10      decision to hire her?

11  A   I believe Dr. Rosen.

12  Q   Okay.  So you're not claiming that Dr. Tosi

13      engaged in discrimination in the hiring of

14      Dr. Dill, are you?

15  A   I don't think so.  No.

16  Q   And you're not claiming that the University of

17      Massachusetts Medical School made a discriminatory

18      decision to hire Dr. Dill, right?

19  A   No.

20  Q   And you're not claiming Marlborough Hospital made

21      a discriminatory decision to hire Dr. Dill,

22      correct?

23  A   Yes.  They did not.

24  Q   So you're claiming instead, Dr. Rosen made a

174

1           MS. WASHIENKO:  Objection.

2    A    I did not talk to them.  But I have -- in the

3         department, there were other people who were

4         getting them, so.

5    Q    Yes, but we were talking about the trial, Dill and

6         Schmidlin, the ones you identified.  So you didn't

7         talk to them about whether or not IT support was

8         available to them during the trial, right?

9    A    I did not.

10   Q    Now, Count 2 of your Complaint is the Federal

11        Equal Pay Act claim, which means you're claiming

12        that you weren't paid equally to male

13        counterparts, and you named every defendant in

14        this Count.  You named the medical group, you

15        named the medical center, Marlborough Hospital,

16        Dr. Tosi, Dr. Brennan, Dr. Rosen, Dr. Dill, and

17        the medical school.

18            Are you claiming every one of those were

19        involved in the decision of the setting of your

20        compensation or the setting of compensation of

21        males?

22   A    I don't know exactly who decides, so.

23            I don't know.

24   Q    Are you claiming Marlborough Hospital did not pay

Charu Desai vs                                              Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.              September 18, 2020

175

1       you correctly under the Equal Pay Act?

2   A   No.

3   Q   Are you claiming the University of Massachusetts

4       Medical School did not pay you correctly under the

5       Equal Pay Act?

6   A   No.

7   Q   Are you claiming Dr. Tosi did not pay you

8       correctly under the Equal Pay Act?

9   A   No.

10  Q   Are you claiming Dr. Dill did not pay you

11      correctly under the Equal Pay Act?

12  A   No.

13  Q   Are you claiming Dr. Brennan didn't pay you

14      correctly under the Equal Pay Act?

15  A   No.

16  Q   Are you claiming UMass. Memorial Medical Center

17      didn't pay you correctly under the Equal Pay Act?

18  A   I don't know if they are the deciding factor

19      though, so I cannot tell about that.  Probably,

20      but I don't know.

21  Q   Are you claiming UMass. Memorial Medical Group

22      didn't pay you correctly under the Equal Pay Act?

23  A   To my knowledge, yes.

24  Q   Okay.  And are you claiming Dr. Rosen didn't pay

# In the Matter of:

*Charu Desai vs*

*UMASS Memorial Medical Center, Inc., et al.*

---

*Charu S. Desai, M.D. Vol II*

*October 22, 2020*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



217

1    Q.  Okay.  I'm going to move to Defendant,

2   Marlborough Hospital.  So you've named Marlborough

3   Hospital as a specific Defendant in this action, and

4   again, as I read your complaint, I don't see

5   specific allegations against Marlborough Hospital.

6   I see it for other entities and individuals such as

7   Dr. Rosen.  I don't see specifics against

8   Marlborough.

9        What are you claiming specifically

10  Marlborough Hospital did or didn't do that forms the

11  basis for your complaints?

12   A.  Because it started from one of the

13  physicians from Marlborough Hospital.  Robinson is a

14  pulmonary physician.  That's why.

15   Q.  Meaning that Dr. Robinson complained about

16  your quality and so that's why you're claiming

17  Marlborough Hospital --

18   A.  Yes.

19   Q.  -- engaged in discrimination?

20   A.  Yes.

21   Q.  Okay.  Anything else?

22   A.  Not that I recall.

23   Q.  Okay.  And now I'd like to move to

24  Dr. Stephen Tosi.  His name does appear in the

233

1      A.  Because of my intention.  You just want to

2   get rid of somebody, so you find a reason for it,

3   and this is the way to do it, and it is pathetic.

4   It really is pathetic.

5           I'm a professional and I should have been

6   treated professional.  This is -- it just -- it's

7   not even worth talking about it.  Okay.

8      Q.  So Dr. --

9      A.  Remember -- remember, I worked at UMass.

10  for so many years, 27 years, not one day, not two

11  day, not ten days, and there are a lot more

12  physicians at UMass. than Marlborough.

13          So if -- if what you are telling me that

14  UMass. that I'm such a bad freaking radiologist that

15  you had to terminate me, wouldn't you think all

16  these years that other physician will also complain

17  somebody?  What -- what an Earth is going on here?

18  Really.

19      Q.  So, Dr. Desai, you admit that the president

20  of the medical staff at Marlborough Hospital, Kim

21  Robinson, made a complaint about your quality,

22  correct?

23      A.  That's what it seems like but -- but it is

24  not correct.  She has complained about a lot of

234

1   people.

2        Q.  Did she --

3        A.  And yet you don't want to hear my half of

4   the answer, but she has.  Did we do independent

5   investigation for all of those physicians?  No.  So

6   this was started as premeditated murder.  That's

7   what -- what I want to say.

8            MR. KILROY:  Pat, I ask you to consider --

9   and I'm fine going off the record, if you'd like --

10  consider talking to your client about the need to

11  answer my questions as opposed to making speeches

12  outside of my question because I know you're worried

13  about the time limit, as am I.

14           I don't want to prolong the deposition, and

15  she's -- she's prolonging it for me.  I can't get to

16  my next question because she's looking to tell me

17  things I'm not asking, and so I'm asking whether you

18  would consider speaking with her about that so that

19  she understands the rules of depositions.

20           MS. WASHIENKO:  I think she's answering

21  your questions to the best of her ability, Rob.

22           MR. KILROY:  Okay.  I'll move on.

23  BY MR. KILROY:

24       Q.  Do you know whether or not Dr. Robinson

## EXHIBIT B

AGREEMENT BETWEEN
UMASS MEMORIAL MEDICAL GROUP, INC.
AND
Charu Desai , M.D.

AGREEMENT by and between the UMass Memorial Medical Group, Inc., a non-profit corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at One Biotech Park, Worcester, Massachusetts 01605 (the "Medical Group"), a subsidiary corporation of UMass Memorial Health Care, Inc. (the "System") and    Charu Desai, M.D., a physician duly licensed to practice medicine in the Commonwealth of Massachusetts (the "Practitioner").

## RECITALS

The principal purpose of the Medical Group is to employ physicians to provide, on behalf of the System,  patient care at a level of quality and efficiency consistent with generally accepted standards and otherwise to fulfill professional and institutional obligations to patients, students of health care, health care professionals, and the community; and,

The successful fulfillment of the principal purpose of the Medical Group is dependent on the rendering of professional medical and administrative services in conjunction with the clinical operations of  the System by qualified practitioners; and,

The Practitioner is trained and qualified and desires to provide professional medical, educational and administrative services to the Medical Group; and,

The Medical Group desires to engage the Practitioner to provide professional medical, educational and administrative services;

Therefore, in consideration of the mutual covenants and conditions set forth below, the Medical Group and the Practitioner do hereby agree as follows:

I.    RESPONSIBILITIES OF PRACTITIONER

1.1.    Professional Qualifications

(a)   The Practitioner must at all times during the term of this Agreement: (i) possess a valid and unlimited license to practice medicine pursuant to Chapter 112, Section 2 of the General Laws of the Commonwealth of Massachusetts; and, (ii) be appointed to and maintain continuous status as a member in good standing of the UMass Memorial Medical Center (the "Medical Center") Active Medical Staff or the Medical Staff of the appropriate Member Hospital with appropriate clinical privileges in the Department of Radiology (the "Department")  (iii) for

Charu Desai, MD

Exhibit_11

9/18/2020

those physicians who are on staff at the Medical Center, receive, and maintain, a faculty appointment at the University of Massachusetts Medical School (the "Medical School"); (iv) possess a valid federal narcotics number and state controlled substances number (unless such number is not required by the Practitioner's specialty);  (v) be, and remain, a participating provider in the Medicare and Medicaid programs and not be barred, excluded or otherwise ineligible to participate in these or other Federal programs; and (vi) be or, at the Medical Group's request, agree to be, and remain, a participating physician in any health insurance plan or managed care program accepted by the System, including the System's contractual relationships with preferred provider organizations and health maintenance organizations, and to execute any documents requested by the Medical Group in connection with participating in a provider contract in which the Medical Group or the System agrees to participate.  If at any time during the term of this Agreement the Practitioner fails to meet one or more of the qualifications set forth herein, such failure shall constitute a breach in accordance with Section 7.4 of this Agreement.

(b)  The Medical Group and the Practitioner further acknowledge and agree that this Agreement is not, and shall not be construed as, any form of guarantee or assurance by the System that the Practitioner will receive and maintain the necessary appointment to the Active Medical Staff or the grant of appropriate clinical privileges for the purposes of discharging the Practitioner's responsibilities hereunder; application, appointment, reappointment, and the grant of clinical privileges shall be governed solely by the Bylaws of the Medical Staff of the Medical Center then in effect.  Further, appointment to the faculty of the Medical School shall be governed solely by the applicable policies and procedures of the Medical School.

1.2.   Services.  The Practitioner shall be responsible for providing professional medical and administrative services as set forth in Appendix A, attached and incorporated as part of this Agreement.

1.3   Provider Agreements.  The Practitioner hereby authorizes the Medical Group to execute provider agreements, acknowledgments and consent forms that obligate or confirm the Practitioner's obligation to participate in provider agreements executed by or on behalf of the Medical Group and to abide by and conform to all applicable requirements under such provider agreements.

1.4.   Schedule of Fees.  The Medical Group will establish a current schedule of fees, as may be amended from time to time, to be charged by the Medical Group for direct patient care services provided by the Practitioner under this agreement.

1.5.   Standards of Practice.  The Practitioner shall at all times provide services in a competent and professional manner, consistent with quality assurance standards of the Medical Center's Active Medical Staff and in compliance with all applicable statutes, regulations, rules and directives of federal, state and other governmental and regulatory bodies having jurisdiction over the Medical Center; the Bylaws, Rules and Regulations, policies and procedures of the

2

System, the Medical Center and the Medical Staff; applicable standards of the Joint Commission on Accreditation of Health Care Organizations and currently accepted and approved methods and practices applicable to the provision of medical services.

1.6.    Compliance and Quality Assurance.  The Practitioner shall abide by the Code of Ethics and Business Conduct of the System.  The Practitioner shall participate in the programs of the System and the Medical Center regarding compliance, quality assurance, utilization review, risk management, and peer review, in accordance with the rules, policies and bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, the Patient Care Assessment regulations of the Board of Registration in Medicine, and upon request of the Department Chair.  The Quality Assurance committee of the Medical Staff of the Medical Center will be responsible for reviews and audits of and concerning quality assurance in the Department.

1.7.    Committee Responsibilities.  The Practitioner shall serve on committees of the Medical Center's Medical Staff and committees established pursuant to the Bylaws of the System, upon reasonable request of the Chairman of the Board of Trustees, the President/Chief Executive Officer, the Chief Operating Officer, the Chief Medical Officer, the President of the Medical Group (the "President") or the Department Chair.

1.8.    Medical Records and Reports.  (a) The Practitioner shall prepare or cause to be prepared in a timely manner any and all appropriate notes and information in the medical records of and reports pertaining to each patient for whom the Practitioner has rendered services pursuant to this Agreement.  The Practitioner shall cause these records and reports to be completed and submitted within such period of time after the rendering of such services as may be required by the Bylaws of the Medical Staff of the Medical Center, upon request of the President or Department Chair, or by applicable law or regulation.  The parties understand and agree that the System has the rights of ownership and control of all of the patients' medical records and reports generated pursuant to this Agreement.  It is further agreed that all practitioners at the System have the right to consult such records and reports in order to facilitate the continuity of proper patient care.

(b)    Time Allocation Reports:  The Practitioner agrees to cooperate with the Department Chair to  maintain adequate and proper time records in accordance with the Medical Group's policies.  This may include submitting a written allocation of time reports specifying the respective amounts of time the Practitioner has devoted to clinical, administrative, teaching and research activities. The Practitioner agrees to make available to the Medical Group all time records and data recorded by the Practitioner upon the request of the Medical Group.

1.9.    Academic Service.  The Practitioner shall aid in the clinical teaching program of the Medical Center as an attending physician on in-patient services and in ambulatory settings. The Practitioner shall also aid in the didactic teaching programs of the Medical Center upon the request of the Department Chair. The Practitioner shall also participate for reasonable periods of time as an instructor in education programs conducted or offered by the Medical Center,

3

CD 00053

including grand rounds, and shall perform such other teaching functions within the Medical Center as are reasonable and necessary to assure the Medical Center's compliance with the requirements of all applicable accrediting bodies, upon the request of the Department Chair. The Practitioner, as a member of the Medical School faculty, is expected to provide a reasonable amount of academic service (on the order of approximately two hundred (200) hours per year) under the supervision of the Chancellor at the direction of the Chair or his designee.

1.10.   <u>Non-Physician Personnel</u>.   The Practitioner shall, upon the request of the President or Chair, or at such other times as are appropriate, make recommendations concerning the qualifications, hiring, firing, and disciplining of such non-physician personnel as the System or the Medical Group may employ, engage or otherwise provide in support of the Practitioner's practice.   The Practitioner shall make any such recommendations in furtherance of and in accordance with the needs and best interests of the Medical Group and the proper conduct of its functions.   The Practitioner agrees that any supervision of nurse practitioners and physician assistants shall be conducted in accordance with the governing regulations of the Board of Registration in Medicine.

1.11.   <u>Protocols and Procedures</u>.   The Practitioner agrees to work cooperatively with all of the System's clinical departments, Medical Staff, the Medical Group, administration, the President and the Department Chair to assure that services are available on a timely, coordinated, efficient, and professional basis.   The Practitioner also agrees to comply with all of the Medical Center's clinical policies and procedures and all applicable Human Resources policies.

1.12.   <u>Confidentiality of Information</u>.   The Practitioner agrees to uphold and maintain the confidentiality of patient and other information for which the Practitioner has an ethical, professional, or legal obligation not to disclose.   The Practitioner further agrees to uphold and maintain the confidentiality of proprietary or other confidential information relating to the Medical Group or the System of which the Practitioner may become aware while employed hereunder. This provision shall survive the termination of this Agreement.

1.13.   <u>Continuing Education</u>.   The Practitioner shall comply with and satisfy any and all of the professional obligations and requirements regarding continuing education and any other related areas of medical practice required for the maintenance of a license to practice **medicine** in Massachusetts or appropriate to the rendering of competent professional services pursuant to this Agreement as determined by the Department Chair.

1.14.   <u>Dual-Employment with Medical School</u>.   The parties acknowledge that a certain percentage of the Practitioner's time and salary may be allocated to, and governed by, a so-called "Dual-Employment" arrangement with the Medical School (the "Dual-Employment Arrangement").   The Practitioner acknowledges that the terms and conditions of employment with the Medical Group are governed by this Agreement and the policies and practices of the Medical Group. The Practitioner further acknowledges that if this Agreement is terminated for any reason, the related employment relationship with the Medical School shall also terminate

4

unless the Practitioner has a new or continuing agreement with the Medical School or is a tenured faculty member.

2.   RESPONSIBILITIES OF THE SYSTEM

    2.1.   Space, Equipment, Services, and Supplies.

        (a)   The Medical Group, through agreement with the System, shall be committed to making available reasonable and necessary space, equipment and supplies for the delivery of the agreed services hereunder by the Practitioner, shall provide customary services and maintenance to maintain such equipment in good order and repair, shall furnish services to the Practitioner including, but not limited to, utilities, telephone, housekeeping and record keeping services; and shall provide all necessary supplies needed for the proper provision of services by the Practitioner pursuant to this Agreement.

        (b)   The Practitioner agrees to use such space, equipment, services and supplies for purposes of the System and in furtherance of the obligations governed by this Agreement.

    2.2.   Non-Physician Personnel.   The System or the Medical Group shall employ, engage or otherwise make available to the Practitioner all non-physician personnel determined by the Medical Group to be reasonably needed for the proper delivery of services pursuant to this Agreement.   The System or the Medical Group shall exercise ultimate control and management of non-physician personnel.

    2.3   Professional Liability Insurance.   The Medical Group, at its expense, shall arrange for professional liability insurance coverage for the Practitioner with regard to professional medical services rendered by the Practitioner for Medical Group-related activities billed through the Medical Group during the term of this Agreement.   The Practitioner shall be covered by such insurance to the same extent as other similarly-situated practitioners within the Medical Group. Coverage limits shall be set in the discretion of the Medical Group and/or the UMass Memorial Self-Insurance Program from time to time and shall be made known to the Medical Group Practitioners on a regular basis.

3.   REIMBURSEMENT REQUIREMENTS

    3.1.   The Practitioner shall comply with all laws, regulations and System requirements, policies and procedures regarding record keeping relating to third-party reimbursement for services provided pursuant to this Agreement as may be in effect from time to time.   In the event that there are subsequent changes or clarifications of statutes, regulations or rules relating to record-keeping which the Medical Group determines must be complied with to insure proper reimbursement from third parties for services provided pursuant to this Agreement, the Medical Group shall, after reasonable notice and opportunity to comply, notify the Practitioner of any actions it reasonably deems are necessary to comply with such changes and the Practitioner shall

5

CD 00055

promptly take such actions.

4.    COMPENSATION

4.1.    **Compensation of Practitioner.**   The Medical Group shall compensate the Practitioner for the services which the Practitioner renders in accordance with the terms of this Agreement.   The agreed compensation is set forth in detail in Appendix B, attached   and incorporated as part of this Agreement.

5.    BILLING AND PAYMENT

5.1.    **Billing.**   Except as otherwise may be expressly stated in this Agreement or other published, written policy or procedure of the Medical Group, all fees, payments and other income attributable to the Practitioner's clinical services during the term of this Agreement shall belong to the Medical Group, whether paid to the Practitioner, to the Medical Group or its designee or to a third party.   The Medical Group shall have the sole right to bill for and to receive, hold and disburse such fees and income and the Practitioner agrees to abide by the billing policies and procedures of the Medical Group.   The Practitioner hereby assigns to the Medical Group all of the Practitioner's rights in all fees, payments, bonuses or distributions or other income or monies due from all sources relating directly or indirectly to clinical  services rendered by the Practitioner pursuant to this Agreement.   The Practitioner shall cooperate fully with the Medical Group in facilitating collection of such monies, including prompt endorsement and delivery to the Medical Group of all checks received from patients or third-party payors on behalf of the Practitioner and completion of all forms necessary for such collections.   To the extent applicable, the Practitioner agrees to work with the Medical Group to collect all patient co-payments for services rendered and promptly to forward such funds to the Medical Group.   Upon termination of this Agreement for any reason whatsoever, all such monies then outstanding shall be deemed to be the sole and exclusive property of the Medical Group and not subject to any claim by the Practitioner.   The Practitioner's obligation under this provision shall survive termination of this Agreement.

6.    TERM

This Agreement shall be effective from your original hire date of January 5, 1992 and shall remain in effect unless otherwise terminated by the parties as provided in Section 7 of this Agreement.   As of the effective date of this Agreement, this Agreement shall supercede and revoke any existing prior employment agreement with the Medical Group or any of its predecessor entities.

7.    TERMINATION

7.1. Mutual Agreement.  This Agreement may be terminated by mutual agreement of the parties, in a writing signed by the parties, at any time from the date of execution hereof.

CD 00056

7.2   <u>Notice of Party</u>. This Agreement may be terminated by the Medical Group at any ~ the giving of written notice to the Practitioner (as set forth in Section 14.1 below), in accordance with the following notice schedule:

| Number of Years Practitioner Employed | Requisite Notice Period |
|---|---|
| 0-2 | 4 months |
| >2 – 10 | 6 months |
| >10- 15 | 8 months |
| >15 – 20 | 10 months |
| >20 | 12 months |

This Agreement may be terminated by the Practitioner at any time upon the giving of as much notice as is practicable to the Medical Group, and in any event a minimum of one hundred twenty (120) days' written notice.

Where either the Medical Group or the Practitioner is terminating the employment relationship, the Notice Period is characterized as "working notice." In the interests of patient care, the Medical Group expects the Practitioner to continue to fulfill the responsibilities of the position and to maintain productivity levels for the full notice period. Vacation time may be taken during the Notice Period only with the consent of the Department Chair and the President of the Medical Group. The Practitioner will be compensated for unused pro-rated vacation time not taken at the time of termination. The Medical Group does not permit "terminal vacations," i.e., the use of vacation time to complete the final portion of the Notice Period.

7.3      <u>For Cause</u>. The Medical Group may terminate this Agreement effective immediately for cause at any time upon written notice to the Practitioner setting forth in reasonable detail the nature of such cause. "Cause" shall be defined as any material breach by the Practitioner of this Agreement, including but not limited to the following:

i.      Practitioner's fraud or dishonesty with respect to the Medical Group or those associated with it, acts or conduct materially detrimental to patient care or to the reputation or operations of the Medical Group, or otherwise in connection with the Practitioner's services under this Agreement;

ii.      Practitioner's conviction of, a plea of nolo contendere or admission of sufficient facts to a crime involving moral turpitude, or an offense relating to health care or adversely affecting the Practitioner's ability to perform services under this Agreement; or

iii.      Practitioner's   material negligence or misconduct (other than by reason of disability or approved leave) in the performance of duties assigned by the Chair under this

7

Agreement,

iv.     Failure of the Practitioner to follow UMass Memorial policies and procedures and other rules of conduct made known to the Practitioner and applicable to all physicians of UMass Memorial and/or the Medical Group, including without limitation, policies prohibiting unlawful discrimination, and the Practitioner has exhausted the grievance procedure available to Medical Group physicians and, if applicable, all due process procedures available under the Medical Staff Bylaws of the Medical Center.

7.4.   **Automatic**.  This Agreement shall terminate automatically upon the breach of Section 1.1. by the Practitioner, except that the Medical Group, in its sole discretion, may, but is not obligated to, suspend this Agreement for a specified reasonable period to enable the Practitioner to cure the breach.  If the Practitioner fails to cure the breach within the specified period, this Agreement will terminate immediately upon written notice to the Practitioner by the Medical Group.  Further, the Medical Group reserves the right to terminate this Agreement in the event the Practitioner's medical staff membership or clinical privileges are suspended or in any way restricted.

7.5  **Suspension**.  The Medical Group may suspend the Practitioner for cause, without compensation.  Such cause may include, but shall not be limited to, any suspension, restriction or revocation of the Practitioner's Medical Staff membership or clinical privileges at the Medical Center or any suspension, restriction or revocation of the Practitioner's license to practice medicine in any jurisdiction.

8.     **EFFECT OF TERMINATION**

8.1.   **Effect of Termination on this Agreement**.  The termination of this Agreement in accordance with Section 7, hereunder, shall terminate any and all rights and obligations of the Medical Group and the Practitioner pursuant to this Agreement.   The effective date of termination of this Agreement shall be as set forth in the above-mentioned section(s);  provided, however, that upon the termination of this Agreement, the parties shall be and remain obligated and responsible for: (i) any and all obligations accruing prior to the date of termination; and, (ii) any and all obligations, promises, or covenants contained herein which are expressly made to extend beyond the term of this Agreement; and, (iii) the Practitioner shall use reasonable and diligent efforts to assist the System and the Medical Group in arranging for appropriate alternative medical coverage for patients under the care of the Practitioner. Prior to the termination of this Agreement, the Practitioner shall prepare a notice to patients in a form approved by the Medical Group and the Department Chair. Practitioner shall finalize all outstanding billing documentation and complete all patient records prior to his or her departure. Immediately upon the termination of this Agreement, the Practitioner shall deliver to the System sole custody, and total, exclusive and complete use of the System's space, equipment and supplies and shall remove any and all personal possessions from the property of the System. The System shall give the Practitioner reasonable time to effect these conditions.  In the event of

8

CD 00058

termination of this Agreement, payment by the Medical Group of any base salary due the Practitioner under Section 4.1 and Appendix B to the date of termination and of any pay in lieu of notice due Practitioner under Section 7.2 shall constitute the entire obligation of the Medical Group to the Practitioner. The Practitioner recognizes that no compensation is earned after termination of this Agreement.

## 9.    GOVERNING RULES, REGULATIONS AND BYLAWS

9.1    Governing Rules, Regulations and Bylaws.    Notwithstanding anything in this Agreement to the contrary, it is hereby expressly understood and agreed by and between the Medical Group and the Practitioner that any and all rights, responsibilities, and obligations of the parties shall at all times during the term of this Agreement be subject to the Bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, all applicable rules and regulations of the System, or its successor, as now exist or as hereinafter may be amended or promulgated by the Board of Trustees of the Medical Group, the Medical Staff of the Medical Center and the President/Chief Executive Officer of the System, or any duly authorized designee thereof.

## 10.    ASSIGNMENT AND DELEGATION

10.1.    Assignment and Delegation.    No assignment of this Agreement or the rights hereunder, or delegation of this Agreement or the obligations hereunder shall be valid without the specific written consent of both parties;  provided, however, that this Agreement may be assigned by the Medical Group as a result of reorganization or merger, or to any successor entity providing the services now provided by the System or the Medical Group.

## 11.    ENTIRE AGREEMENT

11.1.    Entire Agreement.    This Agreement contains the entire agreement between the parties and no statement, promises, inducements, or writings made by any party or agent of any party which is not contained in this written Agreement shall be valid or binding; and this Agreement  may not be enlarged, modified, or altered except in a subsequent writing signed by the parties and attached hereto.  This Agreement supersedes any and all prior agreements for professional services between the Practitioner and the Medical Group, the System or any other affiliate of the System.

## 12.    AMENDMENTS

12.1.    Amendments.  This Agreement may be amended only by an instrument in writing signed by the Medical Group and the Practitioner.  Such writing must make specific reference to the terms and conditions of this Agreement which it amends, and will become effective as of the date stipulated therein.

9

CD 00059

13.    GOVERNING LAW

     13.1. Massachusetts Law. This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed in the Commonwealth of Massachusetts.

14.    NOTICE

     14.1. Notice. Notices or communications required or permitted to be given pursuant to this Agreement shall be given in writing to the respective parties by hand, by certified mail or by overnight delivery service (e.g., Federal Express, UPS) (such notice being deemed given as of the date of mailing) and addressed to the Practitioner at the Practitioner's last known address kept within the records of the Medical Group, or in the case of the Medical Group, One Biotech Park, Worcester, Massachusetts, attention of the President, UMass Memorial Medical Group.

15.    EXECUTION

     15.1. Execution. This Agreement and any and all amendments hereto shall be executed in duplicate copies on behalf of each party by the Practitioner and an official specifically authorized by the Medical Group Board with respect to such execution. Each duplicate copy shall be deemed an original, but both duplicate originals shall together constitute one and the same instrument.

16.    SECTION HEADINGS

     Section Headings. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

17.    WAIVER.

     Waiver. A waiver of the breach of any term or condition of this Agreement by either party shall not constitute a waiver of any subsequent breach or breaches of the same term or condition, or any other term or condition hereunder.

18.    SEVERABILITY.

     Severability. If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect by a court of competent jurisdiction, then the remainder of this Agreement, and the application of such provision in circumstances other than those as to which it is so declared invalid or unenforceable, shall not be affected thereby, and each such provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

CD 00060

IN WITNESS WHEREOF, the Medical Group and the Practitioner have caused this Agreement to be signed and sealed as of this_____ day of _____, 20___.

Dated:                 By: _Charu S. Desai____ M.D_
                            Charu Desai , M.D.


                UMASS MEMORIAL MEDICAL GROUP, INC.


Dated 2/12/    By: _____
                    Michele Streeter, Executive Director


               By: _____
                    Joseph T. Ferrucci, M.D., Chair
                    Department of Radiology


11

CD 00061

## APPENDIX A

The Practitioner shall be responsible for providing professional medical services to patients of the System in need of such services and to enrollees of health plans as to which the Medical Group and Practitioner are participating providers.  The services to be rendered hereunder include, but are not limited to outpatient work, inpatient consultative work and direct patient care.  The Practitioner's performance hereunder shall be evaluated by the President of the Medical Group and the Department Chair in accordance with the Bylaws of the Medical Staff of the Medical Center.  The Practitioner agrees that the practice of medicine shall be limited to the services to be provided pursuant to this Agreement or for the Medical School under its agreement unless Practitioner obtains the prior written approval of the Chair under Medical Group policy to do otherwise.

The Medical Group and the Department Chair shall determine the specific professional medical duties to be performed by the Practitioner, as well as the time and manner of performance, in accordance with and subject to the terms of this Agreement; provided, however, the Medical Group and Department Chair shall not impose requirements which would interfere with the Practitioner's professional judgment in connection with the treatment of patients or cause the Practitioner to violate applicable ethical codes or any law or regulation.

The Practitioner shall at all times provide services to all persons who may become patients of the Medical Group in accordance with the Medical Group's policies and without regard to race, color, creed, sex or ability to pay for services; and

The Practitioner shall participate in Medicare, Medicaid and managed care programs and other third party payor arrangements or governmental programs in which the Medical Group participates and the Practitioner shall abide by and act in accordance with the terms and conditions of all managed care agreements, network, affiliation agreements, provider agreements and other contracts to which the Medical Group or Practitioner (with the Medical Group's consent) is or becomes a party.

12

CD 00062

## APPENDIX B

1. The Practitioner's compensation for services rendered pursuant to this Agreement, and under a Dual-Employment Arrangement with the Medical School, if applicable, shall be a total base salary, which if annualized would be at the rate of Three-hundred Twenty-Five Thousand Dollars ($325,000) per year, less all legally required and voluntarily-authorized deductions, payable in accordance with Medical Group payroll practices. (Practitioners who participate in the Dual-Employment Arrangement with the Medical School may receive paychecks from both the Medical Group and the Medical School, which together shall equal the base salary referenced above.)

The Practitioner shall also participate in the Physician Incentive Compensation Program of the Department as established by the Medical Group (the "Incentive Compensation Program"), subject to its terms and conditions of participation as in effect or amended from time to time. The Incentive Compensation Program includes eligibility for bonuses and/or salary increases based upon productivity. The Practitioner acknowledges that participation in the Incentive Compensation Program may also involve imposing salary withholds if performance does not meet Medical Group requirements. The Practitioner further acknowledges that, following the first twelve months' of the Practitioner's employment, under the terms of the Incentive Compensation Program, the Medical Group may decrease the Practitioner's base salary if the applicable productivity targets are not met. Salary adjustments will be made upon thirty (30) days written notice to the Practitioner. Salary reductions, if any, shall be consistent with the Department's compensation plan and shall in no event exceed twenty percent of the Practitioner's base salary in any twelve month period.

Subject to the Practitioner's payment of any contribution required of physician employees generally, the Practitioner will be eligible to participate during the term of this Agreement in any and all employee benefit plans made generally available to other physician employees of the Medical Group as in effect from time to time. Such participation by the Practitioner shall be subject to (i) the terms of the applicable plan documents, (ii) generally applicable policies of the Medical Group, and (iii) the discretion of the Board of Trustees of the Medical Group or any administrative or other committee provided for in or contemplated by such plan or policy of the System. A description of the benefits program currently in effect (and subject to change by the Group Board and UMass Memorial Compensation Committee) is attached hereto as Appendix C, "Physician Benefits at a Glance."

13

CD 00063

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-cv-10520-TSH

CHARU DESAI,
      Plaintiff,

    v.

UMASS MEMORIAL MEDICAL
CENTER, INC., et al.,
      Defendants.

**AFFIDAVIT OF
MAX ROSEN, M.D., M.P.H.**

I, Max Rosen, M.D., M.P.H, hereby depose and state as follows:

1.      I am the Chair of the Department of Radiology for UMass Memorial Health (the "Department"), and in this capacity I have personal knowledge of the facts set forth herein.

2.      I was appointed as the Chair of the Department effective September 1, 2012.

3.      I am employed by UMass Memorial Medical Group, Inc., and the University of Massachusetts Medical School.

4.      Charu Desai, M.D., was formerly employed by the Medical Group as a physician specializing in chest radiology.

5.      Dr. Desai was employed pursuant to an Agreement between UMass Memorial Medical Group, Inc., and Charu Desai, M.D. ("Employment Agreement"), a copy of which is attached as **Exhibit A.** Pursuant to the Employment Agreement, Dr. Desai was dually-employed by the Medical Group and the University of Massachusetts Medical School. Exhibit A, ¶ 1.14.

6.      In my capacity as Chair, I supervised and managed all radiologists employed by the Medical Group, including Dr. Desai. As Chair, I am responsible for the performance of

Medical Group physicians in the Radiology Department. Among my duties as Chair is to ensure that the Department provides high quality and safe imaging services for patients.

7.      Dr. Desai's job duties involved reviewing radiological images in the form of computed tomography ("CT") or radiographs ("x-rays" or "plain films"), interpreting the images, describing findings, and opining on diagnoses of disease and medical conditions revealed in the images. Dr. Desai was not qualified to read magnetic resonance imaging (MRI) and did not read MRIs in the course of her employment.

8.      As a radiologist, Dr. Desai's practice was focused on and limited to thoracic (a/k/a chest) imaging, and Dr. Desai worked within the Department's Thoracic Division (a/k/a Chest Division).

9.      Dr. Desai performed her duties for the Medical Group while located at UMass Memorial Medical Center (the "Medical Center") facilities. The Medical Center is a multi-facility academic hospital which provides tertiary-level care.

10.      In her role as a radiologist for the Medical Group, Dr. Desai reviewed and interpreted images for patients originating from multiple hospitals, including campuses of the Medical Center, Marlborough Hospital, and Clinton Hospital. These hospitals are each separate entities.

11.      The Medical Group is responsible for staffing radiologists to review images originating from different hospitals, and the Medical Group directs the radiologists' assignments.

12.      The hospitals, including Marlborough Hospital and the Medical Center, did not direct Dr. Desai or any other radiologist with respect to the reading of images or in any other job duties. Dr. Desai was supervised by Medical Group employees at all times.

13.     Dr. Desai was never employed by the Medical Center. The Medical Center did not set the compensation for radiologists, did not set the work schedules for radiologists, and did not have the power to hire, fire, or discipline radiologists, including Dr. Desai.

14.     In order to provide medical services as a physician for Medical Center patients, Dr. Desai was required to be granted clinical privileges by the Medical Center and be a member of the Medical Center's medical staff.

15.     Darren Brennan, M.D., served as the Chief of Radiology for Marlborough Hospital from 2015 to 2018. He was not an employee of Marlborough Hospital, but at all times has been employed by the Medical Group as a radiologist.

16.     As Chief of Radiology, Dr. Brennan performed an administrative role which involved serving as a representative of the Medical Group's Radiology Department, serving as a liaison with Marlborough Hospital, and ensuring that the Medical Group was performed its obligations under its contract with Marlborough Hospital. In Dr. Brennan's capacity as Chief of Radiology, he oversaw staffing coverage for the Medical Group's reading of studies originating from Marlborough Hospital.

17.     Dr. Brennan served as the Department's Vice Chair for Enterprise Operations and Community Radiology from 2015 to 2019. In my absence, I would sometimes designate Dr. Brennan to address concerns within the Department in his role as Vice Chair. On September 21, 2017, Dr. Brennan addressed a matter between Dr. Desai and Karin Dill, M.D., in that capacity and at my request.

18.     Dr. Desai had a Sick Bank as well as Salary Continuation she could use for paid medical leave. At the time of her separation from employment, Dr. Desai had not exhausted her available sick leave and had available 116.55 hours in her Sick Bank.

19.     In 2014, a physician in the Department, █████ , M.D., requested a change in her work hours due to a medical issue, and an accommodation to her schedule was approved by me which remains in place to the present day.

20.     The Department maintained a policy for physicians to be allotted academic or administrative time to conduct non-clinical duties ("Academic and Administrative Time Policy"), a copy of which is attached as **Exhibit B**. Pursuant to the Academic and Administrative Time Policy, academic time can be allotted to academic responsibilities including teaching and conference preparation, writing papers or texts, completing research projects, attending institutional and department committees, attending conferences, or serving on committees of local, regional, national or international organizations.

21.     Dr. Desai was not allotted academic time since at least 2010, and the Department does not have a record of Dr. Desai having ever been allotted academic time. In the time I have been Chair, Dr. Desai never requested academic time for the purposes of performing academic work, research, or other scholarly activities nor has she ever made any proposal for academic work she wished to perform. In addition, she never requested time to participate in the work of local, regional, national, or international organizations.

22.     Medical Group radiologists are required to work "call" where they are scheduled to work certain weekends and holidays to ensure coverage for patients every day of the year. The Department has a policy which requires all regularly-employed staff members to provide "call," a copy of which is attached as **Exhibit C**. The requirements for call vary by division due to coverage needs, but the time commitment of the call coverage is substantially the same.

23.     For members of the Chest Division, a radiologist must work one-fifth of weekends, or ten weekends per year, as well as a portion of holidays, which are scheduled in advance in an equitable manner among the radiologists working in the division.

24.     Performing call is an essential and critical part of being a radiologist in the Department, and is required in order to provide timely and high-quality care to patients, as UMass Memorial is a tertiary-care referral center and level one trauma center which operates twenty four hours a day every day of the year. If a radiologist does not perform call, those responsibilities fall on other employees.

25.     At one time, the Department implemented a program in which staff members could elect to "sell" calls, where other staff radiologists could perform additional call for additional compensation, and the radiologist not doing call would have their salary reduced by an equivalent amount. This policy was in place for two fiscal years, from October 1, 2015, to September 30, 2017.

26.     Dr. Desai elected to sell, and others in the department elected to "take" six out of her ten call weekends for these years, and during this period she performed substantially reduced call. Dr. Desai's salary was reduced accordingly during this time period due to her "sale" of her calls to other radiologists, in the amount of $19,200 per year. The rate that each call was valued was in accordance with the Department's per diem rates in effect at that time.

27.     At least one other radiologist in the Department also elected to sell calls during this period.

28.     The policy of selling calls was ended due to the administrative difficulties in managing the program, as well as the lack of staff radiologists interested in taking additional call.

29.     It is common for staff radiologists to not want to take call.

30.     The Medical Group employs physicians in part-time roles, in which their hours are reduced and their call obligations are proportionately reduced.

31.     The Medical Group employs physicians in "per diem" status, in which the employees work on an hourly basis, and are not obligated to take call. Because staff radiologists who are on per diem status are not obligated to take call, some radiologists have chosen to change their status to per diem in order to be relieved of that obligation.

32.     Mona Korgaonkar, M.D., a female radiologist who is older than Dr. Desai, requested to move to a part time schedule, which I granted, and she subsequently requested that she not take call, and I offered, and she accepted the ability to change her status to per diem to be exempt from call responsibilities. Dr. Korgaonkar remains employed by the Medical Group.

33.     In response to Dr. Desai requesting to be exempt from call, I discussed with her the option to transition to per diem status.

34.     In October 2017, I asked Dr. Joseph Ferrucci if he would consider speaking with Dr. Desai to share his experience moving from active to per diem status with the Medical Group to assist her with her decision. I did not tell Dr. Ferrucci that I intended to terminate Dr. Desai's employment or to require her to move from active to per diem status. I did not tell Dr. Ferrucci that I had an obligation to think about recruiting younger staff for service needs, and I did not discuss the age or longevity of any staff member, including Dr. Desai, at any time, with Dr. Ferrucci.

35.     At no time did Dr. Desai state that she desired to be exempted from taking call or desired an alteration to her call scheduled due to a heart condition or any other health condition.

36.     The Department began to utilize remote workstations for staff radiologists to use from home on a trial basis beginning in early 2017. Only the following radiologists used home

workstations in the initial year of the implementation: Andrew Chen, M.D., Karin Dill, M.D., and Philip Steeves, M.D.

37.     Dr. Steeves is five years older than Dr. Desai.

38.     Nine radiologists used home workstations from implementation until the date of Dr. Desai's separation: Aly Abayazeed, M.D., Satish Dundamadappa, M.D., Carolyn Dupuis, M.D., David Choi, M.D., Andrew Chen, M.D., Karin Dill, M.D., Sami Erbay, M.D., Philip Steeves, M.D., and Eric Schmidlin, M.D.

39.     Dr. Abayazeed, Dr. Dundamadappa, Dr. Choi, Dr. Chen, and Dr. Erbay specialized in neuroradiology and were among the first to test and use home workstations due to the unique scheduling in neuroradiology where radiologists would rotate working routine evening shifts.

40.     No staff member was permitted to take call remotely through the use of a home workstation or otherwise during the time Dr. Desai was employed.

41.     The Department has a quality assurance system designed to improve the quality of radiology services. Prior to 2019, the quality assurance system was based, in part, on a peer review system, where other radiologists within the Department would review each other's reads.

42.     In this system, all radiologists in the Department were asked to enter information into the quality assurance system in two circumstances: (1) through an automated process that requests that a certain number of cases be double-read periodically by each radiologist on staff; and (2) when a radiologist is made aware of a quality issue about an interpretation, the radiologist was obligated to enter that information into the peer review privileged database.

43.     When radiologists reviewed the studies, they would input a numerical score as to their review, with scores denoting the following: a "1" indicated the reviewer concurred with the

reviewee's radiological interpretation; a "2" indicated the reviewer identified a discrepancy in interpretation/not ordinarily expected to be made, but which was denoted as an "understandable miss;" a "3" indicated the reviewer identified a discrepancy in the reviewee's interpretation and that the discrepancy should have been caught by the radiologist "most of the time;" and a "4" indicated the reviewer noted a discrepancy in interpretation that represented a "misinterpretation of findings" and that should be identified "almost every time."

44.     At their annual faculty reviews, I provided staff radiologists with information from the quality assurance database regarding peer review reads labelled with scores of either "3" or "4." I would advise the radiology staff members of these entries and ask the staff member to review the cases if they had not already done so, as a part of the quality improvement process.

45.     I provided Dr. Desai with such a summary from the quality assurance system during her 2016-2017 annual faculty review (the "Peer Review Summary"), a copy of which is attached as **Exhibit D**.

46.     Karin Dill, M.D., was hired as a radiologist and the Division Chief of the Thoracic Division on February 29, 2016. The Division Chief position was publicly posted and the Department conducted recruiting efforts to fill the position. Dr. Desai did not apply for or ever express interest in the position. Dr. Dill was more qualified than Dr. Desai to be Division Chief, based on her education, training, professional involvement, research, qualifications, and experience.

47.     According to data recorded in the quality assurance system, in the course of Dr. Dill's employment, she entered information in the quality assurance system indicating disagreement with the radiologist's initial read for 31 radiologists, in 79 instances.

48. Kimberly Robinson, M.D., is a pulmonologist (a physician specializing in the respiratory system) who treats patients at Marlborough Hospital, and for a period served as President of the Medical Staff for Marlborough Hospital.

49. Radiology, like other diagnostic medical work, can involve a degree of probability and subjectivity, and concerns or disagreements can be raised by treating physicians at times. Treating physicians have raised concerns to me with individual reads or quality issues from time to time. I evaluated quality concerns raised to me and took appropriate action based on the individual circumstances. I likewise evaluated quality concerns whenever they were raised to me by Dr. Robinson.

50. Neither Dr. J.F. Dr. H.L., Dr. G.T. nor Dr. D.B. specialized in chest radiology. Dr. J.F. is 12 years older than Dr. Desai, Dr. G.T. is less than 2 years younger than Dr. Desai, and Dr. D.B. is 60 years old.

51. I was aware that several of Dr. Desai's cases were entered in the Department's quality assurance database labelled as potentially significant misses, based on my distribution of data from the quality assurance system to Dr. Desai as a part of her annual review.

52. On January 31, 2017, I met with representatives from Marlborough Hospital and its medical staff regarding radiology issues at the hospital. This meeting included the President of the Marlborough Hospital Medical Staff and pulmonologist Kimberly Robinson, M.D., and the President of Marlborough Hospital, Steven Roach. A copy of the minutes of this meeting are attached as **Exhibit E**.

53. A significant concern addressed at the meeting was the quality of chest imaging. At the time, there were three radiologists specializing in chest in the Medical Group's Chest

Division, Karin Dill, M.D., Eric Schmidlin, M.D., and Dr. Desai. No concerns were raised at the meeting related to the reads of Dr. Dill or Dr. Schmidlin.

54.     At this meeting, Dr. Robinson expressed serious concerns with the quality of CT reads performed by Dr. Desai. Dr. Robinson stated to me that she never believed Dr. Desai's reports and could not rely on them.

55.     In response, I agreed that I would conduct a focused review of Dr. Desai's CT reads. I believed that I had to address the concerns raised to me in the interests of patient safety and the Department's obligations to provide high quality services to patients and providers.

56.     To ensure fairness and to confirm that the quality concerns were justified prior to taking further action, I opted to have an independent, blinded review of Dr. Desai's CT reads conducted.

57.     I did not choose to arrange an independent review of Dr. Desai's reads based on isolated concerns regarding a read or a request to re-review a study read by Dr. Desai. I did not make the decision to do so based on one or two misreads by Dr. Desai.

58.     I made the decision to perform an independent review based on reports of quality concerns from Dr. Dill, my awareness of errors in the peer review system, and the complaints from Dr. Robinson, in particular her comments at the January 31, 2017, meeting.

59.     I did not consider Dr. Desai's age, sex, or disability in making the decision to have the independent review performed.

60.     I requested that the Department's file room staff randomly select 25 chest CT studies reviewed by Dr. Desai and, as a control group, 25 chest CT studies reviewed by other radiologists. The studies included in the review were selected randomly, and I was not involved in selecting the studies.

61.     The CT studies selected for inclusion in the review were thoracic/chest studies, but the studies were not limited to those read by radiologists specializing in chest imaging. Eighteen out of the 25 control group studies were read by radiologists who did not specialize in chest imaging.

62.     I selected Diana Litmanovich, M.D., to conduct the independent review. Dr. Litmanovich is a thoracic radiologist at Beth Israel Deaconess Medical Center and is a faculty member of Harvard Medical School. Dr. Litmanovich is not employed by the Medical Group or affiliated with the UMass Memorial Health system. I believe Dr. Litmanovich to be an expert in the interpretation of thoracic CT images.

63.     I requested that Dr. Litmanovich review the images for each CT study and the corresponding report and provide her opinion whether she agreed or disagreed with the interpretation, and if she disagreed, to indicate whether it was a minor or major disagreement and whether or not the disagreement would have an impact on patient care in her opinion.

64.     Dr. Litmanovich provided me with her findings, and I un-blinded them through reference to their identifying numbers. Based on the findings, Dr. Litmanovich concluded that of the reads conducted by Dr. Desai, there were five major errors and nine errors she opined would impact patient care. Dr. Litmanovich concluded that of the reads conducted by other radiologists, there was one major error and five errors she opined would impact patient care.

65.     As a result of my assessment of the results of the independent review, I determined that Dr. Desai's quality was not acceptable for the Department, and I made the decision that Dr. Desai could not continue to work in the Department in order to ensure patient safety and provide high quality services to patients.

66.     On March 14, 2018, I met with Dr. Desai and informed her that her employment will be terminated on March 17, 2019.

67.     Pursuant to Dr. Desai's Employment Agreement, she was entitled to twelve months' notice prior to termination. Exhibit A, ¶ 7.2.

68.     I determined that in the time until Dr. Desai's employment ended, she would be restricted from reading CT images and would review only x-rays, due to the concerns raised regarding the quality of her CT reads from the independent review and my obligation to ensure patient safety and provide high quality services to patients.

69.     Neither I nor anyone else communicated the restriction of Dr. Desai from reading CTs throughout the Department, and this information was shared only in a discreet manner on a need-to-know basis for the purposes of scheduling and workflow for the reading of studies.

70.     On April 24, 2018, at Dr. Desai's request, I held a meeting with Dr. Desai and Vice Chair for Quality, Patient Safety and Process Improvement Steven Baccei, M.D., as well as Dr. Sarwat Hussain, a radiologist in the Department who Dr. Desai invited. At the meeting, I provided Dr. Desai with data from the independent reviewer's findings.

71.     I have made the decision to end the employment of other physicians in the Department due to performance concerns related to ability, including R.G. , M.D., separated June 23, 2017, R.N. , D.O., separated May 31, 2017, and A.R. M.D., separated December 12, 2015.

72.     An external independent review was performed of Dr. R.G. s competency prior to the decision to end his employment. In addition, I reviewed data from the quality assurance system to evaluate Dr. R.G. s performance.

73.     An internal review and investigation was conducted of Dr. ██R.N.██'s performance prior to the decision to end his employment. Dr. ██R.N.██ was forty years of age at the time of his separation.

74.     With respect to these physicians, I advised them that due to their performance, they would no longer be able to be employed with the Medical Group, and the physicians elected to resign in lieu of termination.

75.     Stephen Tosi, M.D., was the President of UMass Memorial Medical Group, Inc., at the time of Dr. Desai's termination.

76.     Following Dr. Desai's notice of termination, she was replaced in the Department by Maria Barile, M.D., who is a female.

77.     In 2019, I hired a Division Chief for the Thoracic Division who is 59 years of age.

78.     Presently, the Medical Group employs approximately 92 radiologists. The Department includes 24 radiologists who are age 60 years or older, and three over 70 years of age. I myself am 62 years of age.

79.     During my tenure as Chair of the Department, I have hired 14 radiologists who were 60 years of age or older and two who were over 70 years of age, as well as 32 radiologists who are female.

80.     I have made the decision to end the employment of eight regularly-employed radiologists as Chair (who either were terminated or elected to resign in lieu of termination), and seven were male, and seven were younger than Dr. Desai.

81.     In 2016, the Medical Group conducted an internal review of the compensation of its radiologists as a part of an effort to standardize salaries to address pay inequities and increase compensation to align more closely with the market for all radiologists. The Medical Group also

engaged an outside resource to perform an external market study to assist in establishing a standardized compensation structure.

82.     As a result of these efforts, the Medical Group was able to provide additional funds to the Radiology Department, and a large percentage of radiologists' salaries were increased.

83.     Based on the evaluation, the Medical Group implemented a new, standardized salary structure for radiologists effective March 1, 2017. Under this pay structure, the Department set a base salary, with additional designated sums based on academic rank as well as leadership and administrative positions which carried with them additional job duties and responsibilities. A copy of my correspondence to diagnostic radiologists informing them of this new structure is attached as **Exhibit F**.

84.     As a result of the implementation of the new compensation structure, Dr. Desai received a large increase in pay, from $302,575 to $340,000 per year. Her compensation was set based on the base salary for a diagnostic radiologist of $330,000, plus an additional $10,000 due to her rank as Associate Professor. A copy of my correspondence to Dr. Desai informing her of her new salary is attached as **Exhibit G**.

85.     Dr. Desai did not hold any leadership roles or perform additional duties for the Department.

86.     As a result of the new pay structure, every single full-time female radiologist who was employed as of March 1, 2017, whose pay was not already at the standard, received a pay increase, and they were paid in accordance with the standardized pay scale.

87.     Dr. Desai was a diagnostic radiologist, and Dr. Aaron Harman is an interventional radiologist. Diagnostic radiology involves reviewing images of the body and making

interpretations, and interventional radiology is image-guided surgery. Interventional radiologists perform invasive procedures on patients, and the radiology component relates to the use of imaging such as fluoroscopy, CT, ultrasound, and MRI to guide their procedures. Interventional Radiologists also have completed additional training through an ACGME accredited Interventional Radiology fellowship and some (including Dr. Harman) have also taken an additional board-certifying examination (Certificate of Added Qualification) in Interventional Radiology.

88.     Interventional radiologists generally earn substantially more than diagnostic radiologists. Thus, the Department has implemented a different pay scale for interventional radiology than diagnostic radiology. Under this structure, Dr. Harman's salary was $365,000 per year, which is the base salary for an interventional radiologist.

89.     Dr. Eric Schmidlin specialized in chest imaging and worked within the Chest Division with the same duties as Dr. Desai. Dr. Schmidlin did not receive higher compensation than Dr. Desai. His starting salary in 2012 was $300,000 per year, less than Dr. Desai's salary, and at the time of his separation from regular employment, he earned $294,000 per year, less than Dr. Desai's salary. Dr. Schmidlin left regular employment with the Medical Group on June 28, 2016, and he continued to work on a per diem, hourly basis. His hourly rate since has been $162.50, and Dr. Desai's rate when calculated on an hourly basis is $163.46.

90.     Byron Chen, M.D., and Hemang Kotecha, M.D., have always earned less than Dr. Desai; each with a salary of $330,000 per year at the time of Dr. Desai's separation. Both worked in different divisions than Dr. Desai.

91.     Dr. Karin Dill's base salary was the same as Dr. Desai's. However, Dr. Dill served as a Division Chief, and was paid an additional sum for those duties and responsibilities.

92.     Division Chiefs are responsible for the effective daily operational management of their division, financial stability, long term strategic planning, faculty development, and service for patients and referring clinicians. Divisions Chiefs are responsible for the business and operational functions of their divisions, and include responsibilities for clinical operations, financial sustainability, customer service, quality assurance and improvement, faculty development, recruitment and retention, research/scholarship, innovation, resident/fellow training, medical student education, and other division-specific functions.

93.     A radiologist's performance of non-clinical duties for the Department, including service in leadership, academic, and administrative positions, is separate and apart from their clinical duties and is extremely valuable to the Department.

94.     Steven Baccei, M.D., was paid a higher salary due to his leadership roles within the Department, pursuant to the salary structure. Dr. Baccei was the Division Chief for musculoskeletal radiology, and he served as the Department's Vice Chair of Quality, Safety, and Process Improvement. The duties of the Vice Chair include oversight of all quality assurance functions of the Department, specifically, maintaining the peer review database, managing department quality assurance meetings and review processes, responding to quality issues, handling risk management matters, and management of quality review projects, among other duties.

95.     Christopher Cerniglia, D.O. served in multiple leadership and administrative roles in the Department, for which he received additional compensation. Prior to 2017, he had served as a Division Chief for musculoskeletal radiology, and, thereafter, he continued to serve as 1) the Director for Medical Student Education in Radiology, in which he is responsible for organizing all of the radiology educational activities for the first and second year medical students, 2) the

Co-Course Director for the UMass Medical School DSF (Design, Structure, and Function) course, in which he runs the imaging lab within the anatomy lab, oversees imaging in connection with the course, and oversees all medical student, non-radiology interns and resident, and visiting medical student rotations in radiology, and 3) the Fellowship Director for Musculoskeletal Radiology, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education policies.

96.     Sathish Dundamadappa, M.D., has served as the interim Division Chief of neuroradiology as well as the Fellowship Director for Neuroradiology and the Fellowship Director for MRI, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education, for both of these areas, as well as compliance with accreditation requirements for neuroradiology, and he has received additional compensation for these additional duties and responsibilities.

97.     Dennis Coughlin, M.D., has served as the Division Chief for Emergency Radiology, for which he has been compensated an additional amount for those duties and responsibilities.

Signed under pains and penalties of perjury this 15th day of December 2021.

Max Rosen, M.D., M.P.H.

**<u>EXHIBIT A</u>**

AGREEMENT BETWEEN
UMASS MEMORIAL MEDICAL GROUP, INC.
AND
Charu Desai , M.D.

AGREEMENT by and between the UMass Memorial Medical Group, Inc., a non-profit corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at One Biotech Park, Worcester, Massachusetts 01605 (the "Medical Group"), a subsidiary corporation of UMass Memorial Health Care, Inc. (the "System") and    Charu Desai, M.D., a physician duly licensed to practice medicine in the Commonwealth of Massachusetts (the "Practitioner").

## RECITALS

The principal purpose of the Medical Group is to employ physicians to provide, on behalf of the System,  patient care at a level of quality and efficiency consistent with generally accepted standards and otherwise to fulfill professional and institutional obligations to patients, students of health care, health care professionals, and the community; and,

The successful fulfillment of the principal purpose of the Medical Group is dependent on the rendering of professional medical and administrative services in conjunction with the clinical operations of  the System by qualified practitioners; and,

The Practitioner is trained and qualified and desires to provide professional medical, educational and administrative services to the Medical Group; and,

The Medical Group desires to engage the Practitioner to provide professional medical, educational and administrative services;

Therefore, in consideration of the mutual covenants and conditions set forth below, the Medical Group and the Practitioner do hereby agree as follows:

1.     RESPONSIBILITIES OF PRACTITIONER

1.1.     Professional Qualifications

(a)    The Practitioner must at all times during the term of this Agreement: (i) possess a valid and unlimited license to practice medicine pursuant to Chapter 112, Section 2 of the General Laws of the Commonwealth of Massachusetts; and, (ii) be appointed to and maintain continuous status as a member in good standing of the UMass Memorial Medical Center (the "Medical Center") Active Medical Staff or the Medical Staff of the appropriate Member Hospital with appropriate clinical privileges in the Department of Radiology (the "Department")  (iii) for

Charu Desai, MD

Exhibit_11

9/18/2020

those physicians who are on staff at the Medical Center, receive, and maintain, a faculty appointment at the University of Massachusetts Medical School (the "Medical School"); (iv) possess a valid federal narcotics number and state controlled substances number (unless such number is not required by the Practitioner's specialty);   (v) be, and remain, a participating provider in the Medicare and Medicaid programs and not be barred, excluded or otherwise ineligible to participate in these or other Federal programs; and (vi) be or, at the Medical Group's request, agree to be, and remain, a participating physician in any health insurance plan or managed care program accepted by the System, including the System's contractual relationships with preferred provider organizations and health maintenance organizations, and to execute any documents requested by the Medical Group in connection with participating in a provider contract in which the Medical Group or the System agrees to participate.  If at any time during the term of this Agreement the Practitioner fails to meet one or more of the qualifications set forth herein, such failure shall constitute a breach in accordance with Section 7.4 of this Agreement.

(b)  The Medical Group and the Practitioner further acknowledge and agree that this Agreement is not, and shall not be construed as, any form of guarantee or assurance by the System that the Practitioner will receive and maintain the necessary appointment to the Active Medical Staff or the grant of appropriate clinical privileges for the purposes of discharging the Practitioner's responsibilities hereunder; application, appointment, reappointment, and the grant of clinical privileges shall be governed solely by the Bylaws of the Medical Staff of the Medical Center then in effect.   Further, appointment to the faculty of the Medical School shall be governed solely by the applicable policies and procedures of the Medical School.

1.2.   Services.  The Practitioner shall be responsible for providing professional medical and administrative services as set forth in Appendix A, attached and incorporated as part of this Agreement.

1.3   Provider Agreements.  The Practitioner hereby authorizes the Medical Group to execute provider agreements, acknowledgments and consent forms that obligate or confirm the Practitioner's obligation to participate in provider agreements executed by or on behalf of the Medical Group and to abide by and conform to all applicable requirements under such provider agreements.

1.4.   Schedule of Fees.  The Medical Group will establish a current schedule of fees, as may be amended from time to time, to be charged by the Medical Group for direct patient care services provided by the Practitioner under this agreement.

1.5.   Standards of Practice.   The Practitioner shall at all times provide services in a competent and professional manner, consistent with quality assurance standards of the Medical Center's Active Medical Staff and in compliance with all applicable statutes, regulations, rules and directives of federal, state and other governmental and regulatory bodies having jurisdiction over the Medical Center; the Bylaws, Rules and Regulations, policies and procedures of the

2

System, the Medical Center and the Medical Staff; applicable standards of the Joint Commission on Accreditation of Health Care Organizations and currently accepted and approved methods and practices applicable to the provision of medical services.

1.6.    Compliance and Quality Assurance.   The Practitioner shall abide by the Code of Ethics and Business Conduct of the System.  The Practitioner shall participate in the programs of the System and the Medical Center regarding compliance, quality assurance, utilization review, risk management, and peer review, in accordance with the rules, policies and bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, the Patient Care Assessment regulations of the Board of Registration in Medicine, and upon request of the Department Chair.  The Quality Assurance committee of the Medical Staff of the Medical Center will be responsible for reviews and audits of and concerning quality assurance in the Department.

1.7.    Committee Responsibilities.   The Practitioner shall serve on committees of the Medical Center's Medical Staff and committees established pursuant to the Bylaws of the System, upon reasonable request of the Chairman of the Board of Trustees, the President/Chief Executive Officer, the Chief Operating Officer, the Chief Medical Officer, the President of the Medical Group (the "President") or the Department Chair.

1.8.    Medical Records and Reports.  (a)  The Practitioner shall prepare or cause to be prepared in a timely manner any and all appropriate notes and information in the medical records of and reports pertaining to each patient for whom the Practitioner has rendered services pursuant to this Agreement.  The Practitioner shall cause these records and reports to be completed and submitted within such period of time after the rendering of such services as may be required by the Bylaws of the Medical Staff of the Medical Center, upon request of the President or Department Chair, or by applicable law or regulation.  The parties understand and agree that the System has the rights of ownership and control of all of the patients' medical records and reports generated pursuant to this Agreement.  It is further agreed that all practitioners at the System have the right to consult such records and reports in order to facilitate the continuity of proper patient care.

(b)    Time Allocation Reports:   The Practitioner agrees to cooperate with the Department Chair to maintain adequate and proper time records in accordance with the Medical Group's policies.  This may include submitting a written allocation of time reports specifying the respective amounts of time the Practitioner has devoted to clinical, administrative, teaching and research activities.  The Practitioner agrees to make available to the Medical Group all time records and data recorded by the Practitioner upon the request of the Medical Group.

1.9.    Academic Service.   The Practitioner shall aid in the clinical teaching program of the Medical Center as an attending physician on in-patient services and in ambulatory settings. The Practitioner shall also aid in the didactic teaching programs of the Medical Center upon the request of the Department Chair.  The Practitioner shall also participate for reasonable periods of time as an instructor in education programs conducted or offered by the Medical Center,

3

CD 00053

including grand rounds, and shall perform such other teaching functions within the Medical Center as are reasonable and necessary to assure the Medical Center's compliance with the requirements of all applicable accrediting bodies, upon the request of the Department Chair. The Practitioner, as a member of the Medical School faculty, is expected to provide a reasonable amount of academic service (on the order of approximately two hundred (200) hours per year) under the supervision of the Chancellor at the direction of the Chair or his designee.

1.10.   Non-Physician Personnel.   The Practitioner shall, upon the request of the President or Chair, or at such other times as are appropriate, make recommendations concerning the qualifications, hiring, firing, and disciplining of such non-physician personnel as the System or the Medical Group may employ, engage or otherwise provide in support of the Practitioner's practice. The Practitioner shall make any such recommendations in furtherance of and in accordance with the needs and best interests of the Medical Group and the proper conduct of its functions. The Practitioner agrees that any supervision of nurse practitioners and physician assistants shall be conducted in accordance with the governing regulations of the Board of Registration in Medicine.

1.11.   Protocols and Procedures.   The Practitioner agrees to work cooperatively with all of the System's clinical departments, Medical Staff, the Medical Group, administration, the President and the Department Chair to assure that services are available on a timely, coordinated, efficient, and professional basis. The Practitioner also agrees to comply with all of the Medical Center's clinical policies and procedures and all applicable Human Resources policies.

1.12.   Confidentiality of Information.   The Practitioner agrees to uphold and maintain the confidentiality of patient and other information for which the Practitioner has an ethical, professional, or legal obligation not to disclose. The Practitioner further agrees to uphold and maintain the confidentiality of proprietary or other confidential information relating to the Medical Group or the System of which the Practitioner may become aware while employed hereunder. This provision shall survive the termination of this Agreement.

1.13.   Continuing Education.   The Practitioner shall comply with and satisfy any and all of the professional obligations and requirements regarding continuing education and any other related areas of medical practice required for the maintenance of a license to practice **medicine** in Massachusetts or appropriate to the rendering of competent professional services pursuant to this Agreement as determined by the Department Chair.

1.14.   Dual-Employment with Medical School.   The parties acknowledge that a certain percentage of the Practitioner's time and salary may be allocated to, and governed by, a so-called "Dual-Employment" arrangement with the Medical School (the "Dual-Employment Arrangement"). The Practitioner acknowledges that the terms and conditions of employment with the Medical Group are governed by this Agreement and the policies and practices of the Medical Group. The Practitioner further acknowledges that if this Agreement is terminated for any reason, the related employment relationship with the Medical School shall also terminate

4

CD 00054

unless the Practitioner has a new or continuing agreement with the Medical School or is a tenured faculty member.

2.    RESPONSIBILITIES OF THE SYSTEM

    2.1.    Space, Equipment, Services, and Supplies.

            (a)  The Medical Group, through agreement with the System, shall be committed to making available reasonable and necessary space, equipment and supplies for the delivery of the agreed services hereunder by the Practitioner, shall provide customary services and maintenance to maintain such equipment in good order and repair, shall furnish services to the Practitioner including, but not limited to, utilities, telephone, housekeeping and record keeping services; and shall provide all necessary supplies needed for the proper provision of services by the Practitioner pursuant to this Agreement.

            (b)  The Practitioner agrees to use such space, equipment, services and supplies for purposes of the System and in furtherance of the obligations governed by this Agreement.

    2.2.    Non-Physician Personnel.  The System or the Medical Group shall employ, engage or otherwise make available to the Practitioner all non-physician personnel determined by the Medical Group to be reasonably needed for the proper delivery of services pursuant to this Agreement.  The System or the Medical Group shall exercise ultimate control and management of non-physician personnel.

    2.3    Professional Liability Insurance.  The Medical Group, at its expense, shall arrange for professional liability insurance coverage for the Practitioner with regard to professional medical services rendered by the Practitioner for Medical Group-related activities billed through the Medical Group during the term of this Agreement.  The Practitioner shall be covered by such insurance to the same extent as other similarly-situated practitioners within the Medical Group.  Coverage limits shall be set in the discretion of the Medical Group and/or the UMass Memorial Self-Insurance Program from time to time and shall be made known to the Medical Group Practitioners on a regular basis.

3.    REIMBURSEMENT REQUIREMENTS

    3.1.    The Practitioner shall comply with all laws, regulations and System requirements, policies and procedures regarding record keeping relating to third-party reimbursement for services provided pursuant to this Agreement as may be in effect from time to time.  In the event that there are subsequent changes or clarifications of statutes, regulations or rules relating to record-keeping which the Medical Group determines must be complied with to insure proper reimbursement from third parties for services provided pursuant to this Agreement, the Medical Group shall, after reasonable notice and opportunity to comply, notify the Practitioner of any actions it reasonably deems are necessary to comply with such changes and the Practitioner shall

5

CD 00055

promptly take such actions.

4.    COMPENSATION

4.1.    **Compensation of Practitioner.**   The Medical Group shall compensate the Practitioner for the services which the Practitioner renders in accordance with the terms of this Agreement.   The agreed compensation is set forth in detail in Appendix B, attached   and incorporated as part of this Agreement.

5.    BILLING AND PAYMENT

5.1.    **Billing.**   Except as otherwise may be expressly stated in this Agreement or other published, written policy or procedure of the Medical Group, all fees, payments and other income attributable to the Practitioner's clinical services during the term of this Agreement shall belong to the Medical Group, whether paid to the Practitioner, to the Medical Group or its designee or to a third party.   The Medical Group shall have the sole right to bill for and to receive, hold and disburse such fees and income and the Practitioner agrees to abide by the billing policies and procedures of the Medical Group.   The Practitioner hereby assigns to the Medical Group all of the Practitioner's rights in all fees, payments, bonuses or distributions or other income or monies due from all sources relating directly or indirectly to clinical  services rendered by the Practitioner pursuant to this Agreement.   The Practitioner shall cooperate fully with the Medical Group in facilitating collection of such monies, including prompt endorsement and delivery to the Medical Group of all checks received from patients or third-party payors on behalf of the Practitioner and completion of all forms necessary for such collections.   To the extent applicable, the Practitioner agrees to work with the Medical Group to collect all patient co-payments for services rendered and promptly to forward such funds to the Medical Group.   Upon termination of this Agreement for any reason whatsoever, all such monies then outstanding shall be deemed to be the sole and exclusive property of the Medical Group and not subject to any claim by the Practitioner.   The Practitioner's obligation under this provision shall survive termination of this Agreement.

6.    TERM

This Agreement shall be effective from your original hire date of January 5, 1992 and shall remain in effect unless otherwise terminated by the parties as provided in Section 7 of this Agreement.   As of the effective date of this Agreement, this Agreement shall supercede and revoke any existing prior employment agreement with the Medical Group or any of its predecessor entities.

7.    TERMINATION

7.1. Mutual Agreement.  This Agreement may be terminated by mutual agreement of the parties, in a writing signed by the parties, at any time from the date of execution hereof.

6

CD 00056

7.2   <u>Notice of Party.</u> This Agreement  may be terminated by the Medical Group at any  the giving of written notice to the Practitioner (as set forth in Section 14.1 below), in accordance with the following notice schedule:

| Number of Years Practitioner Employed | Requisite Notice Period |
|---|---|
| 0-2 | 4 months |
| >2 – 10 | 6 months |
| >10- 15 | 8 months |
| >15 – 20 | 10 months |
| >20 | 12 months |

This Agreement may be terminated by the Practitioner at any time upon the giving of as much notice as is practicable to the Medical Group, and in any event a minimum of  one hundred twenty (120) days' written notice.

Where either the Medical Group or the Practitioner is terminating the employment relationship, the Notice Period is characterized as "working notice."  In the interests of patient care, the Medical Group expects the Practitioner to continue to fulfill the responsibilities of the position and to maintain productivity levels for the full notice period.  Vacation time may be taken during the Notice Period only with the consent of the Department Chair and the President of the Medical Group.  The Practitioner will be compensated for unused pro-rated vacation time not taken at the time of termination.  The Medical Group does not permit "terminal vacations," i.e., the use of vacation time to complete the final portion of the Notice Period.

7.3       <u>For Cause.</u>  The Medical Group may terminate this Agreement effective immediately for cause at any time upon written notice to the Practitioner setting forth in reasonable detail the nature of such cause.  "Cause" shall be defined as any material breach by the Practitioner of this Agreement, including but not limited to the following:

i.       Practitioner's fraud or dishonesty with respect to the Medical Group or those associated with it, acts or conduct materially detrimental to patient care or to the reputation or operations of the Medical Group,  or otherwise in connection with the Practitioner's  services under this Agreement;

ii.       Practitioner's conviction of, a plea of nolo contendere or admission of sufficient facts to a crime involving moral turpitude, or an offense relating to health care or adversely affecting the Practitioner's ability to perform services under this Agreement; or

iii.       Practitioner's    material negligence or misconduct (other than by reason of disability or approved leave) in the performance of duties assigned by the Chair under this

CD 00057

Agreement,

     iv.    Failure of the Practitioner to follow UMass Memorial policies and procedures and other rules of conduct made known to the Practitioner and applicable to all physicians of UMass Memorial and/or the Medical Group, including without limitation, policies prohibiting unlawful discrimination, and the Practitioner has exhausted the grievance procedure available to Medical Group physicians and, if applicable, all due process procedures available under the Medical Staff Bylaws of the Medical Center.

     7.4.   <u>Automatic</u>.  This Agreement shall terminate automatically upon the breach of Section 1.1. by the Practitioner, except that the Medical Group, in its sole discretion, may, but is not obligated to, suspend this Agreement for a specified reasonable period to enable the Practitioner to cure the breach. If the Practitioner fails to cure the breach within the specified period, this Agreement will terminate immediately upon written notice to the Practitioner by the Medical Group. Further, the Medical Group reserves the right to terminate this Agreement in the event the Practitioner's medical staff membership or clinical privileges are suspended or in any way restricted.

     7.5  <u>Suspension</u>. The Medical Group may suspend the Practitioner for cause, without compensation. Such cause may include, but shall not be limited to, any suspension, restriction or revocation of the Practitioner's Medical Staff membership or clinical privileges at the Medical Center or any suspension, restriction or revocation of the Practitioner's license to practice medicine in any jurisdiction.

## 8.    <u>EFFECT OF TERMINATION</u>

     8.1.  <u>Effect of Termination on this Agreement</u>. The termination of this Agreement in accordance with Section 7, hereunder, shall terminate any and all rights and obligations of the Medical Group and the Practitioner pursuant to this Agreement. The effective date of termination of this Agreement shall be as set forth in the above-mentioned section(s); provided, however, that upon the termination of this Agreement, the parties shall be and remain obligated and responsible for: (i) any and all obligations accruing prior to the date of termination; and, (ii) any and all obligations, promises, or covenants contained herein which are expressly made to extend beyond the term of this Agreement; and, (iii) the Practitioner shall use reasonable and diligent efforts to assist the System and the Medical Group in arranging for appropriate alternative medical coverage for patients under the care of the Practitioner. Prior to the termination of this Agreement, the Practitioner shall prepare a notice to patients in a form approved by the Medical Group and the Department Chair. Practitioner shall finalize all outstanding billing documentation and complete all patient records prior to his or her departure. Immediately upon the termination of this Agreement, the Practitioner shall deliver to the System sole custody, and total, exclusive and complete use of the System's space, equipment and supplies and shall remove any and all personal possessions from the property of the System. The System shall give the Practitioner reasonable time to effect these conditions. In the event of

CD 00058

termination of this Agreement, payment by the Medical Group of any base salary due the Practitioner under Section 4.1 and Appendix B to the date of termination and of any pay in lieu of notice due Practitioner under Section 7.2 shall constitute the entire obligation of the Medical Group to the Practitioner. The Practitioner recognizes that no compensation is earned after termination of this Agreement.

9.    GOVERNING RULES, REGULATIONS AND BYLAWS

9.1    Governing Rules, Regulations and Bylaws.    Notwithstanding anything in this Agreement to the contrary, it is hereby expressly understood and agreed by and between the Medical Group and the Practitioner that any and all rights, responsibilities, and obligations of the parties shall at all times during the term of this Agreement be subject to the Bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, all applicable rules and regulations of the System, or its successor, as now exist or as hereinafter may be amended or promulgated by the Board of Trustees of the Medical Group, the Medical Staff of the Medical Center and the President/Chief Executive Officer of the System, or any duly authorized designee thereof.

10.    ASSIGNMENT AND DELEGATION

10.1.    Assignment and Delegation.    No assignment of this Agreement or the rights hereunder, or delegation of this Agreement or the obligations hereunder shall be valid without the specific written consent of both parties;  provided, however, that this Agreement may be assigned by the Medical Group as a result of reorganization or merger, or to any successor entity providing the services now provided by the System or the Medical Group.

11.    ENTIRE AGREEMENT

11.1.    Entire Agreement.    This Agreement contains the entire agreement between the parties and no statement, promises, inducements, or writings made by any party or agent of any party which is not contained in this written Agreement shall be valid or binding; and this Agreement  may not be enlarged, modified, or altered except in a subsequent writing signed by the parties and attached hereto.  This Agreement supersedes any and all prior agreements for professional services between the Practitioner and the Medical Group, the System or any other affiliate of the System.

12.    AMENDMENTS

12.1.    Amendments.  This Agreement may be amended only by an instrument in writing signed by the Medical Group and the Practitioner.  Such writing must make specific reference to the terms and conditions of this Agreement which it amends, and will become effective as of the date stipulated therein.

9

CD 00059

13.   GOVERNING LAW

13.1. Massachusetts Law. This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed in the Commonwealth of Massachusetts.

14.   NOTICE

14.1. Notice. Notices or communications required or permitted to be given pursuant to this Agreement shall be given in writing to the respective parties by hand, by certified mail or by overnight delivery service (e.g., Federal Express, UPS) (such notice being deemed given as of the date of mailing) and addressed to the Practitioner at the Practitioner's last known address kept within the records of the Medical Group, or in the case of the Medical Group, One Biotech Park, Worcester, Massachusetts, attention of the President, UMass Memorial Medical Group.

15.   EXECUTION

15.1. Execution. This Agreement and any and all amendments hereto shall be executed in duplicate copies on behalf of each party by the Practitioner and an official specifically authorized by the Medical Group Board with respect to such execution. Each duplicate copy shall be deemed an original, but both duplicate originals shall together constitute one and the same instrument.

16.   SECTION HEADINGS

Section Headings. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

17.   WAIVER.

Waiver. A waiver of the breach of any term or condition of this Agreement by either party shall not constitute a waiver of any subsequent breach or breaches of the same term or condition, or any other term or condition hereunder.

18.   SEVERABILITY.

Severability. If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect by a court of competent jurisdiction, then the remainder of this Agreement, and the application of such provision in circumstances other than those as to which it is so declared invalid or unenforceable, shall not be affected thereby, and each such provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

10

CD 00060

IN WITNESS WHEREOF, the Medical Group and the Practitioner have caused this Agreement to be signed and sealed as of this_____ day of _____, 20__.

Dated:          By: _Charu S. Desai   MD_

                        Charu Desai , M.D.


UMASS MEMORIAL MEDICAL GROUP, INC.

Dated 2/2/       By: _____

                        Michele Streeter, Executive Director


                By: _____

                        Joseph T. Ferrucci, M.D., Chair
                        Department of Radiology

11

CD 00061

# APPENDIX A

The Practitioner shall be responsible for providing professional medical services to patients of the System in need of such services and to enrollees of health plans as to which the Medical Group and Practitioner are participating providers.   The services to be rendered hereunder include, but are not limited to outpatient work, inpatient consultative work and direct patient care.   The Practitioner's performance hereunder shall be evaluated by the President of the Medical Group and the Department Chair in accordance with the Bylaws of the Medical Staff of the Medical Center.   The Practitioner agrees that the practice of medicine shall be limited to the services to be provided pursuant to this Agreement or for the Medical School under its agreement unless Practitioner obtains the prior written approval of the Chair under Medical Group policy to do otherwise.

The Medical Group and the Department Chair shall determine the specific professional medical duties to be performed by the Practitioner, as well as the time and manner of performance, in accordance with and subject to the terms of this Agreement; provided, however, the Medical Group and Department Chair shall not impose requirements which would interfere with the Practitioner's professional judgment in connection with the treatment of patients or cause the Practitioner to violate applicable ethical codes or any law or regulation.

The Practitioner shall at all times provide services to all persons who may become patients of the Medical Group in accordance with the Medical Group's policies and without regard to race, color, creed, sex or ability to pay for services; and

The Practitioner shall participate in Medicare, Medicaid and managed care programs and other third party payor arrangements or governmental programs in which the Medical Group participates and the Practitioner shall abide by and act in accordance with the terms and conditions of all managed care agreements, network, affiliation agreements, provider agreements and other contracts to which the Medical Group or Practitioner (with the Medical Group's consent) is or becomes a party.

12

CD 00062

## APPENDIX B

1. The Practitioner's compensation for services rendered pursuant to this Agreement, and under a Dual-Employment Arrangement with the Medical School, if applicable, shall be a total base salary, which if annualized would be at the rate of Three-hundred Twenty-Five Thousand Dollars ($325,000) per year, less all legally required and voluntarily-authorized deductions, payable in accordance with Medical Group payroll practices. (Practitioners who participate in the Dual-Employment Arrangement with the Medical School may receive paychecks from both the Medical Group and the Medical School, which together shall equal the base salary referenced above.)

The Practitioner shall also participate in the Physician Incentive Compensation Program of the Department as established by the Medical Group (the "Incentive Compensation Program"), subject to its terms and conditions of participation as in effect or amended from time to time. The Incentive Compensation Program includes eligibility for bonuses and/or salary increases based upon productivity. The Practitioner acknowledges that participation in the Incentive Compensation Program may also involve imposing salary withholds if performance does not meet Medical Group requirements. The Practitioner further acknowledges that, following the first twelve months' of the Practitioner's employment, under the terms of the Incentive Compensation Program, the Medical Group may decrease the Practitioner's base salary if the applicable productivity targets are not met. Salary adjustments will be made upon thirty (30) days written notice to the Practitioner. Salary reductions, if any, shall be consistent with the Department's compensation plan and shall in no event exceed twenty percent of the Practitioner's base salary in any twelve month period.

Subject to the Practitioner's payment of any contribution required of physician employees generally, the Practitioner will be eligible to participate during the term of this Agreement in any and all employee benefit plans made generally available to other physician employees of the Medical Group as in effect from time to time. Such participation by the Practitioner shall be subject to (i) the terms of the applicable plan documents, (ii) generally applicable policies of the Medical Group, and (iii) the discretion of the Board of Trustees of the Medical Group or any administrative or other committee provided for in or contemplated by such plan or policy of the System. A description of the benefits program currently in effect (and subject to change by the Group Board and UMass Memorial Compensation Committee) is attached hereto as Appendix C, "Physician Benefits at a Glance."

13

CD 00063

**EXHIBIT B**

Updated June 8, 2017

## ACADEMIC AND ADMINISTRATIVE TIME POLICY

**I.   Academic Time**

1. Academic time is defined as time allocated to academic responsibilities including teaching/conference preparation, writing papers/texts, completing research project, attending institutional and department committees, attending a conference, serving on committees of local, regional, national or international organizations other than UMMMS or UMMMC.

2. Academic activities will be reviewed annually during individual annual academic planning sessions

3. In order to be eligible for academic time a radiologist must be 0.6 FTE or greater. As a new hire, academic time will be granted for up to 2 years based on mutually agreed upon planned activity. For faculty with 2 or more years of service, allocation will be based on prior activity and mutually agreed upon future activity.

4. The baseline for academic time is 12 days/year (1 day/month). This number is prorated for FTE.

**II.   Administrative Time**

Administrative time is defined as time allocated to specific administrative roles as defined in job descriptions. The number of days is determined as follows:

| Administrative Role | Days Per Year |
|---|---|
| Residency Program Director | 49 (includes 4 days AUR) |
| Quality and Patient Safety Director | 67.5 |
| Assist Residency Program Director | 12 (includes 4 days AUR) |
| Radiology Undergraduate Medical Education | 99 days (includes 4 days AUR, 5 days AAMC or GEA/NEGEA, 36 days DSF course) |
| Fellowship Director ACGME | 12 |
| Fellowship Director  Non-ACGME | 4 |
| Division Chief | 12 |
| Other – Admin/Academic Functions defined by Chair | 6 to 46 Days per year at Chair Discretion |

**During academic/administrative time, faculty must be reachable by pager and available to cover clinical service if need arises (unless away at a conference).**

Charu Desai, MD
Exhibit_12
9/18/2020

Academic time can be used to attend a conference, however, prior approval must be obtained from the Chair.

III.    **Scheduling of Academic/Administrative time**

1.  Academic/ administrative time off will be assigned by the Physician Staffing Coordinator under the direction of the Division Chief and/or Chair. Faculty requests will be considered and honored when feasible.

2.  Requests to attend meetings/conferences using accumulated academic/administrative time must be requested within the context of vacation planning, subject to vacation request deadlines and approved by the Division Chief.

3.  Clinical Schedule will take precedence over academic and/or administrative time.

4.  Academic/Administrative time may be scheduled in half day increments.

5.  Academic/Administrative time will not be routinely scheduled on Friday unless preapproved by Division Chief.

6.  Academic/Administrative time cannot be used to extend a leave (vacation) and will not be scheduled immediately before or after a leave.

7.  Academic/Administrative time will be reduced on a prorated basis if an authorized leave of absence is taken during the Fiscal Year. For example if a leave is 3 of 12 months, academic/administrative time is reduced by 25%.

8.  Academic/Administrative time should be taken within the quarter and cannot be carried over to the next Fiscal Year.

9.  Academic/Administrative time will be removed once a resignation notice is communicated.

# EXHIBIT C

**Revised October 2015**

## CALL AND/OR WEEKEND/HOLIDAY COVERAGE POLICY

## PRINCIPLES

1. Call and/or Weekend/ Holiday Coverage is Division based.

2. The frequency of call and/or Weekend/Holiday duties will be maintained at approximately 1/5 or roughly 10 to 11 weeks or weekends per year.  Minor adjustments may be necessary from time to time for Divisions temporarily under or overstaffed at the discretion of the Chair's Office.

3. WRVU's earned during call or weekend/holiday obligation will count for yearend productivity calculation.

4. Call and weekend/holiday schedule will be made by the Division Chief in concert with the Physician Staffing Coordinator.  When possible call/weekend/holiday schedule will be done one year in advance at the beginning of each FiscalYear and follow Departmental guidelines.

5. Senior attending  are exempt from call and weekend/holiday coverage but will maintain incentive bonus eligibility if they meet  2 of the following 3 criteria:

   - Age 72 years.
   - Academic rank of full Professor
   - 20 years of continuous service to the Department.

1

## WEEKEND AND HOLIDAY COVERAGE – 1/5

ABDOMINAL IMAGING DIVISION –  ON SITE MEMORIAL CAMPUS
        8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
Memorial House Doctor - Contrast Coverage, emergent US and Fluoro
Responsible for any NVIR procedures at Memorial Campus.
On Site Chest person will be back-up House Doctor.

            Reading Assignments
            Adult non ED Abdominal Imaging – All locations
                    Priority
                    a.   Stats
                    b.   Inpatient
                    c.   Outpatient
                    (Each category Prioritized by Date and Time (not Campus))


MSK DIVISION – ON SITE SHREWSBURY STREET
        8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
        Contrast Monitoring – Shrewsbury Street MR

            Reading Assignments
            Adult non ED MSK imaging all locations
                    Priority
                    a.   Stats
                    b.   Inpatient
                    c.   Outpatient
                    (Each category Prioritized by Date and Time (not location)


CHEST DIVISION – ON SITE – MEMORIAL CAMPUS
        8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
        Reading Assignments
        Adult non ED CHEST imaging all locations
                    Priority
                    a.   Stats
                    b.   Inpatient
                    c.   Outpatient
                    (Each category Prioritized by Date and Time (not location)

2

UMM-04923

**SATURDAY COVERAGE (12/YEAR)**

BREAST DIVISION – ON SITE- MEMORIAL CAMPUS
8 HOUR SHIFT- with FELLOW

ASSIGNMENT RESPONSIBILITIES: Screening

**CALL 7 DAYS -  FRIDAY 5 PM TO FRIDAY 8 AM INCLUDING ON-SITE SAT/SUN/HOLIDAY – 1/5**

PEDIATRIC DIVISION – ON SITE – UNIVERSITY CAMPUS
8A-5P – SATURDAY/SUNDAY/HOLIDAY
BEEPER AFTER 5, 7 days (FRIDAY TO FRIDAY)

Reading Assignments (Saturday/Sunday/Holiday)
All Pediatric Imaging –all locations
Priority
a.   ED-Pedi (Read out resident)
b.   Stats
d.   Inpatient
e.   Carewell Urgent Care: read all prior day's cases, be available for
STAT calls
f.   Outpatient
(Each category Prioritized by Date and Time (not location))

NEURORADIOLOGY DIVISION – ON SITE – UNIVERSITY CAMPUS
8A-5P – SATURDAY/SUNDAY/HOLIDAY
BEEPER AFTER 5,  7 days (FRIDAY TO FRIDAY)

Reading Assignments (Saturday/Sunday/Holiday)
All Neuroradiology Imaging –all locations
Priority
Read out resident
a.   ED-Neuro
b.   Stats
c.   Inpatient
d.   Outpatient
(Each category Prioritized by Date and Time (not location)

**CALL (7 DAYS) ONLY**

VASCULAR DIVISION –ON CALL FOR VIR AND ABDOMINAL* PROCEDURES
CALL 7 days (FRIDAY 5P THRU FRIDAY 8A)
*All Abdominal Procedures EXCEPT Memorial Campus Saturday/ Sunday/
Holiday 8A-5)

NEURO INTERVENTIONAL DIVISION –ON CALL FOR PROCEDURES
CALL 7 days (FRIDAY 5P THRU FRIDAY 8A)

3

UMM-04924

## ED Division- ON SITE- University Campus 24/7

**Mon-Fri Shifts**

7am-4pm — All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro and Pediatrics) Carewell urgent care cases from prior day, available for STAT calls

4pm-10pm — All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro) Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List. Available for calls from Carewell until 8pm

    Priority
    a. ED
    b. STATs- All non-neuro including non-ED
        i. Inpatient
        ii. Outpatient

*Pediatric cases will be entered as Preliminary by ED resident*

10pm-7am — All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.

    Priority
    a. ED
    b. STATs- All non-ED STATs including Neuro
        i. Inpatient
        ii. Outpatient
        iii. Other backlog in non-STAT, non-ED cases

*Pediatric cases will be entered as Preliminary by ED resident*
*Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only*

**Sat/Sun/Holiday**

7am-4pm — All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro and Pediatrics) Carewell urgent care cases from prior day, available for STAT calls

4pm-10pm — All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List. Available for calls from Carewell until 8pm

    Priority
    a) ED
    b) STATs- All non-ED STATs including Neuro
        i. Inpatient
        i. Outpatient
        ii. Other backlog in non-STAT, non-ED cases

*Pediatric cases will be entered as Preliminaryby ED resident*
*Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only*

4

UMM-04925

10pm-7am

All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital
Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.

   Priority
   a) ED
   b) STATs- All non-ED STATs including Neuro
      i.    Inpatient
      ii.   Outpatient
      iii.  Other backlog in non-STAT, non-ED cases

*Pediatric cases will be entered as Preliminaryby ED resident*
*Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only*

UMM-04926

**EXHIBIT D**

CD 000049

Charu Desai, MD
Exhibit_34

10/22/2020

## Peer Review:     Desai, Charu                          7/1/2016 - 6/30/2017

4b. Likely to be significant

Desai, Charu

Review Count

6
4
2
0

| Modality | Comment | Drop-Down Selection | Reviewee | Accession | Study Description | Study Date Time |
|---|---|---|---|---|---|---|
| CR | Called to review cxr. Cardiomegaly. Regular subsegmental atelectasis. KDiii | 4b. Likely to be significant | Desai, Charu | ▬ | | 3/7/2017 12:01 PM |
| CT | RUL nodule adjacent to cyst highly suspicious for lung ca | 4b. Likely to be significant | Desai, Charu | ▬ | CT: Chest without Cont | 4/24/2017 4:18 PM |
| CT | Asked to review case. Growing tracheal nodule since CT 2013. This was not accurately identified (question of comparison) reported as, "Question mucus along the anterior wall of upper trachea, image 22 series 4." K DIIMD | 4b. Likely to be significant | Desai, Charu | ▬ | CT: Chest without Contrast | 3/17/2016 11:38 AM |
| CR | Asked to review.  approx 6.5 cm ascending aortic aneurysm not diagnosed/ mentioned on cxr. KDiii | 4b. Likely to be significant | Desai, Charu | | Chest:PA,AP, Apical or Lateral | 4/28/2016 5:48 AM |
| CT | asked to re-review case. PET demoistrates nodule is FDG avid.  Report stated, "Approximately 5 mm ill-defined nodular density anteriorly in the left upper lobe. Question etiology. Question small focal area of infiltrate less likely nodule." KDiii MD | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 2/24/2016 1:31 PM |
| CT | asked to over read. CT dictated as nodular density, likely not nodule –no call made or electronic recording of notification for f/u.  subsequent pre op CT reveals enlargement and new nodule, no physician was aware of nodule. | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 2/24/2016 1:31 PM |

# EXHIBIT E

## Rosen, Max

| | |
|---|---|
| **From:** | Rosen, Max |
| **Sent:** | Wednesday, February 08, 2017 1:02 PM |
| **To:** | Brennan, Darren; Tennyson, Joseph; Robinson, Kimberly (Pulmonary); Roach, Steve; Brown, Douglas |
| **Cc:** | Rosen, Max |
| **Subject:** | Meeting – Review of Radiology issues at Marlborough: |
| | |
| **Categories:** | Desai_Confidential |

Please let me know if anyone has any edits, etc.

Thanks for meeting with me and Darren.
Max

Meeting – Review of Radiology issues at Marlborough:

Drs. Rosen, Brennan, Tennyson, Robinson, Mr. Roach & Brown Jan 31, 2017

1. Actions taken to address concerns about turn around time and accessibility of Radiologists:
   o Changed staffing model:  All studies read on site (at Marlborough) expect Neuro, Peds, ED, Nucs
   o Radiology has created Community Radiology Division to be more responsive to community needs
   o New Community Neuroradiology rotation:  M-F 8 am to 10 pm, one single phone number for point of contact
   o Extended hours for Community Radiology until 8 pm, M-F
   o Trainees will not be reading Marlborough studies
   o Will work with new version of PowerScribe to see if time-stamp for addenda can be designed to not "add" to TAT  BRENNAN [ ]
   o Dr. Brennan will report monthly Radiology TAT to Med-Exec
2. Chest:
   o Dr. Schmidlin now has home workstation
   o Drs. Schmidlin and Dill will read all high resolution chest CTs
   o Will create template to standardize all chest CT reads        DILL [ ]
   o Template for CXR has been implemented, feedback has been positive
   o Quality issues: Dr. Rosen will perform focused peer-review for physician where issues have been raised.  ROSEN [ ]
3. Stroke:  Will work on streamlining  stroke activation  & review current performance        BRENNAN [ ]
4. Identification of inpatient exams needing to be read at night/weekends:
   o Dr. Brennan will work with Paul Riggieri to have techs manually mark all inpatient CTs "stat" when performed nights/weekends.  BRENNAN [ ]
5. QA:
   o Dr. Rosen has reviewed, and provided feedback for Dr. Robinson for neuro case that was questioned.
   o Radiology will provide access to the person from Marlborough who maintains the QA reporting system (? STARS) so that any Radiology cases can be entered in the Radiology (Pe[      ]  BRENNAN [ ]
   o

Max P. Rosen, M.D.

Exhibit_27

5/7/2021

1

Max P. Rosen, MD MPH
Professor and Chair
U Mass Memorial Medical Center
U Mass School of Medicine
55 Lake Ave. North - Room S2-824
Worcester, MA 01655
508-856-3252
508-856-4910 fax

max.rosen@umassmemorial.org
Follow me on LinkedIn or Twitter
**www.umassmed.edu/radiology**

*Confidentiality Notice:*
*This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential, proprietary and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender immediately and destroy or permanently delete all copies of the original message.*

## EXHIBIT F

 

Department of Radiology

University Campus
55 Lake Avenue North
Worcester, MA 01655
Tel: 508-856-3252
Fax: 508-856-4910
max.rosen@umassmemorial.org
www.umassmemorial.org

Max P. Rosen, MD, MPH, FACR
Professor and Chair

February 14, 2017

Dear Diagnostic Radiology Faculty,

I am pleased to introduce the new salary structure for the Department of Radiology that will be effective March 1, 2017.

Here are the highlights:

1) The base salary will be $330,000.
2) Associate Professors will receive an additional $10,000.
3) Professors will receive an additional $10,000.
4) Division and/or Medical Chiefs will receive $15,000.
5) Vice Chairs will receive $15,000.
6) Other administrative/clinical roles may receive monetary support at the discretion of the Chair.
7) The above salary and stipends are full-time faculty and will be prorated for part-timers.

For this year, salary adjustments will be made for faculty with more than a 1000 RVUs behind the 50th percentile of the AAARAD RVU benchmark. The adjustment will be capped at 5% of the total salary. The monetary value of an RVU will be based on the average collection/RVU in fiscal year 2016. This was mandated by the hospital's funds flow committee.

You will receive individual letters outlining your new salary effective March 1, 2017.

Thank you for your patience with this project. I am confident that this new structure will provide competitive salaries, compensation transparency, and a clear promotion trajectory.

Sincerely,

Max P. Rosen, MD, MPH
Chair Department of Radiology


Cc. Randa Mowlood

# **<u>EXHIBIT G</u>**

 **UMassMemorial** |  **University of Massachusetts Medical School**

*Department of Radiology*

*University Campus*
*55 Lake Avenue North*
*Worcester, MA 01655*
*Tel: 508-856-3252*
*Fax: 508-856-4910*
*max.rosen@umassmemorial.org*
*www.umassmemorial.org*

*Max P. Rosen, MD, MPH, FACR*
*Professor and Chair*

February 16, 2017

Charu Desai, MD
Abdominal Division
Department of Radiology
UMass Memorial
55 Lake Avenue North
Worcester, MA 01655

Dear Charu,

As you know, we are introducing a new salary structure for the Department of Radiology that will be effective March 1, 2017.

Your annual salary will increase from $ 302,575 to $340,000. Your new salary was calculated as follows:

Base:                   $330,000
Associate Professor:    $10,000
Total:                  $340,000

Thank you for your commitment to our Department.

Sincerely,

Max P. Rosen, MD, MPH
Chair Department of Radiology

Cc. Randa Mowlood

UMf

Charu Desai, MD
Exhibit_32
10/22/2020

**<u>EXHIBIT D</u>**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-cv-10520-TSH

CHARU DESAI,
    Plaintiff,

    v.

UMASS MEMORIAL MEDICAL
CENTER, INC., et al.,
    Defendants.

**AFFIDAVIT OF
MICHAEL J. PARUTA**

I, Michael J. Paruta, hereby depose and state as follows:

1.    I am the Director of Human Resources for Marlborough Hospital, and in this capacity I have personal knowledge of the facts set forth herein.

2.    I was asked to review Marlborough Hospital's records to determine whether Charu Desai, M.D., Darren Brennan, M.D., or Kimberly Robinson, M.D., were ever employed by Marlborough Hospital.

3.    I conducted a comprehensive review of applicable records and can confirm that Dr. Charu Desai, Dr. Darren Brennan, and Dr. Kimberly Robinson have never been employed by Marlborough Hospital.

4.    Marlborough Hospital does not employ any physicians who provide medical care at Marlborough Hospital.

5.    Dr. Kimberly Robinson has served as an independent contractor to Marlborough Hospital in the role of Medical Director of the Intensive Care Unit. Dr. Robinson's independent contractor arrangement with Marlborough Hospital in this role is subject to an independent contractor agreement, a copy of which is attached hereto as **Exhibit A**.

6.      Dr. Kimberly Robinson has also served as an independent contractor to Marlborough Hospital in the role of Medical Director for Respiratory Care Services. Dr. Robinson's independent contractor arrangement with Marlborough Hospital in this role is subject to an independent contractor agreement, a copy of which is attached hereto as **Exhibit B**.

7.      As stated in the two independent contractor agreements between Dr. Robinson and Marlborough Hospital: "Physician shall perform all services hereunder as an independent contractor. Physician and its employees, agents, and subcontractors are not employees or agents of the Hospital, and shall not hold themselves out as, or claim to be, officers or employees of Hospital, and will not make any claim, demand, or application to or for any right or privilege applicable to an officer or employee of Hospital, including, but not limited to, worker's compensation coverage, unemployment insurance benefits, social security benefits, or retirement membership or credit." Exhibits A & B, ¶ 19.

8.      In addition, Dr. Robinson provides on-site shift coverage on an independent contractor basis to the Intensive Care Unit of Marlborough Hospital, with such services being subject to a Physician Consultant Contract – a copy of which is attached as **Exhibit C**.

9.      As stated in the Physician Consultant Contract: "Contractor shall perform all services under this Contract as an independent contractor. The Contractor is not an employee or agent of the Hospital, and shall not hold him/herself out as, nor claim to be, an officer or employee of the Hospital and will not make any claim, demand, or application to or for any right or privilege applicable to an officer or employee of Hospital, including, but not limited to, worker's compensation coverage, unemployment insurance benefits, social security benefits, or retirement membership or credit." Exhibit C, ¶ 10.

10.     Dr. Kimberly Robinson is a member of Mass Lung and Allergy, P.C., a professional corporation which is unaffiliated with Marlborough Hospital. Mass Lung and Allergy, P.C., provides intensivist critical care coverage through its member physicians on an independent contractor basis at Marlborough Hospital, pursuant to an Intensivist Coverage Agreement, a copy of which is attached as **Exhibit D**.

11.     Dr. Robinson has served for a period as the President of the Marlborough Hospital Medical Staff, which is a position selected by the Medical Staff and not the Hospital. The President of the Medical Staff is not an employee of Marlborough Hospital does not act on its behalf.

12.     Dr. Brennan and Dr. Desai have performed professional radiology services at Marlborough Hospital pursuant to a Professional Services Agreement By and Between Marlborough Hospital and UMass Memorial Medical Group, Inc. (the "Professional Services Agreement"), a copy of which is attached as **Exhibit E**.

13.     As stated in the Professional Services Agreement, "Radiologists shall not be employees of the Hospital." Exhibit E, ¶ 12. Instead, the radiologists who perform services at Marlborough Hospital are employed by the UMass Memorial Medical Group, Inc. (the "Medical Group").

14.     The Professional Services Agreement also states: "It is expressly understood and agreed that, in the performance of services under this Agreement, the [Medical] Group and the employees and independent contractors engaged by the Group shall at all times act as independent contractors with respect to the Hospital and as an independent private radiologist practice, and not as employees or agents of the Hospital." Exhibit E, ¶ 18.

15.     The Professional Services Agreement further provides: "The [Medical] Group shall be responsible for paying compensation to all Group Radiologists." Exhibit E, ¶ 12.

16.     The Professional Services Agreement further provides that the Medical Group, with the approval of Marlborough Hospital's President, will select one of its physician-employees as the Chief of Radiology for Marlborough Hospital, to perform various administrative duties as set forth in the Agreement. Exhibit E, ¶ 8, Ex. A.

17.     The physician appointed as Chief of Radiology for Marlborough Hospital is not an employee of Marlborough Hospital.

18.     The physician appointed as Chief of Radiology for Marlborough Hospital does not have the authority to act on behalf of the Hospital, except to the extent reflected in the Professional Services Agreement.

19.     Marlborough Hospital does not have, and has not had, the power to hire, fire or discipline Dr. Desai, Dr. Brennan, or any other member of the Medical Group.

20.     Marlborough Hospital has never had the power to set the compensation for Dr. Desai, Dr. Brennan, or any other member of the Medical Group, nor has it played any role in setting such compensation.

21.     Marlborough Hospital does not, and has not, set the work schedules for either Dr. Desai or Dr. Brennan.

22.     Marlborough Hospital does not maintain employment records for Dr. Desai, Dr. Brennan, or Dr. Robinson.

23.     Marlborough Hospital has not directed Dr. Desai in the performance of her job duties and responsibilities.

24.     Marlborough Hospital has not directed Dr. Brennan in the performance of his job duties and responsibilities.

25.     Marlborough Hospital has not directed Dr. Robinson in the performance of her job duties and responsibilities, except within the scope of the agreements governing her independent contractor roles as set forth in the agreements references herein.

26.     The terms of Dr. Robinson's compensation as an independent contractor, her work schedule, and Marlborough Hospital's ability to terminate the independent contractor relationship are set forth in the respective agreements.

Signed under pains and penalties of perjury this *10* day of December 2021.

Michael J. Paruta

# **EXHIBIT A**

**MEDICAL DIRECTOR AGREEMENT**
**INENSIVE CARE UNIT**

This Medical Director Agreement ("Agreement") dated November 1,2020 is made by and between Kimberly Robinson, M.D. (hereinafter called **"Physician"**), and Marlborough Hospital (hereinafter called **"Hospital"**), a not for profit corporation organized under the laws of the Commonwealth of Massachusetts. Hospital desires to enter into an agreement for services, and Physician represents itself as competent and qualified to accomplish the specific requirements of this Agreement; therefore, Hospital and Physician enter into this Agreement under the following terms and conditions:

1.  **Scope of Services**.  Physician agrees to perform the services described in **Attachment A**, "Scope of Services," attached hereto and made a part hereof.  If applicable, specific performance metrics and/or quality indicators are incorporated in the Scope of Services and set forth in Attachment A.

2.  **Term.**  This initial term of this Agreement will commence upon execution by both parties and expire December 31, 2021.  The term shall automatically renew for successive terms of one year each unless terminated earlier as provided herein.

3.  **INTENTIONALLY OMITTED.**

4.  **Service Fees**.  Hospital shall compensate Physician for the services in the amount of Thirty Thousand Dollars ($30,000) per year ("Service Fees").  The Service Fees shall be re-evaluated annually and adjusted as needed to reflect fair market value for the services.  In the event the parties can not agree on the Service Fees after good faith negotiations, then either party may terminate the Agreement by providing at least thirty (30) days prior written notice.

5.  **Physician's Certification.**  Physician certifies the following:  (a) that it has the requisite authority, skill, and experience to perform the services hereunder in accordance with applicable professional standards, and has obtained all requisite licenses and permits to perform those services; (b) that it has complied with all Massachusetts laws relating to contributions and payment in lieu of contributions to the Employment Security System, and with all laws relating to Worker's Compensation (M.G.L. c. 152); (c) that neither it nor any of its directors, officers, agents, employees or subcontractors (i) are currently, or have ever been, excluded, suspended or debarred from, have been declared ineligible to participate in, or are currently a party to an action or proceeding seeking to exclude, suspend or debar them from or to declare them ineligible to participate in, the Medicare or Medicaid programs or any other federal or state program, or (ii) have been convicted under federal or state law of a criminal offense related to the neglect or abuse of a patient, or the delivery of an item or service, including the performance of management or administrative services related to the delivery of an item or service, under the Medicare or Medicaid Programs.  If at any time during the term of this Agreement there is a change in circumstances such that Physician is unable to make all of the certifications set forth in this Section 5, then Physician will immediately notify Hospital in writing, whereupon Hospital may terminate this Agreement by providing Physician with thirty (30) days prior written notice.

6.  **Termination.**  This Agreement may be terminated without cause by either party by giving written notice to the other at least thirty (30) calendar days prior to the effective date of termination stated in said notice.  If Physician fails to fulfill its obligations, Hospital may terminate this Agreement by giving written notice to Physician at least seven (7) calendar days before the effective date of termination stated in the notice.  The notice shall state the circumstances of the alleged breach and may state a period during which the alleged breach may be cured, which cure shall be subject to approval by Hospital.

7.  **Obligations in Event of Termination.**  Upon termination, all finished or unfinished documents, data,

computer software, studies, and reports made, developed, and/or prepared by Physician pursuant to this Agreement shall become the property of Hospital. Hospital shall pay Physician for all services performed to the effective date of termination, subject to (i) any indemnification provisions of this Agreement and (ii) offset of sums due Physician against sums owed by Physician to Hospital.

8.     **Recordkeeping, Audit, and Inspection of Records.** Physician shall maintain books, records and other compilations of data pertaining to the requirements of this Agreement in such detail as shall properly substantiate claims for payment hereunder. All such records shall be kept for a period of six (6) years or for such longer period as is specified herein. All retention periods start on the first day after final payment owed by Hospital under this Agreement is made to Physician. If any litigation, claim, negotiation, audit or other action involving the records is commenced prior to the expiration of the applicable retention period, all records shall be retained until completion of the action and resolution of all issues, or until the end of the applicable retention period, whichever is later. Hospital, or any of its duly authorized representatives or designees, shall have the right at reasonable times and upon reasonable notice, to examine and copy the books, records, and other compilations of data of Physician that pertain to the provisions and requirements of this Agreement, wherever such data is located. If Physician provides services to Hospital for compensation of more than $10,000.00 within a twelve (12) month period, Physician hereby consents to grant the Federal Controller General or Health and Human Services or the Centers for Medicare and Medicaid Services, or their agents, access to Physician's books, documents or records in accordance with the Omnibus Reconciliation Act of 1980.

9.     **Treatment of Assets.** Title to all property furnished by Hospital shall remain with Hospital. Title to all property purchased by Physician from funds provided under this Agreement shall vest with Hospital. Any property of Hospital furnished to Physician shall be used only for the performance of this Agreement. Physician shall be responsible for any loss or damage to Hospital property caused by Physician's misconduct, negligence, lack of good faith, or failure to maintain or administer the property in accordance with sound management practices. Physician will immediately notify the Designated Hospital Representative of any loss or damage to Hospital property. Prior to, or upon termination of, this Agreement, Physician will return Hospital's property in like condition as it was furnished to Physician. All reference to Physician under this clause shall include any of Physician's employees, agents, or subcontractors.

10.    **Safeguarding of Patient and Hospital Information.**

       (a)     Physician will (i) comply with all applicable federal, state and local laws and regulations, and (ii) in receiving, reviewing, processing, storing or otherwise dealing with any medical record, including medical records that document or reflect the provision of substance abuse treatment by UMass Memorial or UMass Memorial Members to any identified patient, be bound by the provisions of 42 U.S.C. Section 290dd-2 and any accompanying regulations, as amended.

       (b)     Physician acknowledges that in the performance of this Agreement, Physician may acquire or have access to medical records or confidential medical information about patients and/or employees. Physician may acquire or have access to "Personal Information," as defined under Massachusetts law (M.G.L. c. 93H), of patients and/or employees. Physician shall comply with all applicable Massachusetts laws and regulations (including M.G.L. c. 93H and 93I) and federal laws and regulations relating to patient confidentiality, privacy and security (including the federal law known as HIPAA, and all implementing regulations relating thereto), and with all Hospital policies and procedures regarding medical records and information. If Physician is a "Business Associate" and receives "Protected Health Information" (as those terms are defined under HIPAA) from Hospital pursuant to this Agreement, then Physician shall execute and be bound by Hospital's Business Associate Agreement ("BAA"), which shall be attached hereto as Attachment C. In the event of any conflict between the terms of the BAA and this Section, the BAA will control. Physician shall at all times recognize Hospital's ownership of medical records and the exclusive

right and jurisdiction of Hospital and Hospital patients to control the use of medical records and information.  The use or disclosure of any part of any information concerning a patient of Hospital, its subsidiaries or affiliates, for any purpose not directly connected with the services under this Agreement is prohibited.  Physician shall notify Hospital orally and in writing within five business days of its discovery that any Protected Health Information or Personal Information in its possession or control has been improperly used, copied or removed by anyone except an authorized representative of Hospital. Physician shall cooperate with Hospital in taking such steps as Hospital deems appropriate to enjoin the misuse, regain possession of the data, and otherwise protect Hospital and the patient's rights and privacy.

Physician agrees to comply with the requirements of Massachusetts General Law Chapter 93I for the disposing of records containing Personal Information and shall implement and monitor compliance with policies and procedures that prohibit unauthorized access to, acquisition of, or use of personal information during the collection, transportation, and disposal of Personal Information.

(c)      Physician shall take all reasonable steps to assure the security of Protected Health Information, Personal Information, and other confidential information in its possession, including, but not limited to: alarm systems, locked files, guards or other devices reasonably calculated to prevent unauthorized access to electronically or mechanically held data, limited terminal access, encryption, limited access to input documents and outputs documents, and design provisions that avoid unnecessary use of names or other identifying characteristics of patients or others.  Hospital shall have access at all times to any Protected Health Information, medical records, data or information maintained pursuant to this Agreement without the consent of the patient.  Agents, employees, or subcontractors of Physician who shall have access to Protected Health Information, Personal Information, medical records, or information shall sign Hospital's applicable confidentiality agreement.  Physician agrees to instruct its employees, agents, and subcontractors having access to Protected Health Information or Personal Information of their obligations under this Agreement.

(d)      Physician shall also hold in strict confidence and not release to any third party, without the written approval of Hospital, any information provided to Physician by Hospital or its affiliates, or their agents and employees, which is identified as confidential or proprietary, or which Physician knows or has good reason to know is confidential or proprietary, including, without limitation, all pricing information, information relating to third party rates of reimbursement and information about Hospital finances or strategies.

(e)      Any failure of Physician to comply with these requirements shall be deemed a material breach by Physician.

11.      **Assignment and Subcontracting.**  Physician will not assign or in any way transfer any interest in this Agreement, nor shall it subcontract any services hereunder, without Hospital's prior written approval, and in the event Physician assigns, transfers, or subcontracts all or part of this Agreement, Physician shall ensure that the assignee, transferee and/or subcontractor will jointly and severally assume responsibility along with Physician for all applicable certifications and obligations of Physician set forth herein including, without limitation, the obligations in Section 16.  Hospital may assign this Agreement to UMass Memorial Health Care, Inc. or any of its subsidiaries, and Hospital will provide Physician with notice of any such assignment.

12.      **Nondiscrimination in Employment.**  Hospital is an equal opportunity employer and federal contractor or subcontractor.  Consequently, the parties agree that, as applicable, they will abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a) and that these regulations are incorporated herein by reference.  These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and they prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender

identity or national origin. These regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability. The parties also agree that, as applicable, they will abide by the requirements of Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of rights under federal labor laws.

13.    **Choice of Law.**  This Agreement shall be construed under and governed by the laws of the Commonwealth of Massachusetts. The parties agree to bring any legal proceedings arising under this Agreement in a state court of competent jurisdiction within the Commonwealth of Massachusetts. This paragraph shall not be construed to limit any other legal rights of the parties.

14.    **Force Majeure.**  Neither party shall be liable to the other or be deemed to be in breach of this Agreement for any failure or delay in rendering performance arising out of causes beyond its reasonable control and without its fault or negligence. Such causes may include, but are not limited to, acts of God or of a public enemy, government orders, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, or unusually severe weather. Dates or times of performance shall be extended to the extent of delays excused by this section, provided that the party whose performance is affected notifies the other promptly of the existence and nature of such delay.

15.    **Compliance with Laws and Hospital Policies.**  Physician shall comply with all applicable laws, rules, regulations, ordinances, orders or requirements of any governmental authority, as well as all applicable bylaws, policies, and rules and regulations of Hospital, relating to the delivery of the services specified in this Agreement. Hospital has the right to require Physician to pay fines, penalties, and damages that may arise or be imposed because of Physician's breach or failure to comply with the provisions of this Agreement.

16.    **Insurance and Indemnification.**  Physician will maintain insurance policies sufficient to cover its responsibilities under this Agreement including, but not limited to, professional and general liability, automobile, and/or property liability as appropriate. Within thirty (30) days of commencement of work, Physician shall provide the Hospital with properly executed Certificates of Insurance evidencing such coverage and provide that such coverage shall not be canceled except on thirty (30) days prior written notice to Hospital. Coverage should be placed with an A-rated carrier qualified to do business in Massachusetts unless Hospital otherwise consents in writing. Physician shall indemnify and hold harmless Hospital, its Affiliates, agents, officers and employees against any and all liability, loss, damages, penalties, costs or expenses (i) resulting from, arising out of, or in connection with a breach of Section 10 by Physician, its agents, officers, employees or subcontractors and/or (ii) for personal injury or damage to real or tangible personal property which Hospital may sustain, incur or be required to pay, resulting from, arising out of, or in connection with the services performed or delivered under this Agreement by reason of negligence, reckless or intentional misconduct of Physician, its agents, officers, employees, or subcontractors. Physician's obligation to indemnify is contingent upon Hospital notifying Physician of any claim within a reasonable time after Hospital becomes aware of it, and Physician being afforded an opportunity to participate in the defense of such claim. In such event, no negotiated settlement agreement shall be binding on a party without that party's concurrence, which shall not be unreasonably withheld.

17.    **Waivers.**  All conditions, covenants, duties, and obligations contained in this Agreement may be waived only by written agreement. Forbearance or indulgence in any form or manner by a party shall not be construed as a waiver or in any way limit the legal or equitable remedies available to that party.

18.    **Notice.**  Unless otherwise specified in an Attachment hereto, any notice hereunder shall be in writing addressed to the persons and addresses indicated below.

        **To:     Marlborough Hospital**

DocuSign Envelope ID: E9BB3A4F-5380-4A07-8745-4BE896055E73

**157 Union Street**
**Marlborough, MA 01752**
**Attn:  President**

With a required copy to:

**UMass Memorial Health Care**
**Office of the General Counsel**
**365 Plantation Street**
**3rd Floor, Suite 334**
**Worcester, MA 01605**

To:  Physician:

_____
_____
_____

19. **Independent Physician**.  Physician shall perform all services hereunder as an independent contractor. Physician and its employees, agents, and subcontractors are not employees or agents of Hospital, and shall not hold themselves out as, or claim to be, officers or employees of Hospital, and will not make any claim, demand, or application to or for any right or privilege applicable to an officer or employee of Hospital including, but not limited to, worker's compensation coverage, unemployment insurance benefits, social security benefits, or retirement membership or credit.

20. **Approval of Physician's Personnel.**  Hospital shall have the right to approve all personnel assigned to this Agreement before such personnel begin performance under this Agreement, and the right at any time, with reasonable notice to Physician, to require Physician to replace any person assigned by Physician to provide services under this Agreement.

21. **Health Monitoring of Physician Personnel.**  In accordance with Hospital's policy, Hospital may require that Physician's personnel undergo physical examination and/or laboratory testing before providing services at Hospital's health care facilities, if Hospital determines that such examinations and/or testing is reasonably necessary to protect the health and safety of Hospital patients.  Hospital may also require Physician to ensure that such personnel have had the appropriate examinations, tests, immunizations and other screening required by Hospital or by state, federal, or local laws and regulations.  Physician shall retain and, if requested, provide certification that such examinations, tests, or other requirements have been met.

22. **Hospital Tax Exemption.**  Any material, equipment, or service provided to Hospital purchased under this Agreement is exempt from Massachusetts Sales Tax.

23. **Quality.**  Physician represents that all services provided pursuant to this Agreement will be rendered in accordance with the ethical and professional standards of The Joint Commission.

24. **Amendments.**  No amendment to this Agreement shall be effective unless it is signed by authorized representatives of the parties and complies with all other regulations and requirements of law.

25. **Headings.**  The section headings of this Agreement are made for reference only, and shall not be construed to define or limit the scope or intent of the terms and conditions herein.

26. **Entire Agreement.**  The parties understand and agree that this Agreement and Attachments (if any) supersede and void all other oral and written agreements and negotiations by the parties relating to the

services under this Agreement. This Agreement shall not be binding against either party unless both parties have signed below. If language in Attachments A and/or B contradicts any provision of this Agreement, the contradictory language in such Attachments shall be disregarded, and the terms of this Agreement shall prevail, unless it is indicated that the language of the Attachment specifically overrides this Section 26 and the Attachment is separately signed by an authorized officer of the Hospital.

IN WITNESS WHEREOF, the parties hereto set their hands as of the date first written above:

## MARLBOROUGH HOSPITAL

By: *John E. Bronhard II*
Print Name:
Title:

By: *Kimberly Robinson*
Kimberly Robinson, MD

DocuSign Envelope ID: E9BB3A4F-5390-4A07-9745-4BF806955E73

## ATTACHMENT A: SCOPE OF SERVICES

### PART A: Description of the Services

### Duties/Responsibilities for the Medical Director of the Intensive Care Unit

The duties and responsibilities shall include:

1. Serving as Chair of the Intensive Care Unit Committee, including developing the agenda, creating and reviewing meeting minutes, assigning tasks and monitoring progress.
2. Functioning as Physician Leader of the ICU, including championing the use of the most relevant evidence medicine to deliver the highest standards of care.
3. Monitoring and evaluating the quality and appropriateness of care provided in the ICU as well as critical care provided in other areas of the hospital while temporizing while awaiting transfer to the ICU. Working in conjunction with the Chief Medical Officer and Chief Nursing Officer. Act as a resource to nursing and other physicians and providers with respect to issues related to patient care management, as appropriate. Medical Directors provide 24-hour availability, including where necessary, an appropriately qualified designee(s) to share these responsibilities or assume them in director's absence.
4. Supporting the development and maintenance of nursing programs and the educational plan for nurses in the ICU and participate in these programs as appropriate.
5. Updating the medical staff regarding changes in the ICU Protocols, Policies and Practices. Ensure policies relative to the Medical Staff Bylaws, Rules and Regulations are followed.
6. Working with the Nurse Manager/Director regarding prioritization of placement of patients, including serving as liaison to the medical staff regarding available resources. The Medical Director shall communicate and will have final authority for decisions regarding patient placement in the ICU and the Medical Director will communicate such decisions to medical staff and nurse manager.
7. Participate in discussions regarding development, evaluation, and introduction of services, equipment and procedures.
8. Participate in design and coordination of, and/or serve as principal investigator or study coordinator, for, and registries or studies ongoing within the ICU as applicable.
9. Member of the MEC, PCMC and MS Quality Assurance Committee and others as per the MH MS Bylaws and Rules and Regulations.
10. Medical Director will work with infectious control committee to develop and implement procedures to prevent the transmission of infections in the ICU and prevention of other hazards to patients and staff.
11. Function as the Physician leader of the ICU with the ability to implement policies of the medical staff (i.e. consult, write orders, etc.) when needed.
12. Represent the ICU committee regarding medical care considerations in meetings with Medical Staff.
13. Meet periodically with EICU leaders to review performance i.e. quality outcomes
14. Oversee, supervise, and evaluate the performance of all advanced practice providers working in the ICU as required by the Medical Staff credentialing processes and MA standards of care.
15. Advise Administration, and participate in the recruitment, selection, credentialing, and development of advanced practice providers for the ICU to ensure adequate coverage of the unit in accordance with agreed upon staffing plans when necessary.

<u>**ATTACHMENT A:   SCOPE OF SERVICES**</u>

**PART B:  Performance Metrics and Quality Indicators**

- ***Clinical/Licensed (non-credentialed) Personnel:***
  - *Provider Staff meeting Minimal Qualifications*
    - *Licensure/Training*
    - *Experience*
    - *References*
- ***Quality of care***
  - *Patient Satisfaction -providers*
  - *Provider Satisfaction*
  - *Complaints involving providers*
  - *Incident reports involving providers*

- ***Credentialed Personnel***
  - *Completes the credentialing and privileging process*
  - *Meets criteria for OPPE/FPPE evaluations*
  - *Participates in Departmental/Divisional Quality/Performance improvement activities.*

**Contractor will maintain the above performance metrics and quality indicators.  Except as otherwise stated, failure to meet the requirements shall constitute a default under this Agreement.**

**EXHIBIT B**

# MEDICAL DIRECTOR AGREEMENT
# RESPIRATORY CARE SERVICES

This Medical Director Agreement ("Agreement") dated November 1, 2020 is made by and between Kimberly Robinson, M.D. (hereinafter called **"Physician"**), and Marlborough Hospital (hereinafter called **"Hospital"**), a not for profit corporation organized under the laws of the Commonwealth of Massachusetts. Hospital desires to enter into an agreement for services, and Physician represents itself as competent and qualified to accomplish the specific requirements of this Agreement; therefore, Hospital and Physician enter into this Agreement under the following terms and conditions:

1.  **Scope of Services**.  Physician agrees to perform the services described in **Attachment A**, "Scope of Services," attached hereto and made a part hereof.  If applicable, specific performance metrics and/or quality indicators are incorporated in the Scope of Services and set forth in Attachment A.

2.  **Term.**  This initial term of this Agreement will commence upon execution by both parties and expire December 31, 2021.  The term shall automatically renew for successive terms of one year each unless terminated earlier as provided herein.

3.  **INTENTIONALLY OMITTED.**

4.  **Service Fees**.  Hospital shall compensate Physician for the services in the amount of Ten Thousand Dollars ($10,000) per year ("Service Fees").  The Service Fees shall be re-evaluated annually and adjusted as needed to reflect fair market value for the services.  In the event the parties can not agree on the Service Fees after good faith negotiations, then either party may terminate the Agreement by providing at least thirty (30) days prior written notice.

5.  **Physician's Certification.**  Physician certifies the following:  (a) that it has the requisite authority, skill, and experience to perform the services hereunder in accordance with applicable professional standards, and has obtained all requisite licenses and permits to perform those services; (b) that it has complied with all Massachusetts laws relating to contributions and payment in lieu of contributions to the Employment Security System, and with all laws relating to Worker's Compensation (M.G.L. c. 152); (c) that neither it nor any of its directors, officers, agents, employees or subcontractors (i) are currently, or have ever been, excluded, suspended or debarred from, have been declared ineligible to participate in, or are currently a party to an action or proceeding seeking to exclude, suspend or debar them from or to declare them ineligible to participate in, the Medicare or Medicaid programs or any other federal or state program, or (ii) have been convicted under federal or state law of a criminal offense related to the neglect or abuse of a patient, or the delivery of an item or service, including the performance of management or administrative services related to the delivery of an item or service, under the Medicare or Medicaid Programs.  If at any time during the term of this Agreement there is a change in circumstances such that Physician is unable to make all of the certifications set forth in this Section 5, then Physician will immediately notify Hospital in writing, whereupon Hospital may terminate this Agreement by providing Physician with thirty (30) days prior written notice.

6.  **Termination.**  This Agreement may be terminated without cause by either party by giving written notice to the other at least thirty (30) calendar days prior to the effective date of termination stated in said notice.  If Physician fails to fulfill its obligations, Hospital may terminate this Agreement by giving written notice to Physician at least seven (7) calendar days before the effective date of termination stated in the notice.  The notice shall state the circumstances of the alleged breach and may state a period during which the alleged breach may be cured, which cure shall be subject to approval by Hospital.

7.   **Obligations in Event of Termination.**  Upon termination, all finished or unfinished documents, data, computer software, studies, and reports made, developed, and/or prepared by Physician pursuant to this Agreement shall become the property of Hospital. Hospital shall pay Physician for all services performed to the effective date of termination, subject to (i) any indemnification provisions of this Agreement and (ii) offset of sums due Physician against sums owed by Physician to Hospital.

8.   **Recordkeeping, Audit, and Inspection of Records.**  Physician shall maintain books, records and other compilations of data pertaining to the requirements of this Agreement in such detail as shall properly substantiate claims for payment hereunder.  All such records shall be kept for a period of six (6) years or for such longer period as is specified herein.  All retention periods start on the first day after final payment owed by Hospital under this Agreement is made to Physician.  If any litigation, claim, negotiation, audit or other action involving the records is commenced prior to the expiration of the applicable retention period, all records shall be retained until completion of the action and resolution of all issues, or until the end of the applicable retention period, whichever is later.  Hospital, or any of its duly authorized representatives or designees, shall have the right at reasonable times and upon reasonable notice, to examine and copy the books, records, and other compilations of data of Physician that pertain to the provisions and requirements of this Agreement, wherever such data is located.  If Physician provides services to Hospital for compensation of more than $10,000.00 within a twelve (12) month period, Physician hereby consents to grant the Federal Controller General or Health and Human Services or the Centers for Medicare and Medicaid Services, or their agents, access to Physician's books, documents or records in accordance with the Omnibus Reconciliation Act of 1980.

9.   **Treatment of Assets**.  Title to all property furnished by Hospital shall remain with Hospital. Title to all property purchased by Physician from funds provided under this Agreement shall vest with Hospital.  Any property of Hospital furnished to Physician shall be used only for the performance of this Agreement.  Physician shall be responsible for any loss or damage to Hospital property caused by Physician's misconduct, negligence, lack of good faith, or failure to maintain or administer the property in accordance with sound management practices.  Physician will immediately notify the Designated Hospital Representative of any loss or damage to Hospital property.  Prior to, or upon termination of, this Agreement, Physician will return Hospital's property in like condition as it was furnished to Physician.  All reference to Physician under this clause shall include any of Physician's employees, agents, or subcontractors.

10.   **Safeguarding of Patient and Hospital Information**.

(a)    Physician will (i) comply with all applicable federal, state and local laws and regulations, and (ii) in receiving, reviewing, processing, storing or otherwise dealing with any medical record, including medical records that document or reflect the provision of substance abuse treatment by UMass Memorial or UMass Memorial Members to any identified patient, be bound by the provisions of 42 U.S.C. Section 290dd-2 and any accompanying regulations, as amended.

(b)    Physician acknowledges that in the performance of this Agreement, Physician may acquire or have access to medical records or confidential medical information about patients and/or employees.  Physician may acquire or have access to "Personal Information," as defined under Massachusetts law (M.G.L. c. 93H), of patients and/or employees.  Physician shall comply with all applicable Massachusetts laws and regulations (including M.G.L. c. 93H and 93I) and federal laws and regulations relating to patient confidentiality, privacy and security (including the federal law known as HIPAA, and all implementing regulations relating thereto), and with all Hospital policies and procedures regarding medical records and information.  If Physician is a "Business Associate" and receives "Protected Health Information" (as those terms are defined under HIPAA) from Hospital pursuant to this Agreement, then Physician shall execute and be bound by Hospital's Business Associate Agreement ("BAA"), which shall be attached hereto as Attachment C.  In the event of any conflict between the terms of the BAA and this Section, the BAA will control.

Physician shall at all times recognize Hospital's ownership of medical records and the exclusive right and jurisdiction of Hospital and Hospital patients to control the use of medical records and information. The use or disclosure of any part of any information concerning a patient of Hospital, its subsidiaries or affiliates, for any purpose not directly connected with the services under this Agreement is prohibited. Physician shall notify Hospital orally and in writing within five business days of its discovery that any Protected Health Information or Personal Information in its possession or control has been improperly used, copied or removed by anyone except an authorized representative of Hospital. Physician shall cooperate with Hospital in taking such steps as Hospital deems appropriate to enjoin the misuse, regain possession of the data, and otherwise protect Hospital and the patient's rights and privacy.

Physician agrees to comply with the requirements of Massachusetts General Law Chapter 93I for the disposing of records containing Personal Information and shall implement and monitor compliance with policies and procedures that prohibit unauthorized access to, acquisition of, or use of personal information during the collection, transportation, and disposal of Personal Information.

(c)      Physician shall take all reasonable steps to assure the security of Protected Health Information, Personal Information, and other confidential information in its possession, including, but not limited to: alarm systems, locked files, guards or other devices reasonably calculated to prevent unauthorized access to electronically or mechanically held data, limited terminal access, encryption, limited access to input documents and outputs documents, and design provisions that avoid unnecessary use of names or other identifying characteristics of patients or others. Hospital shall have access at all times to any Protected Health Information, medical records, data or information maintained pursuant to this Agreement without the consent of the patient. Agents, employees, or subcontractors of Physician who shall have access to Protected Health Information, Personal Information, medical records, or information shall sign Hospital's applicable confidentiality agreement. Physician agrees to instruct its employees, agents, and subcontractors having access to Protected Health Information or Personal Information of their obligations under this Agreement.

(d)      Physician shall also hold in strict confidence and not release to any third party, without the written approval of Hospital, any information provided to Physician by Hospital or its affiliates, or their agents and employees, which is identified as confidential or proprietary, or which Physician knows or has good reason to know is confidential or proprietary, including, without limitation, all pricing information, information relating to third party rates of reimbursement and information about Hospital finances or strategies.

(e)      Any failure of Physician to comply with these requirements shall be deemed a material breach by Physician.

11.      **Assignment and Subcontracting.** Physician will not assign or in any way transfer any interest in this Agreement, nor shall it subcontract any services hereunder, without Hospital's prior written approval, and in the event Physician assigns, transfers, or subcontracts all or part of this Agreement, Physician shall ensure that the assignee, transferee and/or subcontractor will jointly and severally assume responsibility along with Physician for all applicable certifications and obligations of Physician set forth herein including, without limitation, the obligations in Section 16. Hospital may assign this Agreement to UMass Memorial Health Care, Inc. or any of its subsidiaries, and Hospital will provide Physician with notice of any such assignment.

12.      **Nondiscrimination in Employment.** Hospital is an equal opportunity employer and federal contractor or subcontractor. Consequently, the parties agree that, as applicable, they will abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a) and that these regulations are incorporated herein by reference. These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and they prohibit

discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. These regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability. The parties also agree that, as applicable, they will abide by the requirements of Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of rights under federal labor laws.

13.     **Choice of Law.** This Agreement shall be construed under and governed by the laws of the Commonwealth of Massachusetts. The parties agree to bring any legal proceedings arising under this Agreement in a state court of competent jurisdiction within the Commonwealth of Massachusetts. This paragraph shall not be construed to limit any other legal rights of the parties.

14.     **Force Majeure.** Neither party shall be liable to the other or be deemed to be in breach of this Agreement for any failure or delay in rendering performance arising out of causes beyond its reasonable control and without its fault or negligence. Such causes may include, but are not limited to, acts of God or of a public enemy, government orders, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, or unusually severe weather. Dates or times of performance shall be extended to the extent of delays excused by this section, provided that the party whose performance is affected notifies the other promptly of the existence and nature of such delay.

15.     **Compliance with Laws and Hospital Policies.** Physician shall comply with all applicable laws, rules, regulations, ordinances, orders or requirements of any governmental authority, as well as all applicable bylaws, policies, and rules and regulations of Hospital, relating to the delivery of the services specified in this Agreement. Hospital has the right to require Physician to pay fines, penalties, and damages that may arise or be imposed because of Physician's breach or failure to comply with the provisions of this Agreement.

16.     **Insurance and Indemnification.** Physician will maintain insurance policies sufficient to cover its responsibilities under this Agreement including, but not limited to, professional and general liability, automobile, and/or property liability as appropriate. Within thirty (30) days of commencement of work, Physician shall provide the Hospital with properly executed Certificates of Insurance evidencing such coverage and provide that such coverage shall not be canceled except on thirty (30) days prior written notice to Hospital. Coverage should be placed with an A-rated carrier qualified to do business in Massachusetts unless Hospital otherwise consents in writing. Physician shall indemnify and hold harmless Hospital, its Affiliates, agents, officers and employees against any and all liability, loss, damages, penalties, costs or expenses (i) resulting from, arising out of, or in connection with a breach of Section 10 by Physician, its agents, officers, employees or subcontractors and/or (ii) for personal injury or damage to real or tangible personal property which Hospital may sustain, incur or be required to pay, resulting from, arising out of, or in connection with the services performed or delivered under this Agreement by reason of negligence, reckless or intentional misconduct of Physician, its agents, officers, employees, or subcontractors. Physician's obligation to indemnify is contingent upon Hospital notifying Physician of any claim within a reasonable time after Hospital becomes aware of it, and Physician being afforded an opportunity to participate in the defense of such claim. In such event, no negotiated settlement agreement shall be binding on a party without that party's concurrence, which shall not be unreasonably withheld.

17.     **Waivers.** All conditions, covenants, duties, and obligations contained in this Agreement may be waived only by written agreement. Forbearance or indulgence in any form or manner by a party shall not be construed as a waiver or in any way limit the legal or equitable remedies available to that party.

18.     **Notice.** Unless otherwise specified in an Attachment hereto, any notice hereunder shall be in writing addressed to the persons and addresses indicated below.

To:    **Marlborough Hospital**
        **157 Union Street**
        **Marlborough, MA 01752**
        **Attn:  President**

**With a required copy to:**

        **UMass Memorial Health Care**
        **Office of the General Counsel**
        **365 Plantation Street**
        **3rd Floor, Suite 334**
        **Worcester, MA 01605**

To:    **Physician:**

        _____
        _____
        _____

19.    **Independent Physician**.  Physician shall perform all services hereunder as an independent contractor. Physician and its employees, agents, and subcontractors are not employees or agents of Hospital, and shall not hold themselves out as, or claim to be, officers or employees of Hospital, and will not make any claim, demand, or application to or for any right or privilege applicable to an officer or employee of Hospital including, but not limited to, worker's compensation coverage, unemployment insurance benefits, social security benefits, or retirement membership or credit.

20.    **Approval of Physician's Personnel.**  Hospital shall have the right to approve all personnel assigned to this Agreement before such personnel begin performance under this Agreement, and the right at any time, with reasonable notice to Physician, to require Physician to replace any person assigned by Physician to provide services under this Agreement.

21.    **Health Monitoring of Physician Personnel.**  In accordance with Hospital's policy, Hospital may require that Physician's personnel undergo physical examination and/or laboratory testing before providing services at Hospital's health care facilities, if Hospital determines that such examinations and/or testing is reasonably necessary to protect the health and safety of Hospital patients.  Hospital may also require Physician to ensure that such personnel have had the appropriate examinations, tests, immunizations and other screening required by Hospital or by state, federal, or local laws and regulations.  Physician shall retain and, if requested, provide certification that such examinations, tests, or other requirements have been met.

22.    **Hospital Tax Exemption.**  Any material, equipment, or service provided to Hospital purchased under this Agreement is exempt from Massachusetts Sales Tax.

23.    **Quality.**  Physician represents that all services provided pursuant to this Agreement will be rendered in accordance with the ethical and professional standards of The Joint Commission.

24.    **Amendments.**  No amendment to this Agreement shall be effective unless it is signed by authorized representatives of the parties and complies with all other regulations and requirements of law.

25.    **Headings.**  The section headings of this Agreement are made for reference only, and shall not be construed to define or limit the scope or intent of the terms and conditions herein.

26.    **Entire Agreement.**  The parties understand and agree that this Agreement and Attachments (if any)

supersede and void all other oral and written agreements and negotiations by the parties relating to the services under this Agreement. This Agreement shall not be binding against either party unless both parties have signed below. If language in Attachments A and/or B contradicts any provision of this Agreement, the contradictory language in such Attachments shall be disregarded, and the terms of this Agreement shall prevail, unless it is indicated that the language of the Attachment specifically overrides this Section 26 and the Attachment is separately signed by an authorized officer of the Hospital.

IN WITNESS WHEREOF, the parties hereto set their hands as of the date first written above:

**MARLBOROUGH HOSPITAL**

By: John E. Brouhard II

Print Name: 27E5B54CF...

Title:

By: Kimberly Robinson

Kimberly Robinson, MD

**ATTACHMENT A:   SCOPE OF SERVICES**

**PART A:   Description of the Services**

**Duties/Responsibilities for the Medical Director, Respiratory Care Services (includes Respiratory Care Department and Pulmonary Function Lab)**

The duties and responsibilities shall include:

1. Collaborate with the leadership of the Marlborough Hospital Blood Gas Lab to ensure optimal patient care, compliance with regulatory requirements, and staff education needs are met.
2. Be accountable to the Medical Staff for the quality of patient care delivered by Respiratory Care Services personnel.
3. Interact directly with Respiratory Care Services personnel, and promote bedside problem solving and guidance.
4. With technical assistance, balance quality and cost effectiveness of respiratory therapies.
5. Formulate policies governing diagnostic and therapeutic procedures performed by technical staff, including tracheotomy tube management, pulmonary hygiene, ventilator management, and inhaled bronchodilator therapy.
6. Participate in the development, evaluation, and introduction of new respiratory services, equipment, protocols and procedures and monitor current respiratory services for continued medical usefulness.
7. Quality review of the testing interpretation performed in the Pulmonary Function Laboratory.
8. Ensuring pulmonary function tests are read within ninety-six (96) hours, and that physician coverage is assigned and communicated to Pulmonary Function Staff.
9. Participating in decision making regarding what types of testing will be performed in the Pulmonary Function Laboratory and what equipment will be used.
10. Assessing the training and/or credentials requirements and evaluating the performance of the technical personnel in the Pulmonary Function Laboratory.
11. Developing written protocols for all testing procedures. Signed review of written policies, procedures, and protocols as required.
12. In conjunction with the Respiratory Care / Pulmonary Function Laboratory Supervisor, developing, implementing and monitoring of a performance improvement program for the operation of the Pulmonary Function Lab and the Respiratory Care Department and a quality control program for all tests performed.
13. Developing and implementing procedures to prevent the transmissions of infection by the Respiratory Care Department equipment and personnel and for the prevention of other hazards to the patients and staff.
14. On call 24 hours/365 days or appointing appropriate designee. Communication of who the covering physician is to the Respiratory Care /Pulmonary Function Laboratory Supervisor.

## ATTACHMENT A:   SCOPE OF SERVICES

**PART B:  Performance Metrics and Quality Indicators**

- ***Diagnostic or Treatment Services***:

    *Availability*

    > *Turnaround time for reports*

    *Quality of Care*

    > *Provider Satisfaction*
    > *Complaints*
    > *Incident reports*
    > *Compliance with external metrics (licensing requirements, quality standards from applicable accrediting or quality organizations)*

- ***Provision of Care -Test Reads***:

    *Availability*

    > *Turnaround time for PFT test reads*

- ***Clinical/Licensed (non-credentialed) Personnel:***

    > *Staff Provided Meet Minimal Qualifications*
    > *Licensure/Training*
    > *References*

    *Quality of care -Oversight*

    > *Provider Satisfaction*
    > *Complaints*
    > *Incident reports*

- ***Credentialed Personnel***

    > *Completes the credentialing and privileging process*
    > *Meets criteria for OPPE/FPPE evaluations*
    > *Participates in Departmental/Divisional Quality/Performance improvement activities.*

**Contractor will maintain the above performance metrics and quality indicators.  Except as otherwise stated, failure to meet the requirements shall constitute a default under this Agreement.**

**EXHIBIT C**

## PHYSICIAN CONSULTANT
## CONTRACT-
## Marlborough Hospital, Inc.

**Kimberly Robinson, MD**

This Contract dated April 14, 2020 is made by and between **Kimberly Robinson, MD,** a physician duly-licensed by the Commonwealth of Massachusetts (the "Contractor"), and Marlborough Hospital ("Hospital") a not for profit corporation organized under the laws of the Commonwealth of Massachusetts. Whereas the Hospital desires to enter into a contract for services, and the Contractor represents him/herself as competent and qualified to accomplish the specific requirements of this Contract, therefore this Contract is entered into under the following terms and conditions:

1.     The Contractor agrees to perform the professional services described in *Attachment A,* "Scope of Services".

2.     **Term of the Contract:** This Contract shall commence on April 14, 2020 and remain in effect unless otherwise terminated as provided below.

> **Designated Hospital Representative: Charles E. Cavagnaro III, Corporate VP & Chief Medical Officer**
> **Contractor: Kimberly Robinson, MD**

   **Payment:** The Hospital shall compensate the Contractor for the services as provided in *Attachment B,* "Contract Budget." As they are authorized and approved by the Designated Hospital Representative.   Except as otherwise provided on **Attachment B,** Contractor shall bill the Hospital for services monthly in accordance with Attachment B. Contractor shall provide such documentation of the time spent and specific services performed as may be requested from time to time by the Hospital.

1.     **Contractor's Certification:** The Contractor represents that (s)he is qualified to perform the described service(s) and has obtained all requisite licenses (including a license to practice medicine in the Commonwealth of Massachusetts), and requisite hospital credentials to perform those services. Contractor further certifies that (s)he is not currently excluded from participation in the Medicare program.  Contractor represents that all services provided pursuant to this Contract will be rendered in accordance with the ethical and professional standards of the Joint Commission and/or other nationally recognized accreditation organization.

2.     **Professional Liability Insurance:** The Contractor shall be responsible for obtaining and maintaining, at his or her expense, during any and all periods in which services are provided pursuant to this contract, professional liability insurance covering the services provided hereunder in coverage amounts of at least $1,000,000 per incident and $3,000,000 per annual

aggregate. Prior to commencing this arrangement, the Contractor will supply a certificate or other verification of coverage to the Hospital.

3. **Billing:** The Hospital shall have the right to bill and retain revenue related to the technical component of any services provided and the Contractor shall have the right to bill and retain revenue related to any professional services that may be provided to patients in connection with this Agreement.

   **4. Termination:** This Contract shall terminate immediately if either party fails to maintain the required license, certificate or other form of governmental approval required to perform services under this Contract. Hospital may terminate this Contract immediately if the Contractor (i) is excluded from participation in the Medicare, Medicaid or any other federal health program; (ii) is terminated from membership of the medical staff at any hospital; (iii) fails to be covered by professional liability insurance for any reason; or (iv) is notified that his or her license to practice medicine is revoked or in any way restricted. This contract may be terminated with or without cause by either party at any time upon thirty (7) days written notice to the other party.

5. **Obligations in Event of Termination:** Upon termination, the Contractor shall be responsible for the proper completion of all medical records and billing documentation related to professional services provided hereunder. All such records and documentation are the property of the Hospital. The Hospital shall pay the Contractor for all services performed to the effective date of termination, subject to any indemnification provisions of this Contract.

6. **Record keeping, Audit, and Inspection of Records:** The Contractor shall maintain books, records and other compilations of data pertaining to the requirements of the Contract to the extent and in such detail as shall properly substantiate claims for payment under the Contract All such records shall be kept for a period of six (6) years or for such longer period as is specified herein. All retention periods start on the first day after final payment under this Contract. If any litigation, claim, negotiation, audit or other action involving the records is commenced prior to the expiration of the applicable retention period, all records shall be retained until completion of the action and resolution of all issues, or until the end of the applicable retention period, whichever is later. Hospital, or any of its duly authorized representatives or designees, shall have the right at reasonable times and upon reasonable notice, to examine and copy, at reasonable expense, the books, records, and other compilations of data of the Contractor which pertain to the provisions and requirements of this Contract. Such access shall include on-site audits, review, and copying of records. Contractors providing services to a hospital for compensation of more than $10,000.00 within a twelve (12) month period do hereby consent to grant the Federal Controller General or HHS or their agents access to the Contractor's books, documents or records as per the Omnibus Reconciliation Act of 1980.

7. **Safeguarding of Patient Information**

The Contractor acknowledges that in the performance of this Contract, the Contractor will acquire or have access to medical records. The Contractor shall comply with all applicable Massachusetts laws and regulations, applicable federal. laws and regulations relating to confidentiality and privacy, and policies and procedures of HealthAlliance regarding medical records and information. The Contractor shall at all times recognize Hospital's ownership of medical records and the exclusive right and jurisdiction of HealthAlliance and its patients to control the use of medical records and information.

The use or disclosure of any part of any information concerning a patient of HealthAlliance- Clinton, its subsidiaries or affiliates, for any purpose not directly connected with the services under this Contract is prohibited. The Contractor shall notify Hospital orally and in writing within twenty-four (24) hours of its discovery that any medical data in his/her possession or control has been improperly used, copied or removed by anyone except an authorized representative of Hospital. The Contractor shall cooperate with Hospital in taking such steps as Hospital deems appropriate to enjoin the misuse, regain possession of the data, and otherwise protect Hospital and the patient's rights and privacy.

The Contractor shall take all reasonable steps to assure the security of medical data and other confidential information in his/her possession, including, but not limited to: alarm systems, locked files, guards, or other devices reasonably calculated to prevent unauthorized access to electronically or mechanically held data; limited terminal access; encryption, limited access to input documents and outputs documents; and design provisions which avoid unnecessary use of the names or other identifying characteristics of patients. The Hospital shall have access at all times to any medical record data or information maintained pursuant to this Contract without the consent of the patient.

Contractor shall sign the applicable Confidentiality Agreement of the Hospital upon request prior to providing services under this Contract. Any failure of the Contractor to comply with these requirements shall be deemed a material breach by the Contractor and shall be grounds for termination for cause by the Hospital.

8. **Choice of Law:** This Contract shall be construed under and governed by the laws of the Commonwealth of Massachusetts. The Contractor agrees to bring any federal or state legal proceedings arising under this Contract in a court of competent jurisdiction within the Commonwealth of Massachusetts. This paragraph shall not be construed to limit any other legal rights of the parties.

9. **Compliance with Laws and Indemnification:** The Contractor shall comply with all applicable laws, rules, regulations, ordinances, orders or requirements

of the Commonwealth of Massachusetts and any governmental authority relating to the delivery of the services specified in this Contract. The Contractor shall indemnify and hold harmless the Hospital, its agents, officers and employees against any and all liability, loss, damages, penalties, costs or expenses for personal injury or damage to real or tangible personal property which the Hospital may sustain, incur or be required to pay, resulting from, arising out of, or in connection with the services pel formed or delivered under this Contract by reason of negligence, reckless or intentional misconduct of the Contractor, its agents, officers, employees or subcontractors; provided that the Contractor is notified of any claim within a reasonable time after the Hospital becomes aware of it, and the Contractor is afforded an opportunity to participate in the defense of such claim. In such event, no negotiated settlement agreement shall be binding on the Contractor without the Contractor's concurrence.

**10.**   **Independent Contractor:** Contractor shall perform all services under this Contract as an independent contractor. The Contractor is not an employee or agent of the Hospital, and shall not hold him/herself out as, nor claim to be, an officer or employee of the Hospital and will not make any claim, demand, or application to or for any right or privilege applicable to an officer or employee of the Hospital, including, but not limited to, worker's compensation coverage, unemployment insurance benefits, social security benefits, or retirement membership or credit.

4

In witness whereof, the parties hereto sign below:


MARLBOROUGH HOSPITAL

BY:_____   Date:_____

Steve Roach, CEO



CONTRACTOR

By:_____   Date: 4/15/20

Name:    Kimberly Robinson MD

In witness whereof, the parties hereto sign below:


MARLBOROUGH HOSPITAL

BY: _____  Date: 4/17/20
Steve Reach, CEO



CONTRACTOR

By: _____  Date: 4/15/20
Name:    Kimberly Robinson MD

## **APPENDIX** A
## SCOPE OF SERVICES

The Contractor/Physician shall provide on-site coverage from 7PM to 7AM, per a mutually agreed schedule, in the Intensive Care Unit and the designated ICU Surge Unit of the Hospital, rendering necessary medical services to the patients of this unit.

## APPENDIX B
CONTRACT BUDGET

The Hospital shall compensate the Contractor for the services provided at the rate of $4,000 per each pre-authorized twelve (12) hour shift of onsite services at the Hospital.

**<u>EXHIBIT D</u>**

## INTENSIVIST COVERAGE AGREEMENT
## BETWEEN
## MARLBOROUGH HOSPITAL
## AND
## MASS LUNG AND ALLERGY, P.C.

This Intensivist Coverage Agreement ("Agreement") is effective as of April 1, 2011 (the "Effective Date") by and between Marlborough Hospital a non-profit corporation organized under the laws of the Commonwealth of Massachusetts, located at 157 Union Street, Marlborough, Massachusetts ("Hospital") and Mass Lung and Allergy, P.C., a professional corporation located at 50 Memorial Drive, Leominster, Massachusetts ("MLA" or the "Physicians").

### RECITALS

WHEREAS, Hospital is the owner and operator of a general acute care hospital located in Marlborough, Massachusetts and requires the services of an intensivist physician group to provide on call and attending coverage for its Intensive Care Unit ("ICU");

WHEREAS, MLA employs or retains physicians who are duly qualified and licensed to practice medicine in the Commonwealth of Massachusetts, who are trained as intensivists, and who are experienced and qualified to provide the professional services required by the Hospital and who are members of Hospital's medical staff; and

WHEREAS, Hospital desires to retain MLA to provide the services as are specified in this Agreement, and MLA and its physicians desire to provide such services for the Hospital in accordance with the provisions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Agreement, the Parties hereby agree as follows:

### PHYSICIAN OBLIGATIONS

1. Professional Services. MLA, through its member physicians, namely Kimberly Robinson, M.D., Jeffrey Scott, M.D., Payam Aghassi, M.D., Corey Saltin, D.O., Plutarco Castellanos, M.D. and Oren Schaefer, M.D., (collectively, the "MLA Physicians") shall provide professional services as set forth in Exhibit A attached (the "Professional Services"). It is understood that from time to time, MLA may need to retain other qualified physicians trained as intensivists to provide on-call and related coverage, in order to fulfill its obligations under this Agreement.

2. Physician Qualifications. The MLA Physicians shall at all times during the term of this Agreement, (a) possess a valid and unlimited license to practice medicine pursuant to Chapter 112, Section 2 of the General Laws of the Commonwealth of Massachusetts; (b) be board certified (or, with the approval of Hospital's President and CEO, or his/her designee, board eligible) in Physician's Specialty; (c) be a member in good standing of the Hospital's medical staff with appropriate privileges in Medicine ; (d) be, and remain, a participating

provider in the Medicare and Medicaid programs (Titles XVIII and XIX of the Social Security Act, respectively); (f) be or agree to apply to be a participating physician in any insurance coverage arrangement or managed care plan in which Hospital participates and that is reasonably available to Physician; and (g) maintain unrestricted federal and state drug enforcement registration numbers. Each MLA Physician shall provide documentation of compliance with all provisions of this Section 1.2 as from time to time requested by Hospital. This Agreement is not, and shall not be construed as, any form of guarantee or assurance by Hospital that any MLA Physician shall receive membership on the Hospital medical staff or privileges for the purposes of discharging such Physician's responsibilities hereunder; provided, however, that such membership and/or privileges shall not be unreasonably denied, restricted or terminated.

3. Physician Representations and Warranties. MLA and each MLA Physician represents and warrants to Hospital that: (a) Physician's license to practice medicine in any state has never been suspended, revoked or restricted; (b) Physician has never been reprimanded, sanctioned or disciplined by any licensing board or state or local medical society or specialty board; (c) Physician has never been denied membership or reappointment of membership on the medical staff of any hospital and no hospital medical staff membership or clinical privileges of Physician have ever been suspended, curtailed or revoked; (d) Physician has never been excluded from participation in, or sanctioned by, any state, federal or local health care program, including, without limitation, Medicare or Medicaid; (e) Physician has never been reprimanded, sanctioned or disciplined by a federal or state drug enforcement agency or commission, been denied a federal or state drug enforcement registration number or had a federal or state drug enforcement registration number restricted; and (f) Physician has never been denied professional liability or general liability insurance coverage or had such insurance coverage restricted. .

4. Compliance With Hospital Standards. Throughout the term of this Agreement, each MLA Physician shall (a) comply with all applicable terms of this Agreement and all policies, bylaws, rules and regulations of Hospital and Hospital's medical staff as in effect and provided to Physician from time to time; (b) comply with Hospital's Legal Compliance Program ("Compliance Program"), which shall be provided to Physicians at the commencement of this Agreement and thereafter whenever modified; (c) cooperate in good faith to investigate any complaints made by Hospital patients or Hospital personnel and to resolve such complaints in a reasonable time with appropriate action; and (d) ensure that all services provided at or under the auspices of the Hospital are at all times rendered in a timely, competent and professional manner, consistent with the continuous quality improvement standards of the Hospital as in effect from time to time.

5. Compliance with Applicable Laws, Regulations and Standards. MLA and the MLA Physicians shall comply with all applicable laws, rules and regulations of all governmental authorities and accrediting agencies having jurisdiction over Hospital, physicians, allied health professionals and/or this Agreement, including, without limitation, (a) Medicare and Medicaid laws, rules and regulations, (b) federal and state laws governing referral of patients, (c) federal and state laws prohibiting discrimination against individuals, and (d) federal and state laws governing the confidentiality and privacy of patient health information. In addition, the Physician shall comply with all hospital and professional

licensure and reimbursement laws, regulations, rules and policies, including, without limitation, all applicable standards of voluntary accrediting institutions (including, without limitation, the Joint Commission) in which Hospital participates. . .

6.   HIPAA.  MLA, the MLA Physicians and Hospital agree to comply with the regulations promulgated under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as currently issued, as amended from time to time, and as promulgated at any time during the term of this Agreement (collectively, the "HIPAA Regulations"), with respect to the privacy and security of "protected health information" (as defined in the HIPAA Regulations) created, transmitted, maintained or received by them pursuant to or in connection with the performance of their obligations under this Agreement ("PHI"). The Physician and the Hospital agrees to use appropriate safeguards to prevent use or disclosure of PHI except as authorized hereunder, and to notify the other of any such unauthorized use or disclosure promptly upon becoming aware thereof. Further, the parties agree that they will amend this Agreement from time to time as reasonably requested by any party to incorporate any relevant changes to the HIPAA Regulations. Each party hereby agrees to abide by all policies and procedures implemented by Hospital (or otherwise required by law) to ensure compliance with the HIPAA Regulations, and Hospital and Hospital medical staff policies and procedures regarding patient privacy and confidentiality; provided the same are provided to Physician at the commencement of this Agreement and thereafter whenever modified.  The Parties agree that the Physician, in providing treatment to Hospital patients, operate as an organized health care arrangement with Hospital.

7.   Medical Records.  The MLA Physicians shall document promptly in the medical record all medical services provided to Hospital patients, in accordance with industry standards, and in compliance with all state and federal laws and regulations, standards of the voluntary accrediting institutions (including, without limitation, the Joint Commission) in which Hospital participates, Hospital medical staff bylaws, Hospital policies and rules and regulations (to the extent the Hospital policies and rules and regulations are provided to Physician at the commencement of this Agreement and thereafter whenever modified), and all requirements for participation and payment associated with private, federal, state, or other public third party payment programs.  All medical records shall be and shall remain the property of Hospital, although the Physician shall have reasonable access to the records after termination of this Agreement for appropriate clinical or legal reasons, consistent with Hospital policy.

## HOSPITAL OBLIGATIONS

8.   Professional and Administrative Support.  Hospital shall provide such space, equipment, supplies, resources, and non-physician personnel as are reasonably necessary for the performance of the MLA Physicians' duties hereunder, as determined by Hospital in Hospital's sole discretion.

## BILLING AND COMPENSATION

9.   Payment for Coverage Shifts.  In consideration of providing on-call and attending intensivist critical care coverage for 52 weekends per year from 5:00 pm each Friday

through 7:00 am each Monday and the related services detailed in Exhibit A, Hospital shall pay to MLA a stipend of One Hundred Thirty Thousand ($130,000) per year, payable in equal monthly installments of ten thousand eight hundred thirty three dollars. ($10,833.00). MLA will submit invoices on a monthly basis. Payments made more than 30 days past the invoice date will accrue interest at a rate of 18% per annum (1.5% per month).

10.  Billing and Collection. MLA shall be entitled to bill independently for any Professional Services rendered to patients of the Hospital by a MLA Physician, beyond the scope of services outlined in Exhibit A.  Hospital shall make no payment to the MLA or its Physicians for Professional Services rendered hereunder and shall not bill for, guarantee the collectability of, or have any claim or interest in or to the amounts billed by the Physicians; however, Hospital shall, to the best of its ability, cooperate in providing appropriate information to the Physicians and/or the Physicians' billing agent(s) to facilitate an efficient and effective billing and collection process.

11.  Non-Referral. Nothing in this Agreement or in any other written or oral agreement between the Parties, nor any consideration offered or paid in connection with this Agreement, contemplates or requires the admission or referral of any patient to Hospital. Any consideration specified in this Agreement is consistent with what the Parties reasonably believe to be fair market value for the on-call coverage and related services provided hereunder.

## INSURANCE AND INDEMNIFICATION

12.  MLA and MLA Physicians' Professional Liability Insurance. MLA shall purchase and maintain throughout the term of this Agreement professional liability insurance covering Professional Services rendered by the MLA Physicians under this Agreement in the amount of at least $2,000,000 for each occurrence with a per annum aggregate limitation of at least $6,000,000 and shall obtain so-called "tail insurance" in the above amounts if the insurance being provided is on a claims-made as opposed to an occurrence basis.  In the event that MLA, in order to fulfill its obligations under this Agreement, needs from time to time to retain other qualified physicians trained as intensivists to provide on-call and related coverage, MLA shall be responsible for ensuring that any such physicians have and maintain sufficient professional liability insurance as described above.  MLA shall deliver to Hospital a certificate reflecting such insurance coverage, and shall instruct and obtain the consent of each insurer to provide prior written notice to Hospital (equal to notice given to the Physician) of any actual or proposed cancellation, termination, expiration, non-renewal, reduction, or other change in the amount or scope of any coverage under such policy for any cause.  Hospital shall not be required to provide such insurance nor shall Hospital be liable for the payment of any premiums on such insurance.  The provisions of this section shall survive termination of this Agreement.

## TERM AND TERMINATION

13.  Term. This Agreement shall have a term of one (1) year commencing on the Effective Date of this Agreement, unless sooner terminated as otherwise provided in this Agreement. This Agreement will automatically renew for successive one (1) year terms unless any

Party gives written notice of intent to terminate not less than sixty (60) days prior to the end of the then-current term.

14. Termination Without Cause. Any Party may terminate and cancel this Agreement without cause at any time upon ninety (90) days prior written notice to the other Parties.

15. Termination For Cause. Any Party may terminate and cancel this Agreement for cause at any time if there is a material default in performance hereunder by another Party upon thirty (30) days prior written notice to the other Parties and an opportunity to cure during said thirty (30) day period.

16. Immediate Termination by Hospital. Notwithstanding the foregoing, this Agreement may, in the discretion of Hospital, be immediately terminated in the event that MLA, or any of its Physicians fails to maintain compliance with all of the qualifications, covenants, provisions, representations and warranties set forth in Sections 1.2 or 1.3 herein. This Agreement may further be terminated by Hospital immediately upon oral notice, subsequently confirmed in writing to the Physician, in the event Hospital determines in good faith and consistent with prevailing medical standards that the provision of Professional Services under this Agreement by any Physician constitutes an immediate threat to the health or safety of its patients.

17. Effect of Termination. Upon termination of this Agreement, as herein above provided, no Party shall have any further obligation hereunder except for (i) obligations accruing prior to the date of termination, (ii) obligations, promises, or covenants contained herein which are expressly made to extend beyond the term of this Agreement including, without limitation, any indemnities and access to books and records, and (iii) obligations which are based upon requirements of the Marlborough Hospital Medical Staff Bylaws, Rules and Regulations, and Policies. Upon termination of this Agreement, MLA and the MLA Physicians shall immediately deliver to Hospital sole custody, and total, exclusive, and complete use of Hospital's premises, equipment, and supplies.

## MISCELLANEOUS PROVISIONS

18. Notices. Written notice required under this Agreement shall be effective when delivered by hand-delivery or sent by United States registered or certified mail, postage prepaid and return receipt requested, or consigned to an established overnight mail carrier, and addressed or delivered to the Parties at the following addresses (or such address as may hereafter be designated by a Party by written notice thereof to the other Parties actually received):

To MLA:          Payam Aghassi, MD, President
Mass Lung and Allergy, P.C.
50 Memorial Drive, #113
Leominster, MA 01453

To Hospital:     Jeff Dion
CFO
Marlborough Hospital
157 Union Street
Marlborough, MA 01752

19.   Amendment. This Agreement may be amended at any time by mutual agreement of the Parties, provided that any amendment shall become effective only when reduced to writing and signed by the Parties.

20.   Assignment and Delegation. No assignment of this Agreement or delegation of the rights and obligations hereunder shall be valid without the specific written consent of all Parties hereto, except that this Agreement may be assigned by Hospital as a result of reorganization, merger, consolidation, sale of assets, change in control or sponsorship, or bankruptcy, or to any successor entity. Subject to the prohibition contained in this paragraph, this Agreement shall be binding upon and inure to the benefit of the successors and permitted assigns of the Parties hereto.

21.   Governing Law. This Agreement and all matters arising out of and relating to this Agreement shall be construed and enforced in accordance with the laws of The Commonwealth of Massachusetts, without regard to conflict of law rules.

22.   Waiver. No delay or omission by any Party to exercise any right or remedy under this Agreement shall be construed to be either acquiescence or the waiver of the ability to exercise any right or remedy in the future. Any waiver of any terms and conditions hereof must be in writing, and signed by the Parties hereto. A waiver of any term or condition hereof shall not be construed as a future waiver of the same or any other term or condition hereof.

23.   Entire Agreement. This Agreement, including all Exhibits and attachments, constitutes the entire agreement between the Parties with respect to the subject matter hereof. This Agreement supercedes all prior agreements, negotiations, and communications, whether written or oral, between the Parties hereto with respect to the subject matter hereof.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized representatives under seal effective as of the date first above written.

**MARLBOROUGH HOSPITAL**

By:_____

Jeffrey Dion, CFO

**MASS LUNG AND ALLERGY, PC**

By:_____

Payam Aghassi, M.D., President

## EXHIBIT A

## DESCRIPTION OF PROFESSIONAL SERVICES

Weekend Coverage

MLA shall be solely responsible for providing the full complement of year-round, weekend on-call intensivist coverage to the Hospital's Intensive Care Unit ("ICU"), from 5 pm each Friday through 7 am each Monday. Each Physician designated as being on-call shall be available to come to the Hospital as needed to attend to ICU patients.

This responsibility is understood not to be replacing in house ICU nighttime coverage or eICU coverage.

In addition to round-the-clock weekend telephone availability, one or more MLA Physicians shall also have daily physician presence in the ICU to round on patients. These duties also include providing pulmonary/critical care consultation to patients in the ICU.

The MLA Physicians shall also provide pulmonary consultations within the hospital from 5 pm each Friday through 7 am each Monday and on established Hospital Holidays, upon request of the attending physician or covering staff.

## EXHIBIT E

## PROFESSIONAL SERVICES AGREEMENT
## BY AND BETWEEN
## MARLBOROUGH HOSPITAL
## AND
## UMASS MEMORIAL MEDICAL GROUP, INC.

This Professional Services Agreement (the "Agreement") is made by and between Marlborough Hospital, a notforprofit corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business at 157 Union Street, Marlborough, Massachusetts (the "Hospital") and UMass Memorial Medical Group, Inc., a not-for-profit corporation organized under the laws of the Commonwealth of Massachusetts (the "Group").

WHEREAS, the Hospital seeks to contract with the Group, through its Department of Radiology, for the exclusive provision of professional radiology services at the Hospital, and the Group desires to provide such services in accordance with the provisions set forth;

In consideration of the mutual covenants and conditions contained in this Agreement, the Parties hereby agree as follows:

1. Provision of Radiology Services by the Group:

The Group shall designate certain of its employed physicians licensed in Radiology (the "Group Physicians") to provide professional radiology services ("Radiology Services") to all patients of the Hospital's Imaging Department (including Women's Imaging) who require the same in accordance with terms and conditions contained herein, without regard to the insurance coverage of the patient (or lack of the same) or the patient's ability to pay. The Group's responsibilities hereunder apply only to facilities under the hospital license of Marlborough Hospital including its facility located at Newton Street in Southborough, Massachusetts and other clinical satellites. This Agreement shall also extend to the provision of Radiology Services at any additional sites owned or operated by the Hospital during the term of this Agreement. The Group Physicians will devote reasonable best efforts, skill and ability in the performance of the services hereunder. In all matters related to the discharge of responsibilities under the terms and conditions of this Agreement, the Group shall be responsible jointly to the Chair of the Department of Radiology at UMass Memorial Medical Group and to the Hospital's President or their respective designees. The Group Physicians shall comply with all bylaws, policies, rules and regulations of the Hospital made known to it in writing, including any corporate compliance policy or code of conduct now or hereafter adopted by the Hospital, including the Hospital's Medical Staff Bylaws, as well as with applicable standards of the Joint Commission and the Hospital's performance improvement policies.

2. Term

The Term of this Agreement will commence on March 1, 2015 (the "Commencement Date") and expire on February 28, 2018.  The Term will automatically renew for additional terms of three (3) years each unless either party terminates this Agreement by delivering written notice to the other party at least nine (9) months prior to the expiration of the existing Term.

3.  Radiology Services

During the Term of this Agreement, the Group agrees to provide the following Radiology services:  A General Radiologist on-site at the Hospital who shall be available to interpret chest, bone and abdominal X-Rays, CT scans of the chest abdomen and pelvis, ultrasound of the abdomen, pelvis, thyroid and testicle  and perform drainages of all organ systems (excluding breast interventions) Mondays through Fridays during the hours of eight (8) am until five (5) pm. Neuro-radiology, nuclear medicine, MRI, and any other exam not interpreted on-site, may be interpreted remotely by sub-specialized Radiologists.   All remote interpretations will be performed by UMass Memorial Medical Group Radiologists, and will not be sub-contracted to any third party.

UMMMG will provide a Radiologist on site at the Hospital during the hours of 8 am to 5 pm Monday through Friday (Excluding Marlborough Hospital holidays) of each week:

- A dedicated Radiologist specializing in Breast Imaging will be on-site at the Marlborough Hospital Southborough Medical Group facility as needed to accommodate all diagnostic mammograms, breast ultrasound and other related imaging services and interventions.  On-site breast imaging coverage shall be provided for a minimum of five (5) days per week, and will be increased as needed and mutually agreed upon by the President of the Hospital and the Chair of Radiology for the Group. If Marlboro Hospital develops Breast Imaging Services on site at Marlborough Hospital (or other locations), in addition to Southborough Medical Group, UMMMG Radiology will provide staffing to ensure that wait times for a diagnostic mammogram are not greater than 48 hours (2 business days). If Marlborough Hospital moves all breast imaging services from Southborough Medical Group to Marlborough Hospital, the same level of service currently provided at Southborough will be provided at Marlborough.

- Remote on-call coverage by Emergency Radiologists at UMass Memorial Medical Group to provide services Mondays through Fridays from five (5) pm until eight (8) am and twenty-four (24) hour coverage for Saturdays, Sundays and Holidays;

- Supervision and monitoring for all professional Radiology accreditations (e.g., American College of Radiology, Mammography Quality Standards Act);

- The parties will develop mutually-agreeable performance metrics to be monitored on a monthly basis by the Department Chair of the Group and the President of the Hospital and reported to the President of the Hospital at least on a quarterly basis.

- The Services provided pursuant to this Agreement shall be provided at Marlborough Hospital unless patient safety or the need for equipment not

available at the Hospital would necessitate performing the services at another location.

- The Services provided pursuant to this Agreement shall be performed in a manner consistent with the Hospital Radiology Turn Around Time Policy attached as Exhibit B.

- A more comprehensive list of the procedures to be provided under this Agreement is attached as Exhibit C.

4. Payor Contracting and Professional Billing

The Group will be responsible for entering into payor contracts and arranging for billing and collection services during the Term. The Group shall be responsible for billing and collections for the professional component of Radiology Services for all examinations performed on behalf of Hospital patients.

5. Personnel, Facility and Equipment Support

A.    Facilities and Equipment

(i)    The Hospital shall furnish to the Group such Hospital on-site office, equipment, telephone, supplies and other facilities and services, including computers, email system, fax and communication equipment, transcription services, dictation system (or voice recognition system) and PACS system, as are reasonably necessary for the performance of the Group's obligations under this Agreement and in accordance with (and subject to) all applicable laws and professional standards. All tangible personal property furnished by Hospital pursuant to this Section 5 shall remain the property of Hospital. The Hospital will coordinate with the Group to perform repairs and/or maintenance on radiology equipment.

(ii)    The Group (and/or UMass Memorial Medical Center) will be responsible for the purchase, support and maintenance of any and all property it chooses to be located off-site of the Hospital's service locations including, but not limited to, all computer hardware and software equipment and accessories and Internet connectivity. It is Group's responsibility to ensure that all such off-site computer equipment used in the provision of services under this Agreement is compatible with Hospital's Information Systems. The Group shall maintain and operate such off-site property in accordance with all applicable laws and professional standards including, but not limited to, the federal Health Insurance Portability and Accountability Act of 1996 and regulations promulgated pursuant thereto. The Hospital shall use commercially reasonable efforts to maintain its Information Systems in good working order such that off-site connectivity is available to the Group at all times. The Hospital may, in its sole discretion, provide technical support to the Group's off-site image interpretation equipment used primarily for hospital-bases studies, which equipment may include teleradiology and PACS systems.

B.    The Hospital shall employ and make available to the Group competent non-physician clinical personnel and support staff to enable the Group to perform its duties and provide a high level of care under this Agreement, including but not limited to, personnel necessary for

3

scheduling of appointments, performing the technical portion of the exam and transcription. The Hospital agrees to seek the Group's input on significant employment decisions concerning key positions within the Imaging Department, including but not limited to, directors and supervisors. The Hospital shall also seek the Group's input when undertaking performance reviews of key personnel within the Imaging Department, which shall be conducted in accordance with Hospital policies.

6. Support of Billing Company Interface

The Hospital, and in particular the Hospital's information systems department, will use reasonable best efforts to work with Group's billing provider to maintain an effective interface with the Hospital to transmit examination information, patient demographics and insurance information in order to be able to process billing information promptly and efficiently.

7. Support for Transcription

The Hospital will provide and maintain appropriate voice recognition software and hardware tools and technology, at its sole cost, sufficient to meet the Imaging Department needs. The Hospital may make any changes to the manner, method and/or mode of transcription services as the Hospital deems necessary or desirable to meet the changing needs of the Hospital and its patients so long as same does not unreasonably interfere with the Group's ability to perform the obligations under this Agreement. The Group shall be responsible for the cost and maintenance of any and all off-site transcription tools and technology Group chooses to utilize.

8. Chief of Radiology

The Appointment of the Hospital's Chief of Radiology shall at all times be subject to the requirements of the Hospital's Medical Staff Bylaws. The Group, with the approval of Hospital's President, will select a Department Chief according to the following rules:

> The Chief, when acting in the capacity of Chief, must work on the Hospital campus at least 100 calendar days (no less than 8 hours of each calendar day) during each year of the term;

> The Chair of the Group Department of Radiology will nominate a Chief from among the Group Physicians assigned to the Hospital, and appointment shall be subject to the approval of the Hospital's President, not to be unreasonably withheld or delayed. Each Chief shall serve for a term of 2-4 years, as specifically determined by the Department Chair and the Hospital's President.

The Chief of Radiology shall at all times meet the requirements set forth in Exhibit A attached hereto. Should the role of Chief of Radiology expand to require additional time and effort commitments beyond those contemplated at the commencement of this Agreement, the parties agree that they will negotiate in good faith to determine an appropriate administrative stipend to be paid in consideration for any such additional commitment of time and effort.

9. Termination

In the event that either Party has failed to perform any material term or condition of this Agreement, whether by act or omission, the other Party shall notify the breaching Party in writing of the nature of the default. The defaulting Party shall then have thirty (30) days to cure such default, or such additional time as reasonable if the breach is of such a nature that further time is necessary to effect such cure. If the breaching Party has failed to cure the breach within said cure period, the non-breaching Party may terminate this Agreement by providing thirty (30) days written notice to the breaching Party. In the event this Agreement is terminated pursuant to this Section 9, the non-breaching Party shall have all remedies available hereunder.

10. Validity and Enforceability

The Parties hereto warrant and represent that the undersigned representatives have the requisite corporate authority to enter into and to bind their respective entities to perform the obligations set forth herein. The undersigned further warrant and represent that this Agreement represents the legal, valid and binding obligations of the Parties with respect to the matters set forth herein.

11. Exclusivity

A.     In consideration of the terms and conditions herein, the Group shall be entitled to provide Radiology Services at Marlborough Hospital on an exclusive basis, meaning that during the Term of this Agreement, the Hospital shall not grant medical staff privileges to or contract with any radiologist or provider of imaging services which are within the routine scope of practice within the UMass Memorial Medical Group Department of Radiology to provide services at any facility under the hospital license of Marlborough Hospital unless s/he is employed by, or under contract with, the Group, without the Group's prior written consent.

B.     In the event the Hospital and/or any entity controlled by the Hospital provides new diagnostic services outside its service area (including the Hospital's acquisition of a controlling interest in any type of imaging center) which also require interpretations that only licensed radiologists are qualified to provide, Group shall have a first right of refusal on Hospital's reasonable terms to be the exclusive provider of such Radiology Services.

C. Southborough Medical Group: As of the execution of this Agreement, Marlborough Hospital provides imaging services at Southborough Medical Group ("SMG"), and to the extent that arrangement continues, the Group shall have the exclusive right to provide Radiology services for that location. In the event that the arrangement between the Hospital and SMG may be modified, this Agreement shall be amended accordingly.

D.  Imaging performed as part of the direct care of non-Radiology providers: The parties understand that in the ordinary course of providing directed care to a physician's own patient, that various types of image guidance may be employed. Examples may include: use of fluoroscopy for ureteral stent placement by Urology, fluoroscopic guidance for ERCP by gastroenterology, or fetal ultrasound performed by OB/GYN for a patient for whom that service

is providing direct clincial clinical care.  These types of imaging shall be excluded from the exclusivity provisions of this Agreement.   However, clinicians who are not UMMMG Radiologists may not perform or interpret imaging for patients who are not under their direct clinical care, or for whom imaging is not required to perform a procedure commonly performed by that specialty.  Radiologists who are not employed by UMMMG may not interpret images obtained at the Marlborough campus (or future sites owned or licensed by Marlboro Hospital) unless subcontracted through UMMMG Radiology. Clinicians may not subcontract with non-UMMMG Radiologists to interpret imaging studies performed by in the course of imaging performed in the direct care of their patients.

12. Physician Qualifications

It is understood that the Group may provide any radiologist(s) to perform the obligations herein (each a "Group Radiologist"), provided that each such physician has been approved by the Hospital's President, such approval not to be unreasonably withheld or delayed, and further provided that each physician meets the requirements set forth in this Agreement.  The Group represents that each Group Radiologist: (1) will have a valid and unlimited license to practice medicine pursuant to Chapter 112, Section 2 of the General Laws of the Commonwealth of Massachusetts; and (2) is qualified for and has obtained appropriate membership in good standing on the Medical Staff of Hospital.  The Group Radiologists shall not be employees of the Hospital.  The Group shall be responsible for paying compensation to all Group Radiologists.  The Group represents that each Group Radiologist shall at all times during the term of this Agreement participate in and accept reimbursement from the Medicare and Medicaid programs and provide services to Hospital patients without regard to insurance coverage or patient's ability to pay.

13.  Standards of Practice and Service

As part of Hospital's Quality Assurance and Improvement Program, the Group shall participate in recommendations for criteria and procedures to assure the consistency and quality of services provided by Hospital.  The Group shall cause each Group Radiologist to ensure that all clinical services provided hereunder are at all times rendered in a competent and professional manner, consistent with quality assurance standards of Hospital and in compliance with all applicable statutes, regulations, rules and directives of federal, state, and other governmental and regulatory bodies having jurisdiction over the Hospital or licensed providers; the rules and regulations of Hospital and of Hospital's Medical Staff; applicable standards of the Joint Commission on Accreditation of Healthcare Organizations, the Council on Medical Education of the American Medical Association, the American Academy of Pediatrics and currently accepted and approved methods and practices applicable to the practice of radiology.

14.  Medical Records

Group shall cause Group Radiologists to prepare accurate and complete records with respect to all services provided to Hospital's patients under this Agreement to be included in the patient's medical record.  All such medical records shall be and shall remain the property of

Hospital. During and after the term of this Agreement, Group shall have access to such records as reasonably necessary for billing and other appropriate purposes related to services provided pursuant to this Agreement including, but not limited to, the defense of legal claims, regulatory compliance, medical license maintenance and other similar matters. Each of the Parties shall maintain the confidentiality of all patient information including medical records in compliance with applicable federal and state laws including, but not limited to, the federal Health Insurance Portability and Accountability Act of 1996 and regulations promulgated pursuant thereto.

15. Expenses

The Hospital shall not be responsible for any personal or professional expenses incurred by the Group including, but not limited to, any property located off-site, licensing fees, professional liability insurance, membership fees and dues in professional organizations, medical books and journals, and expenses incurred in attending medical conventions and meetings.

16. Professional Liability Insurance

Prior to providing any services hereunder, Group shall purchase and maintain, or cause each Group Radiologist to purchase and maintain, professional liability insurance covering each radiologist for medical services rendered under this Agreement in the amount of at least $2,000,000 per claim with an annual aggregate limit of at least $6,000,000. The Group shall also maintain comprehensive general liability insurance in the amount of at least $1,000,000 per claim with an annual aggregate limit of at least $3,000,000 if available on a commercially reasonable basis. The Hospital shall not be required to provide such insurance nor shall the Hospital be liable for the payment of any premiums on such insurance. The Group further agrees that its radiologists will cooperate with and participate in Hospital's Quality Assurance and Improvement Program.

17.    Indemnification

Each Party shall indemnify, defend, and hold the other Party (including its officers and employees) harmless from all claims, loss, damage or injury of any kind or character (including, without limitation, attorneys' fees and costs of defense) to any person or property caused by or arising from any negligence or any wrongful or willful misconduct of the indemnifying Party, its agents, contractors and/or employees; provided, however, that the indemnifying Party is notified of any claim within a reasonable period of time after the other Party becomes aware of it, and the indemnifying Party is afforded an opportunity to participate in the defense of such claim. In such event, no negotiated settlement agreement shall be binding on the indemnifying Party without its consent, not to be unreasonably withheld or delayed. The provisions of this Section 17 shall survive termination of this Agreement.

18. Status of the Parties

It is expressly understood and agreed that, in the performance of services under this Agreement, the Group and the employees and independent contractors engaged by the Group

shall at all times act as independent contractors with respect to the Hospital and as an independent private radiologist practice, and not as employees or agents of the Hospital. Neither the Group nor its employees or independent contractors shall have any claim under this Agreement or otherwise against the Hospital for vacation pay, paid sick leave, retirement benefits, social security, workers compensation, health insurance, disability or unemployment insurance benefits or other employee benefits of any kind. The Group understands and agrees that: (i) the Group and its employees and independent contractors will not be treated as Hospital employees for federal tax purposes, (ii) the Hospital will not withhold on behalf of Group and its employees and independent contractors any sums for income tax, unemployment insurance, FICA, or any other withholding pursuant to any law or requirement of any governmental body or make available any of the benefits afforded to employees of Hospital; (iii) all of such payments, withholdings, and benefits, if any, are the sole responsibility of the Group; and (iv) the Group will indemnify and hold Hospital harmless from any and all loss or liability arising from its failure to make such payments, withholdings, and benefits, if any. In the event the Internal Revenue Service or any other governmental agency should question or challenge the independent contractor status of the Group or any of its employees, radiologists or independent contractors, the Parties hereby agree that both the Group and the Hospital shall have the right to participate in any discussion or negotiation occurring with such agency or agencies, regardless of with whom or by whom such discussions or negotiations are initiated.

19. Assignment

The Group may assign its obligations hereunder; provided, however, that it has first provided the Hospital with information about such assignee in detail reasonably sufficient for the Hospital to determine whether such assignee will be able to meet, to Hospital's reasonable satisfaction, the Group's obligations herein, and further provided that Hospital has granted its consent to such assignment, such approval not to be unreasonably withheld or delayed.

20. Intellectual Property

It is agreed that in the event either Party acquires any rights to intellectual property outside the terms of this Agreement, including without limitation the development of inventions or intellectual property by such Party in their own time and at their own expense, the other Party shall have no claim with respect to such intellectual property unless both Parties have otherwise agreed in writing. The foregoing notwithstanding, it is expressly agreed that all title and rights to any work performed by the Group pursuant to this Agreement that is legally recognized as intellectual property shall belong to and remain with the Hospital unless otherwise agreed in writing by the Parties.

21. Compliance with Payor Requirements

The Group will comply with all applicable requirements for reimbursement by Medicare and Medicaid, and any applicable thirdparty payors under contract with the Group, and will provide all information requested by Hospital and necessary for the Hospital to comply with all relevant federal and state regulations. The Group shall submit all required records and reports in an accurate and timely fashion and shall require its employees and independent contractors to

8

comply with these provisions as a condition of employment or engagement. The Hospital shall not enter into managed care contracts (or extend or renew existing contracts) that subject the Group to rates for professional services without first providing the Group reimbursement rate information on radiology reimbursement and giving consideration to information and feedback by the Group to the Hospital on radiology reimbursement as it relates to the Group. The Group shall be free to negotiate fee schedules with patients and third parties not otherwise covered by Hospital's managed care agreements.

22. Access to Books and Records

During the term hereof and until the expiration of four years following the effective date of termination of this Agreement, the Group shall upon request make available to the Secretary, U.S. Department of Health and Human Services, the U.S. Comptroller General, and their representatives, this Agreement and all other books, documents, and records necessary to certify the nature and extent of the costs incurred by the Hospital in purchasing services under this Agreement. If Group provides such services through a subcontract worth $10,000 or more over a twelvemonth period with a related organization, the subcontract shall also contain a clause permitting access by the Secretary, Comptroller General, and their representatives to the books and records of the related organization.

23. No Requirement to Make Referrals

There is no requirement that the Group make referrals to, be in a position to make referrals to, or otherwise generate medical business for, the Hospital as a condition of receiving any benefits or amounts hereunder.

24. Medicare Access to Books and Records

The Group agrees that during the term hereof and until the expiration of four (4) years after the effective date of termination of this Agreement, the Group shall make available, upon written request to the Secretary of the U.S. Department of Health and Human Services, or upon request to the U.S. Comptroller General, or any of their duly authorized representatives, this Agreement, and books, documents and records of the Group that are necessary to certify the nature and extent of the cost of services provided pursuant to this Agreement. If the Group carries out any of the duties of this Agreement through a subcontract, with a value or cost of $10,000 or more over a twelve (12) month period, with a related organization, such subcontract shall contain a clause to the effect that until the expiration of four (4) years after the effective termination date of such subcontract, the related organization shall make available, upon written request from the Secretary of the U.S. Department of Health and Human Services or upon request to the U.S. Comptroller General or any of their duly authorized representatives, the subcontract, any books, documents and records of such organization that are necessary to certify the nature and extent of the cost of services provided pursuant to said subcontract.

25. Compliance With Laws

In performing its obligations herein, the Parties will comply with all applicable federal, state and local laws, rules and regulations. Each Party shall indemnify and hold the other Party harmless for any damages resulting from violation of any applicable federal, state or local laws, rules and regulations. The offending Party shall be responsible for all costs, including attorneys'nfees, incurred by the non-offending Party as a result of the offending Party's breach of the provisions of this Section 25. The Parties' obligations under this Section 25 shall survive termination of this Agreement.

26. Changes in Law

In the event that there are substantial changes or clarifications of statutes, regulations or rules which otherwise materially affect either Party's right to reimbursement from third Parties for services rendered under this Agreement, that Party may by notice to the other Party propose a new basis for payment for the services rendered pursuant to this Agreement. If such notice of new basis is given but the receiving Party disagrees with the new basis for payment, the Parties shall proceed in good faith to resolve their differences in order to achieve efficient and timely reimbursement.

27. Severability

If any provision of this Agreement shall be held to be invalid or unenforceable as against either Party, all other provisions of this Agreement shall be valid and shall be enforced to the same extent as if the invalid provision had not been included.

28. Applicable Law/Conflicts

This Agreement shall take effect and be construed in accordance with the laws of The Commonwealth of Massachusetts.

29. Successors and Assigns

Except and as further provided herein, the provisions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

30. Notice

Notice under this Agreement shall be in writing, delivered by hand, or by overnight delivery service. Notice to the Hospital shall be addressed to: Marlborough Hospital, 157 Union Street, Marlborough, MA 01752, Attention: President, and to the Group at: UMass Memorial Medical Group, Department of Radiology, 55 Lake Avenue North, Worcester, MA 01655,Attention: Department Chair.

31. Entire Agreement; Amendments; Survival

This Agreement constitutes the entire agreement and understanding between the Hospital and the Group and supersedes all prior agreements between the Parties relating to the subject matter herein. This Agreement may be amended only in a written instrument signed by both Parties. This Agreement and the rights, obligations, covenants, representations and warrantees provided hereunder, unless otherwise specifically provided herein, shall terminate as of the expiration of this Agreement or the earlier termination as provided herein, except for those provisions hereof which reasonably require performance by a Party hereto after the termination or other expiration hereof for a longer reasonable period of time, and during which longer period of time such provisions shall survive. IN WITNESS WHEREOF, the Hospital and the Group have caused this Agreement to be signed and sealed as of the Effective Date.

**MARLBOROUGH HOSPITAL**

Steve Roach, President

**UMASS MEMORIAL MEDICAL GROUP, INC.**

Max Rosen, MD, Chair
Department of Radiology

Michele Streeter, Executive Vice President
Chief Operations Officer

11

## EXHIBIT A

Duties of Chief of Imaging Department

- The Chief will provide, under the general direction of the CEO or his/her designee, overall administrative direction and management of the Department in accordance with the standards of the Joint Commission on Accreditation of Healthcare Organizations; applicable standards approved by the American College of Radiology, the Code of Ethics of the American Medical Association; federal, state and local laws; and the policies, rules and regulations of the Hospital and the Medical Staff Bylaws.

- The Group, will designate an individual to serve, subject to Hospital's approval not to be unreasonably withheld, as the Hospital's Radiation Safety Officer.

- The Chief will provide administrative supervision which will include, but not be limited to, performance or delegation of the following functions: development of policies and procedures, scheduling of physicians for on-site and on-call coverage, development of in-service training and continuing education programs for physicians and technical personnel, recommendations concerning equipment purchases and maintenance of equipment, development and implementation of quality assurance protocols and procedures, and such other services related to the administration of the Department and education of Hospital personnel.

- The Chief will assist in the coordination of the Department with other Departments of the Hospital, with respect to both professional and administrative matters, and will handle all other functions required of a Department Chief in accordance with the Medical Staff Bylaws.

- The Chief will attend regular medical and administrative meetings and assigned committee meetings as specified by the Medical Staff Bylaws or as otherwise reasonable requested by the Hospital.

- The Chief will actively participate in hospital programs regarding customer service, Quality Assurance and Improvement Program, utilization review, risk management, peer review and process improvement.

- The Chief (or in his absence, his designee as approved by the Hospital) shall attend the following Hospital meetings: Medical Executive Committee, Medical Staff Quality Assurance Committe, Patient Care Assessment Committee and the quarterly meetings of the full Medical Staff.

# EXHIBIT B
# UMass Memorial Medical Center
# Department of Radiology
### Policies/Procedures and or Clinical Guidelines

| Policy #:  Rad1100 Guidelines: Turnaround Time to Final Report | |
|---|---|
| Developed By: Steven Baccei, MD Director, Radiology Quality, Patient Safety, and Process Improvement | Effective Date: 5/1/2014<br><br>Approved by: _____<br>            Max Rosen, MD  Radiology Chair<br><br>Approved by: _____<br>            Kathryn Green, Sr. Director Radiology |
| Applicability: This guideline applies to all radiologists and radiology staff | Rescission: Supersedes policy dated: 7/5/07 |
| Keywords: | |

## I.    Policy:

This guideline defines the services standards to assure timely reporting of diagnostic radiological testing and procedures necessary for determining the patient's health care needs.

## II.    Definitions:

ADULT ED = Non-Neuroradiology Imaging on Emergency Department Patients 18 years and Older

PEDIATRIC ED = Non-Neuroradiology Imaging on Emergency Department Patients <18 years old

NEURO ED = Neuroradiology Imaging on Emergency Department Patients

PRELIMINARY REPORT = A preliminary radiology report that may issued by a Radiology Resident and often contains limited information.  This report is subject to change in the final report and pending Attending Radiologist review.

FINAL REPORT = The final report is the definitive means of communicating to the referring physician or other relevant healthcare provider the results of an imaging examination or procedure.  The final report is signed by the attending radiologist directly responsible for interpretation of the diagnostic study or procedure in question.

IP = Inpatient

ED = Emergency Department

OP = Outpatient

TAT = Turn Around Time:  Measured as the time the study/test is completed by the technologist to the time the report is finalized by the radiologist.

WET = Wet Reading: A direct request to a radiologist, typically from the ordering clinician, for an urgent interpretation on a radiology diagnostic study or procedure.

## III.   Responsibility:

It is the responsibility of all radiologists and radiology staff to comply with established hospital and departmental guidelines to achieve turnaround times as defined in this guideline and to assist in identifying opportunities to improve turnaround time or identify issues that may negatively impact turnaround.

## IV.   General Guidelines:

Effective communication is a critical component of diagnostic imaging. Quality patient care can be achieved when study results are conveyed in a timely fashion to those ultimately responsible for patient care and treatment decisions.   Effective communications include timeliness of reporting, physician to physician communication for consultation or critical findings, and processes to minimize communication errors. This guideline applies to all diagnostic imaging and interventional procedures performed by the Department of Radiology.

## V.   Procedure:

A.  Expected turnaround times for reporting results:

**≤ 2 hrs**

ADULT ED examinations Final Reports

PEDIATRIC ED examinations Preliminary Reports

NEURO ED examinations Preliminary Reports

WET reading request examinations Preliminary Reports

**≤ 24 hrs**

PEDIATRIC ED examinations Final Reports

NEURO ED examinations Final Reports

IP examinations Final Reports

**≤ 48 hrs**

OP examinations Final Reports

B.  Tracking Performance:

1.  The Director, Quality, Patient Safety, and Process Improvement Department of Radiology will analyze performance monthly through the collection of the Turn Around Time report (UTATEXC), in accordance with turnaround time standards

and categories defined in section VI. A. of this guideline.  The following metric will be captured:

> ➢        Time:  Study complete (by technologist) to final report

2. Report findings will be assessed for compliance with the turnaround time standards defined in this guideline and for opportunities for improvement. Findings and assessment(s) will be reported to the Department of Radiology Leadership Team and reviewed at faculty and staff meetings.

3. Performance improvement plans will be established and implemented where appropriate.

## VI.  References:

American College of Radiology, Practice Guideline for Communication of Diagnostic Imaging Findings, October 2005.

# Exhibit C
# Diagnostic Imaging Procedures

| | Exam Code | Exam Description |
|---|---|---|
| **CT** | | |
| | CTASP | CT: Cyst Aspiration |
| | CTCHTUBE | CT: Chest Tube Placement |
| | CTDASP | CT:  Drainage/Asp - Abscess, Hematoma or Cyst |
| | CTDKI | CT: Abscess Drain |
| | CTENTG | CT: Enterography |
| | CTNEPH | CT: Nephrostomy Tube Placement |
| | CTXLI | CT: Bx Liver |
| | CTXLU | CT: Bx Lung |
| | CTXPA | CT: Bx Pancreas |
| | CTCYSTO | CT: Cystogram |
| | CTXPL | CT: Bx Pleura |
| | CTXRP | CT: Bx Abd/Retroperitoneal |
| | CTXST | CT: Biopsy Soft Tissue |
| | CTXBD | CT: Bx Bone- Deep |

| | Exam Code | Exam Description |
|---|---|---|
| **IR** | | |
| | IRAFILTR | IR: IVC Filter Placement |
| | IRAPCDC | IR: PICC Replace/Remove w/ Fluoro & US Guidance |
| | IRPCFL | IR: PICC Line with Fluoro |
| | IRPCFLUS | IR: PICC with Fluoro & U/S |
| | IRPTC | IR: Percutaneous Tube Change |
| | DXARANKL | DX: Arthrogram Left Ankle |
| | DXARANKR | DX: Arthrogram Right Ankle |
| | DXARELL | DX: Arthrogram Left Elbow |
| | DXARELR | DX: Arthrogram Right Elbow |
| | DXARHIPL | DX: Arthrogram Left Hip |
| | DXARHIPR | DX: Arthrogram Right Hip |
| | DXARKNL | DX: Arthrogram Left Knee |
| | DXARKNR | DX: Arthrogram Right Knee |
| | DXARSHL | DX: Arthrogram Left Shoulder |
| | DXARSHR | DX: Arthrogram Right Shoulder |
| | DXARWL | DX: Arthrogram Left Wrist |

| | |
|---|---|
| DXARWR | DX: Arthrogram Right Wrist |
| DXBE1 | DX: Barium Enema |
| DXBE2 | DX: BE with Air |
| DXBE3 | DX: BE with water |
| DXBS | DX: Ba Swallow with Video (Modified) |
| DXBS3 | DX: Ba Swallow without Video |
| DXBXRB | DX: Biopsy (Bone) with Fluoro |
| DXBXRB | DX: Biopsy (Bone) with Fluoro |
| DXCYST | DX: Cystogram |
| DXERCP | DX: Pancreatogram (ERCP) |
| DXFIST | DX: Fistulogram |
| DXGI1 | DX: GI Series Upper |
| DXGI2 | DX: GI Series Air Cont |
| DXGI5 | DX: GI with Air & Barium Swallow |
| DXGI5 | DX: GI with Air & Barium Swallow |
| DXGISB | DX: Upper GI Series & SBFT |
| DXGISB3 | DX: Ba Swallow & UGI  & SBFT |
| DXGISB3 | DX: Ba Swallow & UGI  & SBFT |
| DXGU5 | DX: Urethrogram |
| DXLP | DX: Lumbar Puncture |
| DXPNINJ | DX: Pain Injection Large Joint |
| DXPNINJ2 | DX: Pain Injection Medium Joint |
| DXPNINJ2 | DX: Pain Injection Medium Joint |
| DXSALP | DX: Hysterosalpingogram |
| DXSBFT | DX: Small Bowel Follow Through |

## US/Echo

| | Exam Code | Exam Description |
|---|---|---|
| Southborough | USBBXL | US: Breast Bx- Left |
| Southborough | USBBXR | US: Breast Bx- Right |
| Southborough | USBCAL | US: Breast Asp- Left |
| Southborough | USBCAR | US: Breast Asp- Right |
| | USBEXT | US: Bx Extremity |
| Southborough | USBFNL | US: Breast Left - FNA/Bx |
| Southborough | USBFNR | US: Breast Right - FNA/Bx |
| Southborough | USBLL | US: Breast Left Needle Loc |
| Southborough | USBLLA | US: Breast Left Needle Loc- Addn'L Site |
| Southborough | USBLR | US: Breast Right Needle Loc |
| Southborough | USBLRA | US: Breast Right Needle Loc- Addn'L Site |
| Southborough | USBRAL | US: Breast Left  with Cyst Asp |
| Southborough | USBRAL | US: Breast Left  with Cyst Asp |
| Southborough | USBRAR | US: Breast Right  with Cyst Asp |
| Southborough | USBRAR | US: Breast Right  with Cyst Asp |

| | |
|---|---|
| USBXN | US: Bx Thyroid |
| USBXNT | US: Bx Neck/Thorax |
| USPAININJ | US: Pain Injection, Single Tendon/Ligament |
| USXLU | US: Bx Lung |
| USXPL | US: Bx Pleura |
| USPARA | US: Abd Paracentesis/Lavage- Initial |
| USPARS | US: Abd Paracentesis/Lavage- Subsequant |

## Mammo

| | Exam Code | Exam Description |
|---|---|---|
| Southborough | MAMSTEREOL | Mam: Stereo Bx Left with Clip, Specimen, &  Mammo |
| Southborough | MAMSTEREOR | Mam: Stereo Bx Right with Clip, Specimen, &  Mammo |
| Southborough | MAMNLL | Mam: Localization- Left |
| Southborough | MAMNLR | Mam: Localization- Right |

## MRI

| | |
|---|---|
| MRIBX | MRI- Guided Biopsy |

## NM

| | |
|---|---|
| NMLN | Lymphoscintigraphy/Sentinal Node with imaging |

- 
-

**EXHIBIT E**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-cv-10520-DHH

CHARU DESAI,
Plaintiff,

v.

UMASS MEMORIAL MEDICAL
CENTER, INC., et al.,
Defendants.

**AFFIDAVIT OF
STEVEN P. ROACH**

I, Steven P. Roach, hereby depose and state as follows:

1.      I am the President of Marlborough Hospital, and in this capacity I have personal knowledge of the facts set forth herein.

2.      Marlborough Hospital does not employ any physicians who provide medical care at Marlborough Hospital.

3.      Radiologists employed by UMass Memorial Medical Group, Inc., provide radiology services to Marlborough Hospital pursuant to a Professional Services Agreement. Marlborough Hospital does not employ the radiologists who perform services under this Agreement.

4.      Marlborough Hospital has never employed Charu Desai, M.D.

5.      All physicians are required to be credentialed and appointed as members of the medical staff in order to have privileges to provide medical care to patients at Marlborough Hospital.

6.      Physicians who are credentialed and appointed as members of the medical staff are not employees of Marlborough Hospital.

7.      Dr. Charu Desai formerly served as a member of Marlborough Hospital's medical staff, providing radiology services for patients of Marlborough Hospital as a member of its medical staff.

8.      On April 4, 2019, I signed a letter to Charu S. Desai, M.D., in which I stated: "Marlborough Hospital has accepted your resignation as a member of the Department of Radiology with regret. Thank you very much for your service to Marlborough Hospital." A copy of this letter is attached as **Exhibit A**.

9.      This letter was in reference to Dr. Desai's resignation as a member of Marlborough Hospital's medical staff, and was thanking her for her service to Marlborough Hospital as a member of its medical staff.

10.      This letter was generated as a result of the Medical Staff Services Office being notified that Dr. Desai's employment with UMass Memorial Medical Group, Inc., was ending, and was sent to Dr. Desai as confirmation of the corresponding termination of her medical staff privileges at Marlborough Hospital.

11.      This letter was not in reference to Dr. Desai's resignation of employment by Marlborough Hospital, as she was never employed by Marlborough Hospital, nor did she have any other relationship with Marlborough Hospital other than providing radiology services under Marlborough Hospital's Professional Services Agreement with Dr. Desai's employer, UMass Medical Group, Inc.

12.      At no time did Marlborough Hospital restrict the privileges of Dr. Desai to perform reads of CT images.

13.    Marlborough Hospital did not participate in the decision to end Dr. Desai's employment with UMass Medical Group, Inc.

Signed under pains and penalties of perjury this ___ day of December 2021.

_____

Steven Roach

## **EXHIBIT A**



**UMassMemorial
Marlborough Hospital**

157 Union Street
Marlborough, MA 01752
Tel: 508-481-5000
www.umassmemorial.org

April 4, 2019

Charu S. Desai, MD
UMass Memorial Medical Center
55 Lake Avenue North
Worcester, MA  01655

Dear Dr. Desai:

Marlborough Hospital has accepted your resignation as a member of the Department of
Radiology with regret.

Thank you very much for your service to Marlborough Hospital.

Sincerely,

Steven P. Roach
President and CEO

**CONFIDENTIAL**

UMM-03638

**EXHIBIT F**

**PROFESSIONAL SERVICES AGREEMENT**
**BY AND BETWEEN**
**MARLBOROUGH HOSPITAL**
**AND**
**UMASS MEMORIAL MEDICAL GROUP, INC.**

This Professional Services Agreement (the "Agreement") is made by and between Marlborough Hospital, a notforprofit corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business at 157 Union Street, Marlborough, Massachusetts (the "Hospital") and UMass Memorial Medical Group, Inc., a not-for-profit corporation organized under the laws of the Commonwealth of Massachusetts (the "Group").

WHEREAS, the Hospital seeks to contract with the Group, through its Department of Radiology, for the exclusive provision of professional radiology services at the Hospital, and the Group desires to provide such services in accordance with the provisions set forth;

In consideration of the mutual covenants and conditions contained in this Agreement, the Parties hereby agree as follows:

1. Provision of Radiology Services by the Group:

The Group shall designate certain of its employed physicians licensed in Radiology (the "Group Physicians") to provide professional radiology services ("Radiology Services") to all patients of the Hospital's Imaging Department (including Women's Imaging) who require the same in accordance with terms and conditions contained herein, without regard to the insurance coverage of the patient (or lack of the same) or the patient's ability to pay. The Group's responsibilities hereunder apply only to facilities under the hospital license of Marlborough Hospital including its facility located at Newton Street in Southborough, Massachusetts and other clinical satellites. This Agreement shall also extend to the provision of Radiology Services at any additional sites owned or operated by the Hospital during the term of this Agreement. The Group Physicians will devote reasonable best efforts, skill and ability in the performance of the services hereunder. In all matters related to the discharge of responsibilities under the terms and conditions of this Agreement, the Group shall be responsible jointly to the Chair of the Department of Radiology at UMass Memorial Medical Group and to the Hospital's President or their respective designees. The Group Physicians shall comply with all bylaws, policies, rules and regulations of the Hospital made known to it in writing, including any corporate compliance policy or code of conduct now or hereafter adopted by the Hospital, including the Hospital's Medical Staff Bylaws, as well as with applicable standards of the Joint Commission and the Hospital's performance improvement policies.

2. Term

The Term of this Agreement will commence on March 1, 2015 (the "Commencement Date") and expire on February 28, 2018.  The Term will automatically renew for additional terms of three (3) years each unless either party terminates this Agreement by delivering written notice to the other party at least nine (9) months prior to the expiration of the existing Term.

3. Radiology Services

During the Term of this Agreement, the Group agrees to provide the following Radiology services:  A General Radiologist on-site at the Hospital who shall be available to interpret chest, bone and abdominal X-Rays, CT scans of the chest abdomen and pelvis, ultrasound of the abdomen, pelvis, thyroid and testicle  and perform drainages of all organ systems (excluding breast interventions) Mondays through Fridays during the hours of eight (8) am until five (5) pm. Neuro-radiology, nuclear medicine, MRI, and any other exam not interpreted on-site, may be interpreted remotely by sub-specialized Radiologists.   All remote interpretations will be performed by UMass Memorial Medical Group Radiologists, and will not be sub-contracted to any third party.

UMMMG will provide a Radiologist on site at the Hospital during the hours of 8 am to 5 pm Monday through Friday (Excluding Marlborough Hospital holidays) of each week:

- A dedicated Radiologist specializing in Breast Imaging will be on-site at the Marlborough Hospital Southborough Medical Group facility as needed to accommodate all diagnostic mammograms, breast ultrasound and other related imaging services and interventions.  On-site breast imaging coverage shall be provided for a minimum of five (5) days per week, and will be increased as needed and mutually agreed upon by the President of the Hospital and the Chair of Radiology for the Group. If Marlboro Hospital develops Breast Imaging Services on site at Marlborough Hospital (or other locations), in addition to Southborough Medical Group, UMMMG Radiology will provide staffing to ensure that wait times for a diagnostic mammogram are not greater than 48 hours (2 business days). If Marlborough Hospital moves all breast imaging services from Southborough Medical Group to Marlborough Hospital, the same level of service currently provided at Southborough will be provided at Marlborough.

- Remote on-call coverage by Emergency Radiologists at UMass Memorial Medical Group to provide services Mondays through Fridays from five (5) pm until eight (8) am and twenty-four (24) hour coverage for Saturdays, Sundays and Holidays;

- Supervision and monitoring for all professional Radiology accreditations (e.g., American College of Radiology, Mammography Quality Standards Act);

- The parties will develop mutually-agreeable performance metrics to be monitored on a monthly basis by the Department Chair of the Group and the President of the Hospital and reported to the President of the Hospital at least on a quarterly basis.

- The Services provided pursuant to this Agreement shall be provided at Marlborough Hospital unless patient safety or the need for equipment not

available at the Hospital would necessitate performing the services at another location.

- The Services provided pursuant to this Agreement shall be performed in a manner consistent with the Hospital Radiology Turn Around Time Policy attached as Exhibit B.

- A more comprehensive list of the procedures to be provided under this Agreement is attached as Exhibit C.

4. Payor Contracting and Professional Billing

The Group will be responsible for entering into payor contracts and arranging for billing and collection services during the Term. The Group shall be responsible for billing and collections for the professional component of Radiology Services for all examinations performed on behalf of Hospital patients.

5. Personnel, Facility and Equipment Support

A.    Facilities and Equipment

(i)    The Hospital shall furnish to the Group such Hospital on-site office, equipment, telephone, supplies and other facilities and services, including computers, email system, fax and communication equipment, transcription services, dictation system (or voice recognition system) and PACS system, as are reasonably necessary for the performance of the Group's obligations under this Agreement and in accordance with (and subject to) all applicable laws and professional standards. All tangible personal property furnished by Hospital pursuant to this Section 5 shall remain the property of Hospital. The Hospital will coordinate with the Group to perform repairs and/or maintenance on radiology equipment.

(ii)    The Group (and/or UMass Memorial Medical Center) will be responsible for the purchase, support and maintenance of any and all property it chooses to be located off-site of the Hospital's service locations including, but not limited to, all computer hardware and software equipment and accessories and Internet connectivity. It is Group's responsibility to ensure that all such off-site computer equipment used in the provision of services under this Agreement is compatible with Hospital's Information Systems. The Group shall maintain and operate such off-site property in accordance with all applicable laws and professional standards including, but not limited to, the federal Health Insurance Portability and Accountability Act of 1996 and regulations promulgated pursuant thereto. The Hospital shall use commercially reasonable efforts to maintain its Information Systems in good working order such that off-site connectivity is available to the Group at all times. The Hospital may, in its sole discretion, provide technical support to the Group's off-site image interpretation equipment used primarily for hospital-bases studies, which equipment may include teleradiology and PACS systems.

B.    The Hospital shall employ and make available to the Group competent non-physician clinical personnel and support staff to enable the Group to perform its duties and provide a high level of care under this Agreement, including but not limited to, personnel necessary for

scheduling of appointments, performing the technical portion of the exam and transcription. The Hospital agrees to seek the Group's input on significant employment decisions concerning key positions within the Imaging Department, including but not limited to, directors and supervisors.  The Hospital shall also seek the Group's input when undertaking performance reviews of key personnel within the Imaging Department, which shall be conducted in accordance with Hospital policies.

6.  Support of Billing Company Interface

The Hospital, and in particular the Hospital's information systems department, will use reasonable best efforts to work with Group's  billing provider to maintain an effective interface with the Hospital to transmit examination information, patient demographics and insurance information in order to be able to process billing information promptly and efficiently.

7.  Support for Transcription

The Hospital will provide and maintain appropriate voice recognition software and hardware tools and technology, at its sole cost, sufficient to meet the Imaging Department needs.  The Hospital may make any changes to the manner, method and/or mode of transcription services as the Hospital deems necessary or desirable to meet the changing needs of the Hospital and its patients so long as same does not unreasonably interfere with the Group's ability to perform the obligations under this Agreement.  The Group shall be responsible for the cost and maintenance of any and all off-site transcription tools and technology Group chooses to utilize.

8.  Chief of Radiology

The Appointment of the Hospital's Chief of Radiology shall at all times be subject to the requirements of the Hospital's Medical Staff Bylaws.  The Group, with the approval of Hospital's President, will select a Department Chief according to the following rules:

> The Chief, when acting in the capacity of Chief, must work on the Hospital campus at least 100 calendar days (no less than 8 hours of each calendar day) during each year of the term;
>
> The Chair of the Group Department of Radiology will nominate a Chief from among the Group Physicians assigned to the Hospital, and appointment shall be subject to the approval of the Hospital's President, not to be unreasonably withheld or delayed.  Each Chief shall serve for a term of 2-4 years, as specifically determined by the Department Chair and the Hospital's President.

The Chief of Radiology shall at all times meet the requirements set forth in Exhibit A attached hereto.  Should the role of Chief of Radiology expand to require additional time and effort commitments beyond those contemplated at the commencement of this Agreement, the parties agree that they will negotiate in good faith to determine an appropriate administrative stipend to be paid in consideration for any such additional commitment of time and effort.

9. Termination

In the event that either Party has failed to perform any material term or condition of this Agreement, whether by act or omission, the other Party shall notify the breaching Party in writing of the nature of the default. The defaulting Party shall then have thirty (30) days to cure such default, or such additional time as reasonable if the breach is of such a nature that further time is necessary to effect such cure. If the breaching Party has failed to cure the breach within said cure period, the non-breaching Party may terminate this Agreement by providing thirty (30) days written notice to the breaching Party. In the event this Agreement is terminated pursuant to this Section 9, the non-breaching Party shall have all remedies available hereunder.

10. Validity and Enforceability

The Parties hereto warrant and represent that the undersigned representatives have the requisite corporate authority to enter into and to bind their respective entities to perform the obligations set forth herein. The undersigned further warrant and represent that this Agreement represents the legal, valid and binding obligations of the Parties with respect to the matters set forth herein.

11. Exclusivity

A.      In consideration of the terms and conditions herein, the Group shall be entitled to provide Radiology Services at Marlborough Hospital on an exclusive basis, meaning that during the Term of this Agreement, the Hospital shall not grant medical staff privileges to or contract with any radiologist or provider of imaging services which are within the routine scope of practice within the UMass Memorial Medical Group Department of Radiology to provide services at any facility under the hospital license of Marlborough Hospital unless s/he is employed by, or under contract with, the Group, without the Group's prior written consent.

B.      In the event the Hospital and/or any entity controlled by the Hospital provides new diagnostic services outside its service area (including the Hospital's acquisition of a controlling interest in any type of imaging center) which also require interpretations that only licensed radiologists are qualified to provide, Group shall have a first right of refusal on Hospital's reasonable terms to be the exclusive provider of such Radiology Services.

C. Southborough Medical Group: As of the execution of this Agreement, Marlborough Hospital provides imaging services at Southborough Medical Group ("SMG"), and to the extent that arrangement continues, the Group shall have the exclusive right to provide Radiology services for that location. In the event that the arrangement between the Hospital and SMG may be modified, this Agreement shall be amended accordingly.

D. Imaging performed as part of the direct care of non-Radiology providers: The parties understand that in the ordinary course of providing directed care to a physician's own patient, that various types of image guidance may be employed. Examples may include: use of fluoroscopy for ureteral stent placement by Urology, fluoroscopic guidance for ERCP by gastroenterology, or fetal ultrasound performed by OB/GYN for a patient for whom that service

is providing direct clincial clinical care.  These types of imaging shall be excluded from the exclusivity provisions of this Agreement.   However, clinicians who are not UMMMG Radiologists may not perform or interpret imaging for patients who are not under their direct clinical care, or for whom imaging is not required to perform a procedure commonly performed by that specialty.  Radiologists who are not employed by UMMMG may not interpret images obtained at the Marlborough campus (or future sites owned or licensed by Marlboro Hospital) unless subcontracted through UMMMG Radiology. Clinicians may not subcontract with non-UMMMG Radiologists to interpret imaging studies performed by in the course of imaging performed in the direct care of their patients.

12.  Physician Qualifications

It is understood that the Group may provide any radiologist(s) to perform the obligations herein (each a "Group Radiologist"), provided that each such physician has been approved by the Hospital's President, such approval not to be unreasonably withheld or delayed, and further provided that each physician meets the requirements set forth in this Agreement.  The Group represents that each Group Radiologist: (1) will have a valid and unlimited license to practice medicine pursuant to Chapter 112, Section 2 of the General Laws of the Commonwealth of Massachusetts; and (2) is qualified for and has obtained appropriate membership in good standing on the Medical Staff of Hospital.  The Group Radiologists shall not be employees of the Hospital.  The Group shall be responsible for paying compensation to all Group Radiologists.  The Group represents that each Group Radiologist shall at all times during the term of this Agreement participate in and accept reimbursement from the Medicare and Medicaid programs and provide services to Hospital patients without regard to insurance coverage or patient's ability to pay.

13.  Standards of Practice and Service

As part of Hospital's Quality Assurance and Improvement Program, the Group shall participate in recommendations for criteria and procedures to assure the consistency and quality of services provided by Hospital.  The Group shall cause each Group Radiologist to ensure that all clinical services provided hereunder are at all times rendered in a competent and professional manner, consistent with quality assurance standards of Hospital and in compliance with all applicable statutes, regulations, rules and directives of federal, state, and other governmental and regulatory bodies having jurisdiction over the Hospital or licensed providers; the rules and regulations of Hospital and of Hospital's Medical Staff; applicable standards of the Joint Commission on Accreditation of Healthcare Organizations, the Council on Medical Education of the American Medical Association, the American Academy of Pediatrics and currently accepted and approved methods and practices applicable to the practice of radiology.

14.  Medical Records

Group shall cause Group Radiologists to prepare accurate and complete records with respect to all services provided to Hospital's patients under this Agreement to be included in the patient's medical record.  All such medical records shall be and shall remain the property of

Hospital.  During and after the term of this Agreement, Group shall have access to such records as reasonably necessary for billing and other appropriate purposes related to services provided pursuant to this Agreement including, but not limited to, the defense of legal claims, regulatory compliance, medical license maintenance and other similar matters.  Each of the Parties shall maintain the confidentiality of all patient information including medical records in compliance with applicable federal and state laws including, but not limited to, the federal Health Insurance Portability and Accountability Act of 1996 and regulations promulgated pursuant thereto.

### 15. Expenses

The Hospital shall not be responsible for any personal or professional expenses incurred by the Group including, but not limited to, any property located off-site, licensing fees, professional liability insurance, membership fees and dues in professional organizations, medical books and journals, and expenses incurred in attending medical conventions and meetings.

### 16. Professional Liability Insurance

Prior to providing any services hereunder, Group shall purchase and maintain, or cause each Group Radiologist to purchase and maintain, professional liability insurance covering each radiologist for medical services rendered under this Agreement in the amount of at least $2,000,000 per claim with an annual aggregate limit of at least $6,000,000.  The Group shall also maintain comprehensive general liability insurance in the amount of at least $1,000,000 per claim with an annual aggregate limit of at least $3,000,000 if available on a commercially reasonable basis.  The Hospital shall not be required to provide such insurance nor shall the Hospital be liable for the payment of any premiums on such insurance.  The Group further agrees that its radiologists will cooperate with and participate in Hospital's Quality Assurance and Improvement Program.

### 17.   Indemnification

Each Party shall indemnify, defend, and hold the other Party (including its officers and employees) harmless from all claims, loss, damage or injury of any kind or character (including, without limitation, attorneys' fees and costs of defense) to any person or property caused by or arising from any negligence or any wrongful or willful misconduct of the indemnifying Party, its agents, contractors and/or employees; provided, however, that the indemnifying Party is notified of any claim within a reasonable period of time after the other Party becomes aware of it, and the indemnifying Party is afforded an opportunity to participate in the defense of such claim.  In such event, no negotiated settlement agreement shall be binding on the indemnifying Party without its consent, not to be unreasonably withheld or delayed.  The provisions of this Section 17 shall survive termination of this Agreement.

### 18. Status of the Parties

It is expressly understood and agreed that, in the performance of services under this Agreement, the Group and the employees and independent contractors engaged by the Group

shall at all times act as independent contractors with respect to the Hospital and as an independent private radiologist practice, and not as employees or agents of the Hospital. Neither the Group nor its employees or independent contractors shall have any claim under this Agreement or otherwise against the Hospital for vacation pay, paid sick leave, retirement benefits, social security, workers compensation, health insurance, disability or unemployment insurance benefits or other employee benefits of any kind. The Group understands and agrees that: (i) the Group and its employee and independent contractors will not be treated as Hospital employees for federal tax purposes, (ii) the Hospital will not withhold on behalf of Group and its employees and independent contractors any sums for income tax, unemployment insurance, FICA, or any other withholding pursuant to any law or requirement of any governmental body or make available any of the benefits afforded to employees of Hospital; (iii) all of such payments, withholdings, and benefits, if any, are the sole responsibility of the Group; and (iv) the Group will indemnify and hold Hospital harmless from any and all loss or liability arising from its failure to make such payments, withholdings, and benefits, if any. In the event the Internal Revenue Service or any other governmental agency should question or challenge the independent contractor status of the Group or any of its employees, radiologists or independent contractors, the Parties hereby agree that both the Group and the Hospital shall have the right to participate in any discussion or negotiation occurring with such agency or agencies, regardless of with whom or by whom such discussions or negotiations are initiated.

19. Assignment

The Group may assign its obligations hereunder; provided, however, that it has first provided the Hospital with information about such assignee in detail reasonably sufficient for the Hospital to determine whether such assignee will be able to meet, to Hospital's reasonable satisfaction, the Group's obligations herein, and further provided that Hospital has granted its consent to such assignment, such approval not to be unreasonably withheld or delayed.

20. Intellectual Property

It is agreed that in the event either Party acquires any rights to intellectual property outside the terms of this Agreement, including without limitation the development of inventions or intellectual property by such Party in their own time and at their own expense, the other Party shall have no claim with respect to such intellectual property unless both Parties have otherwise agreed in writing. The foregoing notwithstanding, it is expressly agreed that all title and rights to any work performed by the Group pursuant to this Agreement that is legally recognized as intellectual property shall belong to and remain with the Hospital unless otherwise agreed in writing by the Parties.

21. Compliance with Payor Requirements

The Group will comply with all applicable requirements for reimbursement by Medicare and Medicaid, and any applicable thirdparty payors under contract with the Group, and will provide all information requested by Hospital and necessary for the Hospital to comply with all relevant federal and state regulations. The Group shall submit all required records and reports in an accurate and timely fashion and shall require its employees and independent contractors to

comply with these provisions as a condition of employment or engagement. The Hospital shall not enter into managed care contracts (or extend or renew existing contracts) that subject the Group to rates for professional services without first providing the Group reimbursement rate information on radiology reimbursement and giving consideration to information and feedback by the Group to the Hospital on radiology reimbursement as it relates to the Group. The Group shall be free to negotiate fee schedules with patients and third parties not otherwise covered by Hospital's managed care agreements.

22. Access to Books and Records

During the term hereof and until the expiration of four years following the effective date of termination of this Agreement, the Group shall upon request make available to the Secretary, U.S. Department of Health and Human Services, the U.S. Comptroller General, and their representatives, this Agreement and all other books, documents, and records necessary to certify the nature and extent of the costs incurred by the Hospital in purchasing services under this Agreement. If Group provides such services through a subcontract worth $10,000 or more over a twelvemonth period with a related organization, the subcontract shall also contain a clause permitting access by the Secretary, Comptroller General, and their representatives to the books and records of the related organization.

23. No Requirement to Make Referrals

There is no requirement that the Group make referrals to, be in a position to make referrals to, or otherwise generate medical business for, the Hospital as a condition of receiving any benefits or amounts hereunder.

24. Medicare Access to Books and Records

The Group agrees that during the term hereof and until the expiration of four (4) years after the effective date of termination of this Agreement, the Group shall make available, upon written request to the Secretary of the U.S. Department of Health and Human Services, or upon request to the U.S. Comptroller General, or any of their duly authorized representatives, this Agreement, and books, documents and records of the Group that are necessary to certify the nature and extent of the cost of services provided pursuant to this Agreement. If the Group carries out any of the duties of this Agreement through a subcontract, with a value or cost of $10,000 or more over a twelve (12) month period, with a related organization, such subcontract shall contain a clause to the effect that until the expiration of four (4) years after the effective termination date of such subcontract, the related organization shall make available, upon written request from the Secretary of the U.S. Department of Health and Human Services or upon request to the U.S. Comptroller General or any of their duly authorized representatives, the subcontract, any books, documents and records of such organization that are necessary to certify the nature and extent of the cost of services provided pursuant to said subcontract.

25. Compliance With Laws

In performing its obligations herein, the Parties will comply with all applicable federal, state and local laws, rules and regulations. Each Party shall indemnify and hold the other Party harmless for any damages resulting from violation of any applicable federal, state or local laws, rules and regulations. The offending Party shall be responsible for all costs, including attorneys'nfees, incurred by the non-offending Party as a result of the offending Party's breach of the provisions of this Section 25. The Parties' obligations under this Section 25 shall survive termination of this Agreement.

26. Changes in Law

In the event that there are substantial changes or clarifications of statutes, regulations or rules which otherwise materially affect either Party's right to reimbursement from third Parties for services rendered under this Agreement, that Party may by notice to the other Party propose a new basis for payment for the services rendered pursuant to this Agreement. If such notice of new basis is given but the receiving Party disagrees with the new basis for payment, the Parties shall proceed in good faith to resolve their differences in order to achieve efficient and timely reimbursement.

27. Severability

If any provision of this Agreement shall be held to be invalid or unenforceable as against either Party, all other provisions of this Agreement shall be valid and shall be enforced to the same extent as if the invalid provision had not been included.

28. Applicable Law/Conflicts

This Agreement shall take effect and be construed in accordance with the laws of The Commonwealth of Massachusetts.

29. Successors and Assigns

Except and as further provided herein, the provisions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

30. Notice

Notice under this Agreement shall be in writing, delivered by hand, or by overnight delivery service. Notice to the Hospital shall be addressed to: Marlborough Hospital, 157 Union Street, Marlborough, MA 01752, Attention: President, and to the Group at: UMass Memorial Medical Group, Department of Radiology, 55 Lake Avenue North, Worcester, MA 01655,Attention: Department Chair.

31. Entire Agreement; Amendments; Survival

This Agreement constitutes the entire agreement and understanding between the Hospital and the Group and supersedes all prior agreements between the Parties relating to the subject matter herein.   This Agreement may be amended only in a written instrument signed by both Parties. This Agreement and the rights, obligations, covenants, representations and warrantees provided hereunder, unless otherwise specifically provided herein, shall terminate as of the expiration of this Agreement or the earlier termination as provided herein, except for those provisions hereof which reasonably require performance by a Party hereto after the termination or other expiration hereof for a longer reasonable period of time, and during which longer period of time such provisions shall survive. IN WITNESS WHEREOF, the Hospital and the Group have caused this Agreement to be signed and sealed as of the Effective Date.

**MARLBOROUGH HOSPITAL**

Steve Roach, President

**UMASS MEMORIAL MEDICAL GROUP, INC.**

Max Rosen, MD, Chair
Department of Radiology

Michele Streeter, Executive Vice President
Chief Operations Officer

**EXHIBIT A**

Duties of Chief of Imaging Department

- The Chief will provide, under the general direction of the CEO or his/her designee, overall administrative direction and management of the Department in accordance with the standards of the Joint Commission on Accreditation of Healthcare Organizations; applicable standards approved by the American College of Radiology, the Code of Ethics of the American Medical Association; federal, state and local laws; and the policies, rules and regulations of the Hospital and the Medical Staff Bylaws.

- The Group, will designate an individual to serve, subject to Hospital's approval not to be unreasonably withheld, as the Hospital's Radiation Safety Officer.

- The Chief will provide administrative supervision which will include, but not be limited to, performance or delegation of the following functions:  development of policies and procedures, scheduling of physicians for on-site and on-call coverage, development of in-service training and continuing education programs for physicians and technical personnel, recommendations concerning equipment purchases and maintenance of equipment, development and implementation of quality assurance protocols and procedures, and such other services related to the administration of the Department and education of Hospital personnel.

- The Chief will assist in the coordination of the Department with other Departments of the Hospital, with respect to both professional and administrative matters, and will handle all other functions required of a Department Chief in accordance with the Medical Staff Bylaws.

- The Chief will attend regular medical and administrative meetings and assigned committee meetings as specified by the Medical Staff Bylaws or as otherwise reasonable requested by the Hospital.

- The Chief will actively participate in hospital programs regarding customer service, Quality Assurance and Improvement Program, utilization review, risk management, peer review and process improvement.

- The Chief (or in his absence, his designee as approved by the Hospital) shall attend the following Hospital meetings:  Medical Executive Committee, Medical Staff Quality Assurance Committe, Patient Care Assessment Committee and the quarterly meetings of the full Medical Staff.

# EXHIBIT B
# UMass Memorial Medical Center
# Department of Radiology
## Policies/Procedures and or Clinical Guidelines

| Policy #:  Rad1100 Guidelines: Turnaround Time to Final Report | |
| --- | --- |
| Developed By: Steven Baccei, MD Director, Radiology Quality, Patient Safety, and Process Improvement | Effective Date: 5/1/2014<br><br>Approved by: _____<br>                Max Rosen, MD  Radiology Chair<br><br>Approved by: _____<br>                Kathryn Green, Sr. Director Radiology |
| Applicability: This guideline applies to all radiologists and radiology staff | Rescission: Supersedes policy dated: 7/5/07 |
| Keywords: | |

## I.    Policy:

This guideline defines the services standards to assure timely reporting of diagnostic radiological testing and procedures necessary for determining the patient's health care needs.

## II.    Definitions:

ADULT ED = Non-Neuroradiology Imaging on Emergency Department Patients 18 years and Older

PEDIATRIC ED = Non-Neuroradiology Imaging on Emergency Department Patients <18 years old

NEURO ED = Neuroradiology Imaging on Emergency Department Patients

PRELIMINARY REPORT = A preliminary radiology report that may issued by a Radiology Resident and often contains limited information.  This report is subject to change in the final report and pending Attending Radiologist review.

FINAL REPORT = The final report is the definitive means of communicating to the referring physician or other relevant healthcare provider the results of an imaging examination or procedure.  The final report is signed by the attending radiologist directly responsible for interpretation of the diagnostic study or procedure in question.

IP = Inpatient

ED = Emergency Department

OP = Outpatient

TAT = Turn Around Time:  Measured as the time the study/test is completed by the technologist to the time the report is finalized by the radiologist.

WET = Wet Reading: A direct request to a radiologist, typically from the ordering clinician, for an urgent interpretation on a radiology diagnostic study or procedure.

## III.  Responsibility:

It is the responsibility of all radiologists and radiology staff to comply with established hospital and departmental guidelines to achieve turnaround times as defined in this guideline and to assist in identifying opportunities to improve turnaround time or identify issues that may negatively impact turnaround.

## IV.  General Guidelines:

Effective communication is a critical component of diagnostic imaging. Quality patient care can be achieved when study results are conveyed in a timely fashion to those ultimately responsible for patient care and treatment decisions.   Effective communications include timeliness of reporting, physician to physician communication for consultation or critical findings, and processes to minimize communication errors. This guideline applies to all diagnostic imaging and interventional procedures performed by the Department of Radiology.

## V.  Procedure:

A.  Expected turnaround times for reporting results:

**≤ 2 hrs**

ADULT ED examinations Final Reports

PEDIATRIC ED examinations Preliminary Reports

NEURO ED examinations Preliminary Reports

WET reading request examinations Preliminary Reports

**≤ 24 hrs**

PEDIATRIC ED examinations Final Reports

NEURO ED examinations Final Reports

IP examinations Final Reports

**≤ 48 hrs**

OP examinations Final Reports

B.  Tracking Performance:

1.  The Director, Quality, Patient Safety, and Process Improvement Department of Radiology will analyze performance monthly through the collection of the Turn Around Time report (UTATEXC), in accordance with turnaround time standards

and categories defined in section VI. A. of this guideline.  The following metric will be captured:

> ➤       Time:  Study complete (by technologist) to final report

2. Report findings will be assessed for compliance with the turnaround time standards defined in this guideline and for opportunities for improvement. Findings and assessment(s) will be reported to the Department of Radiology Leadership Team and reviewed at faculty and staff meetings.

3. Performance improvement plans will be established and implemented where appropriate.

## VI.  References:

American College of Radiology, Practice Guideline for Communication of Diagnostic Imaging Findings, October 2005.

# Exhibit C
# Diagnostic Imaging Procedures

| Exam Code | Exam Description |
|---|---|
| **CT** | |
| CTASP | CT: Cyst Aspiration |
| CTCHTUBE | CT: Chest Tube Placement |
| CTDASP | CT:  Drainage/Asp - Abscess, Hematoma or Cyst |
| CTDKI | CT: Abscess Drain |
| CTENTG | CT: Enterography |
| CTNEPH | CT: Nephrostomy Tube Placement |
| CTXLI | CT: Bx Liver |
| CTXLU | CT: Bx Lung |
| CTXPA | CT: Bx Pancreas |
| CTCYSTO | CT: Cystogram |
| CTXPL | CT: Bx Pleura |
| CTXRP | CT: Bx Abd/Retroperitoneal |
| CTXST | CT: Biopsy Soft Tissue |
| CTXBD | CT: Bx Bone- Deep |

| Exam Code | Exam Description |
|---|---|
| **IR** | |
| IRAFILTR | IR: IVC Filter Placement |
| IRAPCDC | IR: PICC Replace/Remove w/ Fluoro & US Guidance |
| IRPCFL | IR: PICC Line with Fluoro |
| IRPCFLUS | IR: PICC with Fluoro & U/S |
| IRPTC | IR: Percutaneous Tube Change |
| DXARANKL | DX: Arthrogram Left Ankle |
| DXARANKR | DX: Arthrogram Right Ankle |
| DXARELL | DX: Arthrogram Left Elbow |
| DXARELR | DX: Arthrogram Right Elbow |
| DXARHIPL | DX: Arthrogram Left Hip |
| DXARHIPR | DX: Arthrogram Right Hip |
| DXARKNL | DX: Arthrogram Left Knee |
| DXARKNR | DX: Arthrogram Right Knee |
| DXARSHL | DX: Arthrogram Left Shoulder |
| DXARSHR | DX: Arthrogram Right Shoulder |
| DXARWL | DX: Arthrogram Left Wrist |

| | |
|---|---|
| DXARWR | DX: Arthrogram Right Wrist |
| DXBE1 | DX: Barium Enema |
| DXBE2 | DX: BE with Air |
| DXBE3 | DX: BE with water |
| DXBS | DX: Ba Swallow with Video (Modified) |
| DXBS3 | DX: Ba Swallow without Video |
| DXBXRB | DX: Biopsy (Bone) with Fluoro |
| DXBXRB | DX: Biopsy (Bone) with Fluoro |
| DXCYST | DX: Cystogram |
| DXERCP | DX: Pancreatogram (ERCP) |
| DXFIST | DX: Fistulogram |
| DXGI1 | DX: GI Series Upper |
| DXGI2 | DX: GI Series Air Cont |
| DXGI5 | DX: GI with Air & Barium Swallow |
| DXGI5 | DX: GI with Air & Barium Swallow |
| DXGISB | DX: Upper GI Series & SBFT |
| DXGISB3 | DX: Ba Swallow & UGI  & SBFT |
| DXGISB3 | DX: Ba Swallow & UGI  & SBFT |
| DXGU5 | DX: Urethrogram |
| DXLP | DX: Lumbar Puncture |
| DXPNINJ | DX: Pain Injection Large Joint |
| DXPNINJ2 | DX: Pain Injection Medium Joint |
| DXPNINJ2 | DX: Pain Injection Medium Joint |
| DXSALP | DX: Hysterosalpingogram |
| DXSBFT | DX: Small Bowel Follow Through |

## US/Echo

| | Exam Code | Exam Description |
|---|---|---|
| Southborough | USBBXL | US: Breast Bx- Left |
| Southborough | USBBXR | US: Breast Bx- Right |
| Southborough | USBCAL | US: Breast Asp- Left |
| Southborough | USBCAR | US: Breast Asp- Right |
| | USBEXT | US: Bx Extremity |
| Southborough | USBFNL | US: Breast Left - FNA/Bx |
| Southborough | USBFNR | US: Breast Right - FNA/Bx |
| Southborough | USBLL | US: Breast Left Needle Loc |
| Southborough | USBLLA | US: Breast Left Needle Loc- Addn'L Site |
| Southborough | USBLR | US: Breast Right Needle Loc |
| Southborough | USBLRA | US: Breast Right Needle Loc- Addn'L Site |
| Southborough | USBRAL | US: Breast Left  with Cyst Asp |
| Southborough | USBRAL | US: Breast Left  with Cyst Asp |
| Southborough | USBRAR | US: Breast Right  with Cyst Asp |
| Southborough | USBRAR | US: Breast Right  with Cyst Asp |

| | |
|---|---|
| USBXN | US: Bx Thyroid |
| USBXNT | US: Bx Neck/Thorax |
| USPAININJ | US: Pain Injection, Single Tendon/Ligament |
| USXLU | US: Bx Lung |
| USXPL | US: Bx Pleura |
| USPARA | US: Abd Paracentesis/Lavage- Initial |
| USPARS | US: Abd Paracentesis/Lavage- Subsequant |

| | Exam Code | Exam Description |
|---|---|---|
| **Mammo** | | |
| Southborough | MAMSTEREOL | Mam: Stereo Bx Left with Clip, Specimen, &  Mammo |
| Southborough | MAMSTEREOR | Mam: Stereo Bx Right with Clip, Specimen, &  Mammo |
| Southborough | MAMNLL | Mam: Localization- Left |
| Southborough | MAMNLR | Mam: Localization- Right |
| **MRI** | MRIBX | MRI- Guided Biopsy |
| **NM** | NMLN | Lymphoscintigraphy/Sentinal Node with imaging |

- 
-

**EXHIBIT G**

| | |
|---|---|
| **From:** | Brennan, Darren <Darren.Brennan@umassmemorial.org> |
| **Sent:** | Thursday, September 21, 2017 10:27 AM |
| **To:** | Desai, Charu <Charu.Desai@umassmemorial.org> |
| **Cc:** | Rosen, Max <Max.Rosen@umassmemorial.org> |
| **Subject:** | Incident with Dr Dill today |

Charu

Max is out today so this has come to me today . I have asked Karin for and already received a short written statement of her version of today's incident in your office so now can I ask the same of you? - just what led up to and what your remember for the conversation

Also , my cell is 617-435-5141 : please feel free to call me if you want

DB

UMM-03867

**<u>EXHIBIT H</u>**

# MEDICAL DIRECTOR AGREEMENT
# INENSIVE CARE UNIT

This Medical Director Agreement ("Agreement") dated November 1,2020 is made by and between Kimberly Robinson, M.D. (hereinafter called **"Physician"**), and Marlborough Hospital (hereinafter called **"Hospital"**), a not for profit corporation organized under the laws of the Commonwealth of Massachusetts.  Hospital desires to enter into an agreement for services, and Physician represents itself as competent and qualified to accomplish the specific requirements of this Agreement; therefore, Hospital and Physician enter into this Agreement under the following terms and conditions:

1.  **Scope of Services**.  Physician agrees to perform the services described in **Attachment A**, "Scope of Services," attached hereto and made a part hereof.  If applicable, specific performance metrics and/or quality indicators are incorporated in the Scope of Services and set forth in Attachment A.

2.  **Term.**  This initial term of this Agreement will commence upon execution by both parties and expire December 31, 2021.  The term shall automatically renew for successive terms of one year each unless terminated earlier as provided herein.

3.  **INTENTIONALLY OMITTED.**

4.  **Service Fees**.  Hospital shall compensate Physician for the services in the amount of Thirty Thousand Dollars ($30,000) per year ("Service Fees").  The Service Fees shall be re-evaluated annually and adjusted as needed to reflect fair market value for the services.  In the event the parties can not agree on the Service Fees after good faith negotiations, then either party may terminate the Agreement by providing at least thirty (30) days prior written notice.

5.  **Physician's Certification.**  Physician certifies the following:  (a) that it has the requisite authority, skill, and experience to perform the services hereunder in accordance with applicable professional standards, and has obtained all requisite licenses and permits to perform those services; (b) that it has complied with all Massachusetts laws relating to contributions and payment in lieu of contributions to the Employment Security System, and with all laws relating to Worker's Compensation (M.G.L. c. 152); (c) that neither it nor any of its directors, officers, agents, employees or subcontractors (i) are currently, or have ever been, excluded, suspended or debarred from, have been declared ineligible to participate in, or are currently a party to an action or proceeding seeking to exclude, suspend or debar them from or to declare them ineligible to participate in, the Medicare or Medicaid programs or any other federal or state program, or (ii) have been convicted under federal or state law of a criminal offense related to the neglect or abuse of a patient, or the delivery of an item or service, including the performance of management or administrative services related to the delivery of an item or service, under the Medicare or Medicaid Programs.  If at any time during the term of this Agreement there is a change in circumstances such that Physician is unable to make all of the certifications set forth in this Section 5, then Physician will immediately notify Hospital in writing, whereupon Hospital may terminate this Agreement by providing Physician with thirty (30) days prior written notice.

6.  **Termination.**  This Agreement may be terminated without cause by either party by giving written notice to the other at least thirty (30) calendar days prior to the effective date of termination stated in said notice.  If Physician fails to fulfill its obligations, Hospital may terminate this Agreement by giving written notice to Physician at least seven (7) calendar days before the effective date of termination stated in the notice.  The notice shall state the circumstances of the alleged breach and may state a period during which the alleged breach may be cured, which cure shall be subject to approval by Hospital.

7.  **Obligations in Event of Termination.**  Upon termination, all finished or unfinished documents, data,

computer software, studies, and reports made, developed, and/or prepared by Physician pursuant to this Agreement shall become the property of Hospital. Hospital shall pay Physician for all services performed to the effective date of termination, subject to (i) any indemnification provisions of this Agreement and (ii) offset of sums due Physician against sums owed by Physician to Hospital.

8.    **Recordkeeping, Audit, and Inspection of Records.**  Physician shall maintain books, records and other compilations of data pertaining to the requirements of this Agreement in such detail as shall properly substantiate claims for payment hereunder. All such records shall be kept for a period of six (6) years or for such longer period as is specified herein. All retention periods start on the first day after final payment owed by Hospital under this Agreement is made to Physician. If any litigation, claim, negotiation, audit or other action involving the records is commenced prior to the expiration of the applicable retention period, all records shall be retained until completion of the action and resolution of all issues, or until the end of the applicable retention period, whichever is later. Hospital, or any of its duly authorized representatives or designees, shall have the right at reasonable times and upon reasonable notice, to examine and copy the books, records, and other compilations of data of Physician that pertain to the provisions and requirements of this Agreement, wherever such data is located. If Physician provides services to Hospital for compensation of more than $10,000.00 within a twelve (12) month period, Physician hereby consents to grant the Federal Controller General or Health and Human Services or the Centers for Medicare and Medicaid Services, or their agents, access to Physician's books, documents or records in accordance with the Omnibus Reconciliation Act of 1980.

9.    **Treatment of Assets.**  Title to all property furnished by Hospital shall remain with Hospital. Title to all property purchased by Physician from funds provided under this Agreement shall vest with Hospital. Any property of Hospital furnished to Physician shall be used only for the performance of this Agreement. Physician shall be responsible for any loss or damage to Hospital property caused by Physician's misconduct, negligence, lack of good faith, or failure to maintain or administer the property in accordance with sound management practices. Physician will immediately notify the Designated Hospital Representative of any loss or damage to Hospital property. Prior to, or upon termination of, this Agreement, Physician will return Hospital's property in like condition as it was furnished to Physician. All reference to Physician under this clause shall include any of Physician's employees, agents, or subcontractors.

10.    **Safeguarding of Patient and Hospital Information.**

(a)    Physician will (i) comply with all applicable federal, state and local laws and regulations, and (ii) in receiving, reviewing, processing, storing or otherwise dealing with any medical record, including medical records that document or reflect the provision of substance abuse treatment by UMass Memorial or UMass Memorial Members to any identified patient, be bound by the provisions of 42 U.S.C. Section 290dd-2 and any accompanying regulations, as amended.

(b)    Physician acknowledges that in the performance of this Agreement, Physician may acquire or have access to medical records or confidential medical information about patients and/or employees. Physician may acquire or have access to "Personal Information," as defined under Massachusetts law (M.G.L. c. 93H), of patients and/or employees. Physician shall comply with all applicable Massachusetts laws and regulations (including M.G.L. c. 93H and 93I) and federal laws and regulations relating to patient confidentiality, privacy and security (including the federal law known as HIPAA, and all implementing regulations relating thereto), and with all Hospital policies and procedures regarding medical records and information. If Physician is a "Business Associate" and receives "Protected Health Information" (as those terms are defined under HIPAA) from Hospital pursuant to this Agreement, then Physician shall execute and be bound by Hospital's Business Associate Agreement ("BAA"), which shall be attached hereto as Attachment C. In the event of any conflict between the terms of the BAA and this Section, the BAA will control. Physician shall at all times recognize Hospital's ownership of medical records and the exclusive

right and jurisdiction of Hospital and Hospital patients to control the use of medical records and information. The use or disclosure of any part of any information concerning a patient of Hospital, its subsidiaries or affiliates, for any purpose not directly connected with the services under this Agreement is prohibited. Physician shall notify Hospital orally and in writing within five business days of its discovery that any Protected Health Information or Personal Information in its possession or control has been improperly used, copied or removed by anyone except an authorized representative of Hospital. Physician shall cooperate with Hospital in taking such steps as Hospital deems appropriate to enjoin the misuse, regain possession of the data, and otherwise protect Hospital and the patient's rights and privacy.

Physician agrees to comply with the requirements of Massachusetts General Law Chapter 93I for the disposing of records containing Personal Information and shall implement and monitor compliance with policies and procedures that prohibit unauthorized access to, acquisition of, or use of personal information during the collection, transportation, and disposal of Personal Information.

(c)     Physician shall take all reasonable steps to assure the security of Protected Health Information, Personal Information, and other confidential information in its possession, including, but not limited to: alarm systems, locked files, guards or other devices reasonably calculated to prevent unauthorized access to electronically or mechanically held data, limited terminal access, encryption, limited access to input documents and outputs documents, and design provisions that avoid unnecessary use of names or other identifying characteristics of patients or others. Hospital shall have access at all times to any Protected Health Information, medical records, data or information maintained pursuant to this Agreement without the consent of the patient. Agents, employees, or subcontractors of Physician who shall have access to Protected Health Information, Personal Information, medical records, or information shall sign Hospital's applicable confidentiality agreement. Physician agrees to instruct its employees, agents, and subcontractors having access to Protected Health Information or Personal Information of their obligations under this Agreement.

(d)     Physician shall also hold in strict confidence and not release to any third party, without the written approval of Hospital, any information provided to Physician by Hospital or its affiliates, or their agents and employees, which is identified as confidential or proprietary, or which Physician knows or has good reason to know is confidential or proprietary, including, without limitation, all pricing information, information relating to third party rates of reimbursement and information about Hospital finances or strategies.

(e)     Any failure of Physician to comply with these requirements shall be deemed a material breach by Physician.

11.     **Assignment and Subcontracting.** Physician will not assign or in any way transfer any interest in this Agreement, nor shall it subcontract any services hereunder, without Hospital's prior written approval, and in the event Physician assigns, transfers, or subcontracts all or part of this Agreement, Physician shall ensure that the assignee, transferee and/or subcontractor will jointly and severally assume responsibility along with Physician for all applicable certifications and obligations of Physician set forth herein including, without limitation, the obligations in Section 16. Hospital may assign this Agreement to UMass Memorial Health Care, Inc. or any of its subsidiaries, and Hospital will provide Physician with notice of any such assignment.

12.     **Nondiscrimination in Employment.** Hospital is an equal opportunity employer and federal contractor or subcontractor. Consequently, the parties agree that, as applicable, they will abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a) and that these regulations are incorporated herein by reference. These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and they prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender

identity or national origin.  These regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability.  The parties also agree that, as applicable, they will abide by the requirements of Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of rights under federal labor laws.

13.     **Choice of Law.**  This Agreement shall be construed under and governed by the laws of the Commonwealth of Massachusetts.  The parties agree to bring any legal proceedings arising under this Agreement in a state court of competent jurisdiction within the Commonwealth of Massachusetts. This paragraph shall not be construed to limit any other legal rights of the parties.

14.     **Force Majeure.**  Neither party shall be liable to the other or be deemed to be in breach of this Agreement for any failure or delay in rendering performance arising out of causes beyond its reasonable control and without its fault or negligence.  Such causes may include, but are not limited to, acts of God or of a public enemy, government orders, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, or unusually severe weather.  Dates or times of performance shall be extended to the extent of delays excused by this section, provided that the party whose performance is affected notifies the other promptly of the existence and nature of such delay.

15.     **Compliance with Laws and Hospital Policies.**  Physician shall comply with all applicable laws, rules, regulations, ordinances, orders or requirements of any governmental authority, as well as all applicable bylaws, policies, and rules and regulations of Hospital, relating to the delivery of the services specified in this Agreement.  Hospital has the right to require Physician to pay fines, penalties, and damages that may arise or be imposed because of Physician's breach or failure to comply with the provisions of this Agreement.

16.     **Insurance and Indemnification.**  Physician will maintain insurance policies sufficient to cover its responsibilities under this Agreement including, but not limited to, professional and general liability, automobile, and/or property liability as appropriate.  Within thirty (30) days of commencement of work, Physician shall provide the Hospital with properly executed Certificates of Insurance evidencing such coverage and provide that such coverage shall not be canceled except on thirty (30) days prior written notice to Hospital.  Coverage should be placed with an A-rated carrier qualified to do business in Massachusetts unless Hospital otherwise consents in writing.  Physician shall indemnify and hold harmless Hospital, its Affiliates, agents, officers and employees against any and all liability, loss, damages, penalties, costs or expenses (i) resulting from, arising out of, or in connection with a breach of Section 10 by Physician, its agents, officers, employees or subcontractors and/or (ii) for personal injury or damage to real or tangible personal property which Hospital may sustain, incur or be required to pay, resulting from, arising out of, or in connection with the services performed or delivered under this Agreement by reason of negligence, reckless or intentional misconduct of Physician, its agents, officers, employees, or subcontractors.  Physician's obligation to indemnify is contingent upon Hospital notifying Physician of any claim within a reasonable time after Hospital becomes aware of it, and Physician being afforded an opportunity to participate in the defense of such claim.  In such event, no negotiated settlement agreement shall be binding on a party without that party's concurrence, which shall not be unreasonably withheld.

17.     **Waivers.**  All conditions, covenants, duties, and obligations contained in this Agreement may be waived only by written agreement.  Forbearance or indulgence in any form or manner by a party shall not be construed as a waiver or in any way limit the legal or equitable remedies available to that party.

18.     **Notice.**  Unless otherwise specified in an Attachment hereto, any notice hereunder shall be in writing addressed to the persons and addresses indicated below.

        **To:     Marlborough Hospital**

**157 Union Street**
**Marlborough, MA 01752**
**Attn:  President**

With a required copy to:

**UMass Memorial Health Care**
**Office of the General Counsel**
**365 Plantation Street**
**3rd Floor, Suite 334**
**Worcester, MA 01605**

To:   Physician:

_____
_____
_____

19.  **Independent Physician**.  Physician shall perform all services hereunder as an independent contractor. Physician and its employees, agents, and subcontractors are not employees or agents of Hospital, and shall not hold themselves out as, or claim to be, officers or employees of Hospital, and will not make any claim, demand, or application to or for any right or privilege applicable to an officer or employee of Hospital including, but not limited to, worker's compensation coverage, unemployment insurance benefits, social security benefits, or retirement membership or credit.

20.  **Approval of Physician's Personnel.**  Hospital shall have the right to approve all personnel assigned to this Agreement before such personnel begin performance under this Agreement, and the right at any time, with reasonable notice to Physician, to require Physician to replace any person assigned by Physician to provide services under this Agreement.

21.  **Health Monitoring of Physician Personnel.**  In accordance with Hospital's policy, Hospital may require that Physician's personnel undergo physical examination and/or laboratory testing before providing services at Hospital's health care facilities, if Hospital determines that such examinations and/or testing is reasonably necessary to protect the health and safety of Hospital patients.  Hospital may also require Physician to ensure that such personnel have had the appropriate examinations, tests, immunizations and other screening required by Hospital or by state, federal, or local laws and regulations.  Physician shall retain and, if requested, provide certification that such examinations, tests, or other requirements have been met.

22.  **Hospital Tax Exemption**.  Any material, equipment, or service provided to Hospital purchased under this Agreement is exempt from Massachusetts Sales Tax.

23.  **Quality.**  Physician represents that all services provided pursuant to this Agreement will be rendered in accordance with the ethical and professional standards of The Joint Commission.

24.  **Amendments.**  No amendment to this Agreement shall be effective unless it is signed by authorized representatives of the parties and complies with all other regulations and requirements of law.

25.  **Headings.**  The section headings of this Agreement are made for reference only, and shall not be construed to define or limit the scope or intent of the terms and conditions herein.

26.  **Entire Agreement.**  The parties understand and agree that this Agreement and Attachments (if any) supersede and void all other oral and written agreements and negotiations by the parties relating to the

services under this Agreement. This Agreement shall not be binding against either party unless both parties have signed below. If language in Attachments A and/or B contradicts any provision of this Agreement, the contradictory language in such Attachments shall be disregarded, and the terms of this Agreement shall prevail, unless it is indicated that the language of the Attachment specifically overrides this Section 26 and the Attachment is separately signed by an authorized officer of the Hospital.

IN WITNESS WHEREOF, the parties hereto set their hands as of the date first written above:

**MARLBOROUGH HOSPITAL**

By: *John E. Brouhard II*

Print Name:

Title:

By: *Kimberly Robinson*

Kimberly Robinson, MD

## ATTACHMENT A:  SCOPE OF SERVICES

### PART A:  Description of the Services

### Duties/Responsibilities for the Medical Director of the Intensive Care Unit

The duties and responsibilities shall include:

1. Serving as Chair of the Intensive Care Unit Committee, including developing the agenda, creating and reviewing meeting minutes, assigning tasks and monitoring progress.
2. Functioning as Physician Leader of the ICU, including championing the use of the most relevant evidence medicine to deliver the highest standards of care.
3. Monitoring and evaluating the quality and appropriateness of care provided in the ICU as well as critical care provided in other areas of the hospital while temporizing while awaiting transfer to the ICU. Working in conjunction with the Chief Medical Officer and Chief Nursing Officer. Act as a resource to nursing and other physicians and providers with respect to issues related to patient care management, as appropriate. Medical Directors provide 24-hour availability, including where necessary, an appropriately qualified designee(s) to share these responsibilities or assume them in director's absence.
4. Supporting the development and maintenance of nursing programs and the educational plan for nurses in the ICU and participate in these programs as appropriate.
5. Updating the medical staff regarding changes in the ICU Protocols, Policies and Practices. Ensure policies relative to the Medical Staff Bylaws, Rules and Regulations are followed.
6. Working with the Nurse Manager/Director regarding prioritization of placement of patients, including serving as liaison to the medical staff regarding available resources. The Medical Director shall communicate and will have final authority for decisions regarding patient placement in the ICU and the Medical Director will communicate such decisions to medical staff and nurse manager.
7. Participate in discussions regarding development, evaluation, and introduction of services, equipment and procedures.
8. Participate in design and coordination of, and/or serve as principal investigator or study coordinator, for, and registries or studies ongoing within the ICU as applicable.
9. Member of the MEC, PCMC and MS Quality Assurance Committee and others as per the MH MS Bylaws and Rules and Regulations.
10. Medical Director will work with infectious control committee to develop and implement procedures to prevent the transmission of infections in the ICU and prevention of other hazards to patients and staff.
11. Function as the Physician leader of the ICU with the ability to implement policies of the medical staff (i.e. consult, write orders, etc.) when needed.
12. Represent the ICU committee regarding medical care considerations in meetings with Medical Staff.
13. Meet periodically with EICU leaders to review performance i.e. quality outcomes
14. Oversee, supervise, and evaluate the performance of all advanced practice providers working in the ICU as required by the Medical Staff credentialing processes and MA standards of care.
15. Advise Administration, and participate in the recruitment, selection, credentialing, and development of advanced practice providers for the ICU to ensure adequate coverage of the unit in accordance with agreed upon staffing plans when necessary.

## ATTACHMENT A:   SCOPE OF SERVICES

**PART B:  Performance Metrics and Quality Indicators**

- ***Clinical/Licensed (non-credentialed) Personnel:***
  - *Provider Staff meeting Minimal Qualifications*
    - *Licensure/Training*
    - *Experience*
    - *References*
- ***Quality of care***
  - *Patient Satisfaction -providers*
  - *Provider Satisfaction*
  - *Complaints involving providers*
  - *Incident reports involving providers*

- ***Credentialed Personnel***
  - *Completes the credentialing and privileging process*
  - *Meets criteria for OPPE/FPPE evaluations*
  - *Participates in Departmental/Divisional Quality/Performance improvement activities.*

**Contractor will maintain the above performance metrics and quality indicators.  Except as otherwise stated, failure to meet the requirements shall constitute a default under this Agreement.**

**<u>EXHIBIT I</u>**

# MEDICAL DIRECTOR AGREEMENT
# RESPIRATORY CARE SERVICES

This Medical Director Agreement ("Agreement") dated November 1, 2020 is made by and between Kimberly Robinson, M.D. (hereinafter called **"Physician"**), and Marlborough Hospital (hereinafter called **"Hospital"**), a not for profit corporation organized under the laws of the Commonwealth of Massachusetts. Hospital desires to enter into an agreement for services, and Physician represents itself as competent and qualified to accomplish the specific requirements of this Agreement; therefore, Hospital and Physician enter into this Agreement under the following terms and conditions:

1.  **Scope of Services**.  Physician agrees to perform the services described in **Attachment A**, "Scope of Services," attached hereto and made a part hereof.  If applicable, specific performance metrics and/or quality indicators are incorporated in the Scope of Services and set forth in Attachment A.

2.  **Term.**  This initial term of this Agreement will commence upon execution by both parties and expire December 31, 2021.  The term shall automatically renew for successive terms of one year each unless terminated earlier as provided herein.

3.  **INTENTIONALLY OMITTED.**

4.  **Service Fees**.  Hospital shall compensate Physician for the services in the amount of Ten Thousand Dollars ($10,000) per year ("Service Fees").  The Service Fees shall be re-evaluated annually and adjusted as needed to reflect fair market value for the services.  In the event the parties can not agree on the Service Fees after good faith negotiations, then either party may terminate the Agreement by providing at least thirty (30) days prior written notice.

5.  **Physician's Certification.**  Physician certifies the following:  (a) that it has the requisite authority, skill, and experience to perform the services hereunder in accordance with applicable professional standards, and has obtained all requisite licenses and permits to perform those services; (b) that it has complied with all Massachusetts laws relating to contributions and payment in lieu of contributions to the Employment Security System, and with all laws relating to Worker's Compensation (M.G.L. c. 152); (c) that neither it nor any of its directors, officers, agents, employees or subcontractors (i) are currently, or have ever been, excluded, suspended or debarred from, have been declared ineligible to participate in, or are currently a party to an action or proceeding seeking to exclude, suspend or debar them from or to declare them ineligible to participate in, the Medicare or Medicaid programs or any other federal or state program, or (ii) have been convicted under federal or state law of a criminal offense related to the neglect or abuse of a patient, or the delivery of an item or service, including the performance of management or administrative services related to the delivery of an item or service, under the Medicare or Medicaid Programs.  If at any time during the term of this Agreement there is a change in circumstances such that Physician is unable to make all of the certifications set forth in this Section 5, then Physician will immediately notify Hospital in writing, whereupon Hospital may terminate this Agreement by providing Physician with thirty (30) days prior written notice.

6.  **Termination.**  This Agreement may be terminated without cause by either party by giving written notice to the other at least thirty (30) calendar days prior to the effective date of termination stated in said notice.  If Physician fails to fulfill its obligations, Hospital may terminate this Agreement by giving written notice to Physician at least seven (7) calendar days before the effective date of termination stated in the notice.  The notice shall state the circumstances of the alleged breach and may state a period during which the alleged breach may be cured, which cure shall be subject to approval by Hospital.

7.  **Obligations in Event of Termination.**  Upon termination, all finished or unfinished documents, data, computer software, studies, and reports made, developed, and/or prepared by Physician pursuant to this Agreement shall become the property of Hospital. Hospital shall pay Physician for all services performed to the effective date of termination, subject to (i) any indemnification provisions of this Agreement and (ii) offset of sums due Physician against sums owed by Physician to Hospital.

8.  **Recordkeeping, Audit, and Inspection of Records.**  Physician shall maintain books, records and other compilations of data pertaining to the requirements of this Agreement in such detail as shall properly substantiate claims for payment hereunder. All such records shall be kept for a period of six (6) years or for such longer period as is specified herein. All retention periods start on the first day after final payment owed by Hospital under this Agreement is made to Physician. If any litigation, claim, negotiation, audit or other action involving the records is commenced prior to the expiration of the applicable retention period, all records shall be retained until completion of the action and resolution of all issues, or until the end of the applicable retention period, whichever is later.  Hospital, or any of its duly authorized representatives or designees, shall have the right at reasonable times and upon reasonable notice, to examine and copy the books, records, and other compilations of data of Physician that pertain to the provisions and requirements of this Agreement, wherever such data is located. If Physician provides services to Hospital for compensation of more than $10,000.00 within a twelve (12) month period, Physician hereby consents to grant the Federal Controller General or Health and Human Services or the Centers for Medicare and Medicaid Services, or their agents, access to Physician's books, documents or records in accordance with the Omnibus Reconciliation Act of 1980.

9.  **Treatment of Assets.**  Title to all property furnished by Hospital shall remain with Hospital. Title to all property purchased by Physician from funds provided under this Agreement shall vest with Hospital. Any property of Hospital furnished to Physician shall be used only for the performance of this Agreement. Physician shall be responsible for any loss or damage to Hospital property caused by Physician's misconduct, negligence, lack of good faith, or failure to maintain or administer the property in accordance with sound management practices. Physician will immediately notify the Designated Hospital Representative of any loss or damage to Hospital property. Prior to, or upon termination of, this Agreement, Physician will return Hospital's property in like condition as it was furnished to Physician. All reference to Physician under this clause shall include any of Physician's employees, agents, or subcontractors.

10.  **Safeguarding of Patient and Hospital Information.**

     (a)     Physician will (i) comply with all applicable federal, state and local laws and regulations, and (ii) in receiving, reviewing, processing, storing or otherwise dealing with any medical record, including medical records that document or reflect the provision of substance abuse treatment by UMass Memorial or UMass Memorial Members to any identified patient, be bound by the provisions of 42 U.S.C. Section 290dd-2 and any accompanying regulations, as amended.

     (b)     Physician acknowledges that in the performance of this Agreement, Physician may acquire or have access to medical records or confidential medical information about patients and/or employees. Physician may acquire or have access to "Personal Information," as defined under Massachusetts law (M.G.L. c. 93H), of patients and/or employees. Physician shall comply with all applicable Massachusetts laws and regulations (including M.G.L. c. 93H and 93I) and federal laws and regulations relating to patient confidentiality, privacy and security (including the federal law known as HIPAA, and all implementing regulations relating thereto), and with all Hospital policies and procedures regarding medical records and information. If Physician is a "Business Associate" and receives "Protected Health Information" (as those terms are defined under HIPAA) from Hospital pursuant to this Agreement, then Physician shall execute and be bound by Hospital's Business Associate Agreement ("BAA"), which shall be attached hereto as Attachment C. In the event of any conflict between the terms of the BAA and this Section, the BAA will control.

Physician shall at all times recognize Hospital's ownership of medical records and the exclusive right and jurisdiction of Hospital and Hospital patients to control the use of medical records and information. The use or disclosure of any part of any information concerning a patient of Hospital, its subsidiaries or affiliates, for any purpose not directly connected with the services under this Agreement is prohibited. Physician shall notify Hospital orally and in writing within five business days of its discovery that any Protected Health Information or Personal Information in its possession or control has been improperly used, copied or removed by anyone except an authorized representative of Hospital. Physician shall cooperate with Hospital in taking such steps as Hospital deems appropriate to enjoin the misuse, regain possession of the data, and otherwise protect Hospital and the patient's rights and privacy.

Physician agrees to comply with the requirements of Massachusetts General Law Chapter 93I for the disposing of records containing Personal Information and shall implement and monitor compliance with policies and procedures that prohibit unauthorized access to, acquisition of, or use of personal information during the collection, transportation, and disposal of Personal Information.

(c)     Physician shall take all reasonable steps to assure the security of Protected Health Information, Personal Information, and other confidential information in its possession, including, but not limited to: alarm systems, locked files, guards or other devices reasonably calculated to prevent unauthorized access to electronically or mechanically held data, limited terminal access, encryption, limited access to input documents and outputs documents, and design provisions that avoid unnecessary use of names or other identifying characteristics of patients or others. Hospital shall have access at all times to any Protected Health Information, medical records, data or information maintained pursuant to this Agreement without the consent of the patient. Agents, employees, or subcontractors of Physician who shall have access to Protected Health Information, Personal Information, medical records, or information shall sign Hospital's applicable confidentiality agreement. Physician agrees to instruct its employees, agents, and subcontractors having access to Protected Health Information or Personal Information of their obligations under this Agreement.

(d)     Physician shall also hold in strict confidence and not release to any third party, without the written approval of Hospital, any information provided to Physician by Hospital or its affiliates, or their agents and employees, which is identified as confidential or proprietary, or which Physician knows or has good reason to know is confidential or proprietary, including, without limitation, all pricing information, information relating to third party rates of reimbursement and information about Hospital finances or strategies.

(e)     Any failure of Physician to comply with these requirements shall be deemed a material breach by Physician.

11.     **Assignment and Subcontracting.**  Physician will not assign or in any way transfer any interest in this Agreement, nor shall it subcontract any services hereunder, without Hospital's prior written approval, and in the event Physician assigns, transfers, or subcontracts all or part of this Agreement, Physician shall ensure that the assignee, transferee and/or subcontractor will jointly and severally assume responsibility along with Physician for all applicable certifications and obligations of Physician set forth herein including, without limitation, the obligations in Section 16. Hospital may assign this Agreement to UMass Memorial Health Care, Inc. or any of its subsidiaries, and Hospital will provide Physician with notice of any such assignment.

12.     **Nondiscrimination in Employment.**  Hospital is an equal opportunity employer and federal contractor or subcontractor. Consequently, the parties agree that, as applicable, they will abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a) and that these regulations are incorporated herein by reference. These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and they prohibit

discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. These regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability. The parties also agree that, as applicable, they will abide by the requirements of Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of rights under federal labor laws.

13. **Choice of Law.** This Agreement shall be construed under and governed by the laws of the Commonwealth of Massachusetts. The parties agree to bring any legal proceedings arising under this Agreement in a state court of competent jurisdiction within the Commonwealth of Massachusetts. This paragraph shall not be construed to limit any other legal rights of the parties.

14. **Force Majeure.** Neither party shall be liable to the other or be deemed to be in breach of this Agreement for any failure or delay in rendering performance arising out of causes beyond its reasonable control and without its fault or negligence. Such causes may include, but are not limited to, acts of God or of a public enemy, government orders, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, or unusually severe weather. Dates or times of performance shall be extended to the extent of delays excused by this section, provided that the party whose performance is affected notifies the other promptly of the existence and nature of such delay.

15. **Compliance with Laws and Hospital Policies.** Physician shall comply with all applicable laws, rules, regulations, ordinances, orders or requirements of any governmental authority, as well as all applicable bylaws, policies, and rules and regulations of Hospital, relating to the delivery of the services specified in this Agreement. Hospital has the right to require Physician to pay fines, penalties, and damages that may arise or be imposed because of Physician's breach or failure to comply with the provisions of this Agreement.

16. **Insurance and Indemnification.** Physician will maintain insurance policies sufficient to cover its responsibilities under this Agreement including, but not limited to, professional and general liability, automobile, and/or property liability as appropriate. Within thirty (30) days of commencement of work, Physician shall provide the Hospital with properly executed Certificates of Insurance evidencing such coverage and provide that such coverage shall not be canceled except on thirty (30) days prior written notice to Hospital. Coverage should be placed with an A-rated carrier qualified to do business in Massachusetts unless Hospital otherwise consents in writing. Physician shall indemnify and hold harmless Hospital, its Affiliates, agents, officers and employees against any and all liability, loss, damages, penalties, costs or expenses (i) resulting from, arising out of, or in connection with a breach of Section 10 by Physician, its agents, officers, employees or subcontractors and/or (ii) for personal injury or damage to real or tangible personal property which Hospital may sustain, incur or be required to pay, resulting from, arising out of, or in connection with the services performed or delivered under this Agreement by reason of negligence, reckless or intentional misconduct of Physician, its agents, officers, employees, or subcontractors. Physician's obligation to indemnify is contingent upon Hospital notifying Physician of any claim within a reasonable time after Hospital becomes aware of it, and Physician being afforded an opportunity to participate in the defense of such claim. In such event, no negotiated settlement agreement shall be binding on a party without that party's concurrence, which shall not be unreasonably withheld.

17. **Waivers.** All conditions, covenants, duties, and obligations contained in this Agreement may be waived only by written agreement. Forbearance or indulgence in any form or manner by a party shall not be construed as a waiver or in any way limit the legal or equitable remedies available to that party.

18. **Notice.** Unless otherwise specified in an Attachment hereto, any notice hereunder shall be in writing addressed to the persons and addresses indicated below.

To:     **Marlborough Hospital**
        **157 Union Street**
        **Marlborough, MA 01752**
        **Attn: President**

**With a required copy to:**

        **UMass Memorial Health Care**
        **Office of the General Counsel**
        **365 Plantation Street**
        **3rd Floor, Suite 334**
        **Worcester, MA 01605**

 To:    **Physician:**

        _____
        _____
        _____

19.    **Independent Physician**. Physician shall perform all services hereunder as an independent contractor. Physician and its officers, agents, and subcontractors are not employees or agents of Hospital, and shall not hold themselves out as, or claim to be, officers or employees of Hospital, and will not make any claim, demand, or application to or for any right or privilege applicable to an officer or employee of Hospital including, but not limited to, worker's compensation coverage, unemployment insurance benefits, social security benefits, or retirement membership or credit.

20.    **Approval of Physician's Personnel.** Hospital shall have the right to approve all personnel assigned to this Agreement before such personnel begin performance under this Agreement, and the right at any time, with reasonable notice to Physician, to require Physician to replace any person assigned by Physician to provide services under this Agreement.

21.    **Health Monitoring of Physician Personnel.** In accordance with Hospital's policy, Hospital may require that Physician's personnel undergo physical examination and/or laboratory testing before providing services at Hospital's health care facilities, if Hospital determines that such examinations and/or testing is reasonably necessary to protect the health and safety of Hospital patients. Hospital may also require Physician to ensure that such personnel have had the appropriate examinations, tests, immunizations and other screening required by Hospital or by state, federal, or local laws and regulations. Physician shall retain and, if requested, provide certification that such examinations, tests, or other requirements have been met.

22.    **Hospital Tax Exemption.** Any material, equipment, or service provided to Hospital purchased under this Agreement is exempt from Massachusetts Sales Tax.

23.    **Quality.** Physician represents that all services provided pursuant to this Agreement will be rendered in accordance with the ethical and professional standards of The Joint Commission.

24.    **Amendments.** No amendment to this Agreement shall be effective unless it is signed by authorized representatives of the parties and complies with all other regulations and requirements of law.

25.    **Headings.** The section headings of this Agreement are made for reference only, and shall not be construed to define or limit the scope or intent of the terms and conditions herein.

26.    **Entire Agreement.** The parties understand and agree that this Agreement and Attachments (if any)

supersede and void all other oral and written agreements and negotiations by the parties relating to the services under this Agreement. This Agreement shall not be binding against either party unless both parties have signed below. If language in Attachments A and/or B contradicts any provision of this Agreement, the contradictory language in such Attachments shall be disregarded, and the terms of this Agreement shall prevail, unless it is indicated that the language of the Attachment specifically overrides this Section 26 and the Attachment is separately signed by an authorized officer of the Hospital.

IN WITNESS WHEREOF, the parties hereto set their hands as of the date first written above:

**MARLBOROUGH HOSPITAL**

DocuSigned by:

By John E. Brouhard II

Print Name 27E5B54CF...

Title:

DocuSigned by:

By: Kimberly Robinson

Kimberly Robinson, MD

## ATTACHMENT A:  SCOPE OF SERVICES

**PART A:  Description of the Services**

**Duties/Responsibilities for the Medical Director, Respiratory Care Services (includes Respiratory Care Department and Pulmonary Function Lab)**

The duties and responsibilities shall include:

1. Collaborate with the leadership of the Marlborough Hospital Blood Gas Lab to ensure optimal patient care, compliance with regulatory requirements, and staff education needs are met.
2. Be accountable to the Medical Staff for the quality of patient care delivered by Respiratory Care Services personnel.
3. Interact directly with Respiratory Care Services personnel, and promote bedside problem solving and guidance.
4. With technical assistance, balance quality and cost effectiveness of respiratory therapies.
5. Formulate policies governing diagnostic and therapeutic procedures performed by technical staff, including tracheotomy tube management, pulmonary hygiene, ventilator management, and inhaled bronchodilator therapy.
6. Participate in the development, evaluation, and introduction of new respiratory services, equipment, protocols and procedures and monitor current respiratory services for continued medical usefulness.
7. Quality review of the testing interpretation performed in the Pulmonary Function Laboratory.
8. Ensuring pulmonary function tests are read within ninety-six (96) hours, and that physician coverage is assigned and communicated to Pulmonary Function Staff.
9. Participating in decision making regarding what types of testing will be performed in the Pulmonary Function Laboratory and what equipment will be used.
10. Assessing the training and/or credentials requirements and evaluating the performance of the technical personnel in the Pulmonary Function Laboratory.
11. Developing written protocols for all testing procedures. Signed review of written policies, procedures, and protocols as required.
12. In conjunction with the Respiratory Care / Pulmonary Function Laboratory Supervisor, developing, implementing and monitoring of a performance improvement program for the operation of the Pulmonary Function Lab and the Respiratory Care Department and a quality control program for all tests performed.
13. Developing and implementing procedures to prevent the transmissions of infection by the Respiratory Care Department equipment and personnel and for the prevention of other hazards to the patients and staff.
14. On call 24 hours/365 days or appointing appropriate designee. Communication of who the covering physician is to the Respiratory Care /Pulmonary Function Laboratory Supervisor.

## ATTACHMENT A:   SCOPE OF SERVICES

**PART B:  Performance Metrics and Quality Indicators**
- ***Diagnostic or Treatment Services***:
  *Availability*
  > *Turnaround time for reports*

  *Quality of Care*
  > *Provider Satisfaction*
  > *Complaints*
  > *Incident reports*
  > *Compliance with external metrics (licensing requirements, quality standards from applicable accrediting or quality organizations)*

- ***Provision of Care -Test Reads***:
  *Availability*
  > *Turnaround time for PFT test reads*

- ***Clinical/Licensed (non-credentialed) Personnel:***
  > *Staff Provided Meet Minimal Qualifications*
  > *Licensure/Training*
  > *References*

  *Quality of care -Oversight*
  > *Provider Satisfaction*
  > *Complaints*
  > *Incident reports*

- ***Credentialed Personnel***
  > *Completes the credentialing and privileging process*
  > *Meets criteria for OPPE/FPPE evaluations*
  > *Participates in Departmental/Divisional Quality/Performance improvement activities.*

**Contractor will maintain the above performance metrics and quality indicators.  Except as otherwise stated, failure to meet the requirements shall constitute a default under this Agreement.**

**<u>EXHIBIT J</u>**

## PHYSICIAN CONSULTANT
## CONTRACT-
## Marlborough Hospital, Inc.

**Kimberly Robinson, MD**

This Contract dated April 14, 2020 is made by and between **Kimberly Robinson, MD,** a physician duly-licensed by the Commonwealth of Massachusetts (the "Contractor"), and Marlborough Hospital ("Hospital") a not for profit corporation organized under the laws of the Commonwealth of Massachusetts. Whereas the Hospital desires to enter into a contract for services, and the Contractor represents him/herself as competent and qualified to accomplish the specific requirements of this Contract, therefore this Contract is entered into under the following terms and conditions:

1. The Contractor agrees to perform the professional services described in *Attachment A,* "Scope of Services".

2. **Term of the Contract:** This Contract shall commence on April 14, 2020 and remain in effect unless otherwise terminated as provided below.

   **Designated Hospital Representative: Charles E. Cavagnaro III, Corporate VP & Chief Medical Officer**
   **Contractor: Kimberly Robinson, MD**

   **Payment:** The Hospital shall compensate the Contractor for the services as provided in *Attachment B,* "Contract Budget." As they are authorized and approved by the Designated Hospital Representative.   Except as otherwise provided on **Attachment B,** Contractor shall bill the Hospital for services monthly in accordance with Attachment B. Contractor shall provide such documentation of the time spent and specific services performed as may be requested from time to time by the Hospital.

1. **Contractor's Certification:** The Contractor represents that (s)he is qualified to perform the described service(s) and has obtained all requisite licenses (including a license to practice medicine in the Commonwealth of Massachusetts), and requisite hospital credentials to perform those services. Contractor further certifies that (s)he is not currently excluded from participation in the Medicare program.  Contractor represents that all services provided pursuant to this Contract will be rendered in accordance with the ethical and professional standards of the Joint Commission and/or other nationally recognized accreditation organization.

2. **Professional Liability Insurance:** The Contractor shall be responsible for obtaining and maintaining, at his or her expense, during any and all periods in which services are provided pursuant to this contract, professional liability insurance covering the services provided hereunder in coverage amounts of at least $1,000,000 per incident and $3,000,000 per annual

aggregate. Prior to commencing this arrangement, the Contractor will supply a certificate or other verification of coverage to the Hospital.

3.   **Billing:** The Hospital shall have the right to bill and retain revenue related to the technical component of any services provided and the Contractor shall have the right to bill and retain revenue related to any professional services that may be provided to patients in connection with this Agreement.

   **4. Termination:** This Contract shall terminate immediately if either party fails to maintain the required license, certificate or other form of governmental approval required to perform services under this Contract. Hospital may terminate this Contract immediately if the Contractor (i) is excluded from participation in the Medicare, Medicaid or any other federal health program; (ii) is terminated from membership of the medical staff at any hospital; (iii) fails to be covered by professional liability insurance for any reason; or (iv) is notified that his or her license to practice medicine is revoked or in any way restricted. This contract may be terminated with or without cause by either party at any time upon thirty (7) days written notice to the other party.

5.   **Obligations in Event of Termination:** Upon termination, the Contractor shall be responsible for the proper completion of all medical records and billing documentation related to professional services provided hereunder. All such records and documentation are the property of the Hospital. The Hospital shall pay the Contractor for all services performed to the effective date of termination, subject to any indemnification provisions of this Contract.

6.   **Record keeping, Audit, and Inspection of Records:** The Contractor shall maintain books, records and other compilations of data pertaining to the requirements of the Contract to the extent and in such detail as shall properly substantiate claims for payment under the Contract All such records shall be kept for a period of six (6) years or for such longer period as is specified herein. All retention periods start on the first day after final payment under this Contract. If any litigation, claim, negotiation, audit or other action involving the records is commenced prior to the expiration of the applicable retention period, all records shall be retained until completion of the action and resolution of all issues, or until the end of the applicable retention period, whichever is later. Hospital, or any of its duly authorized representatives or designees, shall have the right at reasonable times and upon reasonable notice, to examine and copy, at reasonable expense, the books, records, and other compilations of data of the Contractor which pertain to the provisions and requirements of this Contract. Such access shall include on-site audits, review, and copying of records. Contractors providing services to a hospital for compensation of more than $10,000.00 within a twelve (12) month period do hereby consent to grant the Federal Controller General or HHS or their agents access to the Contractor's books, documents or records as per the Omnibus Reconciliation Act of 1980.

7.    **Safeguarding of Patient Information**

The Contractor acknowledges that in the performance of this Contract, the Contractor will acquire or have access to medical records. The Contractor shall comply with all applicable Massachusetts laws and regulations, applicable federal. laws and regulations relating to confidentiality and privacy, and policies and procedures of HealthAlliance regarding medical records and information. The Contractor shall at all times recognize Hospital's ownership of medical records and the exclusive right and jurisdiction of HealthAlliance and its patients to control the use of medical records and information.

The use or disclosure of any part of any information concerning a patient of HealthAlliance- Clinton, its subsidiaries or affiliates, for any purpose not directly connected with the services under this Contract is prohibited. The Contractor shall notify Hospital orally and in writing within twenty-four (24) hours of its discovery that any medical data in his/her possession or control has been improperly used, copied or removed by anyone except an authorized representative of Hospital. The Contractor shall cooperate with Hospital in taking such steps as Hospital deems appropriate to enjoin the misuse, regain possession of the data, and otherwise protect Hospital and the patient's rights and privacy.

The Contractor shall take all reasonable steps to assure the security of medical data and other confidential information in his/her possession, including, but not limited to: alarm systems, locked files, guards, or other devices reasonably calculated to prevent unauthorized access to electronically or mechanically held data; limited terminal access; encryption, limited access to input documents and outputs documents; and design provisions which avoid unnecessary use of the names or other identifying characteristics of patients. The Hospital shall have access at all times to any medical record data or information maintained pursuant to this Contract without the consent of the patient.

Contractor shall sign the applicable Confidentiality Agreement of the Hospital upon request prior to providing services under this Contract. Any failure of the Contractor to comply with these requirements shall be deemed a material breach by the Contractor and shall be grounds for termination for cause by the Hospital.

8.    **Choice of Law:** This Contract shall be construed under and governed by the laws of the Commonwealth of Massachusetts. The Contractor agrees to bring any federal or state legal proceedings arising under this Contract in a court of competent jurisdiction within the Commonwealth of Massachusetts. This paragraph shall not be construed to limit any other legal rights of the parties.

9.    **Compliance with Laws and Indemnification:** The Contractor shall comply with all applicable laws, rules, regulations, ordinances, orders or requirements

of the Commonwealth of Massachusetts and any governmental authority relating to the delivery of the services specified in this Contract. The Contractor shall indemnify and hold harmless the Hospital, its agents, officers and employees against any and all liability, loss, damages, penalties, costs or expenses for personal injury or damage to real or tangible personal property which the Hospital may sustain, incur or be required to pay, resulting from, arising out of, or in connection with the services pe1formed or delivered under this Contract by reason of negligence, reckless or intentional misconduct of the Contractor, its agents, officers, employees or subcontractors; provided that the Contractor is notified of any claim within a reasonable time after the Hospital becomes aware of it, and the Contractor is afforded an opportunity to participate in the defense of such claim. In such event, no negotiated settlement agreement shall be binding on the Contractor without the Contractor's concurrence.

**10.** **Independent Contractor:** Contractor shall perform all services under this Contract as an independent contractor. The Contractor is not an employee or agent of the Hospital, and shall not hold him/herself out as, nor claim to be, an officer or employee of the Hospital and will not make any claim, demand, or application to or for any right or privilege applicable to an officer or employee of the Hospital, including, but not limited to, worker's compensation coverage, unemployment insurance benefits, social security benefits, or retirement membership or credit.

4

In witness whereof, the parties hereto sign below:


MARLBOROUGH HOSPITAL

BY:_____   Date:_____

Steve Roach, CEO



CONTRACTOR

By:_____   Date: 4/15/20

Name:    Kimberly Robinson MD

5

In witness whereof, the parties hereto sign below:


MARLBOROUGH HOSPITAL

BY:_____   Date: 4/17/20
Steve Roach, CEO


CONTRACTOR

By:_____   Date: 4/15/20
Name:   Kimberly Robinson MD

## APPENDIX A
## SCOPE OF SERVICES

The Contractor/Physician shall provide on-site coverage from 7PM to 7AM, per a mutually agreed schedule, in the Intensive Care Unit and the designated ICU Surge Unit of the Hospital, rendering necessary medical services to the patients of this unit.

## APPENDIX B
CONTRACT BUDGET

The Hospital shall compensate the Contractor for the services provided at the rate of $4,000 per each pre-authorized twelve (12) hour shift of onsite services at the Hospital.

**EXHIBIT K**

## INTENSIVIST COVERAGE AGREEMENT
## BETWEEN
## MARLBOROUGH HOSPITAL
## AND
## MASS LUNG AND ALLERGY, P.C.

This Intensivist Coverage Agreement ("Agreement") is effective as of April 1, 2011 (the "Effective Date") by and between Marlborough Hospital a non-profit corporation organized under the laws of the Commonwealth of Massachusetts, located at 157 Union Street, Marlborough, Massachusetts ("Hospital") and Mass Lung and Allergy, P.C., a professional corporation located at 50 Memorial Drive, Leominster, Massachusetts ("MLA" or the "Physicians").

### RECITALS

WHEREAS, Hospital is the owner and operator of a general acute care hospital located in Marlborough, Massachusetts and requires the services of an intensivist physician group to provide on call and attending coverage for its Intensive Care Unit ("ICU");

WHEREAS, MLA employs or retains physicians who are duly qualified and licensed to practice medicine in the Commonwealth of Massachusetts, who are trained as intensivists, and who are experienced and qualified to provide the professional services required by the Hospital and who are members of Hospital's medical staff; and

WHEREAS, Hospital desires to retain MLA to provide the services as are specified in this Agreement, and MLA and its physicians desire to provide such services for the Hospital in accordance with the provisions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Agreement, the Parties hereby agree as follows:

## PHYSICIAN OBLIGATIONS

1.  Professional Services. MLA, through its member physicians, namely Kimberly Robinson, M.D., Jeffrey Scott, M.D., Payam Aghassi, M.D., Corey Saltin, D.O., Plutarco Castellanos, M.D. and Oren Schaefer, M.D., (collectively, the "MLA Physicians") shall provide professional services as set forth in Exhibit A attached (the "Professional Services"). It is understood that from time to time, MLA may need to retain other qualified physicians trained as intensivists to provide on-call and related coverage, in order to fulfill its obligations under this Agreement.

2.  Physician Qualifications. The MLA Physicians shall at all times during the term of this Agreement, (a) possess a valid and unlimited license to practice medicine pursuant to Chapter 112, Section 2 of the General Laws of the Commonwealth of Massachusetts; (b) be board certified (or, with the approval of Hospital's President and CEO, or his/her designee, board eligible) in Physician's Specialty; (c) be a member in good standing of the Hospital's medical staff with appropriate privileges in Medicine ; (d) be, and remain, a participating

provider in the Medicare and Medicaid programs (Titles XVIII and XIX of the Social Security Act, respectively); (f) be or agree to apply to be a participating physician in any insurance coverage arrangement or managed care plan in which Hospital participates and that is reasonably available to Physician; and (g) maintain unrestricted federal and state drug enforcement registration numbers. Each MLA Physician shall provide documentation of compliance with all provisions of this Section 1.2 as from time to time requested by Hospital. This Agreement is not, and shall not be construed as, any form of guarantee or assurance by Hospital that any MLA Physician shall receive membership on the Hospital medical staff or privileges for the purposes of discharging such Physician's responsibilities hereunder; provided, however, that such membership and/or privileges shall not be unreasonably denied, restricted or terminated.

3.   Physician Representations and Warranties.  MLA and each MLA Physician represents and warrants to Hospital that: (a) Physician's license to practice medicine in any state has never been suspended, revoked or restricted; (b) Physician has never been reprimanded, sanctioned or disciplined by any licensing board or state or local medical society or specialty board; (c) Physician has never been denied membership or reappointment of membership on the medical staff of any hospital and no hospital medical staff membership or clinical privileges of Physician have ever been suspended, curtailed or revoked; (d) Physician has never been excluded from participation in, or sanctioned by, any state, federal or local health care program, including, without limitation, Medicare or Medicaid; (e) Physician has never been reprimanded, sanctioned or disciplined by a federal or state drug enforcement agency or commission, been denied a federal or state drug enforcement registration number or had a federal or state drug enforcement registration number restricted; and (f) Physician has never been denied professional liability or general liability insurance coverage or had such insurance coverage restricted.  .

4.   Compliance With Hospital Standards.  Throughout the term of this Agreement, each MLA Physician shall (a) comply with all applicable terms of this Agreement and all policies, bylaws, rules and regulations of Hospital and Hospital's medical staff as in effect and provided to Physician from time to time; (b) comply with Hospital's Legal Compliance Program ("Compliance Program"), which shall be provided to Physicians at the commencement of this Agreement and thereafter whenever modified; (c) cooperate in good faith to investigate any complaints made by Hospital patients or Hospital personnel and to resolve such complaints in a reasonable time with appropriate action; and (d) ensure that all services provided at or under the auspices of the Hospital are at all times rendered in a timely, competent and professional manner, consistent with the continuous quality improvement standards of the Hospital as in effect from time to time.

5.   Compliance with Applicable Laws, Regulations and Standards.  MLA and the MLA Physicians shall comply with all applicable laws, rules and regulations of all governmental authorities and accrediting agencies having jurisdiction over Hospital, physicians, allied health professionals and/or this Agreement, including, without limitation, (a) Medicare and Medicaid laws, rules and regulations, (b) federal and state laws governing referral of patients, (c) federal and state laws prohibiting discrimination against individuals, and (d) federal and state laws governing the confidentiality and privacy of patient health information.  In addition, the Physician shall comply with all hospital and professional

licensure and reimbursement laws, regulations, rules and policies, including, without limitation, all applicable standards of voluntary accrediting institutions (including, without limitation, the Joint Commission) in which Hospital participates. . .

6.  HIPAA.  MLA, the MLA Physicians and Hospital agree to comply with the regulations promulgated under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as currently issued, as amended from time to time, and as promulgated at any time during the term of this Agreement (collectively, the "HIPAA Regulations"), with respect to the privacy and security of "protected health information" (as defined in the HIPAA Regulations) created, transmitted, maintained or received by them pursuant to or in connection with the performance of their obligations under this Agreement ("PHI").  The Physician and the Hospital agrees to use appropriate safeguards to prevent use or disclosure of PHI except as authorized hereunder, and to notify the other of any such unauthorized use or disclosure promptly upon becoming aware thereof.  Further, the parties agree that they will amend this Agreement from time to time as reasonably requested by any party to incorporate any relevant changes to the HIPAA Regulations.  Each party hereby agrees to abide by all policies and procedures implemented by Hospital (or otherwise required by law) to ensure compliance with the HIPAA Regulations, and Hospital and Hospital medical staff policies and procedures regarding patient privacy and confidentiality; provided the same are provided to Physician at the commencement of this Agreement and thereafter whenever modified.  The Parties agree that the Physician, in providing treatment to Hospital patients, operate as an organized health care arrangement with Hospital.

7.  Medical Records.  The MLA Physicians shall document promptly in the medical record all medical services provided to Hospital patients, in accordance with industry standards, and in compliance with all state and federal laws and regulations, standards of the voluntary accrediting institutions (including, without limitation, the Joint Commission) in which Hospital participates, Hospital medical staff bylaws, Hospital policies and rules and regulations (to the extent the Hospital policies and rules and regulations are provided to Physician at the commencement of this Agreement and thereafter whenever modified), and all requirements for participation and payment associated with private, federal, state, or other public third party payment programs.  All medical records shall be and shall remain the property of Hospital, although the Physician shall have reasonable access to the records after termination of this Agreement for appropriate clinical or legal reasons, consistent with Hospital policy.

## HOSPITAL OBLIGATIONS

8.  Professional and Administrative Support.  Hospital shall provide such space, equipment, supplies, resources, and non-physician personnel as are reasonably necessary for the performance of the MLA Physicians' duties hereunder, as determined by Hospital in Hospital's sole discretion.

## BILLING AND COMPENSATION

9.  Payment for Coverage Shifts.  In consideration of providing on-call and attending intensivist critical care coverage for 52 weekends per year from 5:00 pm each Friday

through 7:00 am each Monday and the related services detailed in Exhibit A, Hospital shall pay to MLA a stipend of One Hundred Thirty Thousand ($130,000) per year, payable in equal monthly installments of ten thousand eight hundred thirty three dollars. ($10,833.00). MLA will submit invoices on a monthly basis. Payments made more than 30 days past the invoice date will accrue interest at a rate of 18% per annum (1.5% per month).

10.  Billing and Collection. MLA shall be entitled to bill independently for any Professional Services rendered to patients of the Hospital by a MLA Physician, beyond the scope of services outlined in Exhibit A.   Hospital shall make no payment to the MLA or its Physicians for Professional Services rendered hereunder and shall not bill for, guarantee the collectability of, or have any claim or interest in or to the amounts billed by the Physicians; however, Hospital shall, to the best of its ability, cooperate in providing appropriate information to the Physicians and/or the Physicians' billing agent(s) to facilitate an efficient and effective billing and collection process.

11.  Non-Referral. Nothing in this Agreement or in any other written or oral agreement between the Parties, nor any consideration offered or paid in connection with this Agreement, contemplates or requires the admission or referral of any patient to Hospital. Any consideration specified in this Agreement is consistent with what the Parties reasonably believe to be fair market value for the on-call coverage and related services provided hereunder.

**INSURANCE AND INDEMNIFICATION**

12.  MLA and MLA Physicians' Professional Liability Insurance.  MLA shall purchase and maintain throughout the term of this Agreement professional liability insurance covering Professional Services rendered by the MLA Physicians under this Agreement in the amount of at least $2,000,000 for each occurrence with a per annum aggregate limitation of at least $6,000,000 and shall obtain so-called "tail insurance" in the above amounts if the insurance being provided is on a claims-made as opposed to an occurrence basis.  In the event that MLA, in order to fulfill its obligations under this Agreement, needs from time to time to retain other qualified physicians trained as intensivists to provide on-call and related coverage, MLA shall be responsible for ensuring that any such physicians have and maintain sufficient professional liability insurance as described above.  MLA shall deliver to Hospital a certificate reflecting such insurance coverage, and shall instruct and obtain the consent of each insurer to provide prior written notice to Hospital (equal to notice given to the Physician) of any actual or proposed cancellation, termination, expiration, non-renewal, reduction, or other change in the amount or scope of any coverage under such policy for any cause.  Hospital shall not be required to provide such insurance nor shall Hospital be liable for the payment of any premiums on such insurance.  The provisions of this section shall survive termination of this Agreement.

**TERM AND TERMINATION**

13.  Term. This Agreement shall have a term of one (1) year commencing on the Effective Date of this Agreement, unless sooner terminated as otherwise provided in this Agreement. This Agreement will automatically renew for successive one (1) year terms unless any

Party gives written notice of intent to terminate not less than sixty (60) days prior to the end of the then-current term.

14. Termination Without Cause. Any Party may terminate and cancel this Agreement without cause at any time upon ninety (90) days prior written notice to the other Parties.

15. Termination For Cause. Any Party may terminate and cancel this Agreement for cause at any time if there is a material default in performance hereunder by another Party upon thirty (30) days prior written notice to the other Parties and an opportunity to cure during said thirty (30) day period.

16. Immediate Termination by Hospital. Notwithstanding the foregoing, this Agreement may, in the discretion of Hospital, be immediately terminated in the event that MLA, or any of its Physicians fails to maintain compliance with all of the qualifications, covenants, provisions, representations and warranties set forth in Sections 1.2 or 1.3 herein. This Agreement may further be terminated by Hospital immediately upon oral notice, subsequently confirmed in writing to the Physician, in the event Hospital determines in good faith and consistent with prevailing medical standards that the provision of Professional Services under this Agreement by any Physician constitutes an immediate threat to the health or safety of its patients.

17. Effect of Termination. Upon termination of this Agreement, as herein above provided, no Party shall have any further obligation hereunder except for (i) obligations accruing prior to the date of termination, (ii) obligations, promises, or covenants contained herein which are expressly made to extend beyond the term of this Agreement including, without limitation, any indemnities and access to books and records, and (iii) obligations which are based upon requirements of the Marlborough Hospital Medical Staff Bylaws, Rules and Regulations, and Policies. Upon termination of this Agreement, MLA and the MLA Physicians shall immediately deliver to Hospital sole custody, and total, exclusive, and complete use of Hospital's premises, equipment, and supplies.

## MISCELLANEOUS PROVISIONS

18. Notices. Written notice required under this Agreement shall be effective when delivered by hand-delivery or sent by United States registered or certified mail, postage prepaid and return receipt requested, or consigned to an established overnight mail carrier, and addressed or delivered to the Parties at the following addresses (or such address as may hereafter be designated by a Party by written notice thereof to the other Parties actually received):

To MLA:        Payam Aghassi, MD, President
               Mass Lung and Allergy, P.C.
               50 Memorial Drive, #113
               Leominster, MA 01453

To Hospital:        Jeff Dion
                    CFO
                    Marlborough Hospital
                    157 Union Street
                    Marlborough, MA 01752

19.  Amendment. This Agreement may be amended at any time by mutual agreement of the Parties, provided that any amendment shall become effective only when reduced to writing and signed by the Parties.

20.  Assignment and Delegation. No assignment of this Agreement or delegation of the rights and obligations hereunder shall be valid without the specific written consent of all Parties hereto, except that this Agreement may be assigned by Hospital as a result of reorganization, merger, consolidation, sale of assets, change in control or sponsorship, or bankruptcy, or to any successor entity. Subject to the prohibition contained in this paragraph, this Agreement shall be binding upon and inure to the benefit of the successors and permitted assigns of the Parties hereto.

21.  Governing Law. This Agreement and all matters arising out of and relating to this Agreement shall be construed and enforced in accordance with the laws of The Commonwealth of Massachusetts, without regard to conflict of law rules.

22.  Waiver. No delay or omission by any Party to exercise any right or remedy under this Agreement shall be construed to be either acquiescence or the waiver of the ability to exercise any right or remedy in the future. Any waiver of any terms and conditions hereof must be in writing, and signed by the Parties hereto. A waiver of any term or condition hereof shall not be construed as a future waiver of the same or any other term or condition hereof.

23.  Entire Agreement. This Agreement, including all Exhibits and attachments, constitutes the entire agreement between the Parties with respect to the subject matter hereof. This Agreement supercedes all prior agreements, negotiations, and communications, whether written or oral, between the Parties hereto with respect to the subject matter hereof.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized representatives under seal effective as of the date first above written.

**MARLBOROUGH HOSPITAL**

By:_____

Jeffrey Dion, CFO

**MASS LUNG AND ALLERGY, PC**

By:_____

Payam Aghassi, M.D., President

## EXHIBIT A

## DESCRIPTION OF PROFESSIONAL SERVICES

Weekend Coverage

MLA shall be solely responsible for providing the full complement of year-round, weekend on-call intensivist coverage to the Hospital's Intensive Care Unit ("ICU"), from 5 pm each Friday through 7 am each Monday. Each Physician designated as being on-call shall be available to come to the Hospital as needed to attend to ICU patients.

This responsibility is understood not to be replacing in house ICU nighttime coverage or eICU coverage.

In addition to round-the-clock weekend telephone availability, one or more MLA Physicians shall also have daily physician presence in the ICU to round on patients. These duties also include providing pulmonary/critical care consultation to patients in the ICU.

The MLA Physicians shall also provide pulmonary consultations within the hospital from 5 pm each Friday through 7 am each Monday and on established Hospital Holidays, upon request of the attending physician or covering staff.

**<u>EXHIBIT L</u>**


**UMassMemorial**
**Marlborough Hospital**

*157 Union Street*
*Marlborough, MA 01752*
*Tel: 508-481-5000*
*www.umassmemorial.org*

April 4, 2019

Charu S. Desai, MD
UMass Memorial Medical Center
55 Lake Avenue North
Worcester, MA  01655

Dear Dr. Desai:

Marlborough Hospital has accepted your resignation as a member of the Department of
Radiology with regret.

Thank you very much for your service to Marlborough Hospital.

Sincerely,

Steven P. Roach
President and CEO

**CONFIDENTIAL**

**EXHIBIT M**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARU DESAI, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )     CIVIL ACTION NO.: |
| | )     **4:19-CV-10520-DHH** |
| UMASS MEMORIAL MEDICAL CENTER, | ) |
| INC. et al. | ) |
| | ) |
| Defendants | ) |

## PLAINTIFF CHARU DESAI'S ANSWERS TO DEFENDANT UMASS MEMORIAL MARLBOROUGH HOSPITAL'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Charu Desai, M.D. ("Plaintiff" or "Dr. Desai"), hereby submits the following answers and objections to Defendant UMass Memorial Marlborough Hospital's ("Marlborough Hospital") First Set of Interrogatories.

The following responses are made without waiver of, and with preservation of (a) all applicable rights and privileges; (b) all objections as to competency, relevancy, materiality, privilege, and admissibility of each response and the documents referred to therein; (c) the right to object on any grounds at any time to any demand or request or further documents or other discovery proceeding involving or relating thereto; and (d) the right at any time to revise, supplement, amend or clarify any of the responses made herein, whether at the conclusion of the discovery or otherwise.

These answers are based on Plaintiff's present knowledge, information, and belief. Plaintiff reserves the right to supplement, amend or otherwise change these answers in the event that discovery reveals facts that would justify such supplementation, amendment or change.

Plaintiff answers Defendant Marlborough Hospital's First Set of Interrogatories as follows:

## INTERROGATORIES

## INTERROGATORY NO. 1

Please state all facts and identify all documents that support your claim that you were employed by, or jointly employed by, Marlborough Hospital.

1

## ANSWER NO. 1

Dr. Desai refers to and incorporates the facts set forth in her Amended Complaint in this action and her Charges of Discrimination filed with the Massachusetts Commission Against Discrimination ("MCAD").   Dr. Desai further answers as follows:   Marlborough Hospital exercised substantial control over the terms and conditions of her employ.

Marlborough Hospital promulgated work rules and issued operating instructions which controlled the conditions of Plaintiff's employment.  Per the "Professional Services Agreement by and between Marlborough Hospital and UMass Memorial Medical Group, Inc.," Dr. Desai and the other physicians in the Department of Radiology at UMass Memorial Medical Group ("Department") were required to abide by Marlborough Hospital's by-laws, policies, and rules and regulations, including the Medical Staff by-laws.  See UMM 2642-2659.  Dr. Desai and the physicians of the Department were also subject to "mutually agreeable performance metrics," which were monitored by "the President of the Hospital."  Id.  The fact that Dr. Rosen was regularly required to appear before Marlborough Hospital committees regarding issues with the radiology service further supports that Marlborough Hospital controlled Dr. Desai and the other radiologists' employ.  See, e.g., UMM 30065-30067; UMM 30022-30024.

Marlborough Hospital also exercised direct authority / control over Plaintiff's duties and her termination.  First, Dr. Brennan – the Chief of Radiology at Marlborough Hospital – controlled and directed Dr. Desai and the other physicians in the Department's work assignments.  See CV of Darren Brennan, UMM 9497-9507; UMM 9533. Indeed, Dr. Brennan exercised supervisory authority over radiologists in the Department when, for example, he directed the group to prioritize work at Marlborough.  See UMM 30040.  In addition, Dr. Brennan exercised supervisory authority directly over Dr. Desai when he directed her to submit a statement following the incident between her and Dr. Dill in September of 2017.  See UMM 3867.  Next and critically, the complaint from Dr. Kimberley Robinson, which Dr. Rosen cited as his reason for terminating Dr. Desai, originated from Marlborough Hospital.  See, e.g., Deposition Testimony of M. Rosen, M.D.; Defendants' Answers to Plaintiff's Interrogatories; and UMM 707-708.

Further, Dr. Desai was not an independent contractor at Marlborough Hospital; she (and the other radiologists in the Department) performed the very same services at/for Marlborough Hospital that she was employed to perform at the other UMass Memorial entities– *i.e.*, Radiology readings.  (Dr. Joseph Ferrucci, a radiologist in the Department and a former Chair of the Department testified that he worked for/at Marlborough Hospital.)  Dr. Desai was regularly re-appointed for privileges at Marlborough Hospital. See, e.g., UMM 3344, 3594, and other documents produced by Defendants.  She was also regularly required to pay dues as a member of the medical staff at Marlborough Hospital. See UMM 3629-3635.

Finally, Marlborough Hospital plainly recognized its employment relationship with Dr. Desai, as it apparently felt it necessary to generate a letter "accept[ing] [Dr. Desai's] resignation as a member of the Department of Radiology." See UMM 3638.  It did so despite the fact that Dr. Desai did not resign her employment.

Dr. Desai expressly observes her right to supplement this answer as discovery is ongoing.

Signed under the penalties of perjury, this 23rd day of June, 2021.

/s/ Charu Desai
CHARU DESAI


AS TO OBJECTIONS:

/s/ Patricia A. Washienko
PATRICIA A. WASHIENKO (BBO 641615)
pwashienko@fwlawboston.com
BRENDAN T. SWEENEY (BBO 703992)
bsweeney@fwlawboston.com
FREIBERGER & WASHIENKO, LLC
211 Congress Street, Suite 720
Boston, Massachusetts 02110
Telephone:  617-723-0008
Fax:  617-723-0009

Dated: June 23, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2021 Plaintiff Charu Desai's Answers To Defendant UMass Memorial Marlborough Hospital's First Set Of Interrogatories was served by electronic mail only to counsel for the above named Defendants:

Reid Wakefield, Esq.
Robert L. Kilroy, Esq.
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
(508) 860-1477
rkilroy@mirickoconnell.com

Mark Johnson, Esq.
University of Massachusetts Office of the General Counsel
333 South Street, 4th Floor
Shrewsbury, MA 01545
(617) 287-4064
MAJohnson@umassp.edu

/s/ Patricia A. Washienko
Patricia A. Washienko

## **<u>EXHIBIT N</u>**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARU DESAI, | ) |
| | ) |
|     Plaintiff | ) |
| | ) |
| v. | ) CIVIL ACTION NO.: |
| | ) **4:19-CV-10520-DHH** |
| UMASS MEMORIAL MEDICAL CENTER, | ) |
| INC.; UMASS MEMORIAL MEDICAL | ) |
| GROUP; UNIVERSITY OF | ) |
| MASSACHUSETTS MEDICAL SCHOOL, | ) |
| UMASS MEMORIAL MARLBOROUGH | ) |
| HOSPITAL, MAX ROSEN, M.D., DARREN | ) |
| BRENNAN, M.D., STEPHEN TOSI, M.D., | ) |
| And KARIN DILL, M.D., | ) |
| | ) |
|     Defendants | ) |

## PLAINTIFF CHARU DESAI'S ANSWERS TO DEFENDANT UMASS MEMORIAL MEDICAL CENTER, INC.'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Charu Desai, M.D., ("Plaintiff" or "Dr. Desai"), hereby submits the following answers and objections to Defendant UMass Memorial Medical Center, Inc.'s ("Medical Center") First Set of Interrogatories.

The following responses are made without waiver of, and with preservation of (a) all applicable rights and privileges; (b) all objections as to competency, relevancy, materiality, privilege, and admissibility of each response and the documents referred to therein; (c) the right to object on any grounds at any time to any demand or request or further documents or other discovery proceeding involving or relating thereto; and (d) the right at any time to revise, supplement, amend or clarify any of the responses made herein, whether at the conclusion of the discovery or otherwise.

These answers are based on Plaintiff's present knowledge, information, and belief. Plaintiff reserves the right to supplement, amend or otherwise change these answers in the event that discovery reveals facts that would justify such supplementation, amendment or change. Each Interrogatory is responded to subject to the general objections set forth below.

Plaintiff answers Defendant UMass Memorial's First Set of Interrogatories as follows:

**INTERROGATORY NO. 7**

Identify each co-worker whom you claim was paid more than you based on gender and state the basis for your claim, including the dates by which such co-worker was paid more than you based on gender and the amounts you claim he or she was paid more than you based on gender.

**ANSWER NO. 7**

Dr. Desai refers to and incorporates in her answer the facts set forth in her Amended Complaint in this action, her Charges of Discrimination filed with the Massachusetts Commission Against Discrimination ("MCAD"), and Plaintiff's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1). Dr. Desai further answers as follows:

1. Dr. Aaron Harman
   Medical Center, 55 Lake Avenue North, Worcester, MA 01655, (508) 334-1000.
   Dr. Harman was hired in or about July 2017. Upon information and belief, at his hire Dr. Harman was paid a salary of approximately $365,000. Despite Dr. Desai's greater experience, the Medical Group and Medical Center paid Dr. Desai only $340,000 per year.

Dr. Desai has requested salary information from defendants regarding the pay of her male colleagues in radiology from Defendants. Dr. Desai expressly observes her right to supplement this answer as discovery is ongoing.

**INTERROGATORY NO. 8**

Identify each verbal or written statement you claim is defamatory, including without limitation, identifying the individual you claim made the alleged defamatory statement.

**ANSWER NO. 8**

Dr. Desai refers to and incorporates in her answer the facts set forth in her Amended Complaint in this action, her Charges of Discrimination filed with the Massachusetts Commission Against Discrimination ("MCAD"), and Plaintiff's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1). Dr. Desai further answers as follows:

1. 2017-2018 Faculty Annual Performance Review of C. Desai by M. Rosen; the document speaks for itself; a copy of this document has been produced.

2. July 1, 2016 – June 30, 2017 Peer Review of Dr. Desai by K. Dill; the document speaks for itself; a copy of this document has been produced.

3. April 17, 2018 Letter from M. Rosen to C. Desai; the document speaks for itself; a copy of this document has been produced.

11

4. April 17, 2018 3:58 PM Email from M. Rosen to C. Desai re: March 14th, 2018 Meeting; the document speaks for itself; a copy of this document has been produced.

5. April 18, 2018 5:12 PM Email from M. Rosen to C. Desai re: Meeting to Review QA data; the email speaks for itself; a copy of the communication has been produced.

6. March 9, 2018 Letter from M. Rosen and S. Tosi to C. Desai re: Notice of Termination of Employment

7. April 24, 2018 Meeting between Dr. Rosen and Dr. Desai, also attended by Dr. Sarwat Hussain.  At this meeting, Dr. Rosen stated and projected on a screen false statements that Dr. Desai had performance issues and had committed major misreads of radiology films.

8. September – December 2017, Quality Assurance Review by D. Litmanovich and accompanying documents; the documents speak for themselves; Defendants have produced some documents related to this review.  Plaintiff has requested further documents in Defendants' possession, custody, and control concerning this review.

9. Defendants' suspension of Dr. Desai's performance of duties and responsibilities, known to all in the radiology department and to numerous others throughout the hospital, constitutes defamation by deed.  Defendants' termination of Dr. Desai, known to all in the radiology department and to numerous others throughout the hospital, also constitutes defamation by deed.

Dr. Desai expressly observes her right to supplement this answer as discovery is ongoing.

**INTERROGATORY NO. 9**

Please describe in detail every request for an accommodation related to a disability you may have that you made to UMass Memorial from January 1, 2000, through the end of your employment, and provide the date each request was made, identify the person to whom each request was made, identify all communications related to each request, and state whether each requested accommodation was granted.

**ANSWER NO. 9**

Dr. Desai refers to and incorporates in her answer the facts set forth in her Amended Complaint in this action, her Charges of Discrimination filed with the Massachusetts Commission Against Discrimination ("MCAD"), and Plaintiff's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1).  Dr. Desai further answers as follows:

In or about May 2016, Dr. Desai complained to Dr. Rosen about his disparate allotment of academic days compared to her younger and/or non-disabled colleagues.  Dr. Desai requested that she be granted the same number of academic days as her younger and/or non-disabled colleagues as an accommodation for her heart condition.  See May 13, 2016 3:15 PM Email from

Signed under the penalties of perjury, this 5th day of June, 2020.


/s/ Charu Desai
CHARU DESAI


AS TO OBJECTIONS:

CHARU DESAI
By her attorneys,


/s/ Patricia A. Washienko
PATRICIA A. WASHIENKO (BBO 641615)
pwashienko@fwlawboston.com
BRENDAN T. SWEENEY (BBO 703992)
bsweeney@fwlawboston.com
FREIBERGER & WASHIENKO, LLC
211 Congress Street, Suite 720
Boston, Massachusetts 02110
Telephone:  617-723-0008
Fax:  617-723-0009

Dated: June 5, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2020 Plaintiff Charu Desai's Answers To Defendant UMass Memorial Medical Center Inc.'s First Set Of Interrogatories was served by electronic mail only to counsel for the above named Defendants:

Robert L. Kilroy, Esq.
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
(508) 860-1477
rkilroy@mirickoconnell.com

Mark Johnson, Esq.
University of Massachusetts Office of the General Counsel
333 South Street, 4th Floor
Shrewsbury, MA 01545
(617) 287-4064
MAJohnson@umassp.edu

                                    /s/ Patricia A. Washienko
                                    Patricia A. Washienko