UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-CV-10520-TSH

| | |
|---|---|
| CHARU DESAI,<br>    Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL MEDICAL<br>CENTER, INC., et al.,<br>    Defendants. | **STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANT, KARIN DILL, M.D.** |

Pursuant to D. Mass. Local Rule 56.1, Defendant, Karin Dill, M.D. ("Dr. Dill"), submits the following Statement of Material Facts in support of her Motion for Summary Judgment.[1]

1. Karin Dill, M.D., was hired by UMass Memorial Medical Group, Inc. (the "Medical Group"), on February 29, 2016, as a radiologist. See Affidavit of Karin Dill ("Dill Aff.") at ¶ 2, attached as **Exhibit A** to Affidavit of Reid Wakefield, Esq. ("Wakefield Aff.").

2. Dr. Dill was employed by the Medical Group pursuant to an Employment Agreement, under which she was dually-employed with the University of Massachusetts Medical School. Ex. A, Dill Aff. at ¶ 3.

3. Throughout the duration of her employment, Dr. Dill served as the Division Chief of the Thoracic Division (a/k/a Chest Division). Ex. A, Dill Aff. at ¶ 4.

4. At no time was Dr. Dill ever employed by UMass Memorial Medical Center, Inc., or Marlborough Hospital. Ex. A, Dill Aff. at ¶ 5.

---

[1] This Statement of Material Facts is offered for the purpose of Defendant's Motion only. The facts recited herein are accepted for this purpose only, and they do not constitute admissions or stipulations for trial.

5.     Plaintiff was a member of the Thoracic Division and specialized in chest imaging. As Division Chief, Dr. Dill provided supervision and oversight over Plaintiff in her role as a chest radiologist. Ex. A, Dill Aff. at ¶ 6.

6.     Dr. Dill did not participate in the decision to terminate Plaintiff's employment. Ex. A, Dill Aff. at ¶ 7.

7.     Dr. Dill was not informed and did not know that Plaintiff's employment would be terminated until after Plaintiff was given notice of her termination. Ex. A, Dill Aff. at ¶ 8.

8.     Dr. Dill did not participate in the independent review of Plaintiff's radiological reads conducted by Diana Litmanovich, M.D. Ex. A, Dill Aff. at ¶ 9.

9.     Dr. Dill did not know that an independent review was conducted until after Plaintiff was given notice of her termination. Ex. A, Dill Aff. at ¶ 10.

10.    Dr. Dill does not have knowledge of the results of the independent review, but only became aware after the fact that the findings contributed to the decision to terminate Plaintiff. Ex. A, Dill Aff. at ¶ 11.

11.    Dr. Dill has never seen the results of the independent review. Ex. A, Dill Aff. at ¶ 12.

12.    Dr. Dill did not participate in or make any decisions regarding Plaintiff's academic time, exemption from call, or denial of a home workstation. Ex. A, Dill Aff. at ¶ 13.

13.    Dr. Dill did not participate in evaluating or making any decisions regarding any accommodation for a disability Plaintiff may have had. Ex. A, Dill Aff. at ¶ 14.

14.    Plaintiff never made a request for accommodation for her claimed disability to Dr. Dill. Ex. A, Dill Aff. at ¶ 15.

15. Dr. Dill became aware at one point that Plaintiff had been approved for intermittent leave under the Family and Medical Leave Act, but she did not participate in evaluating or approving such leave requests. Ex. A, Dill Aff. at ¶ 16.

16. Dr. Dill did not make or participate in any decision to limit Plaintiff's privileges, including the restriction on Plaintiff's reading of CT studies. Ex. A, Dill Aff. at ¶ 17.

17. Dr. Dill did not perform a targeted review of the quality of Plaintiff's CT reads at any time. Ex. A, Dill Aff. at ¶ 18.

18. As the Division Chief, Dr. Dill was responsible for the quality of the Chest Division. See Deposition Transcript of Max Rosen, M.D. ("Rosen Dep."), at 54:18-55:1; 88:10-12, attached as **Exhibit B** to Wakefield Aff.

19. The Radiology Department has a quality assurance system designed to improve the quality of radiology services and to protect patient safety, as a part of its peer-review privileged program. Ex. A, Dill Aff. at ¶ 19.

20. During Dr. Dill's employment, the quality assurance system was based, in part, on a peer review system, where other radiologists within the Department would review each other's reads. Ex. A, Dill Aff. at ¶ 20.

21. In this system, all radiologists in the Department were asked to enter information into the quality assurance system in two circumstances: (1) through an automated process that requests that a certain number of cases be double-read periodically by each radiologist on staff; and (2) when a radiologist is made aware of a quality issue about an interpretation, the radiologist was obligated to enter that information into the peer review privileged database. Ex. A, Dill Aff. at ¶ 21; Ex. B, Rosen Dep. at 224:8-225:6.

22. When radiologists reviewed the studies, they would input a numerical score as to their review, with scores denoting the following: a "1" indicated the reviewer concurred with the reviewee's radiological interpretation; a "2" indicated the reviewer identified a discrepancy in interpretation/not ordinarily expected to be made, but which was denoted as an "understandable miss;" a "3" indicated the reviewer identified a discrepancy in the reviewee's interpretation and that the discrepancy should have been caught by the radiologist "most of the time;" and a "4" indicated the reviewer noted a discrepancy in interpretation that represented a "misinterpretation of findings" and that should be identified "almost every time." See Affidavit of Max Rosen, M.D., M.P.H. ("Rosen Aff.") at ¶ 43, attached as **Exhibit C** to Wakefield Aff.

23. At their annual faculty reviews, Dr. Rosen provided staff members with information from the quality assurance database regarding peer review reads labelled with scores of either "3" or "4." Dr. Rosen would advise the radiology staff members of these entries and ask the staff member to review the cases if they had not already done so, as a part of the quality improvement process. Ex. B, Rosen Dep. at 169:19-171:10; Ex. C, Rosen Aff. at ¶ 44.

24. Plaintiff was provided with such a summary from the quality assurance system during her 2016-2017 annual faculty review, which was conducted by Dr. Rosen. Ex. B, Rosen Dep. at 169:19-171:10; Ex. C, Rosen Aff. at ¶ 45; see Peer Review Summary Document (the "Peer Review Summary"), attached as **Exhibit D** to Wakefield Aff.

25. Plaintiff speculated during testimony she believes that Dr. Dill produced the Peer Review Summary, and Plaintiff admitted she has "no idea" how she got it, and believes she found it when cleaning her office. See Deposition Transcript for Charu Desai, M.D. ("Desai Dep."), at 322:3-323:2; 325:17-24, attached as **Exhibit E** to Wakefield Aff.

26. Plaintiff does not know whether the Peer Review Summary or the information within is related to discrimination. Ex. E, Desai Dep. at 325:17-24.

27. Plaintiff believes that information contained in the Peer Review Summary is not true. She believes that Dr. Dill similarly said things that were not true to put people down and it was not just with her. Ex. E, Desai Dep. at 248:5-249:10; 422:4-13.

28. Dr. Dill did not produce or generate the Peer Review Summary, nor did she conduct a targeted review to produce the Peer Review Summary. In fact, Dr. Dill never possessed a copy of the Peer Review Summary. Ex. A, Dill Aff. at ¶ 22.

29. Dr. Dill did not give the Peer Review Summary to Plaintiff or to any other person. Ex. E, Desai Dep. at 367:9-23; 427:2-5.

30. Certain studies included in the Peer Review Summary had been reviewed by Dr. Dill on an individual case basis in the normal course of Dr. Dill's duties as a part of the Department's quality assurance process, and were identified as errors in her opinion. Ex. A, Dill Aff. at ¶¶ 23-25.

31. In the course of her employment, Dr. Dill entered information in the quality assurance system indicating disagreement with the radiologist's initial read for 31 radiologists, in 79 instances. Ex. C, Rosen Aff, ¶ 47; Ex. A, Dill Aff. at ¶ 26;

32. Dr. Dill did not enter information about Plaintiff's reads in the peer review system, including with respect to the cases identified in the Peer Review Summary, for any reason other than for quality improvement within the Department in accordance with the peer review process. Ex. A, Dill Aff. at ¶ 27.

33. All information that Dr. Dill entered in the peer review system regarding reads conducted by Plaintiff was done in good faith and in keeping with her job duties and

responsibilities as a radiologist in the Department and as Thoracic Division Chief. Ex. A, Dill Aff. at ¶ 28.

34.     Dr. Dill informed Dr. Rosen that she had received complaints about Plaintiff's reads and that she had received requests to re-review Plaintiff's reads. Ex. B, Rosen Dep. at 53:22-55:1; 153:14-20; 232:9-16.

35.     Based on information received from attending physicians as well as on her own observations, Dr. Dill had concerns with Plaintiff's quality of reads of chest CT images. Ex. A, Dill Aff. at ¶ 29.

36.     Dr. Dill never considered Plaintiff's sex, age, or disability in any decisions she made with respect to Plaintiff, including in entering information in the peer review system. Ex. A, Dill Aff. at ¶ 30.

37.     Dr. Dill never interfered with Plaintiff's ability to take time off or to take a break for a medical reason, or any other reason. Ex. E, Desai Dep. at 154:22-155:3.

38.     Dr. Dill never made any statements, verbal or written, about Plaintiff that she knew to be false or suspected may be false. Ex. A, Dill Aff. at ¶ 31.

39.     To the extent Dr. Dill ever communicated with others within the department about the restriction of Plaintiff's ability to read CT studies, all such communications were made for the limited purpose of making staffing decisions in the normal course of Dr. Dill's duties. Ex. A., Dill Aff. at ¶ 32.

40.     On September 21, 2017, Dr. Dill and Plaintiff had a disagreement and personal exchange at work, in which Plaintiff accused Dr. Dill of being rude to her. Ex. E, Desai Dep. at 220:6-19.

41.     Following the incident, Dr. Dill sent an E-mail documenting her concerns to Department Chair Max Rosen, M.D., and Vice Chair Darren Brennan, M.D. E-mail dated September 21, 2017, from K. Dill to M. Rosen and D. Brennan, attached as **Exhibit F** to Wakefield Aff.

42.     Dr. Brennan asked Plaintiff to provide a statement with her version of events of the incident. See E-mail dated September 21, 2017, from D. Brennan to C. Desai, attached as **Exhibit G** to Wakefield Aff.

43.     Plaintiff sent an email to Dr. Brennan describing her version of the events and providing her opinion of the incident. In her E-mail, Plaintiff stated that she accused Dr. Dill of being rude and that Dr. Dill had accused her of being rude as well. Ex. E, Desai Dep. at 331:20-333:2; 335:4-19; see also E-mail dated September 21, 2017, from C. Desai to D. Brennan, attached as **Exhibit H** to Wakefield Aff.

44.     Plaintiff admits that Dr. Dill's statement that Plaintiff had been rude was a statement of "opinion" by Dr. Dill. Ex. E, Desai Dep. at 248:5-13; 249:3-6.

45.     The only things that Plaintiff can identify that Dr. Dill said about her that she believes were not true were the alleged creation of the Peer Review Summary and her statements in E-mail that Plaintiff was rude. Ex. E, Desai Dep. at 219:4-220:23; 248:5-249:10; 422:4-13; see also Plaintiff's Answers to UMass Medical Center, Inc.'s Interrogatories, at Interrogatory 8, attached as **Exhibit I** to Wakefield Aff.

46.     Plaintiff contends that a statement that defamed her is a "July 1, 2016 - June 30, 2017 Peer Review of Dr. Desai by K. Dill;" the Peer Review Summary. Ex. I, Pl. Answers to Interr., at Interrogatory 8.

Respectfully submitted,

**KARIN DILL, M.D.**

By her attorneys,

/s/ Reid M. Wakefield
Robert L. Kilroy, Esq., BBO # 636853
Reid M. Wakefield, Esq., BBO # 569026
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA  01581
Phone 508.860.1474
Fax 508.983.6261
rkilroy@mirickoconnell.com
rwakefield@mirickoconnell.com

Dated:  December 17, 2021

## CERTIFICATE OF SERVICE

I, Reid M. Wakefield, hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this day.

/s/ Reid M. Wakefield
Reid M. Wakefield, Esq.

Dated: December 17, 2021