# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:4:19-CV-10520-TSH

CHARU DESAI,
    Plaintiff,

v.

UMASS MEMORIAL MEDICAL
CENTER, INC., et al.,
    Defendants.

**AFFIDAVIT OF REID M. WAKEFIELD, ESQ., IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANT, KARIN DILL, M.D.**

I, Reid M. Wakefield, hereby depose and state as follows:

1.      I am employed as an attorney with the law firm Mirick, O'Connell, DeMallie, & Lougee, LLP, and have been retained as defense counsel, along with Robert L. Kilroy, Esq., for Defendant, Karin Dill, M.D., in the above-referenced action.

2.      I have personal knowledge of the facts contained within this affidavit.

3.      I attest to the following Exhibits, which are attached hereto, as containing true and accurate copies of the documents referenced therein:

4.      **Exhibit A** is a true and accurate copy of the Affidavit of Karin Dill, M.D., dated December 13, 2021.

5.      **Exhibit B** is a true and accurate copy of excerpts of the transcript of the deposition of Max Rosen, M.D., taken on May 7, 2021, and June 1, 2021.

6.      **Exhibit C** is a true and accurate copy of the Affidavit of Max Rosen, M.D., M.P.H., dated December 15, 2021.

7.      **Exhibit D** is a true and accurate copy of the redacted 2016-2017 Peer Review Summary Document.

8.      **Exhibit E** is a true and accurate copy of excerpts of the transcript of the deposition of Charu Desai, M.D., taken on September 18, 2020 and October 22, 2020.

9.      **Exhibit F** is a true and accurate copy of an E-mail from Karin Dill, M.D., to Max Rosen, M.D., and Darren Brennan, M.D., dated September 21, 2017.

10.     **Exhibit G** is a true and accurate copy of an E-mail from Darren Brennan, M.D., to Charu Desai, M.D., dated September 21, 2017.

11.     **Exhibit H** is a true and accurate copy of an E-mail from Charu Desai, M.D., to Darren Brennan, M.D., dated September 21, 2017.

12.     **Exhibit I** is a true and accurate copy of excerpts of Plaintiff Charu Desai's Answers to Defendant UMass Medical Center, Inc.'s First Set of Interrogatories.

Signed under pains and penalties of perjury this 17th day of December, 2021.

Reid M. Wakefield, Esq.

# EXHIBIT A

DocuSign Envelope ID: 6FF9E6EE-71DC-47CC-8AF7-F86E21B96E03

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-cv-10520-TSH

CHARU DESAI,
     Plaintiff,

v.

UMASS MEMORIAL MEDICAL
CENTER, INC., et al.,
     Defendants.

**AFFIDAVIT OF KARIN DILL, M.D.**

I, Karin Dill, M.D., hereby depose and state as follows:

1.     I am a former radiologist and Division Chief of Thoracic Radiology at UMass Memorial Medical Group, Inc. (the "Medical Group"), and in this capacity I have personal knowledge of the facts set forth herein.

2.     I was hired by the Medical Group on February 29, 2016, as a physician specializing in radiology.

3.     I was employed by the Medical Group pursuant to an Employment Agreement, under which I was dually-employed with the University of Massachusetts Medical School.

4.     Throughout the duration of my employment with the Medical Group, I served as the Division Chief of the Thoracic Division (a/k/a Chest Division).

5.     At no time was I ever employed by UMass Memorial Medical Center, Inc., or Marlborough Hospital.

6.     During my employment, Dr. Charu Desai was a member of the Thoracic Division and specialized in chest imaging. As Division Chief, I provided supervision and oversight over Dr. Desai in her role as a chest radiologist.

7.      I did not participate in the decision to terminate Dr. Desai's employment.

8.      I was not informed and did not know that Dr. Desai's employment would be terminated until after she was given notice of her termination.

9.      I was did not participate in the independent review of Dr. Desai's radiological reads conducted by Diana Litmanovich, M.D.

10.     I did not know that an independent review was conducted until after Dr. Desai was given notice of her termination.

11.     I do not have knowledge of the results of the independent review, but only became aware after the fact that the findings contributed to the decision to terminate Dr. Desai.

12.     I have never seen the results of the independent review.

13.     I did not participate in or make any decisions regarding Dr. Desai's academic time, exemption from call, or denial of a home workstation.

14.     I did not participate in evaluating or making any decisions regarding any accommodation for a disability Dr. Desai may have had.

15.     Dr. Desai never made a request to me for an accommodation due to a disability.

16.     I became aware at one point that Dr. Desai had been approved for intermittent leave under the Family and Medical Leave Act, but I did not participate in evaluating or approving such leave requests.

17.     I did not make or participate in any decision to limit Dr. Desai's privileges, including the restriction on Dr. Desai reading of CT studies.

18.     I did not perform a targeted review of the quality of Plaintiff's CT reads at any time.

19.     The Medical Group's Radiology Department has a quality assurance system designed to improve the quality of radiology services and to protect patient safety, as a part of its peer-review privileged program.

20.     During my employment, the quality assurance system was based, in part, on a peer review system, where other radiologists within the Department would review each other's reads.

21.     In this system, all radiologists in the Department were asked to enter information into the quality assurance system in two circumstances: (1) through an automated process that requests that a certain number of cases be double-read periodically by each radiologist on staff; and (2) when a radiologist is made aware of a quality issue about an interpretation, the radiologist was obligated to enter that information into the peer review privileged database.

22.     I did not produce or generate the document attached as **Exhibit A**, and I did not conduct a targeted review to produce this document. I have never previously possessed a copy of this document until it was provided to me in this litigation. I did not give this document to any person.

23.     In the normal course of my duties as a part of the Department's quality assurance process, I would enter information in the peer review system.

24.     There were occasions when I identified reads conducted by Dr. Desai in the system as errors, based on my opinion.

25.     Upon review of the document attached as Exhibit A, it appears that certain studies included had been reviewed by me on an individual case basis in the normal course of my duties as a part of the Department's quality assurance process, were identified as errors in my opinion, and entered in the system as required.

DocuSign Envelope ID: 6FF9E6EE-71DC-47CC-8AF7-F86F21B96F03

26.     During the course of my employment, I entered information in the peer review system indicating disagreement with the radiologist's initial read for many radiologists in dozens of instances.

27.     I did not enter information about Dr. Desai's reads in the peer review system for any reason other than for quality improvement within the Department in accordance with the peer review process.

28.     All information that I entered in the peer review system regarding reads conducted by Dr. Desai was done in good faith and in keeping with my job duties and responsibilities as a radiologist in the Department and as Thoracic Division Chief.

29.     Based on information received from attending physicians as well as on my own observations, I had concerns with Dr. Desai's quality of reads of chest CT images.

30.     I never considered Dr. Desai's sex, age, or disability in any decisions I made with respect to Dr. Desai, including in entering information in the peer review system.

31.     I never made any statements, verbal or written, about Dr. Desai that I knew to be false or suspected may be false.

32.     If I communicated with others within the Department about the restriction of Dr. Desai's ability to read CT studies in her final year of employment, all such communications were made for the limited purpose of making staffing decisions in the normal course of my duties.

Signed under pains and penalties of perjury this __13__ day of December 2021.

_Karin Dill, M.D._
_____
Karin Dill, M.D.

# EXHIBIT A

CD 000049

Charu Desai, MD
Exhibit_34
10/22/2020

# Peer Review:   Desai, Charu   7/1/2016 - 6/30/2017

**Review Count**

4b. Likely to be significant
Desai, Charu

| Modality | Comment | Drop-Down Selection | Reviewee | Accession | Study Description | Study Date Time |
|---|---|---|---|---|---|---|
| CR | Called to review cor. Cardiomegaly. Regular subsegmental atelectasis. KDili | 4b. Likely to be significant | Desai, Charu | | | 3/7/2017 12:01 PM |
| CT | RUL nodule adjacent to cyst highly suspicious for lung ca | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 4/24/2017 4:18 PM |
| CT | Asked to review case. Growing tracheal nodule since CT 2013. This was not accurately identified (question of comparison) reported as, "Question mucus along the anterior wall of upper trachea, image 22 series 4." K DIlMD | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Contrast | 3/17/2016 11:38 AM |
| CR | Asked to review. approx 6.5 cm ascending aortic aneurysm not diagnosed/ mentioned on cor. KDili | 4b. Likely to be significant | Desai, Charu | | Chest:PA,AP, Apcial or Lateral | 4/28/2016 5:48 AM |
| CT | asked to re-review case. PET demonstrates nodule is FDG avid. Report stated, "Approximately 5 mm ill-defined nodular density anteriorly in the left upper lobe . Question etiology. Question small focal area of infiltrate less likely nodule." KDIli MD | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 2/24/2016 1:31 PM |
| CT | asked to over read. CT dictated as nodular density, likely not nodule –no call made or electronic recording of notification for f/u. subsequent pre op CT reveals enlargement and new nodule, no physician was aware of nodule. | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 2/24/2016 1:31 PM |

**<u>EXHIBIT B</u>**

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3    -------------------------------x

 4    CHARU DESAI,

 5                   Plaintiff,

 6         vs.                        Civil Action No.
                                      4:19-cv-10520-DHH
 7
      UMASS MEMORIAL MEDICAL CENTER,
 8    INC., ET AL.,

 9                   Defendants.

10    -------------------------------x

11

12

13

14            DEPOSITION OF MAX P. ROSEN, M.D.

15                 Conducted Remotely

16                1800 West Park Drive

17                    Suite 400

18             Westborough, Massachusetts

19                   May 7, 2021

20             10:10 a.m. to 5:03 p.m.

21

22

23

24    Reporter:  Laurie J. Berg, CCR, RPR, CRR, CLR, CER
```

53

 1  did.
 2      Q.   Do you recall if Dr. Ferrucci ever told you
 3  that he had any concerns about Dr. Desai's
 4  performance?
 5      A.   I don't recall.
 6      Q.   Who is Dr. Richard Irwin?
 7      A.   Dr. Irwin is a -- either critical care or
 8  pulmonologist -- critical care specialist or
 9  pulmonologist.  I'm not sure of his exact specialty,
10  and was one of the senior critical care pulmonary
11  people at UMass.
12      Q.   In his capacity as a senior pulmonologist at
13  UMass, would he have had opportunity to work with
14  Dr. Desai?
15      A.   Yes.
16      Q.   Did Dr. Irwin ever express to you concerns
17  about Dr. Desai's performance?
18      A.   I asked Dr. Irwin for his opinion of
19  Dr. Desai's performance.
20      Q.   Do you recall when that was?
21      A.   I don't recall the exact date.
22      Q.   Do you recall why you asked him?
23      A.   I had received, from Dr. Dill, several
24  complaints about Dr. Desai's performance, and concerns

54

1  had been brought to Dr. Dill.  Also Dr. Robinson, at
2  Marlborough Hospital, had raised concerns with me
3  about Dr. Desai's performance.
4      Q.   When you asked Dr. Irwin about Dr. Desai's
5  performance, what did he tell you?
6      A.   He shrugged his shoulders and said, well, I
7  can read my own chest x-rays.
8      Q.   And you understood from that, that he was
9  saying that he did not need her?
10     A.   Correct.  That he was perfectly capable of
11  interpreting his own chest x-rays and was not -- did
12  not need to rely on Dr. Desai's interpretation.
13     Q.   You -- you mentioned a minute ago that you
14  asked him, because Dr. Dill brought concerns to your
15  attention and that concerns had been brought to her
16  attention; is that correct?
17     A.   Correct.
18     Q.   Do you know who brought concerns to
19  Dr. Dill's attention?
20     A.   Not specifically, and I don't recall
21  specifically.  But as the section chief, Dr. Dill was
22  responsible for the quality of -- of the division,
23  and, often, people would ask her to re-read or review
24  studies that Dr. Desai had interpreted for Dr. Dill's

55

```
 1  opinion.
 2      Q.   You also said that Dr. Robinson brought
 3  concerns to your attention --
 4      A.   Yes.
 5      Q.   -- correct?
 6           Did she -- can you summarize what her
 7  concerns were?
 8      A.   General concerns about doctor -- the quality
 9  of Dr. Desai's interpretations.  At one point, she
10  said to me that she never believed any of Dr. Desai's
11  reports and could not rely on them.
12      Q.   Did you, at any point prior to your decision
13  to terminate Dr. Desai, inform her of these concerns?
14      A.   No.  I communicated the concerns to Dr. Dill,
15  as the section chief, who would then be responsible
16  for overseeing the quality of people in her division.
17      Q.   So you would agree with me that Dr. Robinson
18  lodged a number of complaints about radiologists in
19  the radiology department at UMass Memorial, correct?
20      A.   Dr. Robinson, over time, had raised multiple
21  issues with me; some, you know, over a wide range of
22  topics.
23      Q.   Including the performance of the radiologists
24  at UMass Memorial, correct?
```

88

1  was available, she was your default; is that correct?

2      A.   Yes.

3      Q.   I see.  At the time that you asked her to

4  serve as the quality person working with Dr. Baccei

5  for the chest division, had you concerns about her

6  performance?

7      A.   I don't recall the exact date that I -- that

8  Dr. Desai was serving in the quality function for the

9  department, so I really can't answer that.

10     Q.   Was she ever removed from that role?

11     A.   At some point, Dr. Dill took over the quality

12 role in the division.

13     Q.   Did you ever explain to Dr. Desai that she

14 would no longer serve in that role because of concerns

15 about her performance?

16     A.   I don't recall ever speaking to her about her

17 role -- the quality role within the division.

18     Q.   Does UMass have a morbidity and mortality

19 conference or process in place?

20     A.   Yes.  That's -- the way our quality structure

21 works is that the cases are in our database, and then

22 each division should have a quality review meeting on

23 a regular basis, and the frequency depends on each

24 individual section's specifics.  And that cases from

Charu Desai vs                                          Max P. Rosen, M.D.
UMASS Memorial Medical Center, Inc., et al.                    May 07, 2021

153

1      Q.   -- concerned about her quality at that time?

2      A.   Well, a few things.  As I said earlier, I had

3   several complaints from Kim Robinson.  I've also, you

4   know, stated that Kim Robinson had, you know, several

5   issues.  Also, looking at our QA database, that there

6   were several cases in there that were labeled threes

7   or fours which are, you know, potentially significant

8   misses from Dr. Desai.

9         And at everybody's annual review, my standard

10  process was to print out threes and fours for people

11  and give them to the radiology faculty to make sure

12  that they were aware of these cases and ask them to go

13  and look at them.

14        And then, also, with issues raised by

15  Dr. Dill, in her role as the section chief for

16  thoracic radiology, where people would come to her and

17  ask her to re-review studies that Dr. Dill had

18  interpreted and -- that Dr. Desai had interpreted and

19  Dr. Dill had -- had concerns about the quality of

20  Dr. Desai's reads.

21        So, at that point, I felt it had risen to the

22  level where I needed to conduct an independent review

23  to see if what I was concerned about was substantiated

24  by a blind, independent review process.

169

1  Marlborough data into the UMass Memorial peerVue

2  system?

3      A.    (Deponent viewing exhibit.)  Well, what I'm

4  assuming is, the Marlborough QA system, which, I

5  guess, is called STARS, is separate from the radiology

6  peer-review system.

7           So my understanding of this bullet point is

8  that -- is that we were looking for a way of importing

9  any radiology cases, that were reported by the

10 Marlborough physicians in STARS, that those could be

11 imported into the radiology database, so we would be

12 aware of any radiology issues reported into

13 Marlborough, which might not necessarily, on their

14 own, make it into the radiology database.

15          Does that make sense --

16     Q.    It does.

17     A.    -- the way --

18     Q.    No, it does.  It was very clear, thank you.

19          Dr. Rosen, with regard to the peerVue

20 database that you have, is it possible to ask the

21 system very nicely to generate a report of any matter

22 by physician that was flagged as of concern?

23     A.    Yes, it's a --

24     Q.    Did you do that?

170

1      A.   It's a --

2      Q.   Okay.

3      A.   It's a queryable database.

4           MADAM COURT REPORTER:  I'm sorry, can you

5  repeat that, Dr. Rosen?

6           THE DEPONENT:  Yeah, it's a queryable

7  database.

8           MADAM COURT REPORTER:  Thank you.

9        BY MS. WASHIENKO:

10     Q.   Do you know if you had run one of those for

11  Dr. Desai?

12     A.   Yes.

13     Q.   And -- and was that ever shared with her?

14     A.   Well, it -- at Dr. Desai's annual review, she

15  should have received a copy of the list of all threes

16  and fours that were attributable to her during the

17  academic year.  And because those -- that report

18  contained protected QA information, it's not

19  appropriate for that to be kept in an employment file.

20  And as I said earlier, the -- that faculty, that

21  annual faculty review form, is a medical school form,

22  not a hospital form.

23           So the way we would organized it would be

24  that we would run the report for each physician, each

171

1  radiologist.  I would meet with them in person for
2  their annual review.  In that review folder would be
3  the list of QA cases.  I would, then, give the list to
4  the radiologist and ask them to take it upon
5  themselves to review those cases and make sure that,
6  if there were issues, that they learned from them.
7  And then that confidential QA information was no
8  longer -- it -- it, then, was not sent to the medical
9  school for the processing of the faculty annual
10 review.
11         Does that -- is that clear?  Does that make
12 sense?
13     Q.   I -- it makes sense.
14         So the medical school employment files on a
15 physician would not have the QA data, because it
16 contained PHI and MRN numbers and whatnot?
17     A.   Correct.  And I know this might be splitting
18 hairs, but I don't think the annual faculty review is
19 considered an employment document.  It's a faculty
20 appointment document.
21     Q.   Still not --
22     A.   Yeah, not -- should not have, you know --
23     Q.   Still -- I understand.
24     A.   -- it shouldn't have information in it.  But

# In the Matter of:

*Charu Desai vs*

*UMASS Memorial Medical Center, Inc., et al.*

---

*Max P. Rosen, M.D. Vol II*

*June 01, 2021*

---

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



224

1  BY MS. WASHIENKO:

2      Q.  I'm now going to turn our attention to a

3  document that I think I've managed to mark as

4  Exhibit 35 and distribute.  Dr. Rosen, can you tell

5  me what this form is.

6      A.  This is a form which was generated from our

7  quality assurance reporting system in radiology.

8      Q.  So it's automatically generated based on

9  what?

10     A.  So data is or cases are entered into this

11 system in two ways; one was through an automated

12 system which requested that X number of cases that

13 were being read by a radiologist were then

14 double-read.

15         So, for example, if I was reading a chest

16 x-ray on Mr. Jones on June 1st and it was the X

17 number of cases that I had read that day and there

18 was a prior x-ray of the chest for Mr. Jones in his

19 record, this system would automatically ask me to go

20 back and reread the prior chest x-ray and report if

21 I agreed or disagreed with the original

22 interpretation.

23         The second way that things -- that cases

24 can be entered into this database is, if somebody is

1  made aware of a quality issue about an
2  interpretation of a case, that the radiologist would
3  then enter that case into the database.
4          So there is an automated identification of
5  cases, and then there is a manual identification of
6  cases which are entered into this database.
7      Q.  When you look at this document, Dr. Rosen,
8  can you tell whether any of the entries was
9  generated automatically by the system requesting a
10  double-read or whether it was manually entered by a
11  radiologist who believed he or she saw a potentially
12  significant error?
13      A.  The only way to identify cases which were
14  flagged through an automated process or a manual
15  process would be in the comments.
16      Q.  And, looking at the comments here, can you
17  tell me if Dr. Dill manually entered the first in
18  the row, "Called to review cxr.  Cardiomegaly,
19  lingular subsegmental..." -- however you say that
20  last word.
21      A.  Atelectasis.
22      Q.  Thank you.  Can you tell if she manually
23  entered that?
24      A.  I would assume because Dr. Dill commented,

232

1  a section chief, Dr. Dill was responsible for the

2  quality of the division, and often people will --

3  would ask her to reread or review studies that

4  Dr. Desai had interpreted.  How do you know that?

5          MR. WAKEFIELD:  Object to form.

6      A.  Could you restate the question, please.

7      Q.  How do you know that, as section chief,

8  Dr. Dill was responsible -- strike that.

9          How do you know that, as section chief,

10 people would ask Dr. Dill to reread or review

11 studies that Dr. Desai had interpreted?

12     A.  Dr. Dill told me that people frequently

13 came to her and asked her to review studies and, as

14 we saw in a prior exhibit today, Dr. Dill had

15 entered several of these cases into the QA database

16 that she was requested to re-review.

17     Q.  Do you have any idea, Dr. Rosen, how many

18 cases were entered about other radiologists into

19 this peer learning system?

20     A.  Not without looking at the database.

21     Q.  I'm changing gears a smidge, Dr. Rosen.

22         As chair of the department, did you have

23 authority to authorize that radiologists be given

24 personal workstations to work at home?

**<u>EXHIBIT C</u>**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-cv-10520-TSH

|  |  |
|---|---|
| CHARU DESAI,<br>　　　Plaintiff,<br><br>　　v.<br><br>UMASS MEMORIAL MEDICAL<br>CENTER, INC., et al.,<br>　　　Defendants. | **AFFIDAVIT OF**<br>**MAX ROSEN, M.D., M.P.H.** |

I, Max Rosen, M.D., M.P.H, hereby depose and state as follows:

1.　　　I am the Chair of the Department of Radiology for UMass Memorial Health (the "Department"), and in this capacity I have personal knowledge of the facts set forth herein.

2.　　　I was appointed as the Chair of the Department effective September 1, 2012.

3.　　　I am employed by UMass Memorial Medical Group, Inc., and the University of Massachusetts Medical School.

4.　　　Charu Desai, M.D., was formerly employed by the Medical Group as a physician specializing in chest radiology.

5.　　　Dr. Desai was employed pursuant to an Agreement between UMass Memorial Medical Group, Inc., and Charu Desai, M.D. ("Employment Agreement"), a copy of which is attached as **Exhibit A.** Pursuant to the Employment Agreement, Dr. Desai was dually-employed by the Medical Group and the University of Massachusetts Medical School. Exhibit A, ¶ 1.14.

6.　　　In my capacity as Chair, I supervised and managed all radiologists employed by the Medical Group, including Dr. Desai. As Chair, I am responsible for the performance of

Medical Group physicians in the Radiology Department. Among my duties as Chair is to ensure that the Department provides high quality and safe imaging services for patients.

7.      Dr. Desai's job duties involved reviewing radiological images in the form of computed tomography ("CT") or radiographs ("x-rays" or "plain films"), interpreting the images, describing findings, and opining on diagnoses of disease and medical conditions revealed in the images. Dr. Desai was not qualified to read magnetic resonance imaging (MRI) and did not read MRIs in the course of her employment.

8.      As a radiologist, Dr. Desai's practice was focused on and limited to thoracic (a/k/a chest) imaging, and Dr. Desai worked within the Department's Thoracic Division (a/k/a Chest Division).

9.      Dr. Desai performed her duties for the Medical Group while located at UMass Memorial Medical Center (the "Medical Center") facilities. The Medical Center is a multi-facility academic hospital which provides tertiary-level care.

10.      In her role as a radiologist for the Medical Group, Dr. Desai reviewed and interpreted images for patients originating from multiple hospitals, including campuses of the Medical Center, Marlborough Hospital, and Clinton Hospital. These hospitals are each separate entities.

11.      The Medical Group is responsible for staffing radiologists to review images originating from different hospitals, and the Medical Group directs the radiologists' assignments.

12.      The hospitals, including Marlborough Hospital and the Medical Center, did not direct Dr. Desai or any other radiologist with respect to the reading of images or in any other job duties. Dr. Desai was supervised by Medical Group employees at all times.

13.     Dr. Desai was never employed by the Medical Center. The Medical Center did not set the compensation for radiologists, did not set the work schedules for radiologists, and did not have the power to hire, fire, or discipline radiologists, including Dr. Desai.

14.     In order to provide medical services as a physician for Medical Center patients, Dr. Desai was required to be granted clinical privileges by the Medical Center and be a member of the Medical Center's medical staff.

15.     Darren Brennan, M.D., served as the Chief of Radiology for Marlborough Hospital from 2015 to 2018. He was not an employee of Marlborough Hospital, but at all times has been employed by the Medical Group as a radiologist.

16.     As Chief of Radiology, Dr. Brennan performed an administrative role which involved serving as a representative of the Medical Group's Radiology Department, serving as a liaison with Marlborough Hospital, and ensuring that the Medical Group was performed its obligations under its contract with Marlborough Hospital. In Dr. Brennan's capacity as Chief of Radiology, he oversaw staffing coverage for the Medical Group's reading of studies originating from Marlborough Hospital.

17.     Dr. Brennan served as the Department's Vice Chair for Enterprise Operations and Community Radiology from 2015 to 2019. In my absence, I would sometimes designate Dr. Brennan to address concerns within the Department in his role as Vice Chair. On September 21, 2017, Dr. Brennan addressed a matter between Dr. Desai and Karin Dill, M.D., in that capacity and at my request.

18.     Dr. Desai had a Sick Bank as well as Salary Continuation she could use for paid medical leave. At the time of her separation from employment, Dr. Desai had not exhausted her available sick leave and had available 116.55 hours in her Sick Bank.

19.     In 2014, a physician in the Department, ▮▮S.A.▮▮, M.D., requested a change in her work hours due to a medical issue, and an accommodation to her schedule was approved by me which remains in place to the present day.

20.     The Department maintained a policy for physicians to be allotted academic or administrative time to conduct non-clinical duties ("Academic and Administrative Time Policy"), a copy of which is attached as **Exhibit B**. Pursuant to the Academic and Administrative Time Policy, academic time can be allotted to academic responsibilities including teaching and conference preparation, writing papers or texts, completing research projects, attending institutional and department committees, attending conferences, or serving on committees of local, regional, national or international organizations.

21.     Dr. Desai was not allotted academic time since at least 2010, and the Department does not have a record of Dr. Desai having ever been allotted academic time. In the time I have been Chair, Dr. Desai never requested academic time for the purposes of performing academic work, research, or other scholarly activities nor has she ever made any proposal for academic work she wished to perform. In addition, she never requested time to participate in the work of local, regional, national, or international organizations.

22.     Medical Group radiologists are required to work "call" where they are scheduled to work certain weekends and holidays to ensure coverage for patients every day of the year. The Department has a policy which requires all regularly-employed staff members to provide "call," a copy of which is attached as **Exhibit C**. The requirements for call vary by division due to coverage needs, but the time commitment of the call coverage is substantially the same.

23.     For members of the Chest Division, a radiologist must work one-fifth of weekends, or ten weekends per year, as well as a portion of holidays, which are scheduled in advance in an equitable manner among the radiologists working in the division.

24.     Performing call is an essential and critical part of being a radiologist in the Department, and is required in order to provide timely and high-quality care to patients, as UMass Memorial is a tertiary-care referral center and level one trauma center which operates twenty four hours a day every day of the year. If a radiologist does not perform call, those responsibilities fall on other employees.

25.     At one time, the Department implemented a program in which staff members could elect to "sell" calls, where other staff radiologists could perform additional call for additional compensation, and the radiologist not doing call would have their salary reduced by an equivalent amount. This policy was in place for two fiscal years, from October 1, 2015, to September 30, 2017.

26.     Dr. Desai elected to sell, and others in the department elected to "take" six out of her ten call weekends for these years, and during this period she performed substantially reduced call. Dr. Desai's salary was reduced accordingly during this time period due to her "sale" of her calls to other radiologists, in the amount of $19,200 per year. The rate that each call was valued was in accordance with the Department's per diem rates in effect at that time.

27.     At least one other radiologist in the Department also elected to sell calls during this period.

28.     The policy of selling calls was ended due to the administrative difficulties in managing the program, as well as the lack of staff radiologists interested in taking additional call.

29.     It is common for staff radiologists to not want to take call.

30.     The Medical Group employs physicians in part-time roles, in which their hours are reduced and their call obligations are proportionately reduced.

31.     The Medical Group employs physicians in "per diem" status, in which the employees work on an hourly basis, and are not obligated to take call. Because staff radiologists who are on per diem status are not obligated to take call, some radiologists have chosen to change their status to per diem in order to be relieved of that obligation.

32.     Mona Korgaonkar, M.D., a female radiologist who is older than Dr. Desai, requested to move to a part time schedule, which I granted, and she subsequently requested that she not take call, and I offered, and she accepted the ability to change her status to per diem to be exempt from call responsibilities. Dr. Korgaonkar remains employed by the Medical Group.

33.     In response to Dr. Desai requesting to be exempt from call, I discussed with her the option to transition to per diem status.

34.     In October 2017, I asked Dr. Joseph Ferrucci if he would consider speaking with Dr. Desai to share his experience moving from active to per diem status with the Medical Group to assist her with her decision. I did not tell Dr. Ferrucci that I intended to terminate Dr. Desai's employment or to require her to move from active to per diem status. I did not tell Dr. Ferrucci that I had an obligation to think about recruiting younger staff for service needs, and I did not discuss the age or longevity of any staff member, including Dr. Desai, at any time, with Dr. Ferrucci.

35.     At no time did Dr. Desai state that she desired to be exempted from taking call or desired an alteration to her call scheduled due to a heart condition or any other health condition.

36.     The Department began to utilize remote workstations for staff radiologists to use from home on a trial basis beginning in early 2017. Only the following radiologists used home

workstations in the initial year of the implementation: Andrew Chen, M.D., Karin Dill, M.D., and Philip Steeves, M.D.

37.     Dr. Steeves is five years older than Dr. Desai.

38.     Nine radiologists used home workstations from implementation until the date of Dr. Desai's separation: Aly Abayazeed, M.D., Satish Dundamadappa, M.D., Carolyn Dupuis, M.D., David Choi, M.D., Andrew Chen, M.D., Karin Dill, M.D., Sami Erbay, M.D., Philip Steeves, M.D., and Eric Schmidlin, M.D.

39.     Dr. Abayazeed, Dr. Dundamadappa, Dr. Choi, Dr. Chen, and Dr. Erbay specialized in neuroradiology and were among the first to test and use home workstations due to the unique scheduling in neuroradiology where radiologists would rotate working routine evening shifts.

40.     No staff member was permitted to take call remotely through the use of a home workstation or otherwise during the time Dr. Desai was employed.

41.     The Department has a quality assurance system designed to improve the quality of radiology services. Prior to 2019, the quality assurance system was based, in part, on a peer review system, where other radiologists within the Department would review each other's reads.

42.     In this system, all radiologists in the Department were asked to enter information into the quality assurance system in two circumstances: (1) through an automated process that requests that a certain number of cases be double-read periodically by each radiologist on staff; and (2) when a radiologist is made aware of a quality issue about an interpretation, the radiologist was obligated to enter that information into the peer review privileged database.

43.     When radiologists reviewed the studies, they would input a numerical score as to their review, with scores denoting the following: a "1" indicated the reviewer concurred with the

reviewee's radiological interpretation; a "2" indicated the reviewer identified a discrepancy in interpretation/not ordinarily expected to be made, but which was denoted as an "understandable miss;" a "3" indicated the reviewer identified a discrepancy in the reviewee's interpretation and that the discrepancy should have been caught by the radiologist "most of the time;" and a "4" indicated the reviewer noted a discrepancy in interpretation that represented a "misinterpretation of findings" and that should be identified "almost every time."

44.     At their annual faculty reviews, I provided staff radiologists with information from the quality assurance database regarding peer review reads labelled with scores of either "3" or "4." I would advise the radiology staff members of these entries and ask the staff member to review the cases if they had not already done so, as a part of the quality improvement process.

45.     I provided Dr. Desai with such a summary from the quality assurance system during her 2016-2017 annual faculty review (the "Peer Review Summary"), a copy of which is attached as **Exhibit D**.

46.     Karin Dill, M.D., was hired as a radiologist and the Division Chief of the Thoracic Division on February 29, 2016. The Division Chief position was publicly posted and the Department conducted recruiting efforts to fill the position. Dr. Desai did not apply for or ever express interest in the position. Dr. Dill was more qualified than Dr. Desai to be Division Chief, based on her education, training, professional involvement, research, qualifications, and experience.

47.     According to data recorded in the quality assurance system, in the course of Dr. Dill's employment, she entered information in the quality assurance system indicating disagreement with the radiologist's initial read for 31 radiologists, in 79 instances.

48.     Kimberly Robinson, M.D., is a pulmonologist (a physician specializing in the respiratory system) who treats patients at Marlborough Hospital, and for a period served as President of the Medical Staff for Marlborough Hospital.

49.     Radiology, like other diagnostic medical work, can involve a degree of probability and subjectivity, and concerns or disagreements can be raised by treating physicians at times. Treating physicians have raised concerns to me with individual reads or quality issues from time to time. I evaluated quality concerns raised to me and took appropriate action based on the individual circumstances. I likewise evaluated quality concerns whenever they were raised to me by Dr. Robinson.

50.     Neither Dr. J.F.  Dr. H.L. , Dr. G.T.  nor Dr. D.B.  specialized in chest radiology. Dr. J.F. is 12 years older than Dr. Desai, Dr. G.T. is less than 2 years younger than Dr. Desai, and Dr. D.B. is 60 years old.

51.     I was aware that several of Dr. Desai's cases were entered in the Department's quality assurance database labelled as potentially significant misses, based on my distribution of data from the quality assurance system to Dr. Desai as a part of her annual review.

52.     On January 31, 2017, I met with representatives from Marlborough Hospital and its medical staff regarding radiology issues at the hospital. This meeting included the President of the Marlborough Hospital Medical Staff and pulmonologist Kimberly Robinson, M.D., and the President of Marlborough Hospital, Steven Roach. A copy of the minutes of this meeting are attached as **Exhibit E**.

53.     A significant concern addressed at the meeting was the quality of chest imaging. At the time, there were three radiologists specializing in chest in the Medical Group's Chest

Division, Karin Dill, M.D., Eric Schmidlin, M.D., and Dr. Desai. No concerns were raised at the meeting related to the reads of Dr. Dill or Dr. Schmidlin.

54.     At this meeting, Dr. Robinson expressed serious concerns with the quality of CT reads performed by Dr. Desai. Dr. Robinson stated to me that she never believed Dr. Desai's reports and could not rely on them.

55.     In response, I agreed that I would conduct a focused review of Dr. Desai's CT reads. I believed that I had to address the concerns raised to me in the interests of patient safety and the Department's obligations to provide high quality services to patients and providers.

56.     To ensure fairness and to confirm that the quality concerns were justified prior to taking further action, I opted to have an independent, blinded review of Dr. Desai's CT reads conducted.

57.     I did not choose to arrange an independent review of Dr. Desai's reads based on isolated concerns regarding a read or a request to re-review a study read by Dr. Desai. I did not make the decision to do so based on one or two misreads by Dr. Desai.

58.     I made the decision to perform an independent review based on reports of quality concerns from Dr. Dill, my awareness of errors in the peer review system, and the complaints from Dr. Robinson, in particular her comments at the January 31, 2017, meeting.

59.     I did not consider Dr. Desai's age, sex, or disability in making the decision to have the independent review performed.

60.     I requested that the Department's file room staff randomly select 25 chest CT studies reviewed by Dr. Desai and, as a control group, 25 chest CT studies reviewed by other radiologists. The studies included in the review were selected randomly, and I was not involved in selecting the studies.

61.     The CT studies selected for inclusion in the review were thoracic/chest studies, but the studies were not limited to those read by radiologists specializing in chest imaging. Eighteen out of the 25 control group studies were read by radiologists who did not specialize in chest imaging.

62.     I selected Diana Litmanovich, M.D., to conduct the independent review. Dr. Litmanovich is a thoracic radiologist at Beth Israel Deaconess Medical Center and is a faculty member of Harvard Medical School. Dr. Litmanovich is not employed by the Medical Group or affiliated with the UMass Memorial Health system. I believe Dr. Litmanovich to be an expert in the interpretation of thoracic CT images.

63.     I requested that Dr. Litmanovich review the images for each CT study and the corresponding report and provide her opinion whether she agreed or disagreed with the interpretation, and if she disagreed, to indicate whether it was a minor or major disagreement and whether or not the disagreement would have an impact on patient care in her opinion.

64.     Dr. Litmanovich provided me with her findings, and I un-blinded them through reference to their identifying numbers. Based on the findings, Dr. Litmanovich concluded that of the reads conducted by Dr. Desai, there were five major errors and nine errors she opined would impact patient care. Dr. Litmanovich concluded that of the reads conducted by other radiologists, there was one major error and five errors she opined would impact patient care.

65.     As a result of my assessment of the results of the independent review, I determined that Dr. Desai's quality was not acceptable for the Department, and I made the decision that Dr. Desai could not continue to work in the Department in order to ensure patient safety and provide high quality services to patients.

66.     On March 14, 2018, I met with Dr. Desai and informed her that her employment will be terminated on March 17, 2019.

67.     Pursuant to Dr. Desai's Employment Agreement, she was entitled to twelve months' notice prior to termination. Exhibit A, ¶ 7.2.

68.     I determined that in the time until Dr. Desai's employment ended, she would be restricted from reading CT images and would review only x-rays, due to the concerns raised regarding the quality of her CT reads from the independent review and my obligation to ensure patient safety and provide high quality services to patients.

69.     Neither I nor anyone else communicated the restriction of Dr. Desai from reading CTs throughout the Department, and this information was shared only in a discreet manner on a need-to-know basis for the purposes of scheduling and workflow for the reading of studies.

70.     On April 24, 2018, at Dr. Desai's request, I held a meeting with Dr. Desai and Vice Chair for Quality, Patient Safety and Process Improvement Steven Baccei, M.D., as well as Dr. Sarwat Hussain, a radiologist in the Department who Dr. Desai invited. At the meeting, I provided Dr. Desai with data from the independent reviewer's findings.

71.     I have made the decision to end the employment of other physicians in the Department due to performance concerns related to ability, including R.G. , M.D., separated June 23, 2017, R.N. , D.O., separated May 31, 2017, and A.R. M.D., separated December 12, 2015.

72.     An external independent review was performed of Dr. R.G. s competency prior to the decision to end his employment. In addition, I reviewed data from the quality assurance system to evaluate Dr. R.G. s performance.

73.     An internal review and investigation was conducted of Dr. ███R.N.███'s performance prior to the decision to end his employment. Dr. ███R.N.███ was forty years of age at the time of his separation.

74.     With respect to these physicians, I advised them that due to their performance, they would no longer be able to be employed with the Medical Group, and the physicians elected to resign in lieu of termination.

75.     Stephen Tosi, M.D., was the President of UMass Memorial Medical Group, Inc., at the time of Dr. Desai's termination.

76.     Following Dr. Desai's notice of termination, she was replaced in the Department by Maria Barile, M.D., who is a female.

77.     In 2019, I hired a Division Chief for the Thoracic Division who is 59 years of age.

78.     Presently, the Medical Group employs approximately 92 radiologists. The Department includes 24 radiologists who are age 60 years or older, and three over 70 years of age. I myself am 62 years of age.

79.     During my tenure as Chair of the Department, I have hired 14 radiologists who were 60 years of age or older and two who were over 70 years of age, as well as 32 radiologists who are female.

80.     I have made the decision to end the employment of eight regularly-employed radiologists as Chair (who either were terminated or elected to resign in lieu of termination), and seven were male, and seven were younger than Dr. Desai.

81.     In 2016, the Medical Group conducted an internal review of the compensation of its radiologists as a part of an effort to standardize salaries to address pay inequities and increase compensation to align more closely with the market for all radiologists. The Medical Group also

engaged an outside resource to perform an external market study to assist in establishing a standardized compensation structure.

82.     As a result of these efforts, the Medical Group was able to provide additional funds to the Radiology Department, and a large percentage of radiologists' salaries were increased.

83.     Based on the evaluation, the Medical Group implemented a new, standardized salary structure for radiologists effective March 1, 2017. Under this pay structure, the Department set a base salary, with additional designated sums based on academic rank as well as leadership and administrative positions which carried with them additional job duties and responsibilities. A copy of my correspondence to diagnostic radiologists informing them of this new structure is attached as **Exhibit F**.

84.     As a result of the implementation of the new compensation structure, Dr. Desai received a large increase in pay, from $302,575 to $340,000 per year. Her compensation was set based on the base salary for a diagnostic radiologist of $330,000, plus an additional $10,000 due to her rank as Associate Professor. A copy of my correspondence to Dr. Desai informing her of her new salary is attached as **Exhibit G**.

85.     Dr. Desai did not hold any leadership roles or perform additional duties for the Department.

86.     As a result of the new pay structure, every single full-time female radiologist who was employed as of March 1, 2017, whose pay was not already at the standard, received a pay increase, and they were paid in accordance with the standardized pay scale.

87.     Dr. Desai was a diagnostic radiologist, and Dr. Aaron Harman is an interventional radiologist. Diagnostic radiology involves reviewing images of the body and making

interpretations, and interventional radiology is image-guided surgery. Interventional radiologists perform invasive procedures on patients, and the radiology component relates to the use of imaging such as fluoroscopy, CT, ultrasound, and MRI to guide their procedures. Interventional Radiologists also have completed additional training through an ACGME accredited Interventional Radiology fellowship and some (including Dr. Harman) have also taken an additional board-certifying examination (Certificate of Added Qualification) in Interventional Radiology.

88.     Interventional radiologists generally earn substantially more than diagnostic radiologists. Thus, the Department has implemented a different pay scale for interventional radiology than diagnostic radiology. Under this structure, Dr. Harman's salary was $365,000 per year, which is the base salary for an interventional radiologist.

89.     Dr. Eric Schmidlin specialized in chest imaging and worked within the Chest Division with the same duties as Dr. Desai. Dr. Schmidlin did not receive higher compensation than Dr. Desai. His starting salary in 2012 was $300,000 per year, less than Dr. Desai's salary, and at the time of his separation from regular employment, he earned $294,000 per year, less than Dr. Desai's salary. Dr. Schmidlin left regular employment with the Medical Group on June 28, 2016, and he continued to work on a per diem, hourly basis. His hourly rate since has been $162.50, and Dr. Desai's rate when calculated on an hourly basis is $163.46.

90.     Byron Chen, M.D., and Hemang Kotecha, M.D., have always earned less than Dr. Desai; each with a salary of $330,000 per year at the time of Dr. Desai's separation. Both worked in different divisions than Dr. Desai.

91.     Dr. Karin Dill's base salary was the same as Dr. Desai's. However, Dr. Dill served as a Division Chief, and was paid an additional sum for those duties and responsibilities.

92.     Division Chiefs are responsible for the effective daily operational management of their division, financial stability, long term strategic planning, faculty development, and service for patients and referring clinicians. Divisions Chiefs are responsible for the business and operational functions of their divisions, and include responsibilities for clinical operations, financial sustainability, customer service, quality assurance and improvement, faculty development, recruitment and retention, research/scholarship, innovation, resident/fellow training, medical student education, and other division-specific functions.

93.     A radiologist's performance of non-clinical duties for the Department, including service in leadership, academic, and administrative positions, is separate and apart from their clinical duties and is extremely valuable to the Department.

94.     Steven Baccei, M.D., was paid a higher salary due to his leadership roles within the Department, pursuant to the salary structure. Dr. Baccei was the Division Chief for musculoskeletal radiology, and he served as the Department's Vice Chair of Quality, Safety, and Process Improvement. The duties of the Vice Chair include oversight of all quality assurance functions of the Department, specifically, maintaining the peer review database, managing department quality assurance meetings and review processes, responding to quality issues, handling risk management matters, and management of quality review projects, among other duties.

95.     Christopher Cerniglia, D.O. served in multiple leadership and administrative roles in the Department, for which he received additional compensation. Prior to 2017, he had served as a Division Chief for musculoskeletal radiology, and, thereafter, he continued to serve as 1) the Director for Medical Student Education in Radiology, in which he is responsible for organizing all of the radiology educational activities for the first and second year medical students, 2) the

Co-Course Director for the UMass Medical School DSF (Design, Structure, and Function) course, in which he runs the imaging lab within the anatomy lab, oversees imaging in connection with the course, and oversees all medical student, non-radiology interns and resident, and visiting medical student rotations in radiology, and 3) the Fellowship Director for Musculoskeletal Radiology, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education policies.

96.     Sathish Dundamadappa, M.D., has served as the interim Division Chief of neuroradiology as well as the Fellowship Director for Neuroradiology and the Fellowship Director for MRI, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education, for both of these areas, as well as compliance with accreditation requirements for neuroradiology, and he has received additional compensation for these additional duties and responsibilities.

97.     Dennis Coughlin, M.D., has served as the Division Chief for Emergency Radiology, for which he has been compensated an additional amount for those duties and responsibilities.

Signed under pains and penalties of perjury this 15th day of December 2021.

_____
Max Rosen, M.D., M.P.H.

## **EXHIBIT A**

AGREEMENT BETWEEN
UMASS MEMORIAL MEDICAL GROUP, INC.
AND
Charu Desai , M.D.

AGREEMENT by and between the UMass Memorial Medical Group, Inc., a non-profit corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at One Biotech Park, Worcester, Massachusetts 01605 (the "Medical Group"), a subsidiary corporation of UMass Memorial Health Care, Inc. (the "System") and    Charu Desai, M.D., a physician duly licensed to practice medicine in the Commonwealth of Massachusetts (the "Practitioner").

## RECITALS

The principal purpose of the Medical Group is to employ physicians to provide, on behalf of the System,  patient care at a level of quality and efficiency consistent with generally accepted standards and otherwise to fulfill professional and institutional obligations to patients, students of health care, health care professionals, and the community; and,

The successful fulfillment of the principal purpose of the Medical Group is dependent on the rendering of professional medical and administrative services in conjunction with the clinical operations of  the System by qualified practitioners; and,

The Practitioner is trained and qualified and desires to provide professional medical, educational and administrative services to the Medical Group; and,

The Medical Group desires to engage the Practitioner to provide professional medical, educational and administrative services;

Therefore, in consideration of the mutual covenants and conditions set forth below, the Medical Group and the Practitioner do hereby agree as follows:

1.    RESPONSIBILITIES OF PRACTITIONER

1.1.    Professional Qualifications

(a)    The Practitioner must at all times during the term of this Agreement: (i) possess a valid and unlimited license to practice medicine pursuant to Chapter 112, Section 2 of the General Laws of the Commonwealth of Massachusetts; and, (ii) be appointed to and maintain continuous status as a member in good standing of the UMass Memorial Medical Center (the "Medical Center") Active Medical Staff or the Medical Staff of the appropriate Member Hospital with appropriate clinical privileges in the Department of Radiology (the "Department")  (iii) for

Charu Desai, MD
Exhibit_11
9/18/2020

those physicians who are on staff at the Medical Center, receive, and maintain, a faculty appointment at the University of Massachusetts Medical School (the "Medical School"); (iv) possess a valid federal narcotics number and state controlled substances number (unless such number is not required by the Practitioner's specialty);   (v) be, and remain, a participating provider in the Medicare and Medicaid programs and not be barred, excluded or otherwise ineligible to participate in these or other Federal programs; and (vi) be or, at the Medical Group's request, agree to be, and remain, a participating physician in any health insurance plan or managed care program accepted by the System, including the System's contractual relationships with preferred provider organizations and health maintenance organizations, and to execute any documents requested by the Medical Group in connection with participating in a provider contract in which the Medical Group or the System agrees to participate.  If at any time during the term of this Agreement the Practitioner fails to meet one or more of the qualifications set forth herein, such failure shall constitute a breach in accordance with Section 7.4 of this Agreement.

(b)  The Medical Group and the Practitioner further acknowledge and agree that this Agreement is not, and shall not be construed as, any form of guarantee or assurance by the System that the Practitioner will receive and maintain the necessary appointment to the Active Medical Staff or the grant of appropriate clinical privileges for the purposes of discharging the Practitioner's responsibilities hereunder; application, appointment, reappointment, and the grant of clinical privileges shall be governed solely by the Bylaws of the Medical Staff of the Medical Center then in effect.   Further, appointment to the faculty of the Medical School shall be governed solely by the applicable policies and procedures of the Medical School.

1.2.    Services.  The Practitioner shall be responsible for providing professional medical and administrative services as set forth in Appendix A, attached and incorporated as part of this Agreement.

1.3    Provider Agreements.  The Practitioner hereby authorizes the Medical Group to execute provider agreements, acknowledgments and consent forms that obligate or confirm the Practitioner's obligation to participate in provider agreements executed by or on behalf of the Medical Group and to abide by and conform to all applicable requirements under such provider agreements.

1.4.    Schedule of Fees.  The Medical Group will establish a current schedule of fees, as may be amended from time to time, to be charged by the Medical Group for direct patient care services provided by the Practitioner under this agreement.

1.5.    Standards of Practice.  The Practitioner shall at all times provide services in a competent and professional manner, consistent with quality assurance standards of the Medical Center's Active Medical Staff and in compliance with all applicable statutes, regulations, rules and directives of federal, state and other governmental and regulatory bodies having jurisdiction over the Medical Center; the Bylaws, Rules and Regulations, policies and procedures of the

2

System, the Medical Center and the Medical Staff; applicable standards of the Joint Commission on Accreditation of Health Care Organizations and currently accepted and approved methods and practices applicable to the provision of medical services.

1.6.   Compliance and Quality Assurance.  The Practitioner shall abide by the Code of Ethics and Business Conduct of the System.  The Practitioner shall participate in the programs of the System and the Medical Center regarding compliance, quality assurance, utilization review, risk management, and peer review, in accordance with the rules, policies and bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, the Patient Care Assessment regulations of the Board of Registration in Medicine, and upon request of the Department Chair.  The Quality Assurance committee of the Medical Staff of the Medical Center will be responsible for reviews and audits of and concerning quality assurance in the Department.

1.7.   Committee Responsibilities.  The Practitioner shall serve on committees of the Medical Center's Medical Staff and committees established pursuant to the Bylaws of the System, upon reasonable request of the Chairman of the Board of Trustees, the President/Chief Executive Officer, the Chief Operating Officer, the Chief Medical Officer, the President of the Medical Group (the "President") or the Department Chair.

1.8.   Medical Records and Reports.  (a)  The Practitioner shall prepare or cause to be prepared in a timely manner any and all appropriate notes and information in the medical records of and reports pertaining to each patient for whom the Practitioner has rendered services pursuant to this Agreement.  The Practitioner shall cause these records and reports to be completed and submitted within such period of time after the rendering of such services as may be required by the Bylaws of the Medical Staff of the Medical Center, upon request of the President or Department Chair, or by applicable law or regulation.  The parties understand and agree that the System has the rights of ownership and control of all of the patients' medical records and reports generated pursuant to this Agreement.  It is further agreed that all practitioners at the System have the right to consult such records and reports in order to facilitate the continuity of proper patient care.

(b)   Time Allocation Reports:  The Practitioner agrees to cooperate with the Department Chair to maintain adequate and proper time records in accordance with the Medical Group's policies.  This may include submitting a written allocation of time reports specifying the respective amounts of time the Practitioner has devoted to clinical, administrative, teaching and research activities.  The Practitioner agrees to make available to the Medical Group all time records and data recorded by the Practitioner upon the request of the Medical Group.

1.9.   Academic Service.  The Practitioner shall aid in the clinical teaching program of the Medical Center as an attending physician on in-patient services and in ambulatory settings. The Practitioner shall also aid in the didactic teaching programs of the Medical Center upon the request of the Department Chair.  The Practitioner shall also participate for reasonable periods of time as an instructor in education programs conducted or offered by the Medical Center,

3

including grand rounds, and shall perform such other teaching functions within the Medical Center as are reasonable and necessary to assure the Medical Center's compliance with the requirements of all applicable accrediting bodies, upon the request of the Department Chair. The Practitioner, as a member of the Medical School faculty, is expected to provide a reasonable amount of academic service (on the order of approximately two hundred (200) hours per year) under the supervision of the Chancellor at the direction of the Chair or his designee.

1.10.   <u>Non-Physician Personnel</u>.   The Practitioner shall, upon the request of the President or Chair, or at such other times as are appropriate, make recommendations concerning the qualifications, hiring, firing, and disciplining of such non-physician personnel as the System or the Medical Group may employ, engage or otherwise provide in support of the Practitioner's practice.   The Practitioner shall make any such recommendations in furtherance of and in accordance with the needs and best interests of the Medical Group and the proper conduct of its functions.   The Practitioner agrees that any supervision of nurse practitioners and physician assistants shall be conducted in accordance with the governing regulations of the Board of Registration in Medicine.

1.11.   <u>Protocols and Procedures</u>.   The Practitioner agrees to work cooperatively with all of the System's clinical departments, Medical Staff, the Medical Group, administration, the President and the Department Chair to assure that services are available on a timely, coordinated, efficient, and professional basis.   The Practitioner also agrees to comply with all of the Medical Center's clinical policies and procedures and all applicable Human Resources policies.

1.12.   <u>Confidentiality of Information</u>.   The Practitioner agrees to uphold and maintain the confidentiality of patient and other information for which the Practitioner has an ethical, professional, or legal obligation not to disclose.   The Practitioner further agrees to uphold and maintain the confidentiality of proprietary or other confidential information relating to the Medical Group or the System of which the Practitioner may become aware while employed hereunder.   This provision shall survive the termination of this Agreement.

1.13.   <u>Continuing Education</u>.   The Practitioner shall comply with and satisfy any and all of the professional obligations and requirements regarding continuing education and any other related areas of medical practice required for the maintenance of a license to practice **medicine** in Massachusetts or appropriate to the rendering of competent professional services pursuant to this Agreement as determined by the Department Chair.

1.14.   <u>Dual-Employment with Medical School</u>.   The parties acknowledge that a certain percentage of the Practitioner's time and salary may be allocated to, and governed by, a so-called "Dual-Employment" arrangement with the Medical School (the "Dual-Employment Arrangement").   The Practitioner acknowledges that the terms and conditions of employment with the Medical Group are governed by this Agreement and the policies and practices of the Medical Group. The Practitioner further acknowledges that if this Agreement is terminated for any reason, the related employment relationship with the Medical School shall also terminate

4

CD 00054

unless the Practitioner has a new or continuing agreement with the Medical School or is a tenured faculty member.

2.    RESPONSIBILITIES OF THE SYSTEM

    2.1.    Space, Equipment, Services, and Supplies.

        (a)  The Medical Group, through agreement with the System, shall be committed to making available reasonable and necessary space, equipment and supplies for the delivery of the agreed services hereunder by the Practitioner, shall provide customary services and maintenance to maintain such equipment in good order and repair, shall furnish services to the Practitioner including, but not limited to, utilities, telephone, housekeeping and record keeping services; and shall provide all necessary supplies needed for the proper provision of services by the Practitioner pursuant to this Agreement.

        (b)  The Practitioner agrees to use such space, equipment, services and supplies for purposes of the System and in furtherance of the obligations governed by this Agreement.

    2.2.    Non-Physician Personnel.  The System or the Medical Group shall employ, engage or otherwise make available to the Practitioner all non-physician personnel determined by the Medical Group to be reasonably needed for the proper delivery of services pursuant to this Agreement.  The System or the Medical Group shall exercise ultimate control and management of non-physician personnel.

    2.3    Professional Liability Insurance.  The Medical Group, at its expense, shall arrange for professional liability insurance coverage for the Practitioner with regard to professional medical services rendered by the Practitioner for Medical Group-related activities billed through the Medical Group during the term of this Agreement.  The Practitioner shall be covered by such insurance to the same extent as other similarly-situated practitioners within the Medical Group.  Coverage limits shall be set in the discretion of the Medical Group and/or the UMass Memorial Self-Insurance Program from time to time and shall be made known to the Medical Group Practitioners on a regular basis.

3.    REIMBURSEMENT REQUIREMENTS

    3.1.    The Practitioner shall comply with all laws, regulations and System requirements, policies and procedures regarding record keeping relating to third-party reimbursement for services provided pursuant to this Agreement as may be in effect from time to time.  In the event that there are subsequent changes or clarifications of statutes, regulations or rules relating to record-keeping which the Medical Group determines must be complied with to insure proper reimbursement from third parties for services provided pursuant to this Agreement, the Medical Group shall, after reasonable notice and opportunity to comply, notify the Practitioner of any actions it reasonably deems are necessary to comply with such changes and the Practitioner shall

5

CD 00055

promptly take such actions.

4.    COMPENSATION

4.1.    **Compensation of Practitioner.**   The Medical Group shall compensate the Practitioner for the services which the Practitioner renders in accordance with the terms of this Agreement.   The agreed compensation is set forth in detail in Appendix B, attached   and incorporated as part of this Agreement.

5.    BILLING AND PAYMENT

5.1.    **Billing.**   Except as otherwise may be expressly stated in this Agreement or other published, written policy or procedure of the Medical Group, all fees, payments and other income attributable to the Practitioner's clinical services during the term of this Agreement shall belong to the Medical Group, whether paid to the Practitioner, to the Medical Group or its designee or to a third party.   The Medical Group shall have the sole right to bill for and to receive, hold and disburse such fees and income and the Practitioner agrees to abide by the billing policies and procedures of the Medical Group.   The Practitioner hereby assigns to the Medical Group all of the Practitioner's rights in all fees, payments, bonuses or distributions or other income or monies due from all sources relating directly or indirectly to clinical  services rendered by the Practitioner pursuant to this Agreement.   The Practitioner shall cooperate fully with the Medical Group in facilitating collection of such monies, including prompt endorsement and delivery to the Medical Group of all checks received from patients or third-party payors on behalf of the Practitioner and completion of all forms necessary for such collections.   To the extent applicable, the Practitioner agrees to work with the Medical Group to collect all patient co-payments for services rendered and promptly to forward such funds to the Medical Group.   Upon termination of this Agreement for any reason whatsoever, all such monies then outstanding shall be deemed to be the sole and exclusive property of the Medical Group and not subject to any claim by the Practitioner.   The Practitioner's obligation under this provision shall survive termination of this Agreement.

6.    TERM

This Agreement shall be effective from your original hire date of January 5, 1992 and shall remain in effect unless otherwise terminated by the parties as provided in Section 7 of this Agreement.   As of the effective date of this Agreement, this Agreement shall supercede and revoke any existing prior employment agreement with the Medical Group or any of its predecessor entities.

7.    TERMINATION

7.1.    Mutual Agreement.   This Agreement may be terminated by mutual agreement of the parties, in a writing signed by the parties, at any time from the date of execution hereof.

6

CD 00056

7.2 <u>Notice of Party</u>. This Agreement may be terminated by the Medical Group at any the giving of written notice to the Practitioner (as set forth in Section 14.1 below), in accordance with the following notice schedule:

| Number of Years Practitioner Employed | Requisite Notice Period |
|---|---|
| 0-2 | 4 months |
| >2 – 10 | 6 months |
| >10- 15 | 8 months |
| >15 – 20 | 10 months |
| >20 | 12 months |

This Agreement may be terminated by the Practitioner at any time upon the giving of as much notice as is practicable to the Medical Group, and in any event a minimum of one hundred twenty (120) days' written notice.

Where either the Medical Group or the Practitioner is terminating the employment relationship, the Notice Period is characterized as "working notice." In the interests of patient care, the Medical Group expects the Practitioner to continue to fulfill the responsibilities of the position and to maintain productivity levels for the full notice period. Vacation time may be taken during the Notice Period only with the consent of the Department Chair and the President of the Medical Group. The Practitioner will be compensated for unused pro-rated vacation time not taken at the time of termination. The Medical Group does not permit "terminal vacations," i.e., the use of vacation time to complete the final portion of the Notice Period.

7.3 <u>For Cause</u>. The Medical Group may terminate this Agreement effective immediately for cause at any time upon written notice to the Practitioner setting forth in reasonable detail the nature of such cause. "Cause" shall be defined as any material breach by the Practitioner of this Agreement, including but not limited to the following:

i. Practitioner's fraud or dishonesty with respect to the Medical Group or those associated with it, acts or conduct materially detrimental to patient care or to the reputation or operations of the Medical Group, or otherwise in connection with the Practitioner's services under this Agreement;

ii. Practitioner's conviction of, a plea of nolo contendere or admission of sufficient facts to a crime involving moral turpitude, or an offense relating to health care or adversely affecting the Practitioner's ability to perform services under this Agreement; or

iii. Practitioner's material negligence or misconduct (other than by reason of disability or approved leave) in the performance of duties assigned by the Chair under this

7

CD 00057

Agreement,

iv.     Failure of the Practitioner to follow UMass Memorial policies and procedures and other rules of conduct made known to the Practitioner and applicable to all physicians of UMass Memorial and/or the Medical Group, including without limitation, policies prohibiting unlawful discrimination, and the Practitioner has exhausted the grievance procedure available to Medical Group physicians and, if applicable, all due process procedures available under the Medical Staff Bylaws of the Medical Center.

7.4.   **Automatic**.  This Agreement shall terminate automatically upon the breach of Section 1.1. by the Practitioner, except that the Medical Group, in its sole discretion, may, but is not obligated to, suspend this Agreement for a specified reasonable period to enable the Practitioner to cure the breach.  If the Practitioner fails to cure the breach within the specified period, this Agreement will terminate immediately upon written notice to the Practitioner by the Medical Group.  Further, the Medical Group reserves the right to terminate this Agreement in the event the Practitioner's medical staff membership or clinical privileges are suspended or in any way restricted.

7.5  **Suspension**.  The Medical Group may suspend the Practitioner for cause, without compensation.  Such cause may include, but shall not be limited to, any suspension, restriction or revocation of the Practitioner's Medical Staff membership or clinical privileges at the Medical Center or any suspension, restriction or revocation of the Practitioner's license to practice medicine in any jurisdiction.

8.     EFFECT OF TERMINATION

8.1.   Effect of Termination on this Agreement.  The termination of this Agreement in accordance with Section 7, hereunder, shall terminate any and all rights and obligations of the Medical Group and the Practitioner pursuant to this Agreement.   The effective date of termination of this Agreement shall be as set forth in the above-mentioned section(s);  provided, however, that upon the termination of this Agreement, the parties shall be and remain obligated and responsible for: (i) any and all obligations accruing prior to the date of termination; and, (ii) any and all obligations, promises, or covenants contained herein which are expressly made to extend beyond the term of this Agreement; and, (iii) the Practitioner shall use reasonable and diligent efforts to assist the System and the Medical Group in arranging for appropriate alternative medical coverage for patients under the care of the Practitioner. Prior to the termination of this Agreement, the Practitioner shall prepare a notice to patients in a form approved by the Medical Group and the Department Chair. Practitioner shall finalize all outstanding billing documentation and complete all patient records prior to his or her departure. Immediately upon the termination of this Agreement, the Practitioner shall deliver to the System sole custody, and total, exclusive and complete use of the System's space, equipment and supplies and shall remove any and all personal possessions from the property of the System. The System shall give the Practitioner reasonable time to effect these conditions.  In the event of

CD 00058

termination of this Agreement, payment by the Medical Group of any base salary due the Practitioner under Section 4.1 and Appendix B to the date of termination and of any pay in lieu of notice due Practitioner under Section 7.2 shall constitute the entire obligation of the Medical Group to the Practitioner. The Practitioner recognizes that no compensation is earned after termination of this Agreement.

9.    GOVERNING RULES, REGULATIONS AND BYLAWS

     9.1    Governing Rules, Regulations and Bylaws.   Notwithstanding anything in this Agreement to the contrary, it is hereby expressly understood and agreed by and between the Medical Group and the Practitioner that any and all rights, responsibilities, and obligations of the parties shall at all times during the term of this Agreement be subject to the Bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, all applicable rules and regulations of the System, or its successor, as now exist or as hereinafter may be amended or promulgated by the Board of Trustees of the Medical Group, the Medical Staff of the Medical Center and the President/Chief Executive Officer of the System, or any duly authorized designee thereof.

10.    ASSIGNMENT AND DELEGATION

     10.1.    Assignment and Delegation.   No assignment of this Agreement or the rights hereunder, or delegation of this Agreement or the obligations hereunder shall be valid without the specific written consent of both parties; provided, however, that this Agreement may be assigned by the Medical Group as a result of reorganization or merger, or to any successor entity providing the services now provided by the System or the Medical Group.

11.    ENTIRE AGREEMENT

     11.1.    Entire Agreement.   This Agreement contains the entire agreement between the parties and no statement, promises, inducements, or writings made by any party or agent of any party which is not contained in this written Agreement shall be valid or binding; and this Agreement may not be enlarged, modified, or altered except in a subsequent writing signed by the parties and attached hereto. This Agreement supersedes any and all prior agreements for professional services between the Practitioner and the Medical Group, the System or any other affiliate of the System.

12.    AMENDMENTS

     12.1.    Amendments.   This Agreement may be amended only by an instrument in writing signed by the Medical Group and the Practitioner. Such writing must make specific reference to the terms and conditions of this Agreement which it amends, and will become effective as of the date stipulated therein.

9

CD 00059

13.   GOVERNING LAW

13.1. Massachusetts Law.  This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed in the Commonwealth of Massachusetts.

14.   NOTICE

14.1. Notice.  Notices or communications required or permitted to be given pursuant to this Agreement shall be given in writing to the respective parties by hand, by certified mail or by overnight delivery service (e.g., Federal Express, UPS) (such notice being deemed given as of the date of mailing) and addressed to the Practitioner at the Practitioner's last known address kept within the records of the Medical Group, or in the case of the Medical Group, One Biotech Park, Worcester, Massachusetts, attention of the President, UMass Memorial Medical Group.

15.   EXECUTION

15.1. Execution.  This Agreement and any and all amendments hereto shall be executed in duplicate copies on behalf of each party by the Practitioner and an official specifically authorized by the Medical Group Board with respect to such execution.  Each duplicate copy shall be deemed an original, but both duplicate originals shall together constitute one and the same instrument.

16.   SECTION HEADINGS

Section Headings.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

17.   WAIVER.

Waiver.   A waiver of the breach of any term or condition of this Agreement by either party shall not constitute a waiver of any subsequent breach or breaches of the same term or condition, or any other term or condition hereunder.

18.   SEVERABILITY.

Severability.  If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect by a court of competent jurisdiction, then the remainder of this Agreement, and the application of such provision in circumstances other than those as to which it is so declared invalid or unenforceable, shall not be affected thereby, and each such provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

CD 00060

IN WITNESS WHEREOF, the Medical Group and the Practitioner have caused this Agreement to be signed and sealed as of this_____ day of _____, 20___.

Dated:      By: _Charu S. Desai_ MD

                 Charu Desai , M.D.


UMASS MEMORIAL MEDICAL GROUP, INC.

Dated 2/2/     By: _____

            Michele Streeter, Executive Director

By: _____

      Joseph T. Ferrucci, M.D., Chair
      Department of Radiology


11

CD 00061

## APPENDIX A

The Practitioner shall be responsible for providing professional medical services to patients of the System in need of such services and to enrollees of health plans as to which the Medical Group and Practitioner are participating providers. The services to be rendered hereunder include, but are not limited to outpatient work, inpatient consultative work and direct patient care. The Practitioner's performance hereunder shall be evaluated by the President of the Medical Group and the Department Chair in accordance with the Bylaws of the Medical Staff of the Medical Center. The Practitioner agrees that the practice of medicine shall be limited to the services to be provided pursuant to this Agreement or for the Medical School under its agreement unless Practitioner obtains the prior written approval of the Chair under Medical Group policy to do otherwise.

The Medical Group and the Department Chair shall determine the specific professional medical duties to be performed by the Practitioner, as well as the time and manner of performance, in accordance with and subject to the terms of this Agreement; provided, however, the Medical Group and Department Chair shall not impose requirements which would interfere with the Practitioner's professional judgment in connection with the treatment of patients or cause the Practitioner to violate applicable ethical codes or any law or regulation.

The Practitioner shall at all times provide services to all persons who may become patients of the Medical Group in accordance with the Medical Group's policies and without regard to race, color, creed, sex or ability to pay for services; and

The Practitioner shall participate in Medicare, Medicaid and managed care programs and other third party payor arrangements or governmental programs in which the Medical Group participates and the Practitioner shall abide by and act in accordance with the terms and conditions of all managed care agreements, network, affiliation agreements, provider agreements and other contracts to which the Medical Group or Practitioner (with the Medical Group's consent) is or becomes a party.

12

## APPENDIX B

1. The Practitioner's compensation for services rendered pursuant to this Agreement, and under a Dual-Employment Arrangement with the Medical School, if applicable, shall be a total base salary, which if annualized would be at the rate of Three-hundred Twenty-Five Thousand Dollars ($325,000) per year, less all legally required and voluntarily-authorized deductions, payable in accordance with Medical Group payroll practices. (Practitioners who participate in the Dual-Employment Arrangement with the Medical School may receive paychecks from both the Medical Group and the Medical School, which together shall equal the base salary referenced above.)

The Practitioner shall also participate in the Physician Incentive Compensation Program of the Department as established by the Medical Group (the "Incentive Compensation Program"), subject to its terms and conditions of participation as in effect or amended from time to time. The Incentive Compensation Program includes eligibility for bonuses and/or salary increases based upon productivity. The Practitioner acknowledges that participation in the Incentive Compensation Program may also involve imposing salary withholds if performance does not meet Medical Group requirements. The Practitioner further acknowledges that, following the first twelve months' of the Practitioner's employment, under the terms of the Incentive Compensation Program, the Medical Group may decrease the Practitioner's base salary if the applicable productivity targets are not met. Salary adjustments will be made upon thirty (30) days written notice to the Practitioner. Salary reductions, if any, shall be consistent with the Department's compensation plan and shall in no event exceed twenty percent of the Practitioner's base salary in any twelve month period.

Subject to the Practitioner's payment of any contribution required of physician employees generally, the Practitioner will be eligible to participate during the term of this Agreement in any and all employee benefit plans made generally available to other physician employees of the Medical Group as in effect from time to time. Such participation by the Practitioner shall be subject to (i) the terms of the applicable plan documents, (ii) generally applicable policies of the Medical Group, and (iii) the discretion of the Board of Trustees of the Medical Group or any administrative or other committee provided for in or contemplated by such plan or policy of the System. A description of the benefits program currently in effect (and subject to change by the Group Board and UMass Memorial Compensation Committee) is attached hereto as Appendix C, "Physician Benefits at a Glance."

13

CD 00063

## EXHIBIT B

Updated June 8, 2017

## ACADEMIC AND ADMINISTRATIVE TIME POLICY

I. **Academic Time**

1. Academic time is defined as time allocated to academic responsibilities including teaching/conference preparation, writing papers/texts, completing research project, attending institutional and department committees, attending a conference, serving on committees of local, regional, national or international organizations other than UMMMS or UMMMC.

2. Academic activities will be reviewed annually during individual annual academic planning sessions

3. In order to be eligible for academic time a radiologist must be 0.6 FTE or greater. As a new hire, academic time will be granted for up to 2 years based on mutually agreed upon planned activity. For faculty with 2 or more years of service, allocation will be based on prior activity and mutually agreed upon future activity.

4. The baseline for academic time is 12 days/year (1 day/month). This number is prorated for FTE.

II. **Administrative Time**

Administrative time is defined as time allocated to specific administrative roles as defined in job descriptions. The number of days is determined as follows:

| Administrative Role | Days Per Year |
|---|---|
| Residency Program Director | 49 (includes 4 days AUR) |
| Quality and Patient Safety Director | 67.5 |
| Assist Residency Program Director | 12 (includes 4 days AUR) |
| Radiology Undergraduate Medical Education | 99 days (includes 4 days AUR, 5 days AAMC or GEA/NEGEA, 36 days DSF course) |
| Fellowship Director ACGME | 12 |
| Fellowship Director Non-ACGME | 4 |
| Division Chief | 12 |
| Other – Admin/Academic Functions defined by Chair | 6 to 46 Days per year at Chair Discretion |

**During academic/administrative time, faculty must be reachable by pager and available to cover clinical service if need arises (unless away at a conference).**

Charu Desai, MD
Exhibit_12
9/18/2020

**Academic time can be used to attend a conference, however, prior approval must be obtained from the Chair.**

III.    **Scheduling of Academic/Administrative time**

1.  Academic/ administrative time off will be assigned by the Physician Staffing Coordinator under the direction of the Division Chief and/or Chair. Faculty requests will be considered and honored when feasible.

2.  Requests to attend meetings/conferences using accumulated academic/administrative time must be requested within the context of vacation planning, subject to vacation request deadlines and approved by the Division Chief.

3.  Clinical Schedule will take precedence over academic and/or administrative time.

4.  Academic/Administrative time may be scheduled in half day increments.

5.  Academic/Administrative time will not be routinely scheduled on Friday unless preapproved by Division Chief.

6.  Academic/Administrative time cannot be used to extend a leave (vacation) and will not be scheduled immediately before or after a leave.

7.  Academic/Administrative time will be reduced on a prorated basis if an authorized leave of absence is taken during the Fiscal Year. For example if a leave is 3 of 12 months, academic/administrative time is reduced by 25%.

8.  Academic/Administrative time should be taken within the quarter and cannot be carried over to the next Fiscal Year.

9.  Academic/Administrative time will be removed once a resignation notice is communicated.

CD 00002

# EXHIBIT C

**Revised October 2015**

## CALL AND/OR WEEKEND/HOLIDAY COVERAGE POLICY

## PRINCIPLES

1. Call and/or Weekend/ Holiday Coverage is Division based.

2. The frequency of call and/or Weekend/Holiday duties will be maintained at approximately 1/5 or roughly 10 to 11 weeks or weekends per year.  Minor adjustments may be necessary from time to time for Divisions temporarily under or overstaffed at the discretion of the Chair's Office.

3. WRVU's earned during call or weekend/holiday obligation will count for yearend productivity calculation.

4. Call and weekend/holiday schedule will be made by the Division Chief in concert with the Physician Staffing Coordinator.  When possible call/weekend/holiday schedule will be done one year in advance at the beginning of each FiscalYear and follow Departmental guidelines.

5. Senior attending  are exempt from call and weekend/holiday coverage but will maintain incentive bonus eligibility if they meet  2 of the following 3 criteria:

   - Age 72 years.
   - Academic rank of full Professor
   - 20 years of continuous service to the Department.

1

**UMM-04922**

## WEEKEND AND HOLIDAY COVERAGE – 1/5

ABDOMINAL IMAGING DIVISION –  ON SITE MEMORIAL CAMPUS
    8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
Memorial House Doctor - Contrast Coverage, emergent US and Fluoro
Responsible for any NVIR procedures at Memorial Campus.
On Site Chest person will be back-up House Doctor.

        Reading Assignments
        Adult non ED Abdominal Imaging – All locations
            Priority
            a.   Stats
            b.   Inpatient
            c.   Outpatient
        (Each category Prioritized by Date and Time (not Campus))

MSK DIVISION – ON SITE SHREWSBURY STREET
    8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
    Contrast Monitoring – Shrewsbury Street MR

        Reading Assignments
        Adult non ED MSK imaging all locations
            Priority
            a.   Stats
            b.   Inpatient
            c.   Outpatient
        (Each category Prioritized by Date and Time (not location)

CHEST DIVISION – ON SITE – MEMORIAL CAMPUS
    8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
        Reading Assignments
        Adult non ED CHEST imaging all locations
            Priority
            a.   Stats
            b.   Inpatient
            c.   Outpatient
        (Each category Prioritized by Date and Time (not location)

UMM-04923

**SATURDAY COVERAGE (12/YEAR)**

BREAST DIVISION – ON SITE- MEMORIAL CAMPUS
8 HOUR SHIFT- with FELLOW

ASSIGNMENT RESPONSIBILITIES: Screening

**CALL 7 DAYS -  FRIDAY 5 PM TO FRIDAY 8 AM INCLUDING ON-SITE SAT/SUN/HOLIDAY – 1/5**

PEDIATRIC DIVISION – ON SITE – UNIVERSITY CAMPUS
8A-5P – SATURDAY/SUNDAY/HOLIDAY
BEEPER AFTER 5, 7 days (FRIDAY TO FRIDAY)

Reading Assignments (Saturday/Sunday/Holiday)
All Pediatric Imaging –all locations
Priority
a.   ED-Pedi (Read out resident)
b.   Stats
d.   Inpatient
e.   Carewell Urgent Care: read all prior day's cases, be available for
STAT calls
f.   Outpatient
(Each category Prioritized by Date and Time (not location))

NEURORADIOLOGY DIVISION – ON SITE – UNIVERSITY CAMPUS
8A-5P – SATURDAY/SUNDAY/HOLIDAY
BEEPER AFTER 5,  7 days (FRIDAY TO FRIDAY)

Reading Assignments (Saturday/Sunday/Holiday)
All Neuroradiology Imaging –all locations
Priority
Read out resident
a.   ED-Neuro
b.   Stats
c.   Inpatient
d.   Outpatient
(Each category Prioritized by Date and Time (not location)

**CALL (7 DAYS) ONLY**

VASCULAR DIVISION –ON CALL FOR VIR AND ABDOMINAL* PROCEDURES
CALL 7 days (FRIDAY 5P THRU FRIDAY 8A)
*All Abdominal Procedures EXCEPT Memorial Campus Saturday/ Sunday/
Holiday 8A-5)

NEURO INTERVENTIONAL DIVISION –ON CALL FOR PROCEDURES
CALL 7 days (FRIDAY 5P THRU FRIDAY 8A)

UMM-04924

## ED Division- ON SITE- University Campus 24/7

**Mon-Fri Shifts**

7am-4pm
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro and Pediatrics)
Carewell urgent care cases from prior day, available for STAT calls

4pm-10pm
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro)
Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.
Available for calls from Carewell until 8pm
    Priority
    a.  ED
    b.  STATs- All non-neuro including non-ED
        i.   Inpatient
        ii.  Outpatient
*Pediatric cases will be entered as Preliminary by ED resident*

10pm-7am
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital
Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.
    Priority
    a.  ED
    b.  STATs- All non-ED STATs including Neuro
        i.   Inpatient
        ii.  Outpatient
        iii. Other backlog in non-STAT, non-ED cases
*Pediatric cases will be entered as Preliminary by ED resident*
*Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only*

**Sat/Sun/Holiday**

7am-4pm
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro and Pediatrics)
Carewell urgent care cases from prior day, available for STAT calls

4pm-10pm
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital
Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.
Available for calls from Carewell until 8pm
    Priority
    a)  ED
    b)  STATs- All non-ED STATs including Neuro
        i.   Inpatient
        i.   Outpatient
        ii.  Other backlog in non-STAT, non-ED cases
*Pediatric cases will be entered as Preliminaryby ED resident*
*Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only*

4

UMM-04925

10pm-7am          All cases ordered in the Emergency Department for the University and Memorial
                  Campus, Marlborough Hospital and Clinton Hospital
                  Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT
                  Chest List.
                        Priority
                        a)   ED
                        b)   STATs- All non-ED STATs including Neuro
                                i.    Inpatient
                                ii.   Outpatient
                                iii.  Other backlog in non-STAT, non-ED cases
                  *Pediatric cases will be entered as Preliminaryby ED resident*
                  *Neurocases will have a final report depending on case mix and Radiologist skill set. If*
                  *not will receive a "memo" only*

5

UMM-04926

**<u>EXHIBIT D</u>**

CD 000049

Charu Desai, MD
Exhibit_34
10/22/2020

## Peer Review: Desai, Charu         7/1/2016 - 6/30/2017

**4b. Likely to be significant**
Desai, Charu

Review Count
6 4 2 0

| Modality | Comment | Drop-Down Selection | Reviewee | Accession | Study Description | Study Date Time |
|---|---|---|---|---|---|---|
| CR | Called to review cor. Cardiomegaly. Regular subsegmental atelectasis. KDill | 4b. Likely to be significant | Desai, Charu | | | 3/7/2017 12:01 PM |
| CT | RUL nodule adjacent to cyst highly suspicious for lung ca | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 4/24/2017 4:18 PM |
| CT | Asked to review case. Growing tracheal nodule since CT 2013. This was not accurately identified (question of comparison) reported as, "Question mucus along the anterior wall of upper trachea, image 22 series 4." K DillMD | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Contrast | 3/17/2016 11:38 AM |
| CR | Asked to review. approx 6.5 cm ascending aortic aneurysm not diagnosed/ mentioned on cor. KDill | 4b. Likely to be significant | Desai, Charu | | Chest:PA,AP, Apical or Lateral | 4/28/2016 5:48 AM |
| CT | asked to re-review case. PET demonstrates nodule is FDG avid. Report stated, "Approximately 5 mm ill-defined nodular density anteriorly in the left upper lobe . Question etiology. Question small focal area of infiltrate less likely nodule." KDill MD | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 2/24/2016 1:31 PM |
| CT | asked to over read. CT dictated as nodular density, likely not nodule –no call made or electronic recording of notification for f/u. subsequent pre op CT reveals enlargement and new nodule, no physician was aware of nodule. | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 2/24/2016 1:31 PM |

# EXHIBIT E

## Rosen, Max

| | |
|---|---|
| **From:** | Rosen, Max |
| **Sent:** | Wednesday, February 08, 2017 1:02 PM |
| **To:** | Brennan, Darren; Tennyson, Joseph; Robinson, Kimberly (Pulmonary); Roach, Steve; Brown, Douglas |
| **Cc:** | Rosen, Max |
| **Subject:** | Meeting – Review of Radiology issues at Marlborough: |
| | |
| **Categories:** | Desai_Confidential |

Please let me know if anyone has any edits, etc.

Thanks for meeting with me and Darren.
Max

Meeting – Review of Radiology issues at Marlborough:

Drs. Rosen, Brennan, Tennyson, Robinson, Mr. Roach & Brown Jan 31, 2017

1. Actions taken to address concerns about turn around time and accessibility of Radiologists:
   - Changed staffing model:  All studies read on site (at Marlborough) expect Neuro, Peds, ED, Nucs
   - Radiology has created Community Radiology Division to be more responsive to community needs
   - New Community Neuroradiology rotation:  M-F 8 am to 10 pm, one single phone number for point of contact
   - Extended hours for Community Radiology until 8 pm, M-F
   - Trainees will not be reading Marlborough studies
   - Will work with new version of PowerScribe to see if time-stamp for addenda can be designed to not "add" to TAT   BRENNAN [ ]
   - Dr. Brennan will report monthly Radiology TAT to Med-Exec
2. Chest:
   - Dr. Schmidlin now has home workstation
   - Drs. Schmidlin and Dill will read all high resolution chest CTs
   - Will create template to standardize all chest CT reads          DILL [ ]
   - Template for CXR has been implemented, feedback has been positive
   - Quality issues: Dr. Rosen will perform focused peer-review for physician where issues have been raised.   ROSEN [ ]
3. Stroke: Will work on streamlining  stroke activation  & review current performance          BRENNAN [ ]
4. Identification of inpatient exams needing to be read at night/weekends:
   - Dr. Brennan will work with Paul Riggieri to have techs manually mark all inpatient CTs "stat" when performed nights/weekends.   BRENNAN [ ]
5. QA:
   - Dr. Rosen has reviewed, and provided feedback for Dr. Robinson for neuro case that was questioned.
   - Radiology will provide access to the person from Marlborough who maintains the QA reporting system (? STARS) so that any Radiology cases can be entered in the Radiology (Pe   BRENNAN [ ]
   - 

Max P. Rosen, M.D.
Exhibit_27
5/7/2021

1

Max P. Rosen, MD MPH
Professor and Chair
U Mass Memorial Medical Center
U Mass School of Medicine
55 Lake Ave. North - Room S2-824
Worcester, MA 01655
508-856-3252
508-856-4910 fax

max.rosen@umassmemorial.org
Follow me on LinkedIn or Twitter
**www.umassmed.edu/radiology**

*Confidentiality Notice:*
*This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain*
*confidential, proprietary and privileged information. Any unauthorized review, use, disclosure or distribution is*
*prohibited. If you are not the intended recipient, please contact the sender immediately and destroy or*
*permanently delete all copies of the original message.*

**EXHIBIT F**

 **UMassMemorial** |  **University of Massachusetts Medical School**

*Department of Radiology*

*University Campus*
*55 Lake Avenue North*
*Worcester, MA 01655*
*Tel: 508-856-3252*
*Fax: 508-856-4910*
*max.rosen@umassmemorial.org*
*www.umassmemorial.org*

*Max P. Rosen, MD, MPH, FACR*
*Professor and Chair*

February 14, 2017

Dear Diagnostic Radiology Faculty,

I am pleased to introduce the new salary structure for the Department of Radiology that will be effective March 1, 2017.

Here are the highlights:

1) The base salary will be $330,000.
2) Associate Professors will receive an additional $10,000.
3) Professors will receive an additional $10,000.
4) Division and/or Medical Chiefs will receive $15,000.
5) Vice Chairs will receive $15,000.
6) Other administrative/clinical roles may receive monetary support at the discretion of the Chair.
7) The above salary and stipends are full-time faculty and will be prorated for part-timers.

For this year, salary adjustments will be made for faculty with more than a 1000 RVUs behind the 50th percentile of the AAARAD RVU benchmark. The adjustment will be capped at 5% of the total salary. The monetary value of an RVU will be based on the average collection/RVU in fiscal year 2016. This was mandated by the hospital's funds flow committee.

You will receive individual letters outlining your new salary effective March 1, 2017.

Thank you for your patience with this project. I am confident that this new structure will provide competitive salaries, compensation transparency, and a clear promotion trajectory.

Sincerely,

Max P. Rosen, MD, MPH
Chair Department of Radiology

Cc. Randa Mowlood

# **EXHIBIT G**

 **UMassMemorial** |  **University of Massachusetts Medical School**

Department of Radiology

University Campus
55 Lake Avenue North
Worcester, MA 01655
Tel: 508-856-3252
Fax: 508-856-4910
max.rosen@umassmemorial.org
www.umassmemorial.org

Max P. Rosen, MD, MPH, FACR
Professor and Chair

February 16, 2017

Charu Desai, MD
Abdominal Division
Department of Radiology
UMass Memorial
55 Lake Avenue North
Worcester, MA 01655

Dear Charu,

As you know, we are introducing a new salary structure for the Department of Radiology that will be effective March 1, 2017.

Your annual salary will increase from $ 302,575 to $340,000. Your new salary was calculated as follows:

| | |
|---|---|
| Base: | $330,000 |
| Associate Professor: | $10,000 |
| Total: | $340,000 |

Thank you for your commitment to our Department.

Sincerely,

Max P. Rosen, MD, MPH
Chair Department of Radiology

Cc. Randa Mowlood

Charu Desai, MD
Exhibit_32
10/22/2020

**<u>EXHIBIT D</u>**

CD 000049

Charu Desai, MD
Exhibit_34
10/22/2020

## Peer Review:     Desai, Charu     7/1/2016 - 6/30/2017

4b. Likely to be significant
Desai, Charu

Review Count: 6, 4, 2, 0

| Modality | Comment | Drop-Down Selection | Reviewee | Accession | Study Description | Study Date Time |
|---|---|---|---|---|---|---|
| CR | Called to review cor. Cardiomegaly. Regular subsegmental atelectasis. KDiII | 4b. Likely to be significant | Desai, Charu | ▉ | | 3/7/2017 12:01 PM |
| CT | RUL module adjacent to cyst highly suspicious for lung ca | 4b. Likely to be significant | Desai, Charu | ▉ | CT: Chest without Cont | 4/24/2017 4:18 PM |
| CT | Asked to review case. Growing tracheal nodule since CT 2013. This was not accurately identified (question of comparison) reported as, "Question mucus along the anterior wall of upper trachea, image 22 series 4." K DiIMD | 4b. Likely to be significant | Desai, Charu | ▉ | CT: Chest without Contrast | 3/17/2016 11:38 AM |
| CR | Asked to review. approx 8.5 cm ascending aortic aneurysm not diagnosed/ mentioned on cor. KDiII | 4b. Likely to be significant | Desai, Charu | | Chest:PA,AP, Apical or Lateral | 4/28/2016 5:48 AM |
| CT | asked to re-review case. PET demonstrates nodule is FDG avid. Report stated, "Approximately 5 mm ill-defined nodular density anteriorly in the left upper lobe. Question etiology. Question small focal area of infiltrate less likely nodule." KDiII MD | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 2/24/2016 1:31 PM |
| CT | asked to over read. CT dictated as nodular density, likely not nodule –no call made or electronic recording of notification for f/u. subsequent pre op CT reveals enlargement and new nodule, no physician was aware of nodule. | 4b. Likely to be significant | Desai, Charu | | CT: Chest without Cont | 2/24/2016 1:31 PM |

**<u>EXHIBIT E</u>**

1              UNITED STATES DISTRICT

2            DISTRICT OF MASSACHUSETTS

3              CIVIL ACTION NO. 4:19-cv-10520-DHH

4    * * * * * * * * * * * * * * * * * * * * * * * * *
     CHARU DESAI,
5                   PLAINTIFF

6     v.

7    UMASS MEMORIAL MEDICAL CENTER, INC., et al.,
                    DEFENDANTS
8    * * * * * * * * * * * * * * * * * * * * * * * * *

9

10

11          DEPOSITION OF CHARU DESAI, M.D.,

12              Conducted Remotely

13          211 Congress Street, Suite 720

14           Boston, Massachusetts  02110

15

16           Friday, September 18, 2020

17            10:37 a.m. to 5:00 p.m.

18

19                 Pages 1-202

20

21

22

23

24

Charu Desai vs                                    Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.        September 18, 2020

154

1         capable of performing your job despite your
2         disability "most of the time."  Based on your
3         testimony, I'm asking, were there times where you
4         were incapable of performing your job due to your
5         disability?
6    A    No.  It is I have to just take a break, that's
7         all, like what just happened.  It is, like, if I
8         get three, four spell, I have to stop what I'm
9         doing.  Why are you --
10   Q    Okay.  And did UMass. Memorial ever prevent you
11        from taking a break when you had an issue?
12   A    No.
13   Q    And in fact, you had years worth of FMLA approvals
14        to allow you to take time off from work if you had
15        a problem with your heart, isn't that right?
16   A    Yeah, but I hardly used it except the surgery.
17   Q    Yes.  And in fact, you were given full ability to
18        take as much time as you needed based on years
19        worth of FMLA approvals if you had a problem due
20        to your health condition, isn't that true?
21   A    Because I applied for FMLA, yes.
22   Q    And UMass. Memorial, Marlborough Hospital,
23        University of Massachusetts Medical School,
24        Dr. Tosi, Dr. Rosen, Dr. Brennan, Dr. Dill, nobody

Charu Desai vs                                      Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.        September 18, 2020

155

1         ever interfered with your ability to take time off
2         if you felt you needed a break, isn't that true?
3    A    Yes.
4    Q    Did you apply for Division Chief Physician,
5         Division Chief of Chest Radiology when it was
6         open?
7    A    No.
8    Q    Why not?
9    A    Because it was automatically, that if you are
10        senior, that you should be a case asked.
11   Q    I'm sorry, I didn't mean to interrupt you.
12             Is this similar to your view that you should
13        be grandfathered?
14             MS. WASHIENKO:  Objection.
15   A    No.  Please repeat the question?
16   Q    You're saying, based on your seniority, you should
17        have been asked to be given the position.  Is this
18        similar to your view that you should have been
19        grandfathered in for academic time?
20   A    No, that has been happening in the department.
21   Q    So you believe that they should not have
22        interviewed for the position but they should have
23        given you the position?
24   A    No, they should have asked.

# In the Matter of:

*Charu Desai vs*

*UMASS Memorial Medical Center, Inc., et al.*

---

*Charu S. Desai, M.D. Vol II*

*October 22, 2020*

---

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



219

1   did or didn't do that constitutes the basis for your
2   claims against him?
3        A.   Not that I recall.
4        Q.   Okay.  And, now, the -- the last individual
5   Defendant named was Dr. Karin Dill, and she's
6   addressed in your complaint in various places.  But
7   my question is, what are you specifically claiming
8   she did or didn't do that forms the basis for your
9   complaints against her?
10       A.   I think that she did say a few things
11  against me which was not true.
12       Q.   Okay.  And what specifically did she say
13  that you claim was not true?
14       A.   I don't recall everything but...
15       Q.   Anything that you recall?
16       A.   I don't recall anything.
17       Q.   I'm sorry?
18       A.   I don't recall.
19       Q.   Okay.  Is there anything else that you're
20  claiming Dr. Dill did or didn't do that forms the
21  basis for your complaint, other than your belief
22  that she said things that weren't true but you can't
23  recall what those things are?
24       A.   No.

Charu Desai vs                                    Charu S. Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.              October 22, 2020

220

1       Q.  And, as you sit here today, is there
2   anything you can think of that would help you recall
3   what Dr. Dill may have said that you think was not
4   true about you?
5       A.  Can you repeat the question.
6       Q.  Sure.  You said you can't recall what she
7   may have said about you that you think was not true.
8   I'm -- I'm asking, is there anything you can think
9   of that would help you recall what she said that you
10  say was not true about you?
11      A.  Incidents with her regarding that I was
12  rude, which was completely exaggerated and
13  misinterpreted, and HR was involved and there was
14  nothing came out of it, and same thing happened to
15  my colleague three months later.
16      Q.  Okay.  So you're referring to a
17  conversation that you had with Dr. Dill where she
18  accused you of being rude to her, is that right?
19      A.  Yes.
20      Q.  Okay.  And, aside from that conversation,
21  is there anything else you can recall that forms the
22  basis for your claims against Dr. Karin Dill?
23      A.  I don't recall at this present.
24      Q.  Okay.  During Day 1 of your testimony, you

248

1     Q.  Let's move to Dr. Darren Brennan.  Is there
2   anything that you claim Dr. Brennan said or wrote
3   about you that you claim was defamatory?
4     A.  Not that I recall.
5     Q.  Is -- let's move to Dr. Karin Dill.  Is
6   there anything that Dr. Karin Dill said or wrote
7   about you that you claim was defamatory toward
8   you?
9     A.  Except that we talk about things, and
10  there's nothing else that I recall.
11    Q.  Just the fact that she had claimed that you
12  had been rude to her, is that right?
13    A.  Correct.  Yes.
14    Q.  Would you agree that, when Dr. Dill is
15  characterizing a conversation with you as rude,
16  that's her opinion of the conversation?
17        MS. WASHIENKO:  Objection.
18        You can answer.
19    A.  Yeah, but it is missing the -- it says it
20  right in the -- they did the investigation.  There
21  is nothing came out of it.
22    Q.  Right.  But she --
23    A.  And she did the same thing to somebody
24  else, too --

249

1      Q.  Yeah.  She --

2      A.  -- to colleagues.

3      Q.  She may be right or wrong when she calls

4  you rude but it's her -- it's her opinion as to

5  whether or not she thinks you're rude, right?

6      A.  Yes.

7      Q.  Okay.  Anything else that Dr. Dill said or

8  wrote about you that you claim constitutes

9  defamation?

10     A.  Not that I recall.

11     Q.  Now, you mentioned the termination letter

12  that was signed by Dr. Rosen and Dr. Tosi as the

13  letter itself constituting a basis for the

14  termination.  You'd agree that -- that you were, in

15  fact, terminated from employment, right?

16     A.  Yeah.

17     Q.  And the letter simply informed you of the

18  termination of your employment, correct?

19     A.  Yes.

20     Q.  So they were being truthful when they wrote

21  that letter to you as to what was happening to your

22  employment, correct?

23          MS. WASHIENKO:  Objection.

24          But you can answer.

322

1    introduced it yet.  I'm sorry.

2              MS. WASHIENKO:  It's okay.

3              MR. KILROY:  Yup.  It's Exhibit 34 now.

4              MS. WASHIENKO:  Okay.

5    BY MR. KILROY:

6        Q.  Do you recognize this document?

7        A.  Let me see.  Yes.

8        Q.  Do you see that it has a Bates stamp C --

9    excuse me -- CD 00049 up in the top right corner?

10       A.  Say that again, please.

11       Q.  CD 00049, do you see that number?

12       A.  Yes.

13       Q.  Okay.  I'll represent to you that's a

14   number that was put on there by your -- your

15   counsel.  So this document was produced by you.  You

16   had this document.  Why did you have a peer-review

17   document in your possession?

18       A.  I have -- I have no idea.  I mean, I was

19   cleaning my office.  This happened when I came

20   across this.

21       Q.  How did you get access to this document

22   when you were working there?

23       A.  I have no idea.  I'm telling you the truth

24   under oath.  I just cleaning my office, and I

UMASS Memorial Medical Center, Inc., et al.

Charu S. Desai, M.D.
October 22, 2020

323

1  happened to see it, and then I thought, wow, she is
2  doing damage to me.
3          Then, by the way, when I looked at the
4  cases because I was still working there, one of them
5  is on, and all the other work she's getting it is
6  bad, it's completely wrong, my friend.  This is
7  somebody trying to damage you.  That's what I was
8  saying, that somebody --
9      Q.  Were you -- were you required to -- to
10  conduct an analysis of these cases, these peer
11  review cases?
12      A.  When I came across when I was cleaning my
13  office, I don't recall how I had it, to be truthful,
14  but then I looked at it.  This is saying for me
15  everything is significant.  Completely is wrong,
16  wrong to the wazoo.
17      Q.  Who do you -- who have you shared this
18  document with, other than your counsel?
19      A.  Nobody else, no.
20      Q.  Did you share it with your daughter, Diana
21  Desai?
22      A.  No.  I'm saying I have nothing to do with
23  this, my case.  She has nothing to do with this it
24  seems.  She saw it as a -- as a document but nothing

888.825.3376 - production@court-reporting.com

Page 323

325

1    friend.

2         Q.  Has she seen the document, Dr. Desai?

3         A.  I wouldn't know, but my file had -- had

4    this document, and we -- we put away the file, you

5    know...

6         Q.  Do you have peer-review reports -- reports

7    like this for other individuals?

8         A.  No.  Why would I have for other

9    individuals?

10        Q.  Do you claim that this peer-review document

11   somehow supports your claim of discrimination?

12        A.  It is -- here it is marked personal.  This

13   is somebody sabotaging you with wrong readings.

14        Q.  Answer my question, please.  Are you

15   claiming this document supports your claims?

16        A.  Claiming -- say that question, please.

17        Q.  Are you claiming this document supports

18   your claims of discrimination?

19        A.  I don't know if you put this under

20   discrimination or not.  I don't know.  I'm -- I'm

21   just saying the word, CD, was wrong.  That's all I'm

22   saying.

23        Q.  Who is she?  Who is she?

24        A.  Dr. Dill did that.

331

1  talk to Dr. Desai, and we will circle back with you
2  shortly.
3        MR. KILROY:  Great.  Thank you.
4        (Recess, 12:53 p.m. - 1:08 p.m.)
5              (Document marked as Exhibit 36
6              for identification)
7  BY MS. WASHIENKO:
8     Q.  All right.  Dr. Desai --
9     A.  Yes.
10    Q.  -- you should be seeing Exhibit 36 now, and
11 this is just showing certification of your FMLA for
12 that same time frame, March of 2017 to March of
13 2018.
14    A.  Yes.
15    Q.  All right.  Now, I'm going to bring up the
16 next exhibit.
17             (Document marked as Exhibit 37
18             for identification)
19 BY MR. KILROY:
20    Q.  Are you seeing an email, Exhibit 37?  Do
21 you see that exhibit, Dr. Desai?
22    A.  I do.
23    Q.  Okay.  And I'm going to focus on halfway
24 down the page, the email from Dr. Karin Dill dated

332

1  September 21st, 2017, to Dr. Rosen, Dr. Brennan, and
2  the subject matter is Incident 9/21/17.  And it's
3  fair to say she documents an interaction that she
4  had with you that day, correct?
5      A.  Yes.  We already talked about this before.
6  Right?
7      Q.  We haven't talked about this exhibit,
8  ma'am.
9      A.  Okay.
10      Q.  The bottom paragraph on the first page of
11  Dr. Dill's email, she quotes you where you say, "I
12  will show you but first I want to let you know that
13  last week you were very rude to me, and I don't
14  appreciate it."
15          Now, previously today you testified that
16  Dr. Dill saying -- calling you rude would be
17  defamatory to you.  So were you being defaming
18  Dr. Dill by calling her rude?
19          MS. WASHIENKO:  Objection.
20          You can answer.
21      A.  Yes.  She was -- she was rude so...
22      Q.  And so it's okay for you to call her rude
23  but it's not okay for her to refer to you as rude?
24      A.  That's not -- just like you said, it was

333

1   her opinion.  Here it is my opinion that she was
2   rude.
3       Q.  Okay.  So you agree --
4       A.  Right.
5       Q.  -- that both of you have an opinion that
6   each other was rude?
7           MS. WASHIENKO:  Objection.
8           You can answer.
9       Q.  Is that right?
10          I'll withdraw the question because I want
11   to move on.
12          Fair to say that Dr. Dill based on her
13   email felt that she was attacked by you on
14   September 21st of 2017?
15          MS. WASHIENKO:  Objection.
16          You can answer.
17      A.  Absolutely overblown.  Absolutely overblown
18   and misinterpreted and it -- there was nothing came
19   out of it, so --
20      Q.  Would you agree?
21      A.  By the way, she did the same thing to my
22   colleague a few months later, exact same thing.
23      Q.  Ma'am, I didn't ask you that.  Please just
24   focus on my question only.

335

1              (Document marked as Exhibit 38
2              for identification)
3    BY MR. KILROY:
4         Q.  I'm showing you Exhibit 38.  Do you see
5    that?
6         A.  I just want to correct on this email.
7    Okay.  In the first paragraph, she did it few days
8    ago, and then she did -- she did it that day.  I
9    didn't put it in the email, okay, but just to let
10   you know.
11        Q.  I'm just -- yeah.  I'm just asking about
12   the document.  The document is you sending to
13   Dr. Brennan about the same incident later in the day
14   at 1:46 p.m., correct?
15        A.  Yes.
16        Q.  And here you admit that you told her that
17   she was rude to you a couple of days ago, right?
18        A.  Yeah.  And that, also, which I did not put
19   it here, two times.
20        Q.  Okay.  And, by comparison at least, Dr.
21   Dill provides a great deal of detail as to the
22   interaction; you provide very little detail, would
23   you agree?
24        A.  Yeah.  Yeah, because there is only

367

1    identifying the individual you claim made the

2    alleged defamatory statement."

3          And, in your answer, there is nine items

4    listed.  The first one is your 2017 to 2018 faculty

5    annual performance review by Dr. Rosen.  Who, other

6    than you, do you claim received a copy of that from

7    Dr. Rosen?

8        A.  No, nobody.

9        Q.  Nobody.  No. 2, July 1st, 2016, to

10   June 30th, 2017, peer review of Dr. Desai by

11   Dr. Dill.  Who, other than you, do you claim

12   received a copy of that from -- from Dr. Dill?

13         MS. WASHIENKO:  Objection.

14       A.  See, apart from my agony because she has

15   all the copies.  You're not talking about the

16   attorney, are you?

17       Q.  I'm talking about what your answer says

18   here, ma'am.  It's your answer.

19       A.  You're saying who has the document.  My

20   attorney does have the document.

21       Q.  Oh, I'm sorry.  I'm saying, who -- who did

22   Karin Dill send the document to, other than you?

23       A.  Probably, nobody.  I don't know.

24       Q.  Okay.  No. 3, April 17th, 2018, letter from

422

1  Dr. Dill and she said that you were rude.  Do you
2  recall that?
3       A.   Yeah.  I recall the incident.
4       Q.   Did you -- were there any other actions
5  that Dr. Dill took with regard to you that you
6  believe harmed your reputation?
7       A.   Just what are we saying, that peer-review
8  paper where she's saying significant, significant,
9  which is not true.  So she is just trying to put the
10 other people down so she can look good.  That was
11 the theme, and it's not just with me; other
12 physicians, too, in the section.  She made people
13 cry sometimes.
14      Q.   I just want to pick up on something you
15 were saying earlier today about you having spells.
16      A.   Yes.
17      Q.   Did I hear you correctly that sometimes you
18 have spells or had spells between when you parked
19 your car at work and when you got to your work
20 area?
21      A.   Many times.
22           MR. KILROY:  Objection.
23      A.   Many times.  And there were a lot of
24 witnesses, different people come across me, you

427

1    A.  I have no idea but -- I don't know.

2    Q.  Do you have any idea with regard to Answer

3  No. 2 if Dr. Dill shared her peer review with

4  anyone, other than you or Dr. Rosen?

5    A.  No idea.

6    Q.  With regard to any of the documents listed

7  in your response here, Answer No. 8, do you have any

8  idea if Dr. Rosen or anyone else at UMass. shared

9  this with any other people?

10    MR. KILROY:  Objection.  Asked and

11  answered.

12    A.  I don't know.

13    Q.  Dr. Desai, earlier today Mr. Kilroy asked

14  if you could take a vacation day if you were tired.

15  Do you recall that question?

16    A.  Yes.

17    Q.  I believe you said yes, correct?

18    A.  Yes.

19    Q.  Okay.  Did you have to put in for vacation

20  time ahead of when you hoped to take a vacation?

21    A.  Yes.

22    Q.  Can you tell me how that process worked.

23    A.  Because there are a few people in the

24  section you have to give beforehand, so, like,

# **EXHIBIT F**

**From:** Mowlood, Randa <Randa.Mowlood@umassmemorial.org>
**Sent:** Thursday, September 21, 2017 11:55 AM
**To:** Leblanc, Kathleen; Pendergast, Karen
**Subject:** FW: Incident 9/21/17

**From:** Rosen, Max
**Sent:** Thursday, September 21, 2017 11:51 AM
**To:** Mowlood, Randa <Randa.Mowlood@umassmemorial.org>
**Subject:** Fwd: Incident 9/21/17

FYI. Max

Sent from my iPhone

Begin forwarded message:

> **From:** "Dill, Karin" <Karin.Dill@umassmemorial.org>
> **Date:** September 21, 2017 at 10:02:53 AM EDT
> **To:** "Dill, Karin" <Karin.Dill@umassmemorial.org>, "Rosen, Max"
> <Max.Rosen@umassmemorial.org>, "Brennan, Darren"
> <Darren.Brennan@umassmemorial.org>
> **Subject:** Incident 9/21/17
>
> To whom it may concern,
>
> There has been an incident today which I will document below:
>
> At approximately 9:20 AM on 9/21/17, I was sitting at my workstation in the chest reading room when Dr. Desai approached me. She asked if she could speak with me. I said of course. She walked to her office which is around the corner from the reading room. I followed her. There was silence. She open the door to her office and we entered. She said," Sit."
>
> I said,"what's up?"  She said," I want to let you know that I don't appreciate what you've done and I'm very upset." I said,"what have I done?" She said," first of all I'm very mad about Dr. Rosen's email that was sent. " I said I'm confused I'm not sure what you're speaking about. " She said,"I will show you but first I want to let you know that last week you were very rude to me and I don't appreciate it. I let it go but now I need to discuss it. " I said, "When was I rude to you?"  She said," Last week I asked the residents to read out with me but I didn't see you in the room. You were doing your CTAs or whatever and I didn't see you. You were very rude and said to me, no, you have to read out with the residents." I said," this is not at all what happened Charu.  As you know from the division chief meeting July 17, there is a schedule for readouts for the attendings with residents. Every Tuesday I perform CTAs in the morning but the readout is with me Tuesday, Wednesday, and  Thursdays.  I was sitting in my chair when you asked both residents to read out with you."  She said,"But I didn't see you there but you were very rude and said no you have to read out." I said,"Charu I wasn't rude to you and I didn't say it that way.

1

UMM

What I did say after you read out with the first resident and approached the second while I was sitting at my workstation was," let's take turns with attendings and there is a reading schedule on the new updated resident curriculum of reading days..." Before I could finish, she interrupted me and she said,"well I let that slide but now I'm not because I'm very angry about this email in here I'll show you." I said, "What email are you speaking about?" She said," I don't appreciate this treatment." I said,"Charu I don't appreciate that you're yelling at me and by you calling me names like I'm rude. I've never been rude to you. You have been unkind to me and have yelled at me multiple times since I started. She said," I only did that to you once." I said," No, it's been many times and you have been rude to me since I started. "At this point she leaned forward and took her index finger pointing at me and put it close to my face about two or 3 inches from my face, shook it in my face and said some more things that were difficult for me to understand because I was very worried about being hit in the face. I told Dr. Desai " I don't like  you putting your hand in my face like you're going to hit me and you need to stop yelling at me." I said, "This meeting is now over" and stood up.  She said," I have only yelled at you one time." I exited her office. I walked directly to Dr. Rosen's office to report the incident.

Sincerely, Karin Dill

2

UMM 00536

**<u>EXHIBIT G</u>**

| **From:** | Brennan, Darren <Darren.Brennan@umassmemorial.org> |
| **Sent:** | Thursday, September 21, 2017 10:27 AM |
| **To:** | Desai, Charu <Charu.Desai@umassmemorial.org> |
| **Cc:** | Rosen, Max <Max.Rosen@umassmemorial.org> |
| **Subject:** | Incident with Dr Dill today |

Charu

Max is out today so this has come to me today . I have asked Karin for and already received a short written statement of her version of today's incident in your office so now can I ask the same of you? - just what led up to and what your remember for the conversation

Also , my cell is 617-435-5141 : please feel free to call me if you want

DB

UMM-03867

**<u>EXHIBIT H</u>**

**Rosen, Max**

| | |
|---|---|
| **From:** | Brennan, Darren |
| **Sent:** | Thursday, September 21, 2017 1:48 PM |
| **To:** | Rosen, Max |
| **Subject:** | Fwd: Incident today on 9/21/2017 |

**From:** "Desai, Charu" <Charu.Desai@umassmemorial.org>
**Subject:** Incident today on 9/21/2017
**Date:** 21 September 2017 13:46
**To:** "Brennan, Darren" <Darren.Brennan@umassmemorial.org>
**Cc:** "Desai, Charu" <Charu.Desai@umassmemorial.org>

Hi Darren,

Regarding an incident this morning on Thursday, 9/21/2017 at 10AM; I asked Karin to speak with me in my office today. She did come to my office and we spoke. The conversation lasted approximately two minutes. I told her that I did not appreciate that she was rude a couple of days ago; Dr. Dill said "I want to sign out the resident".

Dr. Dill stated that I have been rude to her as well. I was stating with my index finger that it was only once. I definitely was not rude but Dr. Dill believed that I was (this was at a monthly chest division meeting and Dr. Sena was there as well). Dr. Dill became angry and walked out of my office.

Thank you for your time and have a good day.

Charu

1



Charu Desai, MD
Exhibit_38
10/22/2020

# **EXHIBIT I**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| CHARU DESAI, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | **4:19-CV-10520-DHH** |
| UMASS MEMORIAL MEDICAL CENTER, | ) | |
| INC.; UMASS MEMORIAL MEDICAL | ) | |
| GROUP; UNIVERSITY OF | ) | |
| MASSACHUSETTS MEDICAL SCHOOL, | ) | |
| UMASS MEMORIAL MARLBOROUGH | ) | |
| HOSPITAL, MAX ROSEN, M.D., DARREN | ) | |
| BRENNAN, M.D., STEPHEN TOSI, M.D., | ) | |
| And KARIN DILL, M.D., | ) | |
| | ) | |
| Defendants | ) | |

## PLAINTIFF CHARU DESAI'S ANSWERS TO DEFENDANT UMASS MEMORIAL MEDICAL CENTER, INC.'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Charu Desai, M.D., ("Plaintiff" or "Dr. Desai"), hereby submits the following answers and objections to Defendant UMass Memorial Medical Center, Inc.'s ("Medical Center") First Set of Interrogatories.

The following responses are made without waiver of, and with preservation of (a) all applicable rights and privileges; (b) all objections as to competency, relevancy, materiality, privilege, and admissibility of each response and the documents referred to therein; (c) the right to object on any grounds at any time to any demand or request or further documents or other discovery proceeding involving or relating thereto; and (d) the right at any time to revise, supplement, amend or clarify any of the responses made herein, whether at the conclusion of the discovery or otherwise.

These answers are based on Plaintiff's present knowledge, information, and belief. Plaintiff reserves the right to supplement, amend or otherwise change these answers in the event that discovery reveals facts that would justify such supplementation, amendment or change. Each Interrogatory is responded to subject to the general objections set forth below.

Plaintiff answers Defendant UMass Memorial's First Set of Interrogatories as follows:

1

**INTERROGATORY NO. 7**

Identify each co-worker whom you claim was paid more than you based on gender and state the basis for your claim, including the dates by which such co-worker was paid more than you based on gender and the amounts you claim he or she was paid more than you based on gender.

**ANSWER NO. 7**

Dr. Desai refers to and incorporates in her answer the facts set forth in her Amended Complaint in this action, her Charges of Discrimination filed with the Massachusetts Commission Against Discrimination ("MCAD"), and Plaintiff's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1).  Dr. Desai further answers as follows:

1. Dr. Aaron Harman
   Medical Center, 55 Lake Avenue North, Worcester, MA 01655, (508) 334-1000.
   Dr. Harman was hired in or about July 2017. Upon information and belief, at his hire Dr. Harman was paid a salary of approximately $365,000.  Despite Dr. Desai's greater experience, the Medical Group and Medical Center paid Dr. Desai only $340,000 per year.

Dr. Desai has requested salary information from defendants regarding the pay of her male colleagues in radiology from Defendants. Dr. Desai expressly observes her right to supplement this answer as discovery is ongoing.

**INTERROGATORY NO. 8**

Identify each verbal or written statement you claim is defamatory, including without limitation, identifying the individual you claim made the alleged defamatory statement.

**ANSWER NO. 8**

Dr. Desai refers to and incorporates in her answer the facts set forth in her Amended Complaint in this action, her Charges of Discrimination filed with the Massachusetts Commission Against Discrimination ("MCAD"), and Plaintiff's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1).  Dr. Desai further answers as follows:

1. 2017-2018 Faculty Annual Performance Review of C. Desai by M. Rosen; the document speaks for itself; a copy of this document has been produced.

2. July 1, 2016 – June 30, 2017 Peer Review of Dr. Desai by K. Dill; the document speaks for itself; a copy of this document has been produced.

3. April 17, 2018 Letter from M. Rosen to C. Desai; the document speaks for itself; a copy of this document has been produced.

4.  April 17, 2018 3:58 PM Email from M. Rosen to C. Desai re: March 14th, 2018 Meeting; the document speaks for itself; a copy of this document has been produced.

5.  April 18, 2018 5:12 PM Email from M. Rosen to C. Desai re: Meeting to Review QA data; the email speaks for itself; a copy of the communication has been produced.

6.  March 9, 2018 Letter from M. Rosen and S. Tosi to C. Desai re: Notice of Termination of Employment

7.  April 24, 2018 Meeting between Dr. Rosen and Dr. Desai, also attended by Dr. Sarwat Hussain.  At this meeting, Dr. Rosen stated and projected on a screen false statements that Dr. Desai had performance issues and had committed major misreads of radiology films.

8.  September – December 2017, Quality Assurance Review by D. Litmanovich and accompanying documents; the documents speak for themselves; Defendants have produced some documents related to this review.  Plaintiff has requested further documents in Defendants' possession, custody, and control concerning this review.

9.  Defendants' suspension of Dr. Desai's performance of duties and responsibilities, known to all in the radiology department and to numerous others throughout the hospital, constitutes defamation by deed.  Defendants' termination of Dr. Desai, known to all in the radiology department and to numerous others throughout the hospital, also constitutes defamation by deed.

Dr. Desai expressly observes her right to supplement this answer as discovery is ongoing.

**INTERROGATORY NO. 9**

Please describe in detail every request for an accommodation related to a disability you may have that you made to UMass Memorial from January 1, 2000, through the end of your employment, and provide the date each request was made, identify the person to whom each request was made, identify all communications related to each request, and state whether each requested accommodation was granted.

**ANSWER NO. 9**

Dr. Desai refers to and incorporates in her answer the facts set forth in her Amended Complaint in this action, her Charges of Discrimination filed with the Massachusetts Commission Against Discrimination ("MCAD"), and Plaintiff's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1).  Dr. Desai further answers as follows:

In or about May 2016, Dr. Desai complained to Dr. Rosen about his disparate allotment of academic days compared to her younger and/or non-disabled colleagues.  Dr. Desai requested that she be granted the same number of academic days as her younger and/or non-disabled colleagues as an accommodation for her heart condition.  See May 13, 2016 3:15 PM Email from

Signed under the penalties of perjury, this 5th day of June, 2020.


/s/ Charu Desai
CHARU DESAI


AS TO OBJECTIONS:

CHARU DESAI
By her attorneys,


/s/ Patricia A. Washienko
PATRICIA A. WASHIENKO (BBO 641615)
pwashienko@fwlawboston.com
BRENDAN T. SWEENEY (BBO 703992)
bsweeney@fwlawboston.com
FREIBERGER & WASHIENKO, LLC
211 Congress Street, Suite 720
Boston, Massachusetts 02110
Telephone:  617-723-0008
Fax:  617-723-0009

Dated: June 5, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2020 Plaintiff Charu Desai's Answers To Defendant UMass Memorial Medical Center Inc.'s First Set Of Interrogatories was served by electronic mail only to counsel for the above named Defendants:

Robert L. Kilroy, Esq.
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
(508) 860-1477
rkilroy@mirickoconnell.com

Mark Johnson, Esq.
University of Massachusetts Office of the General Counsel
333 South Street, 4th Floor
Shrewsbury, MA 01545
(617) 287-4064
MAJohnson@umassp.edu

/s/ Patricia A. Washienko
Patricia A. Washienko