UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| CHARU DESAI, | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 4:19-cv-10520-TSH |
| | ) |
| UNIVERSITY OF MASSACHUSETTS, | ) |
| MEMORIAL MEDICAL CENTER, INC. | ) |
| UNIVERSITY OF MASSACHUSETTS | ) |
| MEMORIAL MEDICAL GROUP, | ) |
| UNIVERSITY OF MASSACHUSETTS | ) |
| MEDICAL SCHOOL, UMASS | ) |
| MEMORIAL HOSPITAL, MAX ROSEN, | ) |
| M.D., DARREN BRENNAN, M.D., | ) |
| STEPHEN TOSI, M.D., KARIN DILL, | ) |
| M.D., | ) |
| Defendants. | ) |

_____)

**MEMORANDUM IN SUPPORT OF UNIVERSITY OF MASSACHUSETTS CHAN
MEDICAL SCHOOL'S MOTION FOR SUMMARY JUDGMENT AND FOR
DISMISSAL OF CERTAIN CLAIMS IN ACCORD WITH RULE 12(B)(1)**

The University of Massachusetts Chan Medical School ("Medical School")[1]

moves for Rule 12(b)(1) dismissal of three of plaintiff Dr. Charu Desai's remaining

claims:  The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 (Count 3); the

Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1) (Count 4);

M.G.L. c. 151B, § 4 (age, disability, and gender) (Count 5).  This Court lacks subject

_____

[1] The Medical School's name changed to the University of Massachusetts Chan Medical School effective
September 7, 2021.

matter jurisdiction as to Counts 3, 4 and 5 because the Medical School is a public entity entitled to Eleventh Amendment immunity.[2]

The Medical School contemporaneously seeks Fed. R. Civ. P. 56 summary judgment in its favor on Dr. Desai's other three remaining claims because the Medical School did not establish or administer any of the policies and/or make any of the decisions on which Dr. Desai bases these claims:  Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-1 et seq. (gender) (Count 1); the Federal Equal Pay Act ("FEPA"), 29 U.S.C. §§ 206(d), 216 (Count 2); and the Massachusetts Equal Pay Act ("MEPA"), M.G.L. c. 149, § 105A (Count 6).

## I.     Summary of Undisputed Material Facts.

Dr. Desai is a woman and a physician who is board-certified in diagnostic radiology.  Statement of Material Facts ("SMF"), ¶ 2.  She had an employment agreement ("Agreement") with defendant UMass Memorial Medical Group ("Medical Group").  SMF, ¶ 3.  The Agreement and the policies and practices of the Medical Group governed the terms of Dr. Desai's Medical Group employment.  SMF, ¶ 4.

The Medical School is a distinct entity from the Medical Group and the other institutional defendants – UMass Memorial Medical Center, Inc. ("Medical Center") and UMass Memorial Marlborough Hospital (collectively the "Memorial entities").  SMF, ¶

---

[2] In the L.R. 7.1(a)(2) conferral process, Dr. Desai's counsel indicated that Dr. Desai will not oppose the Medical School's sovereign immunity arguments as to the ADA, ADEA, and c. 151B claims.  See L.R. 7.1 Certification in accompanying Motion, p. 2.

1.  The Medical School is one of five campuses of the University of Massachusetts; the Memorial entities are all affiliated organizations under UMass Memorial Health Care ("UMMHC"), a private not-for-profit health care provider.  Id.  Dr. Desai also had a "Dual Employment" arrangement with the Medical School, pursuant to which she had a non-tenured faculty appointment at the Medical School that was governed by the Medical School's Academic Personnel Policy ("APP").  SMF, ¶ 5.

The Memorial entities had an Academic and Administrative Time Policy ("Policy"), which allowed qualifying physicians to take time away from their clinical duties to focus on scholarly or administrative pursuits.  SMF, ¶¶ 7-8.  The Medical School did not establish or administer the Policy.  SMF, ¶ 8.  In any event, Dr. Desai did not serve in a qualifying administrative role and was on a clinical track, not an academic track, and did not prioritize scholarly work.  SMF, ¶¶ 9-10.  She never submitted proposals to describe how she would use the academic time she wished to take and wanted to use academic days to take time off and recuperate, not to pursue academic activities.  SMF, ¶¶ 12-13.  Indeed, Dr. Desai admits that she did not qualify for academic time under terms of the Policy.[3]  SMF, ¶ 11.

Nevertheless, on May 25, 2017, in a meeting with Dr. Max Rosen – the Chair of the Department of Radiology at the Medical Center and the Medical School – Dr. Desai

---

[3] Dr. Rosen did grant academic time to other female radiologists in the Department.  SMF, ¶ 14.

claimed that she was being subjected to discrimination in relation to not being granted academic time.[4]  SMF, ¶ 15.  She filed her Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC") more than 300 days later, on May 4, 2018.  SMF, ¶ 17.

The Medical Group also had exclusive authority to set Dr. Desai's total salary.[5] SMF, ¶ 18.  Accordingly, when, in late 2016 and early 2017, salary levels in the Department were reviewed and certain radiologists, including Dr. Desai, had their salaries increased, this process was conducted by the Medical Group.[6]  SMF, ¶ 20.  Dr. Desai testified in her deposition that she is not claiming that the Medical School violated FEPA.  SMF, ¶ 24.

---

[4] Approximately one year earlier, in May 2016, Dr. Desai had also made complaints to Dr. Rosen regarding alleged discrimination in not awarding her academic time.  SMF, ¶ 16.

[5] Up until several months before the end of Dr. Desai's employment, 20% of the salary set by the Medical Group was paid by the Medical School, but that expense was ultimately transferred and charged back to the Medical Group: this was an organizational practice at the time and not specific to Dr. Desai. SMF, ¶ 19.

[6] Dr. Desai admits that, in conducting this process, the Medical Group acted reasonably and in good faith and made reasonable progress in eliminating pay differences and that the adjusted pay structure was not discriminatory in any way.  SMF, ¶¶ 21-23.  Nevertheless, in the amended complaint (Ex. 2, Dkt. 23, ¶¶ 32, 78, 99), she claims that Dr. Aaron Harman was paid more than her for substantially equal and/or comparable work.  However, Dr. Harman is an interventional radiologist, which is a different specialty than diagnostic radiology.  SMF, ¶¶ 25-26.  Interventional radiological procedures require the physician to invade the body; diagnostic procedures do not involve invading the body.  SMF, ¶ 27.  As of September 2020, Dr. Desai had not performed any interventional radiological procedures for approximately 15 years.  SMF, ¶ 28.  Dr. Desai acknowledges that interventional radiologists are generally paid more than general radiologists and chest radiologists.  SMF, ¶ 29.

4

In or around 2016 and early 2017, Dr. Rosen became aware of complaints about the quality Dr. Desai's radiological reads that were made directly by Dr. Kimberly Robinson of Marlborough Hospital and the Chief of Dr. Desai's Division, Dr. Karin Dill, as well as other such complaints that were made to Dr. Dill.[7]  SMF, ¶ 33.  Based on these complaints, Dr. Rosen arranged for an independent, blind review of the quality of 50 radiological reads - 25 of which had been performed by Dr. Desai and 25 of which had been performed by other radiologists in the Department.  SMF, ¶ 34.

Dr. Desai admits that Dr. Rosen did not make up his concerns about the quality of her work, had an obligation to ensure patient safety and the quality of radiological reads, and should act when he thinks a radiologist's work is substandard.  SMF, ¶¶ 35-37.  She also admits that an independent review is one way to assess quality in a manner that is not discriminatory, that Dr. Rosen was trying to remove himself from the process, and that the decision to have the review conducted (and the selection of Dr. Litmanovich to conduct the review) had nothing to do with discrimination and specifically nothing to do with the fact that Dr. Desai is a woman.  SMF, ¶¶ 38-41.

Dr. Desai admits that Dr. Litmanovich did not discriminate against her in conducting the independent review, that Dr. Litmanovich identified five major and five

---

[7] Dr. Karin Dill was hired as Division Chief of the Cardiovascular and Thoracic Imaging Division – Dr. Desai's Division– no later than March 2016.  SMF, ¶ 30.  Dr. Desai claims that this decision was discriminatory, but she is not claiming that the Medical School made that decision.  SMF, ¶ 31.

minor errors in her 25 cases, compared to one major and seven minor errors in the 25 other randomly selected cases, and that these findings were not discriminatory.  SMF, ¶¶ 42-44.  She also admits that Dr. Rosen relied upon the independent review, acted fairly and appropriately in doing so instead of making the determination himself, and should not have ignored the results of the independent review.  SMF, ¶¶ 45-47.

Dr. Rosen makes decisions about terminations in conjunction with the Medical Group's lawyers.  SMF, ¶ 32.  Both Dr. Desai's Agreement with the Medical Group and the Medical School's APP provided that the termination of the Agreement by the Medical Group would also end Dr. Desai's faculty appointment at the Medical School.  SMF, ¶ 49.  In a meeting on March 14, 2018, Dr. Rosen notified Dr. Desai that, due to concerns about the quality of her clinical work and the results of the independent review, her employment with the Medical Group and the Medical School would be ending effective March 17, 2019, and he handed her a letter to that effect.  SMF, ¶ 48.

The Medical School's APP has a provision that allows for the direct termination of only the faculty appointment of non-tenured "UMMHC-Employed" faculty members "Not For Cause" with at least 30 days written notice.  SMF, ¶ 50.  Yet, here, Dr. Desai was terminated with 12 months of notice based on her years of service in accord with terms of the Agreement with the Medical Group, and she kept her faculty appointment for that 12-month period.  SMF, ¶¶ 51-52.  Dr. Desai admits that Dr. Rosen terminated her based on an assessment of the quality of her reads as substandard.  SMF, ¶ 53.  She

6

also acknowledges that her termination had nothing to do with her duties at the

Medical School and that she understood this when she was notified of her termination

in March 2018.  SMF, ¶ 54.

## II.   The Court Lacks Subject Matter Jurisdiction as to the Claims Against the Medical School in Counts 3-5.

The Eleventh Amendment poses a jurisdictional bar to several of Dr. Desai's

claims against the Medical School.  Rule 12(b)(1) is "[t]he proper vehicle for challenging

a court's subject-matter jurisdiction," including on the basis of sovereign immunity.[8]

Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362 (1st Cir. 2001).  Dr. Desai has the burden

of establishing that the Court has subject matter jurisdiction.  See Lujan v. Defenders of

Wildlife, 504 U.S. 555, 561 (1992).  The standard of review is similar to the one used to

assess Rule 12(b)(6) motions, see Murphy v. United States, 45 F.3d 520, 522 (1st Cir.

1995), and thus courts "may dismiss a complaint only if it is clear that no relief could be

granted under any set of facts that could be proved consistent with the

allegations." Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61, 66 (1st

Cir. 2004), citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

This Court and the First Circuit have both recognized that the Medical School

and the Memorial entities have been distinct entities for more than 20 years.  See U.S. v.

---

[8] The motion may be raised at any time during the litigation.  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99, 104 n.8 (1984).  The Medical School reserved its right to file a Rule 12(b)(1) motion in the Memorandum in Support of its Motion to Dismiss.  Dkt. 26, p. 2 n.1.

Univ. of Mass., Worcester, 80 F. Supp. 3d 296, 301 n.5 (D. Mass. 2015) ("In 1997, the

Massachusetts Legislature 'separate[d] the operations, assets, liabilities and obligations

of the existing clinical division' of the [Medical School], known as UMass Medical

Center, thereby privatizing the clinical division so that it could 'operate as a self-

supporting entity.'"), quoting 1997 Mass. Acts Ch. 163 § 1(i); U.S. v. Univ. of Mass.,

Worcester, 812 F.3d 35, 42 (1st Cir. 2016).  See also SMF, ¶ 1.  The Medical School is a

public entity and one of the five campuses of the University of Massachusetts

educational system.  M.G.L. c. 75, § 1 et seq.; SMF, ¶ 1.  The First Circuit has held that

the University of Massachusetts, specifically including the Medical School, is an arm of

the state entitled to Eleventh Amendment immunity.  See U.S. v. Univ. of Mass.,

Worcester, 812 F.3d at 39-43.  See also McNamara v. Honeyman, 406 Mass. 43, 47 (1989).

Congress may abrogate sovereign immunity through "appropriate legislation."

Va. Off. for Prot. & Advocacy v. Stewart, 563 U.S. 247, 254 (2011).  In addition, "a State

may waive its sovereign immunity by consenting to suit." Coll. Sav. Bank v. Fla.

Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999)  However, neither of

those two exceptions applies to the following claims in this case:

**ADA (Count 3)**:  Count 3 references Title II of the ADA, 42 U.S.C. § 12132, but

employment claims against public entities must be brought under Title I of ADA.  See

Murphy v. Mass. – Exec. Off. of the Trial Court, 335 F. Supp. 3d 137, 145-46 (D. Mass.

2018) and cases cited (following the majority of Circuits that have considered the issue

and concluding that "Title II unambiguously does not cover employment discrimination").  Title I prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The Supreme Court has held that "Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I [of the ADA]."  Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 374 n.9 (2001).  See also Murphy, 335 F. Supp. 3d at 145; Cross v. Mass., 2019 WL 1936735, at *3 (D. Mass. May 1, 2019).

**ADEA (Count 4)**:  The ADEA makes it unlawful for an employer "to fail or refuse to hire . . . any individual or otherwise discriminate against any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  Here, again, the Supreme Court has held that, in passing the statute, Congress "[did] not validly abrogate the States' sovereign immunity."  Kimel v. Florida Bd. of Regents, 528 U.S. 62, 92 (2000). See also Nordberg v. Mass. Teachers' Ret. Sys., 2020 WL 7974329, at *2 (D. Mass. Nov. 30, 2020) (slip op.).

**M.G.L. c. 151B, § 4 (Count 5)**:  The Eleventh Amendment prohibits federal courts from hearing claims against states under state law unless the law contains a provision specifically authorizing such claims to proceed in federal court.  See Nordberg, 2020 WL 7974329, at *2.  Chapter 151B does not contain such a provision, and thus the Eleventh

9

Amendment bars Dr. Desai's c. 151B, § 4 claims against the Medical School.  See Lopez

v. Mass., 588 F.3d 69, 73 n.1 (1st Cir. 2009), citing Pennhurst State Sch., 465 U.S. at 121.

See also Murphy, 335 F. Supp. 3d at 144; Cross, 2019 WL 1936735, at *3; Nordberg, 2020

WL 7974329, at *2.

  In addition to these claims that are jurisdictionally barred, Dr. Desai has also

voluntary dismissed her claims for discrimination based on race and national origin

against all defendants (Dkt. 58).  Thus, as against the Medical School, her three

remaining claims, for alleged violations of Title VII, FEPA, and MEPA, involve only

gender-based allegations.  None of these claims has a legal basis.

  **III.**  **Summary Judgment Standard of Review.**

  "Summary judgment is appropriate when there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law . . .."

Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008).  "A fact is material if it has

the potential of determining the outcome of the litigation."  Maymi v. P.R. Ports Auth.,

515 F.3d 20, 25 (1st Cir. 2008).  "To defeat a motion for summary judgment, evidence

offered by the non-movant must be significantly probative of specific facts."  Prescott v.

Higgins, 538 F.3d 32, 40 (1st Cir. 2008) (citation and quotation marks omitted).  "Once the

moving party avers the absence of genuine issues of material fact, the nonmovant must

show that a factual dispute does exist . . .."  Ingram v. Brink's, Inc., 414 F.3d 222, 228-29

(1st Cir. 2005).  "Even in employment discrimination cases where elusive concepts such

as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  Ray v. Ropes & Gray LLP, 799 F.3d 99, 116–17 (1st Cir. 2015).

## IV.    Summary Judgment is Appropriate as to Counts 1, 2, and 6.

The amended complaint (Ex. 2, Dkt. 23) contains few references to the Medical School, and the Medical School responded to it by filing a Rule 12(b)(6) motion to dismiss (Dkt. 25-26).  The Court denied the motion as to, inter alia, the Title VII, FEPA, and MEPA claims and identified, as possible areas of entitlement to relief, the application of the Academic and Administrative Time Policy ("Academic Time Policy" or "Policy"), Dr. Desai's salary compared to certain colleagues, and the termination of Dr. Desai's employment.  Dkt. 31, pp. 5-6.  However, discovery has established that the Medical School had no connection to these policies and decisions, and, even assuming that it did, the claims have no basis.

### A.  The Medical School Did Not Establish or Administer the Academic Time Policy, Dr. Desai Did Not Qualify Under the Terms of the Policy, and Any Such Claims Are Time-Barred.

Where, as in this context, there is no direct evidence of gender discrimination, courts use the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Lockridge v. Univ. of Maine Sys., 597 F.3d 464, 470 (1st Cir. 2010).  In the first step, a plaintiff has the burden of proving a prima facie case of discrimination.  See McDonnell Douglas, 411 U.S. at 802.  If the plaintiff does so,

the burden of production shifts to the defendant to rebut the presumption of

discrimination by identifying a legitimate, non-discriminatory reason for the adverse

action.  See id.  Finally, if the defendant meets its burden, "the McDonnell

Douglas framework 'disappears' and the sole remaining issue is 'discrimination vel

non.'"  Cham v. Station Operators, Inc., 685 F.3d 87, 93 (1st Cir. 2012), quoting Reeves v.

Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142–43 (2000).

Dr. Desai cannot establish a prima face case regarding the Academic Time Policy

because the Medical School did not take any adverse action against her with respect to

the Policy, which is exclusively established and administered by the Memorial entities,

not by the Medical School.  SMF, ¶ 8.  In any event, Dr. Desai admits that she did not

qualify under the terms of the Policy.  SMF, ¶ 11.  Dr. Desai did not serve in a qualifying

administrative role, and she was on a clinical track, not an academic track, and did not

prioritize scholarly work.  SMF, ¶¶ 9-10.  Indeed, she never submitted proposals to

substantiate how she would use academic time precisely because she wanted to use it to

take time off and recuperate, not to pursue academic activities.  SMF, ¶¶ 12-13.

Finally, any such claims are time-barred.  "To bring a civil action for employment

discrimination pursuant to Title VII, an employee must first file a 'charge' with either:

(1) [EEOC] within 180 days of the alleged unlawful employment practice; or (2) a

parallel state agency—in this case, MCAD—within 300 days of said practice."  Aly v.

Mohegan Council, Boy Scouts of Am., 711 F.3d 34, 41 (1st Cir. 2013), citing 42 U.S.C. §

2000e–5(e)(1); M.G.L. c. 151B, § 5; Jorge v. Rumsfeld, 404 F.3d 556, 564 (1st Cir. 2005).

Here, Dr. Desai did not file her Charge against the Medical School with the MCAD and

EEOC until May 4, 2018.  SMF, ¶ 17.  Yet, well over 300 days earlier, on May 25, 2017,

Dr. Desai claimed that she was being subjected to discrimination in relation to not being

granted academic time.[9]  SMF, ¶ 15.  Plainly, as of that date, Dr. Desai had specifically

concluded that the application of the Policy was discriminatory, and her claims related

to that issue are therefore untimely.

### B.  The Medical School Did Not Set Dr. Desai's Salary.

Dr. Desai alleges that the Medical School violated FEPA, MEPA, and Title VII in

relation to her wages.  FEPA prohibits wage discrimination "between employees on the

basis of sex . . . for equal work on jobs the performance of which requires equal skill,

effort, and responsibility, and which are performed under similar working conditions,"

unless certain affirmative defenses apply.  29 U.S.C. § 206(d)(1).  The prima facie

showing requires a plaintiff to prove "that the employer paid different wages to specific

employees of different sexes for jobs performed under similar working conditions and

requiring equal skill, effort and responsibility."  Ingram, 414 F.3d at 232, citing Corning

---

[9] Dr. Desai also made similar complaints to Dr. Rosen approximately one year earlier, in May 2016, although she did not reference gender as a basis for the allegations of discrimination.  SMF, ¶ 16 (in particular Ex. 9, Dr. Desai's Ans. to Medical Center's Int. Nos. 4, 9, which reference only age and disability in regard to this meeting).  Notably, the amended complaint also does not reference gender in this context. Ex. 2, ¶¶ 34, 36, 75 (Dkt. 23).  Thus, it is not even clear that Dr. Desai is making a gender-based claim regarding the Policy.  In any event, Dr. Rosen did grant academic time to other female radiologists in the Department.  SMF, ¶ 14.

Glass Works v. Brennan, 417 U.S. 188, 195 (1974).  MEPA prohibits gender-based wage discrimination related to "comparable work," which it defines as work that is "substantially similar in that it requires substantially similar skill, effort and responsibility and is performed under similar working conditions."  M.G.L. c. 149, § 105A(a) & (b).  The two steps for determining whether work is comparable under MEPA are (1) "whether the substantive content of the jobs is comparable, that is, whether the duties of the jobs have 'important common characteristics,'" Jancey v. Sch. Comm. of Everett, 421 Mass. 482, 489 (1995), quoting Bureau of Labor & Indus. v. Roseburg, 75 Or. App. 306, 309 n. 2 (1985) and (2) "whether the two positions entail comparable skill, effort, responsibility, and working conditions."  Id. at 490.  Both questions must be answered affirmatively for the equal pay requirement to apply.  Id.

Here, Dr. Desai cannot make out a prima facie case against the Medical School under either equal pay statute first and foremost because the Medical School played no role in determining her total salary amount; the Memorial Group had exclusive authority to set her salary.  SMF, ¶ 18.  Indeed, Dr. Rosen confirmed in his deposition that salaries are set in conjunction with Medical Group's finance team and administration, and raises that he suggests must be approved by the Medical Group.  Id.  Accordingly, when, in late 2016 and early 2017, salary levels in the Department were reviewed and certain radiologists, including Dr. Desai, had their salaries increased, this process was conducted by the Medical Group.  SMF, ¶ 20.  While, at certain times, the Medical School paid 20%

of Dr. Desai's total salary as part of an organizational practice that was not specific to Dr.

Desai (an expense that was ultimately charged back to the Medical Group) (SMF, ¶ 19),

again, it did not set and had no authority to set Dr. Desai's total salary amount.  Dr. Desai

confirmed her understanding of this in her deposition when she testified that she is <u>not</u>

claiming that the Medical School violated FEPA.[10]  SMF, ¶ 24.

## C. Dr. Desai's Termination Had Nothing To Do With Her Medical School Duties, and She Only Lost Her Faculty Appointment Because Her Employment with the Medical Group Was Terminated.

"[A] prima facie [gender discrimination] case requires the plaintiff to show that

(1) she is a member of a protected class, (2) she met her employer's expectations, (3) her

---

[10] Dr. Desai's testimony on this point generally concerned the FEPA claim in Count 2, but it can be reasonably assumed that the rationale for her answer applies with equal force to the MEPA claim.  In any event, even if the Medical School could be held liable for salary decisions that it did not make, Dr. Desai admits that the pay structure that went into effect as a result of the Medical Group's review and adjustment of salaries in 2016-17 was not discriminatory in any way.  SMF, ¶ 23.  Moreover, the one male comparator Dr. Desai cites in the amended complaint – Dr. Aaron Harman – was not performing substantially equal or comparable work.  Dr. Harman practices interventional radiology, which is a different specialty than diagnostic radiology, and interventional radiologists are generally paid more than diagnostic radiologists.  <u>See</u>, <u>supra</u>, p. 4 n.6.

   As the Medical Group is better positioned to address more detailed comparisons of salaries that it set, the Medical School will defer to the Medical Group and rely upon and incorporate the Medical Group's positions in support of its own motion for summary judgment on this issue.  As a final general point, however, Medical School notes that MEPA provides a complete affirmative defense to an employer "who, within the previous 3 years and prior to the commencement of the action, has both completed a self-evaluation of its pay practices in good faith and can demonstrate that reasonable progress has been made towards eliminating wage differentials based on gender for comparable work, if any, in accordance with that evaluation."  M.G.L. c. 149, § 105A(d).  As supported above, the Medical Group undertook just such an evaluation in August 2016, completed it in early 2017, and Dr. Desai specifically admits that, in conducting the salary review and adjusting salaries, including hers, the Medical Group acted reasonably and in good faith and made reasonable progress in eliminating pay differences.  SMF, ¶¶ 20-23.  Dr. Desai filed her original complaint in this case less than three years later, on March 19, 2019.  Dkt. 1.

employer took an adverse action against her, and (4) her employer sought a replacement with similar qualifications or other similarly situated to her in all relevant respects were treated differently by the employer." Gunter v. Shapley & Stern, Inc., 2021 WL 1723849, at *5 (D. Mass. Apr. 30, 2021) (slip op.), citing Ray, 799 F.3d at 113. Dr. Desai is a woman, but several factors make it impossible for her prove the other elements of a prima facie case.

First and foremost, Dr. Desai testified unequivocally that her termination had nothing to do with her duties at the Medical School and that she understood this when she was notified about her termination in March 2018. SMF, ¶ 54. Indeed, the undisputed reasons for the termination concerned Dr. Desai's clinical work for the Memorial entities, particularly the quality of her radiological reads. SMF, ¶¶ 33-48. Dr. Rosen also testified that he is responsible for making decisions about terminations in conjunction with the Medical Group's lawyers. SMF, ¶ 32. Moreover, both Dr. Desai's employment agreement ("Agreement") with the Medical Group and the Medical School's Academic Personnel Policy ("APP") provided that the termination of the Agreement by the Medical Group would also end Dr. Desai's faculty appointment at the Medical School, and that is exactly what occurred here. SMF, ¶ 49. The APP has a separate provision that allows for the direct termination of only the faculty appointment with at least 30 days written notice. SMF, ¶ 50. Thus, if Dr. Rosen had been intent on ending Dr. Desai's faculty appointment as quickly as possible because of anything

related to her Medical School duties, he could have ensured that it ended 30 days after March 14, 2008 (even as her employment with the Medical Group continued for the required 12 months).  Instead, Dr. Desai kept her faculty appointment for those 12 months, and it ended "coterminously" with her Medical Group employment in accord with the APP and Agreement provisions that govern situations in which the termination is based solely on employment with the Medical Group.[11]  SMF, ¶¶ 50-52.

Even assuming arguendo that Dr. Desai could make out a prima facie case, there were legitimate, non-discriminatory reasons for Dr. Desai's termination.  It is undisputed that there were complaints about the quality of Dr. Desai's clinical work, that those complaints led Dr. Rosen to commission the blind, independent review, that Dr. Litmanovich concluded that Dr. Desai's reads were of lower quality than the reads of the other radiologists who were included in the review, and that Dr. Rosen relied upon the review in deciding to terminate Dr. Desai.

Dr. Desai cannot, in turn, prove that those reasons were pretext for gender discrimination.  Here, "[a plaintiff] must 'show by a preponderance of the evidence that [the defendant's] proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory.'"  Theidon v. Harvard Univ., 948 F.3d 477, 496 (1st Cir. 2020), quoting Johnson v. Univ. of P.R., 714 F.3d 48, 54 (1st Cir. 2013).

---

[11] In addition, the fact that there were complaints about Dr. Desai's clinical work, together with the results of the independent review, undermines any notion that Dr. Desai was meeting employer expectations.

A plaintiff "must offer 'some minimally sufficient evidence, direct or indirect, both of pretext and of [the defendant's] discriminatory animus.'"  Pearson v. Mass. Bay Transp. Auth., 723 F.3d 36, 40 (1st Cir. 2013), quoting Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 140 (1st Cir. 2012).

Dr. Desai's numerous admissions about the concerns about the quality of her work and about the independent review preclude a finding of pretext.  Specifically, Dr. Desai admits that Dr. Rosen did not make up his concerns about the quality of her work, had an obligation to ensure patient safety and the quality of radiological reads, and should act when he thinks a radiologist's work is substandard.  SMF, ¶¶ 35-37.  She also admits that an independent review is one way to assess quality in a manner that is not discriminatory, that Dr. Rosen was trying to remove himself from the process, and that the decision to have the review conducted (and the selection of Dr. Litmanovich) had nothing to do with discrimination and, specifically, nothing to do with the fact that Dr. Desai is a woman.  SMF, ¶¶ 38-41.  Dr. Desai admits that Dr. Litmanovich did not discriminate against her in conducting the independent review, that Dr. Litmanovich identified five major and five minor errors in her 25 cases, compared to one major and seven minor errors in the 25 other randomly selected cases, and that these findings were not discriminatory.  SMF, ¶¶ 42-44.  She also admits that Dr. Rosen relied upon the independent review, acted fairly and appropriately in doing so instead of making the determination himself, and should not have ignored the results.  SMF, ¶¶ 45-47.

Dr. Desai's counsel has indicated, albeit informally and not in the pleadings, that Dr. Desai intends to assert that her Title VII gender claim is based on an allegation that the composition of the Division Chiefs with the Department of Radiology was heavily male and thus indicative of gender bias.  It is unclear which time period Dr. Desai intends to cite in this context, but, in any event, the composition of Division Chiefs at any given time when Dr. Desai was employed was known by her or easily knowable, but, again, she did not make this allegation in pleadings, nor has she moved to amend her complaint to include the allegation.[12]  Even assuming this theory would be appropriate to raise at this juncture, there is no basis for it.  First, statistical evidence such as this has less probative value in disparate treatment cases, because "the issue is less whether a pattern of discrimination existed and more how a particular individual was treated, and why."  Cumpiano v. Banco Santander P.R., 902 F.2d 148, 156 (1st Cir. 1990).  Accordingly, "statistical evidence in a disparate treatment case, in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 848 (1st Cir. 1993), citing Walther v. Lone Star Gas Co., 977 F.2d 161, 162 (5th Cir. 1992).

---

[12] "Plaintiffs may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment.'"  Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 76 (1st Cir. 2016), quoting Calvi v. Knox Cty., 470 F.3d 422, 431 (1st Cir. 2006).  "Rather, the appropriate method by which to advance a new claim that arises out of discovery is to amend the complaint, as provided for under Fed. R. Civ. P. 15(a)."  Ellis. v. N. Andover Pub. Sch., --- F.Supp.3d ----, 2021 WL 5040330, *3 (D. Mass. Oct. 29, 2021), citing Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jimenez, 659 F.3d 42, 53 (1st Cir. 2011).

Second, and perhaps more significantly, the only reference to Division Chiefs in the

Amended Complaint concerns the hiring of Dr. Karin Dill, a woman, in that role <u>in Dr.

Desai's own Division</u>.[13]  Ex. 2, ¶¶ 13, 29, 75; <u>see also</u> SMF, ¶ 30.  That Dr. Rosen hired a

woman to lead Dr. Desai's own division is vastly more probative than the overall

gender composition of Division Chiefs.

V.       <u>**Conclusion.**</u>

For the foregoing reasons, the Medical School respectfully requests that this

Court dismiss the claims in Counts 3, 4, and 5 in accord with Rule 12(b)(1) and enter

summary judgment on the claims in Counts 1, 2, and 6 in accord with Rule 56.


Dated:          December 17, 2021

UNIVERSITY OF MASSACHUSETTS
CHAN MEDICAL SCHOOL
By its attorney,

 /s/ Mark A. Johnson
Denise Barton, BBO No. 675245
Chief Deputy General Counsel
Mark A. Johnson, BBO No. 651271
Associate Counsel
University of Massachusetts
Office of the General Counsel
333 South Street, 4th Floor
Shrewsbury, MA 01545
(774) 455-7300
dbarton@umassp.edu
majohnson@umassp.edu

---

[13] Dr. Desai claims that decision to hire Dr. Dill was nevertheless discriminatory on other grounds but she is specifically not claiming that the Medical School made that decision (SMF, ¶ 31), and, regardless, the hiring of a woman could not support a gender-based claim.

**CERTIFICATE OF SERVICE**

I hereby certify that I served a true copy of the above document on all counsel of record by the Electronic Court Filing System (ECF) of the United States District Court for the District of Massachusetts.

*/s/ Mark A. Johnson*
Mark A. Johnson