# Exhibit 2

Charu Desai v. University of Massachusetts Memorial Medical Center, Inc. et al.

Civil Action No. 4:19-cv-10520-DHH

University of Massachusetts Chan Medical School's Motion for Summary Judgment

**Amended Complaint (Dkt. 23)**

PATRICIA A. WASHIENKO (BBO 641615)
pwashienko@fwlawboston.com
BRENDAN T. SWEENEY (BBO 703992)
bsweeney@fwlawboston.com
FREIBERGER & WASHIENKO, LLC
211 Congress Street, Suite 720
Boston, Massachusetts 02110
Telephone:  617-723-0008
Fax:  617-723-0009

Attorneys for Plaintiff Charu Desai

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARU DESAI, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | CIVIL ACTION NO.: |
| ) | **4:19-cv-10520-TSH** |
| UMASS MEMORIAL MEDICAL ) | |
| CENTER, INC.; UMASS MEMORIAL ) | |
| MEDICAL GROUP; UNIVERSITY OF ) | |
| MASSACHUSETTS MEDICAL SCHOOL, ) | |
| UMASS MEMORIAL MARLBOROUGH ) | |
| HOSPITAL, MAX ROSEN, M.D., ) | |
| DARREN BRENNAN, M.D., ) | |
| STEPHEN TOSI, M.D., ) | |
| AND KARIN DILL, M.D., ) | |
| ) | |
| Defendants. ) | |

## <u>AMENDED COMPLAINT AND JURY DEMAND</u>

### <u>INTRODUCTION</u>

For over twenty-six years, Dr. Charu Desai worked at and for the UMass Memorial
Medical Center, Inc., the UMass Memorial Medical Group, the University of Massachusetts
Medical School, and UMass Memorial Marlborough Hospital.  She was an extremely highly-
regarded radiologist, respected by students, trainees, department colleagues and physicians

across those institutions. Beginning in approximately 2016, however, she was subjected to disparate treatment compared to her white, male, younger, U.S.-born and non-disabled colleagues who performed the same or substantially similar work. Then, in 2018, she was falsely accused of performance deficiencies, terminated, and will be replaced by a white, younger, U.S.-born and non-disabled radiologist with less experience, Maria Barile, M.D.

As a result of this treatment, Dr. Desai brings this action for damages against the UMass Memorial Medical Center, Inc., the UMass Memorial Medical Group, the University of Massachusetts Medical School, UMass Memorial Marlborough Hospital, Dr. Max Rosen, Dr. Darren Brennan, Dr. Stephen Tosi, and Dr. Karin Dill for unlawful employment discrimination against her on the basis of age, race, national origin, gender/sex and/or disability, and/or for aiding and abetting discrimination, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1(k); the Americans with Disabilities Act, 42 U.S.C. § 12132, the Age Discrimination in Employment Act, 29 U.S.C. § 216(b), the Massachusetts Fair Employment Practices Law, M.G.L. c. 151B, § 4 and/or the Massachusetts Equal Pay Act, M.G.L. c. 149, § 105A. She also brings claims against them for breach of her employment contract and defamation. Finally, she brings claims against Drs. Rosen, Brennan, Tosi, and Dill for tortious interference with advantageous relations and defamation.

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Charu Desai, M.D. (hereinafter "Dr. Desai") is an adult female resident of Worcester, Massachusetts.

2. Defendant UMass Memorial Medical Center, Inc. (the "Medical Center") is a Massachusetts not-for-profit corporation and the successor to the University of Massachusetts Medical Center ("UMMC"). The Medical Center is the clinical partner of the University of

Massachusetts Medical School, and has administrative offices in Worcester, Massachusetts. The Medical Center employed more than fifty employees within seventy-five miles of Dr. Desai's worksite at all relevant times.

3. At all relevant times, Dr. Desai was an employee of the Medical Center and/or UMMC.

4. Defendant UMass Memorial Medical Group (the "Medical Group") is a not-for-profit organization of physicians who practice at the Medical Center and its affiliated hospitals and facilities. It is located in Worcester, Massachusetts.

5. At all relevant times Dr. Desai was a member of the Medical Group.

6. Defendant UMass Memorial Marlborough Hospital ("Marlborough Hospital") is a hospital affiliate of the Medical Center. It has administrative offices in Marlborough, Massachusetts.

7. At all relevant times, as part of her job responsibilities, Dr. Desai worked for Marlborough Hospital, interpreting radiology studies originating from Marlborough Hospital.

8. Defendant University of Massachusetts Medical School ("Medical School") is a research and teaching institution partnered with the Medical Group and Medical Center with its main administrative office located in Worcester, Massachusetts.

9. At all relevant times, Dr. Desai held a faculty appointment at the Medical School.

10. Defendant Max Rosen, M.D. ("Dr. Rosen") is an adult male resident of Massachusetts. Dr. Rosen was at all times relevant hereto the Chairman of the Department of Radiology at the Medical Center and the Medical School ("Department of Radiology"). A true and accurate screenshot of the website of the Department of Radiology, displaying a welcome message from Dr. Rosen stating, "*Welcome to the Department of Radiology at UMass Medical School*

*and UMass Memorial Medical Center*," with metadata evidencing it was taken on June 27, 2019, is attached hereto at **Exhibit A**.[1]

11. Defendant Dr. Stephen Tosi ("Dr. Tosi") is an adult male resident of Massachusetts.  Dr. Tosi was at all times relevant hereto the Chief Medical Officer of the Medical Center and President of the Medical Group.

12. Defendant Darren Brennan, M.D. ("Dr. Brennan") is an adult male resident of Massachusetts.  Dr. Brennan was at all times relevant hereto the Chief of Radiology at Marlborough Hospital ("Marlborough Radiology").

13. Defendant Karin Dill, M.D. ("Dr. Dill") is an adult female resident of Massachusetts.  Dr. Dill was at times relevant hereto the Division Chief of Chest Radiology with the Medical Group at the Medical Center.  In that capacity, Dr. Dill supervised Dr. Desai's work with Medical Group at the Medical Center and Marlborough Hospital at times relevant hereto.

14. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States, and pendent jurisdiction for the related claims arising under state law.

## STATEMENT OF FACTS

### *Background Regarding Dr. Desai*

15. Dr. Desai is a woman of Indian national origin.  She was born on July 6, 1950.  She suffers from a cardiac arrhythmia, a serious heart condition that substantially limits her major life activities and that required the implantation of a pacemaker in 2001.

---

[1] This welcome message from Dr. Rosen is also available at
https://www.umassmed.edu/radiology/about-us/message-from-the-chair/

16. Dr. Desai is a physician and, specifically, a board certified radiologist. She graduated from Government Medical College at the South Gujarat University School of Medicine, in Surat, Gujarat, India in 1972. She immigrated to the United States in 1974.

17. Dr. Desai first became affiliated with the University of Massachusetts when she became a Resident in Diagnostic Radiology at UMMC in 1978. She served as Chief Resident from 1979 to 1981. She was the first person to complete the Diagnostic Radiology residency at UMMC. Following her residency, she completed a fellowship in Computed Body Tomography / Ultrasound, also at UMMC. Dr. Desai left UMMC to work in private practice in the Worcester area in 1983.

18. Dr. Desai returned to UMMC in January 1992 as an Assistant Professor of Radiology at the Medical School and as an attending physician in the Division of Thoracic (Chest) Radiology at UMMC.

19. Dr. Desai later became a member of the Medical Group and had a "Dual-Employment" relationship with the Medical School and the Medical Group. A true and accurate copy of Dr. Desai's Employment Agreement is attached hereto at **Exhibit B** (see Section 1.14).

20. Dr. Desai was promoted to Clinical Associate Professor of Radiology at the Medical School on or about September 1, 2001. She continued to serve as an attending physician at the Medical Group (the successor to UMMC) and Medical Center.

21. Dr. Desai's radiology duties included reading plain radiographs, CT scans, and Ultrasounds for the Medical Center and Marlborough Hospital, consulting with clinicians regarding patient studies, and providing call coverage for the radiology service. Dr. Desai's teaching duties as a member of the faculty of the Medical School included training medical students while they were completing their clinical rotations in the Department of Radiology.

22. Throughout Dr. Desai's tenure at UMMC, the Medical Group, Medical Center, Medical School, and Marlborough Hospital, her work was highly regarded.  None of Dr. Desai's performance reviews, including her most recent reviews in June 2017 and June 2018, indicated any performance related deficiencies.  On the contrary, her reviews were positive.  She was awarded the Teacher of the Year Award in 2017.

23. Dr. Desai is unaware of any complaint about her performance, clinical skills, CT scan readings and/or any other radiological readings or procedures throughout her entire career.  On the contrary, her performance reviews were consistently strong, and her expertise in radiology was regularly sought by other physicians.  To her knowledge, her cases have never been the subject of a quality assurance review nor a morbidity and mortality conference.  She has never been sued for malpractice.

### *Defendants' Discriminatory Practices Motivated by Plaintiff's Age, Race, National Origin, And/Or Gender, and Discriminatory Failure to Accommodate Her Disability*

24. In approximately 2012, Dr. Rosen became the Chairman of the Department of Radiology.

25. In or about 2013 (*i.e.*, shortly after Dr. Rosen became Chairman of the Department of Radiology), a group of senior radiologists including Drs. Adib Karam, Gopal Vijayaraghanavan, Joseph Makris, and Christopher Cerniglia complained to Dr. Rosen that they were being paid less than younger, less experienced radiologists who performed the same or substantially similar work.  Dr. Rosen did not address their concerns.  Dr. Desai was among those radiologists who were being compensated at a lower rate than younger, less experienced radiologists who performed the same or substantially similar work.

26. Since Dr. Rosen became Chair of the Department of Radiology, a number of radiologists over the age of 40 left and/or were forced out of the Medical Center, including Dr. Joseph Makris, Dr. Abhijit Roychowdhury, Dr. Adib Karam, and Dr. Padmaja Surapaneni.

27. Upon information and belief, Dr. Joseph Makris is in his 50s; Dr. Abhijit Roychowdhury is in his late 50s or early 60s (as he has approximately 36 years of experience at the Medical Center); and Dr. Adib Karam is in his late 40s or 50s (as he has approximately 20 years of experience at the Medical Center). Dr. Rosen recently hired Dr. Maria Barile to replace Dr. Desai. Upon information and belief Dr. Barile is in her early 40s (approximately 25 years younger than Dr. Desai) and is white.

28. In addition, upon information and belief, Dr. Rosen stated to Dr. Roychowdhury, who is Indian, "you don't fit my vision of the Department" (or words to that effect). Also upon information and belief, Dr. Rosen stated to Dr. Padmaja Surapaneni, who is of Indian descent, "you are useless" (or words to that effect).

29. In or about March 2016, Dr. Rosen hired Dr. Dill, who is white, less experienced and younger than Dr. Desai to serve as Division Chief of Chest Radiology for Medical Group at Medical Center. In that capacity, Dr. Dill supervised Dr. Desai's work at Medical Center and Marlborough Hospital. Upon information and belief, Dr. Dill receives a rate of compensation that is significantly greater than Dr. Desai.

30. Upon information and belief, in or around October or November 2016, Drs. Karam, Vijayaraghanavan, Makris, and Cerniglia met with Dr. Tosi, the Chief Medical Officer of the Medical Center and President of the Medical Group, to complain that under Dr. Rosen's Chairmanship of the Department of Radiology, they were paid a lower rate of compensation than younger radiologists who performed the same or substantially similar work.

31. Upon information and belief, after their meeting Dr. Tosi reprimanded Dr. Rosen for the salary disparity and ordered the salaries to be adjusted. Dr. Desai was among those radiologists who were being compensated at a lower rate than newly hired radiologists who performed the same or substantially similar work as she did.

32. The Medical Group and Medical Center recently hired Dr. Aaron Harman, a younger male radiologist, to perform the same or substantially similar work as Dr. Desai. Upon information and belief, Dr. Harman was paid $365,000 per year. Despite Dr. Desai's greater experience, the Medical Group and Medical Center paid Dr. Desai only $340,000 per year.

### *Dr. Desai's Serious Health Condition*

33. In 2001, Dr. Desai required the implantation of a pacemaker to manager her cardiac arrhythmia. Despite the surgery, she occasionally still suffered from episodes of extreme shortness of breath. Given the ongoing nature of her condition and need for recovery time in order to treat that condition when such episodes occurred, she requested and was granted intermittent FMLA leave.

34. Because her condition had deteriorated over the years, in or about 2017, Dr. Desai asked Dr. Rosen for twelve "academic days" per year (days when no additional clinical duties were required) as an accommodation for her heart condition. Dr. Rosen refused. However, Dr. Rosen allowed younger physicians, including those newly hired with vastly less experience and who were not disabled (including Dr. Dill), to designate one and half days per week (i.e., approximately 70 days per year) as academic days.

35. Dr. Desai also asked Dr. Rosen for a workstation so that she could perform work at home on the weekend when she was on-call as an accommodation for her heart condition. Dr. Rosen again refused the request. However, Dr. Rosen allowed younger physicians and those

without disabilities (including Dr. Dill) to work from home with a Medical Center provided personal workstation on both weekdays and/or weekends.

36. In May 2016, Dr. Desai complained to Dr. Rosen about his disparate allotment of academic days compared to her younger and/or non-disabled colleagues. Dr. Rosen again refused to accommodate Dr. Desai with academic days, while upon information and belief, he provided them to other younger attending physicians.

37. Due to episodes of extreme shortness of breath resulting from her heart condition, Dr. Desai was, on rare occasions, late to work. Dr. Rosen was aware of this condition. Yet, despite Dr. Desai's notification to Dr. Rosen when she was suffering from such episodes, he still reprimanded her in May 2016 for being tardy. (Dr. Desai was granted FMLA leave, but rarely used it when she had a flare up of her cardiac condition out of fear of such reprisals from Dr. Rosen).

38. Upon information and belief, when Dr. Desai's younger, white, and/or non-disabled colleges, including Dr. Dill, called Dr. Rosen to inform him that they would not be attending work, or working from home, with no advance notice, Dr. Rosen did not similarly reprimand them.

39. When Dr. Desai again asked to be accommodated for her condition by being assigned fewer days on-call in the Department of Radiology, he again refused. Instead, Dr. Rosen told her she could leave her current position and began working part time or as a locum tenens (i.e., as a physician who temporarily fills in for other absent physicians). She refused.

40. Through others, Dr. Rosen continued thereafter to press Dr. Desai to leave the Medical Center or switch to a part time or locum position. For example, Dr. Desai is reliably informed and believes that in or around late 2017, Dr. Rosen asked Dr. Ferrucci to convince her to accept a part-time or locum position. She again refused.

### *Defendants Falsely Criticize Dr. Desai's Performance, Defame and Terminate Her*

41. On or about March 14, 2018, Dr. Rosen gave to Dr. Desai a letter informing her that her employment would be terminated effective March 17, 2019.  The letter gave no reason for her termination.  A true and accurate copy of Dr. Rosen's termination letter to Dr. Desai is attached hereto at **Exhibit C**.

42. When Dr. Desai asked Dr. Rosen the reasons for her termination, he first stated that he did not need a reason.  He then stated that he was terminating her because her work was of poor quality.  None of Dr. Desai's performance reviews, including her most recent performance reviews in June 2017 and June 2018, however, made any mention of any deficiencies in her performance nor did any review mention poor quality work.

43. When Dr. Desai asked Dr. Rosen to provide any examples, he was unable to do so.

44. When Dr. Desai continued to press Dr. Rosen for any proof of his assertion that her work was of poor quality, he claimed that he had conducted his own "independent review."  At no time had he (or anyone else) brought to Dr. Desai's attention any problems or complaints or concerns about her work, however, nor had he or anyone else spoken with her in connection with any investigation into her work.

45. Dr. Rosen then told Dr. Desai that effective immediately following the meeting in which she was given the letter informing her of the termination of her employment effective March 2019, that she could no longer read any Chest CT scans.  He told Dr. Desai that she could still read chest x-rays, but that he was "going to keep a close eye on her (or words to that effect).  Again, at no prior point had he (or anyone else) brought to Dr. Desai's attention any problems or complaints or concerns about her reviews of Chest CT scans or x-rays.

46. As she did not believe Dr. Rosen's allegations about her performance, shortly after the meeting on March 14, 2018, Dr. Desai asked Dr. Steven Baccei, the Vice-Chair of Quality, Patient Safety, and Process Improvement for the Department of Radiology at for the Medical Group, Medical Center, and Marlborough Hospital, if there had been any issues with her readings. He stated that he was not aware of any.

47. By email on March 24, 2018, Dr. Desai again asked Dr. Rosen to provide evidence of her purportedly poor quality work. It was not until three weeks later, on April 17, 2018, that he responded.

48. In the meantime, although she was absolutely humiliated to do so, Dr. Desai nevertheless complied with Dr. Rosen's order, and turned down colleagues' requests to read CT scans.

49. Dr. Desai is reliably informed and believes that Dr. Maria Barile, who is white and in her 40s, has been hired to work full time in the Chest Division with her start date to be in or around the time of Dr. Desai's exit.

50. Dr. Desai is reliably informed and believes that on or about April 7, 2018, Dr. Darren Brennan, the Vice Chair of Community Radiology at UMass and Chief of Radiology at Marlborough Hospital, stated to Dr. Ferrucci, "we feel bad about what we had to do to Charu" (or words to that effect).

51. Dr. Desai is also reliably informed and believes that Dr. Rosen told Dr. Ferrucci that he fired her as a result of issues/complaints that originated from Marlborough Hospital. At no prior point, however, had he (or anyone else) brought to Dr. Desai's attention any problems or complaints or concerns about her interpretation of radiographs from Marlborough Hospital.

52. By email dated April 17, 2018, Dr. Rosen finally responded to Dr. Desai's March 24 email asking for evidence of her purportedly poor quality work. In his email response, Dr. Rosen

stated that he would be happy to set up a meeting to discuss the results of the "independent review" he had performed on her work. He told Dr. Desai that she could bring a colleague. When Dr. Desai asked to bring an independent expert instead of a colleague (who reported directly to him) to assess the concerns he raised, Dr. Rosen refused to permit her to do so.

53. In a separate email to Dr. Desai, also on April 17, 2018, Dr. Rosen stated that it was inappropriate for her to speak with residents about her employment: "I want to confirm your understanding that it is inappropriate for you to discuss ANY issues related to your UMMMG [the Medical Group] or UMMS [the Medical School] employment with the Radiology residents, and that you will avoid doing so going forward." (Emphasis added; explanation of UMMMG and UMMS supplied.)

54. On April 24, 2018, Dr. Desai met with Dr. Rosen about her purportedly poor quality work. Dr. Desai's colleague Dr. Sarwat Hussain (who reports to Rosen) accompanied her, instead of the independent reviewer she had requested, in light of Dr. Rosen's refusal to permit her to have an independent reviewer join her.

55. At the meeting, Dr. Rosen projected on a screen, information about the alleged deficiencies in the quality of Dr. Desai's CT scan readings. The information was presented in a manner that Dr. Desai found nebulous, disorganized and extremely difficult to comprehend. The information seemed, however, to include reports and/or readings done by several other radiologists. Given the limited information that was "presented" and the very little time Dr. Desai was given to review it, it was not clear if any of the purported poor quality readings were indeed hers. At the end of the meeting, Dr. Desai requested a written copy of the information presented. Dr. Rosen denied this request.

56. In or around August 2018, Dr. Desai discovered a "peer review" evaluation that Dr. Karin
Dill performed assessing the quality of Dr. Desai's work from July 2016 to June 2017.  Dr.
Dill reported that Dr. Desai made errors that were "likely to be significant" in the readings
that she purportedly reviewed.  However, upon review of Dr. Dill's "peer review" results, Dr.
Desai discovered that the cases that Dr. Dill claimed showed errors did not in fact show any
error on Dr. Desai's part, much less significant ones.  Indeed, one case that Dr. Dill claimed
showed a deficiency was actually a reading done by Dr. Dill, not Dr. Desai.  Dr. Dill had
falsely asserted that a case that she herself had personally interpreted and signed, which she
reported as having a significant error, was actually attributable to Dr. Desai.

57. Given Dr. Dill's incorrect attribution to Dr. Desai of errors and misreads in a number of
cases, and her consequent misrepresentation of Dr. Desai's work, her actions support an
inference that her "peer review" was a deliberate attempt to sabotage Dr. Desai.  In doing so,
she aided in prematurely derailing Dr. Desai's illustrious career and caused significant harm
to her professional reputation.

58. Upon information and belief, Dr. Dill did not similarly misrepresent the work of younger,
male, non-disabled, and/or white radiologists within Medical Group at Medical Center and/or
Marlborough Hospital.

59. It is routine practice within the Department of Radiology to send emails to the radiologist
who conducted a reading in which significant misreads or concerns are detected during the
"peer review" process.  Dr. Desai never received any such correspondence regarding the
purportedly "significant errors" documented on Dr. Dill's purported peer review of her.
Further, Dr. Desai never received any correspondence concerning misreads from any of her

peer reviews, throughout her entire employment at Medical Group, Medical Center, and Marlborough Hospital.

60. Upon information and belief, Dr. Dill's targeted and factually incorrect "peer review" of certain of Dr. Desai's cases was used by Dr. Rosen as grounds to terminate Dr. Desai's employment.  (Dr. Rosen included the "incorrect readings" from Dr. Dill's peer review as part of his purportedly "independent" review that concluded Dr. Desai's work was "of poor quality.")

61. When Dr. Desai asked Dr. Rosen when the "independent review" was conducted, he initially stated that he did not know.  He then checked his computer and stated that he began investigating Dr. Desai's work at the end of 2016 and did so through the first quarter of 2017.

62. When Dr. Desai asked Dr. Rosen the name of the independent reviewer he used to review her work and the hospital at which the reviewer worked, he refused to tell her.

63. When Dr. Desai asked Dr. Rosen for all the patient records and other pertinent information regarding her purported deficiencies, he refused to provide it.

64. When Dr. Desai asked Dr. Rosen for a written copy of the information that he projected on a screen that purportedly evidenced deficiencies in the quality of her CT scan readings, he refused to give it to her.  Instead, he gave her only a vague statistical summary of her readings as compared to her peer group.

65. The summary report did not include any concrete examples of Dr. Desai's deficiencies; it simply cited "statistics" from the investigation.  Dr. Desai was given no opportunity to analyze any information Dr. Rosen allegedly used, and therefore had no ability whatsoever to rebut / refute these assertions that her work is of "poor quality."

66. Remarkably, although Defendants claim that the review which concluded that Dr. Desai's CT scan readings were of poor quality began in 2016, Dr. Rosen nevertheless continued to permit her to perform CT scan readings through March 2018.

### *Exhaustion of Administrative Remedies*

67. On May 4, 2018, Dr. Desai filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and Equal Employment Opportunity Commission ("EEOC") (MCAD Docket No. 18WEM01247, EEOC Number 16C-2018-01520) naming the University of Massachusetts Memorial Medical Center, UMass Memorial Medical Group, the University of Massachusetts Medical School, Max Rosen, M.D., Darren Brennan, M.D., and Stephen E. Tosi, M.D., as Respondents.  A copy of Dr. Desai's original Charge is attached hereto as **Exhibit D**.

68. On November 29, 2018, Dr. Desai moved to amend her complaint before the MCAD and EEOC to name Karin Dill, M.D., and UMASS Memorial Marlborough Hospital as Respondents.  Dr. Desai's Motion to Amend was allowed on January 7, 2019.  A copy of the MCAD decision granting Dr. Desai's Motion to Amend is attached hereto as **Exhibit E**.

69. On January 7, 2019, Dr. Desai filed a second Charge of Discrimination with the MCAD and EEOC (MCAD Docket No. 19WEM00371, EEOC Number 16C-2019-00939) naming UMASS Memorial Marlborough Hospital and Dr. Karin Dill, as Respondents.  A copy of Dr. Desai's second Charge is attached hereto as **Exhibit F**. (The document was mistakenly dated January 7, 2018. It was filed with the MCAD on January 7, 2019.)

70. By letter dated March 4, 2019, a true and accurate copy of which is attached hereto as **Exhibit G**, Dr. Desai withdrew her Charge of Discrimination from the MCAD and EEOC in order to file a private cause of action in civil court.

71. By letters dated March 15, 2019, true and accurate copies of which are attached hereto as **Exhibits H and I**, the MCAD and EEOC dismissed the Plaintiff's complaint pursuant to Mass. Gen. Laws c. 151B, § 9 based on Plaintiff's request to file an action in civil court.

## COUNT I
### DISCRIMINATION ON THE BASIS OF RACE, NATIONAL ORIGIN AND GENDER IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-1 et seq.
### (Against Defendants Medical Center, Medical School, Medical Group, Marlborough Hospital, Dr. Rosen, And Dr. Tosi)

72. Plaintiff Dr. Desai re-alleges paragraphs 1 through 71 above and further alleges:

73. Dr. Desai timely met each of the administrative prerequisites to suit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-1 et seq. ("Title VII").

74. By their actions described above, including but not limited to, paying white and/or male radiologists at a greater rate of compensation than Dr. Desai; Defendants Medical Center, Medical Group, Medical School, Marlborough Hospital, Dr. Rosen, and Dr. Tosi, discriminated against Dr. Desai in terms of her compensation as a result of her race, national origin, and gender in violation of Title VII.

75. By their actions described above, including but not limited to, providing more academic days and permission and personal workstations to work from home on call days and regular workdays to her white colleagues; promoting a white radiologist to serve as Division Chief of Chest Radiology instead of Dr. Desai; and hiring a white radiologist to replace Dr. Desai; Defendants Medical Center, Medical Group, Medical School, Marlborough Hospital, Dr. Rosen, and Dr. Tosi, discriminated against Dr. Desai in the terms and conditions of her employment as a result of her race and national origin in violation of Title VII.

76. As a direct and proximate result of the actions of the Defendants, Dr. Desai has suffered and continues to suffer damages including but not limited to loss of income, loss of personal and

professional reputation, loss of community standing, and emotional distress and mental suffering.

## COUNT II
## VIOLATION OF THE FEDERAL EQUAL PAY ACT, 29 U.S.C. §§ 206(d), 216.
### (Against Defendants Medical Center, Medical Group, Medical School, Marlborough Hospital, Dr. Rosen, And Dr. Tosi)

77. Plaintiff Dr. Desai re-alleges paragraphs 1 through 76 above and further alleges:

78. By paying Dr. Desai at a rate less than the rate at which Defendants paid male employees, including but not limited to Dr. Harman, for equal, substantially equal, or lesser work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, Defendants Medical Center, Medical Group, Medical School, Marlborough Hospital, Dr. Rosen, and Dr. Tosi violated the Federal Equal Pay Act, 29 U.S.C. §§ 206(d), 216.

79. Defendants' violation of 29 U.S.C. § 206(d) was willful.

80. As a direct and proximate result of the actions of the Defendants, Dr. Desai has suffered and continues to suffer damages including but not limited to loss of income, loss of personal and professional reputation, loss of community standing, and emotional distress and mental suffering.

## COUNT III
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12132
### (Against All Defendants)

81. Plaintiff Dr. Desai re-alleges paragraphs 1 through 80 above and further alleges:

82. Dr. Desai timely met all of the administrative prerequisites to suit under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132.

83. By their actions described above, including but not limited to, refusing to provide academic days, fewer on-call days and/or a personal workstation for Dr. Desai to work from home,

while providing same for her non-disabled colleagues, Defendants Medical Center, Medical Group, Medical School, Marlborough Hospital, Dr. Rosen, and Dr. Tosi, have discriminated against Dr. Desai in the terms and conditions of her employment and refused to accommodate her disability in violation of the ADA.

84. By their actions described above, including but not limited to, restricting Dr. Desai's CT scan privileges and terminating her based on a fraudulent investigation motivated by her disability, Defendants Medical Center, Medical Group, Medical School, Marlborough Hospital, Dr. Rosen, Dr. Brennan, Dr. Tosi, and Dr. Dill have discriminated against Dr. Desai in the terms and conditions of her employment because of her disability in violation of the ADA.

85. As a direct and proximate result of the actions of Defendants, Dr. Desai has suffered and continues to suffer damages including but not limited to loss of income, loss of personal and professional reputation, loss of community standing, and emotional distress and mental suffering.

## COUNT IV
## AGE DISCRIMINATION IN EMPLOYMENT ACT, 29 U.S.C. § 216(b)
### (Against All Defendants)

86. Plaintiff Dr. Desai re-alleges paragraphs 1 through 85 above and further alleges:

87. Dr. Desai timely met all of the administrative prerequisites to suit under the Age Discrimination in Employment Act ("ADEA"), 29 USC § 216(b).

88. By their actions described above, including but not limited to, paying younger radiologists at a greater rate of compensation than Dr. Desai, Defendants Medical Center, Medical Group, Medical School, Marlborough Hospital, Dr. Rosen, and Dr. Tosi have discriminated against Dr. Desai in terms of her compensation as a result of her age in violation of the ADEA.

89. By their actions described above, including but not limited to, restricting Dr. Desai's CT scan privileges, terminating her based on a fraudulent investigation motivated by her age, and hiring a younger radiologist to replace Dr. Desai, Defendants Medical Center, Medical Group, Medical School, Marlborough Hospital, Dr. Rosen, Dr. Brennan, Dr. Tosi, and Dr. Dill have discriminated against Dr. Desai in terms of her conditions of employment as a result of her age in violation of the ADEA.

90. As a direct and proximate result of the actions of the Defendants, Dr. Desai has suffered and continues to suffer damages including but not limited to loss of income, loss of personal and professional reputation, loss of community standing, and emotional distress and mental suffering.

## COUNT V
## VIOLATION OF MASSACHUSETTS' FAIR EMPLOYMENT PRACTICES ACT,
## M.G.L. c. 151B, § 4
## (Against All Defendants)

91. Plaintiff Dr. Desai re-alleges paragraphs 1 through 90 above and further alleges:

92. Dr. Desai timely met each of the administrative prerequisites to suit under M.G.L. c. 151B.

93. By their actions described above, including but not limited to, paying younger, white, and/or male radiologists at a greater rate of compensation than Dr. Desai; refusing to provide academic days, less on-call time, and/or a personal workstation for Dr. Desai to work from home, while providing same for her younger, non-disabled, and/or white colleagues; restricting Dr. Desai's CT scan privileges and terminating her based on a fraudulent investigation motivated by her age and/or disability; and hiring a younger, white radiologist to replace Dr. Desai; the Defendants Medical Center, Medical Group, Medical School,

Marlborough Hospital, Dr. Rosen, Dr. Tosi, Dr. Brennan and Dr. Dill discriminated against Dr. Desai in terms of her compensation and in the terms and conditions of her employment as a result of her race, national origin, sex, and age in violation of M.G.L. c. 151B, § 4.

94. By his role in refusing to correct Dr. Rosen and Dr. Dill's discriminatory behavior and disparate treatment based on her race, national origin, age, and disability, despite knowledge of same, Defendant Dr. Tosi aided and abetted discrimination against Dr. Desai in violation of M.G.L. c. 151B, § 4(5).

95. By their roles in denying Dr. Desai accommodations for her disability, restricting Dr. Desai's CT scan privileges, and terminating her based on a fraudulent investigation motivated by her age and/or disability, Defendants Dr. Rosen, Dr. Brennan, and Dr. Dill, and Marlborough Hospital aided and abetted discrimination against Dr. Desai in violation of M.G.L. c. 151B, § 4(5).

96. By his role in restricting Dr. Desai's CT scan privileges and terminating her based on a fraudulent investigation motivated by her age and/or disability, Defendant Dr. Brennan aided and abetted discrimination against Dr. Desai in violation of M.G.L. c. 151B, § 4(5).

97. As a direct and proximate result of the actions of the Defendants, Dr. Desai has suffered and continues to suffer damages including but not limited to loss of income, loss of personal and professional reputation, loss of community standing, and emotional distress and mental suffering.

## COUNT VI
## VIOLATION OF MASSACHUSETTS' EQUAL PAY ACT M.G.L. c. 149, § 105A
### (Against Defendants Medical Center, Medical Group, Medical School, Marlborough Hospital, Dr. Rosen, And Dr. Tosi)

98. Plaintiff Dr. Desai re-alleges paragraphs 1 through 97 above and further alleges:

99. By paying Dr. Desai a wage rate less than Dr. Harman and other male radiologists for work that is substantially similar and requires substantially similar skill, effort, and responsibility, and that is performed under similar working conditions, despite Dr. Desai's greater seniority, and experience, Defendants Medical Center, Medical Group, Medical School, Marlborough Hospital, Dr. Rosen, and Dr. Tosi violated the Massachusetts Equal Pay Act, M.G.L. c. 149, § 105a.

100. As a direct and proximate result of the actions of the defendants, Dr. Desai has suffered and continues to suffer damages including but not limited to loss of income, loss of personal and professional reputation, loss of community standing, and emotional distress and mental suffering.

## COUNT VII
## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS RELATIONS
### (Against Defendants Dr. Rosen, Dr. Brennan, Dr. Tosi, And Dr. Dill)

101. Plaintiff Dr. Desai re-alleges paragraphs 1 through 100 above and further alleges:

102. Dr. Desai had contractual/advantageous relationships with Defendants Medical Group, Medical Center, Medical School, and Marlborough Hospital.

103. Defendants Drs. Rosen, Brennan, Tosi, and Dill had knowledge of these relationships.

104. Defendants Drs. Rosen, Brennan, Tosi, and Dill acted with malice when they discriminated against Dr. Desai because of her race, national origin, age, and disability and interfered with these relationships.

105. As a direct and proximate result of the actions of the Defendants, Dr. Desai has suffered and continues to suffer damages including but not limited to loss of income, loss of personal and professional reputation, loss of community standing, and emotional distress and mental suffering.

## COUNT VIII
## DEFAMATION
## (Against All Defendants)

106. Plaintiff Dr. Desai re-alleges paragraphs 1 through 105 above and further alleges:

107. Defendants, Medical Center, Medical School, Medical Group, Marlborough Hospital, Dr. Rosen, Dr. Tosi, Dr. Brennan and Dr. Dill made false statements about Dr. Desai's performance to her peers, superiors and subordinates.

108. Defendants, Medical Center, Medical School, Medical Group, Marlborough Hospital, Dr. Rosen, Dr. Tosi, Dr. Brennan and Dr. Dill's statements impugned Dr. Desai's professional reputation by wrongfully demeaning her competence.

109. As a direct and proximate result of the actions of Defendants, Dr. Desai has suffered and continues to suffer damages including but not limited to loss of income, loss of personal and professional reputation, loss of community standing, and emotional distress and mental suffering.

**WHEREFORE**, plaintiff Charu Desai requests that this Court to enter judgment against the defendants and to award her all damages, fees, costs, interest and further relief to which she is entitled.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury on all of her claims so triable.

Respectfully submitted,

CHARU DESAI
By her attorneys,


/s/ Patricia A. Washienko
PATRICIA A. WASHIENKO (BBO 641615)
pwashienko@fwlawboston.com
BRENDAN T. SWEENEY (BBO 703992)
bsweeney@fwlawboston.com
FREIBERGER & WASHIENKO, LLC
211 Congress Street, Suite 720
Boston, Massachusetts 02110
Telephone:  617-723-0008
Fax:  617-723-0009

Dated: July 2, 2019

# Exhibit A

**UMassMemorial Health Care**

About UMMS | About the UMass System | UMass Memorial

# Department of Radiology

ABOUT  RESEARCH  CLINICAL DIVISIONS  EDUCATION  QUALITY IMPROVEMENT  SPECIAL PROJECTS  FOR CLINICIANS  PUBLICATIONS

Radiology > About > Message from the Chair

Message from the Chair
Faculty
New Members of the Team
Administrators
Radiology Organizational Chart
Diversity and Inclusion
Faculty Photo Archive
RadNews Archive

## Message from the Chair

Welcome to the Department of Radiology at UMass Medical School and UMass Memorial Medical Center.

Our department consists of approximately 50 clinical faculty, 15 research faculty, 20 residents and 9 fellows. Clinical faculty are organized along "organ system" service lines, as well as divisions of Nuclear Medicine, Pediatric Radiology, Vascular and Interventional Radiology, Neuro-Interventional Radiology, 24/7 Emergency Radiology and Global Radiology. We perform over 500,000 imaging studies per year across our two main campuses (University and Memorial) in Worcester, Massachusetts, as well as our two community sites, Marlborough Hospital and Clinton Hospital. In addition, we operate a free-standing MRI center, as part of our UMass Memorial Imaging Center (UMMIC) joint venture with Shields MRI.

Our basic science faculty support a broad range of interdisciplinary research interests, including five investigator-led labs: Biomarker Development, Interventional Neuroradiology, Molecular Imaging, Nuclear Medicine Physics, Radiology Physics; and four Centers of Research Excellence (COREs): Small Animal Imaging, Image-guided Surgery, Advanced MRI, and Breast CT.

Our clinical faculty have a diverse range of academic and research interests. Clinical collaborations support: a robust liver transplant program and hepatitis C (HCC) clinic, multidisciplinary breast center, and interventional oncology program. Several faculty members are actively involved in researching improved methods for teaching communications skills through collaboration with our Medical School's "Sim Center", as well as engaging in several robust Q/A and process improvement initiatives including collaborative research into the physiologic basis for Radiology errors.

We strive to create an inclusive, engaged environment in which faculty, residents, fellows, medical students and staff all learn from each other and freely collaborate with our clinical and basic-science colleagues on our Worcester Campus and across the UMass system.

Please free to call or e-mail me with any questions or to receive additional information about UMass Radiology.

Best,
Max Rosen MD, MPH, FACR

(Phone) 508-856-3252
(E-mail) max.rosen@umassmemorial.org

---

Screen Shot 2019-06-... 642 KB
Modified: Today, 3:07 PM

▼ General:
Kind: PNG image
Size: 642,044 bytes (643 KB on disk)
Where: Macintosh HD ▸ Users ▸ pwashienko ▸ Desktop
Created: Thursday, June27,2019 at 3:07 PM
Modified: Thursday, June27,2019 at 3:07 PM

☐ Stationery pad
☐ Locked

▼ More Info:
Last opened: June27,2019 at 6:16 PM
Dimensions: 1922×1758
Color space: RGB
Color profile: iMac
Alpha channel: Yes

▼ Name & Extension:
Screen Shot 2019-06-27 at 3.07.02 PM
☑ Hide extension

► Comments:
► Open with:
► Preview:

▼ Sharing & Permissions:
You can read and write

Name                          Privilege
pwashienko (M...   ◇ Read & Write
staff                           ◇ Read only
everyone                  ◇ Read only

# Exhibit B

AGREEMENT BETWEEN
UMASS MEMORIAL MEDICAL GROUP, INC.
AND
Charu Desai , M.D.

AGREEMENT by and between the UMass Memorial Medical Group, Inc., a non-profit corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at One Biotech Park, Worcester, Massachusetts 01605 (the "Medical Group"), a subsidiary corporation of UMass Memorial Health Care, Inc. (the "System") and      Charu Desai, M.D., a physician duly licensed to practice medicine in the Commonwealth of Massachusetts (the "Practitioner").

## RECITALS

The principal purpose of the Medical Group is to employ physicians to provide, on behalf of the System, patient care at a level of quality and efficiency consistent with generally accepted standards and otherwise to fulfill professional and institutional obligations to patients, students of health care, health care professionals, and the community; and,

The successful fulfillment of the principal purpose of the Medical Group is dependent on the rendering of professional medical and administrative services in conjunction with the clinical operations of the System by qualified practitioners; and,

The Practitioner is trained and qualified and desires to provide professional medical, educational and administrative services to the Medical Group; and,

The Medical Group desires to engage the Practitioner to provide professional medical, educational and administrative services;

Therefore, in consideration of the mutual covenants and conditions set forth below, the Medical Group and the Practitioner do hereby agree as follows:

## 1.    RESPONSIBILITIES OF PRACTITIONER

### 1.1.    Professional Qualifications

(a)   The Practitioner must at all times during the term of this Agreement: (i) possess a valid and unlimited license to practice medicine pursuant to Chapter 112, Section 2 of the General Laws of the Commonwealth of Massachusetts; and, (ii) be appointed to and maintain continuous status as a member in good standing of the UMass Memorial Medical Center (the "Medical Center") Active Medical Staff or the Medical Staff of the appropriate Member Hospital with appropriate clinical privileges in the Department of Radiology (the "Department") (iii) for

those physicians who are on staff at the Medical Center, receive, and maintain, a faculty appointment at the University of Massachusetts Medical School (the "Medical School"); (iv) possess a valid federal narcotics number and state controlled substances number (unless such number is not required by the Practitioner's specialty); (v) be, and remain, a participating provider in the Medicare and Medicaid programs and not be barred, excluded or otherwise ineligible to participate in these or other Federal programs; and (vi) be or, at the Medical Group's request, agree to be, and remain, a participating physician in any health insurance plan or managed care program accepted by the System, including the System's contractual relationships with preferred provider organizations and health maintenance organizations, and to execute any documents requested by the Medical Group in connection with participating in a provider contract in which the Medical Group or the System agrees to participate. If at any time during the term of this Agreement the Practitioner fails to meet one or more of the qualifications set forth herein, such failure shall constitute a breach in accordance with Section 7.4 of this Agreement.

(h)  The Medical Group and the Practitioner further acknowledge and agree that this Agreement is not, and shall not be construed as, any form of guarantee or assurance by the System that the Practitioner will receive and maintain the necessary appointment to the Active Medical Staff or the grant of appropriate clinical privileges for the purposes of discharging the Practitioner's responsibilities hereunder; application, appointment, reappointment, and the grant of clinical privileges shall be governed solely by the Bylaws of the Medical Staff of the Medical Center then in effect. Further, appointment to the faculty of the Medical School shall be governed solely by the applicable policies and procedures of the Medical School.

1.2.    Services.  The Practitioner shall be responsible for providing professional medical and administrative services as set forth in Appendix A, attached and incorporated as part of this Agreement.

1.3     Provider Agreements.  The Practitioner hereby authorizes the Medical Group to execute provider agreements, acknowledgments and consent forms that obligate or confirm the Practitioner's obligation to participate in provider agreements executed by or on behalf of the Medical Group and to abide by and conform to all applicable requirements under such provider agreements.

1.4.    Schedule of Fees.  The Medical Group will establish a current schedule of fees, as may be amended from time to time, to be charged by the Medical Group for direct patient care services provided by the Practitioner under this agreement.

1.5.    Standards of Practice.  The Practitioner shall at all times provide services in a competent and professional manner, consistent with quality assurance standards of the Medical Center's Active Medical Staff and in compliance with all applicable statutes, regulations, rules and directives of federal, state and other governmental and regulatory bodies having jurisdiction over the Medical Center; the Bylaws, Rules and Regulations, policies and procedures of the

2

System, the Medical Center and the Medical Staff; applicable standards of the Joint Commission on Accreditation of Health Care Organizations and currently accepted and approved methods and practices applicable to the provision of medical services.

1.6.  Compliance and Quality Assurance.  The Practitioner shall abide by the Code of Ethics and Business Conduct of the System.  The Practitioner shall participate in the programs of the System and the Medical Center regarding compliance, quality assurance, utilization review, risk management, and peer review, in accordance with the rules, policies and bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, the Patient Care Assessment regulations of the Board of Registration in Medicine, and upon request of the Department Chair.  The Quality Assurance committee of the Medical Staff of the Medical Center will be responsible for reviews and audits of and concerning quality assurance in the Department.

1.7.  Committee Responsibilities.  The Practitioner shall serve on committees of the Medical Center's Medical Staff and committees established pursuant to the Bylaws of the System, upon reasonable request of the Chairman of the Board of Trustees, the President/Chief Executive Officer, the Chief Operating Officer, the Chief Medical Officer, the President of the Medical Group (the "President") or the Department Chair.

1.8.  Medical Records and Reports.  (a)  The Practitioner shall prepare or cause to be prepared in a timely manner any and all appropriate notes and information in the medical records of and reports pertaining to each patient for whom the Practitioner has rendered services pursuant to this Agreement.  The Practitioner shall cause these records and reports to be completed and submitted within such period of time after the rendering of such services as may be required by the Bylaws of the Medical Staff of the Medical Center, upon request of the President or Department Chair, or by applicable law or regulation.  The parties understand and agree that the System has the rights of ownership and control of all of the patients' medical records and reports generated pursuant to this Agreement.  It is further agreed that all practitioners at the System have the right to consult such records and reports in order to facilitate the continuity of proper patient care.

(b)  Time Allocation Reports:  The Practitioner agrees to cooperate with the Department Chair to  maintain adequate and proper time records in accordance with the Medical Group's policies.  This may include submitting a written allocation of time reports specifying the respective amounts of time the Practitioner has devoted to clinical, administrative, teaching and research activities.  The Practitioner agrees to make available to the Medical Group all time records and data recorded by the Practitioner upon the request of the Medical Group.

1.9.  Academic Service.  The Practitioner shall aid in the clinical teaching program of the Medical Center as an attending physician on in-patient services and in ambulatory settings.  The Practitioner shall also aid in the didactic teaching programs of the Medical Center upon the request of the Department Chair.  The Practitioner shall also participate for reasonable periods of time as an instructor in education programs conducted or offered by the Medical Center,

3

including grand rounds, and shall perform such other teaching functions within the Medical Center as are reasonable and necessary to assure the Medical Center's compliance with the requirements of all applicable accrediting bodies, upon the request of the Department Chair. The Practitioner, as a member of the Medical School faculty, is expected to provide a reasonable amount of academic service (on the order of approximately two hundred (200) hours per year) under the supervision of the Chancellor at the direction of the Chair or his designee.

1.10. Non-Physician Personnel. The Practitioner shall, upon the request of the President or Chair, or at such other times as are appropriate, make recommendations concerning the qualifications, hiring, firing, and disciplining of such non-physician personnel as the System or the Medical Group may employ, engage or otherwise provide in support of the Practitioner's practice. The Practitioner shall make any such recommendations in furtherance of and in accordance with the needs and best interests of the Medical Group and the proper conduct of its functions. The Practitioner agrees that any supervision of nurse practitioners and physician assistants shall be conducted in accordance with the governing regulations of the Board of Registration in Medicine.

1.11. Protocols and Procedures. The Practitioner agrees to work cooperatively with all of the System's clinical departments, Medical Staff, the Medical Group, administration, the President and the Department Chair to assure that services are available on a timely, coordinated, efficient, and professional basis. The Practitioner also agrees to comply with all of the Medical Center's clinical policies and procedures and all applicable Human Resources policies.

1.12. Confidentiality of Information. The Practitioner agrees to uphold and maintain the confidentiality of patient and other information for which the Practitioner has an ethical, professional, or legal obligation not to disclose. The Practitioner further agrees to uphold and maintain the confidentiality of proprietary or other confidential information relating to the Medical Group or the System of which the Practitioner may become aware while employed hereunder. This provision shall survive the termination of this Agreement.

1.13. Continuing Education. The Practitioner shall comply with and satisfy any and all of the professional obligations and requirements regarding continuing education and any other related areas of medical practice required for the maintenance of a license to practice **medicine** in Massachusetts or appropriate to the rendering of competent professional services pursuant to this Agreement as determined by the Department Chair.

1.14. Dual-Employment with Medical School. The parties acknowledge that a certain percentage of the Practitioner's time and salary may be allocated to, and governed by, a so-called "Dual-Employment" arrangement with the Medical School (the "Dual-Employment Arrangement"). The Practitioner acknowledges that the terms and conditions of employment with the Medical Group are governed by this Agreement and the policies and practices of the Medical Group. The Practitioner further acknowledges that if this Agreement is terminated for any reason, the related employment relationship with the Medical School shall also terminate

4

unless the Practitioner has a new or continuing agreement with the Medical School or is a tenured faculty member.

## 2. RESPONSIBILITIES OF THE SYSTEM

### 2.1. Space, Equipment, Services, and Supplies.

(a) The Medical Group, through agreement with the System, shall be committed to making available reasonable and necessary space, equipment and supplies for the delivery of the agreed services hereunder by the Practitioner, shall provide customary services and maintenance to maintain such equipment in good order and repair, shall furnish services to the Practitioner including, but not limited to, utilities, telephone, housekeeping and record keeping services; and shall provide all necessary supplies needed for the proper provision of services by the Practitioner pursuant to this Agreement.

(b) The Practitioner agrees to use such space, equipment, services and supplies for purposes of the System and in furtherance of the obligations governed by this Agreement.

2.2. **Non-Physician Personnel.** The System or the Medical Group shall employ, engage or otherwise make available to the Practitioner all non-physician personnel determined by the Medical Group to be reasonably needed for the proper delivery of services pursuant to this Agreement. The System or the Medical Group shall exercise ultimate control and management of non-physician personnel.

2.3 **Professional Liability Insurance.** The Medical Group, at its expense, shall arrange for professional liability insurance coverage for the Practitioner with regard to professional medical services rendered by the Practitioner for Medical Group-related activities billed through the Medical Group during the term of this Agreement. The Practitioner shall be covered by such insurance to the same extent as other similarly-situated practitioners within the Medical Group. Coverage limits shall be set in the discretion of the Medical Group and/or the UMass Memorial Self-Insurance Program from time to time and shall be made known to the Medical Group Practitioners on a regular basis.

## 3. REIMBURSEMENT REQUIREMENTS

3.1. The Practitioner shall comply with all laws, regulations and System requirements, policies and procedures regarding record keeping relating to third-party reimbursement for services provided pursuant to this Agreement as may be in effect from time to time. In the event that there are subsequent changes or clarifications of statutes, regulations or rules relating to record-keeping which the Medical Group determines must be complied with to insure proper reimbursement from third parties for services provided pursuant to this Agreement, the Medical Group shall, after reasonable notice and opportunity to comply, notify the Practitioner of any actions it reasonably deems are necessary to comply with such changes and the Practitioner shall

5

promptly take such actions.

### 4.    COMPENSATION

4.1.    Compensation of Practitioner.    The Medical Group shall compensate the Practitioner for the services which the Practitioner renders in accordance with the terms of this Agreement.    The agreed compensation is set forth in detail in Appendix B, attached and incorporated as part of this Agreement.

### 5.    BILLING AND PAYMENT

5.1.    Billing.    Except as otherwise may be expressly stated in this Agreement or other published, written policy or procedure of the Medical Group, all fees, payments and other income attributable to the Practitioner's clinical services during the term of this Agreement shall belong to the Medical Group, whether paid to the Practitioner, to the Medical Group or its designee or to a third party.    The Medical Group shall have the sole right to bill for and to receive, hold and disburse such fees and income and the Practitioner agrees to abide by the billing policies and procedures of the Medical Group. The Practitioner hereby assigns to the Medical Group all of the Practitioner's rights in all fees, payments, bonuses or distributions or other income or monies due from all sources relating directly or indirectly to clinical services rendered by the Practitioner pursuant to this Agreement. The Practitioner shall cooperate fully with the Medical Group in facilitating collection of such monies, including prompt endorsement and delivery to the Medical Group of all checks received from patients or third-party payors on behalf of the Practitioner and completion of all forms necessary for such collections.    To the extent applicable, the Practitioner agrees to work with the Medical Group to collect all patient co-payments for services rendered and promptly to forward such funds to the Medical Group. Upon termination of this Agreement for any reason whatsoever, all such monies then outstanding shall be deemed to be the sole and exclusive property of the Medical Group and not subject to any claim by the Practitioner.    The Practitioner's obligation under this provision shall survive termination of this Agreement.

### 6.    TERM

This Agreement shall be effective from your original hire date of January 5, 1992 and shall remain in effect unless otherwise terminated by the parties as provided in Section 7 of this Agreement.    As of the effective date of this Agreement, this Agreement shall supercede and revoke any existing prior employment agreement with the Medical Group or any of its predecessor entities.

### 7.    TERMINATION

7.1.    Mutual Agreement.    This Agreement may be terminated by mutual agreement of the parties, in a writing signed by the parties, at any time from the date of execution hereof.

7.2   Notice of Party. This Agreement may be terminated by the Medical Group at any the giving of written notice to the Practitioner (as set forth in Section 14.1 below), in accordance with the following notice schedule:

| Number of Years Practitioner Employed | Requisite Notice Period |
|---|---|
| 0-2 | 4 months |
| >2 – 10 | 6 months |
| >10- 15 | 8 months |
| >15 – 20 | 10 months |
| >20 | 12 months |

This Agreement may be terminated by the Practitioner at any time upon the giving of as much notice as is practicable to the Medical Group, and in any event a minimum of one hundred twenty (120) days' written notice.

Where either the Medical Group or the Practitioner is terminating the employment relationship, the Notice Period is characterized as "working notice." In the interests of patient care, the Medical Group expects the Practitioner to continue to fulfill the responsibilities of the position and to maintain productivity levels for the full notice period. Vacation time may be taken during the Notice Period only with the consent of the Department Chair and the President of the Medical Group. The Practitioner will be compensated for unused pro-rated vacation time not taken at the time of termination. The Medical Group does not permit "terminal vacations," i.e., the use of vacation time to complete the final portion of the Notice Period.

7.3   For Cause. The Medical Group may terminate this Agreement effective immediately for cause at any time upon written notice to the Practitioner setting forth in reasonable detail the nature of such cause. "Cause" shall be defined as any material breach by the Practitioner of this Agreement, including but not limited to the following:

i.   Practitioner's fraud or dishonesty with respect to the Medical Group or those associated with it, acts or conduct materially detrimental to patient care or to the reputation or operations of the Medical Group, or otherwise in connection with the Practitioner's services under this Agreement;

ii.   Practitioner's conviction of, a plea of nolo contendere or admission of sufficient facts to a crime involving moral turpitude, or an offense relating to health care or adversely affecting the Practitioner's ability to perform services under this Agreement; or

iii.   Practitioner's   material negligence or misconduct (other than by reason of disability or approved leave) in the performance of duties assigned by the Chair under this

7

Agreement.

iv.   Failure of the Practitioner to follow UMass Memorial policies and procedures and other rules of conduct made known to the Practitioner and applicable to all physicians of UMass Memorial and/or the Medical Group, including without limitation, policies prohibiting unlawful discrimination, and the Practitioner has exhausted the grievance procedure available to Medical Group physicians and, if applicable, all due process procedures available under the Medical Staff Bylaws of the Medical Center.

7.4.   Automatic.   This Agreement shall terminate automatically upon the breach of Section 1.1, by the Practitioner, except that the Medical Group, in its sole discretion, may, but is not obligated to, suspend this Agreement for a specified reasonable period to enable the Practitioner to cure the breach. If the Practitioner fails to cure the breach within the specified period, this Agreement will terminate immediately upon written notice to the Practitioner by the Medical Group. Further, the Medical Group reserves the right to terminate this Agreement in the event the Practitioner's medical staff membership or clinical privileges are suspended or in any way restricted.

7.5 Suspension.   The Medical Group may suspend the Practitioner for cause, without compensation. Such cause may include, but shall not be limited to, any suspension, restriction or revocation of the Practitioner's Medical Staff membership or clinical privileges at the Medical Center or any suspension, restriction or revocation of the Practitioner's license to practice medicine in any jurisdiction.

## 8.   EFFECT OF TERMINATION

8.1.   Effect of Termination on this Agreement.   The termination of this Agreement in accordance with Section 7, hereunder, shall terminate any and all rights and obligations of the Medical Group and the Practitioner pursuant to this Agreement.   The effective date of termination of this Agreement shall be as set forth in the above-mentioned section(s); provided, however, that upon the termination of this Agreement, the parties shall be and remain obligated and responsible for: (i) any and all obligations accruing prior to the date of termination; and, (ii) any and all obligations, promises, or covenants contained herein which are expressly made to extend beyond the term of this Agreement; and, (iii) the Practitioner shall use reasonable and diligent efforts to assist the System and the Medical Group in arranging for appropriate alternative medical coverage for patients under the care of the Practitioner. Prior to the termination of this Agreement, the Practitioner shall prepare a notice to patients in a form approved by the Medical Group and the Department Chair. Practitioner shall finalize all outstanding billing documentation and complete all patient records prior to his or her departure. Immediately upon the termination of this Agreement, the Practitioner shall deliver to the System sole custody, and total, exclusive and complete use of the System's space, equipment and supplies and shall remove any and all personal possessions from the property of the System. The System shall give the Practitioner reasonable time to effect these conditions.  In the event of

8

termination of this Agreement, payment by the Medical Group of any base salary due the Practitioner under Section 4.1 and Appendix B to the date of termination and of any pay in lieu of notice due Practitioner under Section 7.2 shall constitute the entire obligation of the Medical Group to the Practitioner. The Practitioner recognizes that no compensation is earned after termination of this Agreement.

## 9. GOVERNING RULES, REGULATIONS AND BYLAWS

9.1    Governing Rules, Regulations and Bylaws.    Notwithstanding anything in this Agreement to the contrary, it is hereby expressly understood and agreed by and between the Medical Group and the Practitioner that any and all rights, responsibilities, and obligations of the parties shall at all times during the term of this Agreement be subject to the Bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, all applicable rules and regulations of the System, or its successor, as now exist or as hereinafter may be amended or promulgated by the Board of Trustees of the Medical Group, the Medical Staff of the Medical Center and the President/Chief Executive Officer of the System, or any duly authorized designee thereof.

## 10. ASSIGNMENT AND DELEGATION

10.1.    Assignment and Delegation.    No assignment of this Agreement or the rights hereunder, or delegation of this Agreement or the obligations hereunder shall be valid without the specific written consent of both parties; provided, however, that this Agreement may be assigned by the Medical Group as a result of reorganization or merger, or to any successor entity providing the services now provided by the System or the Medical Group.

## 11. ENTIRE AGREEMENT

11.1.    Entire Agreement.    This Agreement contains the entire agreement between the parties and no statement, promises, inducements, or writings made by any party or agent of any party which is not contained in this written Agreement shall be valid or binding; and this Agreement may not be enlarged, modified, or altered except in a subsequent writing signed by the parties and attached hereto. This Agreement supersedes any and all prior agreements for professional services between the Practitioner and the Medical Group, the System or any other affiliate of the System.

## 12. AMENDMENTS

12.1.    Amendments.    This Agreement may be amended only by an instrument in writing signed by the Medical Group and the Practitioner. Such writing must make specific reference to the terms and conditions of this Agreement which it amends, and will become effective as of the date stipulated therein.

9

13.   GOVERNING LAW

13.1.   Massachusetts Law.  This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed in the Commonwealth of Massachusetts.

14.   NOTICE

14.1.   Notice.   Notices or communications required or permitted to be given pursuant to this Agreement shall be given in writing to the respective parties by hand, by certified mail or by overnight delivery service (e.g., Federal Express, UPS) (such notice being deemed given as of the date of mailing) and addressed to the Practitioner at the Practitioner's last known address kept within the records of the Medical Group, or in the case of the Medical Group, One Biotech Park, Worcester, Massachusetts, attention of the President, UMass Memorial Medical Group.

15.   EXECUTION

15.1.   Execution.  This Agreement and any and all amendments hereto shall be executed in duplicate copies on behalf of each party by the Practitioner and an official specifically authorized by the Medical Group Board with respect to such execution.  Each duplicate copy shall be deemed an original, but both duplicate originals shall together constitute one and the same instrument.

16.   SECTION HEADINGS

Section Headings.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

17.   WAIVER.

Waiver.   A waiver of the breach of any term or condition of this Agreement by either party shall not constitute a waiver of any subsequent breach or breaches of the same term or condition, or any other term or condition hereunder.

18.   SEVERABILITY.

Severability.  If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect by a court of competent jurisdiction, then the remainder of this Agreement, and the application of such provision in circumstances other than those as to which it is so declared invalid or unenforceable, shall not be affected thereby, and each such provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

IN WITNESS WHEREOF, the Medical Group and the Practitioner have caused this Agreement to be signed and sealed as of this _____ day of _____, 20___.

Dated:          By: _Charu S Desai_ , M.D.
                     Charu Desai , M.D.


UMASS MEMORIAL MEDICAL GROUP, INC.


Dated 2/12/    By: _____
                     Michele Streeter, Executive Director

               By: _____
                     Joseph T. Ferrucci, M.D., Chair
                     Department of Radiology


11

## APPENDIX A

The Practitioner shall be responsible for providing professional medical services to patients of the System in need of such services and to enrollees of health plans as to which the Medical Group and Practitioner are participating providers. The services to be rendered hereunder include, but are not limited to outpatient work, inpatient consultative work and direct patient care. The Practitioner's performance hereunder shall be evaluated by the President of the Medical Group and the Department Chair in accordance with the Bylaws of the Medical Staff of the Medical Center. The Practitioner agrees that the practice of medicine shall be limited to the services to be provided pursuant to this Agreement or for the Medical School under its agreement unless Practitioner obtains the prior written approval of the Chair under Medical Group policy to do otherwise.

The Medical Group and the Department Chair shall determine the specific professional medical duties to be performed by the Practitioner, as well as the time and manner of performance, in accordance with and subject to the terms of this Agreement; provided, however, the Medical Group and Department Chair shall not impose requirements which would interfere with the Practitioner's professional judgment in connection with the treatment of patients or cause the Practitioner to violate applicable ethical codes or any law or regulation.

The Practitioner shall at all times provide services to all persons who may become patients of the Medical Group in accordance with the Medical Group's policies and without regard to race, color, creed, sex or ability to pay for services; and

The Practitioner shall participate in Medicare, Medicaid and managed care programs and other third party payor arrangements or governmental programs in which the Medical Group participates and the Practitioner shall abide by and act in accordance with the terms and conditions of all managed care agreements, network, affiliation agreements, provider agreements and other contracts to which the Medical Group or Practitioner (with the Medical Group's consent) is or becomes a party.

## APPENDIX B

1. The Practitioner's compensation for services rendered pursuant to this Agreement, and under a Dual-Employment Arrangement with the Medical School, if applicable, shall be a total base salary, which if annualized would be at the rate of Three-hundred Twenty-Five Thousand Dollars ($325,000) per year, less all legally required and voluntarily-authorized deductions, payable in accordance with Medical Group payroll practices. (Practitioners who participate in the Dual-Employment Arrangement with the Medical School may receive paychecks from both the Medical Group and the Medical School, which together shall equal the base salary referenced above.)

The Practitioner shall also participate in the Physician Incentive Compensation Program of the Department as established by the Medical Group (the "Incentive Compensation Program"), subject to its terms and conditions of participation as in effect or amended from time to time. The Incentive Compensation Program includes eligibility for bonuses and/or salary increases based upon productivity. The Practitioner acknowledges that participation in the Incentive Compensation Program may also involve imposing salary withholds if performance does not meet Medical Group requirements. The Practitioner further acknowledges that, following the first twelve months' of the Practitioner's employment, under the terms of the Incentive Compensation Program, the Medical Group may decrease the Practitioner's base salary if the applicable productivity targets are not met. Salary adjustments will be made upon thirty (30) days written notice to the Practitioner. Salary reductions, if any, shall be consistent with the Department's compensation plan and shall in no event exceed twenty percent of the Practitioner's base salary in any twelve month period.

Subject to the Practitioner's payment of any contribution required of physician employees generally, the Practitioner will be eligible to participate during the term of this Agreement in any and all employee benefit plans made generally available to other physician employees of the Medical Group as in effect from time to time. Such participation by the Practitioner shall be subject to (i) the terms of the applicable plan documents, (ii) generally applicable policies of the Medical Group, and (iii) the discretion of the Board of Trustees of the Medical Group or any administrative or other committee provided for in or contemplated by such plan or policy of the System. A description of the benefits program currently in effect (and subject to change by the Group Board and UMass Memorial Compensation Committee) is attached hereto as Appendix C, "Physician Benefits at a Glance."

13

# Exhibit C

 **UMassMemorial** |  University of Massachusetts
Medical School

Department of Radiology

University Campus
55 Lake Avenue North
Worcester, MA 01655
Tel: 508-856-3252
Fax: 508-856-4910
max.rosen@umassmemorial.org
www.umassmemorial.org

Max P. Rosen, MD, MPH, FACR
Professor and Chair

**VIA HAND DELIVERY**

March 9, 2018

Charu Desai, MD
Department of Radiology
UMass Memorial Medical Group
55 Lake Avenue North
Worcester, MA 01655

RE: *Notice of Termination of Employment*

Dear Dr. Desai:

As Dr. Rosen has discussed with you, this letter serves as notice that your employment with UMass Memorial Medical Group and the University of Massachusetts Medical School will terminate on March 17, 2019.

Kathleen LeBlanc in our Human Resources Department will be available to discuss any questions you may have regarding benefits and related matters.

Thank you for your efforts and contributions on behalf of the Medical Group and the Medical School.

Sincerely,

Max Rosen, MD
Chair, Department of Radiology

Stephen Tosi, MD, President
UMass Memorial Medical Group

Cc: LuAnn Thorndyke, MD

# Exhibit D

# CHARGE OF DISCRIMINATION
## MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

FEPA NUMBER  :

EEOC NUMBER  :

FILING DATE : May 4, 2018

VIOLATION DATE: March 14, 2018

**RECEIVED**

NAME OF AGGRIEVED PERSON OR ORGANIZATION

MAY – 4 2018

Charu Desai, M.D.
32 Whisper Drive
Worcester, MA  01609

TELEPHONE NUMBERS
HOME   : 508-799-5280
OFFICE :

MCAD
BOSTON

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, OR STATE/LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME

1. UNIVERSITY OF MASSACHUSETTS MEMORIAL MEDICAL CENTER
   55 Lake Avenue North
   Worcester, MA  01655

   TELEPHONE NUMBER: 508-334-1000
   NO. OF EMPLOYEES:  over 300

2. UMASS MEMORIAL MEDICAL GROUP
   55 Lake Avenue North
   Worcester, MA  01655

   TELEPHONE NUMBER: 508-856-3252
   NO. OF EMPLOYEES:  over 300

3. UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
   55 Lake Avenue North
   Worcester, MA  01655

   TELEPHONE NUMBER: 508-334-1000
   NO. OF EMPLOYEES:  over 300

4. Max Rosen, M.D.,
   Chair of the Department of Radiology
   UNIVERSITY OF MASSACHUSETTS MEMORIAL MEDICAL CENTER
   55 Lake Avenue North
   Worcester, MA  01655

   TELEPHONE NUMBER: 508-334-1000

5.  Darren Brennan, M.D.,                    TELEPHONE NUMBER:  508-334-1000
    Vice Chair of Community Radiology
    (and Chief of Radiology at
    Marlborough Hospital)

    UNIVERSITY OF
    MASSACHUSETTS MEMORIAL
    MEDICAL CENTER
    55 Lake Avenue North
    Worcester, MA  01655

6.  Stephen E. Tosi, M.D.,                   TELEPHONE NUMBER:  508-334-1000
    Senior Vice President/Chief Physician
    Executive, Chief Medical Officer
    UNIVERSITY OF
    MASSACHUSETTS MEMORIAL
    MEDICAL CENTER
    55 Lake Avenue North
    Worcester, MA  01655

CAUSE OF DISCRIMINATION BASED ON:  AGE, RACE, NATIONAL ORIGIN, GENDER
AND DISABILITY

THE PARTICULARS ARE:

1)  I am female.  I was born on July 6, 1950.  As of the date of this filing, I am 67½

    years of age.  I was born in India and immigrated to the United States in 1974.  I

    have a serious heart condition that substantially compromises my health and required

    the implantation of a pacemaker in 2001.

2)  I graduated from Government Medical College at the South Gujarat University

    School of Medicine, in Surat, Gujarat, India, in 1972.  I completed an internship at

    Civil Hospital in Surat, India, in 1973.

2

3) In 1975, I completed one year of Residency in Pathology at the Mt. Auburn Hospital in Cambridge, Massachusetts. From 1976-1977, I worked as a house physician at Cushing Hospital in Framingham, Massachusetts.

4) From 1978-1981, I was a Resident in Diagnostic Radiology at the University of Massachusetts Memorial Medical Center ("UMass").[1] I served as Chief Resident from 1979-1981 and, in 1981, became the first individual to complete the Diagnostic Radiology residency at UMass. Following my residency, I completed a fellowship in Computed Body Tomography / Ultrasound at UMass, and then joined the staff of UMass for one year.

5) I became board certified by the American Board of Radiology in 1983.

6) From 1983 through 1992, I worked in private practice (in radiology) in the Worcester area.

7) I returned to UMass in January 1992, as an Assistant Professor of Radiology not on the tenure track. I served in that role and as an attending physician in the Division of Thoracic (Chest) Radiology from 1992 to August 2001.

8) Effective September 1, 2001, I was promoted to the position Clinical Associate Professor of Radiology not on the tenure track. I continued to serve as an attending physician in the Division of Chest Radiology.

9) Throughout the entirety of my time at UMass, my work was extremely highly regarded. Indeed, Dr. Jerry Balikian, a former Division Chief of Chest Radiology, who was recognized as one of the most celebrated and nationally reputed radiologists

---

[1] Over the course of my employ, there have been a number of corporate restructurings and mergers involving the University of Massachusetts Medical School, the University of Massachusetts Medical Center, Memorial Hospital, UMass Memorial, UMass Memorial Medical Group (a physician organization), and various of my employment records and documents reflect each of these entity names. Given their interrelatedness, I refer to all of them, collectively, as UMass.

to have worked at UMass and who worked with and directly supervised my work for 25 years, routinely and consistently praised my work. Drs. Joseph Ferrucci and Edward Smith, who served as Chairs of the Department of Radiology, similarly routinely praised my work, as did (does) Dr. Richard Irwin, Chief of Pulmonology at the Medical Center, who routinely has patients requiring my expertise. (Dr. Ferrucci nicknamed me "Goddess of Chest Radiology.") In connection with my promotion to Clinical Associate Professor, my reviewers stated, among other things, that I was an "outstanding radiologist in terms of my diagnostic ability, particularly with reference to thoracic radiology," a "superb chest radiologist" with an "exceptional mind in picking up abnormalities" and "an extremely competent clinical thoracic radiologist" whose "opinion is widely sought by pulmonary specialists, clinicians, other radiologists, and residents." And as recently as June 2017, I received the Teacher of the Year Award for outstanding teaching and mentoring of residents.

10) To my knowledge, throughout the entirety of my career, I have never received a complaint about my performance, clinical skills or readings. None of my cases have been the subject of a quality assurance review or of a morbidity and mortality conference. None of my colleagues or supervisors over the course of my time at UMass ever raised any concerns to me about my performance, clinical skills, or readings. On the contrary, my colleagues at UMass have consistently sought me out for readings. Indeed, countless attending physicians, residents, and physicians from other departments have consulted with me for interpretations of their patients' x-rays and CT scans. They have praised, among other things, my attention to detail and ability to detect the most subtle of findings. (Colleagues nicknamed me "Nodule

Queen" for this.) Colleagues describe me as careful, thorough, and accurate, and several have stated that I am among the best radiologists with whom they have had the pleasure of working.

11) In approximately 2012, Dr. Max Rosen replaced Dr. Ferrucci as the Chairman of the Department of Radiology.

12) I am reliably informed and believe that in October or November 2016, a group of older radiologists including Doctors Adib Karam, Gopal Vijayaraghanavan, Joseph Makris, and Christopher Cerniglia demanded a meeting with Dr. Stephen Tosi, the CEO of UMass (and UMass Memorial Medical Group), to express frustration with Dr. Rosen ongoing underpayment of them compared to younger radiologists that Dr. Rosen had hired. (I am reliably informed and believe that they had raised this issue directly with Dr. Rosen as early as 2013 and 2014, but that he did not correct the disparities.) I am also reliably informed and believe that at the meeting in October or November 2016, Dr. Tosi reprimanded Dr. Rosen for his actions and ordered the salaries to be adjusted.

13) Since Dr. Rosen became Chair, a number of radiologists have left UMass: Dr. Joseph Makris (who is, to my knowledge, in his fifties), Dr. Abhijit Roychowdhury (a senior physician who has over 36 years of experience, and who is Indian), and Dr. Adib Karam (who has approximately twenty years experience, and is Lebanese) have all left (or been forced out of) the Department of Radiology. I am reliably informed and believe that Dr. Rosen stated to Dr. Roychowdhury, "you don't fit my vision of the Department," or words to that effect. I am also reliably informed and believe that he stated to Dr. Padmaja Surapaneni (a female doctor of Indian descent), "you are

useless." I am reliably informed and believe that as a result of Dr. Rosen's treatment of her, and despite the fact that she worked in the Radiology Department for approximately 15 years, she will be leaving for another position offering significantly less compensation, effective June 2018.

14) My experience of Dr. Rosen was (is) similarly troubled. In March 2016, Dr. Rosen hired Dr. Karin Dill (a less experienced, younger radiologist, who is white) to serve as Division Chief of Chest Radiology, even though I had significantly more experience in the field. I am informed and believe that Dr. Dill's compensation is significantly greater than my own. I also am informed and believe that Dr. Rosen has given to Dr. Dill (and, I understand, other younger doctors) one and one half days per week – i.e., approximately 70 days per year – as "academic/administrative days" (i.e., days on which no clinical duties are expected). Dr. Rosen's treatment of me was (is) markedly worse. As an accommodation to my serious heart condition, I had Dr. Rosen asked for twelve academic days per year. Dr. Rosen declined to give me any. Also as an accommodation to my serious heart condition, I asked Dr. Rosen that I be given a workstation so that I might perform work at home over the weekend. Dr. Rosen declined that request, as well, although he gave to Dr. Dill and other of my younger colleagues equipment to work from home and permits them to do work from home. In addition, I have also learned that Dr. Rosen is paying other newly-hired (and far younger / more junior) radiologists more than I am being paid, despite my far greater experience and seniority.

15) As a result of occasional flares of my heart condition / cardiac arrythmia, which flares cause me extreme (and debilitating) shortness of breath, I was (am)

occasionally forced to be late to work.  Although Dr. Rosen was aware of my condition, in May 2016, he reprimanded me for my occasional tardiness.  I asked if, as an accommodation to my heart condition, he would assign to me fewer "call days" (days on which I would be on call for the radiology practice).  He refused my request, telling me to work part time or as a locum tenens.  (I did, in fact, apply for and was granted FMLA leave.  In light of Dr. Rosen's treatment of me, however, I have rarely used it in fear of reprisal if I do, even when I have had episodes of cardiac arrhythmia.)

16) In or about May 2016, I voiced concerns to Dr. Rosen about his disparate (and far more favorable) treatment of younger, less-experienced, and newly-hired physicians in the allotment of academic days, which he seems to provide to every young(er) radiologist involved in giving departmental conferences.  In the presence of Myra Shah, a human resources representative, Dr. Rosen asserted that he would <u>not</u> honor my requests for academic days that he was eagerly providing to those younger, less experienced, newly-hired physicians.  At this same meeting, I requested fewer calls given my seniority and my heart condition.  Dr. Rosen also refused this request.

17) Rather than provide to me these reasonable accommodations (which he granted to others who are not disabled), Dr. Rosen instead suggested, as he had with other older radiologists, that I should simply work part-time or as a locum, rather than full-time. I declined to do so.

18) Nevertheless, Dr. Rosen continued to attempt to pressure me to go part-time or accept a locum tenens position.  Indeed, I am reliably informed that in late 2017, he met with the former Chair of the Department, Dr. Joseph Ferrucci, and urged Dr.

Ferrucci to convince me to accept a part-time or locum tenens position. (Dr. Ferrucci informed me of Dr. Rosen's actions.) I again declined to accept a part-time or accept a locum tenens position.

19) In retrospect perhaps not surprisingly in light of continuing pressure to have me reduce my hours or accept a locum tenens position and my continuing refusal to do so, on March 14, 2018, Dr. Rosen gave me a letter informing me that my employment with UMass would be terminated effective March 17, 2019. The letter gave no reason for my termination. I was stunned.

20) When I asked Dr. Rosen what prompted him to terminate my employment, he first stated that he did not need a reason to terminate me. Particularly in light of my 26 years of dedicated and loyal service to UMass, I was (again) stunned by his dismissive disregard of me. He then stated that he was terminating me because my work was of poor quality. In all of my performance reviews, including my most recent performance review in June 2017, however, there was no indication whatsoever that my work was anything other than completely fine. So I therefore asked him to provide any examples. He was unable to do so. When I continued to press him for any proof of his assertion, he claimed that he had conducted his own independent review. It was not until three weeks after I requested the data that he reviewed that he agreed to meet with me. Moreover, at no prior point, had he (or anyone else) brought to my attention any problems or complaints or concerns about my work, or spoken with me in connection with any investigation (or otherwise) into my work.

21) Dr. Rosen then told me that effective immediately following the meeting on March 14, 2018, in which I was informed of my termination of employment, I could no longer read any Chest CT scans. He told me that I could (can) still read chest x-rays, but that he was "going to keep a close eye on me" (or words to that effect). I was again stunned. In light of my post-residency subspecialty fellowship training focusing on the interpretation of CT scans, his claim about my purportedly poor quality CT readings was (is) nonsensical. That is particularly true where, as here, at no prior point had he (or anyone else) brought to my attention any problems or complaints or concerns about my reviews of Chest CT scans.

22) As I was (and remain) disbelieving of Dr. Rosen's allegations about my performance, shortly after the meeting on March 14, 2018, I asked Dr. Steven Baccei, the Vice-Chair of Quality, Patient Safety, and Process Improvement for the Department of Radiology at UMass, if there had been any issues with my readings. He stated that he was not aware of any.

23) By email on March 24, 2018, I again asked Dr. Rosen to provide evidence of my purportedly poor quality work. It was not until three weeks later, on April 17, 2018, that he responded.

24) In the meantime, although I was also absolutely humiliated at the thought I would have to state to colleagues and residents who routinely consult with me about their patients' Chest CT scans that I could no longer do so, I nevertheless complied with Dr. Rosen's order. Paradoxically, despite forbidding me to review Chest CT scans, Dr. Rosen has nevertheless still required me to provide "noon coverage" once per week (i.e., to cover the lunch hour, when everyone else is absent), which coverage

9

includes the review of Chest CT scans (including emergency pulmonary embolus studies). This inconsistency makes no sense.

25) Also in the meantime, in early April 2018, I learned that Dr. Rosen hired another radiologist to cover part-time in the Chest Division and part-time in the Abdominal Division. Upon information and belief, she is approximately 15 years younger than I am.

26) Also in the meantime, I am reliably informed and believe that on or about April 7, 2018, Dr. Darren Brennan, the Vice Chair of Community Radiology at UMass and Chief of Radiology at Marlborough Hospital (who I believe is in his forties), stated to Dr. Ferrucci, "we feel bad about what we had to do to Charu" (or words to that effect). As Dr. Brennan is Chief of Radiology at Marlborough Hospital, he was clearly at least in part responsible for the decision to curtail my CT scan reads and terminate my employment.

27) I am also reliably informed and believe that Dr. Rosen told Dr. Ferruci that he fired me as a result of issues/complaints from Marlborough Hospital. At no prior point, however, had he (or anyone else) brought to my attention any problems or complaints or concerns about my work at Marlborough Hospital.

28) As I noted above, by email dated April 17, 2018, Dr. Rosen finally responded to my March 24 email asking for evidence of my purportedly poor quality work. In his email response, he stated that he would be happy to set up a meeting to discuss the results of an "independent analysis" he had performed on my work. He told me I could bring a colleague. I asked to bring an independent expert with me to that meeting instead of a colleague to assess the concerns he raised, explaining that I was

concerned that my colleagues would feel uncomfortable contradicting him, given his authority over them.  He refused to permit me to bring an independent expert.

29) In a separate email to me also on April 17, 2018, Dr. Rosen stated that it was inappropriate for me to speak with residents about my employment, and he threatened, "I want to confirm your understanding that it is inappropriate for you to discuss ANY issues related to your UMMMG or UMMS employment with the Radiology residents, and that you will avoid doing so going forward. [2]" (Emphasis in original.)  I was not, in fact, aware that I could not discuss ANY issues related to my employment with colleagues.  (I am aware of no such proscription in any UMass handbooks and, indeed, I believe that such a prohibition would be illegal.) Moreover, I had not actually had any "inappropriate" conversations with residents regarding my employment.  Rather, in response to residents' requests for assistance reading CT scans (which had been my job), I had simply informed them, accurately, that I was no longer permitted to read CT scans.  When they asked me why, I stated, accurately, that I believed that my employment at UMass would be short lived.  Here too, then, Dr. Rosen's criticisms / accusations are not based on facts.

30) On April 24, 2018, I met with Dr. Rosen and Dr. Baccei about my purportedly poor quality work.   My colleague Dr. Sarwat Hussain (who reports to Rosen) accompanied me, instead of the independent reviewer I had requested.  The entire meeting lasted only approximately fifteen minutes; Dr. Rosen gave me virtually no substantive information.

---

[2] I understand Dr. Rosen's references to UMMS and UMMMG to be references to UMass Medical School and the University of Massachusetts Memorial Medical Group.

i) At that meeting, I asked Dr. Rosen when the review was conducted. He initially stated that he did not know. He then checked his computer and stated that he began investigating my work at the end of 2016 and did so through the first quarter of 2017. That explanation seems false, however, for three reasons. First, he did not bring any purported issue to my attention during this time period, nor did he do so at any time before he informed me on March 14, 2018 of my termination effective March 2019. Second, my most recent performance review, which was conducted in or about June 2017 (just a few short months after the close of the first quarter of 2017), similarly does not even mention the existence of any purported concerns about the quality of my work. *Third, and perhaps most importantly, it is not at all credible that I was permitted to continue to read CT scans for over one year after the conclusion of an "independent review" (purportedly conducted from the end of 2016 and through the first quarter of 2017) allegedly concluded that my work was of poor quality.*

ii) When I asked Dr. Rosen the name of the independent reviewer he used to review my work and the hospital at which s/he worked, he refused to tell me.

iii) When I asked Dr. Rosen for all the patient records and other pertinent information regarding my purported deficiencies, he refused to provide it.

iv) When I asked Dr. Rosen for a written copy of the information that he presented to me (by projecting information on a screen) about the alleged

12

deficiencies in the quality of my CT scan readings, he refused to give it to me. (The information he projected, which purported to show my poor quality work, included the reports of several other radiologists in a manner that was seemingly intentionally disorganized and extremely difficult to comprehend. It is not at all clear, from the little information I was "presented" and the very little time I was given to review it, that any of the purported poor quality readings were indeed mine.)

    v) The summary report of my purportedly poor quality work that Dr. Rosen did provide did not include any concrete examples of my deficiencies; it simply cited "statistics" from the investigation. I was given no opportunity to analyze any information he allegedly used, and therefore have no ability whatsoever to rebut / refute these assertions that my work is of "poor quality."

31) Dr. Rosen's purported reason for my termination is riddled with weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions.

*Age Discrimination claims*:

32) In giving the role and title of Division Chief of Chest Radiology to Dr. Karin Dill, a younger, far less experienced radiologist, despite my qualifications, experience and seniority, Respondents UMass and Dr. Rosen discriminated against me on the basis of age.

33) In terminating me while at the same time hiring Dr. Dill, a younger, less experienced radiologist to replace me (after my departure in March 2019), Respondents UMass and Dr. Rosen discriminated against me on the basis of age.

34) In providing CT training to my younger, less experienced radiology colleagues while failing to offer the same training to me, Respondents UMass and Dr. Rosen discriminated against me on the basis of age.

35) In paying me less than it/they paid my younger, less experienced colleagues, Respondents UMass and Dr. Rosen discriminated against me on the basis of age.

36) In providing to me fewer (no) academic days in contrast to the number of days provided to my younger, less experienced colleagues, Respondents UMass and Dr. Rosen discriminated against me on the basis of age.

*Race / National Origin Discrimination Claims*

37) In giving the role and title of Division Chief of Chest Radiology to a far less experienced radiologist who is white, notwithstanding my similar qualifications, greater experience and greater seniority, Respondents UMass and Dr. Rosen discriminated against me on the basis of race and/or national origin.

38) In terminating me while at the same time hiring Dr. Dill, a less experienced white radiologist to replace me (after my departure in March 2019), Respondents UMass and Dr. Rosen discriminated against me on the basis of race and/or national origin.

39) In paying me less than white colleagues, Respondents UMass and Dr. Rosen discriminated against me on the basis of race and/or national origin.

40) In providing to me fewer (no) academic days than the number provided to my white colleagues, Respondents UMass and Dr. Rosen discriminated against me on the basis of race and/or national origin.

*Gender Discrimination Claims*

41) In paying me less than my male colleagues, Respondents UMass and Dr. Rosen discriminated against me on the basis of gender.

42) In providing to me fewer academic days than the number provided to male colleagues, Respondents UMass and Dr. Rosen discriminated against me on the basis of gender.

*Disability Discrimination and Failure To Accommodate Claim*

43) In providing me fewer (no) academic days than it/they provided to my non-disabled colleagues, and in refusing to permit me to work from home on weekdays and weekends (in contrast to my non-disabled colleagues), Respondents UMass and Dr. Rosen discriminated against me on the basis of disability and failed to accommodate my disability.

*Aiding and Abetting Claim*

44) By his role in terminating my employment, Dr. Brennan aided and abetted discrimination against me.

45) By his actions in refusing to correct Dr. Rosen's discriminatory behavior and disparate treatment of me based on my gender, age, national origin and disability, despite his knowledge of same, Dr. Tosi has aided and abetted discrimination against me.

46) I therefore charge the Respondents with violating federal and state law, including Title VII, the Americans With Disabilities Act, the Age Discrimination in Employment Act, and Mass Gen. L. c. 151B.

47) As a consequence of Respondents' unlawful conduct, I have already lost salary and related benefits of employment, have suffered emotional distress, have lost personal

financial losses.  The Respondents are liable for all of these losses, plus attorney's fees and costs.

I ALSO WANT THIS CHARGE FILED WITH THE EEOC: _____X_____

I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCESSING OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.

I SWEAR OR AFFIRM THAT I HAVE READ THIS COMPLAINT AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF

_Chan S. Desai_
(SIGNATURE OF COMPLAINANT)

SWORN AND SUBSCRIBED BEFORE ME THIS 30th DAY OF APRIL, 2018.

NOTARY PUBLIC: _Patricia Jo Hanley_
MY COMMISSION EXPIRES: _____

Patricia-Jo Hanley
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
April 2, 2021

16

# Exhibit E

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**484 Main Street, Room 320, Worcester, MA 01608**
**Phone:  (508) 453-9630 Fax: (508) 755-3861**

Date: 1/7/2019

Charu Desai
32 Whisper Drive
Worcester, MA 01609

**RE: Charu Desai v. UMass Memorial Center, UMass Memorial Medical Group, UMass Medical**
**School, Marlborough Hospital, Darren Brennan, Stephen E Tosi, Max Rosen, Karin Dill**
**MCAD Docket Number: 18WEM01247**
**EEOC/HUD Federal Charge Number: 16C-2018-01520**

Dear Counsel:

        Enclosed, please find a copy of an Order issued in the above-referenced matter. Respondents
Marlborough Hospital and Karin Dill may file an answer within 21 days of receipt of this order

Very truly yours,

Karlyn Greene
Investigator

Enclosure

Cc:
Jesse Edwards
Director Diversity and Equal Opportunity
Office of Diversity & Incllusion
UMass Medical School
55 Lake Ave. North
Worcester, MA 01655

Karin Dill
UMass Memorial Medical Center
55 Lake Avenue North
Worcester, MA 01655

Michael P. Murphy, Esquire
MIRICK O'CONNELL
1800 West Park Dr., Suite 400
Westborough, MA 01581-3926

Patricia Washienko, Esq.
Freiberger & Washienko, LLC
211 Congress St, Suite 720
Boston, MA 02110

MCAD Docket Number 18WEM01247, Order Issued Cover Letter

## COMMONWEALTH OF MASSACHUSETTS
### COMMISSION AGAINST DISCRIMINATION

CHARU DESAI,

      Complainant

      v.

                              DOCKET NO.  18WEM01247

UNIVERSITY OF MASSACHUSETTS
MEMORIAL MEDICAL CENTER, INC.,
UNIVERSITY OF MASSACHUSETTS
MEMORIAL MEDICAL GROUP,
UNIVERSITY OF MASSACHUSETTS
MEDICAL SCHOOL,
MAX ROSEN, STEPHEN TOSI,
DARREN BRENNAN, MARLBOROUGH
HOSPITAL, KARIN DILL,

      Respondent

### ORDER

      Pursuant to 804 CMR 1.09(2) and 1.10 (6) of the Commission's Rules of Procedure, the above referenced complaint is hereby amended to include additional allegations of discrimination based on age (67 years old at the time of the alleged discrimination), race/color (Non-White), national origin (India), sex (female), and disability (heart issues), in violation of M.G.L. c. 151B, section 4, paragraphs 1, 1C, 5, the ADEA, the ADA, and Title VII and to add Marlborough Hospital and Karin Dill as named Respondents to Complainant's aforementioned charges, as set forth in Complainant's Motion to Amend, dated November 29, 2018, attached hereto and incorporated by reference herein. The complaint shall henceforth be captioned *Charu Desai v. University of Massachusetts Memorial Medical Center, Inc., University of Massachusetts Memorial Medical Group, University of Massachusetts Memorial Medical School, Max Rosen, Stephen Tosi, Darren Brennan, Marlborough Hospital, Karin dill.*

SO AMENDED this  7th  day of  January  , 2019.

Monserrate Quiñones
Investigating Commissioner

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

|  |  |  |
|---|---|---|
| CHARU DESAI, | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | |
| v. | ) | MCAD No.: 18WEM01247 |
| | ) | EEOC No.: 16C-2018-01520 |
| UNIVERSITY OF MASSACHUSETTS | ) | |
| MEMORIAL MEDICAL CENTER, | ) | |
| UMASS MEMORIAL MEDICAL | ) | |
| GROUP, UNIVERSITY OF | ) | |
| MASSACHUSETTS MEDICAL | ) | |
| SCHOOL, Max Rosen, M.D., | ) | |
| Darren Brennan, M.D., | ) | |
| and Stephen E. Tosi, M.D. | ) | |
| | ) | |
| Respondents. | ) | |

## COMPLAINANT'S MOTION TO AMEND CHARGE OF DISCRIMINATION

Pursuant to 804 CMR 1.10(6) and 804 CMR 1.05, Complainant Charu Desai ("Dr. Desai" or the "Complainant") hereby moves this Commission to amend her Charge of Discrimination to add Marlborough Hospital and Karin Dill, M.D., as named Respondents. Complainant's Amended Charge of Discrimination is attached hereto.

A. Complainant's Motion To Amend Should Be Granted In Order To Amplify And Clarify Her Charge Of Discrimination

On May 4, 2018, Complainant timely filed the above-captioned Charge of Discrimination. Since then, she has identified two additional Respondents growing out of the same underlying facts and circumstances. The Amendment seeks to add as named Respondents a joint employer who was identified in the original Charge of Discrimination and an individual who played a role in Complainant's termination. This Amendment also adds relevant facts not originally alleged in the Charge of Discrimination. These additional facts provide additional

1

evidence of discrimination based on age, race, national origin, gender, and disability and aiding and abetting discrimination in violation of G.L. c. 151B. These facts relate to or arise out of the subject matter of the original Charge.

It is well settled that a complainant may amend her Charge of Discrimination to clarify and amplify allegations made therein at any time prior to Certification of Public Hearing. See 804 CMR 1.10(6)(a) and (b). Amendments shall relate back to the original filing date. Id. Pursuant to 804 C.M.R. 1.09(2), the Investigating Commission, upon his/her own motion or upon motion of any party, may at any time during any proceeding or investigation make such substitution, joinder, or amendment of parties as justice or convenience may require. Here, and as set forth more fully below, justice requires such substitution. See also Conroy v. Boston Edison Co., 758 F.Supp. 54, 58-59 (D. Mass. 1991) (explaining that amended facts that "grow out of" the original Charge or which "could have reasonably been discovered through agency investigation" are properly allowed and relate back to the original filing date).

1. Marlborough Hospital Should Be Added As A Respondent

This Motion seeks to add as a named Respondent, Marlborough Hospital, which is identified in Complainant's original Charge of Discrimination as one of the hospitals where Complainant worked and as the source of the complaint that led to her termination.

Joint employment is a recognized path to liability under the anti-discrimination statutes. See Commodore v. Genesis Health Ventures, Inc., 63 Mass. App. Ct. 57, 61 (2005). A joint employer under M.G.L. c. 151B is defined as a company "possessing 'sufficient control over the work of the employees' of another company." Id. at 61 (quoting Boire v. Greyhound Corp., 376 U.S. 473, 481 (1964). Courts have also recognized joint employer liability where an employee is under simultaneous control by two employers and performs services for both. See Williams v. Westover Finishing Co., Inc., 24 Mass. App. Ct. 58, 60, (1987).

2

As described in Paragraphs 26 and 27 of her original Charge of Discrimination, Complainant worked as a Radiologist at Marlborough Hospital, and the complaint that ultimately led to her termination originated at Marlborough Hospital. (Paragraph 18 of Respondent's Position Statement confirms that the alleged internal complaint that ultimately led to Complainant's termination came from Marlborough Hospital.) As a direct consequence thereof, Marlborough Hospital had control of the terms and conditions of Complainant's employment and is therefore a joint employer.

In light of the above, it is clear that Marlborough Hospital had control over Complainant's employment with regard to the discriminatory adverse action she suffered. Accordingly, the evidence overwhelmingly supports Marlborough Hospital being added as a Respondent.

2. Dr. Karin Dill Should Be Added As A Respondent

This Motion also seeks to add Complainant's supervisor, Karin Dill, M.D. ("Dr. Dill"), who is identified in the original Charge of Discrimination, as a named Respondent because of her actions aiding and abetting discrimination against Complainant.

It is unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so." G.L. c. 151B, § 4(5). In "order for an individual to be held liable for a violation of 151B [she] must have, at the very least, 'interfered' with another's rights in a manner that was in deliberate disregard of those rights." See Woodason v. Town of Norton School Committee et. al, 25 MDLR 62, 64 (2003).

Upon information and belief, Dr. Dill generated a "peer review" of Complainant that contained misrepresentations of Complainant's readings which were then used to terminate Complainant. Dr. Dill's "peer review" of Complainant's CT scan readings consisted of six cases taking place between July 1, 2016 and June 30, 2017. Dr. Dill purportedly concluded that these

3

six readings all contained "significant deficiencies." See Peer Review of Dr. Charu Desai by Dr. Karin Dill, attached hereto as Exhibit A. Upon review, however, Complainant discovered that the conclusions that Dr. Dill made in five of six cases were incorrect. Moreover, the sixth conclusion Dr. Dill reached (that there was a significant deficiency in the interpretation of a CT scan) was actually based on a case for which *Dr. Dill had done the reading*, not Complainant. Yet Dr. Dill still falsely claimed that the reading contained a deficiency attributable to Complainant.

At Complainant's April 24, 2018 meeting with Dr. Rosen, described in the original Charge of Discrimination, Dr. Rosen presented "evidence" that Complainant's work was of "poor quality." While much of this data was obscured, Complainant recognized some of the cases presented as the same cases that Dr. Dill reviewed in her "peer review." The presence of Dr. Dill's "reviews" in Dr. Rosen's presentation indicates that Dr. Dill cooperated with Dr. Rosen in order to generate the "independent review" that was then used to discriminatorily terminate Complainant. Because Dr. Dill's false conclusions were used as a means to terminate Complainant's employ, Dr. Dill interfered with Complainant's rights and thus aided and abetted discrimination against her. Evidence therefore supports Dr. Dill being added as an individual Respondent.

All of these amendments arise out of the same facts and circumstances described in the original Charge of Discrimination. Allowing this Amendment will cause no prejudice for either party, as Respondents will have an adequate opportunity to respond to Complainant's new, additional allegations. Moreover, this is Complainant's first request to amend her Charge of Discrimination.

## CONCLUSION

Complainant has taken prompt and affirmative steps to enforce her civil rights before this Commission. If the Motion to Amend is not allowed, justice will not be served. Complainant

will be significantly prejudiced by not being able to name all potential respondents and not being allowed to fully prosecute her legal claims against them. She therefore respectfully requests that her Motion to Amend be allowed.

RESPECTFULLY SUBMITTED,

Complainant Charu Desai, M.D.,

By her Attorneys,

Patricia A. Washienko, BBO# 641615
pwashienko@fwlawboston.com
Marc D. Freiberger, BBO # 650377
mfreiberger@fwlawboston.com
Freiberger & Washienko LLC
211 Congress Street, Suite 720
Boston, MA 02110
(617) 723-0008

Dated: November 21th, 2018

## CERTIFICATE OF SERVICE

I, Patricia A. Washienko, hereby certify that, in accord with 804 CMR 1.05(3)(d), I have this day, November 21, 2018, served a copy of the foregoing document by electronic and first-class mail upon all parties, through counsel:

Michael P. Murphy, Esq.
Mirick O'Connell
1800 West Park Drive, Suite 400
Westborough, MA 01582-3926
mmurphy@mirickoconnell.com

Jesse Edwards
Director, Diversity & Equal Opportunity
55 Lake Avenue North (Room 1-710)
Worcester, MA 01655-0002
Jesse.edwards@umassmed.edu

Patricia A. Washienko

5

# Exhibit F

## CHARGE OF DISCRIMINATION
## MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

FEPA NUMBER :

EEOC NUMBER :

FILING DATE : January 7, 2018

VIOLATION DATE: March 14, 2018

NAME OF AGGRIEVED PERSON OR ORGANIZATION

**RECEIVED**

Charu Desai, M.D.
32 Whisper Drive
Worcester, MA 01609

TELEPHONE NUMBERS
HOME : 508-799-5280
OFFICE :

JAN - 7 2019

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY OR
STATE/LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME

1. UMASS MEMORIAL
   MARLBOROUGH HOSPITAL
   157 Union Street
   Marlborough, MA 01752

   TELEPHONE NUMBER: 508-334-1000
   NO. OF EMPLOYEES: over 300

2. Karin Dill, M.D.,
   Division Chief of Chest Radiology
   UNIVERSITY OF
   MASSACHUSETTS MEMORIAL
   MEDICAL CENTER
   55 Lake Avenue North
   Worcester, MA 01655

   TELEPHONE NUMBER: 508-856-3252

CAUSE OF DISCRIMINATION BASED ON: AGE, RACE, NATIONAL ORIGIN, GENDER
AND DISABILITY

THE PARTICULARS ARE:

1) I am female. I was born on July 6, 1950. As of the date of this filing, I am 67½
   years of age. I was born in India and immigrated to the United States in 1974. I
   have a serious heart condition that substantially compromises my health and required
   the implantation of a pacemaker in 2001.

2) I graduated from Government Medical College at the South Gujarat University
   School of Medicine, in Surat, Gujarat, India, in 1972. I completed an internship at
   Civil Hospital in Surat, India, in 1973.

3) In 1975, I completed one year of Residency in Pathology at the Mt. Auburn Hospital in Cambridge, Massachusetts. From 1976-1977, I worked as a house physician at Cushing Hospital in Framingham, Massachusetts.

4) From 1978-1981, I was a Resident in Diagnostic Radiology at the University of Massachusetts Memorial Medical Center ("UMass"). I served as Chief Resident from 1979-1981 and, in 1981, became the first individual to complete the Diagnostic Radiology residency at UMass. Following my residency, I completed a fellowship in Computed Body Tomography / Ultrasound at UMass, and then joined the staff of UMass for one year.

5) I became board certified by the American Board of Radiology in 1983.

6) From 1983 through 1992, I worked in private practice (in radiology) in the Worcester area.

7) I returned to UMass in January 1992, as an Assistant Professor of Radiology not on the tenure track. I served in that role and as an attending physician in the Division of Thoracic (Chest) Radiology from 1992 to August 2001.

8) Effective September 1, 2001, I was promoted to the position Clinical Associate Professor of Radiology not on the tenure track. I continued to serve as an attending physician in the Division of Chest Radiology at UMass.

9) I also regularly interpreted radiology readings originating from UMass Memorial Marlborough Hospital ("Marlborough Hospital").

10) Throughout the entirety of my time at UMass, my work was extremely highly regarded. Indeed, Dr. Jerry Balikian, a former Division Chief of Chest Radiology, who was recognized as one of the most celebrated and nationally reputed radiologists to have worked at UMass and who worked with and directly supervised my work for

---

Over the course of my employ, there have been a number of corporate restructurings and mergers involving the University of Massachusetts Medical School, the University of Massachusetts Medical Center, Memorial Hospital, UMass Memorial, UMass Memorial Medical Group (a physician organization), and various of my employment records and documents reflect each of these entity names. Given their interrelatedness, I refer to all of them, collectively, as UMass.

25 years, routinely and consistently praised my work. Drs. Joseph Ferrucci and Edward Smith, who served as Chairs of the Department of Radiology, similarly routinely praised my work, as did (does) Dr. Richard Irwin, Chief of Pulmonology at the Medical Center, who routinely has patients requiring my expertise. (Dr. Ferrucci nicknamed me "Goddess of Chest Radiology.") In connection with my promotion to Clinical Associate Professor, my reviewers stated, among other things, that I was an "outstanding radiologist in terms of my diagnostic ability, particularly with reference to thoracic radiology," a "superb chest radiologist" with an "exceptional mind in picking up abnormalities" and "an extremely competent clinical thoracic radiologist" whose "opinion is widely sought by pulmonary specialists, clinicians, other radiologists, and residents." And as recently as June 2017, I received the Teacher of the Year Award for outstanding teaching and mentoring of residents.

11) To my knowledge, throughout the entirety of my career, I have never received a complaint about my performance, clinical skills or readings. None of my cases have been the subject of a quality assurance review or of a morbidity and mortality conference. None of my colleagues or supervisors over the course of my time at UMass ever raised any concerns to me about my performance, clinical skills, or readings. On the contrary, my colleagues at UMass have consistently sought me out for readings. Indeed, countless attending physicians, residents, and physicians from other departments have consulted with me for interpretations of their patients' x-rays and CT scans. They have praised, among other things, my attention to detail and ability to detect the most subtle of findings. (Colleagues nicknamed me "Nodule Queen" for this.) Colleagues describe me as careful, thorough, and accurate, and several have stated that I am among the best radiologists with whom they have had the pleasure of working.

12) In approximately 2012, Dr. Max Rosen replaced Dr. Ferrucci as the Chairman of the Department of Radiology.

3

13) I am reliably informed and believe that in October or November 2016, a group of older radiologists including Doctors Adib Karam, Gopal Vijayaraghanavan, Joseph Makris, and Christopher Cerniglia demanded a meeting with Dr. Stephen Tosi, the CEO of UMass (and UMass Memorial Medical Group), to express frustration with Dr. Rosen ongoing underpayment of them compared to younger radiologists that Dr. Rosen had hired. (I am reliably informed and believe that they had raised this issue directly with Dr. Rosen as early as 2013 and 2014, but that he did not correct the disparities.) I am also reliably informed and believe that at the meeting in October or November 2016, Dr. Tosi reprimanded Dr. Rosen for his actions and ordered the salaries to be adjusted.

14) Since Dr. Rosen became Chair, a number of radiologists have left UMass: Dr. Joseph Makris (who is, to my knowledge, in his fifties), Dr. Abhijit Roychowdhury (a senior physician who has over 36 years of experience, and who is Indian), and Dr. Adib Karam (who has approximately twenty years experience, and is Lebanese) have all left (or been forced out of) the Department of Radiology. I am reliably informed and believe that Dr. Rosen stated to Dr. Roychowdhury, "you don't fit my vision of the Department," or words to that effect. I am also reliably informed and believe that he stated to Dr. Padmaja Surapaneni (a female doctor of Indian descent), "you are useless." I am reliably informed and believe that as a result of Dr. Rosen's treatment of her, and despite the fact that she worked in the Radiology Department for approximately 15 years, she will be leaving for another position offering significantly less compensation, effective June 2018.

15) My experience of Dr. Rosen was (is) similarly troubled. In March 2016, Dr. Rosen hired Dr. Karin Dill (a less experienced, younger radiologist, who is white) to serve as Division Chief of Chest Radiology, even though I had significantly more experience in the field. I am informed and believe that Dr. Dill's compensation is significantly greater than my own. I also am informed and believe that Dr. Rosen

4

has given to Dr. Dill (and, I understand, other younger doctors) one and one half days per week – i.e., approximately 70 days per year – as "academic/administrative days" (i.e., days on which no clinical duties are expected). Dr. Rosen's treatment of me was (is) markedly worse. As an accommodation to my serious heart condition, I had Dr. Rosen asked for twelve academic days per year. Dr. Rosen declined to give me any. Also as an accommodation to my serious heart condition, I asked Dr. Rosen that I be given a workstation so that I might perform work at home over the weekend. Dr. Rosen declined that request, as well, although he gave to Dr. Dill and other of my younger colleagues equipment to work from home and permits them to do work from home. In addition, I have also learned that Dr. Rosen is paying other newly-hired (and far younger / more junior) radiologists more than I am being paid, despite my far greater experience and seniority.

16) As a result of occasional flares of my heart condition / cardiac arrhythmia, which flares cause me extreme (and debilitating) shortness of breath, I was (am) occasionally forced to be late to work. Although Dr. Rosen was aware of my condition, in May 2016, he reprimanded me for my occasional tardiness. I asked if, as an accommodation to my heart condition, he would assign to me fewer "call days" (days on which I would be on call for the radiology practice). He refused my request, telling me to work part time or as a locum tenens. (I did, in fact, apply for and was granted FMLA leave. In light of Dr. Rosen's treatment of me, however, I have rarely used it in fear of reprisal if I do, even when I have had episodes of cardiac arrhythmia.)

17) In or about May 2016, I voiced concerns to Dr. Rosen about his disparate (and far more favorable) treatment of younger, less-experienced, and newly-hired physicians in the allotment of academic days, which he seems to provide to every young(er) radiologist involved in giving departmental conferences. In the presence of Myra Shah, a human resources representative, Dr. Rosen asserted that he would not honor

5

my requests for academic days that he was eagerly providing to those younger, less experienced, newly-hired physicians. At this same meeting, I requested fewer calls given my heart condition. Dr. Rosen also refused this request.

18) Rather than provide to me these reasonable accommodations (which he granted to others who are not disabled), Dr. Rosen instead suggested, as he had with other older radiologists, that I should simply work part-time or as a locum, rather than full-time. I declined to do so.

19) Nevertheless, Dr. Rosen continued to attempt to pressure me to go part-time or accept a locum tenens position. Indeed, I am reliably informed that in late 2017, he met with the former Chair of the Department, Dr. Joseph Ferrucci, and urged Dr. Ferrucci to convince me to accept a part-time or locum tenens position. (Dr. Ferrucci informed me of Dr. Rosen's actions.) I again declined to accept a part-time or accept a locum tenens position.

20) In retrospect perhaps not surprisingly in light of continuing pressure to have me reduce my hours or accept a locum tenens position and my continuing refusal to do so, on March 14, 2018, Dr. Rosen gave me a letter informing me that my employment with UMass would be terminated effective March 17, 2019. The letter gave no reason for my termination. I was stunned.

21) When I asked Dr. Rosen what prompted him to terminate my employment, he first stated that he did not need a reason to terminate me. Particularly in light of my 26 years of dedicated and loyal service to UMass, I was (again) stunned by his dismissive disregard of me. He then stated that he was terminating me because my work was of poor quality. In all of my performance reviews, including my most recent performance review in June 2017, however, there was no indication whatsoever that my work was anything other than completely fine. So I therefore asked him to provide any examples. He was unable to do so. When I continued to press him for any proof of his assertion, he claimed that he had conducted his own

6

independent review. It was not until three weeks after I requested the data that he reviewed that he agreed to meet with me. Moreover, at no prior point, had he (or anyone else) brought to my attention any problems or complaints or concerns about my work, or spoken with me in connection with any investigation (or otherwise) into my work.

22) Dr. Rosen then told me that effective immediately following the meeting on March 14, 2018, in which I was informed of my termination of employment, I could no longer read any Chest CT scans. He told me that I could (can) still read chest x-rays, but that he was "going to keep a close eye on me" (or words to that effect). I was again stunned. In light of my post-residency subspecialty fellowship training focusing on the interpretation of CT scans, his claim about my purportedly poor quality CT readings was (is) nonsensical. That is particularly true where, as here, at no prior point had he (or anyone else) brought to my attention any problems or complaints or concerns about my reviews of Chest CT scans.

23) As I was (and remain) disbelieving of Dr. Rosen's allegations about my performance, shortly after the meeting on March 14, 2018, I asked Dr. Steven Baccei, the Vice-Chair of Quality, Patient Safety, and Process Improvement for the Department of Radiology at UMass, if there had been any issues with my readings. He stated that he was not aware of any.

24) By email on March 24, 2018, I again asked Dr. Rosen to provide evidence of my purportedly poor quality work. It was not until three weeks later, on April 17, 2018, that he responded.

25) In the meantime, although I was also absolutely humiliated at the thought I would have to state to colleagues and residents who routinely consult with me about their patients' Chest CT scans that I could no longer do so, I nevertheless complied with Dr. Rosen's order. Paradoxically, despite forbidding me to review Chest CT scans, Dr. Rosen has nevertheless still required me to provide "noon coverage" once per

week (i.e., to cover the lunch hour, when everyone else is absent), which coverage includes the review of Chest CT scans (including emergency pulmonary embolus studies). This inconsistency makes no sense.

26) Also in the meantime, I am reliably informed and believe that on or about April 7, 2018, Dr. Darren Brennan (who I believe is in his forties), the Vice Chair of Community Radiology at UMass and Chief of Radiology at Marlborough Hospital, stated to Dr. Ferrucci, "we feel bad about what we had to do to Charu" (or words to that effect). As Dr. Brennan is Chief of Radiology at Marlborough Hospital, he was clearly at least in part responsible for the decision to curtail my CT scan reads and terminate my employment.

27) I am also reliably informed and believe that Dr. Rosen told Dr. Ferrucci that he fired me as a result of issues/complaints from Marlborough Hospital. At no prior point, however, had he (or anyone else) brought to my attention any problems or complaints or concerns about my work at Marlborough Hospital.

28) As I noted above, by email dated April 17, 2018, Dr. Rosen finally responded to my March 24 email asking for evidence of my purportedly poor quality work. In his email response, he stated that he would be happy to set up a meeting to discuss the results of an "independent analysis" he had performed on my work. He told me I could bring a colleague. I asked to bring an independent expert with me to that meeting instead of a colleague to assess the concerns he raised, explaining that I was concerned that my colleagues would feel uncomfortable contradicting him, given his authority over them. He refused to permit me to bring an independent expert.

29) In a separate email to me also on April 17, 2018, Dr. Rosen stated that it was inappropriate for me to speak with residents about my employment, and he threatened, "I want to confirm your understanding that it is inappropriate for you to discuss ANY issues related to your UMMMG or UMMS employment with the

8

Radiology residents, and that you will avoid doing so going forward.[2]" (Emphasis in original.)  I was not, in fact, aware that I could not discuss ANY issues related to my employment with colleagues.  (I am aware of no such proscription in any UMass handbooks and, indeed, I believe that such a prohibition would be illegal.)  Moreover, I had not actually had any "inappropriate" conversations with residents regarding my employment.  Rather, in response to residents' requests for assistance reading CT scans (which had been my job), I had simply informed them, accurately, that I was no longer permitted to read CT scans.  When they asked me why, I stated, accurately, that I believed that my employment at UMass would be short lived.  Here too, then, Dr. Rosen's criticisms / accusations are not based on facts.

30) On April 24, 2018, I met with Dr. Rosen and Dr. Baccei about my purportedly poor quality work.  My colleague Dr. Sarwat Hussain (who reports to Rosen) accompanied me, instead of the independent reviewer I had requested, in light of Dr. Rosen's refusal to permit me to have an independent reviewer join me.  The entire meeting lasted only approximately fifteen minutes; Dr. Rosen gave me virtually no substantive information.

   i)  At this meeting, I asked Dr. Rosen when the review was conducted.  He initially stated that he did not know.  He then checked his computer and stated that he began investigating my work at the end of 2016 and did so through the first quarter of 2017.  That explanation seems false, however, for three reasons.  First, he did not bring any purported issue to my attention during this time period, nor did he do so at any time before he informed me on March 14, 2018 of my termination effective March 2019.  Second, my most recent performance review, which was conducted in or about June 2017 (just a few short months after the close of the first

---

[2] I understand Dr. Rosen's references to UMMS and UMMMG to be references to UMass Medical School and the University of Massachusetts Memorial Medical Group.

quarter of 2017), similarly does not even mention the existence of any purported concerns about the quality of my work. *Third, and perhaps most importantly, it is not at all credible that I was permitted to continue to read CT scans for over one year after the conclusion of an "independent review" (purportedly conducted from the end of 2016 and through the first quarter of 2017) allegedly concluded that my work was of poor quality.*

ii) When I asked Dr. Rosen the name of the independent reviewer he used to review my work and the hospital at which s/he worked, he refused to tell me.

iii) When I asked Dr. Rosen for all the patient records and other pertinent information regarding my purported deficiencies, he refused to provide it.

iv) When I asked Dr. Rosen for a written copy of the information that he presented to me (by projecting information on a screen) about the alleged deficiencies in the quality of my CT scan readings, he refused to give it to me. (The information he projected, which purported to show my poor quality work, included the reports of several other radiologists in a manner that was seemingly intentionally disorganized and extremely difficult to comprehend. It is not at all clear, from the little information I was "presented" and the very little time I was given to review it, that any of the purported poor quality readings were indeed mine.)

v) The summary report of my purportedly poor quality work that Dr. Rosen did provide did not include any concrete examples of my deficiencies; it simply cited "statistics" from the investigation. I was given no opportunity to analyze any information he allegedly used, and therefore have no ability whatsoever to rebut / refute these assertions that my work is of "poor quality."

vi) In or around August 2018, I discovered a "peer review" evaluation that Dr. Karin Dill performed assessing the quality of my work from the time period July 2016 to June 2017. Dr. Dill reported that I made errors that were "likely to be significant" in the readings that she purportedly reviewed. However, upon review of Dr. Dill's "peer review" results, I discovered that the cases that Dr. Dill claimed showed errors did not in fact show any error on my part, much less significant ones. Indeed, one case that Dr. Dill claimed showed a deficiency was actually a reading done by Dr. Dill, not me. Dr. Dill had falsely asserted that a case that she personally interpreted and signed, which she reported as having a significant error, was actually attributable to me.

vii) Given Dr. Dill's incorrect attribution to me of errors and misreads in a number of cases, and her consequent misrepresentation of my work, Dr. Dill's actions support an inference that her "peer review" was a deliberate attempt to sabotage me. In doing so, she aided in prematurely derailing my illustrious career and caused significant harm to my professional reputation.

viii) Upon information and belief, Dr. Dill did not similarly misrepresent the work of younger, male, non-disabled, and/or white radiologists within Medical Group at Medical Center and/or Marlborough Hospital.

ix) It is routine practice within the Department of Radiology at UMass to send emails to the radiologist who conducted a reading in which significant misreads or concerns are detected during the "peer review" process. I never received any such correspondence regarding the purportedly "significant errors" documented on Dr. Dill's purported peer review of me. Further, I never received any correspondence concerning

misreads from any of my peer reviews, throughout my entire employment at UMass and Marlborough Hospital.

    x)  Upon information and belief, Dr. Dill's targeted and factually incorrect "peer review" of certain of my cases was used by Dr. Rosen as grounds to terminate my employment (Dr. Rosen included the "incorrect readings" from Dr. Dill's peer review as part of his purportedly "independent" review that concluded that my work was "of poor quality.")

31) Dr. Rosen's purported reason for my termination is riddled with weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions.

32) On May 4, 2018, I filed a Charge of Discrimination against the University of Massachusetts Memorial Medical Center, UMass Memorial Medical Group, the University of Massachusetts Medical School, Max Rosen, M.D., Darren Brennan, M.D., and Stephen E. Tosi, M.D., alleging that I was discriminated against because of my age, race, national origin, gender and disability in violation of Title VII, the Americans With Disabilities Act, the Age Discrimination in Employment Act, and Mass Gen. L. c. 151B. That case is MCAD Docket No: 18WEM01247 and EEOC No: 16C-2018-01520.

33) Following my May 4, 2018 Charge, I discovered that additional Respondents, Marlborough Hospital and Dr. Dill, participated in discrimination against me.

### *Age Discrimination Claims*

34) In giving the role and title of Division Chief of Chest Radiology to Dr. Karin Dill, a younger, far less experienced radiologist, despite my qualifications, experience and seniority, Respondent Marlborough Hospital discriminated against me on the basis of age.

35) In terminating me while at the same time hiring Dr. Barile, a younger, less experienced radiologist to replace me (after my departure in March 2019), Respondent Marlborough Hospital discriminated against me on the basis of age.

36) In providing CT training to my younger, less experienced radiology colleagues while failing to offer the same training to me, Respondent Marlborough Hospital discriminated against me on the basis of age.

37) In paying me less than it/they paid my younger, less experienced colleagues, Respondent Marlborough Hospital discriminated against me on the basis of age.

38) In providing to me fewer (no) academic days in contrast to the number of days provided to my younger, less experienced colleagues, Respondent Marlborough Hospital discriminated against me on the basis of age.

<em>Race / National Origin Discrimination Claims</em>

39) In giving the role and title of Division Chief of Chest Radiology to a far less experienced radiologist who is white, notwithstanding my similar qualifications, greater experience and greater seniority, Respondent Marlborough Hospital discriminated against me on the basis of race and/or national origin.

40) In terminating me while at the same time hiring Dr. Barile, a less experienced white radiologist to replace me (after my departure in March 2019), Respondent Marlborough Hospital discriminated against me on the basis of race and/or national origin.

41) In paying me less than white colleagues, Respondent Marlborough Hospital discriminated against me on the basis of race and/or national origin.

42) In providing to me fewer (no) academic days than the number provided to my white colleagues, Respondent Marlborough Hospital discriminated against me on the basis of race and/or national origin.

### *Gender Discrimination Claims*

43) In paying me less than my male colleagues, Respondent Marlborough Hospital discriminated against me on the basis of gender.

44) In providing to me fewer academic days than the number provided to male colleagues, Respondent Marlborough Hospital discriminated against me on the basis of gender.

### *Disability Discrimination and Failure To Accommodate Claim*

45) In providing me fewer (no) academic days than it/they provided to my non-disabled colleagues, and in refusing to permit me to work from home on weekdays and weekends (in contrast to my non-disabled colleagues), Respondent Marlborough Hospital discriminated against me on the basis of disability and failed to accommodate my disability.

### *Aiding and Abetting Claims*

46) By her role assisting UMass, Marlborough Hospital and Dr. Rosen in terminating my employment by producing a fraudulent peer review of my work, Dr. Dill aided and abetted discrimination against me.

### *Conclusion*

47) I therefore charge the Respondents with violating federal and state law, including Title VII, the Americans With Disabilities Act, the Age Discrimination in Employment Act, and Mass Gen. L. c. 151B.

48) As a consequence of Respondents' unlawful conduct, I have already lost salary and related benefits of employment, have suffered emotional distress, have lost personal and professional reputation and professional opportunities and have suffered other financial losses. The Respondents are liable for all of these losses, plus attorney's fees and costs.

14

I ALSO WANT THIS CHARGE FILED WITH THE EEOC: ____X____

I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCESSING OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.

I SWEAR OR AFFIRM THAT I HAVE READ THIS COMPLAINT AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF

_Charmy Desai_
(SIGNATURE OF COMPLAINANT)

SWORN AND SUBSCRIBED BEFORE ME THIS _6_ DAY OF JANUARY, 2019.

NOTARY PUBLIC: _____
MY COMMISSION EXPIRES: ___JUNE  21, 2024___

**Jonjy Amrit-Rishy Raj Ananth**
**My Commission Expires** _JUNE_ 21 2024

On this 6th day of January, 2019, before me, the undersigned notary public, Chari Desai personally appeared, proved to me through satisfactory evidence of identification, which were personal knowledge of the identity of the principal, to be the person who signed the preceding or attached document and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of her knowledge and belief.

I ALSO WANT THIS CHARGE FILED WITH THE EEOC: ____X____

I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCESSING OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.

I SWEAR OR AFFIRM, UNDER THE PAINS AND PENALTIES OF PERJURY, THAT I HAVE READ THIS COMPLAINT AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.


_Charu S. Desai_
(SIGNATURE OF COMPLAINANT)


SWORN AND SUBSCRIBED BEFORE ME THIS _20_ DAY OF JANUARY, 2018.

NOTARY PUBLIC: _____
MY COMMISSION EXPIRES: ___JUNE 21, 2024___


On this 20th day of January 2019 before me the undersigned notary public, Charu Desai personally appeared, proved to me through satisfactory evidence of identification which were personal knowledge of the principal, to be the person who signed the preceeding or attached document in my presence and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of her knowledge and belief.

Jonjy Amrit-Rishy Raj Ananth
My Commission Expires ___JUNE 21, 2024___

# Exhibit G

# F&W  FREIBERGER & WASHIENKO, LLC

211 CONGRESS STREET, SUITE 720 | BOSTON, MA 02110
617.723.0008 PHONE | 617.723.0009 FAX | FWLAWBOSTON.COM

PATRICIA A. WASHIENKO, ESQ.
pwashienko@fwlawboston.com | EXT. 101

March 4, 2019

*Via Electronic and First-Class Mail*
Cynthia.garcia@state.ma.us

Cynthia Garcia, Clerk
Massachusetts Commission Against Discrimination
One Ashburton Place
Sixth Floor, Room 601
Boston, MA 02108

> Re:  Charu Desai, M.D. v. University of Massachusetts Memorial Medical Center, et al.
> MCAD No.: 18WEM01247; EEOC No.: 16C-2018-01520
>
> Charu Desai, M.D. v. Marlborough Hospital and Karin Dill, M.D.
> MCAD No.: 19WEM00371; EEOC No.: 16C-2019-00939

Dear Ms. Garcia:

In connection with the above-referenced matters, enclosed herein please find for filing Complainant's requests to withdraw her two Charges of Discrimination filed with the Commission. Please note that Complainant is requesting to withdraw from both matters.

Should you have any questions, please do not hesitate to contact me.

Very truly yours,

Patricia A. Washienko

PAW/ya
Enclosures
cc:  Charu Desai, M.D.
Karlyn Greene, Investigator (by First-Class Mail only)
Patricia LaFore, Investigator (by First-Class Mail only)
Robert L. Kilroy, Esq. (By Email Only; rkilroy@mirickoconnell.com)
Jessica K. Rubin, Esq. (By Email Only; jrubin@mirickoconnell.com)
Michael P. Murphy, Esq. (By Email Only; mmurphy@mirickoconnell.com)

## COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION

From:

To:

Massachusetts Commission Against Discrimination
One Ashburton Place, Room 601
Boston, MA 02108
FAX: 617-994-6024

Re:

Charu Desai, M.D. v. University of Massachusetts Memorial Medical Center, et al.

MCAD Docket Number __18WEM01247__ ; EEOC No: __16C-2018-01520__

Dear Commissioner:

I hereby request permission to withdraw my complaint filed with this Commission and if applicable, from the Equal Employment Opportunity Commission, for the following reason:

- [✓] I wish to file a private right of action in civil court.

- [ ] I have reached a satisfactory settlement with the Respondent.

- [ ] I no longer intend to pursue this matter at the Commission.

Authorization for this request is indicated by the following Certification of Withdrawal by Complainant, **OR** Certification of Authorization to Withdraw by Counsel.

---

### Certification of Withdrawal by Complainant

I have been advised that it is unlawful for any person or persons to threaten, intimidate, or harass me because I filed a complaint. I have not been coerced into requesting this withdrawal.

_____

Date

_____

Complainant's signature

_____

Print Name

---

### Certification of Authorization to Withdraw by Counsel

I have been authorized as Counsel of Record for the Complainant and have the authority and permission to sign for the Complainant in this matter. I have advised the Complainant that it is unlawful for any person or persons to threaten, intimidate, or harass him/her because s/he filed a complaint. Complainant has represented that s/he has not been coerced into requesting this withdrawal.

__03/04/19__

Date

_____

Attorney signature

Patricia A. Washienko

Print Name

---

## COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION

From:

To:

Massachusetts Commission Against Discrimination
One Ashburton Place, Room 601
Boston, MA  02108
FAX: 617-994-6024

Re: **Charu Desai, M.D. v. Marlborough Hospital and Karin Dill, M.D.**

MCAD Docket Number _____19WEM00371_____; EEOC No: ____16C-2019-00939____

Dear Commissioner:

I hereby request permission to withdraw my complaint filed with this Commission and if applicable, from the Equal Employment Opportunity Commission, for the following reason:

[✓]  I wish to file a private right of action in civil court.

[ ]  I have reached a satisfactory settlement with the Respondent.

[ ]  I no longer intend to pursue this matter at the Commission.

Authorization for this request is indicated by the following <u>Certification of Withdrawal by Complainant</u>, **OR** <u>Certification of Authorization to Withdraw by Counsel</u>.

---

<u>Certification of Withdrawal by Complainant</u>

I have been advised that it is unlawful for any person or persons to threaten, intimidate, or harass me because I filed a complaint.  I have not been coerced into requesting this withdrawal.

_____                            _____

Date                                                       Complainant's signature

                                                              _____

                                                              Print Name

---

<u>Certification of Authorization to Withdraw by Counsel</u>

I have been authorized as Counsel of Record for the Complainant and have the authority and permission to sign for the Complainant in this matter.  I have advised the Complainant that it is unlawful for any person or persons to threaten, intimidate, or harass him/her because s/he filed a complaint.  Complainant has represented that s/he has not been coerced into requesting this withdrawal.

__02/28/19_____                            _____

Date                                                       Attorney signature

                                                              Patricia A. Washienko

                                                              Print Name

---

MCAD Withdrawal Form June 2010

# Exhibit H

# THE COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION
484 Main Street, Room 320, Worcester, MA 01608
Phone: (508) 453-9630 Fax: (508) 755-3861

## - DISMISSAL -

| | |
|---|---|
| **To:** Charu Desai<br>32 Whisper Drive<br>Worcester, MA 01609 | **Case:** Charu Desai v. UMass Memorial Center, UMass Memorial Medical Group, UMass Medical School, Marlborough Hospital, Darren Brennan, Stephen E Tosi, Max Rosen, Karin Dill<br>**MCAD Docket Number:** 18WEM01247<br>**EEOC Number:** 16C-2018-01520<br>**Investigator:** Karlyn Greene |

Your complaint has been dismissed for the following reasons:

[ ]   The facts alleged fail to state a claim under any of the statutes the Commission enforces.

[ ]   Respondent employs fewer than the required number of employees.

[ ]   Your complaint was not timely filed with the Commission, i.e. you waited too long after the date(s) of the alleged discrimination to file. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[ ]   You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conferences, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your complaint. You have had more than 30 days in which to respond to our written request.

[ ]   The Commission's efforts to locate you have been unsuccessful. You have had at least 30 days in which to respond to a notice sent to your last known address.

[ ]   The Respondent has made a reasonable settlement, offering full relief for the harm you alleged. 30 days have expired since you received actual notice of this settlement offer.

[ ]   The Commission issues the following determination. Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes a violation of the statutes. This does not certify that the Respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this complaint.

[X]   Other – Complainant wishes to file a private right of action in civil court.


_Monserrate Quiñones_                    _March 15, 2019_

Monserrate Quiñones                         Date
Investigating Commissioner


Cc:
Darren Brennan
Marlborough Hospital
Attn: Human Resources/Legal Department

Karin Dill
UMass Memorial Medical Center
55 Lake Avenue North
Worcester, MA 01655

**THE COMMONWEALTH OF MASSACHUSETTS**
**COMMISSION AGAINST DISCRIMINATION**
484 Main Street, Room 320, Worcester, MA 01608
Phone: (508) 453-9630 Fax: (508) 755-3861

Marlborough Hospital
Attn: Director of Human Resources
157 Union Street
Marlborough, MA 01752

Max Rosen
UMass Memorial Medical Center
Attn: Human Resources/Legal Department
55 Lake Avenue North
Worcester, MA 01655

Patricia Washienko, Esq.
Freiberger & Washienko, LLC
211 Congress St, Suite 720
Boston, MA 02110

Robert L. Kilroy, Esq.
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Dr., Suite 400
Westborough, MA 01581

Stephen E Tosi
UMass Memorial Medical Center
Attn: Human Resources/Legal Department
55 Lake Avenue North
Worcester, MA 01655

# THE COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION
484 Main Street, Room 320, Worcester, MA 01608
Phone: (508) 453-9630 Fax: (508) 755-3861

# - DISMISSAL -

| | | |
|---|---|---|
| **To:** | Patricia A. Washienko | **Case:** Charu Desai v. UMASS Memorial Marlborough |
| | Freiberger & Washienko, LLC | Hospital, Karin Dill |
| | 211 Congress St., Suite 720 | **MCAD Docket Number:** 19WEM00371 |
| | Boston, MA 02110 | **EEOC Number:** 16C-2019-00939 |
| | | **Investigator:** Patricia LaFore |

Your complaint has been dismissed for the following reasons:

[ ]   The facts alleged fail to state a claim under any of the statutes the Commission enforces.

[ ]   Respondent employs fewer than the required number of employees.

[ ]   Your complaint was not timely filed with the Commission, i.e. you waited too long after the date(s) of the alleged discrimination to file. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[ ]   You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conferences, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your complaint. You have had more than 30 days in which to respond to our written request.

[ ]   The Commission's efforts to locate you have been unsuccessful. You have had at least 30 days in which to respond to a notice sent to your last known address.

[ ]   The Respondent has made a reasonable settlement, offering full relief for the harm you alleged. 30 days have expired since you received actual notice of this settlement offer.

[ ]   The Commission issues the following determination. Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes a violation of the statutes. This does not certify that the Respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this complaint.

[x]   Other-Commission accepted Certification of Authorization to Withdraw by Counsel.


_____          March 15, 2019
Monserrate Quinones                               _____
Monserrate Quinones                               Date
Investigating Commissioner


Cc:
Robert L. Kilroy, Esq.
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Dr., Suite 400
Westborough, MA 01581

# Exhibit I

THE COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION
484 Main Street, Room 320, Worcester, MA 01608
Phone: (508) 453-9630 Fax: (508) 755-3861

## - DISMISSAL -

| To: | Patricia A. Washienko | Case: Charu Desai v. UMASS Memorial Marlborough |
| | Freiberger & Washienko, LLC | Hospital, Karin Dill |
| | 211 Congress St., Suite 720 | MCAD Docket Number: 19WEM00371 |
| | Boston, MA 02110 | EEOC Number: 16C-2019-00939 |
| | | Investigator: Patricia LaFore |

Your complaint has been dismissed for the following reasons:

[ ]  The facts alleged fail to state a claim under any of the statutes the Commission enforces.

[ ]  Respondent employs fewer than the required number of employees.

[ ]  Your complaint was not timely filed with the Commission, i.e. you waited too long after the date(s) of the alleged discrimination to file.  Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[ ]  You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conferences, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your complaint.  You have had more than 30 days in which to respond to our written request.

[ ]  The Commission's efforts to locate you have been unsuccessful.  You have had at least 30 days in which to respond to a notice sent to your last known address.

[ ]  The Respondent has made a reasonable settlement, offering full relief for the harm you alleged.  30 days have expired since you received actual notice of this settlement offer.

[ ]  The Commission issues the following determination.  Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes a violation of the statutes.  This does not certify that the Respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this complaint.

[x]  Other-Commission accepted Certification of Authorization to Withdraw by Counsel.

_Monserrate Quinones_                    March 15, 2019
Monserrate Quinones                      Date
Investigating Commissioner

Cc:
Robert L. Kilroy, Esq.
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Dr., Suite 400
Westborough, MA 01581