# Exhibit 4

Charu Desai v. University of Massachusetts Memorial Medical Center, Inc. et al.

Civil Action No. 4:19-cv-10520-DHH

University of Massachusetts Chan Medical School's Motion for Summary Judgment

**<u>Excerpts of Dr. Desai's Deposition</u>**

```
 1              UNITED STATES DISTRICT

 2              DISTRICT OF MASSACHUSETTS

 3                 CIVIL ACTION NO. 4:19-cv-10520-DHH

 4  * * * * * * * * * * * * * * * * * * * * * * * *
    CHARU DESAI,
 5                  PLAINTIFF

 6   v.

 7  UMASS MEMORIAL MEDICAL CENTER, INC., et al.,
                    DEFENDANTS
 8  * * * * * * * * * * * * * * * * * * * * * * * *

 9

10

11          DEPOSITION OF CHARU DESAI, M.D.,

12               Conducted Remotely

13            211 Congress Street, Suite 720

14             Boston, Massachusetts   02110

15

16             Friday, September 18, 2020

17              10:37 a.m. to 5:00 p.m.

18

19                  Pages 1-202

20

21

22

23

24
```

22

1   A   No.  Not that.

2   Q   Can you tell me your educational background

3       beginning with your undergraduate degree, please?

4   A   Undergraduate I did in India, college, and then I

5       also did medical school in India, and I did --

6       then because I was already married, I joined my

7       husband in the U.S.

8   Q   When did you graduate medical school?

9   A   1973, approximately.

10  Q   Did you have a specific concentration or field of

11      specialization upon graduation?

12  A   No.

13  Q   What is your medical area or areas of

14      specialization?

15  A   Right now, I was a diagnostic radiologist, and I

16      had a CT ultrasound fellowship.

17  Q   A CT ultrasound fellowship?

18  A   Yes.

19  Q   And in layman's terms, what is that?

20  A   It's a specialty in radiology where you do CT on

21      all parts of the body and other stuff.

22  Q   When did you complete that fellowship?

23  A   Approximately, 1982, I think.

24  Q   Are you board certified?

23

1  A   I am.

2  Q   And is that in diagnostic radiology?

3  A   Yes.

4  Q   Is there any requirement to recertify for the

5      boards or is that perpetual?

6  A   Not for me at present because I did my training

7      long before.  Recent graduates in certain years,

8      they have to do recertification.

9  Q   Okay, but you were grandfathered in so you don't

10     have to recertify?

11 A   Yes.

12 Q   Okay.  Other than the CT ultrasound fellowship,

13     did you complete any other fellowships?

14 A   I did not.

15 Q   Have you ever been qualified as an expert in a

16     court of law?

17 A   Not that I recall.

18 Q   How does your training in diagnostic radiology and

19     CT ultrasound fellowship, how would that differ

20     from an interventional radiologist training, if

21     you know?

22 A   It's just a different radiology, that everybody

23     has to do basic fundamental radiology training,

24     and then they choose whatever area they like.  So

24

```
 1        it's not different.  It's just people's -- what
 2        they like.
 3    Q   To become an interventional radiologist takes
 4        another one or two years of training in education,
 5        correct?
 6    A   Same thing for the CT and all the other specialty
 7        too.
 8    Q   And you opted not to go interventional radiology.
 9        You opted to go CT ultrasound in terms of
10        fellowship, fair?
11    A   Yes.
12    Q   So you would not say you're qualified in any
13        manner as an interventional radiologist, correct?
14            MS. WASHIENKO:  Objection.
15            You can answer, Dr. Desai.
16    Q   Do you understand the question, ma'am?
17    A   Yes, go ahead.  Rephrase, please.
18    Q   Sure.  Fair to say, you are not qualified as an
19        interventional radiologist?
20            MS. WASHIENKO:  Objection.  You can answer,
21        Dr. Desai.
22    A   Yeah, I am not, but --
23    Q   Okay.  You've never performed --
24    A   -- but I just want to answer something.
```

25

1  Q   Sure.

2  A   When I did my training as a diagnostic

3      radiologist, which everybody is required to go

4      through all the areas of training, that includes

5      intervention also.

6  Q   And that would be in the early 1980s, correct?

7  A   Yeah, but for everybody who does the radiology

8      residency, they have to do procedure in

9      everything, which I did.

10 Q   So it's been 35 plus years since you've done any

11     type of interventional radiology work, correct?

12         MS. WASHIENKO:  Objection.

13 A   To my recollection, but even maybe 15 years ago or

14     so, I used to do chest biopsy.  So that is

15     interventional too.

16 Q   So 15 years ago, you did chest biopsies?

17 A   To my recollection, yeah.

18 Q   But beyond that, you never held yourself out to

19     any employer as having the expertise to do

20     interventional radiology on a full-time basis,

21     correct?

22 A   Yes.

23 Q   And since you left UMass. Memorial, you have not

24     applied for any interventional radiologist

29

1   Q    How long --

2   A    Also, I was on a clinical track.  I was not on the

3        regular track.

4   Q    Okay.

5   A    So that -- see, when you are on a regular track,

6        you are supposed to require certain number of

7        papers and all that.

8   Q    So because you were on a clinical track, you

9        elected not to pursue any scholarly publications,

10       is that right?

11           MS. WASHIENKO:  Objection.  That wasn't her

12       testimony.

13           MR. KILROY:  Pat, you need stop coaching

14       her.  I'm asking her a question.  It's a follow-up

15       to her testimony.  I'd like her to answer.

16           MS. WASHIENKO:  Fair enough, Bob, and fair

17       enough, but you just asked her if, because she was

18       on a clinical track she elected not to do any

19       scholarly research, and she had just testified

20       that to the best of her memory she had done some

21       scholarly research and co-authored a paper in the

22       past 15 years.  She just couldn't recall the

23       specifics.  So I just want to get the question

24       reflecting her earlier testimony.

30

1           MR. KILROY:  Okay.

2    Q    Putting aside the scholarly publications that you

3         believe you completed or co-authored, is it fair

4         to say that because you are on a clinical track,

5         you did not prioritize scholarly work?

6           MS. WASHIENKO:  Objection.  You can answer,

7         Dr. Desai.

8    A    Yes.

9    Q    Okay.  Now, if I'm correct, I believe your resume,

10        your CV will show you attended a CT Bootcamp:

11        Principles, Pearls and Protocols in Las Vegas in

12        2015.  Do you recall that?

13   A    Yes, vaguely.  See, you talking about long time,

14        so.

15   Q    So it's been a long time since you attended a CT

16        Bootcamp?

17   A    Yeah, whatever date you are seeing, yes.

18   Q    Okay.  And did you actually attend each session

19        during that bootcamp?

20   A    So that's what I was there for.  As far as I

21        recall, yes.

22   Q    Okay.  That's what I'm asking.  Did you actually

23        go and attend, or did you go on vacation and

24        attend sporadically?

74

```
 1        produced for 2019, 2018, and 2017.
 2             Am I correct that since 2017, you have not
 3        been employed by any entity other than UMass.
 4        Memorial?
 5   A    Please repeat the question?
 6   Q    Sure.  Am I correct that since 2017, you've had no
 7        employment with any entity other than UMass.
 8        Memorial Medical Group and your dual employment
 9        with the medical school?
10   A    Yes.
11   Q    Do you know who Dr. Rosen is?
12   A    Yes.
13   Q    He was your chair of radiology during the last few
14        years of your employment with UMass. Memorial,
15        correct?
16   A    Yes.
17   Q    And as the chair of the radiology department, he
18        was -- he had overall responsibility for radiology
19        at UMass. Memorial Medical Group, correct?
20   A    Yes.
21   Q    Would you agree that Dr. Rosen, as chair of
22        radiology, had an obligation to ensure patient
23        safety?
24   A    Yes.
```

75

1  Q   Would you agree that Dr. Rosen, as chair of

2      radiology, had an obligation to ensure quality of

3      radiological reads by the radiologists who report

4      up to him?

5  A   Yes.

6  Q   And that would include you, correct, when you

7      worked there?

8  A   Yes.

9  Q   Do you believe that Dr. Rosen, based on his

10     training and experience, is capable of assessing

11     the competence of a radiologist?

12         MS. WASHIENKO:   Objection.

13  A   Please repeat the question?

14  Q   I'm sorry, I didn't catch your answer, ma'am.

15  A   Please repeat the question.

16  Q   Oh, sorry.  Sure.  Do you believe that Dr. Rosen,

17     based upon his training and experience, and his

18     role as chair, is capable of assessing a

19     radiologist's competence?

20         MS. WASHIENKO:   Objection.  You can answer,

21     Dr. Desai.

22  A   Maybe.

23  Q   And why do you hesitate and say "maybe" as opposed

24     to yes or no?

76

1   A   Depends on what the circumstance is and what the
2       thing is all about.
3   Q   Okay.  I'll change the question.  Do you believe
4       that Dr. Rosen, based on his training and
5       experience, is capable of assessing quality within
6       the radiology department?
7   A   To a certain extent.
8   Q   Okay.  Well, you testified that you agreed that he
9       had an obligation, as chair, to ensure patient
10      safety, and you testified he had obligation to
11      ensure quality of radiological reads by the
12      radiologists who report to him.  And so, are you
13      saying that despite those obligations, he only to
14      a certain extent had the ability to assess
15      quality?
16  A   I'm not saying that.  It is his territory and I'm
17      not going to discuss that.
18  Q   I'll ask my question again though because I need
19      to understand clearly what you're saying.
20          Are you saying that Dr. Rosen was incapable
21      of assessing the quality of radiologists under him
22      at UMass. Memorial?
23  A   I did not say that.
24  Q   Okay.  So you would agree then, he was capable of

77

| | | |
|---|---|---|
| 1 | | assessing quality of the radiologists who worked |
| 2 | | for him? |
| 3 | A | Like I said, to a certain degree.  Depend what |
| 4 | | area it is in. |
| 5 | Q | Depending on what, ma'am? |
| 6 | A | What modality, what area it is in. |
| 7 | Q | Okay.  What modality is he incapable of assessing |
| 8 | | quality? |
| 9 | A | I don't know. |
| 10 | Q | Well, it's yours words, ma'am.  You said, to an |
| 11 | | extent depending on the modality.  Is there a |
| 12 | | modality that you're claiming Dr. Rosen is |
| 13 | | incapable of assessing quality? |
| 14 | A | It's not capable/incapable, okay.  Yeah, he's |
| 15 | | capable of quality everybody. |
| 16 | Q | Okay.  And would you agree that Dr. Rosen, as |
| 17 | | chair of the department of radiology, as part of |
| 18 | | his job duties, should take action if he believes |
| 19 | | a radiologist's quality is substandard? |
| 20 | A | I do not agree. |
| 21 | Q | You don't believe that he should take action if he |
| 22 | | believes a radiologist's quality is substandard? |
| 23 | A | I do not agree, and the reason I do not agree, |
| 24 | | that he has to bring the person, whoever, X, Y, Z, |

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu Desai, M.D.
September 18, 2020

78

1      to discuss.

2  Q   That could be action, ma'am.  That would be an

3      action for that discussion.  So I'm asking, do you

4      agree that Dr. Rosen -- I'm not asking you

5      specific action, I'm asking just in general -- do

6      you agree Dr. Rosen, as the chair of the

7      department, and as part of his job duties, should

8      take action if he believes a radiologist's quality

9      is substandard?

10 A   He can.

11 Q   I didn't ask if he can.  I know he can.  I'm

12     asking if you believe he should, or should he

13     ignore it?

14 A   He should.

15 Q   Okay.  Do you know why Dr. Rosen made the

16     determination to terminate your employment and

17     give you the one-year notice of termination?

18 A   When he gave me the letter, he told me it was a

19     no-cause termination.

20 Q   I'm asking, do you know why he made that decision

21     to give you a no-cause termination?

22         MS. WASHIENKO:  Objection.  You can answer,

23     Dr. Desai.

24 A   So in the beginning he told me no-cause

79

1          termination, and then further, because I was

2          really upset and I ask him why, then he is telling

3          me it is poor quality of work.

4     Q    Okay.  So you've testified that Dr. Rosen had an

5          obligation to maintain patient safety, an

6          obligation to maintain quality, an obligation as

7          part of his job duties, to take action if he

8          believes a radiologist's quality is substandard,

9          and then, he actually took action in the form of

10         no-cause termination to you based on his

11         assessment that your quality was substandard.  Is

12         that fair?

13    A    I believe that's what he did.

14    Q    Okay.  And are you aware that Dr. Rosen, when

15         making that determination to terminate your

16         employment, based on a quality concern, relied on

17         an independent expert valuation of 25 randomly

18         selected cases of yours?

19             MS. WASHIENKO:  Objection.  You can answer,

20         Dr. Desai.

21    A    I'm aware.

22    Q    Okay.  So are you claiming that by Dr. Rosen

23         asking an independent expert to review 25 randomly

24         selected cases of yours, that he did so based on a

85

1          MS. WASHIENKO:  Objection.

2    A   I don't think review has anything to do with the

3        age.  Both don't go together.

4    Q   I agree.  I'm just trying to make sure you agree.

5        So you're not claiming that he made the decision

6        to have it reviewed because of your age?

7    A   Has nothing to do with age.

8    Q   Okay.  Do you believe that Dr. Rosen made the

9        decision to have 25 of yours cases reviewed for

10       quality purposes by an independent expert based on

11       the fact that you're a female?

12   A   No.

13   Q   Do you believe that Dr. Rosen made a decision to

14       have 25 of your cases reviewed by an independent

15       expert for quality purposes because of your

16       national origin?

17   A   No.

18   Q   Do you believe that Dr. Rosen made a decision to

19       have 25 of your radiological reads reviewed by an

20       independent expert for quality purposes because of

21       your race?

22   A   No.

23   Q   So upon what basis do you claim that Dr. Rosen's

24       decision was discriminatory?

86

1      MS. WASHIENKO:  Objection.

2      On the basis of age, Bob?

3      MR. KILROY:  No.  Any basis.  I went through

4   the categories that are named in her Complaint.  I

5   want to know if there's something I'm missing.

6  A   I think we are mixing up two things.  The

7   independent review is number one.  The age, race,

8   national origin, disability, everything is a

9   separate thing.  Has nothing to do with the

10   independent review.

11  Q   Okay.  So the independent -- just so I'm clear,

12   the independent review you said is not affected in

13   any way by Dr. Rosen acting in a discriminatory

14   manner?

15      MS. WASHIENKO:  Objection.  You can answer.

16  A   To my belief, first of all --

17      MS. WASHIENKO:  Are you okay, Dr. Desai?

18      THE WITNESS:  Huh?

19      MS. WASHIENKO:  Are you okay?

20  A   I believe that without even discussing that

21   anything was wrong, why did he do the independent

22   review?

23  Q   Do you think that he didn't discuss with you

24   before the independent review because of your age?

Charu Desai vs                                          Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.              September 18, 2020

90

```
 1        with you because you're female?  Do you understand
 2        the syntax there?
 3             MS. WASHIENKO:  Ooh, Bob, that's badgering.
 4             MR. KILROY:  I'm trying to make sure she
 5        understands me, Pat.
 6   A    I understand --
 7   Q    Okay.
 8   A    I understand that this has no relation, that's
 9        what I understand, and you still asking me the
10        same question.
11   Q    No, I haven't -- you haven't answered yes or no to
12        the female question.
13   A    Independent review has no relation to the age,
14        sex, whatever.  Why you asking that question?
15   Q    You don't have to worry about why.  So, you --
16   A    Yeah, I do, because I'm answering the question.
17   Q    Am I correct then that you're saying that the
18        independent review has nothing to do with your
19        allegation of discrimination?
20             MS. WASHIENKO:  Objection, but you can
21        answer, Dr. Desai.
22   A    In a way, it is.
23   Q    I'm sorry?
24   A    In a way, it is discrimination.
```

91

1   Q   You're claiming the independent review decision by
2       Dr. Rosen was discriminatory.
3           Now tell me why that's discriminatory to
4       decide to send out for an independent review?
5   A   Because there are a lot of people in the
6       department.  There are maybe qualities for
7       something.  Did he do independent review for all
8       of them?  I don't think so.  I do not think so.
9   Q   Do you think that he made up his concern about
10      quality for you because of your race?
11  A   I do not think he made up.
12  Q   Okay.  So he didn't make it up and he has an
13      obligation to ensure quality.  Would you agree
14      that one way to assess quality, so that it's not
15      running a risk of being discriminatory, is to ask
16      for an independent expert to take a look at the
17      records?  Would you agree that that's one way to
18      assess quality?
19  A   Yes.
20  Q   And would you agree that by doing that, it shows
21      Dr. Rosen is trying to remove himself from being
22      the one assessing your quality directly so he
23      could have a third-party expert make the
24      assessment without knowing that it was you?

92

1    A    Yes.

2    Q    And would you agree that if you are trying to

3         assess someone's quality, whether yours or someone

4         else's, that that's a fair way for a supervisor to

5         go about trying to assess quality?

6             MS. WASHIENKO:  Objection.  You can answer,

7         Dr. Desai.

8    A    Yes, but if it is done the right way.

9    Q    Okay.  I understand.

10   A    But done the right way, and it cannot be people

11        you know.  It has to be third party means third

12        party.  This is not -- it is not done the right

13        way.  If it is done the right way, yes, but in our

14        case, it was not done the right way.

15   Q    Okay.  What was not done right?

16   A    Yeah, just like I told you, take my 25, take other

17        25 for other person, take third person 25, and

18        then compare with each one of them.  You can't

19        compare two of them and 25 of me, or two of

20        someone else, X, Y, Z.  It's completely done

21        wrong.  I do not agree.

22   Q    So you just -- you have a concern that there

23        weren't enough cases reviewed by the expert for

24        other individuals?

93

1   A   Yes.  It should be one to one.

2   Q   And if they had, and the expert came out with the

3       same results as to you, which as you know were

4       five major misses and I think four minor out of

5       the 25, if the expert had the same analysis as to

6       you, could he rely on the expert's analysis as to

7       you?  Forgetting about what she might find on the

8       others.

9   A   I do not agree completely with the expert report.

10  Q   I know but -- I understand that.  This has

11      nothing --

12  A   If is not by major and minor, then it is not.  It

13      is not.

14  Q   But he's relying on what an expert tells him.

15  A   But then even if it is, you know, you talking

16      about somebody 50 year spent, and not only that, I

17      spent 27 years at UMass., and all of a sudden, you

18      are no good?  That I don't agree whatsoever.

19  Q   I didn't say that to you, ma'am.  I didn't say

20      you're not good.

21  A   Yeah, you are saying independent review called

22      five major and five minor, whatever the number is.

23      I do not agree.  So then that is the end of

24      my reason.

Charu Desai vs                                         Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.            September 18, 2020

94

1  Q  So you want to substitute your judgment for the
2     independent expert's judgment?
3         MS. WASHIENKO:  Objection.
4  Q  Is that right, would you agree, if Dr. Rosen is
5     acting fairly by relying on an independent
6     expert's evaluation as opposed to his own
7     evaluation?
8         MS. WASHIENKO:  Objection.
9  A  So what is the -- please repeat that?
10 Q  Sure.  Would you agree Dr. Rosen acted fairly,
11    appropriately, by relying on an independent
12    expert's evaluation as opposed to him making the
13    evaluation himself?
14 A  I agree.
15 Q  Okay.  And so, what he received from the
16    independent expert said you had some quality
17    problems.  You agree with that, right?
18 A  I do not.
19 Q  You don't agree that that's what the report said?
20 A  Report said, but I do not agree.
21 Q  No, I understand you don't agree that the report
22    is right, but you agree that's what the report
23    told him, right?
24 A  Yes.

95

```
1   Q   Okay.  Now, do you think he should ignore the
2       report of the independent expert who was hired to
3       do the evaluation?
4           MS. WASHIENKO:  Objection.  You can answer.
5   A   I didn't say that.
6   Q   I'm sorry?
7   A   I did not say that.
8   Q   So you agree that he should not ignore the report,
9       right?
10          MS. WASHIENKO:  Objection.
11  Q   You have to answer, ma'am.
12  A   Yeah, he should not.
13  Q   Okay.  And you would agree, he did not ignore the
14      report, isn't that right?
15  A   He did not, but there are other steps he could do
16      to see.
17  Q   And in seeking an independent expert's evaluation,
18      do you think Dr. Rosen was acting maliciously
19      toward you?
20  A   I did not hear.  Please repeat.
21  Q   In seeking an independent expert's evaluation, do
22      you think Dr. Rosen was acting maliciously toward
23      you?
24  A   No comment.
```

96

1   Q   What's that?

2           MS. WASHIENKO:  You have to answer,

3       Dr. Desai.

4   A   Please repeat the question?

5   Q   Sure.  Dr. Rosen sought an independent expert's

6       evaluation on quality, and part of that was an

7       evaluation of your quality.  Do you think he was

8       acting maliciously in seeking an independent

9       expert's evaluation on quality?

10          MS. WASHIENKO:  Objection.  You can answer.

11  A   I hope not.

12  Q   Do you have any facts that would support that he

13      was acting maliciously toward you by seeking that

14      independent expert's evaluation?

15  A   Please repeat the question?

16  Q   Can you offer any facts that would the indicate

17      that Dr. Rosen acted maliciously when he was

18      seeking an independent expert's evaluation?

19  A   I do not have right now.

20  Q   I'm sorry, ma'am, I didn't hear you?

21  A   I do not have right now.

22  Q   I'm getting ready to show you Exhibit 11, which is

23      your Employment Agreement with UMass. Memorial

24      Medical Group.

97

1           (Exhibit 11 marked for identification and
2              displayed.)

3    Q    Do you see that?

4    A    How many pages is this?

5    Q    Goes from CD 51 to CD 63, a total of 13 pages.

6    A    All right.  So what are we talking?  Which place
7         you want me to go?

8    Q    At this point, I'm just asking if you agree you
9         were subject to an employment agreement with
10        UMass. Memorial Medical Group?

11   A    Yes.

12   Q    Okay.  And you were dual employed with the
13        University of Massachusetts Medical School,
14        correct?

15   A    Yes.

16   Q    You did not have employment, an employment
17        agreement with the UMass. Memorial Medical Center,
18        correct?

19   A    Please repeat the question?

20   Q    Sure.  So what I'm establishing is that the
21        agreement you had for employment was with the
22        medical group and the medical school.  You did not
23        execute an agreement with the medical center,
24        correct?

98

1    A    Why, is there a different -- medical center?  I
2         thought both are same.
3    Q    If you look at the first paragraph, it will tell
4         you, you were entering an agreement with the
5         medical group, and then later in the agreement, it
6         says dual employment with the medical school.
7    A    On the same page?
8    Q    No, it's much further in.
9    A    Okay.
10   Q    Hold on, I'll get it for you so you can see it.
11            It's on page 4, Dual Employment, paragraph
12        1.14.
13   A    Which page, please?
14   Q    Sure, it's the fourth page.
15   A    Fourth page, okay.  Let me see if I find it.
16   Q    And it's subparagraph 1.14.
17   A    Yeah, I was dual employed.  I know that.
18   Q    Right.  And so, I have never seen an employment
19        agreement for you with UMass. Memorial Medical
20        Center.  I have only seen an employment agreement
21        with the medical group and dual employment with
22        the medical school.  Do you agree that you do not
23        have an employment agreement with the medical
24        center?

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu Desai, M.D.
September 18, 2020

99

1            MS. WASHIENKO:  Objection.  You can answer.

2    A    Yeah, I don't recall.

3    Q    Okay.

4    A    I don't recall.

5    Q    And you do not have a separate employment

6         agreement with Marlborough Hospital, correct?

7    A    As far as I know.  To my knowledge, no.

8    Q    Okay.

9            Now, in paragraph 7.2 of the employment

10        agreement --

11   A    Page number, please?

12   Q    Sure.  Bear with me now.  It is page seven.

13   A    Okay.  Let me scroll.  Seven.  I have seven.

14   Q    And 7.2 is Notice, the Notice provision in the

15        event of termination of employment?

16   A    I see that, yeah.

17   Q    And fair to say, you were provided the appropriate

18        notice period required by your employment

19        agreement, prior to your termination of

20        employment, based on your years of service, right?

21   A    Yes.

22   Q    And you agreed in writing, based on your signature

23        to this agreement, that UMass. Memorial Medical

24        Group could, in fact, terminate your employment

100

1      without cause but subject to a notice period,

2      right?

3   A   Yes.

4   Q   You're not claiming that UMass. Memorial Medical

5      Group violated or breached this employment

6      agreement in any way, correct?

7          MS. WASHIENKO:  Objection.  You can answer,

8      Dr. Desai.

9   A   To my knowledge, what I saw.

10  Q   I'm sorry, I didn't understand your answer.

11  A   To my knowledge, what I saw.

12  Q   To your knowledge, what you saw, you agreed there

13      was no breach of the employment agreement?

14  A   Yes.

15  Q   Okay.  And if we go back, in paragraph 1.5 --

16  A   Page number, please?

17  Q   Page two.  Bottom of page two.

18  A   Let me see.  Okay.  Where are we?

19  Q   So as part of your employment agreement, you had

20      an obligation to comply with the bylaws, rules,

21      regulations, policies, and procedures of UMass.

22      Memorial and your medical staff, right?

23  A   Yes.

24  Q   And that would include handling of peer reviewed

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu Desai, M.D.
September 18, 2020

101

1    privileged materials, right?

2  A  Handling peer review for who?

3  Q  Meaning you have to ensure that you handle peer

4     reviewed privileged materials correctly?

5         MS. WASHIENKO:  Objection.

6  Q  You have to maintain their confidentiality,

7     correct?

8         MS. WASHIENKO:  Objection.

9  Q  Do you agree with that statement?

10 A  Yes.

11 Q  I'm going to show you in a second here,

12    Exhibit 12.

13        (Exhibit 12 marked for identification and

14         displayed.)

15 Q  Do you see that?

16 A  Not yet.

17        Okay.

18 Q  This is the Academic and Administrative Time

19    Policy for UMass. Memorial, Bates number CD 1

20    through CD 2 produced by you to us, and it shows

21    up on the top, "Updated June 8, 2017."

22        You're familiar with this policy, correct?

23 A  Yeah, I see.

24 Q  I may have missed your answer.  You're familiar

102

```
 1        with this policy, Dr. Desai?
 2   A    Yeah, I told you I see it.
 3   Q    Are you claiming that you were not paid for any
 4        days that you worked?
 5             MS. WASHIENKO:  Objection.  You can answer,
 6        Dr. Desai.
 7   A    Please repeat the question.
 8   Q    Sure.  My understanding is you're not making any
 9        claim that UMass. Memorial didn't pay you for any
10        days you actually worked; am I right that you're
11        not making that claim?
12   A    I'm not.
13   Q    Okay.  And fair to say, you did not suffer any
14        loss of pay based on not being granted academic
15        days, correct?
16   A    Please repeat the question?
17   Q    Am I correct, you never suffered a loss of pay
18        based on the decision not to grant you academic
19        days?
20   A    I did not -- repeat the question so I can answer
21        you, please, because I did not --
22   Q    You did not suffer any loss of pay based on the
23        decision not to grant you academic days?
24   A    Indirectly, I did, because people that got
```

103

```
 1        academic day, they didn't have to do the clinical
 2        work.
 3   Q    Right, but those people got paid for working
 4        academic days.  You got paid for working clinical
 5        days.  So what days did you not get paid for when
 6        you were working?
 7             MS. WASHIENKO:  Objection.  You can answer,
 8        Dr. Desai.
 9   A    It's not the same, as far as I'm concerned.
10   Q    Right, it's not -- well, someone can say to me
11        that my being in a deposition is not the same as
12        me being in court or going out to a client meeting
13        at UMass. Memorial, but I get paid for each one of
14        those.  If I'm out at court, I can't be in a
15        deposition.  If you're doing clinical, you can't
16        be doing academic days, and vice versa, but you
17        are getting paid.
18             So I'm asking, in that you got paid for
19        every day you worked for UMass. Memorial, isn't it
20        fair to say that you didn't suffer a loss of pay
21        based on the decision not to grant you academic
22        days?
23             MS. WASHIENKO:  Objection.  Asked and
24        answered.
```

104

1   A   I did more days of clinical work compared to the

2       people who did academic days, so it's not the

3       same.

4   Q   I know it's not the same, but you got paid for the

5       work you did, right?

6           MS. WASHIENKO:  Objection.

7   A   Yes.

8   Q   Okay.  And just to make my point clear, non-leap

9       year, there is 365 days in a year.  If someone

10      worked 365 days, they'd get paid for 365 days.

11         If someone works academic days as a portion

12      of that, they don't get paid 385 days, they get

13      paid the days they work, the full 365, right?

14         So that's what I'm trying to draw the

15      distinction.  You're getting paid for the time you

16      work.  It's just that your work happened to be

17      clinical as opposed to academic, correct?

18           MS. WASHIENKO:  Objection.

19   A   Right, but that's not the same and that's not fair

20      to me.  Right?

21   Q   I'm just focusing on the pay aspect.

22   A   Yeah, number-wise, you saying same, but it is not

23      the same.

24   Q   It is the same for pay though, isn't it?

105

1  A   Pay, yeah.

2  Q   Okay.  That's all I was getting at.

3          Did you ever submit a proposal to anyone at

4      UMass. Memorial to substantiate what you were

5      going to use your academic days for?

6  A   I did not, but at the same token, everybody new

7      hire, when they came, they got one day without --

8      they haven't proven that they have a proposal,

9      so -- and I was not asking once a week.  They were

10     all getting once a week.  I was asking 12 days for

11     a year.  I didn't ask hand and foot.

12 Q   You were told to submit a proposal to substantiate

13     your need for academic days, weren't you?

14 A   Yeah.

15 Q   And you chose not to, didn't you?

16 A   It's not a question of not choosing.  I did not.

17     But the same thing applies to the other people

18     too.

19 Q   Ma'am, I need to ask you that question.  We'll be

20     here for days on end.

21 A   That proves the point.  I want to answer what I

22     think is correct, that yeah, I did not.  To answer

23     the first question, and the substantiate to what I

24     am telling you, people who are just coming out of

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu Desai, M.D.
September 18, 2020

106

| | | |
|---|---|---|
| 1 | | training are less experienced than I do, came, and |
| 2 | | from day one of their employment, they were |
| 3 | | getting once a week academic day. |
| 4 | Q | And is it possible -- |
| 5 | A | I don't see any proposal of anybody doing so many |
| 6 | | things in one day. |
| 7 | Q | Is it possible, ma'am, that they were doing |
| 8 | | academic research? |
| 9 | | MS. WASHIENKO:  Objection. |
| 10 | A | Anything is possible. |
| 11 | | Anything is possible, but as far as I'm |
| 12 | | concerned, I was not treated fairly.  That's all |
| 13 | | my point is.  Okay? |
| 14 | Q | I'm going to move to strike.  I'm going to ask you |
| 15 | | to focus on my question because you're -- your |
| 16 | | attorney can ask you questions at the end of the |
| 17 | | deposition where you can get out your story. |
| 18 | | I'm going to ask you to just focus on my |
| 19 | | question or we'll be here days on end.  Okay. |
| 20 | | So in terms of academically, you said people |
| 21 | | were given academic days when they arrived from |
| 22 | | day one.  Name anyone who was given an academic |
| 23 | | day who had no academic pursuit. |
| 24 | | MS. WASHIENKO:  Objection. |

107

| | | |
|---|---|---|
| 1 | A | There are too many of them. |
| 2 | Q | Can you name anyone by name who had no academic |
| 3 | | pursuits, please? |
| 4 | A | How can you know?  They just changed, so how can I |
| 5 | | know whether they have academic pursuit or not.  I |
| 6 | | can't. |
| 7 | Q | When you were there, who are you claiming was |
| 8 | | given academic days who did no academic work? |
| 9 | A | There were three people I remember.  I don't |
| 10 | | actually remember their name right off the bat, |
| 11 | | but I know they did not. |
| 12 | Q | So at this point in time, you can't name anyone |
| 13 | | who was granted time for academics who didn't do |
| 14 | | something in the realm of academics? |
| 15 | | MS. WASHIENKO:  Objection.  Bob, if you have |
| 16 | | a list of employees? |
| 17 | | MR. KILROY:  No, I'm allowed to ask her a |
| 18 | | question.  She's the one who's telling me she has |
| 19 | | comparatives. |
| 20 | Q | At this point, if a jury -- you were testifying in |
| 21 | | front of a jury, you would have to tell them, I |
| 22 | | can't name anyone who received academic days and |
| 23 | | didn't pursue academic pursuits. |
| 24 | A | I know there was Gunjan.  I forget her last name, |

108

1      in memo.  There are a lot of people, but offhand,

2      I can't tell.  Okay?

3  Q   Can you spell that name for me, Gunjan?

4  A   Gunjan.  I see.  G-U-N-J-A-N, something like that.

5  Q   That's the only person you can remember by name,

6      is that right?

7  A   Yeah, because I'm not keeping tab of them.

8  Q   Now, you were never granted academic time by any

9      department chair, were you?

10  A   Please repeat the question?

11  Q   You were never granted academic time by any

12      department chair, were you?

13  A   I was.  When I got hired in 1992, just like

14      everybody else, I was getting once a week academic

15      day.

16  Q   And when did that stop?

17  A   And that got taken when other people came, and I

18      never pursued it so I just -- different story.  So

19      I should have been grandfathered.

20  Q   Did it stop in the '90s?

21  A   I don't recall when.

22  Q   Okay.  But you weren't granted academic time by

23      Dr. Ferrucci before Dr. Rosen took over, were you?

24  A   That's what I'm saying, that in between it got

109

1      lost.  But I should have been grandfathered.

2   Q  You should have been grandfathered based on what?

3          MS. WASHIENKO:  Objection.

4   Q  What policy grandfathers you?

5   A  What policy?  That's how I was hired.

6   Q  No, what policy -- look at the academic policy.

7          MS. WASHIENKO:  Objection.

8   Q  Show me where it says you get grandfathered.

9          MS. WASHIENKO:  Bob, objection.  My client

10     answered that that's how she was hired.

11         MR. KILROY:  Yes, that's fine.

12  Q  Look at the academic policy and tell me if there's

13     anywhere that says you get grandfathered.

14  A  It doesn't say, but academic policy, academic

15     policy, all that what they are saying they are

16     doing, I haven't seen them.  Not only that, then

17     they leave the department of --

18  Q  Ma'am, I'm going to stop you.  You're not

19     answering my question, and I don't want you to

20     keep running on with a speech.  I want you to

21     focus on my questions.

22         So name anyone who was grandfathered who got

23     academic time based on being, in your words,

24     "grandfathered."

110

1    A    Nobody at least anymore from my time.

2    Q    Okay.  So no one got grandfathered that you're

3         aware?

4              MS. WASHIENKO:  Objection.

5    Q    Did you want them to make an exception for you

6         based on your age?

7              MS. WASHIENKO:  Objection.

8    A    Yeah, there were rules, 20 plus years of service

9         and all that.  Not only that, for my disability, I

10        wanted them to give me a break.

11   Q    I didn't ask you that question.

12             Did you want them to treat you better than

13        others based on your age with respect to academic

14        time?

15   A    Please repeat the question?

16   Q    Did you want them to treat you better than others

17        based on your age with respect to academic time?

18   A    No.

19   Q    Okay.  So you didn't want them to make an

20        exception based on your age?

21   A    I wanted to make an exception for my disability

22        because working 15 days in a row, impossible.

23        Very difficult.  Okay.

24   Q    So you wanted an exception based on your

111

1   disability.  What was it about your disability

2   that prevented from you doing your job?

3        MS. WASHIENKO:  Objection.  Dr. Desai, you

4   can answer.

5   A   I am doing five days of clinical work, then I'm

6   doing the weekend.  Weekend is busy with lot of

7   CT.  And then I'm doing another five days before I

8   get a break, and it just was too much for me.

9   Q   And you submitted a doctor's note saying that you

10  needed to be able to take time off because of the

11  disability, is that right?

12  A   My thing is known for 20 years.

13  Q   Did you submit a doctor's note saying you needed

14  time off, ma'am?

15  A   Not to my knowledge.

16  Q   No, you didn't.

17       And did you ever tell Dr. Rosen you were

18  incapable of performing your clinical job because

19  of your heart condition?

20       MS. WASHIENKO:  Objection.

21  A   That's not the correct word.  It is not incapable.

22  It is tired.

23  Q   So you were capable -- hold on, so you were

24  capable of performing your job despite the heart

112

```
 1       condition, is that right?
 2   A   Yeah, but I used to get tired.
 3   Q   Right.  And do you think other people get tired
 4       working?
 5           MS. WASHIENKO:  Objection.
 6   A   Yeah, they were using their academic time in the
 7       following week.
 8   Q   What were you going to do --
 9   A   They got tired.  They all got tired and they told
10       me.
11   Q   Ma'am, no question is pending.
12           What were you going to do with your academic
13       time?
14   A   Take a break so I can recuperate for the next day.
15   Q   You wanted a day off, didn't you, ma'am?
16           MS. WASHIENKO:  Objection.
17   A   Don't give me that.
18   Q   Ma'am, you wanted a day off, didn't you?
19           MS. WASHIENKO:  Objection.
20   Q   Answer the question, please.
21           MS. WASHIENKO:  Objection.  I'm going to
22       instruct my client not to answer.
23           MR. KILROY:  No, that's a fair question,
24       Pat.
```

113

1   Q   You wanted a day off from work, didn't you?

2           MR. KILROY:  There's no privilege.  I'm not

3       harassing.  I'm asking a fair question.

4   Q   You wanted a day off from work.  That's why you

5       wanted the academic day, isn't that right?

6           MS. WASHIENKO:  You can answer, Dr. Desai.

7   A   Okay.  Repeat the question, please?

8   Q   You wanted a day off from work, that's why you

9       requested academic time, isn't that right?

10  A   I wanted a break from the clinical work so I can

11      recuperate.

12  Q   And that's the same thing as a day off, isn't it,

13      ma'am?

14  A   But everybody else is doing the same because they

15      are tired.  They just using the academic day.  And

16      it is a fact.  They told me, my colleague.  I have

17      a good relation with all my colleagues and they

18      told me that, Only day I can survive because I can

19      use academic day.  So I'm not asking anything

20      different.  And they were getting once a week, by

21      the way, and I am asking --

22  Q   I don't have a question pending.  Tell me the name

23      of the colleague who was committing fraud at

24      UMass. Memorial by taking days off and not using

114

```
 1       an academic day correctly.  What colleague are you
 2       referring to?
 3            MS. WASHIENKO:  Objection.  I'm going to --
 4   Q   You just told me there is a colleague who is
 5       taking academic time and not using it for academic
 6       purpose.  Someone is committing fraud.  Who are
 7       you referring to?
 8            MS. WASHIENKO:  Objection.
 9   A   I don't have the name.
10   Q   You don't have the name?  You said it was your
11       best friend.
12   A   No, it not my best friend.  Almost everybody,
13       because everybody has to recuperate.  UMass. is a
14       busy place.
15   Q   Tell me the names of the doctors you claim who
16       have put --
17            MS. WASHIENKO:  Objection.
18   Q   -- who have put in for academic time, and who are
19       not using it correctly?  Who are you claiming is
20       not using the time correctly?
21            MS. WASHIENKO:  Objection.
22   A   I don't have the list.
23   Q   You don't have any?
24   A   I don't have the list.  The department already
```

115

1      knows --

2   Q   Tell me anyone, ma'am.

3   A   -- who they are using academic time, so I don't

4      have to tell that.

5   Q   Okay.  Let's -- I'm going to change the question.

6      I want you to testify -- and it's going to be in

7      the record when we're in front of a jury.  When I

8      ask you this question in front of a jury, I want

9      you to identify the people you claim who are being

10     granted academic time so they can just take days

11     off and not perform academic work, who are you

12     claiming?

13         MS. WASHIENKO:  Objection.

14  A   I don't have a list.

15  Q   So you can't identify anyone who got the deal that

16     you want, isn't that right?

17         MS. WASHIENKO:  Objection.

18  Q   Am I correct you can't identify anyone who

19     received the deal that you've been asking for?

20  A   The department already knows who gets the academic

21     day.  I don't have to tell you the list, but

22     that's how I feel.

23  Q   Ma'am, you do have to answer my questions.  We can

24     take it to a judge.

116

1      MS. WASHIENKO:  Let's take a break, Bob.

2   Let's take a break.

3      MR. KILROY:  Okay.  Can I get an answer to

4   this question before we break, Pat?

5  A  I don't have a list.  I do not have the list.

6  Q  You told me you don't have to tell me, that UMass.

7   already knows.  I'm telling you we don't know, so

8   I'm asking you for who were you --

9      MS. WASHIENKO:  This sounds like another

10  question.  Can we take a break, Bob?

11     MR. KILROY:  Yes, go ahead.  We can.

12     MS. WASHIENKO:  Thank you very much.

13          (Recess taken.)

14 BY MR. KILROY:

15 Q  If I could refer folks back to Exhibit 12.  I'm

16   hoping everyone still has it up on eDepoze?

17 A  Okay.

18 Q  I'll direct your attention to paragraph 3,

19   numbered paragraph 3 on the page.  It's actually

20   Roman numeral I, then subparagraph 3, last

21   sentence of that paragraph.

22 A  Hold on, I'm not on the correct one.  So, I, and

23   which one?

24 Q  Paragraph 3.

117

1    A    On the first page, right?

2    Q    Yes.

3    A    Number 3.  "In order to be eligible"?

4    Q    Yes.  And last sentence of that paragraph says,

5         "For faculty with two or more years of service,

6         allocation will be based on prior activity and

7         mutually agreed upon future activity."

8    A    Correct.

9    Q    Am I correct that, one, you had no prior activity

10        as of 2015 on for academic service, academic

11        activity, that is, and you never mutually agreed

12        with your chair on future activity?

13   A    Yes.

14   Q    And you would agree that within the radiology

15        group, under the leadership of Dr. Rosen, that

16        other radiologists who were female were granted

17        academic days, correct?

18   A    Yes.

19   Q    And other radiologists who were the same race and

20        national origin as you were granted academic days,

21        correct?

22   A    Yes.

23   Q    And other radiologist over the age of 40 were

24        granted academic days, right?

118

1    A    Yes.

2    Q    And other radiologists who might have had a health

3         condition were granted academic days as well,

4         right?

5    A    I do not recall about them.

6    Q    You don't know?

7    A    Don't recall.  Yeah, I don't know about them.

8    Q    Can you identify any radiologist within the group

9         under Dr. Rosen who had no scholarly activity, no

10        research activity like you, but were granted

11        academic time?

12   A    Please repeat the question?

13   Q    Sure.  Can you identify any radiologist under

14        Dr. Rosen who had no scholarly activity and no

15        research activity, same as you, who was

16        nonetheless granted academic time?

17   A    I do not recall.

18   Q    Okay.  And Dr. Rosen, during several meetings with

19        you over time, discussed this academic time policy

20        with you, right?

21   A    Yes.

22   Q    And he specifically told you, that you could

23        submit a proposal in writing for how you want to

24        use any academic days that you are proposing,

119

1      correct?

2  A   Yes.

3  Q   And you opted not to submit a written proposal to

4      him, right?

5  A   Yes.

6  Q   Under the Academic and Administrative Time Policy,

7      there is a section that deals with administrative

8      time.  You did not have any administrative role

9      that would qualify you for administrative time,

10     right?

11 A   Yes.

12 Q   Yes, meaning you didn't have an administrative

13     role?

14 A   No, I did not.

15 Q   Okay.  And if we continue on in the document to

16     section Roman numeral III, which I believe is the

17     second page, paragraph 2 under Roman numeral III,

18     states, "Requests to attend meetings/conferences

19     using accumulated academic/administrative time

20     must be requested within the context of vacation

21     planning, subject to vacation request deadlines

22     and approved by the Division Chief."

23          Had you ever complied with that by

24     submitting requests in the context of vacation

120

1      planning?

2  A   To the best of my knowledge, yes.

3  Q   And were you denied your request for a conference

4      when you submitted correctly within the context of

5      vacation planning?

6  A   Not that I can recall.

7  Q   And you believed, based on your testimony earlier,

8      that you should have been granted academic time

9      based on being grandfathered or based on your

10     seniority?  Do I have that right?

11 A   Yes.

12 Q   And yet, you can't identify any radiologist whom

13     Dr. Rosen granted academic time based on

14     seniority, correct?

15 A   Because there is nobody right now, from my time.

16 Q   And there is nothing in the policy that specifies

17     that a radiologist should be granted academic time

18     based on seniority, correct?

19 A   Yes.

20 Q   Meaning you agree with me, the policy doesn't

21     address that?

22 A   I agree.

23 Q   I'm going to go to the next Exhibit, Exhibit 13.

24     You'll see it in just a second.

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu Desai, M.D.
September 18, 2020

121

1          (Exhibit 13 marked for identification and
2              displayed.)
3  Q  And it is a letter dated February 13, 2008 from a
4     Dr. Oscar E. Starobin, S T A R O B I N, addressed
5     To Whom It May Concern.  To whom, if anyone at
6     UMass. Memorial, did you provide this letter to?
7  A  I don't recall.  This is so long ago.  I don't
8     recall.
9  Q  Do you recall providing it to anyone at UMass.
10    Memorial?
11 A  I don't recall.
12 Q  And this letter indicates that you had a permanent
13    pacemaker implanted six years prior to the letter,
14    correct?
15 A  Yeah.
16 Q  And the letter indicates that your cardiac status,
17    "may lead to partial or complete disability in the
18    future."  Right?
19 A  Yes.
20 Q  Did you ever become partially or completely
21    disabled as the letter forecast?
22 A  Only partially because when I get tired, I get a
23    lot of spells.  So that's the thing, it has been
24    since.

122

1   Q   Did you ever provide notice via a letter, an
2       updated letter to UMass. Memorial that you had a
3       change in status, health condition status in any
4       way?
5   A   Just the recertification.
6   Q   But at no point in this letter is there any
7       request for any type of accommodation for you,
8       right?
9   A   To the best of my knowledge, no.
10  Q   In fact, all it says is there's concern you might
11      need to be accompanied at home in the evenings,
12      right?
13  A   Yeah.
14  Q   There's nothing that says that you're incapable of
15      any of the essential functions of your job at
16      UMass. Memorial.  Fair?
17  A   Yes.  The main thing is, I can do the work, but if
18      it is heavy work, then I get the spell.  That's
19      the main thing.
20  Q   Right.  But you never requested an accommodation
21      of any kind to change your work hours, for
22      instance, based on your medical condition, isn't
23      that right?
24          MS. WASHIENKO:  Objection.  You can answer,

123

1      Dr. Desai.

2  A   No, I did not, except for I was asking for

3      academic time.

4  Q   Right.  But you were asking for academic time for

5      a day off, not to do academics, right?  Correct?

6  A   I was asking for break time, yes.

7  Q   Okay.  And Dr. Rosen actually offered you the

8      chance for a lighter schedule if you desired it,

9      and you turned him down, right?

10 A   Yes.  He asked me to go part time or go locum.

11 Q   Right.  You could have had days off that you were

12     seeking based on being tired, but you chose not to

13     accept that offer?

14 A   At the time.

15 Q   Well, at all time, you never took him up on that

16     offer, right?

17 A   Because I did not want to go to part time at the

18     time.

19 Q   Right.  You just wanted to have days off while

20     still getting paid, right?

21         MS. WASHIENKO:  Objection, but you can

22     answer, Dr. Desai.

23 Q   Was that a correct statement I made?

24 A   Repeat the question again, please?

124

1   Q   My statement was, you chose not to accept the
2       offer for per diem or locum status; instead, you
3       just wanted to have days off while still being
4       paid full?
5           MS. WASHIENKO:  Objection, but you can
6       answer, Dr. Desai.
7   A   That's not -- I don't agree.  Everybody was
8       getting academic day, and I was -- once a week,
9       and I was only asking for 12 days, so.
10  Q   Right.  You were asking for 12 days off where you
11      would do no work, right?
12  A   For clinical.  I probably come and do other stuff
13      but not -- yeah.  And that's the same thing that
14      is happening with other people too.
15  Q   Okay, but I asked you to name the other people who
16      were getting days off and not doing work on their
17      academic days, and you wouldn't tell me anyone.
18  A   I don't know what they are doing.  I only know who
19      gets academic day.
20  Q   So in terms of identifying someone who has
21      academic days but doesn't pursue academic research
22      or scholarly activities, you would have to tell
23      the jury, I don't know what they do for their
24      academic time?

Charu Desai vs                                              Charu Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.            September 18, 2020

125

1           MS. WASHIENKO:  Objection.  You can answer.

2    A   I cannot.  I can't speak for them what they do.

3    Q   I'm going to turn my attention now to your

4        Complaint that was filed in this action, and

5        specifically Count 1 of the Complaint.  So Count 1

6        of the Complaint is an allegation of

7        discrimination that you've made based on race,

8        national origin, and gender, and you've made it

9        against UMass. Memorial Medical Center, University

10       of Massachusetts Medical School, UMass. Medical

11       Group, Marlborough Hospital, Dr. Rosen and

12       Dr. Tosi.

13           What is your race, ma'am?

14   A   I'm Asian.

15   Q   Asian.  And what is your national origin?

16   A   Indian.

17   Q   Indian.  All right.

18           I'm going to begin with referencing the

19       Complaint under this Count to your compensation.

20           Who made the decision as to the setting of

21       your compensation, do you know?

22   A   We did it together with my attorney.

23   Q   With who?

24   A   My attorney.

135

```
 1        don't have?
 2   A    I did not say that.
 3   Q    It's a question.  Do you think you should be or do
 4        you think that's a distinguishing feature?
 5   A    You say if they have a little supervision they
 6        should be paid more?  That's what you are asking,
 7        right, the question?
 8   Q    Yes.  That's what I'm asking.
 9   A    Yes.  And then the same token, they do less
10        clinical work.
11   Q    Right, but you agree that they are getting paid
12        for their leadership role?
13   A    Yes.
14   Q    Okay.  Now, in your Complaint, as I recall, you
15        only identify one comparative.  You identify the
16        white male who is being paid more than you in your
17        Complaint as Aaron Harmon.
18             Do you recall that?
19   A    Yes.
20   Q    And he has a skill set you don't have, isn't that
21        right?
22   A    He is interventional radiologist.
23   Q    He is an interventional radiologist, which
24        requires additional training, right?
```

136

1    A    I don't agree.

2              All the radiologist, they have to --

3    Q    Is it your testimony that you should be paid the

4         same as interventional radiologists?

5    A    That is my testimony.  I'm telling you that all

6         the radiologists in general, they have to go

7         through the same training, so many years, and

8         everybody looks at the images.

9    Q    Can you answer my question, please; is it your

10        testimony that you should be paid the same as

11        interventional radiologists?

12   A    Repeat the question?

13   Q    Sure.  Is it your testimony that you should be

14        paid the same as an interventional radiologist

15        despite not being an interventional radiologist?

16   A    Yes.

17   Q    Okay.  And have you ever looked at the prevailing

18        market data for interventional radiologists versus

19        general radiologists or chest radiologists?

20   A    Yes.

21   Q    And fair to say, interventional radiologists are

22        paid more, aren't they?

23   A    Yeah.  But it is not justified because everybody

24        does -- just happens they do on a different --

137

1        they get trained -- it is just everybody, all the

2        radiologists go through the basic training, go --

3        they have to have all the same qualification, and

4        then, they'll be doing just a different part of

5        the body; they analyze it, make the diagnosis, and

6        give the written report.  So it just a different

7        unique setting they are working.

8  Q   Sure, and a cardiac surgeon --

9  A   Plus to how many years too, the physician, whether

10     somebody just came out of the training, so

11     assistant associate, I think they should be the

12     same.

13  Q   And ma'am, a cardiac surgeon goes through training

14     just like an orthopedic surgeon, but I'm betting

15     cardiac surgeons make more.  Do you think those

16     should be level playing fields as well; they all

17     should make the same?

18         MS. WASHIENKO:  Objection.

19  A   It is not my place to decide for them.

20  Q   Okay.  But it's your place to decide for the

21     entire market of interventional radiologists

22     versus general radiologists?

23         MS. WASHIENKO:  Objection.

24  A   I didn't say that.

138

1  Q  I'm sorry?  Your answer?

2  A  Please repeat the question?

3  Q  But you believe that it's okay for you to decide

4     for the market in terms of interventional

5     radiologists should not be paid more than general

6     radiologists, is that right?

7          MS. WASHIENKO:  Objection.

8  A  I believe everybody should be paid the same.

9  Q  You recognize interventional radiologists actually

10    invade the body, right?

11 A  Yeah.  I'm just telling you --

12 Q  Ma'am, just answer the question.  Do they invade

13    the body or not?

14 A  Yes.

15 Q  Yes.  And do you?

16 A  Not right now.

17 Q  And you haven't for 15 years, correct?

18 A  I'm not.

19 Q  And you haven't had privileges, for 15 years at

20    least, to be able to invade a body in the

21    interventional radiologist field, correct?

22 A  Yes.

23 Q  And so, despite the fact that there is an invasive

24    skill set that one group of doctors have that you

155

1    ever interfered with your ability to take time off
2    if you felt you needed a break, isn't that true?
3  A  Yes.
4  Q  Did you apply for Division Chief Physician,
5    Division Chief of Chest Radiology when it was
6    open?
7  A  No.
8  Q  Why not?
9  A  Because it was automatically, that if you are
10   senior, that you should be a case asked.
11 Q  I'm sorry, I didn't mean to interrupt you.
12        Is this similar to your view that you should
13   be grandfathered?
14        MS. WASHIENKO:  Objection.
15 A  No.  Please repeat the question?
16 Q  You're saying, based on your seniority, you should
17   have been asked to be given the position.  Is this
18   similar to your view that you should have been
19   grandfathered in for academic time?
20 A  No, that has been happening in the department.
21 Q  So you believe that they should not have
22   interviewed for the position but they should have
23   given you the position?
24 A  No, they should have asked.

156

1    Q    And what would you have said?

2    A    That depends.  But that has happened in other

3         section too.

4    Q    Did you believe that you were facing

5         discrimination based on the hire of Dr. Dill in

6         March of 2016?

7    A    Yes.

8    Q    As Division Chief?

9              You did.  So at the time she was hired, did

10        you believe you were facing discrimination?

11   A    Yes.

12             MS. WASHIENKO:  Asked and answered, but --

13   Q    Okay.  And on what basis?  And by that I mean, was

14        it based on your age, your gender, your race, your

15        color, your disability?  What was it?

16   A    Everything.

17   Q    So just so it's clear, in 2016, you believe that

18        you were facing discrimination based on race,

19        color, national origin, gender, and age based on

20        the hire of Dr. Dill?

21   A    Yes.

22   Q    Did you complain to anyone about it then?

23   A    I did not.

24   Q    Can you explain how it is that for two years now,

168

1       you -- strike that.

2           Do you think it would have been responsible

3       for you to ask Dr. Rosen why he assigned those

4       workstations as opposed to saying that he is

5       motivated by race?

6           MS. WASHIENKO:  Objection.

7    Q  You can answer.

8    A  I could have asked him.

9    Q  On the hire of Dr. Dill, do you know who made the

10      decision to hire her?

11   A  I believe Dr. Rosen.

12   Q  Okay.  So you're not claiming that Dr. Tosi

13      engaged in discrimination in the hiring of

14      Dr. Dill, are you?

15   A  I don't think so.  No.

16   Q  And you're not claiming that the University of

17      Massachusetts Medical School made a discriminatory

18      decision to hire Dr. Dill, right?

19   A  No.

20   Q  And you're not claiming Marlborough Hospital made

21      a discriminatory decision to hire Dr. Dill,

22      correct?

23   A  Yes.  They did not.

24   Q  So you're claiming instead, Dr. Rosen made a

174

1        MS. WASHIENKO:  Objection.

2    A   I did not talk to them.  But I have -- in the

3        department, there were other people who were

4        getting them, so.

5    Q   Yes, but we were talking about the trial, Dill and

6        Schmidlin, the ones you identified.  So you didn't

7        talk to them about whether or not IT support was

8        available to them during the trial, right?

9    A   I did not.

10   Q   Now, Count 2 of your Complaint is the Federal

11       Equal Pay Act claim, which means you're claiming

12       that you weren't paid equally to male

13       counterparts, and you named every defendant in

14       this Count.  You named the medical group, you

15       named the medical center, Marlborough Hospital,

16       Dr. Tosi, Dr. Brennan, Dr. Rosen, Dr. Dill, and

17       the medical school.

18            Are you claiming every one of those were

19       involved in the decision of the setting of your

20       compensation or the setting of compensation of

21       males?

22   A   I don't know exactly who decides, so.

23            I don't know.

24   Q   Are you claiming Marlborough Hospital did not pay

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu Desai, M.D.
September 18, 2020

175

1      you correctly under the Equal Pay Act?

2  A   No.

3  Q   Are you claiming the University of Massachusetts

4      Medical School did not pay you correctly under the

5      Equal Pay Act?

6  A   No.

7  Q   Are you claiming Dr. Tosi did not pay you

8      correctly under the Equal Pay Act?

9  A   No.

10 Q   Are you claiming Dr. Dill did not pay you

11     correctly under the Equal Pay Act?

12 A   No.

13 Q   Are you claiming Dr. Brennan didn't pay you

14     correctly under the Equal Pay Act?

15 A   No.

16 Q   Are you claiming UMass. Memorial Medical Center

17     didn't pay you correctly under the Equal Pay Act?

18 A   I don't know if they are the deciding factor

19     though, so I cannot tell about that.  Probably,

20     but I don't know.

21 Q   Are you claiming UMass. Memorial Medical Group

22     didn't pay you correctly under the Equal Pay Act?

23 A   To my knowledge, yes.

24 Q   Okay.  And are you claiming Dr. Rosen didn't pay

180

1  A   I forgot.

2  Q   Okay.  And what I said was, male employees paid

3      more than you for substantially equal work.  Are

4      you claiming that your work, noninvasive work, is

5      substantially equal to his invasive interventional

6      radiology work?

7  A   Like I said before, at the end of the day, we

8      basically kind of do the same thing.

9  Q   Kind of similar to, at the end of the day, an

10     orthopedic surgeon cuts on my wrist and a

11     neurosurgeon cuts on my brain?  Like that?

12         MS. WASHIENKO:  There's no question.

13  Q   Is that an appropriate analogy; they are both

14     doing the same thing, performing surgery on the

15     body, just different parts?

16  A   That's what I'm saying, that we are taking care of

17     different parts of the body in radiology in

18     general.

19  Q   So you would agree that all surgeons should be

20     paid the same as well?

21         MS. WASHIENKO:  Objection.  You can answer,

22     Dr. Desai.

23  A   Yes, it's not my decision what they do.

24  Q   Now, you are aware that UMass. Memorial responded

181

1      to pay concerns that were raised in 2016 by
2      undertaking an analysis of pay within the
3      radiology department, correct?
4   A  Yes.
5   Q  And as a result, you received a substantial
6      increase in pay, hadn't you?
7   A  I did.  I'm trying to think how much.  I did.  But
8      that was last two years I think it was corrected.
9   Q  You had gone from 283,000 to 329,000.  That's a
10     pretty substantial increase, correct, from January
11     '17 to March of '17?
12  A  Yes.
13  Q  And ultimately, you only went to 320 in March
14     because you had sold back call time.  Do you
15     recall that?
16  A  Just for one year.
17  Q  Yes.  And that depressed your income somewhat.
18     And then in '18 and '19, you went up to just short
19     of $340,000.  And so for the last three years of
20     your employment with UMass., they had actually
21     undertaken a study and attempted to correct any
22     pay disparities within the radiology group --
23     fair?
24  A  Yes.

182

1  Q  And not only had they undertaken that, but they
2     ensured that you received a sizable increase in
3     salary, right?
4  A  Yes.  They make same for all the associate or
5     something like that, they did, I think.
6  Q  But they tried to make it standard across the
7     board, right?
8  A  Yes.
9  Q  And ultimately, from January of '17 to when you
10    left, you had received about a 56,000 plus dollar
11    increase in order to address pay disparities,
12    right?
13 A  Within the two years, right?
14 Q  Yes.
15 A  Okay.
16 Q  And you would agree that was a substantial
17    increase?
18 A  Yes.
19 Q  Do you think that was a reasonable approach by
20    UMass. to try and address the pay disparities?
21       MS. WASHIENKO:  Objection.
22 A  Yes, but how about all the other years I lost?
23 Q  Right.  I'm not asking about that though.
24       Do you think they acted in good faith when

183

1      they tried to address the pay disparities during
2      those last three years of your employment?
3  A    Yes.
4            MS. WASHIENKO:  Hey, Bob?
5            MR. KILROY:  Yes.
6            MS. WASHIENKO:  Is there any chance this
7      might be a reasonable time for a break because I
8      could use a bio break?
9            MR. KILROY:  Yes, absolutely.  This is a
10     good time, Pat.
11           MS. WASHIENKO:  Thank you very much.
12                 (Recess taken.)
13  BY MR. KILROY:
14  Q    All right, Dr. Desai, you all set?
15  A    All set.
16  Q    In Count 3 of your Complaint, you have a claim for
17     Violation of the Americans With Disabilities Act,
18     and is that based on your heart condition?
19  A    Yes.
20  Q    Okay.  And am I right that the only medical
21     documentation you've presented to UMass. Memorial
22     related to your heart condition was Exhibit 13,
23     which you should be looking at currently on the
24     eDepoze, the 2008 letter?

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu Desai, M.D.
September 18, 2020

200

1                    C E R T I F I C A T E

2    COMMONWEALTH OF MASSACHUSETTS

3    MIDDLESEX, SS.

4

5         I, Lisa McDonald, Registered Professional
     Reporter Certified Realtime Reporter and Notary
     Public, in and for the Commonwealth of
6    Massachusetts, do hereby certify that:

7

8         CHARU DESAI, M.D., the witness whose
     deposition is hereinbefore set forth, was duly
     sworn by me remotely, that I saw a picture
9    identification for her in the form of her driver's
     license, and that the foregoing transcript is a
10   true and accurate transcription of my stenotype
     notes to the best of my knowledge, skill and
11   ability.

12

13        I further certify that I am not related to
     any of the parties in this matter by blood or
     marriage and that I am in no way interested in the
14   outcome of this matter.

15

16        IN WITNESS WHEREOF, I have hereunto set my
     hand and notarial seal this 26th day of September,
     2020.

17

18   *Lisa McDonald*

19   Lisa McDonald, RPR, RMR, CRR
            Notary Public
20   My commission expires: May 23, 2025

21

22        THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
     DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME
23   BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
     AND/OR DIRECTION OF THE CERTIFYING REPORTER.

24

```
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF MASSACHUSETTS
 3            CIVIL ACTION NO. 4:19-cv-10520-DHH
 4    * * * * * * * * * * * * * * * * * * * * * * *
 5    CHARU DESAI,
 6                              Plaintiff,
 7    vs.
 8
 9    UMass.. MEMORIAL MEDICAL CENTER, INC., et al.,
10                              Defendants.
11    * * * * * * * * * * * * * * * * * * * * * * *
12                        VOLUME II
13      CONTINUED DEPOSITION OF:  CHARU S. DESAI, M.D.
14                    Conducted Remotely
15              211 Congress Street, Suite 720
16                   Boston, Massachusetts
17      Thursday, October 22, 2020          10:04 a.m.
18
19
20
21
22
23
24
```

280

1   with the email and I have not.

2       Q.  I didn't ask you if you communicated with

3   emails.  You're -- you're being told by your chair

4   to do so and he's telling you that you need to do

5   so, isn't that right?

6           MS. WASHIENKO:  Objection.

7           But you can answer, Dr. Desai.

8       A.  He's just saying -- yeah.  He's saying to

9   do so because, apparently, to receive the email,

10  that's what the idea is in regards to.

11      Q.  He also counseled you that you should not

12  allow work flow problems to go unaddressed,

13  correct?

14          MS. WASHIENKO:  Objection.

15          You can answer.

16      A.  We usually call the people who -- the IT

17  people.  There is -- we don't call Dr. Rosen.

18      Q.  I -- I didn't ask you that question.  My

19  question was, did he counsel you that you should not

20  let work flow problems go unaddressed?

21          MS. WASHIENKO:  Objection.

22          But you can answer, Dr. Desai.

23      A.  Yes.

24      Q.  He also counseled you to ensure that you

281

1  enter quality assurance issues into the Peer-Vue

2  system, correct?

3      A.  Yes.

4      Q.  And he spoke with you concerning the

5  academic time policy, didn't he?

6      A.  Yes.

7      Q.  He specifically advised you, if you

8  believed academic time for you was justified, then

9  you should identify in writing what activities you

10  intended to undertake and then he would discuss

11  additional time for those specific activities,

12  didn't he?

13          MS. WASHIENKO:  Objection.

14          You can answer.

15      A.  Yes.

16      Q.  And you never responded in writing as your

17  chair directed, did you?

18      A.  Not that I recall.  But how about people

19  who got hired --

20      Q.  There's no question pending, Dr. Desai.

21      A.  No.  But to have --

22      Q.  Dr. Desai, there's not a question pending.

23  I'm moving on.

24      A.  You can move on, but the new people who

303

1       MS. WASHIENKO:  Objection.

2    A.  Yes.

3    Q.  And, as long as you were granted the

4  intermittent FMLA, you were capable of performing

5  the essential functions of your job as a

6  radiologist, weren't you?

7       MS. WASHIENKO:  Objection.

8    A.  Yes.

9    Q.  Down on the bottom of the first page it

10  says, "Please, remember it is your responsibility to

11  follow your company's normal absence reporting

12  procedures."  Did you follow the company's absence

13  reporting procedures correctly?

14       MS. WASHIENKO:  Objection.

15    A.  Yeah.  When I was completely not able to go

16  to work, yes.  We do with the phone, yes.  But

17  you -- the thing is, even with the spell, I came to

18  work.  That is --

19    Q.  I didn't ask you that, ma'am.

20    A.  Yeah, but you should know that.

21       MS. WASHIENKO:  I'll circle back with you,

22  Dr. Desai.

23       THE WITNESS:  Okay.

24    Q.  I'm showing you Exhibit 31.

304

1              (Document marked as Exhibit 31

2              for identification)

3    BY MR. KILROY:

4        Q.  Do you recognize that document?

5        A.  Let me see.  Just one page, yeah.

6        Q.  Yes.

7        A.  Okay.  So what is -- this is my own note.

8    I think we probably gave it to you because you say

9    you have to --

10       Q.  But that's your handwriting, correct?

11       A.  It is.

12       Q.  On what basis do you claim you should have

13   been exempted from call requirements within the

14   radiology department?

15       A.  Because of how many years of -- of work.

16   That's what I'm -- see, originally when I started

17   the job, it was five call per year and one holiday

18   when I took the job.  Then it become ten call per

19   year and two holiday.

20       Q.  Is there a policy that says that you get

21   exempted from call in radiology based on number of

22   years working at UMass. Memorial?

23       A.  Yes, there is, but it is -- there are, I

24   think, 20 years, and there is age.  That's kind of

305

 1   policy but I -- I didn't -- I was not that age, but
 2   I finished more than my --
 3        Q.   So you weren't eligible to be exempted --
 4        A.   Yeah.
 5        Q.   -- from call-in policy?
 6        A.   Yes, but I was asking him if he could -- he
 7   would reduce the call or --
 8        Q.   You were asking for an exception to be made
 9   to the --
10        A.   I did.
11        Q.   -- policy, correct?
12        A.   I did.
13        Q.   Was an exception made for anyone else, to
14   your knowledge?
15        A.   Nobody had that seniority and they are not
16   around.  Nobody is around.
17        Q.   So the answer is --
18        A.   I was the last -- I was the last one, so I
19   think that was to get rid of the last one.
20        Q.   So your answer is you're not aware of an
21   exception being made to the call policy in radiology
22   for anyone, correct?
23        A.   Not to my knowledge.  Yes.
24        Q.   Bullet Point 5, could you read that to me,

306

1   please.

2       A.   You mean No. 5 in here?

3       Q.   Yes.

4       A.   I'm saying the newcomers are getting the

5   same pay as I do after -- after 26 years, may pay

6   same.  I am associate.  The others, just after the

7   training, they are assistant.  Does that make sense?

8   No, it does not.

9       Q.   So you wanted to be paid more based on your

10  years of service?

11      A.   It's not a question of paying more.  You --

12  in standard form, you figure that assistant and

13  associate, plus 26 years, not only they are not same

14  pay, they are more than we.  How do you justify

15  that?

16      Q.   I'm just asking, did you want to be paid

17  more based on your years of service?

18      A.   It should have been difference for

19  associate and the years of service, both.

20      Q.   Okay.  Bullet 6 says, "Discrimination,

21  unfairly treated."  What are you referring to

22  there?

23      A.   Same thing.  Newcomers are getting academic

24  time from pay their first week.  On what basis?  Did

307

1  they prove it to you that they wrote -- they wrote
2  time paper or they did the research?  No.  And
3  when -- when we ask, you know what was the answer?
4  That is the market.  If you don't give it, they
5  won't come.
6         By the way, most of them left.  20 people
7  left in, like, two and a half years --
8  approximately, two and a half to three years time.
9  So you're not giving them more time.  They are not
10 lying to you.  They are not -- so whatever.
11     Q.  On day one, I asked you to identify anyone
12 who had academic time who had never performed
13 research or scholarly activities of any kind, and
14 you couldn't identify anyone.  Can you identify
15 anyone now?
16     A.  No.  I -- I did not.
17     Q.  You've answered the question.
18     A.  The -- I don't want to identify because
19 that day you say that you will take action against
20 and this --
21     Q.  Ma'am, you don't have a choice.  Are you
22 saying you know someone who was given academic time
23 who had no academic responsibilities and no academic
24 research?

308

1          MS. WASHIENKO:  Dr. Desai, I'll circle back
2     with you at the end on that.
3          MR. KILROY:  I'm sorry, Pat.  I couldn't
4     hear you.
5          MS. WASHIENKO:  I said, Dr. Desai, I'll
6     circle back with her in the end on that.
7     BY MR. KILROY:
8          Q.  Dr. Desai, are you identifying -- can you
9     identify someone that you're claiming received
10    academic time who was not entitled to it under the
11    policy?
12         A.  I can't.
13         Q.  Okay.
14         A.  I won't.  You already have the schedule who
15    gets academic time.  You already know who is doing
16    research and not doing research.  I can't imagine
17    people just got hired, gets academic time the
18    following week, and they already produced a paper.
19    No.  Unbelievable.
20         Q.  When you state discrimination, on what
21    basis -- and by that I mean, are you claiming
22    discrimination as of May 25th, 2017, based on your
23    age, based on your race, your color, your gender,
24    your national origin?  What are you claiming was in

309

1   your mind at that time?

2       A.  All of it.

3       Q.  Okay.  So, as of May 25th, 2017, you claim

4   you are basing discrimination based on age, race,

5   color, national origin, and disability, correct?

6       A.  Yes.

7       Q.  After May 25th of 2017, what actions are

8   you claiming were discriminatory?  So nothing prior

9   to May 25th, '17.  I just want to know after

10  May 25th, '17.  Was there anything new after

11  May 25th, 2017, that you claim was discriminatory?

12      A.  Not that I recall.  The same I already

13  stated.

14      Q.  Well, I'll try and refresh your

15  recollection.  Aren't you claiming the termination

16  was discriminatory?

17      A.  Yeah.  That we already discussed before.

18      Q.  Okay.  I -- I didn't ask you this question

19  before.  I'm asking you this question.  You've told

20  me that you believed you were facing discrimination

21  as of May 25th, 2017, on age, race, color, national

22  origin, gender, and disability.  Now, I'm -- I'm

23  putting a dividing line in time between May 25th,

24  '17, backwards and May 26th, 2017, forward.  I want

310

1   to know what new happened after May 25th, '17, that

2   you claim was discriminatory on any of those bases.

3          MS. WASHIENKO:  Objection.

4          You can -- you can answer, Dr. Desai.

5      A.   The -- in the past, I haven't seen anybody

6   tell me they'd like me on the call-in thing and all

7   that and did all the fraudulent independent review

8   and all of that.  So that is -- that is all -- it is

9   already discussed before as far as I'm concerned.

10      Q.   Okay.  So -- so beyond, and meaning closer

11  in time after May 25th, 2017, you're claiming the --

12  the quality investigation and the termination were

13  discriminatory.  Anything else?

14          MS. WASHIENKO:  Objection.

15          You can answer.

16      A.   Yeah.  The pay scale, the pay was

17  targeting -- was discriminatory, too.

18      Q.   Why?

19      A.   Yeah.  I can't list the all the things

20  right now.

21      Q.   Ma'am, This is my chance to ask you under

22  oath the basis for your claims.  This is an

23  important question.

24      A.   Yeah.  I thought we already discussed all

311

1    of that before.

2        Q.  No.  I did not ask you for the difference

3    between prior to May 25th, '17, and after.  I have a

4    document in your own handwriting where you're

5    claiming you were facing discrimination as of

6    May 25th, 2017.  You told me all the bases, every

7    basis that you claimed in this case.  I want to know

8    what happened after that that you claim is

9    discriminatory.  All I know right now based on your

10   under oath testimony is the termination and the

11   investigation.  Is there anything else?

12           MS. WASHIENKO:  Bob, I think that Dr. Desai

13   in day one of her deposition -- I think she

14   testified day one of her deposition and today that

15   the workstation was an issue, that the academic days

16   were an issue.

17           MR. KILROY:  Well, let her testify to that,

18   Pat.  She's testified in general, but I want to

19   know, like, when it happened.  I've heard the

20   workstation was in '16; I've heard it was in May of

21   '17.

22           MS. WASHIENKO:  Well, it continued until

23   she left because she was never given a workstation.

24   I -- I -- I think that's pretty clear.

312

1   BY MR. KILROY:

2       Q.  Do you agree with that, Dr. Desai, that

3   you're claiming, after May 25th, 2017, you had asked

4   again for a workstation despite telling me

5   previously me you only asked one time?

6           MS. WASHIENKO:  Objection.

7       A.  I -- that meeting I asked.  After that, I

8   did not ask as far as I recall.  See, this is going

9   back to the day.  It is not easy to remember all

10  that.

11      Q.  Okay.  Is there anything else you want to

12  tell me that you thought was discriminatory that

13  first occurred after May 25th, 2017?

14      A.  Not that I recall.  We already discuss

15  about the other stuff, the pay and all of that.

16              (Document marked as Exhibit 32

17              for identification)

18  BY MR. KILROY:

19      Q.  I'm showing you Exhibit 32.  This is a

20  letter dated February 16th, 2017.  Let me know when

21  you see it.

22      A.  Yes, I have the document.

23      Q.  All right.  And this is a letter to you

24  informing you that there was a new salary structure

313

1  being implemented in the department of radiology

2  that would be effective May -- I'm sorry --

3  March 1st, 2017, correct?

4      A.  Yes.

5      Q.  And you were getting a sizable salary

6  increase then, right?

7      A.  Yes, because I was on the pay all the other

8  years.

9      Q.  And the new salary structure that was put

10 in place, fair to say it was responsive to

11 complaints that had been made about differences in

12 salary amongst physicians in radiology, right?

13     A.  I think so.

14     Q.  But you hadn't complained as of that date,

15 had you?

16     A.  I don't remember this date I complain.  I

17 complain that we already saw the thing.

18     Q.  Okay.  Do you remember that male doctors

19 were complaining about their salaries at this

20 time?

21     A.  Please, repeat the question.

22     Q.  Do you remember that male doctors were

23 complaining about their pay?

24     A.  Yeah.  That was -- I don't remember the

Charu Desai vs                                                    Charu S. Desai, M.D.
UMASS Memorial Medical Center, Inc., et al.                        October 22, 2020

314

1  date, but yes.  They went, actually, to Dr. Tosi and
2  all of that.  Yes.
3      Q.  And those male doctors included white male
4  doctors, didn't they?
5      A.  Some.
6      Q.  And younger, doctors younger than you, male
7  white younger doctors, right?
8      A.  Yeah.  Younger than I am.
9      Q.  And fair to say that this new salary
10  structure was intended to try and address the
11  differences in pay that existed across the
12  department, right?
13     A.  I think so.
14     Q.  Are you claiming the new structure was
15  discriminatory in any way?
16     A.  I think, in my case, I can't say that.
17     Q.  You can or you can't?
18     A.  I -- I cannot say that it is -- it looks
19  okay here because I don't know about the other
20  people but I -- I lost a lot of money previous years
21  because I was underpaid.
22     Q.  Okay.  Would you agree that, once UMass.
23  Memorial undertook this analysis to put in a new
24  salary structure, that they made reasonable progress

315

1   with your pay to try and eliminate differences in

2   pay?

3           MS. WASHIENKO:  Objection.

4           You can answer.

5       A.  They did.  They did.

6       Q.  I'm sorry, Dr. Desai.  I didn't hear your

7   answer.

8       A.  They did.

9       Q.  Okay.  They did.

10          And, would you agree that they were acting

11  in good faith when they were addressing these pay

12  differences?

13          MS. WASHIENKO:  Objection.

14          But you can answer.

15      A.  Yes, they did.

16      Q.  In the interest of time, I'm going to skip

17  over Exhibit 33 and go to Exhibit 34.

18              (Document marked as Exhibit 33

19              for identification)

20  BY MR. KILROY:

21      Q.  Exhibit 34, Dr. Desai, is a --

22      A.  I don't have it.  I don't have it.

23          MS. WASHIENKO:  It hasn't shown up yet,

24  Bob.  33 showed up.

316

 1  BY MR. KILROY:

 2     Q.  Do you have it or no?

 3     A.  You want to skip the 33, right?

 4     Q.  I will skip 33.  Oh, you know what; it

 5  showed up as 33.  It must have changed the numbering

 6  automatically on us.

 7        MS. WASHIENKO:  Okay.

 8        MR. KILROY:  Let me just go back and look

 9  for a second.  That's weird.  Yeah.  All right.  So

10  it did.  So it's listed as Exhibit 33 now.  I'll

11  just have to adjust my outline.

12     Q.  So Exhibit 33 is a faculty annual

13  performance for you, Dr. Desai from July 1, 2016, to

14  June 30, 2017.  Do you see that?

15     A.  Yes.

16     Q.  And I'll let you scan through it.  Fair to

17  say this shows us another year where you haven't

18  recorded any continuing medical education?  Is that

19  right?

20     A.  Yes.

21     Q.  And it's another year that's gone by with

22  no research, creative, or scholarly activities

23  recorded for you, right?

24     A.  Yes.

317

1      Q.  Another year where there's been no

2   professional development activities recorded for

3   you, correct?

4      A.  Yes.

5      Q.  And, once again, Dr. Rosen notes that he

6   spoke with you about the academic time policy,

7   right?  It's on the last page.

8      A.  Yes.  The same thing, yes.

9      Q.  All right.  And, once again, this is where

10  you want to be granted academic time without

11  actually performing academic duties, right?

12          MS. WASHIENKO:  Objection.

13          But you can answer.

14      A.  I was only asking for 12 days per year.

15      Q.  Ma'am, just answer my question.  Do you

16  remember my question?

17      A.  Once, and I was speaking by the -- I got

18  the teacher of the year award, too.

19      Q.  Did you hear my question, ma'am?

20      A.  Yeah.  I heard.  You would -- go ahead.

21  You can ask again.

22      Q.  Once again, you wanted to be granted

23  academic days without needing to actual perform

24  academic duties under the academic time policy,

318

1  correct?

2      MS. WASHIENKO:  Objection.

3      But you can answer, Dr. Desai.

4      A.  Yes.  So were the other people were getting

5  it without doing the academic duties.

6      Q.  And -- and, once again, despite your chair

7  telling you to submit a proposal in writing in the

8  past, you never submitted a proposal in writing for

9  what you would do with the academic time, isn't that

10  right?

11      A.  Yes.  Same with the newcomers.  They did

12  not give any proposal and all of that.  They were

13  getting once a week.  I am asking 12 per year.  I am

14  not asking (inaudible).  And I should have been

15  grandfathered because that was given to me when I

16  started the job.

17      Q.  Ma'am, you keep referencing -- you keep

18  referencing newcomers.  I asked you to identify

19  anyone who was granted academic --

20      A.  The department already knows.

21      Q.  Let me finish.

22      A.  We will give you the list if you want.

23      Q.  Let me finish.

24      A.  The whole -- basically, whole department.

355

1      A.  Oh, I was not reviewing patient chart.  I

2  was checking the deal thing which I came across when

3  I was cleaning my office.  I told you that, and then

4  she is saying everything is significant, which is

5  not.  It is absolutely not, and one of them she laid

6  down by herself.  You know, that is -- because I had

7  to pick it up myself, too, when I come across

8  something.  So there is nothing I did wrong here.

9      Q.  You completed the annual HIPAA training,

10  correct?

11      A.  Yes.

12      Q.  And your testimony under oath is that you

13  didn't understand medical record numbers constituted

14  protected health information?

15      A.  No, I did not.  I knew the patient names.

16  That I knew.

17                  (Document marked as Exhibit 46

18                   for identification)

19  BY MR. KILROY:

20      Q.  Are you seeing Exhibit 46?  It should be an

21  annual performance review July 1, 2017 to June 30th,

22  2018.  Do you see that?

23      A.  Yes.

24      Q.  Okay.  And fair to say this is another full

356

1   year where you have no scholarship activity?

2          MS. WASHIENKO:  Objection.

3      Q.  And no research activity?

4          MS. WASHIENKO:  Objection.

5      Q.  Is that right?

6          MS. WASHIENKO:  Objection.

7      A.  Yes, but I am not -- I am on clinical

8   track.  I'm not academic.

9      Q.  Right.  You're on a clinical track, so,

10  therefore, you don't need academic time I

11  understand.

12         MS. WASHIENKO:  Objection.

13     Q.  Professional development --

14  It's not that -- I didn't say academic time.  I

15  don't have to do the papers and all of that.  That's

16  what I'm saying.  You are testing -- you are testing

17  the matter.

18         THE REPORTER:  You are?  I'm sorry.

19     A.  You are changing the subject on me.  That's

20  what I don't deserve.  Yeah.  A lot of people get to

21  academic time and they don't show any paper or

22  anything.  When you come in the hospital the first

23  week, you don't give the papers and all of that.

24         MS. WASHIENKO:  Dr. Desai, I will circle

357

 1   back with you.
 2           THE WITNESS:  That's fine.
 3       Q.  And it's another full year where you don't
 4   have listed any professional development courses,
 5   programs, workshops that you participated in to
 6   enhance your professional development, correct?
 7       A.  Yes.
 8               (Document marked as Exhibit 47
 9               for identification)
10   BY MR. KILROY:
11       Q.  I show you Exhibit 47.  Exhibit 47 is a
12   letter to you from Absence One, which is the new
13   FMLA provider for UMass.  And fair to say you were
14   approved for another year's worth of intermittent
15   FMLA from March 21st, 2018, through March 20th of
16   2019, right?
17       A.  Yes.
18       Q.  And you were approved for two episodes
19   every two months with each absence lasting up to a
20   day, right?
21       A.  Yes.  But I never did take any time --
22       Q.  And --
23       A.  -- a few times -- except my pacer battery
24   change.  I didn't --

358

1      Q.  And this was -- this was in order to help
2   you deal with your heart condition in the event of a
3   flare-up, right?
4      A.  Yes.
5      Q.  And, other than this request for
6   intermittent FMLA, two episodes every two months
7   lasting up to a day, you hadn't requested any other
8   assistance with respect to your heart condition,
9   correct?
10         MS. WASHIENKO:  Objection.
11      A.  Please, repeat the question.
12      Q.  Other than asking the ability to take time
13   off as listed here on your FMLA certification during
14   this year, you haven't requested any other
15   assistance based on your heart condition, correct?
16         MS. WASHIENKO:  Objection.
17      A.  I -- I requested for the -- just for the
18   call and all of that.
19      Q.  For the -- you mean for the weekend call?
20      A.  Yeah.
21      Q.  And so, other than the weekend call
22   requesting a home workstation and other than the
23   FMLA, you didn't request anything?
24         MS. WASHIENKO:  Objection.

359

1      A.  I asked what the -- like I was saying, the
2   12 days for teaching academic time.  I -- yeah.  I
3   don't recall anything else.
4      Q.  And the -- you never submitted a doctor's
5   note of any kind that said you needed to be able to
6   do remote reads from your home, did you?
7      A.  I don't need the doctor's note.  It is,
8   like, ten days working in a row.
9      Q.  Ma'am, will you just answer my question.
10  Did you ever submit a doctor's certification
11  indicating that you needed to work from home when
12  on-call?
13     A.  No.
14     Q.  And were you able to actually complete your
15  call duties without working from home?
16     A.  Always.  I -- I did it at my house.  Even
17  if I get the spell, I just sit down and then do it.
18     Q.  So you were capable of performing the
19  essential functions of your job as long as you were
20  given FMLA per this certification during 2018
21  to '19, right?
22          MS. WASHIENKO:  Objection.
23     A.  Yes.
24     Q.  And you were never denied the right to take

360

1    that FMLA, were you?

2        A.  No.

3                (Document marked as Exhibit 48

4                for identification)

5    BY MR. KILROY:

6        Q.  Next is Exhibit 48.  Do you know who

7    Dr. Litmanovich is?

8            MS. WASHIENKO:  It hasn't shown up yet,

9    Bob.

10           MR. KILROY:  I'm sorry.

11       A.  I don't know.

12       Q.  Do you know who --

13       A.  I don't know who she is.

14       Q.  Okay.  Do you understand that she was hired

15   as an expert in radiology to do a quality assurance

16   review for the department with respect to 50

17   cases?

18       A.  That what it says here.

19       Q.  Okay.  And you -- you think it was wrong

20   for them to hire Dr. Litmanovich because Dr. Rosen

21   knew of her, is that right?

22           MS. WASHIENKO:  Objection.

23           You can answer.

24       A.  Partly because it is biased.  Right.  And

361

1  the thing is what was done was not correct.  25 of

2  my cases and five or two of other cases.  So it's

3  not -- the methodology was completely wrong.

4      Q.  I'm just asking, are you claiming that

5  because Dr. Rosen knew this expert in radiology and

6  chose her to do this study that that was

7  discriminatory somehow?

8          MS. WASHIENKO:  Objection.

9      A.  I'm not saying it is discriminatory, but I

10  believe this is wrong --

11      Q.  Okay.

12      A.  -- completely wrong.

13          (Document marked as Exhibit 49

14          for identification)

15  BY MR. KILROY:

16      Q.  Okay.  I'm showing you Exhibit 49, which is

17  a summary table which I believe you would have seen

18  when you met to discuss the results, and it's

19  showing for the 50 cases that were reviewed that

20  you -- that the expert found that you had five major

21  errors and five minor and, for the other 25 cases,

22  there was one major error and seven minors.  Do you

23  see that?

24      A.  I do.  I do not agree completely.

362

```
 1        Q.  I didn't you ask you for your agreement or
 2   not.
 3        A.  If you did or not, I have to -- I have to
 4   say that it is completely wrong.
 5        Q.  Fair to say that --
 6        A.  And -- and, by the way, one of the cases
 7   she's -- she's not even talking about my case.
 8        Q.  Ma'am -- ma'am, I don't have a question
 9   pending.  Please, stop.
10            MS. WASHIENKO:  Dr. Desai --
11        A.  If you don't, you should listen.
12            MS. WASHIENKO:  Dr. Desai, I will circle
13   back with you.
14            THE WITNESS:  Yeah, but --
15        Q.  Are you -- are you -- are you claiming Dr.
16   Litmanovich, when she arrived at her findings of
17   five major findings for you, five minor findings,
18   one major for the other 25 and seven minor, are you
19   claiming that her analysis was discriminatory in any
20   way?
21            MS. WASHIENKO:  Objection.
22            You can answer.
23        A.  I'm not saying it is discriminatory.  I'm
24   saying it is wrong.
```

363

1      Q.  Okay.  But you're not claiming that she was
2  discriminating based on age, race, color, gender,
3  disability or national origin, right?
4      A.  I hope not.
5      Q.  Well, it's your claim, ma'am.  I need to
6  know.  Are you claiming she was discriminating when
7  she did this, yes or no?
8          MS. WASHIENKO:  Objection.  Asked and
9  answered.
10          MR. KILROY:  Well, she said, "I hope not,"
11  so now I'm confused.  I don't know what she's
12  actually claiming.
13      A.  How do I know what is going in their mind?
14  I'm not the one.
15      Q.  So you're not claiming she was
16  discriminating, right?
17      A.  I don't think so.
18      Q.  Okay.  I'm going to show you Exhibit -- I
19  believe we're on 49.
20          MS. WASHIENKO:  We might be up to 50, Bob.
21          MR. KILROY:  Yup.  You're correct.  It is
22  50.  Thank you, Pat.
23          MS. WASHIENKO:  You're welcome.  It's about
24  the extent of my math, but I'll show that part.

385

 1      A.  I'm not aware.

 2      Q.  Do you know of any of your colleagues who

 3  had a medical condition that needed an

 4  accommodation?

 5      A.  I don't know.  Maybe, Dr. Sue Afonso, she

 6  went part-time or seeked reduced hours because of

 7  her eye.  That's the only I know.

 8      Q.  Okay.  And that was approved, right?  She

 9  still works for them?

10      A.  I assume it was.

11      Q.  Okay.

12      A.  I can't speak for her.

13      MR. KILROY:  Pat, I'm all set with the

14  exception of, possibly, if there's medical documents

15  we haven't received, but otherwise, I'll -- I'll

16  pass the witness.  Thank you.

17                  CROSS EXAMINATION

18  BY MR. JOHNSON:

19      Q.  Dr. Desai, name is Mark Johnson, and I

20  represent only the medical school in this case.

21      A.  Okay.

22      Q.  And I have a couple of questions.

23          As part of your dual employment, you had a

24  faculty appointment at the medical school, isn't

386

1    that correct?

2        A.   Yes.

3        Q.   Okay, was that a non-tenured position?

4        A.   It was.

5        Q.   And was it -- if you had to describe your

6    duties would they be primarily teaching as part your

7    faculty?

8        A.   Medical student, rotating through chest.

9        Q.   But -- but they were primarily teaching

10   duties?

11       A.   Yes.

12       Q.   Okay.  And were those duties separate from

13   your clinical work?

14       A.   See, when I'm doing the work, they sit next

15   to me and I teach them kind of, and once in a while

16   we give them, like, one hour, half an hour

17   conference.

18            See, in my case it was a chest, so then I

19   show them the chest cases just as a (inaudible).

20       Q.   But in the faculty evaluations that we

21   reviewed earlier -- and I can refer you to a

22   specific exhibit number, if necessary but -- it

23   seemed to list two separate categories, break --

24   broke down percentages of -- of clinical work and

387

1    educational work.  Do you recall seeing that?

2        A.  Yeah.  I know they are separate.  Yeah.

3    Yeah.

4        Q.  Okay.  So your clinical work was separate

5    from your educational work, isn't that right?

6            MS. WASHIENKO:  Objection.

7        A.  Yeah.  In a -- in a -- in a way, it is

8    actually combined, but I don't know.  If you want to

9    separate it, you can.

10       Q.  Okay.  And so I -- I only want to talk

11   about your teaching duties as part of your faculty

12   appointment at the medical school, and as to those,

13   would you agree with me that your termination --

14   your employment termination didn't have anything to

15   do with those -- your performance of specifically

16   those teaching duties at the medical school?

17       A.  I agree.

18       Q.  Okay.

19       A.  It has nothing to do with that.

20       Q.  Okay.  And you understood that at the time

21   of your termination in March of 2018?

22       A.  Yes.

23       Q.  That's all I have.

24       A.  Thank you very much.

409

```
 1        Q.   Prior to learning that Dr. Rosen had had an
 2   independent investigation into your readings done,
 3   had anyone spoken to you about your cases?
 4        A.   Not at all.
 5        Q.   Did Dr. Rosen make you aware in advance
 6   that he was undertaking a review of your readings?
 7        A.   Not at all.
 8        Q.   When did you first learn about the review
 9   of your cases?
10        A.   When I went to the meeting March 14th,
11   2018.
12        Q.   Can you describe what happened that day.
13        A.   It was, like, a regular day because I had
14   no idea what is going to happen in next half an
15   hour.  I -- like, a regular day around -- around
16   11:30 I was checking first part of the morning cases
17   for my resident.  So I was sitting with him, and
18   then one of my pulmonary, Dr. Digis (phonetic) came,
19   and he said, Can you read this case?  I have patient
20   coming in my office.
21             So it was read by somebody else, but he
22   asked my opinion, so I read that, and I said, "Looks
23   like infection.  Just read the patient and repeat
24   the study, but the original say metastatic disease."
```

410

1          So I give him that opinion, and it was

2    done.  As soon as I finished that, my phone rang and

3    it was ten minutes to twelve.  So I picked up the

4    phone, and it was a surgeon from Marlborough

5    Hospital, and he's asking me, "Can you review the

6    case," and I saw it was read by somebody else.  So I

7    said, "Will you please have that person go over,"

8    and he said, "No.  I have a patient coming in the

9    office.  Will you please do it."

10          So I did it, and his main question was that

11   does the patient need a vaginal resection or needs a

12   lobectomy and I said, "It needs lobectomy," and then

13   he did reply, "That's what the Mass. General people

14   also say."

15          So then I'm -- so meeting -- I finished,

16   and it was twelve o'clock.  So I didn't want to be

17   late in the office, and I didn't know what I was

18   getting into the thing.  So I -- and I had asked

19   before when they said there was a meeting, and I had

20   no idea what was it about.  So I just assumed,

21   maybe, Dr. Dill complain about -- because he was

22   doing for everybody and that's why Dr. Rosen wants

23   to talk to me.

24          So I enter the office.  Dr. Rosen was

411

1    there.  Dr. Charles -- I don't even remember his
2    name, and he gave me the letter.  No reaction.  Just
3    like that.  You are terminated as of this.  It felt
4    like somebody put a knife in my heart, and I
5    remember forever that day.
6            So my next question was why, and he said,
7    "no (inaudible)," and then he brought up that there
8    is complaint about poor quality work, and "I did an
9    independent review, and as of now, you're not
10   supposed to read the CT scan."
11           Then I went out of the room.  I couldn't
12   even stand, and suddenly life was upside down like
13   9/11.  I will never get my life before this, and I
14   don't even want my enemy to go through this.
15   Really, it's -- in my life, this was the worst
16   experience I have ever, ever gone through, and it
17   is -- it is like nobody realizes to get to this
18   level -- see, I have more than 35 years of
19   experience in radiology.  Before that I spend,
20   maybe, 12 to more than that to become a doctor, to
21   become a resident to do -- but I went.
22           So it is 40 years of work and hard work
23   dedicated to UMass., so many years, and this is what
24   I get, and it is like -- and the funny thing is --

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu S. Desai, M.D.
October 22, 2020

447

1   COMMONWEALTH OF MASSACHUSETTS )

2   SUFFOLK, SS.                  )

3       I, Valerie Rae Johnston, Shorthand Reporter and

4   Notary Public in and for the Commonwealth of

5   Massachusetts, do hereby certify that there came

6   before me on the 22nd day of October 2020, at 10:04

7   a.m., the person hereinbefore named, who was by me

8   duly sworn to testify to the truth and nothing but

9   the truth of her knowledge touching and concerning

10  the matters in controversy in the cause; that she

11  was thereupon examined upon her oath, and her

12  examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15      I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19      In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this ____ day of

21  November 2020.

22

23

24