# Exhibit 7

Charu Desai v. University of Massachusetts Memorial Medical Center, Inc. et al.

Civil Action No. 4:19-cv-10520-DHH

University of Massachusetts Chan Medical School's Motion for Summary Judgment

**<u>Excerpts of Dr. Rosen's Deposition</u>**

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3    ------------------------------x

4    CHARU DESAI,

5                   Plaintiff,

6        vs.                            Civil Action No.
                                        4:19-cv-10520-DHH
7

     UMASS MEMORIAL MEDICAL CENTER,
8    INC., ET AL.,

9                   Defendants.

10   ------------------------------x

11

12

13

14          DEPOSITION OF MAX P. ROSEN, M.D.

15                Conducted Remotely

16              1800 West Park Drive

17                   Suite 400

18            Westborough, Massachusetts

19                  May 7, 2021

20            10:10 a.m. to 5:03 p.m.

21

22

23

24   Reporter:  Laurie J. Berg, CCR, RPR, CRR, CLR, CER

16

1      Q.   Is there any chance you are on any

2   medications that would impair your comprehension of my

3   questions?

4      A.   No.

5      Q.   Are you on any medication that would impair

6   your ability to testify truthfully?

7      A.   No.

8      Q.   Did you do anything to prepare for the

9   deposition today, other than speak with counsel?

10     A.   No.

11     Q.   Did you discuss the deposition with anyone,

12  other than your attorney?

13     A.   No.

14     Q.   Did you review any documents to prepare for

15  the deposition?

16     A.   Yes.

17     Q.   Can you identify them?

18     A.   They were documents that my attorney has

19  provided for me, which, many of them, I have seen

20  before --

21     Q.   Okay.

22     A.   -- things that I have signed.

23     Q.   Perfect.  Dr. Rosen, I'm going to ask you a

24  little tiny bit about your start at -- of employment.

17

```
 1        You are employed at UMass Memorial Health
 2  Care, correct?
 3     A.   I'm actually employed by UMass Memorial
 4  Medical Group and UMass Medical School.
 5     Q.   You serve as the chair of the Department of
 6  Radiology at UMass Memorial Medical Center; is that
 7  correct?
 8     A.   Correct.
 9     Q.   When did you begin working there?
10     A.   In September of 2012.
11     Q.   Had you been the chair of any department
12  before you became chair of radiology at UMass
13  Memorial?
14     A.   I was the vice chair -- the executive vice
15  chair at Beth Israel Deaconess before this.
16     Q.   So you're -- tell me, what are the duties and
17  responsibilities that you have in your role as chair
18  of the Department of Radiology?
19     A.   There are several.  The first is to ensure
20  the department provides high-quality and safe imaging
21  services for our patients.  The other responsibilities
22  are to ensure the smooth, efficient and appropriate
23  running of the department for -- to support the
24  institution and the other physicians and departments
```

18

 1  and providers in the health care system.

 2        The -- another responsibility is to ensure

 3  the appropriate education of our learners, which

 4  includes medical students, residents, fellows and any

 5  other trainees.  And another responsibility is to

 6  oversee the research operations of the department,

 7  which are based in the medical school.  And another

 8  responsibility is to ensure the well-being and the

 9  career development and work environment for our

10  faculty, our trainees and the staff in the department.

11      Q.   Thank you.  With regard to your role and

12  responsibilities in sort of running the department, I

13  assume that you're in charge of hirings?

14      A.   I'm in charge of hiring the facul -- the

15  radiology faculty, as -- as opposed to the technical

16  side of the department.  For example, I do not hire

17  the technologists or the nurses.

18      Q.   Thank you.  You're responsibile for setting

19  the salaries of the faculty members in the department?

20      A.   I work in conjunction with the medical group

21  finance team to set the salaries.

22      Q.   Does anyone else have any input into salary

23  determinations?

24      A.   Could you be more specific, please?

19

1    Q.   I could try.  You said that you work with the
2  finance group to set salaries.
3           And I'm wondering if there are people, other
4  than those in the finance group, and you, who are
5  responsible for determining salaries?
6    A.   The medical group is run by a medical group
7  president and a COO and also has a board in the
8  finance committee.  And the medical group
9  administration ensures that our salaries are in line
10 with national benchmarks.
11          And the benchmarks that are used in
12 radiology, there's something called AAARAD, which is a
13 benchmark for academic radiology departments, and
14 there's also a benchmark called MGMA, which is another
15 benchmark that the medical group uses in determining
16 salaries.
17   Q.   Thank you.  I assume that, in your role as
18 chair of the department, you are also responsible for
19 awarding raises and/or salary increases?
20   A.   I can suggest them, but, every year, my
21 budget is approved by the medical group finance
22 committee.
23   Q.   Has the medical group finance committee ever
24 rejected your proposed raises and/or compensation

20

1  increases?

2      A.   I always work in conjunction with the medical

3  group finance committee and the CFO to determine what

4  appropriate compensation is.

5      Q.   Thank you.  I assume you are, also in your

6  role as chair of the department, responsible for

7  annual performance evaluations and assessments of

8  physicians?

9      A.   Yes.

10     Q.   And you are responsible for terminations of

11 physicians; is that correct?

12     A.   Yes.  In conjunction with the legal opinion

13 of the medical group lawyers.

14          MS. WASHIENKO:  I'm now going to see,

15 Dr. Rosen, if I can manage eDepoze.

16          (Exhibit 1 marked for identification.)

17          BY MS. WASHIENKO:

18     Q.   With luck, I have now distributed to all a

19 document that has been marked Exhibit 1.

20          THE DEPONENT:  (Viewing computer.)  Do I

21 click on "open new exhibit"?

22          MR. WAKEFIELD:  Yup.

23          THE DEPONENT:  Okay.

24

53

1   did.
2       Q.   Do you recall if Dr. Ferrucci ever told you
3   that he had any concerns about Dr. Desai's
4   performance?
5       A.   I don't recall.
6       Q.   Who is Dr. Richard Irwin?
7       A.   Dr. Irwin is a -- either critical care or
8   pulmonologist -- critical care specialist or
9   pulmonologist.  I'm not sure of his exact specialty,
10  and was one of the senior critical care pulmonary
11  people at UMass.
12      Q.   In his capacity as a senior pulmonologist at
13  UMass, would he have had opportunity to work with
14  Dr. Desai?
15      A.   Yes.
16      Q.   Did Dr. Irwin ever express to you concerns
17  about Dr. Desai's performance?
18      A.   I asked Dr. Irwin for his opinion of
19  Dr. Desai's performance.
20      Q.   Do you recall when that was?
21      A.   I don't recall the exact date.
22      Q.   Do you recall why you asked him?
23      A.   I had received, from Dr. Dill, several
24  complaints about Dr. Desai's performance, and concerns

54

1  had been brought to Dr. Dill.  Also Dr. Robinson, at

2  Marlborough Hospital, had raised concerns with me

3  about Dr. Desai's performance.

4       Q.   When you asked Dr. Irwin about Dr. Desai's

5  performance, what did he tell you?

6       A.   He shrugged his shoulders and said, well, I

7  can read my own chest x-rays.

8       Q.   And you understood from that, that he was

9  saying that he did not need her?

10      A.   Correct.  That he was perfectly capable of

11 interpreting his own chest x-rays and was not -- did

12 not need to rely on Dr. Desai's interpretation.

13      Q.   You -- you mentioned a minute ago that you

14 asked him, because Dr. Dill brought concerns to your

15 attention and that concerns had been brought to her

16 attention; is that correct?

17      A.   Correct.

18      Q.   Do you know who brought concerns to

19 Dr. Dill's attention?

20      A.   Not specifically, and I don't recall

21 specifically.  But as the section chief, Dr. Dill was

22 responsible for the quality of -- of the division,

23 and, often, people would ask her to re-read or review

24 studies that Dr. Desai had interpreted for Dr. Dill's

55
1  opinion.
2      Q.   You also said that Dr. Robinson brought
3  concerns to your attention --
4      A.   Yes.
5      Q.   -- correct?
6           Did she -- can you summarize what her
7  concerns were?
8      A.   General concerns about doctor -- the quality
9  of Dr. Desai's interpretations.  At one point, she
10 said to me that she never believed any of Dr. Desai's
11 reports and could not rely on them.
12     Q.   Did you, at any point prior to your decision
13 to terminate Dr. Desai, inform her of these concerns?
14     A.   No.  I communicated the concerns to Dr. Dill,
15 as the section chief, who would then be responsible
16 for overseeing the quality of people in her division.
17     Q.   So you would agree with me that Dr. Robinson
18 lodged a number of complaints about radiologists in
19 the radiology department at UMass Memorial, correct?
20     A.   Dr. Robinson, over time, had raised multiple
21 issues with me; some, you know, over a wide range of
22 topics.
23     Q.   Including the performance of the radiologists
24 at UMass Memorial, correct?

151

1  the service that we have, and we're continuously

2  trying to improve the service and meet the needs of

3  Marlborough Hospital from what we can provide as a

4  large group.

5          We also provide a robust QA service to them

6  and run a QA program for them that they didn't have

7  before.  We've also expanded the breast services that

8  they have, before.  And, as I said, we also offer 24/7

9  final reads for ED, and we also offer

10 fellowship-trained pediatric radiologists that

11 Marlborough never had.

12    Q.   Thank you.  Now, back to Exhibit 26, I'm

13 going to ask you to take a look at it, and let me know

14 when you've done so.  With luck, I have managed to

15 distribute it.

16    A.   (Deponent viewing exhibit.)  Okay.

17    Q.   Dr. Rosen, do you recognize this document?

18    A.   (Deponent viewing exhibit.)  Well, it's an

19 e-mail to me from Kathy Green, so I -- you know, I

20 assume that I saw this at one point.

21          MS. WASHIENKO:  Just for the record, it's

22 UMM-04745 through -746.

23          BY MS. WASHIENKO:

24    Q.   The e-mail thread starts at the bottom of the

152

 1  page; Kathy Green writing to you on Wednesday,
 2  Feb 1, 2017, in which Ms. Green writes, and I think
 3  it's just a crazy printing issue, but she appears to
 4  be writing, I'm working with Julie to pull reports and
 5  images together for Charu but I need to know, colon,
 6  with a couple of questions; Number 1 and Number 2,
 7  underneath that.
 8          First, who is Julie?
 9      A.   That should be Julie Rivers, who's one of our
10  PACS IT administrators.
11      Q.   I gather from her e-mail to you that, prior
12  to her writing this to you, you had tasked her with
13  pulling reports and images together for Charu,
14  correct?
15      A.   I don't know if I had asked Kathy Green
16  directly or Steve Beaudoin, who's the radiology
17  director at University.
18      Q.   And why had you asked someone, either Steve
19  or Kathy Green, to pull reports and images together
20  for Dr. Desai?
21      A.   Because I was concerned about Dr. Desai's
22  quality.
23      Q.   What made you --
24      A.   As --

153

1    Q.    -- concerned about her quality at that time?

2    A.    Well, a few things.  As I said earlier, I had

3    several complaints from Kim Robinson.  I've also, you

4    know, stated that Kim Robinson had, you know, several

5    issues.  Also, looking at our QA database, that there

6    were several cases in there that were labeled threes

7    or fours which are, you know, potentially significant

8    misses from Dr. Desai.

9         And at everybody's annual review, my standard

10   process was to print out threes and fours for people

11   and give them to the radiology faculty to make sure

12   that they were aware of these cases and ask them to go

13   and look at them.

14        And then, also, with issues raised by

15   Dr. Dill, in her role as the section chief for

16   thoracic radiology, where people would come to her and

17   ask her to re-review studies that Dr. Dill had

18   interpreted and -- that Dr. Desai had interpreted and

19   Dr. Dill had -- had concerns about the quality of

20   Dr. Desai's reads.

21        So, at that point, I felt it had risen to the

22   level where I needed to conduct an independent review

23   to see if what I was concerned about was substantiated

24   by a blind, independent review process.

154

1    Q.   So, to the best of your recollection now, the

2  -- the -- well, so let me pause.  I'm going to direct

3  your attention up to the -- to the next part of the

4  e-mail thread.  You are responding to Kathy Green and

5  you state, Hi -- Just wanted to state that this is a

6  confidential review, which has been requested by a

7  clinician outside of radiology.

8         Who was that?

9    A.   I'm assuming that's my res -- my taking

10 Dr. Robinson's complaints and operationalizing those.

11   Q.   Are you aware if there was a different

12 clinician who brought concerns to you, such that you

13 would have initiated a confidential review of

14 Dr. Desai's cases?

15   A.   Most of the complaints that I received

16 directly were from Dr. Robinson.  But Dr. Dill, I

17 think, had also received complaints from other

18 clinicians who had asked her to review Dr. Desai's

19 studies.

20   Q.   So you let Kathy Green know that you

21 wanted 25 random chest CTs and reports dictated by

22 Dr. Desai, 25 chest CTs and reports dictated by other

23 attendings, and then you just sort of describe in

24 Numbers [sic] 3 and Number 4 the -- sort of the

155

 1  mechanics of the review.

 2          How did you -- how did you decide to

 3  do 25 random chest CTs dictated by Dr. Desai?

 4      A.   I wanted to have a -- a matched number of

 5  Dr. Desai's versus a control group, and I also wanted

 6  to keep the number of studies manageable for one

 7  reviewer.  And an average chest radiologist can read

 8  about 25 chest CTs in a day, and I felt that about two

 9  days' worth of work was appropriate for this, but the

10  -- the selection of 25 was not scientific --

11      Q.   Ahh --

12      A.   -- or, rather, 50.

13      Q.   So do you have any idea how many other

14  attendings' reads were included in the Section 2,

15  25 chest CTs dictated by other attendings?

16      A.   I don't remember.  Again, the studies were

17  pulled randomly.  I was not involved in selecting the

18  studies.

19      Q.   Fair to say that, unless the random selection

20  pulled all 25 from just one other radiologist, that

21  the number of reads by other radiologists that were

22  reviewed in connection with this confidential review,

23  were fewer than the number read that were Desai's

24  reads?

156

1      A.   Correct.  My -- my -- my goal was to compare

2   a body of reads from Dr. Desai against a collective

3   body of reads from 20 -- from other radiologists.

4         And although it's not in here, I think, at

5   some point, I asked for the comparison group not to

6   include Dr. Dill or Dr. Schmidlin, because I wanted to

7   compare Dr. Dill to nonthoracic radiologists -- to

8   compare doctor -- I wanted to compare Dr. Desai to

9   nonthoracic radiologists, so I -- I -- at some point,

10  should have excluded any reads by Dr. Dill or

11  Dr. Schmidlin.

12        And the reason I wanted to compare Dr. Desai

13  to nonthoracic radiologists was actually to give her

14  the benefit of the doubt, because, in my opinion, her

15  level of training and expertise was not at the level

16  of Dr. Dill or Dr. Schmidlin and what a current,

17  modern chest radiologist should be doing.

18     Q.   So you had reports pulled to compare 25 of

19  Dr. Desai's reviews with 25 collective reviews from

20  other attendings.

21        I -- I suppose I'll say it this way; setting

22  aside any sort of comparitory issues, in that however

23  many mistakes might have been revealed by a review of

24  Dr. Desai's cases, fewer would, by definition, be

157

1  revealed of reviews by other attendings, because other

2  attendings did not similarly have 25 readings

3  reviewed?

4      A.   My point was not to compare Dr. Desai to any

5  specific radiologist.  My point was to compare

6  Dr. Desai to a collective of other radiologists who

7  were not thoracic radiologists who were reading chest

8  CTs.

9      Q.   Right.  But one of the consequences of how

10 you pulled the cases is that none of the other

11 attendings had the same number of images to have been

12 reviewed.  In other words; another of the attendings,

13 had he or she had 25 cases reviewed, might have had

14 any number of alleged misreads also uncovered that was

15 not part of the analysis that you set up in pulling

16 just 25 total reads from other radiologists.

17     A.   Well, it's only speculation about what the

18 outcome would've been if I picked 25 of one

19 radiologist, but I could've easily compared Dr. Desai

20 to 25 of Dr. Dill's or 25 of Dr. Schmidlin's, but I

21 was trying to give Dr. Desai the benefit of only being

22 compared to nonthoracic radiologists who were reading

23 chest CT.

24          And Dr. Desai was holding herself out as a

158

1  thoracic radiologist.  So you could argue that the

2  appropriate comparison would've been against a board

3  certified thoracic or -- or fellowship trained,

4  rather, there's no board -- a fellowship-trained

5  thoracic radiologist.

6      Q.   So, you pulled, or had pulled, 25 random

7  chest CTs of Dr. Desai's and 25 chest CTs dictated by

8  other attendings.

9           What did you do with them, then?

10     A.   I asked that they were loaded into a system

11 called LifeImage, which is a -- a cloud-based image

12 sharing system.  And also had the reports

13 de-identified, so there was no patient name, medical

14 record number and no indication of who the radiologist

15 was who read it.  And the file room team identified --

16 matched each study, each imagine, with the report by a

17 number, 001, 002, 003, so the reports could be linked

18 with the images.

19     Q.   Then what?

20     A.   So I, then, identified a thoracic radiologist

21 who was willing to review these studies, and the

22 instructions that I gave them was that I had 50 chest

23 CTs with de-identified reports that I would like them

24 to review.  I did not tell them how many were from one

159

1  person versus the comparative group or anything else.
2  It was 50 chest CTs to be read.
3          And I asked the person to report whether they
4  agreed or disagreed with the interpretation.  If they
5  disagreed with the interpretation, whether it was a --
6  in their opinion, a minor disagreement or a major
7  disagreement, and whether or not that agree -- whether
8  or not that disagreement would have an impact on
9  patient care, in their opinion.
10     Q.   Do you recall who you identified as the
11  radiologist to do this review?
12     A.   Yes.
13     Q.   Who was that?
14     A.   Dr. Litmanovich.
15     Q.   How did you identify her?
16     A.   She has a reputation of being a good thoracic
17  radiologist and that she is somebody who I worked in
18  the same department with years ago.  And so I knew
19  that she was, you know, well-respected, competent,
20  and, if she agreed to do something, that she would,
21  you know, carry through on the project.
22     Q.   Where was it that you worked together?
23     A.   Beth Israel Deaconess.
24             MR. WAKEFIELD:  Let's go off the record

171

1  radiologist.  I would meet with them in person for

2  their annual review.  In that review folder would be

3  the list of QA cases.  I would, then, give the list to

4  the radiologist and ask them to take it upon

5  themselves to review those cases and make sure that,

6  if there were issues, that they learned from them.

7  And then that confidential QA information was no

8  longer -- it -- it, then, was not sent to the medical

9  school for the processing of the faculty annual

10 review.

11         Does that -- is that clear?  Does that make

12 sense?

13    Q.   I -- it makes sense.

14         So the medical school employment files on a

15 physician would not have the QA data, because it

16 contained PHI and MRN numbers and whatnot?

17    A.   Correct.  And I know this might be splitting

18 hairs, but I don't think the annual faculty review is

19 considered an employment document.  It's a faculty

20 appointment document.

21    Q.   Still not --

22    A.   Yeah, not -- should not have, you know --

23    Q.   Still -- I understand.

24    A.   -- it shouldn't have information in it.  But

172

1  I just wanted to make the distinction between

2  employment, which is really with the medical group;

3  and the faculty appointment, which is the medical

4  school -- and sorry, I mean, I know you understand

5  this, but I just want it to be clear in how I think

6  about the different roles that I have with the

7  different institutions.

8      Q.   Fair enough.  Are those reports maintained by

9  you after you generate them for each respective

10  physician?

11     A.   No.  I don't maintain those annual reports.

12     Q.   So you will have given a report to the

13  physicians that will have identified any number of --

14  the three and four flagged potential problematic

15  reads?

16     A.   Mm-hmm.

17     Q.   And they walk out the door with the list?

18     A.   Correct.  Because the QA process is that --

19  the QA -- the person responsible for QA in each

20  section should be managing those cases as they come

21  in.  And they should be reviewing the case with the

22  radiologist, who initially read the study, and then

23  helping to adjudicate who was -- who was right and who

24  was wrong, or whether nobody was right or whether

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Max P. Rosen, M.D.
May 07, 2021

198

```
1   COMMONWEALTH OF MASSACHUSETTS
2   MIDDLESEX, SS.
3
4          I, Laurie J. Berg, Certified Court Reporter,
5   Registered Professional Reporter, Certified Realtime
6   Reporter, Certified LiveNote Reporter, Certified
7   eDepoze Reporter and Notary Public, in and for the
8   Commonwealth of Massachusetts, do hereby certify that
9   pursuant to appropriate notice of taking deposition,
10  there remotely appeared before me the following named
11  person, to wit:  MAX P. ROSEN, M.D., who was by me
12  duly sworn; that he was thereupon examined upon his
13  oath and his examination reduced to writing by me; and
14  that the deposition is a true record of the testimony
15  given by the witness.
16          IN WITNESS WHEREOF, I have hereunto set my
17  hand and seal this 19th day of May, 2021.
18
19  My commission expires:
20  September 14, 2023
21
22
23  _____
24              Notary Public
```

1              UNITED STATES DISTRICT

2              DISTRICT OF MASSACHUSETTS

3          Civil Action No. 4:19-cv-10520-DHH

4   * * * * * * * * * * * * * * * * * *

5   CHARU DESAI,

6                     Plaintiff,

7   vs.

8

9   UMASS MEMORIAL MEDICAL CENTER,

10  INC., ET AL.,

11                    Defendants.

12  * * * * * * * * * * * * * * * * * *

13                  VOLUME II

14    CONTINUED DEPOSITION OF: MAX P. ROSEN, M.D.

15              Conducted Remotely

16         1800 West Park Drive, Suite 400

17            Westborough, Massachusetts

18      Tuesday, June 1, 2021          10:09 a.m.

19

20

21

22

23

24

339

1   BY MS. WASHIENKO:

2       Q.   I have now distributed Exhibit 64, I think.

3       A.   Okay.

4       Q.   This is Dr. Desai's notice of termination,

5   correct?

6       A.   Correct.

7       Q.   And this is your signature in the bottom

8   left-hand signature block?

9       A.   Yes, it is.

10      Q.   It's dated March 9, 2018, but, in fact, you

11  did not give this to Dr. Desai on March 9, 2018,

12  isn't that correct?

13      A.   I see that it's dated March 9th and I see

14  that the termination date is March 17th, but I -- I

15  don't know why there's that discrepancy between

16  those two dates.

17      Q.   Do you recall, Dr. Rosen, that you met with

18  Dr. Desai on March 14th, 2018, and informed her of

19  her termination?

20      A.   I don't recall specifically.

21      Q.   In that -- in that meeting, do you recall

22  that Dr. Desai asked the -- the reason for her

23  termination?

24      A.   I remember meeting with Dr. Desai and I

340

1  remember her asking me why she was being terminated,
2  and my answer would have been over quality issues.
3      Q.  Do you recall stating to her that you did
4  not need a reason to fire her?
5      A.  No.
6      Q.  Do you recall that Dr. Desai asked you to
7  provide examples of the poor quality work?
8      A.  Yes.
9      Q.  Were you able to do so in that meeting?
10     A.  I did not provide it in that meeting.
11     Q.  But you explained that you had had someone
12 conduct an independent review, isn't that correct?
13     A.  Yes.  That I had -- a blinded independent
14 review of her work was performed.
15     Q.  Right.  The termination letter which is
16 Exhibit 64 states that Dr. Desai's employment would
17 terminate on March 17th, 2019.  Do you see that?
18     A.  Yes.
19     Q.  So a year after you informed her of her
20 termination her employment would, in fact, be
21 terminated?
22     A.  Correct.
23     Q.  And the -- the delay was because she was
24 entitled to a year's notice under her contract, is

Charu Desai vs                                                    Max P. Rosen
UMASS Memorial Medical Center, Inc., et al.                       June 01, 2021

                                                                        379

1    PLEASE ATTACH TO THE DEPOSITION OF MAX P. ROSEN, MD

2    CASE:  Charu Desai vs. Umass. Memorial Medical

3           Center, Inc., et al.

4    DATE TAKEN:  Tuesday, June 1, 2021

5                        ERRATA SHEET

6            Please refer to Page X for errata sheet

7    instructions and distribution instructions.

8    PAGE        LINE            CHANGE              REASON

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15           I have read the foregoing transcript

16   of my deposition and except for any corrections or

17   changes noted above, I hereby subscribe to the

18   transcript as an accurate record of the statements

19   made by me.

20           Executed this ____ day of

21   _____, 2021,

22

23   _____

24      MAX P. ROSEN, MD

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Max P. Rosen
June 01, 2021

380

1   COMMONWEALTH OF MASSACHUSETTS )

2   SUFFOLK, SS.                  )

3        I, Valerie Rae Johnston, Shorthand Reporter and

4   Notary Public in and for the Commonwealth of

5   Massachusetts, do hereby certify that there came

6   before me on the 1st day of June 2021, at 10:09

7   a.m., the person hereinbefore named, who was by me

8   duly sworn to testify to the truth and nothing but

9   the truth of his knowledge touching and concerning

10  the matters in controversy in the cause; that he was

11  thereupon examined upon his oath, and his

12  examination reduced to typewriting under my

13  direction; and that the deposition is a true record

14  of the testimony given by the witness.

15       I further certify that I am neither attorney or

16  counsel for, nor related to or employed by, any

17  attorney or counsel employed by the parties hereto

18  or financially interested in the action.

19       In witness whereof, I have hereunto set my hand

20  and affixed my notarial seal this _____ day of June

21  2021.

22

23

24