UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CHARU DESAI, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 4:19-cv-10520-TSH |
| UNIVERSITY OF MASSACHUSETTS | ) | |
| MEMORIAL MEDICAL CENTER, INC., | ) | **LEAVE GRANTED** |
| et al., | ) | **TO EXCEED PAGE LIMIT** |
| | ) | |
| Defendants | ) | |
| | ) | |

<u>PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT SUBMITTED BY DEFENDANTS UNIVERSITY OF MASSACHUSETTS
MEMORIAL MEDICAL CENTER, INC., UNIVERSITY OF MASSACHUSETTS
MEMORIAL MEDICAL GROUP, MAX ROSEN, MD AND STEPHEN TOSI, MD</u>

Pursuant to Federal Rules of Civil Procedure 56 and Local Rule 56.1, Plaintiff Charu Desai ("Dr. Desai") hereby submits the following memorandum of law in opposition to the Motion for Summary Judgment submitted by the University of Massachusetts Memorial Medical Center ("Medical Center"), University of Massachusetts Memorial Medical Group ("Medical Group"), Max Rosen, MD ("Dr. Rosen"), and Stephen Tosi, MD ("Dr. Tosi") (collectively, "Defendants"). As shown in Dr. Desai's Responses to Defendants' Statement of Material Facts and her own Plaintiff's Statement of Material Facts, there is virtually direct evidence of discrimination in this matter; nearly all the facts upon which Defendants rely in support of their motion are vehemently disputed and easily exposed by overwhelming evidence as pretextual; there is considerable other indicia of unlawful discrimination; and there are questions of intent and motivation that as a matter of law cannot be resolved on the papers. Their motion must be denied in its entirety.

## I.      INTRODUCTION AND SUMMARY OF CLAIMS

Dr. Desai references and incorporates herein her Responses to Defendants' Statement of Material facts ("DSOF") and her own Plaintiff's Statement of Material Facts ("PSOF"). In summary, however, Dr. Desai, who is now nearly 72 years old, is a female physician and board-certified radiologist who in 1992 became an attending physician in the Division of Thoracic (Chest) Radiology at the Medical Center and Assistant Professor of Radiology at the University of Massachusetts Medical School ("Medical School") PSOF at ¶ 2.[1] Throughout her twenty-seven-year career working for UMass entitles, she was held in the highest professional regard by colleagues, students, and patients; she was also beloved as a teacher, mentor, and friend. PSOF at ¶¶ 6-7.

---

[1] Citations to PSOF are to the Plaintiff's Statement of Material Facts in Dispute in support of Plaintiff's Opposition to all Defendants' Motions for Summary Judgment, filed contemporaneously herewith.

Beginning in 2012, however, Dr. Desai's working conditions took a turn for the worse when defendant Dr. Rosen became Chair of the Department of Radiology ("Department") and began subjecting her to disparate treatment compared to her younger and/or male and/or non-disabled colleagues to try to force her out. Among other things: although under Department policy and by virtue of her (then) twenty years of service she was exempt from handling call responsibilities, Dr. Rosen demanded she take call. PSOF at ¶¶ 15–19. (He told her if she wanted not to take call, she could go per diem. Affidavit of Charu Desai ("Desai Aff.") at ¶11. Although Dr. Rosen knew that Dr. Desai has a serious heart condition that in 2000 required but was not resolved by the implantation of a pacemaker and that is exacerbated by fatigue, he refused to permit her to take call from home by using a workstation, even though he permitted nine of her younger and non-disabled colleagues to do so. PSOF at ¶¶ 51-56. (In response to her request for a workstation, he told her she could work part time or go per diem PSOF at ¶55.) He refused to grant Academic and Administrative (*i.e.*, non-clinical) Days to Dr. Desai although she was entitled to them by policy, and he granted them to her younger and/or male and/or non-disabled colleagues. PSOF at ¶ 55. As a result, she bore the heaviest clinical workload, exacerbating her fatigue. Desai Aff. at ¶ 25;  PSOF at ¶ 63-64, 71. Despite this treatment, Dr. Desai, for whom the practice of radiology was a life's calling, continued her dedicated full-time employ, declining again and again to work on a per diem or part time basis. Desai Aff. at ¶ 26.

In early 2016, Dr. Rosen hired Dr. Karin Dill, a radiologist 25 years younger and much less experienced than Dr. Desai, to serve as Division Chief of Cardiothoracic Imaging; deviating from prior practice, he did not offer the role to Dr. Desai, the most senior attending physician in the Division. PSOF at ¶ 60. In February 2017, Dr. Rosen begins making arrangements to conduct an independent review of Dr. Desai's radiology reads based in part on the Division Chief's purported

concerns about the quality of Dr. Desai's interpretations. PSOF at ¶115. Although deliberately designed to ensure a poor result, the review in fact concluded there were no life-threatening misses or misinterpretations in Dr. Desai's cases. PSOF at ¶¶ 116, 130, 136. Nevertheless, on March 14, 2018, claiming the review established that Dr. Desai's performance was "woefully deficient," Dr. Rosen informed her that her employment would be terminated effective March 17, 2019. PSOF at ¶ 144-45, 149. He also told Dr. Desai that she could no longer read any Chest CT scans, a restriction that falsely communicated to Dr. Desai's professional colleagues that she was a danger to patients. PSOF at ¶ 153. She was professionally humiliated by the restriction and gutted by the termination, Desai Aff. at ¶ 38, both of which were the subject of public discussion. Id.

Much of the motivation for Defendants' disparate treatment and termination of Dr. Desai is laid bare in two email threads from October 2017. In the first, Dr. Rosen seeks permission to make a job offer to a chest radiologist who would complete his fellowship in 2018, even though there is no open position (nor funding) available, as Dr. Desai is still employed. Dr. Rosen pleads: "*I have been looking for a fellowship trained radiologist for 3 years.*" (Emphasis supplied.) PSOF ¶¶ 169, 173. He concedes, "I … *have not formally resolved Dr. Desai's employment,*" but immediately reassures that the resolution of Dr. Desai's employment is *"planned for 9/30/2018.*" (Emphasis supplied.) Id. To be clear: Dr. Desai had no plans at all to "resolve" her employment, and certainly none to do so by September 2018. PSOF ¶¶ 169-171, 173, 176-177.

Eight days later, former Department Chair Dr. Ferrucci emails Dr. Rosen about the conversation he had with Dr. Desai at Dr. Rosen's request:

Max,

I talked to her. I told her you *wanted to be accommodating especially in recognition of her years of service*. But that *you also had an obligation as Chair to think about recruiting younger staff for service needs* …. I also indicated you were thinking about a term limited contract of c. 12 months. Then maybe a less formal arrangement such as Perdiem (sic). She

3

fussed a bit about being allowed academic days. But I think she'd probably concede on that.  I think you can take the next step in discussions. Good luck.

(Emphasis supplied.) Dr. Rosen responded to Dr. Ferrucci: "Thanks." PSOF ¶ 179.

Based on these and other actions set out below and more fully in Plaintiff's Statement of Material Facts, Dr. Desai brings claims against Defendants for unlawful employment discrimination on the basis of age, gender/sex and/or disability, and/or for aiding and abetting discrimination, in violation of federal and state law; unequal pay; tortious interference with advantageous relations, and defamation. Defendants have moved for summary judgment as to all her claims. For all the reasons set forth in greater detail below, Defendants' motion must be denied.

## II.   LEGAL STANDARDS

Summary judgment is only appropriate when there is no genuine dispute of as to any of the material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Mass. R. Civ. P. 56 (c). In determining whether there is a genuine dispute of material fact, the court must credit all evidence of the party opposing the motion and draw all reasonable inferences in her favor. *Azimi v. Jordan Meats, Inc.* 456 F.3ʳᵈ 228, 241 (1ˢᵗ Cir. 2006); *Attorney General v. Bailey*, 386 Mass. 367, 371 (1982). The court must acknowledge and credit the nonmovant's factual assertions. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). Indeed, at the summary judgment stage, the court should disregard all evidence favorable to the moving party that the jury is not required to believe, even if it is uncontradicted. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 151 (2000).

Assessment of witness credibility is the provenance of the jury at trial. *Reeves*, 530 U.S. at 150 (the court "may not make credibility determinations or weigh the evidence"); *Attorney General v. Bailey*, 386 Mass. 367, 370 (1982) ("The court does not pass upon the credibility of witnesses or the weight of the evidence [or] make [its] own decision of facts."). Summary

judgment is thus disfavored where the defendants' motives and intent are at issue. *Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 473 (1962); *Guinan v. Boston College*, 2006 U.S. Dist. LEXIS 75505, 10-11 (D. Mass. Sept. 29, 2006); *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 38 (2005).

There is rarely "smoking gun" direct evidence in employment discrimination matters. Thus, to evaluate claims based on circumstantial evidence, courts apply a three-stage burden shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990); *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 681 (2016). Under that framework, a plaintiff must first establish a *prima facie* case; defendants must then articulate a legitimate, non-discriminatory reasons for the contested action. To prevail, plaintiff must at the third stage establish pretext (for state law claims) and pretext and proof of discriminatory intent (for federal claims). *Lipchitz v. Raytheon Co*., 434 Mass. 493, 502 (2001) (permitting jury to infer discriminatory animus and causation from proof that an employer has advanced a false reason for the adverse employment decision); *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 16 (1st Cir. 1994) (to prevail under federal law, plaintiff must muster proof that stated reason for adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination).

This "pretext plus" approach does not necessarily require the introduction of additional evidence, however. *Dichner v. Liberty Travel*, 141 F.3d 24, 30 (1st Cir. 1998). It is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation: "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's

proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

## III.    ARGUMENT

### A.    DISCRIMINATION (Count I (Title VII), Count III (ADA), Count IV (ADEA) and Count V (151B))

#### 1.    Dr. Desai Has Established Prima Facie Cases of Disparate Treatment Discrimination on the Basis of Age, Sex and Disability in the Terms and Conditions of Her Employ and in her Termination

A *prima facie* case of discrimination based on disparate treatment generally requires plaintiff to establish (1) she is a member of a protected class; (2) she is qualified for her job; (3) she has suffered an adverse employment action at the hands of her employer; and (4) there is some causal connection between her membership in a protected class and the adverse employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 506; *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000); *Blare v. Husky Injection Molding Sys. Boston*, 419 Mass. 437, 441 (1995). Defendants assert Dr. Desai cannot establish *prima facie* cases for her claims of discrimination based on age, sex, or disability under either federal or state law, solely the grounds that she did not perform her job at an acceptable level.[2] Their assertion, refuted by evidence to the contrary in the record, is unavailing.

A plaintiff may prove that she met her employer's legitimate job expectations by proffering a series of performance reviews in which she received acceptable rankings. *Brennan v. GTE Gov't Sys. Corp.,* 150 F. 3rd 21, 27 (1st Cir. 1998). Here, Dr. Desai received more than acceptable evaluations throughout the entirety of her employ. Her Annual Faculty Evaluations reveal no issues. PSOF at ¶¶ 181-183. None of them, notably including the faculty annual

---

[2] Defendants admit Dr. Desai can meet the remaining elements of her *prima facie* cases of discrimination. See Defendants' Memorandum of Law in Support of Motion for Summary Judgment (Document No. 65) at p.3, n3.

performance review dated September 2017 for her performance through June 2017, document any concerns about her performance. Id. Rosen testified that he generally kept medical competence issues out of Faculty Annual Performance Reviews, but recorded them in Ongoing Professional Performance Evaluations, which are part of the hospital's credentialing process, PSOF at ¶ 184, but there is no memorialization of any privilege restrictions in any of Dr. Desai's credentialing or reappointment applications at the Medical Center, Marlborough, or Clinton Hospitals. PSOF at ¶¶ 186-189, 190-198. In her 2017 Reappointment Appraisal/ Recommendation Form for Marlborough Hospital, which was signed on June 9, 2017, Dr. Desai is rated "EXCELLENT" in all twelve categories listed for evaluation; she is recommended for reappointment to the Medical Staff with no conditions. Id. Dr. Desai's reappointments at the Medical Center and Clinton Hospital are in accord. Id.

In short, the evidence overwhelmingly establishes that throughout her employ, Dr. Desai was more than adequately performing her job. As plaintiff's initial burden "is meant to be a small showing that is easily made," *Trustees of Health & Hosps. of Boston, Inc. v. MCAD*, 449 Mass. 675, 683 (2007), Dr. Desai has clearly established *prima facie* cases of age, gender, and disability discrimination.

## 2. Defendants Fail to Meet Their Burden to Articulate and Provide Credible Evidence of a Purportedly Legitimate, Non-Discriminatory Reasons for The Disparate Treatment of Dr. Desai in the Terms and Conditions of Her Employ and in Her Termination and the Reasons Proffered Also Are Demonstrably Pretextual

Because Dr. Desai has established *prima facie* cases of age, gender and disability discrimination in the terms and conditions of her employ and her termination, the burden shifts to Defendants "to articulate a legitimate, non-discriminatory reason for [the] employment decision and to produce credible evidence to show that the reason advanced was the real reason." *Tobin v.*

*Liberty Mut. Ins. Co.*, 433 F.3d 100, 105 (1st Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Abramian v. Harvard College*, 432 Mass. 107, 116 (2000). If they do so, Dr. Desai must present evidence from which a reasonable jury could infer that "the [employer's] facially proper reasons given for its action … were not the real reasons for that action[.]" *Theidon v. Harvard Univ.*, 948 F.3d 477, 505 (1st Cir. 2020) *citing Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 681 (2016).

Pretext can be proven through several categories of evidence. *Bulwer*, 473 Mass. at 681. "Weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions in the employer's stated reason for the adverse action would support a jury's conclusion that such "reasons" are a pretext for discrimination," *City of Salem v. Massachusetts Comm'n Against Discrimination*, 44 Mass. App. Ct. 627, 643 (1998), as can comparator evidence. *Matthews v. Ocean Spray Cranberries Inc.*, 426 Mass. 122, 130 (1997). Disbelief of proffered reasons, particularly accompanied by suspicion of mendacity, can also establish pretext. *St. Mary's Honor Center v. Hicks*, 509 U.S. at 511. As set out below, Defendants' proffered reasons are demonstrably pretextual.

Of course, Dr. Desai is not limited to the falsity of the employer's articulated reasons in proving discrimination:

> There are many veins of circumstantial evidence that may be mined by a plaintiff to this end. These include, but are no means limited to, statistical evidence showing disparate treatment by the employer of members of the protected class, comments by decisionmakers which denigrate those [in the protected class], the incidence of differential treatment in the workplace, and the deployment of younger replacements. *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 824 (1st Cir. 1991) (internal citations omitted). Evidence of discrimination must be viewed "not in splendid isolation, but as part of an aggregate package of proof offered by the plaintiff." *Id.*

*Kirby v. Payless ShoeSource, Inc.*, 2008 U.S. Dist. LEXIS 89968, *37-38. Here, numerous facts, viewed not in splendid isolation but in their totality and accepted as true, provide considerable

evidence for Dr. Desai's claim that she was discriminated against because of her age, gender, and/or disability.

a. **Disparate Treatment in Terms and Conditions of Employ**

(i) **Call Responsibilities**

In defense of Dr. Desai's claim she was subjected to unlawful disparate treatment compared to younger and/or male and/or non-disabled radiologists in the assignment of call responsibilities, Defendants assert that every radiologist in the Department who performed clinical work and was regularly employed was required to take call on weekends and holidays, the policy was uniformly applied, and no physician was exempted from call. The evidence is to the contrary. Defendants' Call and/or Weekend/Holiday Coverage Policy specifically provides that "Senior attendings are *exempt from call and weekend/holiday coverage*," PSOF at ¶ 15-17, Human Resources personnel (to whom Dr. Desai complained) were aware of the policy and acknowledged that senior radiologist Dr. Jerry Balikian, who is male and not disabled, was exempt from call pursuant to the policy, but Defendants nevertheless demanded Dr. Desai work call anyway, as "the chest division is very tightly staffed and we really need her to participate." PSOF at ¶ 18.

For two fiscal years (from October 1, 2015, through September 30, 2017), the Department implemented a program through which staff members could elect to "sell" calls to other radiologists to perform additional call for additional compensation, and the radiologist not doing call would have their salary reduced by an equivalent amount. PSOF at ¶ 20-21. The rate of each call was valued in accordance with the Department's per diem rates in effect at that time. Id. Due to the deleterious impact on her health of working daily for two weeks (or more) in a row, Dr. Desai was forced to "sell" call (even though she was in fact call exempt). PSOF at ¶ 21. Dr. Desai's

salary was reduced due to her "sale" of six of her ten weekend calls to other radiologists, in the amount of $19,200 in each of those two fiscal years. PSOF ¶ 21.

### (ii) Academic Days and Administrative Time

In defense of Dr. Desai's claim that she was subjected to unlawful disparate treatment compared to younger and/or non-disabled radiologists in the award of academic (*i.e.*, non-clinical) days, Defendants assert that Dr. Desai did not perform any academic work, never made a proposal to do academic work, and never intended to perform academic work and therefore was properly not awarded Academic Days. Here, too, Defendants fail to meet their second-stage burden. The Department's Academic and Administrative Time Policy provides that "*academic time may be allotted for academic responsibilities including teaching ...* [and] *attending institutional and department committees*." PSOF ¶ 27. Dr. Desai's annual performance evaluations signed by Dr. Ferrucci when he served as Chair of the Department memorialize Dr. Desai contributed 8% of her time to education (*i.e.*, teaching); her annual performance evaluations signed by Dr. Rosen memorialize that she devoted 25% of her time to it. PSOF ¶¶ 28-29. In addition, Dr. Desai served (by Dr. Rosen's appointment!) as the Quality Assurance representative for the Chest Division on the Quality Improvement Committee, which service is specifically listed as a qualifying administrative duty. PSOF ¶30-31. Dr. Desai performed yet another administrative role: as the only Full Time Chest Radiologist in the Division, she regularly covered the division in the frequent and disruptive absences of the Division Director.[3] PSOF ¶¶ 32-34.

---

[3] In 2016 and 2017, Dr. Dill, the Division Director, had academic/administrative time /vacation/sick/working from home PACS station that accounted for at least 100 total working days, 72 of which were Academic and Administrative Time. PSOF ¶41.  In September 2018, Dr. Rosen reduced Dr. Dill's non-clinical time to 48 days, to "bring it in line with the rest of the department" and to prevent backlog; he also reminded her that, per policy, if the Department needed her to work on Fridays, she make herself available. PSOF ¶ 72. The evidence shows the Department was often "far behind ... in chest reads." PSOF ¶¶ 63-65.

Moreover, Defendants' purported reasons for denying academic time to Dr. Desai are clearly pretextual.[4] Dr. Desai did not submit a proposal to substantiate the purpose of her academic days because the Academic and Administrative Time Policy does not require her to do so, PSOF ¶¶ 27, and younger and non-disabled colleagues were not required to (and did not) submit formal proposals but nevertheless received academic time. PSOF ¶ 49. With regard to Defendants' assertion (belied by her teaching) that Dr. Desai never intended to perform academic work: Rosen admits that there was no direct monitoring of work produced or performed during any radiologist's assigned non-clinical (academic or administrative) days and the radiologists receiving these were given flexibility as to when they performed the non-clinical work, which may or may not have occurred on the academic and/or administrative day that any particular radiologist designated for this purpose, and may not have occurred at all. PSOF ¶ 45. Although Rosen claims that the academic work performed or produced by a particular radiologist was assessed annually, there also are no records showing whether the amount of academic work performed or produced by any radiologist was appropriate for the number of academic days allotted to the individual. PSOF ¶ 46.

Rosen also advised Desai that academic and administrative time was allocated based on policy and that the policy could not be modified on an individual basis. PSOF ¶ 37. Dr. Rosen made numerous exceptions to the Academic and Administrative Time Policy and modified it on an individual basis for younger and/or non-disabled doctors, however – among others, Drs. Baccei,

---

[4] To the extent the Court concludes that Defendants do meet their second-stage burden, Dr. Desai then must present evidence from which a reasonable jury could infer that "the [employer's] facially proper reasons given for its action … were not the real reasons for that action[.]" *Theidon v. Harvard Univ.*, 948 F.3d 477, 505 (1st Cir. 2020) *citing Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 681 (2016). Pretext can be proven through several categories of evidence. *Bulwer*, 473 Mass. at 681. "Weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions in the employer's stated reason for the adverse action would support a jury's conclusion that such "reasons" are a pretext for discrimination," *City of Salem v. Massachusetts Comm'n Against Discrimination*, 44 Mass. App. Ct. 627, 643 (1998), as can comparator evidence. *Matthews v. Ocean Spray Cranberries Inc.*, 426 Mass. 122, 130 (1997). Disbelief of proffered reasons, particularly accompanied by suspicion of mendacity, can also establish pretext. *St. Mary's Honor Center v. Hicks*, 509 U.S. at 511.

Barile, Dill, Brennan, Brochu, Cerniglia, DiBenedictis, Dundanamdappa, Gauget, Ghosh, Karam, Kim, Leeman, Licho, Makris, Masciocchi, Nicola, Sirkis, Tai, Wallace, Wilson, and Zheng. PSOF ¶ 38. Dr. Dill was granted 72 days, PSOF ¶ 41; Dr. Barile, who replaced Dr. Desai, was granted 36 Academic Days immediately upon hire. PSOF ¶ 42. Dr. Desai sought twelve. PSOF ¶ 36.

### (iii)  Workstation

Defendants admit the Department began to utilize remote workstations so radiologists could work from home on a trial basis beginning in early 2017 and granted personal workstations to nine of Dr. Desai's younger and/or non-disabled colleagues, PSOF ¶ 51, but refused to provide one to her.  The assertion that no radiologists were permitted to take call from home is a red herring: if a radiologist can *work* from home, they certainly can perform *call* (*i.e.*, work) from home. Radiologists perform the same work whether on call or not – they read images and advise and speak with clinicians when necessary. Desai Aff. ¶ 22. Dill frequently worked from home. PSOF ¶¶ 34, 41.

### (iv)  Materially Adverse Action

Defendants' disparate treatment of Dr. Desai as set out above caused her financial, physical and mental harm and constitutes materially adverse action. *Cham v. Station Operators, Inc.,* 685 F.3d 87, 94 (1st Cir. 2012); *Yee v. Massachusetts State Police*, 481 Mass. 290, 295-96 (2019).

### (v)  Conclusion re: Discrimination in Terms and Conditions of Employ

As set out above and at greater length in Plaintiff's Response to Defendant UMMC's Statement of Facts and her own Plaintiff's Statement of Undisputed Facts, the purportedly legitimate non-discriminatory reasons advanced by Defendants for their disparate treatment of Dr. Desai in the terms and conditions of her employ have no evidentiary support and are also fraught with weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions, all of which

would support a jury's conclusion that such "reasons" are a pretext for discrimination. *City of Salem v. Massachusetts Comm'n Against Discrimination*, 44 Mass. App. Ct. 627, 643 (1998); *St. Mary's Honor Center v. Hicks*, 509 U.S. at 511. Defendants' Motion for Summary Judgment as to these claims must be denied.

**b.      Failure to Provide Reasonable Accommodation**

There is considerable evidence that Defendants failed to provide to Dr. Desai a reasonable accommodation. Defendants concede Dr. Desai is a qualified disabled individual. Nevertheless, they argue they were not obligated to provide a reasonable accommodation because they are only required to do so for a known disability, and they did not know about Dr. Desai's. This is nonsense. Defendants were clearly aware of Dr. Desai's heart condition: she collapsed *at work* and had a pacemaker implanted *at work*, PSOF ¶ 8. Notwithstanding Rosen's deposition testimony that although he was aware that Dr. Desai had a pacemaker, he did not know she has a heart condition, Deposition of Max Rosen, MD, 180:12-182:13; he admitted she needed cardiac pacing, id.; Dr. Desai continued to have spells at work, Desai Aff. ¶6; her condition was "well known throughout the department," Deposition of Abhijit Roychowdhury, MD, 25:7-26:15; Dr. Rosen chastised her for tardiness which she advised him was caused by spells on the way to work, Desai Aff. ¶ 7; Dr. Ferrucci described her to Rosen as gasping ("severely dyspneic"), Deposition of Joseph Ferrucci, MD ("Ferrucci Dep.") at 25:19-26:16, attached as Exhibit PP to Washienko Aff.; and Dr. Rosen himself refers to Dr. Desai's FMLA in an email and in deposition testimony, Deposition of Max Rosen, MD, 97:6-103:12.

Defendants next argue they granted to Dr. Desai the only accommodation she needed and requested – *i.e.*, the ability to take time off. This is incorrect. Dr. Desai also requested to be exempt from call responsibilities, granted Academic and Administrative Days, and issued a

personal workstation, all to lighten her clinical load (and to all of which she was entitled). Defendants argue that Dr. Desai did not link her disability to these requests. This claim flies in the face of Rosen's reference, in a single email, to both Dr. Desai's FMLA approval and her request for academic days. Moreover, the law is clear that Dr. Desai was not legally required to state any "magic words" to qualify for an accommodation. *See, e.g., Freadman v. Metro. Prop. and Cas. Ins. Co.*, 484 F.3d 30 91, 103 (1st Cir. 2007) ("The appropriate inquiry is whether defendant knew or reasonably should have known that the reason for [plaintiff's] request was her disability."). Here, Rosen was aware of Dr. Desai's disability, that fatigue exacerbated her condition, and of her repeat requests to be exempt from call and to be granted non-clinical time and a home workstation to mitigate her fatigue. It defies belief that Dr. Rosen – a medical doctor – did not know (or should not reasonably have known) the reason for Dr. Desai's multiple requests was her disability. Defendants had an obligation to provide accommodations or, at the very least, engage in the interactive process.[5] They did not. As to this claim, too, their motion must be denied.

### c.  Age, Gender and/or Disability Discrimination in Termination

Defendants claim that in February 2017, based on (i) complaints raised by Dr. Dill, (ii) Rosen's own knowledge of information in the quality assurance system, and (iii) complaints raised by Dr. Kimberly Robinson, a pulmonologist at Marlboro Hospital, they launched a

---

[5] See MCAD Guidelines: Employment Discrimination of the Basis of Handicap; *Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrim.*, 441 Mass. 632 (2004); *Petsch-Schmid v. Boston Edison Co.*, 914 F.Supp. 697 (D. Mass. 1996). The reasonable accommodation dialogue is a legally required and critical step in providing reasonable accommodations. "The importance of the interactive process cannot be overemphasized. It is intended to identify the precise limitations associated with the employee's disability, and the potential adjustments to the work environment that could overcome those limitations." *Mazeikus v. Northwest Airlines*, 22 MDLR 63, 68-69 (2000). Indeed, the importance of the dialogue is paramount, and even when "the process of negotiating accommodations may not necessarily be an easy one, it is required by law." *Fountas v. Medford Public Schools*, 2000 WL 33665425 *11 (MCAD 2000).

"focused peer review" into Dr. Desai's cases, the results of which led Defendants to conclude Dr. Desai should be terminated due to poor performance. The claim is demonstrably pretextual.

> **(i)      The Purported Quality Concerns That Allegedly Prompted the Targeted Review of Dr. Desai Are Not Documented and/or Are Similar to Concerns Raised About Other Radiologists and Are Therefore Demonstrably Pretextual**

Although it is not 'absolutely necessary' for a plaintiff to provide a similarly situated comparator …, it is usually the most probative means of proving that an adverse action was taken for discriminatory reasons." *Welgoss v. Massachusetts DOT*, Mass. App. Ct., 90 Mass. App. Ct. 1113, 6 (2016), citing *Trustees*, 449 Mass. at 683; *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003). Here, although Defendants claim Dr. Desai was investigated and terminated due to poor performance, there is no evidence that Dr. Desai performed poorly at all, let alone that she performed more poorly than her younger and/or male and/or non-disabled radiologists, who were not investigated and terminated.

**Dr. Dill**.  Defendants' claim to have conducted the targeted review because Dr. Dill expressed concerns to Rosen about the quality of Dr. Desai's interpretation of chest CTs is undermined by the lack of supporting documentation. Drs. Dill and Rosen never spoke or wrote to Dr. Desai about any alleged work quality issues. (Dr. Rosen only informed her on the day of her termination that there were any.) In contrast, there is evidence Dr. Dill communicated directly to other radiologists her concerns about the quality of their interpretations.

**Dr. Rosen**. Defendants' claim to have conducted the targeted review of Dr. Desai based on Rosen's personal knowledge of cases in the quality assurance system is also undermined by the evidence. According to data recorded in the quality assurance ("QA") system, in the three years of Dr. Dill's employment, she entered information in the QA system indicating disagreement with

the radiologist's initial read *for 31 radiologists*. Only Dr. Desai was subjected to a targeted review. Between July 1, 2016, and June 30, 2017, Dr. Dill entered reviews for approximately 87 cases into the QA system, of which only eleven were cases that Dr. Desai had initially interpreted.  PSOF ¶¶ 97-98.  (Dr. Rosen admits that he is not aware of the number of cases entered about each of the other radiologists in the Department. PSOF ¶ 94.)

Dr. Rosen states that in Annual Evaluation meetings with radiologists, he gives them information from the quality assurance database about peer review reads labelled Category 3 (moderate discrepancy, may be clinically significant) and Category 4 (major discrepancy, likely to be clinically significant). PSOF ¶ 90.[6] Dr. Rosen also states he would advise each radiologist of these entries and ask them to review the cases if they had not already done so as a part of the quality improvement process. Id. Dr. Rosen admits, however, that during Dr. Desai's 2016-2017 annual faculty performance review, he never informed Dr. Desai of an excessive number of 3 and 4 misreads. PSOF ¶ 92.

Moreover, Defendants' document "Summary_Peer-Review_Detail_RG_3and 4_14July2016" (UMM08943) evidences that as of mid-July 2016, younger and/or male and/or non-disabled doctors also had cases in which subsequent reviewers noted concern with the original read and identified disagreements as Category 3 or 4. PSOF ¶ 96. In fact, while Dr. Desai had two cases marked 3 and one marked 4, *four younger and/or male and/or non-disabled radiologists had <u>more</u> cases marked as category 3 and 4*. Id.[7] These younger and/or male and/or

---

[6] By his testimony, Dr. Rosen admits he is aware of *every* radiologist's errors in the peer review system.

[7] Dr. **AB** had two cases marked 3 and four marked 4. Dr. **BB** had two cases marked 3 and four marked 4. Dr. **DC** had four cases marked 3 and one marked 4. Dr. **JF** had four cases marked 3 and three marked 4. PSOF ¶ 96.

Dr. **RG** had *ten* cases marked 3 and *six* marked 4. PSOF ¶ 96. Unlike Dr. Desai, he was permitted to resign. So, too, were Dr. **RN** and Dr. **AR**, about whom quality concerns also were alleged. PSOF ¶¶228-231.

non-disabled doctors were not subject to a targeted peer review, nor were they terminated. Rather, Defendants spoke with them and brought concerns to their attention. Rosen testified that he personally approached other doctors about misreads. (In fact, Rosen testified that the entire peer review / peer learning system is (and was) based on sharing reads with the original physician so the physician could improve. Rosen Dep at 172:17 – 173:19. Rosen did not discuss these alleged misreads with Dr. Desai in her annual review or at any other time. PSOF ¶¶112-114. To the contrary, Drs. Rosen and Dill admit that they *never* spoke with Dr. Desai about *any* misreads, utterly and disparately depriving her of the opportunity to address any concerns.

**Dr. Robinson**. Defendants also claim the targeted review was based on complaints by Dr. Robinson, particularly those raised in a meeting on January 31, 2017. The legitimacy of that claim is undermined by, among other things, that Dr. Robinson (and Steven Roach, President of Marlborough Hospital and HealthAlliance-Clinton Hospital, PSOF ¶ 306, who was also present at that meeting, PSOF ¶308) *both* signed off on Dr. Desai's appointment/reappointment application for Marlborough and Clinton Hospitals in June 2017 which, as noted above, rates her as EXCELLENT in all twelve categories measured and which imposes no restrictions or conditions. PSOF ¶¶ 309, 193-195, 197. Dr. Desai was also reappointed to the Medical Staff of Marlborough Hospital by the Patient Care Assessment Committee (Board of Trustees) without condition on July 11, 2017, effective 7/31/2017 *to 7/31/2019*.) PSOF ¶ 194.

Moreover, Dr. Robinson complained not only about reads performed by Dr. Desai, but also about reads performed by several other radiologists, including Drs. █████ AB █████ AK █████, ██ JF ██, ███ DB ███, █ HL █, ██ GT ██ or ███ AS ███. PSOF ¶¶ 204-05, 207-209. In contrast to their treatment of Dr. Desai, Defendants did not conduct a focused

review of the interpretations of these younger and/or male and/or nondisabled radiologists. PSOF ¶ 210. In fact, Drs. Rosen and Brennan (then Chief of Radiology for Marlborough Hospital) contemporaneously exchanged emails admitting the complaints from Marlborough Hospital – *i.e.,* from Dr. Robinson – were "*mostly unjustified*."

As more evidence of disparate treatment and pretext: in 2016 and 2017, various physicians lodged complaints about the readings of Dr. ████, Dr. ██████, Dr. ████ ████, Dr. ████████, and an unnamed radiologist (not Dr. Desai) who did not identify a liver abscess, causing the patient to become septic. PSOF ¶ 204-210, 217. Defendants did not launch a targeted review any of these younger and/or male and/or non-disabled doctors, nor did Defendants terminate them. PSOF ¶¶ 210-213.

### (ii) Chronological Evidence of Pretext

Defendants claim they harbor no animus but merely relied on the feedback of an independent reviewer in making the termination decision. Summary judgment may not enter simply based on a denial by the decisionmaker of the ultimate question of fact to be determined by the jury, however. A jury need not credit employer's statement explaining adverse action, especially where circumstantial evidence casts doubt on the statement's credibility. *St. Mary's Honor Center v. Hicks*, 509 U.S. at 511; *Haddad v. Wal-Mart Stores, Inc.*, 455 Mass. 91, 99 (2009).

Here, a simple chronology illuminates the pretextual nature of Defendants' defense. Beginning shortly after he became Chair, Dr. Rosen routinely suggested that Dr. Desai work for Defendants on a per diem basis rather than as a regular full-time employee. Desai Aff. ¶ 10. Dr. Rosen demanded she cover call though she was exempt per policy, refused to provide to her Academic Days or Administrative Time (to which she was entitled by policy and which he

granted to her younger, male, and/or non-disabled colleagues) and refused to provide to her a personal workstation (which he granted to her younger, male, and/or non-disabled colleagues). When Dr. Dill and Dr. Desai both complained about an interaction in which they exchanged words about signing out residents, Dr. Rosen instructed administrators to run a report showing everything Dr. Desai had read that day. He did not do so for Dr. Dill. PSOF ¶¶123.

In February 2017, Dr. Rosen arranged a targeted peer review of Dr. Desai's reads, the justifications for which there is, as noted above, considerable evidence of pretext. But the reports and images he selected for review were not made available to the independent reviewer until October 13, 2017, *eight months* after the January 2017 meeting at which Dr. Robinson allegedly raised concerns. PSOF ¶ 128. In the face of the claim that Dr. Desai's quality issues warranted her termination, such a delay frankly beggars belief.

On October 3, 2017, *ten days before the independent reviewer had even been granted access to the images to review,* PSOF ¶ 169,  and two months *before* the reviewer logged in to begin reviewing Dr. Desai's (and others') cases, Dr. Rosen extended a job offer to a radiologist who would finish a cardiothoracic fellowship in June 2018. PSOF ¶ 169. (As noted above, he simultaneously admitted he had been trying for three years to hire a chest radiologist. Id.) On October 11, 2017, Dr. Ferrucci emailed Dr. Rosen that he had had a conversation with Dr. Desai (at Dr. Rosen's request) in which he encouraged her to leave full-time employ; he explained that Dr. Rosen had obligation as Chair to think about recruiting younger staff. Dr. Rosen thanked him. PSOF ¶ 179.

This latter exchange is hardly the "stray remark" Defendants posit. It directly relates to the challenged employment action; was written by the former Chair of the Department (*i.e.,* a person with influence over the relevant decision maker) directly to the decision maker; it reflected

and attributed to the decisionmaker unlawful animus (that *Rosen* had an obligation to think about recruiting younger staff); and Dr. Rosen did not disavow the statement; rather, he thanked him. This constitutes direct evidence of age discrimination. *Zampierollo-Rheinfeldt v. Ingersoll-Rand de P.R., Inc.*, 999 F.3d 37 (1st Cir. 2021) (holding employer's use of the word "rejuvenate" constitutes direct evidence of age discrimination); *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 171 (1st Cir. 1998) (citing with approval a Seventh Circuit opinion holding that a "[c]omment by [a] supervisor that the plaintiff's 'accounts could use some younger blood' constituted sufficient direct evidence of discriminatory intent" (quoting *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 746 (7th Cir. 1994))); *Mulero-Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 675-76 (1st Cir. 1996) (discriminatory comments made by those in a position to influence the decisionmaker).

### (iii)    Dr. Rosen's Design of and Conclusions Drawn from the Independent Review Provide More Evidence of Pretext

"Because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent, and because of the difficulty of accurately determining whether an employer's motive is legitimate or is a pretext for discrimination, there is reason to be concerned about the possibility that an employer could manipulate its decisions to purge employees it wanted to eliminate." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998).

Dr. Rosen's design of the targeted peer review provides additional evidence of pretext. The sample size that Dr. Rosen chose – *i.e.*, 25 of Dr. Desai's reads and 25 *total* reads from several other radiologists, who served as a "control group" (*i.e.*, just 2 or 3 images per other radiologist) PSOF ¶ 116 – stacked the deck against Dr. Desai. That Dr. Desai would end up having numerically more reads with errors than any other radiologist was virtually a foregone conclusion based on Dr. Rosen's design, especially since, as the evidence shows (and Plaintiff's expert concurs), Dr. Desai

routinely read the most complicated cases and was routinely and specifically sought out to do so. PSOF ¶¶ 6(d), 7(b). There is additional evidence of Dr. Rosen's deliberate bad faith in the design of the independent review: notwithstanding his deposition testimony he was "under the impression" that he excluded from the independent review studies interpreted by Drs. Dill and Schmidlin (chest radiologists ) to make the review more favorable for Dr. Desai, Rosen Deposition Day 1, at 156:9- 156:11, in his Answers to Interrogatories, Dr. Rosen admitted the 25 control group studies actually included seven that were read by Dr. Dill, who specializes in chest imaging but read less complicated studies. Rosen Aff. at ¶ 61. Exhibit A from Defendant, Max Rosen, MD's Answer to Plaintiff's Second Set of Interrogatories.

Moreover, while Dr. Rosen asserts that the independent reviewer's citation of 36% of Dr. Desai's cases as having patient impacting errors showed she (Desai) was "woefully deficient," PSOF ¶ 144, Dr. B████'s cases had one major and one minor misread *and 50% of his errors were patient impacting*. PSOF ¶142. He was not terminated. (Dr. B████, whom Dr. Rosen had selected B████ to serve as Vice Chair for the Department of Radiology, was in his forties.) Dr. L█'s cases had three minor misreads, *and 33% of the errors were patient impacting*. He was not terminated. (He was in his thirties. Following Dr. B████'s departure from the Department, Dr. Rosen promoted Dr. L█ to serve as Vice Chair.) PSOF ¶¶ 146-148.

In yet more evidence of pretext: although Defendants point to the independent report as grounds for the decision to terminate Dr. Desai, the report in fact concluded that "*no life-threatening misses or misinterpretations were found*." PSOF ¶ 130. (Dr. Desai's expert concluded that Dr. Desai's reads were not of poor quality, but that the reads of a number of other radiologists were dreadful. Of one (QACH20, which was not Dr. Desai's case), Dr. Gruden wrote:

> *This report is a disaster in every way.  The clinical question was ignored, there is no mention of the collapse of the airways or air trapping (which are key to the real diagnosis*

*in this case), the report is filled with significant typographical errors, and the significant pathology was totally missed.  The radiologist obviously does not know what tracheobronchomalacia is or what the findings are, and he or she did not bother to look it up or ask someone else- this is sloppy, careless, unprofessional, and unacceptable.  A report like this at my institution would result in immediate disciplinary action.*

Expert Report of J. Gruden, MD, PSOF ¶ 131-139.[8])

That Rosen made a termination decision first and then concocted an opportunity and *post hoc* justification to effect it is also evident from his repeated refusal to give Dr. Desai access to information about her alleged misreads. When, in the termination meeting, Dr. Desai asked him to provide examples, he was unwilling or unable to do so. PSOF ¶ 160. When he later met with Dr. Desai to review her purportedly poor-quality work, he denied her request to bring an independent expert with her and projected onscreen information in a manner that Dr. Desai found nebulous, disorganized, and extremely difficult to comprehend. PSOF ¶¶ 159, 160; when Dr. Desai requested a written copy of the information so she might analyze and respond, he denied her request. PSOF ¶ 160.

Marlborough Hospital, from which the "mostly unjustified" complaints sprung, also recommended Dr. Desai's appointment and privileges be renewed, PSOF ¶¶190-198; Dr. Brennan, the Chief of Marlborough and Vice Chair of the department of Radiology, who was aware of Dr. Robinson's complaints, signed off.  Id.

### (iv) <u>Other Circumstantial Evidence of Age and Gender</u>

---

[8] Plaintiff's expert opined that, at worst, Dr. Desai's reads contained statements capable of subjective disagreement; they did not warrant termination. PSOF ¶ 134. Drs. Rosen and Ferrucci agree that radiology readings are subjective, often subtle, on a continuum, and not black and white. PSOF ¶¶ 73-76 In his Affidavit, Rosen states "Radiology, like other diagnostic medical work, can involve a degree of probability and subjectivity, and concerns or disagreements can be raised by treating physicians at times. Id. Tellingly, Defendants' expert was retained with a limited scope. She offered no opinion as to whether Dr. Desai's alleged performance issues warranted termination. PSOF ¶ 135.

In his 2020 letter of reference for Dr. Desai, thoracic (chest) surgeon Dr. Fabian Uly, who because of his position was "familiar with Dr. Desai and the quality of her work," described Dr. Desai as "to the point with her readings without too much of the vague and noncommittal terminology which seem[s] to permeate radiology reads nowadays because of medico-legal pressures." PSOF ¶ 7(h).

**Discrimination**

As noted above, in deviation from prior practice within the Division, Dr. Rosen appointed Dr. Dill to the role of Division Chief without asking Dr. Desai if she were interested in the position. PSOF ¶ 60. His history of promotions within the Department provides significant additional evidence of unlawful animus.

There were eleven formally defined Divisions in the Radiology Department at the time of plaintiff separation. PSOF ¶ 245. Rosen hired nine radiologists that, while Dr. Desai was still employed, either before or shortly after her termination, he promoted to positions as Division Chief, Associate Division Chief, or Community Hospital Chief. PSOF ¶ 245. Eight of the nine radiologists that Dr. Rosen hired were in their 30s and or 40s at the time Dr. Rosen gave them these promotions. PSOF ¶ 245. Seven of these nine were male. PSOF ¶ 245 (Rosen did not promote (female) doctors Mona Korgaonkar or Christine Wallace to "chief" positions, despite their approximately 20 years of service (each). PSOF ¶ 248.

Within the organizational structure of the Department of Radiology, there are a total of ten Non-Division Chief administrative roles (excluding the chair role) that can be assigned to attending radiologists within the Department. Dr. Rosen named nine radiologists who were working under him at the time Dr. Desai was actively employed to Non-Division Chief Administrative roles in the Department of Radiology. Seven of those nine radiologists are currently under the age of 50. Furthermore, seven of these nine radiologists in Non-Division Chief Administrative roles at the time Dr. Desai was actively employed are male. PSOF ¶¶ 250-253

Rosen's record of hiring and firing within the Department also evidences age animus. After he terminated Dr. Desai, for example, Dr. Rosen replaced her with Dr. Maria Barile, who

is almost 30 years younger and has vastly less experience than Dr. Desai. PSOF ¶ 296. Dr. Ferrucci, the former Department Chair, conceded that several employees over the age of 50 – including Dr. Roychowdhury, Dr. Joseph Makris, Dr. Padmaja Surapeneni, and Dr. Eugenio Suran – left and/or were forced out under Dr. Rosen's chairmanship. PSOF ¶ 219. Dr. Roychowdhury, one of Plaintiff's former colleagues, testified that he understood Rosen was forcing out older employees. Roychowdhury Deposition, at 33:15- 34:6.  As the court is aware, intentional negative treatment of several employees in the same protected class is evidence of discrimination. *Kirby v. Payless ShoeSource, Inc.,* 2008 U.S. Dist. LEXIS 89968, *37-38 (D. Mass. September 25, 2008); *Knight v. Avon Products*, 438 Mass. at 426 n.9; *Trustees of Health & Hospitals*, 65 Mass. App. Ct. at 336.

In defense, Defendants assert that during his tenure, Dr. Rosen hired several older employees. The radiologists that Dr. Rosen hired who were over (or even close to) 60 years of age, however, were either *per diem* employees (not regular full-time employees) or were quickly separated – *i.e.*, they were hired just to serve temporarily. PSOF ¶ 235.[9] To the extent, moreover, that Defendants are inviting the Court to adopt the same actor inference: it is improper for a judge, at the summary judgment stage to draw an inference in the employer's favor based on the same actor inference. *Beaupre v. Seacoast Sales, Inc.*, 507 F. Supp. 3d 353, 360 (D. Mass. 2020), citing *Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo*, 474 Mass. 382, 405 n. 32 (2016).

Defendants argue that Dr. Desai's deposition testimony as to her belief that Rosen's decision to conduct an independent review of her reads was not based on her sex, age, or disability is controlling as to the validity of her discrimination claims. As a matter of law, it is not. Defendants' motivation is a question for the jury. *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D.

---

[9] Doctors over 60 who were hired after the lawsuit – i.e., in defense of Dr. Desai's claims – are obviously not relevant.

Mass. 2002) ("Thus, while [plaintiff's] impression of why his fellow workers took these actions against him is relevant, it is not conclusive on the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers.").

Finally, Defendants' reliance on *Mesnick v. Gen. Elec. Co.*, 950 F2d 816 (1st Cir. 1991), for the proposition that this Court cannot examine Defendants' justification for the termination of Dr. Desai because courts should not sit as super personnel departments is a misdirection, as is their argument that Dr. Desai admitted Rosen had a responsibility to ensure quality. Dr. Desai does not complain that her termination was merely unfair or irrational. She complains that she was subjected to unlawful disparate treatment based on her age, sex, and disability in connection with her termination. As set out above, there is considerable evidence of this.

### d.    Dr. Tosi

Defendants move for summary judgment on Dr. Desai's claim of aiding and abetting discrimination in violation of Chapter 151B § 4(5) against Dr. Tosi on the grounds that the sole basis for her claim is that he signed her letter of termination. It is not. In her Amended Complaint, Dr. Desai also cites his actions in failing to correct Dr. Rosen and Dr. Dill's discriminatory behavior, despite knowledge of same, and permitting her unlawful termination. The evidence adduced in discovery reveals even more about Dr. Tosi's knowledge, actions and animus.

The evidence shows, for example, that in August 2016, several senior radiologists met with Dr. Tosi to express concern that Dr. Rosen was discriminating against them and paying older radiologists less than younger radiologists.[10] PSOF ¶ 258. Notwithstanding his knowledge of this

---

[10] Dr. Roychowdhury (one of the senior radiologists who complained to Tosi about Rosen's discrimination against older radiologists) also separately complained to Dr. Tosi that Rosen's decision to terminate him was not legitimate and that Rosen could only "explain" it on the grounds that he was not in Rosen's "vision" for the Department; in response, Dr. Tosi did not investigate or even explain why Roychowdhury was not in Rosen's vision but instead informed him that Rosen had the power to terminate Roychowdhury and advised him to resign. PSOF ¶ 256.

discriminatory behavior, however, Dr. Tosi continued to sign off on the employment contracts of several young radiologists who just completed training but nevertheless were offered an equivalent or nearly equivalent annual base salary as Dr. Desai despite their lack of experience; and who were granted Academic Days exceeding the maximum allotment under the Department's Academic/ and Administrative Time Policy. PSOF ¶ 272-289; 259.

The evidence also shows that Dr. Tosi also actively participated in the plan to recruit a replacement for Dr. Desai in October 2017 and was directly involved in planning her termination. PSOF, ¶ 173- 175. Recognizing the likelihood of legal claims flowing from Dr. Desai's termination, he used the phrase "cost of the Desai payout" in his response to Dr. Rosen's request for permission to make an employment offer to a junior radiologist. He granted Rosen permission to extend the offer to the prospective candidate, and he explicitly concurred with Rosen's plan to "resolve" Dr. Desai's employ by September 2018. PSOF ¶ 170. He also emailed Dr. Charles Cavagnaro, Interim Senior Vice President and Chief Medical Officer UMass Memorial, to inform him that his presence and support of Dr. Rosen at the meeting where Dr. Desai's employment would be terminated would be welcomed because, from the information Dr. Rosen had previously relayed to Dr. Tosi, Dr. Tosi believed that conversation was likely to be a difficult one – for Rosen. PSOF ¶ 311.[11]

## C.   SIGNIFICANT EVIDENCE SUPPORTS DR. DESAI'S DISPARATE AND UNEQUAL PAY CLAIMS PAY CLAIMS (Count I (Title VII); Count II (FEPA) and Count IV (MEPA))

---

[11] To the extent the Court concludes Rosen's actions do not rise to the level of aiding and abetting, it is nevertheless clear that that he did interfere with Dr. Desai's rights in violation of G.L. c. 151B, §4(4A). *See, e.g.*, *Soni v. Wespiser*, 239 F. Supp. 3d 373, 384 (D. Mass. 2017) ("However, [plaintiff's] claims are not limited to violations of § 4(1). Her Chapter 151B discrimination claims find legs in the language of *§ 4(4A)*, which does not limit liability to 'employers.'. . .").

Defendants' defense of Dr. Desai's disparate pay based on gender and age (Title VII) and unequal pay (FEPA and MEPA), which rests on the assertion that Dr. Desai has not identified a male radiologist in a role requiring equally or substantially similar skill, effort and responsibility, also fails.  From the documents produced by Defendants in discovery, Dr. Desai can identify several male colleagues who performed comparable work but were paid more or equivalent salary than her despite her vastly greater experience.  Drs. Brochu, Schmidlin, Chen, Kotecha, Baccei, Cerniglia, Dundamadappa and Coughlin. PSOF ¶ 272-289. Defendants' defense that Dr. Desai has not identified a younger radiologist who was paid more than her based on a discriminatory motive fails for the same reason. PSOF ¶ 272-289.

### D.    TORTIOUS INTERFERENCE

Defendants' assertion that Dr. Desai's claim against Rosen and Tosi for tortious interference is barred by the conditional supervisory privilege is incorrect. A supervisor's conditional privilege may be lost if the supervisor's actions are motivated by unfair prejudice. *See LeGoff v. Trustees of Boston University*, 23 F. Supp. 2d 120, 129 (D. Mass. 1998), citing *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 635 (1st Cir. 1996); *Comey v. Hill*, 387 Mass. 11, 20 (Mass. 1982). Here, where there is direct evidence of discriminatory animus and motivation, summary judgment for Defendants is inappropriate.

### E.    DEFAMATION

Conduct may constitute a statement for purposes of a defamation claim. *Krolikowski v. University of Mass. Memorial Med. Ctr.*, 2002 U.S. Dist. LEXIS 8984 (D. Mass. May 16, 2002), citing *Jorgensen v. Massachusetts Port Auth.,* 905 F.2d 515, 520 (1st Cir. 1990) (construing Massachusetts law and holding that for purposes of defamation claim, "a communication [is] defined as conduct that brings an idea to the perception of others"). Here, Defendants' records

show that Dr. Desai's ability to interpret CT scans remained unrestricted throughout the course of her employment in the Department of Radiology at UMMC and Marlborough Hospital, yet Dr. Rosen's ordered her to discontinue interpreting CT scans. PSOF ¶ 198.

Defendants' assertion that their supervisory privilege defeats this claim is erroneous. This conditional privilege may be lost upon a showing that the supervisor was motivated by malice, unfair prejudice, or personal animosity. *Catrone v. Thoroughbred Racing Assocs. of N. Am., Inc.*, 929 F.2d 881, 889 (1st Cir. 1991). *Foley v. Polaroid Corp.*, 400 Mass. 82, 91 (1987). As set forth above and at length in Dr. Desai's Statement of Facts, there is considerable evidence of unlawful animus. It is blackletter law that "summary judgment is inappropriate if a jury reasonably could [find] that [the employer] demonstrated actual malice by clear and convincing evidence," *Catrone*, 929 F.2d at 889. Defendants' motion must be denied as to Dr. Desai's defamation claim as well.

### F.     THERE IS CONSIDERABLE EVIDENCE THAT UMMC CONTROLLED THE MANNER AND MEANS OF DR. DESAI'S PERFORMANCE OF HER JOB

"The most important factor in determining the existence of an employment relationship is 'that control or right of control by the employer which characterizes the relation of employer and employee and differentiates the employee or servant from the independent contractor.' What is at issue is not merely the right to dictate the outcome of the work, but the right to control the 'manner and means' by which the hiree accomplishes that outcome." *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 228 (2d Cir. 2008) (internal citations omitted) (Gertner, J., sitting by designation).[12]

Here, the Medical Center appointed Dr. Desai to its medical staff, granted to her clinical privileges, and retained the right to withdraw them. Her clinical privileges included the use of the Medical Center's facilities and support staff. PSOF ¶ 319. In 2017, the Medical Center's Radiology

---

[12] Undersigned counsel found no First Circuit decisions addressing this issue. The cases UMMC cites in support – from the 4th, 5th, and 8th Circuits – are, similarly, not precedential.

Department began to utilize workstations for radiologists to use at home but denied to Dr. Desai the use of a personal workstation. PSOF 56. Dr. Desai was required to adhere to medical staff rules and by-laws, participate in staff meetings, and participate in the Medical Center's quality assurance program. (In fact, Dr. Rosen appointed her as Quality Assurance representative for the Chest Division on the Quality Improvement Committee, which is a Medical Center committee. PSOF ¶ 321.) Dr. Rosen, a member of the Medical Center's administration, PSOF ¶ 322, was her supervisor. In 2017, Dr. Rosen recommended that Dr. Desai be granted privileges; he did so on a document titled UMass Memorial Medical Center Review and Action Form. PSOF ¶ 322. In addition, Dr. Tosi was directly involved in reappointment/credentialing/approving clinical privileges, in his roles as both Credentials Committee Chair and Chief Medical Officer.

In short, the evidence establishes that the Medical Center exerted control over the manner and means by which Dr. Desai worked – or, at the very least, there are disputed issues of fact as to whether it did so, making the grant of summary judgment to UMMC inappropriate. *See Salamon v. Our Lady of Victory Hosp.*, 514 F.3d at 228 (vacating grant of summary judgment to defendant in Title VII claim based on questions of fact as to the extent of hospital's control over physician); *Mitchell v. Frank H. Mem'l Hosp.*, 853 F.2d 762, 766 (9th Cir. 1988) (same); *Mallare v. St. Luke's Hosp.*, 699 F. Supp. 1127, 1130 (E.D. Pa. 1988) (denying hospital's motion for summary judgment; question of control given that hospital could withdraw staff privileges if physician did not comply with rules).

## IV.    CONCLUSION

Dr. Desai has established *prima facie* cases of age, sex and disability discrimination, both in the terms and conditions of her employ and in her termination. And there is considerable

evidence that Defendants' stated reasons for their disparate treatment and termination of her were pretext. She has established that Dr. Tosi acted in furtherance of Dr. Rosen's unlawful goals. She has established that UMMC was her employer. She has established *prima facie* cases of disparate pay (gender and age discrimination under Title VII)) and unequal pay under FEPA and MEPA. She has established that Defendants acted with malice and tortiously interfered with her employ. She has established that Defendants defamed her and the law is clear they did not have a privilege to do so. At the very least, there are disputed issues of fact as to all of these issues, making the award of summary judgment inappropriate.

Dr. Desai therefore requests that Defendants' motion for summary judgment be its entirety.

Respectfully submitted,

CHARU DESAI
By Her Attorney,

/s/ Patricia Washienko

_____
Patricia A. Washienko, BBO# 641615
pwashienko@fwlawboston.com
Freiberger & Washienko LLC
211 Congress St, Suite 720
Boston, MA 02110
Tel: (617) 723-0008

Dated: February 8, 2022

_____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 8, 2022, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, was served by electronic mail only to counsel for the above-named Defendants:

Robert L. Kilroy, Esq.
Reid Wakefield, Esq.
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
(508) 860-1477
rkilroy@mirickoconnell.com

Mark Johnson, Esq.
Denise Barton, Esq.
University of Massachusetts Office of the General Counsel
One Beacon Street, 31st Floor
Boston, MA 02108
(617) 287-4064
MAJohnson@umassp.edu


/s/ Patricia Washienko

_____
Patricia A. Washienko