UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARU DESAI,<br>       Plaintiff,<br><br>v.<br><br>UNIVERSITY OF MASSACHUSETTS,<br>MEMORIAL MEDICAL CENTER, INC.<br>UNIVERSITY OF MASSACHUSETTS<br>MEMORIAL MEDICAL GROUP,<br>UNIVERSITY OF MASSACHUSETTS<br>MEDICAL SCHOOL, UMASS<br>MEMORIAL HOSPITAL, MAX ROSEN,<br>M.D., DARREN BRENNAN, M.D.,<br>STEPHEN TOSI, M.D., KARIN DILL,<br>M.D.,<br>       Defendants. | Civil Action No. 4:19-cv-10520-TSH |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT UNIVERSITY OF MASSACHUSETTS CHAN MEDICAL SCHOOL'S MOTION FOR SUMMARY JUDGMENT AND ASSENT FOR DISMISSAL OF CERTAIN CLAIMS IN ACCORD WITH RULE 12(B)(1)**

Pursuant to Federal Rules of Civil Procedure 56 and Local Rule 56.1, Plaintiff Charu Desai ("Dr. Desai") hereby submits the following memorandum of law in opposition to the Motion for Summary Judgment submitted by the University of Massachusetts Chan Medical School (the "Medical School" or "Defendant").[1]  Notwithstanding the Medical School's arguments to the contrary and as set forth in detail below, Dr. Desai has established *prima facie* cases of discrimination and unequal pay in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-1 et seq. (gender); the Federal Equal Pay Act ("FEPA"), 29 U.S.C. §§ 206(d), 216); and the Massachusetts Equal Pay Act ("MEPA"), M.G.L. c. 149, § 105A); the

---

[1] The Medical School's name changed to the University of Massachusetts Chan Medical School effective September 7, 2021.

1

Medical School offers no legitimate non-discriminatory reason for its disparate treatment of Dr. Desai. The Medical School's motion must be denied in its entirety.

I. RELEVANT PROCEDURAL BACKGROUND

In December 2021, counsel for the Medical School conferred with undersigned counsel regarding its intent to move for dismissal pursuant to Rule 12(B)(1), on sovereign immunity grounds, three of Dr. Desai's claims: Count 3 (violation of the Americans with Disabilities Act, 42 U.S.C. § 12132); Count 4 (violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1)); and Count 5 (violation of M.G.L. c. 151B, § 4). Undersigned counsel confirmed that Dr. Desai does and will not oppose the Medical School's sovereign immunity arguments as to these claims.

On December 17, 2021, the Medical School moved for summary judgment on Dr. Desai's remaining claims: Count I (violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-1 et seq. (gender); Count II (violation of the Federal Equal Pay Act ("FEPA"), 29 U.S.C. §§ 206(d), 216); and Count VI (violation of the Massachusetts Equal Pay Act ("MEPA"), M.G.L. c. 149, § 105A). For the reasons stated herein, and considering additional facts presented by Dr. Desai, viewed in the light most favorable to her, it is overwhelmingly clear that a jury may find in Plaintiff's favor on these claims and, therefore, this Court must deny the Medical School's motion for summary judgment.

II. FACTUAL BACKGROUND

Dr. Desai references and incorporates herein her Response to the Medical School's Statement of Undisputed Material Facts ("Med. School SOF") and her Statement of Material Facts in Dispute ("PSOF").

III. LEGAL STANDARD

Summary judgment is only appropriate when there is no genuine dispute of as to any of the material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Mass. R. Civ. P. 56 (c). In determining whether there is a genuine dispute of material fact, the court must credit all evidence of the party opposing the motion and draw all reasonable inferences in her favor. *Azimi v. Jordan Meats, Inc.* 456 F.3rd 228, 241 (1st Cir. 2006); *Attorney General v. Bailey*, 386 Mass. 367, 371 (1982). The court must acknowledge and credit the nonmovant's factual assertions. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). Indeed, at the summary judgment stage, the court should disregard all evidence favorable to the moving party that the jury is not required to believe, even if it is uncontradicted. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 151 (2000).

Assessment of witness credibility is the provenance of the jury at trial. *Reeves*, 530 U.S. at 150 (the court "may not make credibility determinations or weigh the evidence"); *Attorney General v. Bailey*, 386 Mass. 367, 370 (1982) ("The court does not pass upon the credibility of witnesses or the weight of the evidence [or] make [its] own decision of facts."). Summary judgment is thus disfavored where the defendants' motives and intent are at issue. *Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 473 (1962); *Guinan v. Boston College*, 2006 U.S. Dist. LEXIS 75505, 10-11 (D. Mass. Sept. 29, 2006); *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 38 (2005).

There is rarely "smoking gun" direct evidence in employment discrimination matters. Thus, to evaluate claims based on circumstantial evidence, courts apply a three-stage burden shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990); *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 681 (2016). Under that framework, a plaintiff must first establish a *prima facie* case;

defendants must then articulate a legitimate, non-discriminatory reasons for the contested action. To prevail, plaintiff must at the third stage establish pretext (for state law claims) and pretext and proof of discriminatory intent (for federal claims). *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 502 (2001) (permitting jury to infer discriminatory animus and causation from proof that an employer has advanced a false reason for the adverse employment decision); *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 16 (1st Cir. 1994) (to prevail under federal law, plaintiff must muster proof that stated reason for adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination).

This "pretext plus" approach does not necessarily require the introduction of additional evidence, however. *Dichner v. Liberty Travel*, 141 F.3d 24, 30 (1st Cir. 1998). It is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation: "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

IV.    ARGUMENT

    A.    Dr. Desai Has Established a Prima Facie Case of Gender Discrimination in Violation of Title VII as to the *Academic Time Policy*

The Medical School argues that Dr. Desai cannot establish a *prima facie* case of unlawful gender discrimination in violation of Title VII regarding the Academic Time Policy ("Policy") because it did not take establish or administer the Policy and therefore it did not take adverse action against her. Their argument is unavailing and contradicted by the evidence.

4

The Policy is a policy of the Department of Radiology. Or, put another way, the Policy is used to govern the award of academic time to members of the Department of Radiology. PSOF ¶ 27. The Radiology Department is a Department of the Medical School. See Exhibit RRR. (Not surprisingly, given the context, the Policy defines academic time as, among other things, "*time allocated to academic responsibilities*" – *i.e.*, to teaching. (Emphasis added.) PSOF ¶¶ 27. Dr. Rosen is dually employed by the Medical School and Medical Center; he is a Professor at the Medical School, and since 2012 has held the role of Chair of the Department of Radiology at the Medical School.  See Rosen Dep. at 17:1-10 at Exhibit S. In his role as Chair, exercising his responsibilities to the Medical School, Dr. Rosen made decisions to award – or deny – academic time to faculty members in the Department. PSOF ¶¶ 41, 42, 43, 35, 36, 37.  Academic time could also be granted for, among other things, attending a conference, which would lead to the expenditure of Medical School funds. PSOF ¶ 27. Against this evidence, the Medical School's argument that it did not establish or administer the Policy, strains credulity.

1. <u>Dr. Desai Qualified for Administrative Time as She Served in An Administrative Role</u>

The Medical School's next argument – that it is entitled to summary judgment because Dr. Desai admitted in her deposition that she did not qualify to be awarded academic time – is not an accurate statement of the law and is contradicted by the evidence. Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that Hospira retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").

The evidence shows that Dr. Desai did, in fact, serve in a qualifying administrative role. She served on the Quality Improvement Committee as Quality Assurance Representative from the Division of Thoracic Radiology beginning in 2014 through the remainder of her employ. PSOF ¶¶ 30, 31. In addition, Dr. Desai assumed leadership responsibilities, including but not limited to administrative responsibilities, for the Division in the frequent and disruptive absence of Dr. Karin Dill, the Division Chief. PSOF ¶¶ 32, 122.

2.  Dr. Desai Qualified for Academic Time

The Medical School's argument that Dr. Desai did not qualify for Academic time because she was on a clinical track and not an academic track, and did not prioritize scholarly work, also fails. Dr. Desai was hired pursuant to a Faculty Recruitment Authorization that specified:

> Specialty: General Radiology – major interest in chest and musculoskeletal radiology.
> Secondary Teaching / Research Interests:  Clinical service, *strong teaching (residents & medical students)* and collaborative clinical research.

(Emphasis added.).  Strong teaching was part of the job description.

Under the terms of the Policy, Academic time is defined as:

> "… *time allocated to academic responsibilities including teachin*g / conference preparation, writing papers / texts, completing research project, *attending institutional and department committees*, attending a conference, serving on committees of local, regional, national or international organizations other than UMMMS or UMMMC.

(Emphasis added.) PSOF ¶¶ 27.

There is no question that Dr. Desai taught extensively at the Medical School. Per her Annual Faculty Reviews for the period 2012-2013 through 2017-2018, twenty-five percent (25%) of her time was allocated to teaching.  PSOF ¶¶ 24-29.  Her teaching was highly regarded, as well. Her student evaluations were outstanding, see PSOF ¶¶ 24, 25, 26, and in 2017, Medical School residents selected her as the recipient of the Teacher of the Year Award based on the collective

6

vote of 20 residents who commended her for her work as a teacher and mentor in addition to her clinical work as a physician. PSOF ¶¶ 26. (When Dr. Desai's teaching load constituted only eight percent (8%) of her time (i.e., before 2012-2013), she co-authored scholarly publications in the form of abstracts with colleagues Drs. Jerry Balikian, Cynthia Umali and residents in the Department of Radiology. She also mentored medical students and residents in the writing of scholarly publications. Plaintiff Response to Medical School SOF, ¶ 10. Dr. Desai also attended institutional and department committees and attended conferences, which also are qualifying PSOF ¶¶ 30, 327.

The Medical School's claim that Dr. Desai did not qualify for academic time because she did not submit proposals to substantiate how she would use academic time is similarly flawed. Dr. Desai did not submit proposals because the Policy did not require her to do so. PSOF ¶ 49. Moreover, the evidence is clear that Dr. Rosen granted academic days to several male radiologists without requiring them to submit proposals. PSOF ¶¶ 38, 40, 43, 259, 260. Dr. Rosen did not evaluate whether a radiologist delivered the amount of academic/administrative/non-clinical work he (Dr. Rosen) expected based on the academic days he allotted to them. PSOF ¶¶44-46. And Defendants produced no evidence that that Dr. Rosen applied any measurable outcomes and deliverables to evaluate the amount of academic/administrative work produced by radiologists on their non-clinical days. PSOF ¶¶ 44-46.

The Medical School does accurately state that Dr. Desai wanted Academic Time because she wanted to take time off from clinical work. That is precisely the point of Academic Time. (It is not surprising that Dr. Desai testified that she also wanted to recuperate by/when having academic time: Dr. Desai has a life-threatening heart condition that required the implantation of a pacemaker and that is exacerbated by fatigue. PSOF 8. Dr. Desai performed clinical duties far in

excess of any other radiologist in the Department, which exacerbated her fatigue, and which caused her to have more frequent heart episodes. PSOF ¶ 71; comparing Dill and Charu's RVUs; PSOF ¶ 7(d) (taking care of the service alone); PSOF ¶ 11 re: more frequent episodes when fatigued.)

The Medical School's implication that Dr. Desai would be resting on her non-clinical day rather than performing academic work, and therefore did not merit an award of academic time, is also undermined by the evidence. Dr. Rosen admitted there was no direct monitoring of work produced or performed during any radiologist's assigned non-clinical (academic or administrative) day, that radiologists were given flexibility as to when they performed the non-clinical work, which may or may not have occurred on the academic and/or administrative day that any radiologist designated for this purpose and may not have occurred at all.  PSOF ¶¶ 45, 46, 326 – 333, 337-344.  Accordingly, there is no question that Dr. Desai qualified for Academic Time.

    3. <u>Dr. Desai Timely Filed Her Complaint</u>

The Medical School's argument that Dr. Desai's Title VII claim for gender-based disparate treatment in the terms and conditions of her employ is time barred is incorrect as a matter of law. To the extent the Court treats the repeated denial of academic time as a series of discrete acts, *AMTRAK v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061 (2002), makes clear that claims based on discrete acts are timely where such acts occurred within the limitations period. Dr. Rosen's denial of academic time to Dr. Desai continued through March 17, 2019, the date of her termination. Dr. Desai filed her charge on May 4, 2018; Dr. Rosen's discriminatory denial of academic days continued for a year thereafter.

   B. <u>Dr. Desai Has Established a Prima Facie Case and Disputed Issues of Material Fact Preclude Summary Judgment as to Unequal Pay Under the Federal Equal Pay Act, the Massachusetts Equal Pay Act</u>

Under Title VII and FEPA, to establish a *prima facie* case, Dr. Desai must show that her employer paid higher wages to a male employee for the performance of "substantially equal" work.[2]  *See McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 298 (1st Cir. 1998).  Substantially equal work is that requiring substantially equal skill, effort and responsibility performed under similar working conditions.  *See McMillan*, 140 F. 3d at 298.  The determination of "substantially equality" ordinarily focuses on the "actual job content, not job titles or descriptions."  *Mullenix v. Forsyth Dental Infirmary for Children*, 965 F. Supp.120, 139 (D. Mass. 1996), and cases cited.  Only one appropriate comparator is necessary to sustain a claim.  *See id.*[3]

The standard under MEPA is different and more favorable to plaintiffs.  MEPA provides pay protection for more than "equal" work; it provides pay protection for work "of like or comparable character or work on like or comparable operations."  M.G.L. c. 149, § 105A.  Under MEPA, if the jobs at issue share important common characteristics, a plaintiff need only establish the performance of work requiring *comparable* skill, effort, and responsibility under *comparable* working conditions.  *See Campbell v. Mitre Corporation*, 144 Lab. Cas. P 34,367, *3 (D. Mass. 2001); *see also Mullenix*, 965 F. Supp. at 148, citing *Jancey v. School Committee of Everett*, 421 Mass. 482, 489-90 (1995).  The term "comparable," as used in MEPA, is more inclusive than the

---

[2] The plaintiff need not establish that her position is identical to the higher paid position.  *Byrd v. Ronayne*, 61 F.3d 1026, 1033-34 (1st Cir. 1995); *Mullenix v. Forsyth Dental Infirmary for Children*, 965 F. Supp. 120 (D. Mass. 1996).

[3] Where, as here, a professional in a department made up of various subspecialties complains of pay disparity, inter- and intra-departmental comparisons are permissible.  *See, e.g., McMillan,* 880 F. Supp. 900 (D. Mass. 1995). (veterinary radiologist compared to other veterinarians of various specialties at MSPCA); *Tan v. Stonehill College*, 23 MDLR 39 (2001) (professor of mathematics compared to others, with various math and computer science specialties, in Mathematics Department; and, as to privileges of rank, compared to other Full Professors outside Mathematics Department).

term "equal," and allows plaintiffs to compare pay in circumstances where FEPA might not apply. *Jancey*, 421 Mass. at 487.

Here, evidence shows that the job that Dr. Desai performed was not simply comparable but was in fact substantially equal in terms of primary functions, skill, effort, responsibility and working conditions to the jobs performed by her male colleagues "without such differentiating or mitigating circumstances that would distinguish their situations." *Matthews v. Ocean Spray Cranberries, Inc.,* 422 Mass. 122, 129-130 (1997), citing *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 17 (1st Cir. 1994).

Dr. Desai can identify several male colleagues who performed comparable work but were paid more than or equal to the amount she was paid despite her years of seniority:

1. Dr. Brian Brochu, a diagnostic radiologist, performs the same clinical duties as Dr. Desai. He received an annual base salary of $375,000 upon hire by Dr. Rosen on March 30, 2018. His base salary offer was not consistent with (but rather exceeded) the revised salary structure that was claimed to be universally implemented for all radiologists within the Department. Moreover, in recognition of Dr. Brochu's five years of service within the UMass system, Dr. Rosen allocated to him 7 weeks (35 days) vacation per year. Dr. Brochu was offered same amount of vacation as Dr. Desai (7 weeks) that she received up until day of termination, at which time she had provided 27 years of service to the Department. In addition, Dr. Rosen granted to Dr. Brochu an additional week of conference time for the first two years of his employ to attend mutually agreed-upon CME courses to enhance his skill set(s). Dr. Brochu has significantly fewer years of experience as an attending physician (less than 10 years) than Dr. Desai (approximately 35 years at time of Dr. Brochu's hire by Dr. Rosen in 2018) but received annual base salary in 2018 that was $45,000 greater than Dr. Desai's annual salary at the time of her separation in 2019. PSOF ¶¶ 272-274.

2. Dr. Eric Schmidlin, a diagnostic radiologist, specialized in chest imaging and worked within the Division of Thoracic Radiology. He performed the same clinical duties as Dr. Desai. (Defendants admit he performed the same work as Dr. Desai. PSOF ¶¶ 275-278.) In 2016, Dr. Desai's annual salary was $283,375.04 and Dr. Schmidlin's annual salary was $294,000. Dr. Schmidlin left regular employment with the Medical Group on June 28, 2016, after approximately four years of full-time employment in the Division, but continued to work on a per diem, hourly basis thereafter. Dr. Schmidlin's hourly per diem rate, established in 2016, is approximately one dollar less than Dr. Desai's hourly rate of compensation in 2019. Dr. Schmidlin has an academic rank of Assistant Professor in the Department; Dr. Desai had an academic rank of Associate Professor. Dr. Schmidlin has

significantly fewer years of experience as an attending physician than Dr. Desai. PSOF ¶¶ 275-278.

3. Dr. Byron Chen, a diagnostic radiologist who performed the same clinical duties as Dr. Desai, earned the same annual base salary as Dr. Desai did at the time of her separation. At the time of Dr. Desai's separation, Dr. Chen had no Division Chief or Administrative Roles within the Department. Dr. Chen has significantly fewer years of experience as an attending physician than Dr. Desai but received the same annual base salary as Dr. Desai at the time of her separation. PSOF ¶¶ 279-281.

4. Dr. Hemang Kotecha, a diagnostic radiologist who performed the same clinical duties as Dr. Desai, earned the same annual base salary as Dr. Desai at the time of Dr. Desai's separation. Dr. Kotecha had no Division Chief or Administrative Roles within the Department. He has significantly fewer years of experience as an attending physician than Dr. Desai. PSOF ¶¶ 282-283.

5. In 2019, Dr. Steven Baccei, a diagnostic radiologist who performed the same clinical duties as Dr. Desai, received an annual rate of compensation of $369,999.97. Under the pay structure implemented for the Department of Radiology effective March 1, 2017, accounting for his additional salary based of his Vice Chair Position, Division Chief Position, and Academic Rank of Associate Professor, Dr. Baccei's annual base salary in 2019 was equivalent to that of Dr. Desai's annual base salary at the time of her separation. Dr. Baccei has significantly fewer years of experience as an attending physician than Dr. Desai. PSOF ¶¶ 284-286.

6. Dr. Christopher Cerniglia, a diagnostic radiologist who performed the same clinical duties as Dr. Desai but has significantly fewer years of experience as an attending physician than Dr. Desai, received the same annual base salary as Dr. Desai at the time of her separation. PSOF ¶ 287.

7. Dr. Satish Dundamadappa, a diagnostic radiologist who performed the same clinical duties as Dr. Desai but has significantly fewer years of experience as an attending physician than Dr. Desai, received the same annual base salary as Dr. Desai at the time of her separation. PSOF ¶ 288.

8. Dr. Coughlin, a diagnostic radiologist who performed the same clinical duties as Dr. Desai but has significantly fewer years of experience as an attending physician than Dr. Desai, received the same annual base salary as Dr. Desai at the time of her separation. PSOF ¶ 289.

In addition, Dr. Rosen exercised discretion reserved to him by virtue of his role as Chair to maintain a $37k salary contribution to Dr. Darren Brennan, a younger male radiologist, despite his

relinquishment of the administrative roles which generated the $37k increase to his compensation. See Plaintiff's Response to Medical School Statement of Facts, ¶ 23.

None of these men are interventional radiologists. Rather, all are, like Dr. Desai, diagnostic radiologists who read radiologic images and communicate their findings to clinicians. The jobs share important common characteristics, *Jancey v. School Comm. of Everett*, 421 Mass 482, 489 (1995). The jobs require comparable skill, effort, and responsibility. And all work in similar working conditions: at workstations in the Medical Center or Marlborough Hospital or Clinton Hospital or at (comparable) workstations at home.

The Medical School argues that Dr. Desai cannot make out a *prima facie* case for her claims of violation of FEPA or MEPA because the Medical School played no role in determining her salary. That is not the test, however. Rather, the law requires Dr. Desai to show that her employer paid different wages to specific employees of different sexes for jobs performed under similar working conditions and requiring equal skill, effort, and responsibility. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).

Contrary to the Medical School's claim, there is considerable evidence that the Medical School employed Dr. Desai. "The most important factor in determining the existence of an employment relationship is 'that control or right of control by the employer which characterizes the relation of employer and employee and differentiates the employee or servant from the independent contractor.' What is at issue is not merely the right to dictate the outcome of the work, but the right to control the 'manner and means' by which the hiree accomplishes that outcome." *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 228 (2d Cir. 2008) (internal citations omitted) (Gertner, J., sitting by designation).

For example, in January 1992, Dr. Desai was hired as an attending physician in the Division

of Thoracic (Chest) Radiology at the Medical Center and Assistant Professor of Radiology at the Medical School.  PSOF ¶ 4.  She was promoted to Associate Professor of Clinical Radiology at the Medical School on September 1, 2001.  Exhibit B.

Section 1.14 of Dr. Desai's employment contract specifically states:

> Dual-Employment with Medical School.  The parties acknowledge ***that a certain percentage of the Practitioner's time and salary may be allocated to, and governed by, a so-called "Dual-Employment" arrangement with the Medical School*** (the "Dual-Employment Arrangement"). […]  The Practitioner further acknowledges that if this Agreement is terminated for any reason, ***the related employment relationship with the Medical School shall also terminate*** unless the Practitioner has a new or continuing agreement with the Medical School or is a tenured faculty member.

Id. (Emphasis added).  Dr. Desai was also paid in accord with Appendix B of the employment contract, which specifically referenced Dr. Desai's dual employment arrangement with the Medical School as follows:

> The Practitioner's compensation for services rendered pursuant to this Agreement, and under a Dual-Employment Arrangement with the Medical School, if applicable, shall be a total base salary, which if annualized would be at the rate of Three-hundred Twenty-Five Thousand Dollars ($325,000) per year, less all legally required and voluntarily-authorized deductions…. ***Practitioners who participate in the Dual-Employment Arrangement with the Medical School may receive paychecks from both the Medical Group and the Medical School***, which together shall equal the base salary referenced above.

Id. (Emphasis added).

Moreover, throughout her employ, in her role as Assistant and, later, Associate Professor of Clinical Radiology in the Department of Radiology at the Medical School, Dr. Desai taught medical students.  See Annual Faculty Performance Evaluations for Charu Desai, M.D., at Exhibit T.

Dr. Desai's Annual Faculty Performance Reviews signed by Dr. Joseph Ferrucci when he served as Chair of the Department of Radiology (the "Department") at the Medical School memorialize that Dr. Desai contributed 8% of her time to education (*i.e.*, teaching). PSOF Exhibit

T. Dr. Desai's Annual Faculty Performance Reviews signed by Dr. Rosen after he replaced Dr. Ferrucci as Chair of the Department[4], memorialize that as of 2012 Dr. Desai increased her commitment and devoted 25% of her time to teaching. Id. (Evidencing Dr. Desai's commitment to the Medical School, Dr. Desai's teaching was highly regarded; in 2017, Medical School residents selected Dr. Desai as the recipient of the Teacher of the Year Award based on the collective vote of 20 residents, and she was commended for her work as a teacher and mentor in addition to her clinical work as a physician. PSOF Exhibit T, 2017-2018.

Additionally, the Annual Faculty Performance Reviews declare themselves to be reviews of Medical School performance; they are titled "University Of Massachusetts Medical School Faculty Annual Performance Review," PSOF ¶ 181, and Dr. Desai's Medical School rank (Associate Professor) is identified. PSOF ¶¶ 4, 181. Dr. Rosen also testified the reason that Dr. Desai's Annual Faculty Performance Evaluations contain no reference to any clinical performance deficiencies was *because they were Medical School forms, and not about her clinical performance.* PSOF ¶¶ 182, 183. Finally, Dr. Rosen signed the Annual Faculty Performance reviews for Dr. Desai in his capacity Department Chair. PSOF ¶¶ 181-183.

Faculty members of the Medical School routinely serve on Credentialling Committees at the Medical Center and/or Marlborough Hospital. PSOF ¶¶ 334 – 337. Two of these faculty members include Dr. Michael Collins and Dr. Brian Brochu. Dr. Collins is currently Chancellor of the Medical School and Dr. Brian Brochu, a radiologist in the Department of Radiology, currently serves as the Chief of Radiology at Marlborough Hospital. As part of the reappointment and recredentialing process, which controls whether someone practices with restrictions, have

---

[4] In 2012, Max Rosen, M.D. ("Dr. Rosen") replaced Dr. Ferrucci as Chair of the Department of Radiology (the "Department") at the Medical School and Medical Center effective September 1, 2012. See Deposition Transcript of Max Rosen, M.D. ("Rosen Dep."), at 17:1-10.

privileges at all, or are reappointed at all, they reviewed Dr. Desai's re-credentialing application. PSOF ¶¶ 338, 339, 340, 341. They approved without restriction Dr. Desai's reappointment and credentialling in the summer of 2017. PSOF Exhibit EEEE.

Dr. Michael Collins, MD, Chancellor of the Medical School, sits on the Patient Care Assessment Committee (*i.e.*, Board of Trustees) that in August 2017, approved Dr. Desai's credentialing and reappointment without any restriction of clinical privileges  PSOF ¶ 337.

Dr. Brian Brochu, MD assumed the role of Chief of Radiology at Marlborough Hospital in approximately March 2018 up until the final day of Dr. Desai's employment (following Dr. Brennan's resignation from the position). He also served on the Credentials Committee at Marlborough Hospital during this time. PSOF ¶¶ 314-315, 336. In his role as Chief of Marlborough Hospital, Dr. Brochu never discussed, or formalized to Dr. Desai any complaints regarding the quality of her work. Defendants produce no evidence in discovery to suggest that Dr. Brochu was even made aware of any concerns regarding Dr. Desai's work performance and/or any quality concerns regarding Dr. Desai that arose from Marlborough Hospital. By way of his postion on the Credentials Committee, Dr. Brochu had input and exercised authority over the approval of Dr. Desai for clinical privileges and/or restriction of her clinical privileges. At no time did such a restriction occur. Dr. Desai's credentialing was approved in the mid 2017 with no restrictions to her privileges at Marlborough Hospital or University of Massachusetts Medical Center for another two-year term until mid 2019.

Communications from the Medical Center and Marlborough Hospital state that there is "no derogatory information on file" regarding Dr. Desai based on a review of her credentials record at both campuses. PSOF ¶¶ 199-200 and Exhibit EEEE. The PCAC approved Dr. Desai's credentialing at both campuses and reappointed her for another full two year term ending in mid

2019. The continued unrestricted reappointment and lack of derogatory information on file for Dr. Desai further serves as a direct contradiction to the complaints lodged by Dr. Robinson. PSOF ¶¶ 194-195, 198-200.

The information provided provides sufficient evidence to prove that Dr. Rosen's stated reason for adverse employment decision is not only a sham, but a sham intended to cover up the the age based discriminatory animus that led him to terminate Dr. Desai's employment.

Notwithstanding the fact that employees of the Medical School reappointed Dr. Desai to the Medical Staff of the Medical Center and Marlborough Hospital without restriction of any clinical privileges, they took no action to correct Dr. Rosen's inappropriate suspension of Dr. Desai's ability to interpret CT reads nor to prevent Dr. Desai's termination.

In these ways, the Medical School exerted significant control over the manner and means of Dr. Desai's employ. There is no question that Dr. Desai was employed by the Medical School.

### C. Dr. Desai Has Established a Prima Facie Case of Gender Discrimination in Pay in Violation of Title VII

A prima facie case under Title VII requires some evidence of "an adverse employment action with respect to compensation" and of more favorable treatment given to similarly situated employees who are not members of the protected class. *Goldstein v. Brigham & Women's Faulkner Hosp., Inc.*, 80 F. Supp. 3d 317, 331 (D. Mass. 2015), citing *Prescott v. Higgins*, 538 538 F.3d 32, 41 (1st Cir. 2008). As noted above, Dr. Desai has readily identified male radiologists who were similarly situated but were paid more than she was. *See Rodriguez v. Smithkline Beecham*, 224 F.3d 1, 8 (1st Cir. 2000).

To rebut a *prima facie* case under the *McDonnell-Douglas* framework, the Medical School must offer a legitimate, non-discriminatory reason for its disparate pay of Dr. Desai. It does not do so. It instead proffers an allegedly legitimate, non-discriminatory reason for her termination, which

16

is inapt here. Dr. Desai's claims against the Medical School (Title VII, FEPA and MEPA) are all premised on the disparate treatment to which she was subjected while she was employed. Her Title VII, FEPA and MEPA claims are not about her termination.

IV.     CONCLUSION

For the reasons set forth above, the motion for summary judgment by Defendant University of Massachusetts Medical School should be denied.

>                              CHARU DESAI
>                              By Her Attorneys,
>
>
>                              /s/ Patricia Washienko
>                              _____
>                              Patricia A. Washienko, BBO# 641615
>                              pwashienko@fwlawboston.com
>                              Freiberger & Washienko LLC
>                              211 Congress St, Suite 720
>                              Boston, MA 02110
>                              Tel: (617) 723-0008
>
>                              Dated: February 11, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on February 11, 2022, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, was served by electronic mail only to counsel for the above-named Defendants:

Robert L. Kilroy, Esq.
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
(508) 860-1477
rkilroy@mirickoconnell.com

Mark Johnson, Esq.
University of Massachusetts Office of the General Counsel
One Beacon Street, 31st Floor
Boston, MA 02108
(617) 287-4064
MAJohnson@umassp.edu


/s/ Patricia Washienko
_____
Patricia A. Washienko