UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CHARU DESAI, | ) | |
|       Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:19-cv-10520-TSH |
| | ) | |
| UNIVERSITY OF MASSACHUSETTS, | ) | |
| MEMORIAL MEDICAL CENTER, INC. | ) | |
| UNIVERSITY OF MASSACHUSETTS | ) | |
| MEMORIAL MEDICAL GROUP, | ) | |
| UNIVERSITY OF MASSACHUSETTS | ) | |
| MEDICAL SCHOOL, UMASS | ) | |
| MEMORIAL HOSPITAL, MAX ROSEN, | ) | |
| M.D., DARREN BRENNAN, M.D., | ) | |
| STEPHEN TOSI, M.D., KARIN DILL, | ) | |
| M.D., | ) | |
|       Defendants. | ) | |
| | ) | |

PLAINTIFF CHARU DESAI, M.D.'s RESPONSE TO STATEMENT OF MATERIAL FACTS SUBMITTED BY UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL MEDICAL GROUP, INC., MAX ROSEN, M.D., AND STEPHEN TOSI, M.D.

Pursuant to Fed. R. Civ. P. 56 and D. Mass. Local Rule 56.1, Dr. Desai Charu Desai, M.D. ("Dr. Desai" or "Dr. Desai"), responds to Statement of Material Facts ("SOF") in submitted by the University of Massachusetts Memorial Medical Center, Inc. (the "Medical Center"), the University of Massachusetts Memorial Medical Group, Inc. (the "Medical Group"), Max Rosen, M.D. ("Dr. Rosen"), and Stephen Tosi, M.D. ("Dr. Tosi") in support of their Motion for Summary Judgment as to all of Plaintiff's claims.

A.    Plaintiff's Employment

     1.     Plaintiff, Charu Desai, M.D., was employed by the Medical Group as a physician specializing in chest radiology. See Affidavit of Max Rosen, M.D., M.P.H. ("Rosen Aff."), at ¶ 4, attached as **Exhibit A** to Affidavit of Reid Wakefield, Esq. ("Wakefield Aff.").

**Response**: Admitted.

2.      Plaintiff was employed pursuant to an Agreement between UMass Memorial Medical Group, Inc., and Charu Desai, M.D. ("Employment Agreement"). Ex. A, Rosen Aff. at ¶ 5; see also Employment Agreement, attached as **Exhibit B** to "Wakefield Aff."

>   **Response**: Admitted that Plaintiff was employed pursuant to an Agreement between
>   UMass Memorial Medical Group, Inc., and Plaintiff. Disputed as to any implication that
>   UMass Memorial Medical Group, Inc. was the Plaintiff's sole employer, as the Medical
>   Center, Medical School, and Marlborough Hospital also exerted control over the manner
>   and means of Plaintiff's work performance.  PSOF ¶¶ 318-325, 326-344, 299-317.

3.      Pursuant to the Employment Agreement, Plaintiff was dually-employed by the Medical Group and the University of Massachusetts Medical School. Ex. A, Rosen Aff. at ¶ 5; Ex. B, at ¶ 1.14.

>   **Response**: Admitted that pursuant to the terms of the Employment Agreement, Plaintiff
>   was dually employed by the Medical Group and the University of Massachusetts Medical
>   School. Disputed as to any implication that the Medical Group, Inc., and Medical School
>   were the Plaintiff's sole employers, as the Medical Center and Marlborough Hospital also
>   exerted control over the manner and means of Plaintiff's work performance. PSOF ¶¶
>   318-325, 326-344, 299-317.

4.      Plaintiff's job duties involved reviewing radiological images in the form of computed tomography ("CT") or radiographs ("x-rays" or "plain films"), interpreting the images,

describing findings, and opining on diagnoses of disease and medical conditions revealed in the images. Ex. A, Rosen Aff. at ¶ 7.

>   **Response**: Admitted.

     5.     Plaintiff was not qualified to read magnetic resonance imaging (MRI) and did not read MRIs in the course of her employment. Ex. A, Rosen Aff. at ¶ 7.

>   **Response**: Denied that Plaintiff was not qualified to read magnetic resonance imaging studies.  Admitted that Plaintiff did not routinely interpret MRI studies during her employment.

     6.     As a radiologist, Plaintiff's practice was focused on and limited to thoracic (a/k/a chest) imaging, and Plaintiff worked within the Thoracic Division (a/k/a Chest Division). Ex. A, Rosen Aff. at ¶ 8.

>   **Response**: Denied that Plaintiff's practice was limited to thoracic (a/k/a chest) imaging, as she interpreted studies related to modalities other than thoracic radiology during her employment. See Affidavit of Charu Desai ("Desai Aff.") at ¶ 57, attached as **Exhibit A** to Affidavit of Patricia Washienko, Esq. ("Washienko Aff."). Otherwise, admitted.

     7.     The Medical Center is a multi-facility academic hospital which provides tertiary-level care. Ex. A, Rosen Aff. at ¶ 9.

>   **Response**: Admitted.

8.      Plaintiff performed her duties for the Medical Group while located at Medical

Center facilities. Ex. A, Rosen Aff. at ¶ 9.

> **Response**: Denied as to any implication that Plaintiff performed her radiological duties
>
> exclusively for the Medical Group and denied that she performed her radiological duties
>
> exclusively while located at Medical Center facilities. In the early 2000s, around the time
>
> that Plaintiff's heart condition was diagnosed, she had a pacemaker implanted.  She was
>
> provided a personal workstation and worked from home.  See Desai Aff. ¶ 4, attached as
>
> **Exhibit A** to Washienko Aff.  In addition, Plaintiff physically performed her duties at the
>
> Clinton and Memorial campuses throughout the course of her employment. Id.


9.      In her role as a radiologist for the Medical Group, Plaintiff reviewed and

interpreted images for patients originating from multiple hospitals, including campuses of UMass

Memorial Medical Center, Marlborough Hospital, and Clinton Hospital, which are each separate

entities. Ex. A, Rosen Aff. at ¶ 10.

> **Response**: Denied that plaintiff performed her radiological duties exclusively for the
>
> Medical Group, but admitted that in her role as a radiologist, Plaintiff reviewed and
>
> interpreted images for patients originating from multiple hospitals including the cited
>
> campuses of UMass Memorial Medical Center, Marlborough Hospital, and Clinton
>
> Hospital. Also disputed that the cited campuses are separate entities, as they are all
>
> members of the UMass Memorial Healthcare System and UMass Memorial Healthcare,
>
> Inc.

10.     The Medical Group was responsible for staffing radiologists to review images originating from different hospitals, and the Medical Group directed radiologists' assignments. Ex. A, Rosen Aff. at ¶ 11.

> **Response**: Disputed. Dr. Darren Brennan, MD, Chief of Radiology at Marlborough Hospital, specifically directed radiologists, including Plaintiff, to prioritize reading radiological films from Marlborough Hospital over all other films. See Affidavit of Max Rosen, MD, ("Rosen Dep.") at 141:23-142:11, attached as Exhibit S to Washienko Aff.; Rosen Dep. Ex. 24.

11.     The hospitals, including Marlborough Hospital and UMass Memorial Medical Center, did not direct Plaintiff or any other radiologist with respect to the reading of images or in any other job duties. Plaintiff was supervised by Medical Group employees. Ex. A, Rosen Aff. at ¶ 12.

> **Response**: Disputed. See Response No. 10 above.

12.     UMass Memorial Medical Center did not set the compensation for radiologists, did not set the work schedules for radiologists, and did not have the power to hire, fire, or discipline radiologists, including Plaintiff. Ex. A, Rosen Aff. at ¶ 13.

> **Response**: Disputed.  Actions of members of the UMass Memorial Medical Center had direct consequences on Plaintiff's ability to provide care for patients located at UMass Memorial Medical Center – e.g., the members of the Medical Center's Credentialing Committee had the power to deny privileges and deny a radiologist's Medical Staff appointment, either of which would be disciplinary in nature and/or terminate a radiologist's employ.

13.     In order to provide medical services as a physician for Medical Center patients, Plaintiff was required to be granted clinical privileges by the Medical Center and be a member of the Medical Center's medical staff. Ex. A, Rosen Aff. at ¶ 14.

**Response**: Admitted.


14.     Plaintiff was never employed by the Medical Center. Ex. A, Rosen Aff. at ¶ 13.

**Response**: Disputed, as the Medical Center exerted control over the manner and means of Plaintiff's employment.  PSOF ¶¶ 318-325, 326-344, 299-317. In addition, the patients for which she interpreted radiographs were those admitted at various UMass Medical Center facilities.


15.     Max Rosen, M.D., was appointed as the Chair of the Department of Radiology (the "Department") effective September 1, 2012. See Deposition Transcript of Max Rosen, M.D. ("Rosen Dep."), at 17:1-10, attached as **Exhibit C** to Wakefield Aff.; Ex. A, Rosen Aff. at ¶ 2.

**Response**: Admitted.


16.     Dr. Rosen is employed by the Medical Group and the Medical School. Ex. C, Rosen Dep. at 17:1-10; Ex. A, Rosen Aff. at ¶ 3.

**Response**: Admitted that Dr. Rosen is employed by the Medical Group and the Medical School. Disputed to the extent this Statement implies that the Medical Center does not exert control over the manner and means of Dr. Rosen's performance.

17.     In his capacity as Chair, Dr. Rosen supervised and managed all radiologists employed by the Medical Group, including Plaintiff. Ex. A, Rosen Aff. at ¶ 6.

> **Response**: Disputed to the extent this implies that only Dr. Rosen had supervisory and management responsibilities over radiologists in the Department; Division Chiefs also had supervisory authority over Plaintiff. Rosen Aff. at ¶ 92.  Admitted that Dr. Rosen supervised and managed all radiologists in the Department of Radiology.

18.     Among Dr. Rosen's duties as Chair is to ensure that the Department provides high quality and safe imaging services for patients. Ex. C, Rosen Dep. at 17:16-21; Ex. A, Rosen Aff. at ¶ 6.

> **Response**: Admitted.

19.     Darren Brennan, M.D., served as the Chief of Radiology for Marlborough Hospital from 2015 to 2018. He was not an employee of Marlborough Hospital, but is employed by the Medical Group. Ex. A, Rosen Aff. at ¶ 15.

> **Response**:  Disputed that Dr. Brennan was not an employee of Marlborough Hospital, as Marlborough Hospital exerted control over the manner and means of his employ.  PSOF ¶¶ 318-325, 326-344, 299-317. In his position as Chief of Radiology for Marlborough Hospital and Vice Chair for Enterprise Operations and Community Radiology from 2015 to 2019, he was directly associated with the governance of that specific campus of UMass Memorial Healthcare Inc. within the UMass Memorial Health System.  UMM 09984. Rosen Aff. at ¶ 92.  Admitted that Darren Brennan, M.D., served as the Chief of Radiology for Marlborough Hospital from 2015 to 2018.

20.     Dr. Brennan served as the Vice Chair for Enterprise Operations and Community Radiology from 2015 to 2019. Ex. A, Rosen Aff. at ¶ 17.

**Response**: Admitted.


21.     In Dr. Rosen's absence, he would sometimes designate Dr. Brennan to address concerns within the Department in his role as Vice Chair. On September 21, 2017, Dr. Brennan addressed a matter between Plaintiff and Karin Dill, M.D., in that capacity and at Dr. Rosen's request. Ex. A, Rosen Aff. at ¶ 17.

**Response**: Admitted that in Dr. Rosen's absence, he would sometimes designate Dr. Brennan to address concerns, including quality concerns, within the Department in his role as Vice Chair and that Dr. Brennan mediated a dispute between Plaintiff and Karin Dill, MD on September 21, 2017, at Dr. Rosen's request. Disputed to the extent that Dr. Brennan did not address other concerns within the Department in his role as Vice Chair and Chief of Radiology for Marlborough Hospital. He did not inform Plaintiff that there were concerns regarding her work quality.


B.     Plaintiff's Medical Condition and Accommodations

22.     Plaintiff has been diagnosed with a heart condition, tachy-brady syndrome. This condition causes Plaintiff to experience spells where she becomes weak, tired, and incapacitated typically for a few minutes. See Deposition Transcript of Charu Desai, M.D. ("Desai Dep."), at 185:13-186:19, attached as **Exhibit D** to Wakefield Aff.

**Response**: The second sentence is disputed as the length of the spells in which Plaintiff becomes weak, tired and incapacitated, and as her fatigue and recovery from such

episodes are variable and unpredictable; the second sentence is admitted as to the fact that the condition causes Plaintiff to experience spells where she becomes weak, tired, and incapacitated. *See* UMM 00360 - 00361 ("[Patient] continues to have episodes of altered consciousness and generalized weakness without loss of consciousness"; "Episode lasts minutes but she then feels washed out and fatigued."). Desai Dep. at 185:13-186:19 and 423:18-22, attached as **Exhibit R** to Washienko Aff. The first sentence is admitted to the extent that her heart condition is sometimes referred to as tachy-brady syndrome.

23.     When Plaintiff gets tired, her spells occur more frequently. Ex. D, Desai Dep. at 423:18-22. Due to her condition, Plaintiff needs a day off on occasion. Ex. D, Desai Dep. at 110:21-111:8.

> **Response**: The first sentence is admitted. See UMM 00360 - 00361 ("Episodes seem to be triggered by . . . fatigue."). The second sentence is disputed to the extent it implies that Plaintiff always needed a day off after a spell. After a spell, Plaintiff generally rested for a period but then was able to return to what she was doing before the spell, including returning to work. At other times, if she was exhausted from working many days in a row without a break, her condition would flare; in that event she may not have been able to work the following day and would call out sick. Desai Dep. at 422:17 – 423:22, attached as **Exhibit R** to Washienko Aff.; Desai Aff. at ¶¶ 5-6, attached as **Exhibit A** to Washienko Aff.  See also Response No. 23, above.

24.     Plaintiff requested and was approved for intermittent leave under the FMLA to take time off of work if she needed it due to her medical condition. Ex. D, Desai Dep. at 154:10-155:3.

> **Response**: Denied as to any implication that Plaintiff is not a qualified disabled individual who was not entitled to a reasonable accommodation during episodic events arising out of her disabling condition. Disputed as to the implication that Plaintiff always needed to take intermittent FMLA leave after spells as the duration of weakness and incapacitation were often unpredictable in nature and the need for relief could not have been previously anticipated. See Desai Dep. at 185:13-186:19, 422:17-423:22, attached as **Exhibit R** to Washienko Aff. Admitted that Plaintiff requested and was granted FMLA leave.

25.     Plaintiff was approved by the Medical Group to take intermittent leave under the FMLA for the period of March 26, 2015, through March 25, 2016, to be absent as she requested for two one-day episodes every two months due to her medical condition. Ex. D, Desai Dep. at 268:5-270:8; see also Approval of Leave Notification 2015, attached as **Exhibit E** to Wakefield Aff.

> **Response**: Denied as to any implication that Plaintiff is not a qualified disabled individual who was not entitled to a reasonable accommodation during episodic events arising out of her disabling condition. Disputed to the extent this implies Plaintiff's episodes and related weakness and incapacitation were limited and/or scheduled to two one-day episodes every two months. Plaintiff's condition was unpredictable in nature and need for relief could not have been previously anticipated. *See* Desai Dep. at 185:13-

186:19 and 422:17-423:22, attached as **Exhibit R** to Washienko Aff. Admitted that

intermittent FMLA leave was granted to Plaintiff.

26.     Plaintiff was approved by the Medical Group to take intermittent leave under the
FMLA for the period of April 8, 2016, through March 8, 2017, to be absent as she requested one
to two days every two months due to her medical condition. Ex. D, Desai Dep. at 273:4-274:15;
see also Approval of Leave Notification 2016, attached as **Exhibit F** to Wakefield Aff.

> **Response**: Denied as to any implication that Plaintiff is not a qualified disabled
> individual who was not entitled to a reasonable accommodation during episodic events
> arising out of her disabling condition. Disputed to the extent this implies Plaintiff's
> episodes and related weakness and incapacitation were limited and/or scheduled to two
> one-day episodes every two months. Plaintiff's condition was unpredictable in nature and
> need for relief could not have been previously anticipated. *See* Desai Dep. at 185:13-
> 186:19 and 422:17-423:22, attached as **Exhibit R** to Washienko Aff. Admitted that
> intermittent FMLA leave was granted to Plaintiff.

27.     Plaintiff was approved by the Medical Group to take intermittent leave under the
FMLA for the period of March 9, 2017, through March 8, 2018, to be absent as she requested
one to two days every two months due to her medical condition. Ex. D, Desai Dep. at 327:18-
329:3; see also Approval of Leave Notification 2017, attached as **Exhibit G** to Wakefield Aff.

> **Response**: Denied as to any implication that Plaintiff is not a qualified disabled
> individual who was not entitled to a reasonable accommodation during episodic events
> arising out of her disabling condition. Disputed to the extent this implies Plaintiff's

episodes and related weakness and incapacitation were limited and/or scheduled to two one-day episodes every two months. Plaintiff's condition was unpredictable in nature and need for relief could not have been previously anticipated. *See* Desai Dep. at 185:13-186:19 and 422:17-423:22, attached as **Exhibit R** to Washienko Aff. Admitted that intermittent FMLA leave was granted to Plaintiff.

28.     Plaintiff was approved for intermittent leave under the FMLA for the period of March 21, 2018, through March 20, 2019, to be absent as she requested one to two days every two months due to her medical condition. Ex. D, Desai Dep. at 357:11-360:2; <u>see also</u> Approval of Leave Notification 2018, attached as **Exhibit H** to Wakefield Aff.

> **Response**: Denied as to any implication that Plaintiff is not a qualified disabled individual who was not entitled to a reasonable accommodation during episodic events arising out of her disabling condition. Disputed to the extent this implies Plaintiff's episodes and related weakness and incapacitation were limited and/or scheduled to two one-day episodes every two months. Plaintiff's condition was unpredictable in nature and need for relief could not have been previously anticipated. *See* Desai Dep. at 185:13-186:19 and 422:17-423:22, attached as **Exhibit R** to Washienko Aff. Admitted that intermittent FMLA leave was granted to Plaintiff.

29.     Plaintiff had a Sick Bank as well as Salary Continuation she could use for paid medical leave. At the time of her separation from employment, Plaintiff had not exhausted her available sick leave and had available 116.55 hours in her Sick Bank. Ex. A, Rosen Aff. at ¶ 18.

**Response**: Denied as to any implication that because Plaintiff had a Sick Bank and Salary Continuation, she was not a qualified individual entitled to an accommodation for her condition. *See* Desai Dep. at 185:13-186:19 and 423:18-22, attached as **Exhibit R** to Washienko Aff.  Admitted that Plaintiff had a Sick Bank as well as Salary Continuation she could use for paid medical leave; and admitted that at the time of her separation from employment, Plaintiff had not exhausted her available sick leave and had available 116.55 hours in her Sick Bank.  Plaintiff's Sick Bank that Defendants refer to is from when she was a State of Massachusetts Employee.  When her employment contract with the State ended, Plaintiff received an unlimited allotment for sick time.

30.     Plaintiff acknowledges that if she was tired then she could call in sick. Ex. D, Desai Dep. at 428:6-11.

**Response**: Denied as to any implication that Plaintiff is not a qualified disabled individual entitled to a reasonable accommodation during episodic events arising out of her disabling condition. Admitted that Plaintiff acknowledges that if she was tired then she *could* call in sick. However, Plaintiff often had spells unpredictably, including in the parking lot, between the parking facility and her workstation, and while actively working at her workstation, but after resting for a bit was able to proceed and/or return to work. The extent, frequency, and aftermath / consequences of her spells were unpredictable. See Desai Aff. ¶ 6, attached as **Exhibit A** to Washienko Aff.; Desai Dep. at 428:15-429:7, attached as **Exhibit R** to Washienko Aff.  Dr. Rosen admits that he does not know what Plaintiff should do when she has a flare up of her heart condition in the parking facility on the way in to work, acknowledging it would not be reasonable for her to

formally request leave or let anyone know that she would be late that day. See Deposition

of Max Rosen, MD ("Rosen Dep.") at 101:16-22, attached as **Exhibit S** to Washienko

Aff.

31.     The Medical Group never interfered with Plaintiff's ability to take time off if she

needed a break from work. Ex. D, Desai Dep. at 154:10-155:3.

**Response**: Denied. Plaintiff was not provided academic (i.e., non-clinical) days to which

she was entitled, and she was required to take call despite being exempt from call duties

and responsibilities under the Call Policy due to her status as a senior attending.  See

Academic and Administrative Time Policy, attached as **Exhibit AA** to Washienko Aff.;

Call and/or Weekend/Holiday Coverage Policy, attached as **Exhibit U** to Washienko Aff.

32.     The Medical Group never prevented Plaintiff from taking leave for a break when

needed. Ex. D, Desai Dep. at 154:10-155:3; 269:14-21; 273:20-24; 328:18-21; 359:24-360:2.

**Response**: Denied as to any implication that Plaintiff was not a qualified disabled

individual also entitled to a reasonable accommodation other (or rather) than taking

leave.  Plaintiff was not provided academic (i.e., non-clinical) days to which she was

entitled, and she was required to take call despite being exempt from call duties and

responsibilities under the Call Policy due to her status as a senior attending.  See

Academic and Administrative Time Policy, attached as **Exhibit AA** to Washienko Aff.;

Call and/or Weekend/Holiday Coverage Policy, attached as **Exhibit U** to Washienko Aff.

Dr. Rosen also did not temporarily relieve Plaintiff of job duties following her episodes,

despite knowing of same and Plaintiff's pacemaker.  See Rosen Dep. at 177:22-178:14,

182:2-182:3, attached as **Exhibit S** to Washienko Aff.; Deposition of Abhijit

Roychowdhury ("Roychowdhury Dep.") at 23:19-27, attached as **Exhibit LL** to

Washienko Aff.; Carl D'Orsi Letter of Recommendation ("despite several chronic

medical problems"), attached as **Exhibit GG** to Washienko Aff. PSOF 6(d).

33.     Plaintiff's medical condition did not affect her ability to perform the essential

functions of her job except to the extent she had an episode that might require her to use FMLA

leave. Ex. D, Desai Dep. at 186:20-187:11.

> **Response**: Denied as to any implication that Plaintiff is not a qualified disabled
>
> individual who was not entitled to a reasonable accommodation during episodic events
>
> arising out of her disabling condition. Also denied as to any implication that Plaintiff was
>
> not also entitled to a reasonable accommodation other (or rather) than taking FMLA
>
> leave; Plaintiff had unpredictable episodes that varied in length and that may or may not
>
> have required her always to use FMLA leave during each flare up of her health condition.
>
> *See* Desai Dep. at 185:13-186:19 and 423:18-22, attached as **Exhibit R** to Washienko
>
> Aff.

34.     Plaintiff admits the only accommodation she needed was the ability to take time

off in the event of an episode. Ex. D, Desai Dep. at 187:7-11.

> **Response**: Disputed. Plaintiff requested but was not provided academic (i.e., non-
>
> clinical) days to which she was entitled, and she was required to take call despite being
>
> exempt from call duties and responsibilities under the Call Policy due to her status as a
>
> senior attending.  See Academic and Administrative Time Policy, attached as **Exhibit**

15

**AA** to Washienko Aff.; Call and/or Weekend/Holiday Coverage Policy, attached as
**Exhibit U** to Washienko Aff. Admitted to the extent that the definition of "take time off"
could vary depending on the severity, frequency, nature associated with each specific
episode and that she did not uniformly require the same accommodation each time.

35.     The only request Plaintiff made to assist her with her medical condition was the
ability to take time off through FMLA when she would have an occurrence of symptoms. Ex. D,
Desai Dep. at 199:8-14.

> **Response**: Denied.  Plaintiff also requested to be relieved of call responsibilities, to be
> granted academic (i.e., non-clinical) days, and again to be given a personal workstation
> so she could work from home.  PSOF ¶ 17, 36, 53-56, 179.

36.     Plaintiff never told Dr. Rosen or the Medical Group that she was not capable of
performing the essential functions of her job due to a disability. Ex. D, Desai Dep. at 145:20-23.

> **Response**: Admitted that Plaintiff did not state to Dr. Rosen or the Medical Group that
> she was not capable of performing the essential functions of her job due to a disability.
> Plaintiff had (has) an episodic disability. She could perform the essential functions of the
> job except when she experienced exhaustion and/or collapse, temporary loss of
> consciousness resulting from unpredictable flare ups of her medical condition requiring
> further, if not immediate attention/accommodation depending on each individual episode.
> Id. Circumstances varied with each individual episode. *See* Desai Dep. at 185:13-186:19
> and 423:18-22, attached as **Exhibit R** to Washienko Aff.

37.      On May 13, 2016, Dr. Rosen met with Plaintiff to discuss several work-related matters, including a concern that Plaintiff was not arriving to work timely or adhering to her work schedule. See E-mail from M. Rosen to C. Desai, May 13, 2016, attached as **Exhibit I** to Wakefield Aff.

> **Response**: Admitted Dr. Rosen met with Plaintiff. Regarding Dr. Rosen's concern that Plaintiff was not arriving to work timely, Plaintiff explained that she might be tardy on occasion if she had a spell on the way to her workstation. Desai Aff. ¶.  Regarding Dr. Rosen's concern that Plaintiff was not adhering to her work schedule, Plaintiff raised concerns about disparate treatment and discrimination in the workplace, which Dr. Rosen did not address. See UMM 04740 (Plaintiff letter to Dr. Rosen re: discriminatory treatment). Also see Exhibit RR (Plaintiff's and Dr. Dill's RVUs for 2017-2018 and 2016-2017) and PSOF ¶ 72 (Dr. Dill clinical productivity issue and Dr. Rosen stating he was reducing her academic days from 60 to 42 per year).  In fact, Dr. Dill had been granted 72 non-clinical days.  PSOF ¶ 72.

38.      At the meeting, Dr. Rosen and Plaintiff discussed accommodating Plaintiff's need for FMLA leave in scheduling, and Plaintiff was advised that if there are medical reasons that she has to be late to contact Human Resources regarding a plan to accommodate her and adjust scheduling. Ex. I, E-Mail May 13, 2016.

> **Response**: Admitted that at the meeting, Dr. Rosen and Plaintiff discussed accommodating Plaintiff's need for FMLA leave in scheduling, and Plaintiff was advised that if there are medical reasons that she has to be late to contact Human Resources regarding a plan to accommodate her and adjust scheduling; but disputed to the extent

17

that this implies that Plaintiff's episodes were predictable (they were not, and would occur while she was in the parking lot, on the way from the parking lot to her workstation, and even when she was actively working and interpreting films); and also denied to the extent this implies she was not a qualified disabled individual entitled to a reasonable accommodation.  Desai Aff. ¶ 6, Exhibit A.


39.     In 2014, a physician in the Department, Susan Afonso, M.D., requested a change in her work hours due to a medical issue, and an accommodation to her schedule was approved by Dr. Rosen which remains in place to the present day. Ex. D, Desai Dep. at 385:2-10; Ex. A, Rosen Aff. at ¶ 19.

**Response**: Admitted.


C.     <u>Academic Time</u>

40. The Department maintained a policy for physicians to be allotted academic or administrative time to conduct non-clinical duties. Ex. A, Rosen Aff. at ¶ 20; <u>see also</u> Academic and Administrative Time Policy, attached as **Exhibit J** to Wakefield Aff.

**Response**: Admitted.


41.     Pursuant to the Academic and Administrative Time Policy, academic time can be allotted to academic responsibilities including teaching and conference preparation, writing papers or texts, completing research projects, attending institutional and department committees, attending a conference, or serving on committees of local, regional, national or international organizations. Ex. A, Rosen Aff. at ¶ 20; Ex. J, Academic and Administrative Time Policy.

**Response**: Admitted.

42.     Pursuant to the policy, a staff member's academic activities are reviewed on an annual basis during individual annual academic planning sessions. Ex. C, Rosen Dep. at 376:4-377:3; Ex. J, Academic and Administrative Time Policy.

> **Response**: Admitted that the policy states that review of a staff member's academic activities are supposed to be discussed annually on an individual basis during individual annual academic planning sessions.  Denied that these discussions in fact occurred during Plaintiff's annual faculty reviews with Dr. Rosen.

43.     Dr. Rosen reviewed each staff member's current and proposed academic activities at these annual meetings to ensure they were pursuing academic endeavors consistent with the Departmental Academic/Administrative Time Policy. Ex. C, Rosen Dep. at 107:15-24; 376:4-377:3.

> **Response**:  Denied.  Dr. Rosen did not evaluate whether a radiologist delivered the amount of academic/administrative/non-clinical work he expected based on the academic days he allotted them. Rosen Dep. at 106:20-107:19. Defendants produced no evidence that that Dr. Rosen applied measurable outcomes and deliverables to evaluate the amount of academic/administrative work produced by radiologists on their non-clinical days.  Id.

44.     Staff members used academic time as time when they were not scheduled to perform clinical work, but the Medical Group was flexible as to when a staff member performed

the academic work, which was sometimes done on nights and weekends. Regardless of when it was performed, the expectation at the end of the year was that the staff member produced an amount of academic work commensurate with the time taken. Ex. C, Rosen Dep. at 109:5-17.

> **Response**: Disputed. Defendants produced no evidence that that Dr. Rosen applied measurable outcomes and deliverables to evaluate the amount of academic/administrative work produced by radiologists on their non-clinical days. See also Rosen Dep. at 106:20-107:19. Also disputed in that staff members also used "academic time" in a manner inconsistent with the Departmental Academic/Administrative Time Policy. PSOF ¶¶ 38-40, 48.  Admitted that staff members used academic time as time when they were not scheduled to perform clinical work and admitted to the extent that there was no routine monitoring as to whether an individual who took an academic day performed academic work on that specific day allotted for such purpose. Rosen Dep. at 108:23-109:17. PSOF ¶ ¶45-46.

45.    Plaintiff was not allotted academic time since at least 2010, and the Department does not have a record of Plaintiff having ever been allotted academic time. Ex. C, Rosen Dep. at 108:1-3; Ex. A, Rosen Aff. at ¶ 21.

> **Response**: Admitted that Plaintiff was not allotted academic time since at least 2010. Denied that Plaintiff was never allotted academic time, as she received academic time weekly under previous Department Chair Dr. Edward Smith, MD. Desai Aff. ¶ .

46.    Plaintiff has not written any scholarly publications since 2002. Ex. D, Desai Dep. at 32:11-23; see also Curriculum Vitae of Charu S. Desai, MD, Exhibit B to Washienko Aff.

**Response**: Denied as to any implication that Plaintiff did not perform academic work as defined under the Academic Time policy since 2002.  Admitted that Plaintiff has not directly authored scholarly publications since 2002.

**Responding further:** The University of Massachusetts Medical Center hired Plaintiff pursuant to a Faculty Recruitment Authorization that specified:

> Specialty: General Radiology – major interest in chest and musculoskeletal radiology.
> Secondary Teaching / Research Interests:  Clinical service, *strong teaching (residents & medical students)* and collaborative clinical research.

See University of Massachusetts Medical Center Authorization for Faculty Replacement, UM00092, attached as Exhibit Y to Washienko Aff.  (Emphasis added.)

> Under the terms of the Policy, Academic time is
>
> "… time allocated to academic responsibilities including teaching / conference preparation, writing papers / texts, completing research project, attending institutional and department committees, attending a conference, serving on committees of local, regional, national or international organizations other than UMMMS or UMMMC.

Exhibit AA to Washienko Aff.

Plaintiff routinely performed following activities: teaching (Education was 25% of her time per her Faculty Evaluations from 2012-2013 through 2017-2018; see Plaintiff's Annual Faculty Reviews, attached as Exhibit T to Washienko Aff.), attending institutional and department committees, and attending conferences.  Resident evaluations submitted regarding Plaintiff were outstanding, see UMM 00287, and in 2017, graduating residents selected Plaintiff as their teacher of the year.  UMM 00307.

When Plaintiff's teaching load was 8% of her time (i.e., before 2012-2013), she co-authored scholarly publications in the form of abstracts with residents in the

Department of Radiology and mentored medical students and residents in the writing of

scholarly publications. Exhibit T to Washienko Aff.

47.     Plaintiff did not perform any academic activities from at least 2009 through the

end of her employment. Ex. D, Desai Dep. at 250:19-252:23; 254:1-257:22; 259:9-263:14;

265:4-267:5; 316:12-317:8; 355:17-357:7; see also Annual Faculty Reviews for Charu Desai,

M.D., 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, 2016-

2017, attached as **Exhibit L** to Wakefield Aff; Annual Faculty Review for Charu Desai, M.D.,

2017-2018, attached as **Exhibit M** to Wakefield Aff.

**Response**: Denied.  See response No. 46, above.

48.     As a part of Plaintiff's 2013-2014 evaluation, Plaintiff and Dr. Rosen discussed

options for academic time, but Dr. Rosen advised that the policy cannot be modified on an

individual basis. Ex. D, Desai Dep. at 262:1-263:14.

**Response**: Admitted.

49.     Since at least 2012, Plaintiff never requested academic time for the purposes of

performing academic work. Ex. A, Rosen Aff. at ¶ 21.

**Response**: Denied.  See Response No. 46, above.

50.     In a May 13, 2016, meeting with Dr. Rosen, Plaintiff expressed a desire to have

academic time. Dr. Rosen advised her that academic time is allocated based on the policy, and

that if she believes academic time is justified to advise him which academic activities she would

like to undertake and they could discuss additional time for the activities. Ex. I, Email May 13, 2016.

> **Response**: Admitted to the extent that Dr. Rosen advised Plaintiff to submit a formal written proposal for justification of her request for academic time, which was not required as per the Departmental Academic/Administrative Time Policy. Denied as to any implication that Plaintiff did not meet requirements to receive academic time as per the Departmental Academic/Administrative Time Policy. See Response No. 46, above; Desai CV, attached as Exhibit B to Washienko Aff.

51.     While Plaintiff was told to submit a proposal to substantiate her need for academic days, Plaintiff never submitted a proposal to substantiate what she was going to use her academic days for. At no point did Plaintiff ever make a proposal to Dr. Rosen to conduct academic work of any kind. Ex. D, Desai Dep. at 105:3-16; 118:18-119:5; 281:4-18; 318:6-11; Ex. A, Rosen Aff. at ¶ 21.

> **Response**: Admitted that Plaintiff never submitted a formal written proposal, as it was not required according to the Departmental Academic/Administrative Time Policy.  See Response No. 46, above. PSOF ¶ 49.

52.     As of 2015, Plaintiff did not have prior academic activity, and she never mutually-agreed with Dr. Rosen regarding future activity. Ex. D, Desai Dep. at 117:9-13.

> **Response**: Denied that Plaintiff did not have prior academic activity as defined by the Departmental Academic/Administrative Time Policy.  See Response No. 46, above.

Admitted that Plaintiff and Dr. Rosen never *mutually* agreed on whether Plaintiff was performing academic activity.

53.     Plaintiff did not intend to use the requested academic time to perform academic work; instead, she intended to use it to take a break from work. Ex. D, Desai Dep. at 112:12-14.

**Response**: Denied. Plaintiff performed academic work as defined by the Departmental Academic/Administrative Time Policy. See Response No. 46, above. Admitted that Plaintiff intended to use the time not to perform clinical work.

54.     While Dr. Rosen was Chair, other female radiologists were granted academic days. Ex. D, Desai Dep. at 117:14-18.

**Response**: Admitted.  When Dr. Rosen was Chair, other female radiologists, as well as male radiologists, were granted academic days, not in accord with the Departmental Academic/Administrative Time Policy. PSOF ¶ 259. (UMM 14129 (Elizabeth Garwood, MD, 46 academic days), UMM 20372 (Christopher Sereni, MD, 23 academic days), UMM25675 (Ryan Tai, MD, 23 academic days), UMM 27870 (George Watts MD, 46 academic days).  Dr. Karin received 72 days of non-clinical time, in excess of the total maximum limit (70) as defined in the policy. See UMM 07667, UMM 08912 (12 academic, 36, admin, 24 interim division director).)

55.     While Dr. Rosen was Chair, other radiologists over the age of forty were granted academic days. Ex. D, Desai Dep. at 117:23-118:1.

**Response**: Admitted. When Dr. Rosen was Chair, other radiologists both over and under the age of forty were granted academic days, not in accord with Policy. In addition, radiologists under the age of forty were granted academic days disproportionately greater than attendings over the age of forty, and sometimes in excess of the maximum limit set out in the Departmental Academic/Administrative Time Policy.  PSOF ¶¶ 43, 260.

56.     Plaintiff cannot identify any radiologist who performed no academic activity and was granted academic time. Ex. D, Desai Dep. at 118:13-17.

**Response**: Denied. While at her deposition, Plaintiff could not recall specific individuals at that time who received academic time not in accordance with the Departmental Academic/Administrative Time Policy, upon further review of evidence produced by Defendants, Plaintiff identifies Dr. Dill as receiving and using academic days not in accordance with the Departmental Academic/Administrative Time Policy. PSOF ¶¶ 43, 260-261.

57.     Plaintiff cannot identify any radiologist who received academic time who was not entitled to it under the policy. Ex. D, Desai Dep. at 308:8-12.

**Response**: Denied.  See Response No. 56, above. PSOF ¶¶ 43, 247, 260-261.

58.     Plaintiff did not have an administrative role that would qualify her for administrative time. Ex. D, Desai Dep. at 119:6-14.

**Response**: Denied. Plaintiff regularly served an administrative role on the Quality Improvement Committee and acted in an administrative/leadership capacity for a

significant amount of time in covering the entire Division of Cardiothoracic Imaging in the absence of Dr. Karin Dill, MD. PSOF ¶¶ 30, 32-34.

59.     Plaintiff believed that she should have been granted academic time based on being "grandfathered" and exempt from the policy based on her seniority. Ex. D, Desai Dep.at 120:7-11.

> **Response**:  Admitted that seniority did not entitle Plaintiff to academic days.  Plaintiff's status as a senior attending entitled her to exemption from weekend/holiday call responsibilities as defined by the Department's Call and/or Weekend/Holiday Coverage Policy. PSOF ¶ 15.

60.     Plaintiff cannot identify any other radiologist who Dr. Rosen granted an exception to the Academic and Administrative Time Policy based on seniority. Ex. D, Desai Dep. at 120:12-15.

> **Response**: Disputed as to the implication that the granting to Plaintiff of Academic and/or Administrative Time pursuant to the Academic and Administrative Time Policy would have required an exception. See Response No. 46, above. Admitted that Plaintiff is not aware the basis on which Dr. Rosen made exceptions to the Academic and Administrative Time Policy.

61.     The Academic and Administrative Time Policy does not contemplate any exception or grandfathering based on seniority. Ex. D, Desai Dep. at 120:16-22; Ex. J, Academic and Administrative Time Policy.

**Response**: Admitted.

D.    Call Time

62. All Medical Group radiologists are required to work "call" where they are scheduled to work certain weekends and holidays to ensure coverage for patients every day of the year. Ex. A, Rosen Aff. at ¶ 22.

**Response**: Disputed.  Under the Department's Call and/or Weekend/Holiday Coverage Policy, radiologists were exempt from "call" based on their status as a senior attending. PSOF ¶ 18.

63.    The Department has a policy which requires all regularly-employed staff members to provide "call" coverage on weekends and holidays. Ex. A, Rosen Aff. at ¶ 22; see also Call and/or Weekend/Holiday Coverage Policy, attached as **Exhibit N** to Wakefield Aff.

**Response**: Denied.  Under the Department's Call and/or Weekend/Holiday Coverage Policy, radiologists were exempt from "call" based on their status as a senior attending. PSOF ¶ 18.

64.    The requirements for call vary by division due to coverage needs, but the time commitment of the call coverage is substantially the same. Ex. C, Rosen Dep. at 192:13-193:21; Ex. A, Rosen Aff. at ¶ 22; Exhibit N.

**Response**: Disputed.  Call responsibilities for diagnostic radiologists are the same, regardless of the Division they are working in.  However, the time commitment of the call coverage varies by Division, and Plaintiff took more weekend call on an annual basis than other diagnostic radiologists. Desai Aff. ¶ .

27

65.     For members of the Chest Division, a radiologist must work one-fifth of weekends, or ten weekends per year, as well as a portion of holidays, which are scheduled in advance in an equitable manner among the radiologists working in the division. Ex. A, Rosen Aff. at ¶ 23.

> **Response**: Disputed.  Under the Department's Call and/or Weekend/Holiday Coverage Policy, radiologists were exempt from "call" based on their status as a senior attending. PSOF ¶ 18.

66.     Performing call is an essential and critical part of being a radiologist in the Department, and is required in order to provide timely and high-quality care to patients, as UMass Memorial is a tertiary-care referral center and level one trauma center which operates twenty four hours a day every day of the year. If a radiologist does not perform call, those responsibilities fall on other employees. Ex. A, Rosen Aff. at ¶ 24.

> **Response**: Disputed.  Under the Department's Call and/or Weekend/Holiday Coverage Policy, radiologists were exempt from "call" based on their status as a senior attending. PSOF ¶ 18.

67.     At one time, the Department implemented a program in which staff members could elect to "sell" calls, where other staff radiologists could perform additional call for additional compensation, and the radiologist not doing call would have their salary reduced by an equivalent amount. Ex. A, Rosen Aff. at ¶ 25.

> **Response**: Admitted.

28

68.     This policy was in place for two fiscal years, from October 1, 2015, to September 30, 2017. Ex. A, Rosen Aff. at ¶ 25.

**Response**: Admitted.


69.     Plaintiff elected to sell, and others in the department elected to "take" six out of her ten call weekends for these years, and during this period she performed substantially reduced call. Ex. A, Rosen Aff. at ¶ 26.

   **Response**: Admitted that Plaintiff was forced to "sell" call as a consequence of her status

   for "call" exemption as per the Call and/or Weekend/Holiday Coverage Policy not being

   honored by Dr. Rosen. PSOF ¶ 21.


70.     Plaintiff's salary was reduced accordingly during this time period due to her "sale" of her calls to other radiologists, in the amount of $19,200 per year. The rate that each call was valued was in accordance with the Department's per diem rates in effect at that time. Ex. A, Rosen Aff. at ¶ 26.

   **Response**: Admitted.


71.     At least one other radiologist in the Department also elected to sell their calls. Ex. A, Rosen Aff. at ¶ 27.

   **Response**: Admitted.

72.     The policy of selling calls was ended due to the administrative difficulties in managing the program, as well as the lack of staff members interested in taking additional calls. Ex. A, Rosen Aff. at ¶ 28.

**Response**: Plaintiff is without sufficient information or knowledge to be able to form this conclusion.


73.     It is common for staff radiologists to not want to take call. Ex. A, Rosen Aff. at ¶ 29.

**Response**: Plaintiff is without sufficient information or knowledge to be able to form general conclusions regarding the opinions of other radiologists in the Department.


74.     Plaintiff told Dr. Rosen that she should be absolved from calls because of the number of years she has worked in the Department. Ex. C, Rosen Dep. at 50:13-18; 227:19-228:1.

**Response**: Admitted that Plaintiff requested call exemption due to her status as a senior attending, as the Department's Call and/or Weekend/Holiday Coverage Policy exempted senior attendings from call. PSOF ¶ 18.


75.     Plaintiff believes that she should have been exempted from calls because of how many years she worked for the Department. Ex. D, Desai Dep. at 304:12-15.

**Response**: Admitted.


30

76.     While Dr. Rosen has been Chair, no radiologist of the Medical Group who does clinical work has been exempted from the call policy, except for those on per diem status. Ex. C, Rosen Dep. at 192:15.

**Response**: Denied.  Dr. Jerry Balikian was exempted from call per the Call and/or Weekend/Holiday Coverage Policy. PSOF ¶ 18.

77.     Plaintiff is not aware of any exception being made to the call policy. Ex. D, Desai Dep. at 305:20-23.

**Response**: Admitted that Plaintiff is not aware of an *exception* being made to the call policy; under the terms of the Call and/or Weekend/Holiday Coverage Policy, certain radiologists are entitled to call *exemptions*. See Call and/or Weekend/Holiday Coverage Policy, Exhibit U.

78.     The Medical Group employs physicians in part-time roles, in which their hours are reduced and their call obligations are proportionately reduced. Ex. A, Rosen Aff. at ¶ 30.

**Response**: Plaintiff is without sufficient information or knowledge to be able to form universal conclusions regarding all part-time employees at UMass.

79.     The Medical Group employs physicians in "per diem" status, in which the employees work on an hourly basis, and are not obligated to take call. Ex. A, Rosen Aff. at ¶ 31.

**Response**: Plaintiff is without sufficient information or knowledge to be able to form universal conclusions regarding all "per diem" employees at UMass.

80.     Because staff radiologists who are on per diem status are not obligated to take call, some radiologists have chosen to change their status to per diem in order to be relieved of that obligation. Ex. A, Rosen Aff. at ¶ 31.

> **Response**: Plaintiff is without sufficient information or knowledge to be able to form universal conclusions regarding the motivation of the radiologists who changed their status to per diem.

81.     Mona Korgaonkar, M.D., a female radiologist who is older than Plaintiff, requested to move to a part time schedule, which was granted by Dr. Rosen, and she subsequently requested that she not take calls, and she was offered and accepted the ability to change her status to per diem to be exempt from call responsibilities. Dr. Korgaonkar remains employed by the Medical Group. Ex. D, Desai Dep. at 225:20-228:15; Ex. A, Rosen Aff. at ¶ 32.

> **Response**: Plaintiff is without sufficient information or knowledge to be able to form a conclusion regarding the employment contract of Dr. Mona Korgaonkar, MD.
>
> **Responding Further**:  Dr. Rosen requested that Dr. Ferrucci consider a per diem arrangement. PSOF ¶ 55.

82.     In response to Plaintiff's request for reduced hours and to not take call, Dr. Rosen offered her the ability to change to part-time or per diem status. Ex. D, Desai Dep. at 123:7-18; 229:21-231:9; Ex. A, Rosen Aff. at ¶ 33.

> **Response**: Admitted that Plaintiff was provided with the option to change her employment status within the Department of Radiology to per diem or part-time, but denied that a change to per diem status was necessary, as under the terms of the

Department's Call and/or Weekend/Holiday Coverage Policy, senior attendings are

entitled to call exemptions. See Call and/or Weekend/Holiday Coverage Policy, at

Washienko Aff. at Ex U.

83.     Plaintiff declined to reduce her hours to part-time or elect per diem status. Ex. D,

Desai Dep. at 123:7-18; 229:21-231:9.

**Response**: Admitted.

84.     In October 2017, Dr. Rosen asked Dr. Ferrucci if he would consider speaking

with Plaintiff to share his experience moving from active to per diem status with the Medical

Group to assist Plaintiff with her decision. Ex. A, Rosen Aff. at ¶ 34.

**Response**: Admitted there is documentation that in October 2017, at Dr. Rosen's request,

Dr. Ferrucci spoke with Plaintiff about going per diem; disputed as to Dr. Rosen's

motivation as, contemporaneously, Dr. Rosen was seeking permission to hire a younger

replacement for Plaintiff.  PSOF ¶¶ 169-180.

85.     Dr. Rosen did not tell Dr. Ferrucci that he intended to terminate Plaintiff's

employment or to require her to move from active to per diem status. Ex. A, Rosen Aff. at ¶ 34.

**Response**: Disputed. Dr. Ferrucci's email response to Dr. Rosen regarding Dr. Rosen's

obligation as Chair to recruit younger employees occurred within eight days of Dr.

Rosen's communications with Michelle Streeter, Executive Vice President and Chief

Operating Officer of UMass Memorial Medical Group, Senior Vice President for Clinical

Strategies, UMass Memorial Health, in which he sought permission to hire as a

replacement for Plaintiff a fellowship-trained chest radiologist who would complete his

fellowship in 2018.  PSOF ¶¶ 169, 179.

86.    Dr. Rosen did not tell Dr. Ferrucci that he had an obligation to think about

recruiting younger staff for service needs, and he did not discuss the age or longevity of any staff

member, including Plaintiff, at any time, with Dr. Ferrucci. Ex. A, Rosen Aff. at ¶ 34.

**Response**:  This statement of fact is supported only by the deposition testimony of Dr.

Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v.*

*Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

**Responding further**: Disputed. Dr. Ferrucci's email to Dr. Rosen states that he informed

Plaintiff that Dr. Rosen had an obligation to recruit younger employees.  Dr. Rosen's

reply to Dr. Ferrucci did not indicate, to any extent, that he disagreed or refuted this

assertion, nor did he qualify, correct, or elaborate upon Dr. Ferrucci's representation to

Dr. Rosen. PSOF ¶ 180.

87.    At no time did Plaintiff state that she desired to be exempted from taking calls due

to her heart condition. Ex. C, Rosen Dep. at 50:13-24; Ex. A, Rosen Aff. at ¶ 35.

**Response**:  This statement of fact is supported only by the deposition testimony of Dr.

Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v.*

*Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

**Responding further**: Denied as to any implication that Dr. Rosen did not know or

should not reasonably have known that Plaintiff's requests to be exempted from taking

calls (and to have Academic Days and to have a home workstation) was due to her heart

condition. It was universally known amongst members of the Radiology Department that Plaintiff had a heart condition that flared up during periods of exhaustion, such as those associated with performing clinical duties for several days in a row in the absence of a break from that type of work, and Dr. Rosen admitted he was aware that Plaintiff had a pacemaker. See Rosen Depo. at 180:14, 182:13, Exhibit S to Washienko Aff.  See Deposition of Abhijit Roychowdhury, at 23:19-27:5, Exhibit LL to Washienko Aff.


88.     Plaintiff never requested an alteration to her call schedule due to a medical condition. Ex. C, Rosen Dep. at 112:16-113:11; Ex. A, Rosen Aff. at ¶ 35.

**Response**:  This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).

**Further responding**: Denied as to any implication that Dr. Rosen did not know or should not reasonably have known that Plaintiff's requests to be exempted from taking calls (and to have Academic Days and to have a home workstation) was due to her heart condition. It was universally known amongst members of the radiology Department that Plaintiff had a heart condition that flared up during periods of exhaustion, such as those associated with performing clinical duties for several days in a row in the absence of a break from that type of work, and Dr. Rosen admitted he was aware that Plaintiff had a pacemaker. See Rosen Depo. at 180:14, 182:13, Exhibit S to Washienko Aff.  See Deposition of Abhijit Roychowdhury, at 23:19-27:5, Exhibit LL to Washienko Aff.

89.     Dr. Rosen was not aware that Plaintiff desired to not take calls or reduce her call time due to her heart condition. Ex. C, Rosen Dep. at 110:1-5.

> **Response**:  This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).
>
> **Responding further:** Denied as to any implication that Dr. Rosen did not know or should not reasonably have known that Plaintiff's requests to be exempted from taking calls and/or reduce her call time (and to have Academic Days and to have a home workstation) was due to her heart condition. It was universally known amongst members of the Radiology Department that Plaintiff had a heart condition that flared up during periods of exhaustion, such as those associated with performing clinical duties for several days in a row in the absence of a break from that type of work, and Dr. Rosen admitted he was aware that Plaintiff had a pacemaker. See Rosen Depo. at 180:14, 182:13, Exhibit S to Washienko Aff.  See Deposition of Abhijit Roychowdhury, at 23:19-27:5, Exhibit LL to Washienko Aff.

90.     Dr. Rosen was not aware that Plaintiff had medical episodes more frequently when she worked many days in a row and was unable to rest for a day. Ex. C, Rosen Dep. at 109:18-24.

> **Response**: This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

**Responding further**: Disputed. It was universally known amongst members of the
Department of Radiology that Plaintiff suffered from a heart condition that was
exacerbated by periods of exhaustion such as those associated with performing clinical
service work several days in a row without the ability to remove herself from clinical
responsibilities.  See Rosen Depo. at 180:14, 182:13, Exhibit S to Washienko Aff.  See
Deposition of Abhijit Roychowdhury, at 23:19-27:5, Exhibit LL to Washienko Aff.

91.     Plaintiff believes it was too much for her to work 10 days in a row, Dr. Rosen
offered her the opportunity to not work 10 days in a row, and she turned it down. Ex. D, Desai
Dep. at 146:12-19.

**Response**: Admitted that performing clinical work for ten consecutive days in a row
would often lead to a flare up of Plaintiff's heart condition; admitted that Dr. Rosen
suggested Plaintiff go part time or per diem.  Dr. Rosen did not offer Plaintiff the ability
to not work 10 days in a row without changing her employment status from a full-time
employee to a part-time or per diem employee.   PSOF ¶¶ 10.

92.     Dr. Rosen was not aware that Plaintiff had medical episodes while at work due to
her heart condition, and Plaintiff never advised him of this. Ex. C, Rosen Dep. at 110:8-14.

**Response**: This statement of fact is supported only by the deposition testimony of Dr.
Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v.
Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

**Responding further**: Disputed. It was universally known amongst members of the
Department of Radiology that Plaintiff suffered from a heart condition and that flare-ups

of her condition often occurred at work. See Rosen Depo. at 180:14, 182:13, Exhibit S to

Washienko Aff.  See Deposition of Abhijit Roychowdhury, at 23:19-27:5, Exhibit LL to

Washienko Aff.

93.     On February 10, 2017, Dr. Ferrucci sent Dr. Rosen an E-mail advising him that he

encountered Plaintiff short of breath, that she had been ill that week, and that she was leaving

work to see her physician. Ex. C, Rosen Dep. at 177:22-178:14; see also E-mails between

M. Rosen and J. Ferrucci, February 10, 2017, attached as **Exhibit O** to Wakefield Aff.

**Response**: Admitted.

94.     Dr. Rosen did not have any reason to believe that this incident was related to a

heart condition or any disability that Plaintiff had. Ex. C, Rosen Dep. at 179:19-180:11.

**Response**: This statement of fact is supported only by the deposition testimony of Dr.

Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v.*

*Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

**Responding further**: Disputed. It was universally known amongst members of the

Department of Radiology that Plaintiff suffered from a heart condition/disability and that

flare-ups of her condition often occurred at work. See Rosen Depo. at 180:14, 182:13,

Exhibit S to Washienko Aff.  See Deposition of Abhijit Roychowdhury, at 23:19-27:5,

Exhibit LL to Washienko Aff.

95.     On February 10, 2017, Plaintiff left work and visited her primary care physician,

who diagnosed her with an upper respiratory illness likely viral in nature, which resulted in a

runny nose, fever, cough, and dyspnea on exertion. At this visit, neither Plaintiff nor her

physician identified her heart condition as being related in any way to the symptoms she was

experiencing. See Record of Primary Care Visit by C. Desai, February 10, 2017, attached as

**Exhibit P** to Wakefield Aff.

> **Response**: Admitted as to the first sentence. Denied as to the implication that Plaintiff's
>
> heart condition, well known to Dr. George Eypper, MD, Plaintiff's primary care
>
> physician, and is well documented in her medical records, did not play a contributory role
>
> as to the symptoms she was experiencing on February 10, 2017.  Denied as to any
>
> implication that Plaintiff's medical records reflecting that on February 10, 2017, she was
>
> diagnosed with an upper respiratory illness likely viral in nature means that Plaintiff is
>
> not a qualified disabled individual who was not entitled to a reasonable accommodation.

E.   Home Workstation

96.    The Department began to utilize remote workstations for staff radiologists to use

from home on a trial basis beginning in early 2017. Ex. C, Rosen Dep. at 233:10-23; Ex. A,

Rosen Aff. at ¶ 36.

> **Response**:  Disputed.  Plaintiff was granted a workstation in the early 2000s around the
>
> time that Plaintiff's heart condition was diagnosed and had a pacemaker implanted. She
>
> was provided a personal workstation and worked from home. PSOF ¶ 50. Plaintiff is
>
> without sufficient information or knowledge to verify specifically when in 2017 staff
>
> radiologists began using remote workstations but admits that the use of remote
>
> workstations did occur for certain radiologists in the Department. See UMM 04377-
>
> 04378; UMM 00707-00708.

97.     Only the following radiologists used home workstations in the initial year of the implementation: Andrew Chen, M.D., Karin Dill, M.D., and Philip Steeves, M.D. Ex. A, Rosen Aff. at ¶ 36.

**Response**:  Denied.  Dr. Schmidlin also used a home workstation 2017, as did Dr. Carolyn Dupuis.  PSOF ¶ 51.

98.     Dr. Steeves is five years older than Plaintiff. Ex. A, Rosen Aff. at ¶ 37.

**Response**: Admitted that Dr. Steeves is older than Plaintiff.

99.     Nine radiologists used home workstations from implementation until the date of Plaintiff's separation: Aly Abayazeed, M.D., Satish Dundamadappa, M.D., Carolyn Dupuis, M.D., David Choi, M.D., Andrew Chen, M.D., Karin Dill, M.D., Sami Erbay, M.D., Philip Steeves, M.D., and Eric Schmidlin, M.D. Ex. C, Rosen Dep. at 233:10-23; Ex. A, Rosen Aff. at ¶ 38.

**Response**:  Plaintiff is without sufficient information or knowledge to verify whether each of the above-named radiologists used home workstations from implementation until the date of Plaintiff's separation.  See also Response No. 97, above.

100.    Dr. Abayazeed, Dr. Dundamadappa, Dr. Choi, Dr. Chen, and Dr. Erbay specialized in neuroradiology and were among the first to test and use home workstations due to the unique scheduling in neuroradiology where radiologists would rotate working routine evening shifts. Ex. C, Rosen Dep. at 233:10-23; Ex. A, Rosen Aff. at ¶ 39.

**Response**:  Plaintiff is without sufficient information or knowledge to verify whether each of the above-named radiologists were among the first to test and use home workstations or whether these individuals were granted personal workstations for the above stated purpose.

101.    Dr. Dill had a home workstation for a short period of time as a trial to see whether it would be helpful for her to be able to read cardiac studies on an emergency basis, but due to technical challenges, the use was discontinued. Ex. C, Rosen Dep. at 234:2-235:9.

**Response**:  Admitted that Dr. Dill had a home workstation. Plaintiff is without sufficient information or knowledge to verify that Dr. Dill had a home workstation for a short period of time, and whether or not its use was discontinued.  Disputed as to the stated purpose.

102.    Dr. Schmidlin had a home workstation for a period of time when he worked as a per diem employee, so that he could continue to assist the department to fulfill service needs on a part-time basis after he left full-time employment. The primary need for him to have a home workstation was in order to be available to read cardiac MRIs. Ex. C, Rosen Dep. at 163:17-164:20.

**Response**:  Admitted that Dr. Schmidlin worked remotely as a per diem employee but disputed that the reason that he was granted a personal workstation was for the above stated purpose. This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

103.    Plaintiff did not perform cardiac imaging or read cardiac MRIs. Ex. D, Desai Dep. at 420:14-16.

**Response**: Admitted that Plaintiff did not perform cardiac imaging or read cardiac MRIs, but disputed as to the implication that workstations were granted only to radiologists who performed cardiac imaging or read cardiac MRIs.  Dr. Schmidlin and Dr. Dill had hme workstations and performed cardiac imaging and/or read cardiac MRIs, but Defendants issued to nine radiologists home workstations. PSOF ¶ 51.

104.    On June 14, 2017, a meeting of the Chest Division was held in which home workstations were discussed. At this meeting, Plaintiff voiced a desire to have a home workstation so that during times of inclement weather, she can read from home. See Minutes from Chest Division Meeting, June 14, 2017, attached as **Exhibit Q** to Wakefield Aff.

**Response**: Admitted to the extent that Plaintiff desired to receive a personal workstation to be able to read images from home in times of inclement weather in order to avoid driving at all, if possible, but especially to avoid driving under risky, hazardous circumstances, as advised by her physician due to the symptoms she experiences as a result of her heart condition. Furthermore, Plaintiff also requested a remote personal workstation to take "call" from home on the weekends.

105.    No staff member was permitted to take call remotely through the use of a home workstation or otherwise during the time Plaintiff was employed. Ex. A, Rosen Aff. at ¶ 40.

**Response**: Denied.  Drs. Dill, Steeves and Schmidlin took call remotely through the use of a home workstation or otherwise during the time Plaintiff was employed.  PSOF ¶¶ 22, 57. ("For services provided remotely, the Medical Group will provide the workstation (PAC station i.e. 4 monitors and the computer) and the dictation system. Physician will be responsible for maintaining the internet connection and for bringing the workstation to the Medical Group for verification and/or repairs, as needed.").  In addition, Plaintiff was permitted to take call and work from home in the early 2000s around the time that Plaintiff's heart condition was diagnosed and she was given a pacemaker. PSOF ¶¶ 22, 57.

106.    Plaintiff asked Dr. Rosen if she could have a home workstation on one occasion so that she could take call at home because she gets tired. Ex. D, Desai Dep. at 222:9-223:22.

**Response**: Admitted to the extent that Plaintiff recalls one specific instance that she asked Dr. Rosen that she be given a personal home workstation; disputed to the extent this implies that Plaintiff asked Dr. Rosen only one time.  The purpose of Plaintiff's request was to take call from home because of fatigue exacerbated her medical condition/disability and caused her to have more frequent spells.  PSOF ¶ 5-7. Of note, Plaintiff should have been exempt from call, as explicitly stated in the Call and/or Weekend/Holiday Coverage Policy.  Exhibit U to Washienko Aff.

107.    Plaintiff did not mention her heart condition as the reason she got tired or desired a home workstation, in this meeting or at any other time. Ex. D, Desai Dep. at 222:9-223:22.

**Response**: Denied. Plaintiff's fatigue caused her heart condition to flare and her to have episodes in which she would suffer altered consciousness and generalized weakness without loss of consciousness.  UMM 00360-00361.  Also denied as to any implication that Dr. Rosen did not know or should not reasonably have known that Plaintiff's requests for a home workstation (and to have Academic Days and to be relieved of call obligations) was due to her heart condition. It was universally known amongst members of the radiology Department that Plaintiff had a heart condition that flared up during periods of exhaustion, such as those associated with performing clinical duties for several days in a row in the absence of a break from that type of work, and Dr. Rosen admitted he was aware that Plaintiff had a pacemaker. See Rosen Depo. at 180:14, 182:13, Exhibit S to Washienko Aff.  See Deposition of Abhijit Roychowdhury, at 23:19-27:5, Exhibit LL to Washienko Aff.

108.    In response, Dr. Rosen offered her the opportunity to go part-time or per diem ("locum"). Ex. D, Desai Dep. at 224:3-13.

**Response**: Admitted.

109.    Plaintiff never told Dr. Rosen or the Medical Group that she was not capable of performing the essential functions of her job without the use of a home workstation. Ex. D, Desai Dep. at 145:20-146:4.

**Response**: Admitted that Plaintiff never stated that she was not capable of performing the without the use of a personal home workstation. Denied as to any implication that

Plaintiff is not a qualified disabled individual who was not entitled to a reasonable accommodation.

110.   Plaintiff never submitted medical documentation regarding a need for a home workstation or to otherwise work at home. Ex. D, Desai Dep. at 359:11-360:2.

**Response**:  Denied as to the relevance of this statement of fact. Employers may request medical documentation when a disability and/or need for accommodation is not known or obvious but are not required to do so to provide an accommodation. Plaintiff's need for an accommodation was known and obvious: she had had a pacemaker implanted at the Medical Center after a serious heart incident at the Medical Center, she regularly (but unpredictably) suffered heart episodes at work; her condition was universally known in the workplace. PSOF ¶¶ 3-6; See Deposition of Abhijit Roychowdhury, at 23:19-27:5, Exhibit LL to Washienko Aff..

**Responding further**: Denied. Plaintiff also submitted medical paperwork in support of her request for FMLA leave.

F.   Quality Assurance

111.    The Department has a quality assurance system designed to improve the quality of radiology services. Ex. A, Rosen Aff. at ¶ 41.

**Response**: Admitted.

112.   Prior to 2019, the quality assurance system was based, in part, on a peer review system, where other radiologists within the Department would review each other's reads. Ex. A, Rosen Aff. at ¶ 41.

**Response**: Admitted, although Dr. Dill read her own cases as well. She reported three of

her own cases as errors. PSOF ¶ 97.

113.    In this system, all radiologists in the Department were asked to enter information

into the quality assurance system in two circumstances: (1) through an automated process that

requests that a certain number of cases be double-read periodically by each radiologist on staff;

and (2) when a radiologist is made aware of a quality issue about an interpretation, the

radiologist was obligated to enter that information into the peer review privileged database.

Ex. C, Rosen Dep. at 224:8-225:6; Ex. A, Rosen Aff. at ¶ 42.

> **Response**: Admitted that this was the Departmental Protocol, although certain
>
> radiologists used the peer review system more frequently than others.

114.    When radiologists reviewed the studies, they would input a numerical score as to

their review, with scores denoting the following: a "1" indicated the reviewer concurred with the

reviewee's radiological interpretation; a "2" indicated the reviewer identified a discrepancy in

interpretation/not ordinarily expected to be made, but which was denoted as an "understandable

miss;" a "3" indicated the reviewer identified a discrepancy in the reviewee's interpretation and

that the discrepancy should have been caught by the radiologist "most of the time;" and a "4"

indicated the reviewer noted a discrepancy in interpretation that represented a "misinterpretation

of findings" and that should be identified "almost every time." Ex. A, Rosen Aff. at ¶ 43.

> **Response**: Admitted that this was the scoring system in place to rate *another*
>
> radiologist's interpretation; denied as to any implication that the reviewer's opinion is
>
> indeed an accurate assessment of the radiologist's work that is being reviewed.

Defendant's expert testified there is an inherent interobserver variability associated with this method. Deposition of Ella Kazerooni, M.D., ("Kazerooni Dep.") at 164:15 – 166:7, attached as Exhibit OOO to Washienko Aff. Furthermore, further review of information produced by Defendants' during discovery indicates that Peer Reviewers sometimes reviewed their own reads, and sometimes falsely attributed their own misreads. PSOF ¶¶ 102-103. Moreover, Defendants admit this system was in place to serve as a general quality improvement tool for all radiologists in the Department rather than as means to assess a particular radiologist's work quality. Rosen Aff. at ¶¶ 41, 44 attached as Exhibit C to Washienko Aff.

115.    At their annual faculty reviews, Dr. Rosen provided staff radiologists with information from the quality assurance database regarding peer review reads labelled with scores of either "3" or "4." Dr. Rosen would advise the radiology staff members of these entries and ask the staff member to review the cases if they had not already done so, as a part of the quality improvement process. Rosen Dep. at 153:9-13; Rosen Aff. at ¶ 44.

**Response**: Admitted.

116.    Plaintiff was provided with such a summary from the quality assurance system during her 2016-2017 annual faculty review, which was conducted by Dr. Rosen. Ex. A, Rosen Aff. at ¶ 45; Ex. C, Rosen Dep. at 224:2-07.

Response: Admitted that Dr. Rosen provided Plaintiff a confidential peer review summary conducted by Dr. Dill. Dr. Dill had entered Plaintiff's cases into the system that was used to generate the Confidential Peer Review Summary that Dr. Rosen gave to

Plaintiff for her review during Plaintiff's 2016-2017 annual faculty review.  The confidentiality was intended for Plaintiff, as it was a summary indicated alleged level 3 and 4 misreads as defined by the scoring system described above. PSOF ¶ 92.

117.    Plaintiff speculated during testimony she believes that Dr. Dill produced the Peer Review Summary, and Plaintiff admitted she has "no idea" how she obtained the Peer Review Summary, but believes she found it when cleaning her office. Ex. D, Desai Dep. at 322:3-323:2; 325:17-24.

> **Response**: Admitted as to the above cited speculation.  Nevertheless, deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). Further review of the documents provided by Defendants in discovery, however, reveals that Dr. Rosen generated the Confidential Peer Review Summary (allegedly comprised of cases of Plaintiff that Dr. Dill reviewed) that he then distributed to Plaintiff. PSOF ¶ 91; Exhibit UU.

118.    Plaintiff does not know whether the Peer Review Summary or the information within is related to discrimination. Ex. D, Desai Dep. at 325:17-24.

**Response**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").

**Responding further:** Denied as to the implication that Plaintiff was not discriminated against. Further review of the information produced by Defendants in discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's work were not legitimate and also knew that her work quality was not worse than that of her peers. PSOF ¶¶ 68, 95, 109-110, 173.

G.    Division Chief Hiring

119.    Karin Dill, M.D., was hired as a radiologist and the Division Chief of the Thoracic Division on February 29, 2016. Ex. A, Rosen Aff. at ¶ 46.

**Response**: Admitted.

120.    The Division Chief position was publicly posted and the Department conducted recruiting efforts to fill the position. Ex. A, Rosen Aff. at ¶ 46.

**Response**: Plaintiff is without sufficient information or knowledge as to the public posting of the Division Chief position. Plaintiff also without sufficient information or knowledge as to how the Division Chief recruitment was performed.

121.    Plaintiff did not apply for or express interest in the position of Division Chief of the Thoracic Division. Ex. D, Desai Dep. at 155:4-7; Ex. A, Rosen Aff. at ¶ 46.

> **Response**: Disputed.  Plaintiff did not apply or express interest in the position of Division Chief because prior practice within the Department was that the most senior remaining radiologist was asked to replace the departing Chief of a Division. Dr. Rosen deviated from this practice when he did not ask Dr. Desai if she was interested in the role. Desai Dep. at 237:5-7, attached as Exhibit R to Washienko Aff.

122.    Dr. Dill was more qualified than Plaintiff to be Division Chief, based on her education, training, professional involvement, research, qualifications, and experience. Ex. A, Rosen Aff. at ¶ 46.

> **Response**: Denied. Plaintiff had significantly more years of experience as an attending thoracic radiologist than did Dr. Dill.  UMM 28187 (Dill CV) and CD00042-00045 (Desai CV). In addition, Plaintiff's years of experience in Thoracic Radiology far surpassed that of Dr. Dill and any other radiologist working in that Division following Dr. Jerry Balikian's departure. In the field of Radiology, it is common practice that physicians with the most experience customarily serve as Division Chiefs. Under Dr. Rosen, the practice was contrary, in that those with minimal or no attending experience were selected to serve as Division Chiefs.  PSOF ¶¶ 60, 225, 226.

123.    Plaintiff does not believe her qualifications are superior to those of Dr. Dill to be the Division Chief. Ex. D, Desai Dep. at 157:12-15.

**Response**: Disputed. Plaintiff expressed that Dr. Dill was qualified to perform duties as a staff radiologist in the Division of Cardiothoracic Imaging, not that Dr. Dill was more qualified to serve as Division Chief. Plaintiff's years of experience in Thoracic Radiology far surpassed that of any radiologist working in that Division following Dr. Jerry Balikian's departure. Desai CV, Exhibit B to Washienko Aff.

124.    Plaintiff does not allege that she should have been given the position of Division Chief. Ex. D, Desai Dep. at 157:12-18.

**Response**: Disputed.  In accord with prior practice, Dr. Desai should have been offered the position of Division Chief, as she was the most senior radiologist in the Division after the departure of Dr. Balikian. Desai CV, Exhibit B to Washienko Aff.

125.    Plaintiff claims that she should have been asked if she wanted the Division Chief position as a "common courtesy," and because she believes a staff member who is senior should be asked "automatically." Ex. D, Desai Dep. at 155:4-10; 157:12-18; 169:16-24.

Response: Disputed. It was customary practice in the Department of Radiology, prior to Dr. Rosen's arrival, that the most senior attending of a Division be asked to assume the leadership of the specific division in the role of Division Chief. Desai Dep. at 237:5-7, at Exhibit R to Washienko Aff.

H.    Independent Review

126.    Dr. Rosen received complaints about the quality of Plaintiff's CT reads from Dr. Dill, and Dr. Dill advised him that concerns about Plaintiff's reads had been brought to her by treating physicians. Ex. C, Rosen Dep. at 53:23-54:3; 153:14-20.

**Response**: Admitted.

127.    As the Division Chief, Dr. Dill was responsible for the quality of the Chest Division. Ex. C, Rosen Dep. at 54:18-55:1; 88:10-12.

> **Response**: Admitted to the extent that the Division Chief was supposed to be responsible for the quality of the Chest Division.  However, Dr. Dill was physically absent from the Department for significant periods of time throughout the course of her employment at UMass Medical Center. PSOF ¶¶ 69, 225 and Exhibit OO to Washienko Aff. ("there is a chronic problem in our chest division with certain CTs unread for a week or weeks at a time.").

128.    Dr. Dill told Dr. Rosen that treating physicians would ask her to re-read or review studies that Plaintiff had interpreted. Ex. C, Rosen Dep. at 54:18-55:1; 153:14-20.

> Response: Plaintiff is without sufficient information or knowledge to know what, specifically, Dr. Dill told Dr. Rosen. Disputed as to the significance of any such request, however, as it was common practice for clinicians to ask for re-reads of cases from radiologists. PSOF ¶ 75. See also UMASS Memorial Medical Center MCAD Second Position Statement, Part A, page 2, paragraph 4, Line 1-2, Exhibit XX to Washienko Aff.

129.    Kimberly Robinson, M.D., was a pulmonologist (specializing in the respiratory system) who treated patients at Marlborough Hospital, and for a period served as President of the Medical Staff for Marlborough Hospital. Ex. A, Rosen Aff. at ¶ 48.

**Response**: Admitted that Kimberly Robinson was a pulmonologist employed at Marlborough Hospital, served as the President of the Medical Staff for Marlborough Hospital, and treated patients at Marlborough Hospital.

130.    Dr. Robinson expressed concerns to Dr. Rosen regarding the quality of Plaintiff's CT interpretations. Ex. C, Rosen Dep. at 53:23-54:3; 55:2-11; 152:18-153:3.

**Response**: Admitted that Dr. Robinson expressed concerns about several radiologists in the Department.  However, Plaintiff is without sufficient information or knowledge as to whether Dr. Robinson expressed concerns about the quality of Plaintiff's CT interpretations directly with Dr. Rosen.

131.    Radiology, like other diagnostic medical work, can involve a degree of probability and subjectivity, and concerns or disagreements can be raised by treating physicians at times. Ex. A, Rosen Aff. at ¶ 49.

**Response**: Admitted.

132.    Treating physicians have raised concerns to Dr. Rosen with individual reads or quality issues from time to time. Dr. Rosen evaluated quality concerns raised to him and took appropriate action based on the individual circumstances. Ex. A, Rosen Aff. at ¶ 49.

**Response**: This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

**Responding further**: Denied that Dr. Rosen took appropriate action based on the individual circumstances.  Admitted that treating physicians raised concerns to Dr. Rosen.

133.    Dr. Rosen evaluated quality concerns whenever they were raised to him by Dr. Robinson. Ex. C, Rosen Dep. at 139:8-20; Ex. A, Rosen Aff. at ¶ 49.

**Response**: This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

**Responding further**: Plaintiff is without sufficient information or knowledge to form a conclusion as to whether Dr. Rosen evaluated quality concerns whenever they were raised to him by Dr. Robinson.

134.    Marlborough Hospital officials had concerns regarding radiology services for the chest specialty. Ex. C, Rosen Dep. at 143:2-8.

**Response**: Disputed.  Drs. Robinson, Brennan, Tennyson, Rosen, Mr. Steve Roach and Mr. Douglas Brown attended a meeting at which radiology services for the chest specialty were discussed, but it is not clear which of them had concerns regarding radiology services for the chest specialty. Disputed to the extent this statement implies Marlborough Hospital officials did not also have concerns regarding radiology services for other specialties.  PSOF ¶ 109.

135.     On January 3, 2018, Dr. Robinson expressed concerns specifically about reads by Plaintiff, Dr. Joseph Ferrucci, Dr. Hao Lo, Dr. Girish Tyagi, and Dr. David Bindman. Dr. Robinson also identified the lack of specialty reads for chest radiology as an issue. Ex. C, Rosen Dep. at 321:2-322:3; see also E-mails initiated from K. Robinson, January 3, 2018, attached as **Exhibit S** to Wakefield Aff.

**Response**: Admitted.

136.     Dr. Rosen evaluated the concerns regarding the physicians Dr. Robinson expressed concerns about, including Dr. Ferrucci, Dr. Lo, Dr. Tyagi, and Dr. Bindman. Ex. C, Rosen Dep. at 322:4-323:6.

**Response**: Denied. This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

137.     None of these physicians specialized in chest radiology. Ex. A, Rosen Aff. at ¶ 50.

**Response**: Disputed. Although none of these physicians were fellowship trained in thoracic radiology, Dr. Ferrucci, in his capacity as a staff radiologist, routinely interpreted films in the Division of Cardiothoracic Imaging.  Furthermore, physicians taking "call" routinely interpreted chest radiology films as part of their call responsibilities.  PSOF ¶ 215.

138.    Dr. Ferrucci is 12 years older than Plaintiff, Dr. Tyagi is less than 2 years younger than Plaintiff, and Dr. Bindman is 60 years old. Ex. A, Rosen Aff. at ¶ 50.

**Response**: Admitted.

139.    In response to Dr. Robinson's concerns regarding Dr. Tyagi's chest CT reads, Dr. Rosen had Dr. Tyagi stop performing reads of chest CT images. He did not specialize in chest, and was able to focus on his area of specialty. Ex. C, Rosen Dep. at 322:4-13.

> **Response**: This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

> **Responding further**: Disputed. Defendants produced no documents evidencing Dr. Rosen's order to Dr. Tyagi to stop interpreting chest CT scans, nor any evidence in Dr. Tyagi's personnel or Department file that such an event occurred.  Admitted that Dr. Tyagi did not specialize in thoracic radiology.

140.    Dr. Rosen was aware that several of Plaintiff's cases were entered in the Department's quality assurance database labelled as potentially significant misses, based on his distribution of data from the quality assurance system to Plaintiff as a part of her 2016-2017 annual review. Ex. C, Rosen Dep. at 152:18-153:13; Ex. A, Rosen Aff. at ¶ 51.

> **Response**: This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

**Responding further**: Further review of the documents produced by Defendants evidence that Dr. Dill entered several of what she believed to be Plaintiff's cases into the Department's quality assurance database labelled as potentially significant misses.  PSOF ¶ 97. However, a case attributed to Plaintiff by Dr. Dill was not a case that the Plaintiff had interpreted.  On at least one occasion, Dr. Dill had inaccurately attributed to Plaintiff a significant error of a case that she interpreted. PSOF ¶ 102.

141.    On January 31, 2017, Dr. Rosen met with representatives from Marlborough Hospital and its medical staff regarding radiology issues at the Hospital. This meeting included the President of the Marlborough Hospital Medical Staff and pulmonologist Kimberly Robinson, M.D., and the President of Marlborough Hospital, Steven Roach. Rosen Aff. at ¶ 52; see also E-mail from M. Rosen regarding Meeting Minutes, February 8, 2017, attached as **Exhibit T** to Wakefield Aff.

**Response**: Admitted.

142.    A significant concern addressed at the meeting was the quality of chest imaging. Ex. A, Rosen Aff. at ¶ 53.

Response: Plaintiff is without sufficient information or knowledge to be able to determine the exact nature of the conversations that occurred regarding chest imaging, but admitted that meeting minutes indicate that a topic of discussion was chest imaging.

143.    At the time, there were three radiologists specializing in chest in the Medical Group's Chest Division, Karin Dill, M.D., Eric Schmidlin, M.D., and Plaintiff. Ex. A, Rosen Aff. at ¶ 53.

**Response**: Admitted.

144.    No concerns were raised at the meeting related to the reads of Dr. Dill or Dr. Schmidlin. Ex. A, Rosen Aff. at ¶ 53.

**Response**: Plaintiff is without sufficient information or knowledge to be able to determine the exact nature of the conversations that occurred at this meeting or issues raised regarding specific radiologists.

145.    At this meeting, Dr. Robinson expressed serious concerns with the quality of CT reads performed by Plaintiff. Dr. Robinson stated to Dr. Rosen that she never believed Plaintiff's reports and could not rely on them. Ex. C, Rosen Dep. at 55:2-11; Ex. A, Rosen Aff. at ¶ 54; Exhibit T.

**Response**: This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).

**Responding further**: Plaintiff is without sufficient information or knowledge to be able to determine the exact nature of the conversations that occurred at this meeting or issues raised regarding specific radiologists, including Plaintiff.

146.     In response, Dr. Rosen agreed that he would conduct a focused review of Plaintiff's CT reads. Ex. A, Rosen Aff. at ¶ 55; Exhibit T.

> **Response**: This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).

> **Further responding**: Disputed. Plaintiff is not identified as the physician in question and therefore Exhibit T does not support Defendants' proposition.

147.     Dr. Rosen additionally agreed that Dr. Dill and Dr. Schmidlin would read all high resolution chest CTs, and that Dr. Schmidlin would use a home workstation since he had recently moved to per diem status, with a full-time position at another institution. Ex. C, Rosen Dep. at 163:17-166:2; Exhibit T.

> **Response**: Admitted.

148.     Dr. Rosen believed that he had to address the concerns raised to him in the interests of patient safety and the Department's obligations to provide high quality services to patients and providers. Ex. A, Rosen Aff. at ¶ 55.

> **Response**: Plaintiff is without sufficient information or knowledge of Dr. Rosen's beliefs to respond to this statement of fact.

149.     To ensure fairness and to confirm that the quality concerns were justified prior to taking further action, Dr. Rosen opted to have an independent, blinded review of Plaintiff's CT reads conducted. Ex. A, Rosen Aff. at ¶ 56.

**Response**:  This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).

**Further responding**: Disputed as to Dr. Rosen's motivation, disputed that Dr. Rosen intended to ensure fairness and to confirm that quality concerns were justified prior to taking further action. Dr. Rosen did not elect to conduct a review of complaints into younger and/or male and/or non-disabled radiologists, PSOF ¶¶ 203-214, nor did he conduct a review similar to the reviews conducted by the Department when issues were raised regarding the performance of other radiologists.  PSOF ¶ 118.


150.    Dr. Rosen did not choose to arrange an independent review of Plaintiff's reads based on isolated concerns regarding a read or a request to re-review a study read by Plaintiff. Dr. Rosen did not make the decision to do so based on one or two misreads by Plaintiff. Ex. A, Rosen Aff. at ¶ 57.

**Response**: This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).

**Further responding**: Plaintiff is without sufficient information or knowledge to be able to determine the extent of concerns regarding other radiologist's quality that were brought to Dr. Rosen's attention.  Plaintiff is without sufficient information or knowledge to determine exactly how many, if any, misreads, were brought directly to his attention (outside of the QA system which is a performance improvement mechanism system used

for all radiologists not limited to Plaintiff) prior to his decision to conduct the
independent review.

151.    Dr. Rosen made the decision to perform an independent review based on reports
of quality concerns from Dr. Dill, his awareness of errors in the peer review system, and the
complaints from Dr. Robinson, in particular her comments at the January 31, 2017, meeting.
Ex. A, Rosen Aff. at ¶ 58.

> **Response**: Admitted Dr. Rosen stated this in his Affidavit, but denied as to the veracity
> of his statement, as Defendants' MCAD Position Statements contradict this statement.
> Exhibits MM and XX to Washienko Aff.

152.    Following Dr. Robinson's complaints regarding Plaintiff at the January 31, 2017
meeting, Dr. Rosen began making arrangements to have an outside independent review
conducted. Ex. C, Rosen Dep. at 154:1-19; 166:5-12; see also E-mails between K. Green and
M. Rosen, February 1, 2017, attached as **Exhibit U** to Wakefield Aff.

> **Response**: Admitted to the extent that on February 1, 2017, Dr. Rosen asked the file
> room staff to begin gathering chest CT scan images interpreted by Plaintiff for inclusion
> in the independent review.

153.    Dr. Rosen requested that the Department's file room staff randomly select 25
chest CT studies reviewed by Plaintiff and, as a control group, 25 chest CT studies reviewed by
other radiologists. Ex. C, Rosen Dep. at 154:20-155:12; 166:5-12; Ex. A, Rosen Aff. at ¶ 60.

> **Response**: Admitted.

154.     The studies included in the review were selected randomly, and Dr. Rosen was not involved in selecting the studies. Ex. C, Rosen Dep. at 155:16-18; Ex. A, Rosen Aff. at ¶ 60.

**Response**: Plaintiff is without sufficient information or knowledge to be able to determine the extent to which Dr. Rosen was involved in selecting studies for review and whether they were selected randomly.

155.     These studies, comprised of images and radiologist reports, were de-identified so that the patient information and identity of the reading radiologist were removed. Ex. C, Rosen Dep. at 158:6-18.

**Response**: Admitted.

156.     Each study was assigned an identification number so the reports could be linked with the images. Ex. C, Rosen Dep. at 158:6-18.

**Response**: Admitted.

157.     The CT studies selected for inclusion in the review were thoracic/chest studies, but the studies were not limited to those read by radiologists specializing in chest imaging. Ex. C, Rosen Dep. at 156:12-158:5; Ex. A, Rosen Aff. at ¶ 61.

**Response**: Admitted that the studies were not limited to those read by radiologists specializing in chest imaging. Dr. Rosen's testimony about this is contradictory, however. Dr. Rosen testified that he intended to omit from the control group studies interpreted by Dr. Dill or Schmidlin because he wanted to compare Dr. Desai to nonthoracic

radiologists, Rosen Dep. at 156:1-156:17, 317:20-317:23; then testified that he was

"under the impression" that he excluded CT studies interpreted by radiologists

specializing in chest imaging, Rosen Dep. at 156:9- 156:11; but then testified that seven

the twenty-five studies selected for inclusion in the control group were, in fact,

interpreted by a radiologist specializing in thoracic imaging and Division Chief of

Cardiothoracic Imaging at the time, Dr. Karin Dill.  Rosen Aff. at ¶ 61, attached as

Exhibit C to Washienko Aff.


158.    Dr. Rosen elected to compare Plaintiff's reads to those of radiologists not

necessarily specializing in chest in order to give Plaintiff the benefit of the doubt and, thereby,

implement a lower standard of comparison. Ex. C, Rosen Dep. at 156:12-158:5.

**Response**: Denied.  Seven of the 25 reads included in the control group were interpreted

by a radiologist specializing in chest radiology and Division Chief of Cardiothoracic

Imaging at the time, Dr. Karin Dill. Exhibit A from Defendant, Max Rosen, MD's

Answer to Plaintiff's Second Set of Interrogatories.


159.    Eighteen out of the 25 control group studies were read by radiologists who did not

specialize in chest imaging. Ex. A, Rosen Aff. at ¶ 61.

**Response**: Disputed. Eighteen out of the 25 control group studies were read by thoracic

radiologists who were not fellowship trained, but some or all of these radiologists

interpreted thoracic radiology films as part of their call responsibilities.  Rosen Dep. at

317:14-318:9, attached as Exhibit S to Washienko Aff.

160.    Dr. Rosen selected Diana Litmanovich, M.D. to conduct the independent review. Ex. A, Rosen Aff. at ¶ 62.

**Response**: Admitted. Dr. Rosen had previously worked with Dr. Litmanovich at Beth Israel Deaconess Medical Center and knew Dr. Litmanovich prior to hiring her to conduct the independent review of Plaintiff. PSOF ¶ 120.

161.    Dr. Litmanovich was a thoracic radiologist at Beth Israel Deaconess Medical Center and was a faculty member of Harvard Medical School. Ex. A, Rosen Aff. at ¶ 62.

**Response**: Admitted.

162.    Dr. Litmanovich was not employed by the Medical Group or affiliated with the UMass Memorial Health system. Ex. A, Rosen Aff. at ¶ 62.

**Response**: Admitted.

163.    Dr. Rosen believed Dr. Litmanovich to be an expert in the interpretation of thoracic CT images. Ex. A, Rosen Aff. at ¶ 62.

**Response**:  Plaintiff is without sufficient knowledge or information to be able to form conclusions regarding Dr. Rosen's beliefs about Dr. Litmanovich.

164.    Dr. Rosen selected Dr. Litmanovich to conduct the review because she had a reputation of being a good thoracic radiologist, and he knew that she was well-respected and competent. Ex. C, Rosen Dep. at 159:10-21.

**Response**:  Plaintiff is without sufficient knowledge or information to be able to form conclusions regarding the reputation of Dr. Litmanovich.


165.    Dr. Rosen provided Dr. Litmanovich with the CT images for the fifty studies, as well as the de-identified report for each of studies. Ex. C, Rosen Dep. at 158:20-159:9.

**Response**: Admitted.


166.    Dr. Rosen requested that Dr. Litmanovich review the images for each CT study and the corresponding report and provide her opinion whether she agreed or disagreed with the interpretation, and if she disagreed, to indicate whether it was a minor or major disagreement and whether or not the disagreement would have an impact on patient care in her opinion. Ex. C, Rosen Dep. at 158:20-159:9; Ex. A, Rosen Aff. at ¶ 63.

**Response**: Admitted.


167.    The Medical Group engaged Dr. Litmanovich and compensated her for her review. See Agreement to Review Radiology Scans, attached as **Exhibit V** to Wakefield Aff.

**Response**: Admitted.


168.    Dr. Litmanovich provided her findings to Dr. Rosen, who un-blinded them through reference to their identifying numbers. Ex. A, Rosen Aff. at ¶ 64.

**Response**: Admitted.

169.    Based on her findings, Dr. Litmanovich concluded that of the reads conducted by Plaintiff, there were five major errors and nine errors she opined would impact patient care. Ex. A, Rosen Aff. at ¶ 64.

> **Response**: Admitted to the extent that these conclusions must be inferred from Dr. Litmanovich's findings, as she did not have access to which radiologist interpreted which radiographs when providing a description of her findings to Dr. Rosen.

170.    Based on her findings, Dr. Litmanovich concluded that of the reads conducted by other radiologists, there was one major error and five errors she opined would impact patient care. Ex. A, Rosen Aff. at ¶ 64.

> **Response**: Admitted to the extent that these conclusions must be inferred from Dr. Litmanovich's findings, as she did not have access to which radiologist interpreted which radiographs when providing a description of her findings to Dr. Rosen on December 25, 2017.

171.    As a result of Dr. Rosen's assessment of the results of the independent review, he determined that Plaintiff's quality was not acceptable for the Department, and he made the decision that Plaintiff could not continue to work in the Department in order to ensure patient safety and provide high quality services to patients. Ex. A, Rosen Aff. at ¶ 65.

> **Response**:  This statement of fact is supported only by the Affidavit of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

**Further responding**: Denied as to the veracity of his assertion and denied that the results of the independent review should have led Dr. Rosen to form the above stated conclusions regarding Plaintiff's quality.

172.     As Chair, Dr. Rosen is responsible for the performance of Medical Group physicians in the Radiology Department. Ex. A, Rosen Aff. at ¶ 6.

**Response**: Admitted.

173.     Plaintiff admits that, in his role, Dr. Rosen has an obligation to ensure patient safety, and has an obligation to ensure the quality of radiological reads by the radiologists in the Department, including Plaintiff. Ex. D, Desai Dep. at 74:11-75:8.

**Response**: Admitted that in his role, Dr. Rosen has an obligation to ensure patient safety and the quality of radiological reads by the radiologists in the Department, including Plaintiff.  Plaintiff denies that Dr. Rosen fulfilled his obligation. PSOF ¶¶ 68, 95, 109-110.

174.     Plaintiff admits that the independent expert determined that she had quality problems. Ex. D, Desai Dep. at 94:15-24.

**Response**:  In her deposition, Plaintiff stated that the conclusions of the expert were that Plaintiff had quality problems. Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling, however; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that

[Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").

**Responding further**: Denied. The independent expert concluded no life-threatening misses or misinterpretations were found.  PSOF ¶ 130. Further review of evidence produced by Defendants in discovery reveals that the independent reviewer concluded that Dr. Desai had any level of discrepancy in 40% of her reads; had a major discrepancy in 20% of her reads; and that 36% of the discrepancies may have had an impact on patient care. PSOF ¶ 89.  Review of Dr. Litmanovich's report reveals errors with 50% of Dr. Darren Brennan's CT scan studies, with one major and one minor misread, and that 50% of the errors would impact patient care. PSOF ¶ 142.  A review of Dr. Litmanovich's report reveals errors with 50% of Dr. Hao Lo's  CT scan studies, with three minor misreads, and that 33% of the errors would impact patient care. PSOF ¶ 143. Raw Data from Dr. Litmanovich's review indicates that she did not perform an accurate or thorough evaluation of cases included in the study, as it is apparent from the data that she mixed up cases and failed to critique cases in which parts of the radiologists' diagnostic reports were incoherent and incomprehensible.  Furthermore, Dr. Litmanovich did not use uniform and consistent criteria when evaluating cases in the study. PSOF ¶ 167 – 168.


175.    Plaintiff admits that Dr. Rosen should not have ignored the expert's determinations. Ex. D, Desai Dep. at 95:1-12.

**Response**: Denied as to any implication that Plaintiff concurred with the independent expert's determinations that she had quality problems.  See Response No. 174, above.

176.     Plaintiff believes that Dr. Rosen should take action if he believes a radiologist's quality is substandard. Ex. D, Desai Dep. at 78:2-14.

**Response**: Denied as to any implication that Plaintiff's quality was substandard or that Dr. Rosen designed a fair review.  Further review of the information produced by Defendants in discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's work were not legitimate and also knew that her work quality was not worse than that of her peers. PSOF ¶¶ 68, 95, 109-110.

Admitted to the extent that Plaintiff believes that Dr. Rosen should take action if a radiologist's quality is actually substandard.  Plaintiff's work, however, was not substandard. See Response No. 174.

177.     Plaintiff believes that by her termination, Dr. Rosen took action based on his assessment that her quality was substandard. Ex. D, Desai Dep. at 79:4-13.

**Response**: Denied. Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling, however; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she

was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").

**Responding further**:  See Response No. 174; see also PSOF ¶¶ 170, 173.


178.    Plaintiff does not believe that Dr. Rosen made the decision to ask an expert to review a sample of her cases for quality purposes because of her age. Plaintiff does not think the "review has anything to do with the age," the two things "don't go together," and Dr. Rosen's decision to have her quality review "[h]as nothing to do with age." Ex. D, Desai Dep. at 84:21-85:7.

**Response**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). "[W]hile [plaintiff's] impression of why … [co-]workers took these actions against [her] is relevant, it is not conclusive on the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers." *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D. Mass. 2002).

**Responding further**:  Further review of the information produced by Defendants in discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's

work were not legitimate and also knew that her work quality was not worse than that of her peers. PSOF ¶¶ 68, 95, 109-110, 179, 173.

179.     Plaintiff does not believe that Dr. Rosen made the decision to have her cases reviewed for quality purposes by an independent expert based on the fact that she is a female. Ex. D, Desai Dep. at 85:8-12.

> **Response**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). "[W]hile [plaintiff's] impression of why … [co-]workers took these actions against [her] is relevant, it is not conclusive on the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers." *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D. Mass. 2002).
>
> **Responding further**:  Further review of the information produced by Defendants in discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's work were not legitimate and also knew that her work quality was not worse than that of her peers. PSOF ¶¶ 68, 95, 109-110, 179, 173.  Dr. Rosen's motivation in conducting the entire review is disputed.

180.    Plaintiff does not believe that Dr. Rosen made the decision to perform the independent review because she has a disability, and she does not "think it has a connection with the disability." Ex. D, Desai Dep. at 195:12-17.

**Response**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). "[W]hile [plaintiff's] impression of why … [co-]workers took these actions against [her] is relevant, it is not conclusive on the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers." *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D. Mass. 2002).

**Responding further**:  Further review of the information produced by Defendants in discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's work were not legitimate and also knew that her work quality was not worse than that of her peers. PSOF ¶¶ 68, 95, 109-110, 179, 173. Dr. Rosen's motivation in conducting the entire review is disputed.

181.    Plaintiff believes that her age and disability are "separate" and they "[h]ad nothing to do with the independent review." Ex. D, Desai Dep. at 86:6-10.

**Response**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). "[W]hile [plaintiff's] impression of why … [co-]workers took these actions against [her] is relevant, it is not conclusive on the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers." *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D. Mass. 2002).

**Responding further**:  Further review of the information produced by Defendants in discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's work were not legitimate and also knew that her work quality was not worse than that of her peers. PSOF ¶¶ 68, 95, 109-110, 179, 173. Dr. Rosen's motivation in conducting the entire review is disputed.


182.    Plaintiff alleges that Dr. Rosen should have spoken with her before conducting the review, but does not claim that Dr. Rosen's action in not speaking with her before conducting the independent review was because of her age, disability, or because she is a female. Ex. D, Desai Dep. at 88:1-20; 89:16-90:14.

**Response**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762

F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). "[W]hile [plaintiff's] impression of why … [co-]workers took these actions against [her] is relevant, it is not conclusive on the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers." *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D. Mass. 2002).

**Responding further**:  Further review of the information produced by Defendants in discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's work were not legitimate and also knew that her work quality was not worse than that of her peers. PSOF ¶¶ 68, 95, 109-110, 179, 173.. Dr. Rosen's motivation in conducting the entire review is disputed.

183.    Plaintiff does not believe that Dr. Rosen made up his concern regarding her quality. Ex. D, Desai Dep. at 91:9-11.

**Response**: Denied. Further review of the information produced by Defendants in discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's work were not legitimate and also knew that her work quality was not worse than that of her peers. PSOF ¶¶ 68, 95, 109-110, 179, 173. Dr. Rosen's motivation in conducting the entire review is disputed.

184.     Plaintiff admits that using an independent expert to review records is a way to assess quality without the risk of being discriminatory. Ex. D, Desai Dep. at 91:12-92:1.

**Response**: Admitted as to Plaintiff's testimony that using an independent expert to review records is a way to assess quality without the risk of being discriminatory. Denied as to any implication that is true with respect to Plaintiff.

**Further responding**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014). Further review of the information produced by Defendants in discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's work were not legitimate and also knew that her work quality was not worse than that of her peers. PSOF ¶¶ 68, 95, 109-110, 179, 173. Dr. Rosen's motivation in conducting the entire review is disputed.

185.     In making the decision to terminate Plaintiff's employment based on a quality concern, Dr. Rosen relied on an independent expert's evaluation. Ex. D, Desai Dep. at 79:14-21.

**Response**: Denied. Further review of the information produced by Defendants in discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's work were not legitimate and also knew that her work quality was not worse than that of her peers. PSOF ¶¶ 68, 95, 109-110, 179, 173.

186.     Plaintiff admits that by doing an independent review, Dr. Rosen was trying to remove himself from being the one assessing her quality so that a third party expert could make

the assessment without knowing that it was Plaintiff being reviewed. Ex. D, Desai Dep. at 91:9-92:1.

> **Response**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). "[W]hile [plaintiff's] impression of why … [co-]workers took these actions against [her] is relevant, it is not conclusive on the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers." *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D. Mass. 2002).

> **Responding further**: Denied. Dr. Rosen's motivation in conducting the review at all and as he did is disputed.  PSOF ¶¶ 68, 95, 109-110, 179, 173. In addition, Dr. Rosen's selection of Dr. Litmanovich, known to him previously, rather than the company / organization the Department previously used to conduct assessments of physicians, also evidences Dr. Rosen's discriminatory intent. PSOF ¶ 120.

187.    Plaintiff admits that Dr. Rosen acted fairly and appropriately by relying on an independent expert's evaluation as opposed to him making the evaluation himself. Ex. D, Desai Dep. at 94:10-14.

**Response**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). "[W]hile [plaintiff's] impression of why … [co-]workers took these actions against [her] is relevant, it is not conclusive on the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers." *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D. Mass. 2002).

**Responding further**: Denied. Denied. Dr. Rosen's motivation in conducting the review at all and as he did is disputed.  PSOF ¶¶ 68, 95, 109-110, 179, 173. In addition, Dr. Rosen's selection of Dr. Litmanovich, known to him previously, rather than the company / organization the Department previously used to conduct assessments of physicians, also evidences Dr. Rosen's discriminatory intent. PSOF ¶ 120.

188.    Plaintiff cannot offer any facts to show that Dr. Rosen was acting maliciously in seeking an independent expert's evaluation of her quality. Ex. D, Desai Dep. at 96:5-21.

**Response**: Denied.  Denied. Further review of the information produced by Defendants in discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's work were not legitimate and also knew that her work quality was not worse than that of her peers. PSOF ¶ 73-81; 82-83; 84-85; 86-104; 169-180.

189.    Plaintiff does not claim that Dr. Litmanovich discriminated against her in performing her independent review. Ex. D, Desai Dep. at 362:15-363:17.

> **Response**: Plaintiff is without sufficient information or knowledge to determine the entirety of the interactions that took place between Dr. Litmanovich and Dr. Rosen and therefore, cannot determine whether or not Dr. Litmanovich discriminated against her in performing her independent review.

190.    Plaintiff believes that the methodology of the review was wrong and that her studies should have been compared to an equal amount of reads by a single other radiologist. Ex. D, Desai Dep. at 92:10-93:1.

> **Response**: Admitted.

191.    Dr. Rosen did not consider Plaintiff's age, sex, or disability in making the decision to have the independent review performed. Ex. A, Rosen Aff. at ¶ 59.

> **Response**: This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).

> **Further responding**: Denied.  PSOF ¶ 73-81; 82-83; 84-85; 86-104; 169-180.

**Termination**

192.    On March 14, 2018, Dr. Rosen met with Plaintiff and informed her that her employment will be terminated on March 17, 2019. Ex. A, Rosen Aff. at ¶ 66.

**Response**: Admitted.

193.    Pursuant to Plaintiff's Employment Agreement, Plaintiff was entitled to twelve months' notice prior to termination. Ex. A, Rosen Aff. at ¶ 67; Ex. B, Employment Agreement, at ¶ 7.2.

> **Response**: Admitted, except to the extent that the contract also reserved to UMMC the
> right to terminate Plaintiff at any time with cause.  See Employment Agreement, section
> 7.3 (termination for cause), attached as Exhibit Y to Washienko Aff.

194. Dr. Rosen determined that in the time until Plaintiff's employment ended, she would be restricted from reading CT images and would review only x-rays, due to the concerns raised regarding the quality of her CT reads from the independent review and Dr. Rosen's obligation to ensure patient safety and provide high quality services to patients. Ex. C, Rosen Dep. at 342:3-14; Ex. A, Rosen Aff. at ¶ 68.

> **Response**: Admitted that Dr. Rosen verbally restricted Dr. Desai from interpreting CT
> scans but disputed that the reason was based on a legitimate belief that there was a true
> issue with Plaintiff's work quality.
>
> **Responding further**: Further review of the information produced by Defendants in
> discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's
> work were not legitimate and also knew that her work quality was not worse than that of
> her peers. PSOF ¶¶ 68, 95, 109-110, 179, 173. Dr. Rosen's motivation in conducting the
> entire review is disputed. PSOF ¶¶ 181-201.

195. Plaintiff does not believe that Dr. Rosen's decision to restrict her ability to read CT images was made because she had a disability, and she is not claiming that he made this decision based on her disability. Ex. D, Desai Dep. at 188:21-189:10.

> **Response**:  Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). "[W]hile [plaintiff's] impression of why … [co-]workers took these actions against [her] is relevant, it is not conclusive on the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers." *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D. Mass. 2002).
>
> **Responding further**: Denied.  Dr. Rosen's motive for the entire review is disputed.

196. Plaintiff is not claiming that the decision to restrict her ability to read CT images was made because of her age. Ex. D, Desai Dep. at 237:19-22.

> **Response**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about

the basis for her subjective belief that she was being retaliated against, not whether she

had introduced evidence of retaliation in her lawsuit"). "[W]hile [plaintiff's] impression

of why … [co-]workers took these actions against [her] is relevant, it is not conclusive on

the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a

motivation that only existed in the minds of his harassers." *Centola v. Potter*, 183 F.

Supp. 2d 403, 411 (D. Mass. 2002).

**Responding further**: Further review of the information produced by Defendants in

discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's

work were not legitimate and also knew that her work quality was not worse than that of

her peers. See, e.g., PSOF ¶¶ 68, 95, 109-110, 179, 173. Dr. Rosen's motivation is

disputed.


197. Plaintiff requested that Dr. Rosen provide her with the information regarding her

quality on which he made his decision. Ex. C, Rosen Dep. at 342:15-23; see also E-mails

between M. Rosen and C. Desai, March 24, 2018, to April 17, 2018, attached as **Exhibit W** to

Wakefield Aff.

    **Response**: Admitted.


198. Dr. Rosen agreed to meet with Plaintiff to discuss the independent review findings.

Ex. C, Rosen Dep. at 342:15-23.

    **Response**: Admitted.

199. Plaintiff requested that she be able to bring a colleague to the meeting and elected to invite Sarwat Hussain, M.D. Ex. C, Rosen Dep. at 344:12-20.

**Response**: Admitted that Plaintiff invited Sarwat Hussain, MD to attend the meeting. However, Plaintiff's original request to bring her own independent reviewer to the meeting was denied by Dr. Rosen.  Furthermore, Plaintiff directly informed Dr. Rosen that radiology colleagues currently working under him may not feel comfortable attending the meeting/visibly supporting Plaintiff in any out of fear of retaliation of Dr. Rosen against them.  PSOF ¶ 159.

200. On April 24, 2018, a meeting was held at which Plaintiff, Dr. Rosen, Dr. Hussain, and Vice Chair for Quality, Patient Safety and Process Improvement Steven Baccei, M.D., attended, and Dr. Rosen provided Plaintiff with data from the independent reviewer's findings. Ex. A, Rosen Aff. at ¶ 70.

**Response**: Admitted that a meeting was held on April 24, 2018 with the following individuals present; disputed as to the provision of data from the reviewer's findings. Dr. Rosen provided Plaintiff with a statistical summary from the independent review that he, himself, created, as part of a larger PowerPoint presentation.  He did not provide Plaintiff with any concrete examples of her deficiencies, nor did he allow her to take hard copies of any of the specific cases that supposedly had a quality issue. PSOF ¶¶ 160-161.

201. Plaintiff recognizes that hospital credentialing is dependent on being employed as a physician. Ex. D, Desai Dep. at 390:5-12.

**Response**: Admitted.


202. Plaintiff filed a complaint against Defendants with the Massachusetts Commission Against Discrimination on May 4, 2018, alleging discrimination in her employment and in her termination. See MCAD Complaint, May 4, 2018, attached as **Exhibit X** to Wakefield Aff.

**Response**: Admitted.


J.    Other Terminations

203.    Dr. Rosen has ended the employment of other physicians in the Department due to performance concerns related to ability, including R█ N.█ G█ N.█, M.D., separated June 23, 2017; R█ y N.█ N.█, D.O., separated May 31, 2017; and A█ N.█ R█ N.█, M.D., separated December 12, 2015. Ex. A, Rosen Aff. at ¶ 71.


**Response**: Admitted that Dr. Rosen alleges that he has ended the employment of other physicians in the Department due to performance concerns related to their ability, including R█ N.█ G█ N.█, M.D., separated June 23, 2017; R█ N.█ N█ N.█, D.O., separated May 31, 2017; and A█ N.█ R█ N.█, M.D., separated December 12, 2015.


204.    An external independent review was performed of Dr. Garrell's competency prior to the decision to end his employment. In addition, Dr. Rosen reviewed data from the quality assurance system to evaluate Dr. Garrell's performance. Ex. A, Rosen Aff. at ¶ 72.

**Response**: Admitted.

205.     An internal review and investigation was conducted of Dr. N. 's performance prior to the decision to end his employment. Ex. A, Rosen Aff. at ¶ 73.

**Response**:  This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

**Responding further**: Defendants produced no evidence in discovery that such an event, officially referred to by Dr. Rosen as an internal review or investigation, took place.

206.     Dr. N. was forty years of age at the time of his separation. Ex. A, Rosen Aff. at ¶ 73.

**Response**: Admitted.

207.     With respect to these physicians, Dr. Rosen advised them that due to their performance, they would no longer be able to be employed with the Medical Group, and the physicians elected to resign in lieu of termination. Ex. C, Rosen Dep. at 57:16-59:1; 134:17-135:6; 365:12-24; 367:16-368:2; Ex. A, Rosen Aff. at ¶ 74.

**Response**: This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

**Responding further**:  Plaintiff is without sufficient information or knowledge to admit or deny this statement of fact.  However, Dr. Roychowdhury was informed that the reason for his termination was that he did not fit in Dr. Rosen's vision. PSOF ¶ 257.

208.     When Dr. Rosen informed Plaintiff that she was being terminated, she did not elect to resign. Ex. C, Rosen Dep. at 365:12-24; 367:16-368:2.

**Response**: Admitted to the extent that Plaintiff was not even aware or ever informed that it was an option, as a formal letter of termination had already been delivered to her the same day that she was verbally informed of her termination, which was officially signed by Dr. Rosen and Dr. Tosi. PSOF ¶¶ 149, 151.

209.     In the year between the time Plaintiff was notified of her termination and the end of her employment, Plaintiff did not elect to resign or ask if she could resign in lieu of termination. Ex. C, Rosen Dep. at 365:12-24; 367:16-368:2.

**Response**: Admitted to the extent that Plaintiff was not even aware or ever informed that resignation was an option. See Response No. 208.

Defamation

210.     Plaintiff alleges that Defendants made the following defamatory statements about her:

1. 2017 – 2018 Faculty Annual Performance Review of C. Desai by M. Rosen. [Ex. M.]

2. July 1, 2016 – June 30, 2017 Peer Review of Dr. Desai by K. Dill. [Ex. R.]

3. April 17, 2018 Letter from M. Rosen to C. Desai. [See **Exhibit Y** to Wakefield Aff.]

4. April 17, 2018 3:58 PM Email from M. Rosen to C. Desai re: March 14th, 2018 Meeting. [Ex. W.]

5. April 18, 2018 5:12 PM Email from M. Rosen to C. Desai re: Meeting to Review QA data. [See **Exhibit Z** to Wakefield Aff.]

6. March 9, 2018 Letter from M. Rosen and S. Tosi to C. Desai re: Notice of Termination of Employment. [See **Exhibit AA** to Wakefield Aff.]

7. April 24, 2018 Meeting between Dr. Rosen and Dr. Desai, also attended by Dr. Sarwat Hussain. At this meeting, Dr. Rosen stated and projected on a screen false statements that Dr. Desai had performance issues and had committed major misreads of radiology films.

8. September – December 2017, Quality Assurance Review by D. Litmanovich and accompanying documents.

9. Defendants' suspension of Dr. Desai's performance of duties and responsibilities, known to all in the radiology department and to numerous others throughout the hospital, constitutes defamation by deed. Defendants' termination of Dr. Desai, known to all in the radiology department and to numerous others throughout the hospital, also constitutes defamation by deed.

See Plaintiff's Answers to UMass Memorial Interrogatories, excerpts, attached as **Exhibit BB** to

Wakefield Aff.

**Response**: Disputed as to any implication these are the only incidents of defamation.

**Responding further**: In addition, please see following statements below.

a.  At 11:47 AM on March 14, 2018, less than fifteen minutes prior to the meeting Dr. Rosen held informing Plaintiff of her termination, Dr. Dill sends Dr. Rosen an email about scheduling for the Chest Division, specifically asking Dr. Rosen whether Dr. Jorge Medina will be on the schedule for July 1. Exhibit X to Washienko Aff.

b.  Also, Dr. Dill was informed that Dr. Rosen spoke with Plaintiff at noon on March 14, 2018, within approximately one hour following the meeting at which Plaintiff was told her employment would be terminated. Exhibit X to Washienko Aff.

c.  Also, Dr. Rosen and Dr. Dill conducted a confidential review of Plaintiff's reads in January 2018, following Dr. Rosen's receipt of Dr. Litmanovich's review results, which he claims were the sole basis for Plaintiff's termination. See Email Thread Between Dr. Dill and Dr. Rosen Subject: confidential review. Exhibit ZZZZ to Washienko Aff.

d.  Dr. Roychowdhury testifies that he learned of Plaintiff's termination from a colleague at a national meeting and that he and others were surprised about the news. Roychowdhury Dep, at 55:9-55:22, 56:5-56:9, 58:7-58:9, at Exhibit LL to Washienko Aff.

    e.   Dr. Roychowdhury testifies that the general discussions that occurred at a national convention amongst attendees was that senior radiologists were gradually being phased out or removed in the Department of Radiology at UMASS. "Abhijit Roychowdhury Deposition, at 56:9-56:16."

    f.   Dr. Dill admits that she was aware that an independent review of Plaintiff's work occurred and that the findings contributed to the decision to terminate Plaintiff's employment. Dill Opposition SMF #10. Dr. Rosen made arrangements for Dr. Litmanovich to conduct an independent review of Plaintiff's CT scan interpretations, and was provided the results, which he cites as the grounds for Plaintiff's termination. Plaintiff did not inform Dr. Dill or anyone in the Department that such a review was conducted of her work, nor did she inform Dr. Dill about the results of the independent review conducted of her work.

211.    Plaintiff does not claim that Dr. Rosen provided her 2017-2018 evaluation to any third party. Ex. D, Desai Dep. at 367:3-8.

**Response**: Admitted.

212.    Plaintiff does not claim that the Medical Group provided the "peer review" document to any third party. Ex. D, Desai Dep. at 367:9-23.

**Response**: Admitted.

213.    Plaintiff is not aware of the Medical Group having provided the April 17, 2018, letter from Dr. Rosen to her to any third party , and does not claim that it was. Ex. D, Desai Dep. at 367:24-368:4.

**Response**: Admitted.

214.    Plaintiff is not aware of the Medical Group having provided the April 17, 2018, E-mail from Dr. Rosen to her to any third party, and does not claim that it was. Ex. D, Desai Dep. at 368:5-10.

**Response**: Admitted.

215.    Plaintiff is not aware of the Medical Group having provided the April 18, 2018, E-mail from Dr. Rosen to her to any third party, and does not claim that it was. Ex. D, Desai Dep. at 368:12-18.

**Response**: Admitted.

216.    Plaintiff is not aware of the Medical Group having provided the March 9, 2018, termination letter to anyone except for administrative staff, and does not claim that it was. Ex. D, Desai Dep. at 245:6-246:12; 342:17-343:5; 368:19-369:4.

  **Response**: Denied.  The termination letter was provided to Dr. Tosi for his signature

  PSOF ¶ 39, and discussed in the presence of Dr. Charles Cavagnaro MD, at the March

  14, 2018 meeting held between Dr. Rosen, Dr. Cavagnaro, and Plaintiff. Id. Dr. Dill was

  informed by Dr. Rosen that he met with Plaintiff on the day of Plaintiff's termination

  shortly after the meeting occurred informing Plaintiff of her termination. PSOF ¶ 254(f).

217.    Plaintiff agrees that the termination letter simply informed her of the termination of her employment and agrees that Dr. Rosen and Dr. Tosi were being truthful in the letter when they stated that her employment was being terminated. Ex. D, Desai Dep. at 249:11-250:7.

**Response**: Admitted. The termination letter did not cite work quality issues as reason for Plaintiff's termination and did not indicate termination was for cause.

218.    Plaintiff is not aware of the Medical Group having provided information regarding her April 24, 2018, meeting with Dr. Rosen and Dr. Baccei to any third party, aside from Dr. Sarwat Hussain who was present due to Plaintiff's invitation, and does not claim that it was. Ex. D, Desai Dep. at 369:5-23.

**Response:** Disputed. Dr. Dill admits that she was aware that an independent review of Plaintiff's work occurred and that the findings contributed to the decision to terminate Plaintiff's employment. Plaintiff's Response to Dill's Statements of Facts ¶ 16.  Plaintiff did not inform Dr. Dill or anyone in the Department that such a review was conducted of her work, nor did she inform Dr. Dill about the results of the independent review conducted of her work.

219.    Plaintiff is not aware of the Medical Group having provided the results of Dr. Litmanovich's review to any third party, and does not claim that it was. Ex. D, Desai Dep. at 369:24-370:6.

**Response**: Disputed. See Response No. 218, above.

220.    Plaintiff informed other individuals that she was not permitted to read CT images, and was not concerned with answering inquiries about her ability to do so truthfully. Ex. D, Desai Dep. at 370:7-371:11.

**Response**: Admitted that Plaintiff informed certain individuals that she was no longer permitted to read CT scans, in accord with Dr. Rosen's instructions; denied that she was

not concerned with answering inquiries about her ability to do so.  Plaintiff was more than concerned; she was humiliated. PSOF ¶ 39.

221.    Neither Dr. Rosen nor the Medical Group communicated Plaintiff's restriction from reading CTs throughout the Department, and shared it only in a discreet manner on a need to know basis for the purposes of scheduling and workflow for the reading of studies. Ex. A, Rosen Aff. at ¶ 69.

**Response**: Disputed. See Response No. 218, above.

L.    Tortious Interference

222.    Plaintiff is claiming tortious interference with her business relations because of Dr. Rosen's decision to terminate her employment. Ex. D, Desai Dep. at 239:8-10.

**Response**: Admitted.

M.    Dr. Tosi

223.     Stephen Tosi, M.D., was the President of UMass Memorial Medical Group, Inc., at the time of Plaintiff's termination. Ex. A, Rosen Aff. at ¶ 75.

**Response**: Admitted.

224.    Plaintiff does not know if Dr. Tosi made the decision to pay in a discriminatory way, and is not claiming that Dr. Tosi did not pay her correctly under the Equal Pay Act. Ex. D, Desai Dep. at 129:12-15; 175:7-9.

**Response**:  Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762

F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").

**Responding further**: Denied. Further review of the documents provided by Defendants in discovery reveals that Dr. Tosi was actively involved in discriminatory pay practices despite meeting with several radiologists from the Department of Radiology to discuss pay disparities within the Department in August 2016. On March 1, 2017, a revised pay structure was implemented for all radiologists in the Department, including Plaintiff. Dr. Tosi actively continued to co-sign employment contracts for new (younger) hires that did not comply with the March 1, 2017 revised pay structure allegedly implemented for all radiologists in the Department, where it was explicitly stated that annual base salaries would be set at $330,000 for ALL radiologists, including diagnostic radiologists.  See PSOF ¶¶ 259-260.


225.    Dr. Tosi did not make the decision regarding the use of home workstations. Ex. D, Desai Dep. at 160:12-15.

**Response**: Admitted.


226.    Plaintiff is not claiming that Dr. Tosi engaged in discrimination in the hiring of Dr. Dill. Ex. D, Desai Dep. at 168:12-15.

**Response**:  Denied.  Dr. Tosi signed Dr. Karin Dill's employment contract on June 10 2015, in which she was hired as Division Chief of Thoracic Radiology, received an annual base salary equivalent to that of Plaintiff's annual base salary at the time of her separation of employment in 2019, and that allotted Dr. Dill a number of non-clinical days in excess of the maximum limit allowed as set forth by the Academic /Administrative Time Policy. Exhibit EE to Washienko Aff.

227.     The basis for Plaintiff's claim of discrimination against Dr. Tosi is that he signed her termination letter, and he could have stopped or questioned the decision. Ex. D, Desai Dep. at 217:23-219:3.

**Response**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit.").

**Responding further**: Denied. Further review of the documents provided by Defendants in discovery reveals Dr. Tosi approved the offer for Plaintiff's anticipated replacement, was aware of Dr. Rosen's desire to end her employment and was concerned about the continued costs associated with keeping Plaintiff employed in the Department of Radiology.  These actions all occurred prior to Dr. Rosen's receipt of the results from the independent review UMM 04627. Rosen Dep. at 278:24-279:5; Rosen Dep. Exhibit 48.

Furthermore, Dr. Tosi supported Dr. Rosen in his decisions to end the employment of other radiologists within the Department of Radiology, informing them that it is Dr. Rosen's jurisdiction to terminate their employment. PSOF ¶ 261; Roychowdhury Dep., at 37:1, Exhibit LL to Washienko Aff.

228. The basis for Plaintiff's claim against Dr. Tosi for tortious interference is that he could have stopped her termination. Ex. D, Desai Dep. at 242:16-23.

**Response**: Denied. See Response No. 227, above.

229.    The only thing Plaintiff claims that Dr. Tosi did that was defamatory was his signing of her termination letter, and she does not know if he sent the letter to anyone other than her. Ex. D, Desai Dep. at 246:19-247:24.

Response: Admitted.

### N.    Department Demographics

230.    Following Plaintiff's notice of her termination, she was replaced in the Department by Maria Barile, M.D., who is a female. Ex. A, Rosen Aff. at ¶ 76.

**Response**: Admitted that Plaintiff was replaced by Dr. Maria Barile, a female in her 40's at the time of hire. PSOF ¶ 42, 295.

231.    After Plaintiff's separation, Dr. Rosen hired a new Division Chief for the Thoracic Division who is 59 years of age. Ex. A, Rosen Aff. at ¶ 77.

**Response**: Admitted that Dr. Rosen hired this Division Chief, who was male, after Plaintiff's separation from employment and she initiated litigation.

232.     Presently, the Medical Group employs approximately 92 radiologists. Ex. A, Rosen Aff. at ¶ 78.

**Response**: Plaintiff is without sufficient information or knowledge to determine whether or not UMass employs approximately 92 radiologists, as no formal documentation has been provided during discovery.

233.     The Department includes 24 radiologists who are age 60 years or older, and three over 70 years of age. Ex. A, Rosen Aff. at ¶ 78.

Response: Denied as to any implication that the employment of older radiologists negates Plaintiff's age discrimination claim, as the evidence produced by Defendants in discovery reveals that older radiologists are predominantly per diem or part-time staff or are separated from employ. Exhibit QQQQ to Washienko Aff.

234.     Dr. Rosen is 62 years of age. Ex. A, Rosen Aff. at ¶ 78.

**Response**: Admitted.

235.     During Dr. Rosen's tenure as Chair of the Department, he has hired 14 radiologists who are 60 years of age or older and two over 70 years of age, as well as 32 radiologists who are female. Ex. A, Rosen Aff. at ¶ 79.

**Response**: Denied as to any implication that the employment of older radiologists negates Plaintiff's age discrimination claim. See Response No. 233, above.

236.     Dr. Rosen has made the decision to end the employment of eight regularly-employed radiologists as Chair (who either were terminated or elected to resign in lieu of termination), and seven were male, and seven were younger than Plaintiff. Ex. A, Rosen Aff. at ¶ 80.

> **Response**: Admitted that it is documented that Dr. Rosen terminated at least eight radiologists as Chair of the Department.  Of the eight documented radiologists seven of the radiologists were male. PSOF ¶ 245.  However, in totality, there are a significantly greater number of males employed in the Department of Radiology than females. Furthermore, Dr. Rosen selected a significantly greater number of males for Division Chief and Non-Division Chief Administrative Positions in the Department of Radiology compared to females. PSOF ¶ 235-249.

## O.     Radiologist Compensation

237.     In 2016, the Medical Group conducted an internal review of the compensation of its radiologists as a part of an effort to standardize salaries to address pay inequities and increase compensation to align more closely with the market for all radiologists. The Medical Group also engaged an outside resource to perform an external market study to assist in establishing a standardized compensation structure. Ex. A, Rosen Aff. at ¶ 81.

> **Response**:  This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

> **Responding further**: Plaintiff is without sufficient information or knowledge to admit or deny this statement of fact.

238.    As a result of these efforts, the Medical Group was able to provide additional funds to the Radiology Department, and a large percentage of radiologists' salaries were increased. Ex. A, Rosen Aff. at ¶ 82.

> **Response**:  This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).
>
> **Responding further**: Plaintiff is without sufficient information or knowledge to admit or deny this statement of fact.

239.    Based on the evaluation, the Medical Group implemented a new, standardized salary structure for radiologists effective March 1, 2017. Under this pay structure, the Department set a base salary, with additional designated sums based on academic rank as well as leadership and administrative positions which carried with them additional job duties and responsibilities. Ex. A, Rosen Aff. at ¶ 83; see also Letter to Diagnostic Radiology Faculty, February 14, 2017, attached as **Exhibit CC** to Wakefield Aff.

> **Response**: Disputed.  The letter Defendants cite states the Department has implanted a new, standardized salary structure, as set out above, but evidence produced by Defendants in discovery illustrate Defendants paid younger radiologists more than the amounts set out in the standardized salary structure.  PSOF ¶ 273.

240.    As a result of the implementation of the new compensation structure, Plaintiff received a large increase in pay, from $302,575 to $340,000 per year. Her compensation was set

based on the base salary for a diagnostic radiologist of $330,000, plus an additional $10,000 due to her rank as Associate Professor. Ex. A, Rosen Aff. at ¶ 84; see also Letter from M. Rosen to C. Desai, February 16, 2017, attached as **Exhibit DD** to Wakefield Aff.

>   **Response**:  Disputed as to the characterization of the increase in pay as large; otherwise, admitted.

241.    Plaintiff did not hold any leadership roles or perform additional duties for the Department. Ex. A, Rosen Aff. at ¶ 85.

>   **Response**:  Denied.  PSOF ¶¶ 30, 32-34.

242.    As a result of the new pay structure, every single full-time female radiologist who was employed as of March 1, 2017, received a pay increase, and they were paid in accordance with the standardized pay scale. Ex. A, Rosen Aff. at ¶ 86.

>   **Response**:  Plaintiff is without sufficient information or knowledge to admit or deny that every single full-time female radiologist who was employed as of March 1, 2017, received a pay increase.

243.    Plaintiff admits that the Medical Group undertook an analysis of compensation within the Department and attempted to correct any pay disparities by making compensation standardized. Ex. D, Desai Dep. at 180:24-182:8.

>   **Response**:  Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no

information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").

**Responding further**: Denied.  PSOF ¶ 273.

244.    Plaintiff admits that the Medical Group took a reasonable approach and acted in good faith to address any pay disparities existing within the last three years of her employment. Plaintiff admits that the Medical Group made reasonable progress to address any pay disparities. Ex. D, Desai Dep. at 181:17-183:3; 314:22-315:15.

> **Response**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").
>
> **Responding further**: Denied.  See Response No. 242 and No. 243, above.

245.    Plaintiff admits that as a result of this analysis and new pay structure, she received a substantial increase in pay. Ex. D, Desai Dep. at 180:24-182:18.

> **Response**: Disputed as to causation and disputed as to the characterization of the increase as substantial; otherwise, admitted.

246.    In her answers to interrogatories, Plaintiff cites, as the sole basis for her belief that she was paid less than her colleagues, the fact that Dr. Aaron Harman was paid more than her, and she identifies Dr. Harman as the only co-worker she claims was paid more than her because of gender. Ex. BB, Answers to Interrogatories.

**Response**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").

**Responding further**: Denied as to any implication that there is no evidence of gender-based pay disparities. Evidence produced by Defendants in discovery reveals several examples. PSOF ¶¶ 273 – 291.


247.    At deposition, Plaintiff has cited Eric Schmidlin, M.D., as a younger, male radiologist allegedly paid more than her, and additionally identified Steven Baccei, M.D., Christopher Cerniglia, D.O., Karin Dill, M.D., Byron Chen, M.D., Hemang Kotecha, M.D., Dennis Coughlin, M.D., and Sathish Dundamadappa, M.D., as those being paid more than her. Ex. D, Desai Dep. at 129:22-130:14; 133:10-17; 176:17-178:6.

**Response**: Admitted. Nevertheless, deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin*

*v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").

248.    Except for Dr. Schmidlin and Dr. Dill, all of the physicians identified by Plaintiff worked in different divisions and had different job duties than Plaintiff. Ex. A. Rosen Aff. at ¶¶ 87, 89-90, 94-97.

   **Response**: Admitted to the extent that with the exception of Dr. Schmidlin and Dr. Dill, all of the physicians identified by Plaintiff, with the exception of Dr. Aaron Harman, were diagnostic radiologists.  They worked in different divisions than Plaintiff.  had the same job duties as Plaintiff did within their respective Divisions, as diagnostic radiologists. PSOF ¶ 283.

249.    Plaintiff was a diagnostic radiologist, and Dr. Harman is an interventional radiologist. Ex. A, Rosen Aff. at ¶ 87.

   **Response**:  Admitted.

250.    Diagnostic radiology involves reviewing images of the body and making interpretations, and interventional radiology is image-guided surgery. Interventional radiologists perform invasive procedures on patients, and the radiology component relates to the use of

imaging such as fluoroscopy, CT, ultrasound, and MRI to guide their procedures. Interventional Radiologists also have completed additional training through an ACGME accredited Interventional Radiology fellowship and some (including Dr. Harman) have also taken an additional board-certifying examination (Certificate of Added Qualification) in Interventional Radiology. Ex. A, Rosen Aff. at ¶ 87.

> **Response**:  Admitted to the extent that diagnostic radiology and interventional radiology exist as distinct areas of expertise.  Admitted to the extent that interventional radiologists require additional training through a fellowship and have taken an additional board-certifying examination, which are also requirements for other specialties within diagnostic radiology.  Furthermore, the foundational radiology training required to perform both disciplines of radiology is the same.  Moreover, Plaintiff performed interventional procedures during residency training and for a period of time as an attending physician.

251.    Interventional radiologists generally earn substantially more than diagnostic radiologists. Thus, the Department has implemented a different pay scale for interventional radiology from diagnostic radiology. Under this structure, Dr. Harman's salary was $365,000 per year, which is the base salary for an interventional radiologist. Ex. A, Rosen Aff. at ¶ 88.

> **Response**:  Plaintiff is without sufficient information or knowledge to admit or deny whether the Department implemented a different pay scale. Admitted Dr. Harman's annual salary was $365,000 in 2017.

252.    Plaintiff is familiar with the market rates of compensation for interventional radiology, and she admits that interventional radiologists are paid more than diagnostic radiologists. Nevertheless, Plaintiff believes that she should be paid the same as an interventional radiologist and does not believe the difference in market rates to be justified despite the significant difference in job duties and education. Ex. D, Desai Dep. at 136:3-137:7.

> **Response:** Plaintiff expressed at the time that interventional radiologists are paid more than diagnostic radiologists, however upon further information and review, Plaintiff is without sufficient information and knowledge to be able to form universal conclusions regarding pay scales for interventional and diagnostic radiologists.

253.    Dr. Schmidlin specialized in chest imaging and worked within the Chest Division with the same duties as Plaintiff. Dr. Schmidlin did not make more than Plaintiff. His starting salary in 2012 was $300,000 per year, less than Plaintiff's salary, and at the time of his separation from regular employment, he earned $294,000 per year, less than Plaintiff's salary. Dr. Schmidlin left regular employment with the Medical Group on June 28, 2016, and he continued to work on a per diem, hourly basis. His hourly rate since has been $162.50, and Plaintiff's rate when calculated on an hourly basis is $163.46. Ex. A, Rosen Aff. at ¶ 89.

> **Response**:  Denied.  See PSOF ¶ 277-280.

254.    Byron Chen, M.D., and Hemang Kotecha, M.D., have also always earned less than Plaintiff; each with a salary of $330,000 per year at the time of Plaintiff's separation. Ex. A, Rosen Aff. at ¶ 90.

> **Response**:  Denied. See PSOF ¶¶ 281-283, 284-285.

255.    Dr. Dill's base salary was the same as Plaintiff's. However, Dr. Dill served as a Division Chief, and was paid an additional sum for those duties and responsibilities. Ex. A, Rosen Aff. at ¶ 91.

**Response**:  Denied. See PSOF ¶ 292-296.

256.    Division Chiefs are responsible for the effective daily operational management of their division, financial stability, long term strategic planning, faculty development, and service for patients and referring clinicians. Divisions Chiefs are responsible for the business and operational functions of their divisions, and include responsibilities for clinical operations, financial sustainability, customer service, quality assurance and improvement, faculty development, recruitment and retention, research/scholarship, innovation, resident/fellow training, medical student education, and other division-specific functions. Ex. A, Rosen Aff. at ¶ 92.

**Response**:  Disputed as to any implication that Dr. Dill fulfilled these responsibilities, but admitted as to the responsibilities.

257.    A radiologist's performance of non-clinical duties for the Department, including service in leadership and administrative positions, is separate and apart from their clinic duties and is extremely valuable to the Department. Ex. A, Rosen Aff. at ¶ 93.

**Response**: Admitted.

258.    Dr. Baccei was paid a higher salary due to his leadership roles within the Department, pursuant to the salary structure. Dr. Baccei was the Division Chief for musculoskeletal radiology, and he served as the Department's Vice Chair of Quality, Safety, and Process Improvement. The duties of the Vice Chair include oversight of all quality assurance functions of the Department, specifically, maintaining the peer review database, managing department quality assurance meetings and review processes, responding to quality issues, handling risk management matters, and management of quality review projects, among other duties. Ex. A, Rosen Aff. at ¶ 94.

**Response**:  Disputed.  See PSOF ¶¶ 286-288.


259.    Dr. Cerniglia served in multiple leadership and administrative roles in the Department, for which he received additional compensation. Prior to 2017, he had served as a Division Chief for musculoskeletal radiology, and, thereafter, he continued to serve as 1) the Director for Medical Student Education in Radiology, in which he is responsible for organizing all of the radiology educational activities for the first and second year medical students, 2) the Co-Course Director for the UMass Medical School DSF (Design, Structure, and Function) course, in which he runs the imaging lab within the anatomy lab, oversees imaging in connection with the course, and oversees all medical student, non-radiology interns and resident, and visiting medical student rotations in radiology, and 3) the Fellowship Director for Musculoskeletal Radiology, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education policies. Ex. A, Rosen Aff. at ¶ 95.

**Response**:  This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

**Responding further**: Disputed. See PSOF ¶¶ 289.


260.     Sathish Dundamadappa, M.D., has served as the interim Division Chief of neuroradiology as well as the Fellowship Director for Neuroradiology and the Fellowship Director for MRI, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education, for both of these areas, as well as compliance with accreditation requirements for neuroradiology, and he has received additional compensation for these additional duties and responsibilities. Ex. A, Rosen Aff. at ¶ 96.

**Response**:  This statement of fact is supported only by the deposition testimony of Dr. Rosen, whose testimony could be appropriately rejected by a reasonable jury. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).

**Responding further**: Disputed. See PSOF ¶ 290.


261.     Dennis Coughlin, M.D., has served as the Division Chief for Emergency Radiology, for which he has been compensated an additional amount for those duties and responsibilities. Ex. A, Rosen Aff. at ¶ 97.

**Response**:  Disputed. See PSOF ¶ 291.

Respectfully submitted,

CHARU DESAI
By Her Attorney,

/s/ Patricia Washienko

_____
Patricia A. Washienko, BBO# 641615
pwashienko@fwlawboston.com
Freiberger & Washienko LLC
211 Congress St, Suite 720
Boston, MA 02110
Tel: (617) 723-0008

Dated: February 11, 2022


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2022, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, was served by electronic mail only to counsel for the above-named Defendants:

Robert L. Kilroy, Esq.
Reid Wakefield, Esq.
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
(508) 860-1477
rkilroy@mirickoconnell.com

Mark Johnson, Esq.
Denise Barton, Esq.
University of Massachusetts Office of the General Counsel
One Beacon Street, 31st Floor
Boston, MA 02108
(617) 287-4064
MAJohnson@umassp.edu


/s/ Patricia Washienko
Patricia A. Washienko