UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARU DESAI,<br><br>     Plaintiff<br><br>v.<br><br>UNIVERSITY OF MASSACHUSETTS<br>MEMORIAL MEDICAL CENTER, INC.,<br>et al.,<br><br>     Defendants | CIVIL ACTION NO.:<br>4:19-cv-10520-TSH |

### AFFIDAVIT OF CHARU DESAI, MD

I, Charu Desai, hereby depose and state as follows:

1. I was born on July 6, 1950.

2. I began working in the Department of Radiology in 1992.

3. On November 7, 2000, I collapsed at home but nevertheless went to work. Radiology colleagues observed that I seemed to have a serious, immediate, and acute health issue. They requested an urgent appointment for me to see a cardiologist; and I did so that day, and tests revealed that I had a heartrate at times in the twenty beats per minute range. Clinicians at the Medical Center diagnosed me with a life-threatening heart condition sometimes known as tachy-brady syndrome. I had a pacemaker implanted by physicians at the Medical Center on November 10, 2001. The pacemaker did not resolve my symptoms.

4. Around the time that my heart condition was diagnosed, and I had a pacemaker implanted, I was provided a personal workstation and worked from home. On occasion

throughout my employ, I also performed work duties at the Clinton and Memorial campuses.

5. My heart condition substantially limits the function of my heart and causes me to experience spells of variable duration, in which I become weak, tired, and incapacitated. These typically but not always last for a few minutes. Often, I can rest for a brief period, and am able to return to what I was doing before the spell, including returning to work. At other times, if I was exhausted from working many days in a row without a break, my condition would flare; in that event that I may not have been able to work the following day and would call out sick.

6. My health spells/episodes were (and are) unpredictable. They would occur while I was in the parking lot, on the way from the parking lot to my workstation, and even when I was actively working and interpreting films. Because my spells happened often at work, my condition was well known throughout the department.

7. On or about May 13, 2016, I spoke with Dr. Rosen about accommodating my need for FMLA leave in scheduling.  He chastised me for tardiness, which I told h im was caused by my spells on the way into work.  Dr. Rosen told me that if there were medical reasons that would cause me to be late, I should contact Human Resources regarding a plan to accommodate me and adjust scheduling.

8. Given my length of service, I was considered a senior attending radiologist.

9. I made several requests to Dr. Rosen that I should be call exempt due to my status as a senior attending.

10. Dr. Rosen told me that if I wanted not to take call, I could go per diem. He frequently suggested that I work on a per diem or part time basis rather than as a full-time basis.

11. Despite my request, I continued to be scheduled for call.

12. Because working daily for two weeks in a row due to being on call caused me fatigue that exacerbated my health condition, I "sold" call to my colleagues. My salary was reduced due to my "sale" of six of my ten weekend calls to other radiologists, in the amount of $19,200 per year for two years.

13. Dr. Rosen appointed me to serve as the Quality Assurance representative for the Chest Division on the Quality Improvement Committee.

14. In the event the Chief of the Division of Thoracic Radiology was absent, I assumed full responsibility for leadership and effective daily operational management of the Division of Thoracic Radiology.

15. In the event the Chief of the Division of Chest Radiology, (i.e. Dr. Dill) was absent, I was the only full-time chest radiologist in the Division of Cardiothoracic Imaging following the departure of Eric Schmidlin (as a full time thoracic radiologist in the Division) up until and for a period after the day that I was informed of my termination, until the arrival of Maria Barile on December 31, 2018.  At those times, I was often the only radiologist physically present in the Division of Cardiothoracic Imaging.

16. I requested 12 Academic and/or Administrative Days per year.  Dr. Rosen declined to grant any to me.

17. I observed that radiologists were often physically absent from the Department during their assigned academic and/or administrative days.

18. I was not allotted academic time since at least 2010.  I received academic time weekly under previous Department Chair Dr. Edward Smith, MD.

19. I was granted a workstation in the early 2000s, around the time that my heart condition was diagnosed and I was given a pacemaker. The Chair of the Department at the time provided me a personal workstation, and I worked from home.

20. Although Dr. Rosen stated that neuroradiologists used home workstations due to "unique scheduling in neuroradiology, Drs. Dupuis, Schmidlin, and Steeves are not neuroradiologists.

21. Dr. Rosen did not grant me a personal home workstation.

22. Radiologists perform the same work whether on call or not.  We read images and advise and speak with clinicians when necessary.

23. Division Chiefs are responsible for the effective daily operational management of their division, financial stability, long term strategic planning, faculty development, and service for patients and referring clinicians. Divisions Chiefs are responsible for the business and operational functions of their divisions, and include responsibilities for clinical operations, financial sustainability, customer service, quality assurance and improvement, faculty development, recruitment and retention, research/scholarship, innovation, resident/fellow training, medical student education, and other division-specific functions. The position of Division Chief is a prestigious position.

24. On April 19, 2016, I met with Dr. Dill to discuss the Division's work schedule and my plans for summer vacation. Their meeting was cordial.

25. On May 31, 2016, I expressed to Dr. Rosen concerns about Dr. Dill's discriminatory treatment of radiologists in the Department. I stated that all attendings in the Division of Chest Radiology should adhere to a fixed work hour schedule, which will avoid the perception of disparate treatment; that there were several radiologists who use days that

they are assigned to the clinical service to complete non-clinical (academic / administrative) responsibilities, which ultimately detracts from their ability to help complete the daily clinical workload, which in turn impacts optimal patient care; that I would not tolerate any inappropriate behavior or discriminatory treatment from any physician, ancillary staff, or trainee; and that all employees should to be subject to equal standards, which will help avoid intra-divisional conflicts. I received no response from Dr. Rosen regarding the concerns that I expressed to him regarding Dr. Dill on May 31, 2016.

26. Due to Dr. Dill's frequent physical absences from the Division, I bore the heaviest clinical workload.

27. Because the practice of radiology was my life's calling, I declined to work on a per diem or part time basis.

28. During my 2016-2017 Annual Faculty Performance Review, Dr. Rosen never informed me that I had an excessive number of 3 and 4 level misreads.

29. My cases accounted for 12.6% of Dr. Dill's entries.  No disciplinary action was taken against the other 87.4% readers, including Dr. Dill.

30. I am not aware of any systemic controls over the misattribution of poor quality reads. Defendants' document UMM 03687-03688, for example, shows that Dr. Dill read her own initial interpretation when conducting quality assurance overreads and entering them into the peer review system.  The system was designed for a reviewer to "peer review" *another* radiologist's reads, not their *own* reads.  However, Dr. Dill often "peer reviewed" her *own* reads, and detected significant errors in the interpretations associated with her *own* reads.

31. The documents produced by Defendants reveal no independent review was conducted of any other radiologist's readings based on Dr. Dill's concerns as reflected in the QA system.

32. Dr. Kimberly Robinson, MD, was a pulmonologist who treated patients at UMass Memorial Health Marlborough Hospital and for a period served as President of the Medical Staff for UMass Memorial Health Marlborough Hospital.

33. Dr. Robinson was unhappy, in general, with the reads provided by University Campus radiologists for UMass Memorial Health Marlborough Hospital.

34. Drs. AB, AK, DB, HL, GT and AS, all read Chest CTs as part of their call responsibilities. Defendants did not investigate any of these younger and/or male and/or non-disabled radiologists based on Dr. Robinson's concerns. Dr. Rosen admits that patients should receive the highest quality, safest care 24 hours a day.

35. None of the 25 chest CT scan studies that were selected for inclusion in the independent review were studies that I interpreted for patients at UMass Memorial Health Marlborough Hospital.

36. Dr. Rosen took no disciplinary action against either Dr. B____ or Dr. L_, despite their similar or greater percentage of patient impacting errors. Drs. B____ and L_ are male, in their 30s and 40s, and non-disabled.

37. On March 14, 2018, Dr. Rosen met with me, in the presence of Dr. Charles Cavagnaro (who attended the meeting at Dr. Tosi's request: see Dr. Tosi section below) and hand delivered to me a letter stating that my employment would be terminated on March 17, 2019.  The letter of termination did not cite a reason my termination.

38. Dr. Rosen restricted m from reading chest CT scans. During the course of my employment, I previously interpreted all types of films (not limited to Chest) and interpreted all types of films (not limited to Chest) while "on call."

39. I was humiliated by the restriction and devastated by the termination.  Both were the subject of public discussion.

40. Dr. Rosen's concern about my clinical performance was limited to my ability to interpret CT scans; he did not have a holistic concern about my overall competency in the field of diagnostic radiology. Dr. Rosen instructed me to continue interpreting plain (non-CT) chest radiographs.

41. Dr. Rosen did not offer to transfer my job responsibilities to reading only plain films chest radiographs or radiographs associated with another practice area of diagnostic radiology. In contrast, in response to Dr. Robinson's complaints about Dr. Tyagi, Dr. Rosen redirected Dr. Tyagi's responsibilities and told him not to read CT scans, but no restrictions are identified in Dr. Tyagi's evaluations.

42. Prior to informing me of my termination, Dr. Baccei had never spoken with me regarding any concerns about my performance.

43. I did not desire to end my employment by September 30, 2018, nor plan to, and never expressed to Dr. Rosen or anyone else that I did.

44. Muriel Fraker serves as Associate General Counsel at UMass Memorial Health Care, Inc.

45. Dr. Rosen stated that Faculty Annual Performance Reviews forms, which he used to conduct radiologists' Annual Reviews, are Medical School forms, and that he therefore did not record clinical performance issues in them. These are the only faculty reviews conducted annually; credentialling and OPPE evaluations are not formally discussed with

radiologists or even made known to radiologists at the Medical Center. Direct evaluation of my performance on OPPE forms were not shared with me, as evidenced by the fact that I signed these forms prior to the date my evaluator signed the forms, and evaluators were asked to submit these forms, often specifically marked as confidential, directly to the office responsible for handling of such forms.

46. The policy states that review of a staff member's academic activities are supposed to be discussed annually on an individual basis during individual annual academic planning sessions.

47. No previous Chairman in the Department of Radiology ever restricted my clinical privileges or recommended reappointment with condition.

48. Dr. Rosen did not terminate Dr. F_____, Dr. B_____, Dr. L__, Dr. T____ Dr. K____ Dr. B____, Dr. S____, Dr. S_____, or Dr. S___.

49. Drs. B_____, L__ T____, K____, B____, Si____r, S_____, and S___ all read Chest CTs as part of their call responsibilities.

50. Dr. ____LS____ was hired by Dr. Rosen as a 0.8 FTE to work primarily in the Division of Cardiothoracic Radiology due to concerns of short staffing in the Division.

51. Prior to Dr. Rosen becoming Chair of the Department of Radiology, Dr. Ferrucci and Dr. Korganokar worked as full-time radiologists in the Department of Radiology. After Dr. Rosen became Chair, Dr. Ferrucci, then age 84, began to work as a per diem radiologist in the Department of Radiology. He nevertheless works 50 hours per week. After Dr. Rosen became Chair, Dr. Korgaonkar, age 75, began to work as a per diem radiologist in the Department of Radiology.

52. In contrast, Dr. Rosen never verbally or in writing offered me the opportunity to resign or retire in lieu of termination.

53. I assumed full responsibility for leadership and daily operation of the Division of Thoracic Radiology in the physical absence of the Division Chief (more than 100 working days in 2016 and 2017) and was the only full-time chest radiologist in the Division in times of Dr. Dill's absence following the departure of Eric Schmidlin, MD in June 2016 as a full time radiologist for the period of time up until the arrival of Dr. Maria Barile, MD on December 31, 2018.

54. I trained the following individuals during their Residency at the Medical Center or as a student at the Medical School: Dr. Brian Brochu, Dr. Dennis Coughlin, Dr. Carolyn Dupuis, Dr. Hemang Kotecha, Dr. Lacey McIntosh, Dr. Andrew Chen, Dr. Monique Tyminksi, Dr. Andrew Chen, Dr. David Choi, Dr. Laureen Sena, Dr. Robert Sheiman, Dr. Jade Watkins, Dr. Abhijit Roychowdhury, Dr. Patricia Cross, Dr. Andrew Smith, Dr. Guillermo Walters. I trained Dr. Aaron Harman, MD in the Department of Radiology while he was a medical student at the University of Massachusetts Medical School.

55. In addition, I trained Dr. Young Kim in thoracic radiology when he began working as an attending physician in the Department of Radiology.

56. I am qualified to read magnetic resonance imaging studies.

57. I interpreted studies related to modalities other than thoracic radiology during my employment.

58. Dr. Charles Cavagnaro, Dr. Kimberly Robinson, Mr. Roach, and Douglas Brown currently serve on the Patient Care Assessment Committee, (a.k.a. Board of Trustees of UMass Memorial Health Marlborough Hospital) and served on this committee when I was actively employed in the Department of Radiology.

59. Dr. Brian Brochu, MD in his role as Chief of UMass Memorial Health Marlborough Hospital in 2018, following Dr. Brennan's departure, never discussed or formalized to me any complaints regarding the quality of my work.  No documentation exists to support that Dr. Brochu directly participated restricting my privileges at UMass Memorial Health Marlborough Hospital or University of Massachusetts Medical Center, nor did he involve or communicate with any other parties in order to restrict my privileges, even though he served on committees that exercised such authority. My credentialing was approved in 2017 with no restrictions to my privileges at UMass Memorial Health Marlborough Hospital or University of Massachusetts Medical Center for another two year term.

60. As part of my employment contract, I received annual Continuing Medical Education funds from the Office of Graduate Medical Education at the University of Massachusetts Medical School.  I routinely exhausted these funds for academic/educational purposes, including, but not limited to the attendance of national meetings.

61. Chancellor Michael Collins, MD, FACP, a Medical School employee, was a member of the Board of Trustees (Patient Care Assessment Committee) at the time I was reappointed for clinical privileges at the Medical Center without condition. He continues to serve in this role to date.

Signed under pains and penalties of perjury,



Charu Desai