# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARU DESAI, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| UNIVERSITY OF MASSACHUSETTS | ) |
| MEMORIAL MEDICAL CENTER, INC., | ) |
| et al., | ) |
| | ) |
| Defendants | ) |
| | ) |

CIVIL ACTION NO.:
4:19-cv-10520-TSH

AFFIDAVIT OF CHARU DESAI, MD

I, Charu Desai, hereby depose and state as follows:

1. I was born on July 6, 1950.

2. I began working in the Department of Radiology in 1992.

3. On November 7, 2000, I collapsed at home but nevertheless went to work. Radiology colleagues observed that I seemed to have a serious, immediate, and acute health issue. They requested an urgent appointment for me to see a cardiologist; and I did so that day, and tests revealed that I had a heartrate at times in the twenty beats per minute range. Clinicians at the Medical Center diagnosed me with a life-threatening heart condition sometimes known as tachy-brady syndrome. I had a pacemaker implanted by physicians at the Medical Center on November 10, 2001. The pacemaker did not resolve my symptoms.

4. Around the time that my heart condition was diagnosed, and I had a pacemaker implanted, I was provided a personal workstation and worked from home. On occasion

throughout my employ, I also performed work duties at the Clinton and Memorial campuses.

5. My heart condition substantially limits the function of my heart and causes me to experience spells of variable duration, in which I become weak, tired, and incapacitated. These typically but not always last for a few minutes. Often, I can rest for a brief period, and am able to return to what I was doing before the spell, including returning to work. At other times, if I was exhausted from working many days in a row without a break, my condition would flare; in that event that I may not have been able to work the following day and would call out sick.

6. My health spells/episodes were (and are) unpredictable. They would occur while I was in the parking lot, on the way from the parking lot to my workstation, and even when I was actively working and interpreting films. Because my spells happened often at work, my condition was well known throughout the department.

7. On or about May 13, 2016, I spoke with Dr. Rosen about accommodating my need for FMLA leave in scheduling.  He chastised me for tardiness, which I told h im was caused by my spells on the way into work.  Dr. Rosen told me that if there were medical reasons that would cause me to be late, I should contact Human Resources regarding a plan to accommodate me and adjust scheduling.

8. Given my length of service, I was considered a senior attending radiologist.

9. I made several requests to Dr. Rosen that I should be call exempt due to my status as a senior attending.

10. Dr. Rosen told me that if I wanted not to take call, I could go per diem. He frequently suggested that I work on a per diem or part time basis rather than as a full-time basis.

11. Despite my request, I continued to be scheduled for call.

12. Because working daily for two weeks in a row due to being on call caused me fatigue that exacerbated my health condition, I "sold" call to  my colleagues. My salary was reduced due to my "sale" of six of my ten weekend calls to other radiologists, in the amount of $19,200 per year for two years.

13. Dr. Rosen appointed me to serve as the Quality Assurance representative for the Chest Division on the Quality Improvement Committee.

14. In the event the Chief of the Division of Thoracic Radiology was absent, I assumed full responsibility for leadership and effective daily operational management of the Division of Thoracic Radiology.

15. In the event the Chief of the Division of Chest Radiology, (i.e. Dr. Dill) was absent, I was the only full-time chest radiologist in the Division of Cardiothoracic Imaging following the departure of Eric Schmidlin (as a full time thoracic radiologist in the Division) up until and for a period after the day that I  was informed of my termination, until the arrival of Maria Barile on December 31, 2018.  At those times, I was often the only radiologist physically present in the Division of Cardiothoracic Imaging.

16. I requested 12 Academic and/or Administrative Days per year.  Dr. Rosen declined to grant any to me.

17. I observed that radiologists were often physically absent from the Department during their assigned academic and/or administrative days.

18. I was not allotted academic time since at least 2010.  I received academic time weekly under previous Department Chair Dr. Edward Smith, MD.

19. I was granted a workstation in the early 2000s, around the time that my heart condition was diagnosed and I was given a pacemaker. The Chair of the Department at the time provided me a personal workstation, and I worked from home.

20. Although Dr. Rosen stated that neuroradiologists used home workstations due to "unique scheduling in neuroradiology, Drs. Dupuis, Schmidlin, and Steeves are not neuroradiologists.

21. Dr. Rosen did not grant me a personal home workstation.

22. Radiologists perform the same work whether on call or not.  We read images and advise and speak with clinicians when necessary.

23. Division Chiefs are responsible for the effective daily operational management of their division, financial stability, long term strategic planning, faculty development, and service for patients and referring clinicians. Divisions Chiefs are responsible for the business and operational functions of their divisions, and include responsibilities for clinical operations, financial sustainability, customer service, quality assurance and improvement, faculty development, recruitment and retention, research/scholarship, innovation, resident/fellow training, medical student education, and other division-specific functions. The position of Division Chief is a prestigious position.

24. On April 19, 2016, I met with Dr. Dill to discuss the Division's work schedule and my plans for summer vacation. Their meeting was cordial.

25. On May 31, 2016, I expressed to Dr. Rosen concerns about Dr. Dill's discriminatory treatment of radiologists in the Department. I stated that all attendings in the Division of Chest Radiology should adhere to a fixed work hour schedule, which will avoid the perception of disparate treatment; that there were several radiologists who use days that

they are assigned to the clinical service to complete non-clinical (academic / administrative) responsibilities, which ultimately detracts from their ability to help complete the daily clinical workload, which in turn impacts optimal patient care; that I would not tolerate any inappropriate behavior or discriminatory treatment from any physician, ancillary staff, or trainee; and that all employees should to be subject to equal standards, which will help avoid intra-divisional conflicts. I received no response from Dr. Rosen regarding the concerns that I expressed to him regarding Dr. Dill on May 31, 2016.

26. Due to Dr. Dill's frequent physical absences from the Division, I bore the heaviest clinical workload.

27. Because the practice of radiology was my life's calling, I declined to work on a per diem or part time basis.

28. During my 2016-2017 Annual Faculty Performance Review, Dr. Rosen never informed me that I had an excessive number of 3 and 4 level misreads.

29. My cases accounted for 12.6% of Dr. Dill's entries.  No disciplinary action was taken against the other 87.4% readers, including Dr. Dill.

30. I am not aware of any systemic controls over the misattribution of poor quality reads. Defendants' document UMM 03687-03688, for example, shows that Dr. Dill read her own initial interpretation when conducting quality assurance overreads and entering them into the peer review system.  The system was designed for a reviewer to "peer review" *another* radiologist's reads, not their *own* reads.  However, Dr. Dill often "peer reviewed" her *own* reads, and detected significant errors in the interpretations associated with her *own* reads.

31. The documents produced by Defendants reveal no independent review was conducted of any other radiologist's readings based on Dr. Dill's concerns as reflected in the QA system.

32. Dr. Kimberly Robinson, MD, was a pulmonologist who treated patients at UMass Memorial Health Marlborough Hospital and for a period served as President of the Medical Staff for UMass Memorial Health Marlborough Hospital.

33. Dr. Robinson was unhappy, in general, with the reads provided by University Campus radiologists for UMass Memorial Health Marlborough Hospital.

34. Drs. ████████, ████████, ████████, ██HL██ ██GT██ and ██AS██ ████████, all read Chest CTs as part of their call responsibilities. Defendants did not investigate any of these younger and/or male and/or non-disabled radiologists based on Dr. Robinson's concerns. Dr. Rosen admits that patients should receive the highest quality, safest care 24 hours a day.

35. None of the 25 chest CT scan studies that were selected for inclusion in the independent review were studies that I interpreted for patients at UMass Memorial Health Marlborough Hospital.

36. Dr. Rosen took no disciplinary action against either Dr. B████ or Dr. L█, despite their similar or greater percentage of patient impacting errors. Drs. B████ and L█ are male, in their 30s and 40s, and non-disabled.

37. On March 14, 2018, Dr. Rosen met with me, in the presence of Dr. Charles Cavagnaro (who attended the meeting at Dr. Tosi's request: see Dr. Tosi section below) and hand delivered to me a letter stating that my employment would be terminated on March 17, 2019.  The letter of termination did not cite a reason my termination.

38. Dr. Rosen restricted m from reading chest CT scans. During the course of my
    employment, I previously interpreted all types of films (not limited to Chest) and
    interpreted all types of films (not limited to Chest) while "on call."

39. I was humiliated by the restriction and devastated by the termination.  Both were the
    subject of public discussion.

40. Dr. Rosen's concern about my clinical performance was limited to my ability to interpret
    CT scans; he did not have a holistic concern about my overall competency in the field of
    diagnostic radiology. Dr. Rosen instructed me to continue interpreting plain (non-CT)
    chest radiographs.

41. Dr. Rosen did not offer to transfer my job responsibilities to reading only plain films
    chest radiographs or radiographs associated with another practice area of diagnostic
    radiology. In contrast, in response to Dr. Robinson's complaints about Dr. Tyagi, Dr.
    Rosen redirected Dr. Tyagi's responsibilities and told him not to read CT scans, but no
    restrictions are identified in Dr. Tyagi's evaluations.

42. Prior to informing me of my termination, Dr. Baccei had never spoken with me regarding
    any concerns about my performance.

43. I did not desire to end my employment by September 30, 2018, nor plan to, and never
    expressed to Dr. Rosen or anyone else that I did.

44. Muriel Fraker serves as Associate General Counsel at UMass Memorial Health Care, Inc.

45. Dr. Rosen stated that Faculty Annual Performance Reviews forms, which he used to
    conduct radiologists' Annual Reviews, are Medical School forms, and that he therefore
    did not record clinical performance issues in them. These are the only faculty reviews
    conducted annually; credentialling and OPPE evaluations are not formally discussed with

radiologists or even made known to radiologists at the Medical Center.  Direct evaluation

of my performance on OPPE forms were not shared with me, as evidenced by the fact

that I signed these forms prior to the date my evaluator signed the forms, and evaluators

were asked to submit these forms, often specifically marked as confidential, directly to

the office responsible for handling of such forms.

46. The policy states that review of a staff member's academic activities are supposed to be

discussed annually on an individual basis during individual annual academic planning

sessions.

47. No previous Chairman in the Department of Radiology ever restricted my clinical

privileges or recommended reappointment with condition.

48. Dr. Rosen did not terminate Dr. F██████, Dr. B██████, Dr. L█, Dr. T████ Dr. K████

Dr. B██████, Dr. S████, Dr. S██████, or Dr. S███.

49. Drs. B██████, L█ T████, K████, B█████, S████r, S██████, and S███ all read Chest CTs

as part of their call responsibilities.

50. Dr. ███LS███ was hired by Dr. Rosen as a 0.8 FTE to work primarily in the Division

of Cardiothoracic Radiology due to concerns of short staffing in the Division.

51. Prior to Dr. Rosen becoming Chair of the Department of Radiology, Dr. Ferrucci and Dr.

Korganokar worked as full-time radiologists in the Department of Radiology.  After Dr. Rosen

became Chair, Dr. Ferrucci, then age 84, began to work as a per diem radiologist in the

Department of Radiology. He nevertheless works 50 hours per week. After Dr. Rosen became

Chair, Dr. Korgaonkar, age 75, began to work as a per diem radiologist in the Department of

Radiology.

52. In contrast, Dr. Rosen never verbally or in writing offered me the opportunity to resign or retire in lieu of termination.

53. I assumed full responsibility for leadership and daily operation of the Division of Thoracic Radiology in the physical absence of the Division Chief (more than 100 working days in 2016 and 2017) and was the only full-time chest radiologist in the Division in times of Dr. Dill's absence following the departure of Eric Schmidlin, MD in June 2016 as a full time radiologist for the period of time up until the arrival of Dr. Maria Barile, MD on December 31, 2018.

54. I trained the following individuals during their Residency at the Medical Center or as a student at the Medical School: Dr. Brian Brochu, Dr. Dennis Coughlin, Dr. Carolyn Dupuis, Dr. Hemang Kotecha, Dr. Lacey McIntosh, Dr. Andrew Chen, Dr. Monique Tyminksi, Dr. Andrew Chen, Dr. David Choi, Dr. Laureen Sena, Dr. Robert Sheiman, Dr. Jade Watkins, Dr. Abhijit Roychowdhury, Dr. Patricia Cross, Dr. Andrew Smith, Dr. Guillermo Walters. I trained Dr. Aaron Harman, MD in the Department of Radiology while he was a medical student at the University of Massachusetts Medical School.

55. In addition, I trained Dr. Young Kim in thoracic radiology when he began working as an attending physician in the Department of Radiology.

56. I am qualified to read magnetic resonance imaging studies.

57. I interpreted studies related to modalities other than thoracic radiology during my employment.

58. Dr. Charles Cavagnaro, Dr. Kimberly Robinson, Mr. Roach, and Douglas Brown currently serve on the Patient Care Assessment Committee, (a.k.a. Board of Trustees of UMass Memorial Health Marlborough Hospital) and served on this committee when I was actively employed in the Department of Radiology.

59. Dr. Brian Brochu, MD in his role as Chief of UMass Memorial Health Marlborough Hospital in 2018, following Dr. Brennan's departure, never discussed or formalized to me any complaints regarding the quality of my work.  No documentation exists to support that Dr. Brochu directly participated restricting my privileges at UMass Memorial Health Marlborough Hospital or University of Massachusetts Medical Center, nor did he involve or communicate with any other parties in order to restrict my privileges, even though he served on committees that exercised such authority. My credentialing was approved in 2017 with no restrictions to my privileges at UMass Memorial Health Marlborough Hospital or University of Massachusetts Medical Center for another two year term.

60. As part of my employment contract, I received annual Continuing Medical Education funds from the Office of Graduate Medical Education at the University of Massachusetts Medical School.  I routinely exhausted these funds for academic/educational purposes, including, but not limited to the attendance of national meetings.

61. Chancellor Michael Collins, MD, FACP, a Medical School employee, was a member of the Board of Trustees (Patient Care Assessment Committee) at the time I was reappointed for clinical privileges at the Medical Center without condition. He continues to serve in this role to date.



Signed under pains and penalties of perjury,

Charu 8 Desai

Charu Desai

# Exhibit B

# CURRICULUM VITAE

## Charu S. Desai, M.D.
32 Whisper Drive
Worcester, MA  01609
(508) 799-5280

### EDUCATION

| | |
|---|---|
| **Premedical**<br>1966-1968 | PT Saravajanik College of Science<br>Surat, India, BS  1968 |
| **Medical School**<br>1968-1972 | Government Medical College, Surat<br>India, MBBS, 1972 |

### POSTGRADUATE TRAINING

| | |
|---|---|
| **Internship**<br>1972-1973 | Civil Hospital<br>Surat, India |
| 1974-1975 | House Physician<br>Youville Hospital<br>Cambridge, MA |
| 1975 | ER Physician<br>Central Hospital<br>Somerville, MA |
| **Residency**<br>1975-1976 | Pathology<br>Mount Auburn Hospital<br>Cambridge, MA |
| 1976-1977 | House  Physician<br>Cushing Hospital<br>Framingham, MA |
| 1978-1981 | Diagnostic Radiology U<br>Mass Medical Center<br>Worcester, MA |
| 1979-1981 | Chief Resident<br>U Mass Medical Center<br>Worcester, MA |
| **Fellowship**<br>1981-1982 | Computed Body Tomography/Ultrasound<br>U Mass Medical Center<br>Worcester, MA |

### CERTIFICATION

| | |
|---|---|
| 1975 | ECFMG – Certificate #194-965-0 |
| 1982 | FLEX – Passed |
| 1983 | Board Certified, Diagnostic Radiology |

Charu Desai, MD

Exhibit_5

9/18/2020

Charu Desai, M. D.

## POSITIONS

| | |
|---|---|
| 1982-1983 | Assistant Professor of Radiology<br>U Mass Medical Center<br>Worcester, MA |
| 1983-1992 | Radiology Clinic, Inc.<br>Worcester, MA |
| 1992-2002 | Assistant Professor of Radiology<br>U Mass Medical Center<br>Worcester, MA |
| 2002-present | Clinical Associate Professor of Radiology<br>U Mass Medical Center<br>Worcester, MA |
| 2015-Present | Attending Radiologist, Clinton Hospital, Clinton, MA |
| 2015-Present | Attending Radiologist, Marlborough Hospital,<br>Marlborough, MA |

## PROFESSIONAL APPOINTMENTS

| | |
|---|---|
| 1983-1990 | Attending Radiologist<br>Worcester City Hospital<br>Worcester, MA |
| 1983-1990 | Attending Radiologist<br>Fairlawn Hospital and Rehabilitation Center<br>Worcester, MA |
| 1983-1990 | Attending Radiologist<br>Doctor's Hospital<br>Worcester, MA |
| 1983-1990 | Attending Radiologist<br>Holden Hospital<br>Holden, MA |
| 1983-1992 | Attending Radiologist<br>Harrington Memorial Hospital<br>Southbridge, MA |
| 1992-present | Clinical Associate Professor and<br>Attending Radiologist<br>U Mass Medical Center<br>Worcester, MA |
| June, 2017 | Best Teacher Award presented by<br>Residents |

CD 00043

Charu Desai, M. D.

**SOCIETIES**  Radiological Society of North America
NERRS (Junior Membership 1978-1981)

**TEACHING EXPERIENCE**

1983-1987  Actively involved in teaching the residents in general surgery, internal medicine, emergency medicine and family practice conducting daily radiology rounds of in-house patients -- Worcester City Hospital.

1992-present  Actively involved in teaching radiology residents and medical students rotating through the radiology department.

On Line teaching residents and medical students 8 to 5 p.m. in chest rotation twice a week.

Teaching residents on-call on weekends
Consultation daily with attendings, residents and medical students.

Sometimes discussion of cases at clinical radiological pulmonary conference.

Monitoring residents for 10 a.m. medical conference.

Sometimes discussion of cases at clinical radiology/pulmonary conference.

Giving conference to medical students.  11/11/99, 2/24/00, 3/1/00, 9/29/00

**LEARNING EXPERIENCES**

10/79-6/80  Physics Course – Massachusetts General Hospital

5/12/80-6/20/80  Armed Forces Institute of Pathology (AFIP) Washington, DC
Radiologic Pathology Course

4/80  Children's Hospital Medical Center-Elective Boston, MA

1980-81  U Mass Medical Center, Worcester, MA
Resident Representative for Radiology,

CD 00044

## CONFERENCES & CERTIFICATES

| | |
|---|---|
| 1986 | Chest Conference, San Francisco, CA |
| 1987 | Mammography Course, Boston, MA |
| 1990 | Diagnostic Radiology, San Francisco, CA |
| 1993 | Chest Imaging, Boston, MA |
| 1996 | Mammography Conference, Virginia |
| 1997 | ASER Meeting, New Orleans, LA |
| 1998 | Summer Radiology, South Carolina |
| 1998 | Radiology 2000, South Carolina |
| 1999 | Missed & Delayed Diagnosis of Breast Cancer, NY |
| 2000 | Clinical Essentials of CT & MRI, Las Vegas, NV |
| 2000 | Advanced Seminars in Ultrasound Diagnosis, NY |
| 2002 | Chest Imaging, Boston, MA |
| 2002 | Emergency Radiology, New York, NY |
| 2003 | Neuroradiology, Harvard Medical School, Boston, MA |
| 2011 | Radiology Review Course given by Harvard in March, 2011 |
| 2012 | Imaging in Hawaii Conference, Kapalua, HI in September, 2012 |
| 2015 | CT Boot Camp; Principles, Pearls and Protocols |
| 2015 | Abdominal and Pelvic Imaging |

## PUBLICATIONS

| | |
|---|---|
| 1996 | Familial Pulmonary Fibrosis in Twins |
| 1997 | The Importance of Azygo-Esophageal Line, presented at RSNA – Poster |
| 1998 | Pulmonary Sling in Adults with Recurrent Pneumonia An Episode of Pulmonary Embolism- Abstract |
| 1999 | Deep Sulcus Sign, presented at AUR - Abstract |
| 2002 | Radiologic imaging of Perflubron, a mode of treatment of ARDS. Abstract. Exibit-AUR. |
| 2002 | Talc geanulomata with positive PET scan. Multiple mass like opacities on plain CXR & CT scan, in a patient with biopsy proven talc geanuloma. Abstract AUR |

CD 00045

# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-cv-10520-TSH

CHARU DESAI,
      Plaintiff,

v.

UMASS MEMORIAL MEDICAL
CENTER, INC., et al.,
      Defendants.

**AFFIDAVIT OF
MAX ROSEN, M.D., M.P.H.**

I, Max Rosen, M.D., M.P.H, hereby depose and state as follows:

1.      I am the Chair of the Department of Radiology for UMass Memorial Health (the "Department"), and in this capacity I have personal knowledge of the facts set forth herein.

2.      I was appointed as the Chair of the Department effective September 1, 2012.

3.      I am employed by UMass Memorial Medical Group, Inc., and the University of Massachusetts Medical School.

4.      Charu Desai, M.D., was formerly employed by the Medical Group as a physician specializing in chest radiology.

5.      Dr. Desai was employed pursuant to an Agreement between UMass Memorial Medical Group, Inc., and Charu Desai, M.D. ("Employment Agreement"), a copy of which is attached as **Exhibit A.** Pursuant to the Employment Agreement, Dr. Desai was dually-employed by the Medical Group and the University of Massachusetts Medical School. Exhibit A, ¶ 1.14.

6.      In my capacity as Chair, I supervised and managed all radiologists employed by the Medical Group, including Dr. Desai. As Chair, I am responsible for the performance of

Medical Group physicians in the Radiology Department. Among my duties as Chair is to ensure that the Department provides high quality and safe imaging services for patients.

7.      Dr. Desai's job duties involved reviewing radiological images in the form of computed tomography ("CT") or radiographs ("x-rays" or "plain films"), interpreting the images, describing findings, and opining on diagnoses of disease and medical conditions revealed in the images. Dr. Desai was not qualified to read magnetic resonance imaging (MRI) and did not read MRIs in the course of her employment.

8.      As a radiologist, Dr. Desai's practice was focused on and limited to thoracic (a/k/a chest) imaging, and Dr. Desai worked within the Department's Thoracic Division (a/k/a Chest Division).

9.      Dr. Desai performed her duties for the Medical Group while located at UMass Memorial Medical Center (the "Medical Center") facilities. The Medical Center is a multi-facility academic hospital which provides tertiary-level care.

10.      In her role as a radiologist for the Medical Group, Dr. Desai reviewed and interpreted images for patients originating from multiple hospitals, including campuses of the Medical Center, Marlborough Hospital, and Clinton Hospital. These hospitals are each separate entities.

11.      The Medical Group is responsible for staffing radiologists to review images originating from different hospitals, and the Medical Group directs the radiologists' assignments.

12.      The hospitals, including Marlborough Hospital and the Medical Center, did not direct Dr. Desai or any other radiologist with respect to the reading of images or in any other job duties. Dr. Desai was supervised by Medical Group employees at all times.

13.    Dr. Desai was never employed by the Medical Center. The Medical Center did not set the compensation for radiologists, did not set the work schedules for radiologists, and did not have the power to hire, fire, or discipline radiologists, including Dr. Desai.

14.    In order to provide medical services as a physician for Medical Center patients, Dr. Desai was required to be granted clinical privileges by the Medical Center and be a member of the Medical Center's medical staff.

15.    Darren Brennan, M.D., served as the Chief of Radiology for Marlborough Hospital from 2015 to 2018. He was not an employee of Marlborough Hospital, but at all times has been employed by the Medical Group as a radiologist.

16.    As Chief of Radiology, Dr. Brennan performed an administrative role which involved serving as a representative of the Medical Group's Radiology Department, serving as a liaison with Marlborough Hospital, and ensuring that the Medical Group was performed its obligations under its contract with Marlborough Hospital. In Dr. Brennan's capacity as Chief of Radiology, he oversaw staffing coverage for the Medical Group's reading of studies originating from Marlborough Hospital.

17.    Dr. Brennan served as the Department's Vice Chair for Enterprise Operations and Community Radiology from 2015 to 2019. In my absence, I would sometimes designate Dr. Brennan to address concerns within the Department in his role as Vice Chair. On September 21, 2017, Dr. Brennan addressed a matter between Dr. Desai and Karin Dill, M.D., in that capacity and at my request.

18.    Dr. Desai had a Sick Bank as well as Salary Continuation she could use for paid medical leave. At the time of her separation from employment, Dr. Desai had not exhausted her available sick leave and had available 116.55 hours in her Sick Bank.

19.     In 2014, a physician in the Department, ███ S.A. ███, M.D., requested a change in her work hours due to a medical issue, and an accommodation to her schedule was approved by me which remains in place to the present day.

20.     The Department maintained a policy for physicians to be allotted academic or administrative time to conduct non-clinical duties ("Academic and Administrative Time Policy"), a copy of which is attached as **Exhibit B**. Pursuant to the Academic and Administrative Time Policy, academic time can be allotted to academic responsibilities including teaching and conference preparation, writing papers or texts, completing research projects, attending institutional and department committees, attending conferences, or serving on committees of local, regional, national or international organizations.

21.     Dr. Desai was not allotted academic time since at least 2010, and the Department does not have a record of Dr. Desai having ever been allotted academic time. In the time I have been Chair, Dr. Desai never requested academic time for the purposes of performing academic work, research, or other scholarly activities nor has she ever made any proposal for academic work she wished to perform. In addition, she never requested time to participate in the work of local, regional, national, or international organizations.

22.     Medical Group radiologists are required to work "call" where they are scheduled to work certain weekends and holidays to ensure coverage for patients every day of the year. The Department has a policy which requires all regularly-employed staff members to provide "call," a copy of which is attached as **Exhibit C**. The requirements for call vary by division due to coverage needs, but the time commitment of the call coverage is substantially the same.

23.     For members of the Chest Division, a radiologist must work one-fifth of weekends, or ten weekends per year, as well as a portion of holidays, which are scheduled in advance in an equitable manner among the radiologists working in the division.

24.     Performing call is an essential and critical part of being a radiologist in the Department, and is required in order to provide timely and high-quality care to patients, as UMass Memorial is a tertiary-care referral center and level one trauma center which operates twenty four hours a day every day of the year. If a radiologist does not perform call, those responsibilities fall on other employees.

25.     At one time, the Department implemented a program in which staff members could elect to "sell" calls, where other staff radiologists could perform additional call for additional compensation, and the radiologist not doing call would have their salary reduced by an equivalent amount. This policy was in place for two fiscal years, from October 1, 2015, to September 30, 2017.

26.     Dr. Desai elected to sell, and others in the department elected to "take" six out of her ten call weekends for these years, and during this period she performed substantially reduced call. Dr. Desai's salary was reduced accordingly during this time period due to her "sale" of her calls to other radiologists, in the amount of $19,200 per year. The rate that each call was valued was in accordance with the Department's per diem rates in effect at that time.

27.     At least one other radiologist in the Department also elected to sell calls during this period.

28.     The policy of selling calls was ended due to the administrative difficulties in managing the program, as well as the lack of staff radiologists interested in taking additional call.

29.     It is common for staff radiologists to not want to take call.

30.     The Medical Group employs physicians in part-time roles, in which their hours are reduced and their call obligations are proportionately reduced.

31.     The Medical Group employs physicians in "per diem" status, in which the employees work on an hourly basis, and are not obligated to take call. Because staff radiologists who are on per diem status are not obligated to take call, some radiologists have chosen to change their status to per diem in order to be relieved of that obligation.

32.     Mona Korgaonkar, M.D., a female radiologist who is older than Dr. Desai, requested to move to a part time schedule, which I granted, and she subsequently requested that she not take call, and I offered, and she accepted the ability to change her status to per diem to be exempt from call responsibilities. Dr. Korgaonkar remains employed by the Medical Group.

33.     In response to Dr. Desai requesting to be exempt from call, I discussed with her the option to transition to per diem status.

34.     In October 2017, I asked Dr. Joseph Ferrucci if he would consider speaking with Dr. Desai to share his experience moving from active to per diem status with the Medical Group to assist her with her decision. I did not tell Dr. Ferrucci that I intended to terminate Dr. Desai's employment or to require her to move from active to per diem status. I did not tell Dr. Ferrucci that I had an obligation to think about recruiting younger staff for service needs, and I did not discuss the age or longevity of any staff member, including Dr. Desai, at any time, with Dr. Ferrucci.

35.     At no time did Dr. Desai state that she desired to be exempted from taking call or desired an alteration to her call scheduled due to a heart condition or any other health condition.

36.     The Department began to utilize remote workstations for staff radiologists to use from home on a trial basis beginning in early 2017. Only the following radiologists used home

workstations in the initial year of the implementation: Andrew Chen, M.D., Karin Dill, M.D.,

and Philip Steeves, M.D.

37.     Dr. Steeves is five years older than Dr. Desai.

38.     Nine radiologists used home workstations from implementation until the date of

Dr. Desai's separation: Aly Abayazeed, M.D., Satish Dundamadappa, M.D., Carolyn Dupuis,

M.D., David Choi, M.D., Andrew Chen, M.D., Karin Dill, M.D., Sami Erbay, M.D., Philip

Steeves, M.D., and Eric Schmidlin, M.D.

39.     Dr. Abayazeed, Dr. Dundamadappa, Dr. Choi, Dr. Chen, and Dr. Erbay

specialized in neuroradiology and were among the first to test and use home workstations due to

the unique scheduling in neuroradiology where radiologists would rotate working routine

evening shifts.

40.     No staff member was permitted to take call remotely through the use of a home

workstation or otherwise during the time Dr. Desai was employed.

41.     The Department has a quality assurance system designed to improve the quality of

radiology services. Prior to 2019, the quality assurance system was based, in part, on a peer

review system, where other radiologists within the Department would review each other's reads.

42.     In this system, all radiologists in the Department were asked to enter information

into the quality assurance system in two circumstances: (1) through an automated process that

requests that a certain number of cases be double-read periodically by each radiologist on staff;

and (2) when a radiologist is made aware of a quality issue about an interpretation, the

radiologist was obligated to enter that information into the peer review privileged database.

43.     When radiologists reviewed the studies, they would input a numerical score as to

their review, with scores denoting the following: a "1" indicated the reviewer concurred with the

reviewee's radiological interpretation; a "2" indicated the reviewer identified a discrepancy in interpretation/not ordinarily expected to be made, but which was denoted as an "understandable miss;" a "3" indicated the reviewer identified a discrepancy in the reviewee's interpretation and that the discrepancy should have been caught by the radiologist "most of the time;" and a "4" indicated the reviewer noted a discrepancy in interpretation that represented a "misinterpretation of findings" and that should be identified "almost every time."

44.     At their annual faculty reviews, I provided staff radiologists with information from the quality assurance database regarding peer review reads labelled with scores of either "3" or "4." I would advise the radiology staff members of these entries and ask the staff member to review the cases if they had not already done so, as a part of the quality improvement process.

45.     I provided Dr. Desai with such a summary from the quality assurance system during her 2016-2017 annual faculty review (the "Peer Review Summary"), a copy of which is attached as **Exhibit D**.

46.     Karin Dill, M.D., was hired as a radiologist and the Division Chief of the Thoracic Division on February 29, 2016. The Division Chief position was publicly posted and the Department conducted recruiting efforts to fill the position. Dr. Desai did not apply for or ever express interest in the position. Dr. Dill was more qualified than Dr. Desai to be Division Chief, based on her education, training, professional involvement, research, qualifications, and experience.

47.     According to data recorded in the quality assurance system, in the course of Dr. Dill's employment, she entered information in the quality assurance system indicating disagreement with the radiologist's initial read for 31 radiologists, in 79 instances.

48.     Kimberly Robinson, M.D., is a pulmonologist (a physician specializing in the respiratory system) who treats patients at Marlborough Hospital, and for a period served as President of the Medical Staff for Marlborough Hospital.

49.     Radiology, like other diagnostic medical work, can involve a degree of probability and subjectivity, and concerns or disagreements can be raised by treating physicians at times. Treating physicians have raised concerns to me with individual reads or quality issues from time to time. I evaluated quality concerns raised to me and took appropriate action based on the individual circumstances. I likewise evaluated quality concerns whenever they were raised to me by Dr. Robinson.

50.     Neither Dr. J.F. Dr. H.L., Dr. G.T. nor Dr. D.B. specialized in chest radiology. Dr. J.F. is 12 years older than Dr. Desai, Dr. G.T. is less than 2 years younger than Dr. Desai, and Dr. D.B. is 60 years old.

51.     I was aware that several of Dr. Desai's cases were entered in the Department's quality assurance database labelled as potentially significant misses, based on my distribution of data from the quality assurance system to Dr. Desai as a part of her annual review.

52.     On January 31, 2017, I met with representatives from Marlborough Hospital and its medical staff regarding radiology issues at the hospital. This meeting included the President of the Marlborough Hospital Medical Staff and pulmonologist Kimberly Robinson, M.D., and the President of Marlborough Hospital, Steven Roach. A copy of the minutes of this meeting are attached as **Exhibit E**.

53.     A significant concern addressed at the meeting was the quality of chest imaging. At the time, there were three radiologists specializing in chest in the Medical Group's Chest

Division, Karin Dill, M.D., Eric Schmidlin, M.D., and Dr. Desai. No concerns were raised at the meeting related to the reads of Dr. Dill or Dr. Schmidlin.

54.     At this meeting, Dr. Robinson expressed serious concerns with the quality of CT reads performed by Dr. Desai. Dr. Robinson stated to me that she never believed Dr. Desai's reports and could not rely on them.

55.     In response, I agreed that I would conduct a focused review of Dr. Desai's CT reads. I believed that I had to address the concerns raised to me in the interests of patient safety and the Department's obligations to provide high quality services to patients and providers.

56.     To ensure fairness and to confirm that the quality concerns were justified prior to taking further action, I opted to have an independent, blinded review of Dr. Desai's CT reads conducted.

57.     I did not choose to arrange an independent review of Dr. Desai's reads based on isolated concerns regarding a read or a request to re-review a study read by Dr. Desai. I did not make the decision to do so based on one or two misreads by Dr. Desai.

58.     I made the decision to perform an independent review based on reports of quality concerns from Dr. Dill, my awareness of errors in the peer review system, and the complaints from Dr. Robinson, in particular her comments at the January 31, 2017, meeting.

59.     I did not consider Dr. Desai's age, sex, or disability in making the decision to have the independent review performed.

60.     I requested that the Department's file room staff randomly select 25 chest CT studies reviewed by Dr. Desai and, as a control group, 25 chest CT studies reviewed by other radiologists. The studies included in the review were selected randomly, and I was not involved in selecting the studies.

61.     The CT studies selected for inclusion in the review were thoracic/chest studies, but the studies were not limited to those read by radiologists specializing in chest imaging. Eighteen out of the 25 control group studies were read by radiologists who did not specialize in chest imaging.

62.     I selected Diana Litmanovich, M.D., to conduct the independent review. Dr. Litmanovich is a thoracic radiologist at Beth Israel Deaconess Medical Center and is a faculty member of Harvard Medical School. Dr. Litmanovich is not employed by the Medical Group or affiliated with the UMass Memorial Health system. I believe Dr. Litmanovich to be an expert in the interpretation of thoracic CT images.

63.     I requested that Dr. Litmanovich review the images for each CT study and the corresponding report and provide her opinion whether she agreed or disagreed with the interpretation, and if she disagreed, to indicate whether it was a minor or major disagreement and whether or not the disagreement would have an impact on patient care in her opinion.

64.     Dr. Litmanovich provided me with her findings, and I un-blinded them through reference to their identifying numbers. Based on the findings, Dr. Litmanovich concluded that of the reads conducted by Dr. Desai, there were five major errors and nine errors she opined would impact patient care. Dr. Litmanovich concluded that of the reads conducted by other radiologists, there was one major error and five errors she opined would impact patient care.

65.     As a result of my assessment of the results of the independent review, I determined that Dr. Desai's quality was not acceptable for the Department, and I made the decision that Dr. Desai could not continue to work in the Department in order to ensure patient safety and provide high quality services to patients.

66.     On March 14, 2018, I met with Dr. Desai and informed her that her employment will be terminated on March 17, 2019.

67.     Pursuant to Dr. Desai's Employment Agreement, she was entitled to twelve months' notice prior to termination. Exhibit A, ¶ 7.2.

68.     I determined that in the time until Dr. Desai's employment ended, she would be restricted from reading CT images and would review only x-rays, due to the concerns raised regarding the quality of her CT reads from the independent review and my obligation to ensure patient safety and provide high quality services to patients.

69.     Neither I nor anyone else communicated the restriction of Dr. Desai from reading CTs throughout the Department, and this information was shared only in a discreet manner on a need-to-know basis for the purposes of scheduling and workflow for the reading of studies.

70.     On April 24, 2018, at Dr. Desai's request, I held a meeting with Dr. Desai and Vice Chair for Quality, Patient Safety and Process Improvement Steven Baccei, M.D., as well as Dr. Sarwat Hussain, a radiologist in the Department who Dr. Desai invited. At the meeting, I provided Dr. Desai with data from the independent reviewer's findings.

71.     I have made the decision to end the employment of other physicians in the Department due to performance concerns related to ability, including ██ R.G. ██, M.D., separated June 23, 2017, ██ R.N. ██, D.O., separated May 31, 2017, and ██ ██ A.R. ██ M.D., separated December 12, 2015.

72.     An external independent review was performed of Dr. ██ R.G. ██'s competency prior to the decision to end his employment. In addition, I reviewed data from the quality assurance system to evaluate Dr. ██ R.G. ██'s performance.

73.     An internal review and investigation was conducted of Dr. ███ 's performance prior to the decision to end his employment. Dr. ███ was forty years of age at the time of his separation.

74.     With respect to these physicians, I advised them that due to their performance, they would no longer be able to be employed with the Medical Group, and the physicians elected to resign in lieu of termination.

75.     Stephen Tosi, M.D., was the President of UMass Memorial Medical Group, Inc., at the time of Dr. Desai's termination.

76.     Following Dr. Desai's notice of termination, she was replaced in the Department by Maria Barile, M.D., who is a female.

77.     In 2019, I hired a Division Chief for the Thoracic Division who is 59 years of age.

78.     Presently, the Medical Group employs approximately 92 radiologists. The Department includes 24 radiologists who are age 60 years or older, and three over 70 years of age. I myself am 62 years of age.

79.     During my tenure as Chair of the Department, I have hired 14 radiologists who were 60 years of age or older and two who were over 70 years of age, as well as 32 radiologists who are female.

80.     I have made the decision to end the employment of eight regularly-employed radiologists as Chair (who either were terminated or elected to resign in lieu of termination), and seven were male, and seven were younger than Dr. Desai.

81.     In 2016, the Medical Group conducted an internal review of the compensation of its radiologists as a part of an effort to standardize salaries to address pay inequities and increase compensation to align more closely with the market for all radiologists. The Medical Group also

engaged an outside resource to perform an external market study to assist in establishing a standardized compensation structure.

82.     As a result of these efforts, the Medical Group was able to provide additional funds to the Radiology Department, and a large percentage of radiologists' salaries were increased.

83.     Based on the evaluation, the Medical Group implemented a new, standardized salary structure for radiologists effective March 1, 2017. Under this pay structure, the Department set a base salary, with additional designated sums based on academic rank as well as leadership and administrative positions which carried with them additional job duties and responsibilities. A copy of my correspondence to diagnostic radiologists informing them of this new structure is attached as **Exhibit F**.

84.     As a result of the implementation of the new compensation structure, Dr. Desai received a large increase in pay, from $302,575 to $340,000 per year. Her compensation was set based on the base salary for a diagnostic radiologist of $330,000, plus an additional $10,000 due to her rank as Associate Professor. A copy of my correspondence to Dr. Desai informing her of her new salary is attached as **Exhibit G**.

85.     Dr. Desai did not hold any leadership roles or perform additional duties for the Department.

86.     As a result of the new pay structure, every single full-time female radiologist who was employed as of March 1, 2017, whose pay was not already at the standard, received a pay increase, and they were paid in accordance with the standardized pay scale.

87.     Dr. Desai was a diagnostic radiologist, and Dr. Aaron Harman is an interventional radiologist. Diagnostic radiology involves reviewing images of the body and making

interpretations, and interventional radiology is image-guided surgery. Interventional radiologists perform invasive procedures on patients, and the radiology component relates to the use of imaging such as fluoroscopy, CT, ultrasound, and MRI to guide their procedures. Interventional Radiologists also have completed additional training through an ACGME accredited Interventional Radiology fellowship and some (including Dr. Harman) have also taken an additional board-certifying examination (Certificate of Added Qualification) in Interventional Radiology.

88.     Interventional radiologists generally earn substantially more than diagnostic radiologists. Thus, the Department has implemented a different pay scale for interventional radiology than diagnostic radiology. Under this structure, Dr. Harman's salary was $365,000 per year, which is the base salary for an interventional radiologist.

89.     Dr. Eric Schmidlin specialized in chest imaging and worked within the Chest Division with the same duties as Dr. Desai. Dr. Schmidlin did not receive higher compensation than Dr. Desai. His starting salary in 2012 was $300,000 per year, less than Dr. Desai's salary, and at the time of his separation from regular employment, he earned $294,000 per year, less than Dr. Desai's salary. Dr. Schmidlin left regular employment with the Medical Group on June 28, 2016, and he continued to work on a per diem, hourly basis. His hourly rate since has been $162.50, and Dr. Desai's rate when calculated on an hourly basis is $163.46.

90.     Byron Chen, M.D., and Hemang Kotecha, M.D., have always earned less than Dr. Desai; each with a salary of $330,000 per year at the time of Dr. Desai's separation. Both worked in different divisions than Dr. Desai.

91.     Dr. Karin Dill's base salary was the same as Dr. Desai's. However, Dr. Dill served as a Division Chief, and was paid an additional sum for those duties and responsibilities.

92.     Division Chiefs are responsible for the effective daily operational management of their division, financial stability, long term strategic planning, faculty development, and service for patients and referring clinicians. Divisions Chiefs are responsible for the business and operational functions of their divisions, and include responsibilities for clinical operations, financial sustainability, customer service, quality assurance and improvement, faculty development, recruitment and retention, research/scholarship, innovation, resident/fellow training, medical student education, and other division-specific functions.

93.     A radiologist's performance of non-clinical duties for the Department, including service in leadership, academic, and administrative positions, is separate and apart from their clinical duties and is extremely valuable to the Department.

94.     Steven Baccei, M.D., was paid a higher salary due to his leadership roles within the Department, pursuant to the salary structure. Dr. Baccei was the Division Chief for musculoskeletal radiology, and he served as the Department's Vice Chair of Quality, Safety, and Process Improvement. The duties of the Vice Chair include oversight of all quality assurance functions of the Department, specifically, maintaining the peer review database, managing department quality assurance meetings and review processes, responding to quality issues, handling risk management matters, and management of quality review projects, among other duties.

95.     Christopher Cerniglia, D.O. served in multiple leadership and administrative roles in the Department, for which he received additional compensation. Prior to 2017, he had served as a Division Chief for musculoskeletal radiology, and, thereafter, he continued to serve as 1) the Director for Medical Student Education in Radiology, in which he is responsible for organizing all of the radiology educational activities for the first and second year medical students, 2) the

Co-Course Director for the UMass Medical School DSF (Design, Structure, and Function) course, in which he runs the imaging lab within the anatomy lab, oversees imaging in connection with the course, and oversees all medical student, non-radiology interns and resident, and visiting medical student rotations in radiology, and 3) the Fellowship Director for Musculoskeletal Radiology, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education policies.

96.     Sathish Dundamadappa, M.D., has served as the interim Division Chief of neuroradiology as well as the Fellowship Director for Neuroradiology and the Fellowship Director for MRI, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education, for both of these areas, as well as compliance with accreditation requirements for neuroradiology, and he has received additional compensation for these additional duties and responsibilities.

97.     Dennis Coughlin, M.D., has served as the Division Chief for Emergency Radiology, for which he has been compensated an additional amount for those duties and responsibilities.

Signed under pains and penalties of perjury this 15th day of December 2021.

Max Rosen, M.D., M.P.H.

# Exhibit D

 UMassMemorial |  **University of Massachusetts**
**Medical School**

*Department of Radiology*

*University Campus*
*55 Lake Avenue North*
*Worcester, MA 01655*
*Tel: 508-856-2520/2215*
*Fax: 508-856-4669*
*jerry.balikian@banyan.ummed.edu*

May 14, 2001

*Jerry P. Balikian, MD, FACR*
*Professor of Radiology*
*Director, Thoracic Radiology*

Edward H. Smith, M.D.
Professor and Chairman
Dept. of Radiology
U Mass Memorial Health Care
Worcester, MA  01655

Dear Ed:

I am most pleased to provide this supporting letter for Charu Desai, M.D; for promotion to "Clinical Associate Professor of Radiology on the non-tenure track".

I have known Dr. Desai for nine years as an associate member of my Division of Thoracic Radiology.

I have come to appreciate and admire her exceptional mind in picking up abnormalities on a chest x-ray.  She is dependable, hardworking and can be trusted with great responsibilities.  She is not only a suburb chest radiologist she is also very well trained with an additional fellowship in abdominal imaging which is a great asset to the institution.

She is shy to servicing conferences and to public appearances but makes up for it by patiently teaching on a person to person level.  Her ability to integrate findings and arrive at a judgment are very commendable.

Charu has a pleasant personality, a good sense of humor and gets along well with the attendings, residents, technicians, and the patients.

I recommend her highly for this promotion.  I am confident that she will justify your trust in her and bring great credit to the Department and the Institution as an outstanding clinical radiologist and teacher.

Sincerely,

Jerry P. Balikian, M.D.

# Exhibit E

 

**UMassMemorial**   **University of Massachusetts Medical School**

Department of Radiology
Division of Nuclear Medicine

Department of Medicine
Division of Cardiology

University Campus
55 Lake Avenue North
Worcester, MA 01655
Tel: 508-856-3711
Fax: 508-856-1016/4572
Appt: 508-856-3452
jeffrey.leppo@umassmed.edu

Jeffrey A. Leppo, MD
Professor/Clinical Director

November 30, 2001

Aaron Lazare, MD
Chancellor/Dean
University of Massachusetts
Medical School

Dear Dr. Lazare:

I am writing in support of the promotion of Dr. Charu Desai to the rank of Clinical Associate Professor of Radiology on the non-tenure track. Dr. Desai was among the first residents to complete her training at UMass in the Department of Radiology. She returned in the early 1990's as a faculty member after working in private practice for several years.

Over the past decade Dr. Desai has achieved a valued position in our clinical service. Her area of expertise is in thoracic radiology. Her clinical acumen is very highly regarded by referring physicians, and her attention to clinical service is impressive. Over the past 8 months the Radiology Service has been under a great deal of stress, and Charu has really risen to the task. With members of her diagnostic division having been out sick or on vacation, she has covered the entire Chest Service as a solo practitioner. Her turnaround time is very rapid and among the leaders of the department. She has been a real supporter of the entire service during this crisis. Although she has not been active in the publication field or giving outside lectures, Dr. Desai has been an excellent one-on-one teacher at the reading area with many present and former residents giving her high marks for her teaching ability. Approximately 2/3 of her teaching evaluations have an average score in the in the above average to outstanding level and individual letters (Drs. Kydd and Kamath) document her personal impact.

Dr. Desai demonstrates continued enthusiasm in support of the department in whatever capacity that is needed. During the past 6 months she has been an inspiration to her colleagues to maintain a high level of clinical service during a period of departmental resignations and a large decline in enthusiasm.

CD 00075

Dr. Desai has achieved excellence in clinical service and teaching ability, which should ensure her credentials for promotion. Her tremendous efforts, loyalty and plucky resolve during this period of intense challenges should be sufficient to merit this well deserved promotion. If our diagnostic service is going to survive, we need radiologists like Charu, and she remains a delightful colleague who is well liked by her professional colleagues as well as the staff technologists.

Therefore, I strongly support this promotion and look forward to having Dr. Desai as a role model for our newer faculty.

Sincerely,

Jeffrey A. Leppo, MD
Interim Chair

JAL:bv

CD 00076

# Exhibit F

 

**University of Massachusetts Medical School**

Department Medicine
Division of Pulmonary, Allergy
and Critical Care Medicine

University Campus
55 Lake Avenue North
Worcester, MA 01655
Tel: 508-856-3121
Fax: 508-856-3999

Richard S. Irwin, MD
Professor of Medicine
Director, Division of Pulmonary, Allergy
and Critical Care Medicine

December 24, 2001

Dr. Jeffrey Leppo
Interim Chair
Department of Radiology
University of Massachusetts Medical School
55 Lake Avenue North
Worcester, MA 01655

Dear Dr. Leppo:

I have been asked to write a letter of support for the promotion of Dr. Charu Desai to the rank of Clinical Associate Professor of Radiology. I do so gladly. My comments are based upon knowledge of Dr. Desai's clinical work that dates back to 1979.

As an individual, Dr. Desai is hard working, pleasant and responsible. While appearing shy in groups, she can be quite animated in one-on-one situations.

With respect to training, Dr. Desai has received very good training. She did her undergraduate medical training in India and then completed an internship at the Mount Auburn Hospital in Cambridge. She was the first individual to complete her radiology residency at our institution where she served as Chief Resident from 1979 to 1981. Following her residency, she completed a fellowship in Computed Body Tomography/Ultrasound at our institution and then joined the staff here for one year. From 1983 until 1991, Dr. Desai was in private practice in Worcester and then returned to join our faculty. She has been on our faculty as Assistant Professor of Medicine since 1992 to the present time.

With respect to clinical skills, Dr. Desai's opinion is widely sought by pulmonary specialists, clinicians, other radiologists and residents. She has demonstrated skillful interpretation of all chest-imaging procedures.

With respect to teaching, I have no direct first hand knowledge of Dr. Desai's performance. It would not surprise me if she received the highest marks from radiology residents in training.

Page 2
December 24, 2001

With respect to research and scholarly activities, Dr. Desai's curriculum vitae shows Dr. Desai's productivity to be on the modest side.

In summary, I support Dr. Desai's promotion from Assistant Professor to Clinical Associate Professor of Radiology.

Sincerely,

Richard S. Irwin, M.D.

kab

# Exhibit G



**UMassMemorial**

Medical Center
Department of Radiology

University Campus
55 Lake Avenue North
Worcester, MA 01655
Tel: 508-856-3578
Fax: 508-856-4669

Carl J. D'Orsi, MD, FACR
Professor and Vice Chairman
Director, Diagnostic Radiology

Aaron Lazare, M.D.
UMass Memorial Health Care
55 Lake Avenue N.
Worcester, MA
01655

January 7, 2002

Dear Dr.Lazare,

I am writing in support of Dr.Charu Desai's proposed promotion to Clinical Associate Professor on the non-tenure track. I've known Dr.Desai for 21 years, first in her role as a resident in radiology and subsequently as a member of the staff. My main interest is breast imaging and I had the good fortune of working with Charu for 5 years in mammography. Clinically she demonstrated excellent skills including detection and diagnosis of breast malignancy and communicative skills. I heavily relied on her to fill in when sudden lapses in coverage occurred and Dr.Desai was always willing to accommodate. At present she is a member of the chest service and has performed with equal excellence. With the current problems that radiology is undergoing, Charu has been a pillar, often taking care of the service alone, despite several chronic medical problems.

She is also trusted for her clinical skills by the clinicians she serves. Dr.Ricciardi writes "Dr.Desai.........(is) always willing to go the extra mile to go over very complicated films of the sick oncology patient." Dr.Irwin comments "Dr.Desai's opinion is widely sought by pulmonary specialists, clinicians, other radiologists and residents." She is also very well received by our residents with the majority of her evaluations extremely positive. Dr.Kydd, our current chief resident describes her as "...........an outstanding radiologist in terms of her diagnostic ability........." and having ".........provided my colleagues and myself with outstanding teaching......." Dr.Sanjay Kamath, a former resident, states that Charu ".......has been wonderful both as a teacher as well as a person."

I have absolutely no reservations in strongly recommending Dr.Desai for the promotion she seeks."

Sincerely,

Carl J.D'Orsi, M.D., FACR
Professor and Vice Chairman
Director, Diagnostic Radiology

The Clinical Partner of the
University of Massachusetts Medical School

# Exhibit H

 

Department of Radiology

University Campus
55 Lake Avenue North
Worcester, MA 01655
Tel: 508-856-3252
Fax: 508-856-4910
E-mail: krishna.kandarpa@umassmed.edu
www.umassmemorial.org

Krishna Kandarpa, MD, PhD
Professor and Chairman
Radiologist-in-Chief

October 25th, 2004

Dear Dr. Desai,

I want to take this opportunity to thank you for your hard work and contributions to the Department during this last year. As you know, our Department is undergoing a fundamental transformation in staffing, administrative structure, space, and technology now that all three hospitals are consolidated under a single academic practice staffing model. I realize that the events of the last year have made transformation to date slightly difficult. However, I hope you agree that by focusing on our stated Vision, we are laying the foundations for a Department that will once again be a leader in clinical service, teaching, and research.

The Department is yet to get on solid fiscal grounds as it undergoes this transformation. Nevertheless, in recognition of your contributions to the Department you will be receiving an increase in your salary. Your salary for the fiscal year Oct 1, 2004 – Sept 30, 2005 will be $235,000. As you are aware, there will no longer be a withhold of your salary. We will deploy a sensible incentive-based compensation plan during this coming year.

I hope to work together with you to realize the Department's Mission and Vision, that we had formulated together this past year. I also expect that all of us will live up to the Department's stated Values and use them to guide us to a better future. Please feel free to contact me if you have any relevant ideas or concerns about the Department and its future. I look forward to your continued support.

Sincerely,

Krishna Kandarpa, MD, PhD
Radiologist-in-Chief
Professor and Chairman, Department of Radiology

UMM 00331

# Exhibit I

 **UMassMemorial** |  **University of Massachusetts Medical School**

Department of Radiology

University Campus
55 Lake Avenue North
Worcester, MA 01655
Tel: 508-856-2520 or 5740
Fax: 508-856-1860
E-mail: balikiaj@ummhc.org
www.umassmemorial.org

Jerry P. Balikian, MD, FACR
Professor, Thoracic Radiology
Interim Director,
Thoracic Radiology

September 20, 2015

To Whom It May Concern:

I am most pleased to provide this letter of recommendation for Dr. Charu Desai.

I have known Dr. Desai for about 20 years as my most esteemed associate in the division of Thoracic Radiology at UMass Memorial – University of Massachusetts Medical School.

Charu is a superb clinical radiologist, very well known for her accurate diagnoses. She spares no time in teaching radiology residents and clinical attendings in face to face discussions of patients radiographic studies. Her interests include pulmonary diseases.

On the personal side, she has a most pleasant personality, highest ethical and moral standards and well respected among her peers.

I recommend her with great enthusiasm and I am confident that she will justify your trust in her and bring great credit to your institution.

With best regards.

Sincerely,

*Jerry P. Balikian M.D. FACR*

Jerry P. Balikian, M.D., F.A.C.R.

CD 00039

# Exhibit J

March 22, 2018

Re: Charu Desai MD.

This is a letter of reference for Charu Desai MD.

I am a senior semi-retired diagnostic radiologist who served as Interim Chair of Radiology from 2007 to 2012 at the UMass Memorial Medical Center in Worcester Mass.
Dr. Desai was on the faculty during those years and she and I continue to serve in the Dept of Radiology at UMass Memorial at the present time.  Thus, I have had an opportunity to observe and work with her as her Chair and as a colleague for some 11 years.

Dr. Desai completed a residency in Radiology in the late 1980's at UMass and has served on the UMass Radiology Faculty continually for over 26 years. As I understand it, she now seeks a slightly less demanding clinical work schedule.

Professionally she is an outstanding radiologist with special excellence in chest radiology to which she devotes her energies essentially full-time. She has an excellent command of the intricacies of interpretation in  chest CT scans and is an expert in plain chest radiographs. She is well regarded by referring clinicians who often seek her out for personal review of scans and clinical consultation. She has been an active teacher over the years and was given the teacher of the year award from the resident staff in 2016.
On a personal level, she is gracious, collegial and reliable. Thus, I am delighted to recommend her for consideration in a diagnostic radiology practice. Do not hesitate to contact me if the occasion should require.

Sincerely,

Joseph T Ferrucci MD
Professor of Radiology Emeritus
University of Massachusetts Medical School

( joseph.ferrucci@umassmemorial.org)

CD 00038

# Exhibit K

 University of
Massachusetts
**UMASS** Medical School

 **UMassMemorial
Health Care**

March 25, 2018

To Whom It May Concern,

I write this letter in enthusiastic support of Dr. Charu Desai's application for a Position in the Department of Radiology at your institution.

I have personally known Dr. Desai for almost a decade, and she is amongst the best radiologists with whom I have had the pleasure of working. Her diligence, attention to detail, and ability to detect the most subtle of findings make Dr. Desai an exceptional candidate for a position in your Department.

She is truly distinguished with regards to the quality of work in interpreting both plain radiographs and CT scans. Dr. Desai is the first person that I consult with when interpreting a difficult chest CT scan, which speaks to her exceptional talent and native ability.

Charu was also the recipient of the Teacher of the Year Award, determined by the collective vote of 20 residents; she is commended for her work as a teacher and a mentor, in addition to being a phenomenal physician.

Dr. Desai is a pleasant, committed, and excellent doctor who is well liked and highly respected amongst all members of our Department at UMMHC. Dr. Desai would be an asset to your Department, and I recommend her with the highest endorsement, without reservation. I am extremely sad that she will be leaving us. Please do not hesitate to contact me shall you have any questions.

Sincerely,

Aaron Harman, MD
Assistant Professor
Department of Radiology
UMass Memorial Medical Center
UMass Medical School
(c): 508-397-5506

# Exhibit L

 **UMassMemorial** |  **University of Massachusetts Medical School**

Department of Medicine
Division of Pulmonary, Allergy
and Critical Care Medicine

University Campus
55 Lake Avenue North
Worcester, MA 01655
Tel: 508-856-1975
Fax: 774-442-3999
www.umassmemorial.org

March 29, 2018

Richard S. Irwin, MD, Master FCCP
Professor of Medicine & Nursing
Chair, Critical Care Operations
Editor-in-Chief, CHEST

To Whomever This May Concern,

I have been asked by Dr. Charu S. Desai to write a letter of recommendation in support of her desire to join your group in the specialty of Thoracic Radiology. I gladly do so because I believe that Dr. Desai is a worthy applicant. My comments are based upon a long-standing collegial relationship that she and I have had since 1979 at the University of Massachusetts Medical Center and then UMass Memorial Medical Center. Dr. Desai was a Chief Resident in Radiology in 1979, the year that I arrived as the Chief of the Pulmonary Division.

As a person, I have always known Dr. Desai to be a hardworking, responsible individual of the highest moral caliber.

While I have not witnessed Dr. Desai's teaching skills first hand, she has achieved high marks by radiology residents that culminated in her being awarded the Best Teacher Award in 2017.

With respect to clinical skills, I cannot remember any of my patients ever suffering any adverse effects based upon readings made by Dr. Desai; and I frequently had the opportunities over the years to seek Dr. Desai's advice about cases. By reading Dr. Desai's curriculum vitae, I have been impressed by the number of courses she has taken to keep up with new thoracic imaging modalities.

In summary, I believe that Dr. Desai is a worthy candidate for a position in your group as a thoracic radiologist. Please do not hesitate to contact me should you wish to speak with me in person.

Sincerely,

Richard S. Irwin, MD, Master FCCP

# Exhibit M

 **UMassMemorial** |  **University of Massachusetts Medical School**

Department of Radiology

*University Campus*
*55 Lake Avenue North*
*Worcester, MA 01655*
*www.umassmemorial.org*

April 3, 2018

To Whom This May Concern:

I am writing this letter on behalf of Dr. Charu Desai. I have personally known Dr. Desai for the last 13 years and can vouch for her dedication, work ethic, knowledge of radiology and passion for teaching.

She taught me chest radiology as a resident at UMass. She is a fixture in the chest department, an inspiration and a role model. She is dedicated to her job, reliable and a team player. The UMass chest division has ungone significant transformations and turmoil in the last 13 years with perpetual turnovers in chest radiologists. This has made the division unstable having gone through 4 division chiefs in the last few years. To her credit, she is the most senior staff remaining in the chest division and the workhorse of that division. Unfortunately, this also adds undue pressure on the few staff that are present to keep the division running. If there is ever a question on a case, we know exactly who is always there and who to ask for help.

It is with a heavy heart to hear that she will be leaving us in the near future. I feel she with be a strong asset to whichever organization she ultimately decides to join.

Sincerely,

Andrew Chen MD
Assistant Professor of Neuroradiology
University of Massachusetts Medical School

CD 00089

# Exhibit N

  **University of Massachusetts Medical School**

*Department of Radiology*

*University Campus*
*55 Lake Avenue North*
*Worcester, MA 01655*
*Tel: 508-856-6316*
*Fax: 508-856-4910*
*E-mail: gopal.vijayaraghavan@*
*    umassmemorial.org*
*www.umassmemorial.org*

*Gopal R. Vijayaraghavan, MD*
*Clinical Associate Professor of Radiology*
*Director, Breast Imaging*

05  April 2018

<u>**TO WHOMSOEVER IT MAY CONCERN**</u>

Dear Sir/Madam,

It gives me immense pleasure to write this letter of recommendation in support of Dr. Charu Desai's application for an attending radiology position in your practice. I have known Dr Desai or Charu as she is better known for the last 14 years. I joined UMass in 2004 as a fellow, when Charu was already an Attending in Chest Radiology. At that time I enjoyed the 1 month tutorship I received from her on my elective rotation.  After my fellowship I joined the Body division as an Attending.  Chest and Body divisions shared the same reading area and I interacted with Charu on an almost daily basis during that time. In 2013 I assumed Directorship of the Breast division and my interactions with Dr Desai have been less frequent since then.

Dr. Desai is personable, intelligent, and hardworking.  She has demonstrated an extraordinary aptitude for reading chest radiographs and CT scans. Her interpretations are highly valued by our clinicians and radiology colleagues.  Infact just this last year the residents awarded Dr Desai with the prestigious "Best Teacher Award" among all radiology faculty at UMass. She is always available, approachable and is a great team-player.

I strongly recommend her for a position in your department.  Please reach out to me if you require any additional information.

MD, MPH.
Gopal Vijayaraghavan.

# Exhibit O



**UMassMemorial
Health Care**

55 Lake Ave North
Worcester MA 01655

No Recipients

April 24, 2018

To Whom It May Concern:

This is a letter of support for Dr. Charu Desai, Attending Radiologist here at UMass. I have known Dr. Desai for more than 15 years.

One of the major benefits of working at a medical center is the ability to walk to the Radiology Department and personally review x-ray images with a radiologist. I have done this 100's of time over my 35+ years at UMass. While I have found the radiology team at UMass to be generally very helpful, there are a few radiologists whom I have found over the years whose knowledge and reliability have been especially outstanding. Dr. Desai is one of these few. She has been my "go to" chest radiologist for many years. She is willing to review complicated cases. Her insight and advice have always been impeccable. I think she is a gem and have been honored to work with her over the years.

Sincerely,

*George H Eypper*

George H Eypper, MD
General Internal Medicine/Adult Primary Care

# Exhibit P

*Charu —
Please let me
know if there is
anything else you'd
like me to include.
to Lacey*

May 15, 2018

To Whom It May Concern:

I am pleased to write this letter of support for Charu Desai, MD for a position in your radiology department.

I have known Charu for 7 years, first as my teacher as a resident in the University of Massachusetts Diagnostic residency program, and currently have the pleasure of working alongside my teacher and now colleague in the chest imaging department at University of Massachusetts Medical Group.

Charu is a careful and observant radiologist, I am always awed at her precision and incredibe ability to pick up findings. This is especially apparent on plain films, which in my opinion is the hardest place to be detecting these findings. I run the weekly thoracic tumor boards, and often review new lung cancer cases that trace back to an amazing call by her on a chest radiograph. I feel lucky to have had her as a teacher. She brings wisdom and experience to the reading room.

As a colleague, Charu is friendly, kind, and caring. She always greets me with a smile, encouraging words, and is an absolute pleasure to be around. I enjoy working with her and will miss her greatly.

Please feel free to contact me with any questions or for further information. In conclusion, I highly recommend Charu without hesitation for a position in your radiology department – both as an esteemed radiologist as well as a wonderful person.


Sincerely,

Lacey McIntosh, DO, MPH


Director of Oncologic Imaging
Body, Chest, and PET/CT Divisions
Department of Radiology, University of Massachusetts Medical Group
 Assistant Professor
University of Massachusetts Medical School
55 Lake Ave North
Worcester, MA 01655
(774) 441-1213

CD 00125

# Exhibit Q

 **UMassMemorial** | **University of Massachusetts Medical School**

Department of Surgery
Division of Thoracic Surgery

March 11, 2020

67 Belmont Street
Worcester, MA 01605, USA
Tel: +(1) 508-334-8996
Fax: +(1) 508-334-6296
www.umassmemorial.org

### Letter of Recommendation

Karl Fabian L. Uy, MD
Chief, Division of Thoracic Surgery
Associate Professor of Surgery

### Dr. Charu Desai

To Whom It May Concern:

I am writing this letter of recommendation on behalf of Dr. Charu Desai, whom I have known and worked with for the past 12 years in her capacity as a diagnostic radiologist at UMass Memorial Medical Center and the University of Massachusetts Medical School.  Much of her clinical time is spent in chest radiology, and because I am a thoracic surgeon I have become familiar with Dr. Desai and the quality of her work, and feel well-qualified to write this letter.

Dr. Desai spent her undergraduate and medical school as well as internship years in India, and thereafter moved to Massachusetts for her training and a long fulfilling career as a radiologist.  She did her residency and fellowship in UMass, and thereafter worked in various hospitals in Central Massachusetts and eventually returned to UMass where she has worked since 1992 – consequently, she is well-known and well-loved and appreciated. The Department of Radiology as well as the entire medical center has benefited greatly over the years from her clinical service, aside from generations of Radiology residents whom she has helped train.  Her mentorship and excellence in teaching was recognized with the Best Teacher Award in 2017 – a very difficult award to achieve because of the rather large number of excellent faculty members within her department.  I am sure that her wealth of knowledge and experience – especially the kind which cannot be sufficiently elaborated on in textbooks – has not been unnoticed by the residents, and that they are showing their appreciation for her sharing this unselfishly.

I and my colleagues in the Division of Thoracic Surgery have benefited immensely from her clinical work – she is very prompt and to-the-point with her readings without too much of the vague and noncommittal terminology which seem to permeate radiology reads nowadays because of medico-legal pressures. I believe she strikes a good balance between the provision of her professional opinion and avoidance of legal issues.  She calls us promptly if there are urgent findings to relay, and does not stop at one call if we were not reached.  These calls are very appropriate, and there has never been a single time that I considered a call too alarmist or wasteful of time and effort on both our parts. We do appreciate the work that she has provided for our patients through all these years.

Dr. Desai has become so established within our medical center that it is difficult to imagine day-to-day life in my specialty without her; however I understand that she is at a point in her career that she wishes to transition to another kind of position.  Given the challenges that we are experiencing in health care in general and in a safety-net hospital such as UMass Memorial Medical Center in particular, I fully understand and support her decision and wish her well in all her future endeavors.  You are fortunate to be considered as an institution where she would like to share her expertise, and you will benefit immensely from her lovely personality also.

CD 00085

Please do not hesitate to contact me if you would like to discuss Dr. Desai's application further.

Sincerely,

Karl Fabian L. Uy, MD, FCCP, FACS
Associate Professor and Chief
Division of Thoracic Surgery
UMass Memorial Health Care
University of Massachusetts Medical School

CD 00086

# Exhibit R

```
 1                   UNITED STATES DISTRICT

 2                 DISTRICT OF MASSACHUSETTS

 3                    CIVIL ACTION NO. 4:19-cv-10520-DHH

 4   * * * * * * * * * * * * * * * * * * * * * * * *
     CHARU DESAI,
 5                    PLAINTIFF

 6    v.

 7   UMASS MEMORIAL MEDICAL CENTER, INC., et al.,
                    DEFENDANTS
 8   * * * * * * * * * * * * * * * * * * * * * * * *

 9

10

11           DEPOSITION OF CHARU DESAI, M.D.,

12                 Conducted Remotely

13              211 Congress Street, Suite 720

14              Boston, Massachusetts   02110

15

16             Friday, September 18, 2020

17              10:37 a.m. to 5:00 p.m.

18

19                    Pages 1-202

20

21

22

23

24
```

185

1    A    Dr. Rosen.

2    Q    All right.  Dr. Rosen.

3         Anyone else?

4    A    I don't know who took a part in my termination.

5    Q    Okay.  So whoever took part in your termination

6         decision you believe was engaging in disability

7         discrimination?

8    A    Yes.

9    Q    Okay.  And setting aside the termination decision,

10        are you claiming anything else was done to

11        constitute disability discrimination?

12   A    Not that I can recall.

13   Q    What is your actual medical condition that you

14        claim is a disability for you?  What's it called?

15   A    It's, like, brady-tachy syndrome, so sometime I

16        just -- like today, do you remember we were taking

17        break, it happened, and at that time, I cannot,

18        literally, function.  It --

19   Q    You become dizzy or lightheaded?

20   A    Not really.  I get really short of breath, my eyes

21        start tearing, weakness all over the body, so if

22        you ask me move from the chair to the couch, I

23        cannot do that.

24             I didn't know if you ask me, are you okay, I

186

1     can nod my head, but any can last few minutes or

2     longer, or it can come back to back.

3           So basically, I'm not doing that, and then,

4     there are so many times on the road, I have to

5     pull the car.  So I never drive on a hill, where

6     there is a hill, because then it will be difficult

7     to pull the car.

8  Q  Right.

9  A  And there are times I have to pull over.

10 Q  So in terms of daily activities or life activities

11    that it limits you in, it sounds like it can

12    affect your breathing, it can affect your driving.

13    Anything else?

14 A  When I am driving.  And the tiredness.  When I get

15    that, then I feel very tired.  And if I don't

16    break the cycle, then the frequency -- next day,

17    the frequency will increase.  So, like, if it

18    comes today, tomorrow, I just, on purpose, I have

19    to do nothing so I can calm down my body kind of.

20 Q  If I'm correct, and correct me if I'm wrong, but

21    just based on what we discussed today, my

22    understanding is that the tachy-brady syndrome did

23    not affect your ability to perform the essential

24    functions of your job except to the extent where

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3           CIVIL ACTION NO. 4:19-cv-10520-DHH

4    * * * * * * * * * * * * * * * * * * * * * * *

5    CHARU DESAI,

6                          Plaintiff,

7    vs.

8

9    UMass.. MEMORIAL MEDICAL CENTER, INC., et al.,

10                         Defendants.

11   * * * * * * * * * * * * * * * * * * * * * * *

12                      VOLUME II

13    CONTINUED DEPOSITION OF:  CHARU S. DESAI, M.D.

14                  Conducted Remotely

15            211 Congress Street, Suite 720

16                Boston, Massachusetts

17      Thursday, October 22, 2020        10:04 a.m.

18

19

20

21

22

23

24

224

1      A.  He did not give it to me.  I don't
2  remember, but he did not say that he give it to me.
3      Q.  Well, when you asked for this, did he say,
4  for instance, Dr. Desai, I'm not going to approve
5  that?  Did he say, Dr. Desai, I'll think about it?
6  Did he -- did he just ignore you?  I mean, was there
7  any -- do you remember any level of response, verbal
8  response from him?
9      A.  The only thing I know that he -- I did not
10  get it.  He did -- I don't remember exactly what he
11  said, but at that point, he said on the contrary --
12  he was saying that go part time or go locum, forget
13  about giving me any accommodations.
14      Q.  Did -- did you ask him -- did you ever ask
15  him why he denied your request for a home
16  workstation?
17      A.  I don't -- I don't recall.
18      Q.  You don't remember?
19      A.  No.
20      Q.  So fair to say you don't know why he denied
21  the request for a home workstation, correct?
22      A.  I don't know why.
23      Q.  Okay.  Did -- based on the denial of the
24  home workstation, fair to say you still received

237

1  after you left?

2          MS. WASHIENKO:  Objection.

3      A.  One of them.

4      Q.  What else?

5      A.  Even for the division chief, also, they --

6  they didn't even ask me.  They just appointed

7  younger white female.

8      Q.  Okay.  What else?

9      A.  Yeah.  I don't -- I don't recall at this

10  moment other stuff.

11      Q.  Okay.  So what I have based on your under

12  oath testimony is they hired a division chief who

13  was younger than you and you believe that was age

14  discriminatory, and they hired someone younger after

15  your employment was terminated and you believe that

16  was age discriminatory, correct?

17      A.  Yes.

18          MS. WASHIENKO:  Objection.

19      Q.  Are you claiming that the decision that was

20  made to restrict your privileges with respect to CT

21  scans was done because of your age?

22      A.  No.

23      Q.  I'm going to move to Count 7 in your

24  complaint.  Count 7 is a claim for tortious

# Exhibit S

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3   -------------------------------x

 4   CHARU DESAI,

 5                 Plaintiff,

 6      vs.                            Civil Action No.
                                       4:19-cv-10520-DHH
 7
     UMASS MEMORIAL MEDICAL CENTER,
 8   INC., ET AL.,

 9                 Defendants.

10   -------------------------------x

11

12

13

14          DEPOSITION OF MAX P. ROSEN, M.D.

15                Conducted Remotely

16               1800 West Park Drive

17                   Suite 400

18             Westborough, Massachusetts

19                   May 7, 2021

20            10:10 a.m. to 5:03 p.m.

21

22

23

24   Reporter:  Laurie J. Berg, CCR, RPR, CRR, CLR, CER
```

O'Brien & Levine Court Reporting Solutions
888.825.3376 - production@court-reporting.com

17

1          You are employed at UMass Memorial Health

2    Care, correct?

3      A.    I'm actually employed by UMass Memorial

4    Medical Group and UMass Medical School.

5      Q.    You serve as the chair of the Department of

6    Radiology at UMass Memorial Medical Center; is that

7    correct?

8      A.    Correct.

9      Q.    When did you begin working there?

10     A.    In September of 2012.

11     Q.    Had you been the chair of any department

12   before you became chair of radiology at UMass

13   Memorial?

14     A.    I was the vice chair -- the executive vice

15   chair at Beth Israel Deaconess before this.

16     Q.    So you're -- tell me, what are the duties and

17   responsibilities that you have in your role as chair

18   of the Department of Radiology?

19     A.    There are several.  The first is to ensure

20   the department provides high-quality and safe imaging

21   services for our patients.  The other responsibilities

22   are to ensure the smooth, efficient and appropriate

23   running of the department for -- to support the

24   institution and the other physicians and departments

21

 1          BY MS. WASHIENKO:

 2      Q.   Dr. Rosen, I'll ask you to take a look at the

 3   document, and let me know when you've had a chance

 4   to -- to do so.

 5      A.   (Deponent viewing exhibit.)  Sure.  Okay.

 6   I've reviewed it.

 7      Q.   Dr. Rosen, do you recognize this document?

 8      A.   (Deponent viewing exhibit.)  I do not

 9   remember seeing this document before.  It appears that

10   it was sent directly to Dr. Cauley from Michele

11   Streeter, although, I am CC'd on it.

12      Q.   Why, to the best of your knowledge, would you

13   have been CC'd on this letter?

14      A.   Dr. Cauley was a radiologist at UMass, and I

15   had made a determination that his actions were not

16   appropriate or commensurate with the goals of the

17   department and suggested that he find employment in

18   another location.

19      Q.   I'd like to direct your attention to the

20   second paragraph of this document, which was marked as

21   Exhibit 1.

22      A.   (Deponent complied.)  Okay.

23      Q.   The third line down, far right, begins with

24   the sentence, "As you further know, you were notified

22

1  that had -- you had the election to resign your

2  employment, rather than have it characterized as a

3  termination."

4         Do you see that?

5     A.   (Deponent viewing exhibit.)  Yes.

6     Q.   Why did you offer Dr. Cauley the opportunity

7  to resign rather than have his separation be

8  characterized as a termination?

9     A.   Dr. -- the issue with Dr. Cauley, as I recall

10  -- and this was now several years ago -- was that he

11  was not fulfilling his role for supporting our

12  residents and fellows and creating an environment that

13  was supportive for learners.  I had no issue with the

14  quality of his -- of his work or his -- his medical or

15  radiologic knowledge.

16         And so, in this case, in Dr. Cauley's case,

17  being in a teaching hospital and having responsibility

18  for overseeing trainees was not something that he was

19  fulfilling.  That had nothing to do with his

20  capability as -- as a radiologist.

21         So, for example, if he was in a position

22  where he was not responsible for -- for teaching and

23  training, you know, residents, fellows, medical

24  students, there would likely be, you know, he's

44

 1  thoracic imaging division and that it was shorthanded?

 2      A.   I know, from this report, that we discussed

 3  it at her annual evaluation, but I don't recall

 4  specifics of discussing it at other times.

 5              MS. WASHIENKO:  We're now going to

 6  introduce another of Dr. Desai's annual evaluations.

 7              (Exhibit 6 marked for identification.)

 8          BY MS. WASHIENKO:

 9      Q.   Dr. Rosen, I'll ask you to take a look at

10  this document.  It has been marked as Exhibit

11  Number 6.

12              MS. WASHIENKO:  For the record, it's

13  UMM 00298 through 00302.

14      A.   (Deponent viewing exhibit.)  Okay.

15      Q.   All set?

16      A.   (Deponent nods head.)

17      Q.   Turning to the final page of the document,

18  Dr. Rosen, that's your signature, correct?

19      A.   (Deponent viewing exhibit.)  Yes.

20      Q.   You would agree with me that, in this

21  performance evaluation for academic year 2015/2016,

22  there is no mention of any concerns about Dr. Desai's

23  performance?

24      A.   (Deponent viewing exhibit.)  Yes.  But the

45

 1   comment here -- my comment here is -- is pretty bare

 2   bones.  It's stating the -- the facts.

 3       Q.   It is not indicating that there have been any

 4   performance criticisms levied against her.

 5       A.   Correct.

 6       Q.   In the ordinary course, you would memorialize

 7   performance criticisms, correct?

 8       A.   This form -- the purpose of this form is an

 9   academic form for the medical school.  And, as such,

10   there are issues which might be occurring within the

11   department which might not bubble up to the level of

12   being included on this form.

13       Q.   Would they be memorialized somewhere else,

14   Dr. Rosen?

15       A.   A more -- often, if it's a clinical issue,

16   then those issues are addressed on the -- the medical

17   center's credentialing forms, the OPE forms.

18       Q.   Can you translate, for the nondoctor in the

19   room, Dr. Rosen, what OPE stands for?

20       A.   I think it stands for ongoing performance

21   evaluation or ongoing professional evaluation.

22       Q.   Thank you.

23       A.   It's part of the hospital's credentialing

24   process.

55

 1  opinion.
 2      Q.   You also said that Dr. Robinson brought
 3  concerns to your attention --
 4      A.   Yes.
 5      Q.   -- correct?
 6           Did she -- can you summarize what her
 7  concerns were?
 8      A.   General concerns about doctor -- the quality
 9  of Dr. Desai's interpretations.  At one point, she
10  said to me that she never believed any of Dr. Desai's
11  reports and could not rely on them.
12      Q.   Did you, at any point prior to your decision
13  to terminate Dr. Desai, inform her of these concerns?
14      A.   No.  I communicated the concerns to Dr. Dill,
15  as the section chief, who would then be responsible
16  for overseeing the quality of people in her division.
17      Q.   So you would agree with me that Dr. Robinson
18  lodged a number of complaints about radiologists in
19  the radiology department at UMass Memorial, correct?
20      A.   Dr. Robinson, over time, had raised multiple
21  issues with me; some, you know, over a wide range of
22  topics.
23      Q.   Including the performance of the radiologists
24  at UMass Memorial, correct?

56

1      A.    She had concerns about some radiologists'
2 interpretation, yes.
3      Q.    Can you tell me who she had concerns about?
4      A.    A -- another radiologist that she had
5 concerns about were Dr. Tyagi's interpretation of
6 chest CTs.
7      Q.    Anyone else?
8      A.    I don't recall.
9      Q.    Did you terminate Dr. Tyagi?
10     A.    No.
11           (Exhibit 8 marked for identification.)
12           BY MS. WASHIENKO:
13     Q.    Dr. Rosen, I am going to show you a document
14 that's been marked as Exhibit Number 8.
15           MS. WASHIENKO:  For the record, it's a
16 single-page document, UMM-03711.
17           BY MS. WASHIENKO:
18     Q.    And I'm going to ask you to take a look at
19 it, and tell me if you recognize this document.
20     A.    (Deponent viewing exhibit.)  Yes.  This was
21 -- I don't recall the letter, but it's a letter to me.
22     Q.    From Dr. Roychowdhury, correct?
23     A.    (Deponent viewing exhibit.)  Correct.
24     Q.    It looks to be a -- a resignation letter from

57

 1  him, correct, dated May 5, 2015?

 2      A.   Correct.

 3      Q.   Dr. Roychowdhury, in the second paragraph,

 4  memorializes a meeting with you in your office on

 5  April 23rd, 2015, about his resignation.

 6           Do you recall speaking with Dr. Roychowdhury

 7  about his resignation?

 8      A.   Not specifically, but, clearly, I did.

 9      Q.   In -- in the third paragraph of this letter,

10  Dr. Roychowdhury writes, it is unfortunate that I have

11  not been able to convince you of my ability to be part

12  of your team and continue my growth in this

13  department.

14           Do you see that?

15      A.   (Deponent viewing exhibit.)  Yes.

16      Q.   Why -- can you tell, from that sentence, why

17  Dr. Roychowdhury believed that he had not been able to

18  convince you of his ability to be part of your team?

19      A.   Can you repeat the question, please?

20      Q.   Sure.  Do you understand, or do you know why

21  Dr. Roychowdhury would have written, in the third

22  paragraph, it's unfortunate I have not been able to

23  convince you of my ability to be part of your team?

24      A.   I had discussed with Dr. Roychowdhury my need

58

1  to have an abdominal radiologist, which is what he

2  was, perform at a higher level for an academic

3  abdominal radiologist than I thought that he was able

4  to perform at.

5      Q.    So, in the second paragraph, Dr. Roychowdhury

6  memorializes that, in April of 2015, you discussed his

7  resignation.

8          Do you see that?

9      A.    (Deponent viewing exhibit.)  Yes.

10     Q.    Yeah.  That suggests that you did not, in

11 fact, simply terminate him for your concerns that his

12 abdominal radiology work needed to be at a higher

13 level, correct?

14     A.    Correct.

15     Q.    Why did you give him an opportunity to resign

16 rather than simply terminate him immediately?

17     A.    Because we had a discussion that his level of

18 -- the level that he was reading abdominal imaging at

19 was not the level that we needed to have in a

20 tertiary-level academic referral center, and I

21 suggested that, given his specific level of skill and

22 expertise, that there would be other departments where

23 that would be a better fit than the level of abdominal

24 imaging expertise that we required at UMass.  We do

59

1   very high-level abdominal imaging.

2          For example, we are a major liver transplant

3   center.  We're also a major center for -- for other

4   forms of liver disease, particularly hepatitis C.  And

5   we also do high-level, complex prostate imaging in the

6   abdominal division, and these are all exams which

7   require a very high level of expertise in interpreting

8   and supporting the clinical services that send us

9   patients.

10      Q.   The -- the point of my question that I,

11  clearly, did not ask well enough was; why did you give

12  him an opportunity to resign?  And I'll contrast that

13  to your informing Dr. Desai that she was being

14  terminated.

15      A.   Dr. Roychowdhury was not performing at a

16  level required -- that I felt was required for our

17  academic tertiary-level department.

18          In Dr. Desai's case, I had many complaints

19  about her, the quality of her interpretations,

20  conducted an independent review of the quality of her

21  interpretation of chest CT, which found many

22  deficiencies and required a chest radiologist who

23  could perform high-level chest CT.  Without having

24  that ability to perform high-level chest CT, I did not

108

1  And to the best of my recollection, Dr. Desai, in all
2  the years that I was her chair, never had any
3  activities in those categories.
4      Q.   Was it your understanding that the
5  radiologists who were granted academic days were, on
6  those days, doing academic work?
7      A.   Could you clarify that question, please?
8      Q.   Sure.  Do you -- so radiologists who were
9  granted academic days, occasionally, took academic
10 days, correct?
11     A.   Yes, they -- on our schedule would be
12 allocated an academic day, on, say, a Wednesday.
13     Q.   Did they have to report in to work that day?
14     A.   Our policy is that if somebody is on an
15 academic day, they have to be available to come in if
16 there's an unforeseen need, but they don't have to be
17 in the hospital.
18          An exception to that is, if people want to
19 use their academic day to attend a meeting or a
20 conference that is outside of, you know, Central
21 Massachusetts, that they need to get approval from me
22 first.
23     Q.   With regard to the academic days that
24 radiologists take and do not appear, physically, at

1  UMass Memorial, do you have any way of assessing
2  whether, on that academic day, they were, in fact,
3  doing work toward the deliverables that you cite in
4  Item Number 5 on Exhibit 15?
5      A.   This goes back to the idea that the faculty
6  are professionals, and I am not micromanaging what
7  they do each hour of the day.  The expectation is that
8  they've been allocated x-number of nonclinical days,
9  and there's an expectation at the end of the year that
10  they produce a commensurate amount of work.
11          Whether they do that on the weekend or nights
12  or some other time, which is not clinical time, is
13  their business.  What I care about is that they
14  produce the work.  Many radiologists, and I'm sure
15  many other, you know, physicians in the medical
16  center, create a lot of academic and educational and
17  other professional work, nights and weekends.
18      Q.   I just want to go back to something we were
19  discussing just a few minutes ago about when Dr. Desai
20  had an episodic, unpredictable episode.
21          Did -- were you aware that these happened
22  more frequently if she had been working for many days
23  in a row and was unable to rest for a day?
24      A.   No.

115

1  there are three items below that entry, that first
2  line.
3      Q.   Karin, now going above on the page, Dr. Dill
4  responds to Dr. Robinson and CCs you and says in her
5  e-mail, "I have copied Max Rosen to help resolve."
6           Do you see that?
7      A.   (Deponent viewing exhibit.)  Yes.
8      Q.   So, turning back, then, to the previous page
9  marked 30082, you respond to Dr. Robinson on Tuesday,
10 August 9, 2016, at 9:36 p.m., correct?
11     A.   (Deponent viewing exhibit.)  Correct.
12     Q.   The -- the first item, you explain that the
13 nodule was non-calcified.  You "expect this was a Typo
14 reported as 'calcified' and should be followed as
15 recommended by Dr. Lo."
16          Does that mean that Dr. Lo was the physician
17 -- the radiologist who read the image and reported
18 something with the typo in it?
19     A.   I am assuming that it would've been Dr. Lo
20 who interpreted the study, yes.
21     Q.   And -- and Number 2, you write, "I don't
22 think there is bronchiectasis."
23          Did I pronounce that anywhere near
24 appropriately?

116

1      A.    Bronchiectasis, but close enough.

2      Q.    Thank you.  And then you say, "I'll cc

3  Dr. Bennett for his review."

4           Is it safe for me to understand that

5  Dr. Bennett actually reviewed that image in the first

6  instance?

7      A.    I would assume so.

8      Q.    When I look at Dr. Robinson's e-mail on this

9  issue on the following page, Item Number 2 starts with

10 the redacted section and then says, "CT chest -- no

11 mention of her extensive bronchiectasis."

12          Was that better?

13     A.    Yes.

14     Q.    Yes.  So -- so Dr. Robinson identified an

15 issue believing that there was extensive

16 bronchiectasis, and, you, in response, having reviewed

17 the study, say, "I don't think there is

18 bronchiectasis," correct?

19     A.    Correct.

20     Q.    So there can often be -- well, so it would

21 appear that Dr. Robinson had a complaint wrong,

22 correct?

23     A.    Well, often, these issues are on a continuum.

24 And I thought, I'm not a chest radiologist, but, in my

117

1  opinion, I can think, probably in this case, there was

2  bronchiectasis and asked Dr. Bennett to re-review it.

3       Q.    Okay.  But in the meantime, Dr. Robinson

4  believed there was extensive bronchiectasis?

5       A.    Yes.

6       Q.    And --

7       A.    That was --

8       Q.    I'm going to direct your attention to Item

9  Number 3 in your e-mail where you talk about a nodule.

10  The second -- sorry, the third line -- sorry, the

11  third sentence reads, "I assume this is why Dr. Karam

12  did not give a specific measurement."

13          Do you see that?

14       A.    (Deponent viewing exhibit.)  Yes.

15       Q.    I assume that means that Dr. Karam was the

16  original reader of the image, correct?

17       A.    I would assume so.

18       Q.    Yeah.  None of those is -- was read by

19  Dr. Desai, correct?

20       A.    Correct.

21       Q.    Did you pull any cases of Dr. Lo's to examine

22  his readings?

23       A.    No.

24       Q.    Did you pull any of Dr. Bennett's cases for

118

 1  further review?

 2      A.   No.

 3      Q.   Did you pull any of Dr. Karam's cases for

 4  further review?

 5      A.   No.

 6      Q.   I just also noticed in -- on the third page,

 7  UMM-30083, Dr. Dill's e-mail to you, at the very top

 8  of the page, Tuesday, August 9, 2016 at 4:36 p.m.

 9           Do you see that?

10      A.   (Deponent viewing exhibit.)  Mm-hmm.  Yes.

11      Q.   It appears that she sent that to you from a

12  Yahoo e-mail account, correct?

13      A.   (Deponent viewing exhibit.)  Yes.

14      Q.   So the information included in Dr. Robinson's

15  e-mail that has been blacked out here will have gone

16  to someone through a Yahoo e-mail account, correct?

17      A.   Yes.

18               (Exhibit 18 marked for identification.)

19           BY MS. WASHIENKO:

20      Q.   I am now going to direct your attention, if I

21  I can get this thing to work to another document -- to

22  another document that has been marked, this time, I

23  think, as Exhibit 18.

24               MS. WASHIENKO:  For the record, it's

134

1  with the x-ray, and we interpret the x-ray, sort of,

2  after the fact, after -- after the patient visit.

3          So, at some point, he was no longer

4  performing the full range of musculoskeletal radiology

5  but was only interpreting x-rays that -- for the most

6  part was interpreting x-rays which had been obtained

7  in conjunction with a patient visit to orthopedics.

8  The ortho -- the orthopod had seen the patient, seen

9  the x-ray and made a treatment decision based on those

10  two.  And the interpretation of the x-ray was to

11  document the report in the radiology system.

12      Q.   Are you aware, Dr. Rosen, that -- that UMass

13  permitted Dr. Nicola to resign, following a discussion

14  with him of performance concerns?

15      A.   I'm sorry.  Could you just restate that or

16  repeat it, rather?

17      Q.   Are you -- are you aware that UMass Memorial

18  permitted Dr. Nicola to resign, after discussing with

19  him performance concerns rather than unilaterally

20  terminating him?

21      A.   If I recall, our conversations with

22  Dr. Nicola were that he would be better off practicing

23  in a location that did not require tertiary-level,

24  academic-level, musculoskeletal imaging.  As -- as a

135

1  complex tertiary referral center, we need to interpret

2  complex studies.

3           We also support a very robust sports medicine

4  group within orthopedics, and there's a certain level

5  of sophistication that our musculoskeletal

6  radiologists need to have to support those services.

7       Q.   I'll just direct your attention to -- to

8  Page 2 of this document.  It's marked 08916.  In the

9  first full paragraph, slightly more than halfway down,

10 Dr. Cerniglia wrote, "Unfortunately it appeared that

11 he," Dr. Nicola, "could not identify common findings

12 of gout and over called fractures several times which

13 were not present.  His level of sophistication in

14 interpretation of MSK cases," musculoskeletal cases,

15 "is well below what I expect for a fellowship trained

16 board certified radiologist.  In fact, many of the

17 cases I would expect a general radiologist or senior

18 resident to make the findings and proper diagnosis or

19 differential."

20           Do you see that?

21      A.   (Deponent viewing exhibit.)  Yes.

22      Q.   That -- that seems to have absolutely no

23 correlation to the fact that UMass Memorial is a

24 tertiary-level-care provider; wouldn't you agree?

136

1    A.    (Deponent viewing exhibit.)  Dr. Cerniglia's

2   not addressing the tertiary-level in that paragraph.

3   But, for example, when he goes down to the next

4   paragraph, to Dr. Most, Dr. Most has a specialty

5   practice in musculoskeletal oncology.

6          And so while he doesn't specifically state,

7   you know, moving the focus to academic level, the

8   tertiary level, the fact Dr. Most and -- I don't know

9   what the specialty of those other musculoskel -- those

10  other orthopods are, or rheumatologists, but, you

11  know, the level of sophistication to support

12  Dr. Most's practice for referral for bone tumors is

13  fairly high.

14   Q.    Fair enough.  But the paragraph we did just

15  read has Dr. Cerniglia referring to a general

16  radiologist or even a senior resident, and drawing the

17  comparison that -- that a general radiologist or

18  senior resident would, in fact, be better able to

19  interpret a number of cases than Dr. Nicola was,

20  correct?

21   A.    Yes.

22              (Exhibit 22 marked for identification.)

23          BY MS. WASHIENKO:

24   Q.    With luck, I have just distributed a document

137

1  that's been marked Exhibit 22.  I'll ask you to take a
2  look at it, Dr. Rosen.
3          MS. WASHIENKO:  For the record, it is
4  UMM-30222 through 30224.
5      A.   (Deponent viewing exhibit.)  Okay.
6      Q.   Dr. Rosen, this document is the minutes of a
7  meeting of Marlborough Hospital's executive committee.
8  It appears that you are listed as a guest.
9          Do you see that?
10     A.   (Deponent viewing exhibit.)  I do.
11     Q.   Do you recall attending the meeting on
12  November 2nd, 2016?
13     A.   Yes.
14     Q.   I'd -- -- I'd like to draw your attention to
15  the section on Radiology Review.  Dr. Robinson appears
16  to have reviewed, at that meeting, concerns -- several
17  issues and concerns, the "communication of critical
18  results, especially to community physicians,
19  discrepancies in reads, call backs for breast imaging
20  with follow up imaging not scheduled in a timely
21  fashion, lung biopsies not being completed,
22  inconsistencies in Chest CT reads, especially those
23  screening for interstitial lung disease and timeliness
24  of reads."

138

1          The next sentence says that you apparently

2    felt a majority of those issues were procedural or a

3    systemic communication problem.

4          Do you see that?

5    A.    (Deponent viewing exhibit.)  Yes.

6    Q.    Does -- did Dr. Desai perform lung biopsies?

7    A.    Not to my knowledge.

8    Q.    I note that Dr. Robinson, then, says

9    something about inconsistencies in chest reads,

10   especially those screening for interstitial lung

11   disease.

12         Had she brought that concern to your

13   attention before?

14   A.    I think so.

15   Q.    Do you recall if you had any opportunity to

16   review any specific cases that she believed showed

17   inconsistencies screening for interstitial lung

18   disease?

19   A.    No.

20   Q.    I just want to, then, on Page 2, draw your

21   attention -- about the fifth line down.  The sentence

22   starts over to the right, "The division chief for

23   chest was out sick for a time and has now returned,

24   and the reads should be completed in a timely fashion

1   again."

2           So I take it, from this notation in the

3   minutes of the meeting on November 2nd, 2016, that --

4   that there were, again, fewer people staffing the

5   chest division than might have been ideal?

6       A.   I don't know.  You can determine that from --

7   or infer this, from this.

8       Q.   It appears from this sentence that, because

9   the division chief was out sick, reads were not being

10  completed in a timely fashion, would you agree?

11      A.   Often, Dr. Robinson would complain about

12  things without substantiated numbers and, on

13  turnaround time, it's always better to look at the

14  numbers than perception.

15      Q.   So -- so Dr. Robinson's complaints,

16  occasionally, or, in your word, "often," complained

17  without substantiation of her complaint?

18      A.   Well, I would always take her complaints and

19  then go and do my own analysis to see if they were

20  founded or not.

21              (Exhibit 23 marked for identification.)

22          BY MS. WASHIENKO:

23      Q.   I am now going to share with you a document

24  that has been marked as Exhibit 23.

140

1           MS. WASHIENKO:  Just for the record, it's
2   UMM-30204 through 30206.

3           BY MS. WASHIENKO:

4      Q.   Dr. Rosen, I believe you testified earlier
5   that minutes of the meetings of the patient care
6   assessment committee were not shared with you
7   regularly or, frankly, even at all; is that correct?

8      A.   Correct.

9      Q.   Do you have, independent of this document,
10  any memory of December 2016, and Dr. Robinson bringing
11  to your attention, a radiology issue safety concern
12  about an admission to ICU from the emergency
13  department with a central line insertion not working
14  properly?  Is that familiar to you at all?

15     A.   No.

16           (Exhibit 24 marked for identification.)

17           BY MS. WASHIENKO:

18     Q.   I am now going to share an exhibit -- a
19  document that's been marked as Exhibit 24 and ask you
20  to take a look at it.

21     A.   (Deponent viewing exhibit.)  Okay.

22     Q.   Dr. Rosen, this document appears to be an
23  e-mail from, at the bottom, Dr. Brennan to Dr. Dill,
24  Karen Shore, Douglas Teich or Teich --

141

1      A.    Teich.

2      Q.    -- Teich, T-E-I-C-H, Daniel Berman and

3  Laureen Sena.

4            Can you identify those people for me?

5      A.    (Deponent viewing exhibit.)  Sure.  Karin

6  Dill, thoracic radiologist and division chief.  Karen

7  Shore was a per diem who helped us in chest and

8  abdomen, mostly.  Doug Teich, also a per diem who

9  helped us in neuro and chest.  Dan Berman was a

10  per diem who helped us predominantly in chest.  And

11  Laureen Sena is a pediatric radiologist who does

12  cardiac imaging and -- adult and pediatric cardiac and

13  chest imaging.

14     Q.    You are CC'd, correct?

15     A.    (Deponent viewing exhibit.)  Correct.

16     Q.    You then, above, respond to the e-mail from

17  Dr. Brennan and include as recipients, Dr. Dill,

18  Dr. Shore, Dr. Teich, if I got that right, I apologize

19  again for my pronunciation, Dr. Berman and Dr. Sena.

20     A.    (Deponent viewing exhibit.)  Correct.

21     Q.    Why is Dr. Desai not on that list?

22     A.    I don't know.

23     Q.    In Dr. Brennan's e-mail to all, he writes,

24  "the chest list never seems to decrease in size and I

142

1  appreciate all the work that you do for the community

2  sites every day but right now can I ask that all

3  Marlborough Chest CTs are cleared by the end of the

4  day and prioritized above all others where clinically

5  feasible.  We have a recurrent, mostly unjustified,

6  complaint around service delivery that is centered on

7  chest and Max" --

8          I assume that's you, Dr. Rosen?

9      A.  I would assume so.

10     Q.  -- "and Max and I really don't want to give

11  this person any ammunition whatsoever."

12          Do you recall who this person was?

13     A.  (Deponent viewing exhibit.)  No.  It could be

14  anybody at Marlborough Hospital.

15     Q.  Is it likely to be Dr. Robinson?

16     A.  She was one of the people at Marlborough who,

17  you know, was in a leadership position on quality, so

18  it certainly could be her or other people, you know,

19  in the ICU or quality position at Marlborough.

20     Q.  This issue had clearly been raised with you

21  earlier because, in your response to Dr. Brennan and

22  everyone, you wrote, "This is Extremely," in all caps,

23  "important."

24          Do you see that?

143

 1     A.    (Deponent viewing exhibit.)  Yes.

 2     Q.    So Marlborough was really just, generally,

 3  very unhappy with UMass Memorial's provision of

 4  radiology services --

 5     A.    (Inaudible.)

 6     Q.    -- (inaudible) chest; is that correct?

 7               MADAM COURT REPORTER:  I'm sorry --

 8     A.    Correct.

 9               MADAM COURT REPORTER:  -- I only got up

10  to Memorial's provision of radiology services, then

11  someone spoke, and I couldn't hear what -- it was cut

12  out.

13          I don't know --

14               THE DEPONENT:  I apolo --

15               MADAM COURT REPORTER:  -- if you can

16  start it over again.

17          It's okay.  It happens.

18          BY MS. WASHIENKO:

19     Q.    So -- so, before -- before Dr. Brennan sent

20  this e-mail to the staff, excluding Dr. Desai, you

21  obviously, were aware that Marlborough physicians had

22  expressed concerns about timely or not reading of

23  Marlborough chest CTs, correct?

24     A.    I'm sorry, can you just repeat the question?

144

```
 1      Q.   I'm not sure I can.
 2              MS. WASHIENKO:  Could you read the
 3   question back?
 4              MADAM COURT REPORTER:  Of course.  No
 5   problem.
 6              (Question read, as requested.)
 7      A.   So the needs at Marlborough are different
 8   than the needs at -- at UMass in Worcester.
 9   Marlborough is a small community hospital where,
10   after 5 p.m., I think there's one doctor for the whole
11   hospital.  There are no interns, residents and
12   fellows.  So they rely on radiology -- are much more
13   dependent on radiology, than at an academic medical
14   center.
15              So, for example, if somebody orders a chest
16   CT in the ICU at either the University campus, and
17   they will, then, call and follow up to get the read of
18   that within half an hour or an hour.
19              At Marlborough, there's nobody who's paying
20   attention to that, and nobody who's calling and asking
21   for a result.  So it's -- it's always been -- there's
22   always been more focus on radiology leading the
23   studies at Marlborough faster than we -- than we need
24   to read them at University or the Memorial campus.
```

145

1          Also, the critical care people at -- at

2   University or Memorial are perfectly, you know, able

3   to look at the chest CT and, for the most part,

4   determine, you know, whether there's a

5   life-threatening condition on the chest CT; where, at

6   Marlborough, there really is nobody after 5 p.m. who's

7   there with the patient who can do that.

8      Q.   Just turning back to -- to the document,

9   Exhibit 24, you, in fact, wanted to emphasize how

10  important it was that Marlborough chest CTs be cleared

11  by the end of the day and prioritized above all

12  others, which is why you, then, wrote, "This is

13  EXTREMELY important," correct?

14     A.   Right.  It's -- it's the issue related to how

15  much clinical staff and the level of expertise of

16  clinical staff that Marlborough has after 5 p.m.

17     Q.   Dr. Rosen, do you know when UMass Memorial

18  began providing radiology services to Marlborough?

19     A.   Sometime after I became the chair.  I don't

20  know the exact date.

21     Q.   Do you know who they had used for radiology

22  services prior to using UMass Memorial radiology?

23     A.   Yes.  There was a four-person radiology group

24  that covered -- that had the contract for Memorial

153

1    Q.   -- concerned about her quality at that time?

2    A.   Well, a few things.  As I said earlier, I had

3 several complaints from Kim Robinson.  I've also, you

4 know, stated that Kim Robinson had, you know, several

5 issues.  Also, looking at our QA database, that there

6 were several cases in there that were labeled threes

7 or fours which are, you know, potentially significant

8 misses from Dr. Desai.

9         And at everybody's annual review, my standard

10 process was to print out threes and fours for people

11 and give them to the radiology faculty to make sure

12 that they were aware of these cases and ask them to go

13 and look at them.

14        And then, also, with issues raised by

15 Dr. Dill, in her role as the section chief for

16 thoracic radiology, where people would come to her and

17 ask her to re-review studies that Dr. Dill had

18 interpreted and -- that Dr. Desai had interpreted and

19 Dr. Dill had -- had concerns about the quality of

20 Dr. Desai's reads.

21        So, at that point, I felt it had risen to the

22 level where I needed to conduct an independent review

23 to see if what I was concerned about was substantiated

24 by a blind, independent review process.

154

1    Q.   So, to the best of your recollection now, the
2  -- the -- well, so let me pause.  I'm going to direct
3  your attention up to the -- to the next part of the
4  e-mail thread.  You are responding to Kathy Green and
5  you state, Hi -- Just wanted to state that this is a
6  confidential review, which has been requested by a
7  clinician outside of radiology.
8         Who was that?
9    A.   I'm assuming that's my res -- my taking
10 Dr. Robinson's complaints and operationalizing those.
11   Q.   Are you aware if there was a different
12 clinician who brought concerns to you, such that you
13 would have initiated a confidential review of
14 Dr. Desai's cases?
15   A.   Most of the complaints that I received
16 directly were from Dr. Robinson.  But Dr. Dill, I
17 think, had also received complaints from other
18 clinicians who had asked her to review Dr. Desai's
19 studies.
20   Q.   So you let Kathy Green know that you
21 wanted 25 random chest CTs and reports dictated by
22 Dr. Desai, 25 chest CTs and reports dictated by other
23 attendings, and then you just sort of describe in
24 Numbers [sic] 3 and Number 4 the -- sort of the

158

1  thoracic radiologist.  So you could argue that the

2  appropriate comparison would've been against a board

3  certified thoracic or -- or fellowship trained,

4  rather, there's no board -- a fellowship-trained

5  thoracic radiologist.

6      Q.   So, you pulled, or had pulled, 25 random

7  chest CTs of Dr. Desai's and 25 chest CTs dictated by

8  other attendings.

9          What did you do with them, then?

10     A.   I asked that they were loaded into a system

11 called LifeImage, which is a -- a cloud-based image

12 sharing system.  And also had the reports

13 de-identified, so there was no patient name, medical

14 record number and no indication of who the radiologist

15 was who read it.  And the file room team identified --

16 matched each study, each imagine, with the report by a

17 number, 001, 002, 003, so the reports could be linked

18 with the images.

19     Q.   Then what?

20     A.   So I, then, identified a thoracic radiologist

21 who was willing to review these studies, and the

22 instructions that I gave them was that I had 50 chest

23 CTs with de-identified reports that I would like them

24 to review.  I did not tell them how many were from one

159

 1  person versus the comparative group or anything else.
 2  It was 50 chest CTs to be read.
 3          And I asked the person to report whether they
 4  agreed or disagreed with the interpretation.  If they
 5  disagreed with the interpretation, whether it was a --
 6  in their opinion, a minor disagreement or a major
 7  disagreement, and whether or not that agree -- whether
 8  or not that disagreement would have an impact on
 9  patient care, in their opinion.
10     Q.   Do you recall who you identified as the
11  radiologist to do this review?
12     A.   Yes.
13     Q.   Who was that?
14     A.   Dr. Litmanovich.
15     Q.   How did you identify her?
16     A.   She has a reputation of being a good thoracic
17  radiologist and that she is somebody who I worked in
18  the same department with years ago.  And so I knew
19  that she was, you know, well-respected, competent,
20  and, if she agreed to do something, that she would,
21  you know, carry through on the project.
22     Q.   Where was it that you worked together?
23     A.   Beth Israel Deaconess.
24              MR. WAKEFIELD:  Let's go off the record

166

1  to read them competently?

2      A.   Yes.

3      Q.   Did you ever tell her that?

4      A.   No.

5      Q.   And then the -- I think it's the fifth bullet

6  point down, it says, "Quality issues:  Dr. Rosen will

7  perform focused peer-review for physician where issues

8  have been raised."

9           The focused peer review is the 25 random

10 chest CTs pulled, read by Dr. Desai, compared with the

11 25 chest CTs dictated by other attendings, correct?

12     A.   Correct.

13     Q.   How quickly did that focused peer review

14 occur?

15     A.   I think Dr. Litmanovich probably contacted

16 her at some point before November, because November is

17 a large radiology meeting called RSNA, and I remember

18 her saying, well, I can get to it, but it has to be

19 after RSNA, because she was preparing papers and

20 abstracts and things for the meeting and so I -- so I

21 contacted her at some point before November, and she

22 completed the review, I imagine, December, January,

23 you know, after -- after the -- after the meeting.

24     Q.   I'm going to direct your attention down to

172

 1  I just wanted to make the distinction between
 2  employment, which is really with the medical group;
 3  and the faculty appointment, which is the medical
 4  school -- and sorry, I mean, I know you understand
 5  this, but I just want it to be clear in how I think
 6  about the different roles that I have with the
 7  different institutions.
 8      Q.   Fair enough.  Are those reports maintained by
 9  you after you generate them for each respective
10  physician?
11      A.   No.  I don't maintain those annual reports.
12      Q.   So you will have given a report to the
13  physicians that will have identified any number of --
14  the three and four flagged potential problematic
15  reads?
16      A.   Mm-hmm.
17      Q.   And they walk out the door with the list?
18      A.   Correct.  Because the QA process is that --
19  the QA -- the person responsible for QA in each
20  section should be managing those cases as they come
21  in.  And they should be reviewing the case with the
22  radiologist, who initially read the study, and then
23  helping to adjudicate who was -- who was right and who
24  was wrong, or whether nobody was right or whether

190

 1   issue.

 2       Q.   So --

 3       A.   So reading this inappropriate would have been

 4   an orange alert, by my interpretation of this.

 5       Q.   So you received a complaint from Dr. Robinson

 6   about Dr. Tyagi, and then you circled back with

 7   Dr. Tyagi about the issue, correct?

 8       A.   (Deponent viewing exhibit.)  Yes.

 9       Q.   You did not circle back with Dr. Desai about

10   issues that anyone brought to your attention about her

11   reads, correct?

12       A.   Well, often -- I mean, I would CC -- Kim sent

13   me this e-mail, specifically, and I, then, acted on it

14   and refer it to Karin, Dr. Dill and Dr. Tyagi.

15       Q.   Right.  The -- the question was; did you ever

16   circle back with Dr. Desai on any reads that were

17   brought to your attention that were reads of concern

18   to other docs?

19       A.   I don't know, but most reads would have been

20   -- gone to Dr. Dill.  I'm not sure, to be honest, why

21   Dr. Robinson CC'd me on this particular case.

22       Q.   So, if Dr. Robinson had e-mailed Dr. Dill

23   specific concerns like the ones we are seeing here in

24   Exhibit 31 about Dr. Desai, in the ordinary course,

 1  Dr. Dill would have circled back with Dr. Desai about

 2  them?

 3       A.   Correct.

 4       Q.   Dr. Rosen, in or about May of 2017, do you

 5  recall meeting with Dr. Charu Desai -- sorry, Charu --

 6  Dr. Desai at the end of -- sorry.

 7            At the end of May 2017, do you recall any --

 8  any meeting with her?

 9       A.   Not offhand, but if you have any

10  documentation of it...

11       Q.   At about what time in any year would you do

12  annual evaluations?

13       A.   At that -- at that point, in 2017, they were

14  usually due by the end of the summer.

15       Q.   When did you start doing them?

16       A.   Usually April, May.

17       Q.   So you might have had an annual meeting with

18  Dr. Desai in May of 2017?

19       A.   Yeah, very -- very possible.  We usually did

20  the annual meetings May, June, July and tried to

21  finish them up, you know, in August.

22       Q.   Do you recall Dr. Desai informing you that,

23  as of January 2018, she will have completed her 26th

24  year at UMass Memorial?

194

 1    A.   I don't recall if I did or didn't.

 2    Q.   At this point, it's been your testimony today

 3 that numerous complaints about her work have been

 4 brought to your attention and, in fact, that you have

 5 decided to initiate a focused peer review, but you did

 6 not inform her there were concerns; isn't that

 7 correct?

 8    A.   The con -- it -- depending on the number of

 9 QA threes and fours that were reported in that year, I

10 would, if there were -- if there were an excessive

11 number that year, I probably would've said something

12 to the fact that there, you know, were an excessive

13 number and it was a bit concerning, please go back

14 and -- and review all these cases.

15    Q.   So, if you -- if you met with Dr. Desai in

16 May of 2017, and there had been an excessive number of

17 threes and fours, you would have informed her of same,

18 correct?

19              MR. WAKEFIELD:  Object to form.

20    A.   I don't recall those -- exactly how many

21 cases were involved in 2017, but that, in a normal

22 course of talking to somebody at the annual review,

23 would have brought that up.

24    Q.   And I'll just draw your attention back to

195

1  Exhibit 7, Dr. Desai's annual review for FY 2016/2017.

2        There's no mention of an alarming number of

3  threes and fours, correct?

4     A.   (Deponent viewing exhibit.)  Correct.  But

5  again, this is a medical school document.  This is not

6  a clinical system QA document.

7     Q.   Right.  But you might have alerted her in

8  this document if there were concerns about her

9  performance, and you didn't?

10          MR. WAKEFIELD:  Object to form.

11       BY MS. WASHIENKO:

12    Q.   You can answer.

13    A.   I tried to keep the faculty issues related to

14 the medical school on this form, as opposed to

15 clinical QA issues on a clinical system form.

16    Q.   But you also have no memory of having

17 informed her at that meeting that there were a number

18 of QA three and four reads?

19    A.   No.

20    Q.   That she should review?

21    A.   No.

22          MS. WASHIENKO:  I'm looking at my watch,

23 Dr. Rosen.  It appears to be five o'clock, 5:01 on the

24 nose, and so I suggest that we wrap up for the day.

1              UNITED STATES DISTRICT

2              DISTRICT OF MASSACHUSETTS

3         Civil Action No. 4:19-cv-10520-DHH

4    * * * * * * * * * * * * * * * * * * *

5    CHARU DESAI,

6                     Plaintiff,

7    vs.

8

9    UMASS MEMORIAL MEDICAL CENTER,

10   INC., ET AL.,

11                    Defendants.

12   * * * * * * * * * * * * * * * * * * *

13                   VOLUME II

14     CONTINUED DEPOSITION OF: MAX P. ROSEN, M.D.

15                Conducted Remotely

16          1800 West Park Drive, Suite 400

17              Westborough, Massachusetts

18       Tuesday, June 1, 2021          10:09 a.m.

19

20

21

22

23

24

211

1  think we're actually now appropriately looking at
2  Exhibit 6 with my apologies.  No.  Wait.  I lied.
3  2016, 2017.  Exhibit 7.
4          Okay.  Can we go off the record for a sec?
5          MR. WAKEFIELD:  Sure.
6          (Recess, 10:14 a.m. - 10:19 a.m.)
7  BY MS. WASHIENKO:
8      Q.  Dr. Rosen, we left off your -- the first
9  day of your deposition looking at Exhibit 7 which
10 was Dr. Desai's faculty annual performance review
11 from July 1, 2016, to June 30th, 2017.  Do you see
12 that?
13     A.  Yes.
14     Q.  We were discussing the fact that this
15 annual review did not indicate that there were a
16 number of significant misreads that Dr. Desai made
17 in the academic year, and you testified that you
18 tried to keep faculty issues related to the medical
19 school on this form and have clinical issues on a
20 different system form.  Do you recall that?
21     A.  Yes.
22     Q.  I would like now -- if I can get it to
23 work -- to introduce a document that's been marked
24 as Exhibit 32, and for the record, it's UMM-02767.

212
1   Dr. Rosen, I'd ask you to take a look at it.

2       A.   The highest number -- oh, sorry.

3       Q.   Has it showed up?

4       A.   Yes.

5       Q.   Do you recognize this document,

6   Dr. Rosen?

7       A.   Yes.

8       Q.   It is a Medical Staff Review and Action

9   Form Reappointment for Dr. Desai, correct?

10      A.   Yes.

11      Q.   And, at the bottom of the document, that's

12  your signature, is that correct?

13      A.   Correct.

14      Q.   And is the date on that 5/8/13?

15      A.   Correct.

16      Q.   Is this the clinical system form that you

17  referred to at the end of Day 1 of your

18  deposition?

19      A.   It's a recredentialing form for the

20  clinical system and there -- depending on the form,

21  sometimes there are other -- other parts to it, but

22  this is a clinical system form for reappointment.

23      Q.   And you would agree with me that at

24  least -- you would agree with me for at least 21 --

213

1          THE REPORTER:  You're echoing.

2          MR. WAKEFIELD:  Rob, did you just join?  I

3    think you might be causing some audio interference.

4    All right.

5          MS. WASHIENKO:  I'll try again, and we'll

6    see if it works.

7          MR. WAKEFIELD:  Sorry about that.

8          MS. WASHIENKO:  All right.

9    BY MS. WASHIENKO:

10       Q.  So, looking at Exhibit 32, Dr. Rosen, would

11   you agree with me, then, for 2013 you in the section

12   called "Department Chair" checked off the box that

13   reappointment and clinical privileges are

14   recommended without conditions for Dr. Desai?

15       A.  Yes.

16       Q.  With luck now, I have distributed to

17   everyone a document that's been marked as Exhibit

18   33.  For the record, that is UMM-03261.  Did I

19   manage to get it to everyone?

20       A.  Yes.

21          MR. WAKEFIELD:  Yes.

22       Q.  Dr. Rosen, is that your signature on the

23   bottom of the page?

24       A.  Yes.

214

1      Q.  And this also appears to be dated 5/8/13,
2  correct?
3      A.  Correct.
4      Q.  And -- and this -- well, let me ask:  Is
5  this another part of the reappointment appraisal
6  that we looked at at Exhibit 32?
7      A.  Yes.
8      Q.  And on this document it indicates that
9  Dr. Charu Desai is -- one, two, three, four, five,
10  six, seven, eight, nine -- is given by you excellent
11  marks in the nine categories identified for your
12  evaluation, correct?
13      A.  Correct.
14      Q.  And that includes provision of patient care
15  which is Box No. 1, correct?
16      A.  Correct.
17      Q.  And medical and clinical knowledge which is
18  Box No. 2?
19      A.  Correct.
20      Q.  And then down at No. 3 toward the bottom of
21  the page, you have checked, "I recommend the
22  applicant for reappointment to the Medical Staff and
23  for renewable" -- "renewal of clinical privileges
24  with no conditions," correct?

215

1     A.  Correct.

2     Q.  So, at least as of 2013, you have

3  memorialized that there have been no issues with

4  Dr. Desai's performance, correct?

5     A.  Correct.

6     Q.  I've now, with luck, distributed a document

7  that's been marked Exhibit 34, and I'd ask you to

8  take a look at it, Dr. Rosen.

9     A.  Okay.

10     Q.  Do you recognize this document,

11  Dr. Rosen?

12     A.  Yes.

13     Q.  Can you tell us what it is.

14     A.  It's the UMass. Memorial Medical Center

15  reappointment -- actually, OPPE form for Dr. Desai,

16  which was generated on March 17th, 2015.

17     Q.  And an OPPE is ongoing professional

18  practice evaluation, is that correct?

19     A.  Correct.

20     Q.  And that was conducted in connection with

21  the Joint Commission's review of the medical center,

22  is that correct?

23     A.  I'm not sure how this form relates to any

24  Joint Commission process.

216

1      Q.   Okay.  This document is signed by you,
2    correct?  That's your signature?
3      A.   Yes, it is.
4      Q.   And it's dated June 5th, 2015, correct?
5      A.   Correct.
6      Q.   In the box immediately under your
7    signature, you've checked off, "In review of this
8    medical staff member, there are no issues which
9    require focused review or peer review.  Continuation
10   of privileges is recommended."  Do you see that?
11     A.   Yes.
12     Q.   And then, in the section below that, which
13   is identified as the section called "Competencies,"
14   you have, again, checked off excellent in the nine
15   areas of competencies set out in this chart,
16   correct?
17     A.   Correct.
18     Q.   And the first listed competency is
19   provision of patient care, correct?
20     A.   Correct.
21     Q.   And the second is medical and clinical
22   knowledge, correct?
23     A.   Correct.
24     Q.   In -- in the first day of your deposition,

224

1   double-read.

2           So, for example, if I was reading a chest

3   x-ray on Mr. Jones on June 1st and it was the X

4   number of cases that I had read that day and there

5   was a prior x-ray of the chest for Mr. Jones in his

6   record, this system would automatically ask me to go

7   back and reread the prior chest x-ray and report if

8   I agreed or disagreed with the original

9   interpretation.

10          The second way that things -- that cases

11  can be entered into this database is, if somebody is

12  made aware of a quality issue about an

13  interpretation of a case, that the radiologist would

14  then enter that case into the database.

15          So there is an automated identification of

16  cases, and then there is a manual identification of

17  cases which are entered into this database.

18     Q.   When you look at this document, Dr. Rosen,

19  can you tell whether any of the entries was

20  generated automatically by the system requesting a

21  double-read or whether it was manually entered by a

22  radiologist who believed he or she saw a potentially

23  significant error?

24     A.   The only way to identify cases which were

225

 1  flagged through an automated process or a manual
 2  process would be in the comments.
 3      Q.  And, looking at the comments here, can you
 4  tell me if Dr. Dill manually entered the first in
 5  the row, "Called to review cxr.  Cardiomegaly,
 6  lingular subsegmental..." -- however you say that
 7  last word.
 8      A.  Atelectasis.
 9      Q.  Thank you.  Can you tell if she manually
10  entered that?
11      A.  I would assume because Dr. Dill commented,
12  Called to review chest x-ray, that this was a case
13  that she manually entered.
14      Q.  And then that would appear to be the same
15  for the third row across?
16      A.  I would assume so.  She's -- Dr. Dill
17  states, "Asked to review case."
18      Q.  Right.  And the fourth row as well?
19      A.  Yes.
20      Q.  And the fifth row, correct?
21      A.  Yes.
22      Q.  And the sixth?
23      A.  On the sixth, the -- the label is obscuring
24  some of the text, but I'm assuming it says, "Asked

231

 1          MS. WASHIENKO:  And, before you object,

 2   Reid, there was foundation laid for that.

 3      Q.  And your response, Dr. Rosen, was not

 4   specifically, you do not recall specifically, but as

 5   a section chief, Dr. Dill was responsible for the

 6   quality of the division, and often people will --

 7   would ask her to reread or review studies that

 8   Dr. Desai had interpreted.  How do you know that?

 9          MR. WAKEFIELD:  Object to form.

10      A.  Could you restate the question, please.

11      Q.  How do you know that, as section chief,

12   Dr. Dill was responsible -- strike that.

13          How do you know that, as section chief,

14   people would ask Dr. Dill to reread or review

15   studies that Dr. Desai had interpreted?

16      A.  Dr. Dill told me that people frequently

17   came to her and asked her to review studies and, as

18   we saw in a prior exhibit today, Dr. Dill had

19   entered several of these cases into the QA database

20   that she was requested to re-review.

21      Q.  Do you have any idea, Dr. Rosen, how many

22   cases were entered about other radiologists into

23   this peer learning system?

24      A.  Not without looking at the database.

241

1        A.  No, I don't.

2        Q.  Dr. Rosen, was Dr. Desai evaluated by a

3    third-party entity that specializes in evaluating

4    competencies?

5        A.  I requested an independent reviewer to

6    review in a blinded fashion Dr. Desai's cases

7    compared to an equal number of cases reported by

8    other radiologists.

9        Q.  So the answer is you -- you engaged someone

10   else but not the third-party entity that specializes

11   in evaluating competencies?

12           MR. WAKEFIELD:  Object to the form.

13           You can answer, if you can.

14       A.  I did not engage the same entity that

15   evaluated Dr. Garrell.

16                   (Document marked as Exhibit 41

17                   for identification)

18   BY MS. WASHIENKO:

19       Q.  Okay.  Dr. Rosen, I'm going to ask you to

20   take a look at the document that, with luck, has

21   been marked as Exhibit 41 and, with luck, that I

22   just distributed.  For the record, it's UMM-08943 to

23   08944.

24           Dr. Rosen, do you recognize this document?

266

1      Q.  Who is Michele Streeter?

2      A.  She is the -- I think the COO of the UMass.

3   Memorial Medical Group.

4      Q.  And -- and, in this email, you are writing

5   to her -- the subject is Confidential -

6   Cardiothoracic Radiology staffing, correct?

7      A.  Correct.

8      Q.  You in the first paragraph write to

9   Michele, "I have found a great chest Radiologist

10  finished a cardiothoracic fellowship at UPenn in

11  June 2018."  Can I assume that 2018 is a typo?

12     A.  I'm sorry.  Can you restate the question.

13     Q.  Well, you wrote this email to Ms. Streeter

14  in October of 2017, but you wrote that the great

15  chest radiologist finished a cardiothoracic

16  fellowship at UPenn in June 2018, which seems

17  chronologically awkward.

18     A.  Yeah.  I think, rather than say finished,

19  it should be finishing, I-N-G; so that he will be

20  finishing in the future.

21     Q.  And then, in the next paragraph, you state

22  that you'd like to make him an offer but have not

23  formally resolved Dr. Desai's employment plan for

24  9/30/2018.  Do you see that?

269

1          You can answer, if you can.

2     A.   In working on staffing and budgets, I

3  always take into account what the overall staffing

4  of the department is and the total number of FTEs,

5  and often, if there is a gap in one division, I can

6  fill that by having some people who work in multiple

7  divisions shift the work that they do.

8          So there are some people who only work in

9  one division, for example, in neuroradiology, but

10  other people who can work in more than one division,

11  and when I'm looking at the budgeting for the entire

12  department, I have to think about the total number

13  of FTEs and where people are working to best meet

14  the needs of the department.

15     Q.   You know, Dr. Rosen, that still does not

16  answer the question which was about the plan that

17  you refer to here of Dr. Desai resolving her

18  employment by September 30th, 2018.  Why did you

19  believe that Dr. Desai planned to resolve her employ

20  by September 30th, 2018?

21     A.   Because Dr. Desai had been complaining to

22  me about her work and about not wanting to take

23  call, and if somebody is no longer taking -- if

24  somebody switches from an employed position to a per

270

 1   diem position, then they no longer are taking call,

 2   but that's also a FTE position which is then

 3   available.

 4       Q.  Right.  Did you plan for her to leave by

 5   then?

 6       A.  No.

 7       Q.  Why did the word, "planned," come up in

 8   your email to Ms. Streeter?

 9       A.  It was one of the options that, if Dr.

10   Desai had stopped her full-time employment or, in

11   the second paragraph, if another radiologist wasn't

12   within the department anymore, that there would be

13   an FTE position to be able to hire somebody in

14   chest.

15          There are lots of different contingencies

16   that happen in the department.

17       Q.  You --

18       A.  Other contingencies are if volume increases

19   or volume decreases.

20       Q.  You referred a minute ago, Dr. Rosen, to

21   the second paragraph about -- you referred to the

22   second paragraph, and I believe you suggested,

23   perhaps, someone else leaving the department.  Where

24   do you see that in the second paragraph?

273

1  department's budget is below -- below expectation
2  for a period of time, that the medical group
3  convenes another group of usually chairs to help
4  sort out why a department is underperforming.
5      Q.  And -- and who is Paula in the next
6  sentence?
7      A.  Oh.  Paula Gilmartin is the CFO for the
8  medical group.
9      Q.  And so Michele has responded to you when
10  you say, "Can I go ahead and make him the offer,"
11  she says, (as read) Oh, I don't think so.  We need
12  to check in with the visiting committee on that," is
13  that correct?
14      A.  Correct.
15      Q.  The previous page should be Page 2 of 4 if
16  I can count.
17      A.  Uh-huh.
18      Q.  At the bottom of the page, you then write
19  back to Ms. Streeter, including Stephen Tosi, and
20  you ask if this can be expedited.  You write, "I've
21  been looking for a fellowship trained chest
22  radiologist for 3 years and finally found someone
23  who wants to come to UMass."  Do you see that?
24      A.  Yes.

275

1    testimony?

2         A.  Yes.

3         Q.  Is that what this sentence, "I'm CC'ing

4    Steve...," refers to?

5         A.  Well, not specifically to Marlborough, but

6    that any given day, you know, having 50 to a hundred

7    chest CTs, you'd ideally like to have that be, you

8    know, much -- a smaller number, and the way to

9    accomplish that is to have more people reading each

10   day.

11        Q.  In response to your email to Michele

12   Streeter at 12:16 p.m. on the 3rd of October, she

13   writes back just a few minutes later at 12:20

14   saying, (as read) "The real impact of replacing

15   Desai is the three months that you will have both.

16   How much, dollar sign, is that.  I am just concerned

17   that we are starting off in a big hole."  Do you see

18   that?

19        A.  Yes.

20        Q.  So this says, in fact, that you would have

21   Dr. Desai and a replacement for three months,

22   correct?

23        A.  Yes.

24        Q.  That actually suggests that the

278

1  Desai would be employed in 2019 because the division
2  would continue to have a deficit in 2019 if your
3  plan only addresses eliminating three months of an
4  FTE for Q4 2018, isn't that correct?
5       A.  No, that is not correct because I have all
6  the salaries of the per diems in chest, and I also
7  have Dr. Ferrucci and Dr. Korgaonkar who are working
8  as per diems; so I would eliminate the -- the per
9  diems in chest, see what the volume was, and then
10 eliminate Dr. Ferrucci's or cut back on Dr. Ferrucci
11 reading chest.
12         He could continue reading bone, and so
13 could Dr. Korgaonkar, and because they are both per
14 diems they can -- I -- they're able to work as few
15 or as many days as I need them, as long as they
16 agree to the number of days.
17      Q.  Dr. Rosen, I'm going to turn your attention
18 to Page 1 of Exhibit 48.  At the bottom of the page,
19 Dr. Tosi writes to you and Ms. Streeter about
20 October 3, 2017, at 6:18 p.m. and he writes, "Hello
21 everyone.  After reviewing all of these emails and
22 Max's contingency plans for mitigating the three
23 month overlap cost of the Desai payout, and
24 factoring in the concerns about the backlog of chest

279

1  CTs, I feel that we should approve making the offer

2  to the chest radiologist who is finishing his

3  fellowship at UPenn. in 6/18.  So, I am officially

4  approving it.  Thanks.  Steve Tosi."  Do you see

5  that?

6      A.  Yes.

7      Q.  What does the three-month overlap cost of

8  the Desai payout mean to you?

9      A.  It's the three months of a fiscal year and

10  the medical -- every fiscal year we start with an

11  even budget; so the only issue for the finances that

12  are relevant here is -- is the fiscal year.  Let's

13  see, if we're in -- in the fiscal year of 2018, and

14  in fiscal year 2019, I start at a zero budget one

15  way or another again.  So this has no -- no

16  implications for the following fiscal year

17  whatsoever.

18      Q.  I'm looking at the word, "payout," Dr.

19  Rosen.  Payout is different than salary continuation

20  because an employee continues to be employed, is it

21  not?

22          MR. WAKEFIELD:  Object to form.

23          You can answer, if you can.

24      A.  A payout can be a payment for salary.

281

1    record, it is UMM-04490.

2         A.  Okay.

3         Q.  Setting aside Ms. Leblanc's response to

4    you, this is an email from you to Ms. Leblanc and

5    cc'ing Randa Mowlood dated Tuesday, October 3rd,

6    2017, at 4:56 p.m.  Do you see that?

7         A.  Yes.

8         Q.  It says -- the subject is confidential.

9    The first line of the email says, (as read) "Dr.

10   Desai, comma, and then it says, "Hi - do you have

11   time to talk more about Dr. Desai.  I've been

12   thinking about how to do this and want to run some

13   things past you.  Thanks.  Max."  And Ms. Leblanc

14   says, "Sure!  Let me know when you are free."

15            In your email to Ms. Leblanc, what did you

16   mean when you said, "I've been thinking a lot about

17   how to do this and want to run some things past

18   you"?

19        A.  I'm assuming this is about the quality

20   concerns that people have raised about Dr. Desai.

21        Q.  Why do you assume that?

22        A.  Because I don't know specifically what I

23   was referring to here but am thinking about trying

24   to have a fair and independent quality review of

284

1    Q.  Did we discuss Dr. Desai's FMLA leave?

2    A.  Yes.

3    Q.  Going back to Exhibit 50, Dr. Ferrucci in

4  the second sentence of his -- third sentence of his

5  email writes, "But that you also had an obligation

6  as chair to think about recruiting younger staff for

7  service needs."  Do you see that?

8    A.  Yes.

9    Q.  Why did Dr. Ferrucci write to Dr. Desai

10  that you had an obligation as chair to think about

11  recruiting younger staff for service needs?

12    A.  I don't know.  Those are Dr. Ferrucci's

13  words, not mine.

14    Q.  Did you at any point correct

15  Dr. Ferrucci?

16    A.  I don't remember.

17    Q.  In the -- I think it's the next paragraph,

18  it starts, "She fussed...."  Do you see that

19  sentence?

20    A.  Yes.

21    Q.  "She fussed a bit about being allowed

22  academic days."  Dr. Desai had repeatedly requested

23  that she be given some academic days, is that

24  correct?

299

1   going, I'm working off of a fuzzy memory.  Did you

2   tell me, Dr. Rosen, why you reached out to Dr.

3   Litmanovich rather than the third-party independent

4   reviewer company that you stated that you hired to

5   review Dr. Garrell's --

6        A.  So I -- I was not the one who hired the

7   third-party review for Dr. Garrell.

8        Q.  Okay.

9        A.  And it's my -- it was my understanding that

10  this third-party company does a much more holistic

11  view of a physician's competence, which can, you

12  know, take on a wide -- a wide variety of issues,

13  and again, I had no idea who this company was.  I

14  never interacted with them.  It was done through

15  other people in -- in the medical staff in -- or the

16  medical group.

17       My specific question for Dr. Desai was, is

18  she competent to read chest CTs; so it was a very

19  focused question that I wanted answered.

20       Q.  And so you -- if I'm understanding your --

21  your testimony correctly, you wanted something more

22  focused than the holistic approach you just

23  described as something that the -- the third-party

24  company undertook and you just wanted someone to

300

1   focus on is Dr. Desai competent to -- to review --

2   to read chest x-rays?

3       A.  Yes.  I had concerns from our internal data

4   and wanted an external person who was completely

5   blinded to the person they were reviewing and the

6   reason for the review, which I felt was the most

7   impartial, unbiased way that I knew of conducting

8   such a review.

9                   (Document marked as Exhibit 53

10                  for identification)

11  BY MS. WASHIENKO:

12      Q.  I'm going to turn your attention to a

13  document that, with luck, I have distributed to all.

14  It is Exhibit 53, and I'm going to ask you to take a

15  look at that.  For the record, this is UMM-30056

16  through 57.

17      A.  Uh-huh.

18      Q.  Dr. Rosen, on the bottom of the first page

19  of this document, it appears that Richard Ellison

20  has written to you and Dr. Dill on October 23rd,

21  2017, about chest CT report.  The subject is

22  confidential peer review, dash, chest CT report.  Do

23  you -- do you see that?

24      A.  Correct.  Yes.

301

1        Q.  And the -- the body of the email says, (as

2    read) "Karin, slash, Max.  I wanted to let you know

3    that there are two issues with a Chest CT reading

4    done on a patient," and then there's a redacted

5    number -- I mean a redacted symbol, "MR#," and

6    another redaction, "and read by Dr. Hadeer

7    Shaikhly."  Do you see that?

8        A.  Yes.

9        Q.  Had you received other complaints about

10   Dr. Shaikhly?

11       A.  Not that I recall.

12       Q.  This -- it appears from doctor -- from the

13   email just above the email we were looking at that,

14   on Monday, October 23rd, 2017, at 1:00 p.m.,

15   Dr. Dill wrote, "Hi Hadeer.  Wanted to pass this on

16   (below).  Can you please review and assess if an

17   addendum is needed."  Do you see that?

18       A.  Correct.

19       Q.  So it appears from this email that

20   Dr. Dill, in fact, reached out to at least

21   Dr. Shaikhly about some potential issues with some

22   of Dr. Shaikhly's readings, correct?

23       A.  Well, a specific concern about not

24   reporting a chest wall fluid collection on this CT.

316

1   Dr. Dill had talked with Dr. Desai about several of

2   these issues, but I did not have those conversations

3   with Dr. Dill prior -- with Dr. Desai prior to

4   terminating her employment.

5           MS. WASHIENKO:  Would you read that answer

6   back.

7           THE REPORTER:  "Answer:  Dr. Dill had --

8   yeah.  My understanding is Dr. Dill had talked with

9   Dr. Desai about several of these issues, but I did

10  not have those conversations with Dr. Dill prior --

11  with Dr. Desai prior to terminating her employment.

12  BY MS. WASHIENKO:

13      Q.  If I understand -- if I understand that,

14  you -- your testimony, Dr. Rosen, is that you think

15  Dr. Dill would have spoken to Dr. Desai about these

16  issues but you did not, is that correct?

17      A.  Correct, that -- from all the quality

18  complaints that went to Dr. Dill, I would have

19  assumed that Dr. Dill had talked to -- with

20  Dr. Desai about the issues that were being raised

21  and the cases that Dr. Dill had entered into our QA

22  database.

23      Q.  So, as I'm looking at the Exhibit 55, it

24  seems that, on December 25th, Dr. Litmanovich sent

317

1   you the summary and a spreadsheet with regard to the

2   results of her QA review of Dr. Desai.  You -- you

3   did not inform Dr. Desai of her termination, though,

4   until March 14th, 2018, isn't that correct?

5        A.  I take your word for the date.

6        Q.  What were you waiting for?

7        A.  I don't take termination lightly, and so

8   after Dr. Litmanovich's review, I went back and I

9   decoded for the first time the -- the 50 reads

10  assigning them to Dr. Desai for the other group of

11  radiologists that comprised the other 25 and then,

12  you know, had to make a decision about what to do,

13  and I -- I don't take that type of decision lightly.

14       Q.  Just circling back briefly to your point

15  about decoding the -- the reads, Dr. Rosen, why is

16  it that, if you selected 25 images that were

17  Dr. Desai's to be read, you did not actually select

18  25 images for each of the other radiologists in the

19  division?

20       A.  I actually thought I was giving the benefit

21  of the doubt to Dr. Desai because I couldn't imagine

22  that her reads would at all rise to the level of

23  Dr. Dill's or Dr. Schmidlin's, who were the other

24  two thoracic radiologists.

320

1   BY MS. WASHIENKO:

2       Q.  I am going to try to pull up a different

3   exhibit that might be already Exhibit 57.  For the

4   record, this is UMM-04299 through 04300.

5       A.  Okay.

6       Q.  Directing your attention to the bottom of

7   the first page, this is an email from Dr. Robinson

8   to Steve Roach dated January 3rd, 2018, that -- and

9   then just above that that -- that Dr. Brennan was

10  cc'd on, and just above that is Dr. Brennan

11  forwarding this email, presumably, to you because on

12  January 8th, 2018, at 2:27 p.m., he writes, "Hi

13  Max."  Do you have memory of this email, Dr.

14  Rosen?

15      A.  Not specifically, but it is an email

16  addressed to me.

17      Q.  Okay.  I just want to direct your attention

18  to Dr. Robinson's email to -- to Mr. Roach and

19  Darren Brennan.  She writes, "Please treat this as

20  confidential and do not forward.  Issues:  Quality

21  of reads," and then she cites Drs. Tyagi, Ho,

22  Ferrucci, Desai, and most recently Bindman.  "Issues

23  include missed findings, inaccurate description of

24  findings, not comparing to old studies that are

321

1   reasonably available, reading as no change."  Do you

2   see that?

3        A.  Yes.

4        Q.  Did you happen to conduct any quality

5   review of Dr. Tyagi?

6        A.  As -- no continue.  I'm sorry.

7        Q.  No.  No.  That was oddly where my question

8   ended.

9        A.  Oh, okay.  Actually, I discussed with

10  Dr. Tyagi his reading chest CT's, and we decided

11  that it was better use of his time and skills to

12  just focus on abdominal and pelvic imaging which is

13  what his fellowship training was in.

14       Q.  What about with Dr. Ho?

15       A.  First, actually, his name is Ho Lou, but

16  he's the head of our ED radiology group, and I have

17  no issues with his functioning as an ED radiologist.

18       Q.  What about with Dr. Ferrucci?

19       A.  Again, I have no issues with Dr. Ferrucci

20  functioning in his ability to read x-rays and bone

21  films and Dr. Ferrucci does not read CTs.  He

22  focuses on the -- the images and the modalities that

23  he is comfortable with at this stage of his

24  career.

322

 1      Q.  And Dr. Bindman?

 2      A.  Yeah, again, no specific issues here, and

 3  Dr. Bindman is somebody who works in both our

 4  chest -- our chest, our community, and our breast

 5  imaging divisions, and is somebody who fills in to

 6  help balance the schedule.

 7      Q.  Dr. Brennan forwards that email to you and

 8  says that he encloses Dr. Robinson's summary of the

 9  issues as she sees them in radiology.  The last line

10  says, "Probably best to talk through these as there

11  was an additional unfortunate language publicly used

12  to describe the Radiologists here that I want to

13  follow up on."  Do you see that?

14      A.  Yes.

15      Q.  Do you recall speaking with Dr. Brennan

16  about that?

17      A.  I don't recall, but I expect that I did.

18      Q.  Do you recall what the unfortunate language

19  likely used was?

20      A.  No, I don't.

21      Q.  And it appears from Dr. Brennan at the top

22  of the email that this was Dr. Robinson's publicly

23  used language, correct?

24      A.  Yes.  That would be my interpretation.

323

1       Q.  You -- you write -- in the middle
2   underneath the word, Dr. Robinson, and before Dr.
3   Brennan's email to you, you write, "Thanks.  I've
4   heard about this from Alice."  Do you see that?
5       A.  Yes.
6       Q.  Who is Alice?
7       A.  Alice Shackman who's my senior VP who
8   oversees radiology at the medical center, not at --
9   at the community hospitals.
10      Q.  Do you recall what Ms. Shackman told you?
11      A.  No.
12      Q.  So, just to be compulsive, you received
13  this email, you spoke with Dr. Tyagi and he --
14      A.  Well, I don't know when he spoke to
15  Dr. Tyagi.  At some point, Dr. Tyagi stopped reading
16  chest CTs, but I don't know when that is.
17      Q.  And I believe you testified that -- and I'm
18  going to get this wrong now because I still have
19  Dr. Ho listed in this email, and I think you just
20  corrected me to say that it's Dr. Lo.
21      A.  Correct.
22      Q.  So Dr. Lo you have no issues with.
23  Dr. Ferrucci you have no issues with, although you
24  noted he does not read CTs anymore, and Dr. Bindman

324

1  you have no specific issues with.  Did you conduct a

2  focused review on any of them?

3       A.  No.

4              (Document marked as Exhibit 58

5              for identification)

6  BY MS. WASHIENKO:

7       Q.  I believe I have just distributed Exhibit

8  58.  For the record it's UMM-04638.  Dr. Rosen, why

9  were you asking Randa Mowlood about Dr. Desai's RVUs

10  for Q1?

11       A.  I don't know specifically, but we routinely

12  look at everybody's RVUs on a quarterly basis.

13       Q.  Based on your academic calendar, when would

14  Q1 have been, Dr. Rosen?

15       A.  So I'm assuming this is Q1 of 2018, which

16  is October 1st to December 31st of 2017.

17       Q.  And you just testified that you routinely

18  looked at RVUs for everyone on a quarterly basis?

19       A.  Correct.  And part -- part of the RVU

20  evaluation is to make sure that, on one hand, people

21  are being protective but, on the other hand, that we

22  are not asking them to read, you know, an exorbitant

23  amount of work and that -- whether people are within

24  our benchmark range.

365

1      Q.  Does that mean, Dr. Rosen, that in the, you

2   know, personnel records for each of the -- for Dr.

3   Alencar, Dr. Roychowdhury, Dr. Suran, Dr. Nicola,

4   Dr. Garrell, Dr. Agrawal, there would be letters of

5   termination much like the letter that you gave to

6   Dr. Desai that is set out at Exhibit something --

7   Exhibit 64?

8      A.  Sorry.  I just looked at Exhibit 64.  Can

9   you go back and repeat the question.

10     Q.  Do the personnel records of Dr. Alencar,

11  Roychowdhury, Suran, Nicola, Garrell, and Agrawal

12  contain termination letters like the termination

13  letter that you gave to Dr. Desai at Exhibit 64?

14     A.  I don't know what's specifically in their

15  folders, but I'm assuming from what's listed here

16  that there's not a termination letter; there's a

17  resignation letter following a performance -- a

18  discussion of their performance.

19         And, again, when I raised their performance

20  issues with all of the other people you mentioned

21  and told them that they could no longer be employed

22  at the medical group, they all went out, found other

23  jobs, and resigned.

24     A.  What I'm --

367

1  conversation was the same; the response of the
2  individuals was different.
3      Q.  I'm now going to try to introduce a
4  document that I am going to need Mr. Sweeney's
5  assistance with because the version of it that was
6  produced to us originally said something about BEING
7  produced in a native file, and when I --
8      A.  Do you mind if we take a five-minute break
9  here?
10     Q.  Happy to.  It will give me a chance to get
11 this up.  Thank you.
12         MR. WAKEFIELD:  Patty, do you have an idea
13 I know we -- we overshot a little bit on an
14 estimate, which is not uncommon, but do you have an
15 idea of -- of how much longer we might have?
16         MS. WASHIENKO:  I have three exhibits
17 that -- one -- we can be off the record.
18         (Recess, 4:42 p.m. - 4:50 p.m.)
19             (Document marked as Exhibit 72
20             for identification)
21 BY MS. WASHIENKO:
22     Q.  I have just distributed a document that has
23 been marked as Exhibit 72.  I need to represent,
24 because I think it's not outrageously clear from the

368

1    document, that this is a document that UMass.

2    produced.

3          On the very bottom line of the first page

4    of the document, you will see that -- I don't

5    know -- two-thirds of the way down it says, "Docs

6    produced by UMass. Memorial 3/31/21 Production Bates

7    No. UMM-04501."

8        A.  I'm sorry.  Which page are you on?

9        Q.  I'm on the very, very bottom line of Page

10   1, it is in the tiniest imaginable font in a footer,

11   Dr. Rosen.

12          MR. WAKEFIELD:  Very bottom.

13       A.  At the bottom I see, "Compensation related

14   benefits."

15          MR. WAKEFIELD:  Below that.  It's, like, a

16   space and it starts out "Z."

17       A.  Oh, "Z:\F & W LLC\Clients \Active

18   Clients\Desai."

19       Q.  Okay Yes.  So, I now represent to all that

20   we received this document from UMass.  It is a

21   UMass. document produced by UMass. given Bates No.

22   04501.  It was produced in an odd way; so this is

23   the best I can do for purposes of the deposition.

24   I'm going to direct your attention to Page 5 and 6.

# Exhibit T

## UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
## WORCESTER, MA

### ANNUAL FACULTY REPORT AND EVALUATION OF PROFESSIONAL ACTIVITIES

**NOTES ON PROCEDURE:** *Please complete electronically.* This report is intended to document contributions as a faculty member at the University of Massachusetts Medical School and our clinical partner UMass Memorial Health Care, Inc.

### I. *General Information*

| | | | |
|---|---|---|---|
| Dates of Evaluation - **From:** July 1, 2009 | | **To:** June 30, 2010 | |
| **Name:** Charu Desai, MD | | **Date:** May 21, 2010 | |
| **Department:** Radiology | | **Division:** Thoracic Radiology | |
| **Rank:** Clinical Associate Professor | | **Years in Present Rank:** 9 | |
| **Faculty Type:** Academically-salaried | | **FTE:** FTE- 100% | |
| **Date of UMMS Appointment:** 7/15/01 | | **Tenure Decision Year:** | |
| **Highest Degree:** MD | | **Degree Date:** 1973 | |

**Percentage effort in the following activities during the evaluation period** (N.B. percentage effort cannot exceed 100%. Time spent on administrative service and leadership functions are to be included in the appropriate categories.):

**Clinical:** 92 %  **Education:** 8 %  **Research:** 0 %

### II. *Teaching*

A. Teaching and development of formal courses for ***undergraduate medical*** education, including individual or group supervision.

> On line teaching residents 3-4 times/wk and preview on call residents

B. Teaching and development of formal courses for ***graduate*** education, including biomedical science and nursing students, residents, etc.; individual or group supervision; CME and other presentations; mentoring faculty.

C. Briefly summarize your impression and data, if available, of student feedback regarding your formal teaching activities.

D. Describe any major changes in your teaching approach or responsibilities during the last year.

> Teaching on line in chest rotation

Page 1

UMM
Charu Desai, MD
Exhibit_14
10/22/2020

E.   Describe your major teaching activities this past year in areas other than the formal curriculum (e.g. clinical teaching, student advising and students or fellows who conducted research under your direction)?

Daily consultant to clinicians, primarily in chest diseases and general radiology in reading room

## III.   *Research, Creative and Scholarly Activities*

A.   Published articles, abstracts, books, monographs, editorials, pre-reviews and reviews during evaluation period (include exact reference with full title, publisher, dates and inclusive pagination).

B.   Work accepted for publication but not yet in print.

C.   Current grants, contracts and clinical studies (identifying the following for each: agency, title, entire project dates, salary percentage, amount funded, and position on project).

D.   Pending grants, contracts and clinical studies (identifying the following for each: agency, title, entire project dates, salary percentage, amount funded and position on project).

E.   Other scholarly activities. (e.g. peer review of articles and editorships of journals and books)

## IV.   *Professional Service*

A.   Departmental/divisional service (e.g. committees and candidate interviews).

B.   School, campus and clinical system service (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.   Regional, national and international committees and other service activities. (e.g. peer review of grants)

Page 2

UMM 00266

D.    Professionally related service activities (e.g. community service and consulting).

---

## V.    *Clinical Inpatient and Outpatient Activities*

A.    Describe clinical practice and specialized clinical skills, including by patient setting/location.

B.    Patient care productivity using departmental measures (see addendum provided by Department).

C.    Quality and timely completion of patient records and billing (see addendum provided by Department).

D.    Other measures and outcomes (patient satisfaction, patient outcome, etc).

E.    Describe efforts to improve quality and safety of patient care, including how you've identified and addressed your own needs to enhance your clinical competencies.

## VI.    *Leadership*

Describe what leadership responsibilities you have regarding clinical, education and research. Note accomplishments in these activities over the past year that you think have had an impact.

## VII.    *Diversity Efforts*

Describe efforts related to diversity that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment.
(For assistance with completing this section, go to http://www.umassmed.edu/ofa/afr/diversity.aspx)

To equally treat diverse staff in education, research, service, clinical, and administration activities

## VIII.    *Honors and Awards*

---

Annual Faculty Report
Revised: 02/19/2009

UMM 00267

**IX. *Faculty Objectives and Career Development***

A.   What were your stated goals and objectives for the past year?  Describe your accomplishments in each of these.  What do you see as your most important contribution to your department, school, and institution?

| 1. | Increase productivity in clinical work. |
|----|----|
| 2. | Online teaching Residents and medical students. |
| 3. | |
| 4. | |
| 5. | |

B.   State three to five goals for the next year, in priority order, in the following areas: *education; research, creative and scholarly activities; service; clinical; leadership; diversity.*  One goal must be related to *diversity.*  Include one or more specific measureable objectives for each goal. (For assistance with completing this section, go to http://www.umassmed.edu/ofa/afr/goals.aspx)

| 1. | Education - engage resident case presentation biweekly, when in chest rotation |
|----|----|
| 2. | Teaching residents and medical students with more emphasis on DID of the disease |
| 3. | In the absence  of the division director, take responsibility of covering the division |
| 4. | Attend Medical Grand Rounds participation |
| 5. | |

C.   Identify your current mentoring activities: faculty and staff you mentor and those who mentor you (including those who may be from outside the University).

| Rotating medical student and visiting residents |
|----|

D.   Describe career development activities completed during the previous year.

| Attend continuing Med Ed conferences and specialty meetings |
|----|

E.   Describe career development plans for the next year (e.g. continuing medical education and career development courses, career development awards and other activities).

| Same |
|----|

Page 4

UMM 00268

## X. *Supervisor / Evaluator Evaluation (Assigned by Department)*

A.  Evaluate the faculty member's contributions to clinical care.

> Adequate quality though just at the median % in terms of productivity. Overall, range of skills is only modest.

B.  Evaluate the faculty member's contributions to education.

> Reading room only. No formal didactic contributions.

C.  Evaluate the faculty member's contributions to research and scholarly activities.

> None.

D.  If applicable, evaluate the faculty member's contributions to leadership.

> NA

## XI. *Faculty's Comments*

## XII. *Department Chair's Evaluation (if not supervisor/evaluator)*
Summary weighted to correspond with effort assignment.

> Stressed new emphasis on measuring multiple missions ie., clinical productivity as well science and teaching.

## XIII. *Signatures*

Faculty Member (Signature/Date): _____ Charles Desai, M.D._____

Supervisor / Evaluator (Signature/Date): _____

Department Chair (Signature/Date): _____ Fen _____ 5/24/2010

Vice Provost for Faculty Affairs, (Signature/Date): _____

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS
UNIVERSITY CAMPUS, S2-333**

Page 5

Annual Faculty Report
Revised: 02/19/2009

**UMM 00269**

## UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
### WORCESTER, MA

### ANNUAL FACULTY REVIEW

**NOTES ON PROCEDURE:** *Please complete electronically.* This report is intended to document contributions as a faculty member of the University of Massachusetts Medical School and UMass Memorial Health Care, Inc.

### I.   *General Information*

Dates of Evaluation - From:   July 1, 2010   **To:**   June 30, 2011

Name:   Charu Desai, MD   **Date:**   July 11, 2011

Department:   Radiology   **Division:**   Thoracic Radiology

Rank:   Clinical Associate Professor   **Years in Present Rank:**   10

Faculty Type:   Academically-salaried   **FTE:**   FTE

Tenure Decision Year:   _____

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should *not* complete this section.):

**Current:**
Clinical: 92 %   Education: 8 %   Research: 0 %   Other: 0 %   Other: 0 %

**Proposed:**
Clinical: 92 %   Education: 8 %   Research: 0 %   Other: 0 %   Other: 0 %

### II.   *Education*

A.   List teaching and development of courses for ***undergraduate medical*** education, including individual or group supervision.

Teaching medical students on line in chest rotation.

B.   List teaching and development of courses for ***graduate*** education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship.

On line teaching residents 3-4 times/wk in chest rotation.

C.   List any other teaching activities during the last year, including CME, or other presentations; outreach or community education.

Charu Desai, MD
Exhibit_15
10/22/2020

D. List current mentoring or advising activities, including student advising, students or fellows who conducted research under your direction, postdoctoral fellows, staff and faculty.

E. Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

### III. Research, Creative and Scholarly Activities

A. List published articles, books, monographs, editorials and reviews (include exact reference with full title, publisher, dates and inclusive pagination).

B. List works submitted for publication (indicate status: under revision, accepted).

C. List active (during reporting period) grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded, and position on project).

D. List pending grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded and position on project).

E. List invited presentations & presentations at professional meetings (include date and institution or place and name of meeting and abstract reference if appropriate).

F. List other research and scholarly activities (e.g. patents and peer review of articles and editorships).

UMM 00271

## IV.  *Professional Service*

    A.   List service activities for the department and division (e.g. committees and candidate interviews).

    B.   List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

    C.   List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels).

    D.   List external service community activities that use your professional expertise.

## V.  *Leadership*

    List any leadership responsibilities or positions.

## VI.  *Clinical Service*

    A.   Describe clinical practice and specialized clinical skills, including patient population/location.

    B.   Patient care productivity using departmental measures (provided by Department).

22.71 % above the 50th percentile of WRVU productivity

    C.   Quality and timely completion of patient records and billing (provided by Department).

N/A

    D.   Other measures and outcomes (patient satisfaction, patient outcomes, etc).

UMM 00272

N/A

    E.   Describe efforts to improve quality and safety of patient care.

## VII.  Diversity Efforts

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment.  (For assistance, see http://www.umassmed.edu/ofa/academic/afr-diversity.aspx)

To equally treat diverse staff in education, research, service, clinical, and administration activities

## VIII.  Honors and Awards

## IX.  Professional Development

List any professional development activities in which you participated.

Attended Radiology Review course given by Harvard in March, 2011.

## X.  Goals and Self Assessment

    A.   List your goals and objectives for this year: copy Section IX.B of your Annual Faculty Review for the previous year.

Education - engage resident case presentation biweekly, when in chest rotation

Teaching residents and medical students with more emphasis on DID of the disease

In the absence of the division director, take responsibility of covering the division

Attend Medical Grand Rounds participation

    B.   Provide a self-assessment narrative summarizing performance during this year: highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

> Increased productivity in clinical work.
> Attended continuing Med Ed conferences.

C. State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.* Include one (or more) specific measureable objective for each goal. (For assistance with completing this section, go to: http://www.umassmed.edu/ofa/academic/goals-objectives.aspx)

| | |
|---|---|
| 1. | Continue to teach residents and medical students in chest rotation |
| 2. | Continue participation in the Radiology medical rounds. |
| 3. | Continue helping other departmental clinicians to discuss the chest cases when needed |
| 4. | Take responsibility of covering the division in the absence of the division director |
| 5. | |

D. Based on your career/professional development plan as noted above, what are your anticipated mentoring needs for the next year?

| |
|---|
| |

UMM 00274

**XI.** *Supervisor / Evaluator Evaluation (Assigned by Department)*

    A.    Evaluate the faculty member's contributions to clinical care (as appropriate).

    B.    Evaluate the faculty member's contributions to education.

    C.    Evaluate the faculty member's contributions to research and scholarly activities.

    D.    Evaluate the faculty member's goals for the coming year.

    E.    Other comments (i.e. from other evaluators or other in other areas).

**XII.** *Faculty's Comments*

Thank you very much.

**XIII.** *Department Chair's Evaluation (if not supervisor/evaluator)*
    Summary weighted to correspond with effort assignment.

Steady, productive, competent, seasoned, professional at all times. Delight to have her continue.

**XIV.** *Signatures*

Faculty Member
(Signature/Date): _Chan S. Desai, M.D. 7/14/2011._

UMM 00275

Supervisor / Evaluator
    (Signature/Date):
Department Chair
    (Signature/Date): _____ 7/14/2011

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS**
**UNIVERSITY CAMPUS, S2-343**

UMM 00276

### UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
### WORCESTER, MA

### ANNUAL FACULTY REVIEW

**NOTES ON PROCEDURE:** *Please complete electronically.* This report is intended to document contributions as a faculty member of the University of Massachusetts Medical School and UMass Memorial Health Care, Inc.

## I.  *General Information*

**Dates of Evaluation –  From:** July 1, 2011      **To:** June 30, 2012

**Name:** Charu Desai, MD      **Date:** May 23, 2012

**Department:** Radiology      **Division:**

**Rank:** Clinical Associate Professor      **Years in Present Rank:** 11

**Faculty Type:** Academically-salaried      **FTE:** FTE

**Tenure Decision Year:**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should *not* complete this section.):

**Current:**
Clinical: 92 %  Education: 8 %  Research: 0 %  Other: 0 %  Other: 0 %

**Proposed:**
Clinical: 92 %  Education: 8 %  Research: 0 %  Other: 0 %  Other: 0 %

## II.  *Education*

A.  List teaching and development of courses for ***undergraduate medical*** education, including individual or group supervision.

B.  List teaching and development of courses for ***graduate*** education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship.

C.  List any other teaching activities during the last year, including CME, or other presentations; outreach or community education.

D.  List current mentoring or advising activities, including student advising, students or fellows who conducted research under your direction, postdoctoral fellows, staff and faculty.

E.  Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

Annual Faculty Report
Revised: 04/09/2012

UMH

Charu Desai, MD
Exhibit_16
10/22/2020

### III.    *Research, Creative and Scholarly Activities*

A.    List published articles, books, monographs, editorials and reviews (include exact reference with full title, publisher, dates and inclusive pagination).

B.    List works submitted for publication (indicate status: under revision, accepted).

C.    List active (during reporting period) grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded, and position on project).

D.    List pending grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded and position on project).

E.    List invited presentations & presentations at professional meetings (include date and institution or place and name of meeting and abstract reference if appropriate).

F.    List other research and scholarly activities (e.g. patents and peer review of articles and editorships).

### IV.    *Professional Service*

A.    List service activities for the department and division (e.g. committees and candidate interviews).

B.    List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.    List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels).

D.    List external service community activities that use your professional expertise.

Annual Faculty Report
Revised: 04/09/2012

**UMM 00278**

**V.   Leadership**

List any leadership responsibilities or positions.

**VI.   Clinical Service**

A.   Describe clinical practice and specialized clinical skills, including patient population/location.

B.   Patient care productivity using departmental measures (provided by Department).

For Q1 and Q2 of fiscal year 2012 – Above 50th percentile.

C.   Quality and timely completion of patient records and billing (provided by Department).

N/A

D.   Other measures and outcomes (patient satisfaction, patient outcomes, etc).

N/A

E.   Describe efforts to improve quality and safety of patient care.

**VII.   Diversity Efforts**

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment.  (For assistance, see http://www.umassmed.edu/ofa/academic/AFRdiversity.aspx)

**VIII.   Honors and Awards**

**IX.   Professional Development**

List any professional development activities in which you participated.

Annual Faculty Report
Revised: 04/09/2012

UMM 00279

**X.** *Goals and Self Assessment*

A.  List your goals and objectives for this year: copy Section IX.B of your Annual Faculty Review for the previous year.

B.  Provide a self-assessment narrative summarizing performance during this year: highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

C.  State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.* Include one (or more) specific measureable objective for each goal. (For assistance with completing this section, go to: http://www.umassmed.edu/ofa/academic/AFRgoals.aspx)

1.
2.
3.
4.
5.

D.  Based on your career/professional development plan as noted above, what are your anticipated mentoring needs for the next year?

Annual Faculty Report
Revised: 04/09/2012

UMM 00280

**XI.**   *Supervisor / Evaluator Evaluation (Assigned by Department)*

A.   Evaluate the faculty member's contributions to clinical care (as appropriate).

B.   Evaluate the faculty member's contributions to education.

C.   Evaluate the faculty member's contributions to research and scholarly activities.

D.   Evaluate the faculty member's goals for the coming year.

E.   Other comments (i.e. from other evaluators or other in other areas).

**XII.**   *Faculty's Comments*

*Thank you very much.*

**XIII.**   *Department Chair's Evaluation (if not supervisor/evaluator)*
Summary weighted to correspond with effort assignment.

Good job this year in focusing on enhanced clinical work output. Otherwise, positive supportive presence in Dept at large. Continue as is!

**XIV.   Signatures**

Faculty Member (Signature/Date):   *Charu S Desai, M.D. 5/23/2012.*

Supervisor / Evaluator (Signature/Date):

Department Chair (Signature/Date):

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS**
**UNIVERSITY CAMPUS, S2-343**

Page 5

Annual Faculty Report
Revised: 04/09/2012

**UMM 00281**

**UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL**
**WORCESTER, MA**

**FACULTY ANNUAL PERFORMANCE REVIEW**

**NOTES ON PROCEDURE:** *Please complete electronically.* This report is intended to document contributions as a faculty member of the University of Massachusetts Medical School and UMass Memorial Health Care, Inc.

## I.   General Information

**Dates of Evaluation -**   **From:** July 1, 2012     **To:** June 30, 2013

**Name:** Charu Desai, MD     **Date:** June 3, 2013

**Department:** Radiology     **Division:** Thoracic Radiology

**Rank:** Associate Professor     **Years in Present Rank:** 12

**Faculty Type:** Academically-salaried     **FTE:** FTE

**Tenure Decision Year:**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should *not* complete this section.):

**Current:**

Clinical: 75 %   Education: 25 %   Research: 0 %   Other: 0 %   Other: 0 %

**Proposed:**

Clinical: 75 %   Education: 25 %   Research: 0 %   Other: 0 %   Other: 0 %

## II.   Education

A.   List teaching and development of courses for ***undergraduate medical*** education, including individual or group supervision.

Teaching medical students on line in chest rotation.

B.   List teaching and development of courses for ***graduate*** education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship.

On line teaching residents 3 – 4 times/wk in chest rotation.
Teaching anesthesia and internal medicine residents in chest rotation.

C.   List any other teaching activities during the last year, including CME, or other presentations; outreach or community education.

D.   List current mentoring or advising activities, including student advising, students or fellows who conducted research under your direction, postdoctoral fellows, staff and faculty.

E.   Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

UMM 00282

## III. Research, Creative and Scholarly Activities

A. List published articles, books, monographs, editorials and reviews (include exact reference with full title, publisher, dates and inclusive pagination).

B. List works submitted for publication (indicate status: under revision, accepted).

C. List active (during reporting period) grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded, and position on project).

D. List pending grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded and position on project).

E. List invited presentations & presentations at professional meetings (include date and institution or place and name of meeting and abstract reference if appropriate).

F. List other research and scholarly activities (e.g. patents and peer review of articles and editorships).

## IV. Professional Service

A. List service activities for the department and division (e.g. committees and candidate interviews).

B. List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C. List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels).

D. List external service community activities that use your professional expertise.

UMM 00283

## V.   Leadership

List any leadership responsibilities or positions.

## VI.   Clinical Service

A.   Describe clinical practice and specialized clinical skills, including patient population/location.

B.   Patient care productivity using departmental measures (provided by Department).

Fiscal year 2013 – At 50th percentile
(October 2012 through March 2013)

C.   Quality and timely completion of patient records and billing (provided by Department).

N/A

D.   Other measures and outcomes (patient satisfaction, patient outcomes, etc).

N/A

E.   Describe efforts to improve quality and safety of patient care.

## VII.   Diversity Efforts

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment.  (For assistance, see http://www.umassmed.edu/ofa/academic/AFRdiversity.aspx)

To equally treat diverse staff in education, research, service, clinical, and administration activities.

## VIII.   Honors and Awards

## IX.   Professional Development

List any professional development activities in which you participated.

Page 3

UMM 00284

## V.   Leadership

List any leadership responsibilities or positions.

## VI.   Clinical Service

A.   Describe clinical practice and specialized clinical skills, including patient population/location.

B.   Patient care productivity using departmental measures (provided by Department).

Fiscal year 2013 – At 50th percentile
(October 2012 through March 2013)

C.   Quality and timely completion of patient records and billing (provided by Department).

N/A

D.   Other measures and outcomes (patient satisfaction, patient outcomes, etc).

N/A

E.   Describe efforts to improve quality and safety of patient care.

## VII.   Diversity Efforts

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment.  (For assistance, see http://www.umassmed.edu/ofa/academic/AFRdiversity.aspx)

To equally treat diverse staff in education, research, service, clinical, and administration activities.

## VIII.   Honors and Awards

## IX.   Professional Development

List any professional development activities in which you participated.

Page 3

UMM 00285

## X.    *Goals and Self Assessment*

A.    List your goals and objectives for this year: copy Section X.C of your Faculty Annual Performance Review for the previous year.

Education – engage resident case presentation biweekly, when in chest rotation.
Teaching residents and medical students with more emphasis on D/D of the disease.
In the absence of the division director, take responsibility of covering the division.

B.    Provide a self-assessment narrative summarizing performance during this year: highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

Increased productivity in clinical work.

C.    State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.*  Include one (or more) specific measureable objective for each goal.  (For assistance with completing this section, go to: http://www.umassmed.edu/ofa/academic/AFRgoals.aspx)

| 1. | Continue to teach residents and medical students in chest rotation. |
|----|---|
| 2. | Continue helping other departmental clinicians to discuss the chest cases when needed |
| 3. | Take responsibility of covering the division in the absence of the division director. |
| 4. | |
| 5. | |

D.    Based on your career/professional development plan as noted above, what are your anticipated mentoring needs for the next year?

UMM 00286

## XI.   Supervisor / Evaluator Evaluation (Assigned by Department)

A.   Evaluate the faculty member's contributions to clinical care (as appropriate).

Fine.

B.   Evaluate the faculty member's contributions to education.

Only 2 responses on resident evaluation for Dr. Desai – however, all were outstanding.

C.   Evaluate the faculty member's contributions to research and scholarly activities.

N/A

D.   Evaluate the faculty member's goals for the coming year.

Continue providing excellent clinical service and clinical teaching at the PACS workstation.

E.   Other comments (i.e. from other evaluators or other in other areas).

## XII.   Faculty's Comments

Thank you very much.

## XIII.   Department Chair's Evaluation (if not supervisor/evaluator)
Summary weighted to correspond with effort assignment.

No issues.  We discussed how improved functionality of PACS and implementation of a critical results reporting system will facilitate Dr. Desai's workflow and productivity. I have offered to consider any education or career development opportunities that Dr. Desai might be interested in. At this time Dr. Desai is content with her faculty rank as Clinical Associate Professor.

## XIV.   Signatures

Faculty Member (Signature/Date):   Charu Desai, MD   6/3/13   *Charu S. Desai, M.D.*

Supervisor / Evaluator (Signature/Date):

Department Chair (Signature/Date):   *Max feel*   6/3/13

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS
UNIVERSITY CAMPUS, S2-337**

Page 5

Annual Faculty Report
Revised: 01/31/2013

UMM 00287

**UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL**
**WORCESTER, MA**

**FACULTY ANNUAL PERFORMANCE REVIEW**

**NOTES ON PROCEDURE:** *Please complete electronically.* This report is intended to document contributions as a faculty member of the University of Massachusetts Medical School and UMass Memorial Health Care, Inc.

## I.   General Information

**Dates of Evaluation -   From:** July 1, 2013     **To:** June 30, 2014

**Name:** Charu Desai, MD     **Date:** September 10, 2014

**Department:** Radiology     **Division:** Thoracic Radiology

**Rank:** Clinical Associate Professor     **Years in Present Rank:** 13

**Faculty Type:** Academically-salaried     **FTE:** FTE

**Tenure Decision Year:**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should *not* complete this section.):

**Current:**     (As of Academic Year 2013)
Clinical:  75  %  Education:  25  %  Research:  0  %  Other:  0  %  Other:  0  %

**Proposed:**
Clinical:  75  %  Education:  25  %  Research:  0  %  Other:  0  %  Other:  0  %

## II.   Education

A.  List teaching and development of courses for ***undergraduate medical*** education, including individual or group supervision.

> Teaching medical students on line in chest rotation.

B.  List teaching and development of courses for ***graduate*** education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship.

> On line teaching residents 3 – 4 times/wk in chest rotation.
> Teaching anesthesia and internal medicine residents in chest rotation.

C.  List any other teaching activities during the last year, including CME, or other presentations; outreach or community education.

D.  List current mentoring or advising activities, including student advising, students or fellows who conducted research under your direction, postdoctoral fellows, staff and faculty.

E.  Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

Page 1

UMI

Charu Desai, MD
Exhibit_18
10/22/2020

### III.    Research, Creative and Scholarly Activities

A.    List published articles, books, monographs, editorials and reviews (include exact reference with full title, publisher, dates and inclusive pagination).

B.    List works submitted for publication (indicate status: under revision, accepted).

C.    List active (during reporting period) grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded, and position on project).

D.    List pending grants, contracts and clinical trials (identify: agency, title, entire project dates, salary percentage, amount funded and position on project).

E.    List invited presentations & presentations at professional meetings (include date and institution or place and name of meeting and abstract reference if appropriate).

F.    List other research and scholarly activities (e.g. patents and peer review of articles and editorships).

### IV.    Professional Service

A.    List service activities for the department and division (e.g. committees and candidate interviews).

Quality control representative from Chest division

B.    List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.    List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels).

D.    List external service community activities that use your professional expertise.

UMM 00289

## V. *Leadership*

List any leadership responsibilities or positions.

```

```

## VI. *Clinical Service*

A. Describe clinical practice and specialized clinical skills, including patient population/location.

```

```

B. Patient care productivity using departmental measures (provided by Department).

FY13 October 2012 to September 2013 - @ or above 50th percentile.
(FY14 Data incomplete at this time)

C. Quality and timely completion of patient records and billing (provided by Department).

N/A

D. Other measures and outcomes (patient satisfaction, patient outcomes, etc.)

N/A

E. Describe efforts to improve quality and safety of patient care.

```

```

## VII. *Diversity Efforts*

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment. (For assistance, see http://www.umassmed.edu/ofa/academic/AFRdiversity.aspx)

To equally treat diverse staff in education, research, service, clinical, and administration activities.

## VIII. *Honors and Awards*

```

```

## IX. *Professional Development*

List any professional development activities in which you participated.

```

```

Page 3

UMM 00290

X.   *Goals and Self Assessment*

A.   List your goals and objectives for this year: copy Section X.C of your Faculty Annual Performance
     Review for the previous year.

| |
|---|
| Education – engage resident case presentation biweekly, when in chest rotation. Teaching residents and medical students with more emphasis on D/D of the disease. In the absence of the division direction, take responsibility of covering the division. |

B.   Provide a self-assessment narrative summarizing performance during this year: highlight what you
     consider your most significant accomplishments and indicate areas where you were not able to reach
     your goals.

| |
|---|
| Increased productivity in clinical work. |

C.   State your goals for the next year, in priority order, in each of the following areas as appropriate:
     *education; research, creative and scholarly activities; professional service; clinical service;*
     *leadership; diversity; career development.* Include one (or more) specific measureable objective for
     each goal. (For assistance with completing this section, go to:
     http://www.umassmed.edu/ofa/academic/AFRgoals.aspx)

| | |
|---|---|
| 1. | Continue to teach residents and medical students in chest rotation. |
| 2. | Continue helping other departmental clinicians to discuss the chest cases when needed. |
| 3. | Take responsibility of covering the division in the absence of the division director. |
| 4. | |
| 5. | |

D.   Based on your career/professional development plan as noted above, what are your anticipated
     mentoring needs for the next year?

| |
|---|
| |

Annual Faculty Report
Revised: 01/31/2013

**UMM 00291**

## XI.   *Supervisor / Evaluator Evaluation (Assigned by Department)*

A.   Evaluate the faculty member's contributions to clinical care (as appropriate).

B.   Evaluate the faculty member's contributions to education.

C.   Evaluate the faculty member's contributions to research and scholarly activities.

D.   Evaluate the faculty member's goals for the coming year.

E.   Other comments (i.e. from other evaluators or other in other areas).

## XII.   *Faculty's Comments*

Thanks.

## XIII.   *Department Chair's Evaluation (if not supervisor/evaluator)*
Summary weighted to correspond with effort assignment.

Dr. Desai and I discussed options for academic time. Unfortunately, the Department's policy has been in place for at least two years, and cannot be modified on an individual basis. I appreciate the clinical efforts of Dr. Desai as well as her contribution to resident teaching at the PACS station.

## XIV.   *Signatures*

Faculty Member (Signature/Date):  *Charu S. Desai, M.D.*   9|10|2014.

Supervisor / Evaluator (Signature/Date): 

Department Chair (Signature/Date):  *[signature]*   9/10/14

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS**
**UNIVERSITY CAMPUS, S2-337**

Page 5

UMM 00292

**UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL**
**WORCESTER, MA**

**FACULTY ANNUAL PERFORMANCE REVIEW**

A Guide to the APR is available online: http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/guide.

## I.   General Information

**Dates of Evaluation -   From:** July 1, 2014   **To:** June 30, 2015
**Name:** Charu Desai, MD   **Date:** June 25, 2015
**Department:** Radiology   **Division:** Thoracic Radiology
**Rank:** Clinical Associate Professor   **Years in Present Rank:** 13.58
**Faculty Type:** Academically-salaried   **FTE:** 1.00
**Tenure Decision Year:**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should *not* complete this section.):

**Current:**
   Clinical: 75 % Education: 25 % Research: % Other: % Other: %

**Proposed:**
   Clinical: 75 % Education: 25 % Research: % Other: % Other: %

## II.   Education and Mentoring

A.   List teaching and development of courses for *undergraduate medical* education, including individual or group supervision. Identify any that are inter-professional.

> Teaching medical students on line in chest rotation.

B.   List teaching and development of courses for *graduate* education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship. Identify any that are inter-professional.

> On line teaching residents 3 – 4 times/wk in chest rotation.
> Teaching anesthesia and internal medicine residents in chest rotation.

C.   List any other teaching activities during the reporting period, including CME, or other presentations; outreach or community education. Identify any which are inter-professional.

D.   List individuals (student, residents, postdoctoral trainees, faculty) whom you have directly advised or mentored during the reporting period. Include the names, program, your role, their current position and any outcomes achieved.

E.   Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

Page 1

UMI

Charu Desai, MD
Exhibit_19
10/22/2020

### III.  Research, Creative and Scholarly Activities

A.  List articles, books, monographs, editorials and reviews published during the reporting period (include complete reference with full title, all authors and inclusive pagination).

B.  List works submitted for publication during the reporting period (indicate status: under revision, accepted).

C.  List active (during reporting period) grants, contracts and clinical trials. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding dates. State your role, identify the PI if not you, and your percent effort.

D.  List pending grants, contracts and clinical trials submitted during the reporting period. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding period. State your role, identify the PI if not you, and your percent effort.

E.  List invited presentations & presentations at professional meetings (include title, date and institution or place and name of meeting and abstract reference if appropriate).

F.  List other research and scholarly activities (e.g. patents, peer review of articles or editorships).

### IV.  Professional Service

A.  List service activities for the department and division (e.g. committees and candidate interviews).

Quality control representative from Chest division

B.  List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.  List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels). Note your role including any leadership positions.

D.  List external community service activities that use your professional expertise.

UMM 00294

## V. Leadership

List leadership responsibilities or positions.

## VI. Clinical Service

A. Describe clinical practice and specialized clinical skills, including patient population/location.

B. Patient care productivity using departmental measures (provided by Department).

FY15 – October 2014 to May 2015 – 50th percentile

C. Quality and timely completion of patient records and billing (provided by Department).

N/A

D. Other measures and outcomes (patient satisfaction, patient outcomes, etc).

N/A

E. Describe efforts to improve quality and safety of patient care.

## VII. Honors and Awards

## VIII. Diversity Efforts

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment. For assistance, see http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/diversity/

To equally treat diverse staff in education, research, service, clinical, and administration activities.

## IX. Professional Development

List any activities (course, programs, workshops etc.) in which you participated to enhance your professional development.

UMM 00295

## X.   *Goals and Self Assessment*

A.   List your goals and objectives for this year; copy Section X.C of your Faculty Annual Performance Review for the previous year.

> Education – engage resident case presentation biweekly, when in chest rotation.
> Teaching residents and medical students with more emphasis on D/D of the disease.
> In the absence of the division direction, take responsibility of covering the division.

B.   Provide a self-assessment narrative summarizing performance during this year; highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

> Increased productivity in clinical work.

C.   State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.*  Include one (or more) specific measureable objective for each goal.  For assistance with completing this section, go to: http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/goals/

> 1.   Continue to teach residents and medical students in chest rotation.
>
> 2.   Continue helping other departmental clinicians to discuss the chest cases when needed.
>
> 3.   Take responsibility of covering the division in the absence of the division director.
>
> 4.
>
> 5.

D.   Based upon your goals as noted above, what are your anticipated mentoring needs for the next year? Do you need assistance to identify mentors?

UMM 00296

**XI.** *Supervisor / Evaluator Evaluation (Assigned by Department)*

A.   Evaluate the faculty member's contributions to clinical care (as appropriate).

B.   Evaluate the faculty member's contributions to education.

C.   Evaluate the faculty member's contributions to research and scholarly activities.

D.   Evaluate the faculty member's goals and mentoring needs for the coming year.

E.   Other comments (i.e. from other evaluators or other in other areas).

**XII.** *Faculty's Comments*

Thank you very much.  I value your feedback.

**XIII.** *Department Chair's Evaluation (if not supervisor/evaluator)*
Summary weighted to correspond with effort assignment.

Dr. Desai and I discussed the overall staffing/functioning of the Thoracic imaging division and growth planned with the arrival of Dr. Dill as the new division chief. As always I appreciate her commitment to the department and teaching our residents.

**XIV.** *Signatures*

Faculty Member (Signature/Date): *Charm S— Desai, M.D.*

Supervisor / Evaluator (Signature/Date):

Department Chair (Signature/Date): *MayParbom  9/24/2015*

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS**

UMM 00297

# UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
## WORCESTER, MA

### FACULTY ANNUAL PERFORMANCE REVIEW

A Guide to the APR is available online: http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/guide.

## I.  General Information

**Dates of Evaluation -   From:**  July 1, 2015       **To:**  June 30, 2016

**Name:**  Charu Desai, MD       **Date:**  June 23, 2016

**Department:**  Radiology       **Division:**  Thoracic Radiology

**Rank:**  Clinical Associate Professor       **Years in Present Rank:**  14.5

**Faculty Type:**  Academically-salaried       **FTE:**  1.00

**Tenure Decision Year:**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should *not* complete this section.):

**Current:**
   Clinical:  75  %  Education:  25  %  Research:  ____  %  Other:  ____  %  Other:  ____  %

**Proposed:**
   Clinical:  75  %  Education:  25  %  Research:  ____  %  Other:  ____  %  Other:  ____  %

## II.   Education and Mentoring

A.   List teaching and development of courses for ***undergraduate medical*** education, including individual or group supervision. Identify any that are inter-professional.

> Teaching medical students on line in chest rotation.

B.   List teaching and development of courses for ***graduate*** education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship. Identify any that are inter-professional.

> On line teaching residents 3 – 4 times/wk in chest rotation.
> Teaching anesthesia and internal medicine residents in chest rotation.

C.   List any other teaching activities during the reporting period, including CME, or other presentations; outreach or community education. Identify any which are inter-professional.

D.   List individuals (student, residents, postdoctoral trainees, faculty) whom you have directly advised or mentored during the reporting period. Include the names, program, your role, their current position and any outcomes achieved.

E.   Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

Page 1

UMM   Charu Desai, MD
Exhibit_20
10/22/2020

## III.   *Research, Creative and Scholarly Activities*

A.   List articles, books, monographs, editorials and reviews published during the reporting period (include complete reference with full title, all authors and inclusive pagination).

B.   List works submitted for publication during the reporting period (indicate status: under revision, accepted).

C.   List active (during reporting period) grants, contracts and clinical trials. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding dates. State your role, identify the PI if not you, and your percent effort.

D.   List pending grants, contracts and clinical trials submitted during the reporting period. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding period. State your role, identify the PI if not you, and your percent effort.

E.   List invited presentations & presentations at professional meetings (include title, date and institution or place and name of meeting and abstract reference if appropriate).

F.   List other research and scholarly activities (e.g. patents, peer review of articles or editorships).

## IV.   *Professional Service*

A.   List service activities for the department and division (e.g. committees and candidate interviews).

Quality control representative from Chest division

B.   List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.   List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels). Note your role including any leadership positions.

D.   List external community service activities that use your professional expertise.

**UMM 00299**

## V.   Leadership

List leadership responsibilities or positions.

## VI.   Clinical Service

A.   Describe clinical practice and specialized clinical skills, including patient population/location.

B.   Patient care productivity using departmental measures (provided by Department).

> FY15 – October 2014 to September 2015 – Actual RVU's – 5,071
> FY16 – October 1, 2015 to January 31, 2016 – Actual RVU's – 1,515

C.   Quality and timely completion of patient records and billing (provided by Department).

> N/A

D.   Other measures and outcomes (patient satisfaction, patient outcomes, etc).

> N/A

E.   Describe efforts to improve quality and safety of patient care.

## VII.   Honors and Awards

## VIII.   Diversity Efforts

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment. For assistance, see http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/diversity/

> To equally treat diverse staff in education, research, service, clinical, and administration activities.

## IX.   Professional Development

List any activities (course, programs, workshops etc.) in which you participated to enhance your professional development.

## X.   Goals and Self Assessment

A.   List your goals and objectives for this year: copy Section X.C of your Faculty Annual Performance Review for the previous year.

> Education – engage resident case presentation biweekly, when in chest rotation.
> Teaching residents and medical students with more emphasis on D/D of the disease.

UMM 00300

In the absence of the division direction, take responsibility of covering the division.

B.   Provide a self-assessment narrative summarizing performance during this year; highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

Increased productivity in clinical work.

C.   State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.* Include one (or more) specific measureable objective for each goal.  For assistance with completing this section, go to: http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/goals/

| 1. | Continue to teach residents and medical students in chest rotation. |
| 2. | Continue helping other departmental clinicians to discuss the chest cases when needed. |
| 3. | Take responsibility of covering the division in the absence of the division director. |
| 4. | |
| 5. | |

D.   Based upon your goals as noted above, what are your anticipated mentoring needs for the next year? Do you need assistance to identify mentors?

## XI.   *Supervisor / Evaluator Evaluation (Assigned by Department)*

A.   Evaluate the faculty member's contributions to clinical care (as appropriate).

B.   Evaluate the faculty member's contributions to education.

C.   Evaluate the faculty member's contributions to research and scholarly activities.

D.   Evaluate the faculty member's goals and mentoring needs for the coming year.

E.   Other comments (i.e. from other evaluators or other in other areas).

## XII.   *Faculty's Comments*

Thanks.

## XIII.   *Department Chair's Evaluation (if not supervisor/evaluator)*
Summary weighted to correspond with effort assignment.

Dr. Desai has contributed to the chest section through her clinical work interpreting chest x-rays and chest CT and teaching residents at the PACS station.

## XIV.   *Signatures*

Faculty Member (Signature/Date):   Charu  S .Desai,M.D. 8/22/2016   *Charu S. Desai 9/9/2016*

Supervisor / Evaluator (Signature/Date):

Department Chair (Signature/Date):   *Marjaale   9/28/2016*

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS**

**UMM 00302**

# UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
## WORCESTER, MA

## FACULTY ANNUAL PERFORMANCE REVIEW

A Guide to the APR is available online: http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/guide.

## I.   *General Information*

**Dates of Evaluation -**    July 1, 2016      **To:**  June 30, 2017
**Name:**  Charu Desai, MD                    **Date:**  June 22, 2017
**Department:**  Radiology                    **Division:**  Thoracic Radiology
**Rank:**  Clinical Associate Professor       **Years in Present**          15.5
**Faculty Type:**  Academically-salaried      **FTE:**  1.00
**Tenure Decision**

**Percentage effort in the following activities during the evaluation period (To be completed by Department. Faculty member should *not* complete this section.):**

**Current:**
Clinical:  75  %  Education:  25  %  Research:       %  Other:       %  Other:       %

**Proposed:**
Clinical:  75  %  Education:  25  %  Research:       %  Other:       %  Other:       %

## II.   *Education and Mentoring*

A.   List teaching and development of courses for *undergraduate medical* education, including individual or group supervision. Identify any that are inter-professional.

Teaching medical students on line in chest rotation.

B.   List teaching and development of courses for *graduate* education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship. Identify any that are inter-professional.

On line teaching residents 3 – 4 times/wk in chest rotation.
Teaching anesthesia and internal medicine residents in chest rotation.

C.   List any other teaching activities during the reporting period, including CME, or other presentations; outreach or community education. Identify any which are inter-professional.

D.   List individuals (student, residents, postdoctoral trainees, faculty) whom you have directly advised or mentored during the reporting period. Include the names, program, your role, their current position and any outcomes achieved.

E.   Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

Page 1

Charu Desai, MD
Exhibit_33
10/22/2020

## III.  *Research, Creative and Scholarly Activities*

A.  List articles, books, monographs, editorials and reviews published during the reporting period (include complete reference with full title, all authors and inclusive pagination).

B.  List works submitted for publication during the reporting period (indicate status: under revision, accepted).

C.  List active (during reporting period) grants, contracts and clinical trials. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding dates. State your role, identify the PI if not you, and your percent effort.

D.  List pending grants, contracts and clinical trials submitted during the reporting period. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding period. State your role, identify the PI if not you, and your percent effort.

E.  List invited presentations & presentations at professional meetings (include title, date and institution or place and name of meeting and abstract reference if appropriate).

F.  List other research and scholarly activities (e.g. patents, peer review of articles or editorships).

## IV.  *Professional Service*

A.  List service activities for the department and division (e.g. committees and candidate interviews).

B.  List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

C.  List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels). Note your role including any leadership positions.

D.  List external community service activities that use your professional expertise.

**UMM 00304**

## V.   Leadership

List leadership responsibilities or positions.

## VI.   Clinical Service

A.   Describe clinical practice and specialized clinical skills, including patient population/location.

B.   Patient care productivity using departmental measures (provided by Department).

FY16 – October 2015 to September 2016 – Actual RVU's – 4,669
FY17 – October 1, 2016 to January 31, 2017 – Actual RVU's – 1,336

C.   Quality and timely completion of patient records and billing (provided by Department).

N/A

D.   Other measures and outcomes (patient satisfaction, patient outcomes, etc.)

N/A

E.   Describe efforts to improve quality and safety of patient care.

## VII.   Honors and Awards

Teacher of the Year Award 2017  given by the Residents

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment. For assistance, see http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/diversity/

To equally treat diverse staff in education, research, service, clinical, and administration activities

## IX.   Professional Development

List any activities (course, programs, workshops etc.) in which you participated to enhance your professional development.

## X.   Goals and Self Assessment

A.   List your goals and objectives for this year: copy Section X.C of your Faculty Annual Performance Review for the previous year.

Education – engage resident case presentation biweekly, when in chest rotation.
Teaching residents and medical students with more emphasis on D/D of the disease.

UMM 00305

In the absence of the division direction, take responsibility of covering the division.

B.  Provide a self-assessment narrative summarizing performance during this year; highlight what you
    consider your most significant accomplishments and indicate areas where you were not able to reach
    your goals.

Increased productivity in clinical work.

C.  State your goals for the next year, in priority order, in each of the following areas as appropriate:
    *education; research, creative and scholarly activities; professional service; clinical service;
    leadership; diversity; career development.*  Include one (or more) specific measureable objective for
    each goal.  For assistance with completing this section, go to:
    http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/goals/

| 1. | Continue to teach residents and medical students in chest rotation. |
| 2. | Continue helping other departmental clinicians to discuss the chest cases when needed |
| 3. | Take responsibility of covering the division in the absence of the division director. |
| 4. | |
| 5. | |

D.  Based upon your goals as noted above, what are your anticipated mentoring needs for the next year?
    Do you need assistance to identify mentors?

UMM 00306

## XI. *Supervisor / Evaluator Evaluation (Assigned by Department)*

A.   Evaluate the faculty member's contributions to clinical care (as appropriate).

B.   Evaluate the faculty member's contributions to education.

C.   Evaluate the faculty member's contributions to research and scholarly activities.

D.   Evaluate the faculty member's goals and mentoring needs for the coming year.

E.   Other comments (i.e. from other evaluators or other in other areas).

## XII. *Faculty's Comments*

Thanks.

## XIII. *Department Chair's Evaluation (if not supervisor/evaluator)*

Summary weighted to correspond with effort assignment.

Dr. Desai and I discussed her recognition by this year's graduating Residents as their "teacher of the year". We also discussed several of her concerns about allocation of academic time, call responsibilities, etc. These had all previously been discussed with Dr. Desai and representatives from the HR department.

## XIV. *Signatures*

Faculty Member (Signature/Date):   *Chaan S. Desai, M.D.   9/11/2017*

Supervisor / Evaluator (Signature/Date):

Department Chair (Signature/Date):   *9/20/2017*

**PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS**

UMM 00307

## UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL
### WORCESTER, MA

### FACULTY ANNUAL PERFORMANCE REVIEW

A Guide to the APR is available online: https://www.umassmed.edu/ofa/academic/faculty-reviews/apr.

### I.   General Information

**Dates of Evaluation -   From:** July 1, 2017     **To:** June 30, 2018

**Name:** Charu Desai, MD          **Date:** May 10, 2018

**Department:** Radiology          **Division:** Thoracic Radiology

**Rank:** Associate Professor       **Years in Present Rank:** 16.6

**Faculty Type:** UMMHC Employed    **FTE:** 1.00

**Tenure Decision Year:**

**Percentage effort in the following activities during the evaluation period** (To be completed by Department. Faculty member should _not_ complete this section.):

**Current:**
   Clinical:  75  %  Education:  25  %  Research:     %  Other:     %  Other:     %

**Proposed:**
   Clinical:  75  %  Education:  25  %  Research:     %  Other:     %  Other:     %

### II.   Education and Mentoring

   A.   List teaching and development of courses for **_undergraduate medical_** education, including individual or group supervision. Identify any that are inter-professional.

   > Teaching medical students on line in chest rotation.

   B.   List teaching and development of courses for **_graduate_** education, including biomedical science and nursing students, residents and fellows in individual or group supervision, including preceptorship. Identify any that are inter-professional.

   > On line teaching residents 3 – 4 times/wk in chest rotation.
   > Teaching anesthesia and internal medicine residents in chest rotation.

   C.   List any other teaching activities during the reporting period, including CME, or other presentations; outreach or community education. Identify any which are inter-professional.

   D.   List individuals (student, residents, postdoctoral trainees, faculty) whom you have directly advised or mentored during the reporting period. Include the names, program, your role, their current position and any outcomes achieved.

   E.   Attach any available evaluations of your educational activities or other evidence of your teaching effectiveness.

Annual Faculty Report
Revised: 02/28/2018

Charu Desai, MD
Exhibit_46
10/22/2020

### III.   *Investigation*

A.  List active (during reporting period) grants, contracts and clinical trials. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding dates. State your role, identify the PI if not you, and your percent effort.

B.  List pending grants, contracts and clinical trials submitted during the reporting period. Include grant title, funding agency and grant number; total, direct & indirect costs; and complete funding period. State your role, identify the PI if not you, and your percent effort.

C.  List other research activities (e.g. patents, development of software).

### IV.   *Scholarship*

A.  List articles, books, monographs, editorials and reviews published during the reporting period (include complete reference with full title, all authors and inclusive pagination).

B.  List works submitted for publication during the reporting period (indicate status: under revision, accepted).

C.  List invited presentations & presentations at professional meetings (include title, date and institution or place and name of meeting and abstract reference if appropriate).

### V.   *Academic Service*

A.  List service activities for the department and division (e.g. committees and candidate interviews).

B.  List service activities for the School, campus and clinical system (e.g. governing and standing committees such as the Admissions Committee and Quality Improvement Committee).

Quality Improvement Committee

C.  List external service activities for regional, national and international committees and professional organizations (e.g. grant review panels). Note your role including any leadership positions.

**UMM 00309**

D.   List editorial and peer review responsibilities.

E.   List external community service activities that use your professional expertise.

## VI.   Leadership

List leadership responsibilities or positions.

## VII.   Health Care Delivery

A.   Describe expertise in a clinical specialty and roles and responsibilities in health care delivery, including patient population/location. Describe any innovations in health care delivery, such as a clinical program, diagnostic test, or intervention, with documented outcomes.

B.   Patient care productivity using departmental measures (provided by Department).

FY17-October 1, 2016-September 30, 2017 - Actual RVU's 4,491
FY18-October 1, 2017-January 31, 2018 – Actual RVU's 1,297

C.   Quality and timely completion of patient records and billing (provided by Department).

N/A

D.   Other measures and outcomes (patient satisfaction, patient outcomes, etc).

N/A

E.   Describe efforts to improve quality, safety, and/or efficacy of patient care, including the outcomes of these efforts.

## VIII.   Honors and Awards

Teacher of the Year Award 2017  given by the Residents

## IX.   Diversity Efforts

Describe efforts that contribute to the department/institution's commitment to an inclusive environment in education, research, service, clinical, leadership activities including faculty, staff, and trainee recruitment. For assistance, see http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/diversity

To equally treat diverse staff in education, research, service, clinical, and administration activities

**X.   *Professional Development***

List any activities (course, programs, workshops etc.) in which you participated to enhance your professional development.

┌─────────────────────────────────────────────────────────────────────────┐
│                                                                           │
└─────────────────────────────────────────────────────────────────────────┘

**XI.   *Goals and Self Assessment***

A.   Define your primary Area of Distinction. Your primary Area is where you devote most effort and/or have the greatest achievements (see here for information on the Areas of Distinction).

Health Care Delivery: [X]   Education: [X]   Investigation: [ ]   Population Health and Public Policy: [ ]

Use the box below for *optional* comments (e.g., if you have more than one Area of Distinction)

┌─────────────────────────────────────────────────────────────────────────┐
│                                                                           │
└─────────────────────────────────────────────────────────────────────────┘

B.   List your goals and objectives for this year: copy Section X.C of your Faculty Annual Performance Review for the previous year.

┌─────────────────────────────────────────────────────────────────────────┐
│ Education – engage resident case presentation biweekly, when in chest rotation. │
│ Teaching residents and medical students with more emphasis on D/D of the disease. │
│ In the absence of the division direction, take responsibility of covering the division. │
└─────────────────────────────────────────────────────────────────────────┘

C.   Provide a self-assessment narrative summarizing performance during this year: highlight what you consider your most significant accomplishments and indicate areas where you were not able to reach your goals.

┌─────────────────────────────────────────────────────────────────────────┐
│ Increased productivity in clinical work.                                  │
└─────────────────────────────────────────────────────────────────────────┘

D.   State your goals for the next year, in priority order, in each of the following areas as appropriate: *education; research, creative and scholarly activities; professional service; clinical service; leadership; diversity; career development.* Include one (or more) specific measureable objective for each goal. For assistance with completing this section, go to:
http://www.umassmed.edu/ofa/academic/faculty-reviews/apr/goals

┌─────────────────────────────────────────────────────────────────────────┐
│ 1.    Continue to teach residents and medical students in chest rotation. │
├─────────────────────────────────────────────────────────────────────────┤
│ 2.    Continue helping other departmental clinicians to discuss the chest cases when needed. │
├─────────────────────────────────────────────────────────────────────────┤
│ 3.    Take responsibility of covering the division in the absence of the division director │
├─────────────────────────────────────────────────────────────────────────┤
│ 4.                                                                        │
├─────────────────────────────────────────────────────────────────────────┤
│ 5.                                                                        │
└─────────────────────────────────────────────────────────────────────────┘

E.   Based upon your goals as noted above, what are your anticipated mentoring needs for the next year? Do you need assistance to identify mentors?

┌─────────────────────────────────────────────────────────────────────────┐
│                                                                           │
└─────────────────────────────────────────────────────────────────────────┘

**UMM 00311**

**XII.** *Supervisor / Evaluator Evaluation (Assigned by Department)*

    A.    Evaluate the faculty member's contributions to clinical care (as appropriate).

    B.    Evaluate the faculty member's contributions to education.

    C.    Evaluate the faculty member's contributions to research and scholarly activities.

    D.    Evaluate the faculty member's goals and mentoring needs for the coming year.

    E.    Other comments (i.e. from other evaluators or other in other areas).

    F.    Rate the faculty member's performance:

        ☐ Satisfactory

        ☐ Unsatisfactory

        A rating of unsatisfactory performance must be supported by documentation in the APR and is based on one or more of the following (*check which apply*):

        ☐ Failure to meet previously set goals

        ☐ Failure to perform assigned duties or responsibilities

        ☐ Repeated failure by the Faculty Member to respond to direction from the supervisor

        ☐ Material violations of the employer's, Department's and/or other applicable and published policies, procedures, or codes of conduct

Supervisor / Evaluator (Signature/Date): _____

**UMM 00312**

**XIII.**  *Faculty Member's Comments (optional)*

> Your comment on my reliance on residents for interpretation on vascular study warrants further explanation. As per your instruction as of March, 2018, I am only to read plain chest x-rays. Which is why I do not involve myself in interpreting other study.
>
> Also, to clarify, I have never read MRI study.

Faculty Member (Signature/Date): _Charu S. Desai, M.D. 9/11/2018_

**XIV.**  *Department Chair's Evaluation (if not supervisor/evaluator)*

Summary weighted to correspond with effort assignment.

> Dr. Desai and I met today (8/22/18), and I asked (and Dr. Desai agreed) that Ms. Randa Mowlood – our group practice administrator join us. We reviewed this faculty performance review form, and I clarified that Dr. Desai's comment in section XI B *"In the absence of the division direction, take responsibility of covering the division"* referred to times when she was the only chest attending in the reading room NOT that the division lacked a division chief. I also reviewed the resident's evaluations and gave Dr. Desai a copy. I discussed, but did not distribute, the one written resident comment which raised concerns about Dr. Desai's apparent reliance on the residents for interpretation of vascular studies. This should no longer be an issue, as Dr. Desai is focusing her efforts of x-rays (rather than CT or MRI).

Department Chair (Signature/Date): _Mark Paul_ 9/28/18

### PLEASE RETURN TO THE OFFICE OF FACULTY AFFAIRS

To CLARIFY-

This evaluation period covers 7/1/17 – 6/30/18 During 9 months of this period- DR. DESAI WAS READING chest CT.

_MPP 9/28/18_

UMM 00313

# Exhibit U

**Revised October 2015**

## CALL AND/OR WEEKEND/HOLIDAY COVERAGE POLICY

### PRINCIPLES

1. Call and/or Weekend/ Holiday Coverage is Division based.

2. The frequency of call and/or Weekend/Holiday duties will be maintained at approximately 1/5 or roughly 10 to 11 weeks or weekends per year. Minor adjustments may be necessary from time to time for Divisions temporarily under or overstaffed at the discretion of the Chair's Office.

3. WRVU's earned during call or weekend/holiday obligation will count for yearend productivity calculation.

4. Call and weekend/holiday schedule will be made by the Division Chief in concert with the Physician Staffing Coordinator. When possible call/weekend/holiday schedule will be done one year in advance at the beginning of each FiscalYear and follow Departmental guidelines.

5. Senior attending are exempt from call and weekend/holiday coverage but will maintain incentive bonus eligibility if they meet 2 of the following 3 criteria:

   - Age 72 years.
   - Academic rank of full Professor
   - 20 years of continuous service to the Department.

1

**WEEKEND AND HOLIDAY COVERAGE – 1/5**

ABDOMINAL IMAGING DIVISION – ON SITE MEMORIAL CAMPUS
    8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
Memorial House Doctor - Contrast Coverage, emergent US and Fluoro
Responsible for any NVIR procedures at Memorial Campus.
On Site Chest person will be back-up House Doctor.

        Reading Assignments
        Adult non ED Abdominal Imaging – All locations
            Priority
            a.   Stats
            b.   Inpatient
            c.   Outpatient
        (Each category Prioritized by Date and Time (not Campus))

MSK DIVISION – ON SITE SHREWSBURY STREET
    8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
    Contrast Monitoring – Shrewsbury Street MR

        Reading Assignments
        Adult non ED MSK imaging all locations
            Priority
            a.   Stats
            b.   Inpatient
            c.   Outpatient
        (Each category Prioritized by Date and Time (not location)

CHEST DIVISION – ON SITE – MEMORIAL CAMPUS
    8A-5P – SATURDAY/SUNDAY/HOLIDAY

ASSIGNMENT RESPONSIBILIITIES
        Reading Assignments
        Adult non ED CHEST imaging all locations
            Priority
            a.   Stats
            b.   Inpatient
            c.   Outpatient
        (Each category Prioritized by Date and Time (not location)

2

UMM-04923

**SATURDAY COVERAGE (12/YEAR)**

BREAST DIVISION – ON SITE- MEMORIAL CAMPUS
8 HOUR SHIFT- with FELLOW

ASSIGNMENT RESPONSIBILITIES: Screening

**CALL 7 DAYS -  FRIDAY 5 PM TO FRIDAY 8 AM INCLUDING ON-SITE SAT/SUN/HOLIDAY – 1/5**

PEDIATRIC DIVISION – ON SITE – UNIVERSITY CAMPUS
8A-5P – SATURDAY/SUNDAY/HOLIDAY
BEEPER AFTER 5, 7 days (FRIDAY TO FRIDAY)

Reading Assignments (Saturday/Sunday/Holiday)
All Pediatric Imaging –all locations
Priority
a.   ED-Pedi (Read out resident)
b.   Stats
d.   Inpatient
e.   Carewell Urgent Care: read all prior day's cases, be available for
STAT calls
f.   Outpatient
(Each category Prioritized by Date and Time (not location))

NEURORADIOLOGY DIVISION – ON SITE – UNIVERSITY CAMPUS
8A-5P – SATURDAY/SUNDAY/HOLIDAY
BEEPER AFTER 5,  7 days (FRIDAY TO FRIDAY)

Reading Assignments (Saturday/Sunday/Holiday)
All Neuroradiology Imaging –all locations
Priority
Read out resident
a.   ED-Neuro
b.   Stats
c.   Inpatient
d.   Outpatient
(Each category Prioritized by Date and Time (not location)

**CALL (7 DAYS) ONLY**

VASCULAR DIVISION –ON CALL FOR VIR AND ABDOMINAL* PROCEDURES
CALL 7 days (FRIDAY 5P THRU FRIDAY 8A)
*All Abdominal Procedures EXCEPT Memorial Campus Saturday/ Sunday/
Holiday 8A-5)

NEURO INTERVENTIONAL DIVISION –ON CALL FOR PROCEDURES
CALL 7 days (FRIDAY 5P THRU FRIDAY 8A)

3

UMM-04924

### ED Division- ON SITE- University Campus 24/7

**Mon-Fri Shifts**

7am-4pm
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro and Pediatrics) Carewell urgent care cases from prior day, available for STAT calls

4pm-10pm
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro) Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List. Available for calls from Carewell until 8pm
      Priority
      a.  ED
      b.  STATs- All non-neuro including non-ED
            i.    Inpatient
            ii.   Outpatient
***Pediatric cases will be entered as Preliminary by ED resident***

10pm-7am
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.
      Priority
      a.  ED
      b.  STATs- All non-ED STATs including Neuro
            i.    Inpatient
            ii.   Outpatient
            iii.  Other backlog in non-STAT, non-ED cases
***Pediatric cases will be entered as Preliminary by ED resident***
***Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only***

**Sat/Sun/Holiday**

7am-4pm
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital (except for Neuro and Pediatrics) Carewell urgent care cases from prior day, available for STAT calls

4pm-10pm
All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List. Available for calls from Carewell until 8pm
      Priority
      a)  ED
      b)  STATs- All non-ED STATs including Neuro
            i.    Inpatient
            i.    Outpatient
            ii.   Other backlog in non-STAT, non-ED cases
***Pediatric cases will be entered as Preliminaryby ED resident***
***Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only***

4

UMM-04925

10pm-7am            All cases ordered in the Emergency Department for the University and Memorial Campus, Marlborough Hospital and Clinton Hospital

Non-ED Inpatient/Outpatient STAT Cases to include monitoring for PE Studies via CT Chest List.

           Priority

     a)    ED

     b)    STATs- All non-ED STATs including Neuro

          i.       Inpatient

         ii.      Outpatient

        iii.      Other backlog in non-STAT, non-ED cases

*Pediatric cases will be entered as Preliminary by ED resident*

*Neurocases will have a final report depending on case mix and Radiologist skill set. If not will receive a "memo" only*

5

UMM-04926

# Exhibit V

| | |
|---|---|
| **From:** | Rosen, Max <max.rosen@exchange.com> |
| **Sent:** | Wednesday, October 11, 2017 10:02 AM |
| **To:** | Ferrucci, Joseph <Joseph.Ferrucci@umassmemorial.org> |
| **Subject:** | RE: Charu Desai |

Thanks. Max

**From:** Ferrucci, Joseph
**Sent:** Wednesday, October 11, 2017 9:48 AM
**To:** Rosen, Max <Max.Rosen@umassmemorial.org>
**Subject:** Charu Desai

Max,
I talked to her. I told her you wanted to be accommodating especially in recognition of her years of service. But that you also had an obligation as Chair to think about recruiting younger staff for service needs. She knows going off call would involve a significant salary reduction. I also indicated you were thinking about a term limited contract of c. 12 months. Then maybe a less formal arrangement such as Perdiem.
She fussed a bit about being allowed academic days. But I think she'd probably concede on that. I think you can take the next step in discussions. Good luck.

Sent from my iPhone

UMM-04631

# Exhibit W

| | |
|---|---|
| **From:** | Mowlood, Randa <mowlood, randa0c9@exchange.com> |
| **Sent:** | Friday, May 19, 2017 12:58 PM |
| **To:** | Shah, Myra <Myra.Shah@umassmemorial.org> |
| **Subject:** | RE: Dr. Desai |

Hi Myra,
It used to be Dr. Balikian but he retired. No one else is included from calls.
Thanks.
Randa

_____

From: Shah, Myra
Sent: Friday, May 19, 2017 12:54 PM
To: Mowlood, Randa <Randa.Mowlood@umassmemorial.org>
Subject: RE: Dr. Desai

Hi Randa:

Who does number 5 on this document apply to? I'll call you in a bit. I have a couple of calls - at 1 and then 2, but can call you after that.

Myra

_____

From: Mowlood, Randa
Sent: Friday, May 19, 2017 12:38 PM
To: Shah, Myra <Myra.Shah@umassmemorial.org <mailto:Myra.Shah@umassmemorial.org> >
Subject: Dr. Desai

Hi Myra,
Dr. Dill is in the process of doing the call schedule. Dr. Desai told her that she does not plan on doing any calls.

We have met with her on several occasions and she insists we owe her to exclude her from calls because of her longevity at UMASS. She has been told that is not our policy (attached) but she is not getting it.

What are our options?

The chest division is very tightly staffed and we really need her to participate in the calls.

FYI, in the past couple of years we have allowed physicians to sell their calls. Unfortunately due to on-going movement of physicians/or people changing their mind, it has become impossible to manage and we let everyone know that we will stopping this practice.

Thanks.

# Exhibit X

| | |
|---|---|
| **From:** | Rosen, Max <max.rosen@exchange.com> |
| **Sent:** | Wednesday, March 14, 2018 1:45 PM |
| **To:** | Dill, Karin <Karin.Dill@umassmemorial.org> |
| **Subject:** | RE: Question |

Great -

I spoke with Charu at noon today.

Also, can we makes plans to get your home PACS to Wellesley?

I'm around this weekend. Max

-----Original Message-----
From: Dill, Karin
Sent: Wednesday, March 14, 2018 1:40 PM
To: Rosen, Max <Max.Rosen@umassmemorial.org>
Subject: Re: Question

Got it thx

Attending the lung cancer collaborative. Lots of great ideas/ resources which I will share when you can discuss.

> On Mar 14, 2018, at 12:45 PM, Rosen, Max <Max.Rosen@umassmemorial.org> wrote:
>
> Basically, yes. But we should discuss before you make any plans. Max
>
> -----Original Message-----
> From: Dill, Karin
> Sent: Wednesday, March 14, 2018 11:47 AM
> To: Rosen, Max <Max.Rosen@umassmemorial.org>
> Subject: Question
>
> Hi Max
> Been working with Jess on the chest schedule.
> Wanted to confirm that Jorge Medina is still coming off of ED and back into schedule for July 1. Is this correct? Thanks Karin

UMM-04659

# Exhibit Y

UNIVERSITY OF MASSACHUSETTS MEDICAL CENTER
**AUTHORIZATION FOR FACULTY RECRUITMENT**

DEPARTMENT: __Radiology__                                              DATE: __4/2/91__

POSITION #: _____ ☐ NEW  ☒ REPLACEMENT FOR  __Gisela Henriquez, MD__

**GENERAL CONTRACT LIMITATIONS:**

1. RANK (NOT TO EXCEED RANK OF) __Associate Professor__

2. SALARY:  MINIMUM OF $ __90,000__          MAXIMUM OF $ __140,000__

3. CONTRACT STATUS: ☐ TENURE TRACK   ☒ NON-TENURE TRACK   ☐ WITH TENURE

4. A.) SPECIALTY: Please indicate below academic/clinical specialty REQUIRED:
   General Radiology - major interest in chest and musculoskeletal radiology.
   B.) SECONDARY TEACHING/RESEARCH INTERESTS: Please indicate below any secondary interests desirable but not required
   Clinical service, strong teaching (residents & medical students) and collaborative clinical research.

**PLEASE TYPE ADVERTISEMENT TEXT:**
THE DEPARTMENT OF RADIOLOGY AT THE UNIVERSITY OF MASSACHUSETTS MEDICAL CENTER in Worcester is seeking a BC/BE General Radiologist with a major interest in chest and musculoskeletal radiology. A strong interest in teaching and collaborative clinical research is desired. Rank and salary are commensurate with experience. The medical center is a 370-bed university hospital and medical school located approximately 40 miles west of Boston. The department consists of 22 staff, 13 residents, and 2-4 fellows and does approximately 130,000 exams/yr. The department is well-equipped with 2 GE 9800 Quick CT scanners as well as 2 GE 1.5 T MRI scanners in a stand-alone facility and a 2.0 T small-bore unit for animal research. The hospital is a major trauma center and is serviced by two Life Flight helicopters. For further information, contact Edward H. Smith, MD, Professor and Chair, Department of Radiology, University of Massachusetts Medical Center, 55 Lake Avenue North, Worcester, MA 01655, (508) 856-3252. UMMC is an equal opportunity/affirmative action

APPROVED BY:

CHAIR: _____                    DATE: __4/2/91__

PROVOST: _____                    DATE: __4/3/91__

DIRECTOR OF AFFIRMATIVE ACTION: _____   DATE: __5 April 91__

CHANCELLOR: _____                    DATE: __4/12/91__

PLEASE LIST BELOW, IN ORDER OF PRIORITY, THE MEDIA SOURCES IN WHICH THE ADVERTISEMENT IS TO BE PLACED
AND INDICATE ACCOUNT # __3-70850__ AND P.O. # __M17707__ FOR PAYMENT.

| ADVERTISING SOURCES | DATES DESIRED | APPROXIMATE COST | ACTUAL RUN DATES |
|---|---|---|---|
| American J of Roentgenology | May-June-July-Aug 91 | | |
| Radiology | May-June-July-August 91 | | |
| Investigative Radiology | May-June-July-August 91 | | |
| | | | |

EMPLOYMENT RECRUITER: _____ _____ DATE PLACED: _____

ADDITIONAL RESOURCES REQUIRED FOR THIS RECRUITMENT:

PERSONNEL: _____   SPACE: _____   OTHER: _____

RETURN ORIGINAL TO: __Jean A. Ward, Rm S5-715__   __x63252__
                                                                    Extension

GS 820101
PROVOST OFFICE 4/87   DISTRIBUTION. White - Department (this copy will be returned to the department at the CONCLUSION of the routing process).
Green - Placement Services;   Yellow - Chancellor;   Pink - Affirmative Action;   Goldenrod - Provost   UM0092

 **UMassMemorial**



**TO:**    Charu Desai, M.D.
Department of Radiology

**FROM:**    Michele Streeter, Executive Director

**RE:**    Physician Employment Agreement

**DATE:**    December 8, 2008

As you may recall, nearly six years ago the Medical Group introduced a standard employment agreement for its physicians. At that time our physicians were given the option of signing this agreement, and since then, all newly-hired physicians have been required to have a signed employment agreement in place. Currently, approximately 90% of our employed physicians have an employment agreement.

We would like to again offer you the opportunity to review and sign the employment agreement, and attach a customized version which references your current compensation and original date of hire. As we have noted in the past, this employment agreement was reviewed and revised on multiple levels, with input from Department Chairs, Medical Group physicians and the Medical Group Board. It provides detail as to the respective rights and obligations of the physician, the Department and the Medical Group. Of particular significance is the Notice provision (Section 7.2), under which our physicians are entitled to up to twelve months' notice (depending upon length of service) in the event employment were to be terminated without cause. Currently, physicians who do not have employment agreements in place do not receive this protection; rather their employment is governed by Medical Group policy, which calls for one hundred twenty days' notice under such circumstances, regardless of length of service.

Please review the agreement – if you choose to sign it, please contact your Department Administrator who will arrange for you to sign two originals. A fully-executed original will be returned to you, once the required Department and Medical Group signatures have been obtained. If you choose not to sign an agreement at this time, please send an email to your Department Administrator to that effect. Contracts will be accepted through January 31, 2009.

UMM 00333

AGREEMENT BETWEEN
UMASS MEMORIAL MEDICAL GROUP, INC.
AND
Charu Desai , M.D.


AGREEMENT by and between the UMass Memorial Medical Group, Inc., a non-profit corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at One Biotech Park, Worcester, Massachusetts 0l605 (the "Medical Group"), a subsidiary corporation of UMass Memorial Health Care, Inc. (the "System") and    Charu Desai, M.D., a physician duly licensed to practice medicine in the Commonwealth of Massachusetts (the "Practitioner").


RECITALS

The principal purpose of the Medical Group is to employ physicians to provide, on behalf of the System,  patient care at a level of quality and efficiency consistent with generally accepted standards and otherwise to fulfill professional and institutional obligations to patients, students of health care, health care professionals, and the community; and,

The successful fulfillment of the principal purpose of the Medical Group is dependent on the rendering of professional medical and administrative services in conjunction with the clinical operations of  the System by qualified practitioners; and,

The Practitioner is trained and qualified and desires to provide professional medical, educational and administrative services to the Medical Group; and,

The Medical Group desires to engage the Practitioner to provide professional medical, educational and administrative services;

Therefore, in consideration of the mutual covenants and conditions set forth below, the Medical Group and the Practitioner do hereby agree as follows:

l.    RESPONSIBILITIES OF PRACTITIONER

l.l.    Professional Qualifications

(a)    The Practitioner must at all times during the term of this Agreement: (i) possess a valid and unlimited license to practice medicine pursuant to Chapter ll2, Section 2 of the General Laws of the Commonwealth of Massachusetts; and, (ii) be appointed to and maintain continuous status as a member in good standing of the UMass Memorial Medical Center (the "Medical Center") Active Medical Staff or the Medical Staff of the appropriate Member Hospital with appropriate clinical privileges in the Department of Radiology (the "Department")  (iii) for

UMM 00334

those physicians who are on staff at the Medical Center, receive, and maintain, a faculty appointment at the University of Massachusetts Medical School (the "Medical School"); (iv) possess a valid federal narcotics number and state controlled substances number (unless such number is not required by the Practitioner's specialty);  (v) be, and remain, a participating provider in the Medicare and Medicaid programs and not be barred, excluded or otherwise ineligible to participate in these or other Federal programs; and (vi) be or, at the Medical Group's request, agree to be, and remain, a participating physician in any health insurance plan or managed care program accepted by the System, including the System's contractual relationships with preferred provider organizations and health maintenance organizations, and to execute any documents requested by the Medical Group in connection with participating in a provider contract in which the Medical Group or the System agrees to participate.  If at any time during the term of this Agreement the Practitioner fails to meet one or more of the qualifications set forth herein, such failure shall constitute a breach in accordance with Section 7.4 of this Agreement.

(b)  The Medical Group and the Practitioner further acknowledge and agree that this Agreement is not, and shall not be construed as, any form of guarantee or assurance by the System that the Practitioner will receive and maintain the necessary appointment to the Active Medical Staff or the grant of appropriate clinical privileges for the purposes of discharging the Practitioner's responsibilities hereunder; application, appointment, reappointment, and the grant of clinical privileges shall be governed solely by the Bylaws of the Medical Staff of the Medical Center then in effect.  Further, appointment to the faculty of the Medical School shall be governed solely by the applicable policies and procedures of the Medical School.

1.2.    Services.  The Practitioner shall be responsible for providing professional medical and administrative services as set forth in Appendix A, attached and incorporated as part of this Agreement.

1.3    Provider Agreements.  The Practitioner hereby authorizes the Medical Group to execute provider agreements, acknowledgments and consent forms that obligate or confirm the Practitioner's obligation to participate in provider agreements executed by or on behalf of the Medical Group and to abide by and conform to all applicable requirements under such provider agreements.

1.4.    Schedule of Fees.  The Medical Group will establish a current schedule of fees, as may be amended from time to time, to be charged by the Medical Group for direct patient care services provided by the Practitioner under this agreement.

1.5.    Standards of Practice.  The Practitioner shall at all times provide services in a competent and professional manner, consistent with quality assurance standards of the Medical Center's Active Medical Staff and in compliance with all applicable statutes, regulations, rules and directives of federal, state and other governmental and regulatory bodies having jurisdiction over the Medical Center; the Bylaws, Rules and Regulations, policies and procedures of the

2

UMM 00335

System, the Medical Center and the Medical Staff; applicable standards of the Joint Commission on Accreditation of Health Care Organizations and currently accepted and approved methods and practices applicable to the provision of medical services.

     1.6.   Compliance and Quality Assurance.  The Practitioner shall abide by the Code of Ethics and Business Conduct of the System.  The Practitioner shall participate in the programs of the System and the Medical Center regarding compliance, quality assurance, utilization review, risk management, and peer review, in accordance with the rules, policies and bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, the Patient Care Assessment regulations of the Board of Registration in Medicine, and upon request of the Department Chair.  The Quality Assurance committee of the Medical Staff of the Medical Center will be responsible for reviews and audits of and concerning quality assurance in the Department.

     1.7.   Committee Responsibilities.  The Practitioner shall serve on committees of the Medical Center's Medical Staff and committees established pursuant to the Bylaws of the System, upon reasonable request of the Chairman of the Board of Trustees, the President/Chief Executive Officer, the Chief Operating Officer, the Chief Medical Officer, the President of the Medical Group (the "President") or the Department Chair.

     1.8.   Medical Records and Reports.  (a)  The Practitioner shall prepare or cause to be prepared in a timely manner any and all appropriate notes and information in the medical records of and reports pertaining to each patient for whom the Practitioner has rendered services pursuant to this Agreement.  The Practitioner shall cause these records and reports to be completed and submitted within such period of time after the rendering of such services as may be required by the Bylaws of the Medical Staff of the Medical Center, upon request of the President or Department Chair, or by applicable law or regulation.  The parties understand and agree that the System has the rights of ownership and control of all of the patients' medical records and reports generated pursuant to this Agreement.  It is further agreed that all practitioners at the System have the right to consult such records and reports in order to facilitate the continuity of proper patient care.

     (b)   Time Allocation Reports:  The Practitioner agrees to cooperate with the Department Chair to  maintain adequate and proper time records in accordance with the Medical Group's policies.  This may include submitting a written allocation of time reports specifying the respective amounts of time the Practitioner has devoted to clinical, administrative, teaching and research activities. The Practitioner agrees to make available to the Medical Group all time records and data recorded by the Practitioner upon the request of the Medical Group.

     1.9.   Academic Service.  The Practitioner shall aid in the clinical teaching program of the Medical Center as an attending physician on in-patient services and in ambulatory settings. The Practitioner shall also aid in the didactic teaching programs of the Medical Center upon the request of  the Department Chair. The Practitioner shall also participate for reasonable periods of time as an instructor in education programs conducted or offered by the Medical Center,

UMM 00336

including grand rounds, and shall perform such other teaching functions within the Medical Center as are reasonable and necessary to assure the Medical Center's compliance with the requirements of all applicable accrediting bodies, upon the request of the Department Chair.  The Practitioner, as a member of the Medical School faculty, is expected to provide a reasonable amount of academic service (on the order of approximately two hundred (200) hours per year) under the supervision of the Chancellor at the direction of the Chair or his designee.

1.10.   Non-Physician Personnel.   The Practitioner shall, upon the request of the President or Chair, or at such other times as are appropriate, make recommendations concerning the qualifications, hiring, firing, and disciplining of such non-physician personnel as the System or the Medical Group may employ, engage or otherwise provide in support of the Practitioner's practice.   The Practitioner shall make any such recommendations in furtherance of and in accordance with the needs and best interests of the Medical Group and the proper conduct of its functions.   The Practitioner agrees that any supervision of nurse practitioners and physician assistants shall be conducted in accordance with the governing regulations of the Board of Registration in Medicine.

1.11.   Protocols and Procedures.  The Practitioner agrees to work cooperatively with all of the System's clinical departments, Medical Staff, the Medical Group, administration, the President and the Department Chair to assure that services are available on a timely, coordinated, efficient, and professional basis.  The Practitioner also agrees to comply with all of the Medical Center's clinical policies and procedures and all applicable Human Resources policies.

1.12.   Confidentiality of Information.  The Practitioner agrees to uphold and maintain the confidentiality of patient and other information for which the Practitioner has an ethical, professional, or legal obligation not to disclose.  The Practitioner further agrees to uphold and maintain the confidentiality of proprietary or other confidential information relating to the Medical Group or the System of which the Practitioner may become aware while employed hereunder. This provision shall survive the termination of this Agreement.

1.13.   Continuing Education.  The Practitioner shall comply with and satisfy any and all of the professional obligations and requirements regarding continuing education and any other related areas of medical practice required for the maintenance of a license to practice **medicine** in Massachusetts or appropriate to the rendering of competent professional services pursuant to this Agreement as determined by the Department Chair.

1.14.   Dual-Employment with Medical School.  The parties acknowledge that a certain percentage of the Practitioner's time and salary may be allocated to, and governed by, a so-called "Dual-Employment" arrangement with the Medical School (the "Dual-Employment Arrangement").  The Practitioner acknowledges that the terms and conditions of employment with the Medical Group are governed by this Agreement and the policies and practices of the Medical Group. The Practitioner further acknowledges that if this Agreement is terminated for any reason, the related employment relationship with the Medical School shall also terminate

4

UMM 00337

unless the Practitioner has a new or continuing agreement with the Medical School or is a tenured faculty member.

2.   RESPONSIBILITIES OF THE SYSTEM

    2.1.   Space, Equipment, Services, and Supplies.

        (a)   The Medical Group, through agreement with the System, shall be committed to making available reasonable and necessary space, equipment and supplies for the delivery of the agreed services hereunder by the Practitioner, shall provide customary services and maintenance to maintain such equipment in good order and repair, shall furnish services to the Practitioner including, but not limited to, utilities, telephone, housekeeping and record keeping services; and shall provide all necessary supplies needed for the proper provision of services by the Practitioner pursuant to this Agreement.

        (b)   The Practitioner agrees to use such space, equipment, services and supplies for purposes of the System and in furtherance of the obligations governed by this Agreement.

    2.2.   Non-Physician Personnel.   The System or the Medical Group shall employ, engage or otherwise make available to the Practitioner all non-physician personnel determined by the Medical Group to be reasonably needed for the proper delivery of services pursuant to this Agreement.   The System or the Medical Group shall exercise ultimate control and management of non-physician personnel.

    2.3   Professional Liability Insurance.   The Medical Group, at its expense, shall arrange for professional liability insurance coverage for the Practitioner with regard to professional medical services rendered by the Practitioner for Medical Group-related activities billed through the Medical Group during the term of this Agreement.   The Practitioner shall be covered by such insurance to the same extent as other similarly-situated practitioners within the Medical Group. Coverage limits shall be set in the discretion of the Medical Group and/or the UMass Memorial Self-Insurance Program from time to time and shall be made known to the Medical Group Practitioners on a regular basis.

3.   REIMBURSEMENT REQUIREMENTS

    3.1.   The Practitioner shall comply with all laws, regulations and System requirements, policies and procedures regarding record keeping relating to third-party reimbursement for services provided pursuant to this Agreement as may be in effect from time to time.   In the event that there are subsequent changes or clarifications of statutes, regulations or rules relating to record-keeping which the Medical Group determines must be complied with to insure proper reimbursement from third parties for services provided pursuant to this Agreement, the Medical Group shall, after reasonable notice and opportunity to comply, notify the Practitioner of any actions it reasonably deems are necessary to comply with such changes and the Practitioner shall

UMM 00338

promptly take such actions.

4.    COMPENSATION

4.1.    Compensation of Practitioner.   The Medical Group shall compensate the Practitioner for the services which the Practitioner renders in accordance with the terms of this Agreement.   The agreed compensation is set forth in detail in Appendix B, attached  and incorporated as part of this Agreement.

5.    BILLING AND PAYMENT

5.1.    Billing.   Except as otherwise may be expressly stated in this Agreement or other published, written policy or procedure of the Medical Group, all fees, payments and other income attributable to the Practitioner's clinical services during the term of this Agreement shall belong to the Medical Group, whether paid to the Practitioner, to the Medical Group or its designee or to a third party.   The Medical Group shall have the sole right to bill for and to receive, hold and disburse such fees and income and the Practitioner agrees to abide by the billing policies and procedures of the Medical Group.   The Practitioner hereby assigns to the Medical Group all of the Practitioner's rights in all fees, payments, bonuses or distributions or other income or monies due from all sources relating directly or indirectly to clinical  services rendered by the Practitioner pursuant to this Agreement.   The Practitioner shall cooperate fully with the Medical Group in facilitating collection of such monies, including prompt endorsement and delivery to the Medical Group of all checks received from patients or third-party payors on behalf of the Practitioner and completion of all forms necessary for such collections.   To the extent applicable, the Practitioner agrees to work with the Medical Group to collect all patient co-payments for services rendered and promptly to forward such funds to the Medical Group.   Upon termination of this Agreement for any reason whatsoever, all such monies then outstanding shall be deemed to be the sole and exclusive property of the Medical Group and not subject to any claim by the Practitioner.   The Practitioner's obligation under this provision shall survive termination of this Agreement.

6.    TERM

This Agreement shall be effective from your original hire date of January 5, 1992 and shall remain in effect unless otherwise terminated by the parties as provided in Section 7 of this Agreement.   As of the effective date of this Agreement, this Agreement shall supercede and revoke any existing prior employment agreement with the Medical Group or any of its predecessor entities.

7.    TERMINATION

7.1.   Mutual Agreement.   This Agreement may be terminated by mutual agreement of the parties, in a writing signed by the parties, at any time from the date of execution hereof.

UMM 00339

7.2   <u>Notice of Party</u>. This Agreement may be terminated by the Medical Group at any time upon the giving of written notice to the Practitioner (as set forth in Section 14.1 below), in accordance with the following notice schedule:

| Number of Years Practitioner Employed | Requisite Notice Period |
|---|---|
| 0-2 | 4 months |
| >2 – 10 | 6 months |
| >10- 15 | 8 months |
| >15 – 20 | 10 months |
| >20 | 12 months |

This Agreement may be terminated by the Practitioner at any time upon the giving of as much notice as is practicable to the Medical Group, and in any event a minimum of one hundred twenty (120) days' written notice.

Where either the Medical Group or the Practitioner is terminating the employment relationship, the Notice Period is characterized as "working notice." In the interests of patient care, the Medical Group expects the Practitioner to continue to fulfill the responsibilities of the position and to maintain productivity levels for the full notice period. Vacation time may be taken during the Notice Period only with the consent of the Department Chair and the President of the Medical Group. The Practitioner will be compensated for unused pro-rated vacation time not taken at the time of termination. The Medical Group does not permit "terminal vacations," i.e., the use of vacation time to complete the final portion of the Notice Period.

7.3   <u>For Cause</u>. The Medical Group may terminate this Agreement effective immediately for cause at any time upon written notice to the Practitioner setting forth in reasonable detail the nature of such cause. "Cause" shall be defined as any material breach by the Practitioner of this Agreement, including but not limited to the following:

i.   Practitioner's fraud or dishonesty with respect to the Medical Group or those associated with it, acts or conduct materially detrimental to patient care or to the reputation or operations of the Medical Group, or otherwise in connection with the Practitioner's services under this Agreement;

ii.   Practitioner's conviction of, a plea of nolo contendere or admission of sufficient facts to a crime involving moral turpitude, or an offense relating to health care or adversely affecting the Practitioner's ability to perform services under this Agreement; or

iii.   Practitioner's material negligence or misconduct (other than by reason of disability or approved leave) in the performance of duties assigned by the Chair under this

7

UMM 00340

Agreement,

     iv.    Failure of the Practitioner to follow UMass Memorial policies and procedures and other rules of conduct made known to the Practitioner and applicable to all physicians of UMass Memorial and/or the Medical Group, including without limitation, policies prohibiting unlawful discrimination, and the Practitioner has exhausted the grievance procedure available to Medical Group physicians and, if applicable, all due process procedures available under the Medical Staff Bylaws of the Medical Center.

     7.4.  <u>Automatic</u>.  This Agreement shall terminate automatically upon the breach of Section l.l. by the Practitioner, except that the Medical Group, in its sole discretion, may, but is not obligated to, suspend this Agreement for a specified reasonable period to enable the Practitioner to cure the breach. If the Practitioner fails to cure the breach within the specified period, this Agreement will terminate immediately upon written notice to the Practitioner by the Medical Group. Further, the Medical Group reserves the right to terminate this Agreement in the event the Practitioner's medical staff membership or clinical privileges are suspended or in any way restricted.

     7.5 <u>Suspension</u>. The Medical Group may suspend the Practitioner for cause, without compensation. Such cause may include, but shall not be limited to, any suspension, restriction or revocation of the Practitioner's Medical Staff membership or clinical privileges at the Medical Center or any suspension, restriction or revocation of the Practitioner's license to practice medicine in any jurisdiction.

## 8.   EFFECT OF TERMINATION

     8.l.  <u>Effect of Termination on this Agreement</u>.  The termination of this Agreement in accordance with Section 7, hereunder, shall terminate any and all rights and obligations of the Medical Group and the Practitioner pursuant to this Agreement.  The effective date of termination of this Agreement shall be as set forth in the above-mentioned section(s); provided, however, that upon the termination of this Agreement, the parties shall be and remain obligated and responsible for: (i) any and all obligations accruing prior to the date of termination; and, (ii) any and all obligations, promises, or covenants contained herein which are expressly made to extend beyond the term of this Agreement; and, (iii) the Practitioner shall use reasonable and diligent efforts to assist the System and the Medical Group in arranging for appropriate alternative medical coverage for patients under the care of the Practitioner. Prior to the termination of this Agreement, the Practitioner shall prepare a notice to patients in a form approved by the Medical Group and the Department Chair. Practitioner shall finalize all outstanding billing documentation and complete all patient records prior to his or her departure. Immediately upon the termination of this Agreement, the Practitioner shall deliver to the System sole custody, and total, exclusive and complete use of the System's space, equipment and supplies and shall remove any and all personal possessions from the property of the System. The System shall give the Practitioner reasonable time to effect these conditions.  In the event of

UMM 00341

termination of this Agreement, payment by the Medical Group of any base salary due the Practitioner under Section 4.1 and Appendix B to the date of termination and of any pay in lieu of notice due Practitioner under Section 7.2 shall constitute the entire obligation of the Medical Group to the Practitioner. The Practitioner recognizes that no compensation is earned after termination of this Agreement.

9.   GOVERNING RULES, REGULATIONS AND BYLAWS

9.1   Governing Rules, Regulations and Bylaws.   Notwithstanding anything in this Agreement to the contrary, it is hereby expressly understood and agreed by and between the Medical Group and the Practitioner that any and all rights, responsibilities, and obligations of the parties shall at all times during the term of this Agreement be subject to the Bylaws of the Medical Group, the Bylaws of the Medical Staff of the Medical Center, all applicable rules and regulations of the System, or its successor, as now exist or as hereinafter may be amended or promulgated by the Board of Trustees of the Medical Group, the Medical Staff of the Medical Center and the President/Chief Executive Officer of the System, or any duly authorized designee thereof.

10.   ASSIGNMENT AND DELEGATION

10.1.   Assignment and Delegation.   No assignment of this Agreement or the rights hereunder, or delegation of this Agreement or the obligations hereunder shall be valid without the specific written consent of both parties;  provided, however, that this Agreement may be assigned by the Medical Group as a result of reorganization or merger, or to any successor entity providing the services now provided by the System or the Medical Group.

11.   ENTIRE AGREEMENT

11.1.   Entire Agreement.   This Agreement contains the entire agreement between the parties  and no statement, promises, inducements, or writings made by any party  or agent of any party which is not contained in this written Agreement shall be valid or binding; and this Agreement  may not be enlarged, modified, or altered except in a subsequent writing signed by the parties and attached hereto.  This Agreement supersedes any and all prior agreements for professional services between the Practitioner and the Medical Group, the System or any other affiliate of the System.

12.   AMENDMENTS

12.1.   Amendments.  This Agreement may be amended only by an instrument in writing signed by the Medical Group and the Practitioner.  Such writing must make specific reference to the terms and conditions of this Agreement which it amends, and will become effective as of the date stipulated therein.

UMM 00342

13.   GOVERNING LAW

13.1.   Massachusetts Law.   This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed in the Commonwealth of Massachusetts.

14.   NOTICE

14.1.   Notice.   Notices or communications required or permitted to be given pursuant to this Agreement shall be given in writing to the respective parties by hand, by certified mail or by overnight delivery service (e.g., Federal Express, UPS) (such notice being deemed given as of the date of mailing) and addressed to the Practitioner at the Practitioner's last known address kept within the records of the Medical Group, or in the case of the Medical Group, One Biotech Park, Worcester, Massachusetts, attention of the President, UMass Memorial Medical Group.

15.   EXECUTION

15.1.   Execution.   This Agreement and any and all amendments hereto shall be executed in duplicate copies on behalf of each party by the Practitioner and an official specifically authorized by the Medical Group Board with respect to such execution.   Each duplicate copy shall be deemed an original, but both duplicate originals shall together constitute one and the same instrument.

16.   SECTION HEADINGS

Section Headings.   The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

17.   WAIVER.

Waiver.   A waiver of the breach of any term or condition of this Agreement by either party shall not constitute a waiver of any subsequent breach or breaches of the same term or condition, or any other term or condition hereunder.

18.   SEVERABILITY.

Severability.   If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect by a court of competent jurisdiction, then the remainder of this Agreement, and the application of such provision in circumstances other than those as to which it is so declared invalid or unenforceable, shall not be affected thereby, and each such provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

10

UMM 00343

IN WITNESS WHEREOF,  the Medical Group and the Practitioner  have caused this Agreement to be signed and sealed as of this_____ day of _____, 20__.

Dated:                    By:_____Charu S. Desai_, M.D._____
                                    Charu Desai  , M.D.


UMASS MEMORIAL MEDICAL GROUP, INC.


Dated 2/12/.    By:_____
                           Michele Streeter, Executive Director

                    By:_____
                          Joseph T. Ferrucci, M.D., Chair
                          Department of  Radiology


11

UMM 00344

## APPENDIX A

The Practitioner shall be responsible for providing professional medical services to patients of the System in need of such services and to enrollees of health plans as to which the Medical Group and Practitioner are participating providers.  The services to be rendered hereunder include, but are not limited to outpatient work, inpatient consultative work and direct patient care.  The Practitioner's performance hereunder shall be evaluated by the President of the Medical Group and the Department Chair in accordance with the Bylaws of the Medical Staff of the Medical Center.  The Practitioner agrees that the practice of medicine shall be limited to the services to be provided pursuant to this Agreement or for the Medical School under its agreement unless Practitioner obtains the prior written approval of the Chair under Medical Group policy to do otherwise.

The Medical Group and the Department Chair shall determine the specific professional medical duties to be performed by the Practitioner, as well as the time and manner of performance, in accordance with and subject to the terms of this Agreement; provided, however, the Medical Group and Department Chair shall not impose requirements which would interfere with the Practitioner's professional judgment in connection with the treatment of patients or cause the Practitioner to violate applicable ethical codes or any law or regulation.

The Practitioner shall at all times provide services to all persons who may become patients of the Medical Group in accordance with the Medical Group's policies and without regard to  race, color, creed, sex or ability to pay for services; and

The Practitioner shall participate in Medicare, Medicaid and managed care programs and other third party payor arrangements or governmental programs in which the Medical Group participates and the Practitioner shall abide by and act in accordance with the terms and conditions of all managed care agreements, network, affiliation agreements, provider agreements and other contracts to which the Medical Group or Practitioner (with the Medical Group's consent) is or becomes a party.

UMM 00345

## APPENDIX B

1. The Practitioner's compensation for services rendered pursuant to this Agreement, and under a Dual-Employment Arrangement with the Medical School, if applicable, shall be a total base salary, which if annualized would be at the rate of Three-hundred Twenty-Five Thousand Dollars ($325,000) per year, less all legally required and voluntarily-authorized deductions, payable in accordance with Medical Group payroll practices. (Practitioners who participate in the Dual-Employment Arrangement with the Medical School may receive paychecks from both the Medical Group and the Medical School, which together shall equal the base salary referenced above.)

The Practitioner shall also participate in the Physician Incentive Compensation Program of the Department as established by the Medical Group (the "Incentive Compensation Program"), subject to its terms and conditions of participation as in effect or amended from time to time. The Incentive Compensation Program includes eligibility for bonuses and/or salary increases based upon productivity. The Practitioner acknowledges that participation in the Incentive Compensation Program may also involve imposing salary withholds if performance does not meet Medical Group requirements. The Practitioner further acknowledges that, following the first twelve months' of the Practitioner's employment, under the terms of the Incentive Compensation Program, the Medical Group may decrease the Practitioner's base salary if the applicable productivity targets are not met. Salary adjustments will be made upon thirty (30) days written notice to the Practitioner. Salary reductions, if any, shall be consistent with the Department's compensation plan and shall in no event exceed twenty percent of the Practitioner's base salary in any twelve month period.

Subject to the Practitioner's payment of any contribution required of physician employees generally, the Practitioner will be eligible to participate during the term of this Agreement in any and all employee benefit plans made generally available to other physician employees of the Medical Group as in effect from time to time. Such participation by the Practitioner shall be subject to (i) the terms of the applicable plan documents, (ii) generally applicable policies of the Medical Group, and (iii) the discretion of the Board of Trustees of the Medical Group or any administrative or other committee provided for in or contemplated by such plan or policy of the System. A description of the benefits program currently in effect (and subject to change by the Group Board and UMass Memorial Compensation Committee) is attached hereto as Appendix C, "Physician Benefits at a Glance."

13

UMM 00346

# Exhibit Z

We would like to start by thanking all of our hardworking faculty for your dedication to resident education. The countless hours you have spent with us at the workstation, in lectures, at journal clubs and interdisciplinary conferences have been invaluable to our training and experience at UMass. You have all shaped us as radiologists in one way or another, and we will be forever grateful.

While there are many of you who are deserving of this award, this year, we want to acknowledge the efforts of one faculty member who has influenced UMass residents for almost three decades. She has taught us residents how to pick up anterior diaphragmatic lymphadenopathy, a solitary spinous process metastasis, and how to properly identify chubby pulmonary vasculature. Thanks to her, we'll be less likely to miss big gumbas and do-dads. By now, I'm sure most of you know that we're talking about Dr. Charu Desai.

It seems that no matter how busy the day, you always take time to store away interesting "WOW" cases and make a point to go through them with the resident on service. Perhaps more importantly, you have also taught us that the job is not just about how to read an imaging study well but how to be professional, accessible, and open-hearted to all. You remind us every day that job satisfaction comes

CD 00141

from dedicating ourselves to the *patient* in front of us. You are an inspiration and an incredible mentor, in addition to your role as an educator.

Your support means the world to us residents and your lessons will be everlasting. It is our honor to present to you the award for Teacher of the Year.

CD 00142