UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
CHARU DESAI,                                    )
                    Plaintiff,                   )
                                                )
v.                                              )          Civil Action No. 4:19-cv-10520-TSH
                                                )
UNIVERSITY OF MASSACHUSETTS,                    )
MEMORIAL MEDICAL CENTER, INC.                   )
UNIVERSITY OF MASSACHUSETTS                      )
MEMORIAL MEDICAL GROUP,                          )
UNIVERSITY OF MASSACHUSETTS                      )
MEDICAL SCHOOL, UMASS                            )
MEMORIAL HOSPITAL, MAX ROSEN,                   )
M.D., DARREN BRENNAN, M.D.,                      )
STEPHEN TOSI, M.D., KARIN DILL,                  )
M.D.,                                           )
                    Defendants.                  )
_____)

PLAINTIFF CHARU DESAI, M.D.'s RESPONSE TO STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF UNIVERSITY OF MASSACHUSETTS CHAN
MEDICAL SCHOOL'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and D. Mass. Local Rule 56.1, Dr. Desai Charu Desai,

M.D. ("Dr. Desai" or "Dr. Desai"), responds to Statement of Material Facts ("SOF") in

submitted by the University of Massachusetts Medical School in support of its Motion for

Summary Judgment as to all of Plaintiff's remaining claims against it: Count I (violation of Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-1 et seq. (gender); Count II

(violation of the Federal Equal Pay Act ("FEPA"), 29 U.S.C. §§ 206(d), 216); and Count VI

(violation of the Massachusetts Equal Pay Act ("MEPA"), M.G.L. c. 149, § 105A).

PLAINTIFF'S REPONSES

    I.  Plaintiff's Employment

1.   The Medical School is a distinct entity from the other institutional defendants in this case – UMass Memorial Medical Center, Inc. ("Medical Center"), UMass Memorial Medical Group ("Medical Group"), and UMass Memorial Marlborough Hospital ("Marlborough Hospital") (collectively the "Memorial entities").  The Medical School is one of five campuses of the University of Massachusetts; the Memorial entities are all affiliated organizations under UMass Memorial Health Care ("UMMHC"), a private not-for-profit health care provider.  Ex. 1, Medical School's Ans. to Dr. Desai's First Int. No. 3.

> **Response:** Disputed as to any implication that the Medical School did not exert control
> over the manner and means of Plaintiff's employment.  See PSOF ¶¶ 326-344.
> Otherwise, admitted.

2.   Plaintiff Charu Desai is a woman and a physician who is board-certified in diagnostic radiology.  Ex. 2, Amended Comp., ¶¶ 15, 16 (Dkt. 23) and partial admissions in Ex. 3, Medical School's Ans. to Amended Comp., ¶¶ 16, 17 (Dkt. 32); Ex. 4, Dr. Desai Depo., pp. 22-23.

> **Response:** Admitted.

3.   Dr. Desai had a written employment agreement ("Agreement") with the Medical Group**.**  Ex. 4, Dr. Desai Depo., pp. 96-97 (discussing Depo. Ex. 11, Agreement, CD 00051-00063 – Ex. 5 to this Statement).

> **Response**:  Denied as to any implication that the Medical School did not exert control
> over the manner and means of Plaintiff's performance.  Otherwise, admitted. Plaintiff has
> a written employment agreement and was considered dually employed by the Medical

Group and the Medical School. Furthermore, a portion of Plaintiff's salary was paid by the Medical School. PSOF ¶ 326.

4. The terms of Dr. Desai's employment with the Medical Group were governed by the Agreement and by the policies and practices of the Medical Group.  Ex. 5, ¶ 1.14 (CD 00054-00055).

> **Response:** Disputed as to any implication that the Medical School did not exert control over the manner and means of Plaintiff's employ and/or the terms and conditions of her employ.  Plaintiff's employment with the Medical Group and the Medical School were governed by the policies, practices, and procedures of both the Medical Group and the Medical School, including those associated with physician credentialing. Members of the Medical School serve on credential committees and Dr. Desai was credentialled without restriction at the Medical Center and at Marlborough Hospital. PSOF ¶¶ 334-341.

5. Dr. Desai also had a "Dual Employment" arrangement with the Medical School, pursuant to which she had a non-tenured faculty appointment at the Medical School that was governed by the Medical School's Academic Personnel Policy ("APP").  Ex. 4, Dr. Desai Depo., pp. 97, 385-86; Ex. 1, Medical School's Ans. to Dr. Desai's First Int. No. 4; Ex. 6, Art. 5, § 5.3(a) (APP provision re: terms of employment and appointment of "UMMHC-Employed Faculty," UM0335-0336, providing, in relevant part, "UMMHC-Employed Faculty are subject to the employment terms and conditions defined in their letter of offer and their employment contract with UMMHC, and by UMMHC policies and procedures. These individuals may also provide services to [the Medical School]. The Faculty appointment of UMMHC-Employed

<u>Faculty is governed by the policies in this APP</u>") (emphasis supplied); Ex. 7, Dr. Rosen Depo., pp. 171-72 ("But I just wanted to make the distinction between employment, which is really with the medical group; and the faculty appointment, which is the medical school . . . I just want it to be clear in how I think about the different roles that I have with the different institutions.").

**Response:**  Disputed as to any implication that the Medical School did not exert control over the manner and means of Plaintiff's employ and/or the terms and conditions of her employ. Admitted that Plaintiff had a dual employment arrangement with the Medical School pursuant to which she had a non-tenured faculty appointment at the Medical School. Admitted that the Medical School's Academic Personnel Policy, as set out above, is accurately cited.

**Responding further**:  Plaintiff's faculty appointment was determined by the Medical School's criteria for promotion and was provided to her by the Medical School.  PSOF ¶ 4.  Faculty appointments/promotions to Associate and/or Full Professor, governed by the Medical School, entitled Plaintiff to additional annual salary. PSOF ¶ 263. Dr. Rosen did not select Plaintiff for a Division Chief and/or non-Division Chief Administrative role. These roles are Medical School roles. PSOF ¶¶ 236, 251. Despite her qualifications to serve in such roles, Dr. Rosen selected predominantly younger (and/or male) radiologists for these roles instead.  PSOF ¶¶ 236-238, 251-253. As a result, Plaintiff was not offered administrative days that are allotted to physicians in these roles as defined in Academic and Administrative Time Policy.  PSOF ¶ 27. In addition, had Plaintiff served in such academic (i.e., Medical School) roles, she would have been entitled to an additional annual salary of $15,000 per role.  PSOF ¶ 263. Dr. Rosen's actions denied Plaintiff opportunities that would have resulted in her promotion to the academic rank of Professor

of Radiology at the Medical School.  Decisions regarding academic rank were executed by the Medical School.  PSOF ¶ 4.  Such a promotion would have entitled Plaintiff to an additional annual salary of $10,000, PSOF ¶ 263, as well as prestige associated with such a rank.  Dr. Rosen denied Plaintiff academic time even though she qualified for it under the Academic and Administrative Time Policy. PSOF ¶ 27.  Plaintiff was not allowed to take time away from her clinical duties to dedicate exclusive and protected time for scholarly or administrative pursuits, whereas younger radiologists received academic time in excess of that allotted by the Policy and/or non-clinical days in excess of the maximum limit as allowed by the Policy to focus on scholarly and administrative pursuits and were excused from clinical duties during such time.  [See Section II below.] Had Dr. Rosen granted Plaintiff academic time to which she was entitled, she would have been able to pursue the scholarly and administrative pursuits that would have resulted in her promotion to Professor of Radiology by the Medical School. Furthermore, other younger radiologists were offered Division Chief and/or non-Division Chief Administrative positions, which expedited their path to promotion and entitled them to additional salary associated with such positions. PSOF ¶ 284, 272, 289.

6.  Dr. Max Rosen has been Chair of the Department of Radiology at the Medical Center and the Medical School since 2012.  Ex. 7, Dr. Rosen Depo., pp. 16-18.

**Response:** Admitted.

II. <u>Academic and Administrative Time Policy</u>.

5

7.  The Academic and Administrative Time Policy ("Policy") allows qualifying physicians to take time away from their clinical duties to focus on scholarly or administrative pursuits.  Ex. 8 (CD 00001-00002) (marked and discussed in Ex. 4, Dr. Desai Depo., pp. 101-25).

> **Response:** Admitted to the extent that the Policy allowed qualifying physicians, excluding Plaintiff, to take time away from their clinical duties to focus on scholarly or administrative pursuits as defined by the Academic and Administrative Time Policy, including teaching, attending institutional and department committees, and attending conferences.  PSOF ¶ 27.

8.  The Policy is exclusively established and administered by the Memorial entities, not by the Medical School.  Ex. 1, Medical School's Ans. to Dr. Desai's First Int. No. 11.  See also Ex. 4, Dr. Desai Depo., pp. 101-02 (acknowledging familiarity with policy described as "the Academic and Administrative Time Policy for UMass. Memorial").

> **Response:** Disputed.  The Policy includes references to teaching, which includes education related to medical students and residents, as evidenced on Plaintiff's faculty annual performance evaluations, which Dr. Rosen reviewed and signed annually.  Annual Faculty Performance Evaluations. Exhibit T to Washienko Aff. These activities are performed/administered based on Plaintiff's responsibilities associated with the Medical School.

9.  Dr. Desai did not serve in a qualifying administrative role for purposes of the Policy. Ex. 4, Dr. Desai Depo., p. 119.

**Response:**   Denied.  Plaintiff was selected by Dr. Rosen, a dually-employed member of

the Medical School, to serve on the Quality Improvement Committee as Quality

Assurance Representative from the Division of Thoracic Radiology beginning in 2014

and through the remainder of her employ.  Desai Aff. ¶ 13. In addition, Plaintiff assumed

leadership responsibilities, including but not limited to administrative responsibilities, for

the Division in absence of Dr. Karin Dill, the Division Chief. See University of

Massachusetts Medical School Faculty Annual Performance Review dated June 30, 2018,

Exhibit T to Washienko Aff., at UMM 00308-00313, at 00313.


10.  Dr. Desai was on a clinical track, not an academic track, and did not prioritize

scholarly work. Id., pp. 29-30.

**Response:** Admitted that Plaintiff held a title as Clinical Associate Professor given by the

Medical School. Disputed as to the implication that Plaintiff did not "prioritize" scholarly

work to be entitled to Academic Time under the terms of the Policy; also disputed that

she did not perform scholarly work.

**Responding further:** The University of Massachusetts Medical Center hired Plaintiff

pursuant to a Faculty Recruitment Authorization that specified:

> Specialty: General Radiology – major interest in chest and musculoskeletal
> radiology.
> Secondary Teaching / Research Interests:  Clinical service, *strong teaching
> (residents & medical students)* and collaborative clinical research.

See University of Massachusetts Medical Center Authorization for Faculty Replacement,

UM00092, attached as Exhibit XX to Washienko Aff.  (Emphasis added.)

Under the terms of the Policy, Academic time is

"… time allocated to academic responsibilities including teaching / conference preparation, writing papers / texts, completing research project, attending institutional and department committees, attending a conference, serving on committees of local, regional, national or international organizations other than UMMMS or UMMMC.

Exhibit AA to Washienko Aff.

Plaintiff routinely performed following activities: teaching (Education was 25% of her time per her Faculty Evaluations from 2012-2013 through 2017-2018; see Plaintiff's Annual Faculty Reviews, attached as Exhibit T to Washienko Aff., attending institutional and department committees, and attending conferences..  Resident evaluations submitted regarding Plaintiff were outstanding, see UMM 00287, and in 2017, graduating residents selected Plaintiff as their teacher of the year.  PSOF ¶¶ 7(b), 26.

When Plaintiff's teaching load was 8% of her time (i.e., before 2012-2013), she co-authored scholarly publications in the form of abstracts with colleagues Drs. Jerry Balikian, Umali and residents in the Department of Radiology and mentored medical students and residents in the writing of scholarly publications. Desai Aff. at ¶ .


11.  Dr. Desai did not qualify for academic time under terms of the Policy.  Id., pp. 117, 316-18, 355-57.

**Response:** Disputed.  See Response No. 10, above.


12.  Dr. Desai never submitted proposals to describe how she would use the academic time she wished to take.  Id., pp. 105, 118-19, 280-81.

**Response:** Disputed that Dr. Desai was required under the terms of the Policy to submit proposals to describe how she would use the academic time she wished to take; disputed also that her colleagues, who were granted academic time, did so. PSOF ¶ 49. Furthermore, Defendants produced no documents evidencing other radiologists who received academic time submitted formal, written proposals to justify their receipt of same.

13.  Dr. Desai wanted to use academic days to take time off and recuperate, not to pursue academic activities.  Id., pp. 113, 123.

**Response:** Admitted that Plaintiff intended to take a break from clinical work.

**Responding further**: Disputed that this was improper. Dr. Rosen admits that radiologists to whom he provided academic days/administrative days were not required to be at work on those days. Rosen Dep. at 108:23-109:17, at Exhibit S to Washienko Aff. The Policy also indicates the same.  Exhibit AA to Washienko Aff.  Dr. Rosen did not monitor whether a particular radiologist taking an academic/administrative day produced any work on those days.  Id. Moreover, there is no evidence produced to suggest that Dr. Rosen applied measurable outcomes and deliverables to evaluate the amount of academic/administrative work produced by radiologists on their non-clinical days.  Nor did Dr. Rosen in fact evaluate whether a radiologist adequately delivered the amount of academic/administrative/non-clinical work he expected based off of the academic days he allotted them. Rosen Dep. at 106:20-107:19 at Exhibit S to Washienko Aff. Furthermore, other radiologists were not using academic/administrative time in accord with the Policy and violated the guidelines set forth by the Policy. PSOF ¶¶  38-39, 40.

14.  Dr. Rosen did grant academic time to other female radiologists in the Department. Id., p. 117.

**Response:** Admitted that Dr. Rosen granted academic time to younger female and/or male radiologists.


15.  In a meeting with Dr. Rosen on May 25, 2017, Dr. Desai claimed that she was being subjected to discrimination in relation to not being granted academic time.  Ex. 9, Dr. Desai's Ans. to Medical Center's Int. No. 4; Ex. 4, Dr. Desai Depo., pp. 303-11.

**Response:** Admitted.


16.  Approximately one year earlier, in May 2016, Dr. Desai had also made complaints to Dr. Rosen regarding alleged discrimination in not awarding her academic time.  Ex. 9, Dr. Desai's Ans. to Medical Center's First Int. Nos. 4, 9.

**Response:** Admitted.


17.  Dr. Desai filed her Charge of Discrimination with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission on May 4, 2018. Ex. 2, Amended Comp., ¶ 67 (Dkt. 23) & Ex. D to Amended Comp. (Dkt. 23-4) and admission in Ex. 10, Memorial's Ans. to Amended Comp., ¶ 67 (Dkt. 24).

**Response:** Admitted**.**


III.  Dr. Desai's Salary

18.  The Medical Group had exclusive authority to set Dr. Desai's total salary.  Ex. 1, Medical School's Ans. to Dr. Desai's First Int. No. 8; Ex. 7, Dr. Rosen Depo., pp. 18-20 (noting that he sets salaries set in conjunction with Medical Group's finance team and administration and raises that he suggests must be approved by the Medical Group).

**Response:** Disputed.  Salary determinations were based, in part, on academic rank (Assistant, Associate, or Full Professor) which was determined by the Medical School. PSOF ¶ 4, Medical School Organizational Chart, Exhibit RRR to Washienko Aff. Furthermore, there were non-clinical administrative positions held by radiologists at the Medical School, which positions "may receive monetary support at the discretion of the Chair" and entitled those receiving positions to additional salary.  Id.  UMMS Radiology Organizational Chart, Exhibit RRR to Washienko Aff.


19.  Up until several months before the end of Dr. Desai's employment, 20% of the salary set by the Medical Group was paid by the Medical School, but that expense was ultimately transferred and charged back to the Medical Group, which was an organizational practice at the time not specific to Dr. Desai.  Accordingly, 80% of Dr. Desai's salary was paid directly to Dr. Desai by UMass Memorial.  Dr. Desai received paychecks from both UMMHC and the Medical School, but the amount paid by the Medical School was then charged back to UMMHC.  Ex. 1, Medical School's Ans. to Dr. Desai's First Int. No. 8.

**Response:** Admitted to that Plaintiff received a portion of her salary from the Medical School.  Plaintiff is without sufficient information or knowledge to determine the organizational practices of the Medical Group and/or Medical School.

11

20.  When, in late 2016 and early 2017, salary levels in the Department were reviewed and

certain radiologists, including Dr. Desai, had their salaries increased, this process was conducted

by the Medical Group.  Ex. 4, Dr. Desai Depo., pp. 180-81, 312-15; Ex. 11, Medical Group's

Ans. to Dr. Desai's First Int. Nos. 6 & 7.

>   **Response**: Plaintiff is without sufficient information or knowledge to be able to
>   determine exactly which entities did or did not review salaries in the Department of
>   Radiology and/or have input/authority in determining a new salary structure for the
>   Department.  However, the new salary structure implemented in 2017 provided additional
>   salary for administrative positions and academic rank, both of which were Medical
>   School positions.  PSOF ¶ 263, UMMS Radiology Organizational Chart, Exhibit RRR to
>   Washienko Aff.

21.  Dr. Desai admits that, in conducting this salary review and adjusting salaries, the

Medical Group acted reasonably and in good faith.  Ex. 4, Dr. Desai Depo., pp. 182-83.

>   **Response:** Deposition testimony with respect to the plaintiff's understanding of her
>   evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762
>   F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no
>   information to support her claim that Hospira retaliated against her for requesting FMLA
>   leave. Her deposition testimony made clear, however, that she was talking about the basis
>   for her subjective belief that she was being retaliated against, not whether she had
>   introduced evidence of retaliation in her lawsuit").
>
>   **Responding further**: Disputed. Plaintiff admits that the Medical Group's specific act of
>   conducting a salary review and adjusting salaries gave her the impression that those

entities that were setting salaries were in fact doing so reasonably and in good faith. However, upon further review of information produced by Defendants in discovery, pay inequities continued to exist in the Department following the implementation of a new salary structure within the Department. See, e.g., PSOF ¶ 272 UMM09985-09986, UMM 00721 (less experienced, younger male diagnostic radiologist received an annual base salary of $375,000 upon hire by Dr. Rosen on March 20, 2018) PSOF 272; UMM 03687-03688 (Rosen exercises Chair discretion for Dr. Brennan, younger male radiologist (who is currently 49) maintaining his $37k salary contribution, despite the radiologist's relinquishment of administrative roles).

22.  Dr. Desai admits that, in increasing her salary, the Medical Group made reasonable progress in eliminating pay differences.  Id., pp. 314-15.

**Response**: Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that Hospira retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").

**Responding further**: Disputed. Plaintiff admits that the Medical Group's specific act of conducting a salary review and adjusting salaries gave her the impression that those entities that were setting salaries were in fact doing so reasonably and in good faith. However, upon further review of information produced by Defendants in discovery, pay

inequities continued to exist in the Department following the implementation of a new salary structure within the Department. See Response No. 21, above.

23. Dr. Desai admits that the new adjusted pay structure was not discriminatory in any way. Id., p. 314.

> **Response:** Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that Hospira retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").
>
> **Responding further:** Plaintiff admits that establishing a new, adjusted pay structure is not discriminatory. Upon further review of information produced by Defendants in discovery, pay inequities continued to exist in the Department following the implementation of a new salary structure within the Department. See, e.g., PSOF ¶ 272; UMM09985-09986, UMM 00721 (less experienced, younger male diagnostic radiologist received an annual base salary of $375,000 upon hire by Dr. Rosen on March 30, 2018 PSOF 272; plaintiff was paid $330,000); UMM 03687-03688 (Rosen exercising Chair discretion re: $37k, despite radiologist's relinquishment of administrative roles).

24. Dr. Desai testified in her deposition that she is not claiming that the Medical School violated the Federal Equal Pay Act. Id., pp. 174-75.

**Response:** Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that [Defendant] retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").

**Responding further:** Upon further review of information produced by Defendants in discovery, gender-based pay inequities continued to exist in the Department following the implementation of a new salary structure within the Department. See Response No. 23, above.

25. Dr. Aaron Harman is an interventional radiologist in the Department whose salary upon hire in or around 2018 was $365,000.  Id., p. 135; Ex. 2, Amended Comp., ¶ 32 (Dkt. 23) and partial admission in Ex. 10, Memorial Ans. to Amended Comp., ¶ 32 (Dkt. 24).

**Response:** Disputed as to Dr. Harman's hire date, which was 2017; otherwise, admitted.

26. Interventional radiology is a different specialty than diagnostic radiology.  Ex. 4, Dr. Desai Depo., pp. 23-24.

**Response:**  Admitted that interventional radiology is a different specialty than thoracic radiology; the foundational training required to practice both specialties is the same, however.

27.  Interventional radiological procedures require the physician to invade the body; diagnostic procedures do not involve invading the body.  Id., p. 138.

**Response:**  Admitted to the extent that the term "interventional" radiology implies that direct interventions, such as procedures, are performed.  A diagnostic radiologist specializes in characterizing a disease process and/or other abnormalities detectable on a radiograph.

28.  As of the time of the first day of her deposition in September 2020, Dr. Desai had not performed any interventional radiological procedures for approximately 15 years.  Id., p. 25.

**Response:**  Plaintiff is without sufficient information or knowledge to determine exactly when she stopped performing radiology procedures. Admitted as to her testimony. Plaintiff did perform such procedures during her radiology training and for a period as an attending radiologist.

29.  Interventional radiologists are generally paid more than general radiologists and chest radiologists.  Id., p. 136.

**Response:** Plaintiff is without sufficient information or knowledge to form universal conclusions as to whether interventional radiologists have greater salaries than other types of radiologists.

IV.  Hiring of Dr. Karin Dill

30.  Dr. Karin Dill was hired as Division Chief of the Cardiovascular and Thoracic Imaging Division ("Chest Division") – Dr. Desai's Division – in or around March 2016.  Ex. 2,

Amended Comp., ¶ 29 (Dkt. 23) and partial admission in Ex. 10, Memorial Ans. to Amended

Comp., ¶ 29 (Dkt. 24); Ex. 4, Dr. Desai Depo., pp. 155-56.

**Response:** Admitted.


31.  To the extent that Dr. Desai is claiming that the decision to hire Dr. Dill was

discriminatory, she is not claiming that the Medical School made that decision.  Ex. 4, Dr. Desai

Depo., p. 168.


**Response:**  Deposition testimony with respect to the plaintiff's understanding of her

evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d

552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information

to support her claim that Hospira retaliated against her for requesting FMLA leave. Her

deposition testimony made clear, however, that she was talking about the basis for her subjective

belief that she was being retaliated against, not whether she had introduced evidence of

retaliation in her lawsuit").

**Responding further**:  Disputed. The role of Division Chief of the Department of

Radiology was a Medical School role. PSOF ¶ 4; Exhibit RRR (Organizational Chart) to

Washienko Aff. Dr. Rosen acted as an agent for the Medical School when he selected Dr. Karin

Dill for the role instead of Plaintiff, despite Plaintiff's qualification for the job and superior

seniority overall and in the Division. Because Plaintiff did not receive such a position, her ability

for promotion to the level of Professor at the Medical School was also affected.  Had the Medical

School promoted Plaintiff to an academic rank of Professor, she would have been entitled to

additional salary as well as prestige associated with such a rank.

V.  Dr. Desai's Termination

32.  Dr. Rosen testified that he is responsible for making decisions about terminations and does so in conjunction with the Medical Group's lawyers.  Ex. 7, Dr. Rosen Depo., p. 20.

**Response:** Admitted that Dr. Rosen testified that he is responsible for making decisions about terminations and does so in conjunction with the Medical Group's lawyers. Plaintiff is without sufficient information or knowledge to determine exactly which other parties are involved in making termination decisions.

33.  In or around 2016 and early 2017, Dr. Rosen became aware of complaints about the quality Dr. Desai's radiological reads that were made directly by Dr. Kimberly Robinson of Marlborough Hospital and Dr. Dill, as well as other such complaints that were made to Dr. Dill. Id., pp. 53-55, 151-55; Ex. 12, Dr. Rosen's Ans. to Dr. Desai's First Int. Nos. 10 & 11.

 **Response:**  Plaintiff is without sufficient information or knowledge to determine precisely when Dr. Rosen became aware of complaints about the quality Dr. Desai's radiological reads that were made directly by Dr. Kimberly Robinson of Marlborough Hospital and Dr. Dill, as well as other such complaints that were made to Dr. Dill, but admits that Rosen testified as to these dates and evidence produced by Defendants in discovery are consistent therewith.

34.  Based on these complaints, Dr. Rosen arranged for an independent, blind review of the quality of 50 radiological reads – 25 of which had been performed by Dr. Desai and 25 of which had been performed by other radiologists in the Department.  The review was performed

by Dr. Diana Litmanovich.  Ex. 7, Dr. Rosen Depo, pp. 151-59; Ex. 12, Dr. Rosen's Ans. to Dr.

Desai's First Int. Nos. 12 & 13.

> **Response:** Admitted that an independent, blinded review was conducted by Dr. Diana
>
> Litmanovich in the manner described above.  Disputed to that Dr. Rosen's decision to
>
> conduct the review was based complaints from Dr. Dill, as Defendants previously stated
>
> under oath that Dr. Dill's quality concerns played no role in Dr. Rosen's decision to
>
> conduct the independent review. Position Statement of Medical Center, et al., to Desai
>
> Amended Charge of Discrimination, at p. 2, Section A, second para., at Exhibits MM and
>
> XX to Washienko Aff.

35.  Dr. Desai admitted in her deposition that Dr. Rosen did not make up his concerns about the

quality of her work.  Ex. 4, Dr. Desai Depo., p. 91.

> **Response:**  Admitted as to Plaintiff's deposition testimony.  Nevertheless, "while
>
> [plaintiff's] impression of why … [co-]workers took these actions against [her] is
>
> relevant, it is not conclusive on the question of why they acted the way that they did.
>
> [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers."
>
> *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D. Mass. 2002).
>
> **Responding further**:  Further review of the information produced by Defendants in
>
> discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's
>
> work were not legitimate and also knew that her work quality was not worse than that of
>
> her peers. See, e.g., UMM08943-8944 (table of, among others, Category 3 and Category
>
> 4 misreads for all radiologists in the Department); UMM 04299, UMM 30072-72, UMM
>
> 30081-30084, UMM 30056-30057, UMM 30015, UMM 30094 (complaints about other

radiologists); UMM30040 ("recurrent, mostly unjustified complaint around service delivery"); UMM 04742 ("The issues in the division are much bigger."); UMM30027-30030 ("I know 1 issue is lack of Chest Radiologists, but the issues extend beyond chest.").

36. Dr. Desai admitted in her deposition that Dr. Rosen had an obligation to ensure patient safety and the quality of radiological reads. Id., pp. 74-75.

**Response:** Admitted as to Plaintiff's testimony but disputed that Dr. Rosen's motivation for his treatment of Dr. Desai was to ensure patient safety and the quality of radiological reads.

37. Dr. Desai admitted in her deposition that Dr. Rosen should act when he thinks a radiologist's work is substandard. Id., p. 78.

**Response:** Admitted as to Plaintiff's testimony but disputed that Dr. Rosen had legitimate reason to think Plaintiff's work was substandard. See Response No. 35, above.

38. Dr. Desai admitted in her deposition that an independent review is one way to assess quality in a manner that is not discriminatory. Id., p. 91.

**Response:** Admitted as to Plaintiff's testimony that an independent review is one way to assess quality in a manner that is not discriminatory but disputed that the review undertaken regarding her interpretations was legitimate or fair, not motivated by unlawful animus, or conducted in a manner consistent with the reviews that had previously been

20

conducted into other radiologists' alleged performance issues.  See Response No. 35,

above, and Rosen Dep. at 299:1-19, at Exhibit S to Washienko Aff.


39.  Dr. Desai admitted in her deposition that the decision to have the independent review

conducted had nothing to do with discrimination and specifically nothing to do with the fact that

she is a woman.  Id., pp. 85-86, 90, 361-62.

> **Response:** Deposition testimony with respect to the plaintiff's understanding of her
>
> evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762
>
> F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no
>
> information to support her claim that Hospira retaliated against her for requesting FMLA
>
> leave. Her deposition testimony made clear, however, that she was talking about the basis
>
> for her subjective belief that she was being retaliated against, not whether she had
>
> introduced evidence of retaliation in her lawsuit").


40.  Dr. Desai admitted in her deposition that, in ordering the independent review, Dr.

Rosen was trying to remove himself from the review process.  Id., pp. 91-92.

> **Response:** Admitted that in ordering the independent review, Dr. Rosen was trying to
>
> remove himself from the review process.  Disputed as to Dr. Rosen's motivation and
>
> disputed that Dr. Rosen in fact removed himself from the review process.  Dr. Rosen's
>
> design of the study, which selected 25 of Plaintiff's cases and 25 total cases from other
>
> radiologists, was designed to skew its results; in addition, Dr. Rosen selected a reviewer
>
> personally known to him rather than using the company the Department had previously
>
> engaged. **See PSOF ¶ 120.**

21

41.  Dr. Desai admitted in her deposition that Dr. Rosen's decision to select Dr. Litmanovich was not discriminatory.  Id., pp. 361-62.

**Response:**  Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that Hospira retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). See also *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D. Mass. 2002) ("Thus, while [plaintiff's] impression of why his fellow workers took these actions against him is relevant, it is not conclusive on the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers.").

**Responding further**: Dr. Rosen's motivation in conducting the entire review is disputed. See, e.g., UMM 04631 ("obligation as Chair to think about recruiting younger staff for service needs."); UMM 04628 ("I have been looking for a fellowship trained chest radiologist for 3 years."). In addition, Dr. Rosen's selection of Dr. Litmanovich, known to him previously, rather than the company / organization the Department previously used to conduct assessments of physicians, also evidences Dr. Rosen's discriminatory intent.

42. Dr. Desai admitted in her deposition that the review was independent and identified five major and five minor errors in her 25 cases, compared to one major and seven minor errors in the 25 other randomly selected cases.  Id., pp. 79, 361.

**Response**:  Admitted that these were the conclusions of the review; disputed as to any implication that the review was legitimate or fair or that its purpose was not discriminatory.  **See PSOF ¶¶ 167-168.**

43. Dr. Desai admits that Dr. Litmanovich did not discriminate against her in conducting the independent review.  Id., p. 363.

**Response:** Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that Hospira retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").

**Responding further**: Plaintiff is without sufficient information or knowledge to determine the extent and/or nature of the interactions between Dr. Litmanovich and Dr. Rosen, prior to, during, or after the independent review was conducted.

44. Dr. Desai admitted in her deposition that Dr. Litmanovich's findings were not discriminatory.  Id., pp. 361-62.

**Response:** Admitted that radiological statistics and a critique of one's interpretations of radiographic images, in themselves, do not demonstrate direct evidence of discrimination.

45.  Dr. Desai admitted in her deposition that Dr. Rosen relied upon the independent review. Id., p. 79.

**Response:** Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that Hospira retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). See also *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D. Mass. 2002) ("Thus, while [plaintiff's] impression of why his fellow workers took these actions against him is relevant, it is not conclusive on the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers.").

**Responding further**: Admitted that Dr. Rosen informed Plaintiff that he allegedly relied upon the independent review to justify Plaintiff's termination. Disputed as to Dr. Rosen's motivations.

46.  Dr. Desai admitted in her deposition that Dr. Rosen acted fairly and appropriately in relying on independent judgment instead of making the determination himself. Id., p. 94.

**Response:**  Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that Hospira retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). See also *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D. Mass. 2002) ("Thus, while [plaintiff's] impression of why his fellow workers took these actions against him is relevant, it is not conclusive on the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers.").

**Responding further**: Dr. Rosen's motivation is disputed.

47.  Dr. Desai admitted in her deposition that Dr. Rosen should not have ignored the results of the independent review.  Id., p. 95.

**Response:**  Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that Hospira retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). See also *Centola v. Potter*, 183 F.

Supp. 2d 403, 411 (D. Mass. 2002) ("Thus, while [plaintiff's] impression of why his fellow workers took these actions against him is relevant, it is not conclusive on the question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a motivation that only existed in the minds of his harassers.").

**Responding further**: Further review of the information produced by Defendants in discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's work were not legitimate and also knew that her work quality was not worse than that of her peers. See, e.g., UMM08943-8944 (table of, among others, Category 3 and Category 4 misreads for all radiologists in the Department); UMM 04299, UMM 30072-72, UMM 30081-30084, UMM 30056-30057, UMM 30015, UMM 30094 (complaints about other radiologists); UMM30040 ("recurrent, mostly unjustified complaint around service delivery"); UMM 04742 ("The issues in the division are much bigger."); UMM30027-30030 ("I know 1 issue is lack of Chest Radiologists, but the issues extend beyond chest."). In addition, disputed as to Dr. Rosen's motivation. See, e.g., UMM 04631 ("obligation as Chair to think about recruiting younger staff for service needs."); UMM 04628 ("I have been looking for a fellowship trained chest radiologist for 3 years.").

48.  In a meeting on March 14, 2018, Dr. Rosen notified Dr. Desai that, due to concerns about the quality of her clinical work and the results of the independent review, her employment with the Medical Group and the Medical School would be ending effective March 17, 2019, and he handed her a letter to that effect.  Id., pp. 409-11; Ex. 7, Dr. Rosen Depo., pp. 339-40 (discussing meeting and Depo. Ex. 64, UM 00253, Termination Letter – Ex. 13 to this Statement).

**Response:** Admitted.

49.   Both Dr. Desai's Agreement with the Medical Group and the Medical School's APP provided that the termination of the Agreement by the Medical Group would also end Dr. Desai's faculty appointment at the Medical School.  Ex. 5, ¶ 1.14 (providing, in relevant part at CD 00054-00055, "[t]he Practitioner further acknowledges that if this Agreement is terminated for any reason, the related employment relationship with the Medical School shall also terminate unless the Practitioner has a new or continuing agreement with the Medical School or is a tenured faculty member"); Ex. 6, Art. 5, § 5.3(a) (APP provision, UM0335-0336, providing, in relevant part, "[i]f the individual's employment agreement with UMMHC is terminated for any reason, their Faculty appointment and any services that the individual may be providing to [the Medical School] also end coterminously, unless the individual has a new or continuing written agreement with UMMS or is a Tenured Faculty Member."); see also id., Art. 5, § 5.1 (providing, in relevant part at UM0334, that "[t]he Faculty appointment of an Employed Faculty Member is contingent on continued employment by . . . UMMHC . . . and ends coterminously with the termination of that employment, unless there is a written agreement to continue the appointment.").

**Response:** Admitted.

50.   The APP has a separate provision that allows for the direct termination of only the faculty appointment of a non-tenured "UMMHC-Employed" faculty member "Not For Cause" with at least 30 days written notice.  Ex. 6, Art. 5, § 5.3(b) (UM0336).

**Response:**  Admitted.

51.  Here, Dr. Desai was terminated with 12 months of notice based on her years of service in accord with terms of the Agreement with the Medical Group.  Ex. 4, Dr. Desai Depo., pp. 99-100; Ex. 5, Agreement, § 7.2 (CD 00057) & § 14.1 (CD 00060); Ex. 13.

**Response**: Admitted.


52.  The termination letter indicated that Dr. Desai's faculty appointment at the Medical School would also be ending on March 17, 2019.  Ex. 13.

**Response:** Admitted. Dr. Desai's faculty appointment and all association with the Medical School ended because of her termination.


53.  Dr. Desai admitted in her deposition that Dr. Rosen terminated her based on an assessment of the quality of her reads as substandard.  Ex. 4, Dr. Desai Depo., p. 79.

**Response:**  Deposition testimony with respect to the plaintiff's understanding of her evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no information to support her claim that Hospira retaliated against her for requesting FMLA leave. Her deposition testimony made clear, however, that she was talking about the basis for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit"). See also *Centola v. Potter*, 183 F. Supp. 2d 403, 411 (D. Mass. 2002) ("Thus, while [plaintiff's] impression of why his fellow workers took these actions against him is relevant, it is not conclusive on the

question of why they acted the way that they did. [Plaintiff] cannot 'admit' to a
motivation that only existed in the minds of his harassers.").

**Responding further**: Further review of the information produced by Defendants in
discovery evidences that Dr. Rosen knew the concerns about the quality of Plaintiff's
work were not legitimate and also knew that her work quality was not worse than that of
her peers. See, e.g., UMM08943-8944 (table of, among others, Category 3 and Category
4 misreads for all radiologists in the Department); UMM 04299, UMM 30072-72, UMM
30081-30084, UMM 30056-30057, UMM 30015, UMM 30094 (complaints about other
radiologists); UMM30040 ("recurrent, mostly unjustified complaint around service
delivery"); UMM 04742 ("The issues in the division are much bigger."); UMM30027-
30030 ("I know 1 issue is lack of Chest Radiologists, but the issues extend beyond
chest."). In addition, disputed as to Dr. Rosen's motivation. See, e.g., UMM 04631
("obligation as Chair to think about recruiting younger staff for service needs."); UMM
04628 ("I have been looking for a fellowship trained chest radiologist for 3 years.").


54.  Dr. Desai testified in her deposition that her termination had nothing to do with her
duties at the Medical School, and she understood that when she was notified of her termination
in March 2018.  Id., p. 387.

**Response:**  Deposition testimony with respect to the plaintiff's understanding of her
evidence is not controlling; rather the evidence is controlling. *Malin v. Hospira, Inc.*, 762
F.3d 552, 564 (7th Cir. 2014) ("[Defendant] claimed that [Plaintiff] admitted she had no
information to support her claim that Hospira retaliated against her for requesting FMLA
leave. Her deposition testimony made clear, however, that she was talking about the basis

for her subjective belief that she was being retaliated against, not whether she had introduced evidence of retaliation in her lawsuit").

**Responding further:** Admitted to the extent that Plaintiff's termination was unrelated to her failure to meet her work-related obligations and/or work quality issues related to her joint employment with the Medical School.  Denied that "her termination had nothing to do with her duties at the Medical School" to the extent that termination would no longer allow her to educate medical students, engage in academic pursuits at the medical school, and receive benefits of employment associated with the Medical School. Furthermore, Dr. Desai was deprived of the academic rank and associated salary distributed by the Medical School for such positions, as well as prestige associated with Medical School promotions.

Respectfully submitted,

CHARU DESAI
By Her Attorney,

/s/ Patricia Washienko

_____
Patricia A. Washienko, BBO# 641615
pwashienko@fwlawboston.com
Freiberger & Washienko LLC
211 Congress St, Suite 720
Boston, MA 02110
Tel: (617) 723-0008

Dated: February 11, 2022


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2022, Plaintiff's Opposition to Defendants' Motion for Summary Judgment, was served by electronic mail only to counsel for the above-named Defendants:

Robert L. Kilroy, Esq.
Reid Wakefield, Esq.
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
(508) 860-1477
rkilroy@mirickoconnell.com

Mark Johnson, Esq.
Denise Barton, Esq.
University of Massachusetts Office of the General Counsel
One Beacon Street, 31st Floor
Boston, MA 02108
(617) 287-4064
MAJohnson@umassp.edu


/s/ Patricia Washienko

_____
Patricia A. Washienko