**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ———————————————————— ) | |
| **CHARU DESAI,** ) | |
| ) | **CIVIL ACTION** |
| **Plaintiff,** ) | **NO.  4:19-10520-TSH** |
| ) | |
| **v.** ) | |
| ) | |
| **UNIVERSITY OF MASSACHUSETTS** ) | |
| **MEMORIAL MEDICAL CENTER,** ) | |
| **UNIVERSITY OF MASSACHUSETTS** ) | |
| **MEMORIAL MEDICAL GROUP,** ) | |
| **UNIVERSITY OF MASSACHUSETTS** ) | |
| **MEDICAL SCHOOL, UNIVERSITY OF** ) | |
| **MASSACHUSETTS MEMORIAL** ) | |
| **MARLBOROUGH HOSPITAL, MAX** ) | |
| **ROSEN, STEPHEN TOSI, and KARIN** ) | |
| **DILL,** ) | |
| ) | |
| **Defendants.** ) | |
| ———————————————————— ) | |

**ORDER AND MEMORANDUM ON DEFENDANTS' MOTIONS FOR SUMMARY**
**JUDGMENT (Docket Nos. 64, 67, 70, 73)**

**May 31, 2022**

**HILLMAN, D.J.**

Plaintiff Charu Desai ("Dr. Desai") brings this action against defendants University of Massachusetts Memorial Medical Center (the "Medical Center"), University of Massachusetts Memorial Medical Group (the "Medical Group"), University of Massachusetts Medical School (the "Medical School"), University of Massachusetts Memorial Marlborough Hospital ("Marlborough Hospital"), Max Rosen ("Dr. Rosen"), Stephen Tosi ("Dr. Tosi"), and Karin Dill ("Dr. Dill") for claims related to her employment as a radiologist.  Dr. Desai alleges that she was discriminated against based on her age, gender, and disability.  The defendants move for summary

judgment.  (Docket Nos. 64, 67, 70, 73).  The Court ***denies*** summary judgment as to Counts IV and V against the Medical Group and as to Counts V and VII against Dr. Rosen.  The Court ***grants*** summary judgment as to the remaining claims against the Medical Group and Dr. Rosen and as to all claims against the Medical Center, Marlborough Hospital, the Medical School, Dr. Tosi, and Dr. Dill.

## Background

Dr. Desai was born in 1950 and graduated from medical school in 1972.  She completed her residency and fellowship at the Medical Center, and then entered private practice.  In 1992, she returned to University of Massachusetts as a physician specializing in chest radiology at the Medical Group and an assistant (later associate) professor at the Medical School.

Dr. Desai specialized in chest radiology, and at University of Massachusetts, she reviewed and interpreted radiological images for patients at multiple hospitals, including the Medical Center campuses[1] and Marlborough Hospital.  She also regularly taught residents.  After twenty-seven years at University of Massachusetts, Dr. Desai's employment was terminated on March 17, 2019.

Dr. Rosen is the Chair of the Department Radiology (the "Department") at University of Massachusetts and has been in that position since 2012.  As Chair, he supervises and manages all radiologists employed by the Medical Group.  Dr. Dill became Division Chief of the Department's Chest Division in February 2016.[2]  Dr. Stephen Tosi was the President of the Medical Group at the time of Dr. Desai's termination.

---

[1] The Medical Center is a multi-facility hospital which provides tertiary-level care.

[2] Dr. Rosen did not ask Dr. Desai whether she wanted to become Division Chief when the position opened.  According to Dr. Desai, it was common practice for the Chair to offer the Division Chief position to the most senior radiologist.  Dr. Rosen disagrees that this was the common practice.  In any event, Dr. Desai did not apply for or express interest in the position.

In 2000, Dr. Desai was diagnosed with a heart condition, known as tachy-brady syndrome, which causes her to experience unpredictable spells, typically lasting a few minutes, of weakness and fatigue. The spells flare where she is overexerted. In 2001, Dr. Desai had a pacemaker implanted, but it did not resolve her symptoms. Beginning in 2015, Dr. Desai requested intermittent leave from work under the FLMA and was approved to take up to two days off from work every two months.

In the years leading to her termination, Dr. Desai requested three changes to her work conditions. First, she requested that she be allotted "academic time," which, according to Department policy, allows physicians to take time away from clinical duties to perform "academic responsibilities," such as teaching and conference preparation, writing papers or texts, completing research projects, attending institutional and departmental committees, attending conferences, and serving on committees of local, regional, national, or international organizations. Second, she requested that she be exempt from being on "call." Radiologists in the Chest Division generally were required to be on call ten weekends per year, but qualified "senior" radiologists were exempt. Third, Dr. Desai requested that she be allowed to use a home workstation, which the Department granted to certain radiologists for remote work.[3] Each of these requests was denied.

Dr. Desai was highly regarded among many of her colleagues. In letters of recommendation written over the years, including up until and past the date of her termination, colleagues described Dr. Desai as a "superb," "excellent," and "careful and observant" radiologist with "excellent command of the intricacies of interpretation in chest CT scans." Indeed, none of Dr. Desai's annual faculty performance reviews reflect any deficiencies in her performance.

---

[3] Dr. Desai was granted a home workstation in the early 2000s, around the time she was diagnosed with her heart condition, under a previous Chair of the Department.

Dr. Dill, however, complained to Dr. Rosen about the quality of Dr. Desai's CT interpretations and advised him that concerns had been raised to her by others. Dr. Dill told Dr. Rosen that treating physicians would ask her to re-read or review studies Dr. Desai had interpreted. On January 31, 2017, Dr. Rosen met with representatives from Marlborough Hospital to address, among other things, the quality of chest imaging at Marlborough Hospital. At this meeting, Dr. Kimberly Robinson, a treating pulmonologist at the hospital, also raised concerns regarding the quality of Dr. Desai's CT interpretations. Dr. Robinson told Dr. Rosen that she never believed Dr. Desai's reports and could not rely on them.[4]

Dr. Rosen decided to conduct a focused review of Dr. Desai's CT interpretations. On February 1, 2017, Dr. Rosen asked Department staff to select randomly twenty-five of Dr. Desai's chest CT interpretations and, as a control group, twenty-five chest CT interpretations from other radiologists. On August 22, 2017, Dr. Rosen contacted Dr. Diana Litmanovich, a chest radiologist unaffiliated with the Medical Group whom Dr. Rosen understood to be an expert in radiological interpretations, to conduct an independent review. Dr. Rosen asked Dr. Litmanovich whether she agreed or disagreed with each interpretation in the group of fifty anonymized studies, and if she disagreed, whether it was a minor or major disagreement and whether in her opinion the disagreement would have an impact on patient care.

On October 3, 2017 (before Dr. Litmanovich's review was complete), Dr. Rosen sent an email to several executives at the Medical Group, including Dr. Tosi, stating that he had found a "great" chest radiologist who was finishing his fellowship in June 2018. Dr. Rosen stated that he

---

[4] Nearly a year later, on January 3, 2018, Dr. Robinson again raised concerns about the quality of Dr. Desai's interpretations, as well as the interpretations of four other radiologists. In response to Dr. Robinson's concerns, Dr. Rosen asked one of the radiologists (not Dr. Desai) to stop performing reads of chest CT images.

wanted to make the radiologist a job offer, but that he had "not formally resolved Dr. Desai's employment - planned for 9/30/18." Dr. Rosen stated that "[i]f for some [r]eason Dr. Desai is still employed after 9/30/18," he would make other staffing adjustments to accommodate the new hire. Dr. Rosen further stated that he had been looking for a fellowship trained chest radiologist for three years, and that, if Dr. Desai left without a replacement, he would not be able to provide adequate clinical service in the Chest Division.

One of the executives responded with concern around the finances of having a potential three-month overlap between the end of Dr. Desai's employment and the start of the new radiologist's employment. Dr. Rosen responded with potential contingencies for mitigating the financial burden, such as adjusting contracts of other radiologists or asking the new radiologist to start later. Dr. Tosi approved the offer. That same day, Dr. Rosen sent an email to Kathleen Leblanc in Human Resources, asking to speak about Dr. Desai, stating, "I've been thinking a lot about how to do this - and want to run some things past you."

A week later, Dr. Joseph Ferrucci, a radiologist working per diem for the Department who had previously served as Chair of the Department, sent an email to Dr. Rosen stating that he had spoken with Dr. Desai and "told her that you wanted to be accommodating especially in recognition of her years of service[,] [b]ut that you also had an obligation as Chair to think about recruiting younger staff for service needs." Dr. Ferrucci stated that he had indicated to Dr. Desai that Dr. Rosen was thinking about offering her a twelve-month contract, or a per diem arrangement. Dr. Ferrucci ended the email by stating, "I think you can take the next step in the discussions. Good luck." Dr. Rosen responded, "Thanks."

Later that day, Leblanc sent an email to Dr. Rosen to follow up on a meeting from the day before. Leblanc stated that "all options have legal ramifications and we should discuss all options

together." Dr. Rosen agreed to meet and stated, "Dr. Ferrucci used a conversation he [had] with Dr. Desai to potentially open a window for us."

Dr. Litmanovich sent Dr. Rosen her findings on December 25, 2017. Among Dr. Desai's interpretations, Dr. Litmanovich identified five major errors and nine errors impacting patient care. Among the interpretations of other radiologists, Dr. Litmanovich identified one major error and five errors impacting patient care. Dr. Litmanovich noted that, overall, she did not find any life-threatening misses or misinterpretations, and that the technical quality of the studies was "very good."

On February 16, 2018, Dr. Dill sent Dr. Rosen an email with the subject line, "confidential review," stating, "What I have so far is concerning. There are two signif[icant] problems caught so far upon my limited review." In response, Dr. Rosen asked Dr. Dill to "review the remainder" and send him a summary.

According to Dr. Rosen, the practice of radiology can involve a degree of probability and subjectivity. As part of this litigation, Dr. Desai hired an expert in radiology to review the fifty interpretations reviewed by Dr. Litmanovich. That expert, Dr. James Gruden, found that Dr. Desai made no significant errors, that her interpretations were "well within the expected standard of care at an urban teaching hospital," and that Dr. Litmanovich's criticism were "entirely subjective."

On March 14, 2018, Dr. Rosen met with Dr. Desai to tell her that her employment would be terminated on March 17, 2019.[5] Dr. Rosen did not tell Dr. Desai that she could resign in lieu of termination, an option he had expressly given to other physicians with performance issues. At

---

[5] Pursuant to her employment agreement with the Medical Group, Dr. Desai was entitled to twelve months' notice prior to termination. The agreement also permitted immediate termination "for cause," such as "material negligence or misconduct (other than by reason of disability or approved leave) in the performance of duties." Dr. Desai's termination was without cause.

a later meeting, Dr. Rosen provided Dr. Desai with a summary of Dr. Litmanovich's independent review.  Dr. Rosen represents that his decision to terminate Dr. Desai's employment was based on his assessment of Dr. Litmanovich's independent review.

On an "employee separation form" signed by Dr. Rosen on November 30, 2018, Dr. Rosen listed the reason for Dr. Desai's termination as "retirement," rather than selecting an option on the form for "performance issues."  Dr. Rosen also selected that he would "maybe" re-employ Dr. Desai.  Dr. Desai's employment with the Medical Group formally ended on March 17, 2019.  This suit followed.

## Legal Standard

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party.  *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994).  A fact is "material" when it may affect the outcome of the suit.  *Id.*  When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

## Discussion

### 1. Medical Group

Dr. Desai alleges that the Medical Group discriminated against her based on her age, gender, and disability.  Each of her claims is governed by a similar burden-shifting framework.  *See Zabala-De Jesus v. Sanofi-Aventis Puerto Rico*, 959 F.3d 423, 429 (1st Cir. 2020) (ADEA claim); *Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 186-87 (1st Cir. 2011) (ADA claim);

*Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 470 (1st Cir. 2010) (Title VII claim); *Blare v. Huskey Injection Molding Sys. Boston, Inc.*, 646 N.E.2d 111, 115-17 (Mass. 1995) (M. G. L. c. 151B claim).

First, Dr. Desai must make out a prima facie case of discrimination. This requires her to show that (1) she belongs to a protected class, (2) she is qualified for her job, (3) the Medical Group subjected her to an adverse employment action, and (4) the Medical Group treated her differently that other comparably qualified individuals. *See Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 317 F.3d 46, 54 (1st Cir. 2000).

Second, if Dr. Desai makes out a prima facie case, the burden shifts to the Medical Group to "articulate a legitimate, non-discriminatory reason for the adverse employment action." *Lockridge*, 597 F.3d at 470. This is a burden of production, not persuasion. *See Zabala-De Jesus*, 959 F.3d at 429.

Third, if the Medical Group offers a non-discriminatory reason for its action, the burden shifts back to Dr. Desai. For her claim under Massachusetts law, Dr. Desai must show that the Medical Group's proffered reason was pretextual. *See Gannon v. City of Boston*, 73 N.E.3d 748, 757 (Mass. 2017); *Blare*, 646 N.E.2d at 117. For her claims under federal law, Dr. Desai must show that that the Medical Group's proffered reason was pretextual <u>and</u> that the Medical Group's real reason was discriminatory. *See Lang v. Wal-Mart Stores East, L.P.*, 813 F.3d 447, 457 (1st Cir. 2016).

### a. Termination

Dr. Desai alleges discrimination in her termination of employment. Otherwise admitting for purposes of this motion that Dr. Desai can make out a prima facie case, the Medical Group argues that Dr. Desai did not perform her job at an acceptable level. It is true that Dr. Desai had

some performance issues.  Dr. Dill and Dr. Robinson complained to Dr. Rosen about the quality of Dr. Desai's chest CT interpretations.  In response, Dr. Rosen hired an outside reviewer, Dr. Litmanovich, to evaluate a sample of Dr. Desai's work.  Among the sample of twenty-five of Dr. Desai's interpretations that Dr. Litmanovich reviewed, Dr. Litmanovich identified five major errors and nine errors affecting patient care.

As Dr. Rosen acknowledges, however, the practice of radiology involves a degree of subjectivity.  And while Dr. Dill and Dr. Robinson had concerns about Dr. Desai's performance, Dr. Desai was highly regarded among many of her other colleagues, as evidenced by her glowing letters of recommendation.  None of her annual faculty reviews, moreover, reflect any deficiencies in her performance.  Finally, Dr. Desai's expert, after evaluating Dr. Litmanovich's review, opined that Dr. Desai had made no significant errors, that her interpretations were "well within the expected standard of care at an urban teaching hospital," and that Dr. Litmanovich's criticism was "entirely subjective."  From this evidence, a jury reasonably could conclude that Dr. Desai was qualified for her job, despite the concerns raised by Dr. Dill and Dr. Robinson and the evaluation from Dr. Litmanovich.  *See Caraballo-Caraballo v. Correctional Admin.*, 892 F.3d 53, 57 (1st Cir. 2018) (making out a prima facie case requires only a "small showing," one that is "easily made").

The Medical Group explains that it terminated Dr. Desai's employment due to her performance issues.  In particular, Dr. Rosen avers that his decision was based on his assessment of Dr. Litmanovich's review of Dr. Desai's work.  A jury reasonably could find that this constitutes a legitimate, non-discriminatory reason.  *See Garcia v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 31 (1st Cir. 2008).

There is sufficient evidence in the record, however, from which a jury reasonably could infer that the Medical Group's proffered reason was pretextual.  Most notably, Dr. Litmanovich

completed her review of the sample of Dr. Desai's work and sent it to Dr. Rosen on December 25, 2017.  More than two months <u>before then</u>, Dr. Rosen sent an email to several executives at the Medical Group, including Dr. Tosi, stating that he wanted to make a job offer to a radiologist who was finishing his fellowship that June, flagging that the end of Dr. Desai's employment was "planned" for September 30, 2018.  The Medical Group contends that the context of these emails suggests that they related to Dr. Desai accepting an offer for a reduced role or leaving voluntarily. Maybe so, but it would not be unreasonable for a jury to conclude otherwise: that the Medical Group had plans to terminate Dr. Desai's full-time employment regardless of how Dr. Litmanovich's review turned out, thus making Dr. Rosen's assessment of Dr. Litmanovich's review -- the proffered non-discriminatory reason -- pretextual.  Accordingly, summary judgment on Dr. Desai's state discrimination claim (Count V) against the Medical Group is <u>denied</u>.  *See Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 82 (1st Cir. 2019) (an employee can survive summary judgment in an M. G. L. c. 151B case by showing pretext); *Gannon*, 73 N.E.3d at 757 (an employee can defeat an employer's motion for summary judgment by showing disputed facts as to whether the employer's reason for the adverse decision was not the real reason).

As to Dr. Desai's federal discrimination claims, Dr. Desai must show that the Medical Group's termination decision was "pretext hiding discrimination." *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 105 (1st Cir. 2005).  Under federal law, "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [she] must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: [age, gender, or disability] discrimination.'" *Mesnick v. General Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco*

*Co.*, 896 F.2d 5, 9 (1st Cir. 1990); *see also Lahens v. AT&T Mobility P.R., Inc.*, 28 F.4th 325, 335 (1st Cir. 2022).

There is evidence in the record to suggest that the Medical Group's real reason for terminating Dr. Desai's employment was her age. The week after Dr. Rosen emailed executives at the Medical Group about the "planned" end of Dr. Desai's employment, Dr. Ferrucci, a former Chair of the Department, emailed Dr. Rosen to say that he had spoken with Dr. Desai, apparently with respect to her request for reduced call responsibilities, and that he had "told her that you wanted to be accommodating especially in recognition of her years of service[,] [b]ut that you also had an obligation as Chair to think about recruiting younger staff for service needs." Dr. Rosen responded, "Thanks." Later that day, Dr. Rosen emailed Human Resources, stating, "Dr. Ferrucci used a conversation he [had] with Dr. Desai to potentially open a window for us."

The Medical Group contends that Dr. Ferrucci's comment about recruiting younger staff was a "stray remark" from a non-decisionmaker. *See Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 69 (1st Cir. 2002). But Dr. Rosen expressly acknowledged Dr. Ferrucci's remark; it would not be unreasonable for a jury to conclude that Dr. Rosen adopted it as his own. *Cf.* Fed. R. Evid. 801(d)(2)(B). Indeed, viewing the evidence in Dr. Desai's favor, Dr. Rosen then relayed the remark, with approval, to Human Resources in connection with discussing how to "resolve[]" Dr. Desai's employment. From these exchanges, a jury reasonably could infer that the Medical Group was motivated by Dr. Desai's age to terminate Dr. Desai's employment, and that Dr. Litmanovich's review was a pretext for that improper motivation. Therefore, summary judgment on Dr. Desai's federal age discrimination claim (Count IV) against the Medical Group is <u>denied</u>.

In contrast, there are no "specific facts" in the record from which a jury reasonably could infer that the Medical Group was motivated to terminate Dr. Desai's employment because of her

gender or disability.  While Dr. Desai has identified several male and/or non-disabled radiologists whose employment was not terminated despite having performance issues, that, alone, is not enough.[6]  *See Rivas Rosado v. Radio Shack, Inc.*, 312 F.3d 532, 534 (1st Cir. 2002); *see also LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993).  "[I]n order to be probative of discriminatory animus, a claim of disparate treatment 'must rest on proof that the proposed analogue is similarly situated in material respects.'"  *Velez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 451 (1st Cir. 2009) (quoting *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 752 (1st Cir. 1996)).  Dr. Desai has not offered sufficient proof to sustain her burden on this point.  Summary judgment is appropriate where the nonmoving party "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  *Theidon v. Harvard Univ.*, 948 F.3d 477, 496 (1st Cir. 2020).  No reasonable jury could find that the Medical Group's proffered reason for terminating Dr. Desai's employment was a pretext for gender- or disability-based discrimination.

### b. Conditions

Dr. Desai also alleges discrimination in her conditions of employment.  Specifically, she takes issue with the denial of her requests for academic time, reduced call responsibilities, and a home workstation.  With respect to academic time, Dr. Desai testified at her deposition that she wanted academic time to have a break from clinical work, not to do academics.  She testified further that she believed that she should have been granted academic time based on her seniority.

---

[6] Due to Dr. Desai's general references to "younger and/or male and/or non-disabled doctors" in her briefing, as well as redactions in the record, it is not entirely clear which doctors she references were male vs. female, or disabled vs. nondisabled, making it difficult to determine whether gender or disability indeed could reasonably be considered a real reason for her termination.  *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 425-26 (1st Cir. 2017) (examples of unpunished male <u>and</u> female employees does not support a finding that the plaintiff was discriminated against based on gender).

According to Department policy, academic time allows physicians to take time away from clinical duties to perform "academic responsibilities."  When Dr. Desai requested academic time, Dr. Rosen told her that if she submitted a written proposal of the activities she hoped to undertake, they could discuss whether academic time was warranted.  Dr. Desai declined to submit a proposal.

The Medical Group argues that enforcement of its academic time policy does not constitute adverse employment action.  The Court agrees.  An adverse employment action is one that materially changes the conditions of a plaintiff's employment.  *See Burns v. Johnson*, 829 F.3d 1, 10 (1st Cir. 2016).  Here, Dr. Desai alleges discrimination not in any changes to the conditions of her employment, but in the Medical Group's refusal to change her conditions of employment. Even if Dr. Desai was undertaking activities that qualified for academic time, and even if other physicians were not required to submit written proposals, Dr. Desai never informed Dr. Rosen of the academic activities grounding her request.  Moreover, and importantly, Dr. Desai has not identified any physician who received academic time for a purpose other than performing academics.  *See Cham v. Station Operators, Inc.*, 685 F.3d 87, 94-95 (1st Cir. 2012) (employee's loss of a shift was not an adverse employment action where the employee was not entitled to any given shift).

The Medical Group argues, in the alternative, that its decision to deny Dr. Desai's request for academic time was legitimate and unrelated to her gender, age, and disability.  Here too, the Court agrees.  The academic time policy represents a legitimate, non-discriminatory reason for denying Dr. Desai's request, and because Dr. Desai has not identified other similarly situated radiologists who received academic time for a purpose other than performing academic work, no reasonable jury could find that the Medical Group's proffered reason was pretext hiding discrimination.

The same holds for Dr. Desai's requests to be exempt from call responsibilities. Department policy states, "Senior attending are exempt from call and weekend/holiday coverage but will maintain incentive bonus eligibility if they meet 2 of the following 3 criteria:" (1) "Age 72 years," (2) "Academic rank of full Professor," and (3) "20 years of continuous service to the Department." The policy, according to its author Dr. Ferrucci, is intended to exempt physicians from call if they meet two of the three listed criteria. When Dr. Desai requested to be exempt from call, she was under the age of 72, had an academic rank of associate professor, and had served the Department for over twenty years. At her deposition, Dr. Desai agreed that because of her age and academic rank, she was not eligible to be exempt from the call policy. The only full-time radiologist in the Department whom Dr. Desai has identified as being exempt from call was exempt under the policy. Accordingly, no reasonable jury could find that the Medical Group's enforcement of its call policy in denying Dr. Desai's request to be exempt from call was pretext hiding discrimination.

With respect to her request for a home workstation, Dr. Desai requested that she be granted one for use in times of inclement weather, and to perform call responsibilities from home because she gets tired. Only nine radiologists in the Department (out of approximately ninety) were granted home workstations around the time of Dr. Desai's requests. Five of the nine radiologists specialized in neuroradiology and rotated working routine evening shifts. A sixth, Dr. Dill, had a home workstation only for a short period, the use of which was discontinued due to technical challenges. Two of the radiologists were per diem employees, one was older than Dr. Desai, and two were women. Dr. Desai has adduced no specific facts in the record from which a jury reasonably could find that the Medical Group discriminated against her by refusing to grant her a home workstation based on her age, gender, or disability. Therefore, summary judgment on Dr.

Desai's federal gender discrimination claim (Count I) against the Medical Group is <u>granted</u>.  There is one further issue to resolve with respect to Dr. Desai's federal disability discrimination claim (Count III).

### c. Reasonable Accommodation

Dr. Desai alleges that the Medical Group should have granted her academic time, reduced call responsibilities, and a home workstation as reasonable accommodations under the Americans with Disabilities Act, 42 U.S.C. § 12112.  For an employer to be liable for failing to accommodate an employee's disability, the employee must show that she "sufficiently requested the accommodation in question."  *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001). "At the least, the request must explain how the accommodation requested is linked to some disability."  *Id.*  Here, Dr. Desai's requests for academic time, reduced call responsibilities, and a home workstation did not reasonably explain how they were connected to her heart condition.

To be sure, the Medical Group was aware that Dr. Desai had a heart condition, and that her condition sometimes required her to miss work.  But that general awareness did not itself link each of Dr. Desai's requests to her heart condition.  *See Murray v. Warren Pumps, LLC*, 821 F.3d 77, 85 (1st Cir. 2016) (an employee may not rely on an employer's "general awareness" of a need for accommodations "where the purported conflict with a medical condition in particular situations is not obvious").  In 2015, Dr. Desai requested intermittent FMLA leave, which the Medical Group granted in the form of two days off every two months.  Thereafter, Dr. Rosen specifically advised Dr. Desai that if she needed to adjust her schedule for medical reasons, she should contact Human Resources in compliance with the Department's FMLA policy to put in place an accommodation plan.  The record does not indicate that Dr. Desai did so.

Indeed, there is no indication in the record that any of Dr. Desai's requests for academic time, reduced call responsibilities, or a home workstation had any reasonably discernable connection to her heart condition. At best, Dr. Desai requested academic time to take "a break" and a home workstation because she gets "tired." More was required. *See Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012) (an employee has an obligation to explain how the accommodation is linked to a disability). Because Dr. Desai did not sufficiently connect her alleged requests for accommodations with her disability, her reasonable accommodation claim fails. For that reason, as well as for the reasons articulated above, summary judgment on Dr. Desai's federal disability claim (Count III) against the Medical Group is <u>granted</u>.

### 2. Medical Center

Dr. Desai alleges that the Medical Center discriminated against her based on her age, gender, and disability. The Medical Center argues that it was not Dr. Desai's employer, and thus, cannot be liable for any discrimination in Dr. Desai's employment. As part of her employment, Dr. Desai reviewed and interpreted radiological images for patients at multiple hospitals, including the Medical Center. Dr. Desai had an employment agreement with the Medical Group, however, which stated that she was dually employed by the Medical Group and the Medical School, not the Medical Center.

Dr. Desai contends that the Medical Center was her employer because it appointed her to its medical staff, granted her clinical privileges, and retained the right to withdraw clinical privileges.[7] This, alone, does not confer employment status. *See Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 929 (5th Cir. 2021); *Salamon v. Our Lady of Victory Hosp.*, 514

---

[7] Dr. Desai does not argue that the Medical Center and the Medical Group were a single, integrated enterprise. *See Torres-Negron v. Merck & Co., Inc.*, 488 F.3d 34, 42 (1st Cir. 2007).

F.3d 217, 231 (2d Cir. 2008).  Dr. Desai's other asserted facts, such as her use of Medical Center staff, her adherence to Medical Center programs, and the Medical Center's involvement with home workstations, lack sufficient citations to the record.  *See* L.R. 56.1.  From the facts and argument presented, no reasonable jury could conclude that the Medical Center was Dr. Desai's employer.  Thus, summary judgment for the Medical Center is <u>granted</u>.

### 3. *Marlborough Hospital*

Dr. Desai alleges that Marlborough Hospital discriminated against her based on her age, gender, and disability.  Like the Medical Center, Marlborough Hospital argues that it was not Dr. Desai's employer.  Marlborough Hospital contracted with the Medical Group for professional radiology services.  Pursuant to the contract, the Medical Group agreed to designate some of its radiologists to perform radiology services for Marlborough Hospital.  The contract called for one general radiologist to work on-site at Marlborough Hospital, but it permitted other radiologists to work off-site.  The contract also called for the Medical Group to appoint a Chief of Radiology for Marlborough Hospital, subject to Marlborough Hospital's approval.  The Medical Group and Marlborough Hospital agreed that the Medical Group's employees and independent contractors working for Marlborough Hospital would act as independent contractors, not employees, of Marlborough Hospital.  The Medical Group remained responsible for paying all Medical Group radiologists.

The Medical Group appointed Dr. Darren Brennan as Chief of Radiology for Marlborough Hospital, and it designated Dr. Desai as a radiologist to perform services for Marlborough Hospital.  Marlborough Hospital appointed Dr. Desai to its staff and granted her clinical privileges.  Marlborough Hospital also required Dr. Desai to pay annual dues.  Dr. Desai performed her work for Marlborough Hospital off-site.  As Chief of Radiology, Dr. Brennan oversaw staffing coverage

for the Medical Group's work for Marlborough Hospital.  At one point, Dr. Brennan directed that Marlborough Hospital chest CTs be prioritized over all other CTs.  On at least two occasions, as explained above, Dr. Robinson raised concerns about the quality of Dr. Desai's work.  In April 2019, the President of Marlborough Hospital wrote a letter to Dr. Desai, stating, "Marlborough Hospital has accepted your resignation as a member of the Department of Radiology with regret."

Whether Dr. Desai had an employment relationship with Marlborough Hospital turns, in large part, on whether Marlborough Hospital had the ability to control Dr. Desai's conditions of employment.  *See Rivas v. Federacion de Asociaciones Pecuarias de P.R.*, 929 F.2d 814, 820 (1st Cir. 1991).  Although Dr. Brennan was the Chief of Radiology for Marlborough Hospital and had the authority the direct some of Dr. Desai's work for Marlborough Hospital, Dr. Brennan himself was an employee of the Medical Group, not Marlborough Hospital.  Dr. Desai's claim that Marlborough Hospital controlled Dr. Brennan's manner and means of work is without any support in the record.  On the record presented, no reasonable jury could conclude that Marlborough Hospital was Dr. Desai's employer.  Thus, summary judgment is warranted.

Even if a jury reasonably could find that Marlborough Hospital was Dr. Desai's employer, no reasonable jury could find Marlborough Hospital liable for discriminating against Dr. Desai based on her age, gender, or disability.  The only discernable connection between Marlborough Hospital and Dr. Desai's termination[8] is Dr. Robinson's complaints to Dr. Rosen and others about Dr. Desai's work performance.  There is no evidence in the record, however, to suggest that Dr. Robinson raised these complaints as a pretext for discriminating against Dr. Desai based on her gender, age, or disability.  Indeed, to the extent Dr. Desai is arguing that her termination was the

---

[8] Marlborough Hospital had no connection to Dr. Desai's requests for academic time, reduced call responsibilities, or a home workstation.

"foreseeable consequence" of Dr. Robinson's complaints, such an argument cuts against her broader theory: that her employment was terminated because of her gender, age, and disability, not her performance.  Finally, the fact that Marlborough Hospital sent Dr. Desai a letter signifying the end of her association with Marlborough Hospital <u>after</u> her employment with the Medical Group ended suggests that the termination decision was not Marlborough Hospital's.  Accordingly, summary judgment for Marlborough Hospital is <u>granted</u>.

### 4. Medical School

Dr. Desai alleges that the Medical School discriminated against her based on her age, gender, and disability.  The Medical School moves to dismiss Dr. Desai's federal disability discrimination claim (Count III), federal age discrimination claim (Count IV), and Massachusetts discrimination claim (Count V) for lack of subject matter jurisdiction because, as a public entity, it is entitled to Eleventh Amendment immunity.  Without opposition from Dr. Desai, the Medical School's request is <u>granted</u>.

The Medical School moves for summary judgment on Dr. Desai's federal gender discrimination claim (Count I).  Dr. Desai raises two arguments in support of her gender discrimination claim against the Medical School: (1) the Medical School discriminated against her with respect to the academic policy, and (2) the Medical School paid her less than similarly situated men.  As to the academic policy, no reasonable jury could find the Medical School liable for discriminating against Dr. Desai based on her gender for denying her academic time.  As noted above, Dr. Desai did not inform the Medical School that she wanted academic time to do academic work, and Dr. Desai has identified no other radiologists at the Medical School who received academic time for a purpose other than doing academic work.

As to pay disparities, to make out the prima facie case of gender discrimination, Dr. Desai must show that there were similarly situated male employees who received more favorable treatment with respect to compensation. *See Prescott v. Higgins*, 538 F.3d 32, 41 (1st Cir. 2008). She cannot do so. First, the records suggests that the Medical Group, not the Medical School, was responsible for setting salary levels. Second, of the eight male colleagues Dr. Desai identifies as receiving more favorable treatment, six of them received the same annual base salary, one received a higher salary (but was the Chief of Radiology for Marlborough Hospital), and one received a lower salary (when accounting for Dr. Desai's reduced call responsibilities at the time). No reasonable jury could find that the Medical School discriminated against Dr. Desai based on her gender. Thus, summary judgment for the Medical School is <u>granted</u>.

### 5. Dr. Rosen

Dr. Desai alleges that Dr. Rosen is liable for discriminating against her in violation of M. G. L. c. 151B and for tortious interference with advantageous relations. As to M. G. L. c. 151B, Dr. Rosen makes no argument independent of the Medical Group. Indeed, the record indicates that most, if not all, of the Medical Group's arguably discriminatory actions were taken or approved by Dr. Rosen. Therefore, for the reasons outlined above, summary judgment on Dr. Desai's state discrimination claim (Count V) against Dr. Rosen is <u>denied</u>.

As to tortious inference, Dr. Desai must establish that Dr. Rosen improperly interfered with her employment relationship. *See Weber v. Community Teamwork, Inc.*, 752 N.E.2d 700, 715 (Mass. 2001). To do so, Dr. Desai must prove that Dr. Rosen acted with "actual malice," or "a spiteful, malignant purpose, unrelated to the legitimate corporate interest" of the Medical Group. *See Blackstone v. Cashman*, 860 N.E.2d 7, 13 (Mass. 2007). A finding of unlawful discrimination "might, but does not necessarily, support an inference of actual malice." *Weber*, 752 N.E.2d at

716; *see also Edsall v. Assumption College*, 367 F. Supp. 2d. 72, 84 (D. Mass. 2005).  Here, a jury reasonably could find that Dr. Rosen acted unlawfully in terminating Dr. Desai's employment due to her age.  Similarly, under the circumstances present, a jury reasonably could infer that Dr. Rosen acted with actual malice.  *See Speen v. Crown Clothing Corp.*, 102 F.3d 625, 635 (1st Cir. 1996).  Accordingly, summary judgment on Dr. Desai's tortious interference claim (Count VII) against Dr. Rosen is <u>denied</u>.

### *6.  Dr. Tosi*

Dr. Desai alleges that Dr. Tosi is liable for aiding and abetting under M. G. L. c. 151B and for tortious interference with advantageous relations.  To establish Dr. Tosi's aiding and abetting liability, Dr. Desai must show that (1) Dr. Tosi committed "a wholly individual and distinct wrong . . . separate and distinct from the claim in main;" (2) Dr. Tosi "shared an intent to discriminate not unlike that of the alleged principal offender;" and (3) Dr. Tosi knew of his supporting role in the discriminatory enterprise.  *See Lopez v. Commonwealth*, 978 N.E.2d 67, 82 (Mass. 2012).  Dr. Tosi is the President of the Medical Group, and as such, he took the following actions: he signed Dr. Desai's termination letter; he signed employment contracts for other radiologists; and he approved making employment offers to other radiologists.  None of these actions constitute distinct and separate wrongs.  *See Soni v. Wespiser*, 239 F. Supp. 3d 373, 388 (D. Mass. 2017).  Moreover, there are no facts in the record from which jury reasonably could infer that Dr. Tosi intended to discriminate against Dr. Desai.  It follows that there is insufficient evidence to establish that Dr. Tosi acted with actual malice in interfering with her employment relationship.  Therefore, summary judgment for Dr. Tosi is <u>granted</u>.

### *7.  Dr. Dill*

Dr. Desai alleges that Dr. Dill is liable for aiding and abetting under M. G. L. c. 151B and for tortious interference with advantageous relations.  It is apparent that Dr. Desai and Dr. Dill did not get along.  But there is no evidence in the record to suggest that Dr. Dill intended to discriminate against Dr. Desai based on her age, gender, or disability, or that Dr. Dill improperly interfered with Dr. Desai's employment relationship.

Dr. Dill was hired by the Medical Group on February 29, 2016.  In her position as Division Chief of the Chest Division, Dr. Dill was responsible for supervising Dr. Desai's work as a chest radiologist.  Three months into Dr. Dill's tenure, Dr. Desai expressed concern to Dr. Rosen about Dr. Dill's management style.  Thereafter, Dr. Dill periodically reviewed Dr. Desai's work and, at times, complained about Dr. Desai's performance to Dr. Rosen.  On September 21, 2017, Dr. Desai and Dr. Dill had an unpleasant interaction, wherein each accused the other of being rude, and the conflict escalated to supervisors.  Viewing the evidence in Dr. Desai's favor, Dr. Dill assisted Dr. Rosen in assessing Dr. Litmanovich's independent review and knew about Dr. Desai's termination before it happened.[9]

From these facts, no reasonable jury could infer that Dr. Dill shared an intent to discriminate against Dr. Desai based on her age, gender, or disability, as is required for aiding and abetting liability under M. G. L. c. 151B, *see Sisco v. DLA Piper LLP*, 833 F. Supp. 2d 133, 147-48 (D. Mass. 2011), or acted out of spite, unrelated to the legitimate corporate interest, as is required for tortious interference claim, *see Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33, 43

---

[9] Dr. Rosen avers that the February 16, 2018 email exchange between him and Dr. Dill was unrelated to Dr. Litmanovich's review and points to another email exchange from the day before. The two email exchanges, however, are not directly linked.  On March 14, 2018, Dr. Rosen emailed Dr. Dill, "I spoke with [Dr. Desai] at noon today."  A jury reasonably could infer that, because Dr. Rosen did not elaborate, Dr. Dill knew that Dr. Rosen was referring to Dr. Desai's notice of termination.

(1st Cir. 2011) (quoting *King v. Driscoll*, 638 N.E.2d 488, 494-95 (Mass. 1994)).  Thus, summary judgment for Dr. Dill is <u>granted</u>.

## **<u>Conclusion</u>**

The motion for summary judgment filed by the Medical Group, the Medical Center, Dr. Rosen, and Dr. Tosi (Docket No. 64) is ***<u>granted in part</u>*** and ***<u>denied in part</u>***.  That motion is denied as to Count IV and Count V against the Medical Group and as to Count V and Count VII against Dr. Rosen.  It is otherwise granted.  The motion for summary judgment filed by Marlborough Hospital (Docket No. 67) is ***<u>granted</u>***.  The motion for summary judgment filed by Dr. Dill (Docket No. 70) is ***<u>granted</u>***.  The motion for summary judgment and dismissal filed by the Medical School (Docket No. 73) is ***<u>granted</u>***.

**SO ORDERED**

*<u>/s/ Timothy S. Hillman</u>*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**