# EXHIBIT A

# In the Matter of:

*Charu Desai vs*

*UMASS Memorial Medical Center, Inc., et al.*

---

*Charu Desai, M.D.*

*September 18, 2020*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



79

```
 1        termination, and then further, because I was
 2        really upset and I ask him why, then he is telling
 3        me it is poor quality of work.
 4    Q   Okay.  So you've testified that Dr. Rosen had an
 5        obligation to maintain patient safety, an
 6        obligation to maintain quality, an obligation as
 7        part of his job duties, to take action if he
 8        believes a radiologist's quality is substandard,
 9        and then, he actually took action in the form of
10        no-cause termination to you based on his
11        assessment that your quality was substandard.  Is
12        that fair?
13    A   I believe that's what he did.
14    Q   Okay.  And are you aware that Dr. Rosen, when
15        making that determination to terminate your
16        employment, based on a quality concern, relied on
17        an independent expert valuation of 25 randomly
18        selected cases of yours?
19            MS. WASHIENKO:  Objection.  You can answer,
20        Dr. Desai.
21    A   I'm aware.
22    Q   Okay.  So are you claiming that by Dr. Rosen
23        asking an independent expert to review 25 randomly
24        selected cases of yours, that he did so based on a
```

84

1         what are you asking, in general what?

2    Q    In general, you would say that the expert's review

3         of your cases constituted a thorough, accurate

4         review of your cases?

5              MS. WASHIENKO:   Objection.   You can answer.

6    A    I do not agree with some of her conclusion.

7    Q    You said just one or two though, right?

8    A    No, that was actually completely different patient

9         she wrote it on, so that's completely miss.   Like

10        case number this, had nothing do with what the

11        planning was.

12   Q    Okay.

13   A    And on the list of things which said it was wrong,

14        I do not agree to most of them.

15   Q    So tell me -- let's start with your age.   Do you

16        believe that Dr. Rosen had cases randomly selected

17        for independent review by an expert because you

18        were age 67 at the time?

19   A    Please repeat the question?

20   Q    Sure.

21             Do you believe Dr. Rosen made a decision to

22        have 25 of your cases reviewed by an expert for

23        quality purposes because you were age 67 at the

24        time?

85

1    MS. WASHIENKO:  Objection.

2  A  I don't think review has anything to do with the

3     age.  Both don't go together.

4  Q  I agree.  I'm just trying to make sure you agree.

5     So you're not claiming that he made the decision

6     to have it reviewed because of your age?

7  A  Has nothing to do with age.

8  Q  Okay.  Do you believe that Dr. Rosen made the

9     decision to have 25 of yours cases reviewed for

10    quality purposes by an independent expert based on

11    the fact that you're a female?

12 A  No.

13 Q  Do you believe that Dr. Rosen made a decision to

14    have 25 of your cases reviewed by an independent

15    expert for quality purposes because of your

16    national origin?

17 A  No.

18 Q  Do you believe that Dr. Rosen made a decision to

19    have 25 of your radiological reads reviewed by an

20    independent expert for quality purposes because of

21    your race?

22 A  No.

23 Q  So upon what basis do you claim that Dr. Rosen's

24    decision was discriminatory?

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu Desai, M.D.
September 18, 2020

86

1         MS. WASHIENKO:  Objection.

2         On the basis of age, Bob?

3         MR. KILROY:  No.  Any basis.  I went through

4   the categories that are named in her Complaint.  I

5   want to know if there's something I'm missing.

6  A  I think we are mixing up two things.  The

7    independent review is number one.  The age, race,

8    national origin, disability, everything is a

9    separate thing.  Has nothing to do with the

10   independent review.

11  Q  Okay.  So the independent -- just so I'm clear,

12    the independent review you said is not affected in

13    any way by Dr. Rosen acting in a discriminatory

14    manner?

15        MS. WASHIENKO:  Objection.  You can answer.

16  A  To my belief, first of all --

17        MS. WASHIENKO:  Are you okay, Dr. Desai?

18        THE WITNESS:  Huh?

19        MS. WASHIENKO:  Are you okay?

20  A  I believe that without even discussing that

21    anything was wrong, why did he do the independent

22    review?

23  Q  Do you think that he didn't discuss with you

24    before the independent review because of your age?

91

1 Q   You're claiming the independent review decision by

2     Dr. Rosen was discriminatory.

3         Now tell me why that's discriminatory to

4     decide to send out for an independent review?

5 A   Because there are a lot of people in the

6     department.  There are maybe qualities for

7     something.  Did he do independent review for all

8     of them?  I don't think so.  I do not think so.

9 Q   Do you think that he made up his concern about

10    quality for you because of your race?

11 A   I do not think he made up.

12 Q   Okay.  So he didn't make it up and he has an

13    obligation to ensure quality.  Would you agree

14    that one way to assess quality, so that it's not

15    running a risk of being discriminatory, is to ask

16    for an independent expert to take a look at the

17    records?  Would you agree that that's one way to

18    assess quality?

19 A   Yes.

20 Q   And would you agree that by doing that, it shows

21    Dr. Rosen is trying to remove himself from being

22    the one assessing your quality directly so he

23    could have a third-party expert make the

24    assessment without knowing that it was you?

92

1   A   Yes.

2   Q   And would you agree that if you are trying to

3       assess someone's quality, whether yours or someone

4       else's, that that's a fair way for a supervisor to

5       go about trying to assess quality?

6           MS. WASHIENKO:   Objection.   You can answer,

7       Dr. Desai.

8   A   Yes, but if it is done the right way.

9   Q   Okay.   I understand.

10  A   But done the right way, and it cannot be people

11      you know.   It has to be third party means third

12      party.   This is not -- it is not done the right

13      way.   If it is done the right way, yes, but in our

14      case, it was not done the right way.

15  Q   Okay.   What was not done right?

16  A   Yeah, just like I told you, take my 25, take other

17      25 for other person, take third person 25, and

18      then compare with each one of them.   You can't

19      compare two of them and 25 of me, or two of

20      someone else, X, Y, Z.   It's completely done

21      wrong.   I do not agree.

22  Q   So you just -- you have a concern that there

23      weren't enough cases reviewed by the expert for

24      other individuals?

94

| | | |
|---|---|---|
| 1 | Q | So you want to substitute your judgment for the |
| 2 | | independent expert's judgment? |
| 3 | | MS. WASHIENKO:  Objection. |
| 4 | Q | Is that right, would you agree, if Dr. Rosen is |
| 5 | | acting fairly by relying on an independent |
| 6 | | expert's evaluation as opposed to his own |
| 7 | | evaluation? |
| 8 | | MS. WASHIENKO:  Objection. |
| 9 | A | So what is the -- please repeat that? |
| 10 | Q | Sure.  Would you agree Dr. Rosen acted fairly, |
| 11 | | appropriately, by relying on an independent |
| 12 | | expert's evaluation as opposed to him making the |
| 13 | | evaluation himself? |
| 14 | A | I agree. |
| 15 | Q | Okay.  And so, what he received from the |
| 16 | | independent expert said you had some quality |
| 17 | | problems.  You agree with that, right? |
| 18 | A | I do not. |
| 19 | Q | You don't agree that that's what the report said? |
| 20 | A | Report said, but I do not agree. |
| 21 | Q | No, I understand you don't agree that the report |
| 22 | | is right, but you agree that's what the report |
| 23 | | told him, right? |
| 24 | A | Yes. |

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Charu Desai, M.D.
September 18, 2020

195

1   Q   So you think that -- let's assume for a moment,

2       just assume for a moment that any number of people

3       would say, Well, it probably would have been

4       better had the chair talked to you first, right?

5       Assume that everyone agrees with that.  Do you

6       think that he had the investigation into quality

7       done because you were disabled, or do you think he

8       had it done because there were quality concerns?

9            MS. WASHIENKO:  Objection.  You can answer,

10      Dr. Desai.

11   A   You can ask him -- Dr. Rosen.

12   Q   I'm asking you.  Are you claiming that he decided

13       to have the quality review done based on quality

14       concerns, or was it based on the fact that you

15       have this disability?

16   A   I don't think it has connection with the

17       disability.

18   Q   Okay.  Are you claiming that you had no quality

19       issues at UMass. Memorial as to CT scans?

20   A   To my recollection.

21   Q   Could your quality have improved?

22            MS. WASHIENKO:  Objection.

23   A   To the best of my knowledge, I put my heart and

24       soul what I did over the years.

# In the Matter of:

*Charu Desai vs*

*UMASS Memorial Medical Center, Inc., et al.*

*Charu S. Desai, M.D. Vol II*

*October 22, 2020*

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



362

1    Q.   I didn't you ask you for your agreement or
2    not.
3    A.   If you did or not, I have to -- I have to
4    say that it is completely wrong.
5    Q.   Fair to say that --
6    A.   And -- and, by the way, one of the cases
7    she's -- she's not even talking about my case.
8    Q.   Ma'am -- ma'am, I don't have a question
9    pending.  Please, stop.
10         MS. WASHIENKO:  Dr. Desai --
11   A.   If you don't, you should listen.
12         MS. WASHIENKO:  Dr. Desai, I will circle
13   back with you.
14         THE WITNESS:  Yeah, but --
15   Q.   Are you -- are you -- are you claiming Dr.
16   Litmanovich, when she arrived at her findings of
17   five major findings for you, five minor findings,
18   one major for the other 25 and seven minor, are you
19   claiming that her analysis was discriminatory in any
20   way?
21         MS. WASHIENKO:  Objection.
22         You can answer.
23   A.   I'm not saying it is discriminatory.  I'm
24   saying it is wrong.

363

1    Q.  Okay.  But you're not claiming that she was
2    discriminating based on age, race, color, gender,
3    disability or national origin, right?
4    A.  I hope not.
5    Q.  Well, it's your claim, ma'am.  I need to
6    know.  Are you claiming she was discriminating when
7    she did this, yes or no?
8         MS. WASHIENKO:  Objection.  Asked and
9    answered.
10         MR. KILROY:  Well, she said, "I hope not,"
11   so now I'm confused.  I don't know what she's
12   actually claiming.
13   A.  How do I know what is going in their mind?
14   I'm not the one.
15   Q.  So you're not claiming she was
16   discriminating, right?
17   A.  I don't think so.
18   Q.  Okay.  I'm going to show you Exhibit -- I
19   believe we're on 49.
20         MS. WASHIENKO:  We might be up to 50, Bob.
21         MR. KILROY:  Yup.  You're correct.  It is
22   50.  Thank you, Pat.
23         MS. WASHIENKO:  You're welcome.  It's about
24   the extent of my math, but I'll show that part.

# **<u>EXHIBIT B</u>**

# In the Matter of:

*Charu Desai vs*

*UMASS Memorial Medical Center, Inc., et al.*

---

*James F. Gruden, M.D.*

*August 31, 2021*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



38

1    counsel about the nature of the engagement, is that

2    right?

3        A.    Oh, yes.  We've spoken many times.

4        Q.    Okay.  And the first conversation that you

5    had, how was that -- how was the project presented

6    to you?  What were you asked about?

7        A.    Basically, if I could read some CT scans,

8    you know, randomly and see if I agreed with the

9    interpretations, essentially.

10        And I was told that there was a particular

11    radiologist that was -- it was felt that their

12    interpretations were suboptimal and that some of the

13    cases would be read by that person and some of the

14    cases would be read by other people.

15        And I was to go through them blinded and

16    just look at the reports and come up with a list of

17    cases that I felt where the reports were probably

18    not -- if I felt any of the reports were either not

19    accurate or, worse, negligent.

20        Q.    Okay.  And I imagine you were told

21    that the attorneys who you spoke with represented

22    Dr. Charu Desai, is that right?

23        A.    I was told that at some point in time,

24    yes.

39

1           MR. WAKEFIELD:   Okay.   And just to

2    help us kind of walk through the timeline, I'm going

3    to show you another document.

4                (Exhibit 5; so marked.)

5       Q.    That has been marked as Exhibit 5.   Did

6    this come up for you?

7                (Reviewing document.)

8       A.    Yes, I see it.

9       Q.    And this appears to be an e-mail from

10   Plaintiff's counsel to you dated July 13, 2020,

11   about this engagement, is that right?

12      A.    Yes.   It looks like what we said.   I was

13   contacted -- they got me through Expert Institute,

14   and I was asked to review 50 chest CTs.

15      Q.    Okay.   Do you know if at the time you

16   received this e-mail you had already reviewed any

17   chest CTs or documents?

18      A.    I must not have because it says we have

19   now received those images [as read].

20      Q.    Okay.   And so you think before this

21   e-mail, you had a conversation about, you know,

22   the -- the scope of the engagement, but you hadn't

23   been provided any documents or hadn't done any

24   review, is that right?

40

1      A.    I assume so.  I don't recall, but from the

2  content of this e-mail, it looks like I didn't have

3  access to the images prior to this.

4      Q.    Okay.  And this e-mail that you were

5  provided with a link to access the 50 chest CT

6  images, is that right?

7      A.    Looks like it, yes.

8      Q.    And then also an attachment to this e-mail

9  were copies of the reports for each study.  Is that

10  your understanding?

11      A.    I don't know if it's attached to this

12  e-mail.  I don't I think the reports were ever

13  attached to an e-mail.  I think were in the same

14  system as the -- as the images were.

15          I can't remember exactly, but to my

16  recollection, I was never given anything like that

17  via e-mail.  It was always on a system that required

18  me to log in with a password.

19      Q.    Okay.  And if you look at -- on the top of

20  this e-mail it says "Attachments:" and there's a

21  document listed, "UMM553-689.pdf."  Do you see that?

22      A.    Yes.  It's possible those are the reports.

23  I don't -- I don't recall, but I don't -- I don't

24  really remember where the reports were versus the

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

41

1   images.

2        Q.    Okay.  And it says in the third paragraph,

3   "The corresponding reports to the studies" et

4   cetera, "are attached to this e-mail."  Do you see

5   that?

6                  (Reviewing document.)

7        A.    It says "The studies are labeled" -- oh,

8   the reports are attached.  Okay.  So the reports

9   were attached to the e-mail.

10       Q.    So prior to receiving this e-mail, you

11  don't remember doing any review or any work on the

12  case other than speaking with counsel, is that

13  right?

14       A.    Well, the date of this is after the

15  invoice before, so I must have done something before

16  this because the invoice was May, I believe, 2020

17  for $2,500, so five hours I must have spent

18  reviewing something or talking to them about

19  something, but I don't recall.

20       Q.    Okay.  But you certainly didn't review any

21  images or reports prior to this, correct?

22       A.    I don't know how I could have

23  because -- because it looks like they weren't

24  available.

42

1      Q.    Right.  And then it says in the fourth

2   paragraph "As discussed in May, could you please

3   review the studies and reports for any major or

4   minor misreads.  We're particularly interested in

5   the studies labeled" and then there's a series of

6   studies identified.  Do you see that?

7      A.    Yes.

8      Q.    Is that what you were asked to do to,

9   "review the studies and reports for any major or

10  minor misreads"?

11     A.    Yes.

12     Q.    And did you do that?

13     A.    I did that multiple times, actually.

14     Q.    Okay.  After receiving this e-mail --

15  after receiving this e-mail, what did you -- what

16  was the next step you took?

17     A.    I tried to -- I'm sure I tried to log into

18  the system.  I believe I had trouble at the

19  beginning with a password or something, but we got

20  it to work eventually and then I did what I was

21  asked to do.

22          I reviewed the 50 cases, and I reviewed

23  each CT first and then I looked at the report after

24  the CT.  I didn't look at the report first.  I

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

43

1   didn't want to bias myself, so I looked at each scan
2   myself and -- to decide what I would have said and
3   then I looked at what they said, and I logged any
4   kind of disagreements.
5          And I believe I had a list also of -- and,
6   again, I'm not sure if it was attached to an e-mail
7   or where it was, but I had a list of what their
8   expert or their internal person said about these
9   cases in terms of what mistakes were made or what
10  this person felt were significant errors.
11         So I had that information as well at some
12  point, although I can't recall when that was
13  provided to me, if it was after this initial review
14  or at the same time.
15         As I said, I've been through these cases
16  multiple times, so I can't recall the sequence of
17  exactly what I did each time, but the first time I
18  know I looked just at the CT first for all 50 cases
19  and then I looked at the report and I logged cases
20  where I felt like there was a -- a problem or a
21  disagreement.
22         And at some point either initially or the
23  second time through I also had access to what the
24  over-reader, the internal expert had to say about

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

44

1    the errors made in these cases.

2        Q.    Okay.  So first -- at one point you

3    reviewed each individual CT image and then the

4    report, and you said you logged problems or

5    disagreements, is that right?

6        A.    I looked at each CT and I looked at the

7    report and I wrote a account of the cases where I

8    felt there was something wrong.

9        Q.    And where did you write that account?

10       A.    Just on paper in my office and I at some

11   point put it in writing for the attorneys.

12       Q.    Do you still have that paper in writing

13   where you logged your opinions and problems or --

14       A.    I probably --

15            COURT REPORTER:  I'm sorry.  I didn't

16   get the question.

17       Q.    Do you have the papers where you logged

18   the problems or disagreement?

19            MS. WASHIENKO:  Objection.

20       A.    No, I don't have those anymore.

21       Q.    What happened to them?

22            MS. WASHIENKO:  Objection.

23       A.    I destroyed them, but the written reports

24   I'm sure are available.

45

1    Q.   So the logs that you kept on your review

2  of the CT, all of the information and the notes,

3  your impressions that you took, you memorialized and

4  provided to your attorneys?

5              MS. WASHIENKO:  Objection.

6    A.   Yes.

7    Q.   And so after receipt of this e-mail

8  July 13th, 2020, you did what you just described

9  and provided that information on your review to

10 Dr. Desai's counsel, is that right?

11             MS. WASHIENKO:  Objection.

12   A.   Yes.

13             THE WITNESS:  Sorry.  Patricia, are

14 you saying something?

15             MR. SWEENEY:  I'm just objecting for

16 the record, Dr. Gruden.

17             THE WITNESS:  Okay.

18   Q.   But your answer was "Yes," Dr. Gruden?

19   A.   Yes.

20   Q.   And it says, again, in this -- the fourth

21 paragraph of this e-mail, "We're particularly

22 interested in the studies labeled as" and then it

23 lists some studies.  In your review, you reviewed

24 all 50, is that right?

48

1    had read because when I read these cases myself and

2    did my written reports, I -- I had no idea which

3    cases were read by their client and which cases were

4    read by other people.  I didn't have that

5    information.

6        Q.   Okay.  So before you had that information,

7    you reviewed all 50 cases, logged your impressions

8    of any problems or disagreements and provided that

9    to Dr. Desai's counsel, right?

10       A.   Yes, sir.

11           (Pause.)

12           (Exhibit 6; so marked.)

13       Q.   And I'm going to share with you another

14    exhibit, Exhibit 6.  Did this come up for you?

15          (Reviewing document.)

16       A.   It did.

17       Q.   All right.  This appears to be an e-mail

18    from Dr. Desai's counsel to you dated July 28, 2020.

19    Does that look right?

20       A.   Yes.

21       Q.   And this is a couple weeks after the

22    previous e-mail.  And it starts off, "As we

23    discussed, the spreadsheet listing which reads the

24    University's reviewer identified as misreads is

49

1   attached."  Do you see that?

2       A.   I do.

3       Q.   And so is this the document you referenced

4   earlier that identifies which studies were done by

5   which radiologist?

6       A.   Yes.  It looks like that, yes.

7       Q.   And then the Attachment, UMM 695-696, this

8   was that document, is that right?

9       A.   I would guess that's what it looks like.

10  It's the University's reviewer statement of the

11  cases that they felt were misread.

12      Q.   Okay.  And then it -- so it starts off

13  "As we discussed."  Did you have a discussion about

14  the --

15      A.   We had a discussion about --

16      Q.   Just wait for me to finish my question --

17      A.   Oh, I'm sorry.

18      Q.   -- even though you know what I'm asking.

19  You had a discussion prior to receiving this e-mail,

20  is that right?

21      A.   I would -- yes, I believe we had a

22  discussion.  We may have had multiple discussions.

23  I can't recall.  I think knowing how I do things, I

24  probably called them about my findings before I sent

50

1   the written document to them, so we would have had a

2   conversation then and we probably had a conversation

3   afterwards as well.

4           The nature of the case was that, you

5   know, information, you know, it went in a stepwise

6   fashion, so I don't recall the number of

7   conversations or their dates.

8           But I do know that I -- the first time I

9   reviewed the cases I was not aware of who read which

10  case and I wasn't necessarily aware of their

11  expert's opinions on them.  That might have happened

12  afterwards.

13      Q.   Okay.  And then so you were provided with

14  this spreadsheet where the reviewer provided

15  opinions on certain reads, is that right?

16      A.   Yes.  And it looks like this is also when

17  I was notified as to which cases were read by their

18  client and which were read by other people.

19      Q.   Okay.

20      A.   Previous to this, I was not aware of who

21  had read what.

22      Q.   And so what did you do in response to this

23  e-mail?

24      A.   I'm sure I went through the cases again

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

68

1      A.    No, sir.

2                  (Pause.)

3      Q.    At this point, have you completed all your

4    work on this matter as far as your review and giving

5    opinions?

6      A.    I hope so.

7      Q.    Is there anything else that presently as

8    you sit here today you plan to do in this matter?

9                  MS. WASHIENKO:  Objection.

10     A.    No.

11                 (Pause.)

12     Q.    So you mentioned that the -- one of the

13   components of your review was reviewing a

14   spreadsheet where a prior review was done of these

15   same 50 CTs, is that right?

16     A.    Yes.

17     Q.    And do you know -- what is your

18   understanding of what was done as part of that

19   review by UMass Memorial?

20     A.    My understanding of that now is that there

21   was an internal radiologist who did that review at

22   UMass.  My understanding before that recently was

23   that I did not know who the outside person was, if

24   it was an outside person or an inside person.  I

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

69

1    just assumed that there was someone who had found

2    these reports to be suboptimal that led to the

3    termination of their client, but I didn't know who

4    it was.  Subsequently, now I know it was somebody

5    internal.  That's about all I know.

6        Q.   How do you know it was someone internal?

7             MS. WASHIENKO:  Objection.

8        A.   I think I asked and I was -- I was told it

9    was an internal person because I couldn't imagine

10   that somebody from the outside would have found any

11   significant errors made by their client.

12           I was really kind of stunned that anyone

13   would find these errors, and I was curious if they

14   actually had a chest person look at these cases to

15   find these errors because I was really surprised

16   that there was anyone who found any kind of errors.

17           And I now know it was somebody internal,

18   but I don't know the -- I don't know how they did it

19   or what the thought process was.  I just know it was

20   somebody at UMass.

21       Q.   And so there were 50 CTs total as part of

22   the review, right?

23       A.   There were 50 total, yes.

24       Q.   And do you have an understanding of how

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

71

```
 1      A.    I think it's Diana something.  Begins with
 2   an L.
 3      Q.    Litmanovich?
 4      A.    Yes, I think so.
 5      Q.    Okay.  Do you know what department she
 6   works in?
 7      A.    I'm assuming she works in the radiology
 8   department.
 9      Q.    At UMass Memorial?
10      A.    Or Marlborough.  I'm not sure which
11   affiliate.
12      Q.    Okay.  Had you ever heard of -- heard that
13   name before?  Do you know her?
14      A.    I think I've heard the name before, but I
15   don't know her.
16      Q.    Do you know how the studies were selected
17   for the review?
18      A.    I do not.
19      Q.    Do you know who selected them?
20      A.    No, I don't.
21      Q.    Do you know if the reviewer reviewed them
22   blind or whether she knew which radiologist read
23   which study?
24      A.    No, I don't know.
```

72

```
 1        Q.    Do you know why the review was conducted?
 2        A.    No, I don't.
 3        Q.    Do you know the method that was used in
 4   conducting the review?
 5        A.    No.
 6        Q.    Do you know the purpose that the review
 7   was conducted?
 8        A.    No.
 9        Q.    And do you know what happened as a result
10   of the review, what it was used for?
11        A.    I know that it was used to terminate the
12   client.  My attorney's client.
13        Q.    Do you know what Dr. Desai's legal claims
14   are in this lawsuit?
15        A.    I do know just vaguely.  I -- I suspect
16   it's partly wrongful termination and partly a
17   thought of discrimination in some -- some way for
18   whatever reason; whether it's sex, age, ethnicity, I
19   really don't know, but I suspect that that's her
20   concern.
21                   (Exhibit 11; so marked.)
22        Q.    And I've just shared with you hopefully
23   Exhibit 11.  Did that come through?
24                   (Reviewing document.)
```

73

1      A.   Yeah.

2      Q.   Do you recognize -- and this is a 137-page

3   document, but looking at the beginning, do you

4   recognize this document?

5      A.   Yes, I do.  These are the reports from the

6   CTs that were provided to me.

7      Q.   Okay.  So these are the reports from the

8   50 CTs that you reviewed along with the images that

9   you were provided, correct?

10     A.   Yes.

11     Q.   And am I correct that these reports are

12  deidentified, meaning it doesn't list the

13  radiologist who performed the review?

14     A.   Yes, that's correct.

15          (Exhibit 12; so marked.)

16     Q.   And I've just distributed Exhibit 12, and

17  this one is a little small.  There is a Zoom feature

18  which you can feel free to use if helpful.  Do you

19  recognize this document?

20          (Reviewing document.)

21     A.   Yes.

22     Q.   And what is this?

23     A.   This is the comments from the expert

24  reviewer.

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

75

1   substantive -- that's all the substantive

2   information on these CTs that you were provided by

3   Dr. Desai's counsel?

4       A.   Images, reports, and -- and this document,

5   yes.

6       Q.   Did anyone at any point give you any other

7   information about the CTs or the reads at all or do

8   these documents contain all the information about

9   the -- the CTs and the studies and the reports,

10  rather?

11      A.   This is -- this is all I had.

12      Q.   Okay.  So no one verbally provided you any

13  explanation on any particular report or study?

14      A.   No.

15      Q.   Okay.  And so without knowing now that

16  this column is here, the "CD" and "O," without that

17  column, is there any way -- sorry.  Strike that.

18           If you were -- if you weren't told who

19  performed the CTs, whether it was Charu Desai or

20  other, based on the -- the information that you had,

21  the images, the CT reports and this, could you have

22  determined who the reviewing radiologist was on any

23  of these studies?

24           MS. WASHIENKO:  Objection.

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

76

1     A.   No.  And as I said, the first time I

2  reviewed them I -- I didn't have this information.

3  This -- this would have been the second time

4  through.

5     Q.  Okay.  So if you were never told which

6  ones were read by Dr. Desai, you would not have

7  known based on any of these documents, correct?  The

8  images or the -- or this document with that column?

9     A.   Not correct.  Actually, the first time I

10  went through there were some really terrible

11  reports, and I assumed those were going to be by

12  Dr. Desai because she was the one being terminated,

13  and it turned out they were not by her, so... I did

14  not know.

15     Q.  And other than the ones performed by

16  Dr. Desai, which you at least eventually knew which

17  ones, you don't know the identity of any other

18  radiologist who performed any of the other reviews,

19  is that right?

20     A.   I do not, and I also don't know if the

21  other radiologists were chest radiologists or what

22  their subspecialty or what their background.  I knew

23  nothing about the other readers or how many there

24  were even.

Charu Desai vs                                              James F. Gruden, M.D.
UMASS Memorial Medical Center, Inc., et al.                     August 31, 2021

77

1      Q.   Right.  You don't know how many of the
2   other -- the others were -- how many other
3   radiologists were included in "other," right?
4      A.   No, I don't.
5      Q.   So if the UMass Memorial reviewer, as
6   we'll use the phrase, did not have this column with
7   "O" and "CD," she wouldn't have known who the
8   reviewing radiologists were either, correct?
9               MS. WASHIENKO:  Objection.
10     A.   Correct, but I don't know what information
11  she had when she did this review.  I don't know
12  anything about how it was done.
13     Q.   And without having -- if the reviewer
14  didn't know who performed which CT, the reviewer
15  couldn't have discriminated against Dr. Desai's
16  reviews, is that right?
17     A.   That's correct.  I -- if you don't know
18  who read what case, you can't discriminate against a
19  reader.
20     Q.   Do you know Dr. Desai's race?
21     A.   Do I know her what?
22     Q.   Her race.
23     A.   I do.
24     Q.   What is your understanding?

78

1      A.    I believe she's from India.

2      Q.    Okay.  Do you know her age?

3      A.    I know that she's older, but I don't know

4   her age.

5      Q.    How do you know that?

6      A.    I don't recall.  It came up in

7   conversation at some point.

8      Q.    And you know --

9      A.    Probably because I was curious as to what

10  her experience level was, if she was, you know,

11  recently trained or, you know, what -- what her

12  career level was when I started reviewing cases or

13  after -- after the first review through, it came up

14  in conversation at some point.

15     Q.    Were you ever provided a copy of her CV or

16  any other credential information?

17     A.    No.

18     Q.    And you're aware that she's a female, is

19  that right?

20     A.    Yes.

21     Q.    Are you aware of whether she has any

22  disabilities?

23     A.    No, I'm not.

24     Q.    And you can't tell any of that information

79

1   from reviewing these reports or studies, right?

2       A.   No, I can't tell.

3       Q.   If you can go back to...

4            (Pause.)

5       Q.   If you can go back to Exhibit 10 for

6   me, --

7       A.   Okay.

8       Q.   -- which is your expert report here.  It

9   says in the first sentence that you "reviewed 50 CT

10  examinations."  The second line, "that were

11  interpreted by Dr. Desai and by other radiologists

12  in the same Department at Marlborough Hospital."

13  Do you see that?

14      A.   Yes, I do.

15      Q.   And when you're referring to other

16  radiologists, you're referring to -- Dr. Desai and

17  other radiologists, you're referring to all 50

18  studies, is that right?

19      A.   Yes.

20      Q.   Is it your understanding that Dr. Desai

21  worked at Marlborough Hospital?

22      A.   It's my understanding at the time I

23  prepared this document.  I didn't -- I don't know

24  believe I knew that beforehand.  I just knew she was

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

80

1  at UMass.  I don't know that I knew that she was at

2  Marlborough Hospital in particular.

3      Q.   Well, what leads you to believe she's at

4  Marlborough Hospital in particular?

5      A.   It came up in conversation with counsel.

6      Q.   And the 50 images you reviewed, do you

7  know what hospital the images originated from?

8      A.   I do not.

9      Q.   Did you ever discuss with Dr. Desai's

10  counsel what hospitals they originated from?

11      A.   No.  I assume they were Marlborough

12  Hospital, but I don't know.

13      Q.   And if you turn back to Exhibit 11, from

14  looking at the reports, is there any way that you're

15  aware of to determine what facility the images

16  originated from?

17      A.   You can look at "Location."  Most of these

18  say something ED, emergency department, but it

19  doesn't say the institution.

20      Q.   So you can't tell what institution from

21  reading these reports?

22      A.   No.  I really wouldn't have tried because

23  it really is not relevant for my purposes.

24      Q.   All right.  If you could jump back to

85

1   felt were misinterpreted.

2       Q.    Okay.  And then jumping ahead, so this is

3   a series of -- of studies mentioned and then jumping

4   ahead to Page 5, if you turn there for me.

5       A.    Mh-hmm.

6       Q.    At the bottom it says, "Specific analysis

7   of cases interpreted by radiologists other than

8   Dr. Desai at Marlborough Hospital follows."  Do you

9   see that?

10      A.    Correct.  Yes.

11      Q.    So am I correct that this report outlines

12  specific commentary you have on Dr. Desai's reads as

13  well as cases interpreted by other radiologists?

14      A.    Yes.

15      Q.    And so out of the 50 CT studies, I count

16  16 studies that are addressed in this report, is

17  that right?

18      A.    I agree with that if that's what you

19  counted.  I didn't count them.

20      Q.    Do you know why there's only 16 addressed

21  out of the 50 in here?

22      A.    These are the cases, as I think I

23  outlined, where the review -- the Dr. Desai cases

24  are where the -- are cases where the over-reader

Charu Desai vs                                         James F. Gruden, M.D.
UMASS Memorial Medical Center, Inc., et al.                 August 31, 2021

86

1   claimed they were misreads and then the remaining
2   cases were selected by me from the cases read by
3   other people where I felt like the reports were not
4   well done.
5           And I don't believe -- at the time I did
6   those cases, I don't think I looked at what the
7   internal UMass reviewer said about these cases read
8   by the other radiologists.
9           I don't think that was included in
10  my -- my written report.  I was only interested in
11  the cases read by Dr. Desai in terms of what the
12  over-reader had to say about those.
13      Q.    And so if this report here, this
14  Exhibit 10, is a summary of all of your opinions you
15  intend to offer in the case, is it fair to say that
16  you don't intend to offer opinions about any studies
17  that are not listed in here?
18              MS. WASHIENKO:  Objection.
19      A.    I -- I don't intend to, but if something
20  comes up I'm happy to, and I -- I did address all of
21  the reports in the initial review and the initial
22  documents, but there may have been other things in
23  that initial document that might be important.
24  But these were targeted -- I specifically focused on

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

90

1    document, QA chest 8 rule out PE 2 2/4/17

2    [as read], I mentioned the Impression could have

3    added the left lower lobe consolidation, but this is

4    not a major error.

5        The important findings were made in -- in

6    the body of the report, so I personally would have

7    made sure to mention that in the Impression, but she

8    mentioned it in the findings.  I think that's the

9    only thing I remember about her reports that I had

10   an issue with.

11       Q.   Okay.  So the reports that are not

12   identified in this document that were conducted by

13   Dr. Desai, you didn't find any errors or you didn't

14   have any disagreements with her reads on those?

15       A.   No.

16       Q.   Is it fair to say that your opinions on

17   those reads would have been reflected in that

18   initial document you did when you reviewed all 50

19   and logged any disagreements?

20            MS. WASHIENKO:  Objection.

21       A.   Yes.

22       Q.   And, again, you touched on this, but

23   there's only six studies in this report that are

24   identified that were performed by other radiologists

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

91

1   other than Dr. Desai.  How did you select those to

2   include in this report?

3        A.   Those were six reports where I felt there

4   was a significant error as -- as I previously

5   defined.  These were substantive, significant

6   errors.

7             The rest that I may have disagreed with or

8   I may have thought the report wasn't great were not

9   of this level of magnitude, and I felt like this

10  number out of -- I don't know how many cases the

11  other radiologists read, but if we assume they read

12  half of them, six major errors out of 25 is not very

13  good and I felt like that was enough.

14       Q.   So for the studies that are not included

15  in here that were performed by other radiologists,

16  you did not identify significant errors in them?

17       A.   I wouldn't say that.  I would say that if

18  there are significant errors, I didn't find them as

19  bad as these six.  I thought these six were pretty

20  bad and they were enough.

21       Q.   Were you provided guidance from

22  Dr. Desai's counsel on how to choose those six?

23       A.   No.  I -- I was asked to review some of

24  the cases that I thought that the other radiologists

93

1      Q.    Okay.  So the reports that were performed

2    by other radiologists that are not included in here

3    you would not consider as having significant errors?

4      A.    Correct.  By my definition, yes.

5                  MR. WAKEFIELD:  Okay.  I think this is

6    a good time to -- I'm going to switch gears.  Can we

7    take like a ten-minute break?

8                  THE WITNESS:  Yes, thank you.

9                  (A break was taken from

10                 10:16 a.m. to 10:30 a.m.)

11     Q.    So, Dr. Gruden, I'm going to ask you some

12   questions about some of your opinions as compared to

13   the CT reports, so we might have to do a fair amount

14   of toggling back between documents, but I'm going to

15   try and make it as easy as I can.

16               But first if you turn to Page 2 of your

17   expert report, which is Exhibit 10, do you have that

18   in front of you?

19     A.    Yes.

20     Q.    So I'm going to ask you about some of

21   these studies.  And so at the time -- for each study

22   listed, it's identified by its number, QACHO8, 9,

23   et cetera.  For each one of these narratives that

24   you provided, at the time you wrote this narrative,

94

1    did you know whether the study was performed by

2    Dr. Desai or someone else?

3        A.   At the time of this narrative, yes, I did.

4        Q.   Okay.  So all of the narratives written

5    for each study in this report, whether a Dr. Desai

6    read or a read that was not done by Dr. Desai, at

7    the time you wrote this, you knew who did what?

8        A.   Yes.

9        Q.   Okay.  And so if you take a look at No. 8,

10   and then so what I'm going to ask you to do is refer

11   back to Exhibit 11 which are the -- the reports,

12   themselves, and if you can turn to QACH 8, which I'm

13   trying to find which page it is for you.

14       A.   I've got it.

15       Q.   Page 13.  Are you on that Page 13?

16       A.   Yes.

17       Q.   So what does "PE" mean?

18       A.   Pulmonary embolism.

19       Q.   And so my understanding is the UMass

20   Memorial reviewer's criticism of this report is that

21   the condition is referred to as consolidations

22   without specifying between pneumonia or rounded

23   atelectasis.  Is that --

24       A.   I have to toggle back.  Is that what I

1          So I'm not sure in this instance why the
2    reviewer felt so strongly that pulmonary edema
3    should not have been mentioned because I can't
4    myself tell that it's not pulmonary, and I don't
5    know how she feels so certain about that.
6          And, again, this is one of those things
7    where I disagree, she disagrees.  You know, it's --
8    this happens, but this is not an error that falls
9    out of the bell curve of what we see every day
10   between radiologist reads that are slightly
11   different from each others.
12      Q.   And so this one judgment is open for
13   interpretation.  You would agree?
14      A.   I think so.  That's -- that's a good way
15   to put it.
16      Q.   And just when you first reviewed this
17   image and the report, you would have taken notes on
18   what you observed from the image?
19      A.   I would have -- I would have jotted down
20   the findings I would have reported.
21      Q.   And, again, --
22      A.   Like my impression.  In my Impression,
23   I would have kind of jotted down my impression on a
24   case.

116

1     Q.   And those -- that information you would
2   have provided to counsel and then destroyed it, is
3   that right?
4           MR. SWEENEY:  Objection.
5     A.   No.  I provided it to counsel in the -- in
6   the form of that written report of the first
7   50 cases.
8           There was nothing that I wrote down or
9   jotted down that I didn't put on that -- that review
10  that I wrote -- that I wrote.  That was -- that was
11  actually more extensive than my notes were.
12    Q.   Okay.  That's what I'm just making sure
13  I'm understanding where this information now might
14  be.  Do you remember whether you recorded whether
15  you observed pulmonary edema when you reviewed this
16  image?
17    A.   My recollection, I agreed with her report.
18  I saw the findings that she saw and I would have
19  described them in a very similar way.
20    Q.   All right.  Turning to No. 10, which is
21  Page 19 (sic) of Exhibit 10.  And, again, feel free
22  to refer to your -- your report and then the
23  reviewer's report as you see fit, and I'll take my
24  time to allow you to do that.

141

1      Q.    According to the report.

2      A.    Yeah, he says the largest is about 5

3   millimeters.

4      Q.    All right.  So under the Fleischner

5   guidelines for between 4 and 6 millimeters, which is

6   where 5 millimeters would fall, for a high-risk

7   patient, it describes the standard follow-up

8   timeline, right?

9      A.    Yes.  As I said, I don't have a problem

10  with this really being in the -- in the bell curve

11  of their most egregious errors.  This isn't a huge

12  mistake.

13          I'm just saying that these are things I

14  would have done differently in this case and in the

15  other one.  I don't find these to be things I would

16  report as major discrepancies.

17     Q.    Is this an error at all?

18     A.    Not really.  It's -- it's more of a --

19  again, because it's done specifically for nodules,

20  it's just a phrasing that I would have used

21  differently to make it clear to the patient and the

22  referring doctor that these are nothing.  That's

23  all.

24     Q.    Okay.  So but No. 23, there's really

142

1    nothing wrong with this report, right?

2         A.    No, I don't -- I don't think so.  In the

3    grand scheme of things, no.

4         Q.    And so -- and then the previous one,

5    No. 22, is this a significant error under your

6    definition that you provided at the outset?

7         A.    I forgot what 22 was.

8                    (Reviewing document.)

9         A.    In terms of affecting patient management

10   or outcome, probably no, but in terms of clarity of

11   a report, as I said, it's not a very -- it's a

12   sloppy report.

13        Q.    Is it a significant error?

14        A.    There's not a significant error in terms

15   of affecting patient outcome or management, no, but

16   the report, itself, is not very -- it's not very

17   good.

18        Q.    I -- you know, I understand.  I understand

19   what your critique is.  I'm just trying to

20   determine -- again, earlier we were talking about

21   line drawing.  Is this No. 22 properly tagged as a

22   significant error in your mind?

23        A.    No.  No, not -- not in that -- in that

24   category.  I don't think very many of these cases

143

1   are.  None of Dr. Desai's were and I think very --
2   not very many of these other people's were either,
3   but the only significant errors of the 50 occurred
4   in the group read by other people by the way that
5   we're defining it.  These cases are -- are not in
6   that group.
7        Q.   And so if you skip to No. 24, and if you
8   refer -- I'm going to ask you to -- I'll take note
9   of this page and I'll give it to you when you come
10  back.  If you could look at Exhibit 12, the
11  reviewer's report for me.  On this one, 24.
12                 (Reviewing document.)
13       A.   Okay.  24.
14       Q.   And if you're looking at 12, my -- Exhibit
15  12, the reviewer's report, my question is, isn't it
16  true that the reviewer identified a disagreement
17  with this, No. 24?
18       A.   Yes.  Is that what I identified as well?
19       Q.   No.  You identified it -- it appears in
20  the report, but I'm going to ask you some -- some
21  questions about it.  If you turn to -- back to
22  Exhibit 11, Page 63.
23                 (Pause.)
24       A.   That's why it wasn't working.  Okay.

147

1　painful, ongoing audit.  We're very meticulous about

2　our reports and making sure that they're -- they

3　don't have these types of errors in them, so this is

4　an issue that I brought up in my overall assessment

5　of these reports that they really need some sort of

6　mechanism to do QA on their reporting because there

7　are a lot of typos and a lot of very unacceptable

8　typographical mistakes in a number of these reports,

9　and they really need to address that because these

10　are legal documents and you can't -- you can't have

11　that.

12　　　　Q.　And understanding that full well, is --

13　was a significant error made in this report, No. 25?

14　　　　A.　By the definition that we're using, no,

15　but if you want to talk about, you know, significant

16　reporting errors in terms of typographical, yes,

17　this report is -- is significantly not acceptable.

18　　　　　It's fortunate that patient care wasn't

19　affected, but the report itself is -- is well

20　outside the standard of care.

21　　　　Q.　And then going to No. 30.

22　　　　A.　No. 30.

23　　　　Q.　Okay.

24　　　　A.　Now I'm trying to find it here.

183

1     Q.   Dr. Gruden, going back to your expert

2  report, Exhibit 10, and I'll ask you a couple more

3  questions about it.  So as we discussed, your

4  opinions that you provide in this report on each

5  individual study were prepared after you knew which

6  reads were done by Dr. Desai and which ones were

7  not, correct?

8     A.   Correct.

9     Q.   And so is there any -- does the initial

10  blinded review you did have any relevance on the

11  conclusions that you came to in -- in this study or

12  is that a separate thing that was done before you

13  prepared this -- these conclusions?

14     A.   That's a separate -- that's a separate

15  thing that was done at a different time point.

16     Q.   Okay.  And so all of -- to your knowledge,

17  all of the opinions that you intend to offer are

18  included in this report and based on these

19  conclusions you come to, correct?

20     A.   Yes.

21     Q.   If you turn to Page 7, about two-thirds of

22  the way to the bottom it says "Although not read at

23  Marlborough Hospital, I also wanted to make a

24  specific notation with regard to QACH 20."  How do

185

1    the last -- or the second-to-last page, Section IV

2    entitled "Expert Opinions."  We -- we talked about

3    your opinions on Dr. Desai's reads, correct?

4        A.    Yes.

5        Q.    And we talked about your opinions on the

6    reads by other radiologists, correct?

7        A.    Correct.

8        Q.    And then so you also provide in the

9    last paragraph an opinion that "based on my

10   experience as a radiologist at a major hospital and

11   the apparent methodology of the instant review

12   (i.e., that all of the cases were submitted in a

13   small window in early 2017), I have formed an

14   opinion to a reasonable degree of certainty, that

15   the method of peer review used in this case does not

16   conform to any appropriate or well-known guidelines

17   for a fair peer review process," is that right?

18       A.    Yes.

19       Q.    But you don't know anything about how the

20   underlying review was conducted, right?

21       A.    I only know these 50 cases.  There may or

22   may not have been more cases that were analyzed.  I

23   don't know.  I only know these 50.

24       Q.    But you don't know the purpose of the

186

1    review, right?

2        A.   I don't.

3        Q.   You don't know what led to the decision to

4    conduct the review?

5        A.   I do recall a mention in discussion with

6    the attorneys that there were -- I believe there

7    were some complaints about their client.

8             I don't remember from whom or whether it

9    was from more that one person, but there were some

10   complaints lodged with the department about her

11   reads.

12       Q.   All right.  Do you know how many

13   complaints?

14       A.   I don't know.

15       Q.   Do you know what the complaints were

16   about?

17       A.   Just her -- her readings.

18       Q.   Okay.  Any -- anymore specifics than that

19   that you're aware of?

20       A.   No.

21       Q.   And you don't know -- or you mentioned

22   before you were told who performed the review,

23   right?

24       A.   Yes.  Long after I was done.

187

1      Q.    You don't know that person's
2  qualifications, right?
3      A.    I -- I believe -- I've heard of her, so I
4  suspect she's a chest radiologist.  I think -- I
5  think she's a chest radiologist.  I don't know much
6  about her other than that.
7      Q.    And you don't know if the reviewer knew
8  the identity of the reading radiologist for each
9  study at the time the review was conducted, right?
10     A.    I don't know.
11     Q.    Do you know how the images were selected
12 for the review?
13     A.    No, I don't.
14     Q.    And you don't know who selected those
15 images?
16     A.    No.
17     Q.    And you don't know which radiologist or
18 the number of radiologists who performs the reads
19 which were not done by Dr. Desai, right?
20     A.    No, I don't know that information.
21     Q.    You don't know why the time period was
22 selected from which these studies were chosen,
23 right?
24     A.    No.

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

188

1    Q.    And you mentioned with respect to the
2  apparent methodology that all the cases were
3  submitted in a small window in early 2017.  Why does
4  that make a difference?
5    A.    Well, first of all, it's not -- it's not
6  a sustained pattern of bad reads when you're only
7  looking at one month.  I don't know what was
8  happening with this person during that month.
9          I don't know what her schedule was like,
10 if she was, you know, overworked or what -- what she
11 was expecting to double cover in other service.  I
12 don't know anything about what happened in that
13 one-month period to make a conclusion about
14 someone's performance.
15         And also, as I think I've mentioned
16 before, the window, you know, may have been a period
17 of time when she was covering specific types of
18 cases that were complicated, like the hospital.
19         She had a lot of complicated cases that I
20 didn't really see reflected in others, so her
21 spectrum of clinical practice during that period of
22 2017 may have been different than it is -- was in
23 other months.  That's -- you know, that's kind of
24 it.

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

189

1       Q.   Okay.  And but you don't know the details

2   there.  You don't know whether she had a specific

3   difference in her duties during that period.  You

4   don't know whether it was normal.  You don't know

5   anything about the answers to those questions that

6   you just raised, right?

7       A.   No, I don't know, and I also don't know

8   if she was ever previously investigated or if she

9   was given feedback and a chance to improve her

10  performance before or if this was just a one-time --

11  the only evidence I have that led to this whole

12  thing is these 50 cases over a one-month period.

13      Q.   And with respect to the time frame, the

14  other studies that were done by other radiologists

15  are from the same period, is that right?

16      A.   I believe so.  I think all the cases were

17  from the same period.

18      Q.   And you don't know when the review was

19  performed, right?  You know when the cases were

20  from, but you don't know when the review was

21  performed?

22      A.   I don't know.

23      Q.   You don't know how long it took to perform

24  the review?

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

190

1      A.    No, I don't.

2      Q.    You mentioned that in the -- in your

3  report that it appears to be a hastily performed

4  review.  What makes you think it was hastily

5  performed?

6      A.    Because the cases were from a very small

7  window of time.  The -- I think it's obvious from

8  what I said in my written opinions that there was

9  nothing here that would warrant a termination.

10         I don't know anything about any --

11  anything about these reports.  There may be other

12  factors here involved.  I'm sure there are and I

13  don't know any of those.

14         But to target a review this quickly, and I

15  wasn't given any information about any of the other

16  radiologists being subjected to the same peer review

17  and the same type of action and feedback despite the

18  fact there their reports were actually worse, this

19  looked like it was all thrown together in a fairly

20  urgent basis without attention to what really

21  qualifies as an objective peer review that's fair

22  and across the board with everybody in the group and

23  representative of, you know, many different types of

24  cases and over a -- over a longer time period.  You

192

1  something dramatic and acute that must have
2  happened, but I didn't see that in any of the
3  reports that I got.  That doesn't mean it didn't
4  happen, but based on these 50 exams, I don't see
5  anything here that would warrant a targeted, urgent
6  review.
7      Q.   And, again, other radiologists were
8  included in the review as well, right?
9      A.   Yes.  I don't know how many.
10     Q.   And so is it fair to say that the peer
11 review process that you're referring to is something
12 different than what this review would be?
13     A.   It seems to me, yes.
14     Q.   Okay.  You don't know what UMass
15 Memorial's peer review process is, right?
16     A.   I don't.  And I don't know if she's -- as
17 I said, I don't know if she's had prior peer reviews
18 that showed something or not.  I -- I only have this
19 50 cases.
20     Q.   Okay.  So is it fair to say that you don't
21 really know what the methodology was for the review
22 done by UMass Memorial?
23     A.   That's correct.
24     Q.   And you mentioned "the method of peer

1    review used in this case does not conform to any

2    appropriate or well-known guidelines for a fair peer

3    review process."  What appropriate or well-known

4    guidelines are you referring to?

5         A.   Well, for one thing, as I said, you

6    typically don't do targeted reviews on -- on one

7    person like this.  You don't do them over a

8    one-month window with a really narrow number

9    of -- small number of cases.

10             And it's supposed to be transparent.

11   It's -- you know, our peer review is pretty

12   transparent, and you give feedback to people when

13   there's issues so they can improve their

14   performance.  Everything's documented.

15             I mean, I don't -- I don't really -- I

16   don't really see a lot of those characteristics

17   present here.

18        Q.   And, again, so does this appear to you to

19   be a review that's outside of the normal peer review

20   process?

21        A.   Yes.  This is -- as I said, this appears

22   to be something that had a specific target and a

23   specific purpose, and I don't know whether that

24   purpose was justified or not, but that's just how it

194

1    comes across.  I could be wrong, but this is all the

2    documentation I have and if this is all there is,

3    this looks like a targeted review that was done for

4    a reason.

5        Q.   Okay.  And assuming it was a targeted

6    review done for a reason, is there anything wrong or

7    do you have any knowledge about whether there was

8    anything wrong about it?

9        A.   No.  I said I have no idea about

10   Dr. Desai's performance on other cases or if there

11   was a history of problems or if there's anything

12   else that I'm -- I don't know anything about the

13   situation.  My opinion is strictly about these

14   50 cases.

15       Q.   And you say that -- you reference that it

16   does not conform to guidelines for a "fair" review

17   process.  Can you tell me what was not fair about

18   this process, if -- if you can?

19       A.   Well, based on my -- what I have.  As I

20   said, the other radiologists are not identified in

21   terms of either name or the number of them.

22            She's identified, you know, by name as to

23   which cases she read.  And on the expert's overview,

24   their internal expert obviously had that information

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

James F. Gruden, M.D.
August 31, 2021

199

1      Q.   But if the reviewer was not internal at

2   UMass and did not know the identities, then you

3   can't think of any reason that -- which would lead

4   you to believe that she would have discriminated

5   against in this -- in these -- in the reviews?

6                MR. SWEENEY:  Objection.

7      A.   No.  I think the -- the other question I

8   had about this peer review process was that -- we

9   didn't go through some of these cases in detail, but

10  there were a couple or three that really had major

11  issues.  One in particular where the report was just

12  gibberish to read.  It was completely illegible.

13             I'm assuming that they gave peer review

14  feedback to these people about proofreading their

15  reports, you know, rather than targeting whether

16  someone mentions secretions in the trachea or not.

17             I mean, those -- those errors -- you know,

18  I -- I don't know the remediation for that, but

19  those errors happen in more than one report over a

20  long -- over the entire month time frame, as far as

21  I remember.  I didn't see any -- any intervention

22  with regard to that.

23     Q.   Is there any other work that you did on

24  this matter that we didn't discuss or did we discuss

201

1    information to counsel.  We have not received copies

2    of those findings and we believe that if he intends

3    to offer any opinions that are based on any blind

4    review, that those are discoverable and should be

5    produced and we're going to reserve the right to

6    keep the deposition open to reconvene and ask him

7    further questions in the event that that becomes

8    necessary.

9              THE WITNESS:  I'm sorry.  Can I just

10   clarify?  That's my recollection.  It's very

11   possible that I didn't write every single of the 50.

12             If there was -- as I said before, I

13   think I alluded to this, if the -- if the case was

14   very straightforward and the report was fine and

15   there was nothing, it's very probable that I didn't

16   include those in the -- in the written documents.

17             MR. WAKEFIELD:  Understand.

18             THE WITNESS:  So I -- I'm not saying

19   that I definitely commented on every one of the 50

20   in -- in writing.

21             MR. WAKEFIELD:  Understood.

22             THE WITNESS:  Okay.

23             MR. WAKEFIELD:  But with that, that's

24   all the questions I have and your -- Mr. Sweeney or

| | |
|---|---|
| **From:** | Brendan Sweeney |
| **To:** | jfg9007@med.cornell.edu |
| **Cc:** | pwashienko@fwlawboston.com |
| **Subject:** | Desai v. University of Massachusetts Memorial Medical Center, Inc., et al. |
| **Date:** | Monday, July 13, 2020 2:10:00 PM |
| **Attachments:** | UMM553-689.pdf |
| | image001.png |

Dr. Gruden:

I hope you are well.  I am Patricia Washienko's associate on the Desai v. University of Massachusetts Memorial Medical Center matter.  I believe you and Patty connected through the Expert Institute in mid-May regarding our requested review of images of 50 chest CT scan studies, which at the time we had not yet received from the Defendants.  (As a brief reminder, the Defendants terminated the Plaintiff based on a purported large number of misreads.  Defendants reviewed 50 chest CT scan studies of various de-identified patients, which reviews were made by various physicians.)

We have now received those CT scan images.  However, they are only accessible via an online portal, which does not allow us to download the images.  As a result, we've set up login information for the portal so that you access the images.  The link to access the portal is: https://cloud.lifeimage.com/universal-inbox.  The username is:  additionaluser@fwlawboston.com; and the password is: ██REDACTED██.

The studies are labelled as QACH01, QACH02, QACH03, and so on.  The corresponding reports to the studies, also labelled as QACH01, QACH02, QACH03, etc., are attached to this email.

As discussed in May, could you please review the studies and reports for any major or minor misreads.  We're particularly interested in the studies labelled as QACH01, 02, 08, 09, 10, 11, 14, 15, 16, 22, 24, 30, 33, 34, 38, 42, 48, and 50.  After you have had a chance to review everything, before you draft anything or put anything in writing, we are hoping to set up a call to discuss your impressions.

Please do let us know if you have any questions or if you need any additional information from us. We are of course happy to discuss.

Thank you,
Brendan

Brendan T. Sweeney, Esq.

 Freiberger & Washienko, LLC

211 Congress Street, Suite 720
Boston, MA 02110
p| 617.723.0008 x 104
f | 617.723.0009
bsweeney@fwlawboston.com

| |
|---|
| James F. Gruden, M.D. |
| Exhibit_5 |
| 8/31/2021 |

www.fwlawboston.com

This transmission is intended only for the designated recipient(s).  It contains confidential information that may be subject to the attorney-client privilege or other confidentiality protections under applicable law.  If you are not a designated recipient, you must not read, use, copy or distribute this message.  If you received this transmission in error, please notify the sender by telephone (617.723.0008) or by reply email and delete this message.

| From: | Brendan Sweeney |
|---|---|
| To: | James F. Gruden |
| Cc: | pwashienko@fwlawboston.com |
| Subject: | RE: Desai v. University of Massachusetts Memorial Medical Center, Inc., et al. |
| Date: | Tuesday, July 28, 2020 1:46:00 PM |
| Attachments: | UMM 695-696.pdf |

Hi Dr. Gruden,

As we discussed, the spreadsheet listing which reads the University's reviewer identified as misreads is attached. (The spreadsheet also identifies, in the second column, whether the specific read was conducted by our client (CD) or another radiologist (O).)  The specific reads we are interested in are our client's reads which the reviewer identified as misreads:  QACH08; QACH09; QACH10; QACH11; QACH30; QACH33; QACH34; QACH38; QACH42; and QACH50.

Please let me know if you have any questions.  We'll look forward to hearing from you -- thank you again for your help!

Best,
Brendan

Brendan T. Sweeney, Esq.
**Freiberger & Washienko, LLC**
bsweeney@fwlawboston.com
p:  617-723-0008 ext. 104

James F. Gruden, M.D.
Exhibit_6
8/31/2021

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CHARU DESAI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO.: |
| ) | **4:19-CV-10520-DHH** |
| UMASS MEMORIAL MEDICAL ) | |
| CENTER, INC.; UMASS MEMORIAL ) | |
| MEDICAL GROUP; UNIVERSITY OF ) | |
| MASSACHUSETTS MEDICAL SCHOOL, ) | |
| UMASS MEMORIAL MARLBOROUGH ) | |
| HOSPITAL, MAX ROSEN, M.D., ) | |
| DARREN BRENNAN, M.D., ) | |
| STEPHEN TOSI, M.D., ) | |
| AND KARIN DILL, M.D., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF CHARU DESAI'S EXPERT WITNESS DISCLOSURE**

The Plaintiff, Charu Desai, M.D., by and through her attorneys, discloses the witness listed below may be called at trial to offer expert testimony.

I.    *Disclosure – James F. Gruden, M.D.*

Plaintiff expects to call James F. Gruden, M.D., of Weill Cornell Medicine in New York, New York to offer opinion testimony. Dr. Gruden is a board certified radiologist. He earned a Bachelor of Arts in Economics and Pre-Professional Studies with Highest Honors in 1983 from the University of Notre Dame and his M.D. degree in 1987 from the University of Miami, School of Medicine, where he was class Valedictorian and was inducted to the Alpha Omega Alpha medical honor society. Dr. Gruden completed his internship year in Internal Medicine at Cabrini Medical Center in New York, New York. He completed his residency training in Diagnostic Radiology (1988-1992) at the New York Hospital-Cornell Medical Center. He

further completed a one-year Fellowship in Thoracic Imaging at the University of California-San Francisco.

Dr. Gruden was thereafter appointed as Assistant Professor of Radiology in Residence at the University of California-San Francisco.  From 1995 through 2000, Dr. Gruden served as Assistant Professor of Radiology at NYU School of Medicine.  In early 2000, he was appointed Associate Professor of Radiology and Internal Medicine at Emory University School of Medicine in Atlanta, Georgia.  Dr. Gruden served as the Division Director of Cardiothoracic Imaging at Emory University Hospital and Clinic and founded Emory's Biomedical Imaging and CT Post-Processing Lab.  From 2005 through 2015, Dr. Gruden was at the Mayo Clinic Arizona in Phoenix-Scottsdale, Arizona, where he served as the Director of Cardiothoracic Imaging.  In January 2015, Dr. Gruden was appointed as the Chief of the Division of Body Imaging in the Department of Radiology at Weill Cornell Medical College and at the New York-Presbyterian Hospital-Weill Cornell Campus.  He further serves as a Full Professor of Radiology at Weill Cornell Medical College and Attending Radiologist at the New York-Presbyterian Hospital - Weill Cornell Campus.

Dr. Gruden's report includes a complete statement of all opinions to be expressed and the basis and reasons therefore, the information considered in forming the opinions, and any exhibits to be used as a summary of or support for the opinions; a copy of his curriculum vitae, which details Dr. Gruden's qualifications; a listing of all publications Dr. Gruden authored within the preceding ten (10) years; and a listing of other cases Dr. Gruden has testified at trial or by deposition in the preceding four (4) years.  In this case, Dr. Gruden is being compensated at a rate of $500.00 per hour for his study and testimony.

Plaintiff expects that Dr. Gruden will offer testimony on issues related to Defendants' review of Plaintiff's CT scans, which it cites as justification for Plaintiff's termination.

More specifically, Dr. Gruden will testify concerning the below:

- His interpretation of the CT scan images and corresponding reports, which were listed in Dr. Litmanovich's findings as containing misreads by Dr. Desai.

- His interpretation of the CT scan images and corresponding reports, which were listed in Dr. Litmanovich's findings as having been read by radiologists other than Dr. Desai for Marlborough Hospital.

- Based on his experience as a radiologist at a major hospital and the apparent methodology of the review, whether the focused peer-review was a fair peer review process.

## II.   *Reservation of the Right to Rebut and Comment*

Plaintiff reserves the right to supplement and amend this disclosure as discovery is ongoing.  Plaintiff reserves the right to have her expert critique, comment upon and rebut the testimony and opinions of the Defendant's experts, if any.  Plaintiff further reserves the right to call as an expert witness any person disclosed by the Defendant as an expert witness.  Plaintiff reserves the right to elicit from such witness testimony on any of the issues in this case without specifically adopting the testimony and opinions of the Defendant or the Defendant's experts.

Respectfully Submitted,

CHARU DESAI,
By her attorneys,


/s/ Patricia A. Washienko
Patricia A. Washienko, BBO# 641615
pwashienko@fwlawboston.com
Brendan T. Sweeney, BBO # 703992
bsweeney@fwlawboston.com
FREIBERGER & WASHIENKO, LLC
211 Congress Street, Suite 720
Boston, MA  02110
p:  617.723.0008  f:  617.723.0009

Dated: August 1, 2021


## CERTIFICATE OF SERVICE

I, Brendan T. Sweeney, hereby certify that a true and accurate copy of the foregoing document was served upon attorneys for the Defendants herein, by electronic mail.


/s/ Brendan T. Sweeney
Brendan T. Sweeney

Dated:  August 1, 2021

4

# **<u>EXHIBIT D</u>**

# Expert Report of James F. Gruden, M.D.

To:     Patricia A. Washienko, Esq.
From:  James F. Gruden, M.D.
Re:     Charu Desai v. UMass Memorial Medical Center, et al.
Date:   July 30, 2021

## I.     Materials Reviewed

I have reviewed the 50 CT examinations and their official reports (QACH 1- 50; UMM00553-UMM00689) that were interpreted by Dr. Desai and by other radiologists in the same Department at Marlborough Hospital.  After reviewing each individual CT examination blindly, I then reviewed the official report for each study and the over-reviewer's provided "log of misreads" one case at a time (UMM00695-UMM00696).  I intend to offer opinions on whether Dr. Desai made significant errors; whether the other radiologists made significant errors at Marlborough Hospital; and whether the peer review process here was fair.  My opinions are based on my review of the records and radiologic studies, my education and training, my knowledge of the relevant medical literature, and my experience and expertise in the field of radiology, particularly in thoracic radiology.

## II.     Qualifications, List of Cases, and Fee Schedule

I am a board certified radiologist.  I earned a Bachelor of Arts in Economics and Pre-Professional Studies with Highest Honors in 1983 from the University of Notre Dame and my M.D. degree in 1987 from the University of Miami, School of Medicine, where I was class Valedictorian and was inducted to the Alpha Omega Alpha medical honor society.  I completed my internship year in Internal Medicine at Cabrini Medical Center in New York, New York.  I completed my residency training in Diagnostic Radiology (1988-1992) at the New York Hospital-Cornell Medical Center.  I further completed a one-year Fellowship in Thoracic Imaging at the University of California-San Francisco.

I was thereafter appointed as Assistant Professor of Radiology in Residence at the University of California-San Francisco.  From 1995 through 2000, I served as Assistant Professor of Radiology at NYU School of Medicine.  In early 2000, I was appointed Associate Professor of Radiology and Internal Medicine at Emory University School of Medicine in Atlanta, Georgia.  I served as the Division Director of Cardiothoracic Imaging at Emory University Hospital and Clinic and founded Emory's Biomedical Imaging and CT Post-Processing Lab.  From 2005 through 2015, I was at the Mayo Clinic Arizona in Phoenix-Scottsdale, Arizona, where I served as the Director of Cardiothoracic Imaging.  In January 2015, I was appointed as the Chief of the Division of Body Imaging in the Department of Radiology at Weill Cornell Medical College and at the New York-Presbyterian Hospital-Weill Cornell Campus.  I further serve as a Full Professor of Radiology at Weill Cornell Medical College and Assistant Attending Radiologist at the New York-Presbyterian Hospital - Weill Cornell Campus.  Through my education, training, review of the medical literature and my other professional activities, I am familiar with the standard of care as it pertains to the practice of radiology, and specifically thoracic radiology.

A copy of my CV including my last 10 years of publications is attached to this report at **Exhibit A**. A list of the cases I have testified in as a witness for the last 4 years is attached at **Exhibit B**. I further state that I am being compensated as an expert in this case at the rate of $500 per hour. I have spent approximately 28 hours up to this point on this case at the present time.

III.   Summary of Findings and Testimony

Based on my review of the scans and reports, Dr. Desai made no significant errors of interpretation and no errors in reporting and certainly there are, therefore, no errors that would affect immediate patient management or outcome. The reports are concise and accurate without significant typographical or descriptive errors. In addition, the reports do not recommend additional unnecessary imaging examinations. They are well within the expected standard of care at an urban teaching hospital. The "criticisms" of Dr. Desai's reporting are entirely subjective, and I found none of them to be clinically significant. I elaborate further below.

Of note, all cases were submitted in a small window in early 2017, and I am not certain why this type of "targeted review" was performed. The method of peer review used here does not conform to any appropriate or well-known guidelines for a fair peer review process. This appears to be a hastily performed focused and targeted project, the need for which I do not know. I find no issues with the accuracy or content of Dr. Desai's reports.

Specific analysis of cases interpreted by Dr. Desai, which the over-reviewer claimed were misreads, are as follows:

**QACH08 R/O PE 2/4/17**

The report here states that RLL and RML consolidation are unchanged since recent prior (prior CT was recent)- she did not call this rounded atelectasis, and I assume it was called round atelectasis on the prior exam (I do not have the report from that study). Regardless, the report clearly states that the appearance of the right lung has not changed.

The report mentions worsening consolidation in the LLL in the findings, but this should have been added to the impression. This is a reasonable critique, but the finding was not missed.

OVERALL: This was a PE study on an inpatient with a recent prior. The case was correctly read as no PE, no change RLL and RML consolidation, and worsening LLL consolidation. ***The impression could have added the LLL consolidation, but this is not a major interpretive error. The important findings were made and reported.***

**QACH09 R/O PE 2/21/17**

The report correctly states that there is no PE. It mentions a scapular fracture that I do not clearly see but there may have been added clinical information that I do not have. Pneumonia and pulmonary edema can be difficult to distinguish, especially in patients with emphysema (as in this case). The criticism is that the findings suggest pneumonia, not pulmonary edema, and that fat embolism should have been raised as a possibility. Fat embolism occurs in the setting of

long bone fracture, and I do not see that history provided (and I am not sure that your client had this history). Interestingly, the CT appearance of fat embolism looks very much like pulmonary edema so the criticism here is that fat emboli (which would look like "edema") should have been mentioned but that pulmonary edema should not have been mentioned and the findings were more likely pneumonia. This is not a logical criticism and a patient with long bone fractures and "pulmonary edema" on a CT would be suspected clinically of having fat embolism. We do not directly see "fat embolism" on CT: we see its effects, which look like pulmonary edema.

OVERALL: ***The reading on this case is well within expected standard of care.*** Fat embolism, cardiogenic edema, and diffuse pneumonia can be hard to distinguish with certainty on one CT exam. This is not an uncommon problem, and I am not sure how we decide who is correct in a case such as this, but the initial report looks fine.

### QACH10 R/O PE, 2/27/17

The critique here states that multifocal pneumonia and bronchitis were not clearly stated, a "major error." The report very clearly discusses a mild multifocal pneumonia in both the Findings and Impression sections. There is also an issue because the report did not mention "bronchitis." However, emphysema was mentioned in this report. Emphysema indicates a history of significant cigarette smoking which is basically always associated with "bronchitis." The "bronchitis" in these patients is typically chronic and managed clinically. The scan quality is poor (breathing artifact, mentioned in report) and the exam is therefore more difficult to interpret, but again, it was correctly read as to the primary indication: no PE. We rarely mention "bronchitis" in patients with emphysema as it can be assumed to be present.

OVERALL: ***I do not see the point of the criticism. The report is accurate.***

### QACH11 R/O PE, 3/7/17

I am not sure what the critique here is. It refers to contusions being reported, but that was reported in Case 12, not Case 11, and in that case, I agree that they are likely not contusions. Case 12 was not read by your client according to my records. However, in Case 11, if that is really the case in question, I see no problem with the interpretation or report. Again, the scan quality is not great (breathing artifact).

OVERALL: ***No discrepancy or problem with Case 11. The critique appears to apply to Case 12, which I am happy to address if needed.***

### QACH30 noncontrast CT for Dyspnea, 2/25/17

A prior CT was two weeks earlier (although I do not have access to the report). The current report describes "infiltrates" in the left lung in both the Findings and Impression sections. While they are not specifically reported as NEW (as the critique states), the scan two weeks ago likely did not report this finding, and the referring physicians are able to realize that the findings are new based on the report, the clinical change in the patient, and referring to the prior scans and the prior report. Secretions in the trachea (not mentioned and raised as a criticism) are present in many patients with pneumonia (and COPD) and failure to mention this finding is not at all important in this instance. It is really a subjective decision by the radiologist as to whether this finding is significant enough to place in the report (it was not in this case). The lymph nodes may well be reactive (as stated in the criticism), but in a patient with a history of an advanced cancer, I see no problem with following these with a future CT to be sure. That is actually the standard of care in this instance.

OVERALL:  *Quarrels with the use of the word "new", the failure to mention tracheal secretions, and the critique of the recommended follow-up of mediastinal adenopathy are unfounded and based on subjective opinion.  There is nothing wrong with this report.*


### QACH33 noncontrast CT for air leak, 2/16/17

This is a complex patient with many findings and no prior imaging. The report accurately reports all the important findings. The criticism centers on the position of one of the chest tubes, which is in fact reported as IN THE MEDIASTINUM in both the Findings and Impression of the report, and there is documentation of a call to the clinical team discussing the results.

OVERALL:  *The chest tube in question is reported as IN THE MEDIASTINUM.  It is clear this means it is NOT in the pleural space. The criticism is unfounded.*


### QACH34 noncontrast CT for cough and weight loss, 2/14/17

The report very clearly describes both emphysema and COPD and describes secretions in the airways. A LLL infiltrate is also reported. The critique, called minor but apparently this qualified as an impact on patient care, states that LLL pneumonia was not mentioned (it was) and that there was severe "bronchitis." I do think that the mention of emphysema, COPD, and secretions in the airways in a patient known to be a smoker clearly means that "bronchitis" is present.

OVERALL:  *The report is accurate, and no information was omitted.*


### QACH38 noncontrast CT, cough and SOB, 1/7/17

The report is accurate. The important findings are reported. The criticism is that there is "large and small airways disease with air trapping." Airway inflammation is basically always present in patients who smoke and who have emphysema and underlying small airway obstruction is also

uniform in this population.  I do not see air trapping without expiratory images, which were not performed, but regardless: the patient is a smoker or former smoker with emphysema- this explains the clinical picture and I have no doubt that airway inflammation and small airway obstruction are also present- it is part of the overall smoking-related disease- reporting these things absolutely does not change management in this particular scenario.

OVERALL:  ***This report is fine.  Criticism is inaccurate (air trapping seen only with expiratory images) and subjective.***


**QACH42 CT with contrast, nodule in a patient with HEENT cancer, 2/16/17**

This report is totally accurate.

The critique states that primary lung cancer is more likely than metastatic disease, and of course this is true but depends on how aggressive the HEENT cancer is and what cell type it is- this an appropriate report and stating that primary lung cancer is more likely than a metastasis absolutely does not change patient management.

The criticism that venous collaterals were not mentioned is interesting.  These enhanced veins are the normal reflux of contrast down branch veins from a rapid contrast injection.

OVERALL:  ***This report is fine.  The criticism is both unfounded and inaccurate.***


**QACH50 CT with contrast, chest wall pain, 1/10/2017**

This is a complex case and the discrepancies were minor and had no bearing on management.  If this becomes important later, we can look more closely.

OVERALL:  ***No significant discrepancies on a complex case.***


*      *      *

The reports of the other radiologists' reads at Marlborough Hospital, however, contain numerous typographical errors, and several have interpretive errors.  My findings suggest that more thorough, consistent, and unbiased peer review and quality improvement projects are needed for the other radiologists who were involved in these cases.

Specific analysis of cases interpreted by radiologists other than Dr. Desai at Marlborough Hospital follows.


**QACH22 noncontrast CT to follow a lung nodule**

The Findings section states that the larger peripheral nodule has increased in size, and reports another nodule but does not give a measurement or image number (both of which should be provided).In the Impression, it states that the larger peripheral nodule is stable and the more central nodule has increased 1-2 mm in size.  This contradicts the statement in the Findings section.  In addition, measurement error is generally considered 1-2 mm on CT of nodules, so a 1-2 mm difference would not be considered significant.  The report describes "biapical fibrous change."  This actually appears consistent with an entity called pleuroparenchymal fibroelastosis (PPFE), which is not mentioned.

OVERALL: *The Findings and Impression sections are contradictory, and the nodules are not thoroughly reported or measured*.  The entity of PPFE was not suggested.


**QACH23 noncontrast CT to follow a lung nodule**

This exam shows a few tiny nodules (that were reported previously and have not changed) that all have a typical benign appearance.  The appearance, coupled with the stability since the priors, should indicate that these are benign and require no follow-up.  Instead, the entire Fleischner Guidelines are attached to the report with follow-up recommendations.  This is cumbersome for the patient and referring doctor to read and is also unnecessary.

OVERALL*: The nodules on CT have a benign appearance and the report should have stated that no follow-up was needed.*


**QACH24 noncontrast CT to follow lung nodules**

The impression states that the patient has "scattered" apical cystic disease.  This CT is actually a classic example of paraseptal emphysema and bullous disease and not cystic lung disease.  "Cystic lung disease" implies a whole different set of pulmonary disorders for which the diagnostic evaluation can be costly and possibly invasive (and here, unnecessary).

OVERALL:  *The incorrect impression of cystic lung disease affects differential diagnosis and patient management.*


**QACH25 noncontrast CT to follow lung nodules**

The report describes stable tiny nodules (seen previously) and correctly states that no follow-up is needed.  However, there are typos in the report, including in the Findings section where the location of the nodules is specified.  This is not an acceptable report.  In addition, unnecessary added tests (ultrasound of the gall bladder and kidney) were recommended for simple gallstones and renal cysts-no added imaging needed to be done.

OVERALL: *Significant typographical errors in the description of the nodules and their location- the impression of benign nodules is correct, but typos in the key sections of a*

*radiology report are careless and sloppy.  Unnecessary added testing was recommended for benign findings.*

## QACH46 CT with contrast to assess for pulmonary embolism (PE)

Emboli are reported but again, in BOTH the Findings and Impression sections, there are significant typographical errors in the description of the emboli and their location.  This is indefensible as these are critical findings and these errors are extensive.  This indicates that the radiologist clearly does not proof reports before signing them, and this type of report is well outside the standard of care.  In addition, these small emboli would be unlikely to cause right heart strain as reported: the right ventricle is not definitely dilated.  Reporting emboli with right heart strain can significantly affect patient management leading to possibly unnecessary aggressive therapy.  This finding was best omitted from the report or perhaps a cardiac echo should have been recommended to asses the equivocal right heart prominence.

OVERALL: *Typos in both the Findings and Impression section make the report incoherent. These are urgent findings that must be accurately documented.  Here, the errors occur in two separate parts of the same report.  This is again sloppy and well outside the standard of care.*

In general, these radiologists do not have guidelines regarding how to structure a proper, clinically useful CT report.  There is no consistency in how the reports are structured.  There is little or no attention to detail in terms of proper description of abnormalities and many findings are poorly or inaccurately reported.  Typos (and retained brackets from pre-filled templates) are rampant; punctuation is essentially nonexistent.  These reports come across as hurried, careless, and sloppy and are often not accurate.  A much more intensive QA with remediation is warranted.

*       *       *

Although not read at Marlborough Hospital, I also wanted to make a specific notation with regard to QACH 20:

## QACH20 NONCONTRAST CT FOR DYSPNEA AND POSSIBLE TRACHEOBRONCHOMALACIA

The report in this case is far outside any standard.  First, the clinical order specifically requested inspiratory and expiratory imaging to assess for suspected tracheobronchomalacia.  The inspiratory/expiratory CT technique was not mentioned in the technique description of the report (although it was in fact performed), and the images actually DO SHOW this pathologic condition with collapse of the central airways on the expiratory imaging and areas of air trapping also on expiration, hallmarks of this diagnosis.  Instead, the report mentions "no evidence of

tracheobronchial calcinosis."   This is a totally different entity and was not part of the clinical indication- this entity is insignificant and causes no symptoms.   These errors show a fundamental failure of understanding of the indication for the scan, the technique used, and the findings of the pathologic entity.   Even worse, read the report in the Findings section under the sub-heading "Lungs." This is absolute gibberish- part of this appears to be a section of a report on a totally different examination for a different patient, and the section is filled with typos and incoherent sentence structure.   Obviously, the radiologist also failed to proofread the report prior to signing it.

OVERALL: ***This report is a disaster in every way.  The clinical question was ignored, there is no mention of the collapse of the airways or air trapping (which are key to the real diagnosis in this case), the report is filled with significant typographical errors, and the significant pathology was totally missed.  The radiologist obviously does not know what tracheobronchomalacia is or what the findings are, and he or she did not bother to look it up or ask someone else- this is sloppy, careless, unprofessional, and unacceptable.  A report like this at my institution would result in immediate disciplinary action.***


IV.   Expert Opinions

Based on my interpretation of the CT scan images and corresponding reports, which were listed in the over-reviewer's findings as containing misreads by Dr. Desai, I have formed an opinion to a reasonable degree of certainty that Dr. Desai made no significant errors of interpretation and no errors in reporting.  Certainly there are, therefore, no errors that would affect immediate patient management or outcome and/or that would justify termination.

Based on my interpretation of the CT scan images and corresponding reports, which were listed in the over-reviewer's findings as having been read by radiologists other than Dr. Desai at Marlborough Hospital, I have formed an opinion to a reasonable degree of certainty, that those reports contain numerous, significant, and inexplicable typographical errors and several significant interpretive errors. Other reports recommended unnecessary additional imagining examinations to evaluate insignificant findings.  The reports of those studies conducted by other radiologists fell outside a reasonable standard.

Finally, based on my experience as a radiologist at a major hospital and the apparent methodology of the instant review (i.e., that all of the cases were submitted in a small window in early 2017), I have formed an opinion to a reasonable degree of certainty, that the method of peer review used in this case does not conform to any appropriate or well-known guidelines for a fair peer review process.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS DAY OF
JULY _2 8_, 2021.

James F. Gruden, M.D.

# **<u>EXHIBIT E</u>**

**F&W**   FREIBERGER & WASHIENKO, LLC

211 CONGRESS STREET, SUITE 720 | BOSTON, MA  02110
617.723.0008  PHONE  |  617.723.0009  FAX  |  FWLAWBOSTON.COM

BRENDAN T. SWEENEY, ESQ.
bsweeney@fwlawboston.com | EXT. 104

September 2, 2021

*Via Electronic Mail*
*(rkilroy@mirickoconnell.com & rwakefield@mirickoconnell.com)*

Reid M. Wakefield, Esq.
Robert L. Kilroy, Esq.
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926

> Re:  *Charu Desai v. University of Massachusetts Memorial Medical Center, Inc., et al.*
>      *Civil Action No.: 4:19-CV-10520*

Dear Reid and Bob:

We write in follow up to Dr. Gruden's deposition, and specifically your inquiries about his notes.  Without waiving any objections, we wanted clarify that Dr. Gruden did not in fact share any notes with us in connection with his initial review of the 50 CT scans.  Moreover, during his deposition Dr. Gruden testified that he does not / did not retain any potential notes.  In light his testimony and that no such notes were ever provided to us / our firm, there are no notes to be produced related to his review.

Please let us know if you have any questions or concerns.

Sincerely,

Brendan T. Sweeney

BTS/aeh
Cc:   Charu Desai, M.D.
      Patricia A. Washienko, Esq.

# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-cv-10520-TSH

| | |
|---|---|
| CHARU DESAI,<br>        Plaintiff,<br><br>        v.<br><br>UMASS MEMORIAL MEDICAL<br>CENTER, INC., et al.,<br>        Defendants. | **AFFIDAVIT OF DIANA<br>LITMANOVICH, M.D.** |

I, Diana Litmanovich, M.D., hereby depose and state as follows:

1.      I am a thoracic radiologist employed at Beth Israel Deaconess Medical Center, and I am a faculty member at Harvard Medical School. I have personal knowledge of the facts set forth herein.

2.      I am board-certified in diagnostic radiology and have completed a fellowship in thoracic radiology. I have practiced in the specialty of thoracic radiology for over fifteen years.

3.      I have never been employed by UMass Memorial Medical Group, Inc., nor have I had any affiliation with the UMass Memorial Health system.

4.      In 2017, Max Rosen, M.D., asked me to perform a review of a set of chest CT studies on behalf of UMass Memorial Medical Group, Inc.

5.      Dr. Rosen provided me with the CT images for fifty studies, as well as the de-identified reports with the findings made by the reviewing radiologist for each of the fifty studies. Each study was assigned an identification number, and the patient information and identity of the reading radiologist were redacted.

6.      Aside from the CT images and de-identified reports, I was not provided with any further documents or information regarding the studies or the radiologists who conducted them.

7.      Dr. Rosen did not provide me with the identity of any radiologist who performed any of the reads included in the fifty studies and did not provide me with any information about any radiologist included. He did not tell me the number of radiologists who performed the reads included in the review.

8.      Dr. Rosen did not tell me the identity of any radiologist who was the subject of the review or provide me any information about any individual being evaluated by the review.

9.      Dr. Rosen requested that I review the images for each CT study and the corresponding reports, and provide my opinion whether I agreed or disagreed with the reading radiologist's interpretation. If I disagreed, I was asked by Dr. Rosen to indicate whether it was a minor or major disagreement and in my opinion whether or not the disagreement would have an impact on patient care.

10.     I completed the review and provided my findings to Dr. Rosen in a spreadsheet. A true and correct copy of the spreadsheet I provided to Dr. Rosen is attached as Exhibit A.

11.     I performed the review blinded, and at no time in the course of the review did I know the identity or any identifying information about any radiologist whose reads were included in the review. I did not know the age, gender, disability status, race, or national origin of any radiologist whose reads were included in the review.

Signed under pains and penalties of perjury this 11 day of October 2022.

_____
Diana Litmanovich, M.D.

| Pateint # | Acc Number | Type (I-, I+, CTA, etc) | Agree with interpretation Y/N) | If no: Major or Minor disagreement | Impact on patient care (Y/N) | Discrepancy 1 | Discrepancy 2 | Discrpancy 3 | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 1 | QACH01 | I- | No | Minor | Yes | Findings that were not mentioned:Pulmonary hypertention, non-hemorrhagic nature of pleural effusion, although still most likely traumatic | | | |
| 2 | QACH02 | I- | No | Minor | No | Listed 5 to 9 rib fractures, I see 5-6 rib fractures | | | |
| 3 | QACH03 | I- | Yes | | | | | | Patient has atrophic kidney, most likely CKD, not mentioned |
| 4 | QACH04 | CTA | yes | | | | | | |
| 5 | QACH05 | CTA | yes | | | | | | |
| 6 | QACH06 | CTA | Yes | | | | | | |
| 7 | QACH07 | CTA | Yes | | | | | | |
| 8 | QACH08 | CTA | No | Major | Yes | No distinction made in the report between pneumonia and rounded atelectasis, all named consolidations, where , in fact, right lower lobe and lingular rounded atelectasis are less important than large pneumonia in left lower lobe in the post-operative lung | | | |
| 9 | QACH09 | CTA | NO | Major | Yes | No pulmonary edema seen, the findigs are of multifocal infection or less likely fat emboli, to be considerd under those clinical circumstances | | | |
| 10 | QACH10 | CPA | No | Major | Yes | Multifocal pneumonia and bronchitis not clearly stated | | | |
| 11 | QACH11 | I+ | No | Minor | Yes | Multifocal opacities are not contusions, but infection or aspiration | | | |
| 12 | QACH12 | I+ | Yes | | | | | | |
| 13 | QACH13 | I+ | Yes | | | | | | |
| 14 | QACH14 | I+ | No | Minor | | Small and large arway inflammation/infection | | | |
| 15 | QACH15 | I+ | No | Minor | Yes | Large airway inflammation/infection, severe Mediastinal and hilar mild lymphadenopathy wasn't mentioned | | | |
| 16 | QACH16 | I+ | No | Minor | Yes | | | | |
| 17 | QACH17 | I+ | Yes | | | | | | |
| 18 | QACH18 | I- | Yes | | | | | | |
| 19 | QACH 19 | I- | Yes | | | | | | |
| 20 | QACH20 | I- | Yes | | | Typos in the final impression | | | |
| 21 | QACH21 | i- | Yes | | | | | | |

UMM 00690

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **22** QACH22 | I- | No | major | Yes | Severe bronchiectasis and airtrapping, | | Findings concerning for MAI, not even mentioned |
| **23** QACH23 | I- | | | Yes | | | |
| **24** QACH24 | I- | No | Minor | Yes | Emphysema, not cystic lung disease | | |
| **25** QACH25 | I- | | | Yes | | | |
| **26** QACH26 | CTA | | | Yes | | | |
| **27** QACH27 | CTA | | | Yes | | | |
| **28** QACH28 | CTA | | | Yes | | | |
| **29** QACH29 | I+ | | | Yes | | | |
| **30** QACH30 | I- | No | Major | Yes | Extensive secretions in trachea, | Most likely aspiration in left lung base AND potentially pneumonia in left apex . No mentioning if new or old or no comparison available | Mediastinal Lymph nodes are most likely reactive |
| **31** QACH31 | I- | | | Yes | | | |
| **32** QACH32 | I- | | Yes | | Recommendations for the follow-up of pulmonary nodules are not in concordance with Fleischner guidelines | | |
| **33** QACH33 | I- | No | Major | Yes | Lower right chest tube is not in the pleural space, this is not clearly stated | | |
| **34** QACH34 | I- | No | Minor | yes | Severe bornchitis with left loer lobe pneumonia | | |
| **35** QACH35 | I- | | | Yes | | | |
| **36** QACH36 | I- | | | Yes | | | |
| **37** QACH37 | I- | | | Yes | | | |
| **38** QACH38 | I- | No | Minor | Yes | Severe large and small airway disease with severe airtrapping in lower lobers right more than left | | |
| **39** QACH39 | I+ | | | Yes | | | |
| **40** QA40CH | I+ | | | Yes | | | |
| **41** QA41CH | I+ | | | Yes | | | |
| **42** QACH42 | I+ | No | Minor | Yes | Second Primary cancer (lung) is much more likely then metastatic disease Very extensive network of venous collaterals has not been  mentioned. | | |
| **43** QACH43 | I+ | | | Yes | | | |
| **44** QACH44 | I+ | | | Yes | | | |
| **45** QACH45 | I+ | | | Yes | | | |
| **46** QACH46 | CTA | | | Yes | | | |
| **47** QACH47 | CTA | | | Yes | | | |
| **48** QACH48 | CTA | No | Minor | Chronic bronchtis should be called | Right hilar LN should be suggested to be followed in 3 months | | |

UMM 00691

| 49 | QACH49 | C+ | Yes |       |      |                                                     |                                                       |
|----|--------|----|----|-------|------|-----------------------------------------------------|-------------------------------------------------------|
| 50 | QACH50 | C- | No | Minor | No?  | LLL endobronchial secretion called pulmonary nodule | Postradiation changes were called pleural thickening |

UMM 00692