UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-CV-10520-TSH

| | |
|---|---|
| CHARU DESAI,<br>    Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL MEDICAL<br>CENTER, INC., et al.,<br>    Defendants. | **MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY OF MICHAEL MORRISON, PH.D., AS TO EMOTIONAL DISTRESS DAMAGES** |

Defendants, UMass Memorial Medical Group, Inc. (the "Medical Group" or "UMass Memorial") and Max Rosen, M.D., move for an Order precluding Plaintiff's economics expert, Michael Morrison, Ph.D., from testifying as to the valuation of Plaintiff's emotional distress damages. In support of this motion, Defendants respectfully submit their motion with incorporated Memorandum of Law.

Plaintiff alleges that she was unlawfully terminated from employment because of discrimination, and she seeks both economic damages and emotional distress damages allegedly incurred as a result of her termination. In support of her valuation of damages, Plaintiff has indicated an intent to offer at trial expert testimony of an economist, Michael Morrison, Ph.D. In her Expert Witness Disclosure, Plaintiff states that "Dr. Morrison will offer testimony on issues related to lost economic benefits, including salary and retirement benefits, due to her employment discrimination." Plaintiff's Expert Witness Disclosure, at 2, attached as **Exhibit A**. However, Plaintiff then states that "specifically, Dr. Morrison will testify concerning the below":

> The present value of Plaintiff's lost past and future earnings as a result of her termination; and
>
> The present value of Plaintiff's reduced quality of life associated with her major

depressive disorder, which resulted from Dr. Desai's termination. Id. Plainly, the "value of Plaintiff's reduced quality of life associated with her major depressive disorder" is not "related to lost economic benefits" at all, but such opinions are unequivocally related to the valuation of Plaintiff's <u>non-economic</u> emotional distress damages.

There are two fatal flaws with Plaintiff's proposal for her <u>economic expert</u> to opine as to the valuation of her <u>emotional distress</u> damages:

1.\tDr. Morrison's opinion related to the calculation of damages based on a reduced quality of life in a discrimination case, as set forth in his Economic Report,[1] fails to satisfy the <u>Daubert</u> standard for reliability of expert testimony in any respect. Instead, Dr. Morrison's opinions are based on a facially improper, unsupported, and illogical valuation of the quality of one's life, paired with unrelated conclusions from articles that in no way support their application to Dr. Morrison's novel theory.

2.\tDr. Morrison's proposed testimony is an attempt to circumvent controlling law prohibiting a plaintiff from specifying a specific dollar figure for alleged pain and suffering or emotional distress damages to a jury.

Dr. Morrison's proposed testimony as to the valuation of emotional distress damages is not based on reliable principles and methods or grounded in scientific fact. His theory cannot be and has not been tested, it has not been subjected to peer review or publication, it has no known rate of error, there are no standards controlling its application or operation; and it is not generally accepted in the scientific community. See <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 593-94 (1993). Indeed, Dr. Morrison fails to meet any element to be able to testify as an expert witness on this subject under Fed. R. Evid. 702, and such testimony should be excluded.

---

[1] Dr. Morrison's Economic Report is attached hereto as **Exhibit B**.

WHEREFORE, Defendants, UMass Memorial Medical Group, Inc., and Max Rosen, M.D., respectfully request that the Court exclude testimony of Dr. Morrison related to the valuation of Plaintiff's emotional distress damages, including, but not limited to, her alleged reduction in quality of life.

**CERTIFICATION OF CONFERENCE**

Pursuant to D. Mass. Local Rule 7.1(a)(2), prior to the filing of this Motion, on November 17 and 18, 2022, counsel for Defendants, Reid M. Wakefield, Esq., conferred with counsel for Plaintiff, Timothy M. Kolman, Esq., in a good-faith attempt to resolve or narrow the issues raised herein, and no agreement could be reached.

**MEMORANDUM OF LAW**

**I.    Standard for Admission of Expert Testimony**

A party may offer an expert witness to testify in the form of an opinion if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702. Federal Rule of Evidence 702 imposes on the trial judge a special "gatekeeping obligation" to ensure that expert testimony is relevant and reliable. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999). This "screening function entails a preliminary evaluation of the proffered expert testimony for both reliability and relevance." United States v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002). "The proponent of the evidence bears the burden of demonstrating its admissibility" and accordingly "must explain to the trial judge why the expert's testimony meets the requirements of Rule 702, so that the court can make an appropriate assessment of its

admissibility." United States v. Tetioukhine, 725 F.3d 1, 6 (1st Cir. 2013). "[T]he trial court has substantial discretion in determining the admissibility of expert testimony." Coleman v. De Minico, 730 F.2d 42, 45 (1st Cir. 1984).

Expert testimony "must be supported by appropriate validation – i.e., 'good grounds,'" and based on "more than subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. A court should not admit opinion evidence that "is connected to existing data only by the *ipse dixit* of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). The court "must exclude expert testimony if it is so fundamentally unreliable that it can offer no assistance to the jury." United States v. Two Elk, 536 F.3 890, 903 (8th Cir. 2008).

## II. Proffered Opinions of Dr. Morrison

In his Economic Report, Dr. Morrison attempts to calculate a dollar figure of Dr. Desai's alleged emotional distress, which presumably Plaintiff intends to suggest to the jury as to the appropriate award of damages. However, his conclusions are not based in any way on Dr. Desai's personal experiences, an examination of her, an interview with her, a review of the facts of her allegations, or a review of her psychological history or treatment. His conclusions are not founded in psychology or medicine. Instead, he attempts to value Dr. Desai's emotional distress on a purely economic basis.

To undertake this task, Dr. Morrison first creates a base valuation for "leisure time" by converting Dr. Desai's annual salary for work performed as a Radiologist to a dollar sum for the value of her life. Second, Dr. Morrison summons "suffering multipliers" from three articles related to reduced life expectancy in the aggregate for individuals with major depressive disorder, which range vastly from 32.1% to 60.74%. Then, Dr. Morrison calculates a monetary "value of reduced quality of life" for Dr. Desai by reducing the value of her life (her former

salary) by these percentages, equating to wildly differing monetary values, reflecting the data from each of the three articles. See Exhibit B at 2-5. Each step in this analysis is flawed and is unsupported by any accepted methodology.

Plaintiff states in her Expert Witness Disclosure that "Dr. Morrison's report includes a complete statement of all opinions to be expressed and the basis and reasons therefore, the information considered in forming the opinions, and any exhibits to be used as a summary of or support for the opinions." Exhibit A at 2. Dr. Morrison cites to and attaches three articles to his Economic Report. In response to Defendants' Subpoena to Produce Documents, requesting (1) "A copy of all 'refereed sources' and/or academic research [Dr. Morrison] relied on in 'establishing' a 'reduction in quality of life' and/or which [he] relied on to determine 'suffering multipliers'" and (2) "All documents [Dr. Morrison] relied upon that set forth a methodology for assigning a dollar value or for calculating a dollar value based on an alleged reduction in quality of life," Dr. Morrison produced the same three articles. Plaintiff's Responses and Objections of Michael Morrison, Ph.D., to Document Requests Propounded by Defendant UMass Memorial Medical Center Inc. in Document Subpoena, attached as **Exhibit C**, Request Nos. 7 & 8.

A review of Dr. Morrison's Economic Report and attachments makes clear that his calculation of emotional distress damages in an employment termination/discrimination case based on alleged reduced quality of life is wholly unsupported by peer reviewed publications. Notably, the three articles attached to the Economic Report and relied upon by Dr. Morrison, bear no relationship to the use of a reduction in quality of life expectancy for measuring the monetary value of damages for emotional distress in an employment termination case and are completely silent on this subject. In fact, each of the articles involves surveys of various populations to either estimate the reduction in life expectancy (by years) for individuals

experiencing major depressive disorder[23] or to examine quality of life <u>based on various levels of treatment</u> for such individuals.[4]  As the three articles provide the sole support for Dr. Morrison's novel approach to calculating emotional distress damages, it is clear that his analysis and novel theory by which he translates a reduction in life expectancy to a dollar value for emotional distress based on prior compensation is wholly unsupported by scientific peer reviewed publications.

One need only read the articles he relies upon to uncover fatal flaws in his reliance.  As an initial matter, the articles do not assign any percent reduction in quality of life to specific individuals with a diagnosis of major depressive disorder.  Importantly, as stated in the Steensma study upon which Dr. Morrison relies:

> "Because of the varied course of depression, with both chronic and episodic cases included in the population studied, the estimates in this study <u>should not be applied to predict the expected health course of any individual</u>. . . .  These period estimates of life expectancy and HALE [Health Adjusted Quality of Life] should only be interpreted as <u>summary measures of population health, and not as the life and healthy life expectancies of any real individual</u>."

---

[2]  <u>See</u> Jia, Haomiao, et al., "Impact of depression on quality of life expectancy (QALE) directly as well as indirectly through suicide," Social psychiatry and psychiatric epidemiology 50 no. 6 (2015): 939-949 ("The first aim of this study is to estimate QALE losses due to depression for US adults and to compare such losses due to depression with previously reported losses due to five other common chronic conditions . . . .  The second aim of this study is to estimate QALE loss due to increased risk of suicide death attributable to depression."; "The life expectancy at age 18 years was 47.3 more years for those with depression and 63.7 more years for those without depression.")

[3]  <u>See</u> Steensma, C., et al., "Describing the population health burden of depression: health-adjusted life expectancy by depression status in Canada," Health promotion and chronic disease prevention in Canada: research, policy and practice 36 no. 10 (2016): 205 ("The objective of our study was to estimate period life expectancy (LE) and health-adjusted life expectancy of Canadian adults (age 20 years and older) according to depression status.").

[4]  <u>See</u> IsHak, et al., "Quality of life in major depressive disorder before/after multiple steps of treatment and one-year follow-up" Acta Psychiatrica Scandivavica 131, no. 1 (2015): 51-60 ("The aim of the study is to examine Quality of Life at the entry and exit of each of the four levels of acute treatment phase as well as the 12-months follow-up phase of the STAR*D study" and noting "Patients in the acute treatment phase in each level made statistically significant improvements" with respect to depressive symptom severity and quality of life.  Further stating:  "One of the primary objectives of the present study was to determine the extent to which observed deficits in QOL [quality of life] in MDD [major depressive disorder] patients could be improved by treatment.")

Steensma, C., et al., "Describing the population health burden of depression: health-adjusted life expectancy by depression status in Canada," Health promotion and chronic disease prevention in Canada: research, policy and practice 36 no. 10 (2016): 205 (emphasis added).

In addition, Dr. Morrison's Economic Report fails to provide any scientifically-accepted, peer-reviewed support <u>at all</u> for the leap he then makes in his analysis between a reduction in years of life expectancy due to depression (based on population studies) and assignment of a monetary value to a reduction in quality of life.

Critically, Dr. Morrison offers no basis for his premise for his baseline value of "leisure time" to which he then applies the reduction in life expectancy multipliers. His opinion that an individual's prior compensation while employed establishes the value of their "leisure time," i.e., the value of their life, is wholly unsupported by any scientific methodology or data. Dr. Morrison then, in turn, calculates damages based on the daily valuation of such leisure time, discounted by a claimed reduction in quality of life, which he equates to "emotional distress." This theory is neither scientifically supported nor logical. Of course, there is no basis for a claim that one's salary they happened to be able to earn is the equivalent of or even related to the value of one's time. Certainly, one individual who is unable to command a salary of hundreds of thousands of dollars may value their time at a much higher rate than another who can. Still another could command such a salary in the market, but specifically choose not to seek it for the sole reason that they value their leisure time <u>more</u> than such a salary, <u>not less</u>.

The obvious extension of this manner of calculating the monetary value of emotional distress is that the emotional distress felt by a highly-paid employee, such as a physician, lawyer, or executive following termination of employment is monetarily of vastly greater value than the emotional distress of a lower income wage earner such as a janitor, mechanic, or waitress.

Essentially, under Dr. Morrison's tortured logic, Dr. Desai's emotional distress flowing from being terminated from employment requires greater monetary compensation than the emotional distress felt by any non-highly compensated wage earner. Indeed, Dr. Morrison's theory dictates that Dr. Desai's damages would be <u>ten times greater</u> than one earning $34,000 per year simply by virtue of the fact that she once happened to earned $340,000 per year. To be sure, applying a dollar value to one's emotional distress in this manner is not only unsupported in scientific literature, it will find no support in case law whatsoever. Of course, is it absurd to suggest that a high income earner's life is more valuable than a low income earner or that one's value of emotional distress differs at all based on their salary.

Lastly, and of equal import, there is no evidence to support that Dr. Morrison has ever met Dr. Desai, has ever interviewed her, or has any specific knowledge of her emotional distress. In fact, there is no dispute Dr. Morrison has no medical training that would even permit him to evaluate her alleged emotional distress in any manner; instead, Dr. Morrison's education and training is entirely focused in the field of economics.[5] Of course, as the Court well-knows, the emotional distress of an individual is uniquely personal, varies considerably, and requires a comprehensive assessment of the facts of the alleged wrong and of the effects on that individual – it cannot be mathematically calculated by an economist.

Simply stated, and as discussed below, Dr. Morrison has not, and cannot possibly, "reliably appl[y] the principles and methods [of his theory] to the facts of [this] case" as is required under Fed. R. Evid. 702.

---

[5] A review of Dr. Morrison's Economics Report reveals he had not reviewed Dr. Desai's deposition transcripts, had not reviewed any of her medical records, nor reviewed the deposition transcript of her treating psychiatrist.

### III. Argument

#### A. Dr. Morrison's Calculation of the Value of Dr. Desai's Emotional Distress Damages Based on Reduced Quality of Life Fails the Reliability Standard of Daubert and Fed. R. Evid. 702.

Rule 702 of the Federal Rules of Evidence codifies the standard of admissibility for expert testimony set forth in Daubert v. Merrill Dow Pharmaceuticals, 509 U.S. 579 (1993). See United States v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002). Under Rule 702, Courts "act as gatekeepers, ensuring that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" Samaan v. St. Joseph Hosp., 670 F.3d 21, 31 (1st Cir. 2012) (quoting Daubert, 509 U.S. at 597). In performing this gatekeeping function, the Court considers (1) whether the proposed expert is qualified by "knowledge, skill, experience, training or education;" (2) whether the subject matter of the proposed testimony properly concerns "scientific, technical, or other specialized knowledge;" and (3) "whether the testimony [will be] helpful to the trier of fact, i.e., whether it rests on a reliable foundation and is relevant to the facts of the case." Bogosian v. Mercedes-Benz of N. Am., Inc., 104 F.3d 472, 476 (1st Cir. 1997).

The requirement that an expert's testimony be based on a reliable scientific foundation is often the "central focus of a Daubert inquiry." Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998). In Daubert, the Supreme Court set forth a non-exhaustive list of factors a court should consider when undertaking its reliability analysis: (1) whether the scientific theory or technique can be (and has been tested); (2) whether it has been subjected to peer review and publication; (3) whether it has a known rate of error; (4) whether there are standards controlling its application or operation; and (5) whether it is generally accepted in the relevant scientific community. Daubert, 509 U.S. at 593-94; Samaan, 670 F.3d at 31-32.

Dr. Morrison's novel approach to calculating emotional distress damages fails each of the <u>Daubert</u> reliability factors. First, it is clear based on Dr. Morrison's Economics Report and attached supporting articles that his approach to determining a monetary value for emotional distress damages has <u>never</u> been tested, nor could it be subject to effective testing. Second, the fact that Dr. Morrison only cites to general population studies aimed at measuring the reduction in life expectancy for individuals facing major depressive disorder, with no connection to its application to the determination of emotional distress damages in an employment termination context, demonstrates that his calculation methodology has never been subject to peer reviewed publication and scrutiny. Third, Dr. Morrison can produce no evidence of a known error rate, as his novel methodology for calculating emotional distress damages in an employment context has never been subject to testing. Fourth, given the lack of scientific support for his approach and complete lack of evidence of acceptance of his approach in either the legal or scientific community, there have certainly been no standards developed to control application of his approach to the personally unique and dramatically varied circumstances related to emotional distress in the context of employment terminations. Last, and most importantly, Plaintiff can point to absolutely no authority establishing general acceptance by any scientific or learned community of Dr. Morrison's approach to calculating emotional distress damages.

Specific flaws in Dr. Morrison's analysis are readily apparent, as he cites to no authority supporting his calculation of the value of "leisure time" based on employee compensation as a proxy for valuing quality of life. Indeed, he makes no attempt to demonstrate its acceptance in the scientific community, nor to establish testing of his leisure time valuation and application to emotional distress damages. Additionally, Dr. Morrison fails to cite to any peer reviewed authority supporting his bold declaration that emotional distress is equal to a reduction in quality

of life, which is to be measured based on population studies related to <u>reduction in life expectancy</u> due to major depressive disorder. The reason for a lack of citation is clear – no such peer reviewed authority exists. Instead, Dr. Morrison appears to have made up the methodology in his Economic Report out of whole cloth.

Despite conducting a diligent search of case law, Defendants have been unable to locate any case law authority in which Dr. Morrison's novel approach to calculating emotional distress damages based on an alleged reduced quality of life premised in a reduction in life expectancy based on major depressive disorder has been accepted. Indeed, courts have declined to accept similar analyses. The First Circuit has rejected a proffer of expert testimony in which the supposed expert made an illogical leap in analysis when calculating damages by relying on valuations related to loss of life to calculate "loss of enjoyment of life" (similar to Dr. Morrison's reliance on studies related to reduction in life expectancy to quantification of emotional distress based on reduction in quality of life). <u>See</u> <u>Smith v. Jenkins</u>, 732 F.3d 51 (1st Cir. 2013). In excluding the proffered expert's testimony in <u>Smith</u>, the First Circuit noted: "[The expert] equated the value of life with the value of enjoyment of life, though it is readily apparent that the two are not the same. A plaintiff who loses enjoyment of life, but is alive is not in the same shoes as a plaintiff who lost his life." <u>Id.</u>, 732 F.3d at 67. The Court further noted, "[t]he studies relied on by [the expert] do not use methodology designed to calculate the loss of enjoyment of life, yet are nonetheless extrapolated by [the expert] into what he claims to be valid data for calculating damages for . . . loss of enjoyment of life." <u>Id.</u> (internal citation omitted). As the Court recognized, "nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." <u>Id.</u> (quoting <u>Gen. Elec. Co. v. Joiner</u>, 552 U.S. 136, 146 (1997)). Likewise, in this case,

Dr. Morrison's analysis and leap of logic is based solely on his own assertions and reasoning without scientific evidentiary support, and, as such, must be excluded as unreliable.

### B. Dr. Morrison's Proposed Testimony Quantifying Damages For Emotional Distress Is Prohibited By Controlling Law

Dr. Morrison's opinion is nothing more than an attempt to circumvent the inability by a party to suggest to the jury what their emotional distress award should be. First Circuit case law prohibits a request for a specific amount of damages to the jury. See Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 79 (1st Cir. 2010); Davis v. Browning-Ferris Indus., Inc., 898 F.2d 836, 837 (1st Cir. 1990); Rodriguez v. Senor Frog's de la Isla, Inc., 642 F.3d 28, 37 (1st Cir. 2011) ("[C]ounsel's mention of either a lump sum or formula for computing pain-and-suffering damages during opening and closing statements constituted reversible error. We have outlawed both practices in this circuit.").

Plaintiff's intent to offer testimony through her economics expert, Dr. Morrison, as to a monetary calculation of emotional distress damages will circumvent the First Circuit's unambiguous prohibition as to suggesting a dollar figure to the jury for emotional distress damages. Given the Court's gatekeeping role as to the reliability of expert testimony, it is imperative Plaintiff not be permitted to circumvent the above authority by offering Dr. Morrison's emotional distress damages calculations, particularly given the dubious, unsupported, and wildly varying calculations of that valuation.

### IV. Conclusion

In light of the foregoing, Defendants respectfully request that Plaintiff be precluded from offering testimony from Dr. Morrison related to the valuation of leisure time, his calculation of reduction in quality of life, and his calculation of monetary damages in support of Plaintiff's claimed emotional distress.

Respectfully submitted,

**UMASS MEMORIAL MEDICAL GROUP, INC., and MAX ROSEN, M.D.**

By their attorneys,

 */s/ Robert L. Kilroy*
Robert L. Kilroy, Esq., BBO # 636853
Reid M. Wakefield, Esq., BBO # 569026
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581
Phone 508.860.1474
Fax 508.983.6261
rkilroy@mirickoconnell.com
rwakefield@mirickoconnell.com

Dated: November 21, 2022

## CERTIFICATE OF SERVICE

      I, Robert L. Kilroy, hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this day.

      */s/ Robert L. Kilroy*
      Robert L. Kilroy, Esq.

Dated: November 21, 2022