UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARU DESAI,<br>*Plaintiff*,<br><br>v.<br><br>UMASS MEMORIAL MEDICAL GROUP, INC., et al.,<br>*Defendants*. | CIVIL ACTION NO. 4:19-cv-10520-TSH<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF DR. JAMES R. GRUDEN, M.D** |

NOW COMES Plaintiff Charu Desai (also referred to as "Plaintiff" or "Desai"), by and through her attorneys, Kolman Law, P.C., and the Upper Charles Legal Group, and files this Memorandum of Law in opposition to Defendants' motion *in limine* to exclude the testimony of James R Gruden, MD.

I.   **RELEVANT FACTUAL BACKGROUND**

Plaintiff Charu Desai ("Dr. Desai") brought an action against defendants University of Massachusetts Memorial Medical Group (the "Medical Group") and Max Rosen ("Dr. Rosen.) Dr. Desai alleged that she was discriminated against based on her age, gender, and disability.

Dr. Desai was born in 1950 and graduated from medical school in 1972. She completed her residency and fellowship at the Medical School and then entered private practice. In 1992, she returned to the University of Massachusetts as a physician specializing in chest radiology at the Medical Group and an assistant (later associate) professor at the Medical Group.

Dr. Desai specialized in chest radiology, and at the University of Massachusetts, she reviewed and interpreted radiological images for patients at multiple hospitals, including the Medical Group campuses and Marlborough Hospital. She also regularly taught residents. After

1

twenty-seven years at University of Massachusetts, Dr. Desai's employment was terminated on March 17, 2019. Dr. Rosen is the Chair of the Department of Radiology (the "Department") at the University of Massachusetts and has been in that position since 2012. As Chair, she supervised and managed all radiologists employed by the Medical Group. Dr. Dill became Division Chief of the Department's Chest Division in February 2016.[2] Dr. Stephen Tosi was the President of the Medical Group at the time of Dr. Desai's termination.

In 2000, Dr. Desai was diagnosed with a heart condition known as tachy-brady syndrome, which causes her to experience unpredictable spells of weakness and fatigue, typically lasting a few minutes. The spells flare when she is overexerted. In 2001, Dr. Desai had a pacemaker implanted, but it did not resolve her symptoms. Beginning in 2015, Dr. Desai requested intermittent leave under the FLMA and was approved to take up to two days off from work every two months.

In the years leading to her termination, Dr. Desai requested three changes to her work conditions. First, she requested that she be allotted "academic time," which, according to Department policy, allows physicians to take time away from clinical duties to perform "academic responsibilities," such as teaching and conference preparation, writing papers or texts, completing research projects, attending institutional and departmental committees, attending conferences, and serving on committees of local, regional, national, or international organizations. Second, she requested that she be exempt from being on "call." Radiologists in the Chest Division generally were required to be on call ten weekends per year but qualified "senior" radiologists were exempt. Third, Dr. Desai requested that she be allowed to use a home workstation, which the Department granted to specific radiologists for remote work. Each of these requests was denied.

Dr. Desai was highly regarded among many of her colleagues. In letters of recommendation written over the years, including up until and past the date of her termination, colleagues described Dr. Desai as a "superb," "excellent," and "careful and observant" radiologist with "excellent command of the intricacies of interpretation in chest CT scans." Indeed, none of Dr. Desai's annual faculty performance reviews reflect any deficiencies in her performance.

Dr. Dill, however, complained to Dr. Rosen about the quality of Dr. Desai's CT interpretations and advised him that others had raised concerns. Dr. Dill told Dr. Rosen that treating physicians would ask her to re-read or review studies Dr. Desai had interpreted. On January 31, 2017, Dr. Rosen met with representatives from Marlborough Hospital to address, among other things, the quality of chest imaging at Marlborough Hospital. At this meeting, Dr. Kimberly Robinson, a treating pulmonologist at the hospital, also raised concerns regarding the quality of Dr. Desai's CT interpretations. Dr. Robinson told Dr. Rosen that she never believed Dr. Desai's reports and could not rely on them.

Dr. Rosen decided to conduct a focused review of Dr. Desai's CT interpretations. On February 1, 2017, Dr. Rosen asked Department staff to randomly select twenty-five of Dr. Desai's chest CT interpretations and, as a control group, twenty-five chest CT interpretations from other radiologists. On August 22, 2017, Dr. Rosen contacted Dr. Diana Litmanovich, a chest radiologist unaffiliated with the Medical Group, whom Dr. Rosen understood to be an expert in radiological interpretations, to conduct an independent review. Dr. Rosen asked Dr. Litmanovich whether she agreed or disagreed with each interpretation in the group of fifty anonymized studies and if she disagreed, whether it was a minor or major disagreement and whether in her opinion the disagreement would have an impact on patient care.

Dr. Litmanovich sent Dr. Rosen her findings on December 25, 2017. Among Dr. Desai's interpretations, Dr. Litmanovich identified five major errors and nine errors impacting patient care. Among the interpretations of other radiologists, Dr. Litmanovich identified one major error and five errors impacting patient care. Dr. Litmanovich noted that, overall, she did not find any life-threatening misses or misinterpretations, and that the technical quality of the studies was "very good."

As part of this litigation, Dr. Desai hired an expert in radiology to review the fifty interpretations reviewed by Dr. Litmanovich. That expert, Dr. James Gruden, found that Dr. Desai made no significant errors, that her interpretations were "well within the expected standard of care at an urban teaching hospital," and that Dr. Litmanovich's criticism "was subjective."

On March 14, 2018, Dr. Rosen met with Dr. Desai to tell her that her employment would be terminated on March 17, 2019. At a later meeting, Dr. Rosen provided Dr. Desai with a summary of Dr. Litmanovich's independent review. Dr. Rosen represented that his decision to terminate Dr. Desai's employment was based on his assessment of Dr. Litmanovich's independent review.

## II.   DEFENDANT'S ARGUMENT TO EXCLUDE THE EXPERT TESTIMONY OF DR. JAMES R. GRUDEN

Defendants now wish to exclude the expert testimony of Dr. James R. Gruden (Dr. Gruden) on the apparent basis that Dr. Gruden has offered no evidence to support his claim that there was anything wrong or unfair with the manner in which Dr. Litmanovich's independent review was performed and that Dr. Gruden's opinions are allegedly biased and an 'after-the-fact second-guessing of the independent review his findings.' Defendants further assert that Dr. Gruden's opinions, in this regard, are not relevant to the factual question in this action as to whether Dr.

Rosen decided to terminate the plaintiff's employment because of her protected class.

Defendants contend that Dr. Gruden's opinion is contrary to the 'independent review his assessment' and that his opinion that the Plaintiff did not make significant errors does not relate to the facts of Dr. Rosen's decision or his motives and will not "help the trier of fact to understand the evidence or to determine a fact in issue." Lastly, defendants argue that if Dr. Gruden's testimony is permitted, its probative value will be substantially outweighed by the danger of unfair prejudice to the defendants and will confuse the issues and mislead the jury, and waste substantial time and resources of the parties, and the court.

### III. PLAINTIFF'S ARGUMENT IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE DR. GRUDEN

#### A. Contrary to Defendants' Representation, Dr. Gruden Does Question the Fairness and Integrity of the 'Independent Review of Plaintiff's CT Scans.'

Defendants wrongfully state that Dr. Gruden's opinion has offered no evidence to support his claim that there was anything wrong or unfair with the manner in which Dr. Litmanovich's independent review was performed. Dr. Gruden's opinion contains the following and is hereto attached and incorporated as Exhibit A.

> Of note, all cases were submitted in a small window in early 2017, and I am not certain why this type of "targeted review" was performed. **The method of peer review used here does not conform to any appropriate or well-known guidelines for a fair peer review process**. This appears to be a hastily performed focused, and targeted project, the need for which I do not know. I find no issues with the accuracy or content of Dr. Desai's reports. (Emphasis added).

### B. Dr. Gruden Does Not Have To Allege Bias to Opine That Dr. Litmanovich's Findings Are Wrong

Defendants argue that Dr. Gruden does not allege that Dr. Litmanovich is biased. He does not have to. His opinion is that Dr. Litmanovich's interpretation of Dr. Desai's CT scans is wrong. He is entitled to this opinion because of his expertise. This is not an 'after-the-fact second-guessing of Dr. Litmanovich's findings. It is Dr. Gruden's findings based on his careful review of the same information reviewed by Dr. Litmanovich.

### C. Dr. Gruden's Findings Are Directly Relevant to the Pretextual Termination of the Plaintiff's Employment.

Contrary to the Defendants' assertions, the findings of Dr. Litmanovich were used by Dr. Rosen as an excuse to terminate the Plaintiff. See Exhibit B, affidavit of Dr. Max Rosen at ¶¶ 63-66.

Further, Dr. Rosen relied on Dr. Litmanovich's findings to render the Plaintiff incompetent. See Exhibit C, deposition of Max Rosen 158:20-162:1. See Exhibit D (Ex. PPP), which Dr. Rosen put together as a PowerPoint to impress his colleagues that Dr. Litmanovich's findings of Plaintiff's incompetency were indeed scientific. To create this document, Dr. Rosen had to review the findings of Dr. Litmanovich. He either did not comprehend or ignored the blatant mistakes made by Dr. Litmanovich.

A jury would understand first that Dr. Rosen singled the Plaintiff out for this so-called 'independent reviewer's assessment' when he did not do so for any other radiologist at any time. Second, a jury would understand that with such blatant mistakes by Dr. Litmanovich, her review should never have been relied on by Dr. Rosen. Dr. Rosen's mistaken and unjustified reliance represents a pretext for Plaintiff's termination because of her age. Contrary to the Defendants' motion, nothing about this could confuse a jury. In fact quite the opposite.

### D. Dr. Gruden's Findings Are Reliable

Dr. Gruden's findings are "helpful" to the jury because they raise a "valid scientific connection to the pertinent inquiry[.]." *Daubert v. Merrell Dow Pharm.,* 43 F.3d 1311, 1320 (9th Cir. 1995). Dr. Gruden's conclusions are relevant to the facts at issue, and each step in his analysis to his conclusions is reliable. Although the court must focus "on principles and methodology, not on the conclusions they generate," *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786, this focus "need not completely [preclude] judicial consideration of an expert's conclusions." *Ruiz-Troche*, 161 F.3d at 81. *In General Electric Co. v. Joiner,* the Supreme Court acknowledged that "conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data.

In this case, there is little, or no "analytical gap between the data and the opinion proffered." Id.; see *Samaan v. St. Joseph Hosp.,* 670 F.3d 21, 32 (1st Cir. 2012) (providing that the trial court may "examin[e] ... [the expert's] conclusions to determine whether they flow rationally from the methodology employed"). An "analytical gap between the data and the opinion proffered" may provide the basis for the expert's exclusion. *Samaan,* 670 F.3d at 32 (quoting *Gen. Elec. Co.,* 522 U.S. at 146, 118 S.Ct. 512). This 'analytical gap' is not present in this case, and therefore, the expert's data, his conclusions, and the facts of the case our reliable. See *id*.

The Daubert inquiry is case-specific. "Exactly what is involved in 'reliability' ... 'must be tied to the facts of a particular case.' " *Milward v. Acuity Specialty Prods. Grp., Inc*., 639 F.3d 14-50 (1st Cir. 2011) (quoting *Beaudette v. Louisville Ladder, Inc.,* 462 F.3d 22, 25 (1st Cir. 2006)). Adding to the complexity, "there is no particular procedure that the trial court is required to follow in executing its gatekeeping function under *Daubert*." *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002). Notably, "Daubert does not require that a party who proffers expert testimony carry

the burden of proving to the judge that the expert's assessment of the situation is correct"; rather, to satisfy Daubert's objective, the proponent must show "that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Milward,* 639 F.3d at 15 (quoting *Ruiz-Troche*, 161 F.3d at 85). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

Rule 702 requires that expert testimony be based on "sufficient facts or data." Fed. R. Evid. 702(b). Although an expert's methodology is the "central focus of a Daubert inquiry," courts "may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Ruiz–Troche*, 161 F.3d at 81. However, district courts must not "unduly scrutinize[ ] the quality of the expert's data" because such scrutiny "usurps the role of the jury." *Manpower*, 732 F.3d at 806.

In this case, Dr. Gruden's analysis of Dr. Litmanovich's data is sufficient to support his opinion. It is only proper that Dr. Litmanovich's data be analyzed by the Plaintiff's own expert since the issue raised by the Defendants is critical to the Plaintiff's case, that being whether the Plaintiff was or was not a competent radiologist when she was terminated.

Dr. Gruden's expert testimony allows the jury to make that judgment and to determine whether Dr. Litmanovich's analysis, which Defendants used as the basis for Plaintiff's termination, was infected by an unlawful and discriminatory animus.

## IV.     **CONCLUSION**

Therefore, in light of the foregoing, the Plaintiff respectfully requests that the expert testimony of Dr. Gruden be permitted.

Respectfully submitted,

CHARU DESAI

By her attorneys,

*/s/ Timothy M. Kolman*

Timothy M. Kolman, Esq., Pro Hac Vice
Kolman Law, P.C.
414 Hulmeville Ave
Penndel, PA 19047
Phone: 215-750-3134
Fax: 215-750-3138
TKolman@KolmanLaw.com

And;

Timothy D. Rodden, Jr., Esq., BBO # 691228
John B. Koury, Esq., BBO # 694088
Joseph F. Comenzo, Esq., BBO # 667624
Upper Charles Law Group, LLC
81 Hartwell Avenue, Suite 101
Lexington, MA 02421
Phone: 617-600-7170
Fax: 781-444-2461
trodden@uclawgroup.com
jkoury@uclawgroup.com
jcomenzo@uclawgroup.com

Dated: November 21, 2022

## CERTIFICATE OF SERVICE

I, Timothy M. Kolman, hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this day.

*/s/ Timothy M. Kolman*
Timothy M. Kolman, Esquire

Dated:  November 21, 2022