# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-cv-10520-TSH

CHARU DESAI,
     Plaintiff,

    v.

UMASS MEMORIAL MEDICAL
CENTER, INC., et al.,
     Defendants.

**AFFIDAVIT OF
MAX ROSEN, M.D., M.P.H.**

I, Max Rosen, M.D., M.P.H, hereby depose and state as follows:

1.     I am the Chair of the Department of Radiology for UMass Memorial Health (the "Department"), and in this capacity I have personal knowledge of the facts set forth herein.

2.     I was appointed as the Chair of the Department effective September 1, 2012.

3.     I am employed by UMass Memorial Medical Group, Inc., and the University of Massachusetts Medical School.

4.     Charu Desai, M.D., was formerly employed by the Medical Group as a physician specializing in chest radiology.

5.     Dr. Desai was employed pursuant to an Agreement between UMass Memorial Medical Group, Inc., and Charu Desai, M.D. ("Employment Agreement"), a copy of which is attached as **Exhibit A.** Pursuant to the Employment Agreement, Dr. Desai was dually-employed by the Medical Group and the University of Massachusetts Medical School. Exhibit A, ¶ 1.14.

6.     In my capacity as Chair, I supervised and managed all radiologists employed by the Medical Group, including Dr. Desai. As Chair, I am responsible for the performance of

Medical Group physicians in the Radiology Department. Among my duties as Chair is to ensure that the Department provides high quality and safe imaging services for patients.

7.      Dr. Desai's job duties involved reviewing radiological images in the form of computed tomography ("CT") or radiographs ("x-rays" or "plain films"), interpreting the images, describing findings, and opining on diagnoses of disease and medical conditions revealed in the images. Dr. Desai was not qualified to read magnetic resonance imaging (MRI) and did not read MRIs in the course of her employment.

8.      As a radiologist, Dr. Desai's practice was focused on and limited to thoracic (a/k/a chest) imaging, and Dr. Desai worked within the Department's Thoracic Division (a/k/a Chest Division).

9.      Dr. Desai performed her duties for the Medical Group while located at UMass Memorial Medical Center (the "Medical Center") facilities. The Medical Center is a multi-facility academic hospital which provides tertiary-level care.

10.     In her role as a radiologist for the Medical Group, Dr. Desai reviewed and interpreted images for patients originating from multiple hospitals, including campuses of the Medical Center, Marlborough Hospital, and Clinton Hospital. These hospitals are each separate entities.

11.     The Medical Group is responsible for staffing radiologists to review images originating from different hospitals, and the Medical Group directs the radiologists' assignments.

12.     The hospitals, including Marlborough Hospital and the Medical Center, did not direct Dr. Desai or any other radiologist with respect to the reading of images or in any other job duties. Dr. Desai was supervised by Medical Group employees at all times.

13.     Dr. Desai was never employed by the Medical Center. The Medical Center did not set the compensation for radiologists, did not set the work schedules for radiologists, and did not have the power to hire, fire, or discipline radiologists, including Dr. Desai.

14.     In order to provide medical services as a physician for Medical Center patients, Dr. Desai was required to be granted clinical privileges by the Medical Center and be a member of the Medical Center's medical staff.

15.     Darren Brennan, M.D., served as the Chief of Radiology for Marlborough Hospital from 2015 to 2018. He was not an employee of Marlborough Hospital, but at all times has been employed by the Medical Group as a radiologist.

16.     As Chief of Radiology, Dr. Brennan performed an administrative role which involved serving as a representative of the Medical Group's Radiology Department, serving as a liaison with Marlborough Hospital, and ensuring that the Medical Group was performed its obligations under its contract with Marlborough Hospital. In Dr. Brennan's capacity as Chief of Radiology, he oversaw staffing coverage for the Medical Group's reading of studies originating from Marlborough Hospital.

17.     Dr. Brennan served as the Department's Vice Chair for Enterprise Operations and Community Radiology from 2015 to 2019. In my absence, I would sometimes designate Dr. Brennan to address concerns within the Department in his role as Vice Chair. On September 21, 2017, Dr. Brennan addressed a matter between Dr. Desai and Karin Dill, M.D., in that capacity and at my request.

18.     Dr. Desai had a Sick Bank as well as Salary Continuation she could use for paid medical leave. At the time of her separation from employment, Dr. Desai had not exhausted her available sick leave and had available 116.55 hours in her Sick Bank.

19.     In 2014, a physician in the Department, Susan Afonso, M.D., requested a change in her work hours due to a medical issue, and an accommodation to her schedule was approved by me which remains in place to the present day.

20.     The Department maintained a policy for physicians to be allotted academic or administrative time to conduct non-clinical duties ("Academic and Administrative Time Policy"), a copy of which is attached as **Exhibit B**. Pursuant to the Academic and Administrative Time Policy, academic time can be allotted to academic responsibilities including teaching and conference preparation, writing papers or texts, completing research projects, attending institutional and department committees, attending conferences, or serving on committees of local, regional, national or international organizations.

21.     Dr. Desai was not allotted academic time since at least 2010, and the Department does not have a record of Dr. Desai having ever been allotted academic time. In the time I have been Chair, Dr. Desai never requested academic time for the purposes of performing academic work, research, or other scholarly activities nor has she ever made any proposal for academic work she wished to perform. In addition, she never requested time to participate in the work of local, regional, national, or international organizations.

22.     Medical Group radiologists are required to work "call" where they are scheduled to work certain weekends and holidays to ensure coverage for patients every day of the year. The Department has a policy which requires all regularly-employed staff members to provide "call," a copy of which is attached as **Exhibit C**. The requirements for call vary by division due to coverage needs, but the time commitment of the call coverage is substantially the same.

23.     For members of the Chest Division, a radiologist must work one-fifth of weekends, or ten weekends per year, as well as a portion of holidays, which are scheduled in advance in an equitable manner among the radiologists working in the division.

24.     Performing call is an essential and critical part of being a radiologist in the Department, and is required in order to provide timely and high-quality care to patients, as UMass Memorial is a tertiary-care referral center and level one trauma center which operates twenty four hours a day every day of the year. If a radiologist does not perform call, those responsibilities fall on other employees.

25.     At one time, the Department implemented a program in which staff members could elect to "sell" calls, where other staff radiologists could perform additional call for additional compensation, and the radiologist not doing call would have their salary reduced by an equivalent amount. This policy was in place for two fiscal years, from October 1, 2015, to September 30, 2017.

26.     Dr. Desai elected to sell, and others in the department elected to "take" six out of her ten call weekends for these years, and during this period she performed substantially reduced call. Dr. Desai's salary was reduced accordingly during this time period due to her "sale" of her calls to other radiologists, in the amount of $19,200 per year. The rate that each call was valued was in accordance with the Department's per diem rates in effect at that time.

27.     At least one other radiologist in the Department also elected to sell calls during this period.

28.     The policy of selling calls was ended due to the administrative difficulties in managing the program, as well as the lack of staff radiologists interested in taking additional call.

29.     It is common for staff radiologists to not want to take call.

30.     The Medical Group employs physicians in part-time roles, in which their hours are reduced and their call obligations are proportionately reduced.

31.     The Medical Group employs physicians in "per diem" status, in which the employees work on an hourly basis, and are not obligated to take call. Because staff radiologists who are on per diem status are not obligated to take call, some radiologists have chosen to change their status to per diem in order to be relieved of that obligation.

32.     Mona Korgaonkar, M.D., a female radiologist who is older than Dr. Desai, requested to move to a part time schedule, which I granted, and she subsequently requested that she not take call, and I offered, and she accepted the ability to change her status to per diem to be exempt from call responsibilities. Dr. Korgaonkar remains employed by the Medical Group.

33.     In response to Dr. Desai requesting to be exempt from call, I discussed with her the option to transition to per diem status.

34.     In October 2017, I asked Dr. Joseph Ferrucci if he would consider speaking with Dr. Desai to share his experience moving from active to per diem status with the Medical Group to assist her with her decision. I did not tell Dr. Ferrucci that I intended to terminate Dr. Desai's employment or to require her to move from active to per diem status. I did not tell Dr. Ferrucci that I had an obligation to think about recruiting younger staff for service needs, and I did not discuss the age or longevity of any staff member, including Dr. Desai, at any time, with Dr. Ferrucci.

35.     At no time did Dr. Desai state that she desired to be exempted from taking call or desired an alteration to her call scheduled due to a heart condition or any other health condition.

36.     The Department began to utilize remote workstations for staff radiologists to use from home on a trial basis beginning in early 2017. Only the following radiologists used home

workstations in the initial year of the implementation: Andrew Chen, M.D., Karin Dill, M.D., and Philip Steeves, M.D.

37.     Dr. Steeves is five years older than Dr. Desai.

38.     Nine radiologists used home workstations from implementation until the date of Dr. Desai's separation: Aly Abayazeed, M.D., Satish Dundamadappa, M.D., Carolyn Dupuis, M.D., David Choi, M.D., Andrew Chen, M.D., Karin Dill, M.D., Sami Erbay, M.D., Philip Steeves, M.D., and Eric Schmidlin, M.D.

39.     Dr. Abayazeed, Dr. Dundamadappa, Dr. Choi, Dr. Chen, and Dr. Erbay specialized in neuroradiology and were among the first to test and use home workstations due to the unique scheduling in neuroradiology where radiologists would rotate working routine evening shifts.

40.     No staff member was permitted to take call remotely through the use of a home workstation or otherwise during the time Dr. Desai was employed.

41.     The Department has a quality assurance system designed to improve the quality of radiology services. Prior to 2019, the quality assurance system was based, in part, on a peer review system, where other radiologists within the Department would review each other's reads.

42.     In this system, all radiologists in the Department were asked to enter information into the quality assurance system in two circumstances: (1) through an automated process that requests that a certain number of cases be double-read periodically by each radiologist on staff; and (2) when a radiologist is made aware of a quality issue about an interpretation, the radiologist was obligated to enter that information into the peer review privileged database.

43.     When radiologists reviewed the studies, they would input a numerical score as to their review, with scores denoting the following: a "1" indicated the reviewer concurred with the

reviewee's radiological interpretation; a "2" indicated the reviewer identified a discrepancy in interpretation/not ordinarily expected to be made, but which was denoted as an "understandable miss;" a "3" indicated the reviewer identified a discrepancy in the reviewee's interpretation and that the discrepancy should have been caught by the radiologist "most of the time;" and a "4" indicated the reviewer noted a discrepancy in interpretation that represented a "misinterpretation of findings" and that should be identified "almost every time."

44.     At their annual faculty reviews, I provided staff radiologists with information from the quality assurance database regarding peer review reads labelled with scores of either "3" or "4." I would advise the radiology staff members of these entries and ask the staff member to review the cases if they had not already done so, as a part of the quality improvement process.

45.     I provided Dr. Desai with such a summary from the quality assurance system during her 2016-2017 annual faculty review (the "Peer Review Summary"), a copy of which is attached as **Exhibit D**.

46.     Karin Dill, M.D., was hired as a radiologist and the Division Chief of the Thoracic Division on February 29, 2016. The Division Chief position was publicly posted and the Department conducted recruiting efforts to fill the position. Dr. Desai did not apply for or ever express interest in the position. Dr. Dill was more qualified than Dr. Desai to be Division Chief, based on her education, training, professional involvement, research, qualifications, and experience.

47.     According to data recorded in the quality assurance system, in the course of Dr. Dill's employment, she entered information in the quality assurance system indicating disagreement with the radiologist's initial read for 31 radiologists, in 79 instances.

48.     Kimberly Robinson, M.D., is a pulmonologist (a physician specializing in the respiratory system) who treats patients at Marlborough Hospital, and for a period served as President of the Medical Staff for Marlborough Hospital.

49.     Radiology, like other diagnostic medical work, can involve a degree of probability and subjectivity, and concerns or disagreements can be raised by treating physicians at times. Treating physicians have raised concerns to me with individual reads or quality issues from time to time. I evaluated quality concerns raised to me and took appropriate action based on the individual circumstances. I likewise evaluated quality concerns whenever they were raised to me by Dr. Robinson.

50.     Neither Dr. Joseph Ferrucci, Dr. Hao Lo, Dr. Girish Tyagi, nor Dr. David Bindman specialized in chest radiology. Dr. Ferrucci is 12 years older than Dr. Desai, Dr. Tyagi is less than 2 years younger than Dr. Desai, and Dr. Bindman is 60 years old.

51.     I was aware that several of Dr. Desai's cases were entered in the Department's quality assurance database labelled as potentially significant misses, based on my distribution of data from the quality assurance system to Dr. Desai as a part of her annual review.

52.     On January 31, 2017, I met with representatives from Marlborough Hospital and its medical staff regarding radiology issues at the hospital. This meeting included the President of the Marlborough Hospital Medical Staff and pulmonologist Kimberly Robinson, M.D., and the President of Marlborough Hospital, Steven Roach. A copy of the minutes of this meeting are attached as **Exhibit E**.

53.     A significant concern addressed at the meeting was the quality of chest imaging. At the time, there were three radiologists specializing in chest in the Medical Group's Chest

Division, Karin Dill, M.D., Eric Schmidlin, M.D., and Dr. Desai. No concerns were raised at the meeting related to the reads of Dr. Dill or Dr. Schmidlin.

54.     At this meeting, Dr. Robinson expressed serious concerns with the quality of CT reads performed by Dr. Desai. Dr. Robinson stated to me that she never believed Dr. Desai's reports and could not rely on them.

55.     In response, I agreed that I would conduct a focused review of Dr. Desai's CT reads. I believed that I had to address the concerns raised to me in the interests of patient safety and the Department's obligations to provide high quality services to patients and providers.

56.     To ensure fairness and to confirm that the quality concerns were justified prior to taking further action, I opted to have an independent, blinded review of Dr. Desai's CT reads conducted.

57.     I did not choose to arrange an independent review of Dr. Desai's reads based on isolated concerns regarding a read or a request to re-review a study read by Dr. Desai. I did not make the decision to do so based on one or two misreads by Dr. Desai.

58.     I made the decision to perform an independent review based on reports of quality concerns from Dr. Dill, my awareness of errors in the peer review system, and the complaints from Dr. Robinson, in particular her comments at the January 31, 2017, meeting.

59.     I did not consider Dr. Desai's age, sex, or disability in making the decision to have the independent review performed.

60.     I requested that the Department's file room staff randomly select 25 chest CT studies reviewed by Dr. Desai and, as a control group, 25 chest CT studies reviewed by other radiologists. The studies included in the review were selected randomly, and I was not involved in selecting the studies.

61.     The CT studies selected for inclusion in the review were thoracic/chest studies, but the studies were not limited to those read by radiologists specializing in chest imaging. Eighteen out of the 25 control group studies were read by radiologists who did not specialize in chest imaging.

62.     I selected Diana Litmanovich, M.D., to conduct the independent review. Dr. Litmanovich is a thoracic radiologist at Beth Israel Deaconess Medical Center and is a faculty member of Harvard Medical School. Dr. Litmanovich is not employed by the Medical Group or affiliated with the UMass Memorial Health system. I believe Dr. Litmanovich to be an expert in the interpretation of thoracic CT images.

63.     I requested that Dr. Litmanovich review the images for each CT study and the corresponding report and provide her opinion whether she agreed or disagreed with the interpretation, and if she disagreed, to indicate whether it was a minor or major disagreement and whether or not the disagreement would have an impact on patient care in her opinion.

64.     Dr. Litmanovich provided me with her findings, and I un-blinded them through reference to their identifying numbers. Based on the findings, Dr. Litmanovich concluded that of the reads conducted by Dr. Desai, there were five major errors and nine errors she opined would impact patient care. Dr. Litmanovich concluded that of the reads conducted by other radiologists, there was one major error and five errors she opined would impact patient care.

65.     As a result of my assessment of the results of the independent review, I determined that Dr. Desai's quality was not acceptable for the Department, and I made the decision that Dr. Desai could not continue to work in the Department in order to ensure patient safety and provide high quality services to patients.

66.     On March 14, 2018, I met with Dr. Desai and informed her that her employment will be terminated on March 17, 2019.

67.     Pursuant to Dr. Desai's Employment Agreement, she was entitled to twelve months' notice prior to termination. Exhibit A, ¶ 7.2.

68.     I determined that in the time until Dr. Desai's employment ended, she would be restricted from reading CT images and would review only x-rays, due to the concerns raised regarding the quality of her CT reads from the independent review and my obligation to ensure patient safety and provide high quality services to patients.

69.     Neither I nor anyone else communicated the restriction of Dr. Desai from reading CTs throughout the Department, and this information was shared only in a discreet manner on a need-to-know basis for the purposes of scheduling and workflow for the reading of studies.

70.     On April 24, 2018, at Dr. Desai's request, I held a meeting with Dr. Desai and Vice Chair for Quality, Patient Safety and Process Improvement Steven Baccei, M.D., as well as Dr. Sarwat Hussain, a radiologist in the Department who Dr. Desai invited. At the meeting, I provided Dr. Desai with data from the independent reviewer's findings.

71.     I have made the decision to end the employment of other physicians in the Department due to performance concerns related to ability, including Ronald Garrell, M.D., separated June 23, 2017, Refky Nicola, D.O., separated May 31, 2017, and Abhijit Roychowdhury, M.D., separated December 12, 2015.

72.     An external independent review was performed of Dr. Garrell's competency prior to the decision to end his employment. In addition, I reviewed data from the quality assurance system to evaluate Dr. Garrell's performance.

73.     An internal review and investigation was conducted of Dr. Nicola's performance prior to the decision to end his employment. Dr. Nicola was forty years of age at the time of his separation.

74.     With respect to these physicians, I advised them that due to their performance, they would no longer be able to be employed with the Medical Group, and the physicians elected to resign in lieu of termination.

75.     Stephen Tosi, M.D., was the President of UMass Memorial Medical Group, Inc., at the time of Dr. Desai's termination.

76.     Following Dr. Desai's notice of termination, she was replaced in the Department by Maria Barile, M.D., who is a female.

77.     In 2019, I hired a Division Chief for the Thoracic Division who is 59 years of age.

78.     Presently, the Medical Group employs approximately 92 radiologists. The Department includes 24 radiologists who are age 60 years or older, and three over 70 years of age. I myself am 62 years of age.

79.     During my tenure as Chair of the Department, I have hired 14 radiologists who were 60 years of age or older and two who were over 70 years of age, as well as 32 radiologists who are female.

80.     I have made the decision to end the employment of eight regularly-employed radiologists as Chair (who either were terminated or elected to resign in lieu of termination), and seven were male, and seven were younger than Dr. Desai.

81.     In 2016, the Medical Group conducted an internal review of the compensation of its radiologists as a part of an effort to standardize salaries to address pay inequities and increase compensation to align more closely with the market for all radiologists. The Medical Group also

engaged an outside resource to perform an external market study to assist in establishing a standardized compensation structure.

82.     As a result of these efforts, the Medical Group was able to provide additional funds to the Radiology Department, and a large percentage of radiologists' salaries were increased.

83.     Based on the evaluation, the Medical Group implemented a new, standardized salary structure for radiologists effective March 1, 2017. Under this pay structure, the Department set a base salary, with additional designated sums based on academic rank as well as leadership and administrative positions which carried with them additional job duties and responsibilities. A copy of my correspondence to diagnostic radiologists informing them of this new structure is attached as **Exhibit F**.

84.     As a result of the implementation of the new compensation structure, Dr. Desai received a large increase in pay, from $302,575 to $340,000 per year. Her compensation was set based on the base salary for a diagnostic radiologist of $330,000, plus an additional $10,000 due to her rank as Associate Professor. A copy of my correspondence to Dr. Desai informing her of her new salary is attached as **Exhibit G**.

85.     Dr. Desai did not hold any leadership roles or perform additional duties for the Department.

86.     As a result of the new pay structure, every single full-time female radiologist who was employed as of March 1, 2017, whose pay was not already at the standard, received a pay increase, and they were paid in accordance with the standardized pay scale.

87.     Dr. Desai was a diagnostic radiologist, and Dr. Aaron Harman is an interventional radiologist. Diagnostic radiology involves reviewing images of the body and making

interpretations, and interventional radiology is image-guided surgery. Interventional radiologists perform invasive procedures on patients, and the radiology component relates to the use of imaging such as fluoroscopy, CT, ultrasound, and MRI to guide their procedures. Interventional Radiologists also have completed additional training through an ACGME accredited Interventional Radiology fellowship and some (including Dr. Harman) have also taken an additional board-certifying examination (Certificate of Added Qualification) in Interventional Radiology.

88.     Interventional radiologists generally earn substantially more than diagnostic radiologists. Thus, the Department has implemented a different pay scale for interventional radiology than diagnostic radiology. Under this structure, Dr. Harman's salary was $365,000 per year, which is the base salary for an interventional radiologist.

89.     Dr. Eric Schmidlin specialized in chest imaging and worked within the Chest Division with the same duties as Dr. Desai. Dr. Schmidlin did not receive higher compensation than Dr. Desai. His starting salary in 2012 was $300,000 per year, less than Dr. Desai's salary, and at the time of his separation from regular employment, he earned $294,000 per year, less than Dr. Desai's salary. Dr. Schmidlin left regular employment with the Medical Group on June 28, 2016, and he continued to work on a per diem, hourly basis. His hourly rate since has been $162.50, and Dr. Desai's rate when calculated on an hourly basis is $163.46.

90.     Byron Chen, M.D., and Hemang Kotecha, M.D., have always earned less than Dr. Desai; each with a salary of $330,000 per year at the time of Dr. Desai's separation. Both worked in different divisions than Dr. Desai.

91.     Dr. Karin Dill's base salary was the same as Dr. Desai's. However, Dr. Dill served as a Division Chief, and was paid an additional sum for those duties and responsibilities.

92.     Division Chiefs are responsible for the effective daily operational management of their division, financial stability, long term strategic planning, faculty development, and service for patients and referring clinicians. Divisions Chiefs are responsible for the business and operational functions of their divisions, and include responsibilities for clinical operations, financial sustainability, customer service, quality assurance and improvement, faculty development, recruitment and retention, research/scholarship, innovation, resident/fellow training, medical student education, and other division-specific functions.

93.     A radiologist's performance of non-clinical duties for the Department, including service in leadership, academic, and administrative positions, is separate and apart from their clinical duties and is extremely valuable to the Department.

94.     Steven Baccei, M.D., was paid a higher salary due to his leadership roles within the Department, pursuant to the salary structure. Dr. Baccei was the Division Chief for musculoskeletal radiology, and he served as the Department's Vice Chair of Quality, Safety, and Process Improvement. The duties of the Vice Chair include oversight of all quality assurance functions of the Department, specifically, maintaining the peer review database, managing department quality assurance meetings and review processes, responding to quality issues, handling risk management matters, and management of quality review projects, among other duties.

95.     Christopher Cerniglia, D.O. served in multiple leadership and administrative roles in the Department, for which he received additional compensation. Prior to 2017, he had served as a Division Chief for musculoskeletal radiology, and, thereafter, he continued to serve as 1) the Director for Medical Student Education in Radiology, in which he is responsible for organizing all of the radiology educational activities for the first and second year medical students, 2) the

Co-Course Director for the UMass Medical School DSF (Design, Structure, and Function) course, in which he runs the imaging lab within the anatomy lab, oversees imaging in connection with the course, and oversees all medical student, non-radiology interns and resident, and visiting medical student rotations in radiology, and 3) the Fellowship Director for Musculoskeletal Radiology, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education policies.

96.     Sathish Dundamadappa, M.D., has served as the interim Division Chief of neuroradiology as well as the Fellowship Director for Neuroradiology and the Fellowship Director for MRI, in which he is responsible for the fellowship's curriculum, fellow recruitment, fellow oversight, performance evaluations, and compliance with Graduate Medical Education, for both of these areas, as well as compliance with accreditation requirements for neuroradiology, and he has received additional compensation for these additional duties and responsibilities.

97.     Dennis Coughlin, M.D., has served as the Division Chief for Emergency Radiology, for which he has been compensated an additional amount for those duties and responsibilities.

Signed under pains and penalties of perjury this 15th day of December 2021.

Max Rosen, M.D., M.P.H.

# Exhibit B

# In the Matter of:

*Charu Desai vs*

*UMASS Memorial Medical Center, Inc., et al.*

---

*Max P. Rosen, M.D.*

*May 07, 2021*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Max P. Rosen, M.D.
May 07, 2021

Page 157

1 **revealed of reviews by other attendings, because other**
2 **attendings did not similarly have 25 readings**
3 **reviewed?**
4    A.  My point was not to compare Dr. Desai to any
5 specific radiologist.  My point was to compare
6 Dr. Desai to a collective of other radiologists who
7 were not thoracic radiologists who were reading chest
8 CTs.
9    **Q.  Right.  But one of the consequences of how**
10 **you pulled the cases is that none of the other**
11 **attendings had the same number of images to have been**
12 **reviewed.  In other words; another of the attendings,**
13 **had he or she had 25 cases reviewed, might have had**
14 **any number of alleged misreads also uncovered that was**
15 **not part of the analysis that you set up in pulling**
16 **just 25 total reads from other radiologists.**
17    A.  Well, it's only speculation about what the
18 outcome would've been if I picked 25 of one
19 radiologist, but I could've easily compared Dr. Desai
20 to 25 of Dr. Dill's or 25 of Dr. Schmidlin's, but I
21 was trying to give Dr. Desai the benefit of only being
22 compared to nonthoracic radiologists who were reading
23 chest CT.
24       And Dr. Desai was holding herself out as a

Page 158

1 thoracic radiologist.  So you could argue that the
2 appropriate comparison would've been against a board
3 certified thoracic or -- or fellowship trained,
4 rather, there's no board -- a fellowship-trained
5 thoracic radiologist.
6    **Q.  So, you pulled, or had pulled, 25 random**
7 **chest CTs of Dr. Desai's and 25 chest CTs dictated by**
8 **other attendings.**
9       **What did you do with them, then?**
10    A.  I asked that they were loaded into a system
11 called LifeImage, which is a -- a cloud-based image
12 sharing system.  And also had the reports
13 de-identified, so there was no patient name, medical
14 record number and no indication of who the radiologist
15 was who read it.  And the file room team identified --
16 matched each study, each imagine, with the report by a
17 number, 001, 002, 003, so the reports could be linked
18 with the images.
19    **Q.  Then what?**
20    A.  So I, then, identified a thoracic radiologist
21 who was willing to review these studies, and the
22 instructions that I gave them was that I had 50 chest
23 CTs with de-identified reports that I would like them
24 to review.  I did not tell them how many were from one

Page 159

1 person versus the comparative group or anything else.
2 It was 50 chest CTs to be read.
3       And I asked the person to report whether they
4 agreed or disagreed with the interpretation.  If they
5 disagreed with the interpretation, whether it was a --
6 in their opinion, a minor disagreement or a major
7 disagreement, and whether or not that agree -- whether
8 or not that disagreement would have an impact on
9 patient care, in their opinion.
10    **Q.  Do you recall who you identified as the**
11 **radiologist to do this review?**
12    A.  Yes.
13    **Q.  Who was that?**
14    A.  Dr. Litmanovich.
15    **Q.  How did you identify her?**
16    A.  She has a reputation of being a good thoracic
17 radiologist and that she is somebody who I worked in
18 the same department with years ago.  And so I knew
19 that she was, you know, well-respected, competent,
20 and, if she agreed to do something, that she would,
21 you know, carry through on the project.
22    **Q.  Where was it that you worked together?**
23    A.  Beth Israel Deaconess.
24       MR. WAKEFIELD:  Let's go off the record

Page 160

1 for a sec.
2       (Off the record at 3:44 p.m.)
3       (Recess taken.)
4       (Back on the record at 3:53 p.m.)
5    MS. WASHIENKO:  Back on the record.
6    BY MS. WASHIENKO:
7    **Q.  Dr. Rosen, I would love to draw your**
8 **attention back to Exhibit Number 9 which, with luck,**
9 **you would be able to access by hitting the back button**
10 **and finding the document identified as Exhibit 9.**
11    A.  (Deponent viewing exhibit.)  Okay.
12    **Q.  And --**
13    A.  (Deponent viewing exhibit.)  Just so I know
14 that this is the Defendant Max Rosen's answer to
15 plaintiff's first set of interrogatories?
16    **Q.  Correct.**
17    A.  Okay.
18    **Q.  Yes.**
19       And I'll direct your attention to Page 5,
20 **and, in particular, Interrogatory Number 11 and your**
21 **response.  And I'll just ask you to take a look at**
22 **that.**
23    A.  (Deponent viewing exhibit.)  Okay.
24    **Q.  In your answer, you state that you held a**

# In the Matter of:

*Charu Desai vs*

*UMASS Memorial Medical Center, Inc., et al.*

---

*Max P. Rosen Vol II*

*June 01, 2021*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Page 337

1 representative.  Was that Randa Mowlood?

2    A.  No.  Kathleen Leblanc.

3    Q.  And you -- without disclosing what you said
4 or what was said to you in your conversation with
5 counsel, why did you speak with counsel?

6    MR. WAKEFIELD:  Object.  Object to form.

7    You can answer to the extent that you're
8 not disclosing the subject matter of what was
9 discussed; so the reason you spoke to counsel
10 specifically you can answer.

11    A.  Well, the reason was this is an employment
12 matter and I wanted to understand what rights
13 Dr. Desai had under the terms of her contract.

14    Q.  You mentioned a minute ago that you were
15 considering all of the information that was
16 presented to you and at your fingertips, including
17 complaints made by other people.  I think you've
18 identified or we in the course of your depositions
19 have identified that Dr. Dill and Dr. Robinson had
20 made complaints about Dr. Desai.  Who were the other
21 people who made complaints about her?

22    A.  A lot of the quality issues that were
23 brought to Dr. Dill I took as a proxy for a
24 complaint because they were issues about quality

Page 338

1 raised with Dr. Dill and her role as section chief.

2    Q.  Do you know who the other people were who
3 made the complaints about Dr. Desai?

4    A.  No.

5    Q.  When did you decide -- to the best of your
6 memory, when did you decide to terminate
7 Dr. Desai?

8    MR. WAKEFIELD:  Object to form.

9    You can answer, if you can.

10    A.  Probably, in the weeks proceeding when I
11 gave her her termination notice.

12    Q.  So, if you informed her of her termination
13 in March of 2018, at some point in February or early
14 March, you will have made the decision to terminate
15 Dr. Desai, is that correct?

16    MR. WAKEFIELD:  Object to form.

17    You can answer if you can.

18    A.  I mean, I can only speculate, but I think
19 that's a reasonable time frame between after --
20 after Dr. Litmanovich's independent review and
21 issuing the termination letter.

22    (Document marked as Exhibit 64
23    for identification)

24

Page 339

1 BY MS. WASHIENKO:

2    Q.  I have now distributed Exhibit 64, I think.

3    A.  Okay.

4    Q.  This is Dr. Desai's notice of termination,
5 correct?

6    A.  Correct.

7    Q.  And this is your signature in the bottom
8 left-hand signature block?

9    A.  Yes, it is.

10    Q.  It's dated March 9, 2018, but, in fact, you
11 did not give this to Dr. Desai on March 9, 2018,
12 isn't that correct?

13    A.  I see that it's dated March 9th and I see
14 that the termination date is March 17th, but I -- I
15 don't know why there's that discrepancy between
16 those two dates.

17    Q.  Do you recall, Dr. Rosen, that you met with
18 Dr. Desai on March 14th, 2018, and informed her of
19 her termination?

20    A.  I don't recall specifically.

21    Q.  In that -- in that meeting, do you recall
22 that Dr. Desai asked the -- the reason for her
23 termination?

24    A.  I remember meeting with Dr. Desai and I

Page 340

1 remember her asking me why she was being terminated,
2 and my answer would have been over quality issues.

3    Q.  Do you recall stating to her that you did
4 not need a reason to fire her?

5    A.  No.

6    Q.  Do you recall that Dr. Desai asked you to
7 provide examples of the poor quality work?

8    A.  Yes.

9    Q.  Were you able to do so in that meeting?

10    A.  I did not provide it in that meeting.

11    Q.  But you explained that you had had someone
12 conduct an independent review, isn't that correct?

13    A.  Yes.  That I had -- a blinded independent
14 review of her work was performed.

15    Q.  Right.  The termination letter which is
16 Exhibit 64 states that Dr. Desai's employment would
17 terminate on March 17th, 2019.  Do you see that?

18    A.  Yes.

19    Q.  So a year after you informed her of her
20 termination her employment would, in fact, be
21 terminated?

22    A.  Correct.

23    Q.  And the -- the delay was because she was
24 entitled to a year's notice under her contract, is

# Exhibit C

# In the Matter of:

*Charu Desai vs*

*UMASS Memorial Medical Center, Inc., et al.*

---

*Ella Kazerooni, M.D., M.S.*

*October 21, 2021*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Ella Kazerooni, M.D., M.S.
October 21, 2021

Page 81

1 uncomfortable answering a question that is related to
2 what I understand to be privileged and confidential
3 medical staff information.
4    Q.  So you, personally, have no experience of
5 conducting, or directing someone else to conduct, a
6 review of the readings of a specific radiologist.
7        Is that your testimony?
8        MR. WAKEFIELD:  Object to form.  And
9 also, Patty, this is well outside the scope of her
10 expert opinion that she's being offered to provide.
11 You know, she can answer that -- that question if she
12 can, but if we could, kind of narrow things a bit.
13    BY MS. WASHIENKO:
14    Q.  You can go ahead and answer that question.
15        MS. WASHIENKO:  And thank you, Reid.
16    A.  Okay.  So, in my role either as an individual
17 physician, or as the director of cardiothoracic
18 radiology, I have not activity participated in the
19 systematic review of an individual's performance for
20 purposes of quality of care, as you've described.
21    Q.  Dr. Kazerooni, you reviewed the documents
22 that were marked QACH and -- 1 through QACH50,
23 correct?
24    A.  Correct.

Page 82

1        MR. WAKEFIELD:  Is this a good time to
2 take a break, if you're switching gears?
3        MS. WASHIENKO:  Sure, that works.
4        (Off the record at 11:01 a.m.)
5        (Recess taken.)
6        (Back on the record at 11:17 a.m.)
7        (Max Rosen no longer present at
8 deposition proceeding.)
9        MS. WASHIENKO:  Back on the record.
10    BY MS. WASHIENKO:
11    Q.  Dr. Kazerooni, I'd like you to direct your
12 attention now to your expert review or expert report,
13 which, I believe, is Exhibit...
14        (Pause.)
15        MS. WASHIENKO:  Okay.  Let's go off the
16 record.
17        (Off the record at 11:18 a.m.)
18        (Recess taken.)
19        (Back on the record at 11:21 a.m.)
20        MR. WAKEFIELD:  So, back on the record.
21    BY MS. WASHIENKO:
22    Q.  Dr. Kazerooni, I'm going to direct your
23 attention to your expert report, which is part of the
24 document that's been introduced as Exhibit 2.  And if

Page 83

1 I managed to do so well, I will also have sent it to
2 you in hard-copy form in a document that -- called
3 Updated Exhibit C that -- that you are welcome to use
4 by way of hard copy instead of electronically looking
5 at Exhibit 2.
6        Do you have a copy of your expert report in
7 front of you?
8    A.  (Deponent viewing exhibit.)  Yes, I do.
9    Q.  Thank you.  And thank you again for your
10 patience.
11        I'd just like to walk through -- or have you
12 walk me through your report.  I'm going to start at
13 Section II which is on the second page of your expert
14 report.
15        In -- in Section II, you state that you
16 reviewed 50 reports and images, correct?
17    A.  (Deponent viewing exhibit.)  Correct.
18    Q.  You then -- and this is one, two, three,
19 four, five lines down in the first paragraph, you
20 state that you performed a review of these materials
21 blinded, correct?
22    A.  (Deponent viewing exhibit.)  Yes.
23    Q.  But as of August 25th, which is a month
24 before you -- the date on your expert review, you

Page 84

1 already knew that you been engaged by UMass, correct?
2    A.  Correct.
3    Q.  Did you -- well, let me just do this, in the
4 second paragraph of Section II, on Page 2 of your
5 expert report, you state that you reviewed images and
6 reports for 20 -- whoops, I beg your pardon, this is
7 still in the first paragraph -- for 25 studies.
8        And we've identified -- you identified them
9 as QACH05, 06, 07, 08, 09, 10, 11, 29, 30, 31, 32, 33,
10 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 49 and 50,
11 correct?
12    A.  (Deponent viewing exhibit.)  Sorry.  I'm just
13 trying to be clear on what you asked.  I looked at 50
14 exams, QACH01 through 50, blinded, with reports and
15 formed an opinion about interpretation error and
16 impact on patient care.
17        And for the 25 numbers that you just listed,
18 I formed an opinion as to whether I agreed with the
19 reviewing radiologist's findings and whether or not
20 errors may have impacted patient care --
21    Q.  Okay.
22    A.  -- and those are the 25 numbers that you read
23 off.
24    Q.  Did you -- how did you determine which 25

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Ella Kazerooni, M.D., M.S.
October 21, 2021

Page 85

1 studies you would review?
2        MR. WAKEFIELD:  Object to form.
3        You can answer, if you can.
4    A.  So I reviewed all 50 cases, the cases in
5 which there was an interpretation error, major or
6 minor, which may have impacted -- and/or which may
7 have impacted patient care or included in the cases in
8 which I formed a summary opinion.
9    Q.  And those cases were the 25 that I just
10 listed; is that correct?
11    A.  That's correct.
12    Q.  The next paragraph says that you also
13 reviewed a spreadsheet of opinions from the review
14 conducted by Diana Litmanovich on studies QACH08, 09,
15 10, 11, 30, 33, 34, 38, 42 and 50.
16        Do you see that?
17    A.  (Deponent viewing exhibit.)  Yes, I see that.
18    Q.  I just -- I -- I -- and you did that specific
19 review of the 25 that are listed in the first
20 paragraph under Section II of your expert report, and
21 the ten of the Litmanovich-reviewed documents, you did
22 that at the instruction of Mr. Wakefield, correct?
23    A.  Correct.
24    Q.  Would you agree with me, Dr. Litmanovich

Page 86

1 [sic], that when someone is asked specifically to
2 evaluate a group of scans, there is inherent
3 psychological bias?
4    A.  I think you just referred to me as somebody
5 else and I'm not sure I understand.
6    Q.  Would you refer to me, Dr. Kazerooni, that
7 when someone, a radiologist, is asked specifically to
8 evaluate a group of scans, there is an inherent bias?
9    A.  I don't think that there is a firm yes-or-no
10 answer to that question.  The purpose of a blinded
11 review is to eliminate bias by not knowing anything
12 about circumstances that would -- that may impose
13 bias.
14    Q.  You received a specific group of cases for
15 review, and Mr. Wakefield directed you specifically to
16 a control group, correct?
17        MR. WAKEFIELD:  Object to form.
18    A.  I understood the cases to in -- to include
19 those of the individual that I subsequently learned to
20 be Dr. Desai, as well as other radiologists
21 interpreting the same types of exams during that same
22 time period.  I was blinded to the information about
23 who the individuals were who -- who read each of the
24 exams that I formed an -- that I reviewed and

Page 87

1 contained that information on a spreadsheet that I
2 sent back to Mr. Wakefield.
3    Q.  So you knew that there were two categories of
4 reports; those that were written -- sorry -- reviewed
5 and written by Dr. Desai and those that were written
6 and reviewed by doctors not Dr. Desai?
7        MR. WAKEFIELD:  Object to form.
8        You can answer, if you can.
9    A.  I'm not sure I would describe them as
10 "categories."  To me, they were 50 cases that were
11 blinded as to who they were that were submitted to me
12 to review.
13    Q.  Okay.
14    A.  I didn't know the -- for example, the number
15 of cases which were from any one individual.  I did
16 not know anything about the circumstances of the
17 interpretation.  There are many things I did not know.
18 What I had was a set of reports with images to which I
19 was blinded to information about who the interpreting
20 physician was and formed an opinion with respect to
21 interpretation and potential impact on patient care.
22    Q.  I'd just direct you to Mr. Wakefield's e-mail
23 to you, dated September 17th, in which he directs you
24 to a control group of radiologists.

Page 88

1        You understood, at some point, correct, that
2 there were reports written by Dr. Desai and reports
3 written by doctors not Dr. Desai, correct?
4    A.  That is correct.  That is why, in the
5 spreadsheet of 19 cases on which an opinion was
6 formulated, there were all of the cases in which a
7 major error and/or one that would impact patient care,
8 where Dr. Desai's were included, some of which
9 Dr. Gruden read an opinion on and some of which he did
10 not.  And there were also three controls in that
11 summary spreadsheet of 19 cases.
12    Q.  I'll direct your attention to that
13 spreadsheet.  I think it's Exhibit Number 9.
14        Do you have that in front of you?
15    A.  (Deponent viewing exhibit.)  Yes.
16    Q.  So I'm going to direct your attention --
17 well, let me -- let me just go over this.  So there
18 are -- there are 19 cases on this.  You reviewed 50 in
19 total.
20        Did you agree with the reads on the other 19
21 cases?  Is that why there are no comments on these?
22        MR. WAKEFIELD:  Object to form.
23        You can answer, if you can.
24    A.  My understanding is that I'm providing my

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Ella Kazerooni, M.D., M.S.
October 21, 2021

---

Page 101

1 itself, is not inappropriate.

2 Q.  I'm going to direct your attention to the
3 next paragraph, Dr. Kazerooni.  This states, the --
4 the specific analysis of cases interpreted by
5 Dr. Desai, which the over-reviewer claimed were
6 misreads, are as follows.

7     Do you see that?

8 A.  (Deponent viewing exhibit.)  Yes, I do.

9 Q.  So, going back to my question a few minutes
10 ago, is it fair to understand that Dr. Gruden opined
11 on these ten because he disagrees with the reads from
12 the over-reviewer that claimed Dr. Desai's reads were
13 misreads?

14 A.  (Deponent viewing exhibit.)  That is what it
15 state -- it's says, that specific analysis of cases
16 interpreted by Dr. Sai -- Desai, which the
17 over-reviewer, claimed were misread are as follows.

18 Q.  And just to clarify, because I know we sort
19 of danced around this before, you are not aware that
20 UMass cited Dr. Litmanovich's opinion of Dr. Desai's
21 alleged misreads as justification to terminate
22 Dr. Desai; is that correct?

23 A.  I have no knowledge of any of the HR matters
24 that were undertaken at UMass.

---

Page 102

1 Q.  You're aware that my client was fired?

2 A.  You have said that, correct.

3 Q.  So, in the Litmanovich spreadsheet, which is
4 in Exhibit 10, Dr. Litmanovich identifies ten --

5     (Technical difficulties.)

6     (Off the record at 11:55 a.m.)

7     (Discussion off the record.)

8     (Back on the record at 11:55 a.m.)

9     BY MS. WASHIENKO:

10 Q.  -- identifies -- identifies ten reports
11 that -- that she states she does not agree with the
12 interpretation.  And I'll just direct your attention
13 to the Litmanovich chart -- one, two, three -- in the
14 fourth column.

15     Do you see that?

16 A.  (Deponent viewing exhibit.)  Yes, I see the
17 exhibit.  I see the list of ten cases, and each one
18 says, agree with interpretation, no.

19 Q.  Perfect.  Turning back to your report now,
20 with regard to QACH08, you state that you disagree
21 with Dr. Gruden's report, correct?

22 A.  (Deponent viewing exhibit.)  Correct.

23 Q.  You did not address Dr. Litmanovich's
24 assessment, correct?

---

Page 103

1 A.  (Deponent viewing exhibit.)  Correct.  In
2 this -- in this summary material, I addressed
3 Dr. Gruden's comments.

4 Q.  Did you have occasion to determine whether
5 you agreed or disagreed with Dr. Litmanovich's
6 assessment?

7     MR. WAKEFIELD:  Objection.  That's
8 outside the scope of what her opinion is.  Her expert
9 report includes the scope of her opinions she's
10 offering in this case.  You know, outside that, it
11 gets into communications and materials that are not
12 supporting, not relied on, those opinions.

13     MS. WASHIENKO:  Your point is noted,
14 Reid.  I will just say that UMass has justified, or
15 explained to my client, that it has justified her
16 termination on the basis of the Litmanovich report,
17 and the Litmanovich chart is, in fact, often disagreed
18 with by Dr. Kazerooni.  And so, I am trying to
19 determine if Dr. Kazerooni is aware that her
20 assessment varied several times with Dr. Litmanovich's
21 report.

22     MR. WAKEFIELD:  And, to that extent,
23 specific questions, as to that issue she can answer,
24 as to the point that -- that that's where her -- you

---

Page 104

1 know, her conclusions reflected in her report.  So she
2 can answer those specific questions, if you want to
3 ask those.

4     MS. WASHIENKO:  That is what I was trying
5 to do, but I'll just carry on.

6     BY MS. WASHIENKO:

7 Q.  With regard to QACH08, Dr. Kazerooni, in the
8 Litmanovich review, which Mr. Wakefield shared with
9 you, that's Exhibit 10, Dr. Litmanovich identifies a
10 major disagreement, that she identifies in discrepancy
11 number one column, as no distinction made in the
12 report between pneumonia and rounded atelectasis.  All
13 named consolidations were, in fact, right lower lobe
14 and lingular rounded atelectasis are less important
15 than large pneumonia in left lower lobe in the
16 postoperative lung.

17     Do you see that?

18 A.  (Deponent viewing exhibit.)  I see what you
19 have read off Dr. Litmanovich's spreadsheet, yes.

20 Q.  When I direct your attention to your report,
21 you disagree with Litmanovich on the very substance of
22 Litmanovich's critique, a hematoma issue that is not
23 even addressed by Dr. Litmanovich, correct?

24 A.  (Deponent viewing exhibit.)  No.  I commented

---

Case 4:19-cv-10520-TSH   Document 145-2   Filed 11/21/22   Page 29 of 42
Charu Desai vs                                                    Ella Kazerooni, M.D., M.S.
UMASS Memorial Medical Center, Inc., et al.                          October 21, 2021

Page 105

1 on two major findings that may impact patient care and
2 disagreed with Dr. Gruden's opinion. The first was
3 the incorrect finding and description and diagnosis of
4 pneumonia, which is, in fact, rounded atelectasis with
5 overlying pleural thickening and not pneumonia
6 requiring treatment, follow-up bronchoscopy or
7 additional testing. This inaccuracy was not discussed
8 by Dr. Gruden.
9      The second major finding that identified was
10 missed is an area of high density in the left pleural
11 space near the lingula that was not described well.
12 It's consistent with an acute hematoma, given that
13 there had been surgery. In the setting of prior
14 surgery, it could also be related to the type of
15 surgical procedure if a pleurodesis had been performed
16 using talc, where it can cluster together and form an
17 area of high density. Dr. Gruden did not identify
18 this as a missed finding.
19     **Q.  And I'll just pick up on that last point.**
20     **You would agree me, would you not,**
21 **Dr. Kazerooni, that Dr. Litmanovich also did not**
22 **identify the hematoma?**
23        MR. WAKEFIELD:  Object to form.
24        You can answer, if you can.

Page 106

1    A.  I would say two things.  Number one,
2 Dr. Gruden incorrectly characterized it as worsening.
3 If I look at Gruden's expert opinion, he discusses
4 pneumonia being unchanged, when, in fact, it is not
5 pneumonia at all, in the right lower lobe and right
6 middle lobe.  And then he indicates that the report
7 men -- had mentioned worsening consolidation in the
8 left lower lobe that should've been added to the
9 impression but didn't find it to be a reasonable
10 error.
11       So he did not even address the finding
12 himself.  Dr. Litmanovich at least described that
13 there was an abnormality there that neither Dr. Desai
14 or Dr. Gruden mentioned.
15     **Q.  And I just want to pick up on the -- your**
16 **report where you refer to a hematoma.  I -- I don't**
17 **actually see that in the Litmanovich report.**
18     A.  (Deponent viewing exhibit.)  What Dr. -- so I
19 described the rounded atelectasis in the right lung
20 with overlying pleural thickening, which is a don't-
21 touch-me lesion, no need to biopsy or be aggressive
22 with management.  Those are unnecessary tests or
23 procedures that could ensue.
24       Dr. Litmanovich did describe lingular rounded

Page 107

1 atelectasis, hematoma, atelectasis that's rounded and
2 enhances with contrast may look similar and talc
3 pleurodesis material may also look high density.  So
4 all three of those things, rounded atelectasis, acute
5 hematoma and talc all look bright, brighter than your
6 normal soft tissue, on a CT.
7      Dr. Gruden made no mention of it at all.
8 Dr. Desai did not mention the abnormality.  And
9 Dr. Litmanovich mentioned the abnormality, but
10 characterized it as being rounded atelectasis.  So she
11 --
12     **Q.  So --**
13     A.  -- did not -- she detected it, she did not
14 correctly characterize it.
15     **Q.  I see.  So you are crediting her identifying**
16 **the abnormality and disagreeing with her use of**
17 **language; is that correct?**
18     A.  Disagreeing with her interpretation of what
19 the finding represented, correct.
20     **Q.  All right.  I'll just turn your attention now**
21 **to QACH09 and -- and just confirm, on this one you**
22 **agreed with Dr. Gruden's findings, and that's the last**
23 **sentence, you are -- you are -- this is consistent**
24 **with Dr. Gruden's findings and the first sentence**

Page 108

1 **says, "I am in disagreement with Dr. Gruden's**
2 **opinion," correct?**
3     A.  (Deponent viewing exhibit.)  Correct.
4     **Q.  You did not address Litmanovich's assessment**
5 **at all, correct?**
6     A.  No.  I was primar -- this report was
7 primarily compared to the expert review done by
8 Dr. Gruden, for which there was summaries -- summary
9 document provided.
10     **Q.  All right.  And I'll just direct your**
11 **attention, briefly, to the Litmanovich chart,**
12 **Exhibit 10.**
13        **With regard to QACH09, Dr. Litmanovich**
14 **describes this -- Dr. Desai's read as a major error,**
15 **correct?**
16     A.  (Deponent viewing exhibit.)  That
17 spreadsheet, yes, does indicate major.
18     **Q.  I will direct your attention now to QACH10**
19 **and -- and just run through the same analysis.**
20        **Here, you're addressing Dr. Gruden's**
21 **assessment and you do not, in fact, comment in any way**
22 **on Litmanovich's assessment, correct?**
23     A.  (Deponent viewing exhibit.)  Correct.  I am
24 addressing Dr. Gruden's expert summary.

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Ella Kazerooni, M.D., M.S.
October 21, 2021

Page 133

1    Q.  I'll direct your attention to QACH42.
2        On this one, you agree with Dr. Gruden's
3  opinion, correct?
4    A.  (Deponent viewing exhibit.)  Correct.  There
5  are a few minor cases in the case and no major issue.
6    Q.  Dr. Gruden's opinion is -- disagrees with
7  Dr. Litmanovich's criticism.
8        Would you agree with me?
9    A.  (Deponent viewing exhibits.)  I'd have to
10 look at Dr. Litmanovich's.  I -- I disagree with part
11 of Dr. Gruden's statement.  He indicates that primary
12 lung cancer is -- he says the critique states that
13 (inaudible) --
14       (Noise interruption.)
15       MADAM COURT REPORTER:  I'm sorry, you
16 broke up after, "He says the critique states."  I
17 couldn't hear.
18       THE DEPONENT:  Oh.
19 BY MS. WASHIENKO:
20   Q.  And -- and, Dr. Kazerooni, I'll just
21 interrupt, because I wanted you to compare your
22 assessment with Dr. Litmanovich's.
23   A.  (Deponent viewing exhibit.)  Yes.  So
24 Dr. Litmanovich stated that a second primary lung

Page 134

1  cancer is more likely than metastatic disease, and
2  that is indeed the case, and I agree with that
3  statement.
4    Q.  I'll turn your attention to QACH50.
5        You agree with Dr. Gruden on this assessment
6  as well, correct?
7    A.  (Deponent viewing exhibit.)  Yes, I agree
8  with Dr. Gruden's opinion.
9    Q.  You earlier referred to a -- a matter that
10 you initially reviewed and indicated a disagreement
11 with, but upon, then, further review, realized that
12 you -- you mistyped on your chart and that, in fact,
13 you agreed with it.
14       Do you recall if this QACH50 is the one that
15 you changed your mind on?
16   A.  (Deponent viewing exhibit.)  That was a
17 different case, and that was, I believe, a change of
18 yes or no for impact on patient care, not on major or
19 minor findings present or absent.
20   Q.  Got you.  So -- so, in this one, you're
21 saying that you thought you found a major error, but
22 in fact, you agree with Dr. Gruden's opinion, correct?
23   A.  Correct.
24   Q.  This is, I take it, an example of when

Page 135

1  colleagues interact with each other and -- and fill in
2  some of that information that may have been missing
3  and -- and help each other come to a -- a good, more
4  accurate diagnosis, correct?
5    A.  Correct.  When -- when different lenses and
6  background look at an abnormality and identify
7  something different, it's always important for us to
8  consider that and refine our understanding and
9  opinion.  This, I believe, was the only case in which
10 I did that.
11   Q.  I'm going to ask you -- I'm going to ask you
12 to look at QACH50 in Exhibit Number 8.  I'm going to
13 ask you to help me translate something from
14 medical-speak to me-speak.
15   A.  (Deponent complied.)  Okay.
16   Q.  So I'm not entirely sure, but I think I read
17 Dr. Litmanovich's criticism to be that Dr. Desai
18 called a 4 millimeter pulmonary nodule, while
19 Dr. Litmanovich thinks that it is a lower left lobe
20 endobronchial secretion.
21       Is that your take on the substance of
22 Dr. Litmanovich's criticism?
23   A.  I would have to go back and look at the
24 images specifically for that, to understand if she was

Page 136

1  specifically referring to what you recalled from the
2  radiology report.
3        (Exhibit 13 marked for identification.)
4  BY MS. WASHIENKO:
5    Q.  Okay.  I'm going to direct your attention to
6  a document that I believe has been marked as
7  Exhibit 13.
8        Do you see that?
9    A.  (Deponent viewing exhibit.)  Yes, I have it.
10   Q.  This is a manuscript that you were one of a
11 number of authors on that was published in 2009, the
12 title of which is, Assessment of Radiologist
13 Performance in the Detection of Lung Nodules, colon,
14 Dependence on the Definition of "Truth," correct?
15   A.  (Deponent viewing exhibit.)  Correct.
16   Q.  I just want to draw your attention down to
17 the bottom of the first page that says, in the
18 paragraph titled Conclusion, "Substantial variability
19 exists across radiologists in the task of lung nodule
20 identification in CT scans.  The definition of 'truth'
21 on which lung nodule detection studies are based must
22 be carefully considered, since even experienced
23 thoracic radiologists may not perform well when
24 measured against the 'truth' established by other

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Ella Kazerooni, M.D., M.S.
October 21, 2021

Page 137

1 experienced thoracic radiologists.
2      **Do you see that?**
3      A.  (Deponent viewing exhibit.)  Yes.
4      **Q.  Does that mean what I think it means,**
5 **Dr. Kazerooni; that, in fact, there can be some**
6 **variability in interpretation of -- of nodules --**
7           MR. WAKEFIELD:  Object to the form of the
8 question.
9      BY MS. WASHIENKO:
10     **Q.  -- from one thoracic radiologist to another?**
11          MR. WAKEFIELD:  Same objection.
12     You can answer.
13     A.  (Deponent viewing exhibit.)  So you will note
14 that this study is now 12 years old; 2009.  The work
15 was largely conducted in the year or two leading up to
16 this.  This is based on work that probably start --
17 probably started in about 2007, adding to the age of
18 the data presented.
19          Since that time, there have been many tools
20 that have been brought forward that radiologists have
21 at their disposal on a PACS system to help them look
22 for lung nodules.  Basic thickening of your slices, we
23 call MITs, for example, are used commonly in practice
24 and available to most radiologists as a tool to help

Page 138

1 detect nodules.
2      So this is without the type of current tools
3 that we how have available to us.  There are now tools
4 that can be integrated into your practice to help
5 identify candidate nodules, measure nodules.  A lot of
6 this has been driven by the rollout of lung cancer
7 screening across the United States and -- and many
8 places of the world where this -- this type of
9 information has been important to drive process
10 improvements to mitigate error.
11     **Q.  And a follow-up question; have there been**
12 **follow-up studies, Dr. Kazerooni, that establish that**
13 **the point that you made, with regard to substantial**
14 **variability existing across radiologists, is no longer**
15 **true since the advance of some of the technologies**
16 **that you're describing?**
17     A.  Yes.  Many of these technologies have been
18 tested, such as basic MIT images that I referred to,
19 which improve the number of nodules radiologists
20 detect amongst them over prior evidence.
21          In addition, nodule identification and
22 detection software, the type that identifies candidate
23 nodules and measures them and tracks their growth over
24 time, are available now from a -- probably the --

Page 139

1 probably over a dozen different vendors and integrated
2 into many practices.  So there are tools available
3 that make this data point not relevant in current
4 average practice across the United States.
5      **Q.  So let me direct your attention to QACH35 and**
6 **your report.  This is in Section II of your report.**
7           **You have identified those in the statement of**
8 **opinions, which is on Page 3 of your expert report, as**
9 **containing opinions of six additional cases, which I**
10 **now understand were reviewed by Dr. Desai that were**
11 **not addressed by Dr. Gruden.  So these cases you point**
12 **out were read by my client and not addressed by**
13 **Dr. Gruden.**
14          **You would acknowledge, would you not, that**
15 **QACH32 was not identified by Dr. Litmanovich as a**
16 **misread?  And you'll see that in Exhibit 10.**
17     A.  I'm bringing that up now.
18          (Deponent viewing exhibit.)  Number 10 says,
19 agree with interpretation, no.  If no major/minor
20 finding, major.  Impacted patient care, yes.  If I'm
21 looking at the same case, if that's what you're
22 referring to.
23     **Q.  So we're looking at QACH32 --**
24     A.  Okay.

Page 140

1      **Q.  -- which I think you will not find on**
2 **Exhibit 10.**
3      A.  (Deponent viewing exhibit.)  You're right.
4 It's not on that -- is it on the different document,
5 the longer one?
6      **Q.  So, on Exhibit 11, you will find, in fact,**
7 **QACH32.  It's on the second page.**
8      A.  (Deponent viewing exhibit.)  Yes, there we
9 are.  Okay.
10     **Q.  And it appears, I think, that Dr. Litmanovich**
11 **agreed with Dr. Charu's read on QACH32, correct?**
12     A.  (Deponent viewing exhibit.)  It says yes.
13 And then there's a note, "Recommendations for the
14 follow-up of pulmonary nodules are not in concordance
15 with Fleischner guidelines."  So, yes, with a comment.
16     **Q.  So not a misread, but the recommendations are**
17 **not in concordance with Fleischner guidance?**
18     A.  Correct.
19     **Q.  You served on the Fleischner Society,**
20 **correct, and the guidelines of 2017?**
21     A.  I was not a member of that guideline paper.
22     **Q.  Are you aware, even though you weren't a**
23 **member of that guideline paper, if the guidelines are**
24 **periodically updated?**

Page 141

1    A.  Yes, the Fleischner Society criteria for the
2  management of unexpected pulmonary nodules are
3  regularly updated.
4    Q.  Do you know if the updated guidelines are
5  universally applied?
6    A.  A thoracic radiologist, as a specialist,
7  would generally be aware of a major change in such a
8  substantive guideline to our practice, and it would be
9  one of the expectations you would expect a thoracic
10  radiologist to be aware of.  The guidelines have been
11  updated.  I think we are currently on the third
12  version in about a 20-year period, so this is not
13  something that are occurs so frequently as to be
14  missed every year, for example.
15    Q.  I'm going to direct your attention to QACH35,
16  which you also cite in your expert report.  Directing
17  your attention as well to Exhibit 11, the Litmanovich
18  spreadsheet, 35 states that Dr. Litmanovich agreed
19  with Dr. Desai's interpretation.
20      Do you see that?
21    A.  (Deponent viewing exhibit.)  Yes.
22    Q.  And the same thing with regard to your
23  reading on QACH36 --
24    A.  Thirty-five or 36?

Page 142

1    Q.  Thirty-five, I think we just covered.  And
2  you noted that in the Litmanovich spreadsheet,
3  Dr. Litmanovich agreed with Dr. Desai's review.  So
4  this is on Exhibit 11 --
5    A.  Okay.
6    Q.  -- on the second page.
7    A.  So QACH36?
8    Q.  QACH35.
9    A.  (Deponent viewing exhibit.)  All right.
10    Q.  I'm just confirming, Dr. Litmanovich agreed
11  with Dr. Desai's reading?
12    A.  Dr. Litmanovich did.  I did not.
13    Q.  Right.  On 36, you commented on this one as
14  well, but on Exhibit 11, Dr. Litmanovich also agreed
15  with Dr. Desai, correct?
16    A.  (Deponent viewing exhibit.)  On QACH36,
17  Dr. Litmanovich agreed.  I did not.
18    Q.  Okay.
19    A.  (Deponent viewing exhibit.)  And on 35 or 36,
20  my summary can be described as incomplete description
21  of the lung abnormalities and lack of synthesis of a
22  lot of descriptive findings that were -- were thrown
23  out towards a differential diagnosis.  That is an
24  important part of being a thoracic radiologist is to

Page 143

1  -- to get your findings, to synthesize them and to
2  narrow to a diagnosis or differential so that
3  referring physicians and act on it.
4      (Technical difficulties.)
5      MADAM COURT REPORTER:  I'm sorry, I
6  didn't hear the end of it.  Can you -- you sounded far
7  away and you cut out.
8      THE DEPONENT:  Oh.
9      MADAM COURT REPORTER:  "And to synthesize
10  them or to narrow"...
11    A.  To narrow the differential diagnosis or
12  provide a -- a preferred diagnosis so that the
13  referring physician can act on the information.  It's
14  not enough to describe only.
15    Q.  So, thank you for that clarification,
16  Dr. Litmanovich -- Litmano -- Dr. Kazerooni,
17  I'd like to confirm very briefly that on, 35, 36
18  and, in fact, on 37, which you also cite as an error,
19  Dr. Litmanovich did not cite them as an error, she did
20  not disagree with Dr. Desai's reading; isn't that
21  correct?
22    A.  That's correct, and she is entitled to her
23  opinion.  In all three of these cases, the same
24  description and synthesis, that activity was not

Page 144

1  performed.  That's the hallmark of a thoracic
2  radiologist.
3      (Technical difficulties.)
4      MADAM COURT REPORTER:  And that's the
5  what of a thoracic radiologist?  I lost that -- I
6  didn't hear that word.
7      THE DEPONENT:  Hallmark.
8      MADAM COURT REPORTER:  Thank you.
9      BY MS. WASHIENKO:
10    Q.  So QACH43 --
11    A.  (Deponent viewing exhibit.)  Yes.
12    Q.  -- looking at Exhibit 11, you would agree
13  with me that Dr. Litmanovich agreed with Dr. Desai's
14  assessment of QACH43, correct?  I understand that you
15  did not, but you would agree with me that
16  Dr. Litmanovich did?
17    A.  (Deponent viewing exhibit.)  She says yes.
18  There's a sidebar comment there, "Very extensive
19  network of venous collaterals has not been mentioned."
20  So there is a specific note provided.  I don't know
21  anything further about what -- what her extent of
22  thought was about that.
23    Q.  And I'll just direct your attention as well,
24  then, to QACH44.  You describe this as a major error.

Charu Desai vs
UMASS Memorial Medical Center, Inc., et al.

Ella Kazerooni, M.D., M.S.
October 21, 2021

Page 145

1      But looking at Exhibit 11, Dr. Litmanovich
2  actually agrees with Dr. Desai's reading, correct?
3      A.  (Deponent viewing exhibit.)  That is correct.
4  However, I did identify, as a major finding, that to
5  say "slightly enlarged lymph nodes," as was described
6  by inappropriately applying the size thresholds that
7  are used of 10 millimeters, can contribute to
8  additional follow-up CTs, potentially biopsy and
9  bronchoscopy that are unnecessary.
10     So it's not simply enough to say, I think
11 there's mildly enlarged lymph nodes.  You need to
12 measure the lymph nodes and make sure they pass the
13 size threshold to call them enlarged, and that's 10
14 millimeters, and I don't see evidence of that having
15 been done.
16     Q.  Right, nor did you see that Litmanovich, in
17 fact, disagreed with the content of Dr. Desai's
18 report, correct?
19     A.  Correct.
20     Q.  And I do -- by the way, just because I know
21 we've got a lot to get through still, that really can
22 just be a yes or no.
23     Litmanovich did not disagree with Dr. Desai's
24 interpretation?

Page 146

1      A.  Correct, she did not.
2      Q.  I'm going to direct your attention now,
3  briefly, to the control group that -- that
4  Mr. Wakefield identified.  He directed you
5  specifically to look at QACH20, 24 and 46.
6      A.  (Deponent viewing exhibit.)  Yes.  I believe
7  Dr. Gruden had commented on six, I believe, of the
8  control cases, and three of those were -- were chosen
9  for me to review.
10     Q.  Right.  Just for clarify, you have a
11 disagreement with Dr. Gruden's assessment, but I'm
12 going to direct your attention again to Exhibit 11 on
13 QACH20.
14     It appears that Dr. Litmanovich did not
15 disagree with the interpretation, although she notes
16 typos in the final impression, correct?
17     A.  (Deponent viewing exhibit.)  It's hard for me
18 to read across because there's not, like, a -- you
19 know, lines going back and forth (indicating), but I
20 believe that that is correct.
21     Q.  But she certainly did not disagree with
22 Dr. Desai's interpretation?
23     A.  She said she agreed, and she made that
24 comment about typos.

Page 147

1      Q.  On QACH24, you disagree, minor concerns with
2  Dr. Gruden, you agree that it has no impact on patient
3  care, correct?
4      A.  (Deponent viewing exhibit.)  I agree.  It has
5  no impact on patient care.
6      Q.  Right.  On QACH46, I believe you state that
7  there is a lack of proofreading on the report, with no
8  potential impact on patient care, correct?
9      A.  (Deponent viewing exhibit.)  Correct.
10     Q.  When you look at QACH46, I think it's
11 Exhibit 8 --
12     A.  (Deponent complied.)  Okay.
13     Q.  -- what do the pulmonary arteries findings
14 section state?
15     A.  (Deponent viewing exhibit.)  "This
16 examination is diagnostic to the subsegmental level.
17 There are multiple bilateral pulmonary emboli the and
18 the in are seen CTs and no to in in with the right is
19 the."
20     Q.  What does that mean?
21     A.  (Deponent viewing exhibit.)  After one gets
22 through, there are multiple bilateral pulmonary
23 emboli, the rest of that sentence does not have
24 meaning.

Page 148

1      Q.  I'm --
2      A.  The --
3      Q.  I'm sorry?
4      A.  (Deponent viewing exhibit.)  You asked about
5  the pulmonary artery section, the impression to go
6  along with that findings does state multiple bilateral
7  pulmonary emboli, and it describes their level in
8  detail and the associated right heart strain.  So
9  there's additional content in the report, past the
10 typo, that describes the same abnormality.
11     Q.  And the impression, which you were just
12 looking at, does that -- does that impression clarify
13 the pulmonary arteries section or, in fact, not help
14 clarify it, for purposes of a report to a subsequent
15 reader or a clinician?
16     A.  It does clarify.
17     Q.  So you do not believe that the findings
18 section typos and impressions section typos make this
19 report somewhat incoherent?
20     A.  Correct.  In its totality, taking the two
21 parts that describe the pulmonary arteries together,
22 the impression describes the level of detail on what
23 one would expect.
24     Q.  Does the University of Michigan, to your

# Exhibit D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:19-cv-10520-TSH

CHARU DESAI,
      Plaintiff,

    v.

UMASS MEMORIAL MEDICAL CENTER,
INC., et al.,
      Defendants.

**DEFENDANTS' PRETRIAL DISCLOSURES**

Pursuant to Fed. R. Civ. P. 26(a)(3)(A), Defendants, UMass Memorial Medical Group, Inc., and Max Rosen, M.D., make the following disclosures regarding the evidence that they may present at trial other than solely for impeachment:

**(i)**    **Witnesses**

Defendants expect to present the following individuals as witnesses at trial:

1.    Max Rosen, M.D.
    c/o Defendants' Counsel

2.    Karin Dill, M.D.
    c/o Defendants' Counsel

3.    Diana Litmanovich, M.D.
    c/o Defendants' Counsel

4.    Mona Korgaonkar, M.D.
    c/o Defendants' Counsel

5.    Joseph Ferrucci, M.D.
    c/o Defendants' Counsel

6.    Stephen Tosi, M.D.
    c/o Defendants' Counsel

7.      Randa Mowlood
        c/o Defendants' Counsel

8.      Kathleen LeBlanc
        c/o Defendants' Counsel

Defendants may call the following individual as an expert witness if the need arises:

9.      Ella Kazerooni, M.D.
        c/o Defendants' Counsel

Defendants reserve the right to disclose additional witnesses necessitated by Plaintiff's

disclosures or the Court's ruling on the Parties' Joint Motion for Clarification of Order on

Defendants' Motion for Summary Judgment.

**(ii)     Designation of Deposition Testimony**

Not applicable.

**(iii)    Exhibits**

Defendants expect to offer the following documents as exhibits:

1.      Curriculum Vitae, Charu S. Desai, M.D.; CD 00042-45.

2.      University of Massachusetts Medical School, Annual Faculty Report and
        Evaluation of Professional Activities, Charu Desai, M.D., July 1, 2009 – June 30,
        2010; UMM 00265-269.

3.      University of Massachusetts Medical School, Annual Faculty Review, Charu
        Desai, M.D., July 1, 2010 – June 30, 2011; UMM 00270-276.

4.      University of Massachusetts Medical School, Annual Faculty Review, Charu
        Desai, M.D., July 1, 2011 – June 30, 2012; UMM 00277-281.

5.      University of Massachusetts Medical School, Faculty Annual Performance
        Review, Charu Desai, M.D., July 1, 2012 – June 30, 2013; UMM 00282-287.

6.      University of Massachusetts Medical School, Faculty Annual Performance
        Review, Charu Desai, M.D., July 1, 2013 – June 30, 2014; UMM 00288-292.

7.      University of Massachusetts Medical School, Faculty Annual Performance
        Review, Charu Desai, M.D., July 1, 2014 – June 30, 2015; UMM 00293-297.

8.      University of Massachusetts Medical School, Faculty Annual Performance Review, Charu Desai, M.D., July 1, 2015 – June 30, 2016; UMM 00298-302.

9.      University of Massachusetts Medical School, Faculty Annual Performance Review, Charu Desai, M.D., July 1, 2016 – June 30, 2017; UMM 00303-307.

10.     University of Massachusetts Medical School, Faculty Annual Performance Review, Charu Desai, M.D., July 1, 2017 – June 30, 2018; UMM 00308-313.

11.     Agreement between UMass Memorial Medical Group, Inc., and Charu Desai, M.D.; UMM 00334-346.

12.     Letter from Max Rosen, M.D., and Stephen Tosi, M.D., to Charu Desai, M.D., March 9, 2018, RE: Notice of Termination of Employment; UMM 00253.

13.     UMass Memorial Medical Center, Ongoing Professional Practice Evaluation/Reappointment Assessment, Charu Desai, M.D., June 21, 2017; UMM 03680.

14.     Email from Max Rosen, M.D., to Darren Brennan, M.D., et al., February 8, 2017, Meeting – Review of Radiology Issues at Marlborough; UMM 00707-708.

15.     Emails between Kathryn Green and Max Rosen, M.D., February 1, 2017, Re: confidential QA; UMM 04745-4746.

16.     Letter to Diana Litmanovich, M.D., from Max Rosen, M.D., September 19, 2017, Re: Agreement to Review Radiology Scans; UMM 00694.

17.     Spreadsheet with Assessments of 50 CT Studies Reviewed by Diana Litmanovich; UMM 00690-692.

18.     Spreadsheet with Assessments of 50 CT Studies Reviewed by Diana Litmanovich, with Identity of Reader Column; UMM 00695-696.

19.     Chest CT QA Study, January 26, 2017 [sic]; UMM 00699-705.

20.     Curriculum Vitae, Karin E. Dill, M.D., March 20, 2018; UMM 28227-28244.

21.     Curriculum Vitae, Max Rosen, M.D.

22.     Curriculum Vitae, Diana Litmanovich, M.D.

23.    Letter from Max Rosen, M.D., to Refky Nicola, M.D., March 1, 2017, RE: Notice of Termination of Employment; UMM 03710.

24.    UMass Memorial Human Resources Information Systems Data, Radiologists aged 60 years or older hired by Max Rosen, M.D., with names and dates of birth.

25.    UMass Memorial Human Resources Information Systems Data, Radiologists aged 60 years or older employed as of March 15, 2019, with names and dates of birth.

26.    UMass Memorial Human Resources Information Systems Data, Radiologists aged 60 years or older currently employed, with names and dates of birth.

27.    Emails between Diana Desai, M.D., and Don Rainwater, July 9, 2019, Re: Radiology Position Applicant; CD 00268-270.

28.    Email from Eric Bevilacqua to Diana Desai, M.D., August 29, 2019, Re: Eric @ Medicus Mass; CD 00240-241.

29.    Emails between Diana Desai, M.D., and Donald Villoni, July 26, 2019, Re: Radiologist Position; CD 00259-260.

30.    Email from American College of Radiology Career Center to Diana Desai, M.D., September 12, 2019, Re: Application submitted for Body Imager – Stamford CT; CD 00169-170.

31.    Email from American College of Radiology Career Center to Diana Desai, M.D., August 25, 2019, Re: Application submitted for Body Radiologist; CD 00173-174.

32.    Email from American College of Radiology Career Center to Diana Desai, M.D., March 10, 2020, Re: Application submitted for Diagnostic Radiologist/Breast Imaging; CD 00179-180.

33.    Email from American College of Radiology Career Center to Diana Desai, M.D., January 6, 2020, Re: Application submitted for Generalist / Neuroradiologist with Light IR-Outstanding Compensation Package Including Sign On Bonus!; CD 00187-188.

34.    Email from American College of Radiology Career Center to Diana Desai, M.D., July 16, 2020, Re: Application submitted for Musculoskeletal Radiology- Tufts Medical Center - Boston, MA; CD 00584-585.

35.    Email from American College of Radiology Career Center to Diana Desai, M.D., September 8, 2020, Re: Application submitted for Radiologist – Beautiful Cape Cod, MA – Live and Work Oceanside; CD 00586-587.

36.     Email from American College of Radiology Career Center to Diana Desai, M.D., June 24, 2021, Re: Application submitted for Musculoskeletal Radiologist; CD 0721-722.

37.     Email from American College of Radiology Career Center to Diana Desai, M.D., June 24, 2021, Re: Application submitted for Abdominal Imaging- Tufts Medical Center- Boston, MA; CD 0725-726.

38.     Text Message, Diana Desai, M.D., to Hemang Kotecha, M.D., March 13, 2020; CD 00164.

39.     Email from Terrence Cole to Max Rosen, M.D., December 10, 2019, Re: Telerad |$400k | 100% from Home | Guaranteed Compensation | Plain Films Only.

40.     Emails between Jessica Flint and Charu Desai, M.D., February 8-18, 2016, RE: vacation moonlight (March-April)?; UMM 04843.

41.     Emails between Myra Shah and Randa Mowlood, February 7, 2018, RE: Dr. Desai; UMM 04567.

42.     Email from Karin Dill, M.D., to Charu Desai, M.D., April 19, 2016, Re: vacation request; UMM 04340.

43.     Email from Charu Desai, M.D., to Max Rosen, M.D., March 23, 2018, Re: CT Scan Readings; UMM 00541.

44.     Emails between Myra Shah, Randa Mowlood, and Kelly Zalegowski, April 28, 2016-May 5, 2016, RE: Dr. Desai; UMM 04811-4813.

45.     Email from Randa Mowlood to Myra Shah, May 19, 2017, Re: Dr. Desai; UMM 04921.

46.     Emails between Randa Mowlood, Max Rosen, M.D., et al., May 13, 2016-May 20, 2016, RE: Dr. Dill/Desai; UMM 04685-4687.

47.     Emails between Randa Mowlood, Kathleen LeBlanc, et al., May 13, 2016-May 20, 2016, RE: Dr. Desai/FMLA; UMM 04533-04534.

48.     Email from Max Rosen, M.D., to Charu Desai, M.D., September 20, 2017, Re: Residents rotating on Chest – need to follow read-out assignments; UMM 04615.

49.     Emails between Max Rosen, M.D., Randa Mowlood, and Charu Desai, M.D., March 16, 2016-March 30, 2016, Re: Vacation time; UMM 04581-4583.

50.     Emails between Max Rosen, M.D., and Charu Desai, M.D., March 16, 2016-March 30, 2016, Re: Vacation time; UMM 04577-4578.

51.     Emails between Karin Dill, M.D., Max Rosen, M.D., and Daniel Burritt, M.D., March 11, 2018, Re: STAT studies; UMM 04454.

52.     Emails between Max Rosen, M.D., and Karin Dill, M.D., February 16, 2018, Re: confidential; UMM 04418.

53.     Emails between Jessica Flint and Karin Dill, M.D., February 14, 2018, RE: chest; UMM 04415.

54.     Emails between Karin Dill, M.D., Max Rosen, M.D., and Kimberly Robinson, M.D., September 28-29, 2017, RE: CT – opinion secure and confidential; UMM 04395-4396.

55.     Emails between Karin Dill, M.D., Max Rosen, M.D., and Richard Irwin, M.D., September 28-29, 2017; Re: secure and confidential; UMM 04394.

56.     Email from Karin Dill, M.D., to Max Rosen, M.D., September 20, 2017, Re: confidential follow up; UMM 04386-4387.

57.     Email from Max Rosen, M.D., to Charu Desai, M.D., August 14, 2017, Re: "Vascular" studies in the Chest CT list; UMM 04382.

58.     Emails between Max Rosen, M.D., and Kathleen LeBlanc, May 26, 2016, RE: Confidential; UMM 04373.

59.     Email from Karin Dill, M.D., to Charu Desai, M.D., May 26, 2016, Re: schedule conversation today; UMM 04349.

60.     Emails between Karin Dill, M.D., Randa Mowlood, and Jessica Flint, May 4, 2016, RE: Vacation/selling calls; UMM 04342-4343.

61.     Emails between Max Rosen, M.D., and Karin Dill, M.D., April 4, 2018, Re: Confidential; UMM 04335.

62.     Emails between Charu Desai, M.D., Karin Dill, M.D., et al., May 9-19, 2018; RE: Weekend call requests; UMM 04064.

63.     Email from Karin Dill, M.D., to Charu Desai, M.D., February 7, 2018; Re: chest shift today; UMM 03864.

64.     Email from Max Rosen, M.D., to Charu Desai, M.D., May 13, 2016, Re: Confirmation of our emeting [sic] today; UMM 00314-315.

65.     Emails from Max Rosen, M.D., to Charu Desai, M.D., May 13-24, 2016, RE: Confirmation of our prior meeting on May 13 and deatils [sic] of May 20 meeting; UMM 04587-4588.

66.     Emails between Diana Desai, M.D., and Charu Desai, M.D., March 14, 2019, and May 30, 2016, Re: Meeting Response, with attachment; DD 0006-8.

67.     Emails between Diana Desai, M.D., and Charu Desai, M.D., March 14, 2019, and April 24, 2018, Re: MEETING SUMMARY: April 24, 2018; DD 0001-3.

68.     Email from Diana Desai, M.D., to Charu Desai, M.D., September 21, 2017, Re: Dr. Dill; UMM 03865.

69.     Email from Karin Dill, M.D., to Max Rosen, M.D., and Darren Brennan, M.D., September 21, 2017, Re: Incident 9/21/17; UMM 04309.

70.     Emails between Darren Brennan, M.D., Max Rosen, M.D., and Charu Desai, M.D., September 21, 2017, Re: Incident today on 9/21/2017; UMM 04294.

71.     Email from Darren Brennan, M.D., to Charu Desai, M.D., September 21, 2017, Re: Incident with Dr Dill today; UMM 03867.

72.     Emails between Darren Brennan, M.D., Max Rosen, M.D., and Charu Desai, M.D., September 21, 2017, No Subject; UMM 04295.

Defendants may offer the following documents as exhibits if the need arises:

73.     De-Identified Radiology Reports for 50 CTs, QACH01-50; UMM 00553-689.

74.     Email from Brendan Sweeney to James Gruden, M.D., July 28, 2020, RE: Desai v. University of Massachusetts Memorial Medical Center, Inc., et al.

75.     Email from Brendan Sweeney to James Gruden, M.D., June 11, 2021, FW: Desai v. UMass Expert Report, without attachments.

76.     Curriculum Vitae, Ella Annabelle Effat Kazerooni, M.D.

77.     Spreadsheet with Assessments of 19 CT Studies Reviewed by Ella Kazerooni, M.D., UMM 30859-30864.

Defendants reserve the right to disclose additional documents necessitated by Plaintiff's disclosures or the Court's ruling on the Parties' Joint Motion for Clarification of Order on Defendants' Motion for Summary Judgment.

Respectfully submitted,

**UMASS MEMORIAL MEDICAL
GROUP, INC., and MAX ROSEN, M.D.**

By their attorneys,


*/s/Reid M. Wakefield*
Robert L. Kilroy, Esq., BBO # 636853
Reid M. Wakefield, Esq., BBO # 569026
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA  01581
Phone 508.860.1474
Fax 508.983.6261
rkilroy@mirickoconnell.com
rwakefield@mirickoconnell.com

Dated:  November 2, 2022

<u>CERTIFICATE OF SERVICE</u>

I, Reid M. Wakefield, hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this day.

*/s/Reid M. Wakefield*
Reid M. Wakefield, Esq.

Dated:  November 2, 2022