1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4     Charu Desai,                )
                    Plaintiff,    )
5                                  )
                                   )
6     vs.                          )    Case No. 19-cv-10520-TSH
                                   )
7                                  )
      UMass Memorial Medical Group )
8     and Max Rosen,               )
                    Defendants.    )
9

10

      BEFORE:  The Honorable Timothy S. Hillman
11

12

                          Jury Trial Day 2
13              Excerpt of the Opening Statements
                Excerpt of the Testimony of Max Rosen
14

15

16

                                   United States District Court
17                                 Courtroom No. 2
                                   595 Main Street
18                                 Worcester, Massachusetts
                                   December 5, 2022
19

20

21

22

                       Marianne Kusa-Ryll, RDR, CRR
23                       Official Court Reporter
                       United States District Court
24                     595 Main Street, Room 514A
                       Worcester, MA 01608-2093
25                  508-929-3399 justicehill@aol.com
                    Mechanical Steno - Transcript by Computer

1    APPEARANCES:

2    Upper Charles Law Group
     Joseph F. Comenzo, Esquire
3    Timothy D. Rodden, Jr., Esquire
     10 Kearney Road, Suite 101
4    Needham, Massachusetts 02494
     on behalf of the Plaintiff
5
     Upper Charles Law Group, LLC
6    David Cromwell Johnson, Jr., Esquire
     81 Hartwell Avenue
7    Suite 101
     Lexington, Massachusetts 02421
8    on behalf of the Plaintiff

9    Kolman Law, PC
     Timothy M. Kolman, Esquire
10   414 Hulmeville Avenue
     Penndel, Pennsylvania 19047
11   on behalf of the Plaintiff

12   Mirick, O'Connell, DeMallie & Lougee, LLP
     Robert L. Kilroy, Esquire
13   Reid Michael Wakefield, Esquire
     1800 West Park Drive
14   Suite 400
     Westborough Massachusetts 01581-3926
15   on behalf of the Defendants

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1    (Excerpt as follows:)

2         MR. KOLMAN:  Good morning again, ladies and gentlemen.

3    My name is Tim Kolman.  Let me introduce you just very

4    briefly.  Joe Comenzo is my colleague.  He'll be trying this

5    case with me.

6         That's Tim Rodden.  He also representing the

7    plaintiff.

8         And this, of course, is my client Dr. Charu Desai, a

9    thoracic radiologist who worked for the defendant for 26 years,

10   exquisite at her job, exquisite at being able to find disease,

11   illness, possible cancer where some radiologists simply could

12   not find it.

13        This, as you've heard, is an age discrimination case

14   in essence.  There are a couple of other courses of action

15   which I'll talk about briefly, but this is what we expect the

16   evidence to show.

17        Number one, we expect to show that Charu Desai was and

18   is an excellent thoracic radiologist with an excellent record.

19   She got excellent reviews for some 26 years until Dr. Max Rosen,

20   sitting behind me, decided in 2017 that he was going to get rid

21   of her by hook or by crook.

22        Now, that raises a lot of questions, which we hope to

23   answer, and you might ask, well, why on earth would UMass

24   Medical get rid of such an excellent employee.  And the answer,

1    as far as we're concerned, and what we wish to prove and what

2    we believe we will prove, is that it was because of age.  We

3    can show that the reason why she was terminated is bogus, that

4    it doesn't have any scientific merit, that the so-called

5    independent review that the defendant used is not an

6    independent review at all, but a biased nonindependent -- not

7    even a review that was used to show that Dr. Desai is

8    incompetent, that she actually cannot read CT scans, that her

9    level of incompetency is such that she had to be terminated.

10           Now, to show that it is bogus, we will be hearing from

11   an expert, Dr. Gruden, who will testify that the reads that

12   were used to terminate her, in other words, the ones that were

13   allegedly defective or incompetent, were not incompetent at

14   all, that, in fact, they were just fine.

15           Further, we will show that the sampling used was front

16   loaded so she couldn't possibly win.  You might ask, well, how

17   is that done?  And we'll get into more detail at the trial, but

18   very briefly they took 25 of Dr. Desai's reads and they

19   compared it to 25 of a variety of other -- other radiologists,

20   and as -- we believe we can show that is statistically unfair

21   from the start.

22           And you may ask, well, why did they go to all this

23   trouble, and we believe the evidence will show it's because she

24   is so good, because they couldn't catch her out on true

25   incompetence, so it had to be created.

1          And then you may ask well, why -- why would they do

2     such a thing?  And the evidence will show that they did it

3     because they wanted to get rid of her and replace her with

4     someone younger, and we believe that the evidence will show

5     just that.  And we'll also show that the defendants are fairly

6     open about that, but that is exactly what they wanted to do,

7     and there's evidence to that effect also.

8          Now, you will hear from, obviously, my client, and

9     you'll hear from Dr. Rosen, and you'll hear from a foreign

10     psychiatrist, Dr. Vaskanian.  We're talking about that the

11     damages that Dr. Desai has suffered as a result of losing her

12     life's work and her vocation.  And you'll hear from the

13     economist as well about economic loss.

14          But you'll also hear about the other two courses of

15     action in this case, which I just alluded to, and that is

16     interference with advantageous relations and aiding and

17     abetting, and the judge will instruct you on those.

18          But very briefly, as far as I understand it at least,

19     the aiding and abetting is, of course, against Dr. Rosen in

20     aiding and abetting in her termination and discrimination, and

21     the interference with advantageous relations are effectively

22     employment relations that she had with UMass Medical.

23          Now, she also had two other employment relationships.

24     One is with Marlborough Hospital, and the other is with the

25     medical school.

1        And so before I forget, I want to thank you so very,

2   very much for your service.  This is not taken for granted at

3   all.  It's a very, very important case to my client.  Thank you

4   so much for your close attention to the case.

5        I or Joe will be back at the end of this case to wind

6   it up, as it were, to talk about the evidence and to talk about

7   what we believe we've proved and obviously to ask you for a

8   verdict in favor of Dr. Desai.

9        Thank you so much for your kind attention.

10       THE COURT:  Thank you, Mr. Kolman.

11       MR. KILROY:  May it please the Court.

12       THE COURT:  You may.

13       MR. KILROY:  Thank you, your Honor.

14       Tim.

15       (Notepad handed to Mr. Kolman.)

16       MR. KOLMAN:  Thanks.

17       MR. KILROY:  You bet.

18       Good morning, ladies and gentlemen.

19       JURORS:  Good morning.

20       MR. KILROY:  As I mentioned on Friday morning, my name

21   is Bob Kilroy.  I am a partner at the law firm of Mirick

22   O'Connell headquartered here in Worcester.

23       With me is my colleague, Reid Wakefield, and it's my

24   privilege to represent UMass Memorial Medical Group in response

25   to Dr. Desai's allegations of age discrimination.

1          I alluded on Friday morning to UMass Memorial Medical

2     Group is what's called the physician arm of the entire UMass

3     Memorial Health Care system.  So any employed physician within

4     the university campus, up on Lakeside Ave., Memorial campus,

5     Marlborough Hospital, Clinton Health Alliance, Leominster,

6     Fitchburg, or the Harrington hospitals or Marlborough Hospital

7     for that matter, any employed physician falls under the

8     umbrella of UMass Memorial Medical Group as the employer.

9          I also have the very distinct privilege to represent

10    Dr. Max Rosen; and as you heard on Friday, Dr. Rosen is the

11    chair or head of the Department of Radiology for the entire

12    UMass Memorial system.  So any hospital within UMass that has

13    radiology services, he is responsible for those radiologists.

14    He is responsible for their quality.  He's responsible for

15    patient safety for those.

16         Dr. Rosen himself is 63 years old, and the evidence

17    that you'll hear during the trial is that Dr. Desai was 67 when

18    she was provided notice of her termination.

19         Dr. Rosen grew up nearby in Pawtucket, Rhode Island.

20         Now, before I forecast what the evidence will show,

21    let me join my brother counsel in thanking you for your

22    service.  UMass Memorial Medical Group is very grateful that

23    you're here to hear the case, particularly during the holidays.

24    You know, it's a two-week commitment.  Granted, we only go to

25    1:00 in the afternoon, but that's a huge commitment, and the

1    Medical Group is very appreciative.

2        More specifically, however, Dr. Rosen wants to thank

3    you for your service, because Dr. Rosen has been waiting a long

4    time during litigation to finally publicly address allegations

5    of age discrimination.  It has been a long haul for Dr. Rosen

6    to wait to address a former colleague calling him an age

7    discriminator.

8        Now, I will invite your attention now and throughout

9    the trial to the actual evidence, the facts that will come in,

10   not a story that I'll tell, not a story that my brother counsel

11   will tell, but the actual evidence, and I'm going to preview

12   that evidence now, and I'll invite you to test me.  What I say,

13   test and see whether or not it's presented during the trial.

14       Although this case is about age; ultimately, this

15   case, as you will see through all the evidence, is about

16   patient safety.  Now, I'll say that again.  This case

17   ultimately is about patient safety.  And the mantle of

18   responsibility that Dr. Rosen shoulders for patient safety, I

19   mentioned to you he has over 80 radiologists that he has to

20   supervise.

21       So each day he has to be concerned about the quality

22   of the reads of his radiologists and concerned about our

23   patients being cared for appropriately.  Throughout this

24   region, referring physicians send to UMass Memorial their

25   patients, particularly for complex, advanced reads within the

1   field of chest radiology, which is Dr. Desai's specialty.

2           By the end of the trial, you'll realize that the case

3   boils down to a single question, just one question, and that's:

4   Did Dr. Rosen, the chair of the Radiology Group, decide to

5   terminate the employment of Dr. Desai because she was 67 years

6   old?  Did he determine that he had to terminate her because she

7   was 67, or will the evidence establish that she was terminated

8   because he -- he had concerns about her quality as a chest

9   radiologist and had to protect patients?

10          What the evidence will show is that Dr. Desai has

11  failed to keep pace with technology.  She has failed to keep

12  pace with quality within the field of radiology.  You're going

13  to see Dr. Desai's résumé or CV, as it's called within the

14  physician community.  I'll invite you to compare her CV to the

15  other radiologists who are going to testify.  You will find

16  there is no comparison.  You're going to see CVs of other

17  radiologists that show dozens and dozens of research and

18  writing, publications in national medical journals about

19  technology, about advances in radiology, about quality, about

20  patient safety.  You will not find that with Dr. Desai.

21          You're going to see tons of evidence in the other CVs

22  of radiologists, chest radiologists, who spend their time going

23  to national conferences, learning from their peers, undergoing

24  additional training, making sure they're at the cutting edge of

25  quality and patient safety.  Compare that to Dr. Desai,

1   because you're not going to find it there.

2          You will hear testimony from a technology standpoint

3   that Dr. Desai has difficulty managing emails, that Dr. Desai

4   cannot engage in text messaging.  She did not keep pace with

5   advanced technology.

6          You'll hear testimony from Dr. Dill, from Dr. Rosen,

7   and I believe from Dr. Desai that the field of chest radiology

8   has evolved significantly over the last 20 years, and more so

9   in the last five years.  That won't be in dispute.  Take that

10  knowledge, compare it to her CV, and see if she evolved with

11  it.

12          Dr. Rosen has given a mandate when he was brought into

13  UMass Memorial in 2012.  Part of that mandate was to improve

14  quality of radiology within this region.  As he took on that

15  responsibility in 2015, he conducted a nationwide search for an

16  expert in chest radiology to become the division chief.  He

17  recognized that UMass Memorial was not on the cutting edge of

18  quality at that time.  They publicly posted a position.  They

19  looked throughout the nation, and they found Karin Dill,

20  Dr. Karin Dill.  She's 53 years old.

21          You're going to hear from her.  She flying in from

22  Atlanta.  She now works at the Emory University Hospital.

23  She'll be flying in to testify on behalf of the defense.

24          You'll see that she is one of the foremost experts in

25  this nation when it comes to chest radiology.  You'll see she

1    has published over 60 times in seven major medical journals

2    across the United States on quality, on patient safety, on

3    radiology within the field of chest.

4         You'll see that she is on virtually every committee

5    under the sun when it comes to radiology, the American Board of

6    Radiology, the Radiology Society of North America.  Compare

7    that to Dr. Desai.  The last time Dr. Desai was involved in the

8    Radiology Society of North America, a society with over 50,000

9    members, was back in 1981.

10        Dr. Dill will present that she came in with a mandate

11   as well from the chair, and that mandate was improve quality

12   within chest.

13        You'll see that she has three advanced fellowships in

14   chest radiology.  Fellowship training is the most advanced

15   training a physician can receive following medical school.  The

16   evidence will show she has three of those specific to chest.

17        And the evidence will show there's no comparison in

18   terms of skill set, in terms of capability, in terms of

19   quality, in terms of patient safety when you look at Dr. Desai

20   versus Dr. Dill.

21        The evidence will also show very clearly Dr. Desai's

22   reaction to Dr. Dill being brought on.  She was hostile to

23   Dr. Dill as the evidence will show.  She was dismissive of her.

24   She undermined her.  She talked behind her back.  That was her

25   boss.  She would yell at her boss.

1          And most importantly, she was unwilling to accept

2     constructive criticism.  Dr. Dill came in and established a new

3     set of templates and protocols for chest CTs so that there

4     would be standardization, and anyone who works in the medical

5     field, as the evidence will show, can tell you standardization

6     is important for quality and patient safety.

7          How did Dr. Desai react to that?  The evidence will

8     show she manually overrode the templates.  She didn't care

9     about patient safety in that regard.

10         So she refused to follow the protocols being

11    established to protect patients.  And Dr. Desai's evidence will

12    show was upset, upset that Dr. Rosen brought Dr. Dill into

13    UMass.  Dr. Dill was recruited from the University of Chicago

14    to come in.  Dr. Desai was upset.  Well, why?  This won't be in

15    dispute.  The "why" is because Dr. Rosen didn't ask her if she

16    wanted to be chief.

17         Dr. Desai will admit she's not as well qualified as

18    Dr. Dill.  The CV comparison will make clear she's not as well

19    qualified as Dr. Dill, but she felt she should have been asked

20    to become division chief.  That's what the evidence is going to

21    show, and she became upset that she wasn't asked.  The position

22    was posted nationwide.  She didn't apply for the position.  She

23    just felt because she had 20 years service at UMass he should

24    have ignored qualifications and asked her.

25         And then the evidence will show this unique

1    entitlement mentality and desire to be treated special simply

2    because she was at UMass for 20-plus years.  Not only did she

3    want to be asked to be division chief, despite admitting she is

4    not qualified, she wanted to be granted what's known as

5    academic days.

6            What are academic days?  UMass Memorial is what's

7    known as an academic medical center.  They're affiliated

8    closely with the University of Massachusetts Medical School.

9    They train medical students.  It's important for the positions

10   at UMass Memorial to enhance the reputation of the school

11   through research writing, through traveling across the country

12   lecturing on advances in medical science to include radiology.

13   Because of that importance and enhancing the stature of UMass

14   Memorial as a medical school, these professors and associate

15   professors's positions are given days within their 365-day

16   calendar to allot to research and writing and lecturing.

17           Dr. Desai demanded to have those days assigned to her.

18   She wanted 12 days.  Why?  The evidence will show it wasn't so

19   she could research.  It wasn't so she could write.  It wasn't

20   so she could lecture.  The evidence will show she was demanding

21   these days because, in her words, she had paid her dues.

22           There is not an academic policy that says you pay your

23   dues you get academic days.  In fact, Dr. Rosen, who you'll

24   learn from watching him on the stand, is a fair man, is a

25   thoughtful man, is a methodical man, and you'll see it not only

1    from his testimony, but from an email.  He asked her, Put in

2    writing your proposal of how you use these academic days so

3    that we can consider it; and if you're going to use them for

4    appropriate purposes, he would have granted her academic days.

5         How does she respond to that proposal, that request

6    from the chair, her boss, two levels up?  She ignored it.  But

7    she kept asking for academic days.  Why was she asking for

8    academic days?  The evidence will show because she wanted days

9    off.  She didn't want to work.  That's not prioritizing patient

10   safety.

11        The evidence will also show that she made other

12   demands, that she wanted to be treated special.  There's what's

13   called call coverage in the field of hospital medicine.  I

14   mentioned UMass as an academic medical center.  It's also a

15   level 1 trauma center.  So regionally, the most complex

16   patients come here.  Trauma patients come here.  UMass Memorial

17   Medical Group does not have the luxury to ever take a day off

18   or an hour off.  They're on 24 hours a day, seven days a week,

19   365 days a year.  Christmas they have to have a radiologist

20   covering, New Year's, Thanksgiving.  It doesn't matter.  Every

21   weekend there has to be coverage.  They're not overflowing with

22   chest radiologists.  They only have so many.  So there's a fair

23   share allotment of weekends and major holidays.  It comes out

24   to about ten weekends a year that a radiologist has to cover.

25        What was Dr. Desai's response to that coverage

1    requirement and the need for quality, the need to be able to

2    read chest CTs on a weekend?  She demanded to be removed.  She

3    demanded not to have to do her fair share.  She demanded that

4    of Dr. Rosen.  She demanded that of her division chief.  She

5    demanded that of a senior academic administrator you'll hear

6    from, Randa Mowlood.  Why?  Because she paid her dues.  Not

7    because she thought it was in the interest of patient safety.

8            You'll hear evidence that Dr. Desai would not respond

9    to email communications from her division chief.  She wouldn't

10   respond to email communications from her chair.  She would

11   ignore them.  He would have to ask would you please respond to

12   this email.

13           You'll hear evidence from the senior academic

14   administrator that they have to plan vacations out a year in

15   advance to determine coverage, make sure all the weekends are

16   covered.  She wouldn't reply.  She wouldn't give her vacation

17   needs.  They would have to ask her over and over again to put

18   them in.  Finally, you'll see an email where they said, We're

19   just going to assign you, because you won't respond to us.

20           The evidence of that combined with how she treated her

21   division chief, the evidence will show, you'll hear from

22   Dr. Rosen, that he had to consider and he did consider, and he

23   met with human resources to consider terminating Dr. Desai's

24   employment for disruptive behavior.

25           I mentioned that you'll be able to assess that

1    Dr. Rosen is a fair man, he's thoughtful, and methodical.  He

2    chose not to go down that path.  At the same time, however,

3    while he was considering possibly having to terminate her for

4    disruptive behavior, he was receiving quality complaints.

5         Go back to the nationwide search that I mentioned.

6    Dr. Dill is brought in to enhance quality.  She does.  People

7    now are seeing -- referring providers are seeing the quality of

8    her reads and others, and now there's a comparative base to

9    Dr. Desai.

10        Providers began complaining to Dr. Dill as division

11   chief about her reads.  These are reads that matter to

12   patients.  These are reads about patients with possible lung

13   cancer or heart problems.  Dr. Dill did what she had always

14   done in her career.  She would do an overread, see if she

15   agreed.  She will testify that she often agreed mistakes were

16   made.  Not always.  Not always, but often.  And she'll tell you

17   what she normally does she did with Dr. Desai.  She went to

18   speak with Dr. Desai about the issues because it's meant to be

19   collegial, collaborative.  It's meant to be a learning

20   experience.

21        Dr. Dill will testify that 99 percent of the time that

22   she would go to a fellow radiologist and say, hey, look, I

23   think you missed this, they would be thrilled because they're

24   learning an advanced patient safety.  There's 1 percent of the

25   time that didn't happen.  She'll testify that 1 percent was

1    Dr. Desai.  In fact, Dr. Desai was dismissive when she would

2    come and try to talk to her about quality.  She actually would

3    put her hand up to dismiss her and keep her away from her being

4    able to talk to her.

5         Given all this, the fact that Dr. Dill is bringing to

6    Dr. Rosen quality concerns, the fact that Dr. Rosen is hearing

7    from others as to quality concerns, and particularly you'll

8    hear from the president of the medical staff of Marlborough

9    Hospital, an acute care pulmonologist, Dr. Robinson, that -- in

10   Dr. Robinson's words to Dr. Rosen, she, who's an expert in

11   lungs, she could not trust the reads by Dr. Desai.

12        You'll also hear Dr. Robinson was tough.  She

13   complained about a number of radiologists, not just Dr. Desai.

14   And Dr. Rosen had to look into each of those, but there's only

15   one where there was a complaint I can't trust the reads in

16   chest, and that was as to Dr. Desai, and there's only one that

17   the expert in radiology from a nationwide search said, We have

18   a problem in chest, and that was as to Dr. Desai.

19        So Dr. Rosen, who I told you has on his shoulders the

20   mantle of responsibility, had to decide how -- what should he

21   do about this.  And he had a variety of choices.

22        One, as he will testify, is terminate the employment

23   of Dr. Desai immediately for quality based on the strength of

24   Dr. Dill's telling him her quality is substandard, we can't

25   afford to keep her reading chest CTs.

1      Well, Dr. Rosen, again, being a fair man recognized

2    there was conflict between Dr. Dill and Dr. Desai.  He didn't

3    do that.

4      The second option he had, and this is an option that

5    all chairs have within a hospital setting, he could refer the

6    matter to a medical executive committee, refer it to the

7    broader medical staff for investigation.

8      You'll hear from Dr. Rosen, he contemplated that.  He

9    didn't do that.  And he'll tell you why he didn't do that.

10   Because if you send it to the medical executive committee, the

11   medical staff, and they conduct an investigation, as Dr. Rosen

12   will tell you, and if they decide to pull her privileges

13   completely, if they were to find she shouldn't have privileges

14   at all, there's a mandatory report to the Board of Registration

15   in Medicine.  That mandatory report will result in an

16   investigation by the Board of Registration against Dr. Desai.

17   That can lead -- not always -- it can lead to revocation of her

18   medical license.  Dr. Rosen was not looking to do that.  He

19   felt that she was capable of chest x-rays.  He didn't know if

20   she was capable of chest CTs.  He's not -- he'll tell you he's

21   a musculoskeletal radiologist.  He's not a chest specialist.

22   He couldn't review the quality himself.  But he didn't want to

23   go to the step where she might lose her license completely.

24      So what did he do?  He chose -- you heard my brother

25   counsel refer to it as an independent review, although he told

1       you it's not independent.  Let me tell you the facts that

2       you're going to hear in evidence to allow you to decide if it's

3       independent.

4             Dr. Rosen directed his staff to pull 25 CTs at random

5       of Dr. Desai.  He could have taken those 25 CTs and sent them

6       out for independent review.  He didn't.  He felt it would be

7       more fair to have a comparative base, so he directed his staff

8       to pull 25 other CTs from other radiologists to compare to.  He

9       could have chosen to say, pull 25 of Dr. Dill's chest CTs, who

10      had not received a great deal of quality complaints.  He could

11      have chosen the other chest radiologist at the time, Eric

12      Schmidlin, who's fellowship trained as well in chest.  He

13      didn't, because he felt -- you'll hear him tell you he felt

14      that would be unfair to Dr. Desai, that would stack the deck

15      against her.  He didn't want to do that.  So he asked for 25

16      and 25 of people who aren't dedicated chest radiologists.  They

17      have to read chests at times because of the volume of chests

18      that come, but they're not dedicated chest radiologists.

19            And then is it independent to send it out to an

20      outside reviewer?  What did he do to ensure independence?  He

21      chose a chest radiologist, a specialist in chest from the Beth

22      Israel Deaconess Medical Center.  You're going to see her CV.

23      Her CV looks a lot like Dr. Dill's.  He chose her, and then he

24      wanted to make sure that she would have no idea of who she's

25      looking at.  So he directed his staff delete the patient names,

1    but also delete the reading radiologist's name.  She had no

2    idea she was reading Dr. Desai's chest CTs.  She actually

3    didn't know if she was reading 50 chest CTs belonging to one

4    radiologist or ten or five or 50 radiologists, one each.  She

5    had no idea what she was looking at, other than she was asked

6    give an opinion, as he will testify, is there a minor error, a

7    major error, could it have affected patient care.

8          And you'll be tasked with deciding whether or not

9    that's an independent approach to assessing quality.  It was

10   completely blinded.  There was no way you could determine age,

11   and there will be no testimony to indicate that Dr. Rosen

12   conferred with this outside reviewer in any manner other than

13   what I just described.

14         Simply put, the testimony will be she had no idea who

15   she was reviewing.  She had no idea of the age who she

16   reviewed.  And she came up with results and sent them to

17   Dr. Rosen.  Her results had no indication that they were

18   Dr. Desai's.  Dr. Rosen had to ask someone else to unblind it

19   now to see which radiologist did what.  Unfortunately,

20   Dr. Desai's readings were substandard compared to the others.

21         Were there misreads by some others?  Yes.  But there

22   were five major misses and four additional minor misses.  The

23   five major misses mean that it could impact negatively patient

24   care.

25         Dr. Desai -- Dr. Rosen did not make a decision related

1    to Dr. Desai's employment based solely on that independent

2    review.  The independent review was designed to confirm or

3    refute the complaints that had been coming in from Dr. Dill and

4    from the president of the medical staff from Marlborough

5    Hospital.  And it did confirm it.  And he felt that he had to,

6    as he'll tell you, he felt constrained he had to act and remove

7    her privileges for CT scans immediately.  And so he did.  He

8    allowed her to continue to do chest x-rays, and just you'll

9    hear evidence about this, again through Dr. Dill and Dr. Rosen.

10   But essentially an x-ray is just like you see in TV.  They

11   throw it up against the back lit screen, and you can see the

12   broken bone, right?

13        CT is like multiple slices that you look at, and then

14   with technology you can form a three-dimensional image and can

15   spin it and try and find nodules.  They determined that she

16   wasn't capable of doing chest CTs going forward in the interest

17   of patient safety.

18        And then he had to decide again his options:  One,

19   terminate her employment immediately.  He didn't do it.  Two,

20   send it to the medical executive committee, which could result

21   in an investigation by the Board of Registration in Medicine.

22   He didn't do it.  Or three, treat it as a termination without

23   cause.  Based on his sense of fairness, that's what he did.

24        Under her contract, and you'll see the contract in

25   evidence, she -- because she was here for over 20 years had a

1    contract that allowed for one-year notice of termination of

2    employment.

3           For someone who's being accused of age discrimination,

4    he was willing to keep her on staff for another year.  He'll

5    tell you why.  He'll testify he kept her on staff for the

6    additional year, because:  One, he felt she could do chest

7    x-rays; and two, he understood how damaging it is to be

8    terminated immediately.

9           In a year's time frame he expected her to land a job

10   elsewhere just doing chest x-rays, not doing chest CTs.  That's

11   what the year of notices provide for, and it's common sense

12   obviously.  When you apply for a job while you're still working

13   you have a better chance, particularly if you're in an academic

14   medical center, saying I'm changing pursuing my career.

15          What will the evidence show as to what Dr. Desai did

16   that year?  Nothing.  She didn't apply for a single job.  She

17   didn't apply for 15 months for a job.

18          Let me go back now to age, age specific, and I'm going

19   to close on some numbers with respect to age.  At the time that

20   Dr. Rosen was initiating an independent review of Dr. Desai's

21   reads, and you're going to hear evidence that this took way too

22   long, Dr. Rosen will admit to you this took way too long.  He

23   should have moved quicker.  He's going to admit that to you.

24   It got delayed based on his workload.  It got delayed based on

25   the expert having to -- the expert being Karin Dill, but then

1    it got delayed based on the discussion with Dr. Litmanovich,

2    the independent reviewer based on her schedule, because she was

3    going to be flying out for a national conference for some time

4    and had to prepare for that.  But during the time of this

5    delay, Dr. Rosen, who's accused of age discrimination, fired a

6    40-year-old male radiologist.  Why?  For quality.  He didn't

7    give that male younger radiologist the benefit of an

8    independent review, because he could assess the quality.  It

9    wasn't a chest radiologist, but it was a younger man.  He fired

10    him.

11        He also during this time fired a 33-year-old

12    radiologist for performance concerns, the same thing, no

13    benefit of an independent review.  He made the decision to move

14    the individual on.

15        Since Dr. Rosen's date of hire in 2012, the evidence

16    is going to be clear.  He has personally hired 15 radiologists

17    over the age of 60.  He has hired 15 over the age of 60, six of

18    them older than Dr. Desai.

19        As of her termination date, March of 2019, she had

20    been given notice in March of 2018; in '19, she's 68 years old.

21    At that time, Dr. Rosen's department employed an 81-year-old

22    radiologist, who is working per diem but working over 40 hours

23    a week, a 74-year-old radiologist, a 73-year-old, a

24    70-year-old, a 69-year-old, and eight others between 60 and 67.

25    This is who he had working for him in his department.

1           Today, as you'll hear in evidence, he has a

2       radiologist who this week will turn 85.  He has another

3       radiologist who is 76, two age 70, three age 69, three age 68,

4       15 others between 60 and 66.  That's clear evidence,

5       overwhelming evidence, that he's not basing these decisions on

6       age.

7           And, last, we're going to hear the testimony of one of

8       those radiologists, Dr. Mona Korgaonkar.  Dr. Korgaonkar is

9       76 years old.  She will testify to you how supportive Dr. Rosen

10      has been throughout her time at UMass.  She wanted to change

11      campuses because it would be more convenient for her to work at

12      Memorial as opposed to University.  He approved it.  She wanted

13      to go part-time because it would better -- it would fit her

14      lifestyle better.  He approved it.  She wanted to convert to

15      per diem.  He approved it.  He approved it because when you go

16      per diem, you don't have to worry about call coverage.  That's

17      the only exception to call coverage.

18          Dr. Desai was offered that exception when she was

19      demanding to be released from call coverage.  She didn't take

20      it.  She didn't want it.  But he offered it to her.  He didn't

21      try and force her.

22          And Dr. Korgaonkar will tell you she asked for it and

23      was given per diem.  Dr. Korgaonkar will also tell you she has

24      been a friend of Dr. Desai's for 40 years, is a colleague of

25      Dr. Desai's.  They worked together in another location.

1   Dr. Korgaonkar will tell you, like Dr. Desai, she went to

2   medical school in India.

3          So what's the difference?  What will the evidence show

4   is the difference?  Three, three things.

5          One, Dr. Korgaonkar is older than Dr. Desai and still

6   working at UMass; two, Dr. Korgaonkar will tell you she kept

7   pace with technology.  She will testify to you that she took it

8   upon herself at her own time to go into Mass. General Hospital

9   two weeks at a time and do mini fellowships, because when she

10  got trained there wasn't CT scanning.  There wasn't MRIs.  The

11  evidence will make clear she's not capable of MRIs, that she

12  avoided vascular studies.  Dr. Korgaonkar got training in MRI

13  so she could do it.  She got training in CT scans so she could

14  do it effectively.  And the biggest thing -- difference that

15  you'll hear from Dr. Korgaonkar compared to Dr. Desai, the

16  76-year-old versus now the 73-year-old, it will come from

17  Dr. Rosen.  Dr. Korgaonkar didn't have quality complaints.  He

18  didn't receive quality complaints from Dr. Korgaonkar from

19  referring providers.  The division chief of Dr. Korgaonkar's

20  division didn't come to him and say we have a problem.  That's

21  the difference.  It all comes down to quality.  It all comes

22  down to patient safety.

23         At the conclusion of the trial, I'll return and I'll

24  ask that based on the evidence that's presented to you, the

25  actual evidence presented, that you return a verdict in favor

1    of UMass Memorial Medical Group and Dr. Rosen.

2         Thank you.

3         THE COURT:  Thank you.

4         Plaintiff, you may call your first witness.

5         MR. KOLMAN:  The plaintiff calls Max Paul Rosen to the

6    stand as on cross.

7         THE COURT:  So ladies and gentlemen, so here's going

8    to be the rough schedule, and we'll see how close we can come

9    to honoring it.  It depends a lot on witnesses.  Obviously,

10   we're going to start at nine o'clock.  We usually go until

11   about 10:30, and then we'll take a 20-minute break.  And then

12   I'll reconvene and go until noon, take a ten-minute break, and

13   go until one o'clock.  However, if you need to use the washroom

14   or if you've just had enough of us and you need to take a

15   break, raise your hand, okay?

16        THE CLERK:  Please raise your right hand.

17        Do you solemnly swear that the testimony you're about

18   to give this Court will be the truth, the whole truth, and

19   nothing but the truth, so help you God?

20        THE WITNESS:  Yes, I do.

21        THE CLERK:  Please be seated.

22        Please state your name and spell your last name for

23   the record.

24        THE WITNESS:  Sure.  My name is Max, M-A-X, Paul,

25   P-A-U-L, Rosen, R-O-S-E-N.

1                          CROSS-EXAMINATION

2     BY MR. KOLMAN:

3     Q.    Good morning, Dr. Rosen.

4     A.    Good morning.

5     Q.    As we've heard from your counsel, you are, I believe, the

6     chair of the Department of Radiology at the University of

7     Massachusetts Memorial Medical Center; is that right?

8     A.    That's correct.

9     Q.    And you've been in that position since 2012; is that

10    correct?

11    A.    Correct, September of 20 -- 2012.

12    Q.    And before that you were the vice chair, that would be the

13    executive vice chair, at Beth Israel and Deaconess Hospital,

14    would that be correct?

15    A.    Yes.

16    Q.    And you have certain duties and responsibilities, some of

17    which have been stated by your counsel.  One of which is, as

18    we've heard, high quality and safe imaging services for the

19    patients of University of Massachusetts, correct?

20    A.    Yeah, correct.

21    Q.    And to ensure the smooth and efficient and appropriate

22    running of the department in order to support the institution

23    and other physicians and departments, correct?

24    A.    Correct.

25    Q.    And also to ensure the appropriate education of the

1    physicians, which includes medical students, residents,

2    fellows, and any other trainees, correct?

3    A.   Correct.

4    Q.   And also you have responsibility to oversee the research

5    operations of the department, which are based in the medical

6    school; is that correct?

7    A.   Yes, that's correct.

8    Q.   And you also have responsibility for the well-being and

9    career development and work environment for the faculty, the

10   trainees, and the staff in the department, correct?

11   A.   Correct.

12   Q.   And that would include Dr. Charu Desai, correct?

13   A.   Correct.

14   Q.   With whom you've worked since you came on board in 2012,

15   correct?

16   A.   Yes, that's correct.

17   Q.   And when you came on board, you took the time and trouble

18   to familiar yourself with the doctors who you were going to

19   supervise, correct?

20   A.   Yes, I pretty much met with everybody.

21   Q.   Can you put the microphone a little bit more towards you.

22        Thank you.

23   A.   Yes.  Yes, when I started at UMass and I was onboarding, I

24   pretty much met with every -- every faculty member and spent

25   half an hour or an hour speaking with them directly.

1    Q.   And not just meet with them, you presumably studied their

2    personnel files, correct?

3    A.   I met with them and talked about their -- their careers.

4    I don't think I went through everybody's personnel file.

5    Q.   Well, you presumably had the CV or the personnel file in

6    front of you when you were talking to the particular faculty

7    member, or perhaps you wouldn't have been able to discuss with

8    them their career aims in quite such detail?

9    A.   I would have reviewed people's CVs, their résumés, at

10   my -- probably the first annual meeting that I had with people.

11   Medical School stipulates that I have an annual meeting once a

12   year; and as part of that review process, as part of the

13   packet, people -- the faculty supply their CV.

14   Q.   And you would have noted with Dr. Desai that she was the

15   first and only resident in the radiology residency program at

16   the University of Mass. when the program first started in 1978,

17   you would have seen that, correct?

18   A.   Dr. Desai had told me that she was part of the first

19   residency class at UMass.

20   Q.   So you knew that?

21   A.   Yes.

22   Q.   And you knew also that she was the first graduate of the

23   radiology residency program as well, correct?

24   A.   I knew she was in the first class.

25   Q.   And that she had fellowship training in CT scans and

1    ultrasounds, and that was also at UMass, correct?

2    A.   That is correct.

3    Q.   And in addition to her general residency training and

4    diagnostic radiology, she also had specific fellowship training

5    in the specialization of interpretation of CT scans and

6    ultrasounds, correct?

7    A.   Yes, Dr. Desai completed a CT and ultrasound fellowship at

8    UMass.

9    Q.   And that she had returned to the University of

10   Massachusetts in January of 1992 and worked for a total of

11   27 years at the University of Massachusetts as an attending

12   radiology physician before being terminated, correct?

13   A.   I knew that Dr. Desai had left UMass at some point and

14   worked in a private practice and then came back to UMass.

15   Q.   So what you don't know is that she worked for 27 years,

16   correct?

17        I mean, you're telling me what you do know.  But what

18   you doesn't know is that she worked for 27 years; is that

19   correct?

20   A.   Well, no, you can do the math of when she -- when she

21   finished training and what the date was, and if that's 27

22   years, that's 27 years.

23   Q.   And that's a long time, correct, for -- for an employee to

24   be at any institution, wouldn't you agree?

25   A.   It -- that's subjective.  I mean, there are people who

1    spend many more years in institutions and people who spend

2    fewer years.

3    Q.   Okay.  So you didn't consider it a long time, really?  And

4    in any event that wouldn't matter to you, would that be

5    correct?

6    A.   People spend varying parts of their careers at

7    institutions.  Twenty -- now, I would say that having spend

8    27 years at one institution would be one of the longer times

9    that somebody would have spent in a department.

10   Q.   Well, I understand that one might expect this and people

11   might expect that, but actually my question is to you

12   personally, Dr. Rosen, as to what you yourself thought.

13        This was a doctor who was at the institution for some

14   27 years; and from 2012 until her termination, you were

15   responsible for evaluating her, correct?

16   A.   Correct.

17   Q.   And that was an annual evaluation, correct?

18   A.   That is correct.

19        MR. KOLMAN:  Why don't we put up Exhibit 29.

20        Okay.  Stop.

21   Q.   I'm showing you on your screen a University of

22   Massachusetts Medical School, Worcester PA annual faculty

23   report and evaluation of professional activities.

24        Now I realize that this is 2009, 2010, but why don't

25   we move ahead to the time that Dr. Rosen was actually at the

1    Medical School.

2          That's fine.

3          It would be fair to say, would it not, that from

4    July 2012 until June 2013, I realize we're going back a little

5    bit, you would have evaluated my client on the basis of this

6    performance review document, correct?

7    A.   This for -- as related to the Medical School.  This is a

8    Medical School form.

9    Q.   Okay.  This is a Medical School form with a faculty annual

10   performance review on it, correct?

11   A.   Correct, for the Medical School.

12   Q.   Okay.  Let's just try to do this in sections.

13          And on it is Dr. Desai's name, correct?

14   A.   Yes.

15   Q.   And on it is her division, thoracic radiology, right?

16   A.   Correct.

17          MR. KOLMAN:  Why don't you go to the end, and let's

18   see the signature.

19   Q.   Okay.  And that's your signature, is it not --

20   A.   Yes, it --

21   Q.   -- Dr. Rosen --

22   A.   Yes, it is.

23   Q.   -- 6/3/13?

24   A.   That is my signature.

25   Q.   Good.

1          MR. KOLMAN:  Go up slightly, just -- that's it.

2     Supervisor/evaluator evaluation.  Just go up slightly.  That's

3     it.

4     Q.   Now, here's an evaluation by you.  You put "fine."  And

5     then evaluate the faculty member's contribution to education.

6     Only two responses to resident's evaluation for Dr. Desai;

7     however, all were outstanding.

8          Evaluate the faculty member's contributions to

9     research and scholarly activities.  N/A.

10          Evaluate the faculty member's goals for the coming

11    year.  Continue providing excellent clinical service and

12    clinical teaching at PACS workstation.

13          Go up.

14          Other comments.  None.

15          Thank you very much, you say, no issues.

16          Now, we can certainly say that for 2013, no problems

17    with Dr. Desai, correct?

18    A.   No problems that I was aware of, correct.

19    Q.   By your answer, you're suggesting that there indeed could

20    have been problems just that you weren't aware of them, and

21    this is why you gave my client her faculty evaluation the way

22    that you did; is that what you're telling us?

23    A.   I rely on the division chief to give me feedback about

24    how --

25    Q.   Is it your testimony --

1            MR. WAKEFIELD:  Objection, your Honor.

2            MR. KOLMAN:  I'm sorry.  What?

3            THE COURT:  So hold up a minute.

4            Are you going to be examining this witness,

5     Mr. Kilroy?

6            MR. WAKEFIELD:  Yeah.

7            THE COURT:  Okay.

8            MR. WAKEFIELD:  Yes, your Honor.

9            THE COURT:  So that objection's overruled.

10            Please let the witness finish the answer.

11            MR. KOLMAN:  Yes, of course.

12            THE COURT:  And the next question, please.

13     BY MR. KOLMAN:

14     Q.   Your testimony, Dr. Rosen, that your own evaluations

15     cannot really be relied upon, because the information that

16     you're getting is from some other source?

17     A.   No, what I'm saying is that I rely on other people, each

18     division chief, to give me feedback on how their faculty

19     members and their division are doing; and at this point, I had

20     no indication that there were any issues with Dr. Desai and

21     hence my -- my comments here.

22     Q.   And in your position, you have to rely on feedback from

23     other doctors.  You couldn't do your job otherwise, correct?

24     A.   Correct.  The department now has 80 faculty.  Back then we

25     probably had about 35 or 40 faculty, and that's why we're

1    structured with divisions and division chiefs to provide me

2    feedback.

3    Q.   But you also discussed you met with my client at that

4    point as well, correct?

5    A.   Yes, I did.

6    Q.   Okay.  Good.

7         MR. KOLMAN:  Why don't we go up.

8         2013 to 2014, why don't you go to the end where the

9    signature line is.

10        Thank you.

11   Q.   This is your signature again, is it not?

12   A.   Yes, that is.

13   Q.   September 14th?

14   A.   Yes, that is.

15   Q.   September -- I'm sorry.  September 2014?

16   A.   Uh-huh.

17        MR. KOLMAN:  Go down a little bit.

18   Q.   Here's your evaluator portion.  That's it.

19        Evaluate the faculty member's contribution.  Nothing.

20        Evaluate the faculty member's contribution to

21   education.  Nothing.

22        Evaluate the faculty member's contribution to research

23   and scholarly activities.  Nothing.

24        Evaluate the faculty member's goal for the coming

25   year.  Nothing.

```
 1              Other comments from other evaluators or other -- or in
 2    other areas.  Nothing.
 3              MR. KOLMAN:  Go down.
 4    Q.   Dr. Desai and I discussed options for academic time.
 5    Unfortunately, the Department's policy has been in place for at
 6    least two years and cannot be modified on an individual basis.
 7    I appreciate the clinical efforts of Dr. Desai as well as her
 8    contribution to resident teaching at the PACS station.
 9              Did I read that accurately?
10    A.   Yes.  Yes, you --
11    Q.   Thank you.
12    A.   Yes, you did.
13    Q.   Why don't we move on.
14              THE COURT:  So, Mr. Kolman, for my purpose and for the
15    record's purposes, is this being offered; and if it isn't, does
16    it have an ID number?
17              MR. KOLMAN:  It does, your Honor.  It's Exhibit 29.
18              THE COURT:  For -- is that -- and is it about to be
19    moved or are you --
20              MR. KOLMAN:  It is going to be moved, your Honor.
21              THE COURT:  And it's Exhibit 29?
22              MR. KOLMAN:  As Exhibit 29.
23              THE COURT:  Is there any objection?
24              MR. WAKEFIELD:  No, your Honor.
25              THE COURT:  All right.  It's so marked.
```

1          (Exhibit No. 29 was received into evidence.)

2    Q.    Moving on now to 2014 --

3          THE COURT:  And just for the record --

4          MR. KOLMAN:  I'm sorry, your Honor.

5          THE COURT:  -- it is how many -- what exactly is it?

6          MR. KOLMAN:  These are University of Massachusetts

7    Medical School faculty annual performance reviews signed by

8    Dr. Rosen concerning Dr. Charu Desai.

9          THE COURT:  And for what years, please?

10         MR. KOLMAN:  They are from 2013 up to, I believe,

11   2017.

12         THE COURT:  Do you agree that's what it is?

13         MR. WAKEFIELD:  I believe they start at 2009, your

14   Honor.  I'm going through it right -- right now.

15         MR. KOLMAN:  I didn't use 2009, because Dr. Rosen was

16   not at the department at that time; and therefore, her faculty

17   annual --

18         THE COURT:  Hold up.

19         MR. KOLMAN:  Sorry.

20         THE COURT:  What do you have?

21         MR. WAKEFIELD:  Your Honor, I just want to be clear

22   that the Exhibit 29 that we're seeing is several or a dozen of

23   the reviews.

24         THE COURT:  That's why I'm getting -- that's what I'm

25   getting at.

1          MR. WAKEFIELD:  Yeah, it looks to me that they're from

2     2009, and the last one is indeed 2017 to 2018.

3          THE COURT:  And are you offering the entire package?

4          MR. KOLMAN:  I'm only offering the portions to which

5     Dr. Rosen has testified, meaning 2012 through 2017, '18.

6          THE COURT:  Are you okay with that?

7          MR. WAKEFIELD:  Yes, I am.  Thank you, your Honor.

8          THE COURT:  All right.  Thank you.

9          MR. KOLMAN:  Thank you.

10    BY MR. KOLMAN:

11    Q.   We're moving to 2014 to 2015.

12         THE COURT:  Do you want to publish that to the jury?

13         MR. KOLMAN:  I'm sorry, your Honor.

14         THE COURT:  Do you want to publish that to the jury?

15         MR. KOLMAN:  Yes, please.  Please publish it.

16    BY MR. KOLMAN:

17    Q.   We are moving --

18         THE COURT:  Oh, hold up.

19         MR. KOLMAN:  Okay.

20         THE COURT:  In your -- in the back row in your arm

21    rests, you have screens.  You can probably pull them out now,

22    if you would; and for those of you in front, are your screens

23    hot?

24         JUROR:  Yes.

25         THE COURT:  Okay.  Please don't cut your fingers off

1    when you're getting those screens out.

2            If I told you how much of our taxpayer money we spent

3    on those, you would probably jump over the railing and dope

4    slap me.

5            Are you guys -- do you got a screen?  You good?

6            JUROR:  Yeah.

7            THE COURT:  Are you guys -- has everybody got a hot

8    screen?

9            JUROR:  Yes.

10           THE COURT:  Okay.  Good.

11           Go ahead, Mr. Kolman.

12   BY MR. KOLMAN:

13   Q.   I'm showing you, Dr. Rosen, and the jury will see this

14   also, this is a faculty annual performance review July 2014 to

15   June 30, 2015.

16           Why don't we go to the end of it where the

17   supervisor's section is.

18           That's your signature, correct?

19   A.   Yes, it is.

20   Q.   Okay.  Move up.  That's it.  This is your evaluation.  You

21   put nothing in A, evaluate the faculty member's contributions

22   to clinical care (as appropriate).

23           B, evaluate the faculty member's contributions to

24   education.  Nothing.

25           Evaluate the faculty member's contributions to

1    research and scholarly activities.  Again, blank.

2            Evaluate the faculty member's goals and mentoring

3    needs for the coming year.  Nothing.

4            Other comments, i.e., from other evaluators or

5    other -- in other areas.  Nothing.

6            MR. KOLMAN:  Go down.

7    Q.   Thank you very much.  I value your feedback.  That is from

8    Dr. Desai; is that correct?

9    A.   Yes, that's correct.

10   Q.   Right.  And then Dr. Desai and I discussed the overall

11   staffing and functioning of the thoracic imaging division and

12   growth planned with the arrival of Dr. Dill as the new division

13   chief.  As always, I appreciate her commitment to the

14   department and teaching our residents, correct?

15   A.   Correct.

16   Q.   And there's nothing else there, correct?

17   A.   Correct.

18   Q.   Thank you.  Why don't we move on to the next evaluation.

19   This is 2015 to 2016.

20           MR. KOLMAN:  Move to the end.  Thank you.

21   Q.   This is your signature again, isn't it, September of 2016,

22   correct?

23   A.   Correct.

24   Q.   Okay.  And again, I'm not going to beat a dead horse,

25   there's nothing here from A through E, correct?

1   A.   Correct.

2   Q.   Except my client's statement thanks, and Dr. Desai has

3   contributed to the chest section through her clinical work

4   interpreting chest x-rays and chest CT and teaching residents

5   at the PACS station, correct?

6   A.   That is correct.

7   Q.   And you wrote that, correct?

8   A.   Correct.

9   Q.   Let's go down a moment and make sure we have the date,

10  2016.  2016, you don't put anything about the fact that she

11  hasn't kept up with education, have you?

12       There's nothing there, correct?

13  A.   If you go back --

14       MR. KOLMAN:  Your Honor, I'm sorry.

15  Q.   Is there anything there or not?

16  A.   If -- that's actually the point.  There is nothing there.

17  If you go back up on that form, there -- I think there are

18  sections that show what other education, what contributions to

19  the field of radiology the faculty member has made, and there's

20  nothing there.

21  Q.   Dr. Rosen, this document is your opportunity as her

22  supervisor to make a comment about her, correct?

23  A.   Correct.

24  Q.   And you have every opportunity to put down there some of

25  the things that your counsel has said that she apparently is

1    deficient in, but you don't put anything there at all, correct?

2           Correct?

3    A.    I acknowledge Dr. Desai's work in teaching --

4    Q.    Okay.

5    A.    -- and education in residents.

6    Q.    Dr. Rosen, it's just a simple question.  We'll be here a

7    long time.  We don't want to be.  It's simply yes or no.

8    A.    Could you repeat the question.

9    Q.    Yes.  You have every opportunity to put down any

10   deficiency at all that your counsel went on and on about, but

11   you don't put down any deficiency here at all, do you?

12   A.    No, but there's also --

13   Q.    No, the answer is no --

14          MR. WAKEFIELD:  Objection, your Honor.

15          THE COURT:  So, Dr. Rosen, if you can answer the

16   question that's asked in the form that it's asked, please do.

17   And if you can't answer it in the form that it's presented,

18   please say so, and be rest assured that counsel is going to be

19   questioning you themselves in order to clean up anything that

20   they think is inaccurate, okay?

21          THE WITNESS:  Of course.  Thank you.

22          THE COURT:  So please answer the question as asked.

23          Please ask a question, Mr. Kolman.

24          MR. KOLMAN:  Sure.

25   BY MR. KOLMAN:

1    Q.   Once again, you had every opportunity to write down

2    anything about my client's deficiencies in this section, but

3    you do not do so, correct?

4    A.   That is correct.

5    Q.   And let's go to 2017.  2016 to 2017.  Let's go to the end.

6              Okay.  This is 2017.  This is September of 2017.

7              When did you terminate my client; do you remember?

8    A.   (No response.)

9    Q.   I can remind you.

10   A.   Please.

11   Q.   March 14th, 2018, does that sound familiar to you?

12   A.   Yes.

13   Q.   So six months before my client is terminated, you evaluate

14   her.

15             MR. KOLMAN:  Why don't you go down slightly, and let's

16   see -- just stop.

17   Q.   Dr. Desai and I discussed her recognition by this year's

18   graduating residents as their teacher of the year.  We also

19   discussed several of her concerns about allocation of academic

20   time, call responsibilities, et cetera.  These have previously

21   been discussed with Dr. Desai and representatives from

22   H -- from the HR department.

23             Did I read that correctly?

24   A.   Yes, you did.

25   Q.   Okay.

1        MR. KOLMAN:  Move -- move down a little bit.

2    Q.   And here we have nothing, A through E.

3        So let's be clear about this.  Six months before you

4    terminate my client, you have absolutely no comment about her

5    abilities according to this document, correct?

6    A.   Correct, this is --

7    Q.   And -- and -- and she is voted teacher of the year by the

8    residents, which you acknowledge, correct?

9    A.   Yes.

10   Q.   Now, teacher of the year by the residents, that means that

11   she was actually teaching residents at the time, correct?

12   A.   Yes, as I've indicated on several other forms,

13   Dr. Desai --

14   Q.   She was teaching residents at the time, and they thought

15   she was so good that they voted her teacher of the year; would

16   you agree with that?

17   A.   Yes, I would like to clarify if I can.

18   Q.   Well, you'll have a chance to clarify, okay?

19   A.   Okay.

20   Q.   Thank you.

21       You don't remember the facts of March 14th, 2018, when

22   you had your secretary call my client into your office and you

23   told her she was being terminated; do you recall that?

24   A.   Yes, I do.

25       MR. KOLMAN:  Why don't we put up Exhibit 95.

1          THE COURT:  Well, just for -- is it being moved?

2          MR. KOLMAN:  It's being moved.

3          MR. WAKEFIELD:  No objection, your Honor.

4          THE COURT:  It is so marked?  And what is it, please,

5   Mr. Kolman?

6          MR. KOLMAN:  Ninety-five, your Honor.

7          THE COURT:  I know it's number 95, but what is it?

8          MR. KOLMAN:  It is a notice of termination of my

9   client, your Honor.

10          THE COURT:  Thank you.

11   (Exhibit No. 95 was admitted into evidence.)

12          MR. KOLMAN:  Move up.  Thank you.

13   BY MR. KOLMAN:

14   Q.   When you called my client into your office, you didn't

15   tell her what it was about, did you?

16   A.   I most likely told her that I needed to meet with her.

17   Q.   Excuse me.  Your secretary was the one who asked her to

18   come.  You actually didn't ask her.

19          Do you recall that?

20   A.   No, I don't.

21   Q.   When she came into your office, Charles Cavagnaro was also

22   there, correct?

23   A.   Correct.

24   Q.   He's the executive VP and -- and chief medical officer; is

25   that right?

1    A.    At the time, yes.  He was the second arm.

2    Q.    Thank you.  And that meeting -- and the meeting was at

3    12:00 noon, correct?

4    A.    I assume so, if you say so.

5    Q.    Did Dr. Desai have any forewarning that this was going to

6    be a termination meeting?

7    A.    I or my secretary did not tell her what the meeting was

8    about.

9    Q.    And you had never met with her before to tell her that her

10   job might be on the line, correct?

11   A.    I had met with Dr. Desai on several occasions throughout

12   the preceding, you know, one to two years, at which as she had

13   various complaints and as we had issues with various aspects of

14   her performance.

15   Q.    Excuse me.  Did you understand my question?

16   A.    Could you please repeat it.

17   Q.    Yes.  You never met with my client to tell her that her

18   job was ever on the line, correct?

19   A.    I never met with her specifically to tell her that her job

20   was on the line --

21   Q.    Thank you.

22   A.    -- but we did have several meetings to discuss --

23   Q.    Okay.

24   A.    -- behavior and other performance issues.

25   Q.    Did I ask you about meetings regarding other performances?

1    Did I ask that question?

2    A.    No.

3    Q.    The answer is I did not, so please just answer my

4    question.

5           You say you had meetings with her, but we looked at

6    the evaluation forms from 2013 to 2017, and you had the ability

7    to comment on those, and you do say that there were meetings,

8    but there's no meetings there that have affected her evaluation

9    in any way, would you agree?

10   A.    The -- the form that you have shown us is a form for the

11   Medical School, which is on the functions of the faculty

12   members at the Medical School.  Faculty have two --

13   Q.    Excuse me.

14          MR. WAKEFIELD:  Objection, your Honor.

15          MR. KOLMAN:  This -- your Honor, this is not

16   responsive.

17          MR. WAKEFIELD:  He answered the question.

18          THE COURT:  Stop.  Stop right now.

19          All right.  See you guys in 20 minutes.

20          THE CLERK:  All rise.

21          (At 10:27 a.m., the jury left the courtroom.)

22          THE COURT:  Doctor, let me just repeat something.  If

23   you can't answer the question in the form that it's asked in,

24   just say so.

25          THE WITNESS:  Okay.

1          THE COURT:  Don't argue with counsel.  If you can

2     answer the question yes or no, please do so.  Trust me, counsel

3     will clean up anything that they think needs cleaning up.

4          THE WITNESS:  Okay.

5          THE COURT:  Okay?

6          THE WITNESS:  Thank you.

7          THE COURT:  All right.  You can -- you can all be

8     seated.  You can step down, Doctor.  Thank you.

9          What did you all want to say about time, please?

10          MR. KILROY:  Yes, your Honor.  When your Honor had

11     asked about the time allotment that was expected during our

12     final pretrial, I had given a true estimate of it was going to

13     take us a week to put on our case.  You know, at this point

14     we're having to respond to their case, put on our case, the 13

15     hours that your Honor has allotted we will actually have to cut

16     witnesses, I'm confident of that, that are necessary for the

17     defense.

18          THE COURT:  What -- what happened between when we had

19     this discussion and today that -- that's different?

20          MR. KILROY:  Your Honor -- what I'm offering, your

21     Honor, is I had indicated we needed a full week, 20 hours.

22          THE COURT:  Uh-huh.

23          MR. KILROY:  And you've cut it to 13.

24          THE COURT:  Well, a full week is really seven -- let's

25     see.  A full week is 17 and a half hours.

1          MR. KILROY:  And I would be pleased with 17 and a half

2     hours, your Honor.

3          THE COURT:  Well, I cut both of you back 25 percent.

4          MR. KILROY:  Your Honor, I'm just offering, I think

5     it's going to be very difficult to put on a full defense,

6     responding to their three experts as well as their witnesses

7     and putting on our case, your Honor.

8          THE COURT:  So what did I give -- how many did I give

9     you?

10         MR. KILROY:  You gave us 13 hours, I believe, your

11    Honor.

12         THE COURT:  So what are you asking for?

13         MR. KILROY:  Your Honor, I was asking for 19.

14         THE COURT:  It's like I feel like I'm bidding against

15    myself every time I ask you, you go up.

16         MR. KILROY:  Your Honor, well, I said I would be happy

17    if your Honor would -- would approve what you had suggested,

18    but what I'm asking for would be 19 hours, your Honor.

19         THE COURT:  Well, I -- you know what, I've got to

20    think about that.  I mean, frankly, and I'm not being critical,

21    you guys try your -- you know, I screwed up enough cases when I

22    was trying them, so I'm not going to give anybody advice, but

23    you've already gone 35 minutes on an opening that your brother

24    went six on.

25         So if I think that you're taking too much time -- let

1    me -- I've got to think about that.

2            MR. KILROY:  Thank you, your Honor.

3            THE COURT:  The other thing I need you all to think

4    about is whether or not we can go a full day Wednesday.  So

5    give me your thoughts after the break, and then I'm going to

6    ask the jurors if they can go a full day.

7            MR. KOLMAN:  Sure.

8            THE COURT:  And then the other date that I'd like to

9    go a full day if we can -- Marty and I need to do some

10   things -- is Thursday, the 15th.  Give it some thought.

11           And by the way, am I getting you two confused?

12           MR. KILROY:  Yes, your Honor.

13           THE COURT:  I'm sorry.

14           MR. KILROY:  I'm Kilroy.

15           THE COURT:  I'm sorry.  I've got to get that.  I've

16   got to put you guys on a -- don't change seats, okay.

17           MR. KOLMAN:  Your Honor, a full day is from 9:00 to

18   1:00 and from 2:00 to 5:00; is that right?

19           THE COURT:  4:00.  2:00 to 4:00.

20           Okay.  Thank you.  See in you in 20.

21           MR. KILROY:  Thank you, your Honor.

22           (Recess from 10:31 a.m. until 10:55 a.m.)

23           THE CLERK:  All rise.

24           THE COURT:  So did you guys say you were good to go

25   all day Wednesday?

1              MR. KILROY:  We're fine to go all day, your Honor.

2              THE COURT:  You?

3              MR. COMENZO:  I think it would be difficult, your

4      Honor.

5              THE COURT:  Come up, please.  We don't need it on the

6      record.

7              THE CLERK:  Court is now open.  You may be seated.

8              THE COURT:  Come up.  Come up.

9              (Sidebar discussion off the record.)

10             THE COURT:  So occasionally we get a break.  We, as I

11     indicated, we go 9:00 to 1:00, and I'm sure Judge Hennessy

12     mentioned that to you.  We have the afternoon for matters that

13     come up during trial and other important business that doesn't

14     wait for us.

15             We do have occasional afternoons where we have

16     openings, and we might have an opening this Wednesday to go all

17     day.  Now, if -- we know -- we've asked you to commit to us

18     from 9:00 to 1:00; and if you can't go all day Wednesday, we

19     will understand, and that's fine, but we would like to give you

20     the opportunity.  And again, we need to work out some things,

21     so I'm not saying it's -- it's a lot, but if you could during

22     your next break just think about that, and I'll ask if you can;

23     and if you can, great; and if you can't, great.

24             As an added incentive, free lunch.  Who does not like

25     that?  So I'll check back with you.  And like I say, no

1    pressure.  If you can do it, great; and if you can't, great.

2            All right.  Mr. Kolman, you're on board.  Let's go.

3            MR. KOLMAN:  Yes, thank you.

4    BY MR. KOLMAN:

5    Q.   When we broke, Dr. Rosen, we were talking about the

6    faculty and your performance review and your interaction with

7    Dr. Desai.  I want to continue with that.

8            You had previously testified that you are responsible

9    for the smooth running of the radiology department, correct?

10   A.   Correct.

11   Q.   And also for the continuing education of the faculty in

12   the department, correct?

13   A.   No.  I'm sorry if I misspoke, but the faculty are

14   responsible for their own continuing education.

15   Q.   I understand.  Thank you for clarifying.

16           Your counsel made an issue of the fact that my client

17   had not -- not attended continuing medical education or

18   published or attended conferences.  That did not affect your

19   decision to permit her to teach students, correct?

20   A.   Dr. Desai was teaching at the -- what we used to call at

21   the view box in the days before electronic -- the electronic

22   system, which is the PACS system.  And as you can see from -- I

23   think in my comments, you know, Dr. Desai was -- was perfectly,

24   you know, good at teaching the residents at, you know, at -- in

25   the daily work --

1    Q.    Okay.

2    A.    -- for mostly chest x-rays.

3    Q.    Okay.  Thank you.

4          At no time in your capacity as a supervisor did you

5    ever write any memo telling her that she needed to do more

6    CMEs, correct?

7    A.    Correct.

8    Q.    And you did not, in your capacity as a supervisor, ever

9    say you need to publish some academic articles, correct?

10   A.    Correct.  Doctor --

11   Q.    And also, you didn't tell her that she had to attend

12   conferences, correct?

13   A.    Dr. Desai had met the CME --

14   Q.    Excuse me.  We're talking about your interaction.  So I'm

15   asking again that you never told her that she had to attend

16   conferences; is that correct?

17   A.    Correct.

18   Q.    And you didn't put her on a performance improvement plan

19   that required her to do any of those things, correct?

20   A.    Correct.

21   Q.    And you didn't tell her that because she had trouble with

22   emails, you would assist her in getting her some -- some help

23   or she could attend some course to make it easier for her,

24   correct?

25   A.    I did communicate with her that she needed to communicate

1    by email, and I think there's actually an email exchange

2    between me and Dr. Desai --

3    Q.    Okay.

4    A.    -- to that effect.

5    Q.    But my question was simply this.  Because apparently,

6    according to your counsel, Dr. Desai had trouble with emails,

7    you never either -- you never acknowledged that she had trouble

8    with emails such that she needed to attend a course to assist

9    her, correct?

10   A.    That is not correct.  There is an email exchange which I

11   had sent Dr. Desai, which clearly states that she needs to be

12   able to communicate by email; and if she had trouble with email

13   or any of other electronic systems to let Dr. Dill, her section

14   chief, know and we would arrange appropriate IT or information

15   technology help for her.

16   Q.    That's fine, but it appears that you didn't know that she

17   had trouble with emails, because you just testified that had

18   you known that or had Dr. Dill known that, there would have

19   been some intervention.

20             Do I understand your answer to be that?

21             Or put another way, all -- all Dr. Desai had to do was

22   to ask?

23   A.    Yes, and I actually have an email to her telling her,

24   letting her know that if she does have problems with the IT

25   systems to please let us know.

1    Q.    Okay.  And she did not let you know, correct?

2    A.    Correct.

3    Q.    But these problems did not reach the point where you wrote

4    an email saying the problems that you have with emails are now

5    affecting your ability to do your job, nothing like that,

6    correct?

7    A.    There is an email that I sent her summarizing a meeting

8    that we had in which I list that the way of communicating in

9    the department is by email; and if she was having trouble with

10   emails, or other electronic systems, to please let us know and

11   we would get her the training needed.

12   Q.    I understand.  And we've been over that, and you answered

13   that question, but if you wouldn't mind, I'd kind of like it if

14   you would answer my question, which was: You never wrote her a

15   memo or sent her an email saying that her alleged problems with

16   emails was affecting her ability to do her job; yes or no?

17         Your attorneys don't have the answer, but yes or no?

18   A.    Not -- so, no, I never sent that --

19   Q.    Okay.

20   A.    -- email specifically.

21   Q.    Thank you.  And we heard from your counsel about the

22   trouble with text messages; do you remember that?

23         And there was never any memo from you stating that the

24   trouble she had with text messages was such that it affected

25   her ability to do her job.  There's nothing like that from you

1    either, is there?

2    A.    No, there is not, you're correct.

3    Q.    Right.  And the fact that she was hostile or dismissive of

4    Dr. Dill allegedly and undermined Dr. Dill or yelled at

5    Dr. Dill, you -- you actually weren't the one to referee that,

6    as I recall; am I right?

7    A.    The interactions were Dr. Desai was yelling at Dr. Dill,

8    I did not witness.

9    Q.    Okay.

10   A.    I did witness her yelling at another one of the faculty

11   members.

12   Q.    Okay.  That's really not the question though.

13          Okay.  I want to go back to the day of termination,

14   and we have there a letter, and it simply says --

15          MR. KOLMAN:  If we could just get that expanded a

16   little.

17          Thank you.

18   Q.    It says, As Dr. Rosen has discussed with you, this letter

19   serves as notice that your employment with UMass Memorial

20   Medical Group and the University of Massachusetts Medical

21   School will terminate on March 17, 2019.

22          Now, your counsel alluded to the ability of Dr. Desai

23   to continue to be employed for another year pursuant to her

24   contract, correct?

25   A.    Correct.

1    Q.   But it was notice of termination right then and there, but

2    the notice -- there was no prior discussion is what I'm asking.

3    So it says, As Dr. Rosen has discussed with you, there was no

4    prior discussion.

5         The discussion's actually on the day of termination,

6    correct?

7    A.   Yes, that is correct.

8    Q.   If you could call it a discussion.

9         After that there was some correspondence between you

10   and -- and Dr. Desai.  I don't know if you recall it.

11        MR. KOLMAN:  One second.  Let's put up then 97, which

12   I'm asking to publish, which is an email string between you

13   and -- and Dr. Desai.

14        THE COURT:  So hold up.  Are you offering that or is

15   it in?

16        MR. KOLMAN:  It's -- it's up on the screen.

17        THE COURT:  I know it's on the screen.  Is it in

18   evidence?

19        MR. KOLMAN:  I don't think there is an objection.

20        THE COURT:  So are you offering it?

21        MR. KOLMAN:  I am.

22        MR. WAKEFIELD:  No objection, your Honor.

23        THE COURT:  All right.  So marked.  And it's an email

24   string.

25   (Exhibit No. 97 was admitted into evidence.)

1   BY MR. KOLMAN:

2   Q.   At the time when you had this discussion with Dr. Desai,

3   she was in your office, along with the chair, you didn't tell

4   her the reason for termination, correct?

5   A.   If I remember correctly, I told her the reason for

6   termination was about the quality of her CT reads.

7   Q.   Thank you.  Thank you for reminding us.  It was the

8   quality of her CT reads, and that was the reason for

9   termination, correct?

10  A.   Yes.

11  Q.   And you didn't say anything else.  That was what you said,

12  correct?

13  A.   Well, I -- if I remember correctly, I also said that

14  during the next year if she was -- when she was still with us

15  during the year's notice that I wanted her to stop reading

16  chest CTs and to read only chest x-rays.

17  Q.   Now, just a quick aside.  X-rays can be quite complicated

18  to read, can't they?

19  A.   Yes, they can.

20  Q.   And, in fact, they can sometimes be a lot more complicated

21  than CT scans, correct?

22  A.   That's a complicated question.

23  Q.   I'm saying sometimes.

24  A.   There's -- it's a -- it's a different skill set.

25  Q.   And part of the reason why it can be difficult to read

1   x-rays is because the organs are all one on top of another, and

2   you have to find whatever --

3   A.   Exactly.  You're looking at a two-dimensional

4   representation --

5   Q.   Right.

6   A.   -- in this case of the chest as opposed to a

7   cross-sectional or three dimensional.

8   Q.   So if -- if Dr. Desai could not read or was not permitted

9   to read CT scans, why would you imperil patients by permitting

10  her to review x-rays?

11  A.   I didn't feel that patients were going to be imperiled by

12  her reading x-rays.  In the era that Dr. Desai trained, x-rays

13  were the vast majority of thoracic imaging, and CAT scanning

14  was just becoming -- becoming to evolve; and over, you know,

15  the ensuing three to four decades, the CAT scan technology, you

16  know, evolved immensely, and the x-ray technology really much

17  stayed -- stayed the same.

18  Q.   Did you tell her that the reason why she was permitted to

19  read x-rays and not CT scans was because CT scan technology had

20  evolved?

21  A.   I would --

22  Q.   Let me put it this way.  You didn't tell her that CT

23  technology had evolved to such a degree that it affected her

24  ability to read CT scans, correct?

25  A.   Any radiologist --

1      Q.   Excuse me.

2           THE COURT:  Just yes or no, Doctor, please.

3           THE WITNESS:  No, I did not tell her that.

4      BY MR. KOLMAN:

5      Q.   Is it your testimony that because CT technology had

6      evolved that it appeared that Dr. Desai somehow could not

7      continue to do her job with CT scans?

8           Was that even a factor?

9      A.   The technology had evolved, and Dr. Desai had not kept up

10     with technology.

11     Q.   Excuse me.  Was -- is there a document that you ever wrote

12     to her?

13     A.   No, there is not a document that I wrote to her to that

14     specific effect.

15     Q.   So my question is this:  If you know that she's not

16     keeping up with technology, and you are allegedly in charge of

17     patient care and patient -- and ensuring that your doctors are

18     up to speed, because this is a tertiary hospital, and you know

19     she's having a problem with emails, and you know she has a

20     problem with text messages, why didn't you say something to

21     her?

22     A.   It was very --

23     Q.   But wait.

24     A.   I'm sorry.

25     Q.   Why didn't you say something to her prior to her

1    termination, and by say, I mean put in writing that these are

2    issues of concern for you and for the hospital?

3    A.   It was very difficult to have conversations like you

4    mentioned, like you outlined with Dr. Desai.  She would often

5    get very defensive and very angry.

6    Q.   My question simply is this, Doctor, is why didn't you put

7    it in writing?  You didn't have to confront her.  You could put

8    it in a memo.  You're a scientist.  You're an administrator.

9         You could write a memorandum to her, couldn't you?

10   A.   I could have, yes.

11   Q.   And you could have -- you could have interacted with HR

12   about these things as well, couldn't you, and they could have

13   advised you, right?

14   A.   Yes.

15   Q.   And, in fact, you didn't even have to write it.  You could

16   have had an administrator write it to her pursuant to the

17   policies of the hospital, correct?

18   A.   Yes.

19   Q.   So it begs the question as to just how serious these

20   issues were if there is no paper trail whatever that they ever

21   affected Dr. Desai's patient care?

22        THE COURT:  Counsel, is that a question or a statement

23   please?  Let's have a question.

24        MR. KOLMAN:  Thank you, your Honor.  You're right.

25   BY MR. KOLMAN:

1  Q.  We're looking at this exhibit, and if you scroll down a

2  little bit.  Scroll down further.  Right.

3         And this is where it starts, and I will read what it

4  says.  And that is from Dr. Desai.  Dr. Rosen -- Dear

5  Dr. Rosen, I'm writing regarding the meeting held on March 14,

6  2018, at noon.  In this meeting, you provided me a written

7  letter indicating that my employment at UMMHC would be

8  terminated.  You verbalized that this was due to my poor

9  quality work.  Can you please elaborate with evidence to

10  substantiate your allegations.

11         Dr. Desai.

12         Did I read that correctly?

13  A.  Yes, you did.

14  Q.  And then you responded, I'm happy to set up a meeting for

15  you, myself, and Dr. Baccei, our director for radiology QA, to

16  review the results of the independent analysis that I had

17  performed.

18         As you have asked previously and I am happy to

19  support, you're welcome to invite a colleague to attend this

20  meeting with you.

21         You will be able to review that data that was

22  presented to me, but will not be able to take any hard copies

23  of the reports.

24         Please contact Cindy to schedule if you still want to

25  meet.

1          Sincerely, Max.  Okay.

2    A.    That is correct.

3    Q.    And -- just leave that up, if you wouldn't mind.

4          And there you say that it is the independent analysis

5    that you had performed, which had resulted in -- in Dr. Desai's

6    termination?

7    A.    That was one of the factors that --

8    Q.    But you don't mention any other factors.  Obviously, it

9    speaks for itself, but you don't mention any other factors in

10   this letter, correct?

11   A.    Correct.

12   Q.    Right.  And the meeting that is being set up that's not a

13   meeting to discuss trouble with emails, is it?

14   A.    No, it is not.

15   Q.    And it's not a meeting to discuss the problems with text

16   messages, correct?

17   A.    Correct.

18   Q.    Or indeed continuing medical education or publishing or

19   attending conferences, correct?

20   A.    Correct.

21   Q.    Or anything to do with her demeanor, hostile or otherwise,

22   correct?

23   A.    Correct.

24   Q.    The issue of the independent analysis, that is what it

25   appears as far as Dr. Desai is concerned you used to show that

1    she was not competent, correct?

2    A.   I don't know what Dr. Desai thought, but in this email I

3    just list the independent analysis, but there were many other

4    things which went into my decision.

5    Q.   Which you don't say anything about until now, correct?

6    A.   I did not say that in this email.

7    Q.   Thank you.

8         And because you didn't say it, we don't know that it

9    ever was a factor, do we?

10        Let me put it this way.  You're a scientist.  You're

11   an administrator.  You put things in writing.  If you don't put

12   it in writing, and you come into court to testify about all the

13   other things that apparently affected your decision and it's

14   not there, why on earth should the jury believe that any of

15   those issues were a factor when you never ever said they were?

16   A.   Well, I think there are several other documents

17   which -- which detail complaints from other -- other providers

18   and difficulties with Dr. Dill, concerns that Dr. Dill has had

19   or had about Dr. Desai's performance.  Those are not in this

20   document here, but they do exist.

21   Q.   And I assure you that we will go over that together, okay.

22        MR. KOLMAN:  Why don't you go down again -- thank you

23   very much by the way.  Just go down.

24   Q.   Dr. Rosen, I accept the offer to meet with you to discuss

25   the assertions you made regarding the quality of my work, both

1    in our meeting on March 14, 2018, and in your email below.

2          I also accept your offer to have a colleague accompany

3    me.  I am concerned, however, that anyone who works under you

4    in the radiology department will be placed in an uncomfortable

5    position and may be reticent to voice their true opinion out of

6    fear of retaliation.  Therefore, I would like to choose an

7    independent, expert reviewer to accompany me to this meeting to

8    ensure neutrality and avoid any potential bias favoring either

9    of our positions on the information presented.

10          I look forward to speaking with you and hope to

11    arrange a mutually convenient meeting date and time.

12          Dr. Desai.

13          Did I read that correctly?

14    A.   Yes, you did.

15    Q.   And why don't we see your answer.  Just go down.

16          Dear Dr. Desai, I will be glad to meet with you, but

17    will not permit an independent reviewer to attend our meeting.

18          You are welcome to bring a colleague from our

19    department with you if you wish.

20          Please call Cindy to schedule a mutually convenient

21    time for our meeting.

22          Max.

23          Now, what is the reason why you won't permit an

24    independent reviewer to attend the meeting?  Because you don't

25    say here.

1   A.   That was at the advice of -- of my counsel.

2   Q.   Okay.  We don't want to hear that.  You are trending on

3   attorney-client privilege and either --

4        THE COURT:  Counsel, let's have a question, please.

5        MR. KOLMAN:  You didn't raise an objection so can he

6   have it?

7        THE COURT:  Counsel.  Counsel.  Counsel.

8        MR. KOLMAN:  Yeah.

9        THE COURT:  Let's have a question, please, to the

10  witness.

11  BY MR. KOLMAN:

12  Q.   Okay.  So it was the result of your -- of your counsel and

13  that was that?

14  A.   Counsel and also my own feeling that this was a matter

15  internal within the department.

16  Q.   Okay.  Did your counsel say that bringing an --

17       MR. WAKEFIELD:  Objection, your Honor.

18       MR. KOLMAN:  I believe it's waived, Judge.  I believe

19  he waived it, waived the attorney-client privilege.

20       THE COURT:  So hold.  Hold.  All right.  Plug in the

21  amps.

22       You're going to need your whisper tech.

23       MR. KOLMAN:  I'm sorry.  Oh.

24       (Sidebar as follows:)

25       THE COURT:  Can you all hear me?

1          MR. WAKEFIELD:  Yes.

2          MR. KOLMAN:  Yes, your Honor.

3          THE COURT:  All right.  Stay -- stay away from the

4    microphones when you speak, and speak softly so the jurors

5    don't hear you.

6          Mr. Wakefield, what's the objection, please?

7          MR. WAKEFIELD:  It's attorney-client privileged

8    communications, your Honor.

9          THE COURT:  I can't hear you.  Press the button.

10         MR. KOLMAN:  I believe he waived it, your Honor.  He

11   had every opportunity to get up and say it's attorney-client

12   privilege.  He did not do that.  Now, I think it's open season.

13         THE COURT:  Sustained.

14         (End of sidebar.)

15         THE COURT:  So, ladies and gentlemen, back in the old

16   days before COVID, we used to have what we used to

17   euphemistically call sidebars where the lawyers would all

18   troupe up here, and Marianne would have to get up and make an

19   accurate stenographic record of what took place over there.

20         When my mom was on jury duty, she thought it was the

21   rudest thing in the world that we were up here talking about

22   you guys outside of your earshot, which is sort of what we're

23   doing.

24         So probably the only good thing that I can think of

25   that came out of COVID is we have these now virtual

```
 1   walkie-talkies, and we don't have to troupe all the way up
 2   here.  It saves us a lot of trouble, and you get to listen to
 3   Eva Cassidy, who that just was.  We have some Rolling Stones on
 4   tap for you, and the great Otis Redding.  So I know you're not
 5   rooting for sidebars, but at least the music will be good.
 6   Okay?
 7             All right.  Mr. Kolman, go ahead, please.
 8             MR. KOLMAN:  Thank you, your Honor.
 9             Why don't we move up just to the end.
10             Okay.
11   BY MR. KOLMAN:
12   Q.   Just to move on fairly swiftly.  There was a meeting,
13   wasn't there, when Dr. Desai did -- did bring a colleague,
14   correct?
15   A.   Correct.
16   Q.   And that was a radiologist from UMass, correct?
17   A.   Correct.
18   Q.   And at that time, you presented certain data to them,
19   correct?
20   A.   Correct.
21   Q.   And you put that in the form, I believe, of a PowerPoint;
22   am I right?
23   A.   Correct.
24   Q.   And that PowerPoint was a consequence -- or rather derived
25   from information of the independent study that we've heard
```

1    about, correct?

2    A.   Correct.

3    Q.   And it was another way of actually taking the information

4    from that independent study and converting it to a PowerPoint,

5    correct?

6    A.   Correct.

7    Q.   The actual documentation that gave rise to the PowerPoint,

8    you did not show that, did you, to Dr. Desai?

9    A.   No, I did not.

10   Q.   And that original information, that had certain CT scans

11   on them obviously anonymous, the patient's name wasn't on, but

12   the result that the person that you had hired to review,

13   Dr. Litmanovich, had determined was either fine or hadn't been

14   read properly; is that correct?

15   A.   Yes, she -- I had asked her to say whether she agreed or

16   disagreed.  If she disagreed whether it was a minor

17   disagreement or a major disagreement --

18   Q.   Right.

19   A.   -- and whether or not she felt that there was an impact on

20   patient care.

21   Q.   And we're going to go over this in more detail, but I just

22   want to touch on it.  This so-called independent review, this

23   was done by Doctor -- I think it's Diana Litmanovich; am I

24   right?

25   A.   Correct.  I think she pronounces it Litmanovich, but --

1    Q.   And you were with her at Beth Deaconess, Beth Israel

2    Deaconess, correct?

3    A.   Yes, we worked in the same department for several years.

4    Q.   And that was for some four years, correct?

5    A.   I don't recall exactly how many years we overlapped there,

6    but it was for several years.

7    Q.   And so you knew who she was, and you gave her a call, but

8    she could hardly be independent if -- if you knew her, could

9    she?

10   A.   I felt that she could.

11   Q.   Okay.  But you had done another independent study, hadn't

12   you, in 2012?

13        I think it had involved Dr. Garrell; am I correct?

14   A.   I'm sorry.  Could you repeat.

15   Q.   You had done another independent review for another

16   physician.  I think it was Dr. Garrell.  It was after you came

17   in 2012.

18        Do you recall that?

19   A.   I re- -- Dr. Garrell, yes, worked in the department.

20   Q.   And that was another similar, presumably independent

21   review where Dr. Garrell's CT scans were reviewed by someone

22   independent, correct?

23   A.   No, actually, it was a different situation.

24   Q.   Well, I'm asking about the independent review, because in

25   your deposition you said you couldn't recall the details of how

1    that independent review was conducted.

2         Am I misremembering how you answered that question in

3    your deposition?

4    A.   I'm happy to explain.

5    Q.   Okay.  And you can explain, but let me ask you this

6    question.  Are you suggesting that the independent review done

7    for Dr. Garrell was a different review than the one done for

8    Dr. Desai?

9    A.   Yes.

10   Q.   And with respect to the review for Dr. Garrell, was the

11   purpose of the review to determine whether Dr. Garrell was

12   competent in -- in some aspect of his work, reading CT scans,

13   reading x-rays, or something else?

14   A.   Yes, that's correct.

15   Q.   And you knew Dr. Litmanovich at the time.

16        How come you didn't call her in?

17   A.   I'm happy to explain the difference, if --

18   Q.   Well, my question is how come you didn't call her in, and

19   you can answer that question.

20   A.   It was a very different situation.

21   Q.   Tell me how it was different.

22   A.   The review for Dr. Garrell was not initiated by me.  It

23   was initiated out of concerns from the -- the medical staff

24   credentialing office, and when he came up for his annual or,

25   you know, every-other-year appointment, the medical staff

1    review committee when they saw how many malpractice cases that

2    he had was concerned about recredentialing him.  So it was a

3    concern raised by the medical staff services not by me.

4           And at that point the medical staff took over, the

5    medical staff office took over the investigation and had a

6    process where they and Dr. Garrell and his attorneys agreed

7    upon a process for him to be evaluated.

8    Q.   And they -- and you were aware of this, correct?

9    A.   Yes.

10    Q.   And Dr. Garrell was a radiologist?

11    A.   Yes, he still is.

12    Q.   I'm sure he is.  He -- he was a radiologist at that time,

13    but you -- although you never initiated that specific

14    investigation, you knew the way it was done, correct?

15    A.   No, actually, I did not.  It was conducted by an outside

16    entity that I had no knowledge of what their process was.

17    Q.   They used some -- you don't know what the -- what the

18    process was, and they used someone outside.

19           So my question is:  Why was it necessary for you to

20    create a process when one had been done in 2012?

21           Isn't it true that all you had to do was look up the

22    way it was done or ask someone the way it was done and follow

23    that?

24    A.   The process for Dr. Garrell was, if I remember correctly,

25    outsourced to another entity which did the evaluation of him.

1    Q.    And that would -- that was fair, wasn't it?

2          It was outsourced to another entity that was unrelated

3    in any way to any connection with UMass, correct, or you?

4    A.    Correct.

5    Q.    So why didn't you do that?

6          That would have been the fair thing, wouldn't it?

7    A.    It was certainly fair for Dr. Garrell, and I felt that I

8    was being very fair to Dr. Desai.  I could have just relied on

9    reviews internally from Dr. Dill or I could have brought

10   somebody in from the outside and told them what they were --

11   what they -- what they were doing or who they were evaluating.

12         Instead, I found somebody from outside the

13   institution, who had no idea what they were -- why they were

14   doing what they were doing or who was being evaluated in a

15   completely deidentified way.

16   Q.    Well, let's talk about fairness for a minute.  You have a

17   long résumé and you've written a lot of learned articles,

18   correct?

19   A.    I hope so.

20   Q.    Yes.  And you've also done research, correct?

21   A.    Correct.

22   Q.    So we've heard terms like blind and double-blind and

23   everything else, but you created the actual way in which this

24   so-called independent test would be done, correct?

25         You were the one who put it together?

1    A.    Yes, I decided that we would pull 25 CTs.

2    Q.    And we're going to do that right now.  You decided that 25

3    of Dr. Desai's CT scans was going to be put against 25 random

4    CT scans taken from five different radiologists, correct?

5    A.    Not exactly.  I did not specify the number of radiologists

6    that it would be taken from.

7    Q.    If I tell you it was five, I think you'll believe me,

8    correct?

9    A.    Okay.  If you say it's five, I have no reason to not

10   believe you.

11   Q.    So, Dr. Rosen, how could it possibly be fair.  You -- in

12   order to have a fair comparison, isn't it true that you would

13   need 25 of Dr. Desai's, 25 of -- of A, B, C, D, E doctors, and

14   then determine what percentage of those scans are misread?

15         That would have been the right way to do it; isn't

16   that correct?

17   A.    Actually, I thought I was being even more fair to

18   Dr. Desai.

19   Q.    Excuse me.

20         THE COURT:  Mr. Kolman, let him finish.

21         MR. KOLMAN:  That would have been the right way to do

22   it.

23         THE COURT:  No.  No.  Whoa.  Whoa.  Whoa.  Don't argue

24   to me.

25         MR. KOLMAN:  Okay.

1        THE COURT:  And don't make statements.

2        MR. KOLMAN:  Okay, your Honor.

3        THE COURT:  I want you to ask questions and not make

4    statements.  Let him finish his answer.  You went on with your

5    question for five minutes, so let him answer.

6        MR. KOLMAN:  Sure.

7        THE COURT:  Go ahead and finish your answer, Doctor.

8        THE WITNESS:  I thought that I was actually being very

9    fair to Dr. Desai.  The other two chest radiologists in the

10   department at the time were Dr. Dill and Dr. Eric Schmidlin,

11   and I could have compared 25 of Dr. Desai's CT reads to 25 of

12   Dr. Dill and -- and/or 25 of Dr. Schmidlin.  I thought that was

13   holding her to a higher standard, because I knew the quality of

14   the reads of Dr. Dill and Dr. Schmidlin.

15        So instead, I wanted to compare Dr. Desai to just a

16   general group of 25 people who were reading chest CTs, which in

17   my mind and my intent was the lower -- a lower common

18   denominator.

19   BY MR. KOLMAN:

20   Q.   Isn't it true that if you take two reads from Doctor A and

21   four reads from Doctor B and five reads from Doctor C and

22   another three, and whatever it takes to make 25, that the one

23   with two has far less chance of having a misread, because the

24   scope of your review is not 25, it's only two?

25        Would you agree with me?

1   A.   No, actually, I would disagree that I was comparing the
2   body of 25 of Dr. Desai's to 25 of another group.  I wasn't
3   comparing one to one.  I was comparing 25 to 25.
4   Q.   There is a doctor who was -- who constitutes one of the
5   A through E doctors that I just mentioned.  One of his reviews
6   was troublesome, but the other wasn't.  That means he had a
7   50 percent failure rate.
8            THE COURT:  Counsel, don't make statements.  Ask a
9   question.
10           MR. KOLMAN:  I'm sorry.
11  BY MR. KOLMAN:
12  Q.   Doesn't that mean he had a 50 percent failure rate?
13  A.   For those two isolated cases, technically, yes, you are
14  correct, but --
15  Q.   And were the others --
16  A.   But I was -- again, I was comparing the 25 against the 25.
17  Q.   So let -- let me -- I'm going to move on, but let me be
18  clear I understand.  So it's your testimony that to take 25 of
19  Dr. Desai's reads and compare them to four of this one, five of
20  this one, three of that one, whatever it takes of these various
21  doctors to make 25, you say that's a fair comparison in your
22  mind; is that correct?
23  A.   Yes, and just to, if I can clarify.
24  Q.   All right.  I see.
25  A.   I did not parse those down into those individual

1   radiologists.  I compared her to the entire group.  And again,

2   I chose to compare it to a group of -- or more of a general

3   group of people reading chest CTs than comparing her to

4   Dr. Dill and/or Dr. Schmidlin.

5   Q.   Do you understand my question about the fact that it is

6   unfair?

7   A.   I understand your question.  I don't agree with you though

8   with all due respect.

9   Q.   Good.  You had alluded to complaints about Dr. Desai, and

10  I want to go into that right now, and it was, was it not, a

11  result of these alleged complaints that you decided to do an

12  independent review; is that correct?

13  A.   Yes, that is correct.

14  Q.   Do you recall when these apparent complaints occurred?

15  A.   Soon after Dr. Dill arrived at -- at UMass.  I think she

16  started in, if I'm correct, around February or March of 2016.

17  It became -- Dr. Dill started to become aware of -- of issues

18  with Dr. Desai's reads, because other clinicians, other, you

19  know, other doctors in the hospital had started to come to

20  Dr. Dill and say, you know, could you please -- could you

21  please reread this study.  I have some questions.

22          And then --

23  Q.   Now, you state, do you not, that it was Dr. Robinson who

24  made complaints; is that correct?

25  A.   Yes, I was starting back with --

1    Q.    Is that correct?

2    A.    Yes.

3    Q.    Okay.  And apparently Dr. Robinson -- it's true that

4    Dr. Robinson complained about a number of physicians, correct?

5    A.    Correct.

6    Q.    And not just Dr. Desai.  And that Dr. Robinson is actually

7    a pulmonologist; is that correct?

8    A.    That is correct.

9    Q.    She's not a radiologist, correct?

10   A.    She's a pulmonologist.

11   Q.    Now, when she complained, you would substantiate the

12   complaint; is that correct?

13   A.    Well, I would investigate the complaint.

14   Q.    You would investigate it.  And so you took your complaints

15   seriously and then investigated them?

16   A.    Yes, as I would for anybody who brought me an issue.

17   Q.    And so with respect to Dr. Desai, where are your

18   investigations of the alleged complaints made by Dr. Robinson?

19   A.    The complaints from Dr. Robinson, I think it was a meeting

20   in January of 2017 is what prompted me to conduct the

21   independent review.

22          So my action in response to Dr. Robinson's complaints

23   was to undertake the independent review.

24   Q.    I'm sorry.  Did you hear my question?

25   A.    If you -- please repeat it.

1    Q.    Sure.  So my question is:  Where are the investigations by
2    you into the complaints by Dr. Robinson about Dr. Desai given
3    your prior testimony?
4    A.    The -- my action was to initiate the independent review.
5    Q.    I'm sorry.  Could you speak up a bit?
6    A.    I'm sorry.  My -- my response to Dr. Robinson's complaints
7    in January of 2017 was to initiate the independent review.
8    Q.    Okay.  So do I understand that you -- that there is no
9    document from you indicating you did an independent review of
10   Dr. Robinson's complaints about Dr. Desai in January of 2017,
11   correct?
12   A.    If I'm interpreting you correctly, and if I'm not, please,
13   I'm sorry.  I did not conduct an independent review of any
14   cases specific to concerns that Dr. Robinson had.  Rather, I
15   took Dr. Robinson's complaints as the -- to initiate the
16   independent review that Dr. Litmanovich did.
17   Q.    So as I understand it, in January -- and you'll correct me
18   if I'm wrong.  In January of 2017, Dr. Robinson makes certain
19   complaints about certain of Dr. Desai's readings, and you don't
20   investigate those, but take Dr. Robinson at her word; is that
21   right?
22   A.    Not exactly.  Dr. Robinson, I don't think, ever gave me
23   specific cases.  She never said it was patient X, Y, Z on this
24   date.  Rather, it was a general -- I think she actually said to
25   me I don't believe Dr. Desai's reads.

1    Q.   But as you prior -- as you previously testified, she did

2    that with a number of doctors, but that never led to an

3    independent review by you, did it?

4    A.   It did not lead to an independent review, but it did lead

5    me to change some other practices in the department.

6    Q.   Okay.  So sitting here today, you don't have the names of

7    the patients Dr. Robinson was referring to -- I'm sorry.  In

8    January of 2017, you did not have the names of the patients

9    that Dr. Robinson was referring to, correct?

10   A.   Correct.

11   Q.   And you did not have the CT scans that Dr. Robinson was

12   referring to, correct?

13   A.   Correct, I was responding to -- sorry, I was responding to

14   more of a general complaint from -- from a doctor.

15   Q.   So Dr. Robinson was generally, according to you,

16   complaining about Dr. Desai.  You previously testified that you

17   would investigate these complaints, but in this case you didn't

18   investigate them, did you?

19        You just took the so-called concerns, general

20   concerns, of Dr. Robinson, correct?

21   A.   I took Dr. Robinson's specific concerns about Dr. Desai's

22   interpretation mostly of CT scans in conjunction with other

23   information that I had and concerns that I had from Dr. Desai

24   and felt those two pieces of information warranted conducting

25   the independent review.

1    Q.    Okay.  So that is different from your prior testimony.

2    You are now adding certain things.  I thought your testimony

3    was, I don't argue this, I just want clarify it.

4              What's your testimony --

5              MR. WAKEFIELD:  Objection, your Honor.

6              THE COURT:  Yeah, let's have a question not a

7    statement.

8    BY MR. KOLMAN:

9    Q.    Was your -- was -- well, let me put this this way.  You

10   are a scientist.  You -- it's true that you never noted down

11   the CT scans, correct?

12   A.    Which CT scans?

13   Q.    The ones that Robinson was concerned about?

14   A.    Correct.

15   Q.    You never sent them for any review, correct?

16   A.    Correct.  She never gave me the patient's name or anything

17   for --

18   Q.    And you never asked for the CT scans, correct?

19   A.    Correct.

20   Q.    Despite the fact that you're head of radiology, and

21   Dr. Desai is working for you, and quality is important to you,

22   correct?

23   A.    Correct, but without --

24   Q.    You took -- isn't it true that you took Dr. Robinson at

25   her word about the unreliability of Dr. Desai and never

1    actually looked at the raw data, correct?

2    A.   No, I would disagree.  I took her general concern and then

3    translated that into a specific evaluat- -- independent

4    evaluation.  If she had given me specific cases, I would have

5    reviewed those cases, as I do all the time; but without the

6    specific cases and her ongoing concern combined with the

7    concerns that Dr. Dill as the section chief had raised, I felt

8    that both of those things warranted the independent evaluation.

9    Q.   You could have asked for the CT scans, couldn't you?

10   A.   If Dr. Robinson was able to provide them, I would have

11   been -- I would have reviewed those specific cases.

12   Q.   You never asked for them, did you?

13   A.   I never asked Dr. Robinson.  There were cases and times I

14   think that Dr. Robinson would call Dr. Dill and ask her to

15   review cases.

16   Q.   You never asked for them in this case?

17   A.   Correct, I never asked for them in this case.

18   Q.   The independent review that we previously talked about,

19   that's the same independent review that you thought about in

20   January of 2017; is that right?

21   A.   Correct.

22        MR. KOLMAN:  Let's put up Exhibit 3.

23        THE COURT:  Wait a minute.  Is it --

24        MR. KOLMAN:  Exhibit 3 is the affidavit.

25        THE COURT:  Is it in evidence?

1          MR. KOLMAN:  It's not, your Honor.

2          THE COURT:  Are you offering it?

3          MR. KOLMAN:  I'd like to move Exhibit 3 into evidence.

4     It's the affidavit of Max Rosen, M.D.

5          THE COURT:  Mr. Wakefield.

6          MR. WAKEFIELD:  I have an objection, your Honor.

7          THE COURT:  All right.  Plug in, please.

8          (Sidebar as follows:)

9          THE COURT:  Can you all hear me?

10          MR. WAKEFIELD:  Yes, your Honor.

11          THE COURT:  What -- what are you offering, Mr. Kolman?

12          MR. KOLMAN:  Your Honor, I'm offering the affidavit of

13     Dr. Desai that was -- I'm sorry, Judge -- Dr. Rosen that was

14     produced in evidence and --

15          THE COURT:  What purpose, please?

16          MR. KOLMAN:  It's a sworn statement about the facts of

17     this case.

18          THE COURT:  Hold up.

19          What's the objection?

20          MR. WAKEFIELD:  Your Honor, that's hearsay, and

21     Dr. Rosen is here today to testify about the facts of this

22     case, and the prior affidavit is not appropriate as an exhibit.

23          THE COURT:  Isn't it a declaration of a party

24     opponent?

25          MR. WAKEFIELD:  Well, the affidavit is a dozen pages

1    long, and I don't know what, if any, limited portions he's

2    offering.  I -- I have to go through the affidavit line by

3    line, and a lot of it is not relevant to the claims that remain

4    in the case.

5              THE COURT:  How much are you offering?

6              MR. KOLMAN:  Just a small amount, your Honor, to deal

7    with just this matter that currently I'm questioning the

8    witness on.

9              THE COURT:  So are you offering it into evidence or

10   are you -- are you showing it to the witness to impeach him or

11   for an admission de bene esse?

12             MR. KOLMAN:  I'm showing it to the witness for the

13   admission of what he said under oath.

14             THE COURT:  All right.  Overruled.

15             (End of sidebar.)

16   (Exhibit No. 3 was admitted into evidence.)

17   BY MR. KOLMAN:

18   Q.   Do you recall, Dr. Rosen, swearing an affidavit on the

19   15th day of December 2021?

20   A.   Yes.

21   Q.   And you understood then that you were signing the content

22   under the penalty of perjury, correct?

23   A.   Yes.

24   Q.   I want to bring your attention to page 10 and specifically

25   paragraphs 54 through 58.

1          And do you mind if I read it?

2     A.    Please.

3     Q.    At this meeting, Dr. Robinson expressed serious concerns

4     with the quality of CT reads performed by Dr. Desai.

5     Dr. Robinson stated to me she never believed Dr. Desai's

6     reports and could not rely on them.

7          In response, I agreed that I would conduct a focused

8     review of Dr. Desai's CT reads.  I believed that I had to

9     address the concerns raised to me in the interests of patient

10    safety and the department's obligations to provide high-quality

11    services to patients and providers.

12         To ensure fairness and to confirm that the quality

13    concerns were justified prior to taking further action, I

14    adopted to have an independent blinded review of Dr. Desai's

15    CT reads.

16         I did not choose to arrange an independent review of

17    Dr. Desai's reads based on isolated concerns regarding a read

18    or a request to review a study read by Dr. Desai.  I did not

19    make the decision to do so based on one or two misreads.

20         I made the decision to perform an independent review

21    based on reports of quality concerns from Dr. Dill, my

22    awareness of errors in the peer review system, and complaints

23    from Dr. Robinson, in particular her comments at the

24    January 31st, 2017, meeting.

25         Did I -- did I read that correctly?

1    A.    Yes, you read it correctly.

2    Q.    And the concerns of Dr. Robinson and possibly later the

3    concerns of Dr. Dill, they were sufficiently concerning to you

4    apparently to do an independent review of the CT scans; is that

5    right?

6    A.    Yes, that's correct.

7    Q.    And they were of concern to you, because as you previously

8    testified, patient safety is a priority, correct?

9    A.    Correct.

10   Q.    And it would be dangerous, would it not, to have a doctor

11   treating patients who could not properly read CT scans, would

12   that be correct?

13   A.    Correct.

14   Q.    And that would be something that you would want to take

15   care of promptly, correct?

16   A.    Correct.

17   Q.    So how is it that you waited until December of that year

18   to get the results of the so-called independent review?

19   A.    So I initiated or I requested that the images, the 50

20   random images, be pulled and deidentified.

21   Q.    Sorry, I can't hear.

22   A.    I'm sorry.  I'm sorry.  I had requested after that meeting

23   in January, so probably in February, to have the 50 cases, you

24   know, pulled from the file room, the images deidentified and

25   the records deidentified.

1          I think probably around mid-March, I received the data

2     set of the images and the -- and the reports.

3          And then very frankly, I should have contacted a

4     reviewer sooner.  I -- it took me about five months to contact

5     Dr. Litmanovich, which I did, I think, in probably mid-August,

6     so before the end of the summer.  And then once I then had a

7     contract with Dr. Litmanovich, she said she would be unable to

8     conduct the review until after the RSNA, the Radiology Society

9     of North America meeting, which happens the week after

10    Thanksgiving, and then she got the results to me in December.

11         So, you know, in hindsight I wish I had contacted

12    Dr. Litmanovich sooner, but I didn't.

13    Q.   So for 12 months quite possibly according to you patient

14    care could have been compromised by Dr. Desai; is that correct?

15    A.   It's possible.

16    Q.   You previously testified that this was very important, and

17    patient care is very important.

18         Isn't it true that you could have gotten an

19    independent reviewer in January of 2017, if it was so

20    significant and impacted patient care so profoundly?

21    A.   I think the earliest that I could have gotten an

22    independent review would be mid or late March, because

23    that -- that was the time that I had the -- the scans pulled

24    and the reports pulled.

25    Q.   So you could have got the independent reviewer in March.

1    Let's say that.  And could you have told that -- that

2    independent reviewer that this matter was critical, could you

3    not?

4    A.    I could have.

5    Q.    And you could have told that independent reviewer that it

6    was critical because you felt that there was a doctor who could

7    not properly read CT scans and that could impact patient care,

8    correct?

9    A.    I could have.  We also --

10   Q.    And --

11   A.    We also have other QA systems in place.  So this is not

12   the only QA system.

13          But as I said, I wish I had done -- I wish I had

14   initiated the independent review sooner.

15   Q.    Why didn't you then?

16          MR. WAKEFIELD:  Objection, your Honor.

17          THE COURT:  Overruled.  You may answer.

18          THE WITNESS:  You know, I had a lot of things going

19   on, was busy, was thinking about who the best person to do the

20   independent review would be, and time went -- time went fast,

21   and as I said, I wished I had done it sooner.

22   BY MR. KOLMAN:

23   Q.    Isn't it true that you weren't really concerned about

24   Dr. Desai's reads at all, which is why this was not a priority

25   for you?

1    A.    No, that -- actually, I was concerned and Dr. Dill, you

2    know, I think over this time was continually getting requests

3    to reread studies that Dr. Desai had -- had interpreted.

4    Q.    Isn't it true that when you got the results of this

5    independent review, you permitted my client to continue to read

6    CT scans until March 14th, the day of her termination; isn't

7    that true?

8    A.    Yes, that is correct.

9    Q.    So now you actually have the results of the so-called

10   independent review, and you continue to allow this alleged

11   incompetent radiologist to read CT scans.

12          What's the reason for the delay this time?

13   A.    I had discussed with HR and with legal, internal, you

14   know, about next steps, and they've compiled the data.  I

15   looked at the data.  I double checked the data to make sure

16   that it was -- that no mistakes, you know, had been made in

17   assigning the blinded reviews, you know, to the correct group.

18   Q.    Is this another case where you wished you had done it

19   sooner?

20   A.    In retrospect, yes.  But I received the results from

21   Dr. Litmanovich, I think, around Christmastime; and over

22   January and February, you know, worked with HR and legal about

23   what the appropriate next steps would be.

24   Q.    But you're the doctor, Dr. Rosen, and you could have told

25   legal and HR that this is critical to the health of your

1    patients, correct?

2    A.    I could have.

3    Q.    So given the delay in getting the independent review done,

4    and given the delay of imposing the results of that independent

5    review on Dr. Desai and given that Dr. Desai is the whole time

6    reading CT scans for a period of 16 months, how significant

7    really was your concern about Dr. Desai if this is what you

8    did?

9    A.    I had real concerns.  I relied on Dr. Dill as the section

10   chief to continuously monitor, you know, the quality of the

11   section, and we also have a peer review process in place

12   to -- to identify, you know, ongoing issues.  And when I met

13   with -- with Dr. Desai, I think in June or July of the summer

14   of -- of '17, I, as part of everybody's annual meeting, I give

15   them feedback on their quality, any kind of cases which have

16   been flagged in our QA database.

17           The QA database scores cases from one to four, one

18   being the -- the second reviewer agreed; two, there was a minor

19   disagreement; three, a potentially serious disagreement; and

20   four, a likely serious disagreement.

21           And so when I met with Dr. Desai in -- in June or

22   July, you know, of '17, I provided Dr. Desai with the feedback

23   of all of the cases I think that were ranked four and asked her

24   to go back and look at these cases and see if she agreed

25   with -- with the second reviewer and if -- and if not to sort

1     of try to understand why.

2     Q.   Dr. Rosen, what you just testified to, that's not in

3     writing anywhere, is it?

4     A.   The --

5     Q.   Your statement that you told her to go back and review all

6     of the CT scans that's nowhere in writing, is it?

7     A.   It would not be part of the annual review, because the

8     annual review is from a Medical School form that doesn't relate

9     to clinical information, but I did give Dr. Desai her threes

10    and fours and did ask her to go back and review those, and I

11    think Dr. Desai actually had a copy of those threes and fours

12    in that report in her office.

13              MR. KOLMAN:  Let's look, if we could, and I'm moving

14    this into evidence, your Honor.  It's a response.  It's a first

15    MCAD.

16              THE COURT:  What's the -- what's the exhibit number,

17    please?

18              MR. KOLMAN:  54.

19              THE COURT:  Let me just check with Mr. Wakefield.

20              Is there any objection?

21              MR. WAKEFIELD:  Yes, your Honor, I object.

22              THE COURT:  All right.  We're going to take the second

23    break here.  We'll see you back in about 10 minutes.

24              THE CLERK:  All rise.

25              (At 11:58 a.m., the jury left the courtroom.)

1          THE COURT:  What's the document, please, Mr. Kolman?

2          MR. KOLMAN:  The document is the first --

3          THE COURT:  You can step down, Doctor.

4          THE WITNESS:  Oh, thank you.

5          MR. KOLMAN:  The first MCAD response to the -- it's an

6     initial position statement of UMass Memorial and the other

7     defendants at the time to the allegations by the petitioner.

8          THE COURT:  Okay.  Hold up.

9          MR. KOLMAN:  And --

10         THE COURT:  So hold up.

11         MR. KOLMAN:  -- there's only one other thing that I

12    wanted to add, your Honor.

13         THE COURT:  Go ahead, please.

14         MR. KOLMAN:  And it's simply signed under oath by

15    Dr. Rosen.  So it's for that purpose that I wish to enter it,

16    the fact that he signed it and there are statements in here

17    which are relevant.

18         THE COURT:  And what's the objection, please?

19         MR. WAKEFIELD:  Your Honor, this is from three years

20    ago, the Massachusetts Commission Against Discrimination

21    position statement, that concerns a variety of claims that most

22    are not involved in the case any longer, you know, claims of

23    age -- gender discrimination, disability discrimination.  It

24    has all kinds of irrelevant -- completely irrelevant

25    information that cannot be parsed through.  It was written in a

1    completely different context.  Even on behalf of parties that

2    are no longer parties to this action.  Dr. Rosen is here to

3    testify today.

4                THE COURT:  Okay.  Stop.

5                MR. KOLMAN:  I'm not going to use any of that, your

6    Honor.

7                THE COURT:  So --

8                MR. KOLMAN:  I just --

9                THE COURT:  Point me in the document, please, to what

10   you're going to use.

11               MR. KOLMAN:  Yes, of course.  Can you plug it.  It's

12   up.  So go to 18, paragraph 18, and go through to 22.

13               MR. COMENZO:  You got a page number?

14               (Plaintiff counsel conferred.)

15               MR. KOLMAN:  No, it's paragraph.  Page 5.

16               THE COURT:  All right.  Hold up.  So you're offering

17   18 to 22?

18               MR. KOLMAN:  Yes.  Yes, your Honor.

19               MR. WAKEFIELD:  Can you scroll it down slightly.  I

20   can't see the bottom of 22.  Please.

21               MR. KOLMAN:  Well, actually, I'm -- I'm only offering

22   18 through 19.  Actually, through 20, and that's it.

23               THE COURT:  So you're offering paragraphs 18, 19 --

24               MR. KOLMAN:  18 through 20, and that's it.  Oh, and --

25   and 28, but I think we've been over that.  I -- 28 is

1    redundant.  That's just redundant.  I'm not going to use that.

2          THE COURT:  Can you go back up to where we were,

3    please.

4          All right.  Hold up.  So 18, 19, and 20?

5          MR. KOLMAN:  Yes, your Honor, and there's a sworn --

6          THE COURT:  Let me just -- let me read them first.

7          MR. KOLMAN:  I'm sorry, your Honor.

8          THE COURT:  Just because I'm not talking doesn't mean

9    you need to fill the air.

10         MR. KOLMAN:  I know.

11         (Pause.)

12         THE COURT:  And what's your objection to that,

13   Mr. Wakefield, those three graphs?

14         MR. WAKEFIELD:  I don't -- for paragraphs 18, 19, and

15   20, I don't have any objection to the admissions of those.

16         I would note just due to your Honor's own concerns,

17   the reference to independent expert.  We were going to make

18   efforts pursuant to the motion to exclude Dr. Litmanovich to

19   never refer to her as an expert to the -- to the jury, and so I

20   just wanted to bring that up to your Honor.  I don't have an

21   objection otherwise.

22         THE COURT:  Yeah, okay.  All right.  So I will let you

23   use those.

24         MR. KOLMAN:  Thank you, Judge.

25         THE COURT:  Counsel, I apologize.  I forgot your name.

1          MR. COMENZO:  Attorney Comenzo, your Honor.

2          THE COURT:  So can you check and let me know whether

3     you can -- are you the lawyer who is going to be examining

4     Dr. Desai?

5          MR. COMENZO:  Dr. Desai, no.

6          THE COURT:  So why can't you guys do on Wednesday

7     again?

8          MR. COMENZO:  Because I do this part.

9          THE COURT:  Oh, I see.  All right.  You can check and

10    let me know whether you can or can't before we come back?

11         MR. COMENZO:  Yes.

12         THE COURT:  Thank you.

13         How are you doing on time?  Are you on schedule or --

14         MR. KOLMAN:  We are moving -- moving along well.

15         THE COURT:  Does that mean ahead or behind or --

16         MR. KOLMAN:  I'm ahead.  I'm pretty much ahead of

17    myself.

18         THE COURT:  That's the spirit.  That's what I want to

19    hear.  All right.  Thank you.

20         MR. KILROY:  Your Honor, just a question, your Honor.

21         THE COURT:  Yeah.

22         MR. KILROY:  Just in terms of logistics.  So you

23    will -- this will all be redacted so there'S only those three

24    these paragraphs that go in?

25         MR. KOLMAN:  Yes, except his signature at the end.

1          THE COURT:  Yeah, you guys are going to have to work

2     out the redaction off line.

3          MR. KILROY:  Thank you.

4          THE COURT:  That would be -- what was that number, 54?

5          MR. KOLMAN:  54, Judge.

6          (Counsel conferred.)

7          (Recess from 12:03 p.m. until 12:21 p.m.)

8          THE CLERK:  All rise.

9          MR. COMENZO:  Thank you, your Honor.

10         The issue that I have with my wife is a childcare

11    issue that I told her I was available at a particular time

12    during the day.  She's working right now, and she has gotten

13    back to me.  She is pushing back.  I don't know that she has

14    ever experienced your Honor in a black robe pushing back at

15    her.

16         THE COURT:  Don't tell her where I live, okay.

17         MR. COMENZO:  I am merely a powerless husband.  If

18    your Honor instructs me to push harder, I will.

19         THE COURT:  So it's -- it's a no?

20         MR. COMENZO:  It's a childcare issue for me at this

21    point, yeah.

22         THE COURT:  So you can't?

23         MR. COMENZO:  I cannot.

24         THE COURT:  Okay.

25         MR. COMENZO:  Thank you.

1          (At 12:22 p.m., the jury entered the courtroom.)

2          THE CLERK:  Court is now open.  You may be seated.

3          THE COURT:  So as it turns out we -- we could not work

4     through the problem we had on the Wednesday, so we will be 9:00

5     to 1:00, but a week from Thursday, if you could check with

6     everybody that you need to check with, and we'll -- I'll ask

7     you tomorrow or later in the week if you can do it.  Not this

8     Thursday, but a week from Thursday.

9          And while I'm thinking of it, while the lawyers are

10    chatting over there, I don't think there will be media coverage

11    of this trial, but that doesn't mean it won't happen.

12    Obviously, if you see an article or there's something on the

13    radio or TV, don't read it, listen to it, or watch it, okay?

14          (Plaintiff counsel conferred.)

15          MR. KOLMAN:  Thank you.

16    BY MR. KOLMAN:

17    Q.   Dr. Rosen, I'm showing you a portion of an affidavit that

18    you -- you signed, and I think we -- I asked you about the data

19    of that before we -- before we broke.

20    A.   Yes.

21    Q.   And, specifically, I want to bring your attention to these

22    three paragraphs, and if you don't mind that, I'll read it.

23          Subsequently, Dr. Rosen received a complaint from the

24    president of the medical staff from Marlborough Hospital,

25    Dr. Kim Robinson.  Dr. Robinson expressed serious concerns that

1    had been raised by the Marlborough Hospital medical staff about

2    the quality of Dr. Desai's work to the point where Dr. Robinson

3    had trouble trusting the accuracy of complainant's reads on

4    CT scans.

5         Do you see that?

6    A.   Yes.

7    Q.   That complaint was never made in writing, was it?

8    A.   The complaint was made at a meeting with Dr. Robinson and

9    several others at Marlborough Hospital, and then I confirmed

10   the complaint in an email which summarized that meeting.

11   Q.   We're going to look at that.  That is the minutes of the

12   meeting --

13   A.   Yes.

14   Q.   -- is that correct?

15   A.   Yes, correct.

16   Q.   Where Dr. Robinson states that she has serious concerns

17   and has trouble trusting the accuracy of Dr. Desai's reads,

18   that statement is not -- there's nothing in writing from

19   Dr. Robinson --

20   A.   Correct.

21   Q.   -- stating that, correct?

22   A.   You're correct, yes.

23   Q.   And as you previously testified, you didn't look at the

24   reads to determine if they were accurate or not, correct?

25   A.   Correct.

1   Q.   Now, are you aware of at any time did Marlborough Hospital

2   not permit Dr. Desai to read CT scans?

3        Are you aware if they did what -- what UMass did?

4   A.   I am aware that when I gave Dr. Desai her notice, I

5   curtailed her privileges to read CT scans.

6   Q.   Okay.  But Marlborough Hospital -- let's be clear about

7   the relationship between UMass and Marlborough.

8        Is it the case that radiologists from UMass actually

9   do radiology at Marlborough Hospital?

10       Is that the way it works?

11  A.   Yes, it's a complicated, and if you'd allow me, I can

12  explain because --

13  Q.   That's okay.  And one of those radiologists was Dr. Desai,

14  correct?

15  A.   Correct.

16  Q.   And Dr. Desai had a separate contract with Marlborough,

17  correct?

18  A.   No, that's not correct.

19  Q.   Wasn't she an independent contractor?

20  A.   No, Dr. Desai was an employee of UMass Memorial Medical

21  Group, and UMass Memorial Medical Group had and has the

22  contract to provide radiology services at Marlborough Hospital.

23  Q.   Now, nonetheless, Marlborough Hospital had to credential

24  Dr. Desai, correct?

25  A.   Correct.

1    Q.   And -- and can you tell us a little bit about what

2    credentialing is, just briefly?

3    A.   Sure.  Credentialing is a hospital or institution's review

4    of a -- in this case a doctor, and saying this person is, you

5    know, okay, to do X, Y, Z tasks or procedures at our hospital.

6    Q.   Thank you.

7         Do you know if Dr. Robinson was on the credential

8    committee of the hospital?

9    A.   Dr. Robinson was at this point the president of the

10   medical staff, but I do not know specifically whether she in

11   that role was also on the credentials committee.

12   Q.   Are you aware that Marlborough Hospital never curtailed

13   the ability of Dr. Desai to read CT scans?

14        Are you aware of that?

15   A.   I'm aware that Dr. Desai was -- I saw one credentialing

16   form where Dr. Desai was credentialed at Marlborough Hospital

17   to read CTs.

18   Q.   Okay.  Thank you.  So -- okay.

19        So at any point did you have a meeting with

20   Marlborough Hospital to say that they were employing a

21   doctor -- employing or they had a doctor, credentialed doctor,

22   who was reading CT scans and UMass didn't allow it and

23   Marlborough shouldn't allow it?

24        Was there any such conversation that you had with

25   Marlborough for the sake of patient safety?

1   A.   I never had the conversation with Marlborough, but the way

2   the work flow is set up, that would actually be a moot point,

3   because Dr. Desai was always sitting at university hospital in

4   our chest reading room, and all of the reads, all of the work

5   that happens in radiology is aggregated onto the same work

6   list.

7           So even if Dr. Desai was still credentialed to read

8   CAT scans at Marlborough Hospital, if we had asked her or told

9   her not to read CTs, then she would not be reading CTs for

10  Marlborough Hospital.

11  Q.   Is it your testimony then that -- that UMass is the

12  conduit through which the CT scans go and, therefore, it would

13  be impossible for Dr. Desai to read CT scans in any event, even

14  if permitted by Marlborough?

15  A.   It would not be impossible, because the CT scans show up,

16  you know, on the work list that Dr. Desai had access to; but if

17  we had asked Dr. Desai not to read CT scans, she should not be

18  reading them.

19  Q.   If -- if Marlborough has a separate credentialing for

20  Dr. Desai in CT scans, why should Dr. Desai not be reading

21  CT scans for Marlborough when she's credentialed to do it, and

22  no one at Marlborough has said she can't?

23  A.   The way our work lists are set up --

24  Q.   It's why.  Why should she not?

25          THE COURT:  Well, I think he's about to answer so --

1          MR. KOLMAN:  Okay.

2          THE COURT:  -- please -- please continue, Doctor.

3          THE WITNESS:  Thank you.

4          So because the contract is with the UMass Memorial

5     Medical Group, all of the work from all the hospitals,

6     Marlborough, Clinton, Health Alliance is all aggregated onto

7     one work list; and while you can separate the work list

8     by -- by hospital, we in chest separated it by -- by modality.

9          So there was a chest x-ray work list from chest x-rays

10    from anywhere across the system and a CAT scan work list from

11    CAT scans across the system.

12         So in the year when Dr. Desai was still working, but I

13    had asked her not to read chest CTs, she could, you know, have

14    a full day's worth of work just reading off of the chest x-ray

15    work list.

16    BY MR. KOLMAN:

17    Q.   Okay.  Thank you.

18         You're -- you are aware of peer review, correct?

19    A.   Correct.

20    Q.   And can you describe to the jury a little bit about what

21    peer review is and perhaps why it exists?

22    A.   Sure.  So a peer review is a system which was set up by

23    the American College of Radiology, called the ACR, and it was a

24    process which was in place for -- for several years, and the

25    way it works is that -- well, so back up for a second.

1          So radiologists read, interpret images on something

2   called a PACS system, which stands for picture archiving and

3   communications system, and it's a setup of usually two

4   high-resolution monitors in the middle and then a monitor on

5   each side.

6          One monitor has the hospital's electronic medical

7   record, or EMR, and the other has a voice recognition system,

8   if you ever used Dragon or any, you know, voice recognition.

9   And these systems all integrate together.  They're all linked

10  behind the scenes, and the way peer review works, it has two

11  components to it.

12         The first component is every -- you can set the system

13  so that every X number of cases that you read from today, when

14  there's a prior study of the same -- the same study, it would

15  automatically flag that and ask the person reviewing today to

16  go back and look at the prior study and say whether they agreed

17  or disagreed with that read.

18         And so the idea was that, you know, in the course of

19  maybe reading a hundred scans or x-rays, maybe one or two of

20  them, you would be asked to go back and -- and essentially

21  reread the prior study.

22         And then you would enter -- and then you would enter

23  data from that comparison into a database and rank or grade the

24  prior study as either a one, which meant that you agreed with

25  the prior read; two, there was a minor disagreement of no -- no

1    significance; three, you disagreed, and it could have been

2    significant, maybe not; and then four, where there was a

3    finding that was missed that should have been really made, you

4    know, all the time.

5         And so over the course of a year, we -- we'd -- you

6    know, or each year, there would be a database that would be

7    developed where you could have, you know, for each radiologist,

8    you know, a certain number of their cases would be peer

9    reviewed, and you would get a printout or a read out on an

10   Excel sheet of how many ones, twos, threes, fours that there

11   were.

12        The other way of doing peer review, if somebody is

13   made actively aware of a discrepancy.  So, for example, if I

14   was or Karin Dill is the division chief for chest radiology, if

15   somebody comes to Dr. Dill and says, Could you review the scan

16   on Mrs. Smith, I think there was -- I think something was

17   missed.  If Dr. Dill reviews that scan and finds that there is

18   something missing she can then manually enter that into -- into

19   the peer review system.  So there are really two ways.

20        One is an automated, you know, X number of cases get

21   double read; and then the other way is if somebody finds an

22   abnormality or discrepancy, they can manually enter it into the

23   system.

24   Q.   Thank you.

25        And the purpose of peer review is to ensure that the

1   doctor is -- is treating the patient at the requisite level?

2   A.   Yes, it's -- so it's a very high level way of getting --

3   getting data on how people are performing.

4        Now, if somebody flags a study as disagreeing with the

5   reading, there's no who's right or who's wrong.  It's just that

6   there is a disagreement.  And our policy in the department was

7   for all the cases where there was a disagreement that the --

8   the division chief or the chief quality officer in that

9   division would -- would look at those cases and then make a

10  determination if there was -- if indeed there was a mistake,

11  and then if there was a mistake to then notify the person who

12  read the study and/or put an addendum onto the report saying we

13  found this discrepancy, and we want to provide this additional

14  information.

15  Q.   And you didn't do that, did you, with Dr. Desai when

16  Dr. Robinson indicated that doctor -- when Dr. Robinson

17  indicated that Dr. Desai's reads were unreliable?

18  A.   Well, the only way you can do it is if you know of a

19  specific case.

20  Q.   And you didn't know of a specific case because you never

21  asked for it, correct?

22  A.   I always asked doctor -- anybody, including Dr. Robinson,

23  if she had specific cases to please let me know.

24  Q.   But in fairness, and we've heard about fairness from your

25  counsel, how could you possibly know that Dr. Desai's readings

1    were unreliable when you didn't have the actual CT scan, and

2    Dr. Robinson was a pulmonologist and not a radiologist?

3    A.   Well, first of all, pulmonologists spend their time

4    studying and treating patients with lung disease.  So

5    pulmonologists are actually quite sophisticated in their

6    knowledge of -- of chest imaging.

7         There were cases that Dr. Robinson contacted Dr. Dill

8    directly about and said, Could you please review this case on

9    Mrs. Smith.  And when I was meeting with Dr. Robinson at this

10   meeting, it was in the context of the general functioning of

11   the radiology department at Marlborough Hospital.

12   Q.   But Doctor -- Dr. Rosen, you -- you sprung a test on my

13   client, which ended up with her being terminated, correct?

14   A.   I conducted an independent review, which resulted in her

15   being terminated.

16   Q.   And this so-called independent review, it -- you could

17   have ordered a peer review of her cases that would have been a

18   much broader study, correct?

19   A.   Well, I think we're getting into --

20   Q.   My question is:  You could have?

21        That's just my question:  You could have ordered a

22   peer review?

23   A.   Effectively what I did was a peer review.  It was just

24   independent.

25   Q.   You didn't do a peer review in accordance with the

1    regulations of UMass, correct?

2    A.    No, that's not correct.

3    Q.    Is it not correct that UMass has regulations for a peer

4    review?

5    A.    We subscribe and -- at that point we're following the

6    American College of Radiology's peer review system, but that's

7    just one component of a comprehensive quality assurance

8    program.  That's not the only component.

9    Q.    But that component you didn't follow either?

10   A.    Yes, I did.  I'm not -- Dr. Desai participated in peer --

11   in the peer review process.  She should have been participating

12   both as a reviewer and was participating -- or her studies were

13   included in -- in as a reviewee.

14         And another part of the credentialing process through

15   the medical staff office is every -- every, I think, nine

16   months, I need to sign off on a -- on an OPPE, ongoing

17   professional performance evaluation; and as part of that OPPE,

18   if I have concerns about a provider, I can then initiate a

19   focused review; and the focused review that I initiated after

20   my concerns were -- were raised was hiring Dr. Litmanovich to

21   do the independent review.

22   Q.    Dr. Litmanovich actually now you raise her, she actually

23   sent you information about how she had done it in another case;

24   do you remember that, in August of 2017, she sent you an email

25   and said, Maybe this is of help.  This is how I've done it in

1    another case.

2              Do you recall that?

3    A.    I don't -- I don't remember the details of that, but I do

4    remember her saying that she had done another review, but I

5    don't remember the details of that.

6    Q.    You don't recall getting the details from Dr. Litmanovich

7    about how she had done another review in another case and gave

8    it to you as a suggestion?

9              You don't recall that?

10   A.    I know that she gave -- that she said she had done another

11   review, but I at this point do not remember the exact details

12   of what she said.

13   Q.    Was there a discussion with you and Dr. Litmanovich in

14   light of the fact that she had done another review that it may

15   be she should do the same review for Dr. Desai?

16             Was there any discussion on that?

17   A.    I did discuss with Dr. Litmanovich how to perform the

18   review, but as far as I remember, the actual -- the number of

19   cases to pull and the criteria to say do you agree, disagree;

20   if you disagree, is there a major or minor discrepancy; and do

21   you feel that discrepancy had an impact on patient care, yes or

22   no, I'm pretty sure that was the paradigm that I came up with.

23   Q.    I understand the paradigm that you came up with was the

24   one used.

25             My question simply was whether there was discussion

1    with Ms. -- with Dr. Litmanovich about what she had done.  That

2    was my only question, and it was either yes, there was, no,

3    there wasn't, or I can't recall.

4    A.    I -- I -- I know that I spoke to Dr. Litmanovich about how

5    to do the review, but I don't recall the details.

6    Q.    Okay.  I'm going to go to Exhibit 54, which is the first

7    MCAD, but only a small section of it, one that has been -- I'm

8    sorry.  We have just been over that.

9         I'm going to go to MCAD 2, which is another MCAD later

10   on.  And we will be looking at -- one second.

11        (Plaintiff counsel conferred.)

12   Q.    We're going to be looking at page 1, 2, 3, just at the

13   top.  Just two paragraphs.  And while you're looking for that,

14   this MCAD was also signed under oath by you, correct?

15   A.    I haven't seen it yet, but --

16   Q.    Okay.  Well, why don't you go to the signature page of

17   that MCAD and the other MCAD.

18        Do you see that?

19   A.    Yes, that's my signature.

20   Q.    Okay.  So does that refresh your recollection that you

21   signed the content under oath?

22   A.    Yes.

23   Q.    Okay.  Thank you.

24        And you signed both under oath, that's MCAD 1 and

25   MCAD 2, and MCAD 2 -- but MCAD 1 was also signed under oath,

1   correct?

2   A.   Yes.

3   Q.   Okay.  Good.  So let's just move on.

4         MR. KOLMAN:  It's page 3 at the top.

5         That's it.  That's it.  Right there.

6   Q.   Now, your testimony, I think, was, if I understood it,

7   that complaints had been fielded by Dr. Dill about Dr. Desai;

8   is that correct?

9   A.   That's correct.

10  Q.   And again, those complaints are nowhere in writing,

11  correct?

12        The actual complaint of the patient's CT scan?

13  A.   I do -- I did not have them in writing.  I don't know if

14  Dr. Dill had those in writing with her communication with

15  Dr. Robinson.

16  Q.   Wouldn't it have been a fair thing to have actually got

17  the CT scans yourself and given them to another radiologist of

18  yours, rather than jumping to this review that you put together

19  that ended up with my client being terminated?

20  A.   Well, Dr. Dill in her function as or her capacity as the

21  section chief of chest radiology would be the person to review

22  specific complaints from doctor -- from Dr. Robinson or anybody

23  else in the -- in the normal course of -- of running the

24  section.

25  Q.   Was it a complaint from Dr. Dill herself that -- that you

1   recall about the x-rays -- I'm sorry -- the CT scans she

2   herself had read and said there's a problem with Dr. Desai; is

3   that what happened?

4   A.   Yes, Dr. Dill voiced concern to me that she was being

5   asked to review a lot of Dr. Desai's CT scan reads and that

6   she, you know, felt that many of the reads that she was

7   reviewing from that Dr. Desai had performed were not accurate.

8   Q.   But Dr. Dill only reviewed a very few cases of Dr. Desai's

9   herself?

10  A.   She would review any case where -- she would review cases

11  in two ways:  One, anything which, you know, randomly, you

12  know, appeared through the peer review system, but as the

13  section chief she would also review, you know, cases if a

14  doctor, a provider, had a question about an interpretation.

15  Q.   So she would review Dr. Desai's cases and also the cases

16  of other doctors, radiologists, correct?

17  A.   Yes, anybody -- any of -- any -- if there was any question

18  about a read of a chest CT, the person who would have -- it

19  would have been referred to would have been Dr. Dill; and if

20  Dr. Dill was available, she would have done the review.

21  Q.   I'm going to read the -- the first two paragraphs, okay.

22  Dr. Dill is an experienced radiologist and the division chief

23  for UMass Memorial cardiovascular and thoracic imaging and

24  director of 3D laboratory.

25          Given her experience and position as division chief of

1   cardiothoracic imaging at UMass Memorial, clinicians frequently

2   ask Dr. Dill for a second opinion.  In that context, Dr. Dill

3   will also log those reviews into the QA system, consistent with

4   the process described above.

5          Moreover, like other radiologists, she reviews

6   comparison studies of reads as part of her normal work and is

7   assigned cases randomly as part of the QA process.  She logs

8   information from those reads into the QA system.

9          I believe you testified to that, correct?

10  A.   Yes, and that's at --

11  Q.   And the next paragraph, between July 1 and 2016 through

12  June 30, 2017, Dr. Dill entered reviews for approximately

13  87 cases into the QA system.  Out of those, only 11 of -- only

14  11 of those cases were cases that Dr. Desai had initially

15  interpreted.

16         Accordingly, Dr. Dill's reviews were anything but a

17  targeted review of Dr. Desai's work.  Her entries in the Q --

18  the QA system were made in the ordinary course of fulfilling

19  her duties as a radiologist and division chief at UMass

20  Memorial.

21         Do you see that?

22  A.   Yes.

23  Q.   So is it your understanding that from July 1, 2016,

24  through June 30, 2018, Dr. Dill only reviewed 11 of the cases

25  done by Dr. Desai?

1    Is that your -- your understanding?

2    A.   My understanding --

3    Q.   From this?

4    A.   From this is that -- that 11 of the 87 cases that Dr. Dill

5    had reviewed in the peer review system were cases of

6    Dr. Desai's.

7    Q.   Right.

8    A.   But -- but I don't know if there are other cases, and I

9    assume that there were, but that where Dr. Dill reviewed a case

10   of Dr. Desai's but might not have entered it into the database.

11   Q.   But there's a lot we don't know.

12        Eleven cases in a year were reviewed by Dr. Dill, and

13   not all of those cases at all by far were in any way defective,

14   correct?

15   A.   I would have to see the data behind this to know what the

16   defect rate was.

17   Q.   How could you possibly springboard in January of 2017 any

18   kind of independent review whether you created it or not, based

19   on Dr. Dill's review of the very few cases done by Dr. Desai?

20   A.   My impetus for performing independent review was based on

21   several factors.  One of those factors were Dr. Robinson's

22   complaints.  Another factor was clinicians in the hospital

23   going to Dr. Dill and saying, Can you please reread this case.

24   Q.   But those clinicians are not set forth, are they?

25        Those doctors are not written done anywhere, are they?

1    A.   No, they're not.

2    Q.   And so it's impossible for anyone to go back and find out

3    what the complaint is, including Dr. Desai; isn't that right?

4    A.   There is -- you are correct, there is --

5    Q.   So my question --

6              THE COURT:  Wait.  Wait.

7              MR. KOLMAN:  I'm sorry.

8              THE COURT:  Please let the witness finish the answer.

9              THE WITNESS:  There is no written records.  In the

10   course of a busy clinical day, you know, we -- we don't

11   document every, every, every conversation, but I relied on

12   Dr. Dill, and I think she'll be here to testify, that there

13   were several and frequent complaints about that she received

14   about Dr. Desai's reads; and based on that and also

15   Dr. Robinson and, I think, in June of '17, when I had my annual

16   meeting with Dr. Desai, I gave her all of the threes and fours

17   that had been flagged in the database.

18             And I don't remember the exact number, but the -- the

19   number of threes and fours that she had was much higher, if I

20   remember correctly, than what I was giving to other

21   radiologists during their annual review.  So the combination of

22   all of those factors is what prompted me to do the independent

23   review.

24   Q.   Did you try and --

25             THE COURT:  We're going to --

1          MR. KOLMAN:  I'm sorry, your Honor.

2          THE COURT:  We're going to break for the day here.

3    We're going to break for the day.

4          MR. KOLMAN:  Oh, okay.  Okay.

5          THE COURT:  So, ladies and gentlemen, I apologize.  I

6    have a one o'clock video hearing I've got to attend to, and I

7    promise this will be the only time.  So we'll see you back here

8    tomorrow morning ready to rumble at nine o'clock.

9          Please don't discuss the case with anyone, including

10   each other, and root for the Celtics.

11         See you tomorrow.

12         THE CLERK:  All rise.

13         (At 12:52 p.m., court adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3              I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4      certify that the foregoing transcript is a true and accurate

5      excerpt of the transcription of my stenographic notes before

6      the Honorable Timothy S. Hillman, to the best of my skill,

7      knowledge, and ability.

8

9

10     /s/ Marianne Kusa-Ryll                        12-07-22

11     Marianne Kusa-Ryll, RDR, CRR                  Date

12     Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25