1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4    Charu Desai,               )
                   Plaintiff,   )
5                               )
                                )
6    vs.                        )    Case No. 19-cv-10520-TSH
                                )
7                               )
     UMass Memorial Medical Group )
8    and Max Rosen,             )
                   Defendants.  )
9

10
     BEFORE:  The Honorable Timothy S. Hillman
11

12
                         Jury Trial Day 5
13

14

15
                              United States District Court
16                            Courtroom No. 2
                              595 Main Street
17                            Worcester, Massachusetts
                              December 8, 2022
18

19

20

21

22
                    Marianne Kusa-Ryll, RDR, CRR
23                     Official Court Reporter
                    United States District Court
24                   595 Main Street, Room 514A
                      Worcester, MA 01608-2093
25               508-929-3399 justicehill@aol.com
                 Mechanical Steno - Transcript by Computer

```
 1   APPEARANCES:

 2   Upper Charles Law Group
     Joseph F. Comenzo, Esquire
 3   Timothy D. Rodden, Jr., Esquire
     10 Kearney Road, Suite 101
 4   Needham, Massachusetts 02494
     on behalf of the Plaintiff
 5
     Upper Charles Law Group, LLC
 6   David Cromwell Johnson, Jr., Esquire
     81 Hartwell Avenue
 7   Suite 101
     Lexington, Massachusetts 02421
 8   on behalf of the Plaintiff

 9   Kolman Law, PC
     Timothy M. Kolman, Esquire
10   414 Hulmeville Avenue
     Penndel, Pennsylvania 19047
11   on behalf of the Plaintiff

12   Mirick, O'Connell, DeMallie & Lougee, LLP
     Robert L. Kilroy, Esquire
13   Reid Michael Wakefield, Esquire
     1800 West Park Drive
14   Suite 400
     Westborough Massachusetts 01581-3926
15   on behalf of the Defendants

16

17

18

19

20

21

22

23

24

25
```

1                                     INDEX

2

3      <ins>WITNESSES</ins>                                          <ins>PAGE</ins>

4       (Evidentiary hearing)

5
       Kartik Trivedi
6      By Mr. Kolman                                          9

7      Max Rosen
       By Mr. Comenzo                                        13
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

| WITNESS: | DIRECT | CROSS | RECROSS | REDIRECT |
|---|---|---|---|---|
| Max Rosen | | | | |
| By Mr. Wakefield | 24 | | | |
| By Mr. Kolman | | | 24 | |
| | | | | |
| Charu Desai | | | | |
| By Mr. Kolman | 30 | | | |
| By Mr. Kilroy | | 88 | | |

1                              E X H I B I T S

2

3
      Exhibit No.              Description                      Received
4

5       184           Offer letter                                23

6       283           Contract                                    90

7       270           Curriculum vitae of Charu Desai            102

8       277           2012 to 2013 faculty review               109

9       274           2009 to 2010 faculty review               111

10      275           2010 to 2011 faculty review               112

11      276           2011 to 2012 faculty review               113

12      278           2013 to 2014 faculty review               115

13      26-1          Excerpt of Dr. Desai's deposition         120

14      279           2014 to 2015 faculty review               123

15      280           2015 to 2016 faculty review               124

16      282           2017 to 2018 faculty review               126

17      26-2          Excerpt of Dr. Desai's deposition         132

18      26-3          Excerpt of Dr. Desai's deposition         137

19      26-4          Excerpt of Dr. Desai's deposition         138

20      26-5          Excerpt of Dr. Desai's deposition         140

21      26-6          Excerpt of De. Desai's deposition         143

22      26-8          Excerpt of Dr. Desai's deposition         146

23

24

25

<pre>
1                        P R O C E E D I N G S

2

3              (The following proceedings were held in open court

4     before the Honorable Timothy S. Hillman, United States District

5     Judge, United States District Court, District of Massachusetts,

6     at the Donohue Federal Building & United States Courthouse,

7     595 Main Street, Worcester, Massachusetts, on December 8,

8     2022.)

9              THE CLERK:  All rise.

10             Court is now open.  You may be seated.

11             THE COURT:  Good morning.

12             MR. KILROY:  Good morning, your Honor.

13             THE COURT:  Mr. Kolman?

14             MR. KOLMAN:  Yes.

15             THE COURT:  Please.

16             MR. KOLMAN:  Thank you, your Honor.

17             Yesterday I was approached by Mr. Kartik Trivedi, who

18    is in the courtroom today, who told me that based on his

19    observations over a number of days, it was apparent to him that

20    defense counsel was signalling during the dep- -- during the

21    testimony of and specifically the cross-examination of

22    Dr. Rosen directly to Dr. Rosen.

23             THE COURT:  So by the cross you mean your examination?

24             MR. KOLMAN:  Exactly, your Honor.

25             THE COURT:  Yeah.  Uh-huh.
</pre>

1         MR. KOLMAN:  And that he was -- and that this
2   communication was not just simply from Mr. Kilroy.  It was also
3   from Mr. Wakefield and consisted of the same gestures that he
4   saw repeated numerous times in addition to Dr. Rosen
5   continually turning to counsel, his counsel, and then turning
6   away.
7         Obviously, when I heard that, I went directly to your
8   Honor's clerk, reported it for obvious reasons, which
9   I -- which if your Honor wishes me to explain, I will, on the
10   record.  I'm happy to do so from a legal standpoint.
11         From that standpoint, Judge, it is obvious that, in my
12   view, if this, in fact, occurred, and I did not see it because
13   I was concentrating on doing my job in terms of
14   cross-examination, then it fundamentally materially undermined
15   the integrity of the trial and of this Court and of the
16   viability of the witness on the stand to be available and
17   completely free from any outside influence, most specifically
18   outside influence from his own counsel.
19         And if indeed this occurred, then it constitutes an
20   extremely severe violation of a whole slew of various
21   requirements.
22         More specifically, perhaps, it violates the
23   expectation of the plaintiff that she will get a fair trial and
24   of the Court itself that it will be an institution free and
25   fair in its -- in its proceedings, both substantively and

1  procedurally.

2          THE COURT:  So before we get into the nuts and bolts,

3  are you making an application for me to do what?

4          MR. KOLMAN:  I'm making -- your Honor, I would ask

5  that your Honor have at least a minimal evidentiary hearing

6  under oath.

7          THE COURT:  Well, for what purpose though?  I --

8          MR. KOLMAN:  In order to --

9          THE COURT:  So there are several things that I need

10  to --

11          MR. KOLMAN:  Sure.

12          THE COURT:  -- to do here based on your allegations.

13  One is as an officer of the Court, and another is as the judge

14  who's presiding at this trial.

15          So with respect to my responsibilities as the judge

16  presiding, are you making an application?

17          MR. KOLMAN:  Making an application for a mistrial,

18  Judge.

19          THE COURT:  Okay.  All right.

20          I'm going to need you to reduce that to writing.

21          Are you going to call this witness?

22          MR. KOLMAN:  I am.

23          THE COURT:  Okay.  So here's what we're going to do.

24  We're going to go until nine o'clock; and then it's jury time,

25  and then we'll figure out if we're not done when we'll finish,

```
 1    okay?

 2            MR. KOLMAN:  Can I call Dr. Rosen as on cross?

 3            THE COURT:  As -- as a witness in the --

 4            MR. KOLMAN:  As a witness in this.

 5            THE COURT:  On the mistrial?

 6            MR. KOLMAN:  Yes, your Honor.

 7            THE COURT:  Well, let's do this witness, and then

 8    we'll see.

 9            MR. KOLMAN:  Okay.  I'm going to call Mr. Kartik

10    Trivedi to the stand.

11            THE CLERK:  Please raise your right hand.

12            Do you solemnly swear the testimony you are about to

13    give this Court will be the truth, the whole truth, and nothing

14    but the truth so help you God?

15            THE WITNESS:  I do.

16            THE CLERK:  Please be seated.  State your name and

17    spell your name for the record.

18            THE WITNESS:  Kartik Trivedi, K-A-R-T-I-K, T --

19            THE COURT:  Hold on.

20            Can I have the first one first, please.

21            THE WITNESS:  Sure.

22            THE COURT:  Spell it.

23            THE WITNESS:  K-A-R-T-I-K.

24            THE COURT:  And last name?

25            THE WITNESS:  T-R-I-V-E-D, as in David, I.
```

```
 1              THE COURT:  K-A-R-T-I-K  T-R-I-U-E-D-I?

 2              THE WITNESS:  T-R-I-V, as in Victor, E as in --

 3              THE COURT:  Oh, V.

 4              THE WITNESS:  Yes.

 5              THE COURT:  Okay.  Got it.  Thank you.

 6              THE WITNESS:  Thank you.

 7                            EXAMINATION

 8    BY MR. KOLMAN:

 9    Q.   Mr. Trivedi, were you in the courtroom yesterday?

10    A.   Yes, I was.

11    Q.   Were you in the courtroom as an observer?

12    A.   Yes.

13    Q.   Have you been an observer in this courtroom for a number

14    of days?

15    A.   Since the trial began, yes.

16    Q.   And where in the courtroom have you regularly sat?

17    A.   I was sitting on the extreme right-hand corner on the

18    second bench.

19              Yesterday, I was on the third bench.

20    Q.   Did you have a free and clear view of defense counsel?

21    A.   I did.

22    Q.   And how long were you in the Court for?

23    A.   Throughout the trial.

24    Q.   And then after the trial yesterday, did you approach me?

25    A.   Yes.
```

1  Q.   And what did you tell me, and -- what did you tell me and

2  how did you tell me?

3           THE COURT:  I don't really care about that.  I'd

4  rather hear what he saw and what he did.

5  BY MR. KOLMAN:

6  Q.   What did you see?

7           Tell the Court what you saw.

8  A.   On what -- I mean, starting on day 2, when I was sitting

9  over there, I was watching --

10          THE COURT:  So by day 2, you mean yesterday?

11          THE WITNESS:  No, sir, on Tuesday.

12          THE COURT:  Tuesday, thank you.

13          THE WITNESS:  On Tuesday, yes.  I was watching the

14  trial over there, and I was observing Dr. Rosen.  As I was

15  watching him, my view was obviously -- doc -- Attorney Kilroy

16  and Attorney Reid, I could see that, because I was way back

17  there.

18          And initially when I was watching Dr. Rosen testify, I

19  kept on seeing him looking directly at the attorneys; and the

20  second day, I was seeing Attorney Kilroy, who was sitting, I

21  believe, on this side where Attorney Reid is sitting, and he

22  kept on -- he kept on moving his hands, kept on doing gestures,

23  going like this (indicating), going like this (indicating),

24  going like this (indicating), kept on going like this

25  (indicating).

1              I didn't think he was -- he was very fidgety at the

2      time.

3              THE COURT:  Hold on.  Hold on.  I'm just trying to --

4      who was doing that?

5              THE WITNESS:  Attorney Kilroy was doing a lot of hand

6      gestures when Dr. Rosen was speaking, and Dr. Rosen was looking

7      towards him.  I did make a notation of what I saw, which was

8      also on day 3, which was yesterday.  I did see when Attorney

9      Kolman was cross-examining Dr. Rosen, at that point I did see

10     Attorney Reid do gestures, going like this (indicating), which

11     is around 1:45 p.m.  They both were going like this

12     (indicating).  And Attorney Kilroy at one point --

13             THE COURT:  So hold up.

14             THE WITNESS:  Yeah.

15             THE COURT:  Hold up.  By Attorney Reid, do you mean

16     Attorney Wakefield?

17             THE WITNESS:  Attorney Wakefield.  I apologize, yes.

18             THE COURT:  Yeah.  So repeat that again as to who was

19     doing what, please.

20             THE WITNESS:  So -- yes, Attorney Wakefield was doing

21     a lot of gesturing.  I felt as if he was doing a lot of

22     gestures.  He was scratching his neck.  And Attorney Kilroy was

23     also continuously going (indicating) with his fingers on his

24     scalp.  He was going like that (indicating).  And towards the

25     end during the Dr. Ferrucci email, I did see Attorney Kilroy do

1   this gesture (indicating).  This was around 1:45, I believe,

2   1:47 p.m., towards the end of the trial.

3          And I was also watching Attorney Reid who kept

4   on -- he did this (indicating), and he was going like this

5   (indicating).  And I saw this throughout the trial.  I didn't

6   think much of it.  On day 2, I saw a lot of it, but I wasn't

7   sure.

8          And on day 3, I was watching Dr. Rosen, who was

9   looking directly at the counsel, and he was talking, and I did

10  see at that point what I just mentioned, and my -- I did

11  mention to -- I just went to Attorney Kolman, and I mentioned

12  it to him, and he brought it to attention straightaway after he

13  heard what I said.  He said, Are you a hundred percent sure of

14  what you saw?  This is a serious matter.  And I said, Yes, I

15  am.  And I'm also aware that there are cameras over here, too.

16  So I did -- I'm very confident in what I saw.

17         THE COURT:  Well, there are cameras, but they don't

18  work.

19         Do you have any other -- do you have questions?

20         MR. KOLMAN:  No, your Honor.  I -- I don't have any

21  more questions.

22         MR. KILROY:  Absolutely not, your Honor.

23         THE COURT:  Okay.  Thank you.

24         THE WITNESS:  Thank you.

25         THE COURT:  Did you say you wanted to call Dr. Rosen?

1      MR. KOLMAN:  I did.

2      THE COURT:  Come on up, Doc.

3      Thank you.

4      Is it Mr. Trivedi, Trivedi, did I say that right?

5      THE WITNESS:  Yes, sir.

6      THE COURT:  Thank you.

7      MR. COMENZO:  Good morning.

8      THE COURT:  Mr. Comenzo, do you have this one?

9      MR. COMENZO:  I have this one, your Honor.  Thank you.

10      THE COURT:  Okay.  Go ahead.

11                        EXAMINATION

12  BY MR. COMENZO:

13  Q.   Good morning, Dr. Rosen.

14  A.   Good morning.

15  Q.   My name is Joe Comenzo.  I apologize that we've had to

16  come here for this reason.

17      My question is:  During the course of -- or questions.

18  During the course of your examination you looked over

19  frequently at counsel.

20      Were -- were you instructed in any way in terms of not

21  what to say, but in terms of the length of the answers that you

22  gave?

23  A.   Absolutely not.

24  Q.   There was -- was there any instruction at all or any

25  signalling at all for going -- regarding the -- not the content

```
 1   of your testimony, but the form of your testimony?
 2   A.    Absolutely not.
 3              MR. COMENZO:  No questions, your Honor.
 4              MR. KILROY:  No follow-up, your Honor.
 5              THE COURT:  Thank you.
 6              THE WITNESS:  Thank you.
 7              MR. KOLMAN:  Your Honor, I -- I'm not sure whether or
 8   not the cameras in this courtroom are on some kind of tape.
 9              THE COURT:  They're -- there are cameras, but they're
10   not on.  We -- and by the way, probably this is for another
11   day, but the cameras were installed close to ten years ago for
12   the Court -- cameras in the courtroom experiment that Chief
13   Justice Roberts wanted to kill before it was born, but we were
14   one of the pilot courts.
15              I will check with the marshals, and they may well have
16   the ability to monitor the proceedings if there's security
17   issues, but my -- my guess, educated guess, is that they're
18   there but not on.  But I -- I will run that down very shortly.
19              MR. KOLMAN:  Okay.  Thank you, your Honor.
20              THE COURT:  The -- which -- and again, not for this
21   discussion, cameras in the courtroom is, as you know, a sore
22   subject down at SCOTUS, and all of the Zoom stuff we have been
23   doing has brought it to a head.  It's not going to help us here
24   with this issue, but --
25              MR. KOLMAN:  I understand.
```

```
 1              THE COURT:  -- as an aside.

 2              MR. KOLMAN:  Okay.

 3         Well, I will --

 4              THE COURT:  And let me -- let me find out about that.

 5              MR. KOLMAN:  Okay.

 6              THE COURT:  But assuming the cameras are not -- were

 7    not working, what would you -- tell me what -- what you would

 8    have me do.  I know you want a mistrial.

 9              MR. KOLMAN:  Yes, I know that, your Honor.

10         Could I -- could I have just a little time to think

11    about that, Judge?

12              THE COURT:  Yeah, of course.  Of course.

13              MR. KOLMAN:  Thank you.

14              THE COURT:  All right.

15              MR. KILROY:  May I be heard briefly, your Honor?

16              THE COURT:  Sure.

17              MR. KILROY:  Your Honor, I have been practicing a

18    quarter century.  I have an unblemished record, as does my

19    colleague.  I find it extremely offensive that as an officer of

20    the Court, and I am an officer of the Court, that this

21    allegation has been leveled.

22              I would absolutely in no way ever signal a witness.  I

23    don't have qualms with the relatives's observation of me doing

24    this (indicating).  I did it throughout the entirety of this

25    proceeding at different times.  It's a -- it's a resting place
```

1    for me.  It's also so that I -- I look professional in front of

2    the jury.

3          I do have concerns about an allegation being leveled

4    against me by fellow counsel and against my colleague by fellow

5    counsel.

6          I would respectfully request, as there is no evidence

7    to suggest signalling as Mr. -- Dr. Rosen has testified very

8    credibly for the last two days and testified in direct response

9    to questioning that the request for a mistrial be -- be denied

10   summarily.

11         I have no problem if there are tapes of going through

12   the tapes in great detail, but I just want it clear that we

13   take great offense to the accusations, your Honor.

14         THE COURT:  Okay.

15         MR. KOLMAN:  I would just say that I appreciate

16   Mr. Kilroy's position and would ask him to understand that this

17   allegation comes not from me directly, but comes from someone

18   in the courtroom, and that I was under a -- an obligation, also

19   as an officer of the Court, or be it pro hac'd, to bring this

20   to the Court's attention, and there was no choice.

21         THE COURT:  I'm not -- I'm not faulting anybody.

22         You know, I'll check on the cameras.

23         I will say that I think we can all agree that

24   Dr. Rosen was -- Doctor, forgive me, loquacious; and frankly, I

25   think if I ask Dr. Rosen what time it was, he could tell me how

```
 1    to build a watch, so I'm not sure how much signalling is
 2    capable of being done.
 3              Don't take that in anything other than the spirit in
 4    which it was offered, Doctor.
 5              DR. ROSEN:  Not at all, your Honor.
 6              THE COURT:  All right.  I'll see you guys in 15.
 7              MR. KOLMAN:  Thank you, Judge.
 8              (Recess at 8:46 a.m. until 9:07 a.m.)
 9              THE CLERK:  All rise.
10              (At 9:07 a.m., the jury entered the courtroom.)
11              THE CLERK:  Court is now open.  You may be seated.
12              THE COURT:  Good morning.
13              JURORS IN UNISON:  Good morning.
14              THE COURT:  How are you all doing?
15              JUROR:  Great.
16              THE COURT:  So you know what I'm going to say.  Has
17    anybody had any difficulty following my instructions not to
18    discuss the case with anyone?
19              JUROR:  No.
20              THE COURT:  Has anybody seen, heard, read or overhead?
21              JUROR:  No.
22              THE COURT:  Is there anything you wish to bring to my
23    attention?
24              So I -- I know Marty and Marianne are so sick of
25    hearing this story, but I'm going to tell it anyway.  When I
```

1    was down in the state court, we tried a case for over three

2    weeks, and it was -- it was a family dispute, and every morning

3    I asked, like I have to do, I asked the jurors the question.

4    The jurors got so sick of it, and then on the final morning

5    they all raised their hands.  So don't do that.

6              All right.  Mr. Kol- -- I'm sorry.  Mr. Wakefield.

7              MR. WAKEFIELD:  Very briefly, your Honor.

8              THE COURT:  Yes, please.  And I think for the third or

9    fourth day, I'm going to remind you you are still under oath.

10             THE WITNESS:  Yes, thank you.

11                   CONTINUED DIRECT EXAMINATION

12   BY MR. WAKEFIELD:

13   Q.   Good morning, Doctor Rosen.

14   A.   Good morning.

15   Q.   If I can show you a document that's previously admitted as

16   Exhibit 107.

17        Do you recall being asked questions about statements by

18   Dr. Ferrucci in this email yesterday?

19   A.   Yes.

20   Q.   After you became chair in 2012, did Dr. Ferrucci have any

21   involvement at all in any hiring decisions for the department?

22   A.   No, not at all.

23   Q.   Have you ever discussed your recruiting efforts or hiring

24   decisions with Dr. Ferrucci at any time?

25   A.   No.

1  Q.   Since you've been chair, has Dr. Ferrucci had any role or

2  involvement at all in department finances?

3  A.   No, not at all.

4  Q.   Looking at the email, did you ever tell Dr. Ferrucci that

5  you had an obligation as chair to think about recruiting

6  younger staff for service needs?

7  A.   Absolutely not.

8  Q.   Did you ever believe you had such an obligation?

9  A.   Absolutely not.

10 Q.   Did you ever tell Dr. Ferrucci that going off call would

11 involve a significant salary reduction?

12 A.   No.

13 Q.   Would going off call involve a significant salary

14 reduction?

15 A.   It would depend on how much somebody worked.  Some people

16 can actually make more money as a per diem than they would as

17 an FTE, depending on how much they worked.

18 Q.   Did you ever tell Dr. Ferrucci that you were thinking

19 about a term-limited contract of 12 months?

20 A.   No.

21 Q.   Did you consider offering Dr. Desai a term-limited

22 contract of 12 months?

23 A.   No.

24 Q.   Did you discuss academic days with Dr. Ferrucci?

25 A.   No.

1    Q.    Did you ever discuss the potential recruit from U Penn.

2    with Dr. Ferrucci?

3    A.    No.

4    Q.    Would it be possible for the reference to next step in the

5    discussion to have related to that candidate in any way?

6    A.    No, definitely not.

7    Q.    What was the date of this email?  Can you please tell me?

8    A.    October 11th, 2017.

9    Q.    If I could show you a document that previously has been

10   admitted into evidence as Exhibit 101, please.

11        Do you recall being asked questions about this email train

12   yesterday, the day before, with Dr. Rosen?

13   A.    Yes.

14   Q.    What was the date of the second email in this chain from

15   you to Dr. Tosi and Ms. Streeter?

16   A.    October 3rd, 2017.

17   Q.    What were you advising them in this email?

18   A.    I was telling them that the candidate --

19            MR. KOLMAN:  Objection, your Honor.

20            THE COURT:  I'm sorry.  Repeat the question.

21   BY MR. WAKEFIELD:

22   Q.    What were you advising them in this email?

23            THE COURT:  Sustained.

24   Q.    At the time -- at this time, did you advise Dr. Tosi and

25   Dr. Streeter that the candidate from U Penn. was probably not

1    coming?

2    A.   Yes.

3    Q.   If I could show you a document that has been previously

4    admitted as Exhibit 343.

5         Look -- looking at your list of hires, did you make any

6    hires around this time?

7    A.   I'm sorry.  I don't remember the date of that other.

8              MR. KOLMAN:  Objection, your Honor.

9              THE COURT:  Well, that answer will stand.  Let's have

10   another question.

11             MR. WAKEFIELD:  Sure.  Could you switch back to

12   Exhibit 101, please.  Or, I'm sorry, 107.

13   Q.   What was the date of the email with Dr. Ferrucci?

14   A.   October 11, 2017.

15   Q.   Okay.  If I can put up for you Exhibit 343 again.

16        And my question was:  Did you make any hires around this

17   time?

18             MR. KOLMAN:  And my objection is -- I have an

19   objection, your Honor.  Beyond the scope.

20             THE COURT:  Overruled.

21             THE WITNESS:  Yes, it looks like September 30th, 2017,

22   I hired Dr. Patricia Cross.

23   BY MR. WAKEFIELD:

24   Q.   How old was Dr. Cross when you hired her on

25   September 30th, 2017?

1    A.    She was 64.

2    Q.    Was there a time, Dr. Rosen, during the calendar year of

3    2016 that you were not recruiting a chest radiologist?

4    A.    No, I have always been recruiting a chest radiologist.

5    Q.    Was there a time during the calendar year of 2017 that you

6    were not recruiting a chest radiologist?

7    A.    No.

8    Q.    Was there a time during the calendar year 2018 that you

9    were not recruiting a chest radiologist?

10   A.    No.

11   Q.    Are you recruiting chest radiologists today?

12   A.    I am.

13   Q.    If I could show you a document just to the witness that

14   has been marked for identification as Exhibit 184.  Just to the

15   witness.

16         Do you recognize this document, Dr. Rosen?

17   A.    Yes.

18   Q.    And what is this?

19   A.    This is an offer letter to Dr. Maria Barile.

20         MR. WAKEFIELD:  Your Honor, I'd like to admit

21   Exhibit 184 into evidence and publish to the jury, please.

22         MR. KOLMAN:  No objection.

23   (Exhibit No. 184 was admitted into evidence.)

24   BY MR. WAKEFIELD:

25   Q.    Does this letter state when Dr. Barile started working in

1   the department?

2   A.   Yes.

3   Q.   And what was her start date?

4   A.   December 31st, 2018.

5   Q.   So she wasn't hired in February or March of 2018 as

6   Mr. Kolman stated yesterday, right?

7   A.   Correct.

8   Q.   What were Dr. Barile's qualifications for this role?

9   A.   Dr. Barile had trained at the Beth Israel Deaconess as a

10  resident, and then she had a -- did a pediatrics -- pediatric

11  radiology fellowship at Children's Hospital, and that was

12  followed by a thoracic radiology fellowship at Brigham and

13  Women's Hospital.  So she had all her training in the Harvard

14  Hospital system and had done two fellowships.

15  Q.   And we've talked about chest fellowships.

16       Does UMass have a chest fellowship program?

17  A.   We do now.

18  Q.   Who runs that program?

19  A.   Dr. Barile is the fellowship director for that program.

20       MR. WAKEFIELD:  No further questions, your Honor.

21       THE COURT:  Mr. Kolman, anything on that?

22       MR. KOLMAN:  Very briefly.

23                    RECROSS EXAMINATION

24  BY MR. KOLMAN:

25  Q.   Very briefly.  When the young man from Penn. could not

1    come on board, did you have a replacement for him?

2         In other words, when the young man -- well, let me put it

3    this way.  When did the young man from Penn. say he couldn't

4    come?

5    A.   I'd have -- whatever the date of that email that

6    I -- whatever that date was.  Actually sitting here, reading

7    all these dates, I don't want to misspeak.  The date of

8    that -- when I just said to -- when I told Dr. Tosi that he was

9    not coming, whatever date that is.

10   Q.   Do you know the date?

11   A.   To be honest, I have a lot of dates flying around in my

12   head right now, and I don't want to misspeak.  I'd be happy to

13   go back and look at the document and give you the exact date.

14   Q.   When he couldn't come, did you have -- were you able to

15   recruit someone in his stead?

16   A.   I'm always recruiting.  The next person that I hired was

17   Dr. Barile.

18   Q.   Did he -- with respect to when he told you he couldn't

19   come, you don't have any recollection of when that was; is that

20   correct?

21              MR. WAKEFIELD:  Objection, your Honor.

22              THE COURT:  Overruled.  Do you have a recollection or

23   not?

24              THE WITNESS:  I -- I just need to see that, the prior

25   email from 2017.  I think it was October of 2017 was that email

1    that I was just shown.

2    BY MR. KOLMAN:

3    Q.   And then after he didn't come, what did you do?

4    A.   I kept recruiting.

5    Q.   Did you find someone?

6    A.   The next --

7    Q.   Did you replace him?

8    A.   The next person that I made an offer to who accepted was

9    Dr. Barile.

10   Q.   Was who?

11   A.   Dr. Maria Barile.

12   Q.   Was that doctor full-time?

13   A.   Which doctor?

14   Q.   The doctor you just mentioned.

15   A.   Dr. Barile?

16   Q.   Yes.  She -- oh, the next offer you made was to her,

17   correct?

18   A.   I don't know if I made subsequent offers between --

19   Q.   Okay.

20   A.   -- the candidate from Penn. and Dr. Barile.

21   Q.   Do you remember when you made that offer to Dr. Barile?

22   A.   The offer to Dr. Barile?

23   Q.   Yes.

24   A.   Was August 2nd, 2018.

25   Q.   Were there discussions before that in terms when she might

1    come on board?

2    A.    I don't remember exactly.  There's always a discussion

3    that I have with people.  Once I make an offer, we then

4    negotiate when their start date is going to be, but it takes at

5    least 6 months to onboard somebody.

6    Q.    Did you have an expectation that she might be able to

7    start sooner?

8    A.    Very unlikely, because as I said, it takes six months to

9    onboard somebody.  They need to go through all the paperwork,

10   they need to be credentialed with UMass, and then they need to

11   be credentialed with the insurers, and that process takes

12   usually between four and six months.

13   Q.    Did she have interviews with you prior to making an offer?

14   A.    Yes.

15   Q.    And do you recall when those interviews were?

16   A.    No.

17   Q.    Do you -- can you recall if they were many months before?

18   A.    I don't know.

19   Q.    When she had interviews was it just with you or with

20   others?

21   A.    No, everybody who interviews, her position interviews with

22   several people.

23   Q.    Did you have to budget for her coming on board in the

24   sense that it was an extra salary?

25   A.    I don't remember the finances and the exact budgeting back

1    in, you know, 2018.

2    Q.   Was there negotiation between the university and her in

3    terms of what the contract would be prior to this being put in

4    writing?

5    A.   Usually once I verbally make somebody an offer, I then

6    follow it very quickly with a written offer, so I don't know

7    exactly in this case, but almost always it's a few days between

8    somebody verbally says, yes, please send me an offer, and I get

9    them an offer letter.

10   Q.   But there would be an interview process before that; is

11   that right?

12   A.   Yes, the process would be somebody would indicate they're

13   interested in UMass.  We would invite them for an interview.

14   They would interview with a group of faculty.  Usually they

15   also meet with some of our residents; and then after that

16   somebody can then say, gee, I am interested or I'm not

17   interested.  It they're interested, we would then talk about

18   the details of the offer, and then I would rapidly follow that

19   with an offer letter.

20   Q.   When was your first contact with Dr. Barile, if you can

21   remember?

22   A.   That I don't remember.

23   Q.   You don't know?  You can't remember?

24   A.   I cannot remember.

25   Q.   Is there correspondence that would indicate that you had

1    communication with her?

2    A.   I don't know.

3    Q.   What we're looking at here is that would be the final

4    incarnation, as it were, of the culmination of meeting with

5    her, interviews with her, negotiations with her, and then this

6    letter; would that be correct?

7    A.   That is correct.

8            MR. KOLMAN:  Okay.  Thank you.  Nothing further.

9            MR. WAKEFIELD:  Nothing further, your Honor.

10           THE COURT:  Thank you, Dr. Rosen.

11           THE WITNESS:  Thank you.

12           THE COURT:  You may step down.

13           The plaintiff.

14           MR. KOLMAN:  The plaintiff calls Dr. Charu Desai to

15   the stand.

16           THE CLERK:  Please stand.  Please raise your right

17   hand.

18           Do you solemnly swear the testimony you are about to

19   give the Court is the truth, the whole truth, and nothing but

20   the truth, so help you God?

21           THE WITNESS:  Yes.

22           THE CLERK:  Please be seated.  Please state your name

23   and spell your last name for the record.

24           THE WITNESS:  Last name Desai, D-E-S-A-I.  The first

25   name is Charu, C-H-A-R-U.

```
 1            THE COURT:  Doctor, I'm going to ask you to move that
 2   microphone a little closer.  I'm sitting right next to you, and
 3   I can barely hear you.  So be sure you speak right into it.
 4            THE WITNESS:  Okay.  Tell me when.  I don't want it to
 5   be soft.  Does that sound correct?
 6            THE COURT:  I'll tell you if it's too loud.  I've
 7   never told anybody that so.
 8            THE WITNESS:  Okay.
 9            THE COURT:  Go ahead.
10            MR. KOLMAN:  Thank you, your Honor.
11                     DIRECT EXAMINATION
12   BY MR. KOLMAN:
13   Q.   Dr. Desai, good morning.
14        I want to clear up, if I could, an issue raised by
15   Mr. Wakefield about Dr. Ferrucci.
16        Do you recall the testimony of Dr. Rosen just some
17   10 minutes ago about Dr. Ferrucci and a meeting with you?  Do
18   you recall that?
19   A.   Yes.
20            MR. COMENZO:  Mr. Clerk, if I could have control of
21   the exhibits.
22            Thank you.
23            MR. KOLMAN:  We're going to put that exhibit up again
24   so you can see it.
25   BY MR. KOLMAN:
```

```
 1    Q.   Do you remember this document?

 2              MR. KILROY:  Exhibit number?

 3    A.   Yes.

 4              MR. COMENZO:  107.

 5              MR. KOLMAN:  What did you say?

 6              MR. COMENZO:  107.

 7              MR. KOLMAN:  107.

 8    BY MR. KOLMAN:

 9    Q.   Dr. Desai --

10    A.   Yes.

11    Q.   -- did you, in fact, have a meeting with Dr. Ferrucci?

12    A.   I did.

13    Q.   And where did that meeting take place?

14    A.   In my office.

15    Q.   And did Dr. Ferrucci tell you --

16              THE COURT:  Hold up a minute, Mr. Kolman.

17              JUROR:  I only see half of her face.

18              THE COURT:  Okay.  Marty, can you move that down just

19    a bit.

20              Thank you.

21              Can you flatten it?  Yeah.

22              THE WITNESS:  Is this enough?  Good morning,

23    everybody.  Thank you.

24              THE COURT:  Hold on a second.  Everybody good?  Thank

25    you for bringing that up.
```

```
 1              MR. KILROY:  Objection to the question, your Honor.
 2              THE COURT:  The question was I can't see her.
 3              MR. KOLMAN:  The question was, your Honor, did
 4    Dr. Ferrucci come -- did you have a meeting with Dr. Ferrucci?
 5              MR. KILROY:  Your Honor, the question was did Dr. --
 6    did you -- did Dr. Ferrucci tell you, and I was getting ready
 7    to --
 8              THE COURT:  Well, if the question was did you have a
 9    meeting with Dr. Ferrucci, I'll let you have it.  If it was
10    something Dr. Ferrucci said, then I won't let you have it.
11              MR. KOLMAN:  Okay.  Thank you, your Honor.
12              THE COURT:  Thank you.
13    BY MR. KOLMAN:
14    Q.   The exhibit that's in front of you, it -- you've read it,
15    correct?
16    A.   Yes.
17    Q.   And it talks about what Dr. Ferrucci apparently said to
18    you?
19    A.   Yes.
20    Q.   Do you have any recollection of what Dr. Ferrucci said to
21    you?
22              THE COURT:  Just yes or no, please.
23    A.   Yes.
24    Q.   Do you have any recollection regarding him saying anything
25    about going off call?
```

```
 1   A.    Yes.
 2   Q.    Do you have any recollection of him talking about --
 3              MR. KILROY:  Objection, your Honor.
 4              THE COURT:  Sustained.
 5              MR. KOLMAN:  Your Honor, if I could be heard briefly.
 6              (Sidebar as follows:)
 7              THE COURT:  Please whisper.
 8              MR. KOLMAN:  Yeah, your Honor, this document is
 9   already in evidence, and Dr. Rosen has already testified about
10   whether the facts of this -- this document actually occurred,
11   and he denies it.
12              Now, in terms of the fact that this document is in
13   evidence, and the fact that Dr. Rosen has already spoken about
14   what he himself told Dr. Ferrucci to do, I believe that the
15   door is open, and it's only appropriate that she be permitted
16   to talk about or at least testify about what Dr. Ferrucci
17   actually did say, because it's directly relevant.  It connects
18   up with what already is in evidence.
19              THE COURT:  So, let me ask you this:  Against whom is
20   this being offered?
21              MR. KOLMAN:  It's not being offered against anyone,
22   your Honor.  It's being offered for the integrity of Dr. Desai
23   and the fact that -- this is the way it's being offered, your
24   Honor.  Dr. Ferrucci was the agent of Dr. Rosen, who was
25   directly given the authority by Dr. Rosen to talk to Dr. Desai
```

1  about the issues in this specific letter and, therefore, it is

2  the statement of an authorized agent and --

3           THE COURT:  All right.  Hold up.

4           What do you say that to that?  It -- what I think your

5  brother is saying and what I'm concerned with is whether or not

6  this is a nonhearsay 801(2).

7           MR. KILROY:  Your Honor -- your Honor, we agree that

8  there could be an exception, but solely as to being asked about

9  going per diem, talking about Ferrucci's experience going per

10 diem.  During the direct exam of Dr. Rosen, he made clear that

11 that's all that he had talked to Dr. Ferrucci about.  So this

12 is classic hearsay out of --

13          THE COURT:  But it -- it -- it is under 801(d)(2).  It

14 might be construed as an admission of the defendant UMass, not

15 Rosen.

16          MR. KILROY:  Your Honor, that would only be if there

17 was any testimony that linked Dr. Rosen to -- to the specifics

18 in this email, and he has made clear there -- there is none.

19 So this is classic hearsay.

20          THE COURT:  Okay.  I'm going to overrule the

21 objection.  You may have this, but keep moving.

22          (End of sidebar.)

23 BY MR. KOLMAN:

24 Q.   Dr. Desai, we're going to deal with this fairly swiftly.

25      You had mentioned that Dr. Ferrucci came to your office?

```
 1   A.    Yes.

 2   Q.    And what was the -- did he say why he was there?

 3   A.    He -- after we -- he went in his office and we talk about

 4   it.

 5   Q.    Okay.  Can you speak clearly, please, and keep your voice

 6   up.

 7   A.    After we went in the office, he -- he told me that the

 8   conversation that --

 9   Q.    He -- did he talk about --

10         THE COURT:  Don't lead.

11   Q.    Did he talk about --

12         THE COURT:  Don't lead.

13   Q.    Okay.  What did he say to you?  Why don't we just deal

14   with that.  Just tell us what he said.

15   A.    He said that Dr. Rosen wanted to recommended me for years

16   of service, and he will do the -- the contract for 12 months

17   and/or per diem, and if he go after call then he knows that

18   there will be salary reduction and said he has the obligation

19   to recruit the younger people to -- for the service needs.

20   Q.    And what -- did you say anything to that?

21   A.    No, I did not at that point.

22   Q.    Did you give him any decision?

23   A.    No, I did not.

24         MR. KOLMAN:  I don't have anything else on this.

25   Q.    Dr. Desai, what made you become a doctor?
```

1    A.   Since I was young, I wanted to become a doctor, because I

2    had a few family member.  Two of my uncles were doctor.  So

3    that -- that was my dream.

4    Q.   Can you move the microphone a touch away.  That's it.  It

5    will be able to be clearer.

6              Can you repeat your answer, please.

7              THE COURT:  Hold up just a minute, please.

8              MR. KOLMAN:  Sorry.

9              (The Court conferred with the clerk.)

10             THE COURT:  Go ahead.

11   BY MR. KOLMAN:

12   Q.   Thank you.  Could you repeat your answer, please, and

13   clearly.  It's just a little fuzzy.

14   A.   Since I was younger --

15   Q.   Thank you.  That's much better.

16   A.   My -- my dream was to become a doctor.  I had few family,

17   two of my uncles were doctors.

18   Q.   You have two relatives who were doctors?

19   A.   Yes.  Yes.

20   Q.   And how did that make you want to become a doctor?

21   A.   When I was looking at them, what they do, it just

22   interested me.

23   Q.   And how young were you when you decided you probably --

24   A.   Probably seven.

25   Q.   How young were you when you decided you wanted to be a

1    doctor?

2    A.    Around 12, 12 years.

3    Q.    And how difficult -- and were you in India at the time?

4    A.    Yes.

5    Q.    And how difficult was it to -- to actually become a

6    doctor?

7    A.    It is.  It is very difficult.

8    Q.    And what did you have to do in order to become a doctor?

9    A.    So first, I had to go high school 12 years.  Then had to

10   go in the college, science college, because you need the

11   biology, those type of subjects.

12   Q.    Is science college competitive?

13   A.    Yes.

14   Q.    And how old were you when you went to science college?

15   A.    Sixteen.

16   Q.    And how long was it for?

17   A.    Two years.

18   Q.    And then after science college?

19   A.    So if you are in the second year, if you get a grade above

20   75th percentile, then you apply and see if you get in.

21   Q.    And you applied?

22   A.    Yeah, and I was fortunate to get in.

23   Q.    How long did it take you to become a doctor?

24   A.    See, in India, we have one and a half year.  That is first

25   year medical school.  Then another one and a half.  That is

1  second.  Then the third one and a half, which is third medical

2  school.  So total of four and a half as far as to study goes.

3      And then you do one year of rotating internship before you

4  get the certificate.

5  Q.  And that entitled you to practice medicine in India?

6  A.  Yes.

7  Q.  And then did you at that point make a decision as to what

8  your specialty might be, if indeed you had a specialty?

9  A.  I was interested even then in radiology, because in the

10 rotation you do come across.

11 Q.  And what was -- what was it about radiology that made you

12 interested in it?

13 A.  It felt like it was a puzzle, and I like to solve the

14 puzzle.  So if you saw the image, what it is and why it is.

15 Q.  And how did you -- how did you end up here in the United

16 States?

17 A.  I -- I wanted to further advance my career in medicine so

18 I came here.

19 Q.  And in what way did you wish to further your education?

20 A.  To -- to come as a doctor and then do the residency in the

21 field I wanted to do.

22 Q.  And do you recall the year that you came to the United

23 States?

24 A.  March '74.

25 Q.  March '74?

1  A.    Yes.

2  Q.    And did you have to take any examinations in order to be

3  considered on the same level as an American physician?

4  A.    I do.  I do.  I have to take ECFMG, and that is another

5  exam, flex exam.  It is for three days long to pass that before

6  you can go do anything else.

7  Q.    And those examinations you took?

8  A.    Here, yeah.

9  Q.    And those were examinations you passed?

10  A.    Yes.

11  Q.    And did you then make application to a medical school?

12  A.    No, for -- for residency, because at that point I can

13  apply for residency.

14  Q.    At that point you could apply for residency?

15  A.    Yes.

16  Q.    And did you apply for residency?

17  A.    Yeah, but I wanted to stay in the area, so I applied for

18  residency.  I got in pathology at Mt. Auburn Hospital.

19  Q.    Oh, I'm sorry.  What hospital was that?

20  A.    Mt. Auburn Hospital in Cambridge, Boston.

21  Q.    Okay.

22  A.    So I did one year of pathology residency.

23  Q.    And how did your career progress from there?

24  A.    So after that in between I did physician job like in the

25  emergency room and all that, because I needed -- I want -- I

1   wanted to do the radiology residency.

2         So then from a friend, I found out that UMass is going

3   to have radiology residency.  So I applied for that.

4   Q.   You found out that UMass was going to have?

5   A.   Radiology residencies.

6   Q.   And did you apply for that?

7   A.   I did.  I did.

8   Q.   And were you accepted?

9   A.   Yes.

10  Q.   And was there anyone else with you also?

11  A.   So at first-year level, we were hired, two resident, but

12  then they let go the second person.  So I was the first and the

13  only one when I graduated from UMass.

14  Q.   And how long was that residency at the University of

15  Massachusetts?

16  A.   Three years.

17  Q.   And what specifically was the residency in in terms of the

18  subject matter?

19  A.   Diagnostic radiology.  Diagnostic radiology.  It means you

20  do everything.

21  Q.   Diagnostic radiology?

22  A.   Yes.

23  Q.   And can you give us the year that you were a resident of

24  the University of Massachusetts?

25  A.   '78 to '81.  1978 to 1981.

1    Q.    And did that expose you to certain modalities in

2    radiology?

3    A.    It did.

4    Q.    And which modalities did it expose you to?

5    A.    So I got interested in the CT scan.

6    Q.    CT scans?

7    A.    And ultrasound.

8    Q.    We have heard testimony about the state of the art of

9    CT scans in the day, as it were.

10        What was the -- what was CT scanning like when you were a

11   resident?

12   A.    The main difference was thickness of the slice.

13   Q.    Thickness of the slice?

14   A.    Slice, yeah, and the clarity, a little bit not that good,

15   because the machines at that time were not -- not great.

16   Q.    The thickness of the slide.  And has the slide become --

17   A.    A lot --

18   Q.    -- less thick over time?

19   A.    Lot thinner, yes.

20   Q.    We heard from Dr. Rosen that it had become thinner; is

21   that true?

22   A.    Yes, correct.

23   Q.    And what difference does that make if it's thick or thin

24   or ultrathin?  Does that make any difference?

25   A.    In reality, no, but it is easy to see.  It is easy to see.

1    In reality the body structures are still the same.  Whether you

2    do thin slice or thick slice, the body, what is in inside is

3    still the same, but it is easier to see.

4    Q.   It is easier to see.  Is it your testimony it's easier to

5    see if it's thinner?

6    A.   More detail, yeah.

7    Q.   More detail?

8    A.   Yeah.

9    Q.   If we're on that anyway, is there some kind of course that

10   you need to take that you haven't taken, which would enable you

11   to -- which would have enabled you to do your job better and

12   more professionally if you -- if you had taken it while you

13   were employed?

14              MR. KILROY:  Objection.

15              THE COURT:  Overruled.

16              THE WITNESS:  In that time or?

17   BY MR. KOLMAN:

18   Q.   Yes, while you were employed at -- at UMass, there has

19   been testimony that you were out of date?

20   A.   I'm not.

21   Q.   Were you -- did you feel in some way that you were not

22   able to do your job well, because there was certain technology

23   or course that you had not mastered or taken?

24   A.   No, I did -- I did -- I went to the conference, and, like

25   I said, the main difference is the thickness of the slice.

1    Otherwise, yeah, I went to the conference every year.

2    Q.   We'll deal with that in a minute.

3    A.   Okay.

4    Q.   I'm talking about, were you -- did you feel able to do

5    your job professionally and to the best of your competence

6    right up until the time that you were terminated?

7    A.   Definitely.

8    Q.   Did you feel that there was anything technologically or

9    medically that you felt you needed to master in order to do

10   your -- your job better than you were already doing it?

11   A.   No.

12   Q.   Over the period of time that CT scans have evolved, was it

13   your testimony that the resolution of the image is actually

14   clearer?

15   A.   Yes.

16   Q.   Does that assist in your ability to diagnose whatever it

17   is you're looking at in the CT scan?

18   A.   Yes.

19   Q.   Is there any skill involved in technically looking at a

20   CT scan when the slides are very thin as to when they are

21   thicker?

22   A.   Nothing different, no.

23   Q.   How many CT scans, approximately, did you look at in a day

24   while you were at UMass?

25   A.   Around 20.

```
 1    Q.    Twenty?
 2    A.    Uh-huh.  And I also did a lot of chest x-rays, too.
 3    Q.    With respect to chest x-ray, we have -- I haven't asked
 4    you about that.
 5          Had -- has x-rays remained more or less the same since
 6    the time of your residency, as opposed to CT scans, which have
 7    become more -- resolution is higher.
 8    A.    Chest x-rays kind of same, but it is also a better
 9    quality, because now it is digital, so it's a little bit better
10    than before.
11    Q.    Is there often the case when you have to look at both the
12    chest x-ray and the CT scans together?
13    A.    Yes, to compare what was -- so if I'm doing a CT scan and
14    they would give me the history that there is something wrong,
15    so that I have to look at the chest x-ray, what was the
16    original reason why it was done.  Because first you have to
17    pick up the finding in the chest x-ray even to do the CT.
18    Q.    When you were employed at UMass and you said you looked at
19    some 20 CT scans a day, it was -- did I understand your
20    testimony to be you also looked at x-rays at the same time?
21    A.    Yeah.  Over -- over the daytime --
22    Q.    And --
23    A.    -- yes.
24    Q.    -- did some of those x-rays relate to the CT scans that
25    you were also looking at?
```

1   A.   No, because I have a separate list.

2   Q.   Is there any difference in the difficulty of looking at

3   x-rays and an x-ray and a CT scan?  I know I'm talking

4   generally, and I know CT scans can complicate it.

5        But generally speaking, can you -- if you can answer that

6   question?

7   A.   Yeah, I can.  So chest x-ray it is like going from front

8   to back of your body.  So you have muscle, you have ribs, you

9   have lungs, you have heart.  So all the things on top of each

10  other.

11       So to pick up anything with -- with -- whether it is -- in

12  each structure has a different density.  So you have to figure

13  out is that related to normal structure or it is abnormal.

14          As in CT, it is a loaf of bread, and you're cutting

15  the slices.  It is, like, laid out for you.  So that's the main

16  difference.

17          So actually chest x-ray, if you want to find a certain

18  finding, like finding a nodule, it is difficult until you are

19  used to it and you look at so many of them.

20  Q.   Does -- does experience help in terms of looking at

21  x-rays?

22  A.   In general for all the modality, the more the experience

23  it is.

24  Q.   And how many years experience did you have in March of

25  2018?

```
 1   A.    Twenty-six years at UMass.  I was also in a private
 2   practice for 11 years, so total of 38 as an attending.  It
 3   doesn't count my fellowship or residency.
 4   Q.    I want to bring you to the actual date of your
 5   termination.
 6           Do you remember that date?
 7   A.    How can I not remember that date.
 8   Q.    Before March 14th of 2018, did you have any idea that your
 9   work was being reviewed in any way?
10   A.    Not at all.  Not at all.
11   Q.    Did you have any idea that apparently there were
12   complaints made by physicians to Dr. Dill and to Dr. Robinson
13   about your work?
14           Did you have any idea about that?
15   A.    No idea whatsoever.
16   Q.    And did anyone ever tell you at any time who these
17   physicians were?
18   A.    No.
19   Q.    While you were at UMass, if a physician wanted to ask you
20   a question about a specific x-ray or CT scan, would
21   they -- would they contact you and ask you?
22   A.    Yeah, if they are in the hospital they always come in
23   person and say, hey, can you please look at this.
24   Q.    And was that a regular routine that if a doctor had a
25   question or an issue that they would contact you?
```

1   A.   Yes.

2   Q.   And would they contact you personally?

3   A.   Yes.

4   Q.   And how would they do that?

5   A.   They come in the reading room.

6   Q.   They would call you?

7   A.   No, they come in the reading room.

8   Q.   Okay.

9   A.   And say this is the patient, will you please look at it.

10  Q.   They come into the reading room?

11  A.   Yeah, where I -- where I sit.  I do the -- near the

12  machine.

13  Q.   And how often, if you can tell us, on a -- on a basis did

14  physicians come into the reading room to ask you questions?

15  A.    It varies, but it can be eight to ten times.  If I'm the

16  only one in the reading room, naturally they're just going to

17  come to you, and they know me from over the years.  So they do

18  it.  They do come.  They come with the residents sometime

19  because they want to teach them.

20  Q.   Can you give us -- oh, and to teach them.

21       Can you give us an example of the kind of questions

22  you might get or, in fact, did get?

23  A.   Yes, sir.  There is CT scan, and then if there is a

24  finding there, then they will say what do you think it is.  So

25  just to get my opinion.

1  Q.   Did you -- were you requested to give second opinions for

2  the diagnoses of other radiologists?

3  A.   Yes.

4  Q.   And was that usually an opinion that the referring

5  physician was coming to you with?

6  A.   Yes.

7  Q.   And did you get emails at times requesting your input on

8  certain x-rays or CT scans?

9  A.   Very few.  Very few.  Usually they come at least in my

10  experience.

11  Q.   Very few?

12  A.   Very few.  Very few.

13  Q.   But when you did get them, how did you respond to the

14  email?

15  A.   Usually the email is to what do I do about this, the

16  finding I have.  I call them so that they know they have an

17  answer.

18  Q.   You would call them on the phone?

19  A.   Yeah, yeah, usually I call them.

20  Q.   And why would you call them as opposed to just emailing

21  them back?

22  A.   It's just I think it is more easier for the physician, and

23  because I, like I said, know so many of them.  They don't mind

24  my phone call.  On the contrary, they appreciate that.  And

25  they take it seriously too.

1   Q.   And in a phone call, are you able to have a discussion

2   back and forth about any issues that --

3   A.   Yeah, what they're asking for mainly.  Mainly.

4   Q.   At any time in your 26 years has any chief of -- well, let

5   me ask you this.  How many chiefs of radiology have you

6   actually worked for in the 26 years you were at UMass?

7   A.   At least six doctors:  Smith, Dr. Felice, Dr. Leppo,

8   Dr. Kandarps.  So, one, two, three, four; Dr. Ferrucci, five;

9   and him, six.

10  Q.   And with respect to the five before Dr. Rosen, at any time

11  did -- did the chief ever indicate there was any problem

12  whatsoever in any form with respect to your reading of x-rays

13  or CT scans?

14  A.   Never.  Not only that, they don't -- everybody wrote a

15  reference letter when you get promoted from assistant to

16  associate.  You have to have a letter from certain number of

17  people.  So they did.  All of them did that.

18  Q.   How long have you been teaching residents by the way?

19  A.   Since January 6, 1992.  So it used to be 40 resident per

20  year.  Now it is recently just five per year.  Not only that

21  the medical student, because when they are in medical school

22  they have to spend a month or so in the regular rotation,

23  rotation.

24  Q.   Are these residents residents who are doing just a

25  rotation in radiology as part of their general medical

1    education?

2    A.    Yeah, resident has to go through all the modalities.

3    Q.    And -- and how long is the rotation that a medical student

4    has to -- has to go through for -- for radiology?

5    A.    Not too long.  Usually they spend a week or two, so like

6    two days in chairs, two days in emergency, different modality,

7    just to get a sense of it, what it is kind of.

8    Q.    What is your style for teaching these residents?  Is it

9    lecturing or is it -- how -- how do you actually teach the

10   residents how to read x-rays or CT scans?

11   A.    I -- I did not give regular lectures, but when I check

12   them, like, see, they give you the cases themself.  And then we

13   sit together.

14   Q.    You sit together?

15   A.    In the -- on the machine.

16   Q.    That's you and?

17   A.    And my resident.

18   Q.    And how many residents are there when you sit together?

19   A.    See, there are usually one or two rotating.  So one -- one

20   person at a time.  One person at a time.

21   Q.    And as you sit together, what do you require the resident

22   to do?

23   A.    So first I bring up the image on my machine, and then I

24   ask them what did you see.

25   Q.    Is that a CT image or an x-ray image?

```
 1    A.   Chest -- chest or -- chest or CT, either one.

 2    Q.   Okay.

 3    A.   Then I look at it myself, and then I say, Did you see

 4    this?  Did you see that?  So it is -- I -- I love to teach, and

 5    over the years more than a hundred residents has gone through

 6    me.  And many time I see them in the conference.  Once in a

 7    while I --

 8              MR. KILROY:  Objection, your Honor.

 9              THE COURT:  Sustained.

10              THE WITNESS:  -- in the restaurant --

11              THE COURT:  Stop.  Stop.

12              THE WITNESS:  Okay.

13              THE COURT:  Let's have a question, please.

14    BY MR. KOLMAN:

15    Q.   In 2017 --

16    A.   Yes.

17    Q.   -- you were voted teacher of the year?

18    A.   Yes.

19    Q.   Who -- who -- who exactly voted for that?

20    A.   All the resident combined, around 20 of them.

21    Q.   All the residents at medical school?

22    A.   Yeah --

23    Q.   -- for that year?

24    A.   -- in radiology for that year.  Not -- so like I said, it

25    is 40 of them now.
```

1    Q.    Okay.

2    A.    So around 20.

3    Q.    Were you ever told --

4    A.    They worked among themself.

5    Q.    I'm sorry.

6    A.    Sorry.

7    Q.    After you could no longer read CT scans, did that affect

8    your ability to teach residents as you had done in the past?

9    A.    Definitely.  I had to --

10   Q.    Were you able to continue to teach them in the way that

11   you had before?

12   A.    No, because now they are not sitting next me to me

13   rightly.  I was stopped, and they were very upset too, because

14   most of them know me.

15           MR. KILROY:  Objection.

16   BY MR. KOLMAN:

17   Q.    Just wait for my question.

18   A.    Okay.

19   Q.    Okay.  What year was it that Dr. Rosen came on board as

20   chief of radiology; do you recall?

21   A.    2012.

22   Q.    And when he came on board, did he meet with you?

23   A.    He met before that, before he actually started.

24   Q.    And in 2012 to 2013, did he indicate any problems with you

25   at all?

1  A.   No.

2  Q.   Did he indicate that there had been any complaints about

3  you from any doctors?

4  A.   No.

5  Q.   And during the year of 2013 to 2014, the same question?

6  A.   No.

7  Q.   And 2014 to '15 --

8  A.   No.

9  Q.   -- the same question?

10      And 2015 to 2016?

11 A.   No.

12 Q.   The same question.  And 2016 to 2017?

13 A.   No.

14 Q.   Did you meet with Dr. Rosen for a regular evaluation once

15 a year?

16 A.   Every year, yeah.  All the faculty, all the faculty did

17 meet him -- meet with him.

18 Q.   The document -- the documents that reflect your

19 evaluations that were given to Dr. Rosen by me, are those

20 documents the documents that reflect your evaluation for that

21 year?

22 A.   Yes.

23 Q.   Are there any other documents for any year that could also

24 be looked at to determine how you were doing that year?

25          MR. KILROY:  Objection.

```
 1              THE WITNESS:  I have never seen it.
 2              THE COURT:  Sustained.  That's sustained.
 3              THE WITNESS:  I never seen it.
 4              THE COURT:  Wait.  Wait for a question, please.
 5    BY MR. KOLMAN:
 6    Q.   Did you ever receive any other documents, apart from the
 7    evaluation documents?
 8    A.   Never.
 9    Q.   Did you have any other discussions with Dr. Rosen in
10    respect to your performance, except the once a year discussion
11    with --
12    A.   No.
13    Q.   Sorry.  In 2017, did you have a meeting with Dr. Rosen as
14    you had done in prior years?
15    A.   Yes.
16    Q.   And do you recall when that meeting was?
17    A.   The annual meeting, yeah, in September.
18    Q.   The evaluation meeting?
19    A.   September, around in Sep- -- early September, probably.
20    Q.   Early September?
21    A.   I don't know the exact date.  Yeah.
22    Q.   I'm sorry.  Did you say September?
23    A.   Yes.
24    Q.   September 2017?
25    A.   '17, yeah.
```

```
1   Q.   And how long was your meeting with Dr. Rosen?

2   A.   Usually not too long, maybe five, 10 minutes.

3   Q.   And do you recall what Dr. Rosen said to you --

4   A.   Yeah.

5   Q.   -- during that meeting?

6   A.   Yeah, he said -- he said about the --

7   Q.   Wait.  Can you tell us what he said?

8   A.   He talk about recently the teacher of the year award.

9   Q.   What did he say?

10  A.   He just said -- he just acknowledge that I did the teacher

11  of the year.

12  Q.   I can't hear you.  You must speak up and clearly too.

13  A.   He -- he -- he talk about my receiving teacher of the year

14  award.

15  Q.   Did he -- and what did he say about that?

16  A.   He just acknowledge.

17  Q.   Okay.  And was there any -- any other discussion about

18  anything else?

19  A.   Not that I recall.

20  Q.   Okay.  After your meeting with Dr. Rosen, was there any

21  other further discussion with Dr. Rosen or any other

22  employer -- any other employee or officer of UMass regarding

23  your performance?

24  A.   No.

25  Q.   At any time were you -- was it suggested that you needed
```

```
 1   to increase your skills by attending courses in order to become
 2   more technologically facile?
 3   A.   No.
 4   Q.   At any time was it suggested to you that you should --
 5   that -- that your not using emails was compromising your
 6   ability to do your job properly?
 7   A.   No.
 8   Q.   After you had your meeting with Dr. Rosen, did you just go
 9   ahead and continue to do your job as you always had done?
10   A.   Yes.
11   Q.   And from September to December, was there any difference
12   between those three months and the way that you had conducted
13   yourself before?
14   A.   No.
15   Q.   With regard to vascular CTs, can you tell us what a
16   vascular CT is?
17   A.   So to check the vessels in the body, you give the contrast
18   and see if there is any abnormality.
19   Q.   Can you speak up, please.
20   A.   To -- to check, like, all the vascular structure, the
21   arteries and all those structures, veins, arteries, you have to
22   do the contrast and see if there's an abnormality.
23   Q.   And are vascular CTs sometimes more difficult than other
24   CTs --
25   A.   Yes.
```

1    Q.    -- of the thoracic region?

2    A.    Yes.  Some of them are complicated, yes.

3    Q.    And can you tell us in words that we can understand why

4    that is?

5    A.    Because it can have different appearance, the different

6    abnormality can have different appearance.  And to make the

7    diagnosis, you have to be correct.

8    Q.    Okay.  Are there sometimes different opinions that

9    radiologists render looking at the same CT?

10   A.    A lot of times.

11   Q.    And can you tell us why that is?

12   A.    That's the radiology.  It has always been --

13   Q.    Speak up.

14   A.    In radiology, different people looking at the same thing

15   can have different opinion.  That's very common.  Very common.

16   Q.    And is it -- is it the case that two radiologists can look

17   at the same image --

18                MR. KILROY:  Objection.

19   Q.    -- and one -- and one can see -- and they can see the same

20   thing, but one determines that it's more dangerous than

21   another?

22   A.    It can.

23   Q.    How do radiologists assure themselves that they

24   are -- they properly or at least as best they can diagnose the

25   image on the screen if, as you say, radiologists can sometimes

1   or often disagree with each other?

2   A.   I don't know if I understood the question correct.

3   Q.   I'm sorry.

4   A.   I don't know if I'm understanding the question right.

5   Q.   Yes.  Given what you said about radiologists disagreeing,

6   is there any way that radiologists ground themselves or ask for

7   other opinions in order to narrow any disagreement between

8   them?

9   A.   Yes, sometime they do, yeah.

10   Q.   And how is that done?

11   A.   If I'm reading something, and if I have a question, then I

12   go ask my colleague, do you agree with this, because it's --

13   end of the day, the patient matters.  It's not my ego.  It is

14   the patient which matters.  So if any time I feel that I don't

15   know what this is --

16   Q.   Uh-huh.

17   A.   -- then I go to my colleague.  And the same thing they do,

18   too.

19   Q.   So were there times when you actually asked radiologists

20   for their opinions --

21   A.   Yes.

22   Q.   -- and input on -- on CTs and x-rays that you --

23   A.   Both.

24   Q.   -- yourself could see?

25   A.   Both.

1   Q.   And did the same happen to you that you were asked for

2   your opinion on the same, CTs and x-rays?

3   A.   Yes.

4   Q.   And did that happen on a regular basis?

5   A.   Quite -- it depends.  It depends.

6   Q.   Now, at any time during the 26 years did you get what's

7   called a peer review of -- of your cases?

8           Well, let me go back.  Did you -- do you understand

9   what a peer review is in radiology?

10  A.   Yeah, there is a system in place, yeah.

11  Q.   Can you tell us in broad terms that we can understand what

12  a peer review actually is?

13  A.   So you are given somebody -- other radiologists's images

14  to see whether what they say is correct or not.

15  Q.   And --

16  A.   And then you put it in the system.

17  Q.   And how -- and were you -- did that ever happen to you

18  that you were subject to a peer review?

19  A.   Only time I saw was one of the -- one of the document, but

20  that I saw in -- but otherwise, no, no, I have not -- anybody

21  has not brought to me as a colleague peer review that I made a

22  mistake kind of.

23  Q.   When you sat down with Dr. Rosen, did Dr. Rosen talk about

24  what's been called fours and threes?

25  A.   Yeah, at the annual meeting he will give you the paper.

1    Q.   And what are fours and what are these threes?  I know we

2    perhaps heard about it from Dr. Rosen, but I would just like to

3    just hear it again from you.

4    A.   So, categories one, two, three, and four.

5    Q.   Okay.

6    A.   So one is person is agreeing what they read.

7    Q.   I'm sorry.  Four is what?

8    A.   Four is that should have picked up the finding, and it

9    would have patient impact kind of.

10   Q.   Okay.  And how were these fours and threes generated; do

11   you know?

12   A.   I think you can do -- see, automatically when you are peer

13   reviewing, whenever these five cases comes, then you do that

14   way.  But somebody can manually put it, too.

15   Q.   And these three and these fours, was it your understanding

16   that Dr. Rosen was giving you that paper for the entire year?

17   A.   Yes.

18   Q.   And did Dr. Rosen ever make any comment on the number of

19   threes or the number of fours?

20   A.   No.

21   Q.   When you looked at the threes and the fours yourself, did

22   you have any opinion as to how you had done for that year in

23   terms of your diagnostic prowess?

24   A.   I did not agree.  And some of -- one of them was the

25   person who criticized me, not realizing criticizing on the

1   study.

2   Q.    Okay.  Now, moving ahead to March 14th, 2018.

3         How did you -- how were you notified that -- that

4   there was going to be a meeting?

5   A.    Like week and a half before that.

6   Q.    A week and a half before?

7   A.    Before the March 14, 2018, there was an email that you

8   have a meeting with Dr. Rosen at noontime.  And I said, What is

9   it about?

10  Q.    You asked what is it about?

11  A.    Yeah, to the secretary.  I didn't talk to anybody else.

12  Q.    Did you get an answer?

13  A.    And I didn't get any answer.

14  Q.    Okay.

15  A.    So I had no idea.

16  Q.    Did you work the full morning before going in to see

17  Dr. Rosen?

18  A.    Yeah -- can I go a little bit longer on that?  So it was

19  like a regular day.  I -- I do my own work in the morning.

20  Then around 10:30, 11:00, the resident sits with me, because I

21  have to check what he did -- sorry -- for that part of the

22  morning.  So he finishes the -- we finished the morning work.

23  Q.    So when you went in to see Dr. Rosen, who else was there?

24  A.    Dr. Charles Cavagnaro and Dr. Rosen.

25  Q.    And who is Dr. Signiori (phonetic)?

```
 1   A.   Charles Cavagnaro is one of the higher people.

 2   Q.   Did you ever know him or meet with him?

 3   A.   Never.

 4   Q.   And can you tell us just what -- tell us in your own words

 5   what happened?

 6   A.   So I was --

 7   Q.   Slowly.

 8   A.   I was given a letter, and he said this is your

 9   termination.

10        And your service will no longer be required March 17,

11   2019, so, like --

12   Q.   Can you speak up, please, and more --

13   A.   The last -- the last day of my employment will be

14   March 17, 2019.

15        Now, looking at that paper, it was almost impossible to

16   keep myself because I had no idea that I was going to go

17   through that.  So my next question was why.

18   Q.   Did Dr. Rosen give you the letter and then say you were

19   terminated, or did he say you were terminated and give you the

20   letter or was the letter open?  Can you give us a little about

21   that.

22   A.   The letter was open.

23   Q.   It was open?

24   A.   It was -- I think it was opened.

25   Q.   And then he said, You're terminated?
```

1    A.    Yeah.

2    Q.    Did he say you're terminated for no cause or just that

3    you're terminated?

4    A.    Yeah, yeah, he did.  So because my -- I was in shock.  I

5    was not -- it was -- even today it's difficult.  So my next

6    immediate question was why.

7              MR. KILROY:  Objection.

8              THE COURT:  Sustained.

9    BY MR. KOLMAN:

10   Q.    Okay.

11   A.    And he said no cause.

12   Q.    Let me -- let me ask you a series of questions.

13         After you received the letter, you asked a question?

14   A.    Yes.

15   Q.    Of -- of the two men in the room.  And what was your

16   question?

17   A.    Why.

18   Q.    And what was the answer?

19   A.    No cause termination, no cause termination.

20   Q.    Okay.  No cause.  Did you have -- okay.  So did you ask

21   another question --

22   A.    Yeah, I said --

23   Q.    -- on that basis?

24         Wait.  What was the question you then asked?

25   A.    Well, it's no cause, because I did not know.  He said it

1   is in your contract.  So my next question was:  Give me the

2   contract.  I want to see it.  And he said, I do not have it

3   right now, but I'll give it to you.

4   Q.   You wanted to see the contract?

5   A.   Yeah, because I -- I -- to me the time was even --

6   Q.   Okay.  And so you asked for the contract?

7   A.   Yeah.

8   Q.   And he didn't have it, but he was going to give it to you?

9   A.   Yeah, he did.

10  Q.   What was your next question?

11  A.   The next thing he told me that as of this afternoon --

12           MR. KILROY:  Objection.

13           THE COURT:  Sustained.

14           THE WITNESS:  As of this afternoon --

15           THE COURT:  Wait.  Wait.  Wait.  When I sustain the

16  question, the --

17           THE WITNESS:  Sorry.

18           THE COURT:  The answer -- that's okay.  Ask a question

19  please, Mr. Kolman.

20  BY MR. KOLMAN:

21  Q.   After -- after you requested the contract, was there any

22  other discussion?

23  A.   There was.

24  Q.   And was that discussion from -- from your side?

25  A.   No, from his side.

1    Q.   From their side?

2    A.   Yeah.

3    Q.   And what was your understanding of what they were then

4    telling you?

5    A.   What he told me as of this afternoon, you're not supposed

6    to read CT scan, because the CT scan of poor quality.

7    Q.   And was that the first time that you had ever heard that

8    you had a problem with CT scans?

9    A.   First time ever.

10   Q.   And did that prompt any further questions from you?

11   A.   He -- I think he did say he did independent review.  I'm

12   not exactly sure.

13   Q.   Okay.

14   A.   But he said independent review, he did.

15   Q.   Did -- were you given an instruction in respect to

16   reviewing CT scans at that time?

17   A.   Instruction was not to do it this afternoon, as of this

18   afternoon.

19   Q.   And did you leave the office at that time?

20   A.   I left the office as if somebody --

21   Q.   And after you left the office, approximately what time was

22   it?

23   A.   Noon, so maybe 12:15, 12:30 around that.

24   Q.   And what did you do?

25   A.   I was -- it was like somebody put a knife through my

1   heart, like I never felt.  This shouldn't happen to anybody.

2   Q.   What did you do?

3   A.   Nothing.  I was -- I couldn't even stand.  I was

4   just -- completely out kind of.  So devastated that when I talk

5   I don't want to talk about it.  It hurts too much.

6   Q.   I understand.  But for these purposes at least we are

7   going to talk about it, okay.  Take a tissue.

8   A.   Okay.

9   Q.   Did it take you a little bit of time to determine what you

10  would do next?

11  A.   Yeah, that day it was completely -- I was so, so bad.  And

12  he did tell me that I can still read the chest x-ray for the

13  year, because the date was 3/17 to completely finish my

14  employment.

15  Q.   Were you able to continue to work that term -- that

16  afternoon?

17  A.   I was not.

18  Q.   And did you leave?  Did you -- did you have to leave the

19  hospital?

20  A.   I called my family up to pick me up.

21  Q.   And -- and did your family come and pick you up?

22  A.   Yeah, they did.

23  Q.   And did you confide in your family?

24  A.   I did.

25  Q.   And your husband?

1  A.   My husband, my daughter.

2  Q.   Is your husband here today?

3  A.   My husband is right there.

4  Q.   Did you go to work the next day?

5  A.   I did.  I did.

6  Q.   You went to work the next day?

7  A.   Yeah, because that's what I love to do.

8  Q.   And the days after that, you went to work?

9  A.   The whole year.  The whole year.

10 Q.   And did you take call that we've heard so much about on a

11 regular basis?

12 A.   I did.  Even that year I did.  Even that year I did.

13 Q.   And following that meeting with -- with Dr. Rosen and

14 Dr. Signiori (phonetic), did you then write any subsequent

15 correspondence to them in respect of what they told you?

16 A.   I did.

17 Q.   And --

18 A.   I wrote -- I wrote email to say I would like to see the

19 cases.

20 Q.   And I believe we may have seen that.  And you were

21 requesting?

22 A.   I was requesting if I can see the poor quality CTs, so if

23 that is true, then I can improve, and I also asked can I bring

24 my independent reviewer.

25 Q.   You -- you wanted to see, as I understand, the actual

1   CT scans?

2   A.    I wanted to.

3   Q.    And those CT scans that you had an understanding were the

4   basis for you now not being able to read CT scans?

5   A.    Yes.

6   Q.    And you had requested to bring an expert.

7         For what purpose did you wish to bring an expert?

8   A.    Because his decision was in bringing the expert.  I wanted

9   to see what my expert says.  Is that really a problem.

10  Q.    And you weren't able to bring an expert?

11  A.    Yeah, he said no, but you can bring a colleague.

12  Q.    And you did bring a colleague?

13  A.    I did bring a colleague, Sarwat Hussain.

14  Q.    And how long after the original meeting in March of 2018

15  was this next meeting with Dr. Hussain and you and Dr. Rosen?

16  When -- when did that take place?

17  A.    April 24.

18  Q.    April 24?

19  A.    '18, yeah.

20  Q.    And when you went to that meeting was anyone there apart

21  from Dr. Rosen?

22  A.    Yeah, Dr. Baccei.  He's vice chair of quality control.

23  Q.    Dr. Baccei?

24  A.    Yeah.

25  Q.    And when you went to that meeting did Dr. Rosen present

1  you with any information that assisted your understanding as to

2  why your privileges in respect to CT scans had been revoked?

3  A.   He did a PowerPoint.  He put a PowerPoint slide on the

4  wall, but I could not make out anything after that.

5  Q.   One question at a time.  He put the PowerPoint on the wall

6  and --

7  A.   One slide.

8  Q.   And while he was putting the PowerPoint on the wall, did

9  he explain what you were supposed to be looking at?

10 A.   Yeah, this -- this side where you made the error that was

11 the idea, but I couldn't see and make out anything after that.

12 Q.   And Dr. Hussain was there as well?

13 A.   Yes.

14 Q.   Was that the whole meeting --

15 A.   Yes.

16 Q.   -- just the PowerPoint?

17 A.   PowerPoint, and I did receive a hard copy of one paper.

18 Q.   Did Dr. Rosen tell you that he himself had designed this

19 PowerPoint -- this test, if you will, did he tell you that was

20 his creation?

21 A.   No, at that time we didn't discuss.  I was not, no.

22 Q.   Did -- did he say who had reviewed the 25 CT scans of you?

23 A.   No, he did not.

24        MR. KILROY:  Objection.

25        THE COURT:  Sustained.  Don't lead.

```
 1              MR. KOLMAN:  Okay.
 2    BY MR. KOLMAN:
 3    Q.   You left, you say, with a lack of understanding.
 4              Did Dr. Hussain have more understanding than you?
 5              MR. KILROY:  Objection, your Honor.
 6              THE WITNESS:  No.
 7              THE COURT:  Sustained.
 8    BY MR. KOLMAN:
 9    Q.   When was the next interaction, if you had one,
10    with -- with Dr. Rosen in respect to this matter?
11    A.   I did not.
12    Q.   There was none?
13    A.   No.
14    Q.   Was there any further correspondence from you to Dr. Rosen
15    after the PowerPoint relevant to what we have just been talking
16    about?
17    A.   Just the email stating that I came and this is what we
18    did.
19    Q.   During the time after that, did you have an understanding
20    that because your contract -- because you had worked for over
21    20 years, there was a year available to you to continue to
22    work?
23    A.   Yeah.
24    Q.   And during that time, you did not review any CT scans?
25    A.   I did not.
```

1    Q.   Did you contemplate trying to get other employment during

2    that year?

3    A.   I did.

4    Q.   And where did you contemplate possibly being reemployed?

5    A.   I tried different, Boston area, Connecticut.

6    Q.   Did you have any sense that because you could not read

7    CT scans or you had been forbidden from reading them that that

8    would be a disadvantage in -- in --

9    A.   Yes.

10   Q.   -- getting a job?

11   A.   Yes.

12   Q.   And why did you think it would be a disadvantage?

13   A.   Because usually that's what people want, the both, the

14   more modalities, both the modalities.  Just x-ray, it is -- any

15   kind of position they want to you to be able to read CT scans.

16   Q.   They want radiologist to have more than one modality; is

17   that what you said?

18   A.   No, more.  Not one thing.  They want people who can do a

19   lot of things.

20   Q.   Were you ever asked the question by a representative of a

21   hospital to whom you applied what had happened to you at UMass?

22   A.   You do.  And they will ask you whether you were

23   terminated.

24   Q.   Did you have to say?

25   A.   Yes.  They will also ask you whether your privilege has

1  been restricted.

2  Q.   I'm sorry.  I didn't hear that.

3  A.   Whether your privilege has been restricted.  That's the

4  other question they ask you.

5  Q.   And then did they ask any follow-up questions when you

6  said --

7  A.   No.

8  Q.   -- that you were terminated?

9  A.   No, you don't --

10  Q.   Did you ever hear from any of those hospitals again?

11  A.   You don't hear from them.

12  Q.   What was it like for you having to tell these other

13  institutions that you had been terminated?

14  A.   Very humiliating to --

15  Q.   Speak up.

16  A.   Very humiliating and degrading.

17  Q.   Humiliating and degrading?

18  A.   Yeah.  Yeah.

19  Q.   When you were employed by UMass, did you regularly go to

20  any medical conventions or further education?

21  A.   I did.

22  Q.   And -- and what specifically did you go to on a regular

23  basis?

24  A.   The CT scan especially --

25  Q.   Speak up.

1  A.   CT scan.  Especially there is a Harvard course on chest

2  imaging every other year.

3  Q.   Every year?

4  A.   Every other year.

5  Q.   Every other --

6  A.   And I made sure that I --

7  Q.   I'm sorry.  Where was that, in Boston?

8  A.   Boston.  Boston.

9  Q.   And what happens at that meeting or -- or educational

10  convention?

11  A.   It is specifically designed for the chest modality, so you

12  have almost like whole week of different lecture on different

13  topic.

14  Q.   Different lectures?

15  A.   Yeah, yeah.

16  Q.   And these lectures are given by?

17  A.   By Harvard specialists and all that.

18  Q.   Are these radiologists?

19  A.   Yes.  They are thoracic radiologists.

20  Q.   And is it your testimony that you regularly attended these

21  conventions?

22  A.   I did.  I did.

23  Q.   And UMass paid for that?

24  A.   Yes.

25  Q.   And did you -- did you have a sense that you could do your

```
 1   job without needing to -- well, let me ask you this:  Were you
 2   ever told of a course that you could take which somehow would
 3   increase your CT and the analytical skills?
 4   A.    No.
 5   Q.    Did you ever receive any flyer in the mail or elsewhere
 6   telling you that there was a course that could assist you in
 7   your diagnostic skills?
 8   A.    Yes, and I went to some of them, right, because we -- yes,
 9   I did.  And see when you get the flyer then you see what is the
10   topic, and I did go to.  Apart from Boston, I did go to.
11   Q.    Now, you worked with other radiologists?
12   A.    I did.
13   Q.    And the question has been brought up as to academic time.
14   Now, we heard Dr. Rosen talk about academic time and
15   did -- was -- did you request at some point from Dr. Rosen
16   academic time?
17   A.    I did, 12.  I only requested 12 per year.
18   Q.    I'm sorry.
19   A.    I only requested 12 days per year.  And according to --
20   Q.    Wait.  How many days did you request?
21   A.    Twelve days.
22   Q.    Okay.
23   A.    Per year.  Because I was teaching so I was entitled for
24   that.
25   Q.    And what did you intend to use those academic days for?
```

1  A.   In my case, I wanted to take a -- take a break for the

2  call in and all that.  Because it was ten days in a row was

3  very difficult.

4  Q.   Did you have any understanding that, according to

5  Dr. Rosen, these academic days could not be used in the way

6  that you wanted to use them?

7  A.   Yes, but the thing is who people just came to be on the

8  job for the first time, from the first week --

9           MR. KILROY:  Objection.

10          THE COURT:  Sustained.

11          THE WITNESS:  The first week they were --

12  BY MR. KOLMAN:

13  Q.   Stop.

14  A.   Okay.

15  Q.   When the judge says "sustained," you have to stop

16  speaking.

17  A.   Okay.

18  Q.   Okay.  All right.  When you spoke to Dr. Rosen, did

19  Dr. Rosen talk to you about academic time and what it was to be

20  used for?

21  A.   He did.  He said give me the --

22  Q.   Wait.  Did Dr. Rosen ask you what you were going to use

23  the academic time for?

24  A.   Yes.

25  Q.   And what did you tell him?

```
 1   A.   He asked me for the proposal, but I did not give it.
 2   Q.   And did you then pursue the issue of academic time?
 3   A.   There was nothing to pursue because he said no.
 4   Q.   Do you know of other doctors who had academic time?
 5   A.   Almost everybody once a week, almost everybody.
 6   Q.   Your testimony is that all other radiologists have
 7   academic time?
 8   A.   Yes.
 9   Q.   As far as you know?
10   A.   Once a week.
11   Q.   As far as you know, do you know how they used that
12   academic time?
13           MR. KILROY:  Objection.
14           THE WITNESS:  With themself.
15           THE COURT:  Sustained.
16   BY MR. KOLMAN:
17   Q.   Wait.  You have to stop, okay?
18   A.   The --
19   Q.   Just wait.  Did Dr. Dill have academic time, if you know?
20   A.   Yeah.
21   Q.   How much time did she have?
22           MR. KILROY:  Objection.
23           THE WITNESS:  72.
24           THE COURT:  Well, so hold up.  Don't answer.  You need
25   to lay a foundation.  Sustained.  I'll let you go there --
```

```
 1              MR. KOLMAN:  Okay.

 2              THE COURT:  -- but you need to lay a foundation.

 3              MR. KOLMAN:  Sure.

 4   BY MR. KOLMAN:

 5   Q.   How did you ever know, first of all, how anyone else,

 6   whatever -- what academic time anyone else had?

 7   A.   Two ways.  In discovery phase, I found out about a lot of

 8   other people.

 9   Q.   Say?

10   A.   In -- in -- when we had a lawsuit in discovery papers.

11   Q.   In the process of discovery of this case?

12   A.   Yes, but regularly on the schedule, also you have read,

13   and this person is academic, and this is administrative.  So

14   that is how.

15   Q.   Is that schedule available for you to see --

16   A.   Yes.

17   Q.   -- while were you working?

18   A.   Yes.

19   Q.   And when it said academic time, did you have any knowledge

20   of the amount of academic time, or was it just that a physician

21   was taking academic time?

22              MR. KILROY:  Objection, your Honor.

23              THE COURT:  Sustained.

24   BY MR. KOLMAN:

25   Q.   This schedule that you looked at --
```

1   A.   Yes.

2   Q.   -- was it a schedule of -- what kind of schedule was it?

3            MR. KILROY:  Objection, your Honor.

4            THE WITNESS:  See, this is --

5            THE COURT:  Well, wait.  When there's an objection,

6   please don't answer.

7            Overruled.  You may answer.

8   BY MR. KOLMAN:

9   Q.   What kind of schedule was this you were looking at?

10  A.   See, I work in chest so I have -- so we have weekly

11  schedule, who is in what area, am I reading CT, am I reading

12  chest x-ray?  So in there it says.

13  Q.   And when you say "in there," were you able to see other

14  physicians taking academic time?

15  A.   If -- if you look at their schedule, yes.

16  Q.   But -- okay.  So in the course of discovery, did you find

17  out how many days Dr. Dill was taking for academic?

18            THE WITNESS:  72.

19            MR. KILROY:  Objection, your Honor.

20            THE COURT:  Sustained.

21  BY MR. KOLMAN:

22  Q.   Let's talk about Dr. Dill for a minute.

23            THE COURT:  Let's do this.  Let's talk about Dr. Dill

24  in 20 minutes.

25            MR. KOLMAN:  Okay.  Thank you.

1           THE COURT:  See you back here soon.

2           THE CLERK:  All rise.

3           (At 10:28 a.m., the jury left the courtroom.)

4           THE COURT:  You can step down, Doctor.  Thank you.

5           THE WITNESS:  Thank you.  Sorry for the -- it's all

6    new so it's difficult.

7           THE COURT:  It's all right.  Wait.

8           MR. KOLMAN:  I can't speak with you, so amuse yourself

9    for 20 minutes, okay.

10          THE COURT:  Mr. Kolman.

11          MR. KOLMAN:  Yes, your Honor.

12          THE COURT:  How much longer?

13          MR. KOLMAN:  Not a great deal, Judge.  Not a great

14   deal, half an hour, I think, at most.

15          MR. KILROY:  It will go through the end of the day and

16   into tomorrow, your Honor.

17          THE COURT:  All right.  See you in 20.

18          (Recess from 10:29 a.m. until 10:53 a.m.)

19          THE CLERK:  All rise.

20          (At 10:53 a.m., the jury entered the courtroom.)

21          THE CLERK:  Court is now open.  You may be seated.

22   BY MR. KOLMAN:

23   Q.   Was Dr. Dill your supervisor in any way?

24   A.   Yes.

25   Q.   Did you meet with Dr. Dill at any time to discuss any

```
1   problem that you might have?
2   A.    No.
3   Q.    Did there come a point where you complained about
4   Dr. Dill?
5   A.    There was an incident.
6   Q.    Please speak up.
7         Please speak up.  If the judge says -- if there's an
8   objection, please don't talk, okay?
9         All right.  If I ask you to repeat your answer, it's
10  because I haven't heard it properly, okay?
11        My question was:  Did you have any -- I think it was did
12  you have any disagreement with Dr. Dill at any time?
13  A.    Yeah, once.
14  Q.    And when was this disagreement?
15  A.    It was two years ago, I think.  It was a while ago.
16  Q.    And did you complain about her to anyone?
17  A.    No, first she complained, so then I responded.
18  Q.    She complained about you?
19  A.    Yes.
20  Q.    Do you recall what that was about?
21  A.    Yes.
22  Q.    What was it about?
23  A.    It was her statement she did in front of the resident so I
24  wanted --
25  Q.    One second.  It was a statement that was made in front of
```

1    the resident?

2    A.    So I just said, Can we talk in the office.

3    Q.    Which -- and did you -- were you the one who made that

4    statement?

5    A.    Yes.

6    Q.    And what was the statement?

7    A.    Can we -- can we talk.  Can we talk in my office.

8    Q.    Okay.  And -- and who was asking if they could talk in the

9    office?  Was it you or was it Dr. Dill?

10   A.    It was me.

11   Q.    And was there a reason you wanted to talk to Dr. Dill in

12   your office?

13   A.    Yes.

14   Q.    And what was that reason?

15   A.    I just wanted to tell her that don't be rude to me in

16   front of the resident.

17   Q.    Did you feel she had been rude?

18   A.    I thought twice.

19   Q.    And why did you think she had been rude?

20   A.    The day before also, so I let it go the first day; then

21   second day I said, Please don't do that.

22   Q.    And did she have a reaction to what you said to her about

23   being rude?

24   A.    Yes, she -- yes, she did.  So the conversation was very

25   short.

1  Q.   And did you make any further complaint as a result of her

2  rudeness?

3  A.   Please repeat the question.

4  Q.   Did you make any other complaint to anyone?

5  A.   No.

6  Q.   Now, did there come a time when you took FMLA, family

7  medical leave?

8  A.   Yes.

9  Q.   And what was the family leave for?

10  A.   For my heart condition.

11  Q.   And do you have a heart condition?

12  A.   I do.

13  Q.   And what is the heart condition?

14  A.   I have a pacemaker.

15  Q.   You have a pacemaker?

16  A.   Yes.

17  Q.   And does that pacemaker or your heart condition cause any

18  issue?

19  A.   Yeah, time to time.

20  Q.   I'm sorry.

21  A.   Time to time it does.  Like yesterday, I had a spell while

22  I was sitting.

23  Q.   And you say "spell"?

24  A.   Yes.

25  Q.   What is a spell?

1  A.   All of a sudden I can feel in two, three minutes before

2  that it's going to come so that time I get short of breath.  My

3  eyelids start tearing and weakness.  So I cannot move or speak.

4  I know who you are, but I cannot do anything.

5  Q.   Has there been a spell during the time that we've been in

6  the courtroom?

7           MR. KILROY:  Objection, your Honor.

8           THE WITNESS:  Yesterday, just --

9           MR. KOLMAN:  Please stop.

10           THE COURT:  Wait.  When there's an objection, please

11  wait until I make a ruling, okay?

12           THE WITNESS:  I'm very, very sorry.

13           THE COURT:  Sustained.

14  BY MR. KOLMAN:

15  Q.   How often do you get these spells?

16           MR. KILROY:  Objection, your Honor.

17           THE WITNESS:  Unpredictable.

18           THE COURT:  Sustained.

19           THE WITNESS:  Unpredictable.

20           MR. KOLMAN:  Stop.

21  BY MR. KOLMAN:

22  Q.   Has this spell ever caused you a problem in your work?

23           MR. KILROY:  Objection, your Honor.

24           THE COURT:  Overruled.

25           THE WITNESS:  Not at all.

1    BY MR. KOLMAN:

2    Q.   Did the people who work with you have an understanding

3    that this spell can occur?

4              MR. KILROY:  Objection.

5              THE WITNESS:  Almost every --

6              THE COURT:  Wait.  Wait.  Wait.  Remember when there

7    is an objection, please don't answer.

8              Sustained.

9    BY MR. KOLMAN:

10   Q.   At any point did you speak to Dr. Rosen or did Dr. Rosen

11   speak to you about your heart condition?

12             MR. KILROY:  Objection, your Honor.

13             THE COURT:  Overruled.

14             THE WITNESS:  No.

15   BY MR. KOLMAN:

16   Q.   Do you know if Dr. Rosen knew about your heart condition?

17   A.   Yes, because he signs the FMLA papers.

18   Q.   With respect to your work, is there anything that happens

19   at work that in any way affects the spells?

20             MR. KILROY:  Your Honor, objection.  May I be heard?

21             THE COURT:  Yeah.

22             (Sidebar as follows:)

23             THE COURT:  Before you go, where are you going with

24   this?

25             MR. KOLMAN:  Your Honor, the issue comes up because of

1   working 10 days in a row, and because she's working 10 days in

2   a row, it increases the possibility of these spells plus she

3   could have a spell in the courtroom right now; and if she does,

4   the jury may not have any idea what's going on, and I'm

5   concerned about that, because she did have a spell -- I didn't

6   notice it.  I was concentrating, but she indicated to me she

7   had a spell, and I saw one of the jurors looking at her at the

8   time because she does look strange, and it could take a minute

9   or two for her to gather herself.  These spells are not

10  infrequent.  So -- so for those two reasons I felt it important

11  that this just be explored.

12          MR. KILROY:  Your Honor -- your Honor, they had a

13  disability claim, both under state law and federal law.  Both

14  of those have been dismissed.  That's the only reason this

15  could be possibly relevant to the jury.

16          THE COURT:  I'm going to ask you to -- I'm going to

17  let you finish with one or two questions, but move.

18          (End of sidebar.)

19  BY MR. KOLMAN:

20  Q.   Does anything -- did anything that you do in your work

21  ever affect the frequency of these spells?

22  A.   If I'm tired, it will come back to back.

23  Q.   When you say back to back?

24  A.   It's more often.  I might get three in a day.

25  Q.   When you're tired?

```
 1   A.    When I'm tired.

 2   Q.    And when you say back to back, what are you talking about?

 3   A.    It might happen now, one hour later, one hour later, kind

 4   of.

 5   Q.    Are you talking about -- I just want to clear this up.

 6   A.    Okay.

 7   Q.    Are you talking about working for periods of time when you

 8   say back to back?

 9   A.    Yeah, if I'm working like when I'm on call, I'm working

10   ten days in a row, 12 days including the weekend, and that --

11   Q.    And how many days in a row is that?

12   A.    Twelve.  Five regular days, five regular days, two

13   weekend, and then five another, so 12 days.

14   Q.    And does that affect your ability to do MRIs?

15             THE COURT:  Let's move on from this, Mr. Kolman.

16             MR. KOLMAN:  Okay.  Sure.  Thank you.

17   BY MR. KOLMAN:

18   Q.    I want to just -- just finish up just a few things.

19        When you had your meeting with -- with Dr. Rosen, did he

20   mention anything else about your quality of your work or

21   anything else about texting or not keeping up or anything else

22   at all?

23   A.    Nothing.

24   Q.    How -- are you -- do you feel able to -- to -- to work as

25   a -- as a radiologist?
```

1    A.    Yes.

2    Q.    Sitting here today?

3    A.    Yes.

4    Q.    As a result of what happened to you, did you need to seek

5    any healthcare of any kind?

6    A.    Yes.

7    Q.    And what kind of healthcare have you sought?

8    A.    Psychiatrist.

9    Q.    I'm sorry.

10   A.    Psych- -- psychiatrist.

11   Q.    And are you seeing a psychologist?

12   A.    Psychiatrist, yeah.

13   Q.    Psychiatrist?

14   A.    Yeah.

15   Q.    And have you been seeing a psychiatrist since this event

16   of your termination?

17   A.    Yeah, little after that because in the beginning I thought

18   I can handle it, so, but --

19   Q.    And why -- why are you going to the psychiatrist?

20   A.    Because it's -- I have a lot of trouble sleeping, and

21   sometime I just start crying and I cannot stop.  It just

22   reminds me, and it -- it is difficult sometime.  I don't want

23   to do anything.  I don't want to go out of the bed sometime.

24   So my husband and my doctor made the phone call.

25   Q.    Have you been prescribed any medication at all in

1    addition?

2    A.    I am.  I am on Cymbalta, 60 milligram, and Trazodone,

3    hundred milligram.

4    Q.    And do you have knowledge as to what -- what that's for?

5    A.    Cymbalta is for the depressant; and Trazodone, because I

6    was having trouble sleeping.

7    Q.    Did you have these problems before your termination

8    from U -- from UMass?

9    A.    Never.

10   Q.    Had you ever seen the psychiatrist before your termination

11   from UMass?

12   A.    Never.

13              (Plaintiff counsel conferred.)

14              MR. KOLMAN:  Your Honor, I have nothing more.  Thank

15   you.

16              THE COURT:  Thank you, Mr. Kolman.

17              And Mr. Kilroy.

18              MR. KILROY:  Thank you, your Honor.

19              If I may just pull this back.

20              THE COURT:  Yes.

21                        CROSS-EXAMINATION

22   BY MR. KILROY:

23   Q.    Good morning, Dr. Desai.

24   A.    Good morning.

25              MR. KILROY:  Mr. Clerk, can I have the document

1   camera, please.  Just for the witness.

2   Q.   Dr. Desai, I'm going to show you a document.

3   A.   Okay.

4   Q.   I'm going to ask you if you recognize the document?

5        Do you recognize that?

6   A.   (Witness reviews the document.)

7   Q.   Do you recognize what that is, Dr. Desai?

8   A.   Yeah.  Do I -- I haven't read the -- how can I go up and

9   down?  Can I?

10  Q.   No, I'm just trying to see if you recognize that this is

11  an agreement between you and UMass Memorial Medical Group, your

12  employment agreement?

13  A.   Yes.

14  Q.   Okay.  And I'm going to show you the page 11 of that

15  document and ask if you recognize the signature on page 11?

16  A.   Yes.

17  Q.   And whose signature is that?

18  A.   The top one is mine.

19  Q.   Right.  So this is the employment agreement that you

20  signed with UMass Memorial Medical Group as your employer,

21  correct?

22  A.   Yes.

23  Q.   And it's also signed by UMass Medical Group by Michele

24  Streeter, whom we heard about yesterday; and by Joseph

25  Ferrucci, Department of Radiology, correct?

1    A.   Yeah.  What is the date, 2'12.  What is the year here?

2    Q.   It's not listed, ma'am.

3    A.   This is 2012, but it doesn't say the year.

4              THE COURT:  Doctor, you need to speak up.  I can't

5    hear you.

6              THE WITNESS:  I was just asking what date the document

7    is.

8              THE COURT:  I understand.  Just speak up.

9              THE WITNESS:  Okay.

10   BY MR. KILROY:

11   Q.   And that's your signature, correct?

12   A.   It is.

13             MR. KILROY:  I ask to publish this to the jury, move

14   it into evidence.

15             THE COURT:  Is it in?

16             MR. KILROY:  It's not, no.

17             THE COURT:  Are you offering it?

18             MR. KILROY:  I am offering it, your Honor.

19             THE COURT:  Any objection?

20             MR. KOLMAN:  No objection, Judge.

21             THE COURT:  What's the number?

22             MR. KILROY:  283, your Honor.

23             THE COURT:  So marked.  And it may be published.

24             (Exhibit No. 283 was admitted into evidence.)

25   BY MR. KILROY:

1    Q.   So, Dr. Desai, I'm going to direct your attention to one

2    particular provision of this contract that you signed.  It's on

3    page 7, Section 7.2.

4         And I'll give you a chance to look at that.

5    A.   (Witness reviewing document.)

6    Q.   Have you had a chance to review that?

7    A.   Okay.

8    Q.   You would agree, Dr. Desai, that UMass Memorial Medical

9    Group had the right to terminate your employment agreement and

10   your employment at any time upon proper notice, correct?

11   A.   That's what it says here.

12   Q.   And -- and that proper notice for you, because you had

13   been there more than 20 years, was 12 months notice, right?

14   A.   Yes.

15   Q.   And you would agree that UMass Memorial, in fact, met its

16   obligations under your contract by giving you a full 12 months

17   notice prior to your employment being terminated, right?

18   A.   Yes.

19   Q.   In fact, you agreed that, to your knowledge, UMass

20   Memorial met all its obligations under this employment contract

21   to you, right?

22   A.   Yes.

23   Q.   Now, you recall questioning over the last several days to

24   Dr. Rosen about your not being asked if you wanted to resign,

25   correct?

```
 1              Do you recall those questions?
 2   A.   Yes, I do.
 3   Q.   Well, in fact, you had the right at any time to resign per
 4   the contract, didn't you?
 5   A.   I didn't know that.
 6   Q.   You had the right -- well, you signed the contract,
 7   correct, ma'am?
 8   A.   Yes.
 9   Q.   Okay.  And you see here that the agreement may be
10   terminated by the practitioner at any time upon the giving of
11   as much as -- notice as is practicable to the medical group,
12   and in any event a minimum of 120 days written notice.
13        So fair to say that at all times during your one-year
14   notice period you could have resigned with 120 days notice,
15   correct?
16   A.   Yes.
17   Q.   You didn't need Dr. Rosen to ask you whether or not you
18   wanted to resign, did you?
19   A.   I did not.
20   Q.   And you actually chose not to resign, right?
21   A.   Don't agree.
22   Q.   I'm sorry.
23   A.   I do not agree.
24   Q.   So you did resign?
25   A.   It's not a question of I -- I didn't think about that I
```

1    can ask him.

2    Q.    Okay.  Dr. Desai, you would agree with me that the

3    chest -- the field of chest radiology has evolved significantly

4    in the last 20 years, right?

5    A.    To a certain extent.

6    Q.    Only to a certain extent?

7    A.    Yeah, basically the chest is the same.  The CT same,

8    but the -- it looks -- it is more.

9    Q.    Do you recall during this case being subject to a

10   deposition?

11   A.    Yes.

12   Q.    Do you recall I'm the attorney who deposed you?

13   A.    I think you were too.

14   Q.    Right, but I was asking you questions, correct, at the

15   deposition?

16   A.    Yes.

17   Q.    And at that deposition, you were represented by counsel,

18   correct?

19   A.    Yes.

20   Q.    And you were sworn in to tell the truth?

21   A.    Yes.

22   Q.    And you told the truth, correct?

23   A.    Yes.

24   Q.    I'm going to show you a tran- -- an excerpt from your

25   deposition.  Page 60, counsel.  And it's Exhibit 26 of yours.

1          MR. KOLMAN:  Thanks.

2   BY MR. KILROY:

3   Q.   I'm going to read my question and your answer.  Page 60,

4   lines 21 to 23.  And I'll ask you if I read that correctly.

5          Would you say that the field of chest radiology has

6   evolved over the past 20 years?

7          Answer:  Yes.

8          Did I read that correctly?

9   A.   Yes.

10  Q.   In fact, you would agree that the field of chest radiology

11  has evolved significantly over the past five years prior to

12  your employment termination, right?

13  A.   Yes.

14  Q.   Given the significant evolution in the field of chest

15  radiology, your profession, you'd agree it's important for a

16  chest radiologist to keep pace with the evolving advances in

17  the field, right?

18  A.   Yes.

19  Q.   And one way to keep pace with the advances in the field is

20  to actively participate in continuing medical education

21  specific to chest radiology, right?

22  A.   Yes.

23  Q.   Another way to keep pace with the advances is to actively

24  be involved in research and writing within the field of chest

25  radiology, correct?

1    A.    I was not on the research side, so.

2    Q.    No, I understand that, but would you agree with me that

3    that's another way to keep pace with the evolution of chest

4    radiology is to be involved in research and writing specific to

5    your field?

6    A.    If somebody wants to do that, yes.

7    Q.    And another way to keep pace would be to actively

8    participate on committees focused on advances in the field

9    within well-known radiological societies, right?

10   A.    Yes.

11   Q.    Do you agree that keeping pace with advances in the field

12   of chest radiology is important to provide safe patient care?

13   A.    Please repeat the question.

14   Q.    Sure.  Do you agree that keeping pace with advances in

15   your field of chest radiology is important to being able to

16   provide safe patient care?

17   A.    I did.  I did attend conferences, and I did provide the

18   quality care.

19   Q.    Okay.  Could you answer my question, please.  My question

20   is just do you agree that keeping pace is important to provide

21   safe patient care?

22   A.    Yes.

23   Q.    And would you agree that UMass Memorial, as a level 1

24   trauma center and an academic medical center, attracts more

25   complex patients than, for instance, a community hospital?

```
 1              MR. KOLMAN:  Objection.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Yes.

 4              MR. KILROY:  May I have the document camera just for

 5       the witness, please.

 6       BY MR. KILROY:

 7       Q.   Dr. Desai, I'm showing you a document.  It's Exhibit 270

 8       for identification.

 9            Do you recognize that document?

10       A.   Yes.

11       Q.   Okay.  And can you tell the jury what that document is?

12       A.   It's my CV.

13       Q.   And you drafted that document, correct?

14       A.   Yes.

15       Q.   And this CV that I'm showing you, and I'll go to the

16       bottom of the document where it has a Bates stamp CD42.

17              This is a document that was produced by your counsel

18       during this discovery, correct?

19       A.   Yes.

20       Q.   And this is the CV that you were using when you were

21       applying for jobs after your termination from UMass Memorial,

22       correct?

23       A.   But there are two.  There are pages missing here that I

24       have attended at the conference after what it says here.  But

25       you can't see -- can't see for the two, so.
```

 1  Q.   Ma'am, can you answer my question, please?

 2  A.   Yes.

 3  Q.   Is this the CV that you were using when you were applying

 4  for employment after your termination from employment by UMass

 5  Memorial?

 6  A.   Including the pages which are missing.

 7  Q.   Well, fair to say you never produced the page that was

 8  missing, correct?

 9  A.   We did.  We did.  Afterwards, when we realized.  So it's

10  my counsel didn't send last two page.

11        MR. KILROY:  Your Honor, may we be heard?

12        (Sidebar as follows:)

13        THE COURT:  Go ahead.

14        MR. KILROY:  Your Honor -- your Honor, on that --

15        THE COURT:  Whisper.

16        MR. KILROY:  Sorry.  On that point, there was never

17  another page produced, and I don't know if we need a limiting

18  instruction or how you would typically handle that, but I don't

19  think my counsel is going to disagree there was no other page

20  produced.

21        MR. KOLMAN:  I'm not certain, Judge, for what purpose

22  this is being given to the witness.  Is he saying that there

23  was only one page of the résumé?  I'm not sure exactly what he

24  is saying.

25        THE COURT:  Well, what -- I -- I'm not sure either.

1          Where are you going with this, Mr. Kilroy?

2          MR. KILROY:  Your Honor, I may have misinterpreted her

3     statement.  When she said another page, it's a multi-page

4     document.  So I will go ahead and fix that.

5          MR. KOLMAN:  Yeah, I think -- I think she -- I think

6     when you presented it, it was one page.  She's referring to all

7     the pages.  I think that's the error here.

8          THE COURT:  So if -- if Mr. Kilroy is correct that

9     there were multiple pages, but only one was produced, how

10    should we handle that?

11         MR. KOLMAN:  Your Honor, we have, I believe, the full

12    résumé, and I did not know --

13         THE COURT:  I understand that.  But if was not

14    delivered, how would you have me address it?

15         MR. KOLMAN:  Judge, I'm not sure in the sense

16    that -- first of all, of course, I was not counsel, and I am

17    now.  I'm -- I'm happy to permit Mr. Kilroy to show her the

18    entire document, and I believe it might -- I think we have it.

19    I think -- and if we do have it as one of our exhibits, so I'm

20    happy to have him use our exhibit.  I think it's number one or

21    number two on our list.

22         MR. KILROY:  Your Honor, I think it's my confusion.  I

23    can show her all the pages I have.  I thought she was adding a

24    page that was never produced.  I can show her all the pages.

25         THE COURT:  All right.  Please clean that up.

1          MR. KILROY:  Thank you, your Honor.

2          (The Court conferred with the clerk.)

3          THE COURT:  Do we have an extra -- do we have an extra

4     one of these for these guys?

5          MR. COMENZO:  Thank you very much, your Honor.

6          THE COURT:  You get two.

7          MR. JOHNSON:  Okay.  He's going to get you a set.

8          THE COURT:  Yeah, we don't want this to look like a

9     program date.

10          (Laughter.)

11          THE COURT:  I'm sorry.  I didn't realize you didn't

12     have one.

13          MR. JOHNSON:  Oh, no, that's fine.  Thank you.

14          THE COURT:  Go ahead --

15          MR. KILROY:  Thank you, your Honor.

16          THE COURT:  Mr. Kilroy.

17     BY MR. KILROY:

18     Q.   Dr. Desai, I believe that was my confusion, and I

19     apologize for confusing you on my questions.  I'll show you the

20     second page of your CV.

21          Is that what you were referring to that there was

22     another page?

23     A.   No, more conference.  It is starting the last page.  There

24     should be more conference.  I attended two conference in April.

25     Q.   I'll show you the third page.  And then I'll show you the

 1  last page of the document that was your CV that was produced.

 2       There we go.  Now, you recognize that document as your CV,

 3  correct?

 4  A.   I do.  But it's correct, the conference, there is -- there

 5  are two I attended in -- in 2018.

 6            MR. KILROY:  Your Honor, that's the issue.

 7            THE COURT:  Okay.  Hold up.  Let's plug in.

 8            (Sidebar as follows:)

 9            MR. KILROY:  Essentially she's testifying that there's

10  more to her CV that was never produced.

11            MR. KOLMAN:  Your Honor, what she's actually

12  testifying to is that this CV does not actually reflect

13  everything that she did since.

14            THE COURT:  Hold up.  Hold up.  Was it produced or not

15  produced?

16            MR. KOLMAN:  There is nothing more that was produced

17  here except this résumé, nothing else.

18            THE COURT:  Is that CV accurate or inaccurate?

19            MR. KOLMAN:  The CV is accurate up to a point, and I

20  think Dr. Desai is trying to say that there's more to it, but

21  of course linguistics are having an issue here.

22            THE COURT:  Well, either that or it wasn't produced.

23            MR. KOLMAN:  Your Honor, there is nothing else, and it

24  wasn't produced because it doesn't exist.

25            THE COURT:  Then I'm going to let Mr. Kilroy ask her

1    about whether it was produced and -- not whether it was

2    produced, but where is it and why wasn't -- didn't she clean it

3    up.

4              MR. KOLMAN:  I think that there's just a

5    misunderstanding in language, that's all.

6              (End of sidebar.)

7              MR. KILROY:  May I inquire, your Honor?

8    BY MR. KILROY:

9    Q.   Dr. Desai, you've indicated that there's more to your CV

10   that wasn't produced.

11             Do you know why it was never produced?

12   A.   I didn't realize that my counsel did not send all the

13   papers, so.

14   Q.   But in any event, the CV that was produced is the one that

15   you actually were seeking employment with, correct?

16   A.   No.  I had the other two conference on the CV when I -- I

17   realized that I sent it -- there are two other -- there's

18   nothing much changed, but there are two other conference.

19   Q.   And which employers did you actually send this updated CV

20   to?

21             None, right?

22   A.   Why are you saying that?  I don't know.

23   Q.   Yeah, because you didn't send an updated CV to any

24   employers, did you?

25   A.   No, we sent you a month and a half ago.  There was an

1    opening at Tufts, and I did send it.

2    Q.   A month and a half ago, you sent an updated CV to an

3    employer?

4    A.   Update is only two conferences, okay.  There is --

5    otherwise, everything is the same.

6    Q.   Right.  So from March of 2018 to September, October of

7    2022, you used the CV that didn't have your updates on it?

8    A.   No, I did use the correct CV.  Please.

9         MR. KILROY:  Your Honor, I would offer this into

10   evidence.

11        THE COURT:  Any objection?

12        MR. KOLMAN:  No, your Honor.

13        THE COURT:  Does it have a number?

14        MR. KILROY:  It's Exhibit 270, your Honor.

15        THE COURT:  So marked.

16        (Exhibit No. 270 was admitted into evidence.)

17        MR. KILROY:  And may I publish it, please?

18        THE COURT:  It may be published.

19   BY MR. KILROY:

20   Q.   Dr. Desai, I'm going to direct your attention to -- toward

21   the bottom of your first page of the CV.  The only fellowship

22   training you list on your CV where you're trying to get a job

23   is something that occurred over 40 years ago, correct?

24   A.   That's when I got thing, and that was at UMass.

25   Q.   And that was not specifically to chest radiology, was it?

1    A.    No, when it is body computography, it includes top to

2    bottom, including the head, the chest, the abdomen.  See, it's

3    the whole body, it is not specialized for chest.

4    Q.    I'll show you a second page of your CV.  And you see you

5    list your positions there.

6              Do you see those?

7    A.    Yes.

8    Q.    You didn't update your CV when you were applying for jobs,

9    did you, with respect to your positions?  Correct?

10   A.    I don't remember.

11   Q.    Well, you falsely list you're still an attending

12   radiologist for Clinton Hospital and Marlborough Hospital,

13   correct?

14   A.    That is nothing falsely.  I'm terminated, so there is

15   nothing to lie about that.

16   Q.    Well, ma'am, you said -- you said --

17   A.    Yeah, I agree, but I don't remember whether it is

18   corrected or not, okay.

19   Q.    But you understand employers are going to look at where it

20   says to the present and think you're still employed by Clinton

21   and Marlborough as an attending physician, correct?

22   A.    Yeah, but some of the résumés I sent was in the year I was

23   still employed, too.

24   Q.    You're claiming you were -- you sent this out during the

25   one-year notice period?

1    A.    Some of them.

2    Q.    Well, ma'am, you testified at deposition.  You know that's

3    not accurate, correct?

4    A.    That --

5    Q.    You didn't apply for any job for 15 months.  So the entire

6    notice period, you didn't apply for a job.

7          Do you remember that?

8    A.    Yes.

9    Q.    So you didn't send this out during the notice period, did

10   you?

11   A.    Yes.

12   Q.    Yes, you didn't, correct?

13   A.    Yes.

14   Q.    Okay.  And you also falsely list that you're still an

15   associate professor.

16         That's not true, is it?

17   A.    Where?  Where would that?

18   Q.    I'm sorry.  Under professional appointments, 1992 to the

19   present, clinical associate professor and attending

20   radiologist.

21         That's false on your résumé also, right?

22   A.    Yes, because I was terminated.

23   Q.    And this is the résumé you had been expecting employers to

24   review when you're trying to get a job up until six weeks ago,

25   as you said, you just sent out this résumé?

1    A.    No, there were other ones.  I'm just saying the latest was

2    that, okay.

3    Q.    But you didn't make those changes on the latest one, did

4    you?

5    A.    I don't remember.

6    Q.    In terms of being active in societies dedicated to

7    radiology, your only listing in your résumé shows that you were

8    active 40 years ago, correct?  Do you remember that?

9    A.    Yes.

10   Q.    And that's the Radiological Society of North America where

11   you had a junior membership that ended in 1981, right?

12   A.    Yes.

13   Q.    You're aware, I assume, being a radiologist for the past

14   29 years or so that the Radiology Society of North America is

15   the largest radiology society in the world, correct?

16   A.    Yes.

17   Q.    They have somewhere between 40 and 60,000 members, right?

18   A.    Yes.

19   Q.    And you yourself have not attended any Radiology Society

20   of North America meetings at least since 1981; isn't that

21   right?

22   A.    Yes.

23   Q.    At the bottom of the third page of your résumé, you begin

24   to discuss learning experiences, correct?

25   A.    Say that again.

```
 1   Q.    Bottom of that page --

 2   A.    Yeah.

 3   Q.    -- you list your learning experiences, right?

 4   A.    Yes.

 5   Q.    And it goes on to the next page, and at least as your CV

 6   shows, you stopped all learning experiences in 2015, right?

 7   A.    No.

 8   Q.    Well, is there something on that CV that shows otherwise?

 9   A.    Here it does not, but I told you I attended.

10   Q.    And as of September 2020, you hadn't updated this résumé

11   when you were applying for jobs, right?

12   A.    I don't remember.

13   Q.    You don't remember?

14   A.    Like I said, I didn't -- otherwise, I don't know if I

15   corrected it or not.

16             THE COURT:  Dr. Desai, can you speak up, please.

17             THE WITNESS:  Sure.

18   BY MR. KILROY:

19   Q.    I'll try and refresh your recollection, Dr. Desai.  And

20   this is from your deposition, September of 2020.

21        MR. KILROY:  Just for the witness, please.

22   Q.    And I asked you the question -- counsel, it's page 53.

23             MR. KOLMAN:  Thank you.

24             MR. KILROY:  Line 16.

25   Q.    And you'll see at the top, conferences and certificates.
```

1          The last time you attended any conference was five

2   years ago in 2015, right?

3          And then you state, Yeah, I see that, but the thing,

4   you see, many time I go, and I did not update the CV.

5   Q.   So as of September of 2020, you hadn't updated your CV,

6   right?

7   A.   Yes.

8   Q.   And you admit that you didn't update it despite claiming

9   you were trying to find another job, right?

10  A.   Yeah, I overlooked certain part, yes.

11  Q.   Do you believe, Dr. Desai, given your testimony where you

12  agreed regarding the significant evolution of chest radiology,

13  that not listing continuing medical education after 2015 would

14  reflect favorably upon you regarding remaining current in the

15  field?

16  A.   Normally when you apply for the job they don't only look

17  at how many conference.  It is years of experience and all that

18  they look to.  And they speak to the previous employer what

19  they say.  Usually jobs are given that way, not just from the

20  paper.

21  Q.   Right.  So could you answer my question, please.

22  A.   Yes.  What is the question?

23  Q.   Sure.  It's given your testimony under oath here

24  concerning the significant advances in chest radiology,

25  particularly in the last five years, do you think that listing

1    no continuing medical education after 2015 reflects favorably

2    upon your commitment to remain current in your field?

3    A.    Like I said, I attended in 2018, too.  So there is -- main

4    thing is my experience of so many years.  It shouldn't matter

5    just attending the conference, there should be more factors

6    than that.

7    Q.    I'll try it one more time, Dr. Desai.  I'm just asking if

8    you agree whether or not the fact that you left blank from 2015

9    on when you're applying for jobs, do you think that reflects

10   favorably on your commitment to remain current in the field?

11   A.    Maybe.

12   Q.    Maybe?

13   A.    Yes.

14   Q.    Now, Dr. Rosen, as your chair, he actually offered to

15   consider -- consider for you any education or career

16   development opportunities you might be interested in, right?

17   A.    Not that I recall.

18   Q.    Okay.  I'm going to show you Exhibit 277 for

19   identification.

20         Do you recognize that document, ma'am?

21   A.    Yes.

22   Q.    And this is the 2012 to 2013 faculty annual performance

23   review of you, correct?

24   A.    Yes.

25         MR. KILROY:  I'd like to offer this into evidence,

1   please.

2             THE COURT:  What was the number?

3             MR. KILROY:  277, your Honor.

4             THE COURT:  Any objection?

5             MR. KOLMAN:  No.

6             THE COURT:  So marked.

7   (Exhibit No. 277 was admitted into evidence.)

8   BY MR. KILROY:

9   Q.   So in this performance review, I'm going to turn to the

10  fifth page where we have Dr. Rosen's supervisor comments.  And

11  I'll read to you -- well, first off, is that your signature?

12  A.   It is.

13  Q.   Okay.  So you received this evaluation, correct?

14  A.   Yes.

15  Q.   And he states to you, I have offered to consider any

16  education or career development opportunities that Dr. Desai

17  might be interested in, right?

18  A.   Yes.

19  Q.   And, Dr. Desai, you actually never requested any career

20  development or educational opportunities as offered by

21  Dr. Rosen, did you?

22  A.   No.

23            (Defendant counsel conferred.)

24  BY MR. KILROY:

25  Q.   With respect to any scholarship, that is research and

1  writing activities, all publications by you stopped over

2  20 years ago, correct?

3  A.   Yes.

4  Q.   Do you believe that the fact that you have not published

5  on any topic in your field in the last two decades reflects

6  favorably upon your applying for jobs?

7  A.   I do not know.

8  Q.   You don't know?

9  A.   Yeah, maybe, but I don't -- I don't think -- depending on

10  what kind of job.  If you're looking for -- every job unless it

11  is academic.  Like I said, I'm on a clinical track not on a

12  research track, so.

13  Q.   You're clinical?

14  A.   And I was never given academic time, too, to do all this.

15  My main focus was doing the clinical work and teaching the

16  residents.

17  Q.   I'm going to show you the next exhibit, Exhibit 274 for

18  identification, please.  274.

19      Do you -- do you recognize that document, Dr. Desai?

20  A.   Yes.

21  Q.   And this is your 2009 to 2010 faculty evaluation, correct?

22  A.   Yes.

23  Q.   And you understood that this evaluation was just in your

24  role as a faculty member of the medical school, right?

25  A.   Yes.

1          MR. KILROY:  Okay.  I'd like to offer this into

2     evidence, your Honor.

3               THE COURT:  What number?

4               MR. KILROY:  274.

5               THE COURT:  Say what?

6               MR. KILROY:  274, your Honor.

7               MR. KOLMAN:  No objection.

8               THE COURT:  So marked.

9     (Exhibit No. 274 was admitted into evidence.)

10    BY MR. KILROY:

11    Q.   Dr. Desai, I'm going to move to the second page of this

12    document.

13    A.   Okay.

14    Q.   And you'll see under Section III, research, creative and

15    scholarly activities.  You'd agree with me that you did not

16    list anything there, correct?

17    A.   Yes.

18    Q.   And likewise, under Section IV C, regional, national and

19    international committees and other service activities, you

20    listed nothing, correct?

21    A.   Yes.

22          MR. KILROY:  I'd like to show the witness 275 for

23    identification, please.

24    BY MR. KILROY:

25    Q.   Dr. Desai, do you recognize this document?

1    A.    Yes.

2    Q.    And this is your 2010 to 2011 faculty review, correct?

3    A.    Yes.

4          MR. KILROY:  I'd like to offer this into evidence,

5    your Honor, as Exhibit 275.

6          THE COURT:  So marked.

7    (Exhibit No. 275 was admitted into evidence.)

8    BY MR. KILROY:

9    Q.    And, Dr. Desai I'm going to show you the second page of

10   this one as well.  This is another year where you show no

11   research, creative or scholarly activities at all, correct?

12   A.    Yes.

13   Q.    And another year, Section IV C, you've had no external

14   service activities for regional, national, or international

15   committees or any professional organizations, right?

16   A.    Yes.

17   Q.    And Section VI E, describing efforts to improve quality

18   and safety of patient care, you didn't include anything, did

19   you?

20   A.    No.

21   Q.    But you did include for professional development that you

22   had attended a course at Harvard in March of 2011, right?

23   A.    Yes.

24   Q.    So you knew enough to include professional development

25   courses if you took them, right?

1    A.    Yes.

2          MR. KILROY:  I'd like to show the witness 276 for

3    identification, please.

4    BY MR. KILROY:

5    Q.    Dr. Desai, do you recognize that document?

6    A.    Yes.

7    Q.    This is your 2011 to 2012 faculty review, correct?

8    A.    Yes.

9          MR. KILROY:  I'd like to offer this into evidence,

10   your Honor, 276, please.

11         THE COURT:  So marked.

12   (Exhibit No. 276 was admitted into evidence.)

13   BY MR. KILROY:

14   Q.    If we look at the third page, Dr. Desai -- the second

15   page, I'm sorry.  Section III.  This is the third year in the

16   row no research, creative or scholarly activities, right?

17   A.    Yeah, I already told you I was not on research side.

18   Q.    And third year in a row you have absolutely zero

19   professional service for regional, national or international

20   committees or professional organizations, right?

21   A.    Yes.

22   Q.    And yet another year where you've listed nothing by way of

23   efforts to improve quality or safety of patient care, correct?

24   A.    Yes.

25   Q.    And in professional development, you had none that year,

1    right?

2    A.   Yes.

3         MR. KILROY:  I'd like to show the witness 277 for

4    identification, please.

5         THE COURT:  I've got 277 as --

6         MR. KILROY:  Oh, it's already in.

7         THE COURT:  -- 12 and 13; is that correct?

8         MR. COMENZO:  That's what I have.

9         MR. KILROY:  That's correct, your Honor.  So it's in.

10        Thank you, your Honor.  I show the witness 277.

11   BY MR. KILROY:

12   Q.   This is your faculty review for 2012-2013, correct?

13   A.   Yes.

14   Q.   And if we look at Section III, we're now at the fourth

15   year, no research, creative or scholarly activities, right?

16   A.   Yes.

17   Q.   Another year with no professional service of any kind,

18   correct?

19   A.   Yes.

20   Q.   Another year where you show no effort with respect to

21   improving quality or safety of patient care, correct?

22   A.   Yes.

23   Q.   And another year where you've listed nothing by way of

24   your own professional development, right?

25   A.   Yes.

```
 1              MR. KILROY:  For identification 278, please.  Exhibit
 2      278.
 3      BY MR. KILROY:
 4      Q.    Did do you recognize that document, Dr. Desai?
 5      A.    Yes.
 6      Q.    There is your 2013 to 2014 faculty annual performance
 7      review, correct?
 8      A.    Yes.
 9              MR. KILROY:  I'd like to offer this into evidence,
10      please, your Honor.
11              THE COURT:  So marked.
12      (Exhibit No. 278 was admitted into evidence.)
13      BY MR. KILROY:
14      Q.    If we look at Section VI E, we're yet in another year
15      without improving quality or safety of patient care, right?
16      A.    Yes.
17      Q.    And no activity on your part for your own professional
18      development, right?
19      A.    Yes.
20      Q.    Now -- and this year your chair notes they discussed
21      options for you to be granted academic time, right?
22              Do you see that?
23      A.    Yes.
24      Q.    Okay.  And you recall Dr. Rosen actually talked to you
25      about the fact that you could be granted academic time, right?
```

1    A.    Yes.

2    Q.    And you'll recall that when he spoke with you, he made

3    clear that at that time you didn't meet the requirements to be

4    granted academic time under the policy, did you?

5    A.    I -- I checked the policy and policy says the clinical

6    work, teaching the resident, and I was a committee member of

7    a -- of quality and for my patient safety, so actually I do

8    meet three criteria.

9    Q.    I just ask you to listen to my question, please.

10          My question was:  Did Dr. Rosen at that time tell you

11   you didn't meet the requirements under the policy?

12   A.    Yeah, he did, but like I said there are three criteria

13   which I fit.

14   Q.    And he noted to you that he couldn't modify the policy for

15   you specifically on an individual basis; isn't that right?

16   A.    He didn't have to qualify -- modify anything because I

17   meet the criteria of clinical work, teaching the resident

18   medical student and --

19   Q.    Your testimony is that the --

20   A.    That's what the policy says.  The policy says.

21   Q.    I haven't completed my question, ma'am.

22   A.    Okay.

23   Q.    Your testimony is that teaching at the view box that

24   that's academic time?

25   A.    Teaching at the view box, a lot more than giving

1    once-a-month conference.  I do four to five times a week.

2    Q.    I'm just asking you is that your --

3    A.    Yeah --

4    Q.    -- testimony that --

5    A.    -- because it doesn't specify it's only lectures in the

6    policy.

7    Q.    And who -- who wrote the policy; do you know?

8    A.    Probably department.

9    Q.    Are you aware of anyone being granted academic time just

10   for teaching at the view box?  Just for teaching at the view

11   box, ma'am?

12   A.    I do not know.

13   Q.    Yeah.  And the reality is, Dr. Desai, you were asking for

14   academic time without having to perform academic research or

15   writing, right?

16   A.    I told you research and writing, I was not on that track.

17   I was on the clinical side.

18   Q.    Right, but I'm just -- my question is:  You were asking

19   for academic time without having to perform research or

20   writing; isn't that true?

21   A.    Yes.

22   Q.    And, Dr. Rosen, during several meetings with you over time

23   discussed this very issue of academic time, didn't he?

24   A.    Yes.

25   Q.    And he specifically told you you could submit a proposal

1    to him in writing for how you wanted to use any academic days

2    that you were proposing, didn't he?

3    A.   Yes, but I would like to tell you that how many attending

4    in the department has a proposal.

5    Q.   And, ma'am, when your chair invited you to submit a

6    written proposal, you never did, did you?

7    A.   I did not.

8    Q.   Do you think it would have been helpful for Dr. Rosen to

9    understand what your proposal was for academic time for him to

10   evaluate whether or not you were entitled to it?

11   A.   Yes.

12   Q.   And you -- you chose not to afford him that right to see

13   what you were going to propose, right?

14   A.   Please repeat the question.

15   Q.   I'll withdraw the question.

16        Now, you were not seeking an exception to the policy

17   for academic time where you wouldn't have to perform academic

18   research and writing based on your age, were you?

19   A.   Academic time has no relation with the age.

20   Q.   No relationship to the age, okay.

21   A.   But --

22   Q.   You've answered the question, ma'am.

23   A.   Yeah.

24   Q.   In -- in fairness, Dr. Desai, you wanted to be granted

25   academic time because you wanted days off where you didn't have

1    to work while getting paid; isn't that true?

2    A.   I wanted academic time when I was working 12 days in a row

3    to have no responsibility for clinical work that day, and I

4    only asked for 12 days per year, and everybody in the

5    department gets once a week starting from the date they start

6    to work, come on the job.

7         MR. KILROY:  Your Honor, may I offer into evidence

8    sworn testimony from Dr. Desai.  It's page 112 of her

9    deposition tran --

10        THE COURT:  Show -- show your brother, please.

11        MR. KOLMAN:  It's 112.

12        (Counsel conferred.)

13        MR. KOLMAN:  Okay.  That's fine.

14   BY MR. KILROY:

15   Q.   Dr. Desai, I'm going to show you your testimony under

16   oath.  Page 112, lines 12 to 14.  I'll ask you if I read your

17   testimony correctly.

18        Question:  What were you going to do with your academic

19   time?

20        Answer:  Take a break so I can recuperate for the next

21   day.

22   A.   Yes.

23        MR. KILROY:  I offer that into evidence, your Honor.

24   I believe it's an excerpt from Exhibit 26.

25        THE COURT:  Does it have a number?

1          MR. KILROY:  It's an excerpt from Exhibit 26, your
2   Honor.
3          THE COURT:  So we'll make it 26-1, how's that?
4          MR. KILROY:  Thank you, your Honor.
5          THE COURT:  And then I'm going to need you to redact
6   it, show your brother, and then make sure Mr. Castles, most
7   importantly, is on board with it.
8          So that's 26-1.  Thank you.
9          MR. KILROY:  Thank you, your Honor.
10  (Exhibit No. 26-1 was admitted into evidence.)
11  BY MR. KILROY:
12  Q.   Dr. Desai, as you sit here under oath, you can't identify
13  a single radiologist who worked for Dr. Rosen who did not
14  perform scholarly activity or research activity, just like you,
15  no research, no writing, but who was nonetheless granted
16  academic time, can you?
17  A.   Please repeat the question.  I didn't quite -- the name of
18  the person.
19  Q.   You can't identify anyone who worked for Dr. Rosen, who
20  received academic time, who did not perform research or
21  writing, correct?
22  A.   There are a lot of physicians, but -- see, like, Dr. Maria
23  Barile, she started the job, and she has it from day -- first
24  week academic time.
25  Q.   Can you tell me --

```
 1   A.   But I don't understand that they already produced the
 2   papers or something in that one week, or they already give the
 3   proposal.
 4            THE COURT:  So, Doctor -- Doctor, Mr. Kolman will
 5   follow up and --
 6            THE WITNESS:  Okay, fine.
 7            THE COURT:  -- ask you to clarify.
 8            THE WITNESS:  Okay.
 9            THE COURT:  But what I'm going to ask you to do --
10            THE WITNESS:  Answer the question, okay.
11            THE COURT:  Just -- just -- just let me finish,
12   please.  So what I'm going to ask you to do is wait until
13   Mr. Kilroy finishes his answer, and then answer the question in
14   the form that it's asked; and if you can't answer it in that
15   form, please say so.
16            THE WITNESS:  Okay.
17            THE COURT:  You can't ask him questions.  That's just
18   not the way it works.
19            THE WITNESS:  Fine.  Fine.
20            THE COURT:  All right.  Mr. Kilroy, please.
21            THE WITNESS:  Sorry about that.
22            MR. KILROY:  Thank you, your Honor.
23   BY MR. KILROY:
24   Q.   Dr. Maria -- Marie Barile, you don't know what she was
25   doing for academic research and writing, do you?
```

1  A.   I don't.

2  Q.   So the answer to my question then is you can't identify

3  anyone who worked for Dr. Rosen who was granted academic time

4  who didn't perform research and writing, right?

5  A.   No, I don't know.

6  Q.   And actually you were seeking academic time based on your

7  statement that you wanted to be grandfathered in based on your

8  years of service, right?

9  A.   Yes, because when I started the job I --

10 Q.   You've answered the question, ma'am.

11 A.   Yes.

12 Q.   And you can't identify any radiologist who Dr. Rosen

13 granted academic time to based on seniority, can you?

14 A.   Yes.

15 Q.   Meaning you can't identify anyone, correct?

16 A.   It's because I don't know what other people do.  I don't

17 keep tab of them, what -- who did what.  It's not my job.

18 Q.   You wanted to use your seniority and your age to get a

19 benefit that no other radiologist received; isn't that true?

20 A.   Yes.

21        MR. KILROY:  279, please.

22 BY MR. KILROY:

23 Q.   I'm going to show you Exhibit 279 for identification.

24        Do you recognize that document?

25 A.   Yes.

1    Q.   This is your 2014 to '15 faculty evaluation, correct?

2    A.   Yes.

3    Q.   And if we skip ahead on it to Section VI E, we have yet

4    another year where you're not engaging in efforts to improve

5    quality or safety of patient care, right?

6    A.   Yes.

7    Q.   And another year, no professional development activities,

8    correct?

9    A.   Yes.

10            (Defendant counsel conferred.)

11            MR. KILROY:  I apologize, your Honor, I didn't move it

12   into evidence.

13            I move 279 into evidence.

14            THE COURT:  And that's '14 and '15?  So marked.

15   (Exhibit No. 279 was admitted into evidence.)

16            MR. KILROY:  Thank you, your Honor.

17   BY MR. KILROY:

18   Q.   I'm going to show you Exhibit 280 for identification.

19       Dr. Desai, this is -- you recognize this document,

20   correct?

21   A.   Yes.

22   Q.   This is your annual faculty report for 2015 to 2016,

23   correct?

24   A.   Yes.

25            MR. KILROY:  I'd like to move this into evidence,

1    please.  Exhibit 280.

2            THE COURT:  So marked.

3    (Exhibit No. 280 was admitted into evidence.)

4    BY MR. KILROY:

5    Q.   And if we jump ahead --

6            THE COURT:  So that's what, '16, '17?

7            MR. KILROY:  This is '15 to '16, your Honor.

8            THE COURT:  Oh, sorry.  Thank you.

9    BY MR. KILROY:

10   Q.   Yet another year, no efforts to improve quality or safety

11   of patient care, correct?

12   A.   Yes.

13   Q.   And again no efforts on your part for professional

14   development?

15   A.   Yes.

16           MR. KILROY:  281.  Your Honor, this is in evidence

17   already.

18   BY MR. KILROY:

19   Q.   I'm going to show you what's Exhibit 281.

20   A.   Uh-huh.

21   Q.   This is your 2016 to '17 annual faculty review, correct?

22   A.   Yes.

23   Q.   And yet another year, no efforts to improve quality or

24   safety of patient care, right?

25   A.   Yes.

1    Q.   And you've done nothing by way of professional development

2    for another year, right?

3    A.   Yes.

4    Q.   And yet it's another year where the topic comes up between

5    you and Dr. Rosen where you continue to request allocation of

6    academic time, and you continue to demand to be let out of call

7    responsibilities, right?

8    A.   Yes.

9    Q.   And he makes clear to you that we've previously discussed

10   this with both you and representatives from the HR department,

11   right?

12   A.   Yes.

13   Q.   And he had made clear to you that you weren't entitled to

14   academic time, right?

15   A.   Yes.

16   Q.   And he also made clear to you that as a patient safety

17   concern, he needed you to take your fair share of call; isn't

18   that right?

19   A.   I always did personal call, yes.

20        MR. KILROY:  282, Exhibit 282 for identification,

21   please.

22   BY MR. KILROY:

23   Q.   Dr. Desai, do you recognize this as your 2017 to 2018 --

24   A.   Yes.

25   Q.   -- faculty annual review?

```
 1              MR. KILROY:  May I offer this into evidence, please,
 2     282.
 3              THE COURT:  So marked.
 4     (Exhibit No. 282 was admitted into evidence.)
 5     BY MR. KILROY:
 6     Q.   Dr. Desai, as we've done in the past, I'll move forward in
 7     the document.  Another year with no efforts on improving
 8     quality, safety, efficacy of patient care, right?
 9     A.   Yes.
10     Q.   And another year you've been silent on professional
11     development, correct?
12     A.   Yes.
13     Q.   And Dr. Rosen's summary comments this year, fair to say he
14     notes that a resident had raised concerns that you were relying
15     on them to interpret the more sophisticated vascular studies,
16     right?
17     A.   I would like to see the case who I read tried with on.
18     Q.   I'm sorry.  I didn't understand.
19     A.   I would like to see the case who I read with on, but if it
20     is, yes.
21              THE COURT:  All right.  Let's take the second break
22     here.
23              Ladies and gentlemen, a couple things.  Just FYI.
24     FYI, all of the documents that you've been seeing and the
25     lawyers have been throwing around all over the place, when you
```

```
 1   retire to deliberate, the screen in there that you have is
 2   called JERS.  It means Jury Evidence Retrieval System.  You're
 3   going to be able to call up each one of those documents in
 4   combination or alone or side by side, enlarge, highlight, do
 5   whatever you want.  So I appreciate we're throwing a lot of
 6   stuff at you, but it's all things that you're going to be able
 7   to call up when you are deliberating.  So that's the first
 8   thing.
 9        The second thing is this, and it's only a suggestion,
10   and I need you to talk about it right now and let me know when
11   we form up again.  If you all wanted to go until three o'clock
12   tomorrow, we would buy you lunch as a reward for putting up
13   with us all week.
14        So -- and again, we understand that we have asked you
15   to come in until one o'clock until the case is finally given to
16   you, but if your schedules allow that and that's what you want
17   to do, we'll do it.  If not we'll just go to your regular
18   schedule.
19        Okay.  See you in a bit.
20        THE CLERK:  All rise.
21        (At 12:01 p.m., the jury left the courtroom.)
22        THE COURT:  How much longer?
23        MR. KILROY:  I would guess an hour and a half, your
24   Honor, thereabouts.
25        THE COURT:  All right.  Thank you.
```

 1          MR. KOLMAN:  Your Honor, if I may.  So my experts are

 2     coming in Monday, Tuesday, and just -- and I've spoken to

 3     Mr. Kilroy about this.  His first witness should be ready to go

 4     after.

 5          THE COURT:  Mr. Kolman, I'm old, speak up.

 6          MR. KOLMAN:  I'm sorry, your Honor --

 7          THE COURT:  You can step down, Doctor.  Doctor, you

 8     can -- be seated everybody else.

 9          MR. KOLMAN:  I spoke to Mr. Kilroy, and I gave him a

10     heads up that it's likely that I would finish or that Dr. Desai

11     would be finished before the end of the week.  My experts are

12     coming in Monday or Tuesday.

13          THE COURT:  So do we -- I presume you have somebody?

14          MR. KILROY:  I have two witnesses, your Honor, but

15     they're two fact witnesses.  My guess is I'll spend about a

16     half hour with each of them, and then our witnesses who have to

17     travel out-of-state are scheduled to come in one on Sunday, one

18     on Tuesday.  So I won't have anyone other than our two fact

19     witnesses tomorrow.  And then actually I don't anticipate

20     anyone other than my experts coming in or one expert and one --

21     Diana Litmanovich.

22          MR. KOLMAN:  I may have questions for these witnesses,

23     but I don't know who they are, your Honor.

24          MR. KILROY:  Well, I can tell you.  It's Mona

25     Korgaonkar.

```
 1              MR. KOLMAN:  I'm sorry.  Who?

 2              MR. KILROY:  Dr. Korgaonkar and Mowlood, Randa

 3     Mowlood.

 4              THE COURT:  Okay.  So I just would like to at least

 5     buy these guys lunch so -- and -- and not have -- more

 6     importantly, not have dead time.  So if you guys have fact

 7     witnesses that you can get here, get them here.

 8              MR. COMENZO:  Will do, your Honor.

 9              THE COURT:  All right.  See you in a couple.

10              (Recess from 12:03 p.m. until 12:18 p.m.)

11              THE CLERK:  All rise.

12              (At 12:18 p.m., the jury entered the courtroom.)

13              THE CLERK:  Court is now open.  You may be seated.

14              THE COURT:  What did you all decide?

15              JURORS IN UNISON:  Yes.

16              THE COURT:  Yes to lunch?

17              JURORS IN UNISON:  Yes.

18              THE COURT:  I love you guys.  All right.  Good.

19              JUROR:  Do we get to choose?

20              THE COURT:  I think -- Marty, do we have -- is this

21     the place where we get the menu?

22              THE CLERK:  No.

23              THE COURT:  I think it is, right.  Is this the one we

24     use, Theater?

25              THE CLERK:  I think they bring, like, just a platter.
```

```
 1              THE COURT:  Oh, I think it's a platter.  Yeah, I was
 2    just going to say, by this time Friday, by this time tomorrow
 3    you're going to be going, Is this it?
 4              All right.  Go ahead, Mr. Kilroy.
 5              MR. KILROY:  Thank you, your Honor.
 6    BY MR. KILROY:
 7    Q.   Dr. Desai, you agree that Dr. Rosen, as the chair of
 8    radiology, had an obligation to ensure patient safety for the
 9    patients served at UMass Memorial Hospital, right?
10    A.   Yes.
11    Q.   And you'd agree that Dr. Rosen, as chair of radiology, had
12    an obligation to ensure patient safety in general?
13    A.   Yes.
14    Q.   And as part of that he had an obligation to ensure the
15    quality of the radiological reads by the radiologists within
16    the department, right?
17    A.   Yes.
18    Q.   And that would include you, right?
19    A.   Yes.
20    Q.   And you'd agree, as part of his job duties as chair, he
21    has to make decisions in his role regarding the quality of the
22    radiologists who work within his department, right?
23    A.   Yes.
24    Q.   And, in fact, you believe or you would agree that
25    Dr. Rosen, as chair and as part of his job duties, should, in
```

```
 1   fact, take action if he believes a radiologist's quality is
 2   substandard, right?
 3   A.   In my case, I don't agree with that.
 4   Q.   Right.  I didn't ask you that question though.  I'm just
 5   asking in general.  Dr. Rosen, as the chair of radiology,
 6   if -- if he believes that a radiologist who works for him
 7   quality is substandard, you agree he should take action on that
 8   belief, right?
 9   A.   Yes.
10   Q.   And you would agree that his decision to do a qualitative
11   assurance analysis of your chest CTs falls within his role as
12   the chair of the department, right?
13   A.   Yes, if it is done the right way.
14   Q.   And with respect to his decision whereby he restricted you
15   from performing CT scans, you understood he made that decision
16   based on determining that your work with respect to CT scans
17   was of poor quality, right?
18   A.   It is his -- his decision, but I don't agree.
19   Q.   Right.  But you understood that's what --
20   A.   Yes.
21   Q.   -- how he made his decision?
22   A.   Yes.
23   Q.   You understood he believed, based on the analysis, that
24   your work was of poor quality, correct?
25   A.   According to him.
```

1          MR. KILROY:  Counsel, page 237 of the deposition.

2     It's page 237, lines 19 to 22.

3          Your Honor, I would like to offer into evidence, I

4     believe now it would be Exhibit 26-2, an excerpt from

5     Dr. Desai's under-oath deposition.

6          THE COURT:  So marked.

7     (Exhibit No. 26-2 was admitted into evidence.)

8          MR. KILROY:  And could I have it published to the

9     jury, please.

10         THE COURT:  You may.

11         MR. KILROY:  Thank you.

12    BY MR. KILROY:

13    Q.   Dr. Desai, you recall your deposition, correct?

14    A.   Yes.

15    Q.   And I asked you:  Are you claiming that the decision that

16    was made to restrict your privileges with respect to CT scans

17    was done because of your age?

18         And you stated:  No.

19         Correct?

20    A.   At the time, but after discovery papers, the

21    recommendation was there.  I don't agree because at that time I

22    didn't have all the information.

23    Q.   So you have your -- you're changing -- you're changing

24    your under-oath testimony?

25    A.   Because now at that time I didn't --

```
 1    Q.    Just yes or no?

 2    A.    I am changing --

 3    Q.    Okay.

 4    A.    -- because I have more informing from the discovery.

 5    Q.    Right.  And you remember at deposition you were -- you

 6    were represented by counsel at the deposition, weren't you?

 7    A.    I was.

 8    Q.    And your deposition -- your second day of deposition

 9    occurred in October of 2022.

10          Do you remember that?

11    A.    Yes.

12    Q.    Yes.  And you, while represented by counsel, had the

13    opportunity to correct your deposition testimony, didn't you?

14    A.    I cannot, because those 200,000 pages I didn't have all

15    that.  See, all -- all the papers you guys submitted, I did not

16    have.  So when I looked at it, it takes time to look at all

17    those papers.  So discrimination was my age, that's all I'm

18    saying.  CT scan has nothing to do with it.

19    Q.    There's no question pending right now, ma'am.  There is no

20    question.

21    A.    Okay.

22    Q.    I understand that I misspoke.  It was October of 2020, not

23    '22.

24          And I just want to make clear, you understood after

25    your deposition, you had the right to make changes to your
```

```
 1   transcript, didn't you?
 2   A.   Yes.
 3   Q.   And, in fact, you made a whole host of changes to your
 4   transcript, didn't you?
 5   A.   Yes.
 6   Q.   And you made those changes while represented by counsel?
 7   A.   Yes.
 8             MR. KILROY:  Exhibit for identification, please.
 9             (Defendant counsel conferred.)
10             MR. KILROY:  This would be 353, your Honor.
11             THE COURT:  And it's not in?
12             MR. KILROY:  It's not in, your Honor.
13   BY MR. KILROY:
14   Q.   Dr. Desai, I'm showing you a letter dated December 10,
15   2020, addressed to me from your counsel Brendan Sweeney.
16             Do you see that?
17   A.   Yes.
18   Q.   And in this letter it says, Enclosed please find a copy of
19   the signed deposition transcript errata sheet (with
20   corrections) from Dr. Charu Desai's deposition on October 22,
21   2020, correct?
22   A.   Yes.
23   Q.   And I go to the last page and it states, I have read the
24   foregoing transcript of my deposition and except for any
25   corrections or changes noted above, I hereby subscribe to the
```

1   transcript as an accurate record of the statements made by me.
2   Executed this 29th day of November, 2020.
3           And that's your signature, correct?
4   A.   Yes.
5   Q.   And you read your deposition before you made changes,
6   didn't you?
7   A.   Yes.
8   Q.   And just to remind you, the testimony we were looking at
9   was on page 237, lines 19 to 22.
10           Do you see that?
11   A.   Yeah.
12   Q.   Do you see anywhere in your errata sheet where you got to
13   make changes, page 237 listed?
14   A.   No, but I told you that I did not have all the information
15   at the time.
16   Q.   So you had been litigating the case for -- since the
17   summer of 2018, but you claimed you didn't have information to
18   know whether or not --
19   A.   No --
20   Q.   Excuse me.  You didn't have information to make a decision
21   whether or not you were facing discrimination based on age due
22   to the restriction of your privileges; that's your testimony?
23   A.   No.  I knew, but I did not have the proof at the time.
24   Q.   Well, ma'am, I didn't ask you for proof.  I said, Are you
25   claiming that the decision was made to restrict your privileges

1   with respect to CT scans because of your age?

2           Your answer was:  No.

3   A.   Yeah, at the time I told you.

4   Q.   So it's only when you have to come to court to testify at

5   trial that you would now claim age, right?

6   A.   Say it -- say it -- please repeat.

7   Q.   Sure.  So when you're under oath at deposition, two years

8   into the litigation, represented by counsel, and you're not

9   prepared for my question, and I ask you:  Are you claiming that

10  the decision that was made to restrict your privileges with

11  respect to CT scans was done because of your age, and you say

12  no, your answer only changes when you have to come to court to

13  testify because if you say -- if you keep no, it's going to

14  hurt your case, right?

15  A.   It's nothing to hurt.  I'm just telling you the truth,

16  that I realized afterwards when I went through 200 pages of the

17  paperworks which was submitted by UMass.

18  Q.   And what is it --

19  A.   And the email trail and all that, so then I realize it was

20  related to the age.

21          MR. KILROY:  Counsel, page 79.

22          MR. COMENZO:  Thank you.

23          MR. KILROY:  Your Honor, I'll be offering -- this will

24  be now 26-3, the substantive testimony of Dr. Desai.  It's

25  page 79 of her transcript, lines 4 through 13.

1    BY MR. KILROY:

2    Q.   Dr. Desai, I'm showing you another excerpt of your

3    deposition when you were under oath.

4         And it states:  So you've testified that Dr. Rosen had

5    an obligation to maintain patient safety, an obligation to

6    maintain quality, an obligation as part of his job duties to

7    take action if he believes a radiologist's quality is

8    substandard, and then he actually took action in the form of a

9    no-cause termination to you based on his assessment that your

10   quality was substandard; is that fair?

11        And you state, I believe that's what he did.

12        Right?  I read that correctly?

13   A.   Yeah.

14   Q.   So over two years after you were terminated from

15   employment --

16        MR. KILROY:  Your Honor, may I have this admitted?  I

17   don't know if I had asked.

18        THE COURT:  You may.

19   (Exhibit No. 26-3 was admitted into evidence.)

20   BY MR. KILROY:

21   Q.   Over two years from your termination from employment, you

22   admitted under oath in the presence of your counsel that your

23   employment was terminated because your quality was substandard,

24   right?

25   A.   But I do not agree.

1  Q.   Now, Dr. Desai, you'd agree that one way to assess quality

2  so there's no risk of being discriminatory is to ask for an

3  independent reviewer to look at the radiology records, right?

4  A.   Yes.

5  Q.   And you'd agree that by doing it that way, it shows

6  Dr. Rosen is trying to remove himself from being the one

7  assessing your quality directly so that he could have a

8  third-party reviewer make the assessment without knowing it was

9  you, right?

10 A.   If it is done the right way.

11 Q.   That's not my question, ma'am.  I'm going to ask you to

12 focus --

13 A.   Yes.

14 Q.   -- on my question.  Okay.

15        MR. KILROY:  Counsel, page 94.

16        Your Honor, I'm going to mark this as 26-4, excerpt

17 from Dr. Desai's deposition transcript, pages 94 through --

18 lines 10 through 14.

19        And can I have it admitted into evidence?

20            THE COURT:  So marked.

21 (Exhibit No. 26-4 was admitted into evidence.)

22        MR. KILROY:  Offered into evidence, your Honor.

23        THE COURT:  Uh-huh.

24        MR. KILROY:  Thank you.

25 BY MR. KILROY:

1    Q.    Dr. Desai, at deposition while under oath, I asked you

2    would you agree Dr. Rosen acted fairly, appropriately, by

3    relying on an independent expert's evaluation as opposed to him

4    making the evaluation himself?

5            You stated:  I agree.

6            Correct?

7    A.    Answer again, if it is done the right way.  And I don't

8    agree.

9    Q.    You don't agree now.  No, I understand you don't agree.

10   A.    No, no, independent evaluation, first of all, already --

11   already knew the person.  Already --

12   Q.    There's not a question pending.

13   A.    That's fine.

14   Q.    And you'd agree that Dr. Rosen, as the chair of radiology

15   responsible for patient safety, should not ignore the report he

16   got from the independent reviewer, right?

17   A.    Yes, if it's done the right way.

18   Q.    Ma'am, you keep saying if it's done the right way.

19   A.    Yeah.

20   Q.    Don't you recall testifying under oath that no, he

21   shouldn't ignore it?  There was no qualifier.

22   A.    I already told you, yes.  But -- but methodology was not

23   correct.

24            MR. KILROY:  Counsel, page 95.

25            (Counsel conferred.)

          1              MR. KILROY:  That's what I'm asking.  Do you want to

          2    be heard?

          3              MR. KOLMAN:  Yes.

          4              MR. KILROY:  Can we have it for identification so the

          5    judge can see what the objection is.

          6              THE COURT:  So is it 26-5?

          7              MR. KILROY:  Yes, your Honor.

          8              (Sidebar as follows:)

          9              THE COURT:  Mr. Kolman.

         10              MR. KOLMAN:  Your Honor, there's an objection from

         11    prior counsel in this transcript, and that objection was

         12    preserved, so I am -- I'm asking that the objection be

         13    sustained.

         14              THE COURT:  Overruled.

         15              (End of sidebar.)

         16              MR. KILROY:  Now, I offer into evidence, your Honor,

         17    26-5, excerpt from Dr. Desai's under-oath testimony.

         18              THE COURT:  So marked.

         19    (Exhibit No. 26-5 was admitted into evidence.)

         20    BY MR. KILROY:

         21    Q.   Dr. Desai, prior to trial under oath, you were asked:  So

         22    you agree that he -- he meaning Dr. Rosen -- should not ignore

         23    the report, right?

         24              And then I had to say, You have to answer, ma'am.

         25              And you said, Yeah, he should not.

1              Did I read that correctly?

2      A.   You do.  But later on I found out the motivation was

3      wrong.

4      Q.   And, Dr. Desai, you're not actually claiming that the

5      independent reviewer's analysis was discriminatory in any way,

6      are you?

7      A.   Discrim- -- all I'm saying, two parts.  One is personnel

8      was already known to each other.  So it's not correct.

9              And the second, the methodology was not correct.

10     That's all I'm saying.

11     Q.   All right.  My -- my question though was different.

12     A.   Yes.

13     Q.   My question is about your claim.  Your claim is

14     discrimination.  What I'm saying is you are actually not

15     claiming to this jury that the independent reviewer's analysis

16     was discriminatory, are you?

17     A.   It's not -- it's discriminatory.

18     Q.   You've answered.  Thank you.

19              MR. KILROY:  Counsel, page 84.

20              MR. COMENZO:  Thank you.

21              MR. KILROY:  It's actually page 84, lines 21 to 24;

22     85, lines 1 to 3.

23              And there is an objection that you need to look at,

24     Tim.

25              MR. KOLMAN:  Thanks.

```
1              (Plaintiff counsel conferred.)

2              MR. KOLMAN:  May I be heard?

3              MR. KILROY:  Could I have one, Tim?

4              MR. KOLMAN:  Yeah.

5              Just for the witness.

6              (Sidebar as follows:)

7              MR. KOLMAN:  Your Honor, this --

8              THE COURT:  Hold up.  Just a minute.

9              Go ahead, Mr. Kolman.

10             MR. KOLMAN:  Your Honor, the objection here was for

11     cause for speculation.  This is very early on in the case, and

12     he -- she could not possibly make a determination, and I also

13     think that the review at that point she didn't know if it had

14     anything to do with age.  And so the impression being given

15     here and has been given all along, and I'm going to have to

16     correct it, is that the plaintiff made effectively legal

17     declarations about age discrimination at a -- at a time when

18     there had been -- there had been no discovery whatever.  Now,

19     it's a legal conclusion, and it also calls for speculation, and

20     for that -- those reasons, I believe the objection should be

21     sustained.

22             THE COURT:  I'm going to overrule the objection.

23     Obviously, you can pick this up on your redirect.

24             (End of sidebar.)

25             MR. KILROY:  This is 26-6.
```

1          Your Honor, I would like to offer into evidence as

2    26-6 page 84 of the transcript, lines 21 to 24; and page 85,

3    lines 1 through 3.

4          THE COURT:  So marked.

5    (Exhibit No. 26-6 was admitted into evidence.)

6    BY MR. KILROY:

7    Q.   Dr. Desai, over two years after you had filed a claim

8    against UMass Memorial and Dr. Rosen, you were asked this

9    question:  Do you believe Dr. Rosen made a decision to have 25

10   of your cases reviewed by an expert for quality purposes

11   because you were age 67 at the time?

12       Your answer:  I don't think review has anything to do with

13   the age.  Both don't go together.

14          Did I read that correctly?

15   A.   Yes, they are separate as an entity doing 25 CTs, but the

16   motivation behind it --

17          MR. KILROY:  Your Honor, I'll move to strike

18   everything after "yes."

19          THE COURT:  Yes, that is stricken.

20          THE WITNESS:  Is wrong.

21          MR. KILROY:  Move to strike that as well, your Honor.

22          THE COURT:  Yeah.  Doctor, I'm going to ask you not to

23   volunteer information, please.

24   BY MR. KILROY:

25   Q.   In fact, Dr. Desai, you know -- you know the independent

```
 1   review had nothing to do with your age or any other
 2   characteristic of yours; isn't that right?
 3   A.   Say that again, please.
 4   Q.   You know, you yourself know, the independent review had
 5   nothing to do with your age or any other characteristics of
 6   yours; isn't that right?
 7   A.   Yeah, in itself, it does not, if you just take as an
 8   independent review, but it was used as a tool to terminate me.
 9        MR. KILROY:  Your Honor, I move to strike all after
10   "yeah, it was not."
11        THE COURT:  No, I'll let that stand.
12        MR. KILROY:  Page 88, counsel.  I'm sorry.  Page 86,
13   lines 6 to 10.
14        MR. COMENZO:  86?
15        MR. KILROY:  86, 6 to 10.
16        MR. COMENZO:  86, 6 to 10.
17        (Counsel conferred.)
18        MR. KILROY:  I believe we have to mark it for
19   identification.  It sounds like there may be an objection, your
20   Honor.  26 -- oops.  26-7.
21        (Sidebar as follows:)
22        THE COURT:  Who is this a discussion between?
23        MR. KILROY:  This is a question, and then she kept
24   answering.
25        THE COURT:  Is that the defendant's statement?
```

```
 1            MR. KILROY:  No, that's her statement.

 2            THE COURT:  Defendant's statement, not counsels?

 3            MR. KILROY:  Your Honor, that's the plaintiff's

 4    statement.

 5            THE COURT:  The plaintiff's.  Thank you.

 6            MR. KOLMAN:  Your Honor, this -- this is being brought

 7    in to show that Dr. Desai brought race, national origin,

 8    disability, and they are no longer in this case.  That's what

 9    this is.  And since we have voluntarily taken those away,

10    they're not in the province of the jury.  This should be

11    sustained.

12            First of all --

13            THE COURT:  Sustained.

14            MR. KILROY:  Your Honor, may -- oh.

15            (End of sidebar.)

16            MR. KILROY:  Counsel, page 88, lines 1 through 8.

17            (Plaintiff counsel conferred.)

18            MR. KILROY:  For identification, Mr. Castles.

19            THE CLERK:  Yeah.

20            (Sidebar as follows:)

21            THE COURT:  Wait a minute.

22            MR. KILROY:  It's -- it's lines 1 through 8, your

23    Honor.  I'm sorry.  No, it's lines 1 through 6.

24            THE COURT:  Mr. Kilroy, I didn't have my ears in.

25    Start over, please.
```

```
 1              MR. KILROY:  It's lines 1 through 6, your Honor.

 2              THE COURT:  Go ahead, Mr. Kolman.

 3              MR. KOLMAN:  Your Honor, this is complete speculation

 4    as to what she might or might not have done.  And she doesn't

 5    even understand the question, so I think it's unfair to bring

 6    it in.

 7              THE COURT:  Overruled.

 8              (End of sidebar.)

 9    BY MR. KILROY:

10    Q.   Dr. Desai, I'm going to show you page 88 of your

11    deposition transcript under oath, lines 1 through 6.

12              MR. KILROY:  I'd offer this into evidence, please.

13              THE COURT:  So marked.

14    (Exhibit No. 26-8 was admitted into evidence.)

15              THE CLERK:  Is that 26-7?

16              MR. KILROY:  26-8.

17              THE COURT:  8?

18              MR. KILROY:  I believe 7 was -- I believe you excluded

19    7, your Honor, so --

20              THE COURT:  Yeah, 7 was excluded.  You're right.  It's

21    26-8.

22              MR. KILROY:  May I have it published, please.

23              THE COURT:  You may.

24              MR. KILROY:  Thank you.

25    BY MR. KILROY:
```

1    Q.   Dr. Desai, you were asked:  Do you believe Dr. Rosen chose

2    not to speak with you before seeking an independent review

3    because of your age?

4             And your answer was, I don't know where the age comes

5    in.  I still don't understand the question.  I really don't.

6             Did I read that correctly?

7    A.   Yes.

8    Q.   You'd agree with me, Dr. Desai, that if an independent

9    reviewer has no idea as to the age of any of the radiologists

10   being reviewed, her report could not reflect age discrimination

11   in any way, right?

12   A.   According to Dr. Rosen, because I didn't pay attention to

13   the age and all that, yes.  Yes.

14   Q.   Okay.  And with respect to the methodology whereby

15   Dr. Rosen chose 25 chest CTs to be pulled randomly of yours and

16   25 of a control group to be pulled randomly from other

17   radiologists, you're not claiming that he chose that

18   methodology because you were -- because of your age, are you?

19   A.   It does not have anything to do with age, no.

20   Q.   It has nothing to do with age, right?

21   A.   No.

22   Q.   And, Dr. Desai, you were involved in interviewing

23   Dr. Karin Dill to become the next division chief of

24   cardiothoracic radiology at UMass, right?

25   A.   Yes.

1    Q.   And as part of that you reviewed her CV, didn't you?

2    A.   Yes.

3    Q.   You were aware that she had received advanced training

4    specific to cardiothoracic radiology through three separate

5    fellowships, right?

6    A.   Yes.

7    Q.   And you were aware she was widely published in the field

8    of cardiothoracic or chest radiology, right?

9    A.   Yes.

10   Q.   You were aware she had multiple leadership positions

11   within professional societies dedicated to the advancement of

12   radiology, correct?

13   A.   Yes.

14   Q.   And were you aware she had expertise in reading MRIs

15   within the field of chest radiology, right?

16   A.   Yes.

17   Q.   And that's expertise you don't have, correct?

18   A.   I cannot tell.  I have a pacemaker so I will die if I do

19   the -- go in the room.

20   Q.   And you agree that Dr. Dill's qualifications to be

21   division chief of chest radiology at UMass were superior to

22   yours, don't you?

23   A.   Please repeat the question.

24   Q.   Sure.  You agree Dr. Dill's qualifications are superior to

25   your qualifications to be division chief of chest radiology,

1    correct?

2    A.   As far as what I meant by that that she has more

3    experience in the cardiac CT and MRI; otherwise, I have more

4    experience.

5    Q.   Can you -- can you just answer my question, ma'am.

6         Do you believe your qualifications are superior to

7    Dr. Dill's to be division chief of chest radiology?

8    A.   Instead the need here, no.

9    Q.   Nonetheless, you were upset you weren't asked by Dr. Rosen

10   if you wanted to become the next division chief instead of

11   Dr. Dill, right?

12   A.   Yes.

13   Q.   Even though you agree Dr. Dill's more qualified, you think

14   Dr. Rosen should have asked you if you wanted to be the

15   division chief of chest, right?

16   A.   He should have asked.

17   Q.   So qualifications don't matter?

18   A.   I didn't say that.

19   Q.   Well --

20   A.   He should have asked, as a senior person in the

21   department, which all the duties are not doing it.  And

22   sometimes people say no after they ask, but it is common

23   courtesy, I would think.  And it has happened in a different

24   division, too.

25   Q.   So even if he believes you are not qualified for the job,

1   he should have asked you to take the job; is that your

2   testimony to the jury?

3   A.   Yes, he should have asked.

4   Q.   And you just thought it's common courtesy because of your

5   seniority?

6   A.   Yes.

7   Q.   And likewise, you think it's common courtesy he shouldn't

8   take action if he believes your quality is substandard, right?

9   A.   If it is really a quality problem.  I don't think I have a

10  quality problem.  It was just used as a tool to terminate me.

11  Q.   Who decides within a -- a physician practice, who decides

12  if a --

13          THE COURT:  Get closer to the microphone.

14          MR. KILROY:  Oh, I'm sorry, your Honor.

15  Q.   Who decides in the physician practice if a subordinate's

16  quality is substandard?

17          MR. KOLMAN:  Objection.

18  Q.   The individual or the superior?

19          THE COURT:  Overruled.  You may answer.

20          THE WITNESS:  Superior can choose.

21  BY MR. KILROY:

22  Q.   And that's what -- and that's what happened here, right?

23  A.   Yes.

24  Q.   And you admire, don't you, that Dr. Rosen wants to look

25  out for patient safety?

```
1    A.    I do too.

2    Q.    That didn't answer my question, ma'am.  You agree --

3    A.    Yeah, he has a responsibility to check.

4    Q.    But do you admire the fact that he is looking out for

5    patient safety?

6    A.    Yes.

7    Q.    And you expect him to do that, don't you?

8    A.    Yes.

9    Q.    It would -- in fact, he wouldn't be qualified for his job

10   if he wasn't looking out for patient safety, right?

11   A.    Yes.

12   Q.    And you would agree with me that in having to look out for

13   patient safety a chair of a department has to make some

14   difficult decisions sometimes, doesn't he?

15   A.    Difficult, but right when he should make the right one.

16   Q.    And -- oh, he should make the right one?

17   A.    Right decision how to do it and how just to get persons.

18   Q.    And -- and the right decision would be the decision you

19   would have made?

20   A.    No, I'm not saying that.  I'm not saying that.

21   Q.    And even though you thought you should have been asked to

22   do -- to become the division chief, you don't even know the

23   division chief job duties, do you?

24   A.    Why do you say that?  I don't have previous experience,

25   yes, I don't.
```

```
 1    Q.    With respect to call coverage, you demanded to be removed

 2    from performing call coverage, right?

 3    A.    Yes, sir, to reduce it.

 4    Q.    You wanted a special exception made for you based on the

 5    number of years you've worked at UMass Memorial, correct?

 6    A.    No, it was done in the past.  Dr. Balikian was call

 7    exempt.

 8    Q.    But you didn't meet the requirements that Dr. Balikian

 9    met, did you?

10    A.    I did, because if you look at the document.

11    Q.    Ma'am, were you over 72 years old at the time?

12    A.    But that only applies to the incentive, and we have the

13    proof.

14    Q.    Can you answer my question, please.  Were you over 72?

15              MR. KOLMAN:  Objection.

16              THE COURT:  Wait.  Wait.  Hold up.

17              So, Doctor, I'm going to ask you to wait for the

18    question --

19              THE WITNESS:  Okay.

20              THE COURT:  -- and only answer the question that's

21    asked.

22              And, Mr. Kilroy, I'm going to ask you to wait until

23    the witness completes her answer before you ask another

24    question.

25              MR. KILROY:  Fair enough.  Thank you, your Honor.
```

1          THE COURT:  Go ahead.  Let's have a question.

2          THE WITNESS:  Sorry.

3    BY MR. KILROY:

4    Q.   And you weren't a full professor, were you?

5    A.   No.

6    Q.   And Dr. Balikian was over 72, right?

7    A.   Yes.

8    Q.   And he was a full professor, wasn't he?

9    A.   Yes.

10   Q.   And you're not aware of anyone who is under the age of 72

11   and who wasn't a full professor, whoever was exempted from

12   their fair share of call coverage in the radiology department;

13   isn't that true?

14   A.   I'm not aware.

15   Q.   And that's over 80 radiologists, right?

16   A.   Yes.

17   Q.   But you wanted to be treated special and be exempted,

18   right?

19   A.   No, I didn't say.

20   Q.   You demanded it?

21   A.   I did.  I did because the -- because the policy says it,

22   if you -- if I interpret it correctly.

23          MR. KILROY:  I'll move to strike after "I did."

24          THE COURT:  Yes, that's stricken.  The jury is to

25   disregard it.

1    BY MR. KILROY:

2    Q.   And after being told that they had discontinued the

3    practice of allowing you to sell call weekends, you continued

4    to demand to sell call weekends, didn't you?

5    A.   It's not continued.  I asked.  Because one year I didn't

6    know it was discontinued until when he said yesterday that

7    after two years it was stopped.  There's nothing wrong with

8    asking for -- see, because I -- it was difficult, I already

9    told you earlier, and people were ready for the money.  I was

10   paying from my own salary, and some people needed extra money

11   so they did it for me.  But the next year I didn't know it was

12   stopped.  So I did ask, yes, I did.

13   Q.   And after you were told it was stopped, you continued to

14   ask, didn't you?

15   A.   Huh?

16   Q.   After you --

17   A.   No, I did not.  I did not.

18   Q.   Okay.

19   A.   Only once I said, but I only found out yesterday that it

20   was stopped after two years.  I didn't have any knowledge.  On

21   the contrary I was upset that why did he say no.  The person I

22   asked was willing to do as many call I wanted to do.

23   Q.   Dr. Desai, you began treating with a psychiatrist by the

24   name of Dr. Mark Cutler May 28th of 2020, correct?

25   A.   Yes.

1   Q.   And your employment termination was March of 2018,

2   correct?

3   A.   Yes.

4   Q.   You didn't seek any treatment for emotional distress from

5   the time of your notice of termination in March of 2018 until

6   May of 2020, correct?

7   A.   See -- yes, see, my -- when I left the job was March 17,

8   2019.  So at that time I had a lot of support from my family,

9   but then with the COVID and all that, it was becoming

10  difficult.  So my husband and my daughter actually called the

11  psychiatrist.

12  Q.   Dr. Desai, do you remember being served a set of questions

13  in this case known as interrogatories?

14  A.   Yes.

15  Q.   And do you remember when you received these?

16  A.   No, I do not.

17          THE COURT:  Why don't we save these until tomorrow.

18          MR. KILROY:  Thank you, your Honor.

19          THE COURT:  All right.  We'll see you guys tomorrow.

20  Have a great night.  Don't talk about the case with anyone,

21  including each other.

22          Doctor, you can step down.

23          THE WITNESS:  Thank you.

24          (At 12:59 p.m., the jury left the courtroom.)

25          THE COURT:  How much longer?

```
 1              MR. KILROY:  Probably a -- 45 minutes, your Honor,
 2      half hour, 45 minutes.
 3              THE COURT:  And on redirect, Mr. Kolman?
 4              MR. KOLMAN:  Maybe the same, Judge.
 5              THE COURT:  Okay.  And then who?
 6              MR. KILROY:  We have -- where we're trying to
 7      coordinate with them now, Dr. Korgaonkar and Dr. Mowlood -- not
 8      doctor -- Randa Mowlood.
 9              THE COURT:  Thank you.
10              MR. KILROY:  Two fact witnesses.
11              THE COURT:  Did you guys have any follow-up on that
12      discussion we had?
13              MR. KILROY:  We did, your Honor.
14              THE COURT:  And?
15              MR. KILROY:  I haven't heard back.
16              THE COURT:  When's that going to happen?  Heard back
17      from your brother?
18              MR. KILROY:  Yes.
19              MR. KOLMAN:  Judge, I have to say that --
20              THE COURT:  No, not on the record.
21              MR. KOLMAN:  Well, I was surprised.  The answer is no.
22              THE COURT:  Okay.  All right.  I've got you at 6 hours
23      and 27 minutes.
24              I've got you at 5 hours and 29 minutes.
25              MR. KILROY:  Thank you, your Honor.
```

1          THE COURT:  See you tomorrow.

2          MR. KILROY:  See you tomorrow.

3          (At 1:02 p.m., court was adjourned.)

1                      C E R T I F I C A T E

2

3          I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4   certify that the foregoing transcript is a true and accurate

5   transcription of my stenographic notes before the Honorable

6   Timothy S. Hillman, to the best of my skill, knowledge, and

7   ability.

8

9

10      /s/ Marianne Kusa-Ryll                    12/13/2022

11      Marianne Kusa-Ryll, RDR, CRR                 Date

12      Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25