1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4     Charu Desai,                )
                    Plaintiff,    )
5                                  )
                                   )
6     vs.                          )    Case No. 19-cv-10520-TSH
                                   )
7                                  )
      UMass Memorial Medical Group )
8     and Max Rosen,               )
                    Defendants.    )
9

10

11    BEFORE:  The Honorable Timothy S. Hillman

12

13                         Jury Trial Day 6

14

15

16                            United States District Court
                              Courtroom No. 2
17                            595 Main Street
                              Worcester, Massachusetts
18                            December 9, 2022

19

20

21

22

23                    Marianne Kusa-Ryll, RDR, CRR
                         Official Court Reporter
24                    United States District Court
                       595 Main Street, Room 514A
25                      Worcester, MA 01608-2093
                    508-929-3399 justicehill@aol.com
                Mechanical Steno - Transcript by Computer

1    APPEARANCES:

2    Upper Charles Law Group
     Joseph F. Comenzo, Esquire
3    10 Kearney Road, Suite 101
     Needham, Massachusetts 02494
4    on behalf of the Plaintiff

5    Upper Charles Law Group, LLC
     David Cromwell Johnson, Jr., Esquire
6    81 Hartwell Avenue
     Suite 101
7    Lexington, Massachusetts 02421
     on behalf of the Plaintiff
8
     Kolman Law, PC
9    Timothy M. Kolman, Esquire
     414 Hulmeville Avenue
10   Penndel, Pennsylvania 19047
     on behalf of the Plaintiff
11
     Mirick, O'Connell, DeMallie & Lougee, LLP
12   Robert L. Kilroy, Esquire
     Reid Michael Wakefield, Esquire
13   Ashlyn E. Dowd, Esquire
     1800 West Park Drive
14   Suite 400
     Westborough Massachusetts 01581-3926
15   on behalf of the Defendants

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2

3    WITNESSES                                               PAGE

4    Charu Desai

5
         Continued Cross-Examination                            6
6        By Mr. Kilroy
         Redirect Examination                                  78
7        By Mr. Kolman
         Recross-Examination                                  115
8        By Mr. Kilroy

9         Mona Korgaonkar

10       Direct Examination                                   121
         By Ms. Dowd
11       Cross-Examination                                    127
         By Mr. Kolman
12       Redirect Examination                                 137
         By Ms. Dowd
13
          Randa Mowlood
14
         Direct Examination                                   140
15       By Mr. Kilroy
         Cross-Examination                                    146
16       By Mr. Kolman

17

18

19

20

21

22

23

24

25

1                            E X H I B I T S

2

       Exhibit No.            Description                    Received
3

4        353          Signed correction sheet                      9

5        310          Email to Dr. Desai, from Dr. Brennan,       32
                      dated 9/21/17
6
         311          Email to Dr. Brennan, from Dr. Desai,       34
7                     dated 9/21/17

8        329          Communication regarding a job in Fall       64
                      River
9
         326          Chain of emails seeking employment          66
10
         330          Email re:  Application for body             70
11                    imager in Connecticut

12       335          Email re: Application for                   71
                      musculoskeletal radiology at Tufts
13                    Medical Center, Boston

14       336          Email re: Application for employment        73
                      in Cape Cod
15
         285          Government form 1099-G                       75
16

17

18

19

20

21

22

23

24

25

1                            P R O C E E D I N G S

2

3            (The following proceedings were held in open court

4      before the Honorable Timothy S. Hillman, United States District

5      Judge, United States District Court, District of Massachusetts,

6      at the Donohue Federal Building & United States Courthouse,

7      595 Main Street, Worcester, Massachusetts, on December 9,

8      2022.)

9            THE COURT:  Good morning.  Good morning.  Good

10     morning.

11           THE CLERK:  All rise.

12           (At 9:06 a.m., the jury entered the courtroom.)

13           THE CLERK:  Court is now open.  You may be seated.

14           THE COURT:  Good morning.

15           JURORS IN UNISON:  Good morning.

16           THE COURT:  Is it cold back there?

17           JUROR:  No.

18           THE COURT:  Okay.  Good.  Good.  You guys are all

19     bundled up.

20           Has anybody had any difficulty following my

21     instructions not to discuss the case?

22           JUROR:  No.

23           THE COURT:  Has anybody seen or read or heard

24     anything?

25           JUROR:  No.

1          THE COURT:  Anything you would like to bring to my

2     attention?

3          JUROR:  No.

4          THE COURT:  All right.  Doctor, good morning.

5          THE WITNESS:  Good morning.

6          THE COURT:  I'm going to remind you you are still

7     under oath from yesterday.

8          And you may inquire, Mr. Kilroy.

9          MR. KILROY:  All right.  Thank you, your Honor.

10         THE COURT:  Good morning, Dr. Desai.

11         THE WITNESS:  Good morning.

12                    CONTINUED CROSS-EXAMINATION

13    BY MR. KILROY:

14    Q.   Dr. Desai, I want to take you back to yesterday when you

15    were testifying in response to Mr. Kolman's questions, and one

16    particular question that he asked you was:  Do you recall

17    Dr. Rosen ever offering to send you to any training to help you

18    remain current in your specialty?

19         Do you recall that?

20    A.   Yes.

21    Q.   And you testified never, correct?

22    A.   That I recall.

23         MR. KILROY:  Could I have Exhibit 277, please, on the

24    document camera.

25         THE CLERK:  For everybody?

1          MR. KILROY:  Yes, please.

2     BY MR. KILROY:

3     Q.    And, Dr. Desai, that's your signature, correct?

4     A.    Yes.

5     Q.    So you actually had been offered by Dr. Rosen any

6     education or career development opportunities that you might be

7     interested in; isn't that right?

8     A.    Yes.

9     Q.    Why did you tell the jury that you were never offered any

10    assistance by Dr. Rosen with respect to --

11    A.    Because I did not remember.  I told you I did not

12    remember.

13    Q.    Do you have difficulty with your memory, ma'am?

14    A.    No, this was a long time ago.

15    Q.    Dr. Desai, I'm going to ask you to help me understand the

16    timeline of your claims with respect to age discrimination.

17          Now, you'll recall yesterday you testified -- I asked

18    you about your testimony under oath at deposition where you

19    indicate that you did not believe your CT scanning privileges

20    were removed by Dr. Rosen based on age, and you stated, I

21    didn't believe it then, but I believe it now.

22          Do you recall that?

23    A.    Yes.

24    Q.    And you recall I showed you from your deposition testimony

25    that your belief then was in September and October of 2020,

1    correct?

2    A.    Yes.

3    Q.    All right.  So September, October, 2020, no belief in age.

4          And you recall I showed you your correction sheet for

5    your deposition testimony where you had an opportunity to make

6    any corrections?

7          MR. KOLMAN:  Your Honor, I would bring your attention

8    to two people who entered the courtroom.  I don't know if

9    they're witnesses; but if they are, I would request they be

10   sequestered.

11         MR. KILROY:  One -- one of them is a witness, your

12   Honor, and we don't have an objection.

13         THE COURT:  Okay.  Can you just instruct that person,

14   please.

15         MR. KILROY:  Ashlyn will.

16   BY MR. KILROY:

17   Q.    And I'm sorry.  You may have answered already, so if I'm

18   repeating myself, I apologize.

19         You recall that I showed you that you had signed a

20   correction sheet as of December 10th, 2020, right?

21   A.    Yeah.

22   Q.    Would it help if I showed it to you again?

23   A.    Please.  Please.

24         MR. KILROY:  Mr. Clerk, Exhibit 353 for

25   identification, please, just for the witness.

1   Q.   And, Dr. Desai, you'll see the highlighted date,

2   December 10th, 2020, and it states, Enclosed please find a copy

3   of the signed deposition transcript errata sheet with

4   corrections from Dr. Charu Desai's deposition on October 22,

5   2020.

6           Do you see that?

7   A.   Yes, but like I said, I did see three days before the

8   deposition like thousands of -- a hundred thousand of paper, so

9   I did not -- I did not review them.

10  Q.   Right.  I'll just ask you to focus on my question, please,

11  ma'am.

12  A.   Okay.

13  Q.   All I asked you was do you agree --

14  A.   Yes.

15  Q.   -- that you had done the errata sheet on December 10th,

16  2020?

17  A.   Yes, yes.

18          MR. KILROY:  Your Honor, I'd move this into evidence,

19  please.

20          MR. KOLMAN:  No objection.

21          THE COURT:  So marked.

22          And it's what number again, please?

23          MR. KILROY:  It's 353, your Honor.

24          THE COURT:  Thank you.  So marked.

25  (Exhibit No. 353 was admitted into evidence.)

1        MR. KILROY:  Publish to the jury, please.

2    BY MR. KILROY:

3    Q.   And you agree that at least as of December of 2020, when

4    you had an opportunity to make corrections, you didn't make

5    any, correct?

6    A.   Yes.

7    Q.   So what we know is as of December 2020, you still believed

8    that Dr. Rosen didn't take actions based on your age, right?

9    A.   Because I did not have all the information at the time.

10   Q.   Right.  And again, I just ask you to focus on my question.

11   A.   Okay.

12   Q.   It's yes or no.

13   A.   Okay.

14   Q.   You actually believed he didn't take actions based on your

15   age?

16   A.   Yeah, because I didn't think anybody could do that to

17   anybody.  I was very -- to find out, I was shocked.

18        MR. KILROY:  Your Honor, I'd ask to move to strike all

19   after "yes."

20        THE COURT:  That is stricken.  Please disregard it.

21   BY MR. KILROY:

22   Q.   And so we're now at December 9th, 2022, correct?

23   A.   Today, yes.

24   Q.   And you'd agree with me, it's been two years since your

25   errata sheet until today, right?

1    A.   Yes.

2    Q.   And by errata sheet, I mean your correction sheet, right?

3    A.   Yes.

4    Q.   You never submitted a new correction sheet of any kind,

5    did you?

6    A.   I do not know.  I don't remember.

7    Q.   Well, I'll represent to you that we've never received it.

8         Do you recall filling out a correction sheet that

9    changed your testimony to say, oh, now, I do believe it was

10   based on age?

11   A.   Like I said, I don't remember if I did.

12   Q.   Ma'am --

13   A.   This --

14   Q.   -- it's not a case of remembering.

15        Did you fill out a new sheet that was to be sent to my

16   office saying that you now believed you were facing age

17   discrimination?

18        MR. KOLMAN:  We will stipulate that she did not.

19        THE COURT:  All right.  Thank you.  Let's move.

20   BY MR. KILROY:

21   Q.   Now, you actually brought your claim initially at the

22   Massachusetts Commission Against Discrimination, correct?

23   A.   Yes.

24   Q.   And at the Massachusetts Commission Against

25   Discrimination, you claimed age discrimination by Dr. Rosen and

1    UMass Memorial, correct?

2    A.   Yes.

3    Q.   And you brought that claim May 4th of 2018; do you

4    remember that?

5    A.   Yes.

6    Q.   And that was while you were still employed by UMass

7    Memorial, correct?

8    A.   Yes.

9    Q.   Your employment terminated March 14th of '19, correct?

10   A.   You're talking about when I got the letter or when

11   completely went out?

12   Q.   When you were -- your last day of work was March 14th of

13   2019?

14   A.   It should be -- it should be 3/17/19.

15   Q.   3/17, that was a Sunday.  Do you remember that?

16   A.   Whatever it is.  That's -- that's what my date was.

17   Q.   Okay.  So March of 2019, you get terminated?

18   A.   Yes.

19   Q.   And as it turns out, on March 19th of 2019, you filed your

20   complaint in this court, right?

21        You filed a complaint of age discrimination in federal

22   court against Dr. Rosen and against UMass Memorial, right?

23        MR. KOLMAN:  We'll stipulate that she did.

24        THE WITNESS:  Yes.

25   BY MR. KILROY:

1   Q.   Do you recall that?

2        Yeah.  And then you actually then amended the

3   complaint, made corrections to it in July of 2019.

4        Do you recall that?

5        MR. KOLMAN:  We will so stipulate.

6   BY MR. KILROY:

7   Q.   So, Dr. Desai, as of October, 2020, when I asked you

8   questions at deposition under oath about do you believe that

9   Dr. Rosen acted based on age, you told me no.

10       So it had been nearly two and a half years since your

11  original -- originally filed a complaint of age discrimination,

12  correct?

13  A.   Whatever the date says, yes.

14  Q.   You filed a complaint of age discrimination against a

15  former colleague and boss of yours when for two and a half

16  years you didn't believe he engaged in age discrimination;

17  isn't that true?

18  A.   That's not true.  If that was the case we couldn't have

19  done the record.  That was the original -- original complaint.

20  So how -- where the other dates, it doesn't matter.  It's not

21  relevant.  And all the -- from the discovery we have the proof

22  so I still believe it was definitely related to age.

23  Q.   Just to be clear, ma'am, you've testified that as of

24  October of 2020, you didn't believe there was age?

25  A.   Yeah, at that time I did not know that anybody could do it

1    to this extent.

2    Q.   Right.  But you filed three separate actions prior to that

3    claiming age?

4    A.   I don't think it makes any difference.  It's the same

5    thing.

6    Q.   It doesn't make difference to you.  Do you think it was

7    fair to publicly file a document accusing a gentleman of age

8    discrimination when you didn't believe it yourself?

9          MR. KOLMAN:  Objection.

10          THE WITNESS:  There is nothing to believe or not.

11          THE COURT:  Wait.  Wait.  Remember the rules.

12          Sustained.

13   BY MR. KILROY:

14   Q.   I show you, Dr. Desai, what's already in evidence,

15   Exhibit 26-2, just so it's clear.  This is in October of 2020.

16          Are you claiming that the decision that was made to

17   restrict your privileges with respect to CT scans was done

18   because of your age?

19          Answer:  No.

20          Correct?

21   A.   At the time.  Because I did not have the information.

22   Q.   Well, at the time that you filed your complaint in federal

23   court in July of 2019, did you believe it was based on age

24   then?

25   A.   Yes.

1    Q.   So what happened between the time you filed in July of '19

2    and the time you were deposed that you no longer believed it

3    was age?

4    A.   What I'm saying, if you take the statement that itself is

5    not, but when you consider the motive behind it, it is, yes.

6    Q.   That the statement was not.  What statement?

7    A.   Can you put the exhibit, please.  Please put the exhibit.

8    Q.   No, I'm going from your testimony, ma'am.

9         What statement was not based on age?

10        What are you telling the jury that the statement

11   wasn't, but everything else was?

12   A.   Will you please put the exhibit.

13   Q.   Ma'am, I'm not putting -- putting it back on.  You

14   testified that there was a statement.

15        What statement are you referring to that was not based

16   on age?

17   A.   That -- that CT -- CT scan was not based on the age.  See,

18   I don't -- you have to put the exhibit, please.

19   Q.   Okay.  So you're saying that remove -- removing your CT

20   scanning privilege wasn't based on age.

21        So then what was?

22   A.   What I'm saying the motive behind was.  To use -- to --

23   Q.   Just so it's clear, the actual removal of your CT scanning

24   privileges had nothing to do with your age, but you think the

25   motive of removing had to do with your age; is that your

1    testimony?

2    A.    Because it was used as an instrument to terminate me.

3    That's all I'm saying.  I'm not -- the CT itself and that there

4    is a next step to it.

5    Q.    I'm going to show you Exhibit 26-3.  It's in evidence from

6    yesterday.  You may recall seeing this.

7          And it states very clearly, so you've testified that

8    Dr. Rosen had an obligation to maintain patient safety, an

9    obligation to maintain quality, an obligation as part of his

10   job duties to take action if he believes a radiologist's

11   quality is substandard, and then he actually took action in the

12   form of no-cause termination to you based on his assessment

13   that your quality was substandard; is that fair?

14         And you stated:  I believe that's what he did.

15         That he actually terminated you because your quality

16   was substandard?

17         Nah.

18   A.    I do not agree.  I do not agree my quality is substandard.

19   Q.    Well, I didn't ask you that question.  You testified that

20   that's why he terminated you.

21         Now, I'm asking you from May 4th of 2018 to December

22   of 2022, here at trial, December 9th of 2022, where along that

23   continuum did you decide that he didn't terminate you because

24   it was substandard?

25   A.    (No response.)

1    Q.   When did you have a change of mind, ma'am?

2    A.   There's nothing change of mind even now.

3    Q.   Okay.  So you didn't change your mind.  You believe he

4    terminated you because your quality was substandard?

5    A.   What I'm saying that this is opinion he did it, but I do

6    not agree with it.  And I -- when we go along, you will have --

7    see the proof.

8    Q.   I'm going to show you Exhibit 26-4, and we'll look at that

9    in relation to your timeline.

10        You were asked:  Would you agree Dr. Rosen acted

11   fairly, appropriately, by relying on an independent expert's

12   evaluation as opposed to him making the evaluation himself?

13        You state:  Agree.

14        Has that opinion changed at any time?

15   A.   Yes, if it was done correctly.  It did change.

16   Q.   Okay.  So did you hold that opinion on May 4th, 2018, when

17   you filed with the MCAD that opinion there, ma'am?

18        You can look at it on the screen.

19   A.   Yeah.

20   Q.   Did you form that opinion that on May 4th, 2018, when you

21   first filed age discrimination?

22   A.   Yeah, that was age discrimination.

23   Q.   I'm asking you, on May 4th when you filed with the

24   MCAD against my client Dr. Rosen, did you believe he had acted

25   fairly?

1    A.   At that time I did not know.

2    Q.   You didn't know?

3    A.   I did not have all the papers.

4    Q.   You didn't know, so you speculated and filed an age

5    discrimination claim without knowledge?

6    A.   Because as far as I'm concerned, what he did I can't

7    figure out any other reason when I look at the paper, okay.

8    Q.   Right.  You can't figure out any other reason --

9    A.   Yeah.

10   Q.   -- so you just speculated that it must be age?

11   A.   It is not speculation, because I didn't have problem with

12   the colleague and all that.  So it was, like, to use the

13   instrument.

14   Q.   What -- what facts, not a conclusion, what facts are you

15   claiming support that Dr. Rosen acted based on your age, as

16   opposed to anything else under the sun, just based on your age,

17   ma'am, what facts?

18   A.   Because he -- he replaced me with the younger person.  He

19   was trying to recruit younger person so -- and those are the

20   facts.

21   Q.   So I just want to be clear for the jury.  The only facts

22   you have that say that Dr. Rosen acted based on your age was

23   that he was trying to recruit someone that you call a

24   replacement who was younger.  That's all you have to offer for

25   facts?

1    A.    I think that's good enough.

2    Q.    Okay.  But, ma'am, answer my question, please.

3    A.    Yes, yes.

4    Q.    Is that correct that's all you have to offer?

5    A.    Yes.

6    Q.    Well, let's talk then about recruiting.

7          When did you first understand that Dr. Rosen was

8    recruiting for a chest radiologist?

9    A.    He can answer.

10   Q.    He can answer.  How about you answer?

11   A.    Because I'm not recruiting.  I'm not recruiting.

12   Q.    So you don't know when he was recruiting?

13   A.    How would I know?

14   Q.    Well, you seem to know --

15   A.    Yeah, because now --

16   Q.    Ma'am, you have to wait for me to finish my question.

17   A.    Okay.

18         THE COURT:  Let's do this.  Let's do this.  Rather

19   than making comments, please ask a question.

20         MR. KILROY:  Okay.

21         THE COURT:  And please answer the question --

22         THE WITNESS:  Okay.

23         THE COURT:  -- in the form in which it's asked.

24         THE WITNESS:  Okay.

25         THE COURT:  And if you can't, please say so, okay?

1          THE WITNESS:  Okay.

2          THE COURT:  All right.  Let's do this.

3          MR. KILROY:  Thank you, your Honor.

4     BY MR. KILROY:

5     Q.   I'll show you Exhibit 289, which I believe is in evidence.

6     Or is it not?

7          (Counsel conferred.)

8     Q.   It is in evidence.  I'm showing you Exhibit 289.

9          Do you see that email to you?

10    A.   Yes.

11    Q.   So three years prior to your employment termination,

12    Dr. Rosen tells you he's aggressively trying to recruit, right?

13    A.   Yes.

14    Q.   So you knew at least three years earlier that he was

15    trying to recruit for a chest radiologist, right?

16    A.   Yes.

17    Q.   And he wasn't trying to recruit for a chest radiologist

18    three years earlier to replace you, was he?

19    A.   I do not know.

20    Q.   You don't know.  You don't know.

21          And you, however, because you worked there, that he

22    wasn't successful in 2016 in finding a chest radiologist, was

23    he?

24    A.   I don't remember who came at that time, but.

25    Q.   And actually at that time and beyond, you complained often

1    about the volume of work that you faced and the other chest

2    radiologists faced because of the high-demand patient load,

3    didn't you?

4    A.   Yes.

5    Q.   Yet you needed help to get through all the chest CTs,

6    didn't you?

7    A.   Yes.

8    Q.   In fact, you were upset that Dr. Karin Dill, your division

9    chief, was doing division chief duties at times and not in the

10   reading room; isn't that true?

11   A.   Yes.

12   Q.   Because you needed help to get through all the chest CTs?

13   A.   Yes.

14   Q.   And the only way you could get help would be to recruit a

15   chest radiologist, right?

16   A.   Not that -- getting rid of me and replacing me, that is

17   not the correct way.  Because if you need the help there was

18   nothing wrong with my quality.  They could have kept me and

19   recruit other people, too, younger or older.  It doesn't

20   matter.  There is no justification here.

21          THE COURT:  So didn't we just have a discussion

22   about --

23          THE WITNESS:  We did, but --

24          THE COURT:  No, no, just -- let me talk, okay.  So I'm

25   going to again ask you --

1          THE WITNESS:  Okay.

2          THE COURT:  -- please only answer the question

3     that -- that Attorney Kilroy asks.

4          THE WITNESS:  Okay.

5          THE COURT:  And if you can't answer it, say so and

6     trust that Mr. Kolman is going to have a chance to ask you

7     questions to clarify anything that he thinks might be confusing

8     to the jury, okay?

9          THE WITNESS:  Thank you.

10         THE COURT:  Go ahead.

11         THE WITNESS:  Sorry.

12         MR. KILROY:  Thank you, your Honor.

13    BY MR. KILROY:

14    Q.   I'll ask my question slightly differently.  Would you

15    agree that one of the most effective ways to get you help with

16    the large volume of chest CTs that have to be read daily would

17    have been to hire a chest radiologist?

18    A.   Yes.

19    Q.   And because you needed so much help, you actually

20    supported Dr. Rosen's efforts to recruit a chest radiologist,

21    right?

22    A.   Yes.

23    Q.   And that was in 2016, you supported it, right?

24    A.   Yes.

25    Q.   And in 2017, you still had a high volume of work, right?

1    A.    Yes.

2    Q.    In 2017, you were still complaining about the high volume

3    of work, correct?

4    A.    Yes.

5    Q.    In 2017, you still needed your chair, Dr. Rosen, to

6    aggressively recruit for a chest radiologist, correct?

7    A.    Yes.

8    Q.    And he was trying, wasn't he?

9    A.    Yes.

10   Q.    And -- and you wanted him to try, right?

11   A.    Yes.

12   Q.    And you wanted him to be successful to bring in a chest

13   radiologist to help you?

14   A.    Yes.

15   Q.    And then in 2018, you still had a high volume of work,

16   didn't you?

17   A.    2018, yes.

18   Q.    And at that time, you still wanted Dr. Rosen to be

19   successful in recruiting another chest radiologist, right?

20   A.    Yes.

21   Q.    And eventually he was successful, wasn't he?

22   A.    Yeah, Dr. Maria Barile.

23   Q.    Correct.  Dr. Marie Barile.  And she began her employment,

24   as we saw yesterday, on December 31st of 2018, correct?

25   A.    Yes.

1   Q.   And so you were happy --

2   A.   Yes.

3   Q.   -- that they recruited an additional chest radiologist due

4   to the workload, right?

5   A.   Yes.

6   Q.   In 2016, when he was recruiting, you weren't claiming he

7   was trying to replace you based on age, were you?

8   A.   Because I had no idea at that time.

9   Q.   Right.  And in 2017, you weren't claiming he was trying to

10  replace you based on age, were you?

11  A.   At that time I didn't have information.

12  Q.   The only time that you complained it was based on age was

13  when an independent review had been conducted and you were

14  terminated for quality, correct?

15  A.   Yes.

16  Q.   And so you're aware, Dr. Desai, that Dr. Kim Robinson, the

17  acute care pulmonologist and president of Marlborough Hospital,

18  you're aware she complained about your quality, right?

19  A.   Yes, she's the only one that I know of.

20  Q.   So in terms of complaints, we know that Dr. Kim Robinson

21  complained about your quality.  And you say she's the only one

22  you know of.

23       Well, aren't you also aware that your division

24  chief --

25  A.   Dr. Dill, yes.

1    Q.   You just have to let me finish --

2    A.   Yeah, sorry.

3    Q.   -- for the record.

4         So you're aware your division chief, Dr. Karin Dill,

5    had real concerns about your quality, too, right?

6    A.   About me and about a lot of others too.

7    Q.   So we have Dr. Dill, division chief, and someone who you

8    admitted yesterday had superior qualifications to -- as

9    compared to you as a chest radiologist, right?

10   A.   In certain area, not all.

11   Q.   And you're also aware that the independent reviewer,

12   Dr. Litmanovich, without knowing who you were, found that

13   you -- according to her, made major errors, right?

14   A.   It was not done the right way, so I do not agree.

15        MR. KILROY:  Your Honor, I'll ask to move to strike,

16   and I'll ask my question again.

17        THE COURT:  That is stricken.  Please disregard it.

18   BY MR. KILROY:

19   Q.   You're aware that the independent reviewer, who didn't

20   know who you were, didn't know your age, Dr. Litmanovich, found

21   what she perceived to be major errors in your CT reads,

22   correct?

23        MR. KOLMAN:  Objection.

24        THE WITNESS:  It is her opinion.

25        MR. KOLMAN:  Objection, your Honor.

1           THE WITNESS:  It is her opinion.

2           THE COURT:  Hold on.  Wait.  When there's an

3   objection, please wait, okay.  Hold on.

4           MR. COMENZO:  Your Honor, I believe we need the

5   devices.

6           (Mr. Castles distributed the whisper tech devices.)

7           THE COURT:  When my grandkids come to the courthouse

8   to visit, this is the only thing they want to do.  They

9   actually hide in, like, the jury room, and then we have to find

10  them.

11          (Sidebar as follows:)

12          THE COURT:  All right.  Mr. Kolman, please.

13          MR. KOLMAN:  Judge, this is not in evidence.  The

14  Litmanovich review is not in evidence and --

15          THE COURT:  So let me ask what was the question.

16          MR. KILROY:  Your Honor, the question was:  Isn't she

17  aware that the independent reviewer found major errors.

18          THE COURT:  Well, if she knows.

19          MR. KOLMAN:  Well, there's no foundation here in terms

20  of Litmanovich doing the review that it was independent when it

21  was done, how it was done.  I mean this is coming directly

22  without any foundation whatever.

23          THE COURT:  I'll -- I'll -- I'm going to let you ask

24  her if she knows, and then if so, I'll let you have it; and if

25  not, I won't.

1          MR. KILROY:  Thank you.

2          (End of sidebar.)

3    BY MR. KILROY:

4    Q.   Dr. Desai, you're aware that the independent review found

5    major errors associated with your reads, correct?

6    A.   Her opinion.

7    Q.   Her opinion?

8    A.   Yes.

9    Q.   But you were aware of that?

10   A.   Yes.

11   Q.   All right.  And so -- so we have a third individual who --

12         MR. KOLMAN:  Objection.  This is a statement.

13         THE COURT:  Yeah, let's have a question, please.

14   BY MR. KILROY:

15   Q.   As to Dr. Kim Robinson, you have not asserted that she

16   acted based on your age when she complained about you, right?

17         THE COURT:  Mr. Kilroy.

18         THE WITNESS:  Yes.

19         THE COURT:  Speak up, please.

20         MR. KILROY:  I'm sorry, your Honor.

21   Q.   As to Dr. Kim Robinson, you did not assert that her

22   complaints about you were because of your age, have you,

23   correct?

24   A.   Correct.

25   Q.   And as to Dr. Dill you're not claiming when she had

1    concerns about you that that's because of your age either,

2    right?

3    A.   Correct.

4    Q.   And you're not claiming that Dr. Litmanovich, her review

5    was based on your age, because it was -- she didn't know your

6    age, right?

7    A.   I don't know.

8    Q.   Can you explain to the jury -- well, let me back up.

9         You agree based on testimony yesterday that Dr. Rosen,

10   as the chair, should take action based on quality concerns,

11   right?

12   A.   Yes.

13   Q.   And can you explain to the jury how it's logical to file

14   an age claim against the individual you admit should take

15   action in response to complaints about quality but not assert

16   that the underlying people making the complaints that their

17   complaints are based on your age?

18              MR. KOLMAN:  Objection.

19              THE COURT:  Sustained.

20   BY MR. KILROY:

21   Q.   Now, yesterday, you testified that you began seeking

22   psychiatric counseling, correct?

23   A.   Yes.

24   Q.   And that was May of 2020, right?

25   A.   Correct.

1    Q.   Do you recall in this case that you were asked to respond

2    to written questions called interrogatories?

3    A.   Yes.

4    Q.   And you actually did respond to those, correct?

5    A.   Yes.

6            MR. KILROY:  Can I have Exhibit 354 for identification

7    just for the witness, please.

8    Q.   Dr. Desai, do you recognize this document?

9    A.   Yes.

10   Q.   And it's UMass Memorial Medical Center's first set of

11   interrogatories to plaintiff, correct?

12   A.   Yes.

13   Q.   I'm going to show you interrogatory No. 15.

14           Do you see that?

15   A.   Okay.

16   Q.   And it's -- interrogatory 15 states:  To the extent you're

17   claiming emotional distress damages in this action, please

18   describe in detail such damages, including without limitation,

19   identifying any and all treatment received for such alleged

20   emotional distress, the providers of such treatment, the dates

21   of such treatment, and the effects of such treatment.

22           Did I read that correctly?

23   A.   Yes.

24           MR. KOLMAN:  Excuse me.  Could we have a date on the

25   interrogatories.

1          MR. KILROY:  I'm going to do it right now.

2          MR. KOLMAN:  Thanks.

3    BY MR. KILROY:

4    Q.   And I'm showing you the date that this was served.

5          Can you read the date for the jury, please?

6    A.   Yes.

7    Q.   What's the date?

8    A.   April 16, 2020.

9    Q.   Correct.  April 16th, 2020.  So your termin- -- you got

10   notice of termination in March of 2018, correct?

11   A.   Yes.

12   Q.   And yesterday you talked about how devastating that was as

13   of March of 2018, correct?

14   A.   Yes.

15   Q.   And that it was difficult for you to even function --

16   A.   Yes.

17   Q.   -- based on that, correct?

18   A.   Yes.

19   Q.   And yet you didn't seek any treatment until May of 2020,

20   over two years later -- I'm sorry.  Yeah, May of 2020, over two

21   years later, right?

22   A.   I did not want to go, because going to psychiatry is like

23   it is a stigma, and I thought I could handle it.

24          MR. KILROY:  Your Honor, I ask to move to strike all

25   after "no."

1          THE COURT:  That's -- that is stricken as being

2    nonresponsive.

3    BY MR. KILROY:

4    Q.   And so you only sought treatment after receiving this

5    interrogatory in the litigation asking if you were seeking

6    treatment, right?

7    A.   I -- I don't remember that, but I know I did not in the

8    beginning that I'm telling you.

9    Q.   Well, let me be clear.  You didn't seek treatment from a

10   psychiatrist until after you received this interrogatory; isn't

11   that right?

12   A.   Yes.

13          MR. KILROY:  310.

14   Q.   Dr. Desai, you recall an incident involving your division

15   chief on September 21st, 2017, right?

16   A.   Yes.

17   Q.   And that morning, the vice chair of the Department of

18   Radiology, Darren Brennan, Dr. Darren Brennan contacted you

19   to -- to request that you provide an account of what happened

20   with Dr. Dill that morning, right?

21   A.   Yes.

22          MR. KILROY:  Exhibit 310 for identification, please.

23   Q.   I'm showing you an email from Dr. Darren Brennan,

24   September 21st, 2017, to yourself with a CC to Dr. Rosen,

25   subject:  Incident with Dr. Dill today.

1          You received this email, right?

2    A.   Yes.

3    Q.   And in the email, Dr. Darren Brennan said he had asked

4    Karin for and already received a short written statement of her

5    version of today's incident in your office.  So now can I ask

6    the same of you just what led up to it and what you remember

7    for the conversation.

8          That's what he asked you, right?

9    A.   Yes.

10         MR. KILROY:  Your Honor, I offer this into evidence.

11         MR. KOLMAN:  I have no objection.

12         THE COURT:  So marked.

13         What number, please?

14         MR. KILROY:  310, your Honor.

15         THE COURT:  So marked.

16   (Exhibit No. 310 was admitted into evidence.)

17         MR. KILROY:  May I publish it, please.

18   BY MR. KILROY:

19   Q.   When you received this email on September 21st, 2017,

20   entitled, incident with Dr. Dill today, you knew what

21   Dr. Brennan was asking you about, right?

22   A.   Yes.

23   Q.   You actually at that time recalled the meeting in your

24   office with Dr. Dill, correct?

25   A.   Yes.

1    Q.    You were aware that Dr. Dill had left your office and had

2    reported the incident to Dr. Brennan that morning, right?

3    A.    That I didn't know until I got this email that she had

4    already complained, but I did not know that.

5    Q.    But eventually you realized she did?

6    A.    Yes, yes.

7    Q.    And he actually told you that he had asked Karin for her

8    statement, right?

9    A.    No, she had already done it.  So he was asking my side.

10   Q.    Right.  But what I'm saying is when you got this email,

11   you knew he already had received the statement from Dr. Dill,

12   right?

13   A.    Yes.

14   Q.    Okay.  And so you responded to Dr. Brennan, correct?

15   A.    Yes.

16   Q.    This was an email you actually responded to, right?

17   A.    I have responded to some other ones too.

18   Q.    And in your view, the incident with Dr. Dill was minor,

19   correct?

20   A.    It was exaggerated.

21   Q.    I'm sorry.

22   A.    It was exaggerated.

23   Q.    Right, but I'm asking you -- I understand you say it was

24   exaggerated.

25             I'm asking you:  Did you view it as just a minor

1   incident with her?

2   A.   As far as I'm concerned she exaggerated what happened.

3   Q.   Right.

4   A.   Yes.  Yeah.

5   Q.   Okay.  And you actually characterized it as just a

6   two-minute conversation in your office, right?

7   A.   Yes.

8   Q.   And --

9        MR. KILROY:  Well, let's go to Exhibit 311 for

10   identification, please.

11   Q.   Dr. Desai, I'm showing you 311 for identification, which

12   is an email that same date, although about three hours later

13   from you to Dr. Darren Brennan.

14        Do you see that?

15   A.   Yes.

16   Q.   And this was your response to Dr. Brennan's request for

17   you to provide information on the incident, right?

18   A.   Yes.

19        MR. KILROY:  Your Honor, I offer this into evidence,

20   Exhibit 311.

21        MR. KOLMAN:  No objection.

22        THE COURT:  So marked.

23   (Exhibit No. 311 was admitted into evidence.)

24        MR. KILROY:  May I publish, please?

25        THE COURT:  You may.

1    BY MR. KILROY:

2    Q.   So, Dr. Desai, when the vice chair of radiology asked for

3    your account of the incident, this is all you initially

4    provided to him, right?

5    A.   Yeah, basically what happened in the 2 minutes.

6    Q.   And as you state in here, the conversation lasted

7    approximately 2 minutes, right?

8    A.   Yeah.

9    Q.   And from your perspective, it was really no big deal what

10   happened with Dr. Dill that morning, right?

11   A.   Yeah, because what she said was not --

12   Q.   Right.  I'm just asking from your perspective, you thought

13   it was no big deal, the interaction?

14   A.   Yeah.

15   Q.   Okay.  Now, you're aware that Dr. Dill provided a much

16   more detailed account of the interaction, correct?

17   A.   Afterwards, I saw that, yeah.

18   Q.   I'm sorry.

19   A.   Afterwards.  I didn't see that --

20   Q.   Right.  As you sit here today --

21   A.   Yes.

22   Q.   -- you know she provided a much more detailed --

23   A.   She did.  She did.

24   Q.   And she provided that prior to your 1:30 recitation,

25   right?

1    A.   Yes.

2         MR. KILROY:  Can I have Exhibit 309 for

3    identification, please.

4         MR. KOLMAN:  Hearsay.

5         MR. KILROY:  I haven't offered it.

6         THE COURT:  Are you going to?

7         MR. KILROY:  No.

8         THE COURT:  Thank you.

9    BY MR. KILROY:

10   Q.   I'm showing you a document.  Dr. Desai, it's a

11   September 21, 2017, email from Dr. Dill to Darren Brennan and

12   Max Rosen, dated -- I'm sorry -- time stamped 10:03 a.m., so

13   over three hours prior to yours, correct?

14   A.   Yes.

15   Q.   And fair to say -- and I'll give you time to read this,

16   and when you want me to move it up, let me know.

17        But fair to say she provides significant amount of

18   detail concerning the interaction with you that morning, right?

19   A.   Yes.  I haven't read everything, but yes.

20   Q.   I'm going to ask you some questions about the interaction.

21   A.   Can I -- can I read them?

22   Q.   Yes, please.  Take your time.

23   A.   (Witness reviewed the document.)

24        MR. KOLMAN:  Your Honor, may I be heard?

25        THE COURT:  In a minute you may, yeah.  I'm just

1    reading it myself.

2            (Pause.)

3            MR. KOLMAN:  Music?

4            THE CLERK:  All set.

5            (Sidebar as follows:)

6            MR. KOLMAN:  Your Honor, this is an attempt to bring

7    in a hearsay document by having it effectively with the content

8    thereof effectively engaging my client.  I believe that it's

9    improper.  When a hearsay document isn't --

10           THE COURT:  Hold up.  What question are you going to

11   ask, please?

12           MR. KILROY:  The initial question, your Honor, is did

13   you say sit to -- to Dr. Dill in the office.  I'm going to ask

14   her, did you say this?  Do you recall her saying that?  I'm

15   going to ask questions about the -- whether she recalls what's

16   being recounted.

17           MR. KOLMAN:  This is an attempt to authenticate this

18   document using hearsay.

19           THE COURT:  Well, I -- I -- I agree with you that this

20   document is not coming in.

21           Can you hear me?  I'm sorry.  I agree with you that

22   this document is not coming in; and frankly, I think it would

23   have been better if you had asked the questions and gotten her

24   memory of that before you showed her this, but she has seen it,

25   and just straight up ask her the questions without referring to

1        the document, and we'll be fine.

2              MR. KILROY:  Thank you, your Honor.

3              (End of sidebar.)

4              MR. KILROY:  Your Honor, I believe the --

5              THE WITNESS:  Can I see the lower part, please?

6              THE COURT:  Oh, I'm sorry.

7              JUROR:  May I be excused for a minute?

8              THE COURT:  Of course, yeah.  Tell you what, why don't

9        we -- why don't we just take 5 minutes, and then we'll all come

10       back then.

11             How does that sound?

12             JUROR:  Okay.  Thank you.

13             THE CLERK:  All rise.

14             (At 9:53 a.m., the jury left the courtroom.)

15             THE COURT:  By the way, I am going to -- you can step

16       down, Doctor.

17             THE WITNESS:  Okay.

18             THE COURT:  I'm going to give the jury a hopeful

19       update on where we are on time by the end of the day.  Okay.

20             MR. KOLMAN:  Sure.

21             THE COURT:  So I'll be asking your opinions.

22             MR. KOLMAN:  Sure.

23             THE COURT:  See -- and seriously, let's try to get

24       them back in five, if we can.

25             (Recess from 9:54 a.m. until 10:01 a.m.)

1           THE CLERK:  All rise.

2           THE COURT:  Court is now open.  You may be seated.

3           MR. KILROY:  Thank you, your Honor.

4    BY MR. KILROY:

5    Q.   Dr. Desai, when we broke -- I'm sorry.

6    A.   Yeah, can I see the lower part of the email, please?

7           MR. KILROY:  That document we had up.

8           THE WITNESS:  Just the lower part.  Even beyond that.

9    Is that the last -- is that it?

10          THE COURT:  Is that the bottom?

11          MR. KILROY:  That's -- that's the bottom.

12          THE COURT:  Okay.

13          THE WITNESS:  Oh, okay.

14          THE COURT:  Thank you.

15   BY MR. KILROY:

16   Q.   Do you still need it up or?

17   A.   No, I'm okay.

18          THE COURT:  I actually do.

19          MR. KILROY:  Okay.  Sorry, your Honor.

20          THE COURT:  I actually do.

21          Thank you.

22   BY MR. KILROY:

23   Q.   Now, back to the incident in your office on September 21st,

24   early that morning with your division chief.

25          Do you recall telling your division chief when she

1    entered your office, sit?

2    A.    Yeah, it was you sit, I sit kind of thing.

3    Q.    Well, did you tell her sit?

4    A.    No, no reason to.

5    Q.    You don't recall that?

6    A.    No reason to.

7    Q.    Okay.  Do you recall saying to Dr. Dill, I'm very mad

8    about Dr. Rosen's email that was sent?

9    A.    Yes.

10   Q.    And, in fact, you were mad that Dr. Rosen, your chair, had

11   sent an email to you providing a directive to you, right?

12   A.    Can I see that email if you have one?

13   Q.    I'd like you to answer my question first.

14   A.    Yes.

15   Q.    You were mad that Dr. Rosen sent you an email that

16   provided the directive to you, right?

17   A.    Yeah, but I don't remember the content right now.  It's so

18   long ago.

19   Q.    I'll show you what's already admitted into evidence as

20   Exhibit 308, which was an email from Dr. Rosen to yourself the

21   prior evening, September 20th, at 6:15 p.m., subject matter,

22   residents rotating on chest need to follow readout assignments.

23         I'll give you a second to read that.

24   A.    So this was the day before, yeah, but I don't remember if

25   this --

1          THE COURT:  Wait.  We need to have a question.

2          THE WITNESS:  Okay.  Go ahead.

3          THE COURT:  Go ahead, Attorney Kilroy, please.

4          MR. KILROY:  Thank you, your Honor.

5     BY MR. KILROY:

6     Q.   Dr. Desai, your chair made clear to you that you were to

7     follow the direction of your division chief, right?

8     A.   Yes.

9     Q.   And he made clear what the purpose of the reading schedule

10    was for the residents, correct?

11    A.   Yes, but I don't think the schedule was made at this

12    point, that's my thing.

13         MR. KILROY:  I'll move to strike all after yes,

14    please.

15         THE COURT:  That's stricken.  Please disregard it.

16    BY MR. KILROY:

17    Q.   And the chair asked you to please respond to the email

18    acknowledging that you'll follow the policy, right?

19    A.   Yes.

20    Q.   And you don't recall ever responding to your chair on this

21    email, do you?

22    A.   I do not.

23    Q.   But you were mad with Dr. Dill, because the chair of

24    radiology told you to follow a directive of Dr. Dill's, right?

25    A.   Please repeat the question.

1    Q.   You were mad with Dr. Dill that morning because the prior

2    evening the chair of radiology told you to comply with the

3    directive?

4    A.   What I thought that seemed liked her complaint.  And at

5    that time I don't think the schedule was there, who was going

6    to read what.

7    Q.   So you were mad because Dr. Dill complained to Dr. Rosen

8    that you weren't following the readout schedule?

9    A.   I was mad at her because she complained.

10   Q.   So --

11   A.   And the schedule was not there, who is going to read what.

12   Q.   So you wanted to talk to your division chief because you

13   were mad at her because she needed help from Dr. Rosen to get

14   you to comply with the readout schedule with the residents,

15   right?

16   A.   No.  The incident had -- was not related to that.  It

17   was some -- her rudeness with me.

18   Q.   Do you recall in that meeting saying to your division

19   chief, well, I let that slide, but now I'm not because I'm very

20   angry about this email?

21   A.   That would have not -- this email is a separate thing.

22   What I was mad that she was rude a few days before also when

23   she was standing in front of the resident that I'm going to

24   read kind of.

25   Q.   Can I ask you to actually answer my question now, please.

1    Did you say to your division chief in your office, well, I let

2    that slide, but now I'm not because I'm very angry about this

3    email?

4    A.   Yeah, I meant -- maybe it didn't come out that way.  I

5    meant that I was --

6    Q.   Okay.  I didn't ask you what you meant.  You said that,

7    right?

8    A.   Yes, but both are not.  It is a different --

9             THE COURT:  So, Doctor, remember, please.

10            THE WITNESS:  Okay, yeah, yes.

11            THE COURT:  Listen, trust -- Doctor.

12            THE WITNESS:  Yes.

13            THE COURT:  Please trust that Mr. Kolman --

14            THE WITNESS:  Yeah, yeah.

15            THE COURT:  -- will have an opportunity --

16            THE WITNESS:  You are right.  I'm sorry.

17            THE COURT:  -- clean up anything that --

18            THE WITNESS:  I'm sorry.

19            THE COURT:  -- that he thinks needs to be cleaned up,

20    okay?

21            THE WITNESS:  Okay.

22            THE COURT:  Thank you.

23            THE WITNESS:  Sorry about that.

24    BY MR. KILROY:

25    Q.   And do you recall your division chief, Karin Dill,

1   Dr. Karin Dill, stating to you, Charu, I don't appreciate that

2   you're yelling at me and by calling me names like I'm rude.

3           Do you recall her saying that to you in your office?

4   A.   Yes.

5   Q.   And do you recall her stating to you, I've never been rude

6   to you?

7   A.   It's not true though.

8   Q.   Do you recall her saying that?

9   A.   She said that I'm not rude to you.

10  Q.   And do you recall --

11  A.   But that is not true though.  Okay.  Fine.

12          THE COURT:  Doctor, didn't we just -- didn't I just

13  talk to you about this?

14          THE WITNESS:  I keep forget.  Okay.

15          THE COURT:  I know.

16          THE WITNESS:  Yes.

17          THE COURT:  Listen --

18          THE WITNESS:  Yes.

19          THE COURT:  -- here's the thing, Doctor.  Here's the

20  thing.  I mentioned this to you a bunch of times, okay.

21          THE WITNESS:  You did.  You did.

22          THE COURT:  So I need you to really --

23          THE WITNESS:  Focus.

24          THE COURT:  -- concentrate.

25          THE WITNESS:  Focus.  I will.  I will try hard.

1        THE COURT:  Thank you.  I appreciate that.

2        THE WITNESS:  I will try hard.

3   BY MR. KILROY:

4   Q.   Do you recall Dr. Dill in that meeting with you that

5   morning stating to you, You have been unkind to me and have

6   yelled at me multiple times since I've started?

7   A.   Yes, she stated that.

8   Q.   And you replied, I only did that to you once, right?

9   A.   Yes.

10  Q.   Do you think it's appropriate for you to yell at your

11  boss?

12  A.   I did not yell at my boss.

13  Q.   Ma'am, you just said --

14  A.   It is her opinion how she took it.

15       MR. KILROY:  I'll move to strike.

16       THE WITNESS:  No, it is not.

17  BY MR. KILROY:

18  Q.   Well, you just admitted you did yell at her because I said

19  to you --

20       MR. KOLMAN:  Objection.

21       THE WITNESS:  Yes.

22       THE COURT:  Sustained.  Sustained.

23       Let's have a question, not a statement, please.

24  BY MR. KILROY:

25  Q.   Do you recall you shook your finger in Dr. Dill's face

1    that morning?

2    A.   Yes, I think it was once.  That was the purpose of the

3    finger.

4    Q.   And do you recall her stating, I don't like you putting

5    your hand in my face like you're going to hit me, and you need

6    to stop yelling at me?

7    A.   There was no intent of hitting anybody.

8    Q.   Ma'am, that wasn't my question.

9         Do you recall her making that statement to you?

10   A.   She did.

11   Q.   Now, if according to you this was a two-minute

12   conversation and no big deal, why did you send another email to

13   Dr. Brennan later that afternoon?

14   A.   Just to explain the situation in the chest division in

15   general.

16   Q.   Well, but you had already explained it, ma'am.

17        Why did you feel the need to send a second email?

18   A.   Just to express how I felt, what is happening in the chest

19   division.

20   Q.   Well, no one asked you for more information, right?

21   A.   Yeah, but.

22   Q.   And -- and actually it was your daughter, Diana Desai?

23   A.   She helped me, yes.

24   Q.   Let me finish, please.  It was your daughter who has been

25   here the majority of the trial, who advised you of the need to

1    send a second email, right?

2    A.    Yes.

3    Q.    And she advised you to do so in an attempt to avoid

4    responsibility for your behavior, right?

5    A.    Responsibility for what?

6    Q.    She advised you in an attempt for you to avoid

7    responsibility for your improper behavior with your chief,

8    right?

9    A.    It was not alleged improper behavior.  It was just to

10   acknowledge what's going on.

11   Q.    I would like you to focus on my question, please.

12         My question is your daughter, Diana Desai, advised you

13   to send a second email in an attempt to avoid responsibility

14   for your improper behavior; isn't that right?

15   A.    No.

16   Q.    And actually, it was your daughter who drafted the email

17   to send, right?

18   A.    She helped me, yes.

19   Q.    Well, she didn't help you, ma'am, she drafted it, right?

20   A.    Yes.

21   Q.    And she drafted an email for you to send so you could try

22   and place blame on Dr. Dill to avoid responsibility for your

23   actions earlier that day, right?

24         MR. KOLMAN:  Objection.

25         THE COURT:  Sustained.

1          MR. KILROY:  312.

2    Q.    I'm going to show you Exhibit 312 for identification.

3          Do you recognize this document?

4          THE COURT:  312?

5          MR. KILROY:  Yes, your Honor.

6          THE COURT:  Thank you.

7          (Counsel conferred.)

8    BY MR. KILROY:

9    Q.    Are you ready, Dr. Desai?

10   A.    Yes.

11   Q.    This is an email dated September 21st, 2017, at 1:55 p.m.,

12   and it's from Diana Desai to you, correct?

13   A.    Yes.

14   Q.    And Diana Desai listed as the subject Dr. Dill, right?

15   A.    Yes.

16   Q.    She didn't list as the subject the incident in that

17   morning that Dr. Darren Brennan asked about, right?

18   A.    That is true.

19   Q.    And instead -- well, Doctor -- Diana Desai did not work

20   with Dr. Dill ever, did she?

21   A.    She did not.

22   Q.    She was not working for UMass Memorial at the time, was

23   she?

24   A.    She was not.  She just helped me, I told you.

25   Q.    She had no idea through personal observation anything

1    about Dr. Dill, did she?

2    A.   It was -- I -- I'm the one who has the idea.

3    Q.   Right.  But she's the one who drafted this email for you?

4    A.   Yes.

5    Q.   And she was trying to protect you from getting in trouble

6    for your behavior that morning, wasn't she?

7    A.   No.

8    Q.   So despite this being a minor issue involving a two-minute

9    conversation that you claim was exaggerated by Dr. Dill, you

10   and your daughter felt the need to send this email later in the

11   day, not about the incident, but about Dr. Dill in general,

12   right?

13   A.   Yes.

14   Q.   And actually your daughter states in the email that

15   Dr. Dill has had several inappropriate interactions with you

16   since she began working in the chest division, right?

17   A.   Yes.

18   Q.   Now, you never raised these inappropriate interactions to

19   Dr. Brennan previously, so why the need to raise them that day?

20   A.   I'm not one of people who is going to complain about

21   anybody, including Dr. Dill.  It's just not in my nature.

22   Q.   So why complain about her that day?

23   A.   Yeah, because I knew that she wrote big thing and made a

24   big deal; and by the way, the etching was on the wall, and I

25   didn't hear anything from them afterwards so.

1    Q.    Ma'am, that's not true.

2              MR. KOLMAN:  Objection.

3              THE COURT:  Sustained.  Let's have a question.

4    BY MR. KILROY:

5    Q.    You testified earlier you didn't see her email.  You

6    didn't know she had written a long email.  And now you're

7    telling the jury that you knew she had written a long email as

8    of 1:55 p.m.?

9    A.    No, but after Dr. Brennan told me, I knew she had written,

10   and I knew it went to the HR meeting and all that.

11   Q.    You didn't go to an HR meeting on September 21st between

12   10:00 a.m. and 1:55, did you?

13   A.    No, I didn't go to --

14   Q.    So how -- I'm sorry.  I didn't mean to interrupt you.

15             Go ahead.

16   A.    I didn't -- but I know that she wrote it, and the subject

17   went for an investigation.  And I never heard anything after

18   that.

19   BY MR. KILROY:

20   Q.    But you knew nothing about what she wrote in her email.

21   You couldn't testify to this jury that she wrote a long email,

22   could you?

23   A.    No, you just showed me.  Yes.

24   Q.    Dr. Desai, fair to say any time you faced constructive

25   critique within UMass Memorial, you turned to your daughter,

1    Diana, who doesn't work at UMass Memorial, to attempt to bail

2    you out of any trouble, right?

3    A.   No, that's not true.  She helps me with the email.

4    Q.   Let's look at Exhibit 96 -- 296.  It's already in

5    evidence.

6         You recall receiving this email from your chair,

7    Dr. Rosen?

8    A.   Yes.

9    Q.   And this was a detailed meeting where Dr. Rosen spoke with

10   you about a whole host of issues involving your performance,

11   right?

12   A.   I don't think it was performance related.  It was general.

13   It was not quality relate -- related to my work.

14   Q.   Right.  I didn't ask you about quality.  He wrote you

15   about a whole host of issues dealing with your work

16   performance, right?

17        MR. KOLMAN:  Objection.

18        THE COURT:  Overruled.

19        THE WITNESS:  It's not work performance.  It's just

20   coming in a little late problem he's talking about.

21   BY MR. KILROY:

22   Q.   Well, coming in late in your assessment that doesn't deal

23   with your work performance?

24   A.   If you say so, maybe it does.

25   Q.   Okay.  And leaving early where there are urgent cases that

1   need to be cleaned up before anyone leaves, that doesn't relate

2   to your work performance?

3   A.   That's completely false.  I'm the one there every day

4   after five o'clock.

5        MR. KILROY:  Move to strike, your Honor.

6   Nonresponsive.

7        THE COURT:  That is stricken.

8   BY MR. KILROY:

9   Q.   My question was:  Do you agree that him speaking about

10  leaving prior to urgent cases being read that that deals with

11  work performance?

12  A.   It's not true.

13  Q.   Can you answer my question now, please?

14  A.   If it was true, then it is, but it is not true.

15  Q.   And he also talked to you about the need to respond to

16  emails in a timely manner, that deals with work performance as

17  well, right?

18  A.   Yes, but I didn't correspond with the email that much.

19  Q.   And he also talked to you about making sure you submit

20  your vacation requests in compliance with policy, that deals

21  with work performance as well, right?

22  A.   I suppose.  I know most of the time I have given him time.

23  Q.   That wasn't my question, ma'am.  Did he --

24  A.   Yes.

25  Q.   Do you agree that --

1    A.   Yes.

2    Q.   Okay.  And he references a thank you for meeting with him

3    and Randa today.

4         Who is Randa?

5    A.   It's his -- what do you call it -- finances he does in

6    that, Dr. Rosen's.

7    Q.   It's Randa Mowlood, correct?

8    A.   Yes.

9    Q.   And fair to say that they met to discuss the issues that

10   were -- that he summarized on this email to you?

11   A.   Yes, I think she was in the room, too, probably.

12   Q.   And in that meeting Dr. Rosen made clear you're to report

13   to work on time unless you have a need to be out due to illness

14   in which case you can use family medical leave, that time,

15   right?

16   A.   Yes.

17   Q.   And he spoke to you about the need for you to handle all

18   urgent or other appropriate cases before leaving for the day,

19   right?

20   A.   I always did.

21   Q.   That wasn't my question.

22   A.   Even if it was after six o'clock.  I did.

23            THE COURT:  Doctor.  Doctor.

24            THE WITNESS:  Yes.

25            THE COURT:  Thank you.

1    BY MR. KILROY:

2    Q.    And you'd agree that that's a necessary expectation in the

3    department to ensure patient safety, right?

4    A.    Yes.

5    Q.    He informed you the -- that emails is the default way of

6    communicating in the department, and you need to respond in a

7    timely manner, right?

8    A.    Yes.

9    Q.    He made clear to you in writing the policy as to academic

10   time, you should submit in writing any activities you'd like to

11   undertake to be granted time, right?

12   A.    Yes.

13   Q.    And he made clear to you to submit your vacation requests

14   in compliance with policy?

15   A.    Yes.

16         MR. KILROY:  Exhibit 297, please.  It's already in

17   evidence.

18   Q.    Do you recognize this May 24th email from Dr. Rosen to

19   you?

20   A.    Yes.

21   Q.    And in this email, Dr. Rosen, as your chair, is writing to

22   you again about arriving late and leaving early, correct?

23   A.    Not true.

24   Q.    I'm asking if he's writing to you about that, ma'am?

25   A.    Yes.

1   Q.   And he's also writing to you about concerns he had as to

2   your attitude at work, right?

3   A.   That's not true also.

4           MR. KILROY:  Motion to strike, your Honor.

5           THE WITNESS:  Yes.  Yes.  Yes.  Yes.

6   BY MR. KILROY:

7   Q.   And he reiterated the need for you to have a positive

8   attitude and refrain from any discussions of interpersonal

9   issues or criticisms about the work process or other faculty in

10  front of residents or trainees, right?

11  A.   Yes.

12  Q.   Now, instead of responding yourself to your chair,

13  Dr. Rosen, your daughter Diana once against crafted a response

14  designed to deflect responsibility, right?

15          MR. KOLMAN:  Objection.

16          THE COURT:  Sustained.

17          MR. KILROY:  Exhibit 300.  For identification only,

18  please.

19  Q.   Dr. Desai, do you recognize this email?

20  A.   Yes.

21  Q.   And the subject of the email is meeting response, correct?

22  A.   Yes.

23  Q.   And the date of this email is May 30th, 2016, right?

24  A.   Yes.

25  Q.   And this was meant to be a response to the meetings that

1    you had with Dr. Rosen, correct?

2    A.    Yes.

3    Q.    Where he addressed concerns about your behavior and the

4    work environment, right?

5    A.    Yes.

6    Q.    And this email is not drafted by you, is it?

7    A.    My daughter helped me, yes.

8    Q.    And your daughter has no personal knowledge of anything in

9    this email, does she?

10   A.    Well, I am telling what is.  She's just helping me to

11   write, because I am working there.

12   Q.    Nearly a year later, following your notice of termination,

13   your daughter once against drafted an email for you to send to

14   Dr. Rosen, right?

15   A.    Yes.

16          MR. KILROY:  For identification, please.  Exhibit 324

17   for identification.

18   Q.    And again, this is your daughter sending you a draft that

19   you could send on to Dr. Rosen, correct?

20   A.    Yes.  Yes.

21   Q.    Fair to say your daughter is very protective of you?

22   A.    She's just helping me.

23          MR. KOLMAN:  Objection.

24   Q.    I'm sorry.

25   A.    She's helping me with the email because I'm --

1          MR. KOLMAN:  Objection.

2          THE COURT:  Overruled.

3   Q.   Fair to say she was incredibly angry that UMass Memorial

4   terminated your employment?

5          MR. KOLMAN:  Objection.

6          THE COURT:  Sustained.

7   BY MR. KILROY:

8   Q.   She has no training in chest radiology, right?

9   A.   No.

10  Q.   No ability to assess your quality in chest, right?

11  A.   No.

12  Q.   And, Dr. Desai, your daughter is the person who told you

13  to file a discrimination claim against Dr. Rosen, isn't she?

14         MR. KOLMAN:  Objection.

15         THE WITNESS:  No.

16         THE COURT:  Sustained.

17         (Defendant counsel conferred.)

18         MR. KILROY:  I'm going to show you Exhibit 95, which

19  is in evidence already.

20  BY MR. KILROY:

21  Q.   This is your notice of termination, correct?

22  A.   Yes.

23  Q.   The two signators on this, one is your chair, Dr. Rosen,

24  right?

25  A.   Yes.

1    Q.   And the other one is Stephen Tosi, the president of the

2    medical group at the time, right?

3    A.   Yes.

4    Q.   And you had known Dr. Tosi since even before joining UMass

5    Memorial in the 1990s, right?

6    A.   Almost 40 years, 35 years I said.

7    Q.   You've always respected Dr. Tosi, haven't you?

8    A.   Yes.

9    Q.   You've always considered him to be a fair man, right?

10   A.   Not in this case, because I was shocked when I saw his

11   signature.

12   Q.   Okay.  He's as old as you, right?

13   A.   Maybe a little bit younger.  I don't know how old he is.

14   Q.   And prior to this you actually considered him to be a

15   friend of yours, right?

16   A.   Hundred percent.  I was shocked when I saw the sign -- the

17   signature, because he knows me very well.

18   Q.   And just to be clear, despite getting notice of

19   termination in March of 2018, you didn't -- in 12 months, you

20   didn't apply for a single job until July of 2019, correct?

21   A.   Yes.

22   Q.   And you're not -- you are not claiming that any emotional

23   distress prevented you from being able to apply for jobs,

24   right?

25   A.   You think this is a novel incident to terminate somebody

1    for.

2              MR. KILROY:  Your Honor.

3              THE WITNESS:  You don't think that affects the brain.

4    That's not --

5              MR. KILROY:  Move to strike, your Honor.

6              THE WITNESS:  No.

7              THE COURT:  That answer's stricken.

8              THE WITNESS:  No.  Okay.  What --

9    BY MR. KILROY:

10   Q.   So my question, ma'am, is you are not claiming that any

11   emotional distress prevented you from being able to apply for

12   employment, right?

13   A.   It did affect me.

14             MR. KILROY:  26-1.

15             THE COURT:  All right.  Why don't we take the morning

16   break here.

17             So let me just give you just sort of a heads up of the

18   schedule today.  So we're going to take the regular break right

19   now, and then we'll see you back here in about 20.  And then

20   what we'll do is we'll go until noon, and we've asked that the

21   lunches be delivered for noon.  We'll see.  But once they get

22   here, we'll break, give you guys 40, 45 minutes.  When you are

23   ready to come back, we'll come back.  We'll see what the break

24   schedule is.  We'll take a break in the afternoon and go until

25   about 3:00.  Okay.

1           THE CLERK:  All rise.

2           THE COURT:  Oh, I'm sorry.  I'm sorry, Marty, one

3   other thing.

4           At the end of today, I am going to give you an update

5   on how we're doing on schedule.  I know that's something that

6   everybody wants to know.  Okay?

7           THE CLERK:  All rise.

8           (At 10:29 a.m., the jury left the courtroom.)

9           THE COURT:  Thank you, Doctor.  You can step down.

10          THE WITNESS:  Thank you.

11          THE COURT:  How much more, Mr. Kilroy?

12          MR. KILROY:  Your Honor, I would anticipate about

13   20 minutes, 15, 20 minutes.

14          THE COURT:  How long?

15          MR. KOLMAN:  I'm sorry, your Honor.  Well, there's a

16   lot to cover.  I'll try to be swift.

17          THE COURT:  I need a number.  I need a number.

18          MR. KOLMAN:  I said 45 minutes, maybe a little longer

19   than that.  Maybe an hour.

20          THE COURT:  Okay.  Thank you.

21          And by the way, I do want to let them know how this is

22   going to end.

23          MR. KOLMAN:  Sure.

24          THE COURT:  And I am holding you to your time.

25          MR. KOLMAN:  Oh, that's right.

1          (Recess from 10:30 a.m. until 10:55 a.m.)

2          THE CLERK:  All rise.

3          (At 10:55 a.m., the jury entered the courtroom.)

4          THE CLERK:  Court is now open.  You may be seated.

5          MR. KILROY:  Thank you, your Honor.

6    BY MR. KILROY:

7    Q.   Dr. Desai, when we broke, just before we broke, I asked

8    you about whether your emotional distress that you're claiming

9    in this case prevented you from applying for jobs, and you

10   talked about it had.

11          I'm going to show you a deposition cite, page 376 of

12   your deposition, lines 8 to 17.

13          There's an embedded objection.  Do you want to be

14   heard on that?

15          MR. KOLMAN:  Yeah.

16          (Sidebar as follows:)

17          THE COURT:  What's your objection?

18          MR. KOLMAN:  First of all, she's not capable of

19   determining her emotional distress at this juncture, and

20   this -- this -- this is an expert opinion as has emotional

21   distress prevented her from being able to apply for employment.

22   I think it's -- it's unfair, completely unfair, improper to ask

23   her that question.

24          THE COURT:  Overruled.

25          (End of sidebar.)

1    BY MR. KILROY:

2    Q.   Dr. Desai, I'll read -- I will read my question and the

3    answer and just ask if I read it correctly.

4         You were asked under oath:  Has your emotional

5    distress prevented you from being able to apply for employment?

6         You answered:  It's difficult.  It's not easy

7    because -- and then I asked:  I'm just asking, has your --

8         You continued:  To think about it is difficult, okay.

9         And I said:  Has it prevented you, ma'am, not

10   difficult, has it prevented you from applying for employment?

11        Your answer:  No.  I have applied all along, right.

12        Did I read that correctly?

13   A.   Yes.

14   Q.   Dr. Desai, when applying for jobs beginning 15 months

15   after your term -- your notice of termination in July of 2020,

16   you submitted all applications through your daughter's,

17   Diana's, email address, didn't you?

18   A.   Yes.

19   Q.   In fact, you instructed your daughter to submit

20   applications on your behalf using her address, not yours,

21   right?

22   A.   Yes.

23   Q.   You did this because you admit you're very poor at using

24   technology such as email or texting on a phone, correct?

25   A.   Yes.

1    Q.   Dr. Desai, would you agree on any given day, 365 days a

2    year, there are job opportunities for radiologists within

3    Massachusetts?

4              MR. KOLMAN:  Objection.

5              THE COURT:  Overruled.

6              THE WITNESS:  Please repeat the question.

7    BY MR. KILROY:

8    Q.   Sure.  Do you agree on any given day, 365 days a year,

9    there are job opportunities available for radiologists in

10   Massachusetts?

11   A.   There are, yeah.

12   Q.   And likewise, 365 days a year, there are job opportunities

13   for radiologists throughout New England, correct?

14   A.   Yes.

15   Q.   And likewise, throughout the United States, right?

16   A.   Yes.

17   Q.   And your applications that you submitted, you never

18   received any level of response from any application, did you?

19   A.   I did not.

20   Q.   And you never inquired as to why you weren't hired for any

21   position, did you?

22   A.   Even if I inquired,they're not going to tell me the truth.

23   Q.   I'm saying you never asked any of the employers who were

24   looking for radiologists why they didn't hire you, right?

25   A.   No.

1    Q.   And you weren't even -- you never even made it to an

2    interview stage, did you?

3    A.   No.

4         MR. KILROY:  Exhibit 329, please.  Exhibit 329 for

5    identification, please.

6    Q.   Dr. Desai, I'm showing you a document dated August 29,

7    2019.

8         Do you recognize this document?

9    A.   Yes.

10   Q.   And this is a communication with your daughter regarding a

11   job opportunity in Fall River, correct?

12   A.   Yes.

13        MR. KILROY:  Your Honor, I offer this into evidence as

14   Exhibit 329, please.

15        MR. KOLMAN:  I don't have an objection.

16        THE COURT:  So marked.

17        MR. KILROY:  May I publish it, please?

18        THE COURT:  You may.

19   (Exhibit No. 329 was admitted into evidence.)

20   BY MR. KILROY:

21   Q.   And just to be clear, the to line is your daughter's email

22   address, correct, Diana Desai?

23   A.   Yes.

24   Q.   So to the outside world -- strike that.

25        To this gentleman Eric Bellagua, he would be

1    communicating with Diana Desai, not you, right?

2    A.   Yes.

3    Q.   And the opportunity that was offered or was available was

4    a position in Fall River, right?

5    A.   Yes.

6    Q.   And you didn't even respond to this when it says, Any

7    interest in working in Fall River reading diagnostics only?

8         You didn't respond, did you?

9    A.   No.

10   Q.   And you didn't respond because you felt Fall River was too

11   far for you to travel; isn't that right?

12   A.   Yes, because I don't drive on the highway.

13   Q.   Right.  You don't drive on the highway at all, do you?

14   A.   No, I don't, because of my heart condition.

15   Q.   And despite not driving on the highway, you never applied

16   for any teleradiology positions, did you?

17   A.   I did not.

18   Q.   And teleradiology positions are positions that you can

19   work from home; isn't that right?

20   A.   Yes.

21   Q.   And you never applied for any per diem positions either,

22   did you?

23   A.   No.  Because all of them require more than one modality.

24        MR. KILROY:  I'll ask to move to strike, your Honor.

25        THE COURT:  That's stricken.

1    BY MR. KILROY:

2    Q.   Dr. Desai, you are not a specialist in abdominal

3    radiolog- -- abdominal imaging, are you?

4    A.   No.

5    Q.   And you're not a -- you are not a specialist in

6    musculoskeletal radiology, are you?

7    A.   No.

8            MR. KILROY:  Exhibit 326 for identification, please.

9    Q.   Dr. Desai, I'm showing you an email chain in July of 2019,

10   and just tell me when you would like me to advance it to the

11   next page so you can see the prior emails, I'll do so.

12   A.   So what is the question?

13   Q.   Just let me know when you want to see the next page of the

14   email.

15   A.   Go ahead.  Yes.

16   Q.   And this is a chain of emails seeking a job opportunity,

17   and again it was being sought through your daughter, Diana

18   Desai, correct?

19   A.   Yes.

20           MR. KILROY:  Your Honor, I'd like to offer this into

21   evidence as Exhibit 326.

22           MR. KOLMAN:  No objection.

23           THE COURT:  So marked.

24   (Exhibit No. 326 was admitted into evidence.)

25           MR. KILROY:  And can I have it published, please.

1    BY MR. KILROY:

2    Q.   And just to orient the top line, from, that's not your

3    email address, is it?

4    A.   Correct.

5    Q.   And the subject was radiology position application?

6    A.   Yes.

7    Q.   I'm going to show you the start of the email chain.

8            The bottom email is from Diana Desai to Dawn Rainwater

9    at VA.gov, and Diana states -- that's her name, it's you, and

10   says that your CV position -- your CV is attached, right?

11   A.   Yes.

12   Q.   And that was the CV that wasn't updated, correct?

13   A.   Yes.

14   Q.   You indicate, however, or your daughter indicates on your

15   behalf, that you're highly interested in that position, right?

16   A.   Yes.

17   Q.   Now, the question arises from Mr. Rainwater, what position

18   are you interested in?

19   A.   Yes.

20   Q.   And your daughter replies abdominal imaging, right?

21   A.   Yes.

22   Q.   You don't have that specialty, do you, ma'am?

23   A.   It's a general radiology, so I know enough.  I can do

24   abdominal imaging.  And it's sometimes to get through the door,

25   and maybe they will find a position what I'm good at.  It is to

1    try to get in anywhere.

2              MR. KILROY:  Your Honor, I move to strike her answer.

3              THE COURT:  Sustained.  It's stricken.

4    BY MR. KILROY:

5    Q.    My question is:  You are not a specialist in abdominal

6    imaging, are you?

7    A.    I do not have fellowship.

8    Q.    Well, you haven't worked as an abdominal imager for over

9    40 years, right?

10   A.    Over?  Say that again.

11   Q.    You haven't worked as an abdominal imager for over

12   40 years; you don't have the experience in abdominal imaging?

13   A.    I do.  I do.  Because in the beginning even it is to --

14   even though you are subspecialized, you teach as a resident

15   where all the modalities are done.

16   Q.    And so when did you just specialize in chest?  When did

17   that occur?

18   A.    Maybe approximately 20 years ago.

19   Q.    Twenty years ago --

20   A.    Yes.

21   Q.    -- since you've done abdominal?

22   A.    Yeah, but I'm --

23   Q.    You've answered the question, ma'am.

24   A.    Yes.

25   Q.    Now, Mr. Rainwater replies to your daughter, still

1    unclear -- where did you see it posted and for what location?

2            And could you read for the jury the response?

3            Do you see Diana's response at the top, ma'am?

4    A.    Yes.

5    Q.    It says, Boston VA, general radiologist maybe?

6            Correct?

7    A.    Yes.

8    Q.    Do you think responses like that inspire confidence that

9    you would be a strong candidate for a position --

10            MR. KOLMAN:  Objection.

11   Q.    -- when you --

12            THE COURT:  Sustained.

13   BY MR. KILROY:

14   Q.    Do you think having your daughter apply for you is an

15   effective application strategy?

16            MR. KOLMAN:  Objection.

17            THE COURT:  Sustained.

18            MR. KILROY:  Exhibit 330, please.  Exhibit 330 for

19   identification, please.

20   Q.    Dr. Desai, I'm showing you what has been identified as

21   Exhibit 330 for identification.  It's a September 12, 2019,

22   email from the American College of Radiology career center to

23   your daughter, subject, application submitted for body

24   imager-Stamford, Connecticut.

25            Do you see that?

1    A.   Yes.

2    Q.   And this was an email received as part of your daughter's

3    application process to try and get you a job, correct?

4    A.   Yes.

5         MR. KILROY:  I'd like to offer this into evidence,

6    your Honor, as 330.

7         MR. KOLMAN:  No objection.

8         THE COURT:  It is marked.

9    (Exhibit No. 330 was admitted into evidence.)

10        MR. KILROY:  And could I have it published, please.

11   BY MR. KILROY:

12   Q.   Dr. Desai, why are you applying for a position in

13   Stamford, Connecticut, when Fall River is too far to drive?

14   A.   I have to try everywhere whatever I can get.

15   Q.   You have to what?

16   A.   This is far, too, but it's like you -- you have to try,

17   and that's what I was doing.

18   Q.   Well, you were never going to accept the job in

19   Connecticut that you had to drive to, because you can't drive

20   on the highway, right?

21   A.   Yeah, but then I had to have help.

22   Q.   Have help.  You were going to have someone drive you five

23   days a week?

24   A.   Yeah, I have to stay there for a few days.  The main thing

25   is nobody's giving me the job because of...

1          MR. KILROY:  Exhibit 335 for identification, please.

2    Q.   Dr. Desai, I'm showing you an email July 16, 2020, from

3    the American College of Radiology career center to Diana Desai.

4    Application submitted for musculoskeletal radiology at Tufts

5    Medical Center, Boston, Mass.

6          Do you see that?

7    A.   Yes.

8    Q.   And this is part of your daughter's application efforts

9    for you, right?

10   A.   Yes.

11         MR. KILROY:  And I offer this into evidence, your

12   Honor, as Exhibit 335, please.

13         (Pause.)

14         MR. KILROY:  Your Honor, I'd offer this into evidence.

15         THE COURT:  I'm sorry.

16         MR. KILROY:  That's all right.

17         THE COURT:  Any objection?

18         MR. KOLMAN:  No.

19         THE COURT:  So marked.  I apologize.

20         MR. KILROY:  That's okay.

21         THE COURT:  331?

22         MR. KILROY:  Thirty-five, your Honor, 335.

23         THE COURT:  Oh, okay.

24   (Exhibit No. 335 was admitted into evidence.)

25         MR. KILROY:  And may I publish it, please.

1   BY MR. KILROY:

2   Q.   Dr. Desai, despite not driving on the highway you're

3   applying to Boston now, correct?

4   A.   I did.

5   Q.   And despite not being a musculoskeletal radiologist,

6   you're applying for a musculoskeletal position, right?

7   A.   Yes.

8   Q.   Did someone tell you it would be better for your lawsuit

9   if you applied for these type positions?

10  A.   There is nothing to tell.  Why would.

11       MR. KILROY:  336, please.  Exhibit 336 for

12  identification only, please.

13  BY MR. KILROY:

14  Q.   Dr. Desai, I'm showing you another application document

15  sent to your daughter, September 8th, 2020, for an application

16  your daughter submitted to live and work oceanside in beautiful

17  Cape Cod.

18       Do you see that?

19  A.   Yes.

20  Q.   And this was an application that she submitted for you,

21  right?

22  A.   Yes.

23       MR. KILROY:  I offer this into evidence, your Honor,

24  Exhibit 336.

25       MR. KOLMAN:  No objection.

1          THE COURT:  Marked.

2     (Exhibit No. 336 was admitted into evidence.)

3          MR. KILROY:  Could I publish, please.

4     BY MR. KILROY:

5     Q.   Dr. Desai, is it your testimony that someone was going to

6     help you by driving you to Cape Cod back and forth so in the

7     summer that could be eight hours a day on the road?

8     A.   Say -- please repeat the question, who is going to drive

9     me?

10    Q.   Is it your testimony that in the summer you would have a

11    family member drive you back and forth to Cape Cod for this

12    job?

13    A.   No, I have to probably live there for the week or stay in

14    a hotel.  I was just trying.  That's all it is.  There is

15    nothing more to that.

16    Q.   So your testimony to the jury is that you would have moved

17    to Cape Cod if you were hired for that position?

18    A.   Reluctantly, but I would have.

19         MR. KILROY:  Exhibit 338 for identification, please.

20    Actually, strike that.

21    Q.   Dr. Desai, the day after your last day of employment at

22    UMass Memorial, you attended a retirement party celebrating

23    your retirement, right?

24    A.   That was a surprise from my daughter, because she knew I

25    was -- how upset I was.

1          MR. KILROY:  Your Honor, I would move to strike and

2     just ask for an answer to my question.

3          THE COURT:  Please.

4          THE WITNESS:  Yes.

5     BY MR. KILROY:

6     Q.   The party was a catered event in a banquet facility in

7     Foxborough, right?

8     A.   Yes.

9     Q.   The Olive & Mint restaurant?

10    A.   Say it again.  Yes.

11    Q.   The Olive & Mint restaurant?

12    A.   Yes.

13    Q.   Several coworkers attended that, correct?

14    A.   Yes.

15    Q.   As well as out-of-state family members came in for your

16    retirement party, right?

17    A.   Yes.

18    Q.   And you were celebrated that night for retirement, weren't

19    you?

20    A.   My -- yes.

21    Q.   And you did not inform anyone at that retirement party

22    that you weren't retiring, did you?

23    A.   I don't see any reason to do that.

24    Q.   And could you answer my question.  You didn't tell anyone

25    you weren't retiring that night, did you?

1    A.    No.

2          MR. KILROY:  Exhibit 285 for identification, please.

3    Q.    Dr. Desai, I'm showing you a document.

4          Do you recognize that?

5    A.    One of the W-2 form or something.  Yeah, what about it?

6          (Counsel conferred.)

7    Q.    I'm sorry.

8    A.    What -- what is this in relation to?

9    Q.    Do you see that this is a -- at the top it says, statement

10   for recipients of certain government payments 1099-G?

11   A.    Yes.

12   Q.    And the recipient's name is Charu Desai?

13   A.    Yes.

14   Q.    And in the number one block it says unemployment

15   compensation, $23,850?

16   A.    Yes.

17   Q.    And this was in 2019, correct?

18   A.    Yes.

19   Q.    So you received unemployment compensation in 2019, right?

20   A.    Yes.

21          MR. KILROY:  Your Honor, I'd offer this into evidence

22   as Exhibit 285, please.

23          MR. KOLMAN:  No objection.

24          THE COURT:  It is marked.

25   (Exhibit No. 285 was admitted into evidence.)

1   BY MR. KILROY:

2   Q.    Dr. Desai, do you know the dollar amount of money

3   contributed to your 401(k) by UMass Memorial in 2018?

4   A.    Not exactly.  I think it's 8 percent or something like

5   that.

6   Q.    You don't know the dollar amount?

7   A.    If I see the paper I can tell you.

8            MR. KOLMAN:  Objection.

9            (Sidebar as follows:)

10           THE COURT:  Relevance?

11           MR. KILROY:  It's going to go to their damages expert,

12   your Honor.  The information hasn't been properly provided to

13   their damages expert.

14           MR. KOLMAN:  I -- I think that he should raise that

15   with the expert.  This is prejudicial.  It has got nothing to

16   do with her income.

17           THE COURT:  Let's -- let's do this.  Just so we don't

18   have an issue of authentication, why don't you do that with

19   this witness; and then to the extent you need to ask any other

20   questions, I'll let you, but don't go far beyond that, okay?

21           MR. KOLMAN:  Your Honor, if I may, the amount of money

22   that she may have incurred would be significant, and I think

23   it's far more prejudicial than probative, because what counsel

24   is attempting to do is show that she basically is bankrolled,

25   and how much, I don't even know, and I think it's totally

1    irrelevant to her getting a job, and I think what counsel may

2    be trying to do -- I don't know this for sure -- is basically

3    show that she had all this money and didn't have to take

4    another job or something like that.

5         MR. KILROY:  Your Honor, if I may be heard?

6         THE COURT:  So -- I will hear from you in just a

7    minute.

8         So what I heard was that the -- your economic expert

9    did not consider it so if -- if -- if he's only putting it in

10   so that he can confront the expert with it, I'm going to let

11   him do it.

12        MR. KOLMAN:  Well --

13        THE COURT:  Does it have a -- can I -- hold on one

14   second.  I apologize.  Can I see it?

15        MR. KILROY:  Your Honor, there isn't a document in

16   evidence.  They didn't ever get a document to put into

17   evidence.  She doesn't know the amount, and the amount is not

18   significant.  It's actually very small, and we'll show that the

19   expert didn't know what he was doing.

20        MR. KOLMAN:  I don't have a problem.

21        THE COURT:  Okay.  Thank you.

22        (End of sidebar.)

23   BY MR. KILROY:

24   Q.   Dr. Desai, you don't know a dollar figure that was

25   contributed by UMass Memorial to your 401(k) in 2018, do you?

1   A.   Like I said, it is 8 percent of the salary.  Twenty --

2   Q.   Ma'am, I would ask you to focus on my question.  It's a

3   yes or no.

4           Do you know --

5   A.   No, I don't.  I don't.

6   Q.   And do you know a dollar figure of contribution in 2017?

7   A.   I do not.

8           MR. KILROY:  No further questions, your Honor.  Thank

9   you.

10                  REDIRECT EXAMINATION

11  BY MR. KOLMAN:

12  Q.   Dr. Desai, you were asked many questions by my brother

13  colleague in respect of your deposition, and since they were

14  very recent, of course, you would recall them; is that right?

15  A.   Yes.

16  Q.   Were you represented by counsel at that deposition?

17  A.   Dr. -- Patricia Washienko.  It was --

18  Q.   A simple question, were you represented by counsel?

19  A.   Yes, I was.

20  Q.   And at the time that your deposition was taken, do you

21  know whether Dr. Rosen's deposition had been taken?

22  A.   It was not.

23  Q.   Do you know whether documents had been produced pursuant

24  to litigation by the defendants?

25          MR. KILROY:  Objection, your Honor.

1          THE COURT:  Overruled.  If you know.

2          THE WITNESS:  Like a hundred thousand pages came three

3    days before my deposition.

4    BY MR. KOLMAN:

5    Q.   How much -- how many?

6    A.   At least a hundred thousand pages.

7    Q.   A hundred thousand?

8    A.   Documents.

9    Q.   And did you get to review those documents --

10   A.   No.

11   Q.   -- with counsel?

12   A.   No.

13   Q.   At the time you admit your deposition was taken, did you

14   consider Dr. Rosen to be a fair man?

15   A.   At that time, I did.

16   Q.   At the time that your deposition was taken, did you have

17   knowledge that he may have -- he may have discriminated against

18   you?

19   A.   I wouldn't think anybody would do that, no.

20   Q.   As the case went on, did you review other documents that

21   clarified the case that you're bringing today?

22   A.   Yes.

23          (Plaintiff counsel conferred.)

24          MR. COMENZO:  Your Honor, may I control the exhibits,

25   please.

1          THE COURT:  You're asking the wrong guy.

2          MR. COMENZO:  Oh, sorry.  Mr. Clerk.

3          THE COURT:  Both of Marty's daughters are now in

4    college, but when they were in junior high school and in high

5    school, they were our IT department, just for the record.

6    BY MR. KOLMAN:

7    Q.   I'm putting up 107, which is already in evidence.

8          Please just refresh your recollection by looking at

9    it.

10   A.   You want me to read it?  No?

11   Q.   Did -- did you -- did you have this document in your

12   possession prior to your deposition?

13   A.   No.

14         MR. KILROY:  What's the exhibit number, please?

15         MR. KOLMAN:  107.

16         MR. KILROY:  107, thanks.

17         MR. KOLMAN:  I'm showing you Exhibit 101.  And can you

18   scroll down.

19         Stop.

20   Q.   Although this is October 3rd, 2017, did you have this

21   document when --

22   A.   No.

23   Q.   -- your -- let me finish.

24   A.   Yes, sir.

25   Q.   When your deposition was taken?

1    A.   No.

2         MR. KOLMAN:  Go down.

3    Q.   And this portion, did you have that?

4    A.   No.

5         MR. KOLMAN:  The next portion.  Move down a little

6    further.  That's it.

7         (Plaintiff counsel conferred.)

8    BY MR. KOLMAN:

9    Q.   Okay.  Are there other documents that you were able to

10   review, which assisted you in determining an opinion with

11   respect to age discrimination?

12        MR. KILROY:  Objection.

13        THE COURT:  Just yes or no.

14        THE WITNESS:  Yes.

15   Q.   Hmm?

16   A.   Yes.

17   Q.   When you brought this case, and throughout this case, have

18   you relied on your counsel to push the case forward?

19   A.   Yes.

20   Q.   And have you relied on the advice of counsel to push this

21   case forward?

22   A.   Yes.

23   Q.   And have you taken your counsel's advice in respect of

24   this case?

25   A.   Yes.

1          (Plaintiff counsel conferred.)

2          MR. KOLMAN:  Why don't we look at one more email.  Can

3     you go to this email.  This is --

4          THE COURT:  Speak up, please, Doctor -- I mean,

5     Mr. Kolman, speak up, please.

6          MR. KOLMAN:  I'm sorry.

7     BY MR. KOLMAN:

8     Q.   Take a look at what's on the screen.

9          And clearly this is not an email that you had at your

10    deposition either?

11    A.   No.

12         MR. KILROY:  Objection.

13         THE COURT:  Overruled.

14    BY MR. KOLMAN:

15    Q.   You testified that you were inspired to become a doctor by

16    seeing certain family members practice.

17         What did you mean by that?

18    A.   Because I had family members, I saw them what doctor

19    means, and I was interested -- I just wanted to make sure I

20    wanted to become one when I grow up.

21    Q.   Did you ever see them publish academic articles?

22         MR. KILROY:  Objection.

23         THE WITNESS:  No.  This is -- this was in India.

24         MR. KOLMAN:  Stop.

25         THE COURT:  Wait.  Sustained.

1  BY MR. KOLMAN:

2  Q.   You were asked yesterday about the academic articles that

3  you did not write.

4        Do you remember that?

5  A.   Yes.

6  Q.   You also said that there were two tracks, the clinical

7  track and the academic track; do you remember that?

8  A.   Yes, I was on clinical.

9  Q.   Can you explain the difference between the clinical and

10 the academic track?

11 A.   The clinical track involves --

12 Q.   And take the microphone a little bit away from --

13 A.   Mainly doing the -- the --

14 Q.   Speak up clearly.  Yeah, go on.

15 A.   I was mainly doing the clinical work, also teaching the

16 resident, the medical student when they are coming over to the

17 department.

18 Q.   You -- did you choose the clinical track?

19 A.   Definitely, yes.

20 Q.   And why did you choose the clinical and not the academic

21 track?

22 A.   Because I -- I was mainly interested in helping the

23 patient, what I'm good at.

24 Q.   Did you have a sense that it was understood by Mass

25 General [sic] that you were only clinical track?

1          MR. KILROY:  Objection.

2          THE COURT:  Sustained.

3   BY MR. KOLMAN:

4   Q.   At any point were you approached by any employee or

5   officer or doctor at -- at UMass and suggested that you go to

6   the academic track?

7   A.   No, I was hired as a clinical.

8   Q.   And was your time spent reviewing CT scans and x-rays?

9   A.   Yes.

10  Q.   And was that all your time when you were employed by

11  UMass?

12  A.   Yes.

13  Q.   Did anyone ever approach you, for example, Dr. Rosen, and

14  speak to you about academic articles that you should write?

15  A.   No.

16  Q.   Did anyone ever suggest to you a research topic that they

17  thought you might be interested in researching?

18  A.   No.

19  Q.   With respect to your teaching of residents, did you

20  consider that an academic activity?

21  A.   Yes.

22  Q.   When you applied to be exempt from call -- well, I'm

23  sorry.

24       When you applied for academic days, was the fact that

25  you were teaching residents something that you considered to be

1    academic and therefore requested academic days?

2            MR. KILROY:  Objection.

3            THE COURT:  Sustained.

4    BY MR. KOLMAN:

5    Q.   You recall when you applied for academic days --

6    A.   Yes.

7    Q.   -- correct?

8            Why did you think you might be entitled to academic

9    days?

10           MR. KILROY:  Objection.

11           THE COURT:  Overruled.

12           THE WITNESS:  Because according to the policy,

13   I -- I'm qualified to get academic days.

14           MR. KILROY:  Objection.

15           THE COURT:  Hold up.

16           (Sidebar as follows:)

17           THE COURT:  Go ahead.

18           MR. KILROY:  It's a -- it's a best evidence objection,

19   your Honor.  She's trying to reference the written policy.

20   It's not in evidence.

21           THE COURT:  Overruled.

22           (End of sidebar.)

23   BY MR. KOLMAN:

24   Q.   Do you remember the question?

25   A.   Yes, whether I was qualified for academic days.

1    Q.   Why do you think you were entitled to academic days?

2    A.   Because it says clinical work, teaching the resident and

3    the medical student.  And I was also quality member.  I have to

4    become a quality member to the faculty of the department.

5              MR. KOLMAN:  Can you do me a favor and move the

6    microphone away from you.  Maybe you'll be clearer.  Just move

7    it away slightly, and keep your voice up.

8              THE WITNESS:  And that was --

9    BY MR. KOLMAN:

10   Q.   That's much better.

11   A.   And that was quality -- quality control in patient

12   committee I was a member of.  I was one of the person.  So

13   there are three criteria I am qualified.

14   Q.   Did you speak to Dr. Rosen about the fact that you thought

15   you were qualified for academic time?

16   A.   I didn't say -- explain those three things, but his main

17   thing was I have to have a proposal for the research and the

18   papers.

19   Q.   When Dr. Rosen said to you that you weren't entitled to

20   academic time, did you argue with him?

21   A.   No.

22   Q.   Did you attempt in -- at any other time to get academic

23   time apart from this one time?

24   A.   Sometime in the -- when I meet him, I ask.

25   Q.   And are those the only times?

1    A.   As far as I remember.

2         MR. KOLMAN:  Why don't we put up Exhibit 275.

3    BY MR. KOLMAN:

4    Q.   Yesterday my brother colleague presented you with this

5    document.

6         Do you remember?

7    A.   Yes.  Yes.

8         MR. KOLMAN:  And go to Section IIB.

9         THE COURT:  Is this in?

10        MR. KOLMAN:  It is.

11        THE COURT:  What number, please?

12        MR. KOLMAN:  273.

13        THE COURT:  Thank you.

14        MR. COMENZO:  275.

15        MR. KOLMAN:  275, I apologize.

16   BY MR. KOLMAN:

17   Q.   Do you see where it says education?

18   A.   Yes.

19   Q.   And did you fill in teaching medical students online in

20   chest rotation and online teaching residents three to four

21   times a week in chest rotation?

22   A.   Yes.

23        MR. KOLMAN:  And let's go to Section IX, Roman

24   numerals.

25   Q.   Professional development, do you see that?

1    A.    Yes.

2    Q.    And it says, Attended radiology review course given by

3    Harvard in March 2011.

4    A.    Yes.

5    Q.    Did you regularly attend courses given by radiologists,

6    possibly Harvard, every other year?

7    A.    Especially the chest one, yes.

8    Q.    And that concerned thoracic imaging?

9    A.    Yes.

10            MR. KILROY:  Objection.

11            THE COURT:  Don't lead.

12   BY MR. KOLMAN:

13   Q.    When was the last time you attended such a -- such a

14   lecture or course?

15   A.    In 2018.

16   Q.    And how long are these courses?

17   A.    I guess a week, four to five days.

18   Q.    A week, five days?

19   A.    Yeah.  Yeah.

20   Q.    Let's go down to XII, Roman numerals.

21            Who was your chief of radiology at the time?

22   A.    Dr. Ferrucci.

23   Q.    And did he write what is in the box?

24   A.    Yes.

25   Q.    I'm going to read this into the record briefly.  Steady,

1   productive, competent, seasoned, professional at all times.

2   Delight to have her continue.

3          Did I read that correctly?

4   A.   Yes.

5   Q.   Let's look at Exhibit 276.

6          You recall when my brother colleague gave you this

7   document, correct?

8   A.   Yes.

9   Q.   Let's go down to Section XIII.

10          Can you read what the department chair said about you?

11   A.   Good job this year in focusing on enhanced clinical work

12   output.  Otherwise positive, supportive presence in the

13   department at large.  Continue as is.

14          MR. KOLMAN:  Let's put 279 up.

15   Q.   I'm showing you a document that also was produced --

16   actually, was produced before my brother colleague used it, but

17   you recognize it?

18   A.   Yes.

19   Q.   Let's go down to Roman Numeral IIB.

20          It says education and mentoring.

21          Can you read what is in the education and mentoring

22   box.

23   A.   Teaching medical students online in chest rotation.

24   Online teaching of residents three to four times a week in

25   chest rotation.  Teaching anesthesia and internal medicine

1    residents in chest rotation.

2    Q.   Did you continue to teach medical students online?

3    A.   Yes.

4    Q.   Did you continue to teach medical students online until

5    your termination, as best you could?

6    A.   Yes, not in the last year; otherwise, yes.

7    Q.   And in respect of teaching residents three or four times a

8    week in chest rotation, did you also do that until your

9    termination?

10   A.   Yes, the last year I did not.

11         MR. KOLMAN:   Can you go down to the last section.

12   Thank you.

13   Q.   This is written by Dr. Rosen?

14   A.   Yes.

15   Q.   And I'm going to read it.  Dr. Desai and I discussed the

16   overall staffing/functioning of the thoracic imaging division

17   and growth planned with the arrival of Dr. Dill as the new

18   division chief.  As always, I appreciate her commitment to the

19   department and teaching our residents.

20         Did you see that?

21   A.   Yes.

22         MR. KOLMAN:   Can you go back up to the year.

23   Q.   That's 2014 to '15.

24         Did you have a meeting with Dr. Rosen in 2015?

25   A.   Yes.

1    Q.   Is this evaluation form the only evaluation form you

2    received yearly from UMass?

3    A.   Annual meeting, yeah, once a year.

4    Q.   With respect to Dr. Dill, there was testimony yesterday

5    that you felt you should have been asked whether you wanted the

6    job.

7         Did -- did I understand your testimony --

8    A.   Yes.

9    Q.   -- to be correct?

10   A.   Yes.

11   Q.   What was the basis on which you thought you had something

12   to offer in that position that might entitle you to be given

13   it?

14   A.   The years of service in that section.

15   Q.   I'm sorry.  Can you speak up?

16   A.   Seniority in that section for so long.  I thought I should

17   have been asked.

18   Q.   And how would that -- how would that, in your mind, be

19   something that would assist in you being a chief or supervisor?

20   A.   Because I know how the department runs, and I have been

21   there from ups and downs that were a very crucial time, when

22   one of the previous chair retired.

23   Q.   Did you have any knowledge whether the position that

24   Dr. Dill was taking was going to be on the academic or on the

25   clinical track?

1    A.   I did not, but I assumed she was on the research --

2    research track.

3    Q.   We've heard testimony about an altercation that appears to

4    have occurred with Dr. Dill.

5         Can you recall that?

6    A.   Yes.

7    Q.   How well did you get on with Dr. Dill, generally speaking?

8    A.   I had no problems.  Sometimes she was rude, but I

9    didn't -- I never want to in all these years had any

10   confrontation with anybody.  I don't want to.

11   Q.   Was there something about this altercation that

12   make -- made you want to take it further?

13   A.   Yeah, because it happened before.

14   Q.   Wait.

15   A.   Okay.

16   Q.   What was it about that altercation that -- that made you

17   want to take it further?

18   A.   Because I think --

19   Q.   Slowly.

20   A.   A few days before in front of the resident, I thought she

21   was rude, and I just wanted to say whatever you want to say,

22   please don't say in front of resident.

23   Q.   Now, we've heard testimony about your daughter Diana

24   Desai?

25   A.   Yes.

1    Q.   Do you recall -- do you recall all the questions that my

2    brother colleague --

3    A.   Yes.

4    Q.   -- asked you?

5    A.   Yes.

6    Q.   Now, it's clear that English is not your first language?

7    A.   It's not.

8    Q.   Do you have some difficulty in composing business like --

9            MR. KILROY:  Objection.

10           THE COURT:  Don't lead.

11           MR. KOLMAN:  I'm sorry.

12           THE COURT:  Don't lead.

13   BY MR. KOLMAN:

14   Q.   Why did you use Dr. Desai -- Diana Desai for letters that

15   were signed by you?

16   A.   Because she -- she has -- she has a good control of the

17   English.  English is not my prime.  So she can, whatever I

18   have, she can put it better in the words.

19   Q.   When -- after you were terminated and in the year that you

20   had from March 14th, 2018, through to 2019, when was the last

21   time before that that you had ever applied for a job?

22   A.   After my termination, right?  Never, because UMass was my

23   place.  That was my home.  I didn't even think in a million

24   year that I was sitting today here.

25   Q.   Did you attend any lecture or seminar on how to apply for

1    a position?

2    A.    No, I did not.

3    Q.    Is that the reason why you requested assistance?

4    A.    Yes.

5    Q.    And was that assistance in -- what was the nature of the

6    assistance, apart from what you testified before?

7    A.    Nothing.  It was technology-wise, otherwise, I am telling

8    what to -- the content I am telling how to put it the words

9    better.

10   Q.    In respect of the -- the positions that you applied for,

11   some of which were given to you by my brother colleague, did

12   you have any knowledge as to whether these positions were

13   remote positions that you could handle remotely?

14   A.    What happens in that also in technology, you still require

15   a lot of modalities to be able to read.  There are -- there are

16   not jobs where you can only do one thing.

17   Q.    Did you request a workstation when you were at UMass?

18             MR. KILROY:  Objection.

19             THE WITNESS:  I --

20             MR. KILROY:  Outside the scope.

21             THE COURT:  Overruled.

22             THE WITNESS:  Only for the weekend, I did request.

23   BY MR. KOLMAN:

24   Q.    And can you tell us briefly what a workstation is?

25   A.    It is what I do on a regular basis at the job.  Those

1   machines are installed at home, and it will be the same thing,

2   except I don't have to travel.

3   Q.   Does a workstation enable you to see --

4        MR. KILROY:  Objection.

5   Q.   -- CT scans?

6        THE COURT:  Overruled.

7   Q.   Enable you to see CT scans and x-rays?

8   A.   Everything, yes.  Yes.

9   Q.   And does a workstation enable you to see these at your

10  home?

11  A.   Yes.

12  Q.   With respect to the actual applications that were made, do

13  you -- did you get any interest from any of the places you

14  applied?

15  A.   Very few.

16  Q.   And when you got the very few, how, if you can, generally

17  speaking, what was the nature of the interaction between you

18  and the prospective employer?

19  A.   The screening question they ask you whether you have been

20  terminated.

21  Q.   Did you speak directly to the specific employer or agent

22  of the employer?

23  A.   Agent.  Agent.

24  Q.   And there was a conversation you're saying between the two

25  of you?

1    A.    Yes.

2    Q.    Did the issue of your termination come up?

3    A.    Yes.

4    Q.    And what did you feel you had to say?

5    A.    I had to say yes.  And the other question is if

6    your -- any privileges stop, and I have to say yes.

7    Q.    And did you hear anything more from any of these specific

8    employers with whom you had a conversation after you had had

9    that conversation with them?

10   A.    No.

11   Q.    We've heard testimony about your emotional distress after

12   the termination.

13   A.    Yes.

14   Q.    And you'll recall that you testified that you had never

15   before taken medication or gone to psychotherapy?

16   A.    Yes.

17   Q.    In the sense that you delayed going for medical help, and

18   you are a physician, can you tell the jury why that was?

19   A.    I didn't want it to, because going to psychiatrist, like,

20   are you crazy kind of.  So that was in my mind.  And my family

21   has been very supportive.  So they help me, and then we have

22   COVID and all that.  It make it very difficult.  So they say,

23   you cannot -- you have to.  So my husband made the phone call

24   to the psychiatrist.

25   Q.    Did you have a sense that during the year after you had

1    been terminated that you weren't getting any better?

2    A.   No, I was not.

3    Q.   Is it your testimony that you actually didn't want to see

4    another doctor?

5              MR. KILROY:  Objection.

6              THE WITNESS:  Psychiatrist, yeah.

7              THE COURT:  Sustained.

8    BY MR. KOLMAN:

9    Q.   Did the fact that you were emotionally distressed affect

10   your interest in your profession?

11   A.   Yes.  Because I was worried, yeah.

12   Q.   How -- how did it affect your interest in your profession?

13             Well, let me rephrase.

14             Did what you had experienced affect your enthusiasm

15   for your profession that you practiced for so long?

16   A.   It was difficult to concentrate on all that.

17   Q.   And can you explain how it was difficult?

18   A.   Because --

19   Q.   Well, let me ask you this question before you get into

20   that.

21             Did you want to practice radiology again?

22   A.   Yes, because that was my love.

23   Q.   Sitting here today, do you want to practice radiology?

24   A.   Yes.

25   Q.   And by radiology for you, what does that mean?

1    A.    That's -- that was my life, I loved to teach, and even

2    with my sickness, I never call in sick.  I had even sick leave

3    left after I stopped, terminated.

4            MR. KILROY:  Objection.  Move to strike.

5            THE COURT:  That's stricken as nonresponsive.  Please

6    disregard.

7    BY MR. KOLMAN:

8    Q.    Do you want to practice radiology as you had done at

9    UMass?

10   A.    Yes.

11   Q.    As you have done at UMass before you were terminated?

12   A.    Please repeat the question.

13   Q.    Yes.  At UMass before they terminated you, that's a yes?

14   A.    Yes.

15   Q.    Okay.

16           (Plaintiff counsel conferred.)

17           MR. KOLMAN:  I'm going to show you Exhibit 280.

18   That's already in evidence.

19   Q.    This was a document that we've seen a lot of.  Just go

20   down to IIB, if you wouldn't mind.

21           Did you write the content of what's in education and

22   mentoring?

23   A.    I did.

24   Q.    Did you also teach anesthesia?

25   A.    Yeah, and it's internal medicine.  They do the rotation.

1    These are residents.  They are not medical students.  These are

2    residents.

3    Q.    Okay.  And let's go to section Roman Numeral IV.

4          Do you see where it says professional service?

5    A.    Yes.

6    Q.    And it says, list service activities for the department

7    and division, committees and candidate interviews.

8          And you put quality control representative from chest

9    division.

10         Can you expand on what that actually was?

11   A.    And this was appointed.  Dr. Rosen is the one who did

12   appointed me.  So every month, we have a meeting, and

13   Dr. Baccei is vice chair of the quality control and patient

14   safety.  So from each section, there will be one person.  He's

15   the vice chair, and there are also technologists, and they also

16   come there, because they are part of it, too.  So if there is

17   any error in any of the cases, it gets discussed there.

18   Q.    And let's go down to Section XIII.

19         And do you recognize this as Dr. Rosen's comment --

20   A.    Yes.

21   Q.    -- in 2016?

22   A.    Yes.

23   Q.    And I'm going to read it.  Dr. Desai has contributed to

24   the chest section through her clinical work interpreting chest

25   x-rays and chest CT and teaching residents at the PACS station.

1           What is PACS?

2    A.    That is the -- you know, the machine we teach on, the

3    computer -- computer system.

4    Q.    And your comment was, Thanks?

5    A.    Yes.

6           MR. KOLMAN:  Let's go to 281.

7           This is in evidence.

8    Q.    Let's go to IIB.  This says, education and mentoring.

9           Do you see that?

10   A.    Yes.

11   Q.    And you wrote in there what you have written before --

12   A.    Yes.

13   Q.    -- a number of times --

14   A.    Yes.

15   Q.    -- which I'm not going to repeat.

16   A.    Yes.

17   Q.    Let's go down to the end.

18           And I'm going to read this.  This is from Dr. Rosen,

19   correct?

20           Dr. Desai and I --

21           MR. KILROY:  Objection, your Honor.

22           THE COURT:  Is it in?

23           MR. KOLMAN:  Yeah.

24           THE COURT:  Overruled.

25   BY MR. KOLMAN:

1    Q.   Dr. Desai and I discussed her recognition by this year's

2    graduating residents as their, quote, teacher of the year,

3    unquote.

4          We discussed several of her concerns about allocation

5    of academic time, call responsibilities, et cetera.  These had

6    previously been discussed with Dr. Desai and representatives

7    from the HR department.

8          Do you see that?

9    A.   Yes.

10   Q.   And you put thanks?

11   A.   Yes.

12   Q.   And was it true that these actually had been discussed

13   with HR?

14   A.   Yeah, yes.

15   Q.   And after it was discussed with HR, did you ever bring up

16   the matter again?

17   A.   No.

18   Q.   And you signed this in September 2017?

19   A.   Yes.

20   Q.   And the only letter you ever wrote about Dr. Dill was the

21   letter we've seen in evidence, right?

22   A.   That's all.

23   Q.   Let's go to 282.  And -- wait.

24          What is the date on this performance review?

25   A.   July 1, '17, to June 30th, 2018.

1    Q.   And did you meet with Dr. Rosen in 2018?

2    A.   Yes.

3    Q.   Why don't we go to the bottom.

4         Do you recognize this as Dr. Rosen's signature in

5    September, September 28th, 2018?

6    A.   Yes.

7         MR. KOLMAN:  Let's go up.  I'm sorry.

8    Q.   You -- you signed this -- did you sign this review?

9    A.   I did.

10   Q.   Let's go to Section II, education and mentoring.

11        And are we looking at what we've looked at before in

12   terms of --

13   A.   Yes.

14   Q.   -- these two areas?

15   A.   Yes.

16   Q.   At the time you signed this review, had Dr. Rosen

17   terminated you?

18   A.   Yes.

19   Q.   So you -- did you continue to do what you had done before

20   in terms of teaching --

21   A.   Yeah, for the --

22   Q.   -- despite being terminated?

23   A.   Just for the chest x-ray, because at that point I was not

24   supposed to read that.  Remember, it is part of the year.  See,

25   he gave me the notice in March, so that time, January to March,

1    even the date of the meeting, I was checking the rest and just

2    before I went to the meeting.

3    Q.   Understood.

4         MR. KOLMAN:  Your Honor, twelve o'clock.  I don't want

5    to -- I didn't want to go on another series of questions.

6         THE COURT:  See you back here -- so the lunches are

7    here.  We'll check -- what I'm thinking is we'll give you about

8    45 minutes to eat, stretch your legs, use the washrooms, and

9    just chill out a bit.  And then we'll check back with you about

10   quarter to 1:00, and if you want to resume, we will.  And if

11   you need a couple more minutes, we'll do that, too.  Okay?

12        Bon Appétit.

13        THE CLERK:  All rise.

14        (At 11:59 a.m., the jury left the courtroom.)

15        MR. KOLMAN:  Not much longer.

16        THE COURT:  How much does that mean?

17        MR. KOLMAN:  Half an hour, if that.

18        THE COURT:  Any -- any recross?

19        MR. KILROY:  Five minutes, your Honor.

20        THE COURT:  Okay.  And then who's -- who's coming?

21        MR. KILROY:  Dr. Korgaonkar and Randa Mowlood.

22        THE COURT:  And Doctor who?

23        MR. KILROY:  Korgaonkar.

24        THE COURT:  You can step down.  Be seated, those of

25   you.

6-104

Case 4:19-cv-10520-TSH  Document 192  Filed 12/21/22  Page 104 of 157

1      MR. KILROY:  Dr. Korgaonkar, your Honor.

2      THE COURT:  And who's he?

3      MR. KILROY:  She.  She is a radiologist, who works for

4  Dr. Rosen.  She's 76 years old.

5      THE COURT:  And what's she going to talk about?

6      MR. KILROY:  The issue of per diem in particular and

7  that it has been an illusion made by my brother counsel that

8  the individuals on the older age chart were all forced to go

9  per diem.  She'll make clear it was her choice.

10     THE COURT:  And how long for her?

11     MR. KILROY:  I suspect 20 minutes to a half hour at

12  most.

13     MR. KOLMAN:  I don't know, Judge, probably -- probably

14  that, maybe less.

15     THE COURT:  And then who?

16     MR. KILROY:  Randa Mowlood, your Honor, a senior

17  academic director who works with Dr. Rosen, and I expect her

18  testimony to run a half hour as well.

19     THE COURT:  Okay.

20     MR. KOLMAN:  Certainly not longer than -- than his

21  direct.

22     THE COURT:  Okay.  Sounds good.

23     And then who's Monday?

24     MR. KOLMAN:  Monday, your Honor, is Dr. Vaskanian, a

25  forensic expert.

1            THE COURT:  He's yours?

2            MR. KOLMAN:  He is.  And Doctor Morrison, the economic

3     expert.

4            THE COURT:  How long is it going be with Dr. --

5            MR. KOLMAN:  I'm trying to think if Morrison is

6     Tuesday.

7            Vaskanian may be long.

8            THE COURT:  And what's -- what's his?

9            MR. KOLMAN:  He's a forensic psychiatrist, your Honor.

10           THE COURT:  So he's a damages expert?

11           MR. KOLMAN:  He is.

12           THE COURT:  And how long?

13           MR. KOLMAN:  It could be a couple of hours for me,

14    maybe more.  Actually, it's going to be my brother colleague,

15    who's at -- who is at an independent argument.  He apologizes.

16    He will be back very shortly.  It's going to be him who

17    will -- who will be asking him the necessary questions pursuant

18    to his expert report.

19           THE COURT:  Will he take up the day Monday?

20           MR. KOLMAN:  He may well.

21           THE COURT:  And then who's on Tuesday, the economic

22    expert?

23           MR. KOLMAN:  Dr. Vaskanian and Dr. Morrison.

24           THE COURT:  He's the expert?

25           MR. KOLMAN:  I think Morrison may be Monday.  Do you

1    know if he's Monday or Tuesday?

2           I'm sorry, your Honor, I can't even remember.

3    Morrison may be also Monday.  He's not going to be long.  He's

4    the economic guy.

5           THE COURT:  And by not long, how long?

6           MR. KOLMAN:  An hour maybe.  An hour and a half.

7           THE COURT:  How long on cross?

8           MR. KILROY:  Twenty minutes to a half hour, your

9    Honor.

10          MR. KOLMAN:  And then there's Dr. Gruden, who is our

11   expert --

12          THE COURT:  Uh-huh.

13          MR. KOLMAN:  -- in respect to Litmanovich and this

14   whole independent review and its content.

15          THE COURT:  And then you're resting?

16          MR. KOLMAN:  We are.  Yes, Judge, we are.

17          THE COURT:  And then who?

18          MR. KILROY:  We have Dr. Litmanovich, your Honor,

19   and --

20          THE COURT:  How long?

21          MR. KILROY:  An hour.  Half hour to an hour, your

22   Honor.  And then the rebuttal expert, which would be likely

23   closer to an hour and a half, two hours, your Honor.

24          Oh, I apologize, your Honor.  Dr. Dill will be coming

25   in as well.

1          THE COURT:  How long is Dill going to be?

2          MR. KILROY:  Somewhere between one and two.  We're

3    going to work on narrowing her this weekend, your Honor.  I

4    hope it's about one hour.

5          THE COURT:  That's the spirit.

6          MR. KOLMAN:  We were actually told by brother counsel

7    that Dill would not be appearing.

8          MR. KILROY:  No, that's not true, your Honor.

9          MR. KOLMAN:  That there would be only two fact

10   witnesses, and now there's Dill as well.

11         MR. KILROY:  Two fact witnesses today, Mr. Kolman.

12         MR. KOLMAN:  We are going to put on after lunch

13   Dr. Karl Uy just very briefly.  He's a doctor who has worked

14   with Dr. Desai and who can testify to her expertise.  That's

15   going to take 15 minutes.

16         MR. KILROY:  Today?

17         MR. KOLMAN:  He also wrote -- yeah.  He also wrote a

18   letter.

19         THE COURT:  Do you guys talk?  I mean --

20         MR. KOLMAN:  Yeah, yeah, I'm trying to --

21         THE COURT:  Listen, you guys understand that you're

22   required to tell each other who you're going to call --

23         MR. KOLMAN:  Absolutely.

24         THE COURT:  -- the next day, right?

25         MR. KOLMAN:  Yeah.

```
1              THE COURT:  Have you been doing that?

2              MR. KOLMAN:  I've been trying.

3              THE COURT:  Have you been doing that?

4              MR. KILROY:  Your Honor, we haven't been putting on

5    witnesses.

6              THE COURT:  Have you been told?

7              MR. KILROY:  No.  We have not, your Honor.

8              THE COURT:  Grr.

9              MR. KILROY:  As to Dr. Uy, we have not.

10             THE COURT:  All right.  See you in a bit.

11             (Recess from 12:04 a.m. until 12:47 p.m.)

12             THE CLERK:  All rise.

13             (At 12:47 p.m., the jury entered the courtroom.)

14             THE CLERK:  Court is now open.  You may be seated.

15   BY MR. KOLMAN:

16   Q.   Dr. Desai, I'm going to show you a couple of things from

17   your deposition that my brother colleague used.

18             Hopefully, this will work.

19             THE CLERK:  Everybody?

20             THE COURT:  Is this in?

21             MR. KOLMAN:  It is, your Honor.

22             THE COURT:  Yes.

23   BY MR. KOLMAN:

24   Q.   I'm asking you to -- to look at that.  This is actually

25   the question.
```

1          You recall this just from, you know, this morning,

2   right?

3   A.   Yes.

4   Q.   And you say, I don't think the review has anything to do

5   with the age.  Both don't go together.

6          Now, you're going to explain something that you didn't

7   get the chance.

8          What do you mean -- what did you mean by that when you

9   said, I don't think the review has anything to do with the age,

10  and both don't go together.  Can you explain.

11  A.   So the review itself --

12         MR. KOLMAN:  Can you push the microphone towards your

13  mouth.

14         THE WITNESS:  The -- the review itself, it take as

15  it -- as it is.  It -- it is the purpose of review what it was

16  used for, the motive behind it that is -- that is the

17  difference, the review itself is not age related.

18  BY MR. KOLMAN:

19  Q.   While we're waiting for that, I'm going to ask you another

20  question.

21         Did you work for Marlborough Hospital?

22  A.   Yes, through UMass, just but I am still stationed at

23  UMass.

24  Q.   Do you know if Marlborough Hospital had a separate

25  credentialing system?

1    A.    Yes.

2    Q.    And do you know if you were the one who -- you were one of

3    the doctors you had to be credentialed through Marlborough

4    Hospital?

5    A.    Yes.

6          MR. KILROY:  Objection, your Honor.  Outside --

7          THE COURT:  I'm sorry.  What was the question?

8          MR. KOLMAN:  Do you know if you had to be credentialed

9    through Marlborough Hospital.

10          THE COURT:  Overruled.  You may answer.

11          THE WITNESS:  Yes.

12   BY MR. KOLMAN:

13   Q.    And were you evaluated by Marlborough Hospital each year

14   similar to being evaluated by UMass?

15   A.    Yes.

16   Q.    And in the year that you were -- well, in 2017, did you

17   receive an evaluation from Marlborough Hospital?

18   A.    Yes, but I don't -- yes.

19   Q.    Do you know who it was who evaluated you?

20   A.    Dr. Darren Brennan.

21   Q.    And who was Darren Brennan at the time?

22   A.    He was chief of Marlborough.  He was also vice chair of

23   UMass.

24   Q.    Do you remember when your evaluation was?

25   A.    I don't know exact date, but --

1    Q.   I'm sorry.

2    A.   I don't know the exact date.

3    Q.   All right.  And do you recall the grades that you got for

4    that evaluation?

5            MR. KILROY:  Objection, your Honor.

6            THE WITNESS:  In the discovery --

7            THE COURT:  It's yes or no.

8            THE WITNESS:  Yes.

9    BY MR. KOLMAN:

10   Q.   And do you recall if it was a good evaluation?

11   A.   It was excellent.

12   Q.   Okay.  Do you recall if there were any comments about your

13   inability to read CT scans?

14   A.   No.

15   Q.   There was some testimony regarding your résumé.

16           Do you remember that?

17   A.   Yes.

18   Q.   And those questions centered on the fact that your résumé

19   was not updated.

20           Do you remember that?

21   A.   Yes.

22   Q.   Can you tell us why the résumé was not updated?

23   A.   It was overlooked, and I never thought I'm going to apply

24   anywhere else in my lifetime.

25   Q.   Did you send out that résumé to any potential employers?

1    A.    Yes.

2    Q.    Did you get any response from employers whereby you had to

3    correct the résumé?

4    A.    No.

5    Q.    Did you ever have to give Dr. Rosen's name to a

6    prospective employer as the chief of radiology with whom you

7    had worked?

8    A.    No.

9    Q.    Did you receive an evaluation from Dr. Dill, a review at

10   any time?

11   A.    Not directly, no.

12   Q.    Not, no, not lately but --

13   A.    I saw one paper where she evaluated some cases, yes.

14   Q.    Did Dr. Dill speak to you about your evaluation?

15   A.    No.

16   Q.    Did she give you any document to reflect your evaluation?

17   A.    Not in person, but I saw the paper, yes.

18              MR. KOLMAN:  Why don't we put up 66.

19              Just for the witness.

20              THE COURT:  Can I talk to counsel on the record.

21              (Sidebar as follows:)

22              THE COURT:  Mr. Kolman, your client's daughter and

23   son-in-law are going through all kinds of machinations back

24   there, and I'm about to rip their heads off, so you may want to

25   counsel them.

1          MR. KOLMAN:  Thank you, Judge.  Can you give me

2     15 seconds?  Thank you.

3          (End of sidebar.)

4          MR. KOLMAN:  Thank you, your Honor.

5          (Counsel conferred.)

6          MR. KOLMAN:  Your Honor, I'd like to move Exhibit 66

7     into evidence.

8          MR. KILROY:  Foundation, your Honor.

9          (Sidebar as follows:)

10          THE COURT:  What is it, please?  Mr. Kolman, what is

11     it?

12          MR. KOLMAN:  Your Honor, this is a peer review from

13     Dr. Dill for Dr. Desai from 2016 to 2017, directly relevant to

14     the issue of the complaints, first of all, that we've heard

15     about -- that we heard about on cross.

16          THE COURT:  So why wouldn't I admit it de bene,

17     subject to Dr. Dill authenticating it?

18          MR. KILROY:  Your Honor, this isn't a document that

19     Dr. Dill created.

20          THE COURT:  Who created it, Mr. Kolman?

21          MR. KOLMAN:  I'm not sure, your Honor.  I thought we

22     got it from the other side.

23          THE COURT:  Okay.  Sustained.

24          (End of sidebar.)

25          (Plaintiff counsel conferred.)

1   BY MR. KOLMAN:

2   Q.   I'm going to put up -- we now have it, a document from

3   your deposition.

4        This was a document that was presented to you by

5   my -- by my brother counsel.

6        Okay.  Hopefully that will do.

7        You see the question that my brother counsel asked

8   you, and you see your response.

9        This was your deposition.  Do you remember?

10  A.   Yes.

11  Q.   So you said, Yeah, he should not, should not ignore the

12  report.

13       Is there anything else you wanted to explain or you

14  weren't asked about in respect of this response?

15       What did you mean when you said, Yeah, he should not

16  ignore it?

17  A.   If it was --

18  Q.   Can you speak up.

19  A.   If it was legitimate and not done the right way, then he

20  should not.

21  Q.   I'm sorry.

22  A.   If the report was legitimate and done the right way, then

23  he should not, and the motive behind it.

24  Q.   Oh, okay.  Thank you.

25            (Plaintiff counsel conferred.)

1    BY MR. KOLMAN:

2    Q.   On the day of your termination, did Dr. Rosen speak to

3    you?

4    A.   Yes, he did.

5    Q.   And did he tell you why you were being terminated?

6    A.   For --

7    Q.   One second.  Did he tell you why you were being

8    terminated?

9    A.   First, he told me it was no cause.

10   Q.   Can you recall what he said?

11   A.   After -- after that he said, you're not supposed -- I did

12   independent review, and your CT quality is poor, so don't read

13   the CT scans as of this afternoon.

14   Q.   And there was nothing else said about the reasons for your

15   termination?

16   A.   Nothing else that I recall.

17            MR. KOLMAN:  I have nothing further.  Thank you.

18            MR. KILROY:  Briefly, your Honor.

19                         RECROSS-EXAMINATION

20   BY MR. KILROY:

21   Q.   Dr. Desai, you agree, teaching residents is a part of

22   every radiologist's job, correct?

23   A.   Yes.

24   Q.   And you're not aware of any radiologist granted academic

25   time based solely on teaching residents, right?

1    A.   I don't know.

2    Q.   You said that the call coverage issue that you raised

3    never came up after 2017, just prior to lunch, right?

4    A.   Yeah.

5         MR. KILROY:  Exhibit 316, please.

6    BY MR. KILROY:

7    Q.   I'm going to show you Exhibit 316 for identification.

8    This is an email dated February 7th, 2018.

9         Do you see the reference being made to your wanting to

10   sell call at that time?

11        MR. KOLMAN:  Your Honor, if I may be heard?

12   Objection.

13        THE COURT:  Yeah.  Just ask whether she did that, not

14   about.

15   Q.   Do you recall --

16   A.   Can I see the date, please, above.

17   Q.   Above, sure.

18   A.   Okay.  So --

19        THE COURT:  Just wait.  We need to have a question,

20   Doctor.

21        So, go ahead, Mr. Kilroy, please.

22   BY MR. KILROY:

23   Q.   Dr. Desai, is it fair to say in February of 2018, you were

24   still trying to sell call?

25   A.   Yeah, I didn't remember.  I did, but it was a few so I

1    don't remember.

2    Q.   When you were asked about your deposition testimony and

3    you said that you weren't aware of the email that the jury has

4    seen involving what Dr. Ferrucci spoke to you about, do you

5    recall that?

6    A.   Yes.

7    Q.   But yesterday you testified that you actually spoke with

8    Dr. Ferrucci about everything in that email, right?

9    A.   I didn't have the document.  That's what I meant.  I did

10   speak to him.

11   Q.   Right.  You spoke to him.  So anything that Dr. Ferrucci

12   claims he said to you in that email, you had knowledge of based

13   on your having actually spoken to him in your office, right?

14          MR. KOLMAN:  Your Honor, if I may be heard?

15          (Sidebar as follows:)

16          THE COURT:  Yes.

17          MR. KOLMAN:  Your Honor, this is beyond the scope

18   of -- of my redirect.

19          THE COURT:  How much longer are you going to be?

20          MR. KILROY:  (Indicating.)

21          THE COURT:  Two questions or two minutes?

22          MR. KILROY:  I'm sorry.  Two minutes, your Honor.

23          THE COURT:  And where are you going with this?

24          MR. KILROY:  This -- I'll be done with this as soon as

25   she answers the question.

1          THE COURT:  All right.  Thank you.

2          (End of sidebar.)

3    BY MR. KILROY:

4    Q.   Am I correct, Dr. Desai?

5    A.   Will you please repeat the question.

6    Q.   Sure.  Am I correct that you had actually physically

7    spoken with Dr. Ferrucci in your office about everything that

8    was contained in that email?

9    A.   Yes.

10   Q.   Now, when asked just shortly, moments ago, or just prior

11   to lunch about your deposition testimony, you stated to

12   Mr. Kolman at the time of your deposition, and I quote, I don't

13   think anyone discriminated against me, as of the day of your

14   deposition.

15          Is that your testimony under oath?

16          MR. KOLMAN:  Judge.

17          THE COURT:  Just yes or no, please.

18          THE WITNESS:  Not to my knowledge, I did.

19   BY MR. KILROY:

20   Q.   And so you didn't think anyone discriminated against you,

21   yet while you were --

22          MR. KOLMAN:  Objection.  Leading.

23          THE COURT:  Well, it's his witness.  It's an adverse

24   witness, so go ahead.

25   BY MR. KILROY:

1   Q.   You didn't think anyone had discriminated against you, yet

2   you filed a federal lawsuit accusing Dr. Rosen and UMass

3   Memorial of discriminating against you?

4         MR. KOLMAN:  Objection.

5         THE WITNESS:  No.

6         THE COURT:  Sustained.

7         THE WITNESS:  No.

8         THE COURT:  No.  Wait.  When there's an objection,

9   Doctor, please wait for me to make a --

10        THE WITNESS:  Yes. --

11        THE COURT:  -- ruling.

12        THE WITNESS:  Yes.  Yes.  Yes.

13        THE COURT:  Okay?

14        MR. KILROY:  Nothing further, your Honor.

15        THE COURT:  Thank you, Doctor.  You may step down.

16        THE WITNESS:  Thank you.  Thanks, everybody.

17        THE COURT:  Next witness.

18        MR. KOLMAN:  I believe the next witness --

19        THE COURT:  Oh, okay.

20        MR. KOLMAN:  -- is coming from the defense.

21        MR. KILROY:  I thought you mentioned that Dr. Uy was

22   coming in.

23        MR. KOLMAN:  He's not.  Not this week.

24        MR. KILROY:  Okay.

25        THE COURT:  Ladies and gentlemen, let me just explain

1    something.  I don't want to jinx us, but, as you know, we've

2    spent the bulk of the week on the two part -- two of the three

3    parties, Dr. Rosen and Dr. Desai, and, of course, UMass is also

4    a defendant.

5            Those witnesses always tend to take a lot of time,

6    because they're the principals.  And in an effort to

7    accommodate the schedules of the witnesses, the plaintiffs and

8    the defendants have spoken, and the defendants are going to

9    take a witness out of order.  The plaintiff has not rested.

10   They still have evidence to produce to you, but some of those

11   witnesses won't be able to be here until next week, and the

12   plaintiff's -- the defendants's witnesses are available at this

13   point in time.

14           So, who has got this witness, Mr. --

15           MR. KILROY:  Ms. Dowd does.

16           MS. DOWD:  I do, your Honor.

17           THE COURT:  Oh, okay.  I'm sorry.

18           MS. DOWD:  That's okay.

19           THE COURT:  So the witness that you're about to see is

20   a defense witness.  The plaintiff hasn't rested.  We're just

21   taking the witness out of order.

22           All right.  Counsel.

23           MS. DOWD:  Good afternoon, your Honor.

24           THE COURT:  Counsel, what's your name, please?

25           MS. DOWD:  Attorney Ashlyn Dowd.

1           THE COURT:  Dowd?

2           MS. DOWD:  D-O-W-D.

3           THE COURT:  Thank you.

4           MS. DOWD:  Uh-huh.

5           THE CLERK:  Please raise your right hand.

6           Do you solemnly swear the testimony you are about to

7    give this Court will be the truth, the whole truth, and nothing

8    but the truth, so help you God?

9           THE WITNESS:  Yes, I do.

10          THE CLERK:  Please be seated.

11          State your name and spell your last name.

12          THE WITNESS:  My name is Mona Korgaonkar.

13          THE COURT:  Spell your last name for the record.

14          THE WITNESS:  K-O-R-G-A-O-N-K-A-R.

15          THE COURT:  Thank you.  Please be seated.

16          THE WITNESS:  Okay.  Can everybody hear me?

17          THE COURT:  Yes, we can.

18          THE WITNESS:  Okay.  Yes.

19                        DIRECT EXAMINATION

20   BY MS. DOWD:

21   Q.   Good afternoon.

22   A.   Good afternoon.

23   Q.   Would you please state your name for the record, again?

24   A.   You have to speak up a little bit.

25   Q.   Sorry.  Could you please state your name for the record?

1    A.    Okay.  My name is Mona.  My middle name is Mohan.  My last

2    name is Korgaonkar.

3    Q.    Thank you.  And where do you work?

4    A.    I work at UMass Memorial.

5    Q.    And what is your job title at UMass Memorial?

6    A.    Well, I am a radiologist.  I specialist in musculoskeletal

7    radiology.  I am also associate professor of radiology, working

8    in the same department, of course, and that's where I have been

9    for quite some time.

10   Q.    And is musculoskeletal radiology, does that differ than

11   chest radiology?

12   A.    Yes, it is very much different from bone radiology.  Bone

13   radiology, the target organ we are looking at is bone, which is

14   a hard organ; and in chest radiology, we are looking at mainly

15   the lungs.  Lungs are very spongy structures, and the diseases

16   that affect the lungs are very much different from the diseases

17   that affect bone.

18         When we superspecialize, for example --

19         THE COURT:  Ms. Dowd, Ms. Dowd, let's have a question.

20   BY MS. DOWD:

21   Q.    Are you qualified to assess the quality of a chest

22   radiologist's work in reading chest CTs?

23   A.    No.

24   Q.    And where did you attend medical school?

25   A.    I attended my undergrad medical school from Armed Forces

1    Medical College, and I did my post graduate degree from PGI,

2    that is Post Graduate Institute in Chandigargh.  That is an

3    affiliate of Hammersmith Hospital in London.

4    Q.    Thank you.  And when did you attend medical school?

5    A.    Late '60s, early '70s.

6    Q.    And when you attended medical school did you receive

7    training on advanced radiological procedures, such as MRI, CT

8    scanning, and musculoskeletal injections?

9    A.    No, they were not existent at that time.

10   Q.    So repetitive, but was MRI even being used when you

11   attended medical school?

12   A.    No, they were not there.

13   Q.    And for how long have you worked at UMass Memorial as a

14   radiologist?

15   A.    About maybe 28, 29 years.

16   Q.    And what are your general job duties and responsibilities

17   there?

18   A.    Well, now I do just musculoskeletal radiology.  That is

19   plain films, but when I was doing part-time and full-time, I

20   was engaged in doing MRIs, CT scans, as well as procedures and

21   the injecting the joints for arthritis and pain, and also I

22   used to teach the residents, who were becoming bone

23   radiology -- radiologists, as well as I used to teach the

24   medical students, and I used to take didactic lectures for the

25   residents and the medical students.

1    Q.    Thank you.  Seeing that you didn't receive training in

2    medical school related to MRIs and CT scans, how did you

3    develop expertise in those areas?

4    A.    Well, when I was -- I joined UMass, and even before that I

5    took many times many fellowships, and I went to MGH and Brigham

6    Hospital to do my mini fellowships one or two weeks at a time

7    several times, and I also attended a lot of national

8    conferences as well as international conferences that were

9    pertaining to my subspecialty, that is musculoskeletal

10   radiology, and I kept up that way.

11   Q.    And why did you elect to pursue this training?

12   A.    Pardon me.

13   Q.    Why did you choose to take on this training?

14   A.    Well, as everybody knows, medicine is always evolving.

15   There are always new, new things are coming up.  If you have

16   just graduated then after one year or two years, there is new

17   things coming up.  So I thought for myself, as to I wanted to

18   be current with everybody else, and I used to read the journals

19   and I used to take the conferences.

20         Plus also, I wanted to give the benefit of my

21   knowledge to my patients so I thought it was very important for

22   me to keep up, though I had graduated a long time ago.

23   Q.    And do you know Dr. Max Rosen, the chair of the Department

24   of Radiology?

25   A.    Yes, I know him.

1   Q.   And for how long would you say you have known Dr. Rosen?

2   A.   Maybe ten or 12 years or so.

3   Q.   Can you describe to the jury your experience working for

4   Dr. Rosen as your chair?

5   A.   Well, in my experience, Dr. Rosen is soft-spoken.  He's

6   very calm.  He doesn't get hyper any time, and whenever I have

7   approached him with any of the problems he has sorted

8   congenially so.

9   Q.   And what types of problems would those be?

10  A.   Well, first, I wanted to go to the other campus, from

11  University campus to the Memorial campus, the reason being a

12  silly one, because it is very difficult to park in University

13  campus.  I wanted to park in easily, so I told him I want to

14  work from Memorial Hospital.  So he said okay.

15          And then I wanted to go part-time.  He allowed me to

16  do that; and after that I wanted to spend more time with my

17  family and my children and grandchildren and my husband.  So I

18  said to him I want more flexibility.  I just want to work per

19  diem.  And he said yes.

20          And in COVID time I said I don't feel comfortable

21  coming to the hospital so he provided all the equipment for me

22  to read from home, and I read from home now.

23  Q.   And what have been your observations as to the priority or

24  not that Dr. Rosen places on ensuring patient safety?

25  A.   Well, patient safety is a priority for all of us doctors.

1    But especially for the chairman of the department, because

2    everything the buck stops at them.  So they have to be very

3    responsible for the patient care as well as the quality of care

4    that we are giving to patients and all those things.

5    Q.    And are you familiar with the plaintiff, Dr. Charu Desai?

6    A.    Yes, I know Charu.

7    Q.    And how do you know her?

8    A.    She is a personal friend of mine for over the last

9    40 years, and we are very good friends, and we worked also

10   together.

11   Q.    Do you work full-time or part-time or per diem?

12   A.    I worked first full-time, then part time, then per diem,

13   and now I work from home.

14   Q.    And right now are you per diem or part-time?

15   A.    I'm per diem.

16   Q.    Per diem.  And why did you transition to this per-diem

17   role?

18   A.    Well, like I said, I wanted to spend more time with my

19   family, and I also wanted flexibility.  So I thought that

20   whatever I'm doing in the hospital, I can be at home and do it

21   and as much as I want to do it or as little as I want to do it,

22   that is the reason I chose it.

23   Q.    And did Dr. Rosen ask you to transition to the per diem

24   status?

25   A.    No, he did not.

1    Q.    Did you request to do so?

2    A.    Yes, I requested myself.

3    Q.    And what was his response when you requested that?

4    A.    Oh, he let me do it.

5    Q.    To what extent, if any, has Dr. Rosen limited your ability

6    to work the number of shifts that you desire?

7    A.    Not to my knowledge, he has not restricted anything for

8    me.

9    Q.    And to your knowledge -- oh, sorry.  Doctor, if you don't

10   mind, would you please tell the jury your age.

11   A.    I'm 76 years old.

12   Q.    And to your knowledge are you the oldest radiologist

13   working for UMass under Dr. Rosen's leadership?

14   A.    No, we have another very distinguished radiologist who is

15   a little bit senior to me.

16   Q.    Do you know his name?

17   A.    His name is Dr. Joseph Ferrucci.

18   Q.    Thank you.

19              MS. DOWD:  That's all.

20              THE WITNESS:  Okay.

21                          CROSS-EXAMINATION

22   BY MR. KOLMAN:

23   Q.   Good afternoon, Dr. Korgaonkar.  My name is Tim Kolman,

24   and I represent Dr. Charu Desai.

25   A.    Okay.

1    Q.   What do you know about the Desai case?

2    A.   Well, she is my friend, personal friend.  Much before she

3    became a radiologist, I knew her, so we are kind of personal

4    friends.

5    Q.   I'm not asking if you know her.  I'm asking about this

6    case.

7         Did you read the complaint that was filed in this

8    case?

9    A.   No.

10   Q.   Do you know why Dr. Desai brought this case?

11   A.   No, actually when this all happened --

12   Q.   A simple no, that's what we need.

13   A.   No.  Yes, no.

14   Q.   Thank you.

15        Do you know any of the facts that underlie my client's

16   case?

17   A.   No.

18   Q.   Any of the facts?

19   A.   I don't.

20   Q.   Isn't it true that you're basically here to give a

21   recommendation to Dr. Rosen that he is not -- he does not

22   discriminate on the basis of age; is that why you're here?

23   A.   No.

24   Q.   Were you asked to come?

25   A.   I was asked to come, and I wanted to come and tell the

1    truth.

2    Q.    Excuse me.  That's just a yes?

3    A.    Yeah.

4    Q.    And who asked you to come?

5    A.    Mr. Kilroy.

6    Q.    Who?

7    A.    Mr. -- my -- our attorney.

8    Q.    Okay.  And did you look at any notes or documents in this

9    case before you came?

10   A.    I haven't looked at any notes.

11   Q.    You talk about being a friend of my client, correct?

12   A.    Yes.  Yes.

13   Q.    Your doctor -- your husband is a surgeon, correct?

14   A.    Yes.

15   Q.    Your husband operated on my client's nephew, correct?

16           MS. DOWD:  Objection.

17           THE WITNESS:  My husband is not on trial, sir.

18           THE COURT:  Wait.  Wait.  Hold up.

19           MS. DOWD:  Objection.

20           THE COURT:  Hold up.  Sustained.

21           MR. KOLMAN:  Your Honor, if I may be heard?

22           THE COURT:  No.

23   BY MR. KOLMAN:

24   Q.    Dr. Korgaonkar, you spoke about keeping up in your -- in

25   your field, correct?

1    A.   Yes.

2    Q.   And attending courses?  Attending courses --

3    A.   Yes.

4    Q.   -- in order --

5    A.   Yes.

6    Q.   According to your résumé, the last time you actually took

7    a course was in the year 2000?

8    A.   In what?

9    Q.   The year 2000?

10   A.   Well, that is not updated, I think.

11   Q.   It's not updated?

12   A.   Yes.  I think.  Because I have been -- I have been

13   attending 12:00 to 1:00 conferences every day, and I have been

14   reading articles.

15   Q.   I understand.  I understand that.

16   A.   Yeah.

17   Q.   This was produced to us from defense counsel.

18   A.   Well, it may not be updated because when I became

19   part-time --

20             MS. DOWD:  Objection, your Honor.

21             THE COURT:  Wait.  I'm sorry.  What?

22             MS. DOWD:  Objection.

23             THE COURT:  What was the question?

24             MR. KOLMAN:  It was I was about to ask it.

25             MS. DOWD:  Lack of foundation for the document.

1          MR. KOLMAN:  Well, I can --

2          THE COURT:  Hold it.

3          MR. KOLMAN:  I can make a foundation, but she's going

4    to have to see it.

5          THE COURT:  Let's -- let's hear the question and then

6    we'll -- no, no, ask the question, if you would, Mr. Kolman.

7    Then I'll --

8    BY MR. KOLMAN:

9    Q.   Do you know if this -- this document was produced by the

10   defense counsel in this case?

11   A.   I don't know.

12   Q.   And you say that your résumé has been updated.  Excuse me,

13   but haven't seen this copy?

14   A.   I have not seen that copy.

15         MR. KOLMAN:  Your Honor, I would like to show the

16   witness the copy of her résumé.

17         THE COURT:  Show it to your sister and then you may.

18   You can use the ELMO, please.

19         MS. DOWD:  We object for relevance.

20         THE COURT:  Well, wait.  Let's -- let's plug in the

21   amps.

22         (Sidebar as follows:)

23         THE COURT:  All right.  Let me do -- do me a favor,

24   please, and for not the jury, can you put that on the ELMO.

25         MR. KOLMAN:  Sure.

1          THE COURT:  On the ELMO.  All right.

2          MR. KOLMAN:  Your Honor --

3          THE COURT:  What's the objection, Ms. Dowd?

4          MS. DOWD:  (Muted.)

5          THE COURT:  You have to press the button.

6          MS. DOWD:  The relevance of this document.

7          THE COURT:  I didn't hear that.

8          MS. DOWD:  The relevance.

9          MR. KOLMAN:  Your Honor, this is the relevance right

10   here.  I'm about to show it.  It ends in 2000.  She is here

11   testifying about how important it is to take courses.  The

12   year 2000 was her last course that she ever took, and I think

13   that's relevant to impeach her on her credibility.

14          MS. DOWD:  Your Honor, she has --

15          THE COURT:  Wait until Mr. Kolman finishes, please.

16          MR. KOLMAN:  I don't need to impeach her credibility,

17   but in the sense that she is a radiologist like my client.  She

18   has not attended any of these courses whatsoever, and yet here

19   she is saying how important it is that that is what she does,

20   et cetera.

21          So I think as a comparator and in respect to her

22   testimony, this should -- this should come in.

23          MS. DOWD:  She has not been applying for jobs since

24   she is currently employed.  So this is not her most updated

25   because she hasn't needed to update it.

1          THE COURT:  All right.  You can bring it up on

2     redirect.  Let's -- let's have this root canal end as soon as

3     possible.  So I'll let you have it.

4               (End of sidebar.)

5               (Counsel conferred.)

6          MR. KOLMAN:  May I approach the witness, your Honor?

7          THE COURT:  Use the ELMO.  Use the ELMO.

8          MR. KOLMAN:  Oh, okay.

9     BY MR. KOLMAN:

10    Q.   I'm showing you a document.

11              THE COURT:  Just for her.

12    Q.   Do you know what this is?

13    A.   Yes.

14    Q.   And what is it?

15    A.   That is my CV.

16    Q.   When was this written?

17    A.   With what you have projected it says licensure,

18    Commonwealth of Massachusetts, federal licensing exam.

19    Q.   My question is simply when did you write this résumé?

20    A.   I -- I haven't had to update -- I have not updated my

21    résumé.

22              THE COURT:  No, the question was when did you write

23    it?

24              THE WITNESS:  I don't know.  I don't remember.

25    BY MR. KOLMAN:

```
1    Q.   Do you see this page?

2    A.   Yes.

3    Q.   Do you see -- do you see that it is headed certificate and

4    courses?

5    A.   Yes.

6    Q.   Do you see the last entry?

7    A.   Yes.

8    Q.   And what date is that?

9    A.   That is 2000.

10   Q.   The year 2000?

11   A.   Yes.

12   Q.   And there isn't any other date of anything else after

13   2000, is there?  It's a yes or no.

14   A.   It -- it is not there.

15   Q.   Thank you.

16        And conferences, I'm going to show you this page.

17   A.   Pardon me.

18   Q.   Take a look at this page.  This shows -- this document

19   ends in the year 2000, correct?

20   A.   Yes.

21   Q.   And there's nothing with respect to conferences

22   thereafter, correct?

23   A.   I need to explain.

24   Q.   Correct?

25   A.   I need to explain.
```

1           THE COURT:  And -- and Attorney Dowd will have an

2   opportunity to ask you any questions that she needs to --

3           THE WITNESS:  Oh, okay.

4           THE COURT:  -- have you clean up.

5           THE WITNESS:  Okay.

6           THE COURT:  For the time being if you would just

7   answer --

8           THE WITNESS:  No.

9           THE COURT:  -- Attorney Kolman's questions.

10  BY MR. KOLMAN:

11  Q.   Are you a clinical radiologist?

12  A.   Yes.

13  Q.   As a clinical radiologist, do you spend your time taking

14  care of patients?

15  A.   Yes, that is reading x-rays.

16  Q.   Do you understand that there are two tracks for radiology,

17  academic and clinical, and you're clinical, correct?

18  A.   Yes.

19  Q.   You don't have to take any extra course in order to do

20  your job, do you?

21  A.   Not true.

22  Q.   You can't do your job without taking an extra course; is

23  that what you're saying?

24  A.   We keep up with reading journals and articles.  That is

25  not recorded anywhere.  I read them at twelve o'clock in the

1    night, so who is going to record that.

2    Q.   You read learned journals and articles up to 12 o'clock

3    at night, but they're not recorded on your résumé?

4    A.   Sir, I can't hear you properly.

5    Q.   Excuse me.  I wanted to understand your answer.  Was that

6    your answer?  Yes or no?

7    A.   I can't hear you properly.  I can't answer if I can't hear

8    you.

9            THE COURT:  Yeah, you have to keep your voice up,

10   Mr. Kolman.

11           THE WITNESS:  You have to speak up and come closer to

12   me and ask me.

13   Q.   When you do your job --

14   A.   I do my job.

15   Q.   Wait.  The question is:  When you do your job, are you

16   able to do it, in your opinion, well?

17   A.   8:00 to 5:00.

18   Q.   In your opinion, do you do your job well?

19   A.   Yes, of course.

20   Q.   And in your opinion, do you have to go to any extra course

21   or learn any extra technique in order to do your job as you do

22   it now?

23   A.   I have done them.

24   Q.   I'm sorry.

25   A.   I have done them, yes.

1    Q.   I understand, but that's not my question.  In order to do

2    your job well, do you -- did you have to go to any extra course

3    in order to learn the technique that you otherwise did not

4    have?

5    A.   I need to explain.  No, but I need to explain this.

6    Q.   Okay.  Thank you.

7         Did Dr. Rosen ever suggest to you that you should

8    write an article?

9    A.   He did not.

10   Q.   Do you -- do you get academic time?

11   A.   No.

12   Q.   Did Dr. Rosen ever suggest you should do any research?

13   A.   No, I was not interested in research.

14   Q.   Did Dr. Rosen ever suggest that you -- the quality of your

15   work as a clinical radiologist was affected adversely by your

16   failure to publish or do research?

17   A.   No, it never affected.

18             MR. KOLMAN:  I have nothing else.

19             THE COURT:  Ms. Dowd.

20             MS. DOWD:  Thank you.

21                      REDIRECT EXAMINATION

22   BY MS. DOWD:

23   Q.   So, Doctor, can you confirm your résumé that was

24   previously shown to you hasn't been updated since 2000; is that

25   fair?  Just yes or no.

1    A.    Well, you know --

2    Q.    Just yes or no to start.

3    A.    No.

4              MR. KOLMAN:  Leading.  Your Honor, leading.

5              THE COURT:  Yeah, don't lead.

6    BY MS. DOWD:

7    Q.    Have you been looking for jobs in the past five to ten

8    years?

9    A.    I might have.  Not five to ten years, maybe when the

10   department was changing hands and everything, I might have, and

11   you know, I -- I chose to remain at UMass because that was the

12   best fit for me, so I remained there.

13   Q.    And have you -- did you submit your résumé in the past ten

14   years to any employers?

15   A.    I have not.

16   Q.    So you didn't update your résumé?

17   A.    No.  No.

18   Q.    Thank you.

19              And previously you were cut off a little bit.  You

20   wanted to explain with regards to your being able to do your

21   job well.  Could you explain to me, do you think you can do

22   your job well?

23   A.    No, I -- I just wanted to tell the other attorney that

24   keeping up doesn't mean just you have to get up and go and go

25   to Boston, go here and there and learn.  The learning and

1    keeping up with the radiology also is reading the articles,

2    seeing the things that -- what people are doing all over the

3    country, and for us radiologists, looking at the pictures and

4    learning.  So it doesn't have to be authenticated or certified

5    by somebody that I have attended the courses.  The very fact

6    that my radiology, my quality and quantity have been very good,

7    that is a testimony for what I am.

8              MS. DOWD:  Thank you.  That's all.

9              THE COURT:  Thank you.  Doctor, you may step down.

10             THE WITNESS:  Thank you, sir.

11             THE COURT:  Who has got the next witness, please?

12             MR. KILROY:  I do, your Honor, and Ms. Dowd is going

13   to get her.

14             THE CLERK:  Please raise your right hand.

15             Do you solemnly swear the testimony you are about to

16   give this Court is the truth, the whole truth, and nothing but

17   the truth, so help you God?

18             THE WITNESS:  Yes.

19             THE CLERK:  Please be seated.

20             Please state your name and spell your last name for

21   the record.

22             THE WITNESS:  Can you hear me?

23             THE COURT:  Yes, can you pull that just a little

24   closer, that microphone, please.

25             There we go, thank you.

1          THE WITNESS:  Randa Mowlood.  R-A-N-D-A, Mowlood,

2   M-O-W-L-O-O-D.

3          THE COURT:  Doctor, I'm sorry.  Ma'am, can you please

4   repeat that spelling.

5          THE WITNESS:  Last name Mowlood.  M, like Mary,

6   O-W-L-O-O-D, like David.  First name Randa, R-A-N, like Nancy,

7   D-A.

8          THE COURT:  Thank you.

9          MR. KILROY:  Thank you, your Honor.

10                      DIRECT EXAMINATION

11   BY MR. KILROY:

12   Q.   Good afternoon, Ms. Mowlood.

13          What's your job title?

14   A.   I'm the senior economic administrator for the Department

15   of Radiology at UMass Memorial Medical Center.

16   Q.   And what are your basic job duties and responsibilities in

17   that role?

18   A.   Mainly assist Dr. Rosen in the administrative aspects of

19   the department.  I oversee the -- the administrative staff.  I

20   oversee the budget, the billing services.  I help with the

21   recruitment.  When there is a new position, I post the

22   position.  I help with the personnel issues, and I also oversee

23   the scheduling of the radiologists, including vacations and

24   calls.

25   Q.   For how long have you worked with the chair, Dr. Rosen?

1    A.   Since 2014, when I was hired.

2    Q.   Do you know the plaintiff in this case, Dr. Charu Desai?

3    A.   Yes, I do.

4    Q.   How do you know her?

5    A.   She was a radiologist in the department from the time I

6    started to the time her employment was terminated in 2019.

7    Q.   You mentioned that you assist with posting of positions

8    within the department.

9         Just focusing on the time from 2014 to the present,

10   has there been any time in which there has not been active

11   postings, job postings for radiologists?

12   A.   No.

13   Q.   Since 2016, to the present, has there been any time that

14   there has not been an active job posting for a chest

15   radiologist?

16   A.   No, this has been a priority since 2016; and, in fact,

17   we're still looking for a fellowship trained chest radiologist

18   today.

19   Q.   Could you describe for the jury your observations of

20   Dr. Rosen as a department chair?

21   A.   I find Dr. Rosen to be very kind.  He's very patient in

22   his interactions with others.  He is very responsive to

23   requests from everyone.  I don't know how he does it, but he

24   does it, and then he is also -- he always try to be fair to

25   everybody.

1    Q.    In your role as the senior academic administrator, did you

2    have occasions to deal directly with Dr. Desai?

3    A.    Yes.

4    Q.    And if you would, could you explain in general what those

5    interactions were like with Dr. Desai?

6    A.    In my experience, I found that Dr. Desai always wanted a

7    little bit of a special treatment compared to other

8    radiologists.  For example, she wanted -- she wanted to be

9    exempt from the obligation of calls, which was a requirement of

10   all the radiologists.  She wanted to have academic days to use

11   as additional vacation days, but she did not want to do the

12   academic work for them.

13   Q.    Did she state the basis for why she felt she was entitled

14   to be exempt from call?

15   A.    Because of her longevity at UMass Memorial.

16   Q.    And was she removed from call coverage?

17   A.    No.

18   Q.    Were you in any meeting with Dr. Rosen and Dr. Desai where

19   the issue of call coverage and her desire not to be a part of

20   it came up?

21   A.    Sorry.  Can you repeat that?

22   Q.    Sure.  Were you in any meetings --

23   A.    Oh, oh.

24   Q.    -- with Dr. Rosen and Dr. Desai where the issue of call

25   coverage was discussed?

1    A.    Yes, I was.

2    Q.    And what, if anything, did Dr. Rosen offer to Dr. Desai in

3    order to try and meet her demand?

4    A.    So he discussed the option that if you don't want to do

5    calls, there's an option in the department which is to be, you

6    know, be a per diem.  Per diems are exempt from doing calls.

7    Q.    In the meetings you had with Dr. Rosen and Dr. Desai, did

8    Dr. Rosen ever -- to what extent, if any, did Dr. Rosen try to

9    force her to go per diem?

10   A.    He did not.

11          MR. KILROY:  Could I have the document camera just for

12   the witness, please.

13   Q.    Ms. Mowlood, I'm going to show you a document.  It's

14   Exhibit 292 for identification.  It's a chain of emails.

15          And I'll just ask if you recognize this, and I'll page

16   through the emails so you can see it.  Just let me know when

17   you're ready to see the next page.

18   A.    Yes, I recognize it.

19   Q.    And then the original start of the email chain?

20   A.    Yes.

21   Q.    Do you recognize this chain of emails?

22   A.    Yes, I do.

23   Q.    And can -- directing your attention to the first email in

24   the chain, dated April 28, 2016, what does this deal with?

25   A.    So I was reaching out to Kelly Zalegowski.

1          MR. KOLMAN:  Objection.

2          THE COURT:  Sustained.

3    BY MR. KILROY:

4    Q.   Do you recall dealing with any issues related to Dr. Desai

5    in the April to May 2016 time frame?

6    A.   Yes.

7    Q.   And what do you recall those issues dealt with?

8    A.   So there -- there were a number of issues.  They were that

9    she was being uncooperative with Dr. Dill, the division chief.

10   She was argumentative.  When there were changes, she was not

11   always open to the changes.  She -- she -- Dr. Dill felt that

12   she was undermining her with the -- with the residents.  I

13   believe those are the issues that were in the email.

14   Q.   Have you yourself experienced any uncomfortable

15   interaction with Dr. Desai?

16   A.   Yes, I did.

17   Q.   And could you explain to the jury what that was.

18   A.   So, I -- I always had the good relationship with

19   Dr. Desai, and one day she came to my office and actually

20   yelled at me, and I don't remember exactly what that

21   interaction was about, but I often had to work with Dr. Desai

22   on things that she didn't agree with.  Would it be that she

23   didn't want to do the call coverage, and I would have to tell

24   her no, you cannot be exempted from it, or it could be because

25   she wanted -- well, the academic, this wasn't my

1    responsibility.  So all I could tell her was you need to talk

2    to Dr. Rosen.

3           It was about vacation time, you know, we needed her to

4    give us her vacation time, but she -- she won't give them to

5    us.

6           So all these interactions were difficult interactions,

7    and sometimes Dr. Desai would get upset; and when she got upset

8    she would raise her tone and, you know, sometimes you felt

9    uncomfortable, because you felt that the tone was a bit

10   hostile, so.

11   Q.   Was there any events in the spring to summer of 2016 where

12   you had to take action with respect to where people were

13   physically located for working that day?

14   A.   Yes, Dr. Dill came to my --

15           MR. KOLMAN:  Objection.

16   A.   -- office that day.

17           MR. KOLMAN:  Your Honor.  Relevance.

18           THE COURT:  What was the question?

19           MR. KILROY:  Any events in the spring to summer of

20   2016, your Honor, where she had to take action with respect to

21   where people were physically working that day.

22           THE COURT:  Overruled.

23           THE WITNESS:  I can go?

24           THE COURT:  That means you can answer.

25           THE WITNESS:  Okay.  Thank you.

1          That day, she -- Dr. Dill, who was a division chief

2     for the chest division, came to my office, and she was very,

3     very distraught, very upset, because she felt that Dr. Desai

4     was creating negativity in the chest reading room, that it

5     was --

6          MR. KOLMAN:  Objection.

7          THE COURT:  Sustained.

8          You -- you can tell me -- you can't tell me what

9     people said, but you can tell me as a result of a conversation

10    what you did, okay?

11         THE WITNESS:  Okay.  And so what I did that day is we

12    found a private office for Dr. Dill to sit in so that she could

13    read peacefully and be productive.

14         MR. KILROY:  Nothing further, your Honor.

15                         CROSS-EXAMINATION

16    BY MR. KOLMAN:

17    Q.   Good afternoon.

18    A.   Hi.

19    Q.   Who's your boss?

20    A.   Who's my boss?

21    Q.   Yeah.

22    A.   Dr. Rosen.

23    Q.   Have you ever had a doctor come to you with an issue apart

24    from my client?

25    A.   They -- the doctors come all the time to our office with

1    issues.

2    Q.    And do you ever have a doctor a little upset or perhaps

3    very upset coming to your office about an issue?

4    A.    Yes.

5    Q.    Not just Dr. Desai, but other doctors?

6    A.    Yes, yes.

7    Q.    So it's not that unusual to have doctors coming in with

8    one issue or another, correct?

9    A.    No, but it's unusual --

10   Q.    Excuse me.

11   A.    Oh, sorry.

12   Q.    You answered the question.  Thank you.

13   A.    Thank you.

14   Q.    What do you know about this case?

15          You know it's an age discrimination case?

16   A.    Yes.

17   Q.    Have you read any documents in respect of this case?

18          MR. KILROY:  Objection, your Honor.

19          THE COURT:  Sustained.

20   BY MR. KOLMAN:

21   Q.    Who asked you to testify today?

22   A.    Sorry?

23          MR. KILROY:  Objection, your Honor.

24          THE COURT:  Overruled.

25          THE WITNESS:  Who asked what?

1    BY MR. KOLMAN:

2    Q.   Who asked you to testify today?

3    A.   Who else is supposed to testify today?

4    Q.   Yeah, who asked you to come to court and speak --

5    A.   Oh, who asked me.  Our counsel, the UMass Memorial

6    counsel.

7    Q.   Do you know how long Dr. Desai had worked or worked -- had

8    worked at UMass?

9    A.   I know many years, but I don't have the date that she

10   started on in my head.

11   Q.   When did you start working at UMass?

12   A.   When did I start?

13   Q.   Yeah.

14   A.   2014.  December 15, 2014.

15   Q.   Dr. Desai was highly regarded, wasn't she?

16   A.   She was.

17            MR. KILROY:  Objection.

18            THE COURT:  Overruled.

19   BY MR. KOLMAN:

20   Q.   Do you know how she was terminated?

21   A.   Yes, I'm aware.

22            (Plaintiff counsel conferred.)

23            MR. KOLMAN:  Just for the witness, your Honor, 101.

24            Any objection?

25            MR. KILROY:  No.

1    BY MR. KOLMAN:

2    Q.   I'm showing you a document already in evidence, 101, and

3    it's a doc -- it's a document -- it's an email, and you have

4    been cc'd on that.

5         Do you see that?

6    A.   Yeah.

7         MR. KOLMAN:   Can you go down and give us the entire

8    string.   Okay.

9    Q.   Do you recall -- you may not recall, but I'm asking if you

10   do recall this email string?

11        Let's start with this email.   Do you recall this

12   email?

13   A.   No, I don't.

14        MR. KOLMAN:   Okay.   Go to the next one.

15   Q.   Are you involved in any way in the recruiting of

16   radiologists?

17   A.   So my -- my involvement is posting the positions, and then

18   making sure when the candidates are coming that we, you know,

19   do the interviews and the -- the itinerary for them.

20        And then when the decision is made to hire someone,

21   you know, making sure that we follow the process of the offer

22   letters and, you know, making sure that we have approval and

23   they're signed.

24   Q.   In October of 2017, do you recall that there was a great

25   chest radiologist from Penn, and Ms. Streeter wanted to make

1   him an offer?  Do you recall that?

2   A.   I don't.  I often am copied on emails, but it doesn't mean

3   that I'm really involved.

4   Q.   Okay.

5        MR. KOLMAN:  Go to the next one.

6        And the next one.  That's fine.

7   Q.   Are you on any committees to discuss the hiring of

8   radiologists?

9   A.   No.

10  Q.   Do you have any input into the budget of the radiology

11  department?

12  A.   Yes.  I'm very involved in the budget.

13  Q.   Do you recall that it was necessary to terminate Dr. Desai

14  in order to make room for another doctor?

15  A.   No.

16  Q.   Another radiologist?

17  A.   No.

18  Q.   Is it the case that once Dr. Desai was terminated there

19  was money available to hire another radiologist?

20  A.   Yes.

21  Q.   And did you ever discuss the timing of Dr. Desai's

22  departure?

23  A.   I -- I was aware of it, because of the letter that she

24  received about the termination, so yes, I was aware of that.

25  Q.   Did you have any discussion with anyone at UMass about the

1   fact that when Dr. Desai was no longer there there would be

2   money to hire another radiologist?

3   A.   No, we always are in so much need for radiologists that we

4   don't wait for someone to leave to have money to hire somebody

5   else.

6        (Plaintiff counsel conferred.)

7   Q.   I'm asking you to look at this email very carefully.  It

8   talks about a three-month overlap.

9        Do you see that?

10  A.   Yeah.

11  Q.   Is it your understanding that, in fact, there would be a

12  three-month overlap, because UMass would hire a radiologist

13  while Dr. Desai was still employed, but that there would only

14  be a dual salary for him and for her for three months?

15  A.   Sorry.  I don't remember it.  I don't remember this at

16  all.

17  Q.   You don't recall?

18  A.   No.

19  Q.   Well, then, do you recall the circumstances that there was

20  discussion about a three-month overlap?

21  A.   No, I don't.

22       MR. KOLMAN:  Okay.  Let's go down.

23       THE WITNESS:  I'm sorry, I don't remember that.

24       (Plaintiff counsel conferred.)

25  BY MR. KOLMAN:

1    Q.   Okay.  Were you involved in any decision to make an offer

2    to this young man from U of Penn?

3    A.   I don't even know who it is, so I'm sorry.  I -- I

4    don't -- I can't answer because I don't know who it is.

5    Q.   That wasn't my question.

6    A.   Sorry.

7    Q.   Are you involved in any way in making an offer from UMass

8    to this young man from Penn.?

9    A.   I wasn't part of that, because I don't remember who you're

10   talking about.  Sorry.

11   Q.   I'm -- you don't need to know the name --

12   A.   Okay.

13   Q.   -- to answer the question.

14        THE COURT:  I think she has.

15        MR. KOLMAN:  Oh, okay.

16   Q.   Do you see the second paragraph of this email, I would

17   like to make him an offer, but I -- but have not formally

18   resolved Dr. Desai's employment-planned for September 30, 2018.

19   I'm working with Kathleen and Muriel but want to make sure this

20   is done in the best way possible.

21        Do you see that?

22   A.   Yeah.

23   Q.   Do -- do you know what this means?

24   A.   I'm not really sure.

25   Q.   You're not really sure?

1    A.   I can interpret the sentences for you, but I don't really

2    know -- I don't know what this was about.

3    Q.   You don't have any theory or conception as to what this

4    paragraphs mean; is that right?

5                MR. KILROY:  Objection.

6                THE COURT:  Sustained.

7                MR. KOLMAN:  Would you go up and show that she was

8    copied.  Okay.

9    Q.   Do you know why you're even copied on all of these emails?

10   A.   Dr. Rosen often copies me on email to keep me aware of

11   what is going on, but sometimes they're not totally relevant to

12   me.  So I have the email, but I don't -- I'm not a participant

13   so I just have them if I need them.

14   Q.   And this is one such --

15   A.   Like if I need an approval, or I need, you know, I go back

16   to emails and use them.  But in this case I was never part of

17   these discussions.

18               MR. KOLMAN:  Okay.  Nothing further.

19               THE WITNESS:  Thank you.

20               MR. KILROY:  Nothing, your Honor.

21               THE COURT:  All right.  Hold up one second.  So why

22   don't we take the afternoon break here, and we'll see you back

23   here in about 10 minutes, okay.

24               THE CLERK:  All rise.

25               (At 1:51 p.m., the jury left the courtroom.)

1          THE COURT:  Can I just say what a pleasure it was to

2     have a witness that actually answered the question without

3     going on ad nauseam.

4          What else do we have?

5          MR. KILROY:  That's it for us, your Honor.  We said we

6     would bring in two fact witnesses today.

7          MR. KOLMAN:  That is it today.

8          THE COURT:  Oh, well, then, Marty, let's get the

9     jurors back in.

10         THE CLERK:  Okay.

11         THE COURT:  Okay.  Hold up.  Before we do that --

12    yeah, Marty bring them out.  Can you just wait by the door.

13         THE CLERK:  Yeah.

14         THE COURT:  So we're going to finish next week?

15         MR. KOLMAN:  Yes.

16         THE COURT:  And, by the way, I'm holding you to your

17    time.

18         MR. KOLMAN:  Yeah.

19         THE COURT:  Yes?  Yes?

20         MR. KOLMAN:  Yes, definitely, and -- and with time to

21    spare.  I'm going to use it all for my closing, Judge, maybe

22    six hours, seven.

23         THE COURT:  Yeah, good, I'm going to look forward to

24    that.

25         Do you agree that we're going to finish this week --

1    next week?

2              MR. KILROY:  Yeah, next week we'll finish.  We believe

3    we need about six hours left to finish, your Honor.

4              THE COURT:  I've got -- you guys are remarkably close.

5    I've got you at 7:27 and you at 7:28, so you're pretty close.

6              MR. KILROY:  Great.

7              (The clerk conferred with the Court.)

8              THE COURT:  You can bring them out.

9              So I'll ask both of the doctors, do all the

10   radiologists talk this much?

11             DR. ROSEN:  That's why they have structured reporting

12   to keep us free.

13             THE COURT:  I'd hate to be in on a department meeting.

14             MR. COMENZO:  Lawyers aren't so terse either, your

15   Honor.

16             THE COURT:  I know.  Good point.  Fair point.

17             THE CLERK:  All rise.

18             (At 1:54 p.m., the jury entered the courtroom.)

19             THE CLERK:  Court is now open.  You may be seated.

20             THE COURT:  Actually, you know what, stay standing.

21   We're -- you can sit if you want.  So we're done for the day.

22   We're out of witnesses.  And it is our best estimate, and these

23   things can go south, but the lawyers have been pretty accurate

24   on their guesstimates on time.  We will finish the case next

25   week.

1          Now, Marty just mentioned, and I saw it as well, there

2     is a chance of snow on Monday.  It doesn't look like it will

3     affect us, but today's Friday and -- and who knows.  So

4     remember we're on the Worcester schedule.  All right.

5          Now, look it, the other thing is this.  I speak only

6     for myself, but I know I speak for the plaintiff and for the

7     defendant and for the lawyers when I tell you how much we

8     appreciate the attention that you have been giving us.  This is

9     hard work.  And I know that when you get home at night you've

10    probably got a headache and you're exhausted.  I know that when

11    I was -- started as a judge, I was exhausted at the end of the

12    day, and I'm sure you guys are too.  But we appreciate the

13    sacrifice that you are making to yourselves and your family and

14    your friends and everybody that depends on you to show up and

15    do your job for us.

16         So thank you.  Have a great weekend.

17         JURORS:  Thank you.

18         JUROR:  Go Celtics.

19         THE COURT:  We'll wait until Monday before we talk

20    about the Patriots.

21         (At 1:56 p.m., court was adjourned.)

22

23

24

25

1                          C E R T I F I C A T E

2

3            I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4     certify that the foregoing transcript is a true and accurate

5     transcription of my stenographic notes before the Honorable

6     Timothy S. Hillman, to the best of my skill, knowledge, and

7     ability.

8

9

10        /s/ Marianne Kusa-Ryll                    12-16-2022

11        Marianne Kusa-Ryll, RDR, CRR                Date

12        Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25