1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2

3

4    Charu Desai,                )
                    Plaintiff,   )
5                                )
                                 )
6    vs.                         )    Case No. 19-cv-10520-TSH
                                 )
7                                )
     UMass Memorial Medical Group )
8    and Max Rosen,              )
                    Defendants.  )
9

10

11   BEFORE:  The Honorable Timothy S. Hillman

12

13                        Jury Trial Day 10

14

15

16                            United States District Court
                              Courtroom No. 2
17                            595 Main Street
                              Worcester, Massachusetts
18                            December 15, 2022

19

20

21

22

23                    Marianne Kusa-Ryll, RDR, CRR
                        Official Court Reporter
24                    United States District Court
                      595 Main Street, Room 514A
25                      Worcester, MA 01608-2093
                    508-929-3399 justicehill@aol.com
                 Mechanical Steno - Transcript by Computer

1    APPEARANCES:

2    Upper Charles Law Group
     Joseph F. Comenzo, Esquire
3    Timothy D. Rodden, Jr., Esquire
     10 Kearney Road, Suite 101
4    Needham, Massachusetts 02494
     on behalf of the Plaintiff
5
     Upper Charles Law Group, LLC
6    David Cromwell Johnson, Jr., Esquire
     81 Hartwell Avenue
7    Suite 101
     Lexington, Massachusetts 02421
8    on behalf of the Plaintiff

9    Kolman Law, PC
     Timothy M. Kolman, Esquire
10   414 Hulmeville Avenue
     Penndel, Pennsylvania 19047
11   on behalf of the Plaintiff

12   Mirick, O'Connell, DeMallie & Lougee, LLP
     Robert L. Kilroy, Esquire
13   Reid Michael Wakefield, Esquire
     1800 West Park Drive
14   Suite 400
     Westborough Massachusetts 01581-3926
15   on behalf of the Defendants

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2
        Witnesses:_____    Direct__    Cross      Redirect    Recross_
3
        Diana Litmanovich
4
        By Mr. Wakefield         18
5       By Mr. Comenzo                        31

6       Charu Desai, Recalled

7       By Mr. Kolman           147

8


9
        Closing Statements:_____    Page
10
        **By Mr. Kolman**                                               **52**
11      **By Mr. Kilroy**                                               **83**
        **By Mr. Kolman**                                               **117**
12

13      **Jury Instructions**                                          **121**

14

15

16

17

18

19

20

21

22

23

24

25

1

**E X H I B I T S**

2

| No. | Description | In Evd. |
|-----|-------------|---------|

3

273        Résumé of Diana Litmanovich                    19

4

84-1       High-level summary prepared by Dr. Litmanovich    28

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(The following proceedings were held in open court

before the Honorable Timothy S. Hillman, United States District

Judge, United States District Court, District of Massachusetts,

at the Donohue Federal Building & United States Courthouse,

595 Main Street, Worcester, Massachusetts, on December 15,

2022.)

THE CLERK:  All rise.

Court is now open.  You may be seated.

THE COURT:  Good morning.

COUNSEL IN UNISON:  Good morning, your Honor.

THE COURT:  We will have a verdict -- proposed verdict

form to you shortly.

Let me start.  I did receive the defendants's edits.

Thank you.

But let me start with the plaintiffs.  Go ahead,

please.

MR. KOLMAN:  Yes, your Honor.  Thank you.

I believe that this may have been reviewed by the

associate --

MR. COMENZO:  Yes.

MR. KOLMAN:  -- who's not yet here.

MR. COMENZO:  He is checking in through security.

He's going to be in in one second.

Fortunately, he did not have a puncture in his car

1     this morning, so.

2              THE COURT:  So do you know if there are edits?

3              MR. COMENZO:  I -- I don't believe that there were any

4     edits.  I don't believe that there were any edits.

5              THE COURT:  Did you --

6              MR. KOLMAN:  I didn't see anything of any

7     significance.

8              THE COURT:  Did you get the defendants's red lines?

9              MR. KOLMAN:  We only got them just now.

10             THE COURT:  Okay.

11             MR. KOLMAN:  And I would note, your Honor, that I'm

12    not sure, it might be my mistake, but I didn't see anything on

13    abetting as an instruction in here.

14             THE COURT:  It is in the -- it was --

15             MR. KOLMAN:  Okay.

16             THE COURT:  -- added by the defendants.

17             Let me -- let me do this just to keep the ball moving.

18    I'll hear from the defendants and come back to you.

19             Do you have any -- so you want me to charge under an

20    aiding and abetting theory?

21             MR. KOLMAN:  I thought that in the sense it is

22    probably in the verdict sheet.  Obviously, I haven't seen the

23    verdict sheet.  It strikes me that the jury probably should be

24    charged on that issue so they're not confused.  So they know

25    what they're doing.

1          THE COURT:  So Dr. Rosen --

2          MR. KOLMAN:  Yeah.

3          THE COURT:  -- on the 151B --

4          MR. KOLMAN:  Right.

5          THE COURT:  -- is to be charged -- you want -- and I

6    think the plaintiffs agree -- be charged only as an aider and

7    abettor, or not as a principal?

8          MR. KOLMAN:  No, I -- I don't agree, your Honor.  I --

9          THE COURT:  Let me -- let's do this then.  Let me hear

10   from them, and then I'll come back to you.

11         MR. KOLMAN:  Thank you.

12         THE COURT:  Go ahead.

13         MR. WAKEFIELD:  Sure, your Honor.

14   Yeah, under 151B --

15         THE COURT:  No, no, let's go through the whole thing.

16         MR. WAKEFIELD:  Absolutely.

17         THE COURT:  So I -- thank you, by the way, for your

18   nice catch on the caption.

19         So I think on page -- so you wanted to add an

20   instruction on parties' statements under oath?

21         MR. WAKEFIELD:  Correct.

22         THE COURT:  I think that makes sense, and I'll happily

23   hear from the -- the plaintiff on that.

24         And by the way, you'll notice in the red-lined version

25   the defendants want that parties' statements under oath on

1      page 10, right after the impeachment.

2                MR. KOLMAN:  One second.  Page 10?

3                MR. COMENZO:  Page 10.

4                THE COURT:  And then...

5                All right.  Talk to me about aiding and abetting.

6                MR. WAKEFIELD:  Sure, your Honor.

7                Under Chapter 151B, an individual is not

8      liable -- cannot be liable for employment discrimination.  Just

9      like under federal law, the difference is under 151B there is a

10     separate provision that does make it unlawful for an individual

11     to aid and abet in discrimination.

12               So Dr. Rosen can't be liable under the same statutory

13     provision as UMass Memorial.  It's the separate provision that

14     has a different standard for liability on his part.

15               So our understanding is that there's a 151B claim for

16     employment discrimination against the employer, and then the

17     only avenue to get liability for Dr. Rosen is under this aiding

18     and abetting, and they're not the same standard so we think

19     it's important to break that out into that separate standard.

20     And I tried to do it as brief as possible in my proposed

21     version.

22               THE COURT:  Thank you.

23               Anything else you want to talk about?

24               MR. WAKEFIELD:  Overall, your Honor?

25               THE COURT:  Yeah.

1          MR. WAKEFIELD:  We made a change from advantageous

2    relations to contractual, and I think that that just matches

3    the facts of the case.

4          THE COURT:  It not only matches the facts of the case,

5    it shows you how long ago I went to law school, because that

6    was the way the tort was...

7          MR. WAKEFIELD:  On page 18, we edited the reason

8    offered for termination to be we would articulate the reason

9    that we terminated Dr. Desai's employment.  I don't think it

10   changes too much, but that's our reason.

11         MR. KOLMAN:  What page is that?

12         MR. KILROY:  Eighteen.

13         MR. KOLMAN:  Okay.  One second.

14         MR. WAKEFIELD:  And then on page 25, the front page,

15   it starts on the bottom of page 24, we would propose a revision

16   to the explanation to the jury about how to calculate front

17   pay.  I believe that the factors that were included are

18   confusing, hard for a jury to calculate, and honestly

19   don't -- in my view of the law doesn't represent the purpose of

20   front pay as an equitable remedy, and so the language I

21   proposed or the defendants proposed is more in line with

22   the -- the general considerations for a jury to take into

23   account how much she would have earned and -- and be clear that

24   she had to prove these different elements how long she would

25   have continued to be employed, whether she would have been

1    continued to be employed at all, offsetting future benefits and

2    earnings along the lines of the back pay instructions with the

3    mitigation provision as well.  I think that's both more helpful

4    to the jury and a more accurate statement of what the law is as

5    to front pay.

6              MR. KOLMAN:  Your Honor, if I may just on that issue.

7              THE COURT:  I'm going to give you a minute.

8              MR. KOLMAN:  Sure.  Thank you.

9              THE COURT:  Just let me finish.

10             MR. WAKEFIELD:  Then I think --

11             THE COURT:  I don't think I'm -- I mean, I want to

12   hear from your brother on your proposed changes.  I don't

13   believe I'm going to give attorneys's fees, costs and interest

14   instruction.  I don't even want to bring it up.

15             MR. KOLMAN:  Right.

16             MR. WAKEFIELD:  Okay.  Just for the record though, and

17   I'll defer to your judgment, of course, the -- the reason we

18   bring it up is just to make sure that the jury when they're

19   coming up with their award they're not including that in their

20   award, but I don't know what your normal practice is.

21             THE COURT:  I don't and my normal practice is not to

22   only because.

23             MR. WAKEFIELD:  Fair.

24             THE COURT:  All right.  Thank you, Mr. Wakefield.

25             Mr. Kolman, you said you had some.

1              MR. KOLMAN:  Thank you, your Honor.  Yeah.

2              I think the prior statements under oath, that's coming

3    in.  I think your Honor made the decision.

4              THE COURT:  Yeah.  Do you have any objection to that?

5    I think you were the ones -- you guys were the ones that were

6    proffering those -- those deposition de bene esse admissions.

7              MR. KOLMAN:  I think it's just a statement of the law.

8    I -- I think -- yeah, I think that's no more than the statement

9    of the law.

10             There's no problem with page 14.

11             So on 21 we have in -- on the top the fact that

12   Dr. Rosen acted as an agent for UMass Memorial Medical, and

13   insofar as acting within his scope of employment, that's clear.

14   But then on the aiding and abetting a supervisor or other

15   decision maker is not liable for discrimination.  I think

16   that's exactly what Mr. Wakefield said.

17             THE COURT:  Don't mumble.

18             MR. KOLMAN:  But the law only prohibits discriminatory

19   employment taken by employers, not their individual officers or

20   employees.  That's clear.  But then for a supervisor to be

21   liable for aiding and abetting, which is a separate count --

22             THE COURT:  Well, it's Count Five.

23             MR. KOLMAN:  Yeah, which is -- yeah, it's not

24   sufficient to show --

25             THE COURT:  It's the -- it's the only count.

1          MR. KOLMAN:  -- only that he made the decision to

2    terminate the employee.  But instead it must be proven by the

3    committee that he acted in a manner distinct and separate from

4    the duties and responsibilities of his position as an official

5    of the employer.  I think, your Honor, respectfully that that

6    should be fleshed out as to what that means.

7          THE COURT:  Well, I'm all ears if you have --

8          MR. KOLMAN:  Yes.

9          THE COURT:  -- an instruction.

10          MR. KOLMAN:  So I would -- I would recommend that what

11   it says is that he's acting separately and out of his -- and

12   personally out of malice, I believe is the -- is the

13   requirement.

14          THE COURT:  No, there's no requirement of malice.

15          MR. KOLMAN:  There's no -- there's no malice.  See

16   this is where Massachusetts state law is involved.

17          THE COURT:  Yeah.

18          MR. KOLMAN:  Are you here to argue that?

19          THE COURT:  You know, it's a wonderful remedy for the

20   plaintiffs.

21          MR. KOLMAN:  Okay.  We'll -- we'll accept it as is.

22          Do you want to take over for me now that you've

23   arrived in terms of the jury instructions?

24          I'm sorry, your Honor, but thank you.

25          THE COURT:  Mr. Johnson.

1           MR. JOHNSON:  Yes, your Honor.

2           THE COURT:  Go ahead, please.

3           MR. KOLMAN:  This is the hard copy.

4           MR. JOHNSON:  Right.  No, I don't -- I don't have any

5   issue with the aiding and abetting charge as the -- as the

6   defendants's proposed red line shows.

7           (Plaintiff counsel conferred.)

8           MR. JOHNSON:  I'm agreeable with the -- with the

9   proposed changes to front pay.

10          MR. KOLMAN:  Your Honor, if I may, on page 25, I don't

11  think it's the burden of the plaintiff to say that she would

12  have continued to have been employed.  We heard evidence that

13  she would have continued to be employed.  I think that the

14  damages flow from the fact of termination and that therefore

15  she would have continued to have been employed.  So, in other

16  words, if she shows that the termination was pretextual then it

17  would follow ipso facto that she would have continued to have

18  been employed.

19          So I think that -- that on 25, I believe

20  it's -- it's -- it doesn't properly reflect the reality.

21          THE COURT:  So you're telling me you want it out, and

22  Mr. Johnson just said that he thought it was fine.

23          MR. KOLMAN:  No, he was talking about something else.

24          THE COURT:  Why don't you all caucus and tell me what

25  you want.

```
 1            MR. KOLMAN:  Yeah, the front pay is fine.  Everything
 2    front pay is calculated, I agree.  That's fine.
 3            THE COURT:  So by -- and just so I understand,
 4    the -- when you say "fine," are you talking about the -- the
 5    defendants's red line or the Court's?
 6            MR. KOLMAN:  I'm talking about the red line is --
 7            THE COURT:  Okay.  Go ahead.
 8            MR. KOLMAN:  Is -- is -- is -- one second.
 9            (Plaintiff counsel conferred.)
10            MR. KOLMAN:  It is Dr. Desai's burden to prove by a
11    fair preponderance of the evidence she would have continued to
12    be employed.  I don't think that that is her burden.  I think
13    it's her burden to show that she was terminated pretextually,
14    and that she would have continued to have been employed as a
15    consequence of that, not some separate area of proof.  It just
16    follows one from the other, and here it looks like she has got
17    a double burden, but, in fact, she doesn't have a double
18    burden.  Once she has shown that the termination was
19    pretextual, then she can show she would have continued to have
20    been employed.  I just think it's -- it puts a -- it puts an
21    unnecessary burden on the plaintiff.
22            THE COURT:  Well, I'm not sure I agree, but I -- let
23    me -- let me think about that.
24            Mr. Johnson or Mr. Kolman, anything else?
25            MR. JOHNSON:  No.
```

```
1              THE COURT:  Okay.

2              MR. JOHNSON:  At least not from my end.

3              MR. KOLMAN:  One second.

4              (Pause.)

5              MR. KOLMAN:  I don't believe there's a burden of

6    proving mitigation.

7              THE COURT:  Of proving what?

8              MR. KOLMAN:  It says however -- oh, the defendants

9    bear that burden.  I'm sorry.  That's correct.

10             One second.

11             (Pause.)

12             MR. KOLMAN:  Apart from what I asked, your Honor,

13   nothing else.

14             THE COURT:  Thank you.

15             Anything?

16             MR. WAKEFIELD:  Yes, just very briefly.  On the front

17   page here, I just want to note my disagreement with plaintiff.

18   Our position is that she has to prove every element of her

19   damages and as stated as -- in conformance with the law.

20             THE COURT:  I think -- I think that's my understanding

21   of this as well, but let me think about that.

22             MR. KOLMAN:  Okay.

23             THE COURT:  I'll --

24             MR. KOLMAN:  Can I just add, your Honor, it's not

25   damages effectively.  It's that she will continue to be
```

1    employed, but I guess they are the same thing in a sense so.

2              THE COURT:  So we'll get you a verdict form in a

3    couple of minutes, and I'll see you in ten.

4              MR. KOLMAN:  Thank you.

5              MR. WAKEFIELD:  Thank you.

6              MR. COMENZO:  Your Honor, if I may.

7              THE COURT:  Yes.

8              MR. COMENZO:  Just -- I just want to confirm that we

9    were going to have -- take our morning recess after the close

10   of the evidence before we begin anything else; otherwise, I

11   think that it would come in the middle of all that stuff.

12             THE COURT:  Uh-huh.

13             MR. COMENZO:  Very well.  Thank you, your Honor.

14             MR. KOLMAN:  Your Honor, on the rebuttal issue, I just

15   have Dr. Desai for, like, two minutes, just to clarify one

16   issue.  That's all I have.

17             THE COURT:  How long are you going to be?

18             MR. WAKEFIELD:  I have one minute.  I have no way

19   of --

20             THE COURT:  No, no, no, not with Dr. Desai.

21             MR. WAKEFIELD:  Oh, I'm sorry.  Thirty minutes or less

22   with Dr. Litmanovich.

23             MR. COMENZO:  Fifteen minutes, I believe, and a

24   real -- realistic 15 minutes, your Honor.

25             MR. WAKEFIELD:  Do you have a watch or timer?

```
 1              MR. COMENZO:  I'm ready.  I'm ready.  Put it up there.
 2    Do you have a little green light or something I can put up
 3    here?
 4              THE COURT:  Yeah.  Sort of like at the circuit where
 5    they --
 6              MR. COMENZO:  Exactly.
 7              THE COURT:  -- yell at you and the light goes on.
 8              MR. COMENZO:  Thank you, your Honor.
 9              (Recess from 8:49 a.m. until 9:02 a.m.)
10              THE CLERK:  All rise.
11              (At 9:02 a.m., the jury entered the courtroom.)
12              THE COURT:  Good morning.
13              THE CLERK:  Court is now open.  You may be seated.
14              THE COURT:  How are you all doing?
15              JURORS:  Good.
16              THE COURT:  Good.  Has anybody had any problem
17    following my instructions?
18              (No response.)
19              THE COURT:  Has anybody seen, heard, read or overheard
20    anything?
21              (No response.)
22              THE COURT:  Is there anything bearing on your service
23    you wish to bring to my attention?
24              (No response.)
25              THE COURT:  So today's -- as you know, we're very
```

```
 1    hopeful that we're going to have arguments, charge, and that
 2    you're going to get your deliberations.  So the schedule is
 3    going to not be the usual one.  So if you need to take a break,
 4    and we will be taking breaks, just let me know.  Okay?
 5              The defendant.
 6              MR. WAKEFIELD:  Thank you, your Honor.
 7              We are calling Diana Litmanovich.
 8              THE CLERK:  Please raise your right hand.
 9              Do you solemnly swear the testimony you're about to
10    give this Court is the truth, the whole truth, and nothing but
11    the truth, so help you God?
12              THE WITNESS:  Yes.
13              THE CLERK:  Please be seated.
14              Please state your name and spell your last name for
15    the record.
16              THE WITNESS:  My name is Diana Litmanovich.  My last
17    name is L-I-T-M-A-N-O-V-I-C-H.
18                        DIRECT EXAMINATION
19    BY MR. WAKEFIELD:
20    Q.   Good morning, Dr. Litmanovich.
21    A.   Good morning.
22    Q.   What is your profession?
23    A.   I'm a cardiothoracic radiologist.
24    Q.   How long have you been practicing radiology?
25    A.   Seventeen years.
```

1   Q.   I'm going to show you a document that has been marked for

2   identification as Exhibit 273.  It will come up on your screen.

3   A.   Uh-huh.

4   Q.   Do you recognize this document?

5   A.   Yes, I do.

6   Q.   And what is this?

7   A.   This is my CV or résumé, professional.

8   Q.   Did -- did you prepare this?

9   A.   Yes.

10   Q.   Is it accurate?

11   A.   Yes.

12         MR. WAKEFIELD:  Can you pull the microphone closer.

13         THE WITNESS:  Of course.

14         MR. WAKEFIELD:  Thank you.

15         THE WITNESS:  Do you hear me well?  Thank you.

16   Q.   I'm sorry.  Is this accurate?

17   A.   Yes, it is accurate.

18         MR. WAKEFIELD:  Your Honor, I'd like to offer Exhibit

19   273 into evidence and publish it to the jury.

20         MR. COMENZO:  No objection, your Honor.

21         THE COURT:  So marked.

22   (Exhibit No. 273 was admitted into evidence.)

23   BY MR. WAKEFIELD:

24   Q.   Where are you currently employed?

25   A.   I'm currently working at Beth Israel Deaconess Medical

1    Center in Boston, Massachusetts.

2    Q.    And what are your positions there?

3    A.    I'm a cardiothoracic section chief.   I'm a

4    director -- medical director of the lung cancer screening

5    program in the hospital, and I'm an associate professor at

6    Harvard Medical School.

7    Q.    And looking at your CV in the education section, where did

8    you go to medical school?

9    A.    I went to medical school in Technion, which is in Haifa,

10   Israel.

11   Q.    Do you have any certifications in radiology?

12   A.    Yes, I'm a board certified radiologist.

13   Q.    Can you describe what training you underwent in radiology?

14   A.    I did five years of residency.   That's the standard

15   program in Israel, and then I came to Beth Israel Deaconess

16   Medical Center, and I did two years of cardiothoracic

17   fellowship.

18   Q.    And looking at your faculty appointments, you noted that

19   you're an associate professor at Harvard Medical School; is

20   that right?

21   A.    That's correct.

22            MR. COMENZO:  Your Honor, may I be heard briefly?

23            (Sidebar as follows:)

24            THE COURT:  Go ahead.

25            MR. COMENZO:  Thank you.  Thank you, your Honor.

 1              Pretrial in our motions we identified an issue, the

 2      possibility that this witness was going to be sort of proffered

 3      as an expert and maybe we were assured that she wasn't.  We can

 4      stipulate -- stipulate that she is a board certified

 5      cardiothoracic radiologist; and if we can move on to the facts

 6      this witness has to offer at trial, I prefer to do that as

 7      opposed to stacking experts and nonexperts when we have fact

 8      experts.

 9              THE COURT:  How much longer are you going to be on

10      this?

11              MR. WAKEFIELD:  I'm going to be very brief, your

12      Honor.

13              (End of sidebar.)

14      BY MR. WAKEFIELD:

15      Q.   Can you tell me, Dr. Litmanovich, what are your duties as

16      the chief of cardiothoracic imaging at Beth Israel?

17      A.   So there are three major aspects of my work.  The first

18      one is to ensure the clinical service we provide is at the

19      highest standard in terms of ensuring the readers are providing

20      appropriate reading, providing it in a timely fashion, and

21      making sure that we satisfy the clinical needs of the hospital.

22              The second one is administrative, to ensure that we

23      are appropriately staffed, that we have appropriate trainees.

24              And the third one is research, conducting research.

25      So those are the three main aspects.

```
 1   Q.    Thank you.  Do you know Dr. Charu Desai?

 2   A.    No.

 3   Q.    Do you know Dr. Max Rosen?

 4   A.    Yes.

 5   Q.    And how do you know Dr. Rosen?

 6   A.    We used to work together at the Beth Israel Deaconess

 7   Medical Center before he left.

 8   Q.    Approximately how long ago was that?

 9   A.    Ten, 12 years, I don't remember.

10   Q.    Okay.

11   A.    Approximately ten years, I would say.

12   Q.    I'm going to show you a document marked for identification

13   as Exhibit 306.

14         MR. WAKEFIELD:  If I could get the document camera for

15   the witness, please.

16   Q.    Do you see this document?

17   A.    Yes.

18   Q.    What -- do you recognize this document?

19   A.    Yes.

20   Q.    And what is this?

21   A.    This is an agreement that was made between Dr. Rosen and I

22   when I agreed to provide the review of cases that he was

23   interested in conducting clinical review on.

24   Q.    Is this your signature at the bottom?

25   A.    Yes, it is.
```

1          MR. WAKEFIELD:  And, your Honor, I'd like to publish

2     this to the jury.  It's already in evidence.  Exhibit 306.

3          THE COURT:  Please.

4     BY MR. WAKEFIELD:

5     Q.   And, Dr. Litmanovich, what did Rosen ask you to do for

6     this project?

7     A.   He asked me to provide a blind review of 50 clinical

8     cases, 50 clinical CTs, cardiothoracic CTs that were performed

9     at UMass in the hospital, and he wanted me to provide the

10    clinical review of those cases.

11    Q.   And did you agree to do that?

12    A.   I did.

13    Q.   Did Dr. Rosen tell you why he wanted the review done?

14    A.   No.

15    Q.   Did he tell you the purpose of the review?

16    A.   No.

17    Q.   What materials did he provide to you in order to perform

18    your review?

19    A.   So I was provided with an access to a web-based platform

20    where I could look at the images of each case, and I was

21    provided with a particular format of the Excel spreadsheet that

22    I had to fill out with my findings and opinions.

23    Q.   And you were provided with the reports as well for the

24    images?

25    A.   I was provided with the reports, with the regional reports

1    on those 50 cases, yes.

2    Q.    From that information you were provided could you tell the

3    identity of the radiologist who performed the review?

4    A.    No.

5    Q.    Did Dr. Rosen tell you the identity of any radiologists

6    who performed any of the reads included in the 50?

7    A.    No.

8    Q.    Did Dr. Rosen provide you any information about the

9    radiologist who performed the reads at all?

10   A.    No.

11   Q.    Did he tell you how many, if more than one, radiologist

12   had performed the reads included in the 50 studies?

13   A.    No.

14   Q.    Did you know whether all 50 were read by the same

15   radiologist or each was read by a different radiologist?

16   A.    No.

17   Q.    Based on the information you had could you tell anything

18   about the identity of the radiologist or radiologist who

19   performed the reads?

20          MR. COMENZO:  Objection.

21          THE COURT:  Repeat that question, please.

22   BY MR. WAKEFIELD:

23   Q.    Based on the information you had could you tell anything

24   about the identity of the radiologist or radiologist who

25   performed the reads?

1          THE COURT:  Overruled.  You may answer.

2          THE WITNESS:  No.

3   BY MR. WAKEFIELD:

4   Q.   Based on the information you had could you tell anything

5   about the age of the radiologist or radiologists who performed

6   the reads?

7   A.   No.

8   Q.   Did Dr. Rosen tell you which of the 50 reads, if any, he

9   was concerned with or which to focus on?

10  A.   No.

11  Q.   And specifically what did Dr. Rosen ask you to -- to do in

12  your review and provide him with?

13  A.   To review the images, to review the report and to provide

14  my opinion, my professional opinion, if I agree with the

15  report; and if I disagree with the report, do I disagree

16  because I see major or minor things which were, in my

17  professional opinion, misinterpreted in the report.

18  Q.   And did he ask you whether -- to give an assessment of

19  whether you believed the disagreement would have an impact on

20  patient care?

21  A.   Yes.

22  Q.   And did you conduct that review that he asked you to do?

23  A.   I did.

24  Q.   Did you provide Dr. Rosen with your findings?

25  A.   I did.

1    Q.    I'm going to show you a document that's already in

2    evidence, Exhibit 341.

3              Do you recognize this document?

4    A.    Yes.

5    Q.    And what is this document?

6    A.    This is the Excel spreadsheet that I filled out when I was

7    providing the review of the cases.

8    Q.    Does this spreadsheet identify which radiologist performed

9    each read?

10   A.    No.

11   Q.    Did you input all the information on this spreadsheet?

12   A.    I input the information to fill out the columns.

13   Q.    Did you input the -- the far left column --

14   A.    No.

15   Q.    -- with the number?

16   A.    No.  No.

17   Q.    Everything else, the substantive information, you

18   included?

19   A.    Yes.  So I -- I -- I include, if you look at the

20   spreadsheet.  Let me explain.

21   Q.    Sure.

22   A.    If I -- if you look at the spreadsheet, what I fill out is

23   the column that says agrees with interpretation, yes or no,

24   then the minor or major disagreement, impact on patient care,

25   discrepancies, and then some comments on the side.  So this

1    information was filled out by me.

2    Q.    Thank you.   How long did it take you to perform your

3    review?

4    A.    Approximately two days, about 16 hours.

5    Q.    Did you believe your findings to be correct at the time

6    you made them?

7    A.    Yes.

8    Q.    When performing the review, how did you define major

9    disagreement?

10   A.    Major disagreement is if there is a finding on the images,

11   that to the best of my professional opinion, was either

12   misinterpreted or not mentioned and that would have an impact

13   on patient care.

14   Q.    And how did you define minor disagreement?

15   A.    Minor disagreement is when there is a finding that could

16   potentially be interpreted in different ways.   I would have

17   interpreted it differently from what it was interpreted in the

18   original report.

19   Q.    Are those definitions standard in your field?

20   A.    Yes.   Yes.   The definitions that are used for quality

21   assessment.

22   Q.    Were you ever asked to assess whether you thought the

23   reviewer was negligent?

24   A.    No.

25            MR. WAKEFIELD:  If I can show just the witness what's

1    been marked for identification as Exhibit 84-1.

2    Q.    Do you see that, Dr. Litmanovich?

3    A.    Yes.

4    Q.    Do you recognize this document?

5    A.    Yes.

6    Q.    And what is this?

7    A.    So after I conducted the review, when I send the results

8    back to Dr. Rosen, I accompanied it with this sort of a

9    high-level summary of what I thought about the findings and the

10   images that I looked at.

11        MR. WAKEFIELD:  Your Honor, I would like to offer

12   Exhibit 84-1 into evidence and publish to the jury, please.

13        MR. COMENZO:  No objection.

14        THE COURT:  So marked.

15   (Exhibit No. 84-1 was admitted into evidence.)

16   BY MR. WAKEFIELD:

17   Q.    If I could ask you, in the middle it says positive under

18   number one, it states the technical quality of the studies is

19   overall very good.

20   A.    Uh-huh.

21   Q.    What does that mean?

22   A.    So that means that when the study was done on the CT

23   scanner, the quality of the study, the quality of the images is

24   good.  That means that it's a way to say that this study can be

25   interpreted appropriately.  There are no technical factors that

1    can mislead the person who interprets it.  It essentially talks

2    about the quality of the CT tech and the machine that did the

3    study.

4    Q.    And under No. 2 it says no life-threatening misses or

5    misinterpretations were found.

6           Why did you note that?

7    A.    Could you repeat what you just said?

8    Q.    Sure.  If you look on this document under positive, No. 2,

9    it says no life-threatening misses or misinterpretations were

10    found.

11           Why did you note that?

12    A.    So there were no findings missed that would put the

13    patient in the immediate, that moment, that hour danger that

14    the patient will die from it at that very moment.  So that's

15    life threatening.

16    Q.    And why did you note that to Dr. Rosen?

17    A.    I thought it was important because it meant that nobody

18    probably was dead at the very moment because of the study.

19    Q.    In your experience if a radiologist read is not life

20    threatening does that mean that the read is acceptable?

21           MR. COMENZO:  Objection.

22           THE COURT:  Overruled.  You may answer.

23           THE WITNESS:  No, it doesn't.

24    BY MR. WAKEFIELD:

25    Q.    You list several statements under negative, below where we

1    were just talking about.

2            Do these statements apply to all of the studies you

3    reviewed?

4    A.    No, they apply to the studies that I made comments on.

5    Q.    As you sit here today do you know who specifically

6    performed each of the reads you reviewed?

7    A.    No.

8    Q.    Other than providing Dr. Rosen with your findings, have

9    you ever discussed your findings with Dr. Rosen at all?

10   A.    No.

11   Q.    Have you ever discussed the plaintiff, Dr. Charu Desai,

12   with Dr. Rosen?

13   A.    No.

14   Q.    As the chief of cardiothoracic imaging section at Beth

15   Israel, are you responsible for recruiting chest radiologists?

16   A.    Yes.

17   Q.    Do you currently have openings for chest radiologists you

18   are seeking to fill?

19   A.    Yes, more than one.

20   Q.    In your experience in recruiting over the past five years

21   have chest radiologists have been difficult to find for you?

22   A.    Extremely challenging.  We actually even have now a

23   national committee that looks into how can we field the

24   critical shortage of cardiothoracic radiologists across the

25   country.

1          MR. WAKEFIELD:  I have nothing further.  Thank you.

2          MR. KILROY:  Your Honor, may I approach?  Thank you.

3          (Water provided to the witness.)

4          THE WITNESS:  Thank you.

5                      CROSS-EXAMINATION

6    BY MR. COMENZO:

7    Q.   Good morning, Dr. Litmanovich.  How are you?

8    A.   Good morning.  Good.

9    Q.   Thank you for joining us this morning.  My name is Joe

10   Comenzo.  I just have a couple of questions for you.

11   A.   Uh-huh.

12   Q.   You -- do you recall approximately when you were first

13   contacted by Dr. Rosen regarding this quality assessment?

14   A.   Vaguely.  I don't recall specifically when was it.

15          MR. COMENZO:  Can you pull up Exhibit No. 75.

16   BY MR. COMENZO:

17   Q.   I'm showing you a document that should be on your screen

18   right now.  It's Exhibit No. 75 that has been introduce in this

19   matter.  It's an email from Dr. Rosen -- or sorry -- from you

20   to Dr. Rosen, August 22nd, and it says in a continuation of our

21   discussion, I'm sending you the parameters I've used for a

22   relatively similar project.

23          Can you tell me, do you remember that conversation,

24   that discussion you had with Dr. Rosen?

25   A.   I don't remember, but I'm sure that this reflects our

1    discussion, yes.

2    Q.    So it's -- as you sit here today, you -- you had a

3    discussion with Dr. Rosen prior to August 22nd; is that right?

4    A.    Yes.  Oh, yes, absolutely.

5    Q.    And in that discussion, did you guys discuss the

6    parameters of a quality assessment review that you might

7    perform?

8    A.    Yes.  In general terms, yes.

9    Q.    And do you recall when you say I'm sending you the

10   parameters that I've used for a relatively similar project, can

11   you tell me what was that relatively similar project?

12   A.    I don't remember the details now.  I don't remember

13   specifically.

14   Q.    Have you ever done a relatively similar project to this?

15   A.    Yes, but I don't remember the details now, and I don't

16   remember the scope.

17   Q.    I haven't asked you that yet.

18   A.    Okay.

19   Q.    How many times have you done a relatively similar project,

20   approximately?

21   A.    Two or three times.

22   Q.    Two or three times.  And how long ago?  Was it 20 years

23   ago?  How long ago did you do one?

24   A.    Probably this project was the last one I have done, the

25   one that we are discussing today.

1    Q.    And prior to that when was the last time you had done a

2    project similar to this?

3    A.    Probably within two or three years that precedes that.

4    Q.    And was that for your hospital or another hospital?

5    A.    I don't remember.  I think it was for another hospital.  I

6    don't think it was for my hospital, but I'm not sure about it.

7    Q.    You have -- I'm going to ask you, do you have any idea

8    what you were talking about -- well, what did you send him that

9    identified -- do you recall what you sent him in this email?

10   A.    I'm sure I sent him this email and --

11   Q.    Poor question, you're right.  In the email you suggest

12   that I am sending you the parameters I've used for a relatively

13   similar project.

14   A.    Okay.

15   Q.    Do you recall what the parameters were that you sent him?

16   A.    I don't.  But I'm sure if I said they're very similar then

17   they were similar to the project that we have done.  Those

18   projects, they're usually with some minor changes going along

19   the same lines in general.

20   Q.    The spreadsheet that you identified in your work on that

21   was provided to you though, right?

22   A.    Yes.

23   Q.    And the categories were provided to you?

24   A.    Yes.

25   Q.    And as you sit here, you don't remember whether that is

1     relatively similar to a project you did?

2     A.    I'm sure it's relative --

3     Q.    Allow me to finish --

4     A.    Oh, sorry.

5     Q.    -- the question, please.  Okay.  I'm sorry.

6     A.    Sorry.  My apology.  My apology.  Sorry.

7     Q.    Madam court reporter will get mad at us.

8           As you sit here today, you can't remember whether the

9     parameters of the project you did for Dr. Rosen is similar to

10    the parameters of a project that you did two or three years

11    prior to that, a similar project that you did?

12    A.    Okay.  So the parameters that are in the project that

13    we're discussing, I'm certain are very similar to the

14    parameters that I have done in the past, because they are going

15    along the lines of the usual parameters used.  I cannot tell

16    you if they are 100 percent similar or they're 90 percent

17    similar or 89 percent similar, but they are very similar, and

18    the reason I say that is because they are the standard

19    parameters, and they would not be and they would be deviating

20    from the standard, I wouldn't agree to do them.

21    Q.    Fair enough.

22          (Plaintiff counsel conferred.)

23    Q.    In the prior -- the -- strike that.

24          The number of CT scans that you would have read in

25    your prior QA assessments is that similar to the number that

1    you would read here?

2    A.    I think it was less from my vague recollection.  I cannot

3    certify that this is a hundred percent exact, but from my vague

4    recollection I think it was less.  It was probably more towards

5    the 20, in the number of 20s, roughly.

6    Q.    And was it your understanding when you did this that you

7    were doing a quality assessment of the department in general

8    and not of a specific individual?

9    A.    Absolutely.  Absolutely.

10   Q.    And in the one that you were talking about before with 20,

11   that was -- was it your understanding that you were doing a

12   quality assessment of a department or did you -- was it your

13   understanding you were doing a quality assessment of a single

14   individual?

15   A.    I don't remember.

16   Q.    You don't remember?

17   A.    I don't remember.

18   Q.    You don't remember any of the circumstances --

19   A.    I --

20   Q.    Oh, allow me to finish my question, please.

21   A.    Sorry.  Sorry again.

22   Q.    Just for the record.

23         You don't recall any of the facts or circumstances

24   surrounding the prior parameters that you were referencing in

25   your August 22nd, 2017, letter to Dr. Rosen?

1    A.    I would say most likely I would remember if I did an

2    assessment of a single individual.  So more likely than not it

3    was also assessing parameters of several people.  That's

4    usually how it's done.

5              THE COURT:  Doctor, can you just get a little closer

6    to the microphone --

7              THE WITNESS:  I'm sorry.

8              THE COURT:  -- either move that closer or move

9    yourself closer.

10             THE WITNESS:  Yes.

11             THE COURT:  Thank you.

12             THE WITNESS:  Should I repeat anything of what I've

13   said?

14             THE COURT:  I don't believe so.

15             Did you all catch that one?  Okay.

16             THE WITNESS:  Thank you.

17   BY MR. COMENZO:

18   Q.    But in this instance, you didn't know whether it was an

19   individual or the department, right?

20   A.    I did not know.

21   Q.    And I assume if you did a similar project in the past, you

22   didn't know if it was an individual or a full department,

23   correct?

24   A.    Most likely.

25   Q.    I just want to confirm the timeline.  In -- so you spoke

1    with Dr. Rosen prior to August 22nd, 2017, according to this

2    email, right; and in that conversation it was discussed

3    that you were going to do some kind of QA for UMass Memorial,

4    right?

5    A.    Correct.

6    Q.    And then in September you get the contract that you were

7    shown on direct examination where it outlines what you're going

8    to do, right?

9          Is that a yes?

10   A.    Ah, yes.

11   Q.    And then in October, I believe, you -- can I get -- is 82

12   in?  Can you put 82 up for the witness, please.

13         Oh, actually before you do that.

14         The letter or the contract that you had indicated that

15   your report would be due before November 30th.

16         Do you remember that?

17   A.    No.

18   Q.    No.

19         MR. COMENZO:  Can we show the witness Exhibit 306,

20   please.  The second-to-last paragraph -- or sorry.  Yeah,

21   second-to-last paragraph that begins in consideration of your

22   services.

23   A.    Yeah.  I see that now, yes.

24   Q.    And so you would have agreed with Dr. Rosen, the project

25   would be completed no later than November 30th, right?

1    A.    Yes.

2                MR. COMENZO:   That's fine.   You can take that down

3    now.

4                In this instance then, you get 82.   The third page.

5    Q.    Do you see here, this is Exhibit No. 82, the third page.

6    There's an email sent to you that I represent to you from the

7    page above was sent by Randa Mowlood.

8                In this email you are receiving access to the images

9    that you're supposed to review?

10   A.    Uh-huh.   Yes.

11   Q.    And at this time, you run with the understanding that you

12   were going to finish it by November 30th?

13   A.    I'm surely was hoping so.   I believe.

14   Q.    At some point you had a conversation with Dr. Rosen where

15   you indicated that you weren't going to be able to do it by

16   that time --

17   A.    Uh-huh.

18   Q.    -- because you were lecturing?

19   A.    Probably or something else probably came up, yeah.

20   Q.    And you let him know that you weren't going to be able to

21   get to it until after the -- that -- the -- strike that.

22                There's some kind of big radiology conference at the

23   end of November, isn't there?

24   A.    That's correct.

25   Q.    And you weren't going to be able to get to this project

1    before that, because you were lecturing, right?

2    A.    That sounds very possible, yes.

3    Q.    And you think you probably talked to Dr. Rosen and said

4    you weren't going to get to it?

5    A.    I probably let him know that I'm not going to finish it by

6    the time that was originally agreed.

7    Q.    And he -- he didn't tell you thanks, but no thanks, I'm

8    going to go to someone else, right?

9         He said it's fine?

10   A.    I believe so if I did the project.

11   Q.    Right.

12   A.    Yeah.

13   Q.    So he said when -- you know, when you're done you go ahead

14   and do it, and we'll get the results?

15   A.    I don't remember the exact wording, but I'm sure he agreed

16   for me to finish it later.

17   Q.    So on -- so you get the -- you get the access on

18   October 30th -- or 13th.  Then, if we scroll up on that email,

19   you see an email from you on December 6th.  You were able to

20   log on and work on the cases.  They were loading relatively

21   slow, but otherwise it works fine.

22        So by November -- by January -- sorry, strike that.

23        By December 6th, you were working on the project?

24   A.    It's -- it shows that I started to, yes.

25   Q.    Right.  Nothing tricky here.  I'm just confirming the

```
 1    timeline.
 2              And then Dr. Rosen responds the next day, thanks, glad
 3    you were able to read them.
 4              Do you recall when you sent your -- your findings to
 5    Dr. Rosen?
 6              We just talked about that a moment ago, I think.
 7    A.    I think it was towards the end of December.
 8    Q.    And that was an email, December 25th, with the attachment
 9    that -- that Attorney Wakefield just discussed with you on
10    direct examination?
11    A.    I believe so, yes.
12    Q.    Before we get there, I'd like to ask you can you put up
13    the witness's spreadsheet.
14              And focus on your response to number QACH11.
15              Can you see that?
16    A.    It's a little bit shifted, but yes.
17    Q.    So it says multifocal opacities are not contusions but
18    infection or aspiration, correct?
19    A.    Uh-huh.  Yes.
20    Q.    And you ascribe a minor error, a minor disagreement with
21    an impact in patient care to the reader of QACH11, correct?
22    A.    That is what this document states, yes.
23    Q.    And this document -- this document you inputted the
24    information here?
25    A.    I did.
```

1    Q.    So a reader of this document would operate under the

2    assumption that that was your opinion?

3    A.    Absolutely.

4              MR. COMENZO:   Can we show the witness QACH11.

5              (Plaintiff counsel conferred.)

6              MR. COMENZO:   If I could have the view screen, please.

7    BY MR. COMENZO:

8    Q.    I know that it's not perfect, Doctor, but showing you your

9    response for QACH11 and the majority of these two reports, can

10   you tell which report QACH11 your -- your discrepancy for

11   QHCH -- QACH11 belongs, whether it's to the report on the left

12   or the report on the right?

13   A.    It's impossible to do it without the images.  I cannot --

14   Q.    It's impossible to do it without the images?

15   A.    I cannot do it without the images.  I don't think it would

16   be responsible on my part to do it.

17   Q.    Let me ask you this then.  Under the impressions of

18   this -- I'm showing what has been marked as 100-12.  Under the

19   impressions it says, There are nodular ground glass opacities

20   scattered throughout both lungs, most pronounced at the base --

21   bases.  While findings could represent contusions, the

22   distribution favors a multifocal infectious or inflammatory

23   process.

24             Without -- while I understand that you can't see the

25   image, would the discrepancy that you ascribe to number QACH11,

1    could that apply to the findings of QACH12?

2    A.   I cannot tell.  I really cannot tell without the images.

3    It may be a similar case with a very similar sort of

4    circumstances, but not the same.

5    Q.   Can you describe or explain to me what -- what your -- can

6    you explain your comments in QACH11.  It says multifocal

7    opacities or contusions are not contusions but infections or

8    aspirations.

9         So by that you mean the reader must have identified

10   multifocal opacities as contusions, but you're correcting the

11   reader in saying they're not contusions but infections or

12   aspirations, correct?

13   A.   I'm sorry that I'm repeating myself, but I will -- I will

14   answer your question.  I'm sorry that I'm repeating myself

15   saying that whatever I'm saying now, without the images, cannot

16   be hold as an ultimate precise answer, because if I look at

17   this finding what I see here is what I said that multifocal

18   opacities are not contusions but infections or aspirations.  So

19   I presume, and this is my presumption, and I don't see the

20   images, and that's how I want you to understand me.  That what

21   I meant to say that contusions are unlikely to be the reason

22   for that and maybe the contusions should not be even mentioned.

23        I presume that.  Again, I feel very uncomfortable

24   professionally to give this opinion without images, but that's

25   my presumption reading that.

1    Q.   We want to understand what you're saying here.  So my

2    understanding from what you're saying is that there were -- the

3    reader identified multifocal opacities and attributed to

4    contusions or equated them to contusions, and you're saying --

5    correcting them saying no, they're not contusions, but

6    something else?

7    A.   What I'm saying here that the findings are not contusions,

8    but infection or aspirations.  That's what it says here.

9    That's how I read it now.

10   Q.   So whatever QACH, whatever finding this -- whatever report

11   this belongs to, there must be a finding of contusions in it

12   which you're saying was incorrect.  It could be -- it's

13   supposed to be something else?

14   A.   So -- so I would disagree respectfully.  What it says that

15   the finding -- the findings that I saw -- the findings on the

16   images are not contusions.  They are infections or aspirations.

17   Q.   I understand.  But the reviewer must have identified them

18   as contusions in order for you to make the correction in your

19   report otherwise?

20   A.   Yes.

21   Q.   So in the written report, you would find there would be a

22   finding, an impression, something which identified contusions

23   that you're disagreeing with in your -- in your review,

24   correct?

25   A.   Correct.

1    Q.    And looking at QACH11, can you identify anywhere in here

2    where there's a discussion of the contusions -- of contusions

3    in any way?

4    A.    There is no word "contusions" here.

5    Q.    And now showing you again QACH12, is the word "contusion"

6    found in there?

7    A.    Yes, in impression under 1.

8    Q.    And in light of the impression No. 1, that the word

9    "contusion" is found, while I understand there -- you have the

10   images in front of you, does the criticism that you make in

11   your report, is it apt -- apply to the -- what's in this -- the

12   written language in QACH12?

13   A.    Can I see my comment one more time?

14   Q.    Of course.

15   A.    Okay.  Can we go back to the impression.  So in the

16   impression No. 1, if you read it, and again I do my disclaimer

17   one more time.  I don't have the images in front of me, but

18   within what I am presented with, if you look at the report it

19   says while findings could represent contusions, the

20   distribution favors the multifocal infection going through an

21   inflammatory process.  So in the report I presume that when I

22   looked at the images my opinion was that the contusion should

23   not be part of the differential diagnosis.  And then when you

24   say while it could represent contusions, you imply that that's

25   part of your differential diagnosis.

1   Q.   Exactly.  And you're saying that was incorrect.

2   Contusions should not be part of the differential diagnosis,

3   correct?

4   A.   Correct.

5   Q.   And you'd agree with me, of course, looking back at

6   QACH11, there's no mention of contusions whatsoever, right?

7   A.   From what I see here in front of me there is no mention of

8   contusion.

9   Q.   And so you wouldn't have to be a thoracic radiologist to

10  know that the information that you input for QACH11 probably

11  doesn't apply to this particular read.  There may be somebody

12  transposed a box, maybe something got messed up, but if you

13  read your -- your commentary and simply read this impression,

14  this report, they don't connect, right?

15        There's no contusion?

16  A.   Okay.  I agree.

17  Q.   So we agree then that the commentary you have for QACH11

18  is more likely to be applied to QACH12, which discusses the

19  contusion, correct?

20  A.   Most likely based on what you're showing me.

21  Q.   And --

22  A.   But if I may ask you to show one more time the Excel

23  spreadsheet, because I think I have mentioned that something

24  shifted there when we looked at it for the first time.

25  Q.   Of course.

1    A.    Uh-huh.  Okay.

2    Q.    Are you satisfied, Doctor?

3    A.    Uh-huh.

4    Q.    Okay.  I'm showing you a document that has been introduced

5    as Exhibit No. 64.

6          On the left-hand column, do you see the QACH numbers?

7    A.    Yes.

8    Q.    QACH No. 11 is not in this list of QACHs, is it?

9    A.    I don't see it here.

10   Q.    QACH12 is located here, correct?

11   A.    Okay.

12   Q.    And the reader of the QACH12 image is, in fact, Dennis

13   Coughlin, MD, correct?

14   A.    That's what is written here.

15   Q.    So the error that you ascribe to QACH11 that we've now

16   attributed to QACH12 should belong to Mr. -- Dr. Dennis

17   Coughlin, correct?

18   A.    Based on what I see from your showing me, yes.

19   Q.    Finally, going back to Exhibit 83 or 84-1.  84-1.  This

20   was the summary of your findings, correct?

21   A.    Correct.

22   Q.    And this was the -- the high-level summary that was sent

23   attached to the spreadsheet that Dr. Rosen asked you to fill

24   out?

25   A.    Yes.

1    Q.   And among the positives obviously you've identified the

2    technical quality of the studies is overall very good.  And

3    you've identified that there were no life-threatening misses or

4    misinterpretations were found, correct?

5    A.   Correct.

6    Q.   And --

7    A.   Correct.

8          MR. COMENZO:  No further questions.  Thank you very

9    much, Doctor.

10         MR. WAKEFIELD:  Nothing further, your Honor.

11         THE COURT:  Thank you, Doctor.

12         THE WITNESS:  Thank you.

13         THE COURT:  You may step down.

14         MR. WAKEFIELD:  And we have no further witnesses.  We

15    rest.

16         THE COURT:  All right.  Thank you.

17         Any redirect?

18         MR. KOLMAN:  Your Honor, plaintiff calls

19    Dr. Diana -- Dr. Charu Desai to the stand.

20         THE COURT:  Dr. Desai, I'm going to remind -- I'm

21    going to remind you you're still under oath.

22                  CHARU DESAI, RECALLED

23                   DIRECT EXAMINATION

24    BY MR. KOLMAN:

25    Q.   Dr. Desai, we've heard about the retirement party that you

1    apparently had.

2              Did you have a retirement party?

3    A.   No.

4              MR. KILROY:  Your Honor, may I be heard?

5              (Sidebar as follows:)

6              MR. KILROY:  Your Honor, this came up during her

7    direct and cross.  This isn't rebuttal.  This is trying to get

8    new information in after they rested.

9              MR. KOLMAN:  Your Honor, it is rebuttal, because she

10   never had a retirement party.  She never organized it.

11             THE COURT:  I'll let you have it, but just get it

12   done.

13             (End of sidebar.)

14   BY MR. KOLMAN:

15   Q.   Did you know anything about the retirement party?

16   A.   No.

17   Q.   Was it a surprise?

18   A.   It was.

19             MR. KOLMAN:  Thank you.

20             Nothing further.

21             THE COURT:  Anything?

22             MR. KILROY:  Nothing, your Honor.

23             THE COURT:  Thank you, Doctor.  You may step down.

24             Any further evidence on rebuttal?

25             MR. KOLMAN:  Nothing, your Honor.

```
 1              THE COURT:  All right.  So the evidential portion of
 2      the trial has concluded, and we're going to -- you can step
 3      down, Doctor.  Thank you.
 4              All right.  Ladies and gentlemen, I'm going to ask you
 5      to go into the jury room, and we'll get you back here as soon
 6      as possible.
 7              THE CLERK:  All rise.
 8              (At 9:45 a.m., the jury left the courtroom.)
 9              MR. KOLMAN:  Dr. Desai.
10              THE COURT:  I'm going to call an ambulance so.
11              MR. KOLMAN:  Okay.  She's having a spell.
12              MR. COMENZO:  Your Honor, may her daughter approach?
13              THE COURT:  Say what?
14              MR. COMENZO:  May her daughter approach?
15              THE COURT:  Yeah.  Yeah.  I need to know whether I
16      should call an ambulance, okay?
17              MR. KOLMAN:  No, your Honor, if I may.  The -- this
18      happens periodically.
19              THE COURT:  I understand.  But do we need an
20      ambulance?
21              MR. COMENZO:  No, your Honor.
22              THE COURT:  All right.  Thank you.
23              MR. KOLMAN:  Your Honor -- your Honor's concern is
24      appreciated.
25              THE COURT:  Let me know when we're ready.
```

1          MR. KOLMAN:  Okay.  She'll be okay soon.

2          How does your Honor want to do this in terms of the

3   instruction of the jury or closing arguments?

4          THE COURT:  I'm going to do -- I'm going to let you

5   close, and then I'm going to instruct.

6          MR. KOLMAN:  Thank you, your Honor.

7          THE COURT:  And we're getting the verdict form up for

8   you now.

9          MR. KOLMAN:  Thank you.

10         When do you want us back here?

11         THE COURT:  Whenever you're ready.

12         MR. KOLMAN:  Thank you.

13         (Recess from 9:46 a.m. until 9:59 a.m.)

14         THE CLERK:  All rise.

15         Court is now open.  You may be seated.

16         THE COURT:  Do you all -- have you all had a chance to

17   look at the verdict form or do you need more time?

18         MR. COMENZO:  We're good.

19         THE COURT:  You're good?  You good?

20         MR. KILROY:  We're just finishing looking at it, your

21   Honor.

22         MR. WAKEFIELD:  At least one minute.

23         (Pause.)

24         MR. KILROY:  It's fine, your Honor.

25         THE COURT:  All right.  So just a little bit of

1    unfinished business here.

2              Do you have a motion?

3              MR. KILROY:  Yes, your Honor, we do.

4              THE COURT:  Make it and then I'm going to reserve on

5    it.  Just -- but make it.

6              MR. KILROY:  Motion for a judgment as a matter of law

7    based on no reasonable juror could find in their favor, your

8    Honor.

9              MR. KOLMAN:  I'm sorry, I can't hear it.

10             MR. KILROY:  Motion for judgment as a matter of law

11   based on no reasonable juror could find in plaintiff's favor.

12             THE COURT:  I'm going to take that under -- under

13   advisement.

14             So with respect for -- to the plaintiff's motion for a

15   mistrial, that motion is denied.

16             I have reviewed the video.  I -- I will be the first

17   to admit it is -- the quality is just not good.  It is

18   available to you.  You need to get a thumb drive, and we will

19   make it, a copy for you.

20             I did not see anything that led me to believe that any

21   signalling was going on on any witness.

22             I also note parenthetically that Dr. Rosen was

23   regularly asked open-ended compound questions on cross, and the

24   answers to which I think would be impossible to signal via a

25   hand signal.

1            In any event, his answers to both cross and direct

2    were often lengthy narratives, which similarly would be hard to

3    script via hand signals so I am denying the motion.

4            All right.  Let's bring them in.

5            THE CLERK:  All rise.

6            (At 10:02 a.m., the jury entered the courtroom.)

7            THE CLERK:  Court is now open.  You may be seated.

8            THE COURT:  So, ladies and gentlemen, the -- as I told

9    you, the evidential portion of the trial has concluded, and we

10   are now at the point of the trial where the attorneys get to

11   make closing statements to you.

12            And I just want to mention something that I talked

13   about with you at the beginning of the trial, that the closings

14   like the openings are not evidence.  It's the lawyers last

15   opportunity to address you to convince you to their side of the

16   story.

17            Under our rules, the plaintiff goes first.

18            Mr. Kolman, will that be you?

19            MR. KOLMAN:  Thank you, your Honor.

20            THE COURT:  Please.

21            MR. KOLMAN:  Good morning, ladies and gentlemen.  As I

22   said at the outset, I would be back here to frame the evidence,

23   but before I do that I'd like to talk about the law and about

24   this case, what it's about.

25            With respect to the law, the judge is the sole arbiter

1      of the law.  What I'm about to tell you comes substantially

2      from the jury instructions, which you have not yet received but

3      will shortly.

4              As far as this case is concerned, the jury

5      instructions state that the defendant, and I quote -- and by

6      the way, I'm doing this as a framework so that what I talk

7      about next, when I talk about the evidence, when I talk about

8      what you heard, you can take it and you can filter it through

9      the law.  You can filter it through -- through the tests that

10     we, as the plaintiff, have to satisfy, but you can also filter

11     it through what the defendants have done and said.

12             And with regard to that the jury instruction says the

13     following: Here the defendants argue that Dr. Desai's

14     employment was terminated to ensure patient safety due to

15     concerns raised regarding the quality of her work as a chest

16     radiologist.  Dr. Desai's employment was terminated to ensure

17     patient safety due to concerns raised regarding the quality of

18     her work as a chest radiologist.  I repeat it because it's

19     repeated here.

20             Why is this important?  It's important for what it

21     does not say.  It does not say anything about academic time or

22     problems she had with Dr. Dill, et cetera.

23             When counsel got up and did his introduction to you,

24     he went on and on about all the things Dr. Desai didn't do,

25     hasn't done, can't do, but this case, this case is focused

1     entirely on the quality of her work.  The issues that were

2     raised regarding her request for academic time, which was

3     denied, and she didn't do anything about it afterwards.  The

4     issues about the fact that she wanted to be off call because of

5     her seniority, that was also denied, but she continued on call.

6             The issues that Dr. Dill brought up, that they had an

7     argument, and Dr. Desai also said that she had an argument with

8     Dr. Dill, that's all just employee nonsense.  That happens

9     everywhere, and Ms. Mowlood, who was up on the stand said, yes,

10    I get lots of complaints from doctors all the time, and

11    Dr. Desai was very highly regarded.

12            There's testimony that she didn't like to respond in

13    emailing, liked to call instead.  There's testimony that she

14    came in late one day.  But all of that, every single part of

15    it, has nothing whatever to do with the quality of her care.

16    And how did we know that?  We know it because the employer,

17    UMass, never ever connected it up.  In fact, they never did

18    what any employer would do, which is warn her, say this is your

19    oral -- this is your verbal warning, you mustn't do it again.

20    This is your written warning.  This is your second written

21    warning.  If you do it again, you'll be terminated.  We require

22    you to go on a performance improvement plan.  A chair is now

23    involved.  You have to meet with your supervisor every month to

24    make sure that you are behaving properly because your lack of

25    behavior and the way that you're functioning is affecting the

1    quality of your work.

2           So there is nothing about that at all.  It is not just

3    a red herring.  It's an entire distraction, and the reason why

4    the defendants have distracted you in that way is to hope that

5    you will focus on those issues or any one of them to sort of

6    say, you know what, she was just a bit of a nuisance, and they

7    got fed up with her.  You know what, she just -- she just

8    wasn't a great employee.  And I kind of get it that they kind

9    of wanted her out.  That is not the reason why this case has

10   been brought, and it's not the reason why she was terminated.

11   The sole reason she was terminated is because of the alleged

12   quality of her work.

13          So I'm asking you to take all of that, all of those

14   issues that they raised, that they say was a problem and just

15   discard card it, because that's what we call the spaghetti

16   defense.  Take the spaghetti, throw it against the wall, and

17   see what sticks.  Nothing sticks with respect to those issues,

18   and the defense spent ages about it.

19          This case is about the quality of her work.  As I

20   said, her employment was terminated to ensure patient safety

21   due to concerns raised regarding the quality of her work as a

22   chest radiologist.  So let's go there first.

23          I'm going to go there first.  We're going to talk

24   about quality, and then I'm going to talk about the law, what

25   we have to prove, and then I'm going to talk about the elements

1   involved to show that we have proved it, and then I'm going to

2   go over the jury slip at the end.

3        But, first, quality of work.  Here is a doctor who

4   worked 26 -- 27 years for the University of Massachusetts as a

5   radiologist.  We saw her reviews.  They were great.  They

6   preceded Dr. Rosen, and they were all excellent.  They were

7   even good in the very last year when Dr. Rosen allegedly had

8   concerns about her ability to do her work, interpret CT scans.

9   She was still good, good, good.

10       The fact is that he never ever mentioned the quality

11  of her work to her or to anyone else.  Now, he says that

12  Dr. Dill should have been the one to have spoken to her, and

13  Dr. Dill says she couldn't speak with Dr. Desai because she was

14  difficult.  She could speak to everyone else.

15       Everyone knows that that's not the way it works when

16  you're employed.  When you're employed and you have a

17  supervisor who can't speak to you, has difficulty, what do the

18  supervisor do?  The supervisor gets HR in.  The supervisor has

19  a meeting with the -- with the boss.  The supervisor puts

20  something in writing and then has the employee respond.

21  There's none of that.  None of it.

22       And so when Dr. Dill says that Dr. Desai was -- was

23  difficult, if she genuinely was difficult, that was absolutely

24  no excuse for not speaking to her, not talking to her,

25  especially if patient safety was involved.

1          So the only conclusion you can come to is that patient

2     safety was not involved.  It was not an issue.  There isn't any

3     email or text or documentation indicating it ever was, and

4     anyway Dr. Dill appears to have had a problem with Dr. Desai.

5     We all saw the handwriting, it's either her or me, et cetera.

6     But fundamentally, it just doesn't make sense, and I know all

7     of you can use and will use your collective experience and

8     intelligence with regard to having been an employee.

9          In respect of quality, let's talk about -- a little

10    bit about how this even came to be.  In February of 2017, the

11    minutes show that Dr. Rosen was going to have a peer review for

12    a physician for which complaints had been made.  It doesn't say

13    who the physician was or is, but Dr. Rosen testified that it

14    applied to Dr. Desai.

15         It's very important to look at that and think about

16    it.  Why is Dr. Rosen doing a peer review of Dr. Desai?  We

17    heard from Dr. Gruden that a peer review is a serious matter.

18    You know, generally, if a patient has been seriously injured

19    or, you know, has died, there is a peer review to find out

20    whether that physician should continue to function, or if

21    not -- or if that physician is -- is still permitted to treat

22    what will be done to help that physician not make that mistake

23    again.  That's what a peer review is really for.

24          Now, it doesn't say how the peer review will be

25    conducted.  It doesn't say who will conduct it.  It simply says

1    peer review.

2              At the same time, Dr. Rosen selects 25 CT scans.  This

3    is in one day.  25 CT scans for Dr. Desai and 25 from another

4    six radiologists.  And it's not clear if you didn't know any

5    more why he's doing it and -- and what's going to happen.  We

6    know what happened, but at that point it wouldn't be clear.

7              Dr. Rosen testified that he was very concerned about

8    the quality of care that Dr. Desai was -- was performing.  He

9    was very, very concerned.  And this was the reason why he

10   decided to have a peer review.  But how concerned could he

11   possibly be when a peer review was not done.  It wasn't done in

12   March, April, May, June, July, August, September, October,

13   November.  December is when Dr. Litmanovich gets those 50 CTs

14   that are in cold storage.

15             Dr. Rosen is in charge of patient safety, among a lot

16   of other things, and he's a responsible man, and he knows what

17   he's doing.  And he's organized.  And this is not something he

18   would ever, ever miss, because he was working hard.  If the

19   defendants are to be believed, this goes to the very heart of

20   what UMass does.  It goes to the very heart of what they do for

21   patient safety, for patient care.  They want you to believe

22   that Dr. Desai is somehow defective in her -- in the quality

23   of -- of her work.  They haven't produced one iota of evidence

24   that she ever hurt anyone seriously or that she ever seriously

25   injured a patient.

1           For 26 years, she did her job.  For 26 years, she

2     reviewed x-rays and CT scans.  You cannot survive in that job

3     for 26 years, certainly not at the University of Massachusetts,

4     which has a very good -- good reputation medically, if there's

5     something wrong with you.

6           And yet suddenly it appears that having done all that

7     so well, in January and February of 2017, Dr. Rosen was willing

8     on the basis of a complaint first from Dr. Robinson, who

9     complained a lot about a lot of people that -- that she was

10    unsatisfied with her reads.  And then later from Dr. Dill.

11          He was going to accelerate this all the way to a peer

12    review.  He wasn't going to speak to her.  He wasn't going to

13    have her review them.  He wasn't have -- he wasn't going to

14    have Dr. Dill go over them with her to determine where the

15    mistakes were or how serious they were.  None of that.  And

16    Dr. Desai didn't know anything about it.

17          What does that tell you?  That tells you they were not

18    interested in the least in teaching her.  They were not

19    interested if -- if that would -- were genuine.  If it was

20    true, if they were really these serious mistakes, then what

21    would they do?  They're a hospital.  It's obvious what they

22    would do.  You would bring the physician in.  You would say,

23    look, I don't know what's wrong with you, you know, has

24    something happened, do you have a vision problem, is something

25    going on in your life that's stressful.  But, look, you were so

1     great for 26 years but -- but look at these.  This, this, this,

2     this, and this, it's not your usual work.  What's going on?  Do

3     you need help?  Why didn't you detect it?  They did nothing,

4     absolutely nothing.

5          And that meant -- that means that effectively from

6     February of 2017 they weren't interested in improving the

7     quality of work, and it turns out that they're not interested

8     in improving the quality of her work because there was nothing

9     wrong with her work.  What they were interested in doing or

10    what Dr. Rosen was interested in doing was establishing

11    the -- the possibility of having a basis for her termination.

12         Now, after Dr. Litmanovich comes back with her

13    analysis, Dr. Rosen now, according to him and his testimony,

14    has direct evidence of the serious lack of quality of care

15    exercised by Dr. Desai.  What does he do?  Nothing.

16         Wouldn't you think that on the day -- it happened on

17    Christmas day.  Wouldn't you think the next day, December 26th,

18    that he would have said to her, hey, you're not reading x-rays

19    and you're not reading CT scans, because you are a danger?

20         Now, why do I mix the two together?  I mix the two

21    together because they both involve perception.  They both

22    involve the necessity to look at a screen and determine if

23    there is something wrong.

24         You heard Dr. Desai, I think it was Dr. Desai, it may

25    have been someone else -- testify about x-rays that sometimes

1     they're trickier than CTs, because the organs are packed one on

2     top of the other.  But anyway, set that aside, you're in charge

3     of patient care.

4           Okay.  So you forgot about it for a year.  You forgot

5     about patient care.  You forgot about what you allegedly

6     thought about Dr. Desai for a whole year, but now you've got

7     Dr. Litmanovich's analysis.  What are you going to do?

8     Nothing.

9           January, February, the middle of March, terminated.

10          Now, you'd ask yourself what's going on?  Dr. Desai is

11    functioning just as she always had all the way up to the

12    morning of March 14th.  As I said, there's nothing that anyone

13    has said to her about anything to do with the quality of her

14    work.  Nothing.  And why is that?  Why is it?  It's because

15    UMass knew that the quality of her work was just fine, that

16    they needed her, they needed her because they -- if they got

17    rid of her they would have caused themselves an even greater

18    problem in regards to all of the work that they had, which was

19    already piling up and for which there was already complaints.

20    So they kept her in her position.  Not only did they keep her

21    in position, but there is a -- an email in August saying that,

22    you know, what are you doing with respect to the vascular CTs,

23    which we've heard are even harder to determine.

24          Now, they have come to you and they've said she's past

25    it.  She couldn't do her job.  She didn't keep up with

1     the -- the -- the developments.  What developments?  We haven't

2     heard about any developments that affected her ability to

3     analyze CTs.

4          There's nothing anywhere suggesting that because she

5     didn't go to this course or read that book or hear that lecture

6     that she was somehow compromised in her ability to read

7     CT scans.  Nothing whatever.  But even if there were, what

8     would you do as an employer?  Charu, you need to go to this

9     lecture.  You need to take this course.  We are implementing X,

10    Y, Z to ensure that you give proper care, that you can see

11    everything you need to see on the images.  There's nothing

12    there.  Nothing at all.  Nothing for anyone.  Because again

13    this idea that she's behind, that she's past it, that she can

14    just review x-rays because she -- she read x-rays in the day

15    and x-ray technology hasn't really changed so she can continue

16    to read x-rays.  It just doesn't hold up at all.

17         So when do things start to change?  And why?  Let's

18    take a look at Exhibit 101 in chronological order.

19         You heard that chest radiologists are incredibly

20    difficult to find, and you've heard that UMass consistently and

21    on an ongoing basis attempts to recruit.  Well, guess what,

22    they thought they lucked out back in -- do you have the date on

23    that?

24         Yes, they thought they lucked out on October 3rd,

25    2017.  Isn't this great.  He's found a great radiologist who

```
 1      just finished his fellowship at UPenn in June 2018.  Dr. Rosen

 2      wants to make him an offer, but please look at this second

 3      paragraph.  It's so important.  I would like to make him an

 4      offer but have not formally resolved Dr. Desai's employment

 5      planned for September 30, 2018.

 6              Why on earth is Dr. Desai's employment got anything to

 7      do with this offer to this young man?  Why is it in this email?

 8              It goes on.  I am working with Kathleen and Muriel,

 9      that's legal and HR, but want to make sure that this is done in

10      the, quote, best way possible.

11              He's referring to the termination of Dr. Desai.  He's

12      referring to the fact that he wants to make an offer to this

13      young man, but hasn't yet resolved the termination of

14      Dr. Desai.  He has to resolve it before he can make an offer.

15      But he wants to make an offer, but he still has got Dr. Desai

16      employed.  And he's working with HR, and he's working with

17      legal to make sure that this is done in the best way possible.

18      Best way possible for who?  Best way possible for UMass.  Best

19      way possible for UMass.

20              And then it goes on, if for some reason Dr. Desai is

21      still employed after September 9, 2018, I would make other

22      staffing arrange -- adjustments so that the new hire's addition

23      to the department would be staffing neutral.

24              Can I go ahead and make him the offer?

25              This is when Dr. Rosen realized that he could
```

1    terminate Dr. Desai because he was going to have another

2    doctor, a much younger doctor, coming in to take her place.

3            Now, he has a budgetary problem, which is reflected in

4    this email string, because UMass doesn't want to pay two

5    radiologists at the same time, and there's going to be a

6    three-month overlap, and Dr. Rosen has to move stuff around so

7    that he maintains his budget, but this is clear evidence that

8    she was supposed to be gone by September -- by September 30th,

9    2017.

10           And that is why, ladies and gentlemen, that is why

11   there is absolutely nothing from January 2017 to September 2017

12   about her performance, about anything else, because they needed

13   her.  They needed her, and there's an email saying I

14   can't -- Dr. Rosen says, I can't adequately run my department

15   without her if she goes, and I don't have a replacement.  What

16   does that tell you?  That tells you that she was functioning

17   fully and completely and perfectly competently as she always

18   had.

19           You don't keep a doctor on your staff who you have

20   serious concerns with in respect of the quality of her care.

21   You don't do that.  Dr. Rosen surely wouldn't do it.  It's his

22   duty to ensure the quality of care.  He said so.

23           They can't have it both ways, ladies and gentlemen.

24   They can't say on the one hand, oh, you know, we had very

25   serious concerns about Dr. Desai and then keep her on and not

1    talk to her about these alleged concerns.  These concerns

2    weren't even talked to -- these concerns don't exist.  That's

3    why they didn't speak to her, but not only that, they wanted to

4    control the timing of her termination because they were so

5    short of staff that if she was gone they were making a rod for

6    their own back.

7            So here's the next one.  Is there any way to expedite

8    this?

9            I've been looking for a fellowship-trained chest

10   radiologist for three years and finally found someone who wants

11   to come to UMass.

12           If I don't hire him, I'm just going to be backfilling

13   chest with per diems.  On any given day we now have 50 to 100

14   unread chest CTs.  There it is.  Evidence of the fact that

15   chest CTs aren't being read, that they're behind, that they're

16   under enormous pressure.  And this is the next sentence.

17           If Charu leaves and I don't replace her, I will not be

18   able to provide adequate clinical service in chest.  So there

19   it is.  Dr. Desai is providing a clinical service at the

20   appropriate standard.  And if she leaves, he won't be able to

21   provide an adequate clinical service.

22           And what's he talking about?  He's talking about

23   she's -- he's talking about budget.  He's talking about paying

24   both of them at the same time.

25           Why don't we go to the next one.

1              And this is the budget issue.  I would find a way to

2    eliminate three times -- three months of a full-time employee

3    for Q4 2018.  I have flexibility with Mona, that's Mona

4    Korgaonkar -- years -- year-to-year contract which expires on

5    June 30, 2018.  If I had to I would give her the summer off and

6    move Dr. Ferrucci to a hundred percent MSK, as chest x-rays

7    would be covered.

8              I can also see when the new hire wants to start.  He

9    might want July off to move and have a vacation, start in

10   August.  The combination would pay for the three-month overlap.

11             So now we are talking about him coming on board.  But

12   this is what is so important.  There's a three-month overlap.

13   Why?  A three-month overlap.  A three-month overlap for what?

14   A three-month overlap while Dr. Desai is working and the -- and

15   the young doctor is working.  A three-month overlap.

16             Oh, budgetary problem.  What am I going to do?  I now

17   have two salaries I need to pay.  Well, you know, Dr. Rosen is

18   a very resourceful guy.  Move this, move that.  Take the summer

19   off here and bring Ferrucci in.  That looks like it will do the

20   trick.  But the important thing is Dr. Desai is going to be

21   terminated in order to allow this young man to take her place.

22   That's what this is about.

23             And he has not -- he has not received the results from

24   Dr. Litmanovich.  This is October 2017.  He didn't receive

25   those until December 25th, 2017.  So what difference does it

1    make?  She's going to be gone in three months when this young

2    man comes on board.  They'll have three months together, and

3    then she is going to be terminated.  That is clear from this

4    and the other emails.

5          Let's go on.

6          Is there anything else?  Here you go.  Hello everyone,

7    after reviewing all of these emails and Max's contingency plans

8    for mitigating the three-month overlap, which I just talked

9    about, cost of the Desai payout.  The Desai payout?  What

10   payout?  This isn't a payout like severance.  This isn't a

11   payout like, oh, we're so sorry we can't keep you here.  Take a

12   year, take this, take that.  The Desai payout here is salary.

13   That's what they're talking about.  The three-month overlap --

14   overlap cost of the Desai payout and factoring in the concerns

15   about the backlog of chest CTs, which Dr. Desai was helping to

16   remove.  I feel that we should approve making the offer to the

17   chest radiologist, who is finishing his fellowship at UPenn.

18   So I'm officially approving it.  So there it is.  This young

19   man is going to come on, and Dr. Desai after three months is

20   going to be gone.  Litmanovich or no Litmanovich.

21         And by the way, the contract doesn't require

22   Dr. Litmanovich as was clearly determined in this trial.

23   You -- they could terminate her for -- for any reason, for no

24   reason.  They could terminate her for cause, if they wished,

25   but their contract did not prevent termination.

1              So is there anything else at the end of this?

2              Okay.  Bring up Ferrucci.  So if this isn't enough,

3      here is Dr. Ferrucci to Dr. Rosen.

4              Now, Dr. Ferrucci was Dr. Rosen's predecessor, and

5      Dr. Rosen because of the conflict between Dr. Rosen and

6      Dr. Desai or for some other reason decides that he's going to

7      deputize Dr. Ferrucci to go to Charu and ask her, you know, was

8      she willing to go per diem, will she take a 12-month contract,

9      et cetera.

10             So as you heard, he goes into her office.  Now,

11     Dr. Ferrucci is the agent of a principal, and that principal is

12     Dr. Rosen.  He was sent by Dr. Rosen, he was told what to say,

13     and he had a duty to try to get her to go part-time or per

14     diem.  Here we are in October.  Why now?  Why is this happening

15     now?  Because it's October.  Because she's going to be gone.

16     Because he wants her cooperation in going.

17             So here it is.  Max, I talked to her.  I told her you

18     wanted to be accommodating especially in recognition of her

19     years of service but that you had an obligation as chair to

20     think about recruiting younger staff for service needs.  Does

21     it get any clearer than that?

22             Dr. Rosen has told Dr. Ferrucci that he has an

23     obligation to recruit, to think about recruiting younger staff

24     for service needs.  And by the way, we're recruiting someone

25     younger.  You're older.  How about a term of limited contract,

1    maybe 12 months.  Guess what?  She gets 12 months anyway once

2    she's terminated.  So what's this limited contract?  What are

3    they giving her?  Answer:  Nothing.  There may be a formal

4    arrangement as per diem.  She fussed a bit about being allowed

5    academic days, but I think she'd probably concede on that.  I

6    think you can take the next step in discussions.  Good luck.

7              What is that next step?  That next step is hiring this

8    young man.

9              But here is, if it wasn't enough direct evidence of

10   recruiting younger staff in -- in Dr. Desai's place.

11             There's nothing here about patient safety.  There's

12   nothing here about the quality of care.

13             What happens next?  Dr. Desai doesn't want to go

14   part-time, doesn't want to go per diem, and this young man, he

15   doesn't -- he doesn't take the offer.  He gets a better one.

16   But there's someone who does take an offer later.  Maria

17   Barile, who happens to be maybe 40, although that's an

18   irrelevance, as I understand it from a legal standpoint in here

19   in Massachusetts.

20             And so here we have Dr. Desai continuing to do her job

21   for the reasons we know.  And again nothing, nothing at all as

22   far as she's concerned until March 14th, 2018.

23             So what does Dr. Rosen do?  She's not cooperating.

24   She's not going to leave.  He wants her to go.  He has got

25   someone to replace her.  So now he's really going to spring the

1    trap.  He's going to do her something that she's never coming

2    back from this.

3            Back, way back when he had the contingency plan, the

4    25 CTs for her, 25 from the variety of others.  Dr. Rosen is a

5    very, very bright man.  And I'm not saying he's necessarily a

6    bad man.  He has got a lot on his plate.  And you can see the

7    concern that he has in terms of trying to man the radiology

8    department.

9            So he feels he's backed into a corner.  So he sends

10   these CTs out.  Now, I spent a lot of time -- I don't know if

11   you followed me -- I spent a lot of time trying to explain why

12   this particular test was unfair from the start, how it

13   front-loaded the possibility of Dr. Desai getting more misreads

14   than the rest, because of the four, five, six.  I dealt with

15   it.  I'm sure you remember.  I'm not going to go over it again.

16           Dr. Rosen created this, and it was unfair from the

17   start.  You wonder what would have happened if Dr. Litmanovich

18   had -- had found that she had made no errors.  And that's just

19   the point.  She made no errors.  She made no errors.

20           How do we know?  Dr. Gruden.  Dr. Gruden is vice chair

21   of his department.  Dr. Gruden testified before you in a very

22   effective and honest manner, and Dr. Gruden's testimony comes

23   right from the front line, right from the hospital that works

24   with patients who come in.  Emergency patients where, guess

25   what, a CT needs to be done.  This is -- these are the

1    parameters.  This is what you do.  Get it out to the clinician

2    as soon as you can.  It's an emergency.  Or if it's not an

3    emergency, still get it out.  Why?  Because you've got 50 to a

4    hundred CTs that you're behind on.

5         We know from every single radiologist here that

6    radiology is sometimes as much an art as anything that

7    radiologists see things and that one thinks it's very

8    important.  One other doesn't think it is.

9         Dr. Gruden mentioned that there are reports that

10   existed prior to one or two of these CT scans, which is why it

11   wasn't mentioned.

12        The entire ten cases, which they're saying Dr. Desai

13   missed, are entirely and completely suspect.  And why do I

14   say -- why is that important?  It's important because she was

15   terminated to ensure patient safety.  So it follows that if

16   these ten are -- are fine, are within the bell curve, as

17   Dr. Gruden says, then there is no threat to patient safety.

18   There just isn't.  It's not there.

19        So let's talk about Dr. Kazerooni.  Well,

20   Dr. Kazerooni is an entirely different animal.  She's coming

21   from high academia.  She's at the very top of her profession.

22   Everyone knows her.  She writes articles, et cetera, but she's

23   not on the ground when ambulances come in, when radiologists

24   have to do real work.  It's all very well to take these

25   CT scans up to your ivory tower and start to say, oh, you know

1   what, hmm, it might be this, it might be that.  It might be the

2   other.  Ah, you know what, hmm, this is inadequate.

3          What they used to judge her CT scans was not a fair

4   judge.  It wasn't fair because, first of all, she had unlimited

5   time; and secondly, she took every single little thing and said

6   it could be this.  It might be that.  This has to be followed

7   up.  That has to be followed up.  Well, of course, in the world

8   of heavenly medical assistance, that's what would happen, but

9   in the real world you have to triage what's coming in.  You

10  have to follow the clinician.  The clinician asks you to look

11  for this.  You look for it.  It's either there or it's not

12  there.  Fine.  If you see something else, of course, you'll

13  mention it, but that's the scope of your review.

14          What I'm effectively saying is you have all this time

15  to listen to Dr. Gruden, Dr. Kazerooni, and now

16  Dr. Litmanovich, and what are you to make of it?  There is only

17  one thing that you need to think about here, and that is the

18  quality of her work.  And then you have to ask yourself, you're

19  going to take 25 CT scans from a doctor who analyzes 4,500 to

20  5,000 a year, and on the basis of those 25 and 25 others you're

21  going to determine whether she moves forward with her career or

22  not.  And you're going to be in charge of it.  This isn't going

23  out to an independent expert like it did in Garrell,

24  Dr. Garrell, who actually was reviewed at the same time, 2017.

25  No.  He's going to do it himself.  So you ask yourself why?

 1    And the reason he's going to do it himself is because he wants

 2    to keep control over the time of termination, and he wants to

 3    make sure that she will be terminated.  If it goes out to an

 4    independent review, is there any way -- is there any way at all

 5    that an independent review would say she doesn't have any

 6    quality?  The answer is no.  So he wasn't going to risk it.  So

 7    he keeps control and front-loads this -- this test.  But the

 8    real issue is is she or is she not qualified.

 9            Are the concerns that are allegedly raised by the

10    defendant pretextual, just an excuse, untrue?  And the answer

11    to that, ladies and gentlemen, is an overwhelming yes, they are

12    untrue, they are pretextual.  All of the reviews and the use of

13    Dr. Desai all the way through to her termination indicate that

14    they knew very well what her quality was.  And it wasn't about

15    quality at all.  It was about replacing her.  It's clear.  It's

16    about replacing her, replacing her with a young man.

17            I want to talk for a moment about what we have to

18    prove, what she has to prove.  It's in the jury instructions.

19            We have to prove by a preponderance of the evidence

20    that Dr. Desai was subject to an adverse action.  In this case,

21    the adverse action is termination.  So we agree on that.

22            And at least 40 years at the time she was an employee.

23    So that's clear.  No problem.

24            Two, we have to show by a preponderance of the

25    evidence that the reason giving -- given by the defendant for

1     the plaintiff's termination was pretextual.  That means it

2     wasn't true.  It was just an excuse, but it had no real basis.

3     That's pretext.  It's a legal term, but that's the term that's

4     used.

5           And three, and this is really important.  The

6     plaintiff must prove by a preponderance of the evidence that

7     she would not have been terminated but for her age.  That's the

8     real issue here, ladies and gentlemen.  She would not have been

9     terminated but for her age.  And this is where I come back to

10    what I originally said.  She wouldn't have been terminated for

11    anything else.  There's no indication she would have been

12    terminated for anything else.  This is that, all of those

13    excuses, the accomodation, and the academic fee, the emails,

14    the coming in late.  It's all a creation of the defendant.  And

15    it never happened.  It was never a concern during her

16    employment.

17          When did it become a concern?  It became a concern

18    after the case was filed and then the defendant had to grub

19    around for something more.  They knew that the 25 CT scans and

20    the other 25 put them in great danger of having us prove

21    pretext.  So what did they do?  They grabbed this from there.

22    They grabbed the emails from there.  They grabbed the fact she

23    was late one day despite having FMLA, and they put it all

24    together, and that's what you heard when Mr. Kilroy opened, all

25    of that.

1            So he's going to say, oh, no, she would have been

2     terminated.  She would have been terminated for all of that.

3     But that is not what they are actually saying.  The

4     circumscription of this case is simply the quality of her work,

5     and we can prove -- I think we have proven that but for her age

6     she would still be employed because we know she would be,

7     because the defendant tells us that.  How?  Because she was

8     still employed.  She was still employed until this young man

9     came along, and then she was no longer employed.  So it is

10    clear that you can conclude that she -- if she had not been

11    terminated because of her age, meaning she was old, and the

12    young man was young, she would still be employed because she

13    had been.

14            So that's one of the aspects of this case, age

15    discrimination.  And we believe that we have proven that, and

16    we only have to prove it by a preponderance of the evidence,

17    which his Honor will tell you is just -- just a feather weight.

18    You have your scale.  Did you prove it by a preponderance?

19    Does the scale move a little?  Yes, it does.  Plaintiff wins.

20            There's a count here for aiding and abetting, which

21    you'll see.  And in the jury instructions it says that under

22    state discrimination law, a supervisor or other decision maker

23    is not liable for discrimination against an employee based only

24    upon a finding that their employer discriminated against the

25    employee.  In other words, when a supervisor terminates

1     someone, or disciplines someone, he or she is acting on behalf

2     of and as an agent of the employer.  So that means that the

3     individual supervisor is not liable, because it's the employer

4     who is liable.

5             But for a supervisor to be liable for aiding and

6     abetting discrimination, it is not sufficient to show that he

7     made the decision to terminate an employee but instead -- and

8     this is the test -- it must be proven by the plaintiff that he

9     acted in a manner distinct and separate from the duties and

10    responsibilities of his position as an official of the

11    employer.

12            Now, that's tricky.  But what it means is that he's

13    acting outside of the scope of his given authority, and I would

14    argue that Dr. Rosen did just that, because if there had been

15    someone else in -- in charge, that person would not have

16    terminated Dr. Desai, because of her long record and because of

17    the quality of her service.  And that person would never have

18    put UMass in jeopardy of an age discrimination case, which has

19    occurred.

20            So the argument is that he is acting separately and in

21    a distinct manner, and he's doing it himself, because he's the

22    one who created the peer review.  He's the one who held onto

23    it.  He's the one who used it as a pretext to terminate her.

24    It's all him.  There's no one else from UMass who's involved.

25    It's him.  He's doing it.  And he's doing it not necessarily in

1    the best interests of his employer.  So that's aiding and

2    abetting.

3         Tortious interference with contractual relations.  So

4    this is -- this is the last count that you will see on the jury

5    slip.  And I'm reading directly from the jury instructions.

6    Dr. Desai claims that Dr. Rosen has tortiously interfered with

7    her contractual relations.  To prevail on her claim, Dr. Desai

8    will first have to show that she had a contractual

9    relationship.  She did, because we saw her contract; and even

10   if there wasn't a contract, there would be a verbal contract.

11   So there's a contract.  Such as an employment relationship with

12   a third party.  The third party being University of Mass.  The

13   parties have agreed that Dr. Desai's employment with UMass was

14   such a relationship.

15        The second test.  This is for us, obviously.

16   Dr. Desai will have to show that Dr. Rosen knowingly and with

17   actual malice induced that third party to break their

18   relationship with Dr. Desai, including a break in a contractual

19   relationship, that includes inducing a party not to continue a

20   business relationship such as an employment relationship.

21        Now, I want to make it clear that Dr. Desai is not

22   saying that Dr. Rosen is a -- is a bad man.  What she is saying

23   is that he was under enormous pressure.  He has a lot of

24   responsibility, but he also does a lot of good.  There's no

25   doubt about it, and he keeps probably pretty tight control over

1          his department.  This is not an easy job for him.

2                  But despite the fact that it's not an easy job that

3          does not give him license to break the law.  Neither does it

4          give him license to somehow circumvent proper procedures, legal

5          procedures, to hire someone on who's younger than Dr. Desai.

6                  Now how he could have done that?  A number of ways.

7          He already did it.  He shuffled stuff around, and he was able

8          to employ both of them where he would have been able to employ

9          both of them for three months.  He could have gone to the

10         powers that be and say, look, you know what, Dr. Desai is fine,

11         and I want to hire this young radiologist.  Give me -- give me

12         a way to do it.  But that didn't happen.

13                 This is the problem that Dr. Rosen has with this case

14         in respect to malice.  It's not necessarily what happens here

15         in September, October.  It's what happens in February of 2017,

16         when he creates the very form, the very test that ultimately

17         will be used to terminate him [sic].  That's where the malice

18         is.  That's where it began.  That's malicious.

19                 It's spiteful.  And in doing it he destroys the

20         contractual relationship that she has with UMass.  He does it.

21         He knows he's probably going to do it one way or another, but

22         that's the malice.  And the reason why it's malicious and

23         spiteful is because she's such a great -- great physician, and

24         he's making that determination.

25                 Now, this is interesting.  So he's making that

1      determination himself.  It's malicious and spiteful, but when

2      he terminates her, he does so in the name of UMass.  That's

3      interference.  That's interference with contract.

4              I want to talk about damages.  In many ways this is

5      the hardest part of this case, because you have a physician who

6      gave her life to looking after patients.  She wasn't on the

7      academic track.  She wasn't interested in publishing this or

8      studying that.  Her whole life was directed to helping

9      patients.  She always knew that at the back of a CT scan, at

10     the back of an x-ray was a real person.

11             And then on March 14th, she's summoned to Dr. Rosen's

12     office, and she's told out of the blue that she is terminated

13     and that she will not be able to review CT scans.

14             It's hard for anyone to put themselves in Dr. Desai's

15     position at that time, because most people have never

16     experienced such a thing, such an abominable thing.  It's so

17     inhuman, and it has no justification, and it's just totally out

18     of the blue, and she served UMass for so long and so well, and

19     this is what they do?

20             So she -- she's really upset.  Of course she's upset.

21     She calls her husband, and he drives her home.  But what does

22     she do the next day, ladies and gentlemen?  What does she do?

23     She goes into work.  She goes into work despite the

24     degradation, despite the humiliation, despite not being able to

25     now read CT scans.  She goes into work to serve her patients.

1    That's character.  That's shows her commitment.  That shows who

2    she is.

3            When Dr. Rosen said that she could not read CT scans

4    any longer, he basically amputated a critical part of her

5    ability to get a job.  He amputated her career.  He humiliated

6    her before everyone, because then they knew she couldn't do it.

7    He degraded her and he caused this woman of great dignity and

8    service continual suffering from then until now.  And I don't

9    think you needed Dr. Voskanian to say how serious it was, and

10   her crying and how depressed she was and the fact she didn't --

11   she thought it would get better, but then she had to go to a

12   psychiatrist, still goes, and she's on medication.  It was

13   clear from her body language how terribly and inconsolably

14   upset she was and still is.

15           And how do you -- how do you even put a figure on

16   that?  You know, we don't have anything else except money.  We

17   don't have anything else.  Money is the only thing we have.

18   It's the only thing we have to express damages, serious

19   damages, the equivalent of what she went through.  That's all

20   we have.  And ladies and gentlemen of the jury, that's going to

21   be your province entirely.

22           Now, we come to the issue of her getting a job.  Now,

23   first of all, Dr. Desai hasn't looked -- has never looked for a

24   job.  So she used her daughter, Diana Desai, to write letters

25   for her.  Fine.  That's fair.  A daughter will help her mother

1    get a job, et cetera.  And she actually puts her name on the

2    top.

3        The problem that Dr. Desai has isn't in the

4    applications.  It's in what happens next.  Were you ever

5    terminated from a job?  Yes.  Were you ever forced to resign in

6    lieu of termination?  No, resignation was never offered.  It's

7    apparently my job to ask for a resignation if I want one.

8        How many modalities do you have?  One.  What's that?

9    I can read x-rays.

10        Is any hospital going to hire her, because x-rays, the

11   number of x-rays that -- to keep a radiologist going are only

12   in a hospital.  Besides which they would call Dr. Rosen for a

13   reference.  Now, Dr. Rosen said he would give her a reference

14   in respect to that, but when it came to CTs, forget it.

15        So you heard the economist say, look, you know, I took

16   ten years, I projected out, you know, move -- you know, if you

17   take her salary and you put it in present value, it's like

18   $4 million.  And counsel, quite rightly, asked you don't know

19   how long she'd be there.  It could have been five years.  What

20   about her health?  Et cetera.  You didn't calculate that, did

21   you, and really gave the economist a really hard time.

22        But the economist predictions in terms of the numbers

23   are accurate, if you assumed that she would be employed for ten

24   years; and if she was employed for longer, it would be a bigger

25   number; if she was employed for less time, it would be less.

1    But this is the point.  UMass makes a big deal about employing

2    radiologists who are like in their 80s, one is in their 90s so

3    we have no reason to think that she wouldn't go on and be

4    employed for a number of years, how many years you believe that

5    would be the case.

6           And we heard about her pacemaker, but that never

7    stopped her.  That never stopped her.  She was on call.  She

8    did her job.  She did it fully.  There is nothing to indicate

9    that she -- she would suffer from anything that would prevent

10   her from sitting down and looking at the CT scans.

11          Furthermore, her 26 years experience made her even

12   better at detecting stuff because she had seen it before.  She

13   knew what it was.

14          So when it comes to mitigating her loss, she didn't

15   apply there or she didn't apply there, et cetera, et cetera.

16   Yes, she did apply, but this was always going to be a hopeless

17   exercise.  That was always going to be hopeless.  She could

18   have applied for a thousand jobs, but Dr. Rosen ensured that

19   she would never be employed again, and she hasn't been.

20          I know you've kept very close attention to this, and

21   my client and I'm sure Dr. Rosen through -- through his

22   attorney thanks you so much for your genuine service to this

23   very, very important matter.  And I ask you to just remember

24   one thing.  Just one thing.  When Dr. Desai was on the stand

25   and she was asked what she wants, she said one word, justice.

1    Justice.

2              Thank you so much for your kind attention.

3              THE COURT:  Thank you, Mr. Kolman.

4              Why don't we take a break, and then we will hear the

5    defendants's closing.

6              THE CLERK:  All rise.

7              (At 11:05 a.m., the jury left the courtroom.)

8              THE COURT:  Who's got the closing?

9              MR. KILROY:  Right here, your Honor.

10             THE COURT:  How long?

11             MR. KILROY:  Forty-five minutes, your Honor.

12             THE COURT:  Thank you.

13             You guys, we're in recess.

14             MR. KILROY:  Thank you.

15             THE COURT:  We're just figuring out lunches.

16             (Recess from 11:06 a.m. until 11:20 a.m.)

17             THE CLERK:  All rise.

18             (At 11:20 a.m., the jury entered the courtroom.)

19             THE CLERK:  Court is now open.  You may be seated.

20             THE COURT:  Attorney Kilroy.

21             MR. KILROY:  May it please the Court.  Thank you, your

22    Honor.

23             Good morning, ladies and gentlemen.  I'll begin where

24    my brother counsel left off, which is to thank you, thank you

25    for your service, thank you for your attentiveness.

1           This trial made two points abundantly clear:  The

2    first, credibility matters.  Credibility of witness testimony

3    as you look at under-oath testimony matters.

4           The second is actual facts, evidence matters.  Not

5    theories, not speculation, not conclusory statements.  The

6    actual facts, and I will address the facts that came out in

7    this trial.

8           Those two things, credibility and facts, matter when

9    you're answering the question that I forecast for you at the

10   start of the trial in my opening.  I told you the trial would

11   boil down to one question ultimately.  That question was:  Did

12   Dr. Rosen terminate Dr. Desai's employment because she was age

13   67 at the time of the notice or did he terminate her employment

14   based on safety patient concerns -- patient safety concerns due

15   to her quality.

16          My brother counsel made all kinds of statements about

17   the timing in this case.  He was complaining that Dr. Rosen was

18   careful and deliberate and took time.

19          Do you think that he and Dr. Desai would claim there

20   was no age discrimination if they terminated her in February of

21   2017 instead of waiting and getting the independent review

22   done?  Of course not.  It's an a red herring, the timing

23   argument that they made.

24          Let me begin with the discussion of credibility.  You

25   remember when we started the case, Mr. Kolman spoke to you in

1    opening, and I wrote this down, Dr. Desai was, quote, exquisite

2    at her job as a radiologist.  She was exquisite at her job.

3    I'd offer the overwhelming word of evidence in this trial

4    through testimony through documentation of problems with her

5    work would lead you to believe the characterization of

6    exquisite in any capacity in her job is far from accurate.

7            What were the facts that you heard?  Not statements,

8    not conclusory statements.  One, she arrived late often.

9            Two, she often left early with critical chest CT reads

10   left undone.  Urgent reads.  No concern for patient safety, no

11   concern for patient care.  She left.  That's not in dispute.

12   Those are facts that came into evidence.

13           She went missing for large portions of the day.  She

14   avoided complex chest studies.  She avoided vascular studies.

15   She did the basic chest x-ray reads.  That's not in dispute

16   either.

17           She undermined her boss.  Openly disrespected her

18   boss, belittled her boss, would not respond to emails from

19   either her boss, Dr. Karin Dill, or the chair of the

20   department.  Wouldn't timely submit vacation requests that were

21   needed to enable Randa Mowlood and her team to schedule and

22   Karin Dill to schedule coverage throughout the year.  No

23   concern for patient safety there.

24           She demanded to be provided 12 academic days despite

25   admitting she does no academic work, admitting she wanted to

1    use the days as time -- the time as days off only.  I agree

2    with my brother counsel, this case has nothing to do with

3    academic days overall.  She wasn't terminated because she was

4    demanding academic days.

5           Why do we bring that to your attention?  To show you

6    that she's looking for special treatment based on her

7    seniority.  This isn't about her being terminated for age in

8    terms of what she's asking for.

9           She demanded to be removed from call coverage.  Why?

10   Because she claims, again, I paid my dues.  There's no

11   paid-your-dues exception.  That gives you insight into how she

12   approaches her job.

13          She got upset because her -- because there was a

14   nationwide search for a division chief, and she wasn't asked to

15   be division chief.  She didn't even apply for the job.  You

16   heard her admit on the stand she's not qualified for the job.

17   She couldn't even tell you what the job duties entail, but she

18   got upset and took it out on her boss because Dr. Rosen didn't

19   ask if she wanted to be division chief.  Not because she could

20   have improved patient safety or quality.  Just because she felt

21   entitled.

22          But most importantly, the evidence is undisputed, the

23   facts that came in.  She was frequently the subject of quality

24   complaints with respect to the accuracy of her chest CT reads.

25   We know that from Dr. Dill's detailed testimony.  She said it

1      was nearly weekly in terms of frequency where she would get a

2      call from a referring provider that she would have to do an

3      over read.

4              We note from both Dr. Dill's testimony and

5      documentation, Dr. Irwin, acute care pulmonologist, the head of

6      acute care pulmonology at UMass Medical Center, complained

7      about her reads.

8              We know that Dr. Robinson, acute care pulmonologist,

9      president of the medical staff of Marlborough Hospital

10     complained about her reads.  In fact, Dr. Robinson, who is an

11     expert in lungs, was so concerned about it that she told

12     Dr. Rosen, I can't trust her reads.  It's difficult to square

13     all of what I just said, which is the evidence that came in

14     factually with a conclusory statement that she's exquisite at

15     her job.

16             It's also important to look at the credibility of the

17     witness testimony that you had.  And I invite you to compare

18     Dr. Desai's under-oath testimony to that of Dr. Rosen,

19     Dr. Dill, Dr. Litmanovich, Dr. Korgaonkar, and Randa Mowlood.

20     You had the opportunity to observe each of them on the witness

21     stand, and I would suggest that the comparison is compelling

22     and self-evident.

23             Each of the defense witnesses testified matter of

24     factly, testified credibly.  They did not get tripped up with

25     prior deposition testimony.  They weren't impeached the way

1    Dr. Desai was.

2              I'm not going to focus on each one of those.  I'll

3    rely on your memory for their testimony.  We'd be here all day

4    if I tried to focus on each of them.  But I will focus on

5    Dr. Rosen, because he was key, and he was called as their first

6    witness, and they kept him on the stand for over two days.  At

7    no time was his testimony effectively impeached by my brother

8    counsel.  At no time was he shown deposition transcripts where

9    Dr. Rosen said yes on the stand here, and they showed that he

10   said no under oath at a different time.  He was completely

11   consistent with his prior testimony.

12             As I forecast in my opening statement regarding

13   Dr. Rosen, and I leave it to you to be the judge, but I told

14   you he would come off as careful, as thoughtful, as methodical,

15   and as fair, and I believe he did that.  He didn't overstate

16   anything when he testified.  He didn't fabricate when he was

17   testifying.  He was clear and unequivocal when he told you the

18   actions he took and what motivated his actions to seek an

19   independent review and then to decide to terminate Dr. Desai's

20   employment based on substandard quality.

21             He also did not rush to judgment.  Now, if you take at

22   face value what my brother counsel says, they would have

23   preferred that he rushed to judgment as of February of 2017.

24   Fire her then.  He didn't.  Why didn't he?  Because he's a fair

25   man.  He wanted to see and have confirmed whether or not the

1    quality concerns were accurate that he was receiving.

2            And by comparison, he has fired others.  You'll see

3    later in my discussion, Dr. Refky Nicola, a much younger

4    radiologist, he didn't get the opportunity for an independent

5    review.  He didn't get the opportunity to sit down and be put

6    on a performance improvement plan.  He got fired, much younger,

7    the same type quality concerns, the same issue where it arose

8    from the division chief complaining about the quality.  So

9    that's Dr. Rosen.

10           Contrast that to Dr. Desai when she testified.  She

11   was often, in fact, very often, entirely inconsistent with her

12   prior deposition testimony.  I suspect like me, you got tired

13   of me going to this document camera and showing her her

14   deposition and showing that she was testifying inconsistently.

15           I would argue to you that when she was not well

16   prepared for questioning, as at deposition, and had to simply

17   testify truthfully, she testified truthfully she had no facts

18   to support her age claims.  In fact, she was adamant in her

19   testimony that there was no age basis for Dr. Rosen's actions.

20           I'll show you what's Exhibit 26-6 that you'll have in

21   the jury evidence room.

22           If I could have the document camera, please.

23           So rather than focus on conclusory statements and

24   theories without support, I'll use her testimony.

25           6-6 -- 26-6.  This is what it said.  Do you believe

```
 1    Dr. Rosen made a decision to have 25 of your cases reviewed by
 2    an expert for quality purposes because you were age 67 at the
 3    time?
 4             What was her answer?  Unequivocal.  I don't think
 5    review has anything to do with the age.  Both don't go
 6    together.
 7             I agree with her, the review had nothing to do with
 8    the age.  But we didn't stop there in terms of her testimony.
 9    26-2, that you'll have access to.  Are you claiming that the
10    decision that was made to restrict your privileges with respect
11    to CT scans was done because of your age?
12             There's no waffling.
13             No.  She does not believe it was done because of her
14    age.  She knows why it was done.  It was done because of
15    substandard quality.
16             26-8.  Do you believe Dr. Rosen chose not to speak
17    with you before seeking an independent review because of your
18    age?
19             Look what she says.  She's adamant.  I don't know
20    where the age comes in.  I still don't understand the question.
21    I really don't.
22             So I continued.  You told me Dr. Rosen didn't speak
23    with you before he sent out for independent review, correct?
24             Yeah.  My --
25             It's yes or no, ma'am; is that correct?
```

1              Yes, no, he didn't.

2              Okay.  And are you claiming that he chose not to speak

3      with you because of your age?

4              Answer:  No.

5              Those are her words.  That's her testimony under oath.

6              She also admitted Dr. Rosen decided to terminate her

7      employment based on quality concerns, not based on age.  Based

8      on quality.  Again, I'm building it off her words.

9              26-3.  Okay.  So you've testified that Dr. Rosen had

10     an obligation to maintain patient safety, an obligation to

11     maintain quality, an obligation as part of his job duties to

12     take action if he believes a radiologist's quality is

13     substandard.  And then, he actually took action in the form of

14     no-cause termination to you based on his assessment that your

15     quality was substandard; is that fair?

16             I believe that's what he did.

17             Did Dr. Rosen act fairly towards her?

18             Exhibit 26-4.  Would you agree Dr. Rosen acted fairly,

19     appropriately, by relying on an independent expert's evaluation

20     as opposed to him making the evaluation himself?

21             Unequivocal.  I agree.

22             Now, you'll likely remember during my

23     cross-examination with Dr. Desai, I asked her about the fact

24     that she had an opportunity to correct her testimony after her

25     deposition.  She testified in September and October of 2020.

1    She was then given time to review her transcripts and change

2    her testimony if she needed to.  She agreed she had that

3    opportunity while represented by counsel.

4         And so on December 10th of 2020, she sent in to my

5    office copies of the signed deposition transcript errata sheets

6    with corrections.  On her cross, I showed you that she had not

7    corrected any of that testimony.  She did correct testimony.

8    She just didn't correct the testimony that dealt with age or

9    with fairness or with being terminated for substandard quality.

10        And she admitted on cross-examination she had two

11   additional years prior to trial, December 2020, when she signed

12   that to December 2022.  Now, at the trial.  Two additional

13   years to let us know she was changing her testimony.  She never

14   did.  She never corrected her testimony.

15        So what does that indicate?  Not theories or to the

16   facts.  What does it indicate?  I'd strongly suggest it

17   establishes Dr. Desai will change her sworn testimony at trial

18   because she realized her case was over if she continued to

19   abide by her sworn-under-oath testimony at deposition.

20        Now, what's important is to remember back to when she

21   was being cross-examined, because she did change her testimony.

22   She said, No, I believe now the review was done as a tool in

23   order to terminate me.

24        So I challenged her.  I said, Tell me any new facts

25   you learned after December of 2020 to trial.  Any new facts.  I

1    didn't limit it.  I didn't try and lead her and put words in

2    her mouth.  I left it wide open for her to fill in.  Any new

3    facts that required that you change your sworn deposition

4    testimony such that now at trial you're claiming age.

5            And what did she say?  That was an important question

6    so I wrote it down.  She said one thing, the hire of Marie

7    Barile, who's younger than me.  Dr. Barile, who was hired.

8    That's what she said.

9            I didn't stop there.  I gave her another opportunity.

10   I said, Are there any other facts that you learned after your

11   deposition testimony that would support your change in

12   testimony, anything?

13           Her words were, I think that's enough, no.

14           And I said, I just want to know if there are any other

15   facts that contribute to your change of testimony?

16           She said, No, that's it.

17           So she had two years to change her testimony.  She

18   then surprises us at trial, changes it.  I give her the

19   opportunity to tell us why, and she noted -- she identifies one

20   thing, the hire of Marie Barile, Dr. Barile, the fellowship

21   trained chest radiologist.

22           Well, contrary to the self-serving testimony that she

23   offered, we know from the record evidence that testimony makes

24   no sense.  Why?  Why?  Because of Exhibit 184 that you will see

25   in the jury room.

1          Exhibit 184 is the hire letter of Dr. Marie Barile.

2     And when was she hired?  December 31st of 2018.

3          Who was still employed at UMass Memorial as of

4     December 31st of 2018?  Dr. Desai.

5          Dr. Desai knew when she was deposed Dr. Barile had

6     been hired.  Dr. Desai knew when she was deposed Dr. Barile was

7     much younger than her.  This isn't a new fact.  She was well

8     aware of this.

9          So her testimony under oath under cross-examination

10    was clearly false.  This wasn't a new fact that would cause her

11    to change her mind.  This was an attempt to find a way to get

12    out from under her sworn testimony at deposition.

13         Her legal counsel on redirect tried to help her out,

14    tried to offer her a lifeline, something that she didn't

15    testify to.  When asked about new facts, she didn't have this.

16    But they offered her that she could change her testimony by

17    looking at the Dr. Ferrucci email in October of 2017 to say

18    that that provided the basis.

19         And you saw my brother counsel walk and talk that

20    email with you with a lot of speculation as to what really

21    happened.

22         Does the proposal by her attorneys throwing her this

23    lifeline hold water?  I suggest it doesn't for several reasons,

24    and my reasons are not in dispute.  It's based on the evidence

25    that was presented to you.

1          First, Dr. Desai testified to you that she spoke with

2     Dr. Ferrucci about what was in that email in October of 2017.

3     She said Dr. Ferrucci came to her office and met with her.  She

4     talked to Dr. Ferrucci.  So anything that was in that email she

5     didn't have to see the email.  She had the discussion with

6     Dr. Ferrucci.  So if he, in fact, said, Dr. Rosen has an

7     obligation to hire a younger radiologist, she would have known

8     that.

9          If you harken back to her testimony when she was

10    testifying off that email, she testified to the fact that

11    Dr. Ferrucci talked to her about his experience going per diem.

12    And then when she -- he -- when she was asked to testify as to

13    anything else in the conversation, what does she do?  She went

14    down and looked to the email.  She couldn't remember anything.

15    The only way she could testify to that email was looking at the

16    email.  The bottom line is she had the conversation with

17    Ferrucci well prior to being deposed.

18          Second, and it's unrebutted, except by speculation by

19    my brother counsel, Mr. Kolman, but there's no evidence of

20    this.  In terms of what the evidence is, Dr. Rosen testified he

21    did not make any statement to Dr. Ferrucci about the need to

22    hire younger radiologists.

23          Did you see Dr. Rosen testify in a way that was not

24    credible at any time?  He told you he didn't make that

25    statement to Dr. Ferrucci.

1          He also testified Dr. Ferrucci is not involved in any

2     way with recruiting or hiring.  And he doesn't talk to him

3     about recruiting or hiring.

4          But we don't even have to necessarily take my word for

5     Dr. Rosen's testimony in that regard.  Prior to September of

6     2017, during September of 2017, and after September of 2017, we

7     can just look at the hire records.

8          Exhibit 343 that you'll see.  What does the actual

9     facts show?  It's not theories, actual facts.  Remember the

10    email by Dr. Ferrucci was early October, 2017.  The last day of

11    September, he's hiring a 64-year-old.  Does that square with

12    having to hire younger radiologists?  Earlier that year he's

13    hiring a 64-year-old.  The year prior, in October '16, he's

14    hiring a 71-year-old.  Those are facts.

15         And now I'm going to ask for your common sense.  I

16    suggest you ask yourselves why is it that Dr. Ferrucci, who's

17    now 85 years old, he had a birthday last week, why is it that

18    Dr. Ferrucci, a close friend of Dr. Desai's, as Dr. Dill

19    testified, was not called to testify as to his conversation

20    either with Dr. Desai or Dr. Rosen?

21         If this conversation actually happened, because

22    Ferrucci says in his email, I told her you have an obligation.

23    He doesn't say, I told her you said to me you have an

24    obligation to hire younger.  It's just Ferrucci's words, I told

25    her you have an obligation.  Well, why not call him to testify

1    and put the words in Dr. Rosen's mouth?

2             I'd suggest the answer's obvious, because he wouldn't.

3    They know that he wouldn't testify in that regard.

4             The final rallying cry for Dr. Desai's counsel to try

5    and help her on this change in testimony is that by Dr. Rosen

6    seeking approval to hire a fellowship trained chest radiologist

7    from UPenn in the fall of 2017, he must have been trying to

8    replace her with a younger radiologist.

9             Again, nice theory, devoid of factual support.  It

10   doesn't line up with the actual hire records, and it's

11   important to note, and I'd ask for your memories on this.  You

12   did not hear any evidence, any factual evidence, any

13   documentary evidence, any testimonial evidence, that the UPenn

14   fellowship-trained radiologist was young.  You heard that from

15   Dr. Kolman [sic].  He repeatedly snuck that in every chance he

16   got.  The younger man from UPenn.  Dr. Rosen was asked on the

17   stand how old was he?  He said, I don't know.  There's no

18   evidence he's a young man.  Now, is it possible he's young?

19   Yes.  It may well be likely he's young, but there was no

20   evidence he's a young man.  And again facts matter.

21            And you will recall that Dr. Rosen had been trying to

22   hire a fellowship-trained chest radiologist in 2015 throughout

23   2016, throughout 2017, and throughout 2018, and now he's still

24   trying to hire, and you heard other chest radiologists tell you

25   it's difficult to get well-trained chest radiologists.

1        I asked Dr. Desai on cross-examination, and she

2   admitted, she supported Dr. Rosen's efforts to hire a chest

3   radiologist into the division.  She admitted she repeatedly

4   complained about being overworked.  They had too much work to

5   do in chest, and she wanted him to hire a chest radiologist.

6   But it appears that the theory of their case is she wanted him

7   to hire a chest radiologist in '15, and she wanted him to hire

8   one in '16, and she wanted him to hire one in '17, early '17

9   through the summer, at least during the time that he started

10  this independent review that she didn't know about, and she

11  wanted him to hire in '18, but there's this two-month gap of

12  October and September of '17 that, oh, I wouldn't want you to

13  hire then because that would be age biased.  It's logically

14  inconsistent.  It makes no sense.

15       And the reason we know her testimony and her theory

16  makes no sense is because she admitted that she wanted him to

17  be trying to hire, and she knew he was trying to hire for all

18  those years.  You can't draw a distinction between those dates.

19       There's another aspect of Dr. Desai's testimony that I

20  believe calls into question her credibility.  Contrary to her

21  claims that she was searching, truly searching for jobs, the

22  evidence is undisputed she and her family celebrated her

23  retirement the day after she left UMass Memorial, and not in

24  like in a quiet dinner of her daughter, her husband, the

25  son-in-law, no.  This was a banquet facility.  They brought in

1    people from out of town, out of state, family and friends came

2    in, and coworkers came in.  And she admitted on the stand that

3    she did not tell anyone she wasn't retiring.  She went through

4    that retirement party indicating she was retiring.  And that

5    was at the Olive & Mint Restaurant.

6            And now put into context.  Now, I know you heard from

7    her this morning after the fact, well, it was a surprise.  I

8    didn't know it was coming.  Square that against what she did in

9    terms of applying for jobs if she wasn't truly retiring.  What

10   did we know?

11           First, there's no evidence she ever applied for a job

12   here in Worcester.  She lives in Worcester.  St. Vincent's

13   Hospital has radiologists.  There's no evidence she ever sought

14   a job there.

15           Second, she admitted she won't drive on highways, yet

16   there's no evidence and she admitted she never applied for a

17   teleradiology job.  Teleradiology, you work from home.  There

18   are teleradiology jobs 365 days a year she admitted in

19   Massachusetts, in New England, and in the United States.  Why

20   didn't she apply for any?  I think the reason is obvious, she

21   retired.  She wasn't looking to apply.

22           She admitted she didn't apply for the Fall River

23   position because it was too far, but then she produced

24   documents showing she was applying in Stamford, Connecticut,

25   and in Boston.  Completely illogical if Fall River's too far.

1              She applied for positions that she was not qualified

2      for.  Musculoskeletal radiology and abdominal imagery.  That's

3      not her specialty.  She admitted she hasn't done any of that

4      for 20 years.  So why she's -- why is she applying for those

5      jobs?

6              And, you saw the evidence, all the applications were

7      done by her daughter, not by her.  Her daughter was responding

8      to each of these.

9              You've seen absolutely no evidence, not a single

10     application that she applied for a chest radiology position.

11             How is that possible for someone who's looking for a

12     job?

13             I'd suggest it casts a long shadow over her testimony

14     that she was actually trying to get a job after UMass Memorial.

15     And she admitted her résumé was false.  She didn't update it

16     despite claiming she was looking for jobs.  I believe you're

17     going to hear from the judge in his instructions that she has a

18     legal obligation to do what's called mitigate or lessen her

19     damages through seeking comparable employment.  I would suggest

20     to you that her efforts, as we showed them, applying for jobs

21     she could never accept, because they're too far, applying for

22     jobs that don't even equate to her chest specialty, never

23     applying for a chest job, never applying for teleradiology, the

24     efforts she made are a sham to make you believe she was

25     attempting to mitigate.  She wasn't attempting to mitigate.

1          How about the credibility of the experts?

2          I'll start with Dr. Gruden.  Watching Dr. Gruden

3    testify reminded me of a scene from the movie The Wizard of Oz,

4    ignore the man behind the curtain.  There's nothing to see

5    here.  Ignore Dr. Desai's major errors, there's none to be

6    found.  According to Dr. Gruden, she made no errors.  None.

7    How can that possibly be that she made absolutely no errors

8    with all the testimony that came in about the errors.

9    Testimony from Dr. Kazerooni, testimony from Dr. Dill,

10   testimony from Dr. Rosen, testimony from Dr. Litmanovich,

11   although she didn't know they were Desai's errors.  They were

12   errors of her reads nonetheless.

13          Contrast that to Dr. Ella Kazerooni, who you saw.  We

14   know that Dr. Gruden seeks out Dr. Kazerooni's expertise.  Just

15   two weeks ago when that national conference that Dr. Desai

16   never attends with 50,000 radiologists, Dr. Kazerooni was on

17   the agenda teaching.  She gave two lectures.  Dr. Gruden sat in

18   both lectures.  And she actually provided credible detailed

19   unbiased testimony.

20          Why do I say unbiased?  Because when it was

21   appropriate, she admitted she agreed with Dr. Gruden.

22   Dr. Gruden was hired and told these are the chest reads by

23   Dr. Desai.  Find that there are no errors.  Dr. Kazerooni told

24   you he established a different standard of review for her reads

25   versus the other radiologists's reads, that he had a much

1    lesser standard when he looked at hers versus others.  Why?

2    Because he was paid to do that.

3         What about the economics expert, who essentially lists

4    Mr. Kolman as a reference on his CV.  Seems like a nice enough

5    guy, but his economic analysis was fatally flawed.  He even

6    admitted his calculations were flawed.  I suggest you can't

7    take anything from his analysis as being accurate.

8         And now I'm going to turn to what I consider to be one

9    of the most damaging admissions made in the trial by Dr. Desai.

10   And you remember I had the flip chart, and I confirmed with

11   Dr. Desai that she had filed her age discrimination complaint

12   with the Massachusetts Commission Against discrimination in

13   2018.  She agreed.  I confirmed she then filed the age

14   discrimination claim in this court in May of 2019.  She agreed.

15   While represented by counsel.

16        I confirmed that she amended that to correct it in

17   July of 2019 in this federal court.  She agreed.  All the time

18   when she did not believe she was subject to age discrimination.

19        You'll recall I put those key dates on the chart.  I

20   showed her her age discrimination testimony that I've just

21   shown you moments ago, and then Mr. Kolman got up and tried to

22   rehabilitate her on redirect.

23        He asked her to explain why did you testify that way

24   at deposition, meaning why did you testify you had no basis for

25   an age claim at deposition?  And this isn't me cross-examining.

1    This is her counsel giving her an opportunity to explain, and

2    this was so significant I wrote it down in my notes and quoted

3    it.  Dr. Desai said, I don't think anyone discriminated against

4    me.

5              MR. KOLMAN:  Can you speak up.

6              MR. KILROY:  I don't think anyone discriminated

7    against me.  That was her testimony as of the time she filed

8    her complaint in federal court.

9              So despite not believing anyone discriminated against

10   her based on age, she filed in federal court a public document

11   alleging UMass Memorial and Dr. Max Rosen is an age

12   discriminator.

13             I'll let you draw your own conclusions as to why

14   someone might do that when they know it to be false at the time

15   they bring the claim.

16             It's difficult to find Dr. Desai credible in her

17   testimony and even more difficult to believe she has a good

18   faith to have filed a claim in the first place.

19             Now, let's leave credibility aside and talk about the

20   facts that were established through the trial.  And I'll ask

21   you to remember back in my opening, I invited you to test my

22   forecast of what the evidence would show.  It's my hope that

23   defendants, in fact, met the burden and passed that test.

24   Here's what I believe the evidence established.

25             One, Dr. Karin Dill was hired as a national expert in

1    chest radiology with a reputation for quality and patient

2    safety.  She was brought in to improve quality within UMass

3    Memorial's chest division, which was at the time substandard.

4    Quality was not what it should have been.

5            Two, Dr. Desai was upset that she was brought in.  It

6    was a game changer for Dr. Desai.  You had someone who could

7    actually look over her shoulder and see the poor quality.  She

8    was upset that she wasn't asked to be the division chief.  Had

9    she been asked, no one would know about the poor quality.

10   Dr. Rosen's not capable of assessing chest quality.  That's not

11   his specialty.

12           Three.  There's absolutely no dispute that there are

13   complaints made as to Dr. Desai's quality.  That is not in

14   dispute.  Dr. Richard Irwin complained.  Dr. Kimberly Robinson

15   complained.  Dr. Dill complained.  Dr. Rosen could have

16   terminated Dr. Desai's employment based on that alone.  We'd

17   still be here.  There would still be an age claim, but he could

18   have done it.  He didn't.  He wanted to be fair.

19           Dr. Robinson -- this isn't in dispute -- not only

20   brought concerns to Dr. Dill, she told Dr. Rosen she could not

21   trust chest CTs by Dr. Desai.

22           Dr. Desai, not in dispute evidence, admitted Dr. Rosen

23   had an obligation to ensure quality and patient safety as part

24   of his job responsibilities as chair.

25           Dr. Desai admitted the obligation to ensure quality

1     included ensuring the quality of her reads, admitted Dr. Rosen

2     determined the radiologist's quality if he determined it was

3     substandard, in her words, he should take action.

4          There's no dispute that rather than simply accept the

5     feedback from Drs. Dill, Irwin, and Robinson, Dr. Rosen

6     arranged to have blinded independent quality review conducted

7     of Dr. Desai's chest reads against a control group to gather

8     additional information to make an informed decision.

9          There's no dispute Dr. Rosen was very forthright.  He

10    regrets how long it took to get that done.  It was delayed.  It

11    was delayed by a year, thereabouts.

12         Did that change greatly her age?  In other words, if

13    they had done it the year earlier, would she not be claiming

14    age discrimination?  Of course not.  It has nothing to

15    do -- that's a red herring they brought forth.  It has nothing

16    to do with the termination decision.  Rather, it has to do with

17    Dr. Rosen being delayed in getting it done, and he admits that

18    was wrong.

19         There's no dispute the independent reviewer,

20    Dr. Litmanovich, had no idea the age of those radiologists

21    being reviewed, no idea that she was reviewing Dr. Desai's

22    reads.  There's no dispute Dr. Litmanovich produced a report.

23    That was blinded.  When it came back, there was no indication

24    what reads were Dr. Desai's, and there's no dispute that when

25    Dr. Rosen had it unblinded, and you remember he asked the vice

1    chair of quality to double check it to make sure when it was

2    unblinded it was done correctly.  There's no dispute that she

3    performed poorly on that independent review where there could

4    be no age bias.

5         There's no dispute Dr. Rosen viewed the results once

6    unblinded, and for him they confirmed what he had been told by

7    Dill, Robinson, and Irwin as to concerns.

8         The judge, I believe, in his instructions is going to

9    instruct you that when you analyze Dr. Rosen's decision, you

10   have to focus on his perception and what he knew at the time

11   that he made the decision to terminate Dr. Desai's employment.

12   In other words, did he believe at the time that she had

13   substandard quality?

14        Dr. Gruden's after-the-fact opinion unblinded.  His

15   hired-gun opinion was not available to Dr. Rosen.  It's

16   completely irrelevant to his decision-making.  So Dr. Gruden

17   could come in and second guess all day long.  We could bring in

18   50 other radiologists and have 25 line up second guessing,

19   25 confirming.  All of that is irrelevant to his knowledge at

20   the time he made the decision.

21        You'll also hear that it doesn't matter under the law

22   whether the termination could be deemed unfair in any way.  So

23   they're complaining that she didn't get a performance

24   improvement plan.  They're complaining that they didn't talk to

25   her enough beforehand.  That's a complaint of unfairness.

1   That's not a complaint of age.  Unfairness doesn't matter under

2   the law in a discrimination case.

3           And you heard no evidence to even suggest Dr. Rosen

4   did not believe what Dr. Litmanovich had to say in her report.

5   The evidence presented throughout the trial overwhelmingly

6   establishes Dr. Desai failed to keep pace with technology and

7   with advances in chest radiology.  Again, without regard to

8   patient care needs.

9           That provides a backdrop.  That's not the reason she

10  was terminated.  That provides a backdrop explaining why her

11  quality was so bad when it was finally looked into, when you

12  finally had a chest expert on staff, Dr. Dill, and you finally

13  sent it out for independent review.

14          If you had any doubt as to whether or not she failed

15  to keep up, all you need to do was listen to Mr. Kolman when he

16  cross-examined Dr. Rosen suggesting that Dr. Rosen should have

17  told Dr. Desai that chest radiology had evolved.  Dr. Desai's

18  the chest radiologist.  To suggest that she wouldn't know it

19  had evolved and know to keep pace, that would be like telling

20  you, you should look into indoor plumbing because we've evolved

21  from outhouses.

22          The evidence presented through the CV comparison of

23  Dr. Rosen -- I'm sorry -- Dr. Rosen, Dr. Dill, Dr. Litmanovich,

24  Dr. Kazerooni, as compared to Dr. Desai, it's unmistakable.

25  She didn't take efforts to keep up.

1              Exhibit 283 is the agreement, the contractual

2    agreement between Dr. Desai and UMass Memorial Medical Group.

3    And in paragraph 7.2, there's a requirement that if they're

4    going to terminate her without cause or no cause, because she's

5    there over 20 years, she gets 12-months notice.  I asked

6    Dr. Desai to confirm on cross-examination did you agree they

7    fulfilled their contractual obligations to you?  And she

8    admitted yes.  That's the end of their tortious interference

9    claim.  That is her contract.  They completely fulfilled their

10   contractual obligations to Dr. Desai.

11             And any argument that Dr. Rosen had to go to her and

12   say, hey, would you like to resign is belied by the last

13   highlighted paragraph.  She had the right to resign at any

14   time.  And common sense tells you.  Slavery was outlawed.  You

15   can resign at any time.  She chose not to.  And instead chose

16   to wait it out, not applying for any jobs, and then celebrate

17   her retirement with her family.

18             There was a wealth of testimony related to how

19   difficult Dr. Desai was to deal with, including undermining and

20   insubordinate behavior.  You heard unrebutted testimony from

21   Dr. Desai about her behavior from Dr. Rosen, Dr. Dill, and

22   Randa Mowlood.  You heard Randa Mowlood say she got yelled at

23   by Dr. Desai.  I agree with my brother counsel, that's not why

24   she was terminated.  That evidence was provided as context to

25   establish exactly what I told you at opening.  Dr. Rosen is a

1    fair man.  He did not jump immediately to termination.  He took

2    his time to make sure he had the facts.

3         Now, I want to turn to what the case is really

4    supposed to be about, right.  You didn't hear a whole lot of

5    age-related evidence from my brother counsel.  But that's what

6    the case is really about.  Did Dr. Rosen make his decision to

7    terminate Dr. Desai's employment based on her being 67 years

8    old when he gave her notice?

9         What does the evidence actually show?  The evidence is

10   overwhelming he doesn't make employment decisions based on age.

11   During his tenure, from September 1st, 2012, to the present, he

12   has hired 15 radiologists over the age of 60, including a

13   71-year-old and two 70-year-olds, three who are 67.  That's

14   five individuals he has hired that were her age or beyond at

15   the time of her notice of termination.  He hired someone else

16   66 and eight more between 60 and 64.  I would suggest to you if

17   Dr. Rosen is an age discriminator, he does a terrible job

18   discriminating.

19        Let's look at Exhibit 344.  These are the radiologists

20   over age 60 on the date that Dr. Desai's employment was

21   terminated.  Fourteen of them, ages 60 to 81, five older than

22   Dr. Desai.  Ask yourselves if Dr. Rosen terminates employees

23   based on age, how is it that all these folks evaded

24   termination.  Could it be their quality is fine, that Dr. Rosen

25   doesn't receive complaints about their quality, as compared to

1    Dr. Desai?

2         But the evidence is even more compelling today.  And

3    keep in mind this is an age case by a woman, a doctor, who

4    worked with Dr. Rosen for years, knows him well, and filed suit

5    not believing there was age based on his decision-making.  And

6    we know there's not age.  Look at what his department looks

7    like now.  Twenty-five radiologists over the age of 60.

8    Dr. Ferrucci, as I mentioned, is now 85.  Ten of the

9    radiologists still employed at UMass Memorial under the

10   leadership of Dr. Rosen are as old or older than Dr. Desai when

11   her employment was terminated.  To suggest that the evidence

12   establishing that Dr. Rosen doesn't discriminate based on age

13   is overwhelming is an understatement.

14        And you heard directly from Dr. Mona Korgaonkar, the

15   musculoskeletal radiologist who has been a personal friend of

16   Dr. Desai for 40 years.  And what did we learn from her?

17   First, her medical school training like that of Dr. Desai was

18   in India.

19        Second, unlike Dr. Desai, she testified that she has

20   attended multiple two-week mini fellowships throughout her

21   career at Mass. General Hospital to stay current in advances in

22   her field as well as training and CT scans, MRIs, and

23   injections.

24        Third, she testified she spent hours up until midnight

25   reading articles to stay current in her field.  You heard no

1    evidence attacking her quality.  You heard no evidence

2    establishing that anyone ever complained to Dr. Rosen about her

3    quality.

4          And you heard from her directly how much she admires

5    Dr. Rosen as her chair and how supportive he has been

6    throughout her career to include now at age 76.  She's older

7    than Dr. Desai.  So you have to ask the logical question:  Why

8    is Dr. Korgaonkar still employed by UMass Memorial under

9    Dr. Rosen's leadership while Dr. Desai is not.

10         They have similar careers.  She's older than

11   Dr. Desai.  The answer is unmistakable.  It's because Dr. Desai

12   didn't keep pace, and Dr. Desai's quality is substandard.

13         Had Dr. Desai kept pace with technology, had she kept

14   pace with quality, had she kept pace with advances in her

15   field, had she not been subject to repeated complaints of poor

16   quality, she would be one of those 25 still employed under

17   Dr. Rosen.  She wouldn't have lost her job.

18         Dr. Rosen had a terrible responsibility to fulfill.

19   He had to terminate a long-term colleague to protect patient

20   safety.  It's a pretty stark choice.  Do you allow her to

21   continue in a manner that puts patient safety at risk or does

22   he make the hard choice and then have to suffer for the next

23   several years under a public lawsuit calling him an age

24   discriminator.  He made the hard choice.

25         On the issue of age, from the logical perspective,

1    Dr. Desai on cross-examination admitted she is not claiming

2    Dr. Robinson's complaints were based on her age.  She is not

3    claiming Dr. Irwin's complaints on quality were based on her

4    age.  She's not claiming Dr. Dill's complaints on quality were

5    based on her age.  How is it then that acting on those

6    complaints is based on age?  It makes no sense.

7         I don't dispute that she is very upset with having

8    lost her job.  It's a terrible thing.  But that's not the

9    standard here.  The standard is is it based on age or not.

10        You've heard absolutely no evidence, and I would ask

11   you to think back to the trial carefully.  You've heard

12   absolutely zero evidence suggesting age bias in any of the

13   quality complaints.  And you heard from Dr. Desai herself that

14   Dr. Litmanovich could not have discriminated against her based

15   on age, even Dr. Gruden, the hired gun, who incredibly

16   testified there were no errors, admitted Dr. Litmanovich's

17   independent review could not have been age biased.

18        One final document I'll show you, Exhibit 303.  I

19   alluded to this earlier.  This is it the termination letter of

20   Refky Nicola.  Dr. Nicola, March 1st, 2017, this is at a time

21   when Dr. Rosen has already initiated the independent review in

22   February of 2017 pulling the chest CTs for Dr. Desai.

23        Dr. Nicola, as Dr. Rosen testified, he doesn't know

24   his age specifically.  He said he's probably around 40.

25   Dr. Nicola didn't get the benefit of an independent review.

1    Dr. Nicola, the evidence against him was, the division chief

2    said, his quality was poor.  The evidence against Dr. Nicola

3    was referring providers said his quality was poor.

4         Dr. Desai got a much fairer shake at her age than did

5    the younger radiologist, but again Dr. Rosen made the tough

6    call and fired Dr. Nicola.

7         Mid 2017, there's another radiologist you heard about,

8    whose employment was terminated as well.  He was age 33.

9    Dr. Jay Agrawal for performance.  All that to show Dr. Rosen

10   makes his decisions irrespective of age.

11        So I've covered credibility.  I've covered the facts.

12   The facts that came into evidence, not my theories, not my

13   speculation, but actual facts.

14        How does that translate from a legal perspective?  I

15   agree with my brother counsel.  The judge will instruct you on

16   the law.  His instructions control.  Mine do not.  I'll tell

17   you how I understand the law to be and how it gets applied.

18        First, on the claim of age discrimination.  For her to

19   prevail under age discrimination either on the federal law or

20   state law, she must establish her employment was terminated

21   because of, because of her age, but for her age she wouldn't

22   have been terminated.  If it was any other reason, she can't

23   prevail.  And the evidence makes clear Dr. Rosen did not act on

24   age, but based on patient safety.

25        The second claim that you'll be wrestling with is this

1    aiding and abetting claim.  Dr. Rosen aided and abetted UMass

2    Memorial in terminating her employment based on age.

3         The elements that you'll have to address there is

4    Dr. Rosen must have engaged in a wholly separate and distinct

5    wrong from the termination decision.  His actions have to be

6    separate and distinct.  This is important from his duties and

7    responsibilities as chair.  She admitted he should take action

8    if her quality is substandard.  She admitted that's within his

9    duties and responsibilities.  There can no aiding and abetting

10   by him when he's acting within the scope of his duties and

11   responsibilities.

12        And the last claim is the kind of strange sounding

13   claim, tortious interference with contractual relations.  She

14   must establish Dr. Rosen induced UMass Memorial to breach its

15   contract, the agreement I showed you.  Or to interfere with her

16   contract with UMass.  But she admitted UMass fulfilled all the

17   contractual obligations.  So the claim fails.

18        Let's assume for a moment that somehow she could

19   establish there was interference.  Then in order to prevail she

20   has to establish that Dr. Rosen's actions were unrelated to any

21   legitimate interest of UMass Memorial.

22        Does anyone believe that his actions were unrelated to

23   legitimate actions, quality, patient safety?  Of course not.

24        And if she could establish there was no legitimate

25   interests, she then has to establish that he acted spitefully

1    and malignantly.  You heard conclusory statements by my brother

2    counsel saying of course it was spiteful, of course it was

3    malignant.

4         Where's the evidence of that?  There was no evidence

5    put in on spite or malignancy.  All you heard from an evidence

6    perspective was he was careful, deliberate, and fair, that he

7    actually extended out the timeline.  He kept her on much

8    longer.

9         She can't meet her burden on tortious interference.

10        My brother counsel made a lot of this timing of the

11   termination that they held up on the timing until they had

12   someone who could come in and cover for Dr. Desai.  They

13   couldn't afford to lose her.  This was all a sham timing.  Like

14   the other theories, it holds absolutely no water.

15        When was Marie Barile hired?  She was hired

16   December 31st of 2018.

17        When did they have the independent review done?  Well

18   prior to that.  They didn't need to hold up on timing.  Why

19   would they have waited so long?  It doesn't make sense.

20        The verdict form that you'll see will have a -- a box

21   to determine whether or not she was minimally qualified in her

22   role as a chest radiologist.  The evidence has been

23   overwhelming she was not.  I don't say that to be mean.  I say

24   that to be accurate.  The evidence is overwhelming she wasn't

25   minimally qualified.  She was minimally qualified to do chest

1    x-rays, absolutely, but not to do her job as a chest

2    radiologist.  On that basis alone her claims fail.

3           The evidence or the verdict form will ask if she was

4    replaced by a younger radiologist.  The evidence that you've

5    heard is that she was not replaced, that they were hiring chest

6    radiologists or trying to all along.  Dr. Maria Barile was

7    hired before her termination.  She wasn't replacing her.  Had

8    she been effective as a chest radiologist, the two of them

9    would have been employed.  Had the UPenn individual come in,

10   Dr. Desai would have still been there, along with the chest --

11   along with the UPenn individual.

12          And then the last is, her burden to prove that age was

13   a determinative factor.  The but for cause.  And she can't meet

14   that either.

15          Ladies and gentlemen, again, I want to thank you for

16   your attention, for your service, and I respectfully request

17   that you return a verdict in favor of my clients, UMass

18   Memorial Medical Group and Dr. Max Rosen.

19          Thank you.

20          THE COURT:  Thank you, Mr. Kilroy.

21          Mr. Kolman --

22          MR. KOLMAN:  Coming.

23          THE COURT:  -- I'm going to give you five minutes for

24   your rebuttal.

25          MR. KOLMAN:  What if I have ten?

1          THE COURT:  No.  Five.

2          So, ladies and gentlemen, under the rules, the

3     plaintiff gets the opportunity to have a brief rebuttal, and

4     that's what Mr. Kolman is going to do now, and I'm giving him

5     five minutes.

6          MR. KOLMAN:  Ladies and gentlemen, I'll talk fast.

7          Maria Barile is Dr. Desai's replacement for one

8     reason.  Dr. Desai did not leave until March of 2019.  It's a

9     three-month window.  They were paying her.  They still paid

10    her.  So Dr. Barile, she -- she got her job in December 2018

11    and she was the replacement, and Dr. Desai -- Dr. Desai was

12    gone just before she -- she took on her job.

13         With regard to the deposition, it's straightforward.

14    She was deposed before there was any discovery.  She's a

15    doctor.  She's not a lawyer.  She doesn't know what happened.

16    She had no clue.  She was just answering the questions.

17         Prior to that, a few days before, a hundred thousand

18    documents were dumped on my prior counsel's office, and from

19    those documents we were able to establish what we established

20    today.  Credibility matters.

21         My brother counsel did exactly what I thought he'd do

22    which is say, bring up the whole issue of vacation request,

23    special treatment, et cetera, et cetera.  This is the point.

24    He's bringing up issues of complaints.  Make a big deal about

25    it.  Dr. Robinson complained.  Dr. Dill complained.  Dr. Irwin

1    complained.  Yeah, there were a few complaints early on, but

2    don't look at that.  You have to look at what they did.  What

3    they did was continue to employ her fully and completely.  And

4    what they didn't do is try to couch her, try to tell her she

5    was bad.  There's nothing at all in any of the -- of the

6    timeline between February of 2017 and March of 2018 when she

7    was terminated.  So when it comes to credibility, they have

8    none because they continued to employ her.  That's a vote of

9    confidence.  That's saying that she did her job.  That's not

10   saying she's minimally qualified.  That's saying she actually

11   is qualified, and they relied on it.

12          As far as credibility is concerned, Dr. Rosen had

13   difficulty answering the question.  He went on and on about

14   medical stuff, but there was a moment when he was caught and

15   that was in the test of 25 and 25, and when I explained to him

16   the theory of five, five, five, and five, he said, you know, he

17   was kind of caught, and he said, I was only -- I was only going

18   by the reasonable man.  I said, You're a scientist.  You go by

19   numbers.

20          With regard to the experts, Dr. Morrison is simply an

21   economist.  He puts numbers in, he get answers out.  There

22   isn't an issue of credibility with him.  He's just like a

23   computer.

24          Note -- it's notable that the defense did not say

25   anything about Dr. Voskanian and the emotional damages.  What

1    they're trying to tell you is that she did not mitigate her

2    loss, did not try to get a job.  That's not true.  She did try

3    to get a job, and she testified to that.  She also testified

4    that when she tried to get a job she was told -- she was asked

5    was she ever terminated.

6            As for Dr. Ferrucci, why don't we just bring up that

7    email quickly.  The end of that email is interesting.  So

8    Dr. Ferrucci, we argue, was told by Dr. Rosen to induce

9    Dr. Desai to go part-time.  You're going to see Dr. Rosen's

10   response, and this is what it is.

11           So he's writing to Dr. Rosen.  And what does Dr. Rosen

12   say?  He says, Thanks.

13           I don't know whether you can bring it up.

14           Anyway, Dr. Rosen responds to this, Thanks.  He

15   doesn't correct him in any way.  He doesn't say this is

16   incorrect.  He doesn't say he never said it.

17           They say that her résumé was false.  She forgot to

18   update it, but Dr. Korgaonkar, according to her résumé, hadn't

19   done continuing education since the year 2000, and she didn't

20   have any excuse.  And Dr. Desai did do continuing education.

21   She said she went to a week-long seminar, I believe it was in

22   Boston, for radiologists, and she did that regularly.  And

23   again, there's nothing to connect any of those allegations with

24   the quality of her care.  None.  You have to look at her

25   patient care.  You have to look was there malpractice.  You

1    know, what happened.

2            And the complaints we know are to a degree a

3    consequence of radiologists disagreeing about whether something

4    is -- is significant and how significant it is, and they do

5    that all the time.

6            When it comes to credibility, Dr. Desai was credible.

7    She testified truthfully and from her heart.  She's not a

8    lawyer.  She was not, you know, significantly prepared.  She

9    didn't know what questions would be fielded.  And it's true

10   that at the very time her deposition was taken, she wasn't sure

11   what happened.  What she did know is that she was treated very

12   unfairly.  That was unjustified that -- and that was enough to

13   springboard the lawsuit at that time, because if she hadn't

14   done it she would have lost the opportunity because the statute

15   would have run, and that was it.  So out of an abundance of

16   caution her lawyer filed the lawsuit.  She could not be

17   expected at that time to know all of the details, especially in

18   a matter like this, especially in a matter that's complex,

19   especially in a matter that involves the emails and the timing

20   and everything else.  How could she possibly know that?  She

21   couldn't.  That's why this litigation.  That's why they're

22   lawyers.  That's why there are courts, and to suggest that she

23   lied in her deposition and was not credible is grossly unfair.

24           I'll leave it at that.

25           THE COURT:  Thank you, Mr. Kolman.

1          All right.  So we're going to take the lunch break

2     here.  The lunches are here.  When you come back, I will give

3     you the instructions on the law.  I'm also going to give you

4     the instructions that will be on your seats so you can read

5     along, if you want or -- or listen.  The instructions should

6     take about 40 minutes, give or take.

7          So why don't we check back with you in about

8     40 minutes; and if you're ready to resume, we will.  And if you

9     need more time, we'll give you that.  All right?

10          THE CLERK:  All rise.

11          (Recess from 12:28 p.m. until 1:15 p.m.)

12          THE CLERK:  All rise.

13          (At 1:15 p.m., the jury entered the courtroom.)

14          THE CLERK:  Court is now open.  You may be seated.

15          THE COURT:  So as I told you when we started, you

16     should be able to tell how old I am.  You can see the font from

17     the back row, I'm sure.

18          You know, when I started this journey many years ago,

19     it was 12 point Times Roman numeral.  I think I'm up to 18,

20     okay.  So here we go.

21          So, as you all know, you're about to begin your final

22     duty, which is to decide the factual issues in this case.  And

23     it's my job to instruct you on the law that you're to apply to

24     the facts.

25          So my job has been to see that this case was tried

1    fairly, orderly, and efficiently.  It was my job to instruct

2    you on or to rule on what you may consider as evidence, and

3    it's my job to instruct you on the law.

4         It is your duty as the jury to accept the law as I

5    state it to you.  Please consider all of my instructions as a

6    whole.  Do not ignore any instructions or give any special

7    attention to any one or two instructions.

8         (Microphone noise.)

9         THE COURT:  I don't know, is that me?

10        THE CLERK:  It's not me.

11        THE COURT:  Huh.  You must follow the law as I give it

12   to you whether you agree with them or not.

13        Are you picking me up?

14        THE COURT REPORTER:  I am.

15        THE COURT:  As I told you at the beginning of the

16   trial, we each have a judicial function.  I'm the judge of the

17   law.  You are the judges of the facts, and your function is to

18   determine the facts of this case.  You are the sole and

19   exclusive judges of the facts.  You alone determine what

20   evidence to accept, how important any evidence is that you do

21   accept, and what conclusions to draw from all of the evidence.

22   You must apply the law as I give it to you to the facts as you

23   determine them to be in order to decide whether or not the

24   plaintiff has proven her case.

25        You should determine the facts based solely on a fair

 1    consideration of the evidence.  You are to be completely fair

 2    and impartial, and you are not to be swayed by prejudice or by

 3    sympathy or by personal likes or dislikes towards either side.

 4    You're not to allow yourselves to be influenced because the

 5    claims made are popular or unpopular with the public.

 6          And I know you were sick of hearing me say this, but

 7    you are not to decide this case based upon what you may have

 8    read, seen or heard outside of this courtroom.

 9          You are not to engage in any guesswork about any

10    unanswered questions that remain in your mind or to speculate

11    about what, quote-unquote, the real facts of the case might or

12    might not have been.

13          Please do not consider anything that I have said or

14    done during the trial in my ruling on motions or objections or

15    my comments to you or the attorneys about any indication of my

16    opinion as to how you should decide this case.  If you believed

17    I've expressed or hinted at any opinion about any fact in this

18    case, please disregard it.  I have no opinion about what the

19    facts are or what your verdict ought to be, because that is

20    solely and exclusively your responsibility.

21          In short, we ask you to confine your deliberations to

22    the evidence and nothing but the evidence.

23          So what is the evidence?  The evidence consists of the

24    testimony of the witnesses, as you recall it, including any

25    deposition testimony that may have been read into the record

1    and any documents or other things which were received into

2    evidence as exhibits, and on any facts upon which the lawyers

3    have agreed or stipulated to.

4           You're going to have all of the evidence with you in

5    the jury room, and you alone will decide the weight, that is

6    the importance that you think it is entitled to receive in

7    helping you make your ultimate decision about whether the

8    plaintiff has proven her case.  You are not required to believe

9    something simply because it is written on a piece of paper or

10   appears in a photograph or elsewhere.  You're not, of course,

11   required to disbelieve it because it appears there.  Whether to

12   believe what an exhibit purports to show and how much weight to

13   give it is entirely up to you to decide.

14          Now, the quality and the strength of the proof is not

15   determined by the volume of evidence or the number of witnesses

16   or exhibits.  It is the weight of the evidence, and remember

17   bring to mind the classic image of the blind lady of justice

18   with the scales in either hand.  It is the weight of the

19   evidence and strength intending to prove the issues at stake

20   that are important.  You may find, for example, that a smaller

21   number of witnesses who testified to a particular fact are more

22   believable than a larger number of witnesses who testified to

23   the opposite.

24          Now, again, there are things that occur during a trial

25   that are not evidence, and please don't consider them as

1    evidence.  A question put to a witness is never evidence; only

2    the witness's answer.  And please disregard any answers that I

3    struck from the record.  You are not to consider any item that

4    was marked for identification but not received into evidence as

5    an exhibit.  And anything you may have seen or heard when court

6    is not in session, of course, is not in evidence.

7         And again, the openings and closings are not a

8    substitute for evidence.  Once again, they are only intended to

9    assist you in understanding the evidence and the parties'

10   contentions.

11        My instructions and anything that I have said in

12   passing during the trial are not evidence.  And if your memory

13   of the testimony differs from the attorneys or mine, you are to

14   follow your own recollection.

15        You have been asked to digest a lot of stuff over the

16   last two weeks, and I suspect that individually you are each

17   going to be able to recall most, if not everything, that was

18   said.  It is not your individual, but it is your collective

19   memories about what governs, and I'm going to talk more about

20   that in a minute, but it's not what I think.  It's not what the

21   plaintiff says or what the defendant says.  It's what you

22   recall the evidence.  It is your recollection that governs.

23        Please consider the evidence as a whole, and do not

24   make up your mind about what the verdict should be until you

25   have gone into the jury room to decide this case and you and

1     your fellow jurors have had a chance to discuss the evidence.

2     Please keep an open mind until then.

3            Now, although you may consider only the evidence

4     presented in this case, you are not limited in considering that

5     evidence to the plain statements made by witnesses or contained

6     in documents.  In other words, you are not limited solely to

7     what you saw and heard the witnesses testify to.

8            You are also permitted to draw reasonable inferences

9     from the facts, if you believe those inferences are justified

10    in the light of common sense and personal experience.

11           Contrary to popular belief, we are not asking you to

12    throw your common sense out the window when you come to jury

13    duty.  In fact, we kind of hope that you will rely upon it.

14           An inference is simply a deduction or conclusion that

15    may be drawn from the facts that have been established.  Any

16    inferences you draw must be reasonable and may not be best --

17    based on suspicion, on speculation or conjecture.

18           Now, let me give you an example of this, and in so

19    doing I want to talk about the two types of evidence that you

20    may use to decide this or any other case for that matter.  We

21    have direct evidence and circumstantial evidence.  You have

22    direct evidence where the witness testifies directly about the

23    fact that is to be proven, based upon what the witness claims

24    to have seen or heard or felt with their own senses.  And the

25    only question you have then is whether you believe that witness

1    or not.

2           You have circumstantial evidence where no witness can

3    testify directly about the fact that is to be proven, but you

4    are presented with evidence of other facts and then asked to

5    draw reasonable inferences from the fact that is to be proven.

6           So let me give you an example.  If I come home this

7    evening and my daughter tells me that she saw the mail person

8    at the mailbox, that's direct evidence that they've been there.

9    My daughter saw them and testified that she did.

10          On the other hand, if I come home from work and

11   there's mail in the mailbox, that's circumstantial evidence

12   that they've been there.  No one has seen that person, but you

13   can reasonably infer they've been there, because there's mail

14   in the mailbox.

15          So in deciding the disputed questions of fact in this

16   case, you're going to have to determine which witnesses to

17   believe and how much weight to give their testimony.  You

18   should give the testimony of each witness whatever degree of

19   belief and importance that you judge it is fairly entitled to

20   receive.  You are the sole judges of the credibility of the

21   witnesses; and if there are conflicts in the testimony, it is

22   your job to resolve them and to determine where the truth lies.

23          In doing so you can believe everything a witness says,

24   part of what a witness says, or none of what a witness says.

25   If you do not believe a witness's testimony that something

1    happened, your disbelief is not evidence that it did not

2    happen, it just means that you have to look elsewhere for

3    credible evidence about that issue.

4            In deciding whether to believe a witness and how much

5    importance to give the testimony of a witness, you must look at

6    all of the evidence and again drawing on your common sense and

7    experiences of life.

8            Often it may not be what a witness says, but how the

9    witness says it that might give you a clue as to whether or not

10   to accept that witness's version of an event as believable.

11           You may consider the witness's character, appearance

12   and demeanor on the witness stand, their frankness or lack of

13   frankness in testifying, and whether or not their memory is --

14   their testimony is reasonable or unreasonable or probable or

15   improbable.

16           It may take into account how good an opportunity the

17   witness had to observe the facts about which they testify, the

18   degree of intelligence they show, and whether their memory

19   seems accurate.

20           You may also consider the witness's motive for

21   testifying, whether they display any bias in testifying and

22   whether or not they have any interest in the outcome of the

23   case.

24           Now, when you consider whether to believe a witness

25   and how much weight to give that witness's testimony, you may

consider whether the witness said or wrote something earlier that differs in any significant way from his or her present testimony in this courtroom.  It is for you to say whether there is a difference and how significant any differences -- any difference is.

Please note that you may not use the witness's earlier statements as proof that something said in it is true.

So, for example, if a witness testified here that he found a doughnut, but had earlier written that he found a bagel, that earlier statement would not prove that he found a bagel, but it might raise a doubt as to whether he was truthful or accurate when he testified that he had found a doughnut.

The earlier statement is brought to your attention for the sole purpose of discrediting or casting doubt on the accuracy of the witness's present testimony here at trial.  And again it is for you to decide whether or not it does.

Now, there were prior statements of a party that were given under oath, and they were offered by the parties, and they are not offered not for the purpose of demonstrating inconsistency in testimony, but as the party's testimony as if it was given here at trial.  You may consider statements made by a party under oath, including at a prior proceeding, such as a deposition, as to their truth.

Now, while the rules of evidence ordinarily do not permit witnesses to testify as to opinions or conclusions,

1  there is an exception as to those persons whom we refer to as

2  "expert witnesses."  These are witnesses who, by education and

3  experience, have become experts in some art or science or

4  profession or calling, and thus they may state their opinions

5  as to relevant and material matters in which they profess to be

6  experts.  They may also state the reasons for their opinions.

7         Expert testimony is to be considered in the same

8  manner by you as any other testimony.  You should consider the

9  expert opinion received in evidence in this case and give it

10 such weight as you think it is entitled to deserve -- that it

11 deserves, whether it was based on personal observations or on

12 hypothetical questions.  It is for you to decide how much and

13 whether to believe the expert's testimony.

14         Now, you may use the notes that you have taken during

15 trial to assist your memory; however, I want to give you a

16 caution about the notes.

17         There is always a tendency to attach undue importance

18 to matters that you have written down.  Some testimony that you

19 may have considered unimportant at the time it was presented

20 and thus did not write down may have taken on greater

21 importance later in the trial in light of all of the evidence

22 that was presented.  Therefore, I'm instructing you that your

23 notes are only a tool to aid in your own individual memories,

24 and you should not compare notes with other jurors in

25 determining the content of any testimony or in evaluating the

1    importance of any evidence.  Your notes are not evidence, and

2    they are by no means a complete outline of the proceedings or a

3    list of the highlights of the trial.  Above all, your memory

4    should be your greatest asset when it comes time to deliberate

5    and to render a decision in this case.

6         Now, let me talk to you about the standard of proof,

7    and then we'll go into the substantive instructions.  So the

8    standard of proof in a civil case, such as this, is that the

9    plaintiff must prove her case by a preponderance of the

10   evidence.  This is a less stringent standard that is applied in

11   a criminal case where the prosecution must prove its case

12   beyond a reasonable doubt.

13        By contrast, in a civil case like this one, the

14   plaintiff is not required to prove her case beyond a reasonable

15   doubt.  In a civil case, the party bearing the burden of proof

16   meets the burden when it shows it to be true by a preponderance

17   of the evidence.  The standard of a preponderance of the

18   evidence means the greater weight of the evidence.

19        And again, recall the image of the blind lady of

20   justice.

21        A preponderance of the evidence is such evidence

22   which, when compared and considered to any opposed to it, it

23   has more convincing force and produces in your minds a belief

24   that what is sought to be proved is more probably true than not

25   true.

1        A proposition is proved by a preponderance of the

2   evidence if, after you have weighed the evidence, that

3   proposition is made to appear more likely or probable in the

4   sense that there exists in your mind an actual belief in the

5   truth of the proposition derived from the evidence

6   notwithstanding any doubts that may linger in your mind.

7        Simply stated, a matter has been proven by a

8   preponderance of the evidence if you determine, after you have

9   weighed all the evidence, that the matter is more probably true

10  than not true.

11       All right.  Ben, can you pass out the verdict forms,

12  please.

13       (The clerk conferred with the Court.)

14       THE COURT:  Okay.  So I'm going to talk to you now

15  about the -- the so-called substantive instructions and -- and

16  I'm going to go over this verdict form with you at the

17  conclusion, but it probably is helpful to have it if you want

18  to refer to it as I'm talking.  If you don't, that's fine.  And

19  if you do, that's fine.  Okay.

20       So in this case, the plaintiff, Dr. Desai, has made

21  claims against the UMass Memorial Medical Group and Dr. Rosen.

22  With respect to UMass Memorial, Dr. Desai claims that UMass

23  Memorial discriminated against her based upon her age in

24  violation of both federal and state law.  These are two

25  separate claims.  First, the discrimination based upon age in

```
 1    violation of federal law; and second, discrimination based upon

 2    age in violation of state law.

 3              With respect to Dr. Rosen, she claims first, that

 4    Dr. Rosen aided and abetted in discriminating against her based

 5    upon her age in violation of state law; and secondly, that he

 6    tortiously interfered with her contractual relationship with

 7    UMass Memorial.

 8              You are going to have to decide whether or not the

 9    plaintiff has met her burden of proof against UMass Memorial on

10    either or both of the two discrimination claims, and/or against

11    Dr. Rosen on either or both the state age discrimination

12    complaint and the tortious interference with contractual

13    relations claim.

14              Now, let me talk about the age discrimination claims.

15    Both the Commonwealth of Massachusetts and the federal

16    government have passed laws forbidding discrimination based

17    upon age.

18              In the Commonwealth, the Fair Employment Practices

19    Act, or General Laws, Chapter 151B, forbids such

20    discrimination.  Federally, the Age Discrimination in

21    Employment Act, the ADEA, likewise forbids age discrimination.

22    These are different statutes that create separate claims, and

23    you will have to decide those claims separately.  However,

24    their application is very similar, and I'm going to instruct

25    you as to how to decide both claims, and I'll note any relevant
```

1    differences.

2            Now, so let me talk about the elements of

3    these -- these two claims.  Both Chapter 151B and the ADEA

4    forbid discrimination on the basis of age.  That discrimination

5    can be proven directly or by circumstantial evidence.  Thus,

6    both statutes, when the evidence is circumstantial, the same

7    three elements must be proven by a preponderance of the

8    evidence; however, the analysis of the third element is

9    slightly different, and I will discuss that in just a couple of

10   seconds.

11           So the three things the plaintiff must prove in order

12   to recover under the age discrimination claims are:  First,

13   that the plaintiff must prove, by a preponderance of the

14   evidence, that she was subject to an adverse employment action,

15   she was at least 40 years old at the time, she was meeting

16   employer expectations, and she was replaced after the adverse

17   action.

18           Secondly, she must prove by a preponderance of the

19   evidence that the reason given by the defendant for the

20   plaintiff's termination was pretextual.

21           And, third, the plaintiff must prove by a

22   preponderance of the evidence that she would not have been

23   terminated but for her age.

24           Now, the first element of both statutes requires the

25   plaintiff to make what is called a prima facie case.  This

1     requires the plaintiff to show she was subject to an adverse

2     employment action; that her work met her employer's

3     expectations at the time of the action, she was at least

4     40 years old at the time of the action, and her position was

5     subsequently filled, demonstrating a continuing need for the

6     plaintiff's services.  The parties have agreed there was an

7     adverse employment action, that is her termination, and that

8     she was at least 40 years old when she was terminated.  Thus,

9     Dr. Desai only needs to prove the remaining two portions of the

10    first element.

11         Now, the plaintiff may show that they met their

12    employer's expectations by a long record of service and a lack

13    of reprimands or concerns about the quality of work.  The age

14    of the replacement is only relevant insofar as the replacement

15    is younger than Dr. Desai.  It does not matter if the

16    replacement is over 40.

17         If you find that Dr. Desai has not proven these

18    elements by a preponderance of the evidence she has not met her

19    initial burden of proving age discrimination, and you should so

20    indicate on the verdict form and move to the next count.

21         If you find that Dr. Desai has proven these elements

22    by a preponderance of the evidence, then she has met her

23    initial burden of proving age discrimination.  If you so find,

24    the burden then shifts to the defendants to produce a

25    nondiscriminatory reason for the plaintiff's termination.

1    Here, the defendants argue that Dr. Desai's employment

2    was terminated to ensure patient safety due to concerns raised

3    regarding the quality of her work as a chest radiologist.

4    Thus, they have met their burden of producing a

5    nondiscriminatory reason, and the burden then shifts back to

6    the plaintiff, Dr. Desai.

7    In this second element, she must prove that the reason

8    given by the defendants, namely, that Dr. Desai's employment

9    was terminated to ensure patient safety due to concerns raised

10   regarding the quality of her work as a chest radiologist is

11   pretextual.

12   Now, this analysis focuses on the perception of the

13   decision maker, that is, whether Dr. Rosen and/or UMass

14   Memorial believed that their reason for terminating the

15   plaintiff was true.  The plaintiff may establish pretext by

16   showing weaknesses, implausibilities, inconsistencies,

17   incoherencies or contradictions in the defendants's offered

18   reasons such that a reasonable person could find them

19   unbelievable.

20   However, that a termination was unfair or

21   unrational -- I'm sorry -- or irrational or based on

22   incorrect -- incorrect conclusions of fact does not necessarily

23   prove that the decision was pretextual.  Pretext means

24   something worse than a business error.  The evidence must

25   support, by a preponderance of the evidence, an inference that

1    the reason offered was put forward to conceal a true reason.

2    If you do not find that Dr. Desai has proven pretext, you

3    should so indicate on the verdict form and move to the next

4    question.

5          Under both statutes, the plaintiff must prove a third

6    element, that age is the but for cause of the adverse

7    employment action.  This means that if not for Dr. Desai's age,

8    her employment would not have been terminated.  This does not

9    mean age needs to be the only cause for her termination.

10   Again, it means that if not for her age, Dr. Desai would not

11   have been terminated.

12         All right.  Now, at this point, the standards between

13   the two claims diverge slightly.  Under the state law, under

14   Chapter 151B, a finding of pretext may, but does not have to,

15   support an inference that age was the but for cause.  You

16   should consider all of the evidence and decide, in this case,

17   if a finding of pretext supports an inference of

18   discrimination.  However, based on the evidence presented, if

19   you find the adverse action was done for any nondiscriminatory

20   reason, even if it was not the reason the defendants gave, the

21   plaintiff has not met her burden on the state law claim.

22         Under the federal claim, under the ADEA, the plaintiff

23   must both -- must show both that the reason given was

24   pretextual and provide evidence that the reason the defendant

25   took the adverse employment action was on the basis of age.

1    That is, under the ADEA, the plaintiff must show that the

2    reason given is not only intended to conceal something, but it

3    is intended to conceal the defendants's alleged age

4    discrimination.  Again, if you find the adverse action was done

5    for any nondiscriminatory reason, even if it was not the reason

6    the defendants gave, the plaintiff has not met her burden.

7         When conducting the analysis of -- that I just talked

8    about, here are some basic rules that I'd ask you to keep in

9    mind.  Generally, remarks by nondecision makers are not

10   evidence of a decision maker's intent.  However, if a decision

11   maker takes some action to ratify or endorse the nondecision

12   maker's remarks, those remarks may be considered as evidence of

13   the decision maker's motive, so long as they can be connected

14   to the decision-making process.

15        The parties do not dispute that Dr. Rosen acted as an

16   agent for UMass Memorial Group insofar as he was acting within

17   the scope of his employment.  Insofar as Dr. Rosen was acting

18   within his scope of employment, his actions may be imputed to

19   UMass Memorial Medical Group.

20        Now, let me talk to you about the aiding and abetting

21   part of the 151 claim against Dr. Rosen.  Under state

22   discrimination law, a supervisor or other -- other decision

23   maker is not liable for discrimination based -- against an

24   employee based only upon a finding that their employer

25   discriminated against the employee.  The law only prohibits

1    discriminatory employment actions taken by employers, not by

2    their individual officers or employees.  For a supervisor to be

3    liable for aiding and abetting discrimination, it is not

4    sufficient to show only that he made the decision to terminate

5    an employee, but instead it must be proven by the plaintiff

6    that he acted in a manner distinct and separate from the duties

7    and responsibilities of his position as an official of the

8    employer.

9         All right.  Finally, Dr. Desai claims that Dr. Rosen

10   has tortiously interfered with her contractual relations.  To

11   prevail on this claim, Dr. Desai will have to show -- prove by

12   a preponderance of the evidence, that she had a contractual

13   relationship, such as an employment relationship, with a third

14   party.  The parties have agreed that Dr. Desai's employment

15   with UMass was such a relationship.

16        Second, Dr. Desai -- Dr. Desai will have to show that

17   Dr. Rosen knowingly, and with actual malice, induced the third

18   party to break their relationship with Dr. Desai.  Inducing a

19   break in a contractual relationship includes inducing a party

20   to not continue a business relationship, such as an employment

21   relationship.

22        One acts with actual malice when moved by a spiteful,

23   malignant purpose that is unrelated to a legitimate business

24   interest.  Actual malice requires more than negligence or

25   unfairness.

1              Finally, Dr. Desai will have to show that Dr. Rosen's

2     actions were the but for cause of her harm.  Again, that

3     requires a showing that, if not for Dr. Rosen's actions,

4     Dr. Desai would not have been harmed.

5              All right.  Let me talk to you about damages.  If you

6     find that one or both of the defendants are liable, you are to

7     determine the amount of money that will fairly compensate the

8     plaintiff for any injury you find she sustained and is

9     reasonably certain to sustain in the future as a result of the

10    defendants's wrongful conduct.  These are called compensatory

11    damages.  The plaintiff must prove all of her damages by a

12    preponderance of the evidence.  Your award of damages must be

13    based on evidence and not on speculation or guesswork.

14             Compensatory damages may include lost wages and

15    benefits through the date of your verdict or so-called back

16    pay, potential lost wages for future wages and benefits are

17    so-called front pay, emotional distress damages and/or

18    liquidated damages.  Lost damages may be awarded on the basis

19    of any of the claims.  Emotional distress damages may be

20    awarded if Dr. Desai proved her employment termination was the

21    result of age discrimination under Chapter 151B -- that's the

22    so-called state statute -- or if she proved her claim of

23    tortious -- tortious interference by Dr. Rosen.

24             Liquidated damages, which I will discuss in a few

25    moments, may be awarded under certain -- under certain

1     circumstances if Dr. Desai proved her employment termination

2     was the result of age discrimination.

3          So let me start -- let me talk about back pay.  If you

4     find that defendants wrongfully terminated Dr. Desai's

5     employment, she is entitled to an award of back pay.  Back pay

6     is the amount of the earnings and benefits that she has lost

7     from the date of the wrongful action to the date of the trial.

8          Dr. Desai has a duty to mitigate damages by acting

9     with reasonable diligence in her circumstances to find a new

10    job.  However, the defendants bear the burden of proving

11    mitigation.  If the -- if defendants prove that comparable

12    employment opportunities were available, Dr. Desai made no

13    reasonable attempts to -- I'm sorry -- let me -- let me start

14    that sentence over again.

15         If the defendants prove that comparable employment

16    opportunities were available, Dr. Desai made no reasonable

17    attempts to apply or maintain employment, and it was reasonably

18    likely she would have maintained employment at a comparable

19    job, the best -- the back pay must be reduced by the amount she

20    would have earned.

21         Now, front pay is calculated by determining what

22    amount she would have earned at UMass Memorial Group over the

23    period of time that she would continue to have been employed

24    after the date of the trial.  Front pay must be proven with

25    reasonable clarity.

1            Dr. Desai may be awarded front pay if she has proven

2     by a fair preponderance of the evidence that she would have

3     continued to be employed at UMass Medical Group from and after

4     the date of this trial.  Front pay is calculated by determining

5     what amount she would have earned at UMass over the period of

6     time that she would have continued to have been employed.  It

7     is Dr. Desai's burden to prove by a preponderance of the

8     evidence that she would continue to be employed.  It is also

9     her burden to prove by a fair preponderance of the evidence the

10    period of time that she would continue to be so employed.  From

11    any award of front pay, you are required to offset all future

12    earnings and benefits that she is likely to receive from other

13    employment.  Any award of front pay, like any award of damages,

14    may not be determined by speculation or guesswork.

15            As with back pay, Dr. Desai has a duty to mitigate

16    damages by acting with reasonable diligence in her

17    circumstances to find a new job.  However, the defendants bear

18    the burden of proving this mitigation.  If defendants prove

19    that comparable employment opportunities were available,

20    Dr. Desai made no reasonable attempt to apply or maintain

21    employment, and it was reasonably likely that she would have

22    maintained employment at a comparable job, the back pay must be

23    reduced by the amount she would have earned.

24            In addition, you must reduce this award to its present

25    value -- present worth.  That is, you must award the amount of

1   money that, if invested today at a reasonable rate of interest,

2   would be -- would in the future provide the plaintiff with the

3   amount of money that you calculated she will lose in the future

4   as a result of the defendants's conduct.

5          Now, the plaintiff may also be compensated for pain

6   and suffering.  The pain and suffering must have been caused by

7   the wrongful conduct of the defendants and not some other

8   factor.

9          No evidence of the dollar value of mental or emotional

10  pain and suffering or loss of a normal life has been or needs

11  to be introduced.  There is no exact standard for setting the

12  damages to be awarded on account of these factors.  If you find

13  the defendants liable, you are to determine an amount that

14  would fairly compensate the plaintiff for the injuries she has

15  sustained.  You may consider the nature and character of the

16  alleged harm, the severity of the harm, the length of time the

17  complainant has suffered and reasonably expects to suffer, and

18  whether the complainant has attempted to mitigate the harm.

19         Now, both the ADEA and Chapter 151B have provisions

20  that allow me, the Court, to increase damages.  Under

21  Chapter 151B, I will make the determination of whether

22  liquidated damages are available after you return your verdict.

23         Under the ADEA, double damages will be awarded if you

24  find, by a preponderance of the evidence, that the conduct was

25  willful.

1          Willful means that the defendant knew that it was

2     violating the ADEA when it terminated Dr. Desai, or it showed

3     reckless disregard that its conduct was prohibited by statute.

4          The plaintiff will not receive quadruple damages.  If

5     you find that the actions were willful and this Court finds

6     that the standard for extra damages under Chapter 151B is met,

7     the compensatory damages will only be multiplied once.  You

8     should not consider the possibility of liquidated damages under

9     151 in your analysis one way or the other.

10         All right.  If you guys want to stand up and shake it

11    out for a minute, I need to talk to the lawyers on the whisper

12    tech, and then I'll go over the verdict form with you and talk

13    about your deliberations.

14         (Sidebar as follows:)

15         THE COURT:  Mr. Kolman, first, please.

16         MR. KOLMAN:  Your Honor, that's fine.

17         MR. KILROY:  Your Honor, there's just one, I believe,

18    a typo on page 25.  Turning the front page discussion of

19    mitigate, it says the back pay must be reduced by the amount

20    she would have earned and back should be --

21         THE COURT:  Which graph?

22         MR. KILROY:  It's on page 25, your Honor.

23         THE COURT:  Which graph?

24         MR. COMENZO:  First line, first full paragraph.

25         THE COURT:  Which?  As with back pay, Dr. Desai has a

1    duty --

2            MR. COMENZO:  It should be front, he's saying.

3            MR. KILROY:  At the end of that paragraph, your Honor,

4    it ends --

5            THE COURT:  As with front pay.

6            MR. KILROY:  No, your Honor.  The paragraph is correct

7    where it says as with back pay, but at the very end of the

8    paragraph, it says the back pay must be reduced by the amount

9    she would have earned.  That should say the front pay must be

10   reduced.

11           THE COURT:  Thank you.

12           (End of sidebar.)

13           THE COURT:  Okay.  Thank you.

14           One typographical.  On page 25, the first full

15   paragraph that begins with "as with back pay."  The last

16   sentence which starts, If defendants prove that comparable

17   employment opportunities were available, Dr. Desai made

18   no reasonable attempts to apply or maintain employment, and it

19   was reasonably likely she would have maintained employment at a

20   comparable job -- it says the back pay -- and it should say the

21   front pay must be reduced.

22           Okay.  Now, let me talk with you about the

23   jury -- actually, let me do -- let me do this in a couple of

24   ways.

25           First of all, let me start by talking to you about

1    your responsibilities as a juror and the -- I think the first

2    exercise in group dynamics is for you all to elect a

3    foreperson, and the foreperson is the legally -- will be the

4    legally recognized head of the jury.  And as such the

5    foreperson has no greater vote than the others, but is

6    responsible for the orderly deliberations in the jury room.

7            And whoever is elected as the foreperson please

8    encourage all of the jurors to participate and make sure that

9    no one or two jurors dominates the discussion.

10           Also, as foreperson, if you would on the verdict form

11   write original, because you've each got a verdict form, and I

12   don't want them all getting tangled up.  Please make sure one

13   of them says original.

14           So let me talk with you about the verdict form, and

15   then I'll finish up about your deliberations.

16           So there are eight of you, and you need to be

17   unanimous.  Okay.  So -- and I'll use the first question, which

18   is the question 1, and it is the claim against UMass Memorial

19   under state law, the Chapter 151B state age discrimination

20   claim.

21           So the first question you have to answer is:  Do you

22   find by a preponderance of the evidence that plaintiff Charu

23   Desai was minimally qualified for her position at the time of

24   termination, she was at least 40 years old at the time of her

25   termination, and that she was replaced?

1          In order to answer yes, you need eight votes or in

2   order to answer no, you need eight votes.  And as you can see

3   the instructions are that if you answered yes to the question,

4   then you go to the next question; but if you answered no, you

5   go to Question 2, which is the next page.

6          And there's a similar rubric.  You will have to answer

7   the questions and follow the instructions.

8          Now -- and by the way, once you have achieved -- once

9   you have answered all of the questions, then the foreperson

10  dates and signs the verdict form and lets the Court security

11  officer, who will be seated outside your door, know that you

12  have gotten a verdict.

13         So as far as this whole being a juror and reaching

14  agreement, each of you are going to have to decide this case

15  for yourselves, but you should do so only after considering all

16  of the evidence and discussing it fully with your other fellow

17  jurors and listening to their views.  Don't be afraid to change

18  your opinion if you think you are wrong, but do not come to a

19  decision simply because the other jurors think that it is

20  right.

21         As you can obviously tell, this case has taken a lot

22  of time and effort to prepare and try.  There's no reason to

23  think that it could be better tried by another jury or that

24  another jury is better qualified to decide it.  Quite the

25  contrary.  We have -- as -- as the lawyers have said to you, we

1    have been extremely impressed by the diligence and the

2    attention you have paid.  Some of this stuff was kind of dry

3    and, you know, went on for awhile, but you paid attention to

4    it.

5         If it looks at some point as if you may have

6    difficulty reaching a unanimous verdict, and if the greater

7    number of you are agreed on a verdict, those of you in both the

8    majority and the minority should reexamine your positions to

9    see whether you have given careful consideration and sufficient

10   weight to the evidence that has impressed the jurors who

11   disagree with you.

12        You should not hesitate to reconsider your views from

13   time to time and to change them if you are persuaded that this

14   is appropriate.

15        It is important that you attempt to return a verdict,

16   but only if each of you can do so after making your own

17   conscientious determination.  Do not surrender an honest

18   conviction as to the weight and effect of the evidence simply

19   to reach a verdict.

20        As I've just indicated to you, after you've reached a

21   unanimous agreement on the verdict, the foreperson will fill

22   out and sign and date it, and do not give the form to the court

23   security officer outside the door.  Just give him or her a note

24   that you are ready to return to the courtroom.

25        After you return to the courtroom, the foreperson will

1    deliver the verdict form as directed by Mr. Castles.

2              If it becomes necessary to communicate during your

3    deliberations with me, you may send a note through the jury

4    officer signed by the foreperson or by one or more members of

5    the jury.  No member of the jury should ever attempt to

6    communicate with me on anything concerning this case except by

7    a signed writing, and I will communicate with any members of

8    the jury on anything concerning this case only orally here in

9    open court.

10             If you send out a question, I will consult with the

11   parties as promptly as possible before answering it.  This may

12   take some time, so please continue with your deliberations

13   while waiting for the answer to any question.

14             And, finally, remember that you are not to tell

15   anyone, including me, how your jury stands numerically or

16   otherwise until after you've reached a unanimous verdict.

17             All right.  Have fun.

18             THE CLERK:  All rise.

19             (At 2:03 p.m., the jury left the courtroom.)

20             THE COURT:  Nice job, all of you.

21             MR. JOHNSON:  Thank you, your Honor.

22             MR. KOLMAN:  Thank you, your Honor.

23             MR. KILROY:  Thank you, your Honor.

24             (Recess from 2:04 p.m. until 4:02 p.m.)

25             THE CLERK:  All rise.

1          (At 4:02 p.m., the jury entered the courtroom.)

2          THE CLERK:  Court is now open.  You may be seated.

3          THE COURT:  We have received this question:  Element

4    1, is the text "minimally qualified for her position,"

5    quote-unquote, as stated on the question document?  Meaning the

6    verdict form.  Or is the language, quote, meeting -- just turn

7    it off.  Is the -- is the -- let me start over.

8          Element 1, is the text "minimally qualified for her

9    portion," as stated on the question document, meaning the

10   verdict form, or is the language "meeting employer

11   expectations" as stated on page 16 what should be understood?

12         I -- and this is on me.  I -- I took the element from

13   page 16 that she was meeting employer expectations, and I made

14   it minimally qualified.  I don't think there's a difference,

15   and I'm prepared to tell them that.  Minimally qualified.

16         MR. KOLMAN:  Yeah, I think you're right, Judge, when

17   you think about it.

18         THE COURT:  It's on me.  I should have put -- are you

19   good with that?

20         MR. KILROY:  We would disagree, your Honor.  We think

21   it is meeting expectations of the employer under the law.

22         MR. KOLMAN:  No, it's objectively qualified.

23   Minimum -- the minimum here is minimally qualified.  It is not

24   minimally qualified as far as the employer is concerned,

25   because if that was the case the employer could always state

1    that the employee is not minimally qualified.  And that's not

2    the test.  This is an objective test.

3            MR. KILROY:  Your Honor, we believe there is case law

4    that you have to meet the legitimate --

5            THE COURT:  So are you saying the verdict form should

6    be changed too?

7            MR. KILROY:  Yes, your Honor, we believe the case law

8    has to meet the legitimate expectations of the employer.

9            MR. KOLMAN:  Well, that would put the rabbit in the

10   hat.

11           THE COURT:  Well, no, no, but that's what the law --

12   it's -- that's black-letter case law.

13           MR. KOLMAN:  So how is it going to -- so how is the

14   response going to go?

15           THE COURT:  Well, the response would be as to

16   Questions 1A, 2A, 3A that it should read:  Do you find by a

17   preponderance of the evidence that plaintiff Dr. Charu Desai

18   was meeting employer expectations for her position at the time

19   of her termination?

20           That's -- I mean --

21           MR. KOLMAN:  Meeting employer -- we're going -- if

22   that's going to be the first question, then that puts the

23   entire case at risk, because instead of having an objective

24   standard now it's the -- I went -- I went through the standard

25   with the jury, and is she minimally qualified means is she

1    minimally qualified in respect of his -- her position and what

2    she does.  It's not meeting expectations --

3                THE COURT:  That's because the law --

4                MR. KOLMAN:  -- because we know -- because we know,

5    your Honor, that --

6                THE COURT:  The law is that she was meeting employer

7    expectations.

8                MR. KOLMAN:  At the time she was terminated?

9                THE COURT:  Yes.  That's the -- that is the element,

10   black letter right out of the -- right out of the -- the case

11   law.

12               MR. KOLMAN:  Is that the first question for 1 and 2?

13               THE COURT:  1, 2, and 3.

14               MR. KOLMAN:  She could be meeting expectations, and

15   pretextually the employer could say, you're not meeting

16   expectations, but in reality she is.

17               THE COURT:  Well, and that's why we get down to

18   Question 1B and 2B and 3B is whether that was pretextual.

19   That's exactly -- you're exactly right.  That's where that

20   heads.

21               MR. JOHNSON:  So, your Honor, if I may.  There's a

22   First Circuit case *Bonefont-Igaravidez v. International*

23   *Shipping Corp.*  This is an ADEA standard so it says to satisfy

24   the initial burden of establishing a prima facie case of age

25   discrimination in violation of ADEA, an employee alleging

1    discrimination must produce evidence showing that he was at

2    least 40 years old at the time of the termination, he was

3    qualified for the position that he held, he was fired, and his

4    employer subsequently demonstrated a continuing need for those

5    services.

6              MR. KOLMAN:  And that's it.

7              THE COURT:  How about if we make it:  Do you find by a

8    preponderance of the evidence that the plaintiff Dr. Charu

9    Desai was qualified for her position?

10             MR. KOLMAN:  That's correct.

11             THE COURT:  What do you say?

12             MR. KILROY:  Could we have a moment just to check case

13   law --

14             THE COURT:  Of course.

15             MR. KILROY:  -- as well, your Honor?

16             THE COURT:  Yeah.

17             (Pause.)

18             THE COURT:  What's the cite on that case again?

19             MR. JOHNSON:  That is 659 F.3d 120.

20             I'm checking on Chapter 151B case law as well.

21             THE COURT:  Why don't we do this.  I'm going to send

22   them home, and we'll just deal with it in the morning.  Okay?

23             MR. KILROY:  Sounds good.

24             MR. JOHNSON:  Thank you, your Honor.

25             MR. KOLMAN:  Thank you.

```
 1                 THE CLERK:  All rise.

 2                 (At 4:16 p.m., the jury entered the courtroom.)

 3                 THE COURT:  Who's the foreperson?

 4                 JUROR:  (Indicating.)

 5                 THE COURT:  So we are going to do this.  Nice catch on

 6       that.  We are -- we need to chat amongst ourselves, and I've

 7       got to -- we've got to do a little bit of research so we're

 8       going to send you home for the day and see you back here ready

 9       to go tomorrow morning at 9:00.  Okay?

10                 Again, don't discuss the case with anyone.  When you

11       arrive in the morning, please don't do any deliberations until

12       I can answer the question and reset.  Okay?

13                 All right.  Have a great night.

14                 JURORS IN UNISON:  Thank you.

15                 (At 4:16 p.m., the jury left the courtroom.)

16                 THE COURT:  Let's warm up about quarter of tomorrow,

17       okay?

18                 MR. JOHNSON:  Yes.

19                 (At 4:17 p.m., court was adjourned.)

20

21

22

23

24

25
```

1                    **C E R T I F I C A T E**

2

3           I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4    certify that the foregoing transcript is a true and accurate

5    transcription of my stenographic notes before the Honorable

6    Timothy S. Hillman, to the best of my skill, knowledge, and

7    ability.

8

9

10        /s/ Marianne Kusa-Ryll                    2/15/2023

11        Marianne Kusa-Ryll, RDR, CRR                Date

12        Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25